# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 03-12872 (JLP) |
| NORTHWESTERN CORPORATION, | ) |  |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
| LAW DEBENTURE TRUST COMPANY | ) |  |
| OF NEW YORK, | ) | Civ. Action No. 05-603-JJF |
| Appellant | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) |  |
|  | ) |  |
| Appellee. | ) |  |
|  | ) |  |

## OPENING BRIEF OF APPELLANT
## LAW DEBENTURE TRUST COMPANY OF NEW YORK, AS INDENTURE TRUSTEE

SMITH, KATZENSTEIN & FURLOW, LLP
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405
- and -
NIXON PEABODY LLP
Amanda D. Darwin (BBO No. 547654)
John V. Snellings (BBO No. 548791)
Lee Harrington (DE No. 4046)
Christopher M. Desiderio
100 Summer Street
Boston, MA 02110
Telephone:    (617) 345-1000
Facsimile:    (617) 345-1300

Dated: November 21, 2006

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT .................................................................................1

II.   JURISDICTION ......................................................................................................1

III.  STANDARD OF REVIEW ......................................................................................1

IV.   FACTS ....................................................................................................................2

      1.  The QUIPS Indenture .....................................................................................2

      2.  Other Indenture Reimbursement Claims ........................................................4

      3.  Commencement of NorthWestern's Chapter 11 Case
          and Adversary Proceeding ...............................................................................4

      4.  The Debtor's First Amended Plan ...................................................................5

      5.  The Debtor's Second Amended Plan ...............................................................7

      6.  The Claim Dispute ..........................................................................................8

      7.  The Fee Dispute ............................................................................................11

V.    ARGUMENT ........................................................................................................18

      1.  The Second Amended Plan Called for Payment of Fees in Full
          and the Treatment Under the Administrative Expense Order is
          Contrary to Representations Made by the Debtor..........................................19

      2.  The Indenture Trustee Substantially Contributed to the Debtor's Estate ......22

      3.  Debtor's Objection was Inconsistent with the
          Treatment of Other Indenture Trustees in the Case .......................................34

V.    CONCLUSION .....................................................................................................37

## TABLE OF AUTHORITIES

### CASES

Ace & Co. v. Balfour Beatty PLC, 148 F. Supp. 2d 418 (D. Del. 2001).......................... 35

In re Consolidated Bancshares, Inc., 785 F.2d 1249 (5th Cir. 1986)................................23

In re Contractors Equip. Supply Co., 861 F.2d 241 (9th Cir. 1988)............................... 2, 6

Grant v. George Schumann Tire & Battery Co., 908 F.2d 874 (11th Cir. 1990) ................2

In re Hassen Imports Partnership, 256 B.R. 916 (9th Cir. BAP 2000)............................1, 2

In the Matter of Baldwin-United Corporation, et al., 79 B.R. 321 (Bankr. S.D. OH
   1987) ................................................................................................................ 33

Matter of Kenneth Leventhal & Co., 19 F.3d 1174 (7th Cir. 1994) .................................2

Lebron v. Mecham Financial Inc., 27 F.3d 937 (3rd Cir. 1994).......................................23

Manufacturers Hanover Trust Company v. Bartsh (In re Flight Transportation
   Corporation Securities Litigation), 874 F.2d 576 (8th Cir. 1989) .........................23, 29

New Hampshire v. Maine, 532 U.S. 742 (2001) .......................................................20, 21

In re Revere Cooper and Brass Incorporated, et al., 60 B.R. 892 (Bankr. S.D.N.Y.
   1986) .............................................................................................................26, 32

Salmon v. Laser Plot, Inc., 189 B.R. 559 (Bankr. D. 1995) ................................................34

Matter of Texas General Petroleum Corp., 52 F.3d 1330 (5th Cir. 1995).......................  34

True North Composites, LLC v. Trinity Industries, Inc., 191 F. Supp. 2d 484 (D.
   Del. 2002) .......................................................................................................35

In re UNR Industries, Inc., 173 B.R. 149 (N.D. Ill. 1994) ................................................34

Wilgus v. Salt Pond Insurance Co., 498 A.2d 151 (Del. Ch. 1989) ..................................35

Wilmington Leasing, Inc. v. Parrish Leading Co., L.P., 1996 WL 560190 (Del.
   Ch. Sept. 25, 1996) ........................................................................................35

## FEDERAL STATUTES

11 U.S.C. § 1129 (a)(7)(ii) 33 ........................................................................... 33

11 U.S.C. § 503 ......................................................................................... 1, 17

28 U.S.C. § 158(a)(1) ......................................................................................... 1

Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 ......................... 6, 11, 12, 13

## MISCELLANEOUS

Restatement (Second) of Contracts § 205 (1981) ............................................ 35

124 Cong. Rec. H 11,093 (Sept. 28, 1978) ................................................... 26

## I. PRELIMINARY STATEMENT

Law Debenture Trust Company of New York, as Indenture Trustee and Guarantee Trustee, by and through its undersigned counsel, submits this brief in support of its appeal of the Order Granting in Part and Denying in part the Request for Payment of Administrative Expenses pursuant to 11 U.S.C. § 503 by Law Debenture Trust Company of New York as successor trustee for the 8.45% Cumulative Preferred, Series A (the "Administrative Expense Order"), which was entered by United States Bankruptcy Judge John L. Peterson on July 5, 2005.  Appellant Designation No. 95.

The Administrative Expense Order was clearly erroneous and arbitrary.  The Administrative Expense Order does not address the fact that the Indenture Trustee's efforts substantially contributed to the Debtor's estate; that the Second Amended Plan called for the payment of fees and expenses in full; and that the treatment of Law Debenture is inconsistent with the treatment of other indenture trustee's in the bankruptcy case.  Accordingly, the Indenture Trustee requests that this Court vacate the Administrative Expense Order and grant its fees and expenses in full.

## II.  JURISDICTION

The Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1), which grants jurisdiction to the district courts of the United States to hear appeals from final judgments, orders and decrees.  The Administrative Expense Order is a final order under 28 U.S.C. § 158(a).

## III.  STANDARD FOR REVIEW

A bankruptcy court's award of attorney's fees is reviewed for an abuse of discretion or an erroneous application of the law.  In re Hassen Imports Partnership, 256 B.R.

916, 920 (9th Cir. BAP 2000). Such discretion may be abused by failing to apply proper legal standards, by failing to follow proper procedures, or by basing the award on findings of fact that are clearly erroneous. Grant v. George Schumann Tire & Battery Co., 908 F.2d 874 (11th Cir. 1990).

If the trial court makes factual findings in deciding whether to award compensation or reimbursement, those findings are reviewed under a clearly erroneous standard. Matter of Kenneth Leventhal & Co., 19 F.3d 1174, 1177 (7th Cir. 1994). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entirety of the evidence, is left with a definite and firm conviction that a mistake has been committed. Id.

Questions of contract interpretation are reviewed de novo. In re Hassen Imports Partnership, supra at 920. Appellant is entitled to de novo review of all questions of law. In re Contractors Equip. Supply Co., 861 F.2d 241, 243 (9th Cir. 1988).

## IV. FACTS

### 1. The QUIPS Indenture

Law Debenture is the successor Trustee (in such capacity, the "Indenture Trustee" or "Law Debenture") to the Bank of New York, under that certain Indenture dated as of November 1, 1996, as amended, (the "QUIPS Indenture") pursuant to which the Montana Power Company ("Montana Power") issued certain 8.5% Junior Subordinated Debentures (the "QUIPS Debentures") to Montana Capital I (the "Property Trust"). Law Debenture also served as the successor Trustee of the Property Trust (the "Property Trustee") and, as such the Property Trustee, is the sole holder of the QUIPS Debentures. Concurrently with the issuance of the QUIPS Debentures, the Property Trust issued certain 8.45% Cumulative Quarterly Income

Preferred Securities, Series A (the "QUIPS"), which are now widely held by both institutions and individual investors.

NorthWestern Corporation ("NorthWestern" or the "Debtor") obtained Montana Power's utility assets (the "Montana Utility Assets") and assumed liability as issuer under the QUIPS Indenture through a series of transfers known as the "Going Flat Transaction" between the Debtor and Montana Power's successor, Clarkfork and Blackfoot LLC ("Clarkfork").

The QUIPS Indenture provides for reimbursement to the Indenture Trustee of its reasonable fees and expenses (including those of its professionals) and grants to the Indenture Trustee a lien on all distributions from its estate to QUIPS holders from the issuer to secure those reimbursement obligations.  Specifically, § 907 of the QUIPS Indenture provides that the Company (as defined in the QUIPS Indenture) shall:

> [R]eimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any provision of this Indenture (including reasonable compensation and expenses and disbursements of its agent and counsel), except to the extent that any such expense, disbursement or advance may be attributable to the Trustee's negligence, willful misconduct or bad faith …

Appellee Designation No. 42, Exhibit A, The QUIPS Indenture § 907.

Section 907 further provides that, when the Indenture Trustee incurs expenses in connection with an Event of Default arising from the commencement of a bankruptcy proceeding of the Debtor:

> [T]he expenses and the compensation for the services (including the fees and expenses of its agent and counsel) are intended to constitute expenses of administration under Bankruptcy Law.

Appellee Designation No. 42, Exhibit A, The QUIPS Indenture § 907.

## 2. Other Indenture Trustee Reimbursement Claims

Provisions for reimbursement of fees and expenses in the QUIPS Indenture are similar to those provisions found in the other indentures governing securities issued by the Debtor. During the NorthWestern proceeding, HSBC Bank USA ("HSBC") was the indenture trustee under the Unsecured Note Indentures.[1] Wilmington Trust Company ("Wilmington") was the indenture trustee under the TOPrS Indentures. Harbert Management Corporation ("Harbert") is the largest holder of TOPrS Notes.

Like the QUIPS Indenture, both the Unsecured Note Indentures and the TOPrS Indentures provided for the reimbursement of their respective indenture trustees' reasonable fees and expenses (including professional fees) and granted each such trustee a lien on all distributions to the holders from the Debtor or its estate to secure those reimbursement obligations.

## 3. Commencement of NorthWestern's Chapter 11 Case and the Adversary Proceeding

On September 14, 2005 (the "Petition Date"), NorthWestern filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of Delaware.

No request was made to appoint a trustee or examiner in the Debtor's bankruptcy case. The Official Committee of Unsecured Creditors was appointed by the Office of the United States Trustee on September 30, 2003.

On April 16, 2004, the Indenture Trustee, along with the largest QUIPS holder, Magten Asset Management, Corp. ("Magten"), commenced an Adversary Proceeding to void the

---

[1] Capitalized terms not otherwise defined have the meanings ascribed to them in the Debtor's Second Amended and Restated Plan of Reorganization.

Going Flat Transaction and to recover the Montana Utility Assets (the "Adversary Proceeding" or the "Complaint").

In the Adversary Proceeding, the Indenture Trustee sought to assert certain rights in the Montana Utility Assets fraudulently conveyed to NorthWestern. Specifically, the Complaint sought an order from the Court: (a) voiding the transfer of the Montana Utility Assets to NorthWestern; and (b) requiring NorthWestern to return those assets to Clarkfork. Alternatively, the Plaintiffs sought a declaration that the Montana Utility Assets were subject to a constructive trust and therefore not a part of this Debtor's estate.

### 4. The Debtor's First Amended Plan

On May 17, 2004, the Debtor filed its First Amended Disclosure Statement in connection with its First Amended Plan of Reorganization (the "First Amended Plan"). See Appellee Designation No. 7.

The First Amended Plan designated six classes of non-priority, unsecured claims, including in pertinent part:

- Class 7 consisting of Unsecured Note Claims against the Debtor;

- Class 8 consisting of Unsecured Subordinated Note Claims against the Debtor; and,

- Class 9 consisting of General Unsecured Claims against the Debtor.

The First Amended Plan further provided that the unsecured claims in these classes would be satisfied by a distribution of New Common Stock in the Reorganized Debtor. In particular, under the First Amended Plan, holders of Class 7 and Class 9 claims were to share pro rata in 98% of the New Common Stock to be issued by the Reorganized Debtor on the Effective Date of the Plan. In addition, so long as Class 8 voted to accept the Plan, holders of the TOPrS and QUIPS, in turn were to receive a pro rata shares of 2% of the New Common Stock to

be issued on the Effective Date. In the event that Class 8 voted to reject the plan, no

distributions of New Common Stock were to be made to the holders of TOPrS and QUIPS – the

so-called "death trap" provision.

In addition to distributions of New Common Stock, the First Amended Plan also

contemplated that Class 7 and 8 claims would be satisfied by the payment in cash of their

respective indenture trustee's fees and expenses on the Effective Date of the Plan. Specifically,

the First Amended Plan provided that:

> On the Effective Date, Reorganized Debtor <u>will pay</u> the Indenture Trustees' Fees
> and Expenses in full in cash, in an amount to be agreed upon among the Debtor
> and each of the Indenture Trustees.

Appellee Designation No. 7, First Amended Plan § 5.18 (emphasis supplied).

The First Amended Plan further provided that:

> [D]istributions to holder of Unsecured Notes [and] Unsecured Subordinated Notes
> . . . will not be reduced on account of payments made to the Indenture Trustee.

<u>Id.</u> (emphasis supplied).

Notwithstanding the Plan's death trap provision, Class 8 voted to reject the First

Amended Plan on August 2, 2004. Wilmington, Harbert, Law Debenture and Magten all timely

interposed substantially similar objections to the First Amended Plan. Among other things, each

of them asserted that the First Amended Plan improperly recognized and proposed to pay debt

(i.e. the Unsecured Notes) that was issued in violation of the Public Utility Holding Company

Act of 1935, 15 U.S.C. § 79.[2] Similarly, Wilmington, Harbert, Law Debenture and Magten also

---

[2]     On July 12, 2004, Harbert and Wilmington also filed a Motion to Disallow and Objection to Claim of HSBC
Bank USA, as Indenture Trustee, and Oaktree Capital Management, LLC, based on violation of the Public
Utility Hold Company Act of 1935 (the "<u>Wilmington Claim Objection</u>"). A hearing to consider the merits of
the Wilmington Claim Objection was scheduled with the hearing to consider confirmation of the First
Amended Plan.

objected to the First Amended Plan on absolute priority grounds. Specifically, they claimed that the Debtor had understated the value of the New Common Stock to be issued on the Effective Date of the Plan and, accordingly, that the Class 7 and Class 9 claimants were receiving more than full satisfaction of their claims. In addition, in connection with those objections, Wilmington and Harbert engaged in extensive discovery on an expedited basis throughout June and July, 2004, while the Indenture Trustee and Magten chose not to do so for purposes of judicial economy and preservation of the estate.

Following the prosecution of these objections, the Debtor elected to pursue settlement negotiations with Wilmington and Harbert, but not the Indenture Trustee. That settlement is memorialized in the Second Amended Plan.

### 5. **The Debtor's Second Amended Plan**

In the Second Amended Plan, the Debtor agreed to satisfy claims arising under both the QUIPS and the TOPrS Indentures with, among other things, a pro rata distribution of: (a) common stock in the Reorganized Debtor representing 8% of the New Common Stock issued and outstanding on the Effective Date; plus (b) warrants exercisable for an additional 13% of the New Common Stock.

As with the First Amended Plan, the Second Amended Plan contemplated that distributions to the holders of Unsecured Note and Unsecured Subordinated Note Claims would be enhanced by the payment of their respective indenture trustees' fees and expenses from estate funds. In addition, with respect to the TOPrS, the Debtor also agreed to pay the legal fees and related costs of Harbert who, on information and belief, directed the tasks performed in the case

by Wilmington and advanced sums for Wilmington's accrued fees and expenses in connection with confirmation and other litigation.[3]

The aggregate amount of fees and expenses that the estate was required to pay Wilmington and Harbert was liquidated at $2.25 million in the Second Amended Plan.  In contrast, under the Second Amended Plan, payment of HSBC and Law Debenture's fees and expenses continued to be governed by the provisions recited above originally contained in the First Amended Plan concerning payment of indenture trustees' fees and expenses.  As detailed above, those provisions contemplated that each of HSBC's and Law Debenture's reasonable fees and expenses in the case would be paid from the estate and not from recoveries to debt holders under the Unsecured Notes and QUIPS Indenture.

Finally, even though the fees and expenses to be paid to the Indenture Trustee under the Second Amended Plan were not liquidated, the Disclosure Statement for the Plan represented that pro rata recoveries to the holders of TOPrS and QUIPS would be identical – 15.3%.

### 6. **The Claim Dispute**

Even though the votes of the TOPrS holders were sufficient in number and amount to bind Class 8, and the distribution of securities under the Plan to the holders of TOPrS and QUIPS were coming from the same bundle of consideration, the Second Amended Plan, in

---

[3]    It is important to note that special counsel and financial advisors hired by Wilmington, as indenture trustee for the TOPrS, were, upon information and belief, designated by, and working in the best interests of, Harbert. Consequently, payment of Wilmington's fees and expenses were, in fact, a payment of Harbert's fees and expenses. Moreover, in addition to paying Wilmington's professionals, specific monies were earmarked for Harbert individually.  In contrast, the Indenture Trustee and its largest holder, Magten, have had separate counsel throughout these proceedings.  This decision was made by mutual agreement between Magten and Law Debenture because of the potential divergence of the interests of Magten and the many individuals who bought the QUIPS on the retail market at full value.  Therefore, the fees and expenses requested by the Indenture Trustee in its fee application do not benefit Magten, which to date has incurred substantial fees and expenses of its own.

contrast with the First Amended Plan, separately classified the claims arising under the TOPrS and the QUIPS Indenture.  Specifically, under the Second Amended Plan, Class 8 was divided into two classes – 8(a) consisting of the claims related to the TOPrS Indenture, including PUHCA-related claims; and Class 8(b) – consisting of claims related to the QUIPS Indenture, including the disputed property rights in the Montana Utility Assets asserted in the Adversary Proceeding.

In addition, treatment of Class 8(b) claims was specifically tailored to obtain a release of the disputed property rights asserted in the Adversary Proceeding.  In particular, the Second Amended Plan provided QUIPS holders with a "choice" of two mutually-exclusive options for the satisfaction of their claims whether or not Class 8(b) voted to accept the Plan.  Under so-called "Option 1," in exchange for an express release of the causes of action and property rights asserted in the Adversary Proceeding, QUIPS holders were to receive a pro rata interest in the New Common Stock and Warrants allocated to Unsecured Subordinated Note Claims under the Second Amended Plan.  Alternatively, under "Option 2," QUIPS holders' recoveries, if any, were limited to:  "a pro rata share of recoveries, if any, upon resolution of [the Adversary Proceeding]."

The Indenture Trustee on behalf of the QUIPS holders timely objected to the Second Amended Plan.  The gist of the Indenture Trustee's objection was that, even though the Second Amended Plan was structured to give the appearance that the holders of QUIPS and TOPrS Claims would receive identical distributions from the estate, the QUIPS holders who elected Option 1 were receiving substantially less than the TOPrS holders because they, unlike the TOPrS, were required to give up valuable (although admittedly disputed) rights in the Montana Utility Assets to receive the same distribution under the Plan.

The Indenture Trustee further argued that the disparate treatment of the TOPrS and QUIPS claims under the Second Amended Plan was contrary to the Bankruptcy Code's priority scheme because it provided for substantially different treatment of claims of identical rank.  In addition, the Indenture Trustee asserted that the separate classification of TOPrS and QUIPS claims in the Second Amended Plan was (i) a veiled attempt by NorthWestern to avoid § 1123(a)(4)'s requirement that a plan provide the same treatment for each claim in a particular class, and (ii) constituted unfair discrimination for purposes of § 1129(b) of the Bankruptcy Code.

In response to the Indenture Trustee's claim that QUIPS holders were receiving substantially less than TOPrS holders, NorthWestern represented both in its papers and in oral argument at the hearing to consider confirmation of the plan that the Second Amended Plan should be confirmed because the holders of the TOPrS and the QUIPS were receiving identical distributions under such Plan in exchange for the release of comparable claims against the estate. Specifically, NorthWestern represented:

> The Plan … does not provide disparate treatment for Class 8(a) [the TOPrS] and Class 8(b) [the QUIPS].  Both will receive the same distribution if each respective class accepts the Plan.

See Appellant Designation No. 51, Debtor's Memorandum of Law in Further Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code and In Response to Supplemental Objection to Confirmation at p. 14 (emphasis supplied).

Based on the Debtor's representations that the TOPrS and the QUIPS holders were receiving the "same distribution" under the Second Amended Plan, the Bankruptcy Court overruled the Indenture Trustee's objection and confirmed the Plan.  Furthermore, the Court's Order confirming the Second Amended Plan (the "Confirmation Order") is expressly premised on the finding that:

> Both Class 8(a) and Class 8(b) will receive the same distribution if each respective class accepts the Plan; accordingly, the Court finds that the plan does not provide for disparate treatment of Class 8(a) and Class 8(b).

Appellant Designation No. 54, Confirmation Order.

The Court's Order confirming the Plan was further premised on the finding that there was no disparate treatment between the holders of Class 8(a) and Class 8(b) claims because:

> Consistent with the treatment provided to Class 8(a), the Plan provides the holders of QUIPS the same opportunity to settle their QUIPS Litigation Claims that was provided to the holders of TOPrS to settle their PUHCA-related claims.

Id. at 34.

### 7. **The Fee Dispute**

Prior to the confirmation of the Plan, on September 17, 2004, the Debtor filed a motion to estimate the claims of the QUIPS holders who elected Option 2 and to establish a disputed claim reserve for such claims. The Indenture Trustee timely filed an objection to the Debtor's motion.

Immediately following confirmation of the Plan, Debtor's counsel contacted counsel to the Indenture Trustee and advised her that establishing a claims reserve for the Option 2 QUIPS holders was a condition to substantial consummation of the Plan. Appellant Designation No. 93, Darwin Affidavit, ¶ 2. The Debtor and the Indenture Trustee engaged in negotiations concerning the appropriate amount of that claims reserve, with the understanding that Law Debenture's fees and expenses would not be disputed by the Debtor and would be paid in accordance with the Plan. Based on Debtor's counsel's representation that the New Common Stock allocated to the disputed claims reserve need not be subject to further reduction by the exercise of the Indenture Trustee's accrued fees and expenses through the Effective Date, the

Indenture Trustee agreed to a $25 million claims reserve, and on October 29, 2004, the Debtor

and Law Debenture filed a stipulation concerning the claims reserve with the Court. Id. at ¶¶ 2-

6. On November 3, 2004 the Court approved the claims reserve.

Shortly after confirmation of the Plan, the Reorganized Debtor expressly

acknowledged in writing its obligation to pay Law Debenture's and other indenture trustee's fees

and expenses in full on the Effective Date. In contemplation of the Effective Date, the

Reorganized Debtor posted on its website a notice that:

> All of the fees and expenses of the Indenture Trustees will have been paid in full
> on the Effective Date with the exception of Wilmington Trust Company,
> Indenture Trustee for Class 8(b) [sic] Trust Preferred Securities, which will
> receive shares of New Common Stock for its final fees and expenses.

See Appellant's Designation No. 92, Affidavit of Francis C. Morrissey, Exhibit A, p. 2.

Shortly thereafter, on or about November 1, 2004, the Debtor paid the fees and

expenses of each and every indenture trustee in this case except Law Debenture. Furthermore,

the Debtor did not require any of the other indenture trustees to file fee applications in this case.

In fact, the Debtor made the payments with little, if any, review of the invoices or other

documentation evidencing the reasonableness of those fees. The Debtor paid Wilmington

$1,948,367.20 and Harbert $301,632.80.[4] Before making those payments, however, the Debtor

did not review a single invoice from Wilmington or Harbert or any other document which

purported to memorialize their actual expenses and the activities for which they were seeking

compensation from this estate. See Appellant's Designation No. 92, Morrissey Affidavit,

Exhibit E, p. 59. The Debtor also paid HSBC and the professionals it employed in the case a

total of $745,029.18. Id. at Exhibit E, p. 38. Before making those payments, the Debtor did not

---

[4]    Wilmington also asserted its charging lien for additional amounts due. As a result, 55,640 shares of New
Common Stock allocated to the TOPrS were issued to Wilmington resulting in a reduction in the recoveries of
the TOPrS holders of less than one-half of one percentage point.

require either HSBC or its counsel, LeBoeuf Lamb Greene & MacKay ("LeBoeuf") and Pryor

Cashman Sherman & Flynn, LLP ("Pryor") to prepare and submit fee applications. Instead, the

Debtor reviewed HSBC's, LeBoeuf's and Cashman's invoices in cursory fashion prior to paying

them. Id. at p. 21. Further, the Debtor also paid Law Debenture's predecessor in interest Bank

of New York $54,302.48. [5]

On November 1, 2004, in accordance with Section 5.18 of the Second Amended

Plan, the Indenture Trustee submitted copies of its bills for legal fees incurred during this

Chapter 11 case and other documents evidencing its fees and expenses to the Debtor for review

and payment by the estate. In response, on November 9, 2004, the Debtor advised the Indenture

Trustee that it "disputes and will not pay any of the fees submitted on behalf of Law Debenture."

The Debtor further advised the Indenture Trustee that: "[f]rom our perspective, Law Debenture

did not make a substantial contribution in NorthWestern's Chapter 11 such that any fees and

expenses incurred by or on behalf of Law Debenture should be allowed pursuant to Section 503

of the Bankruptcy Code." Appellant Designation No. 76, Affidavit of Karol K. Denniston in

Connection with NorthWestern Corporation's Objection to the Request of Law Debenture Trust

Company of New York for Payment of Fees and Reimbursement of Expenses Pursuant to the

Debtor's Plan of Reorganization and Applicable Trust Indenture ("Denniston Affidavit"),

Exhibit B, p. 1 (emphasis supplied). Finally, NorthWestern informed the Indenture Trustee that

if it wished to contest this position, the deadline for filing final fee applications, including an

application pursuant to Section 503 of the Bankruptcy Code, was December 1, 2004. Id.

---

[5]  Ironically, the fees and expenses of Bank of New York, Law Debenture's predecessor, had little to do with
    its duties as Indenture Trustee for the QUIPS holders, as Nixon Peabody LLP represented it in that capacity
    until the successorship could be completed. The fees and expenses paid by the Debtor related mostly to
    Bank of New York's pre-petition fees and expenses, analysis of actions taken by Bank of New York pre-
    petition in connection with the Going Flat Transaction, and legal matters arising out of Bank of New
    York's conflict situation.

Faced with the Debtor's objection to any payment whatsoever by this estate on account of the Indenture Trustee's fees and expenses, the Indenture Trustee was required to exercise its changing lien against the stock to be distributed to the QUIPS holders who elected Option 1 under the Plan.  See Appellant Designation No. 76, Denniston Affidavit, Exhibit A, pp. 2-3.  Accordingly, on November 10, 2004 the Indenture Trustee served Depository Trust Company, LaSalle Bank, N.A., and the Debtor's counsel with a notice that it was exercising its changing lien, in accordance with the provisions of the Plan and the QUIPS Indenture and directed them that no shares of New Common Stock were to be distributed to the QUIPS holders who elected Option 1 until the Indenture Trustee had delivered to the Depository Trust Company a written notice that all of the Indenture Trustee's fees and expenses, including its reasonable legal fees and expenses have been paid in full.  See Appellant's Designation No. 92, Morrissey Affidavit, Exhibit B, pp. 5-6.

On December 1, 2004 the Indenture Trustee timely filed the fee application with the Bankruptcy Court.[6]  It was the only indenture trustee in this case required to do so.  In addition, counsel to the Indenture Trustee advised the Debtor that its position that the Indenture Trustee was not entitled to the payment of any fees and expenses simply because the Debtor "disputes" such fees and expenses was inconsistent with the Plan, representations made by the Debtor to the Bankruptcy Court in support of confirmation of the Plan and counsel to the Debtor's out-of-court statements to counsel for Law Debenture in connection with negotiation of

---

[6]     The Fee Request covered all fees and expenses of the Indenture Trustee up to the Effective Date, November 1, 2004.  The Indenture Trustee accrued and continued to accrue substantial fees and expenses due to, in part, the necessity of filing and prosecuting the Fee Request; administration of any distribution to QUIPS; continued involvement in the Adversary Proceeding as provided for in the Plan and negotiating and documentation of any settlement agreements.  The Indenture Trustee reserved the right to file additional fee requests to seek reimbursement for post-Effective Date activities.

the disputed claims reserve.[7]  See Appellant's Designation No. 92, Morrissey Affidavit, Exhibit C, p. 2.

In response, by letters dated November 30, 2004 and December 21, 2004, the Debtor advised the Indenture Trustee that it intended to comply with its obligations to pay Law Debenture's reasonable fees and expenses pursuant to § 5.18 of the Plan, but took the position that it "did not have sufficient information to determine the reasonableness of the fees and expenses requested by Law Debenture."  Appellant's Designation No. 76, Denniston Affidavit, Exhibit E, pp. 2-3.  The Debtor further represented that:

> Upon receipt of the additional information regarding the fees and expenses incurred by Law Debenture, the Debtor timely will conduct a reasonableness review at such fees and expenses.  Upon completion of its review, the Debtor will advise Law Debenture of the fees and expenses incurred which the Debtor has determined to be reasonable and will pay consistent with the terms of Section 5.18
> …

Id.

Even though the Indenture Trustee's fee application conformed to both applicable bankruptcy and local rules and contained more than sufficient information to determine the reasonableness of Law Debenture's fees and expenses, the Indenture Trustee complied with the Debtor's request.  Specifically, at the Debtor's insistence, the Indenture Trustee reformatted the information previously furnished in its application and its invoices and on December 30, 2005 provided the Debtor with, among other things, a 61-page Excel spreadsheet that broke out all of Nixon Peabody's time entries by category in the format requested by the Debtor.  Appellant's Designation No. 92, Morrissey Affidavit, Exhibit C, p. 63.

---

[7]     On or about October 6 and 7, 2004, Debtor's counsel indicated to the Indenture Trustee's counsel that all fees and expenses would be paid.  See Appellant's Designation No. 93, Affidavit of Amanda D. Darwin ("Darwin Affidavit"), ¶¶ 4-5.

Notwithstanding this reformatted information, on January 3, 2005, the Debtor filed its objection to the Indenture Trustee's fees and expenses. Shortly thereafter, the Indenture Trustee commenced discovery in connection with the Debtor's objection and learned the Debtor's request for additional information was merely pretextual and not made in good faith. The Debtor designated Kendall Kliewer as its representative with full and complete knowledge of the reasonableness of the Indenture Trustee's fees and expenses in this case. At his deposition, however, Mr. Kliewer testified, in part, that:

- He never reviewed or even received a copy of Law Debenture's or its professionals' invoices in this case;

- He never reviewed or even received a copy of Law Debenture's or its professionals' fee request;

- He did not assist in the preparation of the Debtor's objection to Law Debenture's fee request; and

- Finally, he did not know if any other business people at the Debtor assisted in the preparation of the Debtor's objection to Law Debenture's fee requests.

Appellant's Designation No. 92, Morrissey Affidavit, Exhibit D, pp. 97-98.

In January 2005, shortly after objecting to the Indenture Trustee's fees and expenses in their entirety, the Debtor, Magten and Law Debenture began negotiating a possible settlement that included, *inter alia*, dismissal of the Adversary Proceeding and ancillary litigation; a payment to non-accepting holders of QUIPS in exchange for the release of the claims asserted in the Adversary Proceeding; and payment of all the Indenture Trustee's fees and expenses. The Debtor, the Indenture Trustee and Magten reached an agreement that simultaneously (a) resolved all litigation commenced by Law Debenture and Magten against the Debtor and its estate and (b) contrary to its objection, provided for payment of Law Debenture's pre- and post-Effective Date accrued fees and expenses in full. The terms of that agreement

were memorialized in a Settlement Agreement dated as of January 27, 2005. Ultimately, the

Debtor repudiated the Settlement Agreement and refused to present it to the Court for approval.

In response and without the Bankruptcy Courts' permission, the Indenture Trustee and Magten

filed their own motion under Fed R. Bankr. P. 9019 seeking approval of the Settlement

Agreement. By order dated March 10, 2005, the Court denied the Indenture Trustee's and

Magten's motion. See Appellant's Designation No. 80.

On July 5, 2005, the Bankruptcy Court entered its Order Granting in Part and

Denying in Part the Request for Payment of Administrative Expenses Pursuant to 11 U.S.C.

Section 503 by Law Debenture Trust Company of New York as Successor Trustee for the 8/45%

Cumulative Quarterly Preferred Securities, Series A (the "QUIPS") (the "Administrative

Expense Order," Appellant Designation No. 95). Pursuant to the Administrative Expense Order,

the Bankruptcy Court granted an administrative expense to the Indenture Trustee in the amount

of $112,088.66, a fraction of the $1,025,070.36 administrative expenses sought by the Indenture

Trustee. The Bankruptcy Court held that the Indenture Trustee's activities disrupted and

prevented the Debtor's reorganization efforts by the filing of the Adversary Proceeding and

therefore, Law Debenture failed to demonstrate that its efforts resulted in an actual and

demonstrable benefit to the Debtor's estate.

Specifically, the Administrative Expense Order allowed reimbursement of

$67,088.66 in fees incurred by the Indenture Trustee while a member of the Creditors Committee

and another $45,000.00, representing an annual administration fee. The Order denies recovery

of fees and expenses associated with:

- Communication with QUIPS Holders and General Trust Indenture
  Administrative - $65,326.50

- Preparation of Proofs of Claim - $32,113.50

- Review and Analysis of General Bankruptcy Matters - $88,735.00

- Plan and Disclosure Statement Matters - $452,688.90

- Bankruptcy Litigation - $114,511.00

- Expense Reimbursement - $21,994.49

- Local Counsel Fees - $8,047.50

- Law Debenture Fees - $129,564.87

The Indenture Trustee timely filed its notice of appeal of the Administrative Expense Order. No stay of the Order was requested. Nevertheless, a year and four months after its issuance, the Debtor has failed to comply with Order and has not paid the allowed fees. Numerous requests for payment have gone unanswered. Likewise, the Indenture Trustee's requests for post-confirmation fees and expenses relating to making distributions to holders, as provided for under the Plan, have gone unpaid. Such blatant disregard the Court's Order and its obligations under its own Plan, further demonstrates that the Debtor's objections to the Indenture Trustee's fees and expenses were merely punitive in nature and made in order to obtain litigation leverage.

## V. ARGUMENT

The Bankruptcy Court erred in entering the Administrative Expense Order because as such the order does not address the facts that: the Second Amended Plan called for the payment of fees in full; the Indenture Trustee's efforts substantially contributed to the Debtor's estate; and the treatment of the Indenture Trustee is inconsistent with the treatment of other indenture trustees in the bankruptcy case along with other details more fully discussed

herein. Accordingly, the Indenture Trustee requests that this Court vacate the Administrative

Expense Order and grant the Indenture Trustee's fees in full.

**1. The Second Amended Plan Called for Payment of Fees in Full and the Treatment Under the Administrative Expense Order is Contrary to Representations Made by the Debtor.**

Section 5.18 of the Second Amended Plan provides that "[o]n the Effective Date,

Reorganized Debtor will pay the Indenture Trustee's Fees and Expenses in full and in cash, in

amount to be agreed upon among the Debtor and each of the Indenture Trustees." That section

further provides distributions to holders "will not be reduced on account of payments made to the

Indenture Trustees," and that the payment of those fees and expenses requires neither

Bankruptcy Court approval nor even preparation of a fee application for review by the Debtor,

the Fee Auditor and other parties in interest in this case. The Second Amended Plan further

acknowledges and confirms the indenture trustee's charging lien by providing that: "[i]f the fees

and expenses of the respective Indenture Trustees are not reimbursed in full by the Debtor, then

any deficiency may be paid out of the distributions received by the respective Indenture Trustee

on behalf of their respective class claimants."

Further, the Debtor's representations to the Bankruptcy Court that Class 8(a) and

Class 8(b) would receive "the same distribution" under the Second Amended Plan stands in stark

contrast to the Debtor's contesting payment of any of the Indenture Trustee's fees and expenses

on a showing of "substantial contribution." After representing to the Bankruptcy Court that the

holders of QUIPS and TOPrS debt would receive the same pro rata distribution of New Common

Stock under the Plan, and after the Bankruptcy Court premised its Confirmation Order on an

express finding that Class 8(a) and Class 8(b) would be receiving the "same distribution," the

Debtor could not claim that the Indenture Trustee's reasonable fees and expenses were not

compensable from the estate.

Solicitation of acceptances for the Second Amended Plan was premised on the representations of the Debtor that the indenture trustees' fees and expenses would be paid and would not affect the recoveries of the holders. The Plan proposed to include the payment of indenture trustee's fees and expenses as part of the distributions to be made to holders of claims and solicited acceptances to the Plan from these holders by proposing distributions of New Common Stock in the Reorganized Debtor net of accrued indenture trustee fees and expenses.

Notwithstanding the Plan language and the Debtor's own representations to the Bankruptcy Court that the TOPrS and the QUIPS would "receive the same distribution if each respective class accepts the Plan," the Debtors disavowed any liability whatsoever for the Indenture Trustee's fees and expenses in the bankruptcy case.

The Administrative Expense Order held that a majority of the Indenture Trustee's fees and expenses in the bankruptcy case are subject to §503(b)'s "substantial contribution" standard and that only a small portion of its fees and expenses are compensable by the estate because the Indenture Trustee "acted solely in its own interest" and "its actions [did not] result in an actual and demonstrable contribution to the Debtor's case." However, this "substantial contribution" standard is irrelevant to the analysis of whether Law Debenture's administrative claim should be granted, because to deny such claim is inconsistent with the language of the Plan and the Debtor was estopped from this argument.

Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it will be to the prejudice [of other parties]." New Hampshire v. Maine, 532 U.S. 742 (2001). The express

purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. Id.

Both the Supreme Court and the Third Circuit have recognized that the circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation. Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case:

- First, a party's later position must be inconsistent with its earlier position;

- Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that the court was misled;

- Third, courts ask whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire, 532 U.S. at 743.

Each of these elements are present in this case and estop the Debtor from claiming that reimbursement of the Indenture Trustee's fees and expenses was not part of the consideration to be paid under the Second Amended Plan or that those fees and expenses are subject to Section 503(b)'s "substantial contribution" standard. Simply put, each of those self-serving positions is flatly inconsistent with the representations the Debtor made when it solicited acceptances for the Second Amended Plan and argued for its confirmation before the Bankruptcy Court – that the holders of the TOPrS and the QUIPS were receiving the "same distribution" under the Plan. Instead, the QUIPS holders received dramatically less than the TOPrS holders because the Indenture Trustee was required to seek reimbursement through its charging lien from the distributions of New Common Stock made to QUIPS holders.

The Debtor's opportunism and cavalier disregard of representations made to the Bankruptcy Court in October 2004 is further highlighted by its treatment of the fees and expenses of the other indenture trustees in this case. All of those fees and expenses were paid in full by the Debtor's estate on the Effective Date and could not and were not subject to review under Section 503(b). Although those indenture trustees were already compensated for the very work for which the Indenture Trustee seeks compensation, those indenture trustees did not object to the Second Amended Plan and did not continue to prosecute litigation following confirmation of the Plan. The doctrine of judicial estoppel, however, precludes the Debtor from punishing Law Debenture for continuing to prosecute litigation contemplated by the Plan and seeking to gain an unfair advantage in that litigation by repudiating representations made to, and adopted by, the Bankruptcy Court. Instead, judicial estoppel requires that the QUIPS holders get exactly what they were promised under the Second Amended Plan: their pro rata interest in the New Common Stock to be issued to Class 8 net of the Indenture Trustee's fees and expenses as of the Effective Date.

## 2. The Indenture Trustee Substantially Contributed to the Debtor's Estate.

Even if the "substantial contribution" analysis is relevant and the Debtor was not estopped from making the argument, the Bankruptcy Court erred in its finding that the Indenture Trustee did not provide a "substantial contribution" to the Debtor's estate.

The Administrative Expense Order rests on the premise that, because the Indenture Trustee took positions during the Chapter 11 case adverse to the Debtor, the Indenture Trustee did not make a substantial contribution to the reorganization of the Debtor. Put another way, the Administrative Expense Order holds that reaching an agreement with the Debtor was a prerequisite for treating the Indenture Trustee's fees and expenses as an administrative expense.

That is not now, nor should it ever be, the standard for measuring a substantial contribution by an indenture trustee in a reorganization case. This holding puts an indenture trustee, who serves as a fiduciary for holders of securities covered by a trust indenture, in an impossible position: to serve those holders it must submit to the demands of the debtor simply so that its fees and expenses will be reimbursed by the estate rather than subtracted from the distribution allocated in the plan to the beneficiaries of the trust.

The term "substantial contribution" is not defined in the Bankruptcy Code. It is, therefore, left to the courts to develop the standard as a matter of law and the inquiry as to whether that standard has been met is a question of fact. See Manufacturers Hanover Trust Company v. Bartsh (In re Flight Transportation Corporation Securities Litigation), 874 F.2d 576 (8th Cir. 1989); Lebron v. Mecham Financial Inc., 27 F. 3d 937, 946 (3rd Cir. 1994); In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1253 (5th Cir. 1986). In the Third Circuit, the controlling case on this issue is Lebron v. Mecham Financial Inc., 27 F. 3d at 937. Pursuant to Lebron, a contribution is substantial if "the benefit received by the estate [is] more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." Id. at 944. It is clear that in each of its actions in this case, the Indenture Trustee was not acting for its own benefit. It has no economic stake in the QUIPS. Rather, the Indenture Trustee was acting solely as a fiduciary for the holders of the QUIPS and its actions provided a benefit received by the estate. It is also clear that the Indenture Trustee's actions assisted the Debtor in confirming a Chapter 11 plan. As a result, the fees and expenses of the Indenture Trustee are allowable under § 503(b) (3) (d) and the fees and expenses of its counsel are reimbursable under § 503(b) (4).

Over the course of its involvement with the NorthWestern Chapter 11 reorganization proceeding, Law Debenture, in its capacity as Indenture Trustee, has contributed to the reorganization process similar to customary contributions made by indenture trustees in such proceedings. Accordingly, the fees and expenses it has incurred in the course of the Chapter 11 case are appropriately paid pursuant to the Plan or as an expense of administration.

The contributions made by the Indenture Trustee include:

- serving as a member of the Creditors' Committee;

- filing a Proof of Claim on behalf of the holders of QUIPS;

- serving as a vehicle by which QUIPS holders could be informed about the progress of the reorganization effort and could gather information as to how the holders of QUIPS felt about various aspects of that effort;

- continuing to administer the QUIPS Indenture;

- identifying reasons why the proposals made by the Debtor, and documents filed, notably the Plan of Reorganization, the First Amended Plan of Reorganization, and the Second Amended Plan of Reorganization, each with their attendant Disclosure Statements, were deficient and could not achieve confirmation;

- post-confirmation work with the Debtor necessary to allow the confirmed Second Amended Plan of Reorganization to become effective, including resolution of disputed claims reserve;

- post-confirmation work in accordance with Section 5.18 of the Second Amended Plan of Reorganization and the QUIPS Indenture.

Applying the <u>Lebron</u> standard, the Bankruptcy Court allowed the Indenture Trustee's fees and expenses while on the Creditors Committee and its administration fee. However, the Court did not appreciate Law Debenture's unique role as an indenture trustee for all of the holder of QUIPs, which provided a substantial benefit to the Creditors' Committee and

to the reorganization process in general.[8]  It could and did bring to the table the interests of many small and diverse holders of QUIPS, each in their own right not able to participate directly in the reorganization process.  This representative role provided a substantial benefit in this case.

The Debtor's own actions reveal that it viewed the role of the Indenture Trustee for the QUIPS as providing a substantial benefit to the reorganization process.  The Debtor paid The Bank of New York, Law Debenture's predecessor as Indenture Trustee for the QUIPS, all of its fees and expenses associated with the QUIPS Indenture including those stemming from its own conflict of interest that let to the necessary successorship to Law Debenture.  There is simply no credible reason why Law Debenture should be treated any differently than The Bank of New York relative to this or any other aspect of its services.

The Debtor has admitted the importance and thereby the benefit to the Debtor that the Indenture Trustee is providing by continuing to serve as Indenture Trustee for the QUIPS.  That admission is evident in the very terms of the Second Amended Plan of Reorganization that specifically requires that the Indenture Trustee continue to serve post-confirmation as Indenture Trustee for the QUIPS.  The Second Amended Plan states, and the Order Confirming the Second Amended Plan repeats, that "... [the] QUIPS Indenture and all other agreements that govern the rights of holders of the Unsecured Subordinated Notes represented by the QUIPS Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided in the Plan, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Plan."  See Appellant Designation No. 54, Section 5.18 of the Plan and pages 67-68 of the Confirmation

---

[8]  The Court should be aware that Judge Peterson was not the presiding judge during the majority of the Chapter 11 proceeding, but only took over the case post-confirmation.

Order.[9]  The Confirmation Order goes on to provide that, so long as the Indenture Trustee shall

remain the plaintiff in the Adversary Proceeding, the QUIPS holders need not join the lawsuit,

thereby ratifying and confirming the Indenture Trustee's ongoing role as class representative

even after the Effective Date.

      The Debtor is a party to the QUIPS Indenture and willingly obligated itself by its

signature to pay, in accordance with that QUIPS Indenture, all of the fees accrued thereunder by

the Trustee, and to reimburse all of the Indenture Trustee's reasonable fees and expenses,

including the fees and expenses of its counsel.  In the Plan, the Debtor chose to require that the

Indenture Trustee continue to serve as such.  It is the height of hypocrisy to require servitude on

the one hand and refuse compensation for the services required on the other hand.  It is the

inescapable conclusion that these services have been, and must continue to be, a substantial

benefit to the Debtor and to its reorganization.

      Section 501 of the Bankruptcy Code authorizes an indenture trustee to file a proof

of claim; yet, the Administrative Expense Order denies fees and expenses associated with filing

of such proofs.  As the legislative history indicates, the section is permissive and does not require

the indenture trustee to file a proof of claim on behalf of the beneficiaries of the trust.  124 Cong.

Rec. H 11,093 (Sept. 28, 1978); S. 17,410 (Oct. 6, 1978).  The Indenture Trustee filed a proof of

claim in this case on behalf of the holders of QUIPS.  In doing so, it not only relieved the

thousands of holders of QUIPS from having to prepare and file individual proofs of claim, it also

---

9      Courts have likewise found the routine services of an indenture trustee, rendered in accordance with the
trust indenture, to be compensable as ordinary expenses of administration under § 503(a)(1) without the
necessity of a showing of substantial contribution.  See In re Revere Cooper and Brass Incorporated, et al.,
60 B.R. 892, 896, Fn. 4 (Bankr. S.D.N.Y. 1986) ("Although routine, the court is of the view that the
amounts sought as administrative fees ... and agency fees ... are compensable as ordinary expenses of
administration under Code § 503(a)(1) without the necessity of a showing of substantial contribution.  This
is because these fees relate to ordinary and ongoing services necessary for the recordkeeping aspects of a
public issue").

relieved the Debtor from having to process all of those proofs of claim, from providing certain

notices to each of the QUIPS holders during the course of the case and from now making

individualized distributions to those holders.  In light of the expense that the Debtor would

otherwise incur to accomplish these tasks in favor of thousands of QUIPS holders, the estate is

substantially benefited by the Indenture Trustee performing these tasks and is not being harmed

by having to reimburse Law Debenture for the fees and expenses that it incurred in filing a proof

of claim on behalf of the holders of QUIPS.  Thus, the denial of the Indenture Trustee's fees and

expenses relating to the filing of proof of claim was erroneous and should be reviewed.

As mentioned above, the continued existence of the QUIPS Indenture, as required

by the Debtor both during this reorganization case and now post-confirmation, requires that the

Indenture Trustee continue to perform the services required of it by the QUIPS Indenture.  These

services include communication with the holders of QUIPS.  During the Chapter 11 case, the

Indenture Trustee and its counsel have fielded and continue to field calls from holders of QUIPS.

The holders wanted to understand what was happening in the Chapter 11 case, had questions

about events, and wanted to express their opinion about those events and about the Going Flat

Transaction to the Indenture Trustee, and through the Indenture Trustee, to the Debtor or to the

Bankruptcy Court.  Had it not been for the participation by the Indenture Trustee, the Debtor-in-

Possession, its counsel or the Creditors' Committee's counsel, would have been required to field

these inquiries directly.[10]  See § 704(7) of the Bankruptcy Code, made applicable to a Debtor-in-

Possession by § 1107(a).  In fact, both the attorneys for the Debtor and the Attorneys for the

---

[10]    See In re Essential Therapeutics, Inc., et al., Case # 03-11317, page 10 of the Memorandum Opinion of J.
Walrath issued on April 21, 2004 (in allowing partial payment to a preferred stockholder who sought
reimbursement for his fees and expenses including fees and expenses incurred by his counsel in a Chapter
11 reorganization case, the Court states that "Without this assistance, the Debtor's counsel would have had
to devote significant time and resources to perform these services while they were busy with other matters.
As a result, the Debtors were able to cut costs by focusing their efforts on their areas of expertise and
allowing the Preferred Stockholders to assist where appropriate and beneficial to the estate").

Creditors Committee fielded inquiries from creditors and asked the Bankruptcy Court to

reimburse them for that service. And in fact, both the Debtor and Creditors Committee have

referred inquiries from QUIPS holders to Law Debenture. It is unfair and discriminatory to

allow payment as an administrative expense for the same role if played by a debtor's counsel or

counsel to a creditors' committee, but to refuse that same treatment to an indenture trustee. By

relieving the Debtor's counsel and counsel to the Creditors' Committee from this task, those key

parties in the reorganization effort were freed up to focus their attention on the tasks at hand, i.e.

the reorganization of the Debtor. If those attorneys had been required to deal with these creditor

inquiries, they surely would have sought compensation for the effort and been paid as an

administrative expense for having done so. Therefore, the estate is not diminished by Law

Debenture or its counsel being reimbursed for having done so. The Indenture Trustee, therefore,

provided a substantial contribution to the reorganization effort by handling communications with

the holders of QUIPS. Accordingly, Jude Peterson's denial of those fees and expenses should be

reversed.

   By far, the most activity required of the Indenture Trustee revolved around the

Debtor's efforts to formulate, negotiate and confirm a Chapter 11 Plan. The Debtor first filed its

Plan of Reorganization on May 17, 2004, later filed a First Amended Plan of Reorganization, and

finally a Second Amended Plan of Reorganization. At each step, the Debtor also filed a

proposed form of Disclosure Statement providing what it asserted was adequate information

from which holders of claims against or equity interests in the Debtor could determine how to

vote on the reorganization proposed in each Plan. Also at each step, the Indenture Trustee

reviewed the relevant plan and disclosure statement, contacted the Debtor's or Creditors'

Committee's representative to discuss the provisions or disclosures made, and, if those

discussions were not fruitful in causing changes to be made, and except as convinced to the contrary, filed an objection thereto.

At the earliest possible time, the Indenture Trustee and its counsel brought to the Debtor's attention certain realities about the Plan of Reorganization being proposed by the Debtor and each amendment thereto. The deficiencies identified were such, in the view of the Indenture Trustee, as would prevent the Debtor's Plan from being confirmed by the Bankruptcy Court. They were generally correct in that assessment. The initial Plan of Reorganization and the First Amended Plan of Reorganization proposed by the Debtor were simply not confirmable in accordance with the requirements of Section 1129 of the Bankruptcy Code. This was not the fault of the Indenture Trustee and it cannot be rightly criticized for having filed and prosecuted objections to those plans. "[S]ubstantial contribution does not necessarily require such contribution as will lead to confirmation of a plan for, in many cases, it might be a more valuable and substantial contribution if the action of the ... indenture trustee ... has led to proceedings leading to a denial of confirmation of a plan." 3 W. Collier, Collier on Bankruptcy ¶ 503.04 [3] [d], at 503-47 (15th ed. 1988), cited in <u>Manufacturers Hanover Trust Company v. Bartsh (In re Flight Transportation Corporation Securities Litigation)</u>, supra at 583, fn. 7 (8th Cir. 1989). Along the way, many of the issues raised by the Indenture Trustee and its counsel in their objections were adopted by the Debtor and found their way into the terms of the Second Amended Plan of Reorganization that was ultimately confirmed by the Court. Because the raising of many of these issues, and their subsequently being addressed by the Debtor in an amendment to the Plan, resulted in a confirmed Plan in this case, the efforts put forth by the Indenture Trustee to identify, evaluate, and raise these issues and then persuade the Debtor to amend or otherwise modify the Plan accordingly, provided a substantial benefit to the case, i.e.

confirmation of a plan of reorganization. This benefit extended to all creditors and not solely to the holders of QUIPS for whom the Indenture Trustee serves as fiduciary.

The role of the Indenture Trustee in this plan process is informative on the issue of whether it provided a substantial benefit to the estate. The Indenture Trustee, as previously noted, was not a creditor of the Debtor. Its only role was as the duly appointed representative for the holders of the QUIPS in the Chapter 11 proceeding. Accordingly, in pursuing the plan negotiation and confirmation process, Law Debenture was not working for its own benefit. Rather, it had two separate and distinct goals. First, and consistent with its fiduciary responsibilities as an indenture trustee, it sought to obtain the best possible dividend for the holders of QUIPS. However, there was a secondary role that provided a real and substantial benefit to the reorganization process. Instead of simply pursing a course for or against the relevant version of the Plan, as was done by Magten, the holder of a significant portion of the QUIPS, the Indenture Trustee wanted to assure that whatever Plan resulted from the process was confirmable. In many of its positions taken during the Plan negotiation and approval process, the Indenture Trustee did not pursue issues raised and pursued by Magten. However, the initial Plan of Reorganization proposed by the Debtor was simply not confirmable. Filing objections to this Plan allowed the Debtor to identify how the Plan needed to be changed in order to achieve confirmation. The Second Amended Plan of Reorganization represented a significant improvement over the initial proposal and incorporated many of the changes urged by the Indenture Trustee. While these changes may have benefited the holders of QUIPS (albeit not to the extent advocated by the Indenture Trustee) and while the QUIPS holders saw their dividend increase significantly from the initial Plan proposal to the one proposed in the Second Amended

Plan of Reorganization, all creditors and the Debtor benefited by getting the Plan to the point

where it was capable of confirmation.[11]

These changes were numerous and included without limitation, the following:

- an acknowledgement by a split in Class 8 that the QUIPS holders have rights separate and apart from the TOPrS arising out of their claims resulting from the Going Flat Transaction now pending in the Adversary Proceeding;

- deathtrap provision with respect to non-assenting QUIPS holders was removed;

- QUIPS holders were given a choice of recoveries;

- QUIPS holders were given more information regarding their rights and the choices afforded them in the Plan;

- resolicitation of the QUIPS holders afforded them the opportunity to change their votes based on the above-described revised class treatment and heightened disclosure.

All of these changes, while not entirely to the liking of the Indenture Trustee, were changes made

by the Debtor to the Plan directly as a result of the objections raised by Law Debenture and

Magten.  These changes resulted in a Plan that the Bankruptcy Court could, and did, find

confirmable.

A significant number of the holders of QUIPS did vote to accept the Second

Amended Plan of Reorganization.  A larger percentage voted in favor of the releases that formed

an integral part of the Plan.  The Indenture Trustee's reimbursement by the estate for its fees and

expenses under § 503(b) for having made a substantial contribution is not and should not be

dependent on its ability to deliver votes by a majority of the holders of the securities under the

---

[11] Many of the issues raised by Law Debenture were also raised by the indenture trustee of the TOPrS, Wilmington Trust Company.  The Debtor, in the Second Amended Plan, paid substantially all of the fees and expenses of the indenture trustee of the TOPrS, presumably because it has concluded that the indenture trustee of the TOPrS, in filing and pursuing many of the same objections raised by Law Debenture, provided a substantial benefit to the reorganization process.  The fact that Law Debenture pursued an objection to the Second Amended Plan of Reorganization while the indenture trustee of the TOPrS did not is not a sufficient basis to distinguish the substantial contribution made by each of them.

relevant indenture in favor of the particular plan. If that were the case, an indenture trustee would always be risking a breach of fiduciary duty to the beneficiaries of the trust, including those who might decide to vote against the plan, in exchange for assurance that its fees will be covered. That cannot be, and is not, the relevant standard. Instead, what must be expected of an indenture trustee is to work to make the plan as good as possible and still confirmable so that all of the holders, whether they voted to accept or reject the plan, are benefited. This is exactly the role performed by Law Debenture in this case and that performance provided a substantial contribution to the reorganization process.

Perhaps the most virulent accusation made by the Debtor against Law Debenture is that the fees and expenses incurred in filing and prosecuting a Complaint against the Debtor for a fraudulent transfer should not be reimbursed as an administrative expense because it did not make a substantial contribution to the reorganization of the Debtor. The entirety of the Debtor's argument is that the Complaint, of necessity, is adverse to the Debtor's estate and other creditors. According to the Debtor, Law Debenture's pursuit of the Complaint and the Adversary Proceeding it initiated could not be of benefit and, instead, has been quite costly to the estate and, derivatively, to other creditors. However, taking a position adverse to the estate does not automatically disqualify a creditor or its representative from making a substantial contribution to the reorganization effort. The Indenture Trustee was certainly bound by its fiduciary duty to the holders of QUIPS to pursue their interests. In accordance with that fiduciary duty, it filed the Complaint. The fact that the Complaint has survived the Debtor's Motion to Dismiss has confirmed the viability of the Complaint.[12] That, coupled with the fact that approximately 74%

---

[12]    It is not required that Law Debenture prevail in the Adversary Proceeding in order to be entitled to reimbursement of its fees and expenses under Section 503(b) as having made a substantial contribution. See In re Revere Cooper and Brass Incorporated, et al., supra, at page 897 (Bankr. S.D.N.Y. 1986) ("This is not to say that the ultimate outcome of any litigation will in and of itself determine a party's ability to

of the QUIPS holders elected, or were deemed to have elected, to risk their distribution under the Plan in order to pursue their rights under the litigation, is proof that the filing of the Complaint has not been a fool's errand.  Rather, filing the Complaint allowed all parties to see and evaluate a right that holders of QUIPS were entitled to pursue.  It allowed the Plan process to be molded to permit those holders who wished to pursue the litigation initiated by the Complaint, rather than accept what the Second Amended Plan otherwise provided for holders of QUIPS, to elect to do so and give up the dividend otherwise provided.  This election was key to the Court's ability to satisfy the "best interest of creditors test," a necessity to confirmation of the Second Amended Plan, because the holders of QUIPS were entitled to pursue the litigation if the Debtor were liquidated under Chapter 7.  11 U.S.C. § 1129 (a)(7)(ii).  Accordingly, it follows that the efforts of the Indenture Trustee in pursuing the Adversary Proceeding, and prevailing on the Motion to Dismiss, just as was the case with its efforts to otherwise modify the various versions of the Plan to the point where it could be confirmed, allowed the Debtor to provide in the Plan for the holders of QUIPS in such a way as their rights to pursue the litigation were not lost in the reorganization process and the Second Amended Plan, which recognized that right, could be and was confirmed.

---

recover reimbursement for expenses incurred and services rendered under Code § 503(b)(3), (4) or (5).  "Substantial contribution" may not always be synonymous with victory in litigation relevant to a Chapter 11 case.  There may be instances where the mere existence of the litigation, the quality of the representation therein, and/or the strength and merits of the party's legal or factual case greatly adds to and benefits the reorganization of a Chapter 11 debtor regardless of the litigation's ultimate outcome").  In accord, In the Matter of Baldwin-United Corporation, et al., 79 B. R. 321, 340 (Bankr. S.D. OH 1987) ("prevailing in such opposition is not necessarily a prerequisite to finding substantial contribution ...").

### 3. **Debtor's Objection was Inconsistent with the Treatment Of Other Indenture Trustees in the Bankruptcy Case.**

The Bankruptcy Court's disallowance of the Indenture Trustee's fees and expense was arbitrary and capricious when compared to the treatment of the fees and expenses of other indenture trustees involved in the Bankruptcy Case.

In support of its contention that substantially all of Law Debenture's fees and expenses were effectively not compensable by this estate, the Debtor relied exclusively on the following language from § 5.18 of the Plan: "In the event that the parties cannot reach an agreement of the amount [of an Indenture Trustee's reasonable fees and expenses] any disputed amount shall be determined by the Bankruptcy Court, pursuant to Section 503 of the Bankruptcy Code". In its Objection, the Debtor asserted that it would not pay any of Law Debenture's fees and expenses. The Debtor's construction of this provision of the Plan runs headlong into the implied covenant of good faith contained in the Plan that requires the Debtor to refrain from arbitrary and unreasonable conduct. By its own actions, the Debtor prevents QUIPS holders from receiving the distributions promised to them under the Plan, believes representations the Debtor made to the Indenture Trustee, other creditors, counsel and the Bankruptcy Court in seeking confirmation, and is contrary to its course of performance with every other indenture trustee in this case.

In essence, a plan of reorganization is an offer of promises made by a debtor and accepted by creditors following serious and frequently protracted negotiations. In re UNR Industries, Inc., 173 B.R. 149, 157 (N.D. Ill. 1994) (and cases cited therein). Contract law principles, accordingly, govern the interpretation of a plan of reorganization. Id.; see also Matter of Texas General Petroleum Corp., 52 F. 3d 1330, 1335 (5th Cir. 1995); Salmon v. Laser Plot,

Inc., 189 B.R. 559, 560 (Bankr. D. 1995).  And pursuant to § 14.11 of the Plan, Delaware

contract law governs the parties rights and obligations under the Plan.

Delaware law, in turn, imposes a duty of good faith and fair dealing in every

contract.  See, e.g., True North Composites, LLC v. Trinity Industries, Inc., 191 F. Supp. 2d 484

(D. Del. 2002).  This duty is a contract term implied by courts to prevent one party from unfairly

taking advantage of the other side.  Id.  The implied covenant emphasizes faithfulness to, and an

agreed common purpose and consistency with, the justified expectations of the other party.

Furthermore, the implied covenant of good faith and fair dealing applies even

where the contract allows a party to exercise discretion.  See, e.g., Wilmington Leasing, Inc. v.

Parrish Leading Co., L.P., 1996 WL 560190, at *2 (Del. Ch. Sept. 25, 1996)[13].  It requires a

party exercising such discretion "to refrain from arbitrary, or unreasonable conduct which has the

effect of preventing the other party to the contract from receiving the fruits of the contract."

Wilgus v. Salt Pond Ins. Co., 498 A. 2d 151, 159 (Del. Ch. 1989) (citing Restatement (Second)

of Contracts § 205 (1981)), *rev'd by statute on other grounds*; Ace & Co. v. Balfour Beatty PLC,

148 F. Supp. 2d 418, 426 (D. Del. 2001).  Under the Plan, the payment of the Indenture Trustee's

reasonable fees and expenses and the recoveries ultimately obtained by QUIPS holders are

simply not subject to the Debtor's whim.  Any exercise of the Debtor's right to object to the

Indenture Trustee's fees and expenses is subject to the covenant of good faith and fair dealing

imposed by applicable federal and state law.  That covenant prohibits the Debtor from

interposing opportunistic, improperly motivated, bad faith objections calculated to gain leverage

in pending litigation with the Indenture Trustee and the QUIPS holders who elected Option 2

under the Plan.

---

[13] Attached as Ex. 1.

The Debtor's objection to Law Debenture's fees and expenses is plainly contrary to the covenant of good faith imposed by controlling federal and state law. The scope of the Debtor's objection to the Indenture Trustee's fee and expenses, the dramatically disparate treatment of Law Debenture's fees and expenses in this case, the substantial impact on recoveries to QUIPS holders if the Debtors objection was sustained, the absence of any other objection to those fees by the Fee Auditor, Plan Committee or any other party-in-interest and, lastly and perhaps most compellingly, the Debtor's admitted failure to even review the invoices and other documents the Indenture Trustee provided it in support of its fees and expenses, all lead to the inescapable conclusion that the Debtor's insistence that the Bankruptcy Court determine the amount of fees and expenses the estate pays Law Debenture on behalf of QUIPS holders under a "substantial contribution" standard is improperly motivated and designed solely to obtain an unfair advantage in ongoing litigation with QUIPS holders who elected Option 2 under the Plan.

In sharp contrast with the millions of dollars of fees and expenses already paid over two years ago to other indenture trustees on the Effective Date of the Plan (not to mention the tens of millions requested by the professionals of the Debtor and the Committee), the Debtor disputes payment from this estate on account of the Indenture Trustee's accrued fees and expenses. Moreover, rather than identify specific fees and expenses it contends are unreasonable and subject to bona fide dispute, the Debtor disavowed any liability for Law Debenture's fees and expenses under the Plan and insisted that the Bankruptcy Court disallow them in their entirety under a substantial contribution standard. The motivation for this disparatement treatment is not difficult to discern. The Indenture Trustee on behalf of QUIPS holders who elected Option 2 under the Plan, is the only Indenture Trustee who continues to prosecute litigation against this estate and the Debtor has coupled any payment of Law Debenture's fees

and expenses by the estate on settlement of that litigation.  Put bluntly, such bad faith, opportunistic behavior is exactly what the covenant of good faith is intended to police and that doctrine prohibits the Debtor from holding bargained-for-distributions to QUIPS holders who elected Option 1 hostage as means of gaining advantage in litigation with other QUIPS holders. Finally, any doubt that the Debtor's insistence that ALL of the Indenture Trustee's fees and expenses be determined under "substantial contribution" standard is an improper attempt to obtain advantage in litigation with the QUIPS holders who elected Option 2 under the Plan is permanently removed by the Debtor's admission that it never even reviewed the Indenture Trustee's, or its professionals invoices before it objected to those fees and expenses in their entirety.

## V.  CONCLUSION

Accordingly, it is respectfully submitted that this Court enter an order overruling the Administration Expense Order entered by the Bankruptcy Court enter an order allowing the Indenture Trustee's fees and expenses in full and granting such other and further relief as this

Court deems just and proper.

November 21, 2006

SMITH, KATZENSTEIN & FURLOW, LLP

Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405

- and -

NIXON PEABODY LLP
Amanda D. Darwin (BBO No. 547654)
John V. Snellings (BBO No. 548791)
Lee Harrington (BBO No. 548791)
Christopher M. Desiderio
100 Summer Street
Boston, MA 02110
Telephone:    (617) 345-1000
Facsimile:    (617) 345-1300

Counsel for Law Debenture Trust Company of
New York, as Trustee and not individually