# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (KJC) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK | ) | C.A. No. 05-603 (JJF) |
| | ) | |
| Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN CORPORATION | ) | |
| | ) | |
| Appellee | ) | |
| | ) | |

## COMPENDIUM OF UNREPORTED CASES WITH RESPECT TO APPELLEE NORTHWESTERN CORPORATION'S ANSWERING BRIEF

| Decision | Tab |
|---|---|
| In re Nosek, Case No. 06-40170, 2006 WL 3262629 (D. Mass. Nov. 13, 2006) | 1 |
| In re PWS Holding Corp., Case No. 98-212, 2002 WL 32332066 (Bankr. D. Del. Jan. 30, 2002) | 2 |
| Kelly v. McKesson HBOC, Inc. Case No. 99c-09-265 (WCC), 2002 WL 88939 (Del. Super. Jan. 17, 2002) | 3 |
| Moore Bus. Forms, Inc. v. Cordant Holdings Corp., Case No. 13911, 1995 WL 662685 (Del. Ch. Nov. 2, 1995) | 4 |
| Shenandoah Life Ins. Co. v. Valero Energy Corp., Case No. 9032 1988 WL 63491 (Del. Ch. June 21, 1988) | 5 |

# TAB 1

**Westlaw.**

354 B.R. 331                                          Page 1

354 B.R. 331
**(Cite as: 354 B.R. 331)**

**H**
Briefs and Other Related Documents
In re NosekD.Mass.,2006.Only the Westlaw citation
is currently available.
United States District Court,D. Massachusetts.
In re Jacalyn S. NOSEK, Debtor.
Ameriquest Mortgage Company, Appellant,
v.
Jacalyn S. Nosek, Appellee.
**Civ.A. No. 06-40170-WGY.**

Nov. 13, 2006.

**Background:** In Chapter 13 proceedings, debtor
filed adversary proceeding alleging that mortgage
lender violated Real Estate Settlement Procedures
Act (RESPA) and state law. The Bankruptcy Court,
2006 WL 1867096, entered judgment in debtor's
favor, and lender appealed. Debtor moved to
dismiss appeal.

**Holdings:** The District Court, Young, J., held that:

(1) bankruptcy court order satisfied "separate
document" rule;

(2) Bankruptcy Code preempted debtor's state law
claim against lender; and

(3) debtor could not use RESPA's dispute resolution
provisions to resolve disagreements over amount of
lender's claim.

Motion denied; case remanded.

**[1] Bankruptcy 51 ☞3766.1**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3766 Decisions Reviewable

            51k3766.1 k. In General. Most Cited
Cases
Bankruptcy court order satisfied "separate document
" rule, and thus was appealable order, even though
court stated that "judgment shall enter as follows,"
where order was filed contemporaneously with, but
separately from, memorandum of decision.
Fed.Rules Bankr.Proc.Rule 9021, 11 U.S.C.A.

**[2] Bankruptcy 51 ☞3767**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3766 Decisions Reviewable
            51k3767 k. Finality. Most Cited Cases
Judgment may be final, and thus appealable, even
when motion for attorney fees remains to be
resolved. Fed.Rules Civ.Proc.Rule 54(b), 28
U.S.C.A.

**[3] Bankruptcy 51 ☞3767**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3766 Decisions Reviewable
            51k3767 k. Finality. Most Cited Cases
Bankruptcy court order in adversary proceeding
constituted final appealable order, even though
court had not ruled on debtor's application for
attorney fees and costs, where order disposed of all
counts in complaint and assessed damages.
Fed.Rules Civ.Proc.Rule 54(b), 28 U.S.C.A.

**[4] Bankruptcy 51 ☞2002**

51 Bankruptcy
   51I In General
      51I(A) In General
         51k2002 k. Application of State or
Federal Law in General. Most Cited Cases
States may not pass or enforce laws to interfere with
or compliment Bankruptcy Code or to provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331
**(Cite as: 354 B.R. 331)**

additional or auxiliary regulations.

**[5] Bankruptcy 51 ☞3711(1)**

51 Bankruptcy
    51XVIII Individual Debt Adjustment
        51k3704 Plan
            51k3711 Curing Defaults
                51k3711(1) k. In General. Most Cited Cases
Bankruptcy Code preempted Chapter 13 debtor's state law claim against creditor for breach of implied covenant of good faith and fair dealing based on creditor's alleged inability to distinguish between her pre-petition and post-petition payments and creditor's inability to promptly credit her account from suspense account, where creditor's actions violated specific Code provision. 11 U.S.C.A. § 1322(b).

**[6] Bankruptcy 51 ☞2921**

51 Bankruptcy
    51VII Claims
        51VII(E) Determination
            51k2921 k. In General. Most Cited Cases

**Bankruptcy 51 ☞2922**

51 Bankruptcy
    51VII Claims
        51VII(E) Determination
            51k2922 k. Summary Allowance; Necessity for Objection. Most Cited Cases

**Bankruptcy 51 ☞2923**

51 Bankruptcy
    51VII Claims
        51VII(E) Determination
            51k2923 k. Objections Generally; Time, Form, and Sufficiency; Pleading. Most Cited Cases
Remedial scheme in Bankruptcy Code for resolving dispute between debtor and loan servicer conflicted with Real Estate Settlement Procedures Act's (RESPA) remedial scheme, and thus debtor could not use RESPA's dispute resolution provisions to resolve disagreements over amount of servicer's claim under her Chapter 13 plan. 11 U.S.C.A. §

502(b, c); Fed.Rules Bankr.Proc.Rule 3007, 11 U.S.C.A.; 12 U.S.C.A. § 2605(b, c, i).

Jeffrey K. Garfinkle, Buchalter Nemer, Irvine, CA, Robert F. Charlton, Jr., Ablitt & Charlton, PC, Steven A. Ablitt, Ablitt & Caruolo, PC, Stoneham, MA, for Appellant.
Philip M. Stone, Worcester, MA, for Appellee.

*MEMORANDUM AND ORDER*
YOUNG, District Judge.

### I. INTRODUCTION

This is an appeal, brought under 28 U.S.C. § 158(a)(1), from an order entered by the Bankruptcy Court for the District of Massachusetts against Ameriquest Mortgage Company ("Ameriquest") assessing damages for violations of the Real Estate Settlement Procedures Act, the Massachusetts Consumer Protection Act, and the Massachusetts implied covenant of good faith and fair dealing. Ameriquest challenges the order, arguing, inter alia, that the Bankruptcy Code preempts recovery under all three claims. The debtor and appellee, Jacalyn S. Nosek ("Nosek"), opposes the appeal on the merits, but also brings a motion to dismiss, arguing that the Bankruptcy Court has not entered an appealable final judgment.

### II. BACKGROUND

#### A. Undisputed Factual Background

The following facts are essentially undisputed or were found by the Bankruptcy Court and are not clearly erroneous. *See* Fed. R. Bank. P. 8013. On November 25, 1997, Nosek executed a $90,000 Adjustable Rate Note ("Note") in favor of the Ameriquest Mortgage Company and secured by a mortgage on her principal residence located in South Lancaster, Massachusetts, 01561. (R.[FN1] at 18.)

In 2000, Nosek began missing payments on the Note. (R. at 49.) In early 2001, Ameriquest began

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331                                                                                        Page 3

354 B.R. 331
(Cite as: 354 B.R. 331)

foreclosure proceedings on Nosek's residence. *Id.* As a result of the foreclosure proceedings, Nosek filed her first of three bankruptcies on May 15, 2001. (R. at 92.) The Bankruptcy Court dismissed this first case upon motion by the Chapter 13 Trustee (R. at 95.)

Nosek filed her second bankruptcy on February 28, 2002, in response to a second notice of foreclosure. (R. at 49-50, 102.) Once again, upon motion by the Chapter 13 Trustee, the Bankruptcy Court dismissed the case. (R. at 50, 102-03.)

On October 2, 2002, Nosek filed her third and current bankruptcy after receiving her third foreclosure notice. (R. at 50, 142.) In June 2003, Ameriquest and Nosek reached a stipulation agreement after Ameriquest filed a Motion for Relief from the Automatic Stay. (R. at 123-24.) The stipulation resulted from allegations by Ameriquest that Nosek had failed to make three post-petition payments (i.e. post bankruptcy petition) on the Note, specifically for December 1, 2002, January 1, 2002, and February 1, 2003 and that Nosek maintained a pre-petition arrearage of $19,789.14. (Case No. 02-46025, Mot. for Relief From Stay [Doc. No. 29] at 1, 2.) The stipulation required the payment of the regular post-petition payments, a payment of $384.89 to address the post-petition arrearage, and twelve equal, monthly payments to address attorney's fees and costs of $1,175. (R. at 123.) Nosek failed to make all the required payments. (*See* Case No. 02-46025, Certificate of Non-Compliance [Doc. No. 68] at 1, 2.)

On or about November, 2003, Nosek proposed her Second Amended Plan of Reorganization (the "Plan"). (R. at 133.) Under the Plan, Nosek again agreed to pay the pre-petition arrearage, now calculated at $18,810.95, over sixty months in the amount of $313.52 per month. (R. at 134.)

On or about November/December 2003, Nosek sought to refinance her mortgage with another lender. (R. at 50-51.) In order to proceed, Nosek had to provide the new mortgage broker with a pay-off figure and a payment history from Ameriquest. (*Id.*) After providing written authorization, Nosek received a twelve-month payment history, beginning March 10, 2003 and ending May 4, 2004. (R. at 137-38.) The payment history provided the amount Ameriquest determined was owed on the Note, the dates that the payments were recorded, and the placement of each payment in an escrow account called "Suspense." (*Id.*) This "Suspense" account is understood as used to allow lenders to accept partial payments that would otherwise be returned to the debtor for failure to comply with contractual obligations. (R. at 52.) The Bankruptcy Court further explained that the account acts as a "collection bucket" to hold insufficient funds until they cumulatively equal a loan payment that is due. (*Id.*) This process did not distinguish between pre-petition or post-petition payments, but simply looked to satisfy the oldest payment first. (R. at 54.)

Nosek questioned the veracity of the accounting and the accounting practice through a Motion to Determine Amount of Liens filed on August 11, 2004. (R. at 142-45.) In this Motion, Nosek argued that all payments under the stipulation agreement were made in full. (R. at 143.) She also argued that significant discrepancies existed in the payment history regarding the actual amount due, finance charges assessed, and the accounting of certain payments. (R. at 144.) On September 8, 2005, the Bankruptcy Court ordered Ameriquest to provide a detailed accounting of the payments and to file a document explaining the basis and law behind the use of "Suspense" accounts. (Case No. 02-46025, Order for Accounting [Doc. No. 98] at 1.) Ameriquest failed fully to comply with this order and the Bankruptcy Court levied a $500 fine. (Case No. 02-46025, Order [Doc. No. 107] at 1.) Ameriquest finally responded with a memorandum detailing the use of "Suspense" accounts on November 9, 2005. (R. at 163-64.)

Nosek brought the underlying adversarial action asserting claims based upon Ameriquest's use of "Suspense" accounts and their alleged inability to apply, track, and credit payments made during the pendency of Nosek's Chapter 13 case. (R. at 5.)

**B. Procedural Background**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331                                                    Page 4

354 B.R. 331
**(Cite as: 354 B.R. 331)**

On December 2, 2004, Nosek commenced a lawsuit against Ameriquest in the United States Bankruptcy Court, District of Massachusetts, Western Division ( [Case No. 02-46025, Adversary Proceeding No. 04-04517, Doc. No. 1] ). Nosek brought seven claims: for violations of the (1) Truth in Lending Act ("TILA"); (2) Real Estate Settlement Procedures Act ("RESPA"); (3) Sections 2 and 9 of the Massachusetts Consumer Protection Act, chapter 93A of the Massachusetts General Laws; as well as state common law claims for (4) Unjust Enrichment; (5) Breach of Good Faith and Fair Dealing; (6) Infliction of Emotional Distress; and (7) Lost Income.

On October 25, 2005, the Bankruptcy Court allowed, in part, Nosek's motion for summary judgment and ruled that Ameriquest had violated section 2605 of RESPA (Count 2) and section 2(a) of Massachusetts General Laws, chapter 93A (Count 3). (R. at 165.) The Bankruptcy Court granted summary judgment on these two counts as to liability only and continued the matter for trial on damages. (*Id.*) The Bankruptcy Court denied the motion for summary judgment on the other counts. ( *Id.*)

On June 30, 2006, after the conclusion of trial, the Bankruptcy court dismissed Counts One (TILA), Four (Unjust Enrichment), Six (Infliction of Emotional Distress); and Seven (Lost Income). (*Id.* at 83.) The court assessed nominal damages for the previously determined violations of Counts Two and Three by assessing $1 and $25 damages respectfully. (*See id.*) The Bankruptcy Court also found that Ameriquest violated the implied covenant of good faith and fair dealing and awarded damages of $250,000 for the resulting emotional distress. (*Id.*) The status of this determination as a final judgment is in dispute, and Nosek moves to dismiss this appeal.

Ameriquest filed with the bankruptcy court a timely Notice of Appeal on July 10, 2006. Ameriquest subsequently filed a Notice of Appeal with this Court [Doc. No. 1] on August 17, 2006 and filed its brief [Doc. No. 3] ("Appellant Br.") on September 14, 2006. Nosek responded with a brief in opposition to the appeal [Doc. No. 11] ("Appellee

Br.") on September 29, 2006. Ameriquest filed a Reply [Doc. No. 12] ("Appellant Reply") to Nosek's brief in opposition on October 10, 2006.

Additionally, in response to the appeal, Nosek filed a Motion to Dismiss [Doc. No. 5] and a supporting Memorandum [Doc. No. 6] ("Appellee MTD Mem." ). Ameriquest filed its Motion in Opposition to the Motion to Dismiss [Doc. No. 10] and a supporting Memorandum [Doc. No. 9] ("Appellant MTD Mem. ") on September 28, 2006.

Having received memoranda from both parties on both the motion to dismiss and the merits of the appeal, this Court addresses the issues in that order.

### III. DISCUSSION

#### A. Jurisdiction and Standards of Review

This Court has jurisdiction to hear appeals from " final judgments, orders, and decrees" of the Bankruptcy Court. 28 U.S.C. § 158(a)(1). On appeal from a decision of a Bankruptcy Court, this Court sits as an intermediate appellate court and addresses such actions "in the same manner as appeals in civil proceedings generally are taken to the courts of appeal from the district courts...." *Id.* § 158(c)(2); *see In re Ryan,* 282 B.R. 742, 747 (D.R.I.2002). As a result, a federal district court applies a "clearly erroneous" standard as to findings of fact, giving "due regard ... to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bank. P. 8013; *In re LaRoche,* 969 F.2d 1299, 1301 (1st Cir.1992). The same clearly erroneous standard is applied to mixed questions of law and fact unless the bankruptcy court's analysis was "infected by legal error." *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 73 (1st Cir.1995) (quoting *Williams v. Poulos,* 11 F.3d 271, 278 (1st Cir.1993)). In contrast, a *de novo* standard is applied with respect to conclusions of law. *In re LaRoche,* 969 F.2d at 1301.

As a preliminary matter, this Court must address Nosek's motion to dismiss. The motion to dismiss challenges the subject matter jurisdiction of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331

354 B.R. 331
**(Cite as: 354 B.R. 331)**

Court to review the appeal and is properly classified and analyzed under Federal Rule of Civil Procedure 12(b)(1). Since this motion does not challenge a holding of the Bankruptcy Court but raises an issue of law specific to the appeal, this Court reviews the motion in accordance with the general rule for motions to dismiss. "In ruling on a motion to dismiss, a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the [non-moving party]." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir.2001). Such a motion should not be granted unless it appears that jurisdiction would be improper under any set of facts. *See Roma Constr. Co. v. aRusso,* 96 F.3d 566, 569 (1st Cir.1996) (analyzing a 12(b)(6) motion to dismiss); *Murphy v. United States,* 45 F.3d 520, 522 (1st Cir.1995) (reviewing a dismissal under 12(b)(1) in accordance with the same standard applied to a dismissal under 12(b)(6)).

### B. Nosek's Motion to Dismiss

Nosek challenges the jurisdiction of this Court by arguing that the Bankruptcy Judge either failed to or has not yet entered a final judgment in the underlying proceeding. (*See* Appellee MTD Mem. at 1-2, 8.) Specifically, Nosek argues that the Bankruptcy Court Order filed contemporaneously with, but separately from, the Memorandum of Decision on June 30, 2006 does not satisfy the "separate document" rule required by Federal Rule of Bankruptcy Procedure 9021 and its Federal Rule of Civil Procedure corollary, Rule 58. (*See id.* at 2-3.) In addition, even if the "separate document" rule is satisfied, Nosek argues that the judgment is not "final," and thus not ripe for appeal. (*See id.* at 3.)

Federal Rule of Bankruptcy Procedure 9021 requires that "[e]very judgment entered in an adversary proceeding or contested matter shall be set forth on a separate document." Fed. R. Bank. P. 9021. This rule is derived from Federal Rule of Civil Procedure 58 that requires "[e]very judgment .. . must be set forth on a separate document." Fed.R.Civ.P. 58(a)(1). These rules are designed to

eliminate uncertainty as to the finality of the judgment and to provide a clear date to start the clock running as to the time for appeal. *See Smith Corset Shops, Inc. v. Brodeur,* 696 F.2d 971, 975 (1st Cir.1982). Specifically, the "separate document" rule is intended to require the entry of a document separate from the opinion or memorandum of the court. *Id.;* Advisory Committee's Note to Rule 58. To accomplish this purpose, this rule must be mechanically applied. *Smith Corset Shops, Inc.,* 696 F.2d at 975.

Here, at the conclusion of the trial, the Bankruptcy Judge entered a Memorandum of Decision and an Order as two separate documents on the docket. (R. 47-83, 256.) The issue is whether the Order constitutes a judgment in satisfaction of the "separate document" rule. Nosek suggests that the answer is no because the Order states that "judgment *shall* enter," (Appellee MTD Mem. at 2), and argues that the use of this phrase implies that a separate entry of judgment would follow, (*see id.*).

[1] Though the "separate document" rule will be applied mechanically, it will not be done hyper-technically. *See Smith Corset Shops, Inc.,* 696 F.2d at 975. There may be some traction to a suggestion that clarity counsels the use of the word "Judgment" to title such a document rather than "Order," but Bankruptcy Rule 9021 and Civil Procedure Rule 58 focus on the document's function, not on the specific title. This is supported by the definition of the word "Judgment" found in Federal Rule of Civil Procedure 54(a), which states that " 'Judgment' as used in these rules includes a decree and any order from which an appeal lies." Fed.R.Civ.P. 54(a). The effect and not the specific word is, therefore, the focus. The document entered and titled as "Order" satisfies this definition of a "judgment." *See id.*

The use of the phrase, "ORDERED that judgment shall enter as follows," found in the Order does not imply that a further document will be entered, but that the brief, un-cited list following the phrase constitutes the judgment of the court. The Advisory Committee's Note to Rule 58 explains the required elements of a "separate document" as one that "recites the terms of the judgment without offering

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331
**(Cite as: 354 B.R. 331)**

additional explanations or citation of authority" and cites Forms 31 and 32 as examples. Advisory Committee's Note to Rule 58. The Order entered accomplishes this purpose. It mirrors the Forms cited as sufficient examples. (*See* R. at 256.) Additionally, it is separate from the Memorandum of Opinion. *See id.; Smith Corset Shops, Inc.,* 696 F.2d at 975 (holding the "separate document" rule violated when the alleged judgment was included with the memorandum and order of the court). If not entered as the judgment of the court, it serves no other purpose. As a result, the Order constitutes a separate document that satisfies Bankruptcy Rule 9021 and Federal Rule of Civil Procedure 58.

Nosek's second argument is that the Order cannot be final because the award of attorney's fees and costs was not finalized and determined at the time of appeal. (*See* Appellee MTD Mem. at 1.) Nosek argues that the lack of a final determination concerning attorney's fees and costs presents a claim not yet adjudicated and renders the underlying suit open and not yet appealable under Federal Rule of Civil Procedure 54(b). (*See id.* at 5-9.)

[2] This appeal does not, however, ask this Court to review a partial judgment. A judgment may be final even when a motion for attorney's fees remains to be resolved. *See Osterneck v. Ernst & Whinney,* 489 U.S. 169, 175, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989). The rationale underlying this rule is that "a request for attorney's fees is not part of the merits of the underlying action because such fees are not part of the compensation for the plaintiff's injury but traditionally have been regarded as an element of costs awarded to the prevailing party." *Id.; Budinich v. Becton Dickinson and Co.,* 486 U.S. 196, 202, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) ( "[A]n unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final."). The proper inquiry, therefore, is whether after the entry of the Order any issues central to the litigation remain. *In re Bank of New England Corp.,* 218 B.R. 643, 646 (1st Cir.BAP1998); *Cf. Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79, 84, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (determining a final judgment in the context of the claim under the

Federal Arbitration Act).

[3] Here, the Bankruptcy Judge disposed of each of the seven counts in the complaint and assessed damages in his June 30, 2006 Order. (R. at 256.) This Order did not present an interlocutory order or one that was "tentative, informal or incomplete." *See In re Bank of New England,* 218 B.R. at 644 (quoting *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 545-46, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). As a result of the complete disposition of all counts and the inability to argue that a pending determination of attorney's fees and costs constitutes an unresolved claim, this Court holds that a final judgment entered and that a proper appeal followed. Nosek's motion to dismiss is, therefore, denied, and the merits of the appeal will be addressed.

## C. Bankruptcy Code Preemption

Ameriquest appeals the adverse rulings of the Bankruptcy Court that found violations of the Real Estate Procedures Act ("RESPA"), 12 U.S.C. § 2605, the Massachusetts Consumer Protection Act, Mass. Gen. Laws. ch. 93A, and the Massachusetts common law implied covenant of good faith and fair dealing. Ameriquest raises a threshold-and ultimately determinative-argument that recovery under all three claims is preempted or precluded by the Bankruptcy Code. (*See* Appellant Br. at 17-21, 37-40, 43-45.) Because this Court agrees that the two contested claims addressed on the merits by the Bankruptcy Judge are preempted, only the preemption issue as to each claim is addressed.

### 1. Implied Covenant of Good Faith and Fair Dealing

Ameriquest first argues that the Bankruptcy Code (" the Code") preempts any state law cause of action based upon an implied covenant of good faith and fair dealing. (*Id.* at 17.) Specifically, Ameriquest argues that the Bankruptcy Code provides a comprehensive statutory scheme that governs the relationship between Ameriquest as creditor and Nosek as debtor under the Plan. (*Id.* at 19.) Under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331                                                                    Page 7

354 B.R. 331
(Cite as: 354 B.R. 331)

this argument, a state law claim that seeks to redress a breach of the Plan under a state contract theory is preempted by the Code. (*See id.* at 17-19.)

A preemption analysis begins by categorizing and understanding the type of preemption at issue. The Supreme Court, in *Gade v. National Solid Wastes Management Ass'n*, detailed the three types of preemption: (1) explicit preemptive language; (2) a pervasive federal regulation that leaves no room for state law; and (3) conflicting requirements that impede the full purposes and objectives of the federal law. 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). The last two types of preemption are viewed under the umbrella category of implied preemption. (*See id.*) In every preemption case, "[t]he purpose of Congress is the ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)). In divining the Congressional purpose, however, due respect to the historic and often autonomous role of the state counsels a narrow construction and application of a preemptive purpose. *Id.*

Ameriquest advances its preemption argument under the second category, arguing for implied preemption based upon a pervasive federal scheme. (*See* Appellant Br. at 17, 21.) Ameriquest asserts that this federal scheme creates the legal construct of the Plan, Appellant Reply at 3, and completely governs the relationship and remedies under the Plan through its statutory dictates and regulations. (*see* Appellant Br. at 17.)

[4] The Court of Appeals for the First Circuit, in *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, recognized that "states may not pass or enforce laws to interfere with or compliment the Bankruptcy Act or to provide additional or auxiliary regulations." 164 F.3d 677, 682-83 (1st Cir.1999) (quoting *International Shoe v. Pinkus*, 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929)). State law, therefore, may not overlap or conflict with a remedial structure provided for in the Code. *See id.* at 683. Applying this logic, the First Circuit, in *Bessette v. Avco Fin. Servs., Inc.*, held that state law remedies for unjust enrichment were preempted

because violations of section 524 of the Bankruptcy Code were enforceable under section 105. 230 F.3d 439, 447 (1st Cir.2000). After *Bessette*, federal preemption will be found if a remedial measure under the Code can be identified and if the state cause of action either overlaps or adds to such measure. *See id.*

In this case, the Bankruptcy Court found a violation of the implied covenant of good faith and fair dealing due to Ameriquest's alleged inability to "distinguish between pre-petition and post-petition payments made by [Nosek]" and Ameriquest's "inability to promptly credit [Nosek's] account from the suspense account." (R. at 69.) The court found that the failure to distinguish between pre-petition and post-petition payments violated 11 U.S.C. section 1322(b) of the Code that "provides for the curing of any default over the course of the [P]lan." (*Id.*) The court found that this practice "contradicts the purpose of a Chapter 13 plan." (*Id.* at 76.)

[5] The analysis followed in *Bessette* is applicable in this case. The Bankruptcy Court found a violation of 11 U.S.C. section 1322(b), which regulates the modification of the Plan and provides the cures for any defaults. 11 U.S.C. § 1322; (*see* R. 69.) The Bankruptcy Court then grafted onto the Plan an implied covenant of good faith and fair dealing, a state remedy. (*See* R. at 69.) This was error.

Section 105 of the Code provides the proper mechanism for the Bankruptcy Court to remedy specific violations of the Code.[FN2] *See Bessette*, 230 F.3d at 447. If the Bankruptcy Court is to assess damages, it must not look to the state law theory employed in this case, but must do so under the equitable powers granted under the Code. *See id.* The state law remedy in this case overlaps the remedial measures provided for in the Code and is, therefore, preempted. *See In re Weinstein*, 164 F.3d at 683. A contrary ruling would allow a state remedy to superimpose itself on activities that are closely related to and governed by the management of the bankruptcy process.

## 2. Real Estate Procedures Act

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331
**(Cite as: 354 B.R. 331)**

Ameriquest also argues that the general preemption principles described above apply to the alleged violation of RESPA. (Appellant Br. 37-41.) RESPA is a federal consumer protection act that requires any servicer of a federally related mortgage loan to respond to a request from the borrower for information concerning the servicing of the loan. 12 U.S.C. § 2605(e). Ameriquest argues that the Code provides the sole statutory remedy for a borrower to seek such information when related to an ongoing bankruptcy proceeding. (Appellant Br. 37-38.) Following this logic, Nosek could not use the dispute resolution provisions of RESPA to resolve disagreements over the amount of Ameriquest's claim under the Plan. (*Id.* at 37.)

This argument relies, as does the preemption argument above, on a theory of implied preemption, but it more closely relates to a theory of conflict preemption since the Code provides for a remedial measure similar in purpose but different in form. ( *See id.* at 39-41.) In addition, Ameriquest cannot proffer an argument that RESPA is entirely preempted by the Code because RESPA anticipates an interaction and co-existence with the Code in certain respects. *See* 12 U.S.C. §§ 2605(b), (c), (i) (providing explicit exceptions for when bankruptcy proceedings have commenced).

Instead, the preemption question here turns on whether the Code provides a remedial procedure inconsistent with RESPA. Under RESPA, the servicer of the loan must respond to a qualified demand letter from the borrower within 20 days. *Id.* § 2605(e). This section has no explicit exception for bankruptcy proceedings. *See id.* Under the Code and under the bankruptcy rules, however, a different process exists to determine the propriety of claims and to resolve disputes. Section 502 of the Code allows for a proof of claim to be determined true, absent objection by the opposing party. 11 U.S.C. § 502(a). If an objection is registered, the Code entrusts the Bankruptcy Court with the role of determining the proper amount of the claim. *Id.* § 502(b), (c). In addition, Federal Bankruptcy Rule of Procedure 3007 provides for objections to claims in a manner similar to RESPA. *See* Fed. Bank. R.P. 3007. Under Bankruptcy Rule 3007, an objection to a claim must be in writing and filed at least 30 days

prior to the hearing. *Id.*

The facts of this case show how the overlap of these procedures may occur. Nosek sent what the Bankruptcy Court found to be a qualified demand letter under RESPA on July 23, 2004. (R. at 57.) Under RESPA, and outside of the bankruptcy proceeding context, Ameriquest would have had 20 days to reply to this demand letter. 12 U.S.C. §§ 2605(e). Nosek also filed with the Bankruptcy Court a Motion to Determine Amount of Liens on August 11, 2004. (R. at 142-45.) This motion was filed before the RESPA safe harbor time-frame had expired and sought to have the Bankruptcy Court determine the amount owed. (*See* R. at 142.) The Bankruptcy Court proceedings that followed sought to address the disputed claims, and the subsequent adversarial action raised many of the same claims asserted in the motion. (*See* R. at 142-45.) In this case, both the remedial procedures in RESPA and the Motion to Determine Amount of Liens in the bankruptcy proceeding sought to achieve the same effect-the resolution of disputed claims-but through different remedial vehicles.

Thus, the purposes of the Code in determining the disputed claims within the structure of the Bankruptcy Court conflict with RESPA's requirements. Ameriquest analogizes this situation to a Ninth Circuit case, *Walls v. Wells Fargo Bank, N.A.,* where the court noted the Fair Debt Collection Practices Act preempted by the Bankruptcy Code. 276 F.3d 502, 510 (9th Cir.2002). The court in *Walls* held that the Code provides its own remedy for violating section 524 (Effect of Discharge) through the civil contempt statute section 105. *Id.*

[6] In this case, the Bankruptcy Judge dismissed this analogy summarily by stating that "[i]n the instant case the Plaintiff has not yet received a discharge." *In re Nosek,* 2006 WL 2700792, slip. op., *4 (Bankr.D.Mass. September 19, 2006). The status of being discharged from a bankruptcy proceeding or currently embroiled in one does not, however, appear to be a valid distinguishing fact. Instead, *Walls* stands for the proposition that where the remedial scheme in the Code conflicts with a remedial scheme of a separate statute, the former must occupy the field of bankruptcy proceedings

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 B.R. 331

Page 9

354 B.R. 331
**(Cite as: 354 B.R. 331)**

rather than the latter. *See* 276 F.3d at 510. This Court finds that proposition persuasive in the instant case.

As a result, the Code's claim resolution process for ongoing bankruptcy proceedings trumps the alternative remedial procedure found in RESPA.

### 3. Massachusetts Consumer Protection Act, M.G.L., c. 93A

Finally, Ameriquest argues that the state law claim under Massachusetts General Law chapter 93A ought to be preempted according to the same logic and analysis undergirding the preemption of the implied covenant of good faith and fair dealing. (Appellee Mem. at 43-45.) Prudential and comity concerns counsel against going so far.

The Bankruptcy Court held that the violation of RESPA constituted a *per se* violation of chapter 93A. (R. at 63.) Under 940 Code of Massachusetts Regulations § 3.16(4), a violation of chapter 93A occurs automatically if a violation of a federal consumer protection statute is found. 940 Mass.Code. Regs. 3.16(4) (2006). While the Bankruptcy Court correctly applied Massachusetts law, the preemption of the underlying RESPA claim requires reconsideration of the chapter 93A claim. The Massachusetts General Law chapter 93A claim is, therefore, remanded to the Bankruptcy Court for reconsideration as to whether the Bankruptcy Code preempts such state claims and, if that court answers in the negative, for a determination of the claim on the merits.

### IV. CONCLUSION

For the reasons stated above, this Court holds that the Bankruptcy Code preempts both the state claim under the implied covenant of good faith and fair dealing and the claim under section 2605(e) of the Real Estate Settlement Procedures Act. In addition, the claim under Massachusetts General Laws, chapter 93A is remanded for consideration on the merits. Accordingly, Ameriquest's Appeal [Docket No. 1] is ALLOWED and the case is remanded for

further proceedings consistent with this holding.

SO ORDERED.

> FN1. The citations to the Record refer to the Excerpts of the Record [Doc. No. 4] and the Supplemental Excerpts of the Record [Doc. No. 13] that were filed with this Court. The Excerpts and the Supplemental Excerpts are consecutively paginated and are both cited as R.

> FN2. "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

D.Mass.,2006.
In re Nosek
354 B.R. 331

Briefs and Other Related Documents (Back to top)

• 4:06cv40170 (Docket) (Aug. 17, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in B.R.                                                Page 1

Not Reported in B.R., 2002 WL 32332066 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

**H**
In re PWS Holding Corp.Bkrtcy.D.Del.,2002.Only
the Westlaw citation is currently available.
United States Bankruptcy Court,D. Delaware.
In re: PWS HOLDING CORPORATION, Bruno's,
Inc., et al., Debtors.
**No. 98-212-SLR, 98-213-SLR, 98-214-SLR,
98-215-SLR, 98-216-SLR, 98-217-SLR,
98-218-SLR, 98-219-SLR, 98-220-SLR,
98-221-SLR, 98-222-SLR, 98-223-SLR.**

Jan. 30, 2002.

Daniel J. DeFranceschi, Marc T. Foster, Michael
Joseph Merchant, Thomas L. Ambro, Richards,
Layton & Finger, Ian Connor Bifferato, Bifferato,
Bifferato & Gentilotti, Wilmington, DE, for
Debtors.

MEMORANDUM ORDER
WALRATH, J.
*1 At Wilmington this 30th day of January, 2002,
having reviewed the papers submitted and heard
oral argument on the motions of HSBC Bank USA (
"HSBC") and W.R. Huff Asset Management Co.,
L.L.C. ("Huff") for allowance of administrative
expenses;

IT IS ORDERED that said motions are denied, for
the reasons that follow:

1. Jurisdiction. This court has jurisdiction to
consider these motions pursuant to 28 U.S.C. § 1334
.

2. Background. On February 2, 1998, PWS Holding
Corporation, Bruno's Inc., and various of their
affiliates (collectively referred to as "Bruno's") filed
for protection under chapter 11 of the Bankruptcy
Code. On February 18, 1998, the Office of the
United States Trustee for the District of Delaware
appointed a statutory unsecured creditors'
committee (the "Committee"). Among the named

members of the Committee were movants HSBC
and Huff. HSBC was serving at the time as the
Indenture Trustee for Bruno's 10.5% Senior
Subordinated Notes due 2005. As of February
1998, Huff held over 50% of the principal amount
of the Subordinated Notes.[FN1] The remaining
members of the nine-member Committee included
trade and bank representatives.[FN2] The Committee
was represented throughout the chapter 11
proceedings by the law firm of Pepper Hamilton
L.L.P. Nevertheless, HSBC engaged its own
counsel,[FN3] as did Huff.[FN4]

> FN1. During the course of the chapter 11
> cases, Huff purchased additional
> Subordinated Notes and, by 1999, held
> almost 75% of the principal amount of said
> Notes.

> FN2. The Committee also included a union
> representative for a period of time.

> FN3. In February 1998, HSBC engaged
> the New York law firm of Pryor Cashman
> Sherman & Flynn L.L.P. In June 1999,
> HSBC engaged the Delaware law firm of
> Connolly Bove Lodge & Hutz L.L.P.

> FN4. During 1998, Huff was represented
> in the chapter 11 cases by Jones, Day,
> Reavis & Pogue. In May 1999, Huff
> engaged the New York law firm of
> Berlack, Israels & Liberman L.L.P. and the
> Delaware law firm of Klehr, Harrison,
> Harvey, Branzburg & Ellers L.L.P.

3. By January 1999, plan negotiations had
commenced. Although the Committee voted to seek
approval for each of its four constituencies to retain
counsel to represent it in plan negotiations, with
such counsel to be paid by Bruno's, Bruno's
declined to accept responsibility for such costs.
(Huff Ex. # 1) By April, it became apparent that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                   Page 2

Not Reported in B.R., 2002 WL 32332066 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

subordinated bondholders would be out of the money under the plan of reorganization as proposed.

4. Movants' participation in the chapter 11 cases. During the course of the chapter 11 cases, HSBC and Huff participated in the following proceedings:

a. May and June 1999. Both HSBC and Huff filed objections to Bruno's motion to extend its exclusive period to file and seek acceptances of a plan of reorganization. Both objections were denied.

b. Both HSBC and Huff filed motions requesting the appointment of an examiner to investigate Bruno's 1995 leveraged recapitalization. The court ultimately approved these motions and appointed an examiner. Months and over $1,000,000 later, the examiner confirmed Bruno's and the Committee's position that claims based upon the leveraged recapitalization were not viable and should not be pursued by Bruno's or any other party in interest.

c. Both HSBC and Huff filed objections to Bruno's disclosure statement. Although the objections were overruled, both HSBC and Huff were given the opportunity to include counterstatements with their contentions in the disclosure statement. Only Huff took advantage of this opportunity. The plan ultimately was accepted by a clear majority of the unsecured creditors.

d. August 1999. Huff requested authority to conduct due diligence in connection with the preparation of an alternative plan of reorganization. HSBC joined in the motion. The motion was granted. Despite imposing the burdens of due diligence on the estate, however, none of Huff's various proposals ever generated any serious consideration by any other party in interest.

**\*2** e. Huff initiated an action against various third parties in Alabama state court for their role in the 1995 leveraged recapitalization. Bruno's commenced a proceeding in this court to stay the Alabama action. The action was stayed by agreement of the parties.

f. October 1999. After publication of the examiner's report, Huff requested authority to prosecute for its

own benefit certain of the claims pending in the Alabama action. HSBC joined in this motion.

g. December 1999. HSBC and Huff filed objections to Bruno's plan of reorganization. After a contested three-day confirmation hearing, the court overruled the objections, denied Huff's claims prosecution motion, and confirmed the plan.

h. January 2000. Huff filed an emergency motion for stay pending its appeal of the confirmation order. HSBC joined in this motion. The motion was denied.

i. By opinion dated September 18, 2000, the United States Court of Appeals for the Third Circuit denied the appeals filed by HSBC and Huff and affirmed the confirmation order.

5. Movants' contentions. HSBC contends that it is entitled to its attorneys' fees and costs based on three theories. First, it contends that Bruno's was required by the Trust Indenture Act of 1939, as amended, to retain an Indenture Trustee and, therefore, the costs associated therewith should be borne by the estate. Second, HSBC contends that it was performing services under an executory contract-the Indenture-and is entitled to payment for its services pursuant to 11 U.S.C. § 503(b)(1). Third, HSBC contends that, as a member of the Committee, it was performing a service during the chapter 11 cases consistent with 11 U.S.C. § 503(b)(3)(F). Huff contends that it is entitled to reimbursement for its attorneys' fees and costs pursuant to § 503(b)(3)(F), as a member and co-chair of the Committee. Huff also relies on § 503(b)(3)(D) as additional grounds for its request, as a result of its substantial contributions to the chapter 11 cases.

6. Analysis.

a. Compliance with the Trust Indenture Act of 1939, as amended. HSBC cites to the Third Circuit's opinion in *Commonwealth of Pennsylvania v. Conroy*, 24 F.3d 568 (3d Cir.1994), for the proposition that, so long as Bruno's was required by law to retain an Indenture Trustee, Bruno's should be required to pay the costs of its services under the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 2002 WL 32332066 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

Indenture. The Trust Indenture Act of 1939, however, is not a law like the environmental law at issue in *Conroy* that promotes public health or safety. Consequently, there is no evidence of record that the duties of the Indenture Trustee were of such importance that the costs of fulfilling such duties should be accorded administrative expense priority.

b. Performance under an executory contract. HSBC contends that the Indenture is an executory contract. The court disagrees. The Third Circuit has characterized an executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Cinicola v. Scharffenberger,* 248 F.3d 110, 123 (3d Cir.2001) (citing *In re Columbia Gas Sys. Inc.,* 50 F.3d 233, 238 (3d Cir.1995)). Recognizing Bruno's prechapter 11 financial obligation to the Subordinated Noteholders and its prechapter 11 obligation to pay certain fees of the Indenture Trustee, neither the Subordinated Noteholders nor the Trustee owed any duties or had any obligations to Bruno's. The record indicates that all of HSBC's actions during the chapter 11 cases were undertaken on behalf of the Subordinated Noteholders, not on behalf of Bruno's or the estate.

**\*3** c. Service as a Committee member. Both HSBC and Huff claim entitlement to reimbursement for attorneys' fees and costs pursuant to § 503(b)(3)(F), which provides as follows:
(b) After notice and a hearing, there shall be allowed, administrative expenses ... of this title, including-
(3) the actual, necessary expenses ... incurred by-
...
(F) a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee[.]

Section 503(b)(4) allows as administrative expenses(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the

time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

(Emphasis added)

d. The Third Circuit, in *In re Merchants Acceptance Corp.,* 198 F.3d 394 (3d Cir.1999), interpreted the statutory language recited above to include reimbursement by the debtor's estate of attorneys' fees and expenses incurred by a member of the Committee. In so doing, however, the Third Circuit was cognizant of the potential for abuse "if every member of a committee were to claim attorney's and accountant's fees," thus "unnecessarily drain[ing] estate assets." *Id.* at 400. The Third Circuit left it to the bankruptcy court to ensure that only those fees that are demonstrably incurred in the performance of the duties of the committee, the statutory standard, are reimbursed. Moreover, in its review of each application to determine whether the fee requested is reasonable, as required by statute, the bankruptcy court must necessarily determine whether the services were necessary. This review is committed to the sound discretion of the bankruptcy courts.

*Id.* at 403. The burden of proving that the requested fees and expenses are reasonable and necessary is on the applicant. *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.,* 50 F.3d 253, 260 (3d Cir.1995).

e. In this case, HSBC argues that its "fees and expenses were incurred in significant part as a direct result of its services on the Committee, which services were beneficial to the creditors body as a whole." Huff argues that its opposition to what "it viewed as a self-interested plan formulation process ... dominated by parties seeking protection from avoidance actions" was consistent with its fiduciary responsibilities as a Committee member. Moreover, the "propriety of the reimbursement of Huff's actual and necessary expenses ... is particularly compelling here" because Committee counsel recognized that " it could not represent any individual constituency on the Committee" in the plan negotiation process.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                    Page 4

Not Reported in B.R., 2002 WL 32332066 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

f. The court concludes that the "services" rendered by movants as Committee members were neither necessary nor reasonable. Committees appointed under § 1102 generally include representatives of various constituencies harboring different interests and views. To the extent, then, that movants base their fee applications on the mere fact that they represented a constituency with a markedly different take on the reorganization process does not make their services "necessary," as it can be assumed that every committee operates in just this way.[FN5] In other words, just doing their work as Committee members cannot be all that is required under § 503(b)(3)(F). Moreover, to be a "reasonable" expense under § 503(b)(4), it must have been of some value to the estate. In this case, the movants' opposition at virtually every stage of the proceedings diminished the estate, ultimately without any redeeming value.

> FN5. Likewise, the fact that Committee counsel could not represent any individual constituency in plan negotiations strikes the court as being appropriate in every case, not just this case.

**\*4 g. "Substantial contribution."** Huff argues that it is entitled to its expenses under the authority of § 503(b)(3)(D), which provides reimbursement to

> a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial
> contribution in a case under chapter 9 or 11 of this title.

(Emphasis added) "In determining whether there has been a 'substantial contribution' pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron v. Mechem Financial Inc.,* 27 F.3d 937, 944 (3d Cir.1994) (citing *In re Lister,* 846 F.2d 55, 57 (10th Cir.1988)). As further explained by the Third Circuit in *Lebron,* [s]ubsection 503(b)(3)(D) represents an accommodation between the twin objectives of

encouraging "meaningful creditor participation in the reorganization process," ... and "keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." ... Inherent in the term "substantial" is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests.

27 F.3d at 944 (citations omitted). Moreover,[e]ven though a benefit may have been conferred to the estate, reimbursement should be excluded where the activities primarily served the interest of the interested parties, and would not have been undertaken absent an expectation of reimbursement from the estate.... In other words, the acts must have been designed to benefit others who would foreseeably be interested in the estate.... In the absence of such a finding, there can be no award of expenses even though there may have been a benefit to the estate....

*In re AM International, Inc.,* 203 B.R. 898, 904 (Bankr.D.Del.1996) (citations omitted).

h. Movants in these chapter 11 cases argue that they made a substantial contribution to the estate and the creditors in at least two ways: (1) the elimination of certain third-party releases; and (2) an increase in recoveries by general unsecured creditors from 26 cents to 30 cents on the dollar. Bruno's asserts in response that the releases were voluntarily withdrawn and that the causes of action so preserved in fact will inure, if at all, only to the benefit of the moving parties, not to the estate. With respect to the increase in recovery for the unsecured creditors, Bruno's contends that the increase was a result of negotiations between Bruno's, the Senior Lenders, and the trade creditors, not as a result of anything HSBC and Huff did. Moreover, the increase for the unsecured creditors was counterbalanced by an equivalent decrease in the value of the consideration distributed to the Senior Lenders, not as a result of new value being added to the estate.

**\*5 i.** Based on the record, the court concludes that the movants' participation in these bankruptcy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                          Page 5

Not Reported in B.R., 2002 WL 32332066 (Bkrtcy.D.Del.)
**(Cite as: Not Reported in B.R.)**

proceedings did not result in any actual and demonstrable benefit to the estate and its creditors. The movants have not carried their burden of proving that the withdrawal of the releases and the increase in recovery amounts were related to their efforts. To the extent that Huff argues that its efforts "also served to preserve the integrity of the chapter 11 process in these cases," the court respectfully disagrees. The court gave movants every opportunity to demonstrate to the court and the other parties in interest that the reorganization process was legally flawed and that there was value to be had in alternative courses of action. Evidence to support movants' position was never forthcoming. In the absence of any evidence that the "integrity" of the process was ever actually at risk, the court will not reward Huff for its opposition to virtually every step of the reorganization process. In sum, movants' efforts did not result in any actual and demonstrable benefit to any party but their constituents. Under these circumstances, therefore, the court denies both applications for reimbursement of attorneys' fees and expenses.

Bkrtcy.D.Del.,2002.
In re PWS Holding Corp.
Not Reported in B.R., 2002 WL 32332066 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB I**

Westlaw.

Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**C**
Kelly      v.      McKesson      HBOC,
Inc.Del.Super.,2002.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
Judy KELLY, Harriette Owens Waldron, Scott
Symons and Michael Putnick, Plaintiffs,
v.
MCKESSON HBOC, INC., Mark A. Pulido,
Charles W. McCall and Richard H. Hawkins,
Defendants.
**No. CIV.A. 99C-09-265WCC.**

Submitted: Oct. 18, 2001.
Decided: Jan. 17, 2002.

Shareholders in acquired corporation brought
claims for breach of contract, violation of implied
covenant of good faith and fair dealing, and
violations of federal securities law against acquiring
corporation, which had acquired a third-party
corporation by merger before the completion of the
merger with acquired corporation, and against
successor corporation to acquiring corporation and
executive officers and directors of acquiring
corporation and successor corporation, alleging that
third corporation's restatement of earnings because
of accounting irregularities caused shareholders of
acquired corporation to receive fewer shares of
successor corporation pursuant to the merger
agreement. On shareholders' motion for partial
summary judgment and defendants' motion to
dismiss, the Superior Court, New Castle County,
Carpenter, J., held that: (1) neither "bespeaks
caution" doctrine nor pre-existing duty rule
precluded the breach of contract claim; (2) genuine
issues of material fact precluded summary judgment
on the breach of contract claim; (3) acquiring
corporation had duty, under implied covenant of
good faith and fair dealing, to refrain from
distorting its financial condition; (4) stock in
acquiring corporation was exchanged for stock in

acquired corporation pursuant to a "public offering,"
for purposes of Section 11 and Section 12 of the
federal Securities Act of 1933; (5) genuine issue of
material fact precluded summary judgment on
federal securities law claims; (6) Delaware court did
not have personal jurisdiction over officers and
directors, pursuant to Delaware statutes; and (7)
provision of federal Securities Act of 1933
conferring subject matter jurisdiction to state courts
does not also permit plaintiffs to use the Act's
nationwide service of process provision to acquire
personal jurisdiction over defendants in state court.

Shareholders'       motion       denied;      successor
corporation's motion denied; officers' and directors'
motions granted.
West Headnotes
**[1] Corporations 101 ☞587**

101 Corporations
    101XIV Consolidation
        101k587 k. Right to Stock in Consolidated
Corporation. Most Cited Cases
The actions of either the pre-merger acquiring
corporation,     or     the     post-merger     successor
corporation which had merged with a third
corporation before the merger of acquired
corporation into the successor corporation had been
completed, could form the basis of a breach of
contract claim by shareholders of acquired
corporation, relating to express warranties and
representations made in the merger agreement
relating to accuracy of documents filed with
Securities and Exchange Commission (SEC) and
financial statements and alleging that third
corporation's restatement of earnings because of
accounting irregularities caused shareholders of
acquired corporation to receive fewer shares of
successor corporation pursuant to the merger
agreement.

**[2] Corporations 101 ☞587**

101 Corporations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

101XIV Consolidation
    101k587 k. Right to Stock in Consolidated
Corporation. Most Cited Cases
Whether acquiring corporation, in merger
agreement with acquired corporation, gave
warranties regarding the accuracy of financial
information provided by third corporation which
merged into acquiring corporation before the
merger with acquired corporation was completed
was issue for jury, in action by shareholders of
acquired corporation for breach of contract, alleging
that third corporation's restatement of earnings
because of accounting irregularities caused
shareholders of acquired corporation to receive
fewer shares of acquiring corporation pursuant to
merger agreement.

**[3] Corporations 101 &#8918;572**

101 Corporations
    101XIII Reincorporation and Reorganization
        101k572 k. Right of Purchasers of Corporate
Franchise and Property to Reorganize. Most Cited
Cases
Mere allegation that third-party corporation, which
had merged into acquiring corporation before
acquired corporation completed its merger into
acquiring corporation, provided acquiring
corporation with documentation that subsequently
was found to be false did not establish that
acquiring corporation breached express warranties
and representations made in merger agreement with
acquired corporation relating to accuracy of
documents filed with Securities and Exchange
Commission (SEC) and financial statements, in
action by shareholders of acquired corporation for
breach of contract, alleging that third corporation's
restatement of earnings because of accounting
irregularities caused shareholders of acquired
corporation to receive fewer shares of acquiring
corporation pursuant to merger agreement.

**[4] Judgment 228 &#8918;181(31)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(31) k. Stock and

Stockholders, Cases Involving. Most Cited Cases
Genuine issue of material fact as to what was
reasonably known by acquiring corporation, about
the inaccuracy of information supplied to acquiring
corporation by third-party corporation which had
merged into acquiring corporation before acquired
corporation merged into acquiring corporation,
precluded summary judgment for shareholders of
acquired corporation who alleged acquiring
corporation's breach of express warranties and
representations in the merger agreement with
acquired corporation relating to accuracy of
documents filed with Securities and Exchange
Commission (SEC) and financial statements and
alleged that third corporation's restatement of
earnings because of accounting irregularities caused
shareholders of acquired corporation to receive
fewer shares of acquiring corporation pursuant to
merger agreement.

**[5] Corporations 101 &#8918;587**

101 Corporations
    101XIV Consolidation
        101k587 k. Right to Stock in Consolidated
Corporation. Most Cited Cases
Merger agreement, in which acquiring corporation
provided express warranties to acquired corporation
regarding accuracy of documents filed with
Securities and Exchange Commission (SEC), did
not clearly exclude from the warranties documents
submitted by acquiring corporation to the SEC after
the date of the merger agreement but before the date
of the closing of the merger.

**[6] Corporations 101 &#8918;587**

101 Corporations
    101XIV Consolidation
        101k587 k. Right to Stock in Consolidated
Corporation. Most Cited Cases
"Bespeaks caution" doctrine did not preclude
shareholders of acquired corporation from bringing
action against acquiring corporation for breach of
warranties and representations in merger agreement
relating to accuracy of documents filed with
Securities and Exchange Commission (SEC) and
financial statements, alleging that third-party
corporation's restatement of earnings because of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

accounting irregularities caused shareholders of acquired corporation to receive fewer shares of acquiring corporation pursuant to merger agreement with acquiring corporation, though joint proxy and prospectus for merger of acquiring corporation with third corporation contained warnings and cautionary language; the allegedly false and misleading language in the joint proxy and prospectus did not involve projections of future results, and the warnings and cautionary language in the joint proxy and prospectus were not abundant.

**[7] Corporations 101 €═587**

101 Corporations
    101XIV Consolidation
        101k587 k. Right to Stock in Consolidated Corporation. Most Cited Cases
Pre-existing duty rule did not preclude shareholders of acquired corporation from bringing action against acquired corporation for breach of contract, relating to merger agreement's representation that documents acquiring corporation submitted to Securities and Exchange Commission (SEC) did not contain material misstatements or omissions; the representation was more than a simple attempt to enforce acquiring corporation's pre-existing legal duty to comply with federal securities laws.

**[8] Contracts 95 €═205.20**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k205 Warranties
                95k205.20 k. Reliance. Most Cited Cases
A plaintiff must establish reliance as a prerequisite for a breach of warranty claim.

**[9] Judgment 228 €═181(31)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(31) k. Stock and Stockholders, Cases Involving. Most Cited Cases
Genuine issue of material fact as to whether

acquired corporation's shareholders relied on acquiring corporation's representations in merger agreement regarding accuracy of documents filed with Securities and Exchange Commission (SEC) and financial statements precluded summary judgment for shareholders on their claim for breach of warranty, alleging that restatement of earnings by third-party corporation, which merged into acquiring corporation before completion of acquired corporation's merger into acquiring corporation, caused shareholders of acquired corporation to receive fewer shares of acquiring corporation pursuant to the merger agreement.

**[10] Contracts 95 €═168**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k168 k. Terms Implied as Part of Contract. Most Cited Cases
Every contract in Delaware has an obligation of good faith and fair dealing, which is implied into the agreement by law; as such, a party to a contract has made an implied covenant to act reasonably to fulfill the intent of the parties to the agreement.

**[11] Contracts 95 €═168**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k168 k. Terms Implied as Part of Contract. Most Cited Cases
Implied covenant of good faith and fair dealing was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain.

**[12] Contracts 95 €═168**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k168 k. Terms Implied as Part of Contract. Most Cited Cases
When a claim is brought under the implied covenant of good faith and fair dealing, the court must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                Page 4

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

extrapolate the spirit of the agreement through the express terms and determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose.

**[13] Contracts 95 ⛉168**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
       95k168 k. Terms Implied as Part of Contract. Most Cited Cases
The court will not readily imply a contractual obligation, under the implied covenant of good faith and fair dealing, where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication.

**[14] Contracts 95 ⛉168**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
       95k168 k. Terms Implied as Part of Contract. Most Cited Cases
The implied covenant of good faith and fair dealing cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.

**[15] Contracts 95 ⛉326**

95 Contracts
   95VI Actions for Breach
     95k326 k. Grounds of Action. Most Cited Cases
To state a claim for breach of an implied covenant of good faith and fair dealing, the plaintiffs must identify a specific implied contractual obligation.

**[16] Corporations 101 ⛉587**

101 Corporations
   101XIV Consolidation
     101k587 k. Right to Stock in Consolidated Corporation. Most Cited Cases
Acquiring corporation had duty, under implied

covenant of good faith and fair dealing in merger agreement, to refrain from distorting its financial condition, so as to not artificially inflate the value of its stock, which was to be exchanged for acquired corporation's stock in the merger.

**[17] Securities Regulation 349B ⛉18.12**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
       349BI(B)3 Exempt Transactions
         349Bk18.12 k. Number of Offerees or Purchasers. Most Cited Cases
Stock in acquiring corporation was exchanged for stock in acquired corporation pursuant to a "public offering," and thus, the transaction was subject to Section 11 and Section 12 of the federal Securities Act of 1933 regarding misstatements or omissions of material facts in registration statements, prospectuses, and oral communications for public offerings of securities, where acquiring corporation filed registration statement for publicly registered shelf offering, though a private-offering exemption from public registration may have been warranted because acquired corporation had only five shareholders, four of whom had certified themselves as accredited investors and all of whom had access to financial information pursuant to merger agreement. Securities Act of 1933, §§ 11, 12(a)(2), as amended, 15 U.S.C.A. §§ 77, 77k(a)(2); 17 C.F.R. § 230.415.

**[18] Securities Regulation 349B ⛉25.18**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
       349BI(B)4 Registration Statements
         349Bk25.17 False Statements or Omissions; Accuracy
         349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B ⛉25.57**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 5

**Not Reported in A.2d, 2002 WL 88939 (Del.Super.)**
**(Cite as: Not Reported in A.2d)**

349BI(B)5 Prospectuses and Communications
349Bk25.55 False Statements or Omissions; Accuracy
349Bk25.57 k. Particular Prospectuses or Communications. Most Cited Cases
Statements in joint proxy and prospectus for merger of acquiring corporation with acquired corporation and in Form 8-K filed with Securities and Exchange Commission (SEC), regarding financial results for periods before date of filing, were not " forward-looking statements" that were within safe harbor exception to liability under Section 11 and Section 12 of the federal Securities Act of 1933 regarding misstatements or omissions of material facts in registration statements, prospectuses, and oral communications for public offerings of securities. Securities Act of 1933, §§ 11, 12(a)(2), as amended, 15 U.S.C.A. §§ 77, 77k(a)(2); 17 C.F.R. § 230.415; 7 C.F.R. § 230.175.

**[19] Judgment 228 ☞181(31)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k181 Grounds for Summary Judgment
         228k181(15) Particular Cases
            228k181(31) k. Stock and Stockholders, Cases Involving. Most Cited Cases
Genuine issue of material fact as to whether misstatements in or omissions from registration statement for public offering of stock were material precluded summary judgment for offerees, in action under Section 11 of the federal Securities Act of 1933. Securities Act of 1933, § 11, as amended, 15 U.S.C.A. § 77.

**[20] Courts 106 ☞12(2.20)**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction in General
      106k10 Jurisdiction of the Person
         106k12 Domicile or Residence of Party
            106k12(2) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction in General
               106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases

Delaware statute regarding personal jurisdiction over nonresident corporate directors of Delaware corporations did not confer personal jurisdiction in Delaware state courts as to offerees' claims against nonresident directors of offeror, under Section 11 and Section 12 of the federal Securities Act of 1933, for misstatements or omissions of material facts in registration statements and prospectuses for public offering of securities; offerees did not allege breach of fiduciary duty and instead relied solely on directors' status as directors. Securities Act of 1933, §§ 11, 12(a)(2), as amended, 15 U.S.C.A. §§ 77, 77k(a)(2); 10 Del.C. § 3114.

**[21] Courts 106 ☞12(2.20)**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction in General
      106k10 Jurisdiction of the Person
         106k12 Domicile or Residence of Party
            106k12(2) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction in General
               106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases
Conduct of nonresident executive vice president and chief financial officer (CFO) of Delaware corporation in signing, in California, registration statement for public offering of stock was not actual conduct in Delaware, and thus, Delaware state courts did not have personal jurisdiction, under provision of long-arm statute relating to persons transacting business in Delaware, of offerees' claim under Section 11 and Section 12 of the federal Securities Act of 1933, for misstatements or omissions of material facts in registration statements and prospectuses. Securities Act of 1933, §§ 11, 12(a)(2), as amended, 15 U.S.C.A. §§ 77, 77k(a)(2); 10 Del.C. § 3114; 10 Del.C. § 3104(c)(1).

**[22] Courts 106 ☞12(2.1)**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction in General
      106k10 Jurisdiction of the Person
         106k12 Domicile or Residence of Party

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

106k12(2) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction in General
106k12(2.1) k. In General. Most Cited Cases
Provision of Securities Act of 1933 conferring subject matter jurisdiction to state courts does not also permit plaintiffs to use the Act's nationwide service of process provision to acquire personal jurisdiction over defendants in state court. Securities Act of 1933, § 22(a), as amended, 15 U.S.C.A. § 77v(a).

**[23] Courts 106 ☞25**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106k22 Consent of Parties as to Jurisdiction
106k25 k. Of the Person. Most Cited Cases
Individual who served as president, chief executive officer (CEO), and director of acquiring corporation and individual who served as chief executive officer (CEO) of acquired corporation and later served as chairman of acquiring corporation's board of directors did not consent to personal jurisdiction in Delaware state courts as to disputes under the merger agreement, though the agreement contained a consent to jurisdiction provision, where those individuals were neither named parties nor signatories to the merger agreement.

Plaintiffs' Motion for Partial Summary Judgment. Denied.
Defendant McKesson HBOC, Inc.'s Motion to Dismiss. Denied.
Plaintiffs' Motion to Strike Exhibit A of Defendant McKesson HBOC, Inc.'s Opening Brief. Denied.
Defendant Mark A. Pulido's Motion to Dismiss. Granted.
Defendant Charles W. McCall's Motion to Dismiss. Granted.
Defendant Richard H. Hawkins's Motion to Dismiss. Granted.

Jeffrey S. Goddess, Esquire, and Joseph A. Rosenthal, Esquire, Wilmington, Sherrie R. Savett, Esquire and Lawrence J. Lederer, Esquire, Philadelphia, PA, for Plaintiffs.

Anthony W. Clark, Esquire, Paul J. Lockwood, Esquire, and Thomas G. Macauley, Esquire, Wilmington, for Defendant McKesson HBOC, Inc.
Michael D. Goldman, Esquire, and Stephen C. Norman, Esquire, Wilmington, David B. Hennes, Esquire, New York, NY, for Defendant Mark A. Pulido.
Alan J. Stone, Esquire, and Jessica Zeldin, Esquire, Wilmington, Karen S. Kennedy, Esquire, New York, NY, for Defendant Charles W. McCall.
Stuart M. Grant, Esquire, Wilmington, for Richard H. Hawkins.

OPINION

CARPENTER, J.

*1 This is the Court's decision on Plaintiffs' motion for partial summary judgment, each of the Defendants' individual motions to dismiss, and Plaintiffs' motion to strike Exhibit A of Defendant McKesson HBOC, Inc.'s opening brief.

FACTS

On December 17, 1998, Judy Kelly, Harriette Owens Waldron, Scott Symons and Michael Putnick (collectively the "Plaintiffs") sold their businesses, KWS & P, Inc. and KWS & P/SFA, Inc., to McKesson Corporation ("McKesson") [FN1] by entering into an Agreement and Plan of Merger ("Merger Agreement"). This was designed to be a stock-for-stock merger, and in exchange for their businesses, the Plaintiffs were to receive $103.5 million in publicly registered McKesson common stock. The exact number of shares, to which the Plaintiffs were entitled, was determined by computing the average New York Stock Exchange ("NYSE") closing price of McKesson common stock for the ten (10) consecutive trading day period three days prior to closing.

> FN1. The Plaintiffs' businesses, which were sold to McKesson, focused on processing and marketing data for pharmaceutical manufacturers. The businesses assisted pharmaceutical manufacturers in selling their products to and through doctors and consumers by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

analyzing marketing data. Each Plaintiff owned 25% of KWS & P, Inc., while each Plaintiff owned 17.5 % of KWS & P/SFA, Inc. They collectively owned 70%. A fifth stockholder, not a party to this action, owned the remaining 30% interest in KWS & P/SFA, Inc.

On October 18, 1998, prior to the completion of the above merger, McKesson and HBO & Company (" HBOC") publicly announced that they had also agreed to a merger. On January 12, 1999, the McKesson/HBOC merger closed, and McKesson changed its name to McKesson HBOC, Inc. (" McKesson HBOC") <sup>FN2</sup> and HBOC became a wholly-owned subsidiary of the company.

> FN2. McKesson HBOC is a large pharmaceutical and medical-surgical supply management and health care information technology company.

On January 26, 1999, the Plaintiffs' businesses merged into wholly-owned subsidiaries of McKesson HBOC. Pursuant to the Merger Agreement, the Plaintiffs received a total of 998,336 McKesson HBOC shares plus 110,926 additional common stock shares, which were placed in escrow and reflected a stock value of $85.15 per share.

On April 28, 1999, three months after the Plaintiffs' merger closed, McKesson HBOC announced that there were irregularities in the accounting practices of HBOC, which were discovered after the McKesson HBOC merger. McKesson HBOC stated that it had improperly recognized revenue, and that it would have to restate its earnings. As a result of this disclosure, the McKesson HBOC stock plummeted to $32 per share.

On July 14, 1999, McKesson HBOC announced that the write-offs would be larger than originally anticipated indicating they would total $327.4 million, consisting of $245.8 million for fiscal year ending March 31, 1999, and $48.4 million and $33.2 million, respectively, for fiscal years ending March 31, 1998 and March 31, 1997. The massive

write-offs were attributed to revenue recognition of contingent sales, backdated contracts, unavailable products, non-Y2K compliant products, and subscription contracts and expense accruals.

The Plaintiffs brought suit against McKesson HBOC asserting that absent the accounting improprieties, the Plaintiffs would have received far more McKesson HBOC shares at closing in exchange for their businesses. The Plaintiffs also brought suit against several individuals: Defendant Mark A. Pulido ("Pulido"), who was President, CEO and director of McKesson and McKesson HBOC, Defendant Charles W. McCall ("McCall"), who was CEO of HBOC prior to the merger and Chairman of McKesson HBOC's Board when McKesson merged with HBOC, and Defendant Richard H. Hawkins ("Hawkins"), who was McKesson's Executive Vice President and CFO, (collectively, the "individual Defendants").<sup>FN3</sup>

> FN3. McCall was terminated in June 1999, and Pulido and Hawkins resigned in July 1999.

**\*2** In Count I, the Plaintiffs allege a breach of contract against McKesson HBOC based on representations, warranties, and obligations in the Merger Agreement. Specifically, the Plaintiffs allege that McKesson HBOC (1) misrepresented and failed to disclose material adverse facts concerning the financial results and accounting practices; (2) issued false and misleading financial and related statements in documents filed with the Securities and Exchange Commission ("SEC"); (3) failed to comply with federal securities laws and Generally Accepted Accounting Principles ("GAAP "); and (4) failed to advise the Plaintiffs, prior to the time their merger closed, of the material adverse changes in McKesson HBOC's finances. In Count II of the Complaint, the Plaintiffs allege that McKesson HBOC violated the implied covenant of good faith and fair dealing that accompanied the Merger Agreement. In Counts III and IV, the Plaintiffs assert that all the Defendants violated Section 11 and Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act"). Lastly, in Count V, the Plaintiffs claim that the individual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 8

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Defendants violated Section 15 of the Securities Act.


### DISCUSSION

*I. Plaintiffs' Motion for Partial Summary Judgment
Defendant McKesson HBOC's Motion to Dismiss*


While the Plaintiffs and McKesson HBOC
respectively move for partial summary judgment
and to dismiss, the Court will address these motions
together under this section. Summary judgment will
be granted when, in viewing the record in the light
most favorable to the non-moving party, the movant
has shown that no genuine issues of material fact
exist, and that the movant is entitled to judgment as
a matter of law.[FN4] When a motion for summary
judgment is supported by a showing that there are
no material issues of fact, the burden shifts to a
nonmoving party to demonstrate that there are
material issues of fact.[FN5]


    FN4. Super. Ct. Civ. R. 56(c).

    FN5. *Moore v. Sizemore,* 405 A.2d 679
    (1979).

For a motion to dismiss for failure to state a claim
upon which relief can be granted, all allegations in
the complaint must be accepted as true.[FN6] In
addition, such a motion will not be granted if the
plaintiff may recover under any reasonably
conceivable set of circumstances susceptible of
proof under the complaint.[FN7]


    FN6. *Spence v. Funk,* 396 A.2d 967 (1978)
    .

    FN7. *Id.*


### A. Count I

In Count I, the Plaintiffs assert that McKesson
HBOC breached express warranties and
representations made in the Merger Agreement.
Specifically, the Plaintiffs rely upon Paragraph 4.4

of the Merger Agreement, which stated:
*SEC Documents.* Buyer has filed all reports, proxy
statements, forms and other documents required to
be filed by it with the Securities and Exchange
Commission (the "SEC") since March 31, 1996 (the
Annual Reports on Form 10-K, Quarterly Reports
on Form 10-Q, Current Reports on Form 8-K and
Proxy Statements filed by Buyer since March 31,
1996 being hereinafter referred to as the "Buyer
SEC Documents"). As of their respective dates, and
giving effect to any amendments thereto, (a) the
Buyer SEC Documents complied in all material
respects with the applicable requirements of the
federal securities Laws, including the applicable
rules and regulations of the SEC promulgated
thereunder, and (b) none of the Buyer SEC
Documents when filed with the SEC contained any
untrue statement of a material fact or omitted to
state any material fact required to be stated therein
or necessary in order to make the statements made
therein, in the light of the circumstances under
which they were made, not misleading.[FN8]


    FN8. Merger Agreement at ¶ 4.4.


**\*3** The Plaintiffs argue that McKesson HBOC, who
was McKesson's successor-in-interest, included
false and misleading information in their SEC
filings and failed to comply with the federal
securities laws. The Plaintiffs also rely upon
Paragraph 4.5 of the Merger Agreement which
stated:
*Financial Statements.* The financial statements of
Buyer (including any notes and schedules thereto)
included in the Buyer SEC Documents (the "Buyer
Financial Statements") at the time filed or as
subsequently amended by any Buyer SEC
Document filed prior to the date hereof (a)
complied as to form in all material respects with all
applicable accounting requirements and with the
published rules and regulations of the SEC with
respect thereto, (b) were prepared in accordance
with generally accepted accounting principles
applied on a consistent basis (except in the case of
unaudited statements, as permitted by Form 10-Q as
filed with the SEC under the Exchange Act) during
the periods involved (except as may be indicated in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 9

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

the related notes and schedules thereto) and (c) fairly present, in all material respects, the consolidated financial position of Buyer and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to annual year-end audit adjustments which are not, individually or in the aggregate, material).[FN9]

        FN9. Merger Agreement at ¶ 4.5.

The Plaintiffs assert that McKesson HBOC breached these warranties because its financial statements were inaccurately made, according to the SEC rules and regulations, and to GAAP, and were admittedly false. As such, the Plaintiffs move for partial summary judgment with respect to this Count.

McKesson HBOC asserts that there were no breaches under Paragraphs 4.4 and 4.5 because those paragraphs only apply to SEC filings and financial statements made by McKesson, not HBOC or McKesson HBOC. As such, the initial question is whether there was a breach of Paragraphs 4.4 and/or 4.5 of the Merger Agreement.

In analyzing Count I's legal sufficiency, it is important first not to lose sight that, while the underlying claims regarding misrepresentations and false statements lie in the complexities of securities and corporate law, the dispute alleged in this Count is a contractual one. Unfortunately, there is a tendency to merge these legal concepts, which causes confusion, and which complicates them far beyond the parties' intent to this contract. In its simplest terms, the Plaintiffs bargained for a full and accurate financial disclosure by the Defendant so that they could fairly evaluate the appropriateness of the agreed upon sale of their business, and to obtain the appropriate number of shares of McKesson to fully compensate them at the agreed upon price. The Defendants were expected to be candid, and to provide a full accounting of the agreed upon documentation, which in turn would result in their acquisition of the Plaintiffs'

businesses. Obviously these contractual terms have been significantly distorted by the false documents supplied by HBOC and subsequently used by McKesson to file financial statements. While the actions of HBOC are critical to understanding what has occurred, it is important to recognize that the contract in dispute in this litigation only involves McKesson or McKesson HBOC, and it is the conduct of those companies as it relates to the Plaintiffs that will determine whether a breach of contract has occurred. In this vein, the Court makes the following initial general findings.

*4 [1] First, the Court rejects McKesson HBOC's argument that since there is no assertion that McKesson alone filed false or materially misleading documents, and they are the named parties to the contract, that the contract dispute of Count I should be dismissed. The Court will simply not allow McKesson to avoid liability by hiding behind a change in their name. The Plaintiffs' bargain under the Merger Agreement was either with McKesson or McKesson HBOC, and the actions of either entity can form the basis of a breach of the contract.

[2] Secondly, the Court will also not allow McKesson to avoid liability simply because they assert in the filings complained of by the Plaintiffs that they were not warranting the financial information provided by HBOC. While such action can be considered by a jury in assessing the knowledge of McKesson and McKesson HBOC officials, it does not provide an automatic immunity from liability.

[3] Third, the Court also rejects the Plaintiffs suggestion that simply because the documentation provided by HBOC and utilized by McKesson was subsequently found to be false, that they have established their contractual claim found in Count I. As stated before, the contract dispute is between the Plaintiffs and McKesson or McKesson HBOC, and it is the actions and conduct of those entities that the Plaintiffs must establish violated the terms and conditions of the agreement. In other words, it is not at this junction an illogical assumption to surmise that McKesson may have been equally duped into believing the accuracy of the information provided by HBOC, and it will not be sufficient for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 10

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Plaintiffs to merely show that the documents were subsequently found to be false.

[4] With these underlying principles as its guide, the Court finds there remains a dispute, unresolvable by either parties' motion, as to what may have been reasonably known by McKesson, or McKesson HBOC, prior to the closure of Plaintiffs merger with McKesson, that would perhaps constitute a breach of the agreement. As such, the Court will provide the Plaintiffs an opportunity to fully explore these areas in discovery. It is clear that on November 27, 1998, a Joint Proxy Statement/Prospectus was issued by McKesson regarding its merger with HBOC. This Joint Proxy Statement/ provided the summary financial data of McKesson and HBOC, separately, and the unaudited pro forma combined condensed consolidated financial data of McKesson and HBOC, jointly, for the years ending March 31, 1998 and March 31, 1997, as well as for the six months ending September 30, 1998. This Joint Proxy Statement/Prospectus was annexed to the Merger Agreement between McKesson and HBOC dated October 17, 1998, which included Section 3.1(f), entitled "Information Supplied," and stated in part:
The Form S-4 and the Joint Proxy Statement will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations thereunder, except that no representation or warranty is made by McKesson with respect to statements made or incorporated by reference therein based on information supplied by HBO specifically for inclusion or incorporation by reference in the Form S-4 or the Joint Proxy Statement.

**\*5** In the Joint Proxy Statement/Prospectus, there were letters to the shareholders of both McKesson and HBOC. These letters encouraged the shareholders to read the Joint Proxy Statement/Prospectus and the McKesson/HBOC merger agreement.

On January 14, 1999, McKesson HBOC filed a Form 8-K with the SEC, which described the consideration McKesson paid for HBOC and indicated that HBOC had become a wholly-owned subsidiary of the company. It further stated that "

[t]he financial statements required to be filed were previously reported in McKesson's Registration Statement on Form S-4 dated November 13, 1998, as amended by Amendment No. 1 thereto dated November 27, 1998 (No. 333-67299), which is incorporated herein by reference." [FN10] Furthermore, "[t]he unaudited combined condensed pro forma financial statements of McKesson and HBOC were previously reported in McKesson's Registration Statement on Form S-4 dated November 13, 1998, as amended by Amendment No. 1 thereto dated November 27, 1998 (No. 333-67299), which is incorporated herein by reference." [FN11]

> FN10. McKesson HBOC's Form 8-K dated January 14, 1999 at Item 7(a).

> FN11. McKesson HBOC's Form 8-K dated January 14, 1999 at Item 7(b).

These actions occurred prior to the January 26, 1999 closing with the Plaintiff and reasonably call into question the knowledge of McKesson or McKesson HBOC officials as to the accuracy of the information provided by HBOC. If McKesson or McKesson HBOC knew, or had any reason to believe that the information that they or HBOC were disclosing regarding their merger was false, misleading or materially omitted critical information, they had an obligation under the contract with the Plaintiffs to make a disclosure prior to the January 26, 1999 closing. In essence, this is the crux of the dispute now between the parties, and it does not appear from the arguments made in the briefing of these motions to have been adequately explored by the parties at this juncture in the litigation. Since factual issues remain in dispute, it would be inappropriate to grant the Plaintiffs' motion for partial summary judgment at this time.

Having addressed the fundamental arguments of Count I, the Court will briefly discuss the miscellaneous legal arguments that remain as to this count. First, McKesson HBOC argues that the Joint Proxy Statement/Prospectus was not included as a " Buyer SEC Document" defined in Paragraph 4.4 of the Merger Agreement. Under Paragraph 4.4, "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 11

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

Buyer SEC Documents" were defined as "the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and Proxy Statements filed by Buyer since March 31, 1996." While the Joint Proxy Statement/Prospectus dated November 27, 1998 was jointly filed by McKesson and HBOC, the Court considers this document to be included in the Buyer SEC Documents mentioned in Paragraph 4.4 of the Merger Agreement. It fits the definition provided in Paragraph 4.4 and was filed by McKesson HBOC, the legally remaining entity of McKesson.

[5] In addition, McKesson HBOC argues that the January 14, 1999 Form 8-K was not a Buyer SEC Document under Paragraphs 4.4 or 4.5 because it was filed after the Merger Agreement of December 17, 1998. The Court finds that the language in Paragraph 4.4 does not limit the inclusion of the January 14, 1999 Form 8-K as a Buyer SEC Document. Article 4 of the Merger Agreement preludes with the following
*6 [i]n order to induce the Companies and the Shareholders to enter into this Agreement, Buyer and the Merger Subsidiaries, jointly and severally, hereby represent and warrant to the Companies and the Shareholders as of the date hereof and as of the Closing Date as follows.

Paragraph 4.4 then provides in part:*SEC Documents.* Buyer has filed all reports, proxy statements, forms and other documents required to be filed by it with the Securities and Exchange Commission (the "SEC ") since March 31, 1996 (the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and Proxy Statements filed by Buyer since March 31, 1996 being hereinafter referred to as the "Buyer SEC Documents"). As of their respective dates, and giving effect to any amendments thereto,...

The language "[a]s of their respective dates" in no way precludes a Form 8-K dated January 14, 1999 and there is no other limiting language that is date specific except March 31, 1996. In addition, the prelude to Paragraph 4.4 warrants the time frame from December 17, 1998, "as of the date hereof" through the Closing Date, which was January 26, 1999.FN12 Unless there is a clear specific limiting

language in the Agreement, the Court will not exclude from consideration documents filed by the Defendant and referenced in the Merger Agreement. To do otherwise would give the Defendant the freedom to file documents knowingly containing false information after signing the agreement but before closing without any consequences. That obviously is not the intent of the parties nor will it be condoned by the Court. As such, the Plaintiffs are not precluded from using the Form 8-K as a Buyer SEC Document under Paragraph 4.4.

FN12. The Closing Date is defined in 1.6 of the Merger Agreement.

However, the Court finds that the language of Paragraph 4.5 warrants a different result. It provides in part:
*Financial Statements.* The financial statements of Buyer (including any notes and schedules thereto) included in the Buyer SEC Documents (the "Buyer Financial Statements") at the time filed or as subsequently amended by any Buyer SEC Document filed prior to the date hereof ...

The Court finds that based on Paragraph 4.5's language, the Plaintiffs would be precluded from arguing that the financial statements, contained in the January 14, 1999 Form 8-K, fit within the warranties of this paragraph. The limiting language of "filed prior to the date hereof" leads the Court to conclude that for some unexplained reason or by mere oversight the parties agreed to a different time standard in Paragraph 4.5 than they did in Paragraph 4.4. The use of this language, which differs from the prelude to Article 4, indicates that the parties agreed upon a more restrictive date for the financial statements within the Buyer SEC Documents. As such, to the extent that the Plaintiffs argue that McKesson HBOC violated Paragraph 4.5 the documentation relied upon by the Plaintiffs to support this assertion would had to have been filed prior to December 17, 1998.

*7 [6] McKesson HBOC relying upon the " bespeaks caution doctrine" also argues that the Joint Proxy Statement/Prospectus provides no basis for the Plaintiffs' breach of contract claim because it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 12

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

provides material that was forward-looking and thus did not purport to relate misstatements of fact, which could give rise to a breach of Paragraphs 4.4 and 4.5 of the Merger Agreement. The Third Circuit examined this doctrine in *In re Donald J. Trump Casino Securities Litigation-Taj Mahal Litigation.*[FN13] It is premised upon the idea that if sufficient, cautionary statements are included in a prospectus, any alleged misrepresentations and omissions contained in the prospectus, may be nonactionable.[FN14] There, the Court explained:

> FN13. 7 F.3d 357 (3rd Cir.1993).

> FN14. *Id.* at 364(stating "[a]s we see it, " bespeaks caution" is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law.").

[W]e can state as a general matter that, when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the " total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.
The bespeaks caution doctrine is, as an analytical matter, equally applicable to allegations of both affirmative misrepresentations and omissions concerning soft information. Whether the plaintiffs allege a document contains an affirmative prediction/opinion which is misleading or fails to include a forecast or prediction which failure is misleading, the cautionary statements included in the document may render the challenged predictive statements or opinions immaterial as a matter of law. Of course, a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in

the prospectus which the plaintiffs challenge.[FN15]

> FN15. *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d at 371-72.

In finding that the Plaintiffs failed to state an actionable claim, the Third Circuit reasoned that the prospectus truly "bespeaks caution" because, not only did the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly addressed the substance of the statement the Plaintiffs challenged.[FN16]

> FN16. *Id.* at 372.

While the Court believes that the "bespeaks caution" doctrine is not necessarily limited to the alleged violations of federal securities laws, but, instead, may be applied to a breach of contract claim where the underlying misrepresentations relate to securities, it also finds that the "bespeaks caution" doctrine does not immunize the Joint Proxy Statement/Prospectus filed in this litigation from the breach of contract claim. The Court is persuaded by the Plaintiffs' argument that the alleged false and misleading information were not projections of future results, as the information required the restatement of revenue, concerned of the financial statements for the fiscal years ending March 31, 1997 and March 31, 1998 and the six month period ending September 30, 1998. At the time of the November 27, 1998 Joint Proxy Statement/Prospectus, the statements regarding the finances for those times were not futuristic or forward-looking. Moreover, the Third Circuit in *In re Donald J. Trump Casino Sec. Litig., supra,* reasoned that the warnings and cautionary language was abundant, meaningful and tailored to directly address the substance of the statement the Plaintiffs challenged.[FN17] This was not the case here.

> FN17. 7 F.3d at 369 (holding that the prospectus at issue in that case, contained " an abundance of warnings, and cautionary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 13

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

language, which bore directly on the prospective financial success of the Taj Mahal and the Partnerships ability to repay the bonds.").

*8 [7] McKesson HBOC also argues that the claim regarding Paragraph 4.4 fails under the pre-existing duty rule.[FN18] They argue that this provision required McKesson to comply with the federal securities laws, which was already a pre-existing legal duty. As such, McKesson HBOC relying upon *Seidel v. Lee* [FN19] asserts that this claim should be dismissed.

> FN18. The pre-existing duty rule is a well-settled principle of law that states a contract cannot be based upon a duty which one is already legally obligated to perform. *See Seidel v. Lee*, 954 F.Supp. 810, 817 (D.Del.1996)(citing Restatement (Second) of Contracts § § 73, 80(2)(1979); Calamari and Perillo, The Law of Contracts § 49(b)(West 1987)).

> FN19. 954 F.Supp. 810 (D.Del.1996).

While recognizing the validity of the pre-existing duty rule, this Court, like the Delaware Supreme Court in *Rossdeutscher v. Viacom, Inc.*,[FN20] cannot reasonably construe the requirements of Paragraph 4.4 of the merger agreement as an attempt to seek enforcement of an agreement to comply with federal security laws. Clearly Paragraph 4.4(b) does not, and Paragraph 4.4(a) is a certification of the buyer that he has complied with those laws. The certification by the buyer is what is critical to the agreement and what is important to the Plaintiff's decision making process, not the requirement that he do so. As such, this rule is not applicable to the facts of this litigation.

> FN20. 768 A.2d 8 (Del.2001).

In making the findings as to Count I, the Court believes it has addressed all the issues raised by the Defendant in its motion to dismiss. The Court has rejected these arguments, and the motion to dismiss

at this junction in the litigation is hereby denied.

The remaining issues, as to Count I, arise from the Plaintiffs' motion for partial summary judgment. The motion itself is not very helpful in focusing the issues for the Court to consider, since it simply states in a conclusory form that there is no dispute of the existence of McKesson's representations and warranties and the breach by the company, so summary judgment is warranted. The Plaintiffs filed no opening brief in support of their motion, but simply allowed the Defendant in essence to create the legal issues relating to summary judgment in their brief, and then responded in a reply brief. The Court has previously ruled that the factual issues of the case are not as straightforward and uncontroverted as claimed by the Plaintiffs, and that summary judgment is not warranted. Having made this finding it is at least arguable at this point in time that the remaining issues raised by the Defendant in its briefs opposing summary judgment are mooted and should not be addressed. However, in spite of this, to avoid further delay, this Court will address those issues it believes are ripe for decision.

[8] According to sound Delaware law, a plaintiff must establish reliance as a prerequisite for a breach of warranty claim.[FN21] In *Bleacher v. Bristol-Myers Company*,[FN22] this Court held that " [t]he law is clear that in order for a defendant to be responsible for a breach of warranty, plaintiff must have known about the warranty and have relied upon it." [FN23] As further support for this holding, a federal district court in Illinois, interpreting Delaware law in a breach of corporate assets purchase contract, recently re-examined this issue, and held that the plaintiff in that action had to show reliance to prevail on its breach of warranty claim as a matter of Delaware law.[FN24] To support its ruling, the *Middleby* court examined Delaware precedent on the reliance in breach of warranty claims, and noted that

> FN21. *Bleacher v. Bristol-Myers Company*, 163 A.2d 526, 528 (1960); *Loper v. Lingo*, 97 A. 585 (Del.Super.1916); 1 Williston on Sales (Rev. Ed.), § 206.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 14

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN22. 163 A.2d 526 (Del.Super.1960).

FN23. *Bleacher* 163 A.2d at 528.

FN24. *The Middleby Corporation v. Hussmann Corporation,* No. 90C 2744, 1992 WL 220922, at *6 (N.D.Ill. Aug.27, 1992).

*9 [a]lthough Delaware case law is not replete with discussions of whether reliance is an essential element of a breach of warranty claim, several old-but apparently still viable-decisions answer the question in the affirmative. *See Harvard Industries, Inc. v. Wendel,* [Del. Ch.], 178 A.2d 486, 496 (1962) (requiring reliance but somewhat unclear whether referring to fraud or warranty claim); *Bleacher v. Bristol-Myers Co.,* [Del.Super.], 163 A.2d 526, 528 (1960)("The law is clear that in order for a defendant to be responsible for a breach of warranty, plaintiff must have known about the warranty and have relied upon it"); *Loper v. Lingo,* [Del.Super.], 97 A. 585, 586 (1916)(charging the jury that to find liability for breach of warranty in a horse sale, the jury must find "that at the time of the sale the horse was warranted by the defendant to be sound, and that the plaintiff relied upon such warranty").[FN25]

FN25. *Id.*

In the case at bar then, the Plaintiffs' reliance upon *Mowbray v. Waste Management Holdings, Inc.* [FN26] is erroneous. While the *Mowbray* court found that reliance was not an essential element in a breach of warranty claim, that Massachusetts court was interpreting Illinois law, and examined the issue under Illinois law .[FN27] As such, the *Mowbray* holding, in light of the clear Delaware case law, which requires reliance for a breach of warranty claim, is inapplicable.

FN26. 45 F.Supp.2d 132 (D.Mass.1999).

FN27. *Id.* at 135.

[9] McKesson HBOC asserts that the Plaintiffs and

their expert advisors conducted their own independent investigation of McKesson HBOC's financial stability by retaining Bear Stearns & Company as their financial advisor. They further assert that included in the Plaintiffs' Bear Stearns financial team were senior members of that organization that had also worked with McKesson in connection with its merger with HBOC. While this Court believes that such advice and independent oversight was appropriate and important because of the financial stakes involved in the Plaintiffs' merger plans, it does raise factual issues as to what extent the Plaintiffs relied upon the documentation filed by McKesson HBOC, which formed the basis of the Plaintiffs' Complaint in this litigation. This will be an area that the parties will have to explore further in discovery as the litigation moves forward.

The final issue raised in Defendant's answering brief to Count I is the materiality of the breach. First, it appears to this Court that the parties agree that materiality is an issue of fact, not normally subject to a summary judgment proceeding. As such, it is unclear whether there remains a dispute as to this issue. Second, the Court does discuss materiality later in the opinion in the context of a security violation and finds the same reasoning and issues discussed there are applicable in a contractual context.[FN28] However, in fairness to the parties, this Court does not believe that the record has been sufficiently developed on this issue for this Court to rule on its applicability. If at a later point in the litigation the parties want to pursue this issue, they are free to file an appropriate motion, and follow normal briefing patterns to insure that this Court fully appreciates the positions of each party. At the moment, materiality will remain a factual issue for the jury to decide.

FN28. See this Opinion at 35-36.

*10 In conclusion, as to the assertions made as to Count I, both the Defendant's motion to dismiss and the Plaintiffs' motion for partial summary judgment are hereby denied.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.