Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

### B. Count II

McKesson HBOC asserts that Count II, which alleges a breach of an implied duty of good faith and fair dealing, fails to state a claim because claims for breach of this implied duty that mirror breach of contract claims are not permitted. As such, McKesson HBOC moves to dismiss this Count.

[10][11][12][13][14][15] Every contract in Delaware has an obligation of good faith and fair dealing, which is implied into the agreement by law. FN29 As such, a party to a contract has made an implied covenant to act reasonably to fulfill the intent of the parties to the agreement. FN30 This implied covenant was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain.FN31 In such a claim, the Court must extrapolate the spirit of the agreement through the express terms and determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose. FN32 But the Court will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication.FN33 The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.FN34 To state a claim for breach of an implied covenant of good faith and fair dealing, the Plaintiffs must identify a specific implied contractual obligation. FN35

FN29. *Chamison v. Healthtrust, Inc.,* 735 A.2d 912, 920 (Del.Ch.1999).

FN30. *Id.*

FN31. *Id.*

FN32. *Id.* at 921.

FN33. *Moore Business Forms, Inc. v.*

*Cordant Holdings Corp.,* No. 13911, 1995 WL 662685, at *8 (Del.Ch. Nov.2, 1995) (quoting *Abex Inc. v. Koll Real Estate Group Inc.,* No. 13462, 1994 WL 728827, at *12 (Del.Ch. Dec.22, 1994).

FN34. *Chamison,* 735 A.2d at 921.

FN35. *Moore Business Forms* at *12. See also Painewebber R & D Partners, L.P. v. Centocor Inc.,* No. 96C-04-194, 1998 WL 109818 (Del.Super.Feb.13, 1998).

[16] Here the Plaintiffs argue that McKesson HBOC was obligated to accurately and timely disclose their financial position, practices, and results so that the value of McKesson HBOC's shares, and consequently, the full consideration to which the Plaintiffs were actually entitled, could be determined fairly and in good faith. The Plaintiffs argue that McKesson HBOC violated the implied covenant of good faith and fair dealing when it misrepresented, omitted and failed to disclose material facts concerning McKesson HBOC's financial condition and artificially inflated their stock price during the January 1999 valuation period. The Plaintiffs explain that since their consideration was dependent upon the integrity of the market price for McKesson common stock during the valuation period, the Defendant had an implied covenant not to distort the value of the stock by misleading or manipulating the market place.

The Court finds that the Complaint states a legally sufficient claim in Count II under the implied covenant of good faith and fair dealing theory. It appears that the Plaintiffs' implied covenant argument originates from Paragraphs 4.4 and 4.5 of the Merger Agreement, which sets forth the information that would be relied upon during the merger period to insure a fair and accurate valuation of the Defendant's stock as it related to the purchase price of the Plaintiffs' business. Implied in the contractual terms is the understanding that the Defendant would refrain from distorting its financial condition so as to not adversely affect the value of its stock which was to be used as the linchpin to the Plaintiffs' bargain. This implied

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 16

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

covenant insured that there would be no attempt by the Defendant to adversely influence the market to artificially inflate the price of their stock thereby diminishing the number of shares the Plaintiffs were entitled to receive under the agreement. The absence of such an implied obligation would violate the spirit of the Merger Agreement and would result in the Plaintiff not receiving the full benefit of its bargain. As such, the Court finds this assertion has been adequately plead in the Complaint, and there is a legal basis for this claim to proceed forward. As a result, the Defendant's motion to dismiss Count II is denied.

### C. Counts III and IV

**\*11** [17] McKesson HBOC argues that the Plaintiffs' claims against it under Counts III and IV concerning violations of Sections 11 and 12, respectively, of the Securities Act must fail because the issuance of stock to the Plaintiffs was not made pursuant to a public offering. Conversely, the Plaintiffs argue that this was a public offering and that they are entitled to summary judgment. As such, the first question is whether Sections 11 and 12 of the Securities Act are applicable, and more specifically, whether this was a public or a private offering.

It is undisputed by the parties that Sections 11 [FN36] and 12 [FN37] of the Securities Act only apply to public offerings.[FN38] An offering is considered private only if limited to investors who have no need for the protection provided by registration.[FN39] The reason for the registration statement is to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions.[FN40] It is clear that when there has been no registration of the stock and there is a dispute as to the private nature of the offering, the focus of the inquiry is on the need of the offerees for the protections afforded by registration and whether they would have access to the kind of information which registration would disclose. [FN41] In determining whether an offering was appropriately private, courts must make a fact-intensive inquiry into the following factors: (1) the number of offerees; (2) the sophistication of the

offerees, including their access to the type of information that would be contained in a registration statement, and (3) the manner of the offering.[FN42] However, while this logical inquiry is appealing to the Court, its applicability to publicly registered stock is not as clear.[FN43]

> FN36. Section 11 of the Securities Act, 15 U.S.C. § 77k(a)(2), states in part:
> (a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue-
>
> (2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted...

> FN37. Section 12 of the Securities Act, 15 U.S.C. § 77l(a)(2), states in part:
> (a) Any person who-
> (2) offers or sells a security...by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable... to the person purchasing such security

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 17

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon..

.

FN38. *See Van de Walle v. Salomon Bros., Inc.,* No. 9894, 1997 LEXIS 140, at *9(Del. Ch. Sept. 30, 1997)(*citing Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 582, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)).

FN39. *Securities and Exchange Comm'n v. Ralston Purina Co.,* 346 U.S. 119, 125, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

FN40. *Id.* at 124.

FN41. *Id.* at 127.

FN42. *United States v. Arutunoff,* 1 F.3d 1112, 1118 (10th Cir.1993).

FN43. *See Flake v. Hoskins,* 55 F.Supp.2d 1196, 1229, n. 21 (D.Kan.1999).

McKesson HBOC argues that the Court should consider the McKesson stock issue pursuant to the Merger Agreement to be a private offering because it involved a small number of sophisticated offerees, five individuals. It argues that the sophistication is indicated by the Accredited Investor Certificates that were signed by the Plaintiffs. The "Accredited Investor Certificate" stated:
The undersigned represents and warrants that she has completely and accurately filled out the Accredited Investor Information questionnaire attached as Exhibit A. The undersigned further represents and warrants that she is an "accredited investor" within the meaning of Rule 501(a) as promulgated under the Securities Act of 1933, as amended.[FN44]

FN44. The information in the questionnaire provided that each individual's net worth was in excess of

$1,000,000, that each individual's income for each of the years 1997 and 1998 and anticipated 1999 was in excess of $200,000, and that each individual's joint income for the years 1997 and 1998 and anticipated 1999, was in excess of $300,000. Each of the Plaintiffs answered the questions in the affirmative, with the exception of Brian Dillon, who is not a Plaintiff.

Conversely, the Plaintiffs argue that this was not an unregistered private offering of stock, but rather, a publicly registered shelf offering and that because their stock was issued pursuant to a Registration Statement, Sections 11 and 12(a)(2) clearly apply to this case.

McKesson publicly registered all of the shares it issued to the Plaintiffs in its June 24, 1998 Amendment No. 1 to Form S-4 Registration Statement, which contained a Prospectus. The Prospectus related to 5,000,000 shares of common stock of McKesson in a "shelf offering" pursuant to Rule 415 of the Securities Act, 17 C.F.R. § 230.415. [FN45] The Prospectus stated:

FN45. 17 C.F.R. § 230.415, entitled " Delayed or continuous offering and sale of securities," provides in part:
(a) Securities may be registered for an offering to be made on a continuous or delayed basis in the future, Provided, That-
(vii) Securities which are to be issued in connection with business combination transactions;

*12 This Prospectus relates to 5,000,000 shares [ ] of common stock, par value $0.01 per share [ ], of McKesson Corporation [ ] which may be offered and issued from time to time in connection with one or more business combinations with the Company or its subsidiaries. The Shares may be issued from time to time in connection with (I) mergers, consolidations, recapitalizations or similar plans of acquisition;...
The Company anticipates that the specific terms of each such business combination in which Shares

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

will be issued will be the result of negotiations with the owners and controlling persons of the businesses, assets, securities or other interests involved in the business combination....

In a "shelf registration," the registrant can register a large number of securities and offer the securities to the public "on a continuous or delayed basis." [FN46] In a shelf registration, the registration statement is filed but the securities are put on the shelf until the manner and date of the offerings are determined. [FN47]

> FN46. *Finkel v. Stratton Corp.,* 962 F.2d 169, 174 (2d. Cir.1992); 17 C.F.R. § 230.415.

> FN47. Thomas L. Hazen, *The Law of Securities Regulation* § 3.8, at 79 (1985).

In the Merger Agreement, 7.2(e) provides that [t]he shares of McKesson Common Stock to be issued to the Shareholders in the Mergers shall be covered by a Registration Statement, which Registration Statement shall be effective under the Securities Act and applicable state blue sky Laws.

In addition, 6.2(b) states thatBuyer shall use its best efforts to cause the shares of McKesson Common Stock issuable pursuant to the Mergers to be covered by Buyer's Registration Statement on Form S-4 (as amended) dated June 24, 1998 or another effective registration statement under the Securities Act and applicable blue sky laws ... and to be approved for listing on the NYSE and the PE, subject to official notice of issuance, prior to the Closing.

What makes this issue difficult is that the factors utilized to determine whether the private offering exemption to public registration is appropriate are uniquely applicable to the facts of this case. Here, there is a very small group of sophisticated investors who have access guaranteed by their Merger Agreement of significant financial information, and the stock offering is for the limited purpose of acquiring the Plaintiffs' businesses. If

there was no registration of the stock, it appears the Defendant would be able to meet their burden of establishing a private transaction. However, neither party has been able to cite to the Court any authority where a stock offering was publicly registered, and then is subsequently determined by the Court to be a private offering. However, the lack of case law on this issue is not surprising because there is no logical reason once the registration has occurred, and the information publicly disclosed, to make such an argument unless one is attempting to avoid the liabilities imposed by Sections 11 and 12 once a transaction has become problematic. It was McKesson who made the decision to create a publicly registered shelf offering with the express purpose of acquiring other business ventures. Having made that decision, this Court will not allow them to legally reverse what at the time was a rational business decision simply because they now find themselves in a changed economic and legal position. The filing of the registration statement made this a public offering. As such, the Court finds that stock issued in the transaction between McKesson and McKesson HBOC and the Plaintiffs was a public offering and the claims under Sections 11 and 12 of the Securities Act remain viable.[FN48] Further, because of this ruling, the Court finds the arguments made by the Plaintiffs in their motion to strike exhibit A of McKesson HBOC's opening brief have become moot and that motion is thus denied.

> FN48. The Court finds support for its position from both the present and past Chancellors of the Delaware Chancery Court in decisions considering the required elements of a Section 11 claim. Chancellor Allen in the case of *Bernstein v. Vestron, Inc.,* No.1986 WL 3138, at *4 (Del. Ch. Mar. 11, 1986) found that a Section 11 claim required the Plaintiff to acquire a " registered security" and Chancellor Chandler addressing a similar issue in *Glaser v. Norris,* found that the Plaintiff must have purchased under Section 11 "a security issued pursuant to a registration statement."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*13** [18] Although the Court finds that the Sections 11 and 12 claims are viable, McKesson HBOC further asserts that the misstatements in the pro forma financial information contained in the Joint Proxy Statement/Prospectus and the Form 8-K were not actionable because they were non-material, forward-looking statements. Specifically, McKesson HBOC argues that the Joint Proxy Statement/Prospectus and the Form 8-K are immunized under SEC Rule 175, 17 C.F.R. § 230.175, the "safe harbor" rule. Rule 175 provides in part:

(a) A statement within the coverage of paragraph (b) of this section which is made by or on behalf of an issuer or by an outside reviewer retained by the issuer shall be deemed not to be a fraudulent statement (as defined in paragraph (d) of this section), unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.

(c) For the purposes of this rule, the term "forward-looking statement" shall mean and shall be limited to:

(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

(2) A statement of management's plans and objectives for future operations;

(3) A statement of future economic performance contained in management's discussion and analysis of financial condition and results of operations included pursuant to Item 303 of Regulation S-K (§ 229.303 of this chapter) or Item 5 of Form 20-F; or

(4) Disclosed statements of the assumptions underlying or relating to any of the statements described in paragraphs (c)(1), (2) or (3) of this section.

(d) For the purposes of this rule the term "fraudulent statement" shall mean a statement which is an untrue statement of a material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading, or which constitutes the employment of a manipulative, deceptive, or fraudulent device, contrivance,

scheme, transaction, act, practice, course of business, or an artifice to defraud, as those terms are used in the Securities Act of 1933 or the rules or regulations promulgated thereunder.[FN49]

FN49. 17 C.F.R. § 230.175.

The purpose of the safe harbor protection is to encourage the disclosure of projections.[FN50] Rule 175 minimizes the disincentives on corporate disclosure created by the securities fraud laws so that investors may have information directly from the companies themselves about how they believe their economic performance will be.[FN51]

FN50. *Katz v. Household Int'l, Inc.,* 897 F.Supp. 1106 (D.Ill.1995).

FN51. *Id.* at 1112.

However, as ruled earlier in this opinion, the Court does not find that the documentation filed by McKesson with regard to the proposed merger with HBOC were forward-looking statements. They related to financial statements for a period of time prior to the date of the filing and were not projections or statements of future economic performance. While SEC Rule 175 has a specific definition for forward-looking statements, the documentation filed by McKesson also fails to meet the terms of that definition. As such, the safe harbor protection found in this Rule is not applicable to the facts of this case.

**\*14** [19] Because the Court found that the Section 11 claim is viable against McKesson HBOC, the Court must now determine whether the Plaintiffs are entitled to summary judgment under Count III of the Complaint. The Plaintiffs argue that under Section 11(a) of the Securities Act, the issuer is liable when a Registration Statement contains a material misstatement or omission. Under Count III, the Plaintiffs assert, *inter alia,* that because McKesson HBOC admitted that reported financial results were materially false and omitted material facts necessary to make the statements not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

misleading, McKesson HBOC was strictly liable for its misstatements and omissions under Section 11 of the Securities Act. They further argue that McKesson's Registration Statement incorporated McKesson's false SEC filings, including Amendment No.1 to the Company's Form S-4 Registration Statement containing the Joint Proxy Statement/Prospectus for the HBOC transaction filed with the SEC November 27, 1998 and Form 8-K filed with the SEC January 14, 1999.

McKesson HBOC counters that summary judgment should be denied because the Plaintiffs cannot prove damages under Section 11(e) and that summary judgment is inappropriate at this juncture since, under Section 11(a), an alleged misstatement must be material, and materiality creates questions for the fact finder.

The elements of a Section 11 claim require the Plaintiffs to establish (1) that they acquired a registered security and (2) that any part of the registration statement relating to such security contained an untrue statement of a material fact or material omission.[FN52] While scienter is not required, the false statement or omission must be shown to have been or would have been material to a decision to purchase the security or not. The Court has previously ruled that the securities obtained by the Plaintiff were publicly filed and registered and thus it is clear that the initial requirement of a Section 11 claim has been established. It also cannot be reasonably disputed that the registration statement issued by McKesson/McKesson HBOC contained omissions which subsequently had to be corrected by the Defendant. Thus the resolution of this motion centers on whether there are undisputed facts to establish that the McKesson/McKesson HBOC statements were material to the Plaintiffs' decision to proceed with the merger and obtain the stock. There is a natural tendency to believe that the obvious answer to this question is "yes" because of the dramatic drop in the value of the stock once the discrepancies were disclosed. However, this tendency is flawed because it is based on the benefit of hindsight and knowledge of what effect the disclosure had on the value of the stock. The critical inquiry is not whether one would do the transaction now, but whether at the time of the merger the omitted information or false representations were material to the decision to acquire these securities and proceed with the merger. The Court believes the present record is insufficient to make such a finding. At a minimum, there remains a dispute between the parties as to the significance of this information to the merger decision that will need to be flushed out during discovery. While the Court acknowledges that under the appropriate circumstances the issue of materiality, as it relates to alleged misrepresentations or omissions from a registration statement, can become a question of law for the Court to decide, it is generally an issue of fact not suited for disposition by summary judgment. [FN53] As a result, the Plaintiffs' motion for partial summary judgment as to this Count is denied.

> FN52. *Glaser v. Norris,* No. 9538, 1989 WL 79875, at*3, (Del.Ch. July 13, 1989); *Bernstein v. Vestron, Inc.,* 1986 WL 3138, at *4 (Del.Ch. Mar.11, 1986).

> FN53. *Branson v. Exide Electronics Corporation,* 645 A.2d 568 (1994).

**\*15** The Court believes that the final argument made by the Defendant relating to damages has been mooted by the above decision denying the Plaintiffs' motion for partial summary judgment. However, the Court views the issue of damages to be separate and distinct from whether a prima facie case of a Section 11 violation has occurred. Once one establishes such a violation, the issue of whether the plaintiffs have suffered damages and are entitled to an award under Subsection (e) of Section 11 is an issue for the jury to decide with appropriate instructions from the Court as to the law in this area. The Court finds it is not an area appropriately considered in a summary judgment motion.

*III. Defendant Mark A. Pulido's Motion to Dismiss Defendant Charles W. McCall's Motion to Dismiss Defendant Richard H. Hawkins's Motion to Dismiss*

*A. Lack of Personal Jurisdiction*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 21

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

The Plaintiffs assert in Counts III, IV, and V, *inter alia*, that the individual Defendants Pulido, McCall, and Hawkins violated Sections 11, 12(a)(2), and 15 of the Securities Act. Defendants Pulido, McCall, and Hawkins individually have moved to dismiss these claims pursuant to Superior Court Civil Rule 12(b)(2) and 12(b)(6), in essence for lack of personal jurisdiction, and failure to state a claim upon which relief can be granted. Their motions vary based on their individual involvement and the Plaintiffs' personal jurisdiction theories, but Pulido, McCall, and Hawkins, all primarily assert that the Court lacks personal jurisdiction under 10 *Del. C.* § 3114, 10 *Del. C.* § 3104, 15 U.S.C. § 77v, and under the "Consent to Jurisdiction" provision of the Merger Agreement. Before proceeding to the arguments, it is important to generally set forth the positions held by the individual Defendants as they relate to this litigation.

Pulido, a California resident, was Chief Executive Officer, and Director of McKesson and McKesson HBOC. Pulido signed the Registration Statement pursuant to which Plaintiffs' McKesson HBOC shares were issued. In addition, Pulido signed Amendment No. 1 to the November 27, 1998 Form S-4 Registration Statement, which contained the Joint Proxy Statement/Prospectus, the October 17, 1998 merger agreement between McKesson and HBOC, and other SEC filings and related documents, which included documents pertaining to the McKesson HBOC merger.

McCall, a Florida resident, was Chief Executive Officer of HBOC prior to the McKesson HBOC merger, and on January 12, 1999, became Chairman of McKesson HBOC's Board of Directors. On June 21, 1999, McCall was dismissed from his position as Chairman of the Board, but continues to be a director of McKesson HBOC.[FN54] Hawkins, a California resident, was Executive Vice President and Chief Financial Officer of McKesson and McKesson HBOC.

FN54. McCall affidavit at 2.

On a motion to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2), the plaintiff

is obligated to establish a prima facie case, that personal jurisdiction is sound.[FN55] This Court will first consider whether the Plaintiffs have established sufficient service under the provisions of Title 10 of the Delaware Code, and then will address the remaining jurisdictional claims.

FN55. *In re USACafes,* 600 A.2d 43, 47 (Del.Ch.1991).

1. 10 *Del. C.* § 3114

**\*16** [20] Pulido, a California resident, and McCall, a Florida resident, [FN56] were both served pursuant to 10 *Del. C.* § 3114, and assert that this Court does not have personal jurisdiction over them, pursuant to this statute. Section 3114(a) provides in part:

FN56. Hawkins was served under 10 *Del. C.* § 3104.

Every nonresident of this State who ... accepts election or appointment as a director ... of a corporation organized under the laws of this State ... shall, by such acceptance or by such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation ... as an agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director ... is a necessary or proper party, or in any action or proceeding against such director ... for violation of a duty in such capacity, whether or not the person continues to serve as such director... at the time suit is commenced.[FN57]

FN57. 10 *Del. C.* § 3114(a).

The Plaintiffs contend that the individual Defendants availed themselves of the privilege of being directors of a Delaware Corporation, received the protection of Delaware law, and therefore, it is reasonable for them to expect to be held accountable in a Delaware court. This Court however, is bound by the holdings of prior

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 22

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

precedent, and in *Pestolite Inc. v. Cordura Corporation,* this Court thoroughly examined and discussed the legislative intent of 10 *Del. C.* § 3114. The *Pestolite* court noted that § 3114 was the legislative response to *Schaffer v. Heitner,*[FN58] and was designed to protect Delaware's "substantial interest in defining, regulating, and enforcing the fiduciary obligations, which directors of Delaware corporations owe to such corporations and the shareholder who elected them." [FN59] That court also held that § 3114 only authorizes jurisdiction in actions which are "inextricably bound up in Delaware law and where Delaware has a strong interest in providing a forum for redress of injuries inflicted upon or by a Delaware domiciliary." [FN60] Thus, Delaware does not have a significant and substantial interest in overseeing each and every claim brought against a director of a Delaware corporation.[FN61]

FN58. 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

FN59. *Pestolite Inc., v. Cordura Corp.,* 449 A.2d 263, 265 (Del.Super.1982).

FN60. *Id.*

FN61. *See id.*(holding that "[i]n the absence of such substantial interest or legitimate State purpose, the mere status as director of a Delaware corporation, standing alone, is not a significant basis for the individual Defendants to reasonably anticipate being haled into this Court."). *Pestolite* at 267.

It appears then, that 10 *Del. C.* § 3114 only applies to lawsuits brought against a nonresident director of a Delaware corporation for acts performed as a director, which involve fiduciary duty violations. [FN62] Section 3114 "does not confer personal jurisdiction over nonresident corporate directors simply on the basis of their status as directors of Delaware corporations." [FN63] Further, Delaware courts have consistently held that 10 *Del. C.* § 3114 does not confer personal jurisdiction over nonresident directors for alleged violations of the Securities Act.[FN64] The *In Re USACafes* court held

FN62. *Mt. Hawley Ins. Co. v. Jenny Craig, Inc.,* 668 A.2d 763, 768 (Del.Super.1995); *Steinberg v. Prudential-Bache Securities, Inc.,* Del. Ch., No. 8173, Jacobs, V.C. (Apr. 30, 1996)(Mem.Op.).

FN63. *Van de Walle v. Rothschild Holdings, Inc.,* No. 9894, 1994 WL 469150, at *6 (Del.Ch. Sept.30, 1997).

FN64. *See In Re USACafes,* 600 A.2d 43, 47 (Del.Ch.1991).

Because the Securities Act claims do not arise under Delaware law or otherwise substantially implicate action in or affecting this state, the relationship among those claims, Delaware, and the defendants is not strong enough to permit the exercise of jurisdiction here based solely on the directors' status as directors .[FN65]

FN65. *In re USACafes* 600 A.2d at 54.

*17 Based upon the above, this Court finds that § 3114 does not confer this Court with personal jurisdiction over Pulido or McCall. Here, the Plaintiffs have alleged that Pulido and McCall violated Sections 11 and 12 of the Securities Act, but have not asserted directly or by inference, that Pulido and McCall breached their fiduciary duties as directors. Therefore, Pulido and McCall have solely been sued based on their status as directors in a Delaware corporation, and similar to the situation in *In re USACafes,* the relationship here between the alleged Securities Act violations, the State of Delaware, and Pulido and McCall, is not strong enough to confer personal jurisdiction over them.

2. 10 *Del. C.* § 3104

[21] Next, the Plaintiffs assert that jurisdiction over the Defendant Hawkins is proper pursuant to Delaware's long arm statute, 10 *Del.C.* § 3104. Hawkins was the only individual Defendant served

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 23

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

under 10 *Del. C.* § 3104, specifically 10 *Del. C.* § 3104(c)(1), because of his business transactions, which allegedly occurred in Delaware. The Plaintiffs thus premise jurisdiction based on Hawkins' involvement in buying the Plaintiffs' companies.

10 *Del. C.* § 3104(c)(1) gives this Court personal jurisdiction over any nonresident who "transacts any business or performs any character of work or service in the State." [FN66] "In order for a court to exercise jurisdiction under subsection[ ] (c)(1) ... some act must actually occur in Delaware." [FN67] [FN68]

FN66. 10 *Del. C.* § 3104(c)(1).

FN67. *Tristrata Technology, Inc. v. Neoteric Cosmetics, Inc.* 961 F.Supp. 686, 690 (D.Del.1997)(holding that absent actual conduct in Delaware, an employee's position as president, stockholder and researcher for a corporation is insufficient to establish jurisdiction.). The parties have not however, asserted this doctrine in their motions and briefs to this Court.

FN68. *See id.*

As previously indicated, Hawkins, a California resident, was Executive Vice President and Chief Financial Officer of McKesson and McKesson HBOC. The Complaint alleges that through his attorney-in-fact, Hawkins signed (1) the Registration Statement pursuant to which the Plaintiffs' McKesson HBOC shares were issued, (2) the October 17, 1998 merger agreement between McKesson and HBOC, (3) McKesson HBOC's Form 10-Q filed with the SEC on February 13, 1999, and (4) other SEC filings and related documents, including those pertaining to the McKesson and HBOC merger. Hawkins contends that he had no contacts with Delaware, and never conducted business in Delaware. While he was an officer of McKesson and McKesson HBOC when the company changed its name on January 12, 1999, he asserts that the Registration Statement's signing in California, which was filed with the SEC in

Washington, does not equate to "transacting business" under 10 *Del. C.* § 3104.

After a thorough review of the facts and pertinent law, this Court finds that the Plaintiffs did not present sufficient facts to establish that this Court has personal jurisdiction of Hawkins. The signing of the Registration Statement in California on behalf of a Delaware corporation does not meet the contacts necessary to establish personal jurisdiction under 10 *Del. C.* § 3104(c)(1). Absent actual conduct in Delaware, Hawkins' positions at McKesson, or McKesson HBOC, are insufficient to establish jurisdiction.[FN69] Because Hawkins did not have any contacts in Delaware, this Court will not establish personal jurisdiction on the mere fact that he was employed by a Delaware corporation. [FN70] In conclusion, the Court finds that the Plaintiffs have failed to establish sufficient facts to subject Hawkins to the personal jurisdiction of this Court pursuant to 10 *Del. C.* § 3104(c)(1).[FN71]

FN69. *See Tristrata Tech.*961 F.Supp. at 690.

FN70. It would also seem that the fiduciary shield doctrine would prevent personal jurisdiction over Hawkins. This doctrine is judicially created, and immunizes acts performed by an individual in the individual's capacity as a corporate employee from serving as the foundation for the exercise of personal jurisdiction over that individual. Since this issue was not raised by the parties, and is mooted by this Court's decision, it will not be addressed in detail.

FN71. Because the Court concluded that the individual Defendants were not subject to jurisdiction under 10 *Del. C.* § 3114 and 10 *Del. C.* § 3104(c)(1), the Court will not undertake the due process inquiry of whether the individual Defendants had sufficient minimum contacts with Delaware to satisfy the "traditional notions of fair play and substantial justice." *See Tristrata Tech.,* 961 F.Supp. at 691 (*citing*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 24

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

*International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ).

### 3. Nationwide Service of Process

**\*18** Next, the Plaintiffs alternatively argue that personal jurisdiction was established over Pulido, McCall, and Hawkins pursuant to the nationwide service of process provision of the Securities Act, 15 U.S.C. § 77v(a), which provides:
The district courts of the United States and United States courts of any Territory, shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, and, concurrent with State and Territorial courts, except as provided in section 77p of this title with respect to covered class actions, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter. Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found... Except as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States. No costs shall be assessed for or against the Commission in any proceeding under this subchapter brought by or against it in the Supreme Court or such other courts. FN72

FN72. 15 U.S.C. § 77v(a).

The Plaintiffs argue that the Securities Act grants concurrent jurisdiction to state and federal courts, and permits state courts to use nationwide service of process. The Plaintiffs also assert that the Securities Act provisions permit this Court to employ the national contacts test in determining personal jurisdiction.

The Securities Act of 1933 confers subject matter jurisdiction over federal claims to state courts and allows them to hear what has traditionally been matters considered by the federal courts. The Plaintiffs raise the issue of whether two provisions of this statute, one which confers concurrent jurisdiction, and one that provides for nationwide service of process, should be read jointly or separately. If they are read as separate, independent provisions, then the statute confers nationwide service of process only upon federal courts, but would allow the subject matter jurisdiction of the federal claim to remain in state court if the prerequisites of that state's long-arm statutes have been met. FN73

FN73. *See* David Carlebach, Note, *Nationwide Service of Process in State Courts,* 13 Cardozo L.Rev. 223 (1991).

It appears that only two courts have reviewed this issue and have conflicting views on whether the explicit grant of concurrent jurisdiction in 15 U.S.C. § 77v extends to the nationwide service provision as well. In *Lakewood Bank & Trust Company v. Superior Court,* FN74 a California court stated in dicta that the nationwide service of process was available to the state court when enforcing the Securities Act. FN75 Contrary to that holding, a New York court in *Negin v. Cico Oil & Gas Company,* FN76 held that the Securities Act nationwide service provision did not apply to state courts.

FN74. 129 Cal.App.3d 463, 180 Cal.Rptr. 914 (1982).

FN75. *Id.* at 470, 180 Cal.Rptr. 914.

FN76. 46 Misc.2d 367, 259 N.Y.S.2d 434 (1965).

**\*19** [22] Unfortunately neither of these decisions are particularly helpful in analyzing this issue since it was not addressed in detail in those opinions. However, the Court is fortunate that the parties have done an excellent job in addressing this issue in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

their briefs. Having carefully considered those arguments, the Court finds that nationwide service of process is not available to a plaintiff if they choose to pursue their securities act litigation in a state proceeding. First, the Court does recognize that there was no attempt in this litigation to pursue service under this statute when the Complaint was filed with the Court. It is only when questions concerning service and personal jurisdiction under Title 10 of the Delaware Code were raised by the Defendant that the issue of nationwide service has been pursued. However, the Court does not find this circumstance to be fatal to the plaintiff if nationwide service is appropriate and the plaintiffs have complied with the applicable statutes.

Second, the Court finds that the language of the statute reflecting service is clearly written in a federal context. The words "district", not state, are used and clearly these references are to the federal judicial districts into which the federal court system is divided. If Congress had intended to preempt the requirements of service under state law, they could have easily done so in a clear and precise manner. They did not, and the Court must conclude that the drafters of the statute recognized the unique meaning of the word district and the limitations they were placing on the statute.

Third, the Securities Act statute under which nationwide service was enacted was done so in 1933 at a time the *Pennoyer v. Neff* [FN77] decision on territorial sovereignty was still law, and before the Supreme Court had decided *International Shoe Company v. Washington.* [FN78] The Court agrees with the Defendants that given the jurisprudence setting in 1933 it would have been unthinkable for Congress to have passed legislation which would have radically interfered and trounced upon the independence of state rights without explicitly doing so.

FN77. 95 U.S. 714, 24 L.Ed. 565 (1877).

FN78. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Fourth, the Plaintiffs have been unable to cite any

federal court decision nor state court decision other than *Lakewood Bank & Trust Company* that have ruled that the nationwide service provision of the Securities Act applies in a state court action. To the contrary, similar violations involving the Securities Act have been litigated in Delaware and the Chancery Court has resolved issues of personal jurisdiction by analyzing the requirements of Title 10 of the Delaware Code. If nationwide service was applicable to a state court proceeding, such an analysis would have been unnecessary by that Court.

Finally, the Court finds that separately considering these two provisions of the Securities Act does not cause the statute to become inconsistent or irreconcilably in conflict. It would have been appropriate for Congress to increase the number of forums available to individuals to redress conduct actionable under the Securities Act by allowing those actions to be filed in a local court where inconvenience and costs could be minimized. It does not, however, logically flow that with such action, Congress intended to impose upon those courts a service process foreign to it and inapplicable and unavailable to other litigants in that Court. If that was their intent, the Court believes it would have been incumbent upon them to explicitly indicate so in the statute. Since such clear and unequivocal language requiring states to enforce nationwide service inconsistent with the service of process provisions of that state's statutory laws are not present in the statute, the Court declines to create one.

*20 The Plaintiffs have chosen the state court forum to litigate this matter, and as such they will be required to comply with the State of Delaware service provisions regarding personal jurisdiction. As such, the Plaintiffs cannot rely upon the nationwide service provisions of the Securities Act to obtain jurisdiction over the individual Defendants.

4. *The Merger Agreements "Consent to Jurisdiction " Provision*

[23] Lastly, the Plaintiffs assert that Pulido and McCall are bound by the Merger Agreement's terms to the same extent as McKesson, despite the fact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 26

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

Pulido and McCall were not parties to the Merger Agreement. The Plaintiffs rely upon the Merger Agreement's Paragraph 9.12, which provides:

*Consent to Jurisdiction.* EACH OF THE PARTIES HERETO (I) CONSENTS TO SUBMIT TO THE PERSONAL JURISDICTION OF ANY FEDERAL COURT LOCATED IN THE STATE OF DELAWARE OR ANY DELAWARE STATE COURT IN THE EVENT ANY DISPUTE ARISES OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, (II) AGREES THAT SUCH PARTY SHALL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (III) AGREES THAT SUCH PARTY SHALL NOT BRING ANY ACTION RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT IN ANY COURT OTHER THAN A FEDERAL COURT LOCATED IN THE STATE OF DELAWARE OR A DELAWARE STATE COURT. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY TO ENFORCE ANY DECREE OF A FEDERAL COURT LOCATED IN THE STATE OF DELAWARE OR A DELAWARE STATE COURT IN ANY OTHER COURT OF COMPETENT JURISDICTION.

Pulido, McCall, and Hawkins assert that because they were not parties to the Merger Agreement, they are not bound by its terms. Indeed, none of the individual Defendants signed this Merger Agreement, as it was signed by McKesson's Vice President, William J. Dawson. In Delaware, as in other jurisdictions, it is well settled law that "a party may consent to the personal jurisdiction of a court." [FN79] Unlike subject matter jurisdiction, "personal jurisdiction is based on individual liberty interests protected by the due process clause," and it therefore "can be waived by a party's express or implied consent to jurisdiction." [FN80]

FN79. *Resource Ventures, Inc. v. Resources Management Int'l, Inc.,* 42 F.Supp.2d 423, 431 (D.Del.1999)(citing *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Chrysler Capital Corp. V. Wodhling,* 663 F.Supp. 478, 481 (D.Del.1987)).

FN80. *Resource Ventures, Inc.* 42 F.Supp. at 431.

Here, the parties to the Merger Agreement consented to submit to the personal jurisdiction of any Delaware State Court in the event that a dispute arose from the Merger Agreement. The parties to the Merger Agreement consisted of KWS & P, Inc., KWS & P/SFA, Inc., Judy Kelly, Harriette Owens Waldron, Michael Putnick, Scott Symons, Brian Dillon, McKesson, MKW, Inc., and MSF, Inc. Notably, Pulido and McCall were not included in the above mentioned parties, and were not signatories of the Merger Agreement. Because Pulido, McCall, and Hawkins were not parties to the Merger Agreement, and were not signatories of the Merger Agreement, there is no basis to conclude that they have consented to personal jurisdiction by the Delaware court.

**\*21** For the reasons set forth in this section of the opinion, the motions to dismiss filed by Pulido, McCall, and Hawkins are granted due to a lack of personal jurisdiction.[FN81]

FN81. The individual Defendant's remaining assertions in their Motions to Dismiss will not be addressed, as a result of the Court's finding that it lacks personal jurisdiction over them.

CONCLUSION

For the reasons set forth in this opinion, the Plaintiffs' motion for partial summary judgment is denied; Defendant McKesson HBOC's motion to dismiss is denied, Plaintiffs' motion to strike exhibit A of Defendant McKesson HBOC's opening brief is denied, Defendants Mark A. Pulido, Charles W. McCall, and Richard H. Hawkins motions to dismiss are granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 27

Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


Del.Super.,2002.
Kelly v. McKesson HBOC, Inc.
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **TAB 4**

## Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

**H**

Moore Business Forms, Inc. v. Cordant Holdings Corp.Del.Ch.,1995.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
MOORE BUSINESS FORMS, INC., a Delaware Corporation Plaintiff,
v.
CORDANT HOLDINGS CORPORATION, a Delaware corporation, Peter. P. Kusek, C. Kenneth Michlovitz, Kenneth A. Casazza, Gilbert F. Decker, Robert M. Jeffers, and Cordant, Inc., a Maryland Corporation, Defendants.
**Civ. A. No. 13911.**

Submitted: May 19, 1995.
Decided: Nov. 2, 1995.

Richard D. Allen and Kurt M. Heyman of Morris, Nichols, Arsht & Tunnel, Wilmington; and Stephen S. Rosenthal and Jeffery A. Tomasevich of Morrison & Foerster, Washington, DC; for Plaintiff. Henry N. Herndon, Jr. and Joseph C. Schoell of Morris, James, Hitchens & Williams, Wilmington; and Joseph M. Hassett, John C. Keeney, Jr. and David G. Leitch of Hogan & Hartson L.L.P., Washington, DC; and Stephannie Wood, Corporate Counsel, Cordant, Inc., for Defendants.

### *MEMORANDUM OPINION*
JACOBS, Vice Chancellor.
**\*1** Pending are two motions in this action brought by a preferred stockholder against the corporate issuer, its directors, and the issuer's wholly owned subsidiary. The first motion is to dismiss this action under Rule 12(b)(6) for failure to state a claim or, alternatively, for summary judgment. The movants are the corporate defendants, Cordant Holdings Corporation ("Holdings"), and its wholly owned subsidiary, Cordant, Inc. (Cordant"). [FN1] The second motion is by the plaintiff, Moore Business Forms, Inc. ("Moore"), for judgment on the

pleadings. This is the Opinion of the Court on these motions.

> FN1. The individual directors of Holdings -- Messrs. Peter P. Kusek, C. Kenneth Michlovitz, Kenneth A. Casazza, Gilbert F. Decker and Robert M. Jeffers -- have joined in the corporate defendants' motion, and also have moved to dismiss for lack of personal jurisdiction.

### I. *THE FACTS*[FN2]

> FN2. The facts are drawn from the complaint. For purposes of a Rule 12(b)(6) motion, the well pleaded facts and reasonable inferences derived from the complaint are accepted by the Court as true. *Good v. Getty Oil Co.,* Del. Ch., 518 A.2d 973, 975 (1986); *Delaware State Troopers Lodge v. O'Rourke,* Del. Ch., 403 A.2d 1109, 1110 (1979). Documents incorporated by reference into the complaint may also be considered on a motion to dismiss. *Lewis v. Straetz,* Del. Ch., C.A. No. 7859, Hartnett, V.C. (Feb. 12, 1986), Slip Op. at 6-10.

The dispute arises out of the defendants' effort to terminate a business relationship that Holdings, Cordant and Moore formed in early 1990. That relationship involved Moore's participation in the financing of an employee buy-out of Cordant by Holdings. In that transaction, Moore acquired for $11 million all of the outstanding shares of the Series B Noncumulative Convertible Redeemable Preferred Stock (the "Preferred Stock") of Holdings. (Complaint at ¶¶ 12-16). As part of the transaction, Cordant, Holdings and Moore entered into a business development arrangement, called the "Strategic Alliance," the terms of which were embodied in a March 23, 1990 Purchase

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 2

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

Agreement among Cordant, Holdings and Moore (the "Purchase Agreement"). (Complaint at ¶ 14).

Moore is a manufacturer and supplier of business forms and related systems. Cordant is a provider of computer and communication systems integration services. The Strategic Alliance contemplated that Moore and Cordant would work together to identify and develop business opportunities and afford each other a first right of refusal with respect to certain client requirements. (Complaint at ¶ 18). The Strategic Alliance would last a minimum of four and a quarter years, *i.e.,* until June 30, 1994. (Complaint at ¶ 19). After that, the parties would be entitled to terminate the Strategic Alliance in accordance with the terms of the Purchase Agreement. (Complaint at ¶¶ 20-21).

Under the Purchase Agreement, the Preferred Stock becomes convertible into Holdings common stock in specified circumstances. The Preferred Stock also becomes callable by Holdings at fair market value if Holdings or Cordant decide to terminate the Strategic Alliance. (Complaint at ¶¶ 16, 20). All Preferred Stock that is not either converted or repurchased by December 31, 2004 must be redeemed at par value. (Complaint at 16). As the holder of all of the outstanding Preferred Stock, Moore was entitled to designate a director to serve on the boards of directors of both Holdings and Cordant. Moore appointed Mr. Ronald D. Rogers ("Rogers") as its representative on those boards. (Complaint at 17).

Under Section VII.F. of the Purchase Agreement, if Holdings or Cordant decide to terminate the Strategic Alliance, Holdings must repurchase all of the outstanding Preferred Stock. Holdings and Cordant are entitled to terminate the Strategic Alliance on 60 days notice to Moore. In that event, Section VII.F. requires that:
**\*2** ... promptly upon giving of such notice ... [Holdings] shall repurchase all of the [Preferred Stock] ... owned by Moore ... for cash at a price equal to ... the per share value set forth in a fair market value appraisal of the common stock of [Holdings], made as of the end of [Holding's] most recent fiscal quarter, by an accounting firm selected from among those firms formerly known as "the big

eight" or their successors by a majority of the directors of [[[Holdings] other than directors who are executives of [Holdings] or affiliated with Moore, provided that the accounting firm selected will not be one which has audited the financial statements of either Moore or [Holdings] for the most recent three (3) years then ended, ... Moore hereby irrevocably agrres [sic] to the repurchase by [Holdings] provided for by this Section F., subject only to the conditions set forth in this Section F.

Purchase Agreement, Section VII.F.

If, on the other hand, Moore elects to terminate the Strategic Alliance, then Holdings loses its right to repurchase the Preferred Stock and Moore retains its Preferred Stock investment. Section IX.E. of the Purchase Agreement permits Moore to terminate the Strategic Alliance upon 60 days notice, and "[u]pon such termination, ... [the provisions of the Purchase Agreement entitling Holdings to repurchase the Preferred Stock] shall also terminate and be of no further force or effect."

This action arises out of Holdings' election to terminate the Strategic Alliance and repurchase Moore's Preferred Stock. That dispute was triggered by the events now described.

On February 23, 1994, Holdings' board of directors met to decide upon certain stock options and bonus stock to be awarded to key employees. (Complaint at ¶ 26). In that connection, the board considered a valuation of Holdings as at December 31, 1993 that KPMG Peat Marwick ("KPMG") had previously prepared. (*Id.*). KPMG had valued the Preferred Stock at between $4.27 million and $4.72 million, assuming that the Preferred Stock was not converted to Holdings common stock; and at between $4.36 million and $4.84 million, assuming that there was conversion (Complaint at ¶ 25).

That same day, Messrs. Jeffers and Decker (two directors of Holdings who were neither executives of Cordant nor affiliated with Moore) decided to engage KPMG to conduct a fair market value appraisal of Holdings as at March 31, 1994. (Complaint ¶ 31). The complaint alleges that Jeffers and Decker advised Kusek, in a March 8,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

1994 memorandum, that they had selected KPMG " for purposes of purchasing the [Holdings] preferred and/or common stock owned by Moore." [FN3] (Complaint at ¶¶ 31-32). Soon thereafter, Holdings and Cordant entered into negotiations to obtain a commitment from Chase Manhattan Bank of Maryland to finance a potential repurchase of the Preferred Stock by Holdings. (Complaint at ¶ 33).

> FN3. The complaint quotes only that specific excerpt from the March 8, 1994 memorandum, thereby implying that Holdings had already formed an intention to purchase the Preferred Stock. However, the implication is misleading because the quoted excerpt is incomplete. The complete quote is that Decker and Jeffers selected KPMG "for purposes of purchasing the [ [ [Holdings] preferred and/or common stock owned by Moore ... *in the event that Cordant at any time in the future* terminates [the Strategic Alliance]." (March 8, 1994 Memorandum from Jeffers and Decker to Kusek, incorporated by reference in ¶ 31 of the Complaint; emphasis added). Under Section VII.F. of the Purchase Agreement, a valuation of Holdings as of March 31, 1994 could not be used to repurchase the Preferred Stock, because (i) Holdings and Cordant may not terminate the Strategic Alliance until after the quarter ending June 30, 1994 and (ii) the repurchase of the Preferred Stock must be at a value determined by a fair market appraisal of Holdings "made as of the end of [Holdings'] most recent fiscal quarter." Thus, the earliest possible valuation date for purposes of repurchasing the Preferred Stock was June 30, 1994.

**\*3** The defendants did not disclose these actions to Moore. (Complaint ¶¶ 31, 32, 35). Specifically, they did not reveal to Rogers (Moore's representative on the Holdings and Cordant boards) that they had engaged KPMG to value Holdings or that they had taken steps to obtain bank financing for the Preferred Stock repurchase. Nor did they furnish Rogers the March 31, 1994 valuation after it

was received from KPMG. (*Id.*). The plaintiff alleges that in a May 9, 1994 meeting among representatives of Holdings and Moore's corporate parent, Mr. Kusek (Holdings' Board Chairman and Chief Executive Officer) remained silent about those actions, and affirmatively misrepresented that the defendants wanted to make the Strategic Alliance work and had no plans to terminate it. (Complaint at ¶¶ 36-39).

The Holdings board met on May 17, 1994. At that meeting, the directors (a) reviewed the KPMG valuation as of March 31, 1994, (b) voted to authorize Holdings' officers to terminate the Strategic Alliance after June 30, 1994, and (c) voted to obtain a valuation of Holdings as at June 30, 1994 for purposes of repurchasing the Preferred Stock in accordance with Section VII.F. of the Purchase Agreement.[FN4] (Complaint at ¶ 50). The board determined that Holdings and Cordant would not disclose their intention to terminate the Strategic Alliance until after certain current contract negotiations with Moore had been completed and approval from the United States Air Force regarding a substantial contract had been obtained. (Complaint at ¶¶ 48-49).

> FN4. Rogers was excluded from the discussions on this subject.

After the May 17, 1994 board meeting, the defendants continued to conceal their decision and the steps they had taken to terminate the Strategic Alliance. Two months later, in a telephone conversation, Mr. Reto Braun, the President of Moore's corporate parent, and Mr. Kusek discussed the Strategic Alliance and ways to improve relations among Holdings, Cordant and Moore. (Complaint at ¶ 51). They also exchanged letters on that subject on July 19 and August 2, 1994. (Complaint at ¶¶ 53-54). Although Mr. Kusek knew of KPMG's ongoing valuation of Holdings, he did not disclose the actions Holdings and Cordant had taken to value Holdings or to terminate the Strategic Alliance. (Complaint at ¶¶ 52, 54, 56). However, in his August 2, 1994 letter, Kusek did tell Braun of his perception of a "worsening business relationship. " He also communicated his belief that Cordant and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

Moore "should separate that business relationship from [their] equity relationship [and that] an appropriate business relationship can be implemented without an equity relationship but an equity position by a strategic investor should only exist in support of a solid, mutually-beneficial, business relationship." (August 2, 1994, Kusek letter at 3, incorporated by reference in ¶ 54 of the Complaint).

On August 11, 1994, KPMG submitted its valuation of Holdings as at June 30, 1994. (Complaint at ¶ 55). KPMG had valued the Preferred Stock at $4.62 million assuming no conversion into Holdings common stock, and at $4.48 million assuming conversion. (Complaint at ¶¶ 57, 61-62). On August 30, 1994, Cordant and Holdings formally notified Moore of their decision to terminate the Strategic Alliance, and disclosed KPMG's prior retention of Holdings common stock and its $4.48 million valuation of the Preferred Stock as at June 30, 1994. (Complaint at ¶ 61). Cordant and Holdings advised Moore that Holdings was prepared to repurchase the Preferred Stock for $4.48 million. (*Id.*).

**\*4** One week later, on September 8, 1994, Mr. Kusek wrote a letter to Moore on Cordant stationery, enclosing a Cordant check for $4.48 million. (Complaint at ¶ 68). On September 20, 1994, Moore returned the check to Mr. Kusek, taking the position that the Preferred Stock had been undervalued in a flawed process that violated the requirements of the Purchase Agreement. (*Id.*). Moore also contended that the manner in which Cordant had attempted to repurchase the Preferred Stock violated both the Purchase Agreement and the rights of Moore's designee to the Holdings board of directors. (*Id.*).

On December 5, 1994, Moore, contending that Cordant and Holdings had never validly terminated the Strategic Alliance, advised the defendants that it (Moore) had decided to terminate the Strategic Alliance pursuant to Section IX.E of the Purchase Agreement. (Complaint at ¶ 70). Moore takes the position that its termination of the Strategic Alliance extinguished Holdings' repurchase option and that as a consequence, Moore continues to own

the Preferred Stock.

## II. *CONTENTIONS OF THE PARTIES*

Moore argues that the defendants (a) improperly concealed their intention to terminate the Strategic Alliance, (b) improperly selected KPMG to value the Preferred Stock, (c) unfairly excluded Moore from participating in the valuation process; and (d) as a result, improperly selected a flawed valuation methodology that grossly undervalued the Preferred Stock.

That conduct is claimed, in Count I, to constitute a breach by the individual defendants of their duties of loyalty, good faith and fair dealing owed to Moore. Moore further claims that Cordant aided and abetted the individual defendants in that breach of fiduciary duty; and alleges in Count IV that the defendants' conduct amounted to constructive fraud.

In Count II, Moore claims that Holdings' and Cordant's conduct also constituted a breach of their contract with Moore. Specifically, Moore alleges Holdings and Cordant breached the express provision of Section VII.F. of the Purchase Agreement that required a "fair market value appraisal" of Holdings to determine the Preferred Stock repurchase price. Moore also contends that the manner in which Holdings and Cordant conducted the valuation process constituted a breach of their implied covenant of good faith and fair dealing.

Finally Moore claims, in Count III, that the defendants' concealment of and affirmative misrepresentation regarding their intention to terminate the Strategic Alliance, estops them from proceeding to terminate the Strategic Alliance and repurchase the Preferred Stock.

Moore claims that as a result of the alleged wrongdoing it suffered three harms. First, Moore asserts that because it was misled into believing that Holdings and Cordant did not intend to terminate the Strategic Alliance, it (Moore) continued to treat Holdings and Cordant preferentially in business dealings. Next, Moore claims that the defendants'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

concealment of their plans to terminate the Strategic Alliance excluded Moore from participating in the Preferred Stock valuation process. Third, Moore contends that the defendants' conduct caused it to refrain from exercising its own termination rights, which, if done, would have extinguished Holdings' option to repurchase Moore's Preferred Stock.

**\*5** The defendants contend that Moore has failed to state an actionable claim, because (a) the duties owed by the defendants to Moore were contractual, not fiduciary, (b) the complaint does not state an actionable breach of any duty expressed in the Purchase Agreement or arising from the implied covenant of good faith and fair dealing, (c) no equitable estoppel claim is pleaded because the complaint fails (i) to identify any duty of disclosure owed by defendants, other than the 60 day notice period required by the Purchase Agreement; and (ii) fails adequately to plead that the defendants made affirmative misrepresentations upon which Moore justifiably relied.

3

I conclude, for the reasons next discussed, that the defendants' Rule 12(b)(6) motion to dismiss should be granted, except insofar as Count II claims that Holdings breached its contract by failing to tender payment for the Preferred Stock promptly after giving notice of the termination of the Strategic Alliance. The plaintiff's motion for judgment on the pleadings on that claim will be denied, because the defendants' averment that Holdings promptly tendered payment through its agent, Cordant, raises a litigable issue of fact.

Finally, because the plaintiff has not yet had an opportunity to conduct discovery, Chancery Rule 56(f) precludes granting the defendants' motion for summary judgment. Therefore, this Opinion addresses solely the defendants' Rule 12(b)(6) motion (including the defendants' challenges to *in personam* jurisdiction) and the plaintiff's motion for judgment on the pleadings.

### III. *THE DEFENDANTS' MOTION TO DISMISS*

A Rule 12(b)(6) motion to dismiss will not be granted except where, based on the allegations of the complaint and the documents incorporated therein by reference, "it appears with reasonable certainty that, under any set of facts which could be proven to support the claim, plaintiffs would not be entitled to relief." *In re Tri-Star Pictures, Inc. Litigation,* Del. Supr., 634 A.2d 319, 326 (1993). Reasonable inferences or conclusions of law in the complaint will be accepted if they are supported by specific allegations of fact. *Id.* Each Count of the complaint is evaluated in light of this standard.

### A. *The Fiduciary Duty Claim*

Count I claims a breach of fiduciary duties owed by a corporation's directors to a class of preferred stockholders. The rights of preferred stockholders are, in certain respects, both equitable and contractual. The relationship between a corporation and its preferred stockholders is "primarily ... contractual in nature," involving "rights and obligations created contractually by the certificate of designation." *HB Korenvaes Investments, L.P. v. Marriott Corp.,* Del. Ch., C.A. No. 12922, Allen, C. (June 9, 1993), Mem. Op. at 9. However, in limited circumstances fiduciary duties may be owed to preferred stockholders as well. A corporation's directors "are fiduciaries for the [p] referred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to [the corporation's] other shareholders and to [the corporation] itself." *Eisenberg v. Chicago Milwaukee Corp.,* Del. Ch., 537 A.2d 1051, 1062 (1987).

**\*6** Whether or not a given claim asserted by preferred stockholders is governed by contract or fiduciary principles depends on whether the dispute arises from rights and obligations created by contract or from "a right or obligation that is not by virtue of a preference but is shared equally with the common." *Jedwab v. MGM Grand Hotels, Inc.,* Del. Ch., 509 A.2d 584, 594 (1986). Determinations of this kind are highly fact-specific and contextual and do not easily lend themselves to a "bright line" rule. *See, HB Korenvaes Investments, L.P., supra,* at 9-11. What can be said,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 6

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

however, is that disputes that relate to obligations " expressly treated and rights [that are] created" by contract will be governed by contract principles. *Id.* at 13.

Moore claims that the individual defendants' conduct constituted a breach of their fiduciary duties of loyalty, good faith and fair dealing, but Moore provides no support for that assertion. Indeed, in advancing this position, Moore attempts to downplay its status as a preferred stockholder and to portray itself as a common shareholder, by referring to itself throughout Count I as a "minority shareholder." That characterization is inaccurate. Although the Holdings Preferred Stock is convertible into common shares in specified circumstances, nowhere is it alleged that that stock has been converted. Moore's rights flow from its status as a Preferred, not a common, stockholder.

The plaintiff's fiduciary duty argument boils down to an assertion that the claimed rights that are the subject of Count I -- specifically, Moore's right to a fair market valuation of the corporation and to a proper determination of the Preferred Stock repurchase price -- are common to all shareholders. But that is not so: the duties sought to be enforced have a clearly contractual source. This dispute among these parties relates to an event specifically anticipated and expressly provided for in their contract. The Purchase Agreement created, and Holdings issued, a class of stock having unique attributes designed to facilitate a smooth severance of Holdings' relationship with Moore if Holdings became dissatisfied with the Strategic Alliance. In that context the parties contractually created specific procedural guidelines for the valuation and repurchase of the Preferred Stock. What Moore challenges here is the manner in which those procedures were implemented.

The rights Moore seeks to have vindicated are contractual, not fiduciary, in nature. For that reason, Moore's claim for breach of fiduciary duty, as alleged, is legally deficient. Because no cognizable breach of fiduciary duty is stated, Moore's claim in Count I that Cordant aided and abetted the individual defendants' breach of fiduciary duties must be dismissed as well.

### B. *The Constructive Fraud Claim*

Count IV is a claim for constructive fraud. At oral argument Moore's counsel conceded that that claim is essentially a breach of fiduciary duty claim in a different form, that is substantively indistinguishable from the claims alleged in Count I. (Oral Argument, TR., 5/19/95 at 101). Because Count I is dismissible, so, too, is Count IV.

### C. *The Contract Claims*

*7 At the heart of Moore's case are its contract claims. To survive a motion to dismiss, a complaint stating a claim for breach of contract must identify a contractual obligation, whether express or implied, a breach of that obligation by the defendant, and resulting damage to the plaintiff. Ch. Ct. R. 12(b)(6); *See, Goodrich v. E.F. Hutton Group, Inc.,* Del. Ch., 542 A.2d 1200, 1203-4 (1988); Wright & Miller, *Federal Practice and Procedure:* Civil 2d § 1235. Moore alleges, in Count II, that Holdings and Cordant breached an express provision of the Purchase Agreement as well as an implied covenant of good faith and fair dealing. Those claims are now addressed.

### 1. *Express Contract Claim*

Moore claims that Holdings and Cordant breached, in two distinct ways, Section VII.F. of the Purchase Agreement, which requires a "fair market value" appraisal of the Preferred Stock. First, Moore challenges the valuation process, claiming that KPMG conducted an inadequate inquiry and investigation. Second, Moore challenges the result of that process, claiming that KPMG's valuation did not yield a "fair market value" as the Purchase Agreement required. I conclude that the complaint fails to state an actionable breach of contract claim.

To ensure an adequate valuation inquiry and investigation, the process created by the Purchase Agreement relies upon the independence and professional competence of a "big eight" accounting firm. Section VII.F. requires Holdings to repurchase the Preferred Stock "at a price equal to ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 7

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

the per share value set forth in a fair market value appraisal of the common stock of [Holdings]." It also requires that the appraisal be "[1] made as of the end of [Holdings'] most recent fiscal quarter, [2] by an accounting firm selected from among those firms formerly known as 'the big eight' or their successor by [3] a majority of the directors of [Holdings] other than directors who are executives of [[[Holdings] or affiliated with Moore. The foregoing is made subject to the proviso that " ... the accounting firm selected will not be one which has audited the financial statements of either Moore or [Holdings] for the most recent three (3) years then ended .... "

Moore does not allege that Holdings or Cordant failed to comply with any of those express provisions. Nor does it cite any other provision of the Agreement that creates a contractual duty to conduct the valuation inquiry in a particular manner. For these reasons Moore's claim of inadequate inquiry and investigation is legally insufficient.

In the alternative, Moore argues that even if Holdings and Cordant fully complied with the foregoing procedural requirements, the averment that the valuation process did not yield "fair market value" suffices to state a claim for breach of the Purchase Agreement. However, Moore alleges no facts that support this claim. All the Purchase Agreement requires is that the repurchase price be equal to the "...value set forth in a fair market value appraisal ... made ... by an accounting firm selected from among those firms formerly known as 'the big eight'..." That is, the parties, mindful that the "fair market value" of a closely held company is a matter over which reasonable minds might disagree, contractually agreed that the "fair market value" repurchase price would be what the selected "big eight" accounting firm determines it to be. The complaint does not allege that the fair market valuation of Holdings was performed by someone other than a "big eight" accounting firm.

**\*8** In support of its position, Moore argues that the term "fair market value" in the Purchase Agreement was intended to incorporate the "fair value" standard employed in Delaware's appraisal statute, 8

*Del. C.* § 262(a). According to Moore, § 262(a) requires a determination of a corporation's intrinsic or fair value as a going concern. Moore asserts that KPMG's valuation of the Preferred Stock violated Section VII.F. of the Purchase Agreement (as thus interpreted), because the valuation improperly included a discount to reflect the fact that the Preferred Stock is illiquid and does not represent a controlling interest.

The premise of that argument is wrong. Nothing in the Purchase Agreement supports a conclusion that the contracting parties intended for "fair market value" to mean "fair value" within the meaning of 8 *Del. C.* § 262(a). Because it rests upon an invalid premise, this claim is also legally insufficient.

### 2. *Implied Contract Claim*

Because Moore has failed to state a cognizable claim that Holdings or Cordant breached an express provision of the Purchase Agreement, for Count II to survive a motion to dismiss, it must allege an actionable breach of an implied contractual term. However, no such claim is alleged either.

In Count II, Moore contends that the manner in which Holdings and Cordant "initiated, controlled and directed" the valuation of the Preferred Stock constituted a breach of an implied covenant of good faith and fair dealing owed by Holdings and Cordant.

To state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation. *Goodrich,* 542 A.2d at 1204. The cardinal guiding principle in adjudicating a contract claim is to give effect to the intention of the contracting parties. *E.I. du Pont de Nemours v. Shell Oil Co.,* Del. Supr., 498 A.2d 1108, 1113 (1985). Thus, implied contractual obligations are terms that "clearly would have been included [in the contract] had the parties negotiated with respect to them." *Price Organization, Inc. v. Universal Computer Consulting, Inc.,* Del. Ch., C.A. No. 12505, Allen, C. (Oct. 1, 1993), Mem. Op. at 16 (citing *Katz v. Oak Industries,* Del. Ch., 508 A.2d 873, 880 (1986)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 8

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
(Cite as: Not Reported in A.2d)

). By parity of reasoning, "courts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, " yet does not provide for the obligation that is claimed to arise by implication. *Abex, Inc. v. Koll Real Estate Group, Inc.,* Del. Ch., C.A. No. 13462, Jacobs, V.C. (Dec. 22, 1994), Slip Op. at 22.

Moore complains that Holdings and Cordant acted in bad faith by hiring KPMG to value the Preferred Stock, because KPMG had previously valued Holdings in connection with stock option and bonus plans. Moore also claims that it should have been given notice when the defendants decided to conduct a valuation of the Preferred Stock and/or when their boards of directors decided to terminate the Strategic Alliance. Finally, Moore claims that the defendants were obligated to afford Moore the opportunity to provide KPMG with information that Moore considered pertinent to the valuation of Holdings.

*9 The problem with these claims is that the obligations that Moore urges the Court to recognize (by implication) flow from matters expressly addressed by the Purchase Agreement. The conditions to which the Preferred Stock repurchase is made subject are limited to those expressly set forth in Section VII.F. That Section (i) imposes criteria to governing the selection of an accounting firm to conduct the valuation of the Preferred Stock; (ii) establishes a 60 day notice period for the orderly termination of the Strategic Alliance, and (iii) rather than include Moore in the valuation process, specifically permits Holdings to repurchase the Preferred Stock without any notice to or involvement of Moore.[FN5]

> FN5. The 60 day notice period required by Section VII.F. applies only to the termination of the Strategic Alliance. In contrast, Section VII.F. requires that Holdings repurchase the Preferred Stock " *promptly* upon giving of such notice ...." (emphasis added)

Contrary to the duties Moore claims it is owed by virtue of the Purchase Agreement, Section VII.F.

does not require that Holdings and Cordant give notice of their intention to terminate the Strategic Alliance within a period of time after that intention is formed. It merely imposes a 60 day period between the date that Holdings and Cordant announce their decision to terminate the Strategic Alliance, and the date upon which the termination of that Alliance becomes effective. Nor does Section VII.F. require notice to Moore before Holdings may exercise its right to repurchase the Preferred Stock after giving notice of the termination of the Strategic Alliance. All that Section requires is that Holdings repurchase the Preferred Stock, " *promptly* upon giving of such notice...." (emphasis added). Thus, the "implied" duties Moore seeks to enforce are inconsistent with the scheme of express duties created by Section VII.F. Moore cannot, therefore, validly claim that the conduct complained of violated an implied covenant of good faith and fair dealing owed by Holdings and Cordant.

For these reasons, Count II must fail as a matter of law.

### D. *The Equitable Estoppel Claim*

Count III alleges equitable estoppel. To survive a Rule 12(b)(6) motion to dismiss, an equitable estoppel claim must allege inequitable conduct by the defendant that led the plaintiff to change its position, in justifiable reliance on that conduct, to its detriment. *Wilson v. American Ins. Co.,* Del. Supr., 209 A.2d 902, 903-4 (1965). The defendants' conduct may be either an affirmative act or a failure to act when duty required. *Welshire, Inc. v. Harbison,* Del. Ch., 88 A.2d 121, 125 (1952), *aff'd,* Del. Supr., 91 A.2d 404 (1952). Some description of the plaintiff's state of mind is necessary to satisfy the requirement that the plaintiff's reliance be justifiable. *Burge v. Fidelity Bond and Mortg. Co.,* Del. Supr., 648 A.2d 414, 420 (1994).

Here, Moore alleges that it relied to its detriment upon the defendants' omissions to disclose facts and affirmative misrepresentations concerning the status of the Strategic Alliance. With respect to the alleged omissions, the plaintiff claims that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

defendants had a duty, arising from their contractual and fiduciary relationships with Moore, to disclose their intention to terminate the Strategic Alliance. I conclude, for the reasons previously stated in my discussion of Counts I and II, that the defendants owed no disclosure duty beyond the 60 day notice requirement prescribed by the Purchase Agreement. Thus, insofar as the claim for equitable estoppel rests upon a disclosure omission, it must fail.

**\*10** Moore's "affirmative misrepresentation" estoppel claim rests solely upon the allegation that on May 9, 1994, Mr. Kusek "... affirmatively misrepresented Defendants' position by stating that they had no plans to terminate [the Strategic Alliance] ..." (Complaint, ¶ 39). However, nowhere does Moore specifically allege that the defendants had decided to terminate the Strategic Alliance before Kusek made that statement. Moore asks the Court to infer that intent from its use of the word "*mis*represented" in Paragraph 39 of the complaint.[FN6]

> FN6. Moore alleges that "[w]hen asked by Braun at this [May 9] meeting whether, in light of the difficulties the companies were having, Holdings and Cordant wanted to terminate the Strategic Alliance, Defendant Kusek affirmatively *misrepresented* Defendants' position by stating that they had no plans to terminate it, but rather that Holdings and Cordant wanted to make the Strategic Alliance work." (Complaint, ¶ 39) (emphasis added).

Given the alleged sequence of events leading to the termination of the Strategic Alliance, in my view no reasonable inference can be drawn that Holdings had decided to terminate the Strategic Alliance by May 9, 1994. Nowhere does the complaint straightforwardly allege that Holdings had already formed an intention to terminate the Strategic Alliance by that date. All the complaint specifically avers is that on May 17, 1994, the Holdings board met and voted to terminate the Strategic Alliance, and to authorize its officers to obtain a valuation of Holdings as at June 30, 1994 and effect the termination of the Strategic Alliance. (Complaint,

Section F). For the Court to infer that Holdings had decided to terminate the Strategic Alliance by May 9, 1994, it must have a pleaded basis also to infer that (a) a majority of the individual members of Holdings' board had formed the intention to terminate the Strategic Alliance before they met and voted at the May 17, 1994 board meeting, and (b) despite having formed that intention, those directors refrained from recording their decision or authorizing Holdings' officers to act on that decision until the May 17, 1994 meeting. That is too much water for a single word ("*mis* represented") to carry uphill.

To support the conclusory allegation that Kusek's May 9, 1994 statement was a misrepresentation, some minimal factual averments are needed. Here, the only reasonable inference that can be drawn from the complaint is that the Holdings board was actively exploring the possibility of terminating the Strategic Alliance, but did not decide to do that until its members collectively voted at the May 17, 1994 meeting. In short, Moore's allegation of an affirmative misrepresentation is not well pleaded. I therefore need not consider whether Moore has successfully pleaded the other elements essential to a claim of equitable estoppel. Because Count III fails to allege an actionable omission or affirmative misrepresentation by the defendants, it does not state an a valid claim for equitable estoppel.

As analyzed thus far, Counts I through IV state no actionable claim. However, Moore has stated a cognizable contract claim that is the subject of its motion for judgment on the pleadings. Moore alleges that Holdings breached the Purchase Agreement by failing to "repurchase Moore's stock .. . within sixty days of Holdings' and Cordant's notice to Moore" of the termination of the Strategic Alliance. (Complaint ¶ 69). That allegation states a claim sufficient to survive a motion to dismiss. However, it cannot be the basis for judgment on the pleadings, because, as set forth in Part IV below, the pleadings disclose a litigable dispute.

*IV. THE PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279
**(Cite as: Not Reported in A.2d)**

Page 10

*11 Moore's final claim is that even if Holdings and Cordant did legally terminate the Strategic Alliance, Holdings did not validly repurchase the Preferred Stock in accordance with the Purchase Agreement, because payment for the stock was tendered in the form of a Cordant check accompanied by a letter on Cordant stationery, rather than by a check of Holdings, which was the only party contractually entitled to purchase the Preferred Stock. Therefore, Moore argues, Holdings did not validly repurchase the Preferred Stock and as a consequence, Moore continues to own the Preferred Stock as a matter of law.

The pleadings are not sufficient to warrant judgment in Moore's favor, because the defendants have alleged in their Answer that "Holdings handles its financial and other transactions through Cordant." (Answer ¶ 68). That allegation raises the possibility that Cordant was acting as Holdings' agent. Because the pleadings allege a factual scenario inconsistent with Moore's version of the facts, that precludes judgment on the pleadings in Moore's favor. Ch. Ct. R. 12(c); *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* Del. Supr., 624 A.2d 1199, 1205 (1993). As previously noted, however, this claim is sufficient to survive the defendants' motion to dismiss.

## V. *CONCLUSION*

For the foregoing reasons, (a) the defendants' motion for summary judgment and the plaintiff's motion for judgment on the pleadings are denied; (b) the defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted, except with respect to Moore's claim (against Holdings) that Holdings did not repurchase the Preferred Stock in accordance with Section VII.F. of the Purchase Agreement. As to that claim, the motion is denied.[FN7] IT IS SO ORDERED.

    FN7. These rulings render moot the individual defendants' motion to dismiss on jurisdictional grounds, for which reason, those grounds are not addressed.

Del.Ch.,1995.

Moore Business Forms, Inc. v. Cordant Holdings Corp.
Not Reported in A.2d, 1995 WL 662685 (Del.Ch.), 21 Del. J. Corp. L. 279

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 5**

Westlaw.

Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
**(Cite as: Not Reported in A.2d)**

C
Shenandoah Life Ins. Co. v. Valero Energy Corp.Del.Ch.,1988.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
SHENANDOAH LIFE INSURANCE COMPANY, a Virginia corporation, Plaintiff,
v.
VALERO ENERGY CORPORATION, Valero Natural Gas Company, Valero Natural Gas Partners, L.P., Valero Management Partnership, L.P., and William E. Greehey, Defendants.
**CIV. A. No. 9032.**

Submitted: Feb. 2, 1988.
Decided: June 21, 1988.

**\*\*398** Irving Morris, Kevin Gross, and Carolyn D. Mack, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, and William Klein, II, and Ronald S. Oppenheimer, of Tenzer, Greenblatt, Fallon & Kaplan, New York City, for plaintiff.
A. Gilchrist Sparks, III, and Lawrence A. Hamermesh, of Morris, Nichols, Arsht & Tunnell, Wilmington, **\*\*399** and John M. Simpson, of Fulbright & Jaworski, Washington, D.C., and David J. Beck, Michael W. Conlon, and Keith A. Jones, of Fulbright & Jaworski, Houston, Texas, for defendants.
Rand C. Schmidt, Valero Energy Corporation, San Antonio, Texas, for Valero Energy Corporation.

MEMORANDUM OPINION
ALLEN, Chancellor.
**\*1** Pending are motions to dismiss, or in the alternative, for summary judgment in this action purportedly brought on behalf of former holders of two issues of now redeemed debentures of Valero Natural Gas Company, a Delaware corporation. Plaintiff was the holder of debentures that were redeemed and alleges that, in redeeming the debentures, the issuer (1) breached the express

terms of the indentures pursuant to which the debentures were held, (2) breached an implied covenant of good faith and fair dealing, and (3) breached a fiduciary duty it is said to owe to the holders of the debentures. Plaintiff accuses the other defendants-Valero Energy Corporation, Valero Natural Gas Partners, L.P., Valero Management Partnership, L.P. and William E. Greehey-of conspiracy and of inducing Valero Natural Gas Company's breach.

Defendants, of course, deny that the terms of the indenture agreement were violated, that they breached a covenant of good faith and fair dealing, or that they owed any fiduciary duty to the debentureholders. Moreover, according to them, the suit is barred by the terms of the indentures involved. Furthermore, defendants Valero Natural Gas Partners, L.P. and Valero Management Partnership, L.P. allege that there is no cause of action as to them and that all counts against them should be dismissed.

Defendants have called their motion one for judgment on the pleadings. The motion is supported by affidavits attaching various transactional documents and setting forth the details of how the reorganization, of which the redemptions were a part, was effectuated. The motion, therefore, will be treated as one seeking summary judgment of dismissal.

A motion for summary judgment is to be granted only where no genuine issue of material fact exists and movant is entitled to judgment on some valid legal theory applicable to those uncontested facts. Chancery Court Rule 56; *Nash v. Connell,* Del.Ch., 99 A.2d 242 (1953); *Mann v. Oppenheimer & Co.,* Del.Supr., **\*\*400**517 A.2d 1056 (1986). While a summary judgment motion thus presents no occasion to resolve disputed facts, once a movant submits factual matter purporting to establish facts entitling him to judgment, it is necessary for one contending that it would be premature to address

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 2

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
**(Cite as: Not Reported in A.2d)**

the legal issues raised by such a motion, to submit affidavits or other evidentiary materials disclosing the existence of a genuine dispute of material fact. Once a defendant puts in affidavits purporting to disclose relevant facts entitling him to judgment as a matter of law, it is no longer sufficient to preclude a judgment on the merits for a plaintiff to rely upon the allegations of his complaint. *Feinberg v. Makhson,* Del.Supr., 407 A.2d 201 (1979). Should plaintiff, for want of opportunity to discover relevant facts, be unable to submit materials disclosing a basis to conclude that a genuine issue of fact material to the movant's legal theory exists, Rule 56(f) provides a mechanism to permit deferral of the motion.

Applying this test to the record in this case, I conclude, for the reasons that follow, that the issuer owed no fiduciary duty to plaintiff or other holders of its debt instruments (*see* p. 10); that the facts stated in the Benninger Affidavit and uncontested by way of Rule 56(f) affidavit or otherwise, establish [FN1] that the redemption of plaintiff's debentures did not violate the terms of the indentures governing the debentures (pp. 13-21); and that, in the circumstances, the determination that the explicit contractual provision involved was not breached precludes a finding of breach of an implied covenant dealing with the same subject (pp. 21-23). Thus, on the merits of the central issues, I conclude the issuer is entitled to judgment as a matter of law. Moreover, I conclude that the other defendants who are alleged to be secondarily liable can have no liability in these circumstances (pp. 23-24). So concluding, I need not address the brittle, technical argument defendants advance in attempting to deny standing to plaintiff to litigate these claims.

I.

**\*2** In 1982 and 1983, Valero Natural Gas ("VNGC") raised approximately $175 million through the issuance of debentures. In August, 1982, pursuant to a public offering, it sold $75 million principal amount of 16 3/4 Sinking Fund Debentures, due August 15, 2002. In November, 1983, it similarly sold $99,568,000 **\*\*401** principal amount of 13 1/2 Sinking Fund Debentures, due November 20, 2003.

Both series of debentures were subject to a limited restriction on redemption. That restriction provided that for a period of six years they could not be redeemed as part of a refunding by the application, directly or indirectly, of funds borrowed at lower interest cost than the coupon rate of the bonds themselves. The case at bar involves those promises and the assertion that, in letter and in spirit, a complex recapitalization that included the redemption of both series of debentures violated them.

That complex restructuring was effectuated on March 25, 1987. It involved certain of the businesses of the issuer's parent corporation, defendant Valero Energy Corporation, a Delaware corporation, with its principal offices in San Antonio, Texas ("Valero"). At the time of the transactions involved, Valero was a holding company engaged, through a series of operating subsidiaries, in the business of operating an interstate natural gas pipeline system, processing natural gas and marketing natural gas and natural gas liquids. Its principal subsidiary was VNGC, which in turn owned the series of operating subsidiaries (the "Operating Subsidiaries") through which Valero's business operations were conducted.

Viewed broadly, the reorganization involved may be seen as a technique to permit Valero to sell a substantial equity interest in its operating businesses and to borrow on the assets owned by its subsidiaries. To do so, it relinquished approximately 50% of its equity interest in the assets owned by its Operating Subsidiaries, but because it employed limited partnership forms, it maintained complete management control over the businesses involved.

The first step in the reorganization was the formation, under Delaware law, of a new limited partnership, Valero Natural Gas Partners, L.P. (the "Partnership"), which would succeed to substantially all of the intrastate natural gas pipeline and natural gas liquid operations then conducted by the Operating Subsidiaries. The Partnership was to have three classes of partnership interests. Fifty-two percent of the equity was to be owned by holders of "Preference Units of Limited Partner

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 3

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
**(Cite as: Not Reported in A.2d)**

Interests." These units, which came to be publicly distributed through an underwriting, contributed about $200 million in cash to the Partnership. Second, 1% of the Partnership's equity was to be held as a general partnership interest by VNGC. Third, limited partnership interests (called the " Common Units"), which differed in right from the Preference Units in some respects, were to be held by the various Operating **402 Subsidiaries; these were to constitute together 47% of the Partnership's equity.

*3 In addition to the Partnership, the reorganization involved the formation of Valero Management Partnership, L.P., also a Delaware limited partnership (the "Management Partnership"). Valero was to hold a 1% general partnership interest in the Management Partnership and the Partnership was to hold a 99% limited partnership interest.

Finally, in terms of structure, a third tier of limited partnerships was created in which the Operating Subsidiaries' assets would be held. There were eleven of these and in each the Managing Partnership was to hold a 99% limited partnership interest and one of the Operating Subsidiaries was to hold a 1% general partnership interest.

On March 25, 1987, the Operating Subsidiaries transferred substantially all of their assets ("Assets" ) to the Partnership in exchange for limited partnership interests, assumption of liabilities and cash, as explained below. The Partnership then transferred the Assets to the Managing Partnership. The Managing Partnership issued and sold $550 million in First Mortgage Notes bearing an initial weighted average interest rate of 9.49%. The Managing Partnership then transferred the Assets, subject to the lien of the First Mortgage Notes, to the subsidiary operating partnerships and paid approximately $543 million from the proceeds of the First Mortgage Notes to the Partnership in consideration of the transfer to it of the Assets.

Also on that day, the Partnership sold the Preference Units and received net proceeds of $201,020,000, which were held, pursuant to agreement with Banker's Trust Company, in a

separate account. It then transferred to Valero as agent for the Operating Subsidiaries the $543 million proceeds of the First Mortgage Notes (which amount was held in a Citibank account); the $201 million proceeds of the sale of Preference Units (which amount continued to be held in a Banker's Trust Account) and a 47% limited partnership interest in itself, all in consideration of the conveyance to the Partnership of the Assets.

The Operating Subsidiaries then either lent the proceeds of the mortgage note sales to Valero or used them to pay off debts to Valero. Valero then utilized some $486 million of those funds to reduce or eliminate bank debt of the Company.

*4 Also on March 25, 1987, the Operating Subsidiaries, VNGC and Valero executed a Nominee Agreement. Under this agreement, **403 VNGC was made agent for receiving and disbursing the Preference Unit proceeds and the mortgage note proceeds. Under the terms of the agreement, VNGC had to keep the Preference Unit proceeds separate from the mortgage note proceeds. The Operating Subsidiaries loaned the Preference Unit proceeds to VNGC in return for a promissory note carrying a 17% interest rate.

The foregoing can be helpfully summarized, in part at least, in the following chart:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE     TABLE
Five days after all of this, notice of redemption, bearing a date of March 27, 1987, was mailed to holders of the 16 3/4 debentures. It announced that a redemption would occur on April 30, 1987. A similar notice of redemption was given to holders of 13 1/2 debentures on April 1, 1987. The date of redemption was given as May 22, 1987.

On April 29, 1987, redemption checks were mailed to holders of the 16 3/4 debentures. On the next day, Valero transferred $87.5 million from one of the Banker's Trust trust accounts into which the proceeds of the Preference Unit sales had been deposited to the account on which the redemption checks for the 16 3/4 debentures had been drawn. A similar procedure was followed with respect to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
(Cite as: Not Reported in A.2d)

Page 4

the 13 1/2 debentures on May 21, 1987.

**404 On the day that the planned redemption of the 13 1/2 debentures was announced, plaintiff, a holder of 16 3/4 debentures but not 13 1/2 debentures, filed this suit, purportedly on behalf of holders of both series of debentures.

II.

The central inquiry on this motion, as I view the matter, is whether, in redeeming the debentures in question, VNGC breached its express undertaking not to do so with borrowed funds bearing an interest rate lower than the coupon rate of the debentures.[FN2] That undertaking was contained in Section 4.02 of the indenture governing the 16 3/4 debentures (and in a parallel section of the indenture governing the 13 1/2 notes). Section 4.02 permits redemptions subject to restriction. It proves in full as follows:

The New Debentures may be redeemed prior to maturity, in the manner provided in Article Five, as a whole at any time or in part from time to time, at the option of the Company at the General Redemption Prices set forth in the form of New Debenture hereinbefore established, together, in each case, with accrued interest to the date fixed for redemption provided, however, that no New Debenture may be redeemed at the option of the Company prior to August 15, 1989, as a part of a refunding or anticipated refunding operation, by the application, directly or indirectly, of moneys borrowed which shall have an interest cost to the Company, calculated in accordance with accepted financial practice, of less than 16.750% per annum.

Plaintiff asserts that since the reorganization raised some $550 million of debt at a lower interest rate than that borne by either series of debentures, and since money is fungible, the funds from the reorganization used to redeem the debentures must be deemed legally to have come, at least "indirectly, " from the debt financing. **405 In so contending, I do not understand plaintiff to suggest that in fact the "paper trail" of funds' movement and segregation disclosed by the Benninger Affidavit

and set forth above is not technically correct.[FN3] As indicated above, plaintiff has not put in a Rule 56(f) affidavit. But I do understand plaintiff to contend that such segregation of funds in the circumstances of an integrated single transaction such as here occurred is or ought to be legally irrelevant.

*5 Putting aside complexities that might be claimed to arise from the fact that many new entities are involved in the restructuring, the issuer's essential response to this claim on its merits is that it must be conceded that it had the right under the indentures to redeem the debentures at any time with equity capital and that is what it did. It asserts that some $200 million of new capital was raised through the issuance of the Partnership's Preference Units; that that capital did not constitute borrowing but was equity; and that it was those funds that were used to fund the redemption as the Benninger affidavit and its documentary attachments establish for present purposes.

Plaintiff replies that this argument is grounded on clever manipulation, on "juggling" and should not be accepted. Money, we are reminded, is fungible. It can have no real world significance that the $200 million proceeds from the Preference Units were kept in one account and the $543 million proceeds of borrowing kept in another. The reorganization represented a single, integrated transaction. The sale of Preference Units would not have occurred had the lower rate debt not been arranged. (Indeed the issuance of those Units was conditioned upon the sale of the First Mortgage Notes). Thus, it is contended that the $175 million utilized to redeem the debentures should be viewed as "part of a refunding ... operation, by the application ... indirectly of monies borrowed which [has] an interest cost ... [that is less than the coupon rate of the redeemed bonds]. Indenture, ¶ 4.02.

III.

Two courts have addressed issues of contract construction closely similar to the issue here presented. **406See *Franklin Life Insurance Company v. Commonwealth Edison Company*, 451

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 5

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
(Cite as: Not Reported in A.2d)

F.Supp. 602 (S.D.Ill.1978), *aff'd per curiam*, 598 F.2d 1109 (7th Cir.1979), *cert. denied*, 444 U.S. 900 (1979) and *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.Supp. 1529 (S.D.N.Y.1983). Both cases dealt with redemptions of debentures which were governed by restrictions against "refunding" through the use of, or in anticipation of, lower cost debt. In both cases, claims were made by bondholders that a redemption arguably made with new equity was an indirect application of borrowed funds, since in both cases the issuer had lower cost debt in place and anticipated further borrowing at a market rate below the coupon rate of the redeemed bonds.

Our Supreme Court in *Mann v. Oppenheimer & Co.*, Del.Supr., 517 A.2d 1056 (1986) succinctly summarized at pp. 1062-63 the holdings of those cases as follows:

*6 In *Franklin Life*, the restriction was that certain 9.44% preferred shares issued by Commonwealth Edison could not be redeemed "through refunding, directly or indirectly, by or in anticipation of" debt carrying an interest cost, or equity bearing a dividend cost, below 9.44%. *Franklin Life*, 451 F.Supp. at 605, 613. Commonwealth Edison redeemed the shares with money acquired from an issue of common stock. Although the company was also then borrowing funds at less than 9.44%, the redemption was upheld: "[T]he clause forbidding redemption through refunding by or in anticipation of debt, requires an examination of only *the source of the funds actually used* to achieve the redemption." 451 F.Supp. at 614 (emphasis added).

In *Morgan Stanley*, ADM Midland Company (ADM) issued certain 16% debentures in May, 1981. The indenture provided that the bonds were not redeemable before a certain date "pursuant to such option from the proceeds, or in anticipation, of the issuance of any indebtedness ... [if] the interest cost or interest factor applicable thereto ... shall be less than 16.08% per annum." *Morgan Stanley*, 570 F.Supp. at 1531. Subsequent to the issuance of the securities, ADM twice borrowed funds at less than 16.08%. During that time, the company also raised money with two common stock offerings.

ADM then announced on June 1, 1983, that it would redeem the debentures with the proceeds from the two stock offerings.

Morgan Stanley, which held a large block of debentures, **407 filed an action claiming that the redemption was barred by the indenture agreement, and that the use of stock proceeds was a mere "juggling of funds" to avoid the limitation. Adopting the "source" test of *Franklin Life*, the court upheld the redemption. The court also quoted The American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions* (The Commentaries):

[I]nstead of an absolute restriction [on redemption], the parties may agree that the borrower may not redeem with funds borrowed at an interest rate lower than the interest rate in the debentures. *Such an arrangement recognizes that funds for the redemption may become available from [sources] other than borrowing*, but correspondingly recognizes that the debenture holder is entitled to be protected for a while against redemption if interest rates fall and the borrower can borrow funds at a lower rate to pay off the debentures.

*Morgan Stanley*, 570 F.Supp. at 1535 (*citing* American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* at 477. (1971)).

The court concluded: "We read this comment as pointing to the *source* of funds as the dispositive factor in determining the availability of redemption to the issuer ..." *Morgan Stanley*, 570 F.Supp. at 1535. The court also held that debt holders would not be left unprotected by the "source" rule: "An issuer contemplating redemption would still be required to fund such redemption from a source other than lower-cost borrowing, such as reserves, the sale of assets, or the proceeds of a common stock issue." *Id.* at 1536.

(emphasis in original).

*7 Thus, the courts that have had occasion to address questions similar to the one now faced have held that a limited anti-redemption provision of the kind here involved does not restrict an issuer's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 6

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
**(Cite as: Not Reported in A.2d)**

power to redeem bonds, otherwise redeemable, through the application of funds raised by the issuance of equity. It has been said that it is the source of the funds employed for the redemption that should be dispositive. Our Supreme Court, while not required to address the specific point, has indicated approval of this approach. *See Mann v. Oppenheimer & Co., supra,* at 1063. (" Oppenheimer also **408 had the option of becoming a public company, issuing equity securities and using the proceeds ... to redeem....")

Two factors, however, may distinguish this case from *Franklin Life* or *Morgan Stanley.* Here, the new debt was (1) raised contemporaneously with the new equity and (2) as part of a single integrated transaction. Assuming that Valero was careful (as the Benninger affidavit establishes in the circumstances that it was) to keep the equity funds segregated and to apply only those funds to the redemption, should these two factors lead to a different result here? As to the mere fact of timing, I can apprehend no principle that would require or justify a distinction, for these purposes, between borrowings made by an issuer on the basis of time alone. If the borrowings are "part of a refunding or anticipated refunding" of the notes whose redemption is restricted, it is proscribed no matter when it occurs in relation to other financial transactions. If it is not part of such a refunding, ·is not proscribed, even if concurrent with other financial transactions that include permitted redemption.

Thus, the more important point of possible distinction between this case and the cases applying the "source" rule is the fact that here the new borrowing and the new equity infusion were aspects of an integrated single transaction. Without the borrowing, there would have been no new equity from which to redeem the debentures. Does that fact render the redemption "part of a refunding ... by the application ... indirectly of [borrowed] moneys" even where care is taken, as here, to apply only equity funds to the redemption and to apply borrowed funds only to the repayment of bank debt whose "refunding" is not restricted?

A careful parsing of the contract words used (*see*

Section 4.02) does not lead to certainty in this instance. A more reliable guide may thus, in this instance, be found in asking what is the purpose of a provision such as Section 4.02. Provisions such as 4.02 implicitly, but certainly, recognize the right of an issuer to redeem debt with funds raised by new equity (or the sale of assets or retained earnings). It is the application of borrowed funds, directly or indirectly, for the purpose of effecting a redemption that is prohibited. Here, of course, it is clear that there was no direct application of borrowed funds to effect the redemption; borrowed funds were directly applied to eliminate or reduce bank debt that bore no restriction on the source of repayment. Was there an *indirect* application of borrowed funds to bond redemption as that term is **409 used in Section 4.02? The inclusion of the term " indirectly" in Section 4.02 must be taken as an attempt to proscribe some forms of transactions which, when viewed formally, would not be otherwise proscribed by the provision. For example, Section 4.02 would not be offended by a redemption funded by the proceeds of an asset sale. But that provision would, I would think, by reason of the "indirectly" term, be violated by the effectuation of a plan to borrow low-cost funds for the acquisition of an asset intended to be sold for purposes of generating funds for use in a redemption. This would qualify as an indirect application of borrowed funds because after the full transaction were completed, all that would remain is new (cheaper) debt in place of the redeemed bonds. No independent economic function would have been intended or have occurred. Similarly, suppose an issuer incorporated a subsidiary corporation and transferred sufficient assets to it to permit it to borrow money; and suppose that that subsidiary then did borrow low-cost funds and transferred them to its parent either pursuant to a high-interest note or as a capital contribution; and suppose, of course, that the issuer then used those nominally high-interest funds to redeem debentures to which a provision such as 4.02 pertained. Can there be any doubt that such a course would constitute the indirect application of low-cost borrowed funds in violation of a 4.02-type restriction? The reason that that appears so clearly to be the case is, again, that when the transaction has been completed, all that has occurred, from a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
(Cite as: Not Reported in A.2d)

realistic point of view, is the substitution of new (cheaper) debt for the higher interest debentures. The borrowing has no economic purpose or reality other than that substitution.

While it is impossible to generalize perfectly concerning all of the situations in which the " indirectly" language of Section 4.02 might find application, it does appear that the inclusion of that phrase is intended to reach situations in which the underlying economic reality of the completed transaction is the functional equivalent of a direct loan for purposes of effectuating a redemption and nothing more.

**\*8** But the redemption of the debentures in this case does not fall within any such understanding of the reach of the term "indirectly" in Section 4.02. Here, looking through the formal qualities of the reorganization, it is seen that Valero engaged in a complex reorganization that included the raising of substantial new equity which was more than sufficient to redeem the debentures. Those **\*\*410** funds were not borrowed; they constituted equity.[FN4] That aspect of the reorganization transaction did not represent simply an indirect means to employ borrowed funds for the purpose of the redemption.

The issuer implicitly reserved the right to redeem the debt with equity. The underwriter who negotiated the provisions on behalf of the buyers of the debentures did not seek to restrict that right, as could, of course, have been done. I cannot conclude that the limited protection against redemption that was negotiated should be construed to implicitly restrict the issuer's reserve power to redeem the debentures from the proceeds of an equity offering simply because that equity offering is contingent upon the completion of an integrated restructuring which includes a contemporaneous infusion of substantial new, lower-cost debt as well. Stating this conclusion in terms of Section 4.02, I conclude that the new borrowing was not "part of a refunding ..." of the debt protected by Section 4.02. I thus conclude that the redemption of plaintiff's debentures in the circumstances as they appear in the uncontested Benninger Affidavit do not constitute a violation of Section 4.02 of the relevant indenture.

IV.

Plaintiff also complains that the redemption violated an implied covenant of good faith and fair dealing recognized by New York and Delaware Law. *Gardner & Florence Call Cowles Found. v. Empire, Inc.,* 589 F.Supp. 669 (S.D.N.Y.1984); *Van Gemert v. Boeing Co.,* 520 F.2d 1373 (2d Cir.), *cert. denied,* 423 U.S. 947 (1975), *appeal after remand,* 553 F.2d 812, 815 (1977); *Katz v. Oak Industries,* Del.Ch., 508 A.2d 873 (1986). Where, however, a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation **\*\*411** of a different kind that has been breached. *See Gardner,* 589 F.Supp. at 673. As the Fifth Circuit Court of Appeals noted in a case in which, applying New York law as we must here, it denied the violation of an implied covenant of good faith in a bond indenture:

We note first that this implied covenant of good faith and fair dealing cannot give the holders of Debentures any rights inconsistent with those explicitly set out in the Indenture. "[W]here the instrument contains an express covenant in regard to any subject, no covenants are to be implied with respect to the same subject...." *Burr v. Stenton,* 43 N.Y. 462, 464 (1871). "It is ... well established in New York that, where the expressed intention of contracting parties is clear, a contrary intent will not be created by implication." *Neuman v. Pike,* 591 F.2d 191, 194 (2d Cir.1979) (citing and applying New York law). The covenant is breached only when one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other. *Collard v. Incorporated Village of Flower Hill,* 75 A.D.2d 631, 632, 427 N.Y.S.2d 301, 302 (2d Dep't 1980). The mere exercise of one's contractual rights, without more, cannot constitute such a breach. *See Mutual Life Insurance Co. v. Tailored Woman, Inc.,* 309 N.Y. 248, 254, 128 N.E.2d 401, 403 (1955).

*Broad v. Rockwell International Corporation,* 642

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 8

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
**(Cite as: Not Reported in A.2d)**

F.2d 929, 957 (5th Cir.1981). It is all the more unlikely that a court will find the breach of an implied covenant when the express language it has found not to have been breached contains a term such as "indirectly." Once a court has construed such a clause and determined that the acts complained of do not "indirectly" constitute the proscribed act, there would seem to be scant ground upon which to rest an argument of bad faith. Surely, schemes to do indirectly that which the parties proscribed by agreement might well violate an implied covenant of good faith. For example, the two examples described above would likely be found to violate such an implied duty even if there were no "indirectly" language in the restriction. (For one view of an appropriate legal test for determining this, *see Katz v. Oak Industries,* 508 A.2d at 880.) But in this instance, determination of the legal question raised by the allegation of breach of the express contractual provision precludes any possible recovery on a theory of implied covenant.

**\*\*412 V.**

\*9 Concluding that plaintiff has no cause of action against the issuer of its redeemed bonds arising from their redemption, it is not necessary to address in detail the validity of asserted claims against other defendants-all of whom are alleged to be secondarily liable on theories of aiding in, inducing or conspiring in the alleged breach. However, I note in passing that each indenture contains a standard provision restricting liability arising from the debentures to the issuer and expressly negating any liability "upon any obligation, covenant or agreement of this Indenture, or of any Debenture, or for any claim based thereon" on the part of the " incorporators, stockholders, officers or directors, as such, of the Company, or of any successor corporation" of the issuer. *See* Indenture, Section 16.01.[FN5] When the action is for breach of contract and not for fraud in the inducement of the investment, provisions of this kind are effective to limit any liability that may be found to the issuer. *See, e.g., Continental Illinois National Bank and Trust Company v. Hunt International Resources Corp.,* C.A. No. 7888, Jacobs, V.C. (February 27, 1987). Accordingly, even had I determined that

facts material to the issuer's theory of nonliability on this **\*\*413** motion remained in dispute or that that theory was invalid, I would still grant the motion of the defendants who are officers, directors, stockholders or successors to the issuer based upon the conclusive legal effect of Section 16.01.[FN6]

A form of order may be submitted after consultation among the parties.

> FN1. Subject to the qualification stated in note 3.

> FN2. Plaintiffs' breach of fiduciary duty claim does not warrant extended discussion in light of the Delaware law governing that claim. For the moment at least, it is established in this jurisdiction (the question is now before our Supreme Court) that neither an issuing corporation nor its directors owe the distinctive duties of a fiduciary to holders of the corporation debt instruments. This question was dilated upon recently in *Simons v. Cogan,* Del.Ch., --- A.2d ---- (December 2, 1987) and need not be treated further now. The somewhat different question of a breach of an implied covenant of good faith (*see Katz v. Oak Industries, Inc.,* Del.Ch., 508 A.2d at 873 (1986), is treated below at p. 21.

> FN3. If I am incorrect in this, I will delay entering an order on this motion for 90 days, during which time plaintiff may pursue discovery on the matters reflected in the Benninger Affidavit of November 23, 1987. If a genuine dispute of fact is thus uncovered, the court will then be required to assess its materiality and to revisit the subject of the issuer's entitlement to judgment in its favor now.

> FN4. The Preference Units clearly qualify as equity rather than debt. While there may be no single litmus paper test for that conclusion, these interests bear all of the most notable characteristics of equity.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 9

Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396
**(Cite as: Not Reported in A.2d)**

They have no maturity date. Until dissolution of the Limited Partnership, payments with respect to the Units are tied to some form of earnings-"Distributable Cash Flow." (*See* Partnership Agreement, Section 5.1). The Unit holders possess certain voting rights at all times (*i.e.,* not only when a payment due has not been made)-for example, the right to vote for the dissolution of the Management Partnership Agreement. (Partnership Agreement, Section 7.6). Non-partner creditors have priority in repayment over Preference Units. (Partnership Agreement, Section 15.3(a)).

FN5. Section 16.01 provides in full as follows:

No recourse under or upon any obligation, covenant or agreement of this Indenture,

or of any Debenture, or for any claim based thereon or otherwise in respect thereof, shall be had against any incorporator, stockholder, officer or director, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly understood that this Indenture and the obligations issued hereunder are solely corporate obligations, and that no such personal liability whatever shall attach to, or is or shall be incurred by, the incorporators, stockholders, officers or directors, as such, of the Company, or of any successor corporation, or any of them, because of the creation of the indebtedness hereby authorized, or under or by reason of the obligations, covenants or agreements contained in this Indenture or in any of the Debentures or implied therefrom; and that any and all such personal liability, either at common law or in equity or by constitution or statute, of, and any and all such rights and claims against, every such incorporator, stockholder, officer or director, as such, because of the creation of the indebtedness hereby authorized, or under or by reason of the obligations, covenants or agreements contained in this Indenture or in any of the Debentures or implied therefrom, are hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of such Debentures.

FN6. The Limited Partnerships do not fall easily within this language and as to them, for the time being, I will rest my decision upon the lack of primary liability alone. Thus, dismissal as to them, if it is to occur, must await final determination of the issuer's liability. *See* note 3, *supra.*

Del.Ch.,1988.
Shenandoah Life Ins. Co. v. Valero Energy Corp.
Not Reported in A.2d, 1988 WL 63491 (Del.Ch.), 14 Del. J. Corp. L. 396

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.