# APP. 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Northwestern Corporation, | ) | Chapter 11 |
| | ) | Case No. 03-12872 (CGC) |
| | ) | |
| | ) | **Hearing Date: 3:00 pm, May 17, 2004** |
| Debtor. | ) | **Objections due: 4:00 pm, May 3, 2004** |
| | ) | |

**OBJECTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK,
AS SUCCESSOR INDENTURE TRUSTEE TO DEBTOR'S
MOTION TO APPROVE DISCLOSURE STATEMENT**

Law Debenture Trust Company of New York as successor Trustee (the "Indenture Trustee") to The Bank of New York as Trustee under a certain Indenture dated as of November 1, 1996, as amended, pursuant to which The Montana Power Company ("Montana Power") issued certain 8.45% Junior Subordinated Debentures (the "Debentures") to Montana Power Capital I, which then issued certain 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPS"), by and through its undersigned counsel, submits this objection (the "Objection") to the motion (the "Motion") of Northwestern Corporation (the "Debtor") for entry of an order (a) Approving Debtor's Proposed Disclosure Statement; (b) Establishing Procedures for Solicitation and Tabulation of Votes on Debtor's Plan of Reorganization; (c) Approving the Form and Manner of Notice; (d) Scheduling a Hearing on Confirmation; and (e) Granting Related Relief.

As detailed below, the Disclosure Statement should not be approved because, among other things, it describes a Plan of Reorganization (the "Plan") that is unconfirmable on its face, and fails to provide adequate information concerning the Magten/Law Debenture Adversary

BOS1377253.3

Proceeding currently pending against the Debtor. In support of its Objection, Law Debenture states:

## I.    STATEMENT OF FACTS

1.    The Debtor owns and operates utility companies in the United States. The Debtor and its direct and indirect nondebtor energy subsidiaries comprise the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 598,000 customers throughout Montana, South Dakota and Nebraska.

2.    Magten Asset Management Corporation ("Magten") holds in excess of 33% of the QUIPS issued by Montana Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by Montana Power, predecessor in interest to Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The sole asset of the Trust are the 8.45% Debentures issued by Montana Power.

3.    After the Debtor filed its Plan and Disclosure Statement on March 11, 2004, the Indenture Trustee, for and on behalf of the holders of the Debentures and the QUIPS (collectively, the "Holders") and Magten (the Indenture Trustee and Magten are hereinafter sometimes referred to collectively as the "Plaintiffs") commenced an adversary proceeding (the hereinafter referred to as either the "Magten/Law Debenture Adversary Proceeding" or the "Adversary Proceeding") against the Debtor.

4.    As more particularly described in the Plaintiffs' complaint, the Plaintiffs are pursuing an alleged fraudulent conveyance claim and certain related relief against the Debtor which arose out of a so-called going flat transaction (the "Going Flat Transaction") in which the Debtor acquired in 2002 substantially all of the assets and liabilities of its wholly-owned subsidiary, Clark Fork (formerly known as NorthWestern Energy, LLC and the successor by merger to Montana Power).

5.	At the time of the transfer of these assets of Clark Fork to the Debtor (the "<u>Transfer</u>"), the Debtor was the sole equity holder of Clark Fork. Using this control of Clark Fork, the Debtor transferred the assets and liabilities of Clark Fork to itself. The assets of Clark Fork were valued at between $1.15 billion and $1.4 billion (the "<u>Montana Utility Assets</u>") while the assumed liabilities amounted to approximately $700 million. However, the Debtor's other liabilities were so excessive that, even after obtaining Clark Fork's assets for inadequate consideration, the Debtor could not pay its own creditors and ultimately filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6.	The Plaintiffs allege that the Transfer rendered Clark Fork insolvent and undercapitalized, and thereby injured the creditors of Clark Fork, including Magten and all of the other Holders.

8.	The Disclosure Statement is devoid of any reference to the Adversary Proceeding.

## II. ARGUMENTS

### A. The Plan Is Inherently Unconfirmable.

The Disclosure Statement describes a plan that is unconfirmable on its face. The Magten/Law Debenture Adversary Proceeding has severe implications on whether or not the Debtor's Plan is confirmable. If the Plaintiffs are successful in pursuing their claims against the Debtor, a substantial portion of the assets now alleged to be owned by the Debtor will no longer be part of the Debtor's estate. The Plaintiffs submit that unless and until the Magten/Law Debenture Adversary Proceeding is resolved, this Court can not confirm the Debtor's proposed Plan.

Courts have consistently held that "[i]t is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." <u>In re Criimi Mae, Inc.</u>, 251 B.R. 796, 799 (Bankr. D.

3

Md. 2000) (internal citations omitted).  See also In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (finding that allowing a facially nonconfirmable plan to accompany a disclosure statement is both inadequate disclosure and a misrepresentation).  This Court may consider and pass upon confirmation issues in the context of a Disclosure Statement hearing where a plan is so flawed that confirmation is impossible.  While this objection does not raise all objections to confirmation, the confirmation issues which at this time appear insurmountable are raised in an effort to save this Court and the parties the time and expense of raising and adding these issues at confirmation.

    1.    **The Plan Cannot be Confirmed Until the Fraudulent Transfer Claim is Resolved.**

The Debtor is seeking approval of its Disclosure Statement for a Plan that recognizes the Debtor using the Montana Utility Assets.  However, those assets, the value of which is approximately 80% of the Debtor's consolidated EBITDA, are the subject of litigation over whether they are being held in constructive trust for the holders of the QUIPS and the other creditors of Clark Fork.  Resolution of the Magten/Law Debenture Adversary Proceeding against the Debtor is necessary before a Plan can be considered, as this Adversary Proceeding will determine the priority of claims against the Debtor and the assets and funds available for distribution to various classes of creditors.

The Debtor's Plan is predicated upon the conversion of its existing unsecured debt to equity.  The equity distributions in the Plan are based on the presumption that no fraudulent transfer occurred and that all of the assets currently being administered are available to all creditors.  The valuation underlying the Plan and the new equity ignores the fact that litigation is pending over whether the Montana Utility Assets are being held in constructive trust for the

4

creditors of Clark Fork. Thus, since the entire distribution scheme in the Plan may need to be revised, there is no reason to approve the Disclosure Statement at this time.

### 2. The Plan Improperly Classifies Law Debenture's Claim Thereby Rendering The Plan Unconfirmable

The Plan provides for the Holders to receive its *pro rata* share of 2% of the equity of the Reorganized Debtor (subject to dilution). The Debtor has classified the Holders and the TOPrS together in Class 8 of the Plan as Unsecured Subordinated Note Claims. This classification is improper because (i) the claims of the Holders are not substantially similar to the claims of the holders of the TOPrS, and (ii) such classification presupposes that the Holders' claims are subordinate to the Debtor's other creditors, when in fact the Holders' claims are senior to all unsecured creditors.

Section 1122 of the Bankruptcy Code, which governs classification of claims, provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Courts have defined "substantially similar claims" as those claims which share common priority status and other legal rights against the debtor's assets. In re Fairfield Executive Associates, 161 B.R. 595, 600, n. 6 (Bankr. D.N.J. 1993) (citing In re Greystone III Joint Venture, 948 F.2d 134, 139 (5th Cir. 1991), cert. denied, 121 L. Ed. 2d 37, 113 S. Ct. 72 (1992)). In fact, section 1122(a) of the Bankruptcy Code requires that claims placed in the same class be "substantially similar," but does not require that all substantially similar claims be placed in the same class. See John Hancock, Mut. Life Insur. Co v. Route 37 Business Park Assocs., 987 F.2d 154, 158 (3d Cir. 1993). A chapter 11 plan proponent has significant flexibility in classifying claims as long as there is a reasonable basis for the classification scheme and all claims within a class are substantially similar. In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr.

S.D.N.Y. 1992). Cf. In re Bugg, 172 Bankr. 781, 783-84 (E.D. Pa. 1994) (secured creditors with secured interests in distinct properties must be classified separately).

Claims that do not originate from the same creditor are not substantially similar. The Holders and the TOPrS are not substantially similar because the TOPrS are held by a trust previously established by the Debtor, while the Holders are held by a trust previously established by Montana Power. The Holders remain creditors of Clark Fork as successor in interest to Montana Power, while also being creditors of the Debtor, whereas the TOPrS are merely subordinated general unsecured creditors of the Debtor.

In addition, by structuring the Plan in this manner and placing the Holders in the same class as the TOPrS, the Debtors have ignored the fraudulent conveyance claims held by the Holders against the Debtor. To the extent the Debtors solicit acceptances for the Plan prior to the resolution of the Adversary Proceeding, the Plan must, at a minimum, separately classify the Holders' claims.

### 3. The Releases Contained in the Plan Violate the Bankruptcy Code and Third Circuit Precedent

The Plan includes very broad third-party releases (the "Releases"), purporting to release claims held by any party against the Debtor's current or former officers and directors, as well as against current and former officers and directors of the Debtor's non-debtor subsidiary, Clark Fork. Specifically, the Debtor seeks to grant broad, impermissible, third-party releases under the guise of the D&O Insurance Equity Injunction. Section 6.9 of the Plan limits all creditors with claims against the Debtor's current and former officers, directors and affiliates to the proceeds of the Debtor's D&O Policies. In addition, the channeling injunction contained in Section 6.10 of the Plan prohibits any creditor from proceeding directly against the released parties, thus releasing such parties from third party claims.

Certain officers and directors of the Debtor and its non-debtor subsidiary are defendants in numerous lawsuits and may have substantial liability on account of such claims. Under these circumstances, there is no justification for including Releases in the Plan.

The Releases contained in the Plan improperly discharge the liabilities of non-debtors which violates section 524(e) of the Bankruptcy Code, as well as prevailing judicial authority.

Section 524(e) of the Bankruptcy Code states:

> Except as provided in subsection (a)(3) of this section, discharge of a debt of the Debtor does not affect the liabilities of any other entity on, or the property of any other entity for, such debt.

11 U.S.C. § 524(e). Courts within the Third Circuit have held that non-consensual non-debtor releases are not permitted under the Bankruptcy Code. See In re Continental Airlines, 203 F.3d 203, 214 n.11 (3d Cir. 2000) (citing In re Zenith Electronics Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999); In re Arrowmill Dev. Corp., 211 B.R. 497, 506-507 (Bankr. D. N.J. 1997)). "The Bankruptcy laws do not operate as a method to relieve a non-debtor from potential liabilities stemming from lawsuits against them." Id. (citing In re Elsinore Shore Assoc., 91 B.R. 238 (Bankr. D. N.J. 1988)). The protection afforded by filing for bankruptcy should be extended only to those who invoke the process, and not third party bystanders. See In re Sybaris Clubs Int'l. Inc., 189 B.R. 152, 156 (Bankr. N.D. Ill. 1995). As such, a plan containing non-consensual third-party releases may not be confirmed because such provisions conflict with section 524(e) of the Code.

Based on the Third Circuit's approach, the Releases in the Plan do not satisfy the factors necessary to grant such a broad release. The Plan makes no claim that the Releases are fair to the Holders and other creditors, nor are they being given in exchange for adequate consideration. Instead, the Plan attempts to deprive the Holders and the Debtor's other creditors of their valuable claims against third-parties without any consideration to the Holders. In light of the

7

magnitude of the claims brought against the officers and directors, it is unclear whether any consideration would be sufficient to justify these Releases.

In addition, there is no identity of interests between the Debtor and its directors and officers, and its subsidiary's officers and directors, such that a suit against the non-debtor directors and officers is essentially a suit against the Debtor. Also the proposed Releases are in no way essential to the Debtor's reorganization. The absence of the proposed Releases would not have an adverse impact on the Debtor's ability to reorganize. Moreover, the Debtor's other creditors, in addition to the Holders, do not support the Releases in the Plan and have expressed their opposition to granting such broad third-party releases without any provision in the Plan providing for payment of all or substantially all claims of classes affected by the Releases. Accordingly, the Releases in the Plan clearly do not and cannot meet the critical prongs outlined in Continental Airlines. Therefore, the Releases are not appropriate and should not be approved by the Court.

**B.     The Disclosure Statement Does Not Provide Adequate Information That Would Enable A Hypothetical Reasonable Investor To Make An Informed Judgment About The Plan.**

Section 1125 of the Bankruptcy Code states, in relevant part, that:

> an acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b). "Adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable

8

investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).

Bankruptcy courts should "decline approval of a disclosure statement if it does not give 'adequate information' to the entities that will have to vote on the plan." Pecht, 57 B.R. at 139. See In re Bob Grissett Golf Shoppes, Inc., 50 B.R. 598, 610 (E.D. Va. 1985); see also In re Civitella, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981). The disclosure statement must describe all factors known to the plan proponent that may impact the success or failure of the proposals contained in the plan. In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); In re Stanley Hotel, Inc., 13 B.R. 926, 929 (Bankr. D. Colo. 1981). Included among these must be all facts that may inform claimants about the likely financial consequences of acceptance or rejection of a plan. Id. See also In re Regional Building Systems, Inc., 254 F.3d 528, 532-33 (4th Cir. 2001); In re Point Wylie Co., 78 B.R. 453, 460 n.6 (Bankr. D.S.C. 1987); Citivella, 15 B.R. at 208.

Specifically, the Disclosure Statement is deficient because it fails to provide creditors with adequate information in at least the following respects:

### 1. Section III.L. and Litigation

The Disclosure Statement fails to disclose any information regarding the Going Flat Transaction, the Transfer, the Magten/Law Debenture Adversary Proceeding or the fact that the Debtor's Plan may be based largely on assets that it received pursuant to a fraudulent transfer. No description is provided as to what would be the implications on the Debtor's estate if, in fact, the Plaintiffs prevail.

In order to satisfy the requirements of "adequate information," the Disclosure Statement needs to fully and completely describe to the Court and parties in interest the following:

9

(i)   the complaint filed by the Plaintiffs against the Debtor asserting that the Transfer was a fraudulent conveyance;

(ii)   the effect of the pending Adversary Proceeding on the Debtor and its reorganization if the Plaintiffs' complaint and the claims of the other creditors is successful and a constructive trust over the Montana Utility Assets is imposed;

(iii)   potential claims against the Debtor's officers, directors and advisors arising in connection with, among other things, the fraudulent transfer;

(iv)   the pending SEC investigation of the Debtor's financial statements, the risks associated with the investigation, the likelihood of a substantial fine, and the priority treatment of the SEC's claim in the event that the Debtor receives a fine;

(v)   the allegations made by certain creditors that the Debtor's exemption application from PUHCA was misleading and the potential liability arising therefrom; and

(vi)   the nature of the claims that are being released and the justification for the Releases.

2.   **Section IV.G and Conflicts of Interest**

Section IV.G of the Disclosure Statement fails to disclose whether any of the officers or directors of Reorganized Debtor have any conflicts of interest. Bankruptcy Code section 1129(a)(5) requires that the Debtors disclose the identity and the affiliations of post-confirmation management of Reorganized Debtor. See 11 U.S.C. §1129(a)(5)(A)(i). This disclosure must be sufficient to allow a determination that the appointment of such individuals to office is consistent with public policy under Bankruptcy Code Section 1129(a)(5)(A)(ii). See 7 COLLIER ON BANKRUPTCY ¶1129.03[5][a] (15th ed. rev. 1999). Additionally, Section 1123(a)(7) of the Bankruptcy Code provides that:

> [n]otwithstanding any otherwise applicable bankruptcy law, a plan shall … (7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director or trustee.

Sections 1129(a)(5)(a)(ii) and 1123(a)(7) together require the weighing of interests of public policy together with the interests of the creditors in an evaluation of the proposed management of the restructured entity.  See In re Sovereign Group, 1984-21, Ltd., 88 B.R. 325, 328-29 (Bankr. D. Colo. 1988); see also 7 COLLIER ON BANKRUPTCY ¶1123.01[7] (15th ed. rev. 1999).  For such an evaluation to be meaningful, all relevant information relating to the proposed management must be disclosed.  Accordingly, before it determines whether to approve the Disclosure Statement, the Court should order the Debtor to investigate the background and affiliations of the proposed management of the Reorganized Debtor to ascertain whether any conflicts of interest exist and, if so, to disclose those conflicts in the Disclosure Statement.  The Indenture Trustee reserves the right to make an objection to confirmation, *inter alia*, that this issue has not been not adequately disclosed and properly addressed.

### III. CONCLUSION

For all of the foregoing reasons, the Indenture Trustee respectfully requests that its Objection to the Disclosure Statement be sustained and that the Disclosure Statement not be approved, or in the alternative, approved only if modified to address the specific objections raised in the manner set forth herein.

Dated: May 3, 2004                             Respectfully submitted,

                                              LAW DEBENTURE TRUST COMPANY OF
                                              NEW YORK, as successor Indenture Trustee

                                              By its attorneys,


                                                 /s/ Lee Harrington
                                              Amanda D. Darwin, Esq. BBO No. 547654
                                              John V. Snellings, Esq., BBO No. 548791
                                              Lee Harrington, Esq. (DE 4046)
                                              Nixon Peabody LLP
                                              100 Summer Street
                                              Boston, MA  02110
                                              Telephone: (617) 345-1000
                                              Telecopier: (617) 345-1300