# APP. 7 PT 2

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

_____

# FORM 10-Q

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2004**

**Or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from      to**

**Commission File No. 0-692**

_____



| | |
|---|---|
| **Delaware** | **46-0172280** |
| (State of Incorporation) | IRS Employer Identification No. |

**125 South Dakota Avenue**
**Sioux Falls, South Dakota 57104**
(Address of principal office)

_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer. Yes ☒    No ☐

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

Common Stock, Par Value $1.75
37,680,095 outstanding at May 7, 2004

**NORTHWESTERN CORPORATION**
**FORM 10-Q**

**INDEX**

Page

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS** . . . . . . . . . . . . . . . . . . 3

**PART I. FINANCIAL INFORMATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Item 1.   Financial Statements (Unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        Consolidated Balance Sheets—March 31, 2004 and December 31, 2003 . . . . . . . . . . 6

        Consolidated Statements of Income—Three Months Ended March 31, 2004 and 2003 . 7

        Consolidated Statements of Cash Flows—Three Months Ended March 31, 2004 and 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Item 3.   Quantitative and Qualitative Disclosure About Market Risk . . . . . . . . . . . . . . . . . . 46

Item 4.   Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**PART II. OTHER INFORMATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Item 1.   Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Item 6.   Exhibits and Reports on Form 8-K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**SIGNATURES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

On one or more occasions, we may make statements in this Quarterly Report on Form 10-Q regarding our assumptions, projections, expectations, targets, intentions or beliefs about future events. All statements other than statements of historical facts, included or incorporated by reference herein relating to management's current expectations of future financial performance, continued growth, changes in economic conditions or capital markets and changes in customer usage patterns and preferences are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. On September 14, 2003, NorthWestern Corporation filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On May 4, 2004, our subsidiary, Netexit, Inc. (f/k/a Expanets, Inc.) filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Our other subsidiaries are not party to the Chapter 11 case.

Words or phrases such as "anticipates," "may," "will," "should," "believes," "estimates," "expects," "intends," "plans," "predicts," "projects," "targets," "will likely result," "will continue" or similar expressions identify forward-looking statements. Forward-looking statements involve risks and uncertainties which could cause actual results or outcomes to differ materially from those expressed. We caution that while we make such statements in good faith and we believe such statements are based on reasonable assumptions, including without limitation, management's examination of historical operating trends, data contained in records and other data available from third parties, we cannot assure you that our projections will be achieved. Factors that may cause such differences include but are not limited to:

  (i) our common stock will be cancelled and our trust preferred securities will be restructured in a manner that will eliminate or very substantially reduce any remaining value. The sale of noncore assets does not change the fact that our common stock has no value. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities;

 (ii) our ability to successfully develop, prosecute, confirm and consummate a plan of reorganization, emerge from bankruptcy as a going concern and avoid liquidation under the Federal Bankruptcy Code;

(iii) risks associated with third parties seeking and obtaining Bankruptcy Court approval for the appointment of a Chapter 11 trustee or to convert the case to a Chapter 7 proceeding;

 (iv) our ability to operate pursuant to the terms of our $75 million debtor-in-possession financing facility arranged by us with Bank One, N.A. (the DIP Facility) and other financing and contractual arrangements;

  (v) our ability to obtain Bankruptcy Court approval with respect to material motions in the Chapter 11 proceeding from time to time;

 (vi) our ability to obtain the support of the official committee of unsecured creditors and other stakeholders of the company for a plan of reorganization, which may be difficult in light of our inability to preserve any material value in our common equity and our trust preferred securities in a plan of reorganization;

(vii) our ability to offset the negative effects that the filing for reorganization under Chapter 11 has had, or may have, on our business, management and employees including constraints placed on available capital;

(viii) our ability to obtain and maintain normal terms with vendors and service providers;

3

(ix) our ability to maintain contracts, including leases, that are critical to our operations;

(x) the potential adverse impact of the Chapter 11 case on our liquidity or results of operations;

(xi) our ability to develop a long-term strategy and our ability to fund and execute our business plan;

(xii) our ability to avoid or mitigate an adverse judgment against us in (1) that certain lawsuit seeking to recover assets on behalf of Clark Fork and Blackfoot LLC filed by Magten Asset Management Corporation and Law Debenture Trust of New York and (2) similar lawsuits which have been filed by Comanche Park LLC and certain plaintiffs in that pending litigation styled as *McGreevey et al v. The Montana Power Company*;

(xiii) our ability to avoid or mitigate material uninsured monetary judgments, or other adverse judgments, against us in (1) the shareholder class action lawsuit relating to the disposition of the generating and energy-related assets by The Montana Power Company, excluding our acquisition of the electric and natural gas transmission and distribution business formerly held by The Montana Power Company, together with ERISA litigation regarding The Montana Power Company ESOP and 401(k) plan and (2) existing shareholder and derivative litigation or any additional litigation and regulatory action against us, including the initiation by the Securities and Exchange Commission (SEC) of a formal investigation, in connection with the restatement of our 2002 quarterly financial statements, any of which could have a material adverse affect on our liquidity, results of operations and financial condition;

General Factors

(xiv) our ability to maintain an effective internal controls structure;

(xv) our ability to attract, motivate and/or retain key employees;

(xvi) potential additional adverse federal, state, or local legislation or regulation or adverse determinations by regulators, including the final order of the Montana Public Service Commission (MPSC) disallowing the recovery of $6.2 million of natural gas costs we incurred during the past tracker year, and an interim order fixing the recovery price during the next tracker year, which has had and could continue to have a material adverse affect on our liquidity, results of operations and financial condition;

(xvii) unscheduled generation outages, maintenance or repairs which may reduce revenues and increase cost of sales or may require additional capital expenditures or other increased operating costs;

(xviii) unanticipated changes in commodity prices or in fuel supply costs or availability due to higher demand, shortages, weather conditions, transportation problems or other developments, in combination with reduced availability of trade credit, may reduce revenues or may increase operating costs, each of which would adversely affect our liquidity;

(xix) increases in interest rates, which will increase our cost of borrowing;

(xx) adverse changes in general economic and competitive conditions in our service territories; and

(xxi) certain other business uncertainties related to the occurrence of natural disasters, war, hostilities and the threat of terrorist actions.

We have attempted to identify, in context, certain of the factors that we believe may cause actual future experience and results to differ materially from our current expectation regarding the relevant matter or subject area. In addition to the items specifically discussed above, our business and results of operations are subject to the uncertainties described under the caption "Risk Factors" which is a part

of the disclosure included in Item 2 of this Quarterly Report entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations."

From time to time, oral or written forward-looking statements are also included in our reports on Forms 10-K, 10-Q and 8-K, Proxy Statements on Schedule 14A, press releases and other materials released to the public. Although we believe that at the time made, the expectations reflected in all of these forward-looking statements are and will be reasonable, any or all of the forward-looking statements in this quarterly report on Form 10-Q, our reports on Forms 10-K and 8-K, our Proxy Statements on Schedule 14A and any other public statements that are made by us may prove to be incorrect. This may occur as a result of inaccurate assumptions or as a consequence of known or unknown risks and uncertainties. Many factors discussed in this Form 10-Q, certain of which are beyond our control, will be important in determining our future performance. Consequently, actual results may differ materially from those that might be anticipated from forward-looking statements. In light of these and other uncertainties, you should not regard the inclusion of a forward-looking statement in this Form 10-Q or other public communications that we might make as a representation by us that our plans and objectives will be achieved, and you should not place undue reliance on such forward-looking statements.

We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. However, your attention is directed to any further disclosures made on related subjects in our subsequent annual and periodic reports filed with the SEC on Forms 10-K, 10-Q and 8-K and Proxy Statements on Schedule 14A.

*Unless the context requires otherwise, references to "we," "us," "our," "NorthWestern Corporation" and "NorthWestern" refer specifically to NorthWestern Corporation and its subsidiaries.*

# PART 1. FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

### NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION
### CONSOLIDATED BALANCE SHEETS
#### (Unaudited)
#### (in thousands, except per share amounts)

| | March 31, 2004 | December 31, 2003 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 96,050 | $ 15,183 |
| Restricted cash | 27,300 | 27,043 |
| Accounts receivable, net | 112,811 | 106,443 |
| Inventories | 26,528 | 26,521 |
| Regulatory assets | 13,804 | 23,145 |
| Prepaid energy supply | 36,825 | 54,054 |
| Prepaid and other | 31,775 | 41,892 |
| Assets held for sale | 30,000 | 30,000 |
| Current assets of discontinued operations | 81,857 | 106,197 |
| **Total current assets** | **456,950** | **430,478** |
| **Property, Plant, and Equipment, Net** | **1,360,566** | **1,362,749** |
| **Goodwill** | **375,798** | **375,798** |
| **Other:** | | |
| Investments | 10,762 | 11,027 |
| Regulatory assets | 204,116 | 202,174 |
| Other | 59,527 | 61,979 |
| Noncurrent assets of discontinued operations | 63 | 306 |
| **Total assets** | **$2,467,782** | **$2,444,511** |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Liabilities Not Subject to Compromise** | | |
| **Current Liabilities:** | | |
| Current maturities of long-term debt | $ 915,256 | $ 919,392 |
| Accounts payable | 68,784 | 67,602 |
| Accrued expenses | 137,238 | 104,594 |
| Regulatory liabilities | 1,072 | 702 |
| Current liabilities of discontinued operations | 16,320 | 44,496 |
| **Total current liabilities** | **1,138,670** | **1,136,786** |
| **Long-term Debt** | **—** | **—** |
| **Deferred Income Taxes** | **9,620** | **10,536** |
| **Noncurrent Regulatory Liabilities** | **156,308** | **152,851** |
| **Other Noncurrent Liabilities** | **212,685** | **210,094** |
| **Noncurrent Liabilities and Minority Interests of Discontinued Operations** | **667** | **1,998** |
| **Total liabilities not subject to compromise** | **1,517,950** | **1,512,265** |
| **Liabilities Subject to Compromise** | | |
| Financing Debt | 864,844 | 864,844 |
| Trade Creditors | 288,321 | 287,803 |
| Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts | 365,550 | 365,550 |
| **Total liabilities subject to compromise** | **1,518,715** | **1,518,197** |
| **Total liabilities** | **3,036,665** | **3,030,462** |
| **Shareholders' Deficit:** | | |
| Common stock, par value $1.75; authorized 50,000,000 shares; issued and outstanding 37,680,095 | 65,940 | 65,940 |
| Paid-in capital | 301,562 | 301,455 |
| Retained deficit | (930,293) | (947,274) |
| Accumulated other comprehensive loss | (6,092) | (6,072) |
| **Total shareholders' deficit** | **(568,883)** | **(585,951)** |
| **Total liabilities and shareholders' deficit** | **$2,467,782** | **$2,444,511** |

The accompanying notes to consolidated financial statements are an integral part of these statements.

**NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION**
**CONSOLIDATED STATEMENTS OF INCOME**
**(Unaudited)**
**(in thousands, except per share amounts)**

|  | Three Months Ended March 31 | |
|---|---|---|
|  | 2004 | 2003 |
| OPERATING REVENUES | $339,610 | $288,723 |
| COST OF SALES | 206,901 | 155,159 |
| GROSS MARGIN | 132,709 | 133,564 |
| OPERATING EXPENSES |  |  |
| Operating, general and administrative | 74,708 | 73,115 |
| Depreciation | 18,176 | 17,423 |
| Reorganization professional fees and expenses | 6,845 | — |
| TOTAL OPERATING EXPENSES | 99,729 | 90,538 |
| OPERATING INCOME | 32,980 | 43,026 |
| Interest Expense (contractual interest of $46,696 for the three months ended 3/31/2004) | (21,775) | (41,597) |
| Investment Income and Other | 701 | (225) |
| Reorganization Interest Income | 15 | — |
| Income From Continuing Operations Before Income Taxes | 11,921 | 1,204 |
| Benefit (Provision) for Income Taxes | 138 | (37) |
| Income from Continuing Operations | 12,059 | 1,167 |
| Discontinued Operations, Net of Taxes and Minority Interests | 4,922 | 16,225 |
| Net Income | 16,981 | 17,392 |
| Minority Interests on Preferred Securities of Subsidiary Trusts | — | (7,473) |
| Earnings on Common Stock | $ 16,981 | $ 9,919 |
| Average Common Shares Outstanding | 37,397 | 37,397 |
| Earnings per Average Common Share: |  |  |
| Continuing operations | $ 0.32 | $ (0.17) |
| Discontinued operations | 0.13 | 0.43 |
| Basic and Diluted | $ 0.45 | $ 0.26 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

7

**NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(in thousands)**

| | Three Months Ended March 31 | |
|---|---|---|
| | 2004 | 2003 |
| **Operating Activities:** | | |
| Net Income | $ 16,981 | $ 17,392 |
| Items not affecting cash: | | |
| Depreciation | 18,176 | 17,423 |
| Amortization of debt issue costs | 3,029 | 3,745 |
| Income from discontinued operations | (4,922) | (16,225) |
| Deferred income taxes | (916) | (3,235) |
| Changes in current assets and liabilities: | | |
| Restricted cash | (257) | (17,271) |
| Accounts receivable | (6,368) | (7,222) |
| Inventories | (7) | 8,924 |
| Prepaid energy supply costs | 17,229 | (42,041) |
| Prepaid and other | 10,117 | (125) |
| Accounts payable | 1,453 | (1,810) |
| Accrued expenses | 32,206 | (9,663) |
| Change in regulatory assets | 7,399 | 14,201 |
| Change in regulatory liabilities | 3,827 | (12,805) |
| Change in other noncurrent liabilities | 3,276 | 4,300 |
| Other, net | (3,240) | 1,998 |
| **Cash flows provided by (used in) continuing operations** | 97,983 | (42,414) |
| Change in net assets of discontinued operations | (2) | 12,835 |
| **Cash flows provided by (used in) operating activities** | 97,981 | (29,579) |
| **Investment Activities:** | | |
| Property, plant and equipment additions | (13,633) | (18,450) |
| Proceeds from sale of assets | 695 | 429 |
| Purchase of investments | — | (36,126) |
| Proceeds from sale of investments | 39 | 44,960 |
| **Cash flows used in investing activities** | (12,899) | (9,187) |
| **Financing Activities:** | | |
| Minority interest on preferred securities of subsidiary trusts | — | (7,473) |
| Issuance of long-term debt | — | 393,337 |
| Repayment of long-term debt | (4,215) | (19,583) |
| Line of credit repayments, net | — | (255,000) |
| Financing costs | — | (24,908) |
| **Cash flows (used in) provided by financing activities** | (4,215) | 86,373 |
| **Increase in Cash and Cash Equivalents** | 80,867 | 47,607 |
| Cash and Cash Equivalents, beginning of period | 15,183 | 26,554 |
| **Cash and Cash Equivalents, end of period** | $ 96,050 | $ 74,161 |
| **Supplemental Cash Flow Information:** | | |
| Cash paid (received) during the period for: | | |
| Income taxes | $ (4,579) | $ (4,231) |
| Interest | 12,670 | 47,085 |
| Reorganization professional fees and expenses | 5,325 | — |
| Reorganization interest income | 15 | — |

The accompanying notes to consolidated financial statements are an integral part of these statements.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(Reference is made to Notes to Financial Statements
included in NorthWestern Corporation's Annual Report)

**(1)  Management's Statement**

The consolidated financial statements for the interim periods included herein have been prepared by NorthWestern Corporation (the Corporation, Debtor or we), a debtor-in-possession, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission (SEC). The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that may affect the reported amounts of assets, liabilities, revenues and expenses during the reporting period. Actual results could differ from those estimates. Results of operations for the interim periods are not necessarily indicative of the results to be expected for the full year, and these financial statements do not contain the detail or footnote disclosures concerning accounting policies and other matters that would be included in full fiscal year financial statements. Therefore, these financial statements should be read in conjunction with the financial statements and the notes thereto included in the Corporation's Annual Report on Form 10-K for the year ended December 31, 2003.

On September 14, 2003 (the Petition Date), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court). Pursuant to Chapter 11 (as discussed further in Note 3), we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court. Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. The assets and liabilities of such nondebtor subsidiaries are not considered to be material to the consolidated financial statements or are included in discontinued operations.

Beginning in the third quarter of 2003, the consolidated financial statements have been prepared in accordance with the American Institute of Certified Public Accountants' Statement of Position (SOP) 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," and on a going concern basis, which contemplates continuity of operations, realization of assets, and liquidation of liabilities in the ordinary course of business. As a result of our Chapter 11 filing, the realization of assets and liquidation of liabilities are subject to uncertainty. Under SOP 90-7, certain liabilities existing prior to the Chapter 11 filing are classified as Liabilities Subject to Compromise on the Consolidated Balance Sheets. Additionally, professional fees and expenses directly related to the Chapter 11 proceeding and interest income on funds accumulated during the Chapter 11 proceedings are reported separately as reorganization items. Finally, the extent to which our reported interest expense differs from the stated contractual interest is disclosed on the Consolidated Statements of Income.

**(2)  Basis of Consolidation and Nature of Operations**

We are one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving approximately 608,000 customers in Montana, South Dakota and Nebraska. We have generated and distributed electricity in South Dakota and distributed natural gas in South Dakota and Nebraska since 1923 and have distributed electricity and natural gas in Montana since 2002 under the trade name "NorthWestern Energy."

The accompanying consolidated financial statements include our accounts together with those of our wholly and majority-owned or controlled subsidiaries. The financial statements of Netexit and Blue Dot are included in the accompanying consolidated financial statements by virtue of the voting and control rights, and therefore included in references to "subsidiaries." Netexit and Blue Dot are not

9

party to our Chapter 11 case. All significant intercompany balances and transactions have been eliminated from the consolidated financial statements. The operations of Netexit and Blue Dot and our interest in these subsidiaries have been reflected in the consolidated financial statements as Discontinued Operations (see Note 7 for further discussion).

The following table reflects intercompany accounts receivable from (payable to) nondebtor subsidiaries, which are eliminated on consolidation (in thousands):

|  | March 31, 2004 | December 31, 2003 |
|---|---|---|
| Blue Dot Services, Inc. | $ (1,516) | $ (1,519) |
| Canadian Montana Pipeline Corporation | (1,394) | (1,400) |
| Clark Fork and Blackfoot, LLC | (6,089) | (6,625) |
| Netexit, Inc. | 224,025 | 224,025 |
| Grant Inc. | (608) | (591) |
| Montana Megawatts I, LLC | 79,168 | 78,884 |
| Nekota Resources Inc. | 3,752 | 3,364 |
| NorthWestern Capital Corporation | 49,810 | 51,608 |
| NorthWestern Consumer Services | 3,528 | 3,608 |
| NorthWestern Energy Corporation | (9,595) | (4,269) |
| NorthWestern Energy Marketing, LLC | 1,675 | 1,767 |
| NorthWestern Growth Corporation | 582,869 | 586,814 |
| Norcom Advanced Technologies, Inc. | 12 | — |
| Risk Partners Assurance, Ltd. | 26 | 26 |

### (3)  Chapter 11 Filing

As a result of our Chapter 11 filing, we operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable court orders. All vendors are being paid for all goods furnished and services provided after the Petition Date while under the supervision of the Bankruptcy Court. As a debtor-in-possession, we are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Bankruptcy Court, after notice and an opportunity for a hearing.

We filed our disclosure statement and initial plan of reorganization on March 12, 2004. A hearing to approve the disclosure statement is scheduled for May 17, 2004. If the disclosure statement is approved by the Bankruptcy Court, then we will be allowed to disseminate our proposed plan of reorganization for voting on by creditors and other parties-in-interest. Although our proposed disclosure statement and plan of reorganization provides for our emergence from bankruptcy as a going concern, there can be no assurance at this time that the disclosure statement will be approved on or about May 17, and that our plan of reorganization will thereafter be disseminated to creditors and other parties-in-interest and will be confirmed by the Bankruptcy Court, or that any such plan will be implemented successfully. We have incurred, and will continue to incur pending emergence, significant expenses and costs associated with the reorganization.

The United States Trustee for the Bankruptcy Court has appointed an Official Committee of Unsecured Creditors (Creditors' Committee). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court. There can be no assurance that the Creditors' Committee will support our position or our proposed plan of reorganization. Disagreements between us and the Creditors' Committee could protract the Chapter 11 case, negatively impact our ability to operate during the case and prevent our emergence from bankruptcy.

The consolidated financial statements have been prepared on a "going concern" basis in accordance with GAAP. The "going concern" basis of presentation assumes that we will continue in operation for the foreseeable future and will be able to realize our assets and discharge our liabilities in the normal course of business. Because of the Chapter 11 case and the circumstances leading to the filing thereof, our ability to continue as a "going concern" is subject to substantial doubt and is dependent upon, among other things, confirmation of a plan of reorganization, our ability to comply with the terms of the DIP Facility, and our ability to generate sufficient cash flows from operations, asset sales and financing arrangements to meet our obligations. There can be no assurance that this can be accomplished and if it were not, our ability to realize the carrying value of our assets and discharge our liabilities would be subject to substantial uncertainty. Therefore, if the "going concern" basis were not used for the Financial Statements, then significant adjustments could be necessary to the carrying value of assets and liabilities, the revenues and expenses reported, and the balance sheet classifications used.

The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations. As such, we have classified all of our secured debt as current on the balance sheet. Subject to certain exceptions under the Bankruptcy Code, our Chapter 11 filing automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against us or our property to recover on, collect or secure a claim arising prior to the Petition Date. Thus, for example, creditor actions to obtain possession of our property, or to create, perfect or enforce any lien against our property, or to collect on or otherwise exercise rights or remedies with respect to a prepetition claim are enjoined unless and until the Bankruptcy Court lifts the automatic stay.

In April 2004, we reduced the commitment under our DIP Facility from $85 million to $75 million. As of March 31, 2004 we had $12.9 million in letters of credit outstanding and no borrowings under the DIP Facility.

**(4)   Asset Retirement Obligations**

We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by us. The easements are generally perpetual and only require remediation action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. These amounts do not represent Statement of Financial Accounting Standards (SFAS) No. 143 legal retirement obligations. As of March 31, 2004 and December 31, 2003, we have recognized accrued removal costs of $127.4 million and $124.9 million, respectively, which are included in noncurrent regulatory liabilities.

For our generation properties, we have accrued decommissioning costs since the generating units were first put into service in the amount of $12.0 million and $11.9 million as of March 31, 2004 and December 31, 2003, respectively, which is classified as a noncurrent regulatory liability. These amounts also do not represent SFAS No. 143 legal retirement obligations.

**(5)   Stock-based Compensation**

We have a nonqualified stock option and incentive plan that provides for the issuance of options to officers, key employees and directors. Unless established differently by the Compensation Committee

of our Board of Directors, the per share option exercise price is equal to the fair market value of our common stock at the date of grant. We follow Accounting Principles Board Opinion 25, *Accounting for Stock Issued to Employees'* to account for stock option plans. Accordingly, no compensation expense is recognized as options granted under the plan have an exercise price equal to the market value of the underlying stock on the date of grant. The following table illustrates the effect on net income and earnings per share if we had applied the fair value recognition provisions of Financial Accounting Standards Board (FASB) Statement No. 123, *Accounting for Stock-Based Compensation*," (in thousands except per share amounts):

|  | Three Months Ended March 31, | |
|  | 2004 | 2003 |
|---|---|---|
| Earnings on common stock | | |
|   As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $16,981 | $9,919 |
| Less: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects . . . . . . . . . . . . . . . . . . . . . . . . . . | (170) | (247) |
|   Pro forma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $16,811 | $9,672 |
| Diluted earnings per share | | |
|   As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.45 | $ 0.26 |
|   Pro forma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.45 | $ 0.26 |

**(6) Goodwill**

There were no changes in our goodwill during the three months ended March 31, 2004. Goodwill relates entirely to the Montana operations acquired in 2002 included in our Electric and Natural Gas segment and totals $375.8 million as of March 31, 2004 and December 31, 2003.

**(7) Discontinued Operations**

During the second quarter of 2003, we committed to a plan to sell or liquidate our interest in Netexit and Blue Dot. In accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* we classified the results of operations of Netexit and Blue Dot as discontinued operations.

As previously discussed in our Annual Report on Form 10-K for the year ended December 31, 2003, we sold substantially all the assets and business of Expanets, Inc. to Avaya, Inc. (Avaya) and retained certain specified liabilities. Thereafter, Expanets was renamed Netexit, Inc. (Netexit). On February 24, 2004, Avaya submitted its proposed final calculation of the postclosing working capital adjustment required under the sale agreements claiming that Avaya should retain $44.6 million in held-back proceeds plus an additional $4.2 million. Netexit disputed this calculation and entered into a settlement with Avaya on April 27, 2004 resulting in additional cash proceeds of $17.5 million paid to Netexit. Pending the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit. In order to wind-down its affairs in an orderly manner, Netexit filed for bankruptcy protection on May 4, 2004 in the US Bankruptcy Court for the District of Delaware. We recognized an estimated loss on disposal of approximately $49.3 million during 2003 based on the terms of the sale and our expectation of the amount to be received from Avaya. We expect to record a gain in the second quarter of 2004 of approximately $11 million as a result of the settlement with Avaya. However, we will also incur additional expenses related to the bankruptcy filing and may incur losses related to the resolution of open claims.

Summary financial information for the discontinued Netexit operations is as follows (in thousands):

| | March 31, 2004 | December 31, 2003 |
|---|---|---|
| Current assets of discontinued operations . . . . . . . . . . . . . . . . . . . . . | $57,649 | $ 59,949 |
| Current liabilities of discontinued operations . . . . . . . . . . . . . . . . . . | $ 7,838 | $ 11,795 |

| | Three Months Ended March 31, | |
|---|---|---|
| | 2004 | 2003 |
| Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $166,606 |
| Income before income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1,666 | $ 21,120 |
| Income tax provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (140) |
| Income from discontinued operations, net of income taxes . . . . . . . . . | $ 1,666 | $ 20,980 |

Netexit's income before income taxes for the three months ended March 31, 2003, includes a gain on debt extinguishment of $27.3 million.

Blue Dot sold 10 businesses during the first quarter of 2004. As of March 31, 2004, Blue Dot had four remaining businesses. Cash proceeds from business sales remain at Blue Dot. We hope to receive in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided, however, this assumes satisfactory resolutions to remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation. Furthermore, it assumes that the remaining businesses produce their projected cash proceeds and receivables from various sold locations are collectible.

Summary financial information for the discontinued Blue Dot operations is as follows (in thousands):

| | March 31, 2004 | December 31, 2003 |
|---|---|---|
| Accounts receivable, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7,098 | $27,588 |
| Other current assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,110 | 18,660 |
| Current assets of discontinued operations . . . . . . . . . . . . . . . . . . . . . | $24,208 | $46,248 |
| Other noncurrent assets of discontinued operations . . . . . . . . . . . . . . | $ 63 | $ 306 |
| Accounts payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1,514 | $11,486 |
| Other current liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,968 | 21,215 |
| Current liabilities of discontinued operations . . . . . . . . . . . . . . . . . . | $ 8,482 | $32,701 |
| Other noncurrent liabilities of discontinued operations . . . . . . . . . . . | $ 667 | $ 1,998 |

13

|                                                              | Three Months Ended March 31, | |
| --- | --- | --- |
|                                                              | 2004 | 2003 |
| Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $16,593 | $111,195 |
| Loss before income taxes and minority interests . . . . . . . . . . . . . . . . . . | $(4,293) | $ (4,248) |
| Gain on disposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,549 | — |
| Income tax provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (295) |
| Income (Loss) from discontinued operations, net of income taxes . . . . . . | $ 3,256 | $ (4,543) |

During the second and third quarters of 2003, we also sold our interest in two other subsidiaries. We have classified the results of these subsidiaries in discontinued operations. For the three months ended March 31, 2003, revenues from these operations were $7.8 million and losses net of income taxes were $0.2 million.

## (8) Other Comprehensive Income (Loss)

The Financial Accounting Standards Board defines comprehensive income as all changes to the equity of a business enterprise during a period, except for those resulting from transactions with owners. For example, dividend distributions are excepted. Comprehensive income consists of net income and other comprehensive income. Net income may include such items as income from continuing operations, discontinued operations, extraordinary items, and cumulative effects of changes in accounting principles. Other comprehensive income may include foreign currency translations, adjustments of minimum pension liability, and unrealized gains and losses on certain investments in debt and equity securities. Comprehensive income is calculated as follows (in thousands):

|                                                              | Three Months Ended March 31, | |
| --- | --- | --- |
|                                                              | 2004 | 2003 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $16,981 | $17,392 |
| Other comprehensive income (loss), net of tax: | | |
| Unrealized loss on investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (380) |
| Amortization of hedge gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (112) |
| Foreign currency translation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (20) | 91 |
| Comprehensive income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $16,961 | $16,991 |

14

**(9) Income Taxes**

The following table reconciles our effective income tax rate to the federal statutory rate:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2004 | 2003 |
| Federal statutory rate | (35.0)% | (35.0)% |
| State income, net of federal provisions | (3.7) | (21.7) |
| Amortization of investment tax credit | 1.1 | 11.1 |
| Minority interest preferred stock | — | 217.2 |
| Dividends received deduction and other investments | 0.4 | 12.3 |
| Valuation allowance | 41.6 | (185.5) |
| Other, net | (3.2) | (1.5) |
| | 1.2% | (3.1)% |

We have recorded a valuation allowance of $177.3 million and $181.6 million as of March 31, 2004 and December 31, 2003, respectively, against deferred tax assets as it is more likely than not that these benefits will not be realized. In the first quarter of 2004 we reversed $4.3 million of our recorded valuation allowance, including $0.6 million related to Blue Dot and $1.2 million related to Netexit, due to our earnings before taxes for the three months ended March 31, 2004.

**(10) Segment Information**

We currently operate our business in three reporting segments: (i) electric operations, (ii) natural gas operations, and (iii) all other, which primarily consists of our other miscellaneous service and nonenergy related operations and activities that are not included in the other identified segments, together with the unallocated corporate costs and investments, and any eliminating amounts. Items below operating income are not allocated between our electric and natural gas segments.

The accounting policies of the operating segments are the same as the parent except that the parent allocates some of its operating expenses and interest expense to the operating segments according to a methodology designed by management for internal reporting purposes and involves

estimates and assumptions. Financial data for the business segments, excluding discontinued operations, are as follows (in thousands):

| | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| **Three Months Ended March 31, 2004** | | | | | |
| Operating revenues . . . . . . . . . . . . . . . . | $176,989 | $160,068 | $ 337,057 | $ 2,553 | $ 339,610 |
| Cost of sales . . . . . . . . . . . . . . . . . . . . . | 87,729 | 118,478 | 206,207 | 694 | 206,901 |
| Gross margin . . . . . . . . . . . . . . . . . . . . | 89,260 | 41,590 | 130,850 | 1,859 | 132,709 |
| Operating, general and administrative . . . . | 51,957 | 18,420 | 70,377 | 4,331 | 74,708 |
| Depreciation . . . . . . . . . . . . . . . . . . . . . | 14,153 | 3,617 | 17,770 | 406 | 18,176 |
| Reorganization expenses . . . . . . . . . . . . . | — | — | — | 6,845 | 6,845 |
| Operating income (loss) . . . . . . . . . . . . . | 23,150 | 19,553 | 42,703 | (9,723) | 32,980 |
| Interest expense . . . . . . . . . . . . . . . . . . . | N/A | N/A | (20,109) | (1,666) | (21,775) |
| Investment income and other . . . . . . . . . . | N/A | N/A | 707 | (6) | 701 |
| Reorganization interest income . . . . . . . . | N/A | N/A | — | 15 | 15 |
| Income (loss) before taxes . . . . . . . . . . . | N/A | N/A | 23,301 | (11,380) | 11,921 |
| Benefit (provision) for taxes . . . . . . . . . . . | N/A | N/A | (9,228) | 9,366 | 138 |
| Income (loss) from continuing operations . | N/A | N/A | $ 14,073 | $ (2,014) | $ 12,059 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . | N/A | N/A | $2,248,757 | $137,105 | $2,385,862 |
| Capital expenditures . . . . . . . . . . . . . . . . | N/A | N/A | $ 13,623 | $ 10 | $ 13,633 |

| | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| **Three Months Ended March 31, 2003** | | | | | |
| Operating revenues . . . . . . . . . . . . . . . . | $167,644 | $117,693 | $ 285,337 | $ 3,386 | $ 288,723 |
| Cost of sales . . . . . . . . . . . . . . . . . . . . . | 77,155 | 77,286 | 154,441 | 718 | 155,159 |
| Gross margin . . . . . . . . . . . . . . . . . . . . | 90,489 | 40,407 | 130,896 | 2,668 | 133,564 |
| Operating, general and administrative . . . . | 45,234 | 15,640 | 60,874 | 12,241 | 73,115 |
| Depreciation . . . . . . . . . . . . . . . . . . . . . | 13,585 | 3,407 | 16,992 | 431 | 17,423 |
| Operating income (loss) . . . . . . . . . . . . . | 31,670 | 21,360 | 53,030 | (10,004) | 43,026 |
| Interest expense . . . . . . . . . . . . . . . . . . . | N/A | N/A | (26,153) | (15,444) | (41,597) |
| Investment income and other . . . . . . . . . . | N/A | N/A | 66 | (291) | (225) |
| Income (loss) before taxes . . . . . . . . . . . | N/A | N/A | 26,943 | (25,739) | 1,204 |
| Benefit (provision) for taxes . . . . . . . . . . . | N/A | N/A | (10,190) | 10,153 | (37) |
| Income (loss) from continuing operations . | N/A | N/A | $ 16,753 | $(15,586) | $ 1,167 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . | N/A | N/A | $1,966,748 | $482,106 | $2,448,854 |
| Capital expenditures . . . . . . . . . . . . . . . . | N/A | N/A | $ 18,383 | $ 67 | $ 18,450 |

## (11) New Accounting Standards

In December 2003, the FASB issued Interpretation No. 46 (revised December 2003), *Consolidation of Variable Interest Entities*, or FIN 46R. FIN 46R was issued to replace FIN 46 and clarify the accounting for interests in variable interest entities. In February 2004, we became aware that certain long-term purchase power and tolling contracts may be considered variable interests under FIN 46R.

We have various long-term purchase power contracts with other utilities and certain qualifying facility plants. After evaluation of these contracts, we believe two of our qualifying facilities contracts may constitute variable interest entities under the provisions of FIN 46R. We are currently engaged in adversary proceedings with these qualifying facilities, and while we have made exhaustive efforts, we have been unable to obtain the information necessary to further analyze these contracts under the requirements of FIN 46R. We continue to account for the qualifying facilities contracts as executory contracts. Based on the current contract terms with these two qualifying facilities, our estimated gross contractual payments aggregate approximately $1.7 billion through 2029.

**(12) Reclassifications**

Certain 2003 amounts have been reclassified to conform to the 2004 presentation. Such reclassifications have no impact on net loss or shareholders' deficit as previously reported.

**(13) Earnings (Loss) per Average Common Share**

Basic earnings per share is computed on the basis of the weighted average number of common shares outstanding. Diluted earnings per share is computed on the basis of the weighted average number of common shares outstanding plus the effect of the outstanding stock options. The following table presents the shares used in computing the basic and diluted earnings per share for 2004 and 2003:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | **2004** | **2003** |
| Average Common Shares Outstanding For Basic Computation | 37,396,762 | 37,396,762 |
| Dilutive Effect of: | | |
| Stock Options | — | 5,697 |
| Average Common Shares Outstanding For Diluted Computation | 37,396,762 | 37,402,459 |

Certain outstanding antidilutive options have been excluded from the earnings (loss) per average share calculation. These options total 1,359,188 and 1,843,808 for the three months ended March 31, 2004 and 2003, respectively.

**(14) Employee Benefit Plans**

Net periodic benefit cost for our pension and other postretirement plans consists of the following for the three months ended March 31, 2004 and 2003 (in thousands):

|  | Pension Benefits | | Other Postretirement Benefits | |
| --- | --- | --- | --- | --- |
|  | **2004** | **2003** | **2004** | **2003** |
| Components of Net Periodic Benefit Cost (Income) | | | | |
| Service cost | $ 2,166 | $ 1,291 | $ 220 | $ 337 |
| Interest cost | 7,265 | 5,270 | 805 | 1,364 |
| Expected return on plan assets | (7,129) | (4,082) | (76) | (65) |
| Amortization of transitional obligation | 155 | 39 | — | 169 |
| Amortization of prior service cost | 373 | 126 | — | — |
| Recognized actuarial (gain) loss | 701 | 681 | 194 | 117 |
|  | 3,531 | 3,325 | 1,143 | 1,922 |
| Additional (income) or loss recognized: | | | | |
| Curtailment | — | — | — | 3,378 |
| Special termination benefits | — | 196 | — | — |
| Settlement cost | — | — | — | (3,397) |
| Net Periodic Benefit Cost | $ 3,531 | $ 3,521 | $1,143 | $ 1,903 |

In March 2004, our Board of Directors directed management to review and terminate certain nonqualified employee benefit plans. We expect to file motions with the Bankruptcy Court during the second quarter of 2004 seeking to terminate these plans.

In January 2004, the FASB issued Staff Position No. 106-1, *Accounting and Disclosure Requirements Related to the Medicare Prescription Drug Improvement and Modernization Act of 2003* (FSP 106-1). While we have elected to defer recognition of the effects of FSP 106-1 until guidance on the accounting for the federal subsidy is issued, we do not expect the effects of FSP 106-1 to be material to the measurement of our accumulated projected benefit obligation or our periodic postretirement benefit cost.

### (15) Commitments and Contingencies

*Environmental Liabilities*

We are subject to numerous state and federal environmental regulations. Because laws and regulations applicable to our businesses are continually developing and are subject to amendment, reinterpretation and varying degrees of enforcement, we may be subject to, but can not predict with certainty the nature and amount of future environmental liabilities. The Clean Air Act Amendments of 1990 (the Act) stipulate limitations on sulfur dioxide and nitrogen oxide emissions from coal-fired power plants. We believe we can comply with such sulfur dioxide emission requirements at our generating plants and that we are in compliance with all presently applicable environmental protection requirements and regulations. We also are subject to other environmental statutes and regulations including those that relate to former manufactured gas plant sites and other past and present operations and facilities. In addition, we may be subject to financial liabilities related to the investigation and remediation from activities of previous owners or operators of our industrial and generating facilities. The range of exposure for environmental remediation obligations at present is estimated to range between $45.3 million to $84.1 million. Our environmental reserve accrual is $45.3 million as of March 31, 2004.

In light of the Environmental Protection Agency's public announcement in April 2003, favoring removal of the Milltown Dam structure as part of the remedy to address heavy metals contamination in the Milltown Reservoir, we commenced negotiations with the Atlantic Richfield Company, or ARCO, to prevent a challenge from ARCO to our statutorily exempt status under the Comprehensive Environmental Response Compensation and Liability Act as a potentially responsible party. On September 10, 2003, we executed a confidential settlement agreement with ARCO which, among other things, capped our maximum contribution towards remediation of the Milltown Reservoir superfund site. A motion to approve the settlement agreement with ARCO was filed with the Bankruptcy Court on October 17, 2003. On April 7, 2004 we entered into a stipulation with ARCO, the U.S. Environmental Protection Agency, the Department of the Interior, the State of Montana and the Confederated Salish and Kootenai Tribes (collectively the Government Parties), which is intended to resolve both NorthWestern's liability with ARCO in general accordance with the previously negotiated settlement agreement and establish a framework to resolve NorthWestern's liability with the Government Parties for their claims, including natural resource restoration claims, against NorthWestern as they relate to remediation of the Milltown Site. If approved by the Bankruptcy Court, the Stipulation caps NorthWestern's liability to ARCO and the Government Parties at $11.4 million. The amount of the stipulated liability has been fully accrued in the accompanying financial statements. Commencing in the month following Bankruptcy Court approval of the Stipulation and each month thereafter, we will pay $500,000 alternately into two escrow accounts, one for the State of Montana and one for ARCO, until the total agreed amount is funded. No interest will accrue on the unpaid balance due, and the escrow accounts will remain funded until a final, nonappealable consent decree is entered by the United States District Court. If, however, the Stipulation is not approved by the Bankruptcy Court or a consent decree (i) is not executed by the relevant parties, (ii) is not approved by the United

18

States District Court, or (iii) does not become fully effective, then all funds in the escrow accounts will continue to be held in trust pending further court order. The Stipulation, which is subject to Bankruptcy Court approval, incorporates appropriate releases and indemnifications from ARCO under the previously negotiated settlement agreement.

*Legal Proceedings*

As a result of the Chapter 11 filing, attempts to collect, secure or enforce remedies with respect to most prepetition claims against us are subject to the automatic stay provisions of Section 362(a) of Chapter 11.

We, and certain of our present and former officers and directors, were named as defendants in numerous complaints purporting to be class actions which were filed in the United States District Court for the District of South Dakota, Southern Division, alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The complaints contained varying allegations, including that the defendants misrepresented and omitted material facts with respect to our 2000, 2001, and 2002 financial results and operations included in our filings with the SEC, press releases, and registration statements and prospectuses disseminated in connection with certain offerings of debt, equity, and trust preferred securities. The complaints seek unspecified compensatory damages, rescission, and attorneys' fees and costs as well as accountants' and experts' fees. In June 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Securities Litigation*, Case No. 03-4049, and Carpenters Pension Trust for Southern California, Oppenheim Investment Management, LLC, and Richard C. Slump were named as co-lead plaintiffs (the "Lead Plaintiffs"). In July 2003, the Lead Plaintiffs filed a consolidated amended class action complaint naming NorthWestern, NorthWestern Capital Financing II and III, Blue Dot, Expanets, certain of our present and former officers and directors, along with a number of investment banks that participated in the securities offerings. The amended complaint alleges that the defendants misrepresented and omitted material facts concerning the business operations and financial performance of NorthWestern, Expanets, Blue Dot and CornerStone, overstated NorthWestern's revenues and earnings by, among other things, maintaining insufficient reserves for accounts receivable at Expanets, failing to disclose billing problems and lapses and data conversion problems, failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system, concealing losses at Expanets and Blue Dot by improperly allocating losses to minority interest shareholders, maintaining insufficient internal controls, and profiting from improper related-party transactions. We, and certain of our present and former officers and directors, were also named as defendants in two complaints purporting to be class actions which were filed in the United States District Court for the Southern District of New York, entitled *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.*, Case No. 03CV3223, and *Arthur Laufer v. Merle Lewis, et al.*, Case No. 03CV3716, which were brought on behalf of the purchasers of our 7.20%, 8.25%, and 8.10% trust preferred securities which were offered and sold pursuant to our registration statement on Form S-3 filed on July 12, 1999. The plaintiffs' claims are based on similar allegations of material misrepresentations and omissions of fact relating to the registration statement in violation of Sections 11 and 12 of the Securities Act of 1933, and they seek unspecified compensatory damages, rescission and attorneys', accountants' and experts' fees. In July 2003, *Arthur Laufer v. Merle Lewis, et al.* was transferred to the District of South Dakota and consolidated with the consolidated actions pending in that court. In September 2003, *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.* was also transferred to the District of South Dakota. In February 2004, the *Golman Family Trust* action was also consolidated with the actions pending in that court. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. In October 2003, Expanets, Blue Dot, and certain of NorthWestern's present and

former officers and directors filed motions to dismiss the consolidated amended class action complaint for failure to state a claim, which are currently pending in the District of South Dakota.

Certain of our present and former officers and directors and NorthWestern, as a nominal defendant, have been named in two shareholder derivative actions commenced in the United States District Court for the District of South Dakota, Southern Division, entitled *Deryl Lusty, et al. v. Richard R. Hylland, et al.*, Case No. CIV034091 and *Jerald and Betty Stewart, et al. v. Richard R. Hylland, et al.*, Case No. CIV034114. These shareholder derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal shareholder suits. The plaintiffs seek unspecified compensatory damages, restitution of improper salaries, insider trading profits and payments from NorthWestern, and disgorgement under the Sarbanes-Oxley Act of 2002. In July 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091. In October 2003, the action was stayed pending a ruling on defendants' motions to dismiss in the related securities class action, *In re NorthWestern Corporation Securities Litigation*. On November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining the plaintiffs in *In re NorthWestern Corporation Derivative Litigation* from prosecuting the litigation against NorthWestern, its subsidiaries and its current and former officers and directors until further order of the Bankruptcy Court.

On February 7, 2004, the parties to the above consolidated securities class actions and consolidated derivative litigation, together with certain other affected persons and parties, reached a tentative settlement of the litigation. On April 19, 2004 the parties and other affected persons signed a memorandum of understanding which memorialized the tentative settlement. Among the terms of the proposed settlement, we, Expanets, Blue Dot and other parties and persons will be released from all claims to these cases, a settlement fund in the amount of $41 million (of which approximately $37 million would be contributed by our directors and officers liability insurance carriers, and $4 million would be contributed from other persons and parties) will be established, and the plaintiffs would have a $20 million liquidated securities claim against Netexit. We have filed a motion in NorthWestern's bankruptcy proceeding seeking approval of the terms of the memorandum of understanding and related documents. The settlement is subject to the occurrence of several conditions, including approval of the proposed settlement by the Bankruptcy Court in our bankruptcy proceeding and approval of the proposed settlement by the federal District Court for the District of South Dakota, where the consolidated class actions are pending. If for any reason these conditions do not occur and the settlement is not approved, then we intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In December 2003, the SEC notified NorthWestern that it had issued a formal order of private investigation and subsequently subpoenaed documents from NorthWestern, NorthWestern Communications Solutions, Expanets and Blue Dot. This action follows the SEC's requests for information made in connection with the previously disclosed SEC informal inquiry into questions regarding the restatements and other accounting and financial reporting matters. In addition, NorthWestern directors have been interviewed by representatives of the Federal Bureau of Investigation (FBI) concerning questions regarding the restatements and other accounting and financial reporting. NorthWestern has not been contacted by the FBI and has not been advised that NorthWestern is the target of any such FBI investigation. We are cooperating with the SEC's investigation and intend to cooperate with the FBI if we are contacted in connection with its investigation. We understand that the FBI or the Internal Revenue Service (IRS) may have contacted current and former employees of ours or of our subsidiaries. As of the date hereof, we are not aware of any other governmental inquiry or investigation related to these matters. We cannot predict whether

or not any other governmental inquiry or investigation will be commenced, nor can we predict the outcome of the SEC, FBI, IRS or any other governmental inquiry or investigation or related litigation or proceeding.

In January 2004, two of the QFs—Colstrip Electric Limited Partnership (CELP) and Yellowstone Electric Limited Partnership (YELP)—initiated adversary proceedings against NorthWestern in its Chapter 11 proceedings. Both CELP and YELP have also filed claims in NorthWestern's bankruptcy proceeding. In the CELP adversary proceeding, CELP seeks additional payments based on whether or not a force majeure occurred under the terms of the existing power purchase agreement. In the YELP adversary proceeding, YELP seeks a determination of when and who has the right to determine the scheduling of maintenance on the power facility under the terms of the power purchase agreement. We intend to vigorously defend against these adversary proceedings. In the opinion of management, the amount of ultimate liability with respect to these adversary proceedings will not materially affect our financial position or results of operations or our ability to timely confirm a plan of reorganization.

On April 16, 2004 Magten Asset Management Corporation (Magten) and Law Debenture Trust Company of New York (Law Debenture) initiated an adversary proceeding against NorthWestern seeking among other things, to void the transfer of certain assets of Clark Fork and Blackfoot LLC (Clark Fork) to us. Magten and Law Debenture have also filed claims in NorthWestern's bankruptcy proceeding. In essence, Magten and Law Debenture are asserting that the transfer of the transmission and distribution assets acquired from the Montana Power Company was a fraudulent conveyance because such transfer left Clark Fork insolvent and unable to pay certain claims. The plaintiffs also assert that they are creditors of Clark Fork as a result of Magten owning a portion of the Series A 8.45% Quarterly Income Preferred Securities for which Law Debenture serves as the Indenture Trustee. By its adversary proceeding, the plaintiffs seek, among other things, the avoidance of the transfer of assets, declaration that the assets were fraudulently transferred and are not property of our bankruptcy case, the imposition of constructive trusts over the transferred assets and the return of such assets to Clark Fork. In addition to the adversary proceeding filed by Magten and Law Debenture, the plaintiffs in the class action lawsuit entitled *McGreevey, et al v. Montana Power Company, et al* and, separately, Comanche Park LLC have filed motions seeking approval from the Bankruptcy Court to initiate similar adversary proceedings. On April 19, 2004 Magten also filed a substantially similar complaint against certain former and current directors of Clark Fork in U.S. District Court in Montana, but Magten seeks compensatory and punitive damages for breaches of fiduciary duties by such directors. We anticipate those directors will request Clark Fork and us to indemnify them for their legal fees and costs in defending against the lawsuit and any settlement and/or judgment in such lawsuit. At this time, we cannot predict the impact or resolution of any of these lawsuits or reasonably estimate a range of possible loss, which could be material. The resolution of these lawsuits could harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization. We intend to vigorously defend against the adversary proceeding and any subsequently filed similar litigation.

Harbert Management Corporation (Harbert) and Wilmington Trust Company (Wilmington) have filed a motion in NorthWestern's bankruptcy proceeding seeking the bankruptcy court's approval to file certain pleadings with the SEC and participate any proceedings before the SEC to allege certain violations of the Public Utility Company Holding Act of 1935, 15 U.S.C. §79a, et seq. (PUCHA). Harbert and Wilmington allege that NorthWestern at the time of its acquisition of the electric and natural gas transmission and distribution assets from The Montana Power Company could not seek an exemption from the requirements of PUCHA and thus certain senior unsecured and senior secured debt issued after seeking the exemption was void. At this time, we cannot predict the impact or resolution of this motion or if an SEC proceeding is initiated or reasonably estimate a range of possible loss, which could be material. The resolution of these matters could harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

21

We intend to vigorously defend against the motion and or any proceeding initiated by Harbert and Wilmington.

Expanets has been named in an investigation brought by the New York City Comptroller's Office based on five complaints of former employees of Expanets for alleged violations of the New York City prevailing wage laws. Expanets and NorthWestern have been named defendants in two complaints filed with the Supreme Court of the State of New York, County of Bronx, alleging violations of New York's prevailing wage laws, breach of contract, unjust enrichment, willful failure to pay wages, race, ethnicity, national origin and/or age discrimination and retaliation. NorthWestern has been dismissed from both actions through a voluntary dismissal filed by the plaintiffs. In the complaint entitled *Felix Adames et al. v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, Bronx County, Index No. 8664-04,* which has not yet been served upon Expanets, 14 former employees of Expanets seek damages in the amount of $27,750,000, plus interest, penalties, punitive damages, costs, and attorney's fees. In the complaint entitled *Wayne Belnavis and David Daniels v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, Bronx County, Index No. 8729-04,* which has not yet been served upon Expanets, two former employees of Expanets seek damages in the amount of $12,500,000, plus interest, penalties, punitive damages, costs, and attorney's fees. We intend to vigorously defend against the allegations made in these complaints. Though the investigation and complaints may be subject to the automatic stay provisions of the US Bankruptcy Code and the claims by the former Expanets employees may be subject to the claims process of the Netexit bankruptcy proceeding, we cannot currently predict the impact or resolution of these claims or reasonably estimate a range of possible loss, which could be material, and the resolution of these claims may harm our business and have a material adverse impact on our financial condition.

We are one of several defendants in a class action lawsuit entitled *McGreevey, et al. v. The Montana Power Company, et al,* now pending in U.S. District Court in Montana. The lawsuit, which was filed by former shareholders of The Montana Power Company (most of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company were void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern is named as a defendant due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. On November 6, 2003, the Bankruptcy Court approved a stipulation between NorthWestern and the plaintiffs in *McGreevey, et al. v. The Montana Power Company, et al.* The stipulation provides that litigation, as against NorthWestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey, shall be temporarily stayed for 180 days from the date of the stipulation. Upon an agreed upon motion, the automatic stay has been lifted for the limited purpose of conducting a mediation with all parties to the case to seek a resolution. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

*In NorthWestern Corporation vs. PPL Montana, LLC vs. NorthWestern Corporation and Clark Fork and Blackfoot, LLC,* No. CV-02-94-BU-SHE, (D. MT), we are pursuing claims against PPL Montana, LLC (PPL) due to its refusal to purchase the Colstrip transmission assets which under the Asset Purchase Agreement (APA) executed by and between The Montana Power Company (MPC) and PP&L Global, Inc. (PPL Global), NorthWestern claims PPL (PPL Global's successor-in-interest under the APA) is required to purchase the Colstrip transmission assets for $97.1 million. PPL has also asserted a number of counterclaims against NorthWestern and Clark Fork based in large part upon PPL's claim that MPC and/or NorthWestern Energy breached two Wholesale Transition Service

Agreements and certain indemnification obligations under the APA in the approximate amount of $40 million. PPL also filed a proof of claim against NorthWestern's bankruptcy estate which asserts substantially the same claims as the PPL counterclaim. PPL moved the Bankruptcy Court for relief from the automatic stay to pursue its counterclaims. NorthWestern objected to PPL's motion to lift the automatic stay and has also filed a motion to transfer the venue of the entire litigation to the United States District Court for the District of Delaware. On March 19, 2004 the federal court in Montana denied our motion to transfer the entire case. We intend to vigorously defend against the PPL claims in the Bankruptcy Court and the counterclaims in federal court as well as vigorously prosecute our claims against PPL. We cannot currently predict the impact or resolution of the claims or this litigation or reasonably estimate a range of possible loss on the counterclaims, which could be material.

We are also one of several defendants in a class action lawsuit entitled *In Re Touch America ERISA Litigation*, which is currently pending in U.S. District Court in Montana. The lawsuit was filed by participants in the former Montana Power Company retirement savings plan and alleges that there was a breach of fiduciary duty in connection with the employee stock ownership aspects of the plan. The court has recently entered orders indefinitely staying the ERISA litigation because of Touch America Holdings Inc.'s bankruptcy filing. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We, and certain of our former officers and directors, were named as defendants in certain complaints filed against CornerStone Propane Partners, LP and other defendants purporting to be class actions filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, LP. Certain former officers and directors of NorthWestern who are named as defendants in certain of these actions have also been sued in their capacities as directors of the managing general partner. These complaints allege that defendants sold units of CornerStone Propane Partners based upon false and misleading statements and failed to disclose material information about CornerStone Propane Partners' financial condition and future prospects, including overpayment for acquisitions, overstating earnings and net income, and that it lacked adequate internal controls. All of the lawsuits have now been consolidated and Gilbert H. Lamphere has been named as lead plaintiff. The actions have been stayed as to NorthWestern due to its bankruptcy filing. On October 27, 2003, the plaintiffs filed an amended consolidated class action complaint. The new complaint does not name NorthWestern as a defendant, although it alleges facts relating to NorthWestern's conduct. Certain of our former officers and directors are named as defendants in the amended consolidated complaint. The plaintiffs seek compensatory damages, prejudgment and postjudgment interest and costs, injunctive relief, and other relief. We intend to vigorously defend against these lawsuits. On November 6, 2003, the Bankruptcy Court entered an order approving a stipulation between NorthWestern and plaintiffs in this litigation. The stipulation provides that litigation as against NorthWestern shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to NorthWestern, the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We were named in a complaint filed against us, CornerStone Propane GP, Inc., CornerStone Propane Partners LP and other defendants in a lawsuit entitled *Leonard S. Mewhinney, Jr. v.*

23

*NorthWestern Corporation, et al.* in the circuit court of the city of St. Louis, state of Missouri. The complaint alleges that the plaintiff purchased units of Cornerstone Propane Partners, LP between March 13, 1998 and November 29, 2001 and that NorthWestern owned and controlled all or the majority of stock or other indicia of ownership of Cornerstone Propane, GP, Inc. and all other entities that were the general partners of Cornerstone Propane Partners, LP. According to the plaintiff, NorthWestern, Cornerstone Propane GP, Inc., Coast Gas, Inc. and Cornerstone Propane Partners, LP breached fiduciary duties to the plaintiff by engaging in certain misconduct, including mismanaging Cornerstone Propane Partners, LP and transferring its assets for less than market value and other activities. The complaint further alleges that the defendants fraudulently failed to disclose material information regarding the value of units of Cornerstone Propane Partners, LP and violated the Florida Securities Act in connection with the sale of such units. The plaintiff seeks compensatory damages, punitive damages and costs. The complaint was amended to add a state class action claim. All defendants filed a petition to remove the case to the federal court in St. Louis, Missouri, but the federal court granted plaintiff's motion to remand. The case has now been stayed against NorthWestern due to its bankruptcy filing. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

Certain of our present and former officers and directors, and CornerStone Propane Partners, LP, as a nominal defendant, are among other defendants named in two derivative actions commenced in the Superior Court for the State of California, County of Santa Cruz, entitled *Adelaide Andrews v. Keith G. Baxter, et al.*, Case No. CV146662 and *Ralph Tyndall v. Keith G. Baxter, et al.*, Case No. CV146661. These derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal unitholder suits. The plaintiffs seek unspecified compensatory damages, treble damages pursuant to the California Corporations Code, injunctive relief, restitution, disgorgement, costs, and other relief. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

On April 30, 2003, Mr. Richard Hylland, our former President and Chief Operating Officer, filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortious interference and a claim for punitive damages. Mr. Hylland is seeking relief in the amount of $25 million, plus interest, attorney's fees, costs, and punitive damages. Mr. Hylland has also filed claims in our bankruptcy case similar to the claims in his arbitration demand. We dispute Mr. Hylland's claims and intend to vigorously defend the arbitration and object to Mr. Hylland's claims in our bankruptcy case. On May 6, 2003, based on the recommendations of the Special Committee of the NorthWestern Board of Directors formed to evaluate Mr. Hylland's performance and conduct in connection with the management of NorthWestern and its subsidiaries, the Board determined that Mr. Hylland's performance and conduct as President and Chief Operating Officer warranted termination under his employment contract. Though this arbitration has been stayed due to our bankruptcy filing, Mr. Hylland sought to lift the automatic stay to pursue the arbitration. The Bankruptcy Court denied his motion and he appealed the court's order. We have responded and anticipate a ruling from the US District Court for the District of Delaware soon.

On August 12, 2003, the Montana Consumer Counsel (MCC) filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the Montana Public Service Commission (MPSC). On August 22, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices and affiliated transactions. The relief sought includes adoption of new regulatory

24

controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. A procedural schedule was set in January 2004 with a hearing tentatively scheduled for June 2004. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, then we may become subject to material monetary penalties and fines. We are working with the MCC to provide requested information, but we have reserved the right to contest whether this proceeding is stayed as a result of our bankruptcy filing.

On March 17, 2004, certain minority shareholders of Netexit filed a lawsuit against Avaya Inc., Netexit, NorthWestern Growth Corporation, and Merle Lewis, Dick Hylland and Dan Newell entitled *Cohen et al. v Avaya Inc., et al.* in U.S. District Court in Sioux Falls, South Dakota contending that (i) the defendants fraudently induced the shareholders to sell their businesses to Expanets during 1998 and 1999 in exchange for Expanets stock which would have value only if Expanets went public, when in fact no IPO was intended, and (ii) the defendants and NorthWestern (a) hid the true financial condition of NorthWestern, NorthWestern Growth and Expanets, (b) permitted internal controls to lapse, (c) failed to document loans by NorthWestern to Expanets, and (d) allowed the individual defendants to realize millions of dollars in bonus payments at the expense of Expanets and its minority shareholders. The lawsuit alleges federal and state securities laws violations and breaches for fiduciary duties. The plaintiffs have recently filed an amended complaint that reflects one less plaintiff and a clarification on the damages that they seek. In addition, Avaya Inc. has sent NorthWestern a notice seeking indemnification and defense for this lawsuit under the terms of the asset purchase agreement. As a result of the filing by Netexit for bankruptcy protection, the complaint as to Netexit will be subject to the automatic stay provisions of the US Bankruptcy Code. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material.

Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P. (CornerStone), a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor. In November 2002, we divested our economic equity interests in CornerStone and deconsolidated CornerStone and its affiliates from our financial statements. CornerStone has filed a number of claims against our estate, the most significant of which attempts to assert a claim in the approximate amount of $130 million for an alleged capital account deficiency either existing prior to or resulting from the deconsolidation of our interests in CornerStone. We dispute that there was any capital account deficiency with respect to CornerStone that will result in any claim for which we are responsible. CornerStone also has asserted that the entire deconsolidation transaction should be "unwound" and that we, as a result of our asserted improper dominion and control over CornerStone and its operations, should be responsible for certain of CornerStone's obligations. CornerStone further asserts any claim we have against them should be offset against CornerStone's claims as to our estate. We intend to object to the CornerStone claim and to vigorously defend any efforts to unwind the deconsolidation transaction or to deny recovery on our claims against CornerStone. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We are also subject to various other legal proceedings and claims that arise in the ordinary course of business. In the opinion of management, the amount of ultimate liability with respect to these

actions will not materially affect our financial position or results of operations or ability to timely confirm a plan of reorganization.

*Performance Bonds and Letters of Credit*

We have various letter of credit requirements and other collateral obligations of approximately $12.9 million and $16.4 million as of March 31, 2004 and December 31, 2003, respectively.

Blue Dot and Netexit had previously obtained various license, bid and performance bonds to secure the performance of contracts and the adequate provision of services. The total amount of these outstanding surety bonds is approximately $55.3 million and $59.5 million as of March 31, 2004 and December 31, 2003, respectively. Due to the completion of work and as a result of the sale of these subsidiaries' businesses, we estimate the amount of the underlying obligations that such bonds secure is $3.8 million and $3.5 million as of March 31, 2004 and December 31, 2003, respectively.

The surety bonds obtained by Blue Dot and Expanets are supported by indemnity agreements that we entered into for the benefit of Blue Dot and Expanets and are secured by various letters of credit obtained by Blue Dot, Expanets, or us. Approximately $5.5 million and $10 million of these letters of credit and other collateral obligations as of March 31, 2004 and December 31, 2003, respectively, serve to support performance bonds primarily related to Blue Dot and Expanets. In addition, included in other assets at March 31, 2004 are $7.1 million of deposits that support performance bonds related to Blue Dot and Expanets.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Unless the context requires otherwise, references to "we," "us," "our" and "NorthWestern" refer specifically to NorthWestern Corporation and its subsidiaries.*

**OVERVIEW**

On September 14, 2003 (the Petition Date), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code in the Bankruptcy Court under case number 03-12872 (CGC). Pursuant to Chapter 11, we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court. Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. The assets and liabilities of such nondebtor subsidiaries are not considered to be material to the consolidated financial statements or are included in discontinued operations.

In connection with our proposed plan of reorganization, our common stock will be cancelled and our mandatorily redeemable preferred securities of subsidiary trusts (trust preferred securities) will be restructured in a manner that will eliminate or very substantially reduce any remaining value with respect to such trust preferred securities. The sale of noncore assets does not change the fact that our common stock has no value. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities.

On September 15, 2003, in connection with our Chapter 11 filing, the New York Stock Exchange (NYSE) suspended trading and subsequently delisted our common stock and all series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the NYSE to delist our common stock and trust preferred securities. As a result of the delisting of our securities, there can be no assurance that a liquid trading market for those securities will continue.

As a result of our Chapter 11 filing, we operate our business as a "debtor-in-possession" (DIP) under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable court orders. All vendors are being paid for all goods furnished and services provided after the Petition Date under the supervision of the Bankruptcy Court. As a debtor-in-possession, we are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Court, after notice and an opportunity for a hearing.

Our ability to continue as a going concern is predicated upon numerous issues, including our ability to achieve the following:

- having our plan of reorganization confirmed by the Bankruptcy Court in a timely manner;

- being able to successfully implement our business plans and otherwise offset the negative effects that the Chapter 11 filing has had and may continue to have on our business, including the impairment of vendor relations;

- operating within the framework of our DIP Facility, including limitations on capital expenditures and financial covenants, our ability to generate cash flows from operations or seek other sources of financing and the availability of projected vendor credit terms; and

- attracting, motivating and/or retaining key executives and employees.

These challenges are in addition to those operational, regulatory and other challenges that we face in connection with our business as a regional utility.

We filed our disclosure statement and initial plan of reorganization on March 12, 2004. To successfully exit Chapter 11, we will need to obtain confirmation by the Bankruptcy Court of a plan of

reorganization that satisfies the requirements of the Bankruptcy Code. Our proposed plan of reorganization would resolve, among other things, our prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for its corporate governance subsequent to exit from bankruptcy. Under the Chapter 11 proceedings, the rights of and ultimate payments to prepetition creditors, rejection damage claimants and equity investors may be substantially altered. This could result in claims being allowed and/or satisfied in the Chapter 11 proceedings at less (possibly substantially less) than 100% of their face value, and we anticipate the interests of our equity investors will be cancelled. Substantially all prepetition liabilities are subject to settlement under a plan of reorganization to be voted upon by our prepetition creditors and approved by the Bankruptcy Court.

A hearing to approve the disclosure statement is scheduled for May 17, 2004. If the disclosure statement is approved by the Bankruptcy Court, then we will be allowed to disseminate our proposed plan of reorganization for voting on by creditors and other parties-in-interest. Although our proposed disclosure statement and plan of reorganization provides for our emergence from bankruptcy as a going concern, there can be no assurance at this time that the disclosure statement will be approved and that our plan of reorganization will thereafter be disseminated to creditors and other parties-in-interest and will be confirmed by the Bankruptcy Court, or that any such plan will be implemented successfully. We have incurred and will continue to incur pending emergence, significant expenses and costs associated with the reorganization.

As previously discussed in our Annual Report on Form 10-K for the year ended December 31, 2003, we sold substantially all the assets and business of Expanets to Avaya, Inc. (Avaya) and retained certain specified liabilities. Thereafter, Expanets was renamed Netexit, Inc. (Netexit). On February 24, 2004, Avaya submitted its proposed final calculation of the postclosing working capital adjustment required under the sale agreements claiming that Avaya should retain $44.6 million in held-back proceeds plus an additional $4.2 million. Netexit disputed this calculation and entered into a settlement with Avaya on April 27, 2004 resulting in additional cash proceeds of $17.5 million paid to Netexit. Pending the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit. In order to wind-down its affairs in an orderly manner, Netexit filed for bankruptcy protection on May 4, 2004 in the US Bankruptcy Court for the District of Delaware. We recognized an estimated loss on disposal of approximately $49.3 million during 2003 based on the terms of the sale and our expectation of the additional amount to be received from Avaya. We expect to record a gain during the second quarter of 2004 of approximately $11 million as a result of the settlement with Avaya. However, we will also incur additional expenses related to the bankruptcy filing and may incur losses related to the resolution of open claims.

Blue Dot sold 10 businesses during the first quarter of 2004. As of March 31, 2004, Blue Dot had four remaining businesses. Cash proceeds from business sales remain at Blue Dot. We hope to receive in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided however, this assumes satisfactory resolutions to remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation. Furthermore, it assumes that the remaining businesses produce their projected cash proceeds and receivables from various sold locations are collectible.

We are also attempting to sell the Montana First Megawatts generation project. In an effort to facilitate the sale of the Montana First Megawatts project and its ultimate development at its current location in Great Falls, Montana, we filed the power sales agreement with the Federal Energy Regulatory Commission (FERC) on August 18, 2003, requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NorthWestern Energy. A late motion to intervene and protest was filed by the Montana Public Service Commission (MPSC) and the Montana Consumer Counsel (MCC). On October 17, 2003, the FERC issued an order conditionally accepting the power sales agreement, subject to suspension for a designated period, to

28

permit resolution of certain concerns voiced by the MPSC and MCC in their filing. While we are currently attempting to work with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve the documented MPSC and MCC concerns, we have determined our best course of action may be to liquidate this project.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. We base our estimates on historical experience and other assumptions that are believed to be proper and reasonable under the circumstances. We continually evaluate the appropriateness of our estimates and assumptions, including those related to goodwill, qualifying facilities liabilities, impairment of long-lived assets and revenue recognition, among others. Actual results could differ from those estimates.

We have identified the policies and related procedures below as critical to understanding our historical and future performance, as these polices affect the reported amounts of revenue and the more significant areas involving management's judgments and estimates.

### *Goodwill*

We believe that the accounting estimate related to determining the fair value of goodwill, and thus any impairment, is a "critical accounting estimate" because: (i) it is highly susceptible to change from period to period since it requires company management to make cash flow assumptions about future revenues, operating costs and discount rates over an indefinite life; and (ii) recognizing an impairment has had a significant impact on the assets reported on our balance sheet and our operating results. Management's assumptions about future sales margins and volumes require significant judgment because actual margins and volumes have fluctuated in the past and are expected to continue to do so. In estimating future margins, we use our internal budgets.

According to the guidance set forth in Statement of Financial Accounting Standards (SFAS) No. 142, we are required to evaluate our goodwill and indefinite-lived intangible assets for impairment at least annually (October 1) and more frequently when indications of impairment exist. Accounting standards require that if the fair value of a reporting unit is less than its carrying value including goodwill, an impairment charge for goodwill must be recognized in the financial statements. To measure the amount of the impairment loss to recognize, we compare the implied fair value of the reporting unit's goodwill with its carrying value.

### *Qualifying Facilities Liability*

Certain Qualifying Facilities, or QFs, require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. As of March 31, 2004, our gross contractual obligation related to the QFs is approximately $1.8 billion through 2029. A portion of the costs incurred to purchase this energy is recoverable though rates authorized by the MPSC, totaling approximately $1.4 billion though 2029. In computing the liability, we have had to make various estimates in relation to contract costs, capacity utilization, and recoverable amounts. Actual utilization and regulatory changes may significantly impact our results of operations. In light of the executory nature of the QF power sales agreements and certain out-of-market pricing and escalation terms, we are continuing to evaluate our options with respect to continued purchases under these contracts.

### Long-lived Assets

We evaluate our property, plant and equipment for impairment whenever indicators of impairment exist. SFAS No. 144 requires that if the sum of the undiscounted cash flows from a company's asset, without interest charges that will be recognized as expenses when incurred, is less than the carrying value of the asset, impairment must be recognized in the financial statements. If an asset is deemed to be impaired, then the amount of the impairment loss recognized represents the excess of the asset's carrying value as compared to its estimated fair value, based on management's assumptions and projections.

### Revenue Recognition

Revenues are recognized differently depending on the various jurisdictions. For our South Dakota and Nebraska operations, as prescribed by the respective regulatory authorities, electric and natural gas utility revenues are based on billings rendered to customers. Customers are billed on a monthly cycle basis. For our Montana operations, as prescribed by the MPSC, operating revenues are recorded monthly on the basis of consumption or services rendered. To match revenues with associated expenses, we accrue unbilled revenues for electric and natural gas services delivered to the customers but not yet billed at month-end.

### Regulatory Assets and Liabilities

Our regulated operations are subject to the provisions of SFAS No. 71, *Accounting for the Effects of Certain Types of Regulations*. Our regulatory assets are the probable future revenues associated with certain costs to be recovered from customers through the ratemaking process, including our estimate of amounts recoverable for natural gas and default electric supply purchases. Regulatory liabilities are the probable future reductions in revenues associated with amounts to be credited to customers through the ratemaking process. If any part of our operations become no longer subject to the provisions of SFAS No. 71, then the probable future recovery of or reduction in revenue with respect to the related regulatory assets and liabilities would need to be evaluated. In addition, we would need to determine if there was any impairment to the carrying costs of deregulated plant and inventory assets.

While we believe that our assumption regarding future regulatory actions is reasonable, different assumptions could materially affect our results.

### Pension and Postretirement Benefit Plans

Our reported costs of providing pension and other postretirement benefits are dependent upon numerous factors resulting from actual plan experience and assumptions of future experience.

Pension and other postretirement benefit costs, for example, are impacted by actual employee demographics (including age and compensation levels), the level of contributions we make to the plans, earnings on plan assets, and health care cost trends. Changes made to the provisions of the plans may also impact current and future pension and other postretirement benefit costs. Pension and other postretirement benefit costs may also be significantly affected by changes in key actuarial assumptions, including anticipated rates of return on plan assets and the discount rates used in determining the postretirement benefit obligation and postretirement costs.

As a result of the factors listed above, significant portions of pension and other postretirement benefit costs recorded in any period do not reflect (and are generally greater than) the actual benefits provided to plan participants.

Our pension and other postretirement benefit plan assets are primarily made up of equity and fixed income investments. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased pension and other postretirement benefit costs in

future periods. Likewise, changes in assumptions regarding current discount rates and expected rates of return on plan assets could also increase or decrease recorded pension and other postretirement benefit costs.

## RESULTS OF OPERATIONS

### *Three-Month Period Ended March 31, 2004, Compared to the Three-Month Period Ended March 31, 2003.*

#### *Overall Consolidated Results*

The following is a summary of our consolidated results of operations for the three-month periods ended March 31, 2004 and 2003. Our consolidated results include the results of our divisions and subsidiaries constituting each of our business segments. This discussion is followed by a more detailed discussion of operating results by segment.

Consolidated earnings on common stock in the first quarter of 2004 were $17.0 million, an increase of $7.1 million or 71.2% over 2003 results. Due to our bankruptcy filing, we ceased recording interest expense on our unsecured debt and preferred securities, which accounted for a $19.8 million decrease in interest expense, and a $7.5 million decrease in our minority interests on preferred securities of subsidiary trusts, offset by a $9.2 million increase in operating expenses, primarily due to reorganization professional fees and expenses along with an $11.3 million decrease in income of our discontinued operations.

#### *Electric Segment Operations*

We categorize revenues into general business revenues, transmission only revenues, wholesale, and other. General business revenues include fully bundled rates for supplying, transmitting, and distributing electricity to our core customers. In addition, while we no longer supply the electricity for customers who have chosen other commodity suppliers, we continue to earn transmission and distribution revenues for moving their electricity across our transmission and distribution lines. We reflect the distribution revenues as general business revenues and transmission revenues as transmission only revenues.

Revenues in the first quarter of 2004 were $177.0 million, an increase of $9.3 million, or 5.6%, from results in the first quarter of 2003. Revenue recovered for purchased power supply costs increased approximately $9.2 million, or 14.5%, as a result of higher average market rates. As these costs are also reflected in cost of sales, there is no gross margin impact.

Cost of sales in the first quarter of 2004 was $87.7 million, an increase of $10.6 million, or 13.7%, from results in the first quarter of 2003. Purchased power supply costs, which are recovered in rates, increased $9.2 million. Retail costs increased $1.7 million due to a 6% increase in retail volumes, while wholesale costs decreased $1.6 million due to 6.3% lower coal costs. In addition, transmission and wheeling costs increased $0.9 million due to costs associated with energy load scheduling.

Gross margin in the first quarter of 2004 was $89.3 million, a decrease of $1.2 million, or 1.4% from gross margin in the first quarter of 2003. This decrease was primarily attributable to the increased transmission and wheeling costs, partially offset by a 22.9% increase in wholesale margins. Margins as a percentage of revenues decreased to 50.4% for 2004, from 54.0% for 2003. Gross margin as a percentage of revenue is impacted by the fluctuations that occur in power supply costs, which are collected in rates from customers. While these fluctuations impact gross margin as a percentage of revenue, they have no actual impact on gross margin amounts.

Operating, general and administrative expenses for the first quarter of 2004 were $52.0 million, an increase of $6.7 million, or 14.9%, over results in the first quarter of 2003. This increase was primarily due to a $1.8 million increase in directors and officers liability insurance costs, $1.8 million in higher property taxes and an increased allocation of corporate expenses from the all other segment to electric operating expenses. Depreciation was $14.2 million for 2004, an increase of $0.6 million over 2003.

Operating income in the first quarter of 2004 was $23.2 million, a decrease of $8.5 million, or 26.9%, from the first quarter of 2003. This decrease was mainly due to higher transmission and wheeling costs and higher operating, general and administrative expenses.

Interest expense in the first quarter of 2004 for the electric and gas segments combined was $20.1 million, a decrease of $6.0 million or 23.1% from the first quarter of 2003. This decrease was attributable to our suspension of interest expense on unsecured debt effective with our bankruptcy filing.

### Natural Gas Segment Operations

We categorize revenues into general business revenues, transportation and storage revenues, wholesale, and other. General business revenues include fully bundled rates for supplying, transporting, and distributing natural gas to our core customers. In addition, while we no longer supply the natural gas for customers who have chosen other commodity suppliers, we continue to earn transportation and distribution revenues for moving their natural gas across our transmission and distribution pipelines. We reflect the distribution revenues as general business revenues and transmission revenues as transportation and storage revenues. We also reflect revenues for storing natural gas for others as transportation and storage revenues. Wholesale revenues consist primarily of our nonregulated natural gas operations.

Revenues in the first quarter of 2004 were $160.1 million, an increase of $42.4 million, or 36.0%, from results in the first quarter of 2003. Gas supply costs increased $11.4 million, or 43.8%, as a result of higher average market prices. These costs are also reflected in cost of sales, thereby having no impact on gross margin. Also contributing to this increase was a $20.7 million, or 28.3%, increase in retail revenues and a $9.1 million, or 65.7% increase in wholesale revenues. Retail revenues increased primarily due to a $17.9 million increase in sales of surplus gas. As the revenue from sales of surplus gas benefits our general business customers, these sales are also included in cost of sales, thereby having no impact on gross margin. The increase in wholesale revenues primarily resulted from a 44.1% volume increase related to the addition of nonregulated revenues from ethanol plant customers and a 14.9% increase in gas prices.

Cost of sales in the first quarter of 2004 was $118.5 million, an increase of $41.2 million, or 53.3%, from results in the first quarter of 2003. Gas supply costs increased $12.4 million, including a $1.0 million write-off of supply costs for market costs incurred in excess of amounts approved under a July 3, 2003 interim order from the MPSC. Remaining retail costs increased $17.5 million due to the higher sales of surplus gas discussed above, and wholesale costs increased $11.3 million due to the increased volumes discussed above.

Gross margin in the first quarter of 2004 was $41.6 million, an increase of $1.2 million, or 2.9%, over 2003. Higher wholesale volumes were partially offset by the MPSC's disallowance of $1.0 million in gas supply costs. Margins as a percentage of revenues decreased to 26.0% for 2004 from 34.3% for 2003. Gross margin as a percentage of revenue is impacted by the fluctuations that occur in retail costs, which are collected from customers through rates.

Operating, general and administrative expenses for the first quarter of 2004 were $18.4 million, an increase of $2.8 million, or 17.8%, over 2003 results. This increase was primarily due to a $1.0 million increase in directors and officers liability insurance costs, $0.6 million in higher property taxes and an increased allocation of corporate costs from the all other segment to natural gas operating expenses. Depreciation was $3.6 million for 2004, an increase of $0.2 million over 2003.

Operating income in the first quarter of 2004 was $19.6 million, a decrease of $1.8 million, or 8.4%, from 2003. This decrease primarily resulted from the MPSC's disallowance and higher operating, general and administrative expenses.

### All Other Operations

All other operations primarily consists of our other miscellaneous service activities that are not included in the other identified segments, together with the unallocated corporate costs and investments, and any eliminating amounts. The miscellaneous service activities principally include unregulated businesses offering a portfolio of services to residential and business customers, including product sales and maintenance contracts in areas such as home monitoring devices and appliances.

Loss from continuing operations was $2.0 million in the first quarter of 2004, a decrease of $13.6 million or 87.1%, from 2003 results. Effective with our bankruptcy filing, we ceased recording interest expense on unsecured debt, which contributed $13.8 million to this decrease along with a $7.9 million decrease in operating, general and administrative expenses due to a change in allocation of corporate costs from the all other segment to the electric and gas segments. These decreases in costs were partially offset by a $6.8 million increase in legal and other professional fees related to our reorganization efforts and bankruptcy filing.

### Discontinued Communications Segment Operations

As previously discussed in our Annual Report on Form 10-K for the year ended December 31, 2003, we sold substantially all the assets and business of Expanets, Inc. to Avaya, Inc. (Avaya) and retain certain specified liabilities. Thereafter, Expanets was renamed Netexit, Inc. (Netexit). On February 24, 2004, Avaya submitted its proposed final calculation of the postclosing working capital adjustment required under the sale agreements claiming that Avaya should retain $44.6 million in held-back proceeds plus an additional $4.2 million. Netexit disputed this calculation and entered into a settlement with Avaya on April 27, 2004 resulting in additional cash proceeds of $17.5 million paid to Netexit. Pending the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit. In order to wind-down its affairs in an orderly manner, Netexit filed for bankruptcy protection on May 4, 2004 in the US Bankruptcy Court for the District of Delaware. We recognized an estimated loss on disposal of approximately $49.3 million during 2003 based on the terms of the sale and our expectation of the amount to be received from Avaya. We expect to record a gain in the second quarter of 2004 of approximately $11 million as a result of the settlement with Avaya. However, we will also incur additional expenses related to the bankruptcy filing and may incur losses related to the resolution of open claims.

Summary financial information for the discontinued Netexit operations is as follows (in thousands):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2004 | 2003 |
| Revenues ................................................... | $   — | $166,606 |
| Income before income taxes ................................. | $1,666 | $ 21,120 |
| Income tax provision ....................................... | — | (140) |
| Income from discontinued operations, net of income taxes .......... | $1,666 | $ 20,980 |

Netexit's income before income taxes for the three months ended March 31, 2003, includes a gain on debt extinguishment of $27.3 million.

### Discontinued HVAC Segment Operations

Blue Dot sold 10 businesses during the first quarter of 2004. As of March 31, 2004, Blue Dot had four remaining businesses. Cash proceeds from business sales remain at Blue Dot. We hope to receive

in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided, however, this assumes satisfactory resolutions to remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation. Furthermore, it assumes that the remaining businesses produce their projected cash proceeds and receivables from various sold locations are collectible.

Summary financial information for the discontinued Blue Dot operations is as follows (in thousands):

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2004 | 2003 |
| Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $16,593 | $111,195 |
| Loss before income taxes and minority interests . . . . . . . . . . . . . . . . . . . . . . . . | $(4,417) | $ (4,248) |
| Gain on disposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,673 | — |
| Income tax provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (295) |
| Income (Loss) from discontinued operations, net of income taxes . . . . . . . . . . . . | $ 3,256 | $ (4,543) |

## LIQUIDITY & CAPITAL RESOURCES

In April 2004, we reduced the commitment under our DIP Facility from $85 million to $75 million. As of March 31, 2004 we had $12.9 million in letters of credit outstanding and no borrowings under the DIP Facility. We anticipate that our total cash and cash equivalents, together with access to our DIP Facility, will be sufficient to fund our operations during our bankruptcy proceedings.

### Cash Flow and Cash Position

As of March 31, 2004, cash and cash equivalents were $96.1 million, compared to $15.2 million at December 31, 2003.

Cash provided by continuing operations during the three months ended March 31, 2004 totaled $98.0 million compared to cash used in continuing operations of $42.4 million during the three months ended March 31, 2003. This increase was substantially due to improved vendor credit terms and the suspension of interest payments on our unsecured debt during our reorganization. We anticipate our cash flows from operations to decrease during the second quarter. As our electric and natural gas utility business is seasonal and the weather is typically milder during the second quarter, we typically see reduced revenues during this time period. In addition, we expect to make property tax payments of approximately $30 million and an operating lease payment of approximately $16 million during the second quarter.

Cash used in investing activities totaled $12.9 million during the three months ended March 31, 2004 compared to cash used of $9.2 million during the three months ended March 31, 2003. Cash used during 2004 was almost entirely due to property, plant and equipment additions. Cash used during 2003 was primarily due to property, plant and equipment additions and investment purchases offset by proceeds from investment sales.

Cash used in financing activities totaled $4.2 million during the three months ended March 31, 2004 compared to cash provided by financing activities of $86.4 million during the three months ended March 31, 2003. Cash used during 2004 was to make scheduled principal payments on secured long-term debt. During the first quarter of 2003, we received $390.0 million under a senior secured term loan, net of $24.9 million in financing costs, which was used to repay $255.0 million on our line of credit facility.

## Contractual Obligations and Other Commitments

We have a variety of contractual obligations and other commercial commitments that represent prospective requirements in addition to expense. The following table shows our contractual cash obligations and commercial commitments as of March 31, 2004, without regard to the reclassification of long-term debt to current. See our Annual Report on Form 10-K for the year ended December 31, 2003 for additional discussion.

| Commitments | Total | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | |
| **Debt Not Subject to Compromise:** | | | | | | | |
| Senior Secured Term Loan | $ 385,125 | $ 2,925 | $ 3,900 | $378,300 | $ — | $ — | $ — |
| South Dakota Mortgage Bonds, 7.00% and 7.10% | 115,000 | — | 60,000 | — | — | — | 55,000 |
| South Dakota Pollution Control Obligations, 5.85% and 5.90% | 21,350 | — | — | — | — | — | 21,350 |
| Montana First Mortgage Bonds, 7.00%, 7.30%, 8.25% and 8.95% | 157,197 | — | 5,386 | 150,000 | 365 | — | 1,446 |
| Discount on Montana First Mortgage Bonds | (3,404) | — | — | — | — | — | (3,404) |
| Montana Pollution Control Obligations, 6.125% and 5.90% | 170,205 | — | — | — | — | — | 170,205 |
| Montana Secured Medium Term Notes, 7.25% | 13,000 | — | — | — | — | 13,000 | — |
| Montana Natural Gas Transition Bonds, 6.20% | 44,148 | 1,698 | 4,744 | 4,712 | 5,248 | 5,391 | 22,355 |
| Other debt, various | 1,122 | 320 | 343 | 221 | 238 | — | — |
| Capital leases(1) | 11,513 | 2,485 | 2,146 | 1,798 | 1,194 | 738 | 3,152 |
| **Total Debt Not Subject to Compromise** | 915,256 | 7,428 | 76,519 | 535,031 | 7,045 | 19,129 | 270,104 |
| **Debt Subject to Compromise(2):** | | | | | | | |
| Senior Unsecured Notes, 7.875% and 8.75% | 720,000 | — | — | — | 250,000 | — | 470,000 |
| Senior Unsecured Debt, 6.95% | 105,000 | — | — | — | — | — | 105,000 |
| Montana Unsecured Medium Term Notes, 7.07%, 7.96% and 7.875% | 40,000 | — | — | 15,000 | — | — | 25,000 |
| Discount on Montana Unsecured Medium Term Notes | (156) | — | — | — | — | — | (156) |
| **Total Debt Subject to Compromise** | 864,844 | — | — | 15,000 | 250,000 | — | 599,844 |
| **Total Mandatorily Redeemable Preferred Securities of Subsidiary Trusts(2)** | 365,550 | — | — | — | — | — | 365,550 |
| **Future minimum operating lease payments(3)** | 227,388 | 32,921 | 32,883 | 32,576 | 32,288 | 32,268 | 64,452 |
| **Estimated Pension and Other Postretirement Obligations(4)** | 116,000 | 16,000 | 25,000 | 25,000 | 25,000 | 25,000 | N/A |
| **Qualifying Facilities (QFs)(5)** | 1,805,401 | 41,551 | 56,579 | 58,468 | 60,634 | 62,931 | 1,525,238 |
| **Power Purchase Contracts(6)** | 1,173,080 | 188,237 | 227,693 | 164,953 | 98,383 | 45,333 | 448,481 |
| **Interest payments on existing secured debt** | 417,552 | 39,665 | 58,613 | 52,557 | 18,646 | 17,418 | 230,653 |
| **Total Commitments** | $5,885,071 | $325,802 | $477,287 | $883,585 | $491,996 | $202,079 | $3,504,322 |

(1) The capital lease obligations are principally used to finance equipment purchases.

(2) We expect to convert debt subject to compromise and mandatorily redeemable preferred securities of subsidiary trusts to equity based on terms outlined in our plan of reorganization.

(3) While not included on this schedule, NorthWestern has a residual value guarantee related to certain vehicles under operating leases by Blue Dot in the event of default and subsequent failure to cure such default. At March 31, 2004, the amount of this financial guarantee was approximately $0.8 million. In connection with the various sales of Blue Dot businesses, the vehicle lessor has agreed to terminate the NorthWestern guarantee of Blue Dot's performance under the vehicle leases.

(4) We have only estimated cash obligations related to our pension and other postretirement benefit programs for five years, as it is not practicable to estimate thereafter.

(5) The QFs require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our estimated gross contractual obligation related to the QFs is approximately $1.8 billion. A portion of the costs incurred to purchase this energy is recoverable through rates authorized by the MPSC, totaling approximately $1.4 billion. The obligation and payments reflected on this schedule represent the estimated gross contractual obligation.

(6)  We have entered into various purchase commitments, largely purchased power, coal and natural gas supply, electric generation construction and natural gas transportation contracts. These commitments range from one to 30 years.

### Performance Bonds and Letters of Credit

We have various letter of credit requirements and other collateral obligations of approximately $12.9 million and $16.4 million as of March 31, 2004 and December 31, 2003, respectively.

Blue Dot and Netexit had previously obtained various license, bid and performance bonds to secure the performance of contracts and the adequate provision of services. The total amount of these outstanding surety bonds is approximately $55.3 million and $59.5 million as of March 31, 2004 and December 31, 2003. Due to the completion of work and as a result of the sale of these subsidiaries' businesses, we estimate the amount of the underlying obligations that such bonds secure is $3.8 million and $3.5 million as of March 31, 2004 and December 31, 2003, respectively.

The surety bonds obtained by Blue Dot and Netexit are supported by indemnity agreements that we entered into for the benefit of Blue Dot and Expanets and are secured by various letters of credit obtained by Blue Dot, Expanets, or us. Approximately $5.5 million and $10 million of these letters of credit and other collateral obligations as of March 31, 2004 and December 31, 2003, respectively, serve to support performance bonds primarily related to Blue Dot and Expanets. In addition, included in other assets at March 31, 2004 are $7.1 million of deposits that support performance bonds related to Blue Dot and Expanets.

## NEW ACCOUNTING STANDARDS

See Note 11 for a discussion of new accounting standards.

## RISK FACTORS

You should carefully consider the risk factors described below, as well as other information included in this Quarterly Report, before making an investment in our common stock or other securities. The risks and uncertainties described below are not the only ones facing us. These risk factors have been described in greater detail in our Annual Report on Form 10-K for the fiscal year ended December 31, 2003. This risk factors section has been updated to the date of this Quarterly Report. Additional risks and uncertainties not presently known or that we currently believe to be less significant may also adversely affect us.

### Bankruptcy Related Risks

**Our Plan of Reorganization may not be confirmed by the Bankruptcy Court and may not be successfully consummated.**

Our future results are dependent upon successfully obtaining approval, confirmation and implementation of our plan of reorganization. There can be no assurance that our plan of reorganization will be confirmed by the Bankruptcy Court. Section 1129 of Chapter 11 requires, among other things, a showing that confirmation of the plan will not be followed by liquidation or the need for further financial reorganization, and that the value of distributions to dissenting holders of claims and interests may not be less than the value such holders would receive if the Company were liquidated under Chapter 7 of the United States Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude the plan satisfies the requirements of Section 1129. Conversely, the Bankruptcy Court may confirm a plan even though it was not accepted by one or more impaired classes of creditors, if certain requirements of Chapter 11 are met. Currently, it is not possible to predict with certainty the length of time we will operate under the protection of Chapter 11, the outcome of the Chapter 11 proceedings in general, or the effect of the proceedings on our business or on the interests of the various creditors and stakeholders.

36

We filed our initial plan of reorganization on March 12, 2004. A hearing to approve the disclosure statement is scheduled for May 17, 2004. Even if the Bankruptcy Court confirms our plan, consummation of the plan will likely be dependent upon a number of other conditions. There can be no assurance that any or all of the conditions in the plan will be met (or waived) or that the other conditions to consummation of the plan, if any, will be satisfied. Accordingly, we can provide no assurances that the plan will be consummated and the restructuring completed. If a plan is not timely consummated, it could result in our Chapter 11 proceedings becoming protracted or being converted into Chapter 7 liquidation proceedings, either of which could substantially erode the value of our enterprise to the detriment of all stakeholders.

**The Creditors' Committee and other parties in interest may not support our positions in the Chapter 11 proceedings.**

The Creditors' Committee appointed in the bankruptcy proceedings has the right to be heard on all matters that come before the Bankruptcy Court. We are also subject to regulation by FERC and the state public service or utility commissions in the states we serve. There can be no assurance that the Creditors' Committee, our equity holders other parties in interest or our primary regulators will support our positions in the bankruptcy proceeding or the plan of reorganization once proposed, and disagreements between us and such entities could protract the bankruptcy proceedings, could negatively impact our ability to operate during bankruptcy, and could delay our emergence from bankruptcy.

**Our Chapter 11 proceedings may result in a negative public perception of us that may adversely affect our relationships with customers and suppliers, as well as our business, results of operations and financial condition.**

Even if we submit a plan of reorganization that is confirmed by the Bankruptcy Court and consummated by us, our Chapter 11 filing and the resulting uncertainty regarding our future prospects may hinder our ongoing business activities and its ability to operate, fund and execute our business plan by (i) impairing relations with existing and potential customers; (ii) negatively impacting our ability to attract, retain and compensate key executives and associates and to retain employees generally; (iii) limiting our ability to obtain trade credit; and (iv) impairing present and future relationships with vendors and service providers.

**Holders of certain claims and interests will receive no distributions under our proposed plan of reorganization.**

Under Chapter 11, the rights and treatment of prepetition creditors and equity security holders may be substantially altered. At this time, it is not certain what effect the Chapter 11 proceedings will have on our creditors and common shareholders. Under the priority rules established by Chapter 11, certain postpetition liabilities and prepetition liabilities need to be satisfied before shareholders are entitled to receive any distribution. The ultimate recovery to our creditors and common shareholders, if any, will not be determined until confirmation of a plan of reorganization. No assurance can be given as to what values, if any, ultimately will be ascribed in the Chapter 11 proceedings to each of these constituencies. Under any plan of reorganization in the Chapter 11 proceedings, management of NorthWestern expects that unsecured claims against us will be satisfied at a fraction of their face value, and that there will be no value available for distribution to our common shareholders. Because of this, any investment in our common stock is highly speculative. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our equity or debt securities.

**We have incurred, and expect to continue to incur, significant costs associated with the Chapter 11 proceedings.**

We have incurred and will continue to incur significant costs associated with the reorganization. The amount of these costs, which are being expensed as incurred, are expected to have a significant adverse affect on the results of operations and cash flows.

**We must replace our debtor-in-possession credit facility (DIP Facility) in order to emerge from bankruptcy and continue normal operations.**

Our DIP Facility is intended to provide us with financing during our reorganization. We will need a replacement financing, known as an exit facility, to provide financing following our recapitalization. We may use our DIP Facility to provide the cash for our daily operations and to finance our capital expenditures. If we do not obtain a replacement facility in a timely fashion, then we may not be able to implement our recapitalization.

**Our ability to raise capital and the liquidity of our stock may be adversely affected by the fact that our shares are not listed on the New York Stock Exchange or another major exchange.**

On September 15, 2003, in connection with our Chapter 11 filing, the NYSE suspended trading on our common stock and all series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the NYSE to delist our common stock and trust preferred securities. Our common shares are now quoted on NASDAQ's OTC Bulletin Board. The fact that our common stock and all series of our trust preferred securities are not listed on the NYSE or any other major exchange could reduce the liquidity of such securities and make it more difficult for a shareholder to obtain accurate quotations as to the market price of such securities. Reduced liquidity of our common stock and all series of our trust preferred securities also may reduce our ability to access the capital markets in the future. In addition, under our proposed plan of reorganization in the Chapter 11 proceedings, our existing equity securities will be cancelled, and we will issue new equity securities to certain of our creditors upon our emergence from Chapter 11 in full or partial satisfaction of creditor claims. There can be no assurance that any of our new equity securities issued under the plan of reorganization will be listed on any major exchange.

**Our ability to continue as a going concern is dependent on a number of factors.**

The accompanying financial statements have been prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. As a result of the bankruptcy filing and related events, there is no assurance that the carrying amounts of assets will be realized or that liabilities will be liquidated or settled for the amounts recorded. In addition, a plan of reorganization, or rejection thereof, could change the amounts reported in the financial statements. As a result, there is substantial doubt about our ability to continue as a going concern. Our liquidity generally depends on cash provided by operating activities and access to the DIP Facility. Our ability to continue as a going concern (including our ability to meet postpetition obligations) and the continued appropriateness of using the going concern basis for our financial statements are dependent upon, among other things, (i) our ability to comply with the covenants of the DIP Facility, (ii) our ability to maintain adequate cash on hand, (iii) our ability to continue to generate cash from operations, (iv) confirmation of a plan of reorganization under the Bankruptcy Code and the terms of such plan, (v) our ability to attract, retain and compensate key executives and associates and to retain employees generally, and (vi) our ability to achieve profitability following such confirmation.

**Our Chapter 11 filings triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations.**

At December 31, 2003, we had a significant common shareholders' deficit and currently have approximately $2.2 billion in debt and trust preferred instruments outstanding. After failing to implement an out-of-court turnaround plan, we filed a petition with the Bankruptcy Court in order to reorganize our capital and debt structure under Chapter 11 of the Bankruptcy Code. The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations. However, under Chapter 11, actions by creditors to collect claims on prepetition debt are stayed or deferred unless specifically ordered by the Bankruptcy Court.

We may, under certain circumstances, file motions with the Bankruptcy Court to assume or reject our executory contracts. An executory contract is one in which the parties have mutual obligations to perform (e.g., contracts of affreightment, equipment leases and real property leases). Unless otherwise agreed, the assumption of a contract will require that we cure all prior defaults under the related contract, including all prepetition liabilities. Unless otherwise agreed, the rejection of a contract is deemed to constitute a breach of the agreement as of the moment immediately preceding the Chapter 11 filing, giving the other party to the contract a right to assert a general unsecured claim for damages arising out of the breach. Additional liabilities subject to the proceedings may arise in the future as a result of the rejection of executory contracts, including leases, and from the determination of the Bankruptcy Court (or agreement by parties in interest) of allowed claims for contingencies and other disputed amounts. Conversely, the assumption of executory contracts and unexpired leases may convert liabilities shown as subject to compromise to postpetition liabilities. Due to the uncertain nature of many of the potential claims, we are unable to project the magnitude of such claims with any degree of certainty.

**If we are unable to successfully sell our noncore assets, then the amount of proceeds we receive from such sales could be significantly less than anticipated and adversely affect our liquidity.**

As part of our efforts to restructure our business, we are attempting to divest certain noncore assets, including Expanets, Blue Dot and our Montana First Megawatts generation project in Montana. If the sales prices for such assets are less than anticipated, or we encounter unexpected liabilities in connection with such sales, such as costs relating to the wind-down of such operations, including termination of benefit plans and payment of other liabilities, then our liquidity could be adversely affected. Further, we cannot assure you that we will be able to consummate such asset sales or that any asset sales will be at or greater than the current net book value of such assets.

**Company Specific Risks**

**We are one of several defendants in a class action lawsuit brought in connection with the sale of generating and energy-related assets by The Montana Power Company. If we do not successfully resolve this lawsuit, the insurance coverage does not pay for any damages we are found liable for, then our business will be harmed and there will be material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.**

We are one of several defendants in a class action lawsuit entitled *McGreevey, et al. v. The Montana Power Company, et al,*, now pending in federal court in Montana. The lawsuit, which was filed by the former shareholders of The Montana Power Company (many of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company was void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern is named as a defendant

due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

**We are a defendant in an adversary proceeding related to the transfer of certain assets to NorthWestern from Clark Fork, which could result in assets being removed from the property of the Chapter 11 case. Certain current and former directors of Clark Fork are defendants in a lawsuit related to the same transfer of assets. Our business could be harmed and there could be material adverse impact on our financial condition or ability to timely confirm a plan of reorganization if we do not successfully resolve the lawsuit.**

Certain creditors and parties-in-interest have initiated legal action against us related to the transfer of the assets and liabilities comprising our Montana utility operations from Clark Fork & Blackfoot LLC to NorthWestern, and seek the removal of such assets from our estate or the imposition of a constructive trust for the benefit of such creditors. If we do not resolve this action in a timely and successful manner it could adversely affect our business, results of operations and financial condition and our ability to emerge from bankruptcy and continue normal operations.

**We are the subject of a formal investigation by the Securities and Exchange Commission relating to the restatement of our 2002 quarterly financial statements and other accounting and financial reporting matters. If the investigation was to result in a regulatory proceeding or action against us, then our business and financial condition could be harmed.**

In December 2003, the SEC notified NorthWestern that it had issued a formal order of private investigation and subsequently subpoenaed documents from NorthWestern, NorthWestern Communications Solutions, Expanets and Blue Dot. This action follows the SEC's requests for information made in connection with the previously disclosed SEC informal inquiry into questions regarding the restatements and other accounting and financial reporting matters. In addition, a NorthWestern director was interviewed by a representative of the Federal Bureau of Investigation (FBI) concerning certain of the allegations made in the class action securities and derivative litigation matters. We have not been contacted by the FBI and have not been advised that NorthWestern is the target of its investigation. We are cooperating with the SEC's investigation and intend to cooperate with the FBI if we are contacted in connection with its investigation. We understand that the FBI or the Internal Revenue Service (IRS) may have contacted former employees of ours or our subsidiaries. As of the date hereof, we are not aware of any other governmental inquiry or investigation related to these matters. We cannot predict whether or not any other governmental inquiry or investigation will be commenced, nor can we predict the outcome of the SEC, FBI, IRS or any other governmental inquiry or investigation or related litigation or proceeding.

**The impact of ongoing class action litigation and shareholder derivative actions may be material. We are also subject to the risk of additional litigation and regulatory action in connection with the restatement of our 2002 quarterly financial statements and the potential liability from any such litigation or regulatory action could materially harm our business and may have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.**

We, and certain of our present and former officers and directors, have been named in several class action lawsuits and shareholder derivative actions commenced in or removed to federal court and described in detail above. A tentative settlement has been reached in the consolidated securities class action and consolidated derivative litigation as described earlier. Among the terms of the proposed settlement, we, Expanets, Blue Dot and other parties and persons will be released from all claims relating to these cases, a settlement fund in the amount of $41 million (of which approximately $37 million will be contributed by our directors and officers liability insurance carriers, and $4 million would be contributed from other persons and parties) will be established, and, if Netexit seeks bankruptcy protection, the plaintiffs would have a $20 million liquidated securities claim against Netexit. However, that proposed settlement is subject to several conditions, such as approval by the Bankruptcy Court and the Federal District Court in South Dakota, which may or may not occur. If the proposed settlement of the consolidated class actions and derivative litigation is not consummated, then we intend to vigorously defend against these lawsuits. In that event, we cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

As a result of the restatement of our quarterly results for the first three quarters of 2002, we could become subject to additional shareholder derivative actions or other securities litigation. In addition, federal, state or local regulatory agencies, such as the FERC, state public utilities commissions, and/or the NYSE, could commence a formal investigation relating to the restatement of our quarterly results. The initiation of any additional securities litigation, together with the pending securities and shareholder derivative lawsuits described in this Quarterly Report, has had a material adverse affect on our business and financial condition. Until such inquiries, investigations, proceedings and litigation are resolved, it will be more difficult to raise additional capital or favorably refinance or restructure our debt or other obligations. If an unfavorable result occurred in any such action, our business and financial condition could be further harmed and there could be an adverse impact on our ability to timely confirm a plan of reorganization. In addition, we have incurred substantial expenses and are likely to incur additional substantial expenses in connection with such litigation and regulatory inquiries and investigations, including substantial fees for attorneys and other professional advisors. We may also be obligated to indemnify officers and directors named as defendants in such action. These expenses, to the extent not covered by available insurance, have and will continue to adversely affect our cash position.

**If the MPSC disallows the recovery of the costs incurred in entering into default supply portfolio contracts while we are required to act as the "default supplier," then we may not be able to fully recover the costs incurred in procuring default supply contracts, which could adversely affect our net income and financial condition.**

The 1997 Montana Restructuring Act, as amended, provides that certain customers be able to choose their electricity supplier during a transition period ending on June 30, 2027. NorthWestern Energy is required to act as the "default supplier" for customers who have not chosen an alternate supplier. The Restructuring Act provides for full recovery of prudently incurred costs for procuring a default supply portfolio of electric power. The default supplier was required to propose a "cost recovery mechanism" for electrical supply procurement costs before March 30, 2002. On April 25, 2002,

41

the MPSC approved our proposed "cost recovery mechanism." Annual filings under this mechanism will address the recovery and tracking of all future electric default supply costs.

On June 21, 2002, the MPSC issued a final order approving contracts meeting approximately 60% of the default supply winter peak load and approximately 73% of the annual energy requirements. As a result of the order, NorthWestern Energy has implemented a procurement strategy that involves supplying the remainder of the default supply portfolio through open market purchases. Currently, NorthWestern Energy is making short-term purchases to fill intermediate and peak electricity needs. These short-term purchases, along with the MPSC approved base-load supply, are being recovered through our annual electricity cost tracking process pursuant to which rates are based on estimated electricity loads and electricity costs for the upcoming tracking period and are annually reviewed and adjusted by the MPSC for any differences in the previous tracking year's estimates to actual information. This process is similar in many respects to the cost recovery process that has been utilized in Montana, South Dakota and other states for natural gas purchases for residential and commercial customers. The MPSC further stated that NorthWestern Energy has an ongoing responsibility to prudently administer its supply contracts and the energy procured pursuant to those contracts for the benefit of ratepayers. The MPSC could, in any particular year, disallow the recovery of a portion of the default supply costs if it makes a determination that NorthWestern Energy acted imprudently with respect to implementation of its open market purchase strategy or that the approved supply contracts were not prudently administered. A failure to recover such costs could adversely affect our net income and financial condition. On July 3, 2003, the MPSC issued an order disallowing the recovery of certain gas supply costs. The MPSC also granted an interim order on July 3, 2003, for the projected gas cost adjusted for a portion of the gas portfolio at a fixed price of $3.50 per MMBTU as opposed to the market price submitted in the original filing, which was higher. Assuming our average forecast price over the next six months occurs, the disallowance on the volumes at the imputed price compared to market price would be approximately $4.5 million for the period July 1, 2003 through June 30, 2004.

**We are subject to extensive governmental regulations that could impose significant costs or change rates of our operations and changes in existing regulations and future deregulation may have a detrimental effect on our business and could increase competition.**

Our operations and the operations of our subsidiary entities are subject to extensive federal, state and local laws and regulations concerning taxes, service areas, tariffs, issuances of securities, employment, occupational health and safety, protection of the environment and other matters. In addition, we are required to obtain and comply with a wide variety of licenses, permits and other approvals in order to operate our facilities. In the course of complying with these requirements, we may incur significant costs. If we fail to comply with these requirements, we could be subject to civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws, regulations, and interpretations thereof may be adopted or become applicable to us or our facilities and future changes in laws and regulations may have a detrimental effect on our business.

Our utility businesses are regulated by certain state commissions, including as of May 30, 2003, the newly formed Nebraska Public Service Commission, with regard to our natural gas businesses in that state. As a result, these commissions have the ability to review the regulated utility's books and records. This ability to review our books and records could result in prospective negative adjustments to our rates.

The United States electric utility and natural gas industries are currently experiencing increasing competitive pressures as a result of consumer demands, technological advances, deregulation, greater availability of natural gas-fired generation and other factors. Competition for various aspects of electric and natural gas services is being introduced throughout the country that will open these markets to new providers of some or all of traditional electric utility and natural gas services. Competition is likely to

result in the further unbundling of electric utility and natural gas services as has occurred in Montana for electricity and Montana, South Dakota and Nebraska for natural gas. Separate markets may emerge for generation, transmission, distribution, meter reading, billing and other services currently provided by electric utility and natural gas providers as a bundled service. As a result, significant additional competitors could become active in the generation, transmission and distribution segments of our industry.

Proposals have been introduced in Congress to repeal the Public Utility Holding Company Act of 1935, or PUHCA. To the extent regulatory barriers to entry are eliminated, competitive pressures increase, or the pricing and sale of transmission or distribution services or electricity or fuel assume more characteristics of a commodity business, we could face increased competition adverse to our business.

**We may not be able to fully recover transition costs, which could adversely affect our net income and financial condition.**

Montana law required the MPSC to determine the value of net unmitigable transition costs associated with the transformation of the former The Montana Power Company utility business from a vertically integrated electric service company to a utility providing only default supply and transmission and distribution services. The MPSC was also obligated to set a competitive transition charge, or CTC, to be included in distribution rates to collect those net transition costs. The majority of these transition costs relate to out-of-market power purchase contracts, which run through 2032, that the former owner of our Montana transmission and distribution business was required to enter into with certain "qualifying facilities" (QF) as established under the Public Utility Regulatory Policies Act of 1978. The former owner estimated the pretax net present value of its transition costs over the approximate 30-year period to be approximately $304.7 million in a filing with the MPSC on October 29, 2001. On January 31, 2002, the MPSC issued an Order establishing a CTC that would recover $244.7 million on a net present value basis. As a result of this Order, we will undercollect approximately $60 million on a net present value basis over the remaining terms of the QF power supply contracts. While the CTC is designed to adjust and compensate for future changes in sales volumes or other factors affecting actual cost recoveries, the CTC runs through the year 2029, and therefore, we cannot predict with certainty the actual recovery of transition costs. Changes in the recovery of transition costs could adversely affect our net income and financial condition by increasing the current under collection amount.

**We are subject to risks associated with a changing economic environment.**

Events such as the bankruptcy of several large energy and telecommunications companies have adversely affected the availability and cost of capital for our business. Such economic environment, if sustained, could constrain the capital available to our industry and would adversely affect our access to funding for our operations, including the funding necessary to refinance or restructure our substantial indebtedness.

**Our electric and natural gas distribution systems are subject to municipal condemnation.**

The government of each of the municipalities in which we provide electric or natural gas service has the right to condemn our facilities in that community and to establish a municipal utility distribution system to serve customers by use of such facilities, subject to the approval of the voters of the community and the payment to NorthWestern of fair market value for our facilities, including compensation for the cancellation of our service rights. While there are currently no proceedings pending to undertake such condemnation, a few of the communities served by NorthWestern in South Dakota and Montana have taken steps to begin evaluation of the feasibility of such actions.

**Our revenues and results of operations are subject to risks that are beyond our control, including but not limited to future terrorist attacks or related acts of war.**

The cost of repairing damage to our facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events, in excess of reserves established for such repairs, may adversely impact our results of operations, financial condition and cash flows. Generation and transmission facilities, in general, have been identified as potential terrorist targets. The occurrence or risk of occurrence of future terrorist activity may impact our results of operations, financial condition and cash flows in unpredictable ways. These actions could also result in adverse changes in the insurance markets and disruptions of power and fuel markets. The availability of insurance covering risks we and our competitors typically insure against may decrease. In addition, the insurance we are able to obtain may have higher deductibles, higher premiums and more restrictive policy terms. In addition, our electric transmission and distribution, electric generation, natural gas distribution and pipeline and gathering facilities could be directly or indirectly harmed by future terrorist activity.

The occurrence or risk of occurrence of future terrorist attacks or related acts of war could also adversely affect the United States economy. A lower level of economic activity could result in a decline in energy consumption, which could adversely affect our revenues and margins and limit our future growth prospects. Also, these risks could cause instability in the financial markets and adversely affect our ability to access capital.

**Our business could be adversely affected if we are unable to reach agreements with our unions to renew collective bargaining agreements.**

We have existing Collective Bargaining Agreements with seven unions representing 569 employees in Montana, South Dakota and Nebraska. Six of the agreements representing 379 employees in Montana expire between April 30, 2004 and August 30, 2004. We had negotiated an agreement with representatives of Local 44 of the International Brotherhood of Electrical Workers (Local 44), which was later rejected by its membership on March 17, 2004. The current agreement with Local 44 expired on April 30, 2004. The union has taken a procedural strike authorization vote of its members, but a strike has not been authorized by the membership. By the terms of the current agreement, Local 44 must give us written notice at least 30 days prior to a strike. Such notice was provided from Local 44 that it may elect to go on strike on May 31, 2004. While we are continuing negotiations with Local 44, there is no assurance that an agreement will be reached. The failure to reach an agreement could adversely affect our operations and financial condition. We are making the necessary preparations to reduce any adverse impact on the delivery of service to customers in the service area in which Local 44 members are employed.

**Our operating results fluctuate on a seasonal and quarterly basis.**

Our electric and gas utility business is seasonal and weather patterns can have a material impact on their operating performance. Demand for electricity is often greater in the summer and winter months associated with cooling and heating. Because natural gas is heavily used for residential and commercial heating, the demand for this product depends heavily upon weather patterns throughout our market areas, and a significant amount of natural gas revenues are recognized in the first and fourth quarters related to the heating season. Accordingly, our operations have historically generated less revenues and income when weather conditions are milder in the winter and cooler in the summer. In the event that we experience unusually mild winters or summers in the future, our results of operations and financial condition could be adversely affected. In addition, exceptionally hot summer weather could add significantly to working capital needs to fund higher than normal power purchases to meet customer demand for electricity.

**Changes in commodity prices and availability of supply may increase our cost of producing and distributing electricity and distributing natural gas or decrease the amount we receive from selling electricity and natural gas, adversely affecting our financial performance and condition.**

Our wholesale costs for electricity and natural gas are recovered through various pass-through mechanisms in each of the states we serve. The rates are established based upon projected market prices or contract obligations. As these variables change, we adjust our rates through our monthly tracker. To the extent our adjusted rate is deemed inappropriate by the applicable state regulatory commission, we could underrecover our costs during the relevant period. While the tracker mechanisms are designed to allow a timely recovery of costs, a rapid increase in commodity costs may create a temporary, material underrecovery situation. As a result, we may not be able to immediately pass on to our retail customers rapid increases in our energy supply costs, which could reduce our liquidity.

We do not own any natural gas reserves and do not own electric generation assets to service our Montana operations. As a result, we are required to procure our entire natural gas supply and all of our Montana electricity supply pursuant to contracts with third-party suppliers. In light of this reliance on third-party suppliers, we are exposed to certain risks in the event a third-party supplier is unable to satisfy its contractual obligation. Such risk is not present in our South Dakota electric operation because we own interests in generation assets that substantially cover our electric supply requirement in South Dakota.

**If we are unable to obtain investment grade ratings upon exit from bankruptcy, then our working capital could be adversely affected by trade vendors reducing or eliminating customary credit terms.**

In order to fulfill our obligations to supply electrical power and natural gas supply in our service territories, we enter into power and fuel purchase agreements of varying lengths. If we are unable to obtain investment grade ratings upon exit from bankruptcy, under customary contract terms, the power or fuel vendor would have the right to reduce or eliminate credit terms and/or demand credit enhancement, including the posting of letters of credit, bonds, cash deposits or requiring prepayments. If we are required to provide such credit enhancements, then our liquidity will be adversely affected.

**Our utility business is subject to extensive environmental regulations and potential environmental liabilities, which could result in significant costs and liabilities.**

Our utility business is subject to extensive regulations imposed by federal, state and local government authorities in the ordinary course of operations with regard to the environment, including environmental regulations relating to air and water quality, solid waste disposal and other environmental considerations. Many of these environmental laws and regulations create permit and license requirements and provide for substantial civil and criminal fines which, if imposed, could result in material costs or liabilities. We cannot predict with certainty the occurrence of a private tort allegation or government claim for damages associated with specific environmental conditions. We may be required to make significant expenditures in connection with the investigation and remediation of alleged or actual spills, personal injury or property damage claims, and the repair and upgrade of our facilities in order to meet future requirements and obligations under environmental laws.

Environmental laws and regulations require us to incur certain costs, which could be substantial, to operate existing facilities, construct and operate new facilities, and mitigate or remove the effect of past operations on the environment. Governmental regulations establishing environmental protection standards are continually evolving, and, therefore, the character, scope, cost and availability of the measures we may be required to take to ensure compliance with evolving laws or regulations cannot be predicted. Our range of exposure for environmental remediation obligations is estimated to be $45.3 million to $84.1 million. We have an environmental reserve of $45.3 million at March 31, 2004. This reserve was established in anticipation of future remediation activities at our various

environmental sites and does not factor in any exposure to us arising from private tort actions or government claims for damages allegedly associated with specific environmental conditions. To the extent that our environmental liabilities are greater than our reserves or we are unsuccessful in recovering anticipated insurance proceeds under the relevant policies, our results of operations and financial condition could be adversely affected.

**Certain subsidiaries may be subject to potential rescission rights held by their minority shareholders.**

In connection with acquisitions in prior years, Expanets and Blue Dot issued shares of their capital stock as part of the consideration offered to owners of various companies that they acquired. None of these shares were registered under the Securities Act of 1933, as amended, in the belief that the issuance of these shares was exempt from the registration requirements of the Securities Act. It is possible that the exemptions from registration on which Expanets and Blue Dot relied were not available, and that these shares may have been issued in violation of the Securities Act. As a result, the persons who received these shares upon the sale of their companies to Expanets or Blue Dot may have the right to seek recovery from Expanets or Blue Dot damages as prescribed by applicable securities laws.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

We are exposed to the impact of market fluctuations associated with commodity prices and interest rates. We have policies and procedures to assist in controlling these market risks, and we may utilize derivatives to manage a portion of our risk. Our policy allows the use of derivative instruments as part of an overall energy price and interest rate risk management program to efficiently manage and minimize commodity price interest rate risk. We do not enter into financial instruments for speculative or trading purposes.

### Interest Rate Risk

We use fixed and variable rate long-term debt to partially finance capital expenditures and mandatory debt retirements. These debt agreements expose us to market risk related to changes in interest rates. We manage this risk by taking advantage of market conditions when timing the placement of long-term or permanent financing. We have historically used interest rate swap agreements to manage a portion of our interest rate risk and may take advantage of such agreements in the future to minimize such risk. All of our debt has fixed interest rates, with the exception of our senior secured term loan which bears interest at a variable rate (currently approximately 6.75%) tied to the Eurodollar rate. A 1% increase in the Eurodollar rate would increase annual interest expense by approximately $3.8 million. Our new DIP Facility also bears interest at a variable rate tied to the Eurodollar rate, however, we have no outstanding borrowings as of May 7, 2004.

### Commodity Price Risk

The fair value of fixed-price commodity contracts is estimated based on market prices of commodities covered by the contracts. As of March 31, 2004, we have no contracts outstanding with commodity price risk.

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

As reported in our Annual Report on Form 10-K for the year ended December 31, 2003, we outlined actions taken to correct the material weaknesses identified by our independent auditors during their fiscal year 2002 audit. We have discussed those actions with the Audit Committee and our

independent auditors and determined the deficiencies in internal controls that were considered to be a material weaknesses have been corrected.

Based on our management's evaluation (with the participation of our Chief Executive Officer and Chief Financial Officer), as of the end of the period covered by this report, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls (as defined in Rules 13a-15(e) under the Securities and Exchange Act of 1934, as amended, (the Exchange Act)) are effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting during the first quarter of 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

**ITEM 1. LEGAL PROCEEDINGS**

As a result of the Chapter 11 filing, attempts to collect, secure or enforce remedies with respect to most prepetition claims against us are subject to the automatic stay provisions of Section 362(a) of Chapter 11.

We, and certain of our present and former officers and directors, were named as defendants in numerous complaints purporting to be class actions which were filed in the United States District Court for the District of South Dakota, Southern Division, alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The complaints contained varying allegations, including that the defendants misrepresented and omitted material facts with respect to our 2000, 2001, and 2002 financial results and operations included in our filings with the SEC, press releases, and registration statements and prospectuses disseminated in connection with certain offerings of debt, equity, and trust preferred securities. The complaints seek unspecified compensatory damages, rescission, and attorneys' fees and costs as well as accountants' and experts' fees. In June 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Securities Litigation*, Case No. 03-4049, and Carpenters Pension Trust for Southern California, Oppenheim Investment Management, LLC, and Richard C. Slump were named as co-lead plaintiffs (the "Lead Plaintiffs"). In July 2003, the Lead Plaintiffs filed a consolidated amended class action complaint naming NorthWestern, NorthWestern Capital Financing II and III, Blue Dot, Expanets, certain of our present and former officers and directors, along with a number of investment banks that participated in the securities offerings. The amended complaint alleges that the defendants misrepresented and omitted material facts concerning the business operations and financial performance of NorthWestern, Expanets, Blue Dot and CornerStone, overstated NorthWestern's revenues and earnings by, among other things, maintaining insufficient reserves for accounts receivable at Expanets, failing to disclose billing problems and lapses and data conversion problems, failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system, concealing losses at Expanets and Blue Dot by improperly allocating losses to minority interest shareholders, maintaining insufficient internal controls, and profiting from improper related-party transactions. We, and certain of our present and former officers and directors, were also named as defendants in two complaints purporting to be class actions which were filed in the United States District Court for the Southern District of New York, entitled *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.*, Case No. 03CV3223, and *Arthur Laufer v. Merle Lewis, et al.*, Case No. 03CV3716, which were brought on behalf of the purchasers of our 7.20%, 8.25%, and 8.10% trust preferred securities which were offered and sold pursuant to our registration statement on Form S-3 filed on July 12, 1999. The plaintiffs' claims are based on similar allegations of material misrepresentations and omissions of fact relating to the registration statement in violation of Sections 11 and 12 of the Securities Act of 1933, and they seek unspecified compensatory damages, rescission and attorneys', accountants' and experts' fees. In July 2003, *Arthur Laufer v. Merle Lewis, et al.* was transferred to the District of South Dakota and consolidated with the consolidated actions pending in that court. In September 2003, *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.* was also transferred to the District of South Dakota. In February 2004, the *Golman Family Trust* action was also consolidated with the actions pending in that court. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. In October 2003, Expanets, Blue Dot, and certain of NorthWestern's present and former officers and directors filed motions to dismiss the consolidated amended class action complaint for failure to state a claim, which are currently pending in the District of South Dakota.

Certain of our present and former officers and directors and NorthWestern, as a nominal defendant, have been named in two shareholder derivative actions commenced in the United States

District Court for the District of South Dakota, Southern Division, entitled *Deryl Lusty, et al. v. Richard R. Hylland, et al.*, Case No. CIV034091 and *Jerald and Betty Stewart, et al. v. Richard R. Hylland, et al.*, Case No. CIV034114. These shareholder derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal shareholder suits. The plaintiffs seek unspecified compensatory damages, restitution of improper salaries, insider trading profits and payments from NorthWestern, and disgorgement under the Sarbanes-Oxley Act of 2002. In July 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091. In October 2003, the action was stayed pending a ruling on defendants' motions to dismiss in the related securities class action, *In re NorthWestern Corporation Securities Litigation*. On November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining the plaintiffs in *In re NorthWestern Corporation Derivative Litigation* from prosecuting the litigation against NorthWestern, its subsidiaries and its current and former officers and directors until further order of the Bankruptcy Court.

On February 7, 2004, the parties to the above consolidated securities class actions and consolidated derivative litigation, together with certain other affected persons and parties, reached a tentative settlement of the litigation. On April 19, 2004 the parties and other affected persons signed a memorandum of understanding which memorialized the tentative settlement. Among the terms of the proposed settlement, we, Expanets, Blue Dot and other parties and persons will be released from all claims to these cases, a settlement fund in the amount of $41 million (of which approximately $37 million would be contributed by our directors and officers liability insurance carriers, and $4 million would be contributed from other persons and parties) will be established, and the plaintiffs would have a $20 million liquidated securities claim against Netexit. We have filed a motion in NorthWestern's bankruptcy proceeding seeking approval of the terms of the memorandum of understanding and related documents. The settlement is subject to the occurrence of several conditions, including approval of the proposed settlement by the Bankruptcy Court in our bankruptcy proceeding and approval of the proposed settlement by the federal District Court for the District of South Dakota, where the consolidated class actions are pending. If for any reason these conditions do not occur and the settlement is not approved, then we intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In December 2003, the SEC notified NorthWestern that it had issued a formal order of private investigation and subsequently subpoenaed documents from NorthWestern, NorthWestern Communications Solutions, Expanets and Blue Dot. This action follows the SEC's requests for information made in connection with the previously disclosed SEC informal inquiry into questions regarding the restatements and other accounting and financial reporting matters. In addition, NorthWestern directors have been interviewed by representatives of the Federal Bureau of Investigation (FBI) concerning questions regarding the restatements and other accounting and financial reporting. NorthWestern has not been contacted by the FBI and has not been advised that NorthWestern is the target of any such FBI investigation. We are cooperating with the SEC's investigation and intend to cooperate with the FBI if we are contacted in connection with its investigation. We understand that the FBI or the Internal Revenue Service (IRS) may have contacted current and former employees of ours or of our subsidiaries. As of the date hereof, we are not aware of any other governmental inquiry or investigation related to these matters. We cannot predict whether or not any other governmental inquiry or investigation will be commenced, nor can we predict the outcome of the SEC, FBI, IRS or any other governmental inquiry or investigation or related litigation or proceeding.

In January 2004, two of the QFs—Colstrip Electric Limited Partnership (CELP) and Yellowstone Electric Limited Partnership (YELP)—initiated adversary proceedings against NorthWestern in its Chapter 11 proceedings. Both CELP and YELP have also filed claims in NorthWestern's bankruptcy proceeding. In the CELP adversary proceeding, CELP seeks additional payments based on whether or not a force majeure occurred under the terms of the existing power purchase agreement. In the YELP adversary proceeding, YELP seeks a determination of when and who has the right to determine the scheduling of maintenance on the power facility under the terms of the power purchase agreement. We intend to vigorously defend against these adversary proceedings. In the opinion of management, the amount of ultimate liability with respect to these adversary proceedings will not materially affect our financial position or results of operations or our ability to timely confirm a plan of reorganization.

On April 16, 2004 Magten Asset Management Corporation (Magten) and Law Debenture Trust Company of New York (Law Debenture) initiated an adversary proceeding against NorthWestern seeking among other things, to void the transfer of certain assets of Clark Fork and Blackfoot LLC (Clark Fork) to us. Magten and Law Debenture have also filed claims in NorthWestern's bankruptcy proceeding. In essence, Magten and Law Debenture are asserting that the transfer of the transmission and distribution assets acquired from the Montana Power Company was a fraudulent conveyance because such transfer left Clark Fork insolvent and unable to pay certain claims. The plaintiffs also assert that they are creditors of Clark Fork as a result of Magten owning a portion of the Series A 8.45% Quarterly Income Preferred Securities for which Law Debenture serves as the Indenture Trustee. By its adversary proceeding, the plaintiffs seek, among other things, the avoidance of the transfer of assets, declaration that the assets were fraudulently transferred and are not property of our bankruptcy case, the imposition of constructive trusts over the transferred assets and the return of such assets to Clark Fork. In addition to the adversary proceeding filed by Magten and Law Debenture, the plaintiffs in the class action lawsuit entitled *McGreevey, et al v. Montana Power Company, et al* and, separately, Comanche Park LLC have filed motions seeking approval from the Bankruptcy Court to initiate similar adversary proceedings. On April 19, 2004 Magten also filed a substantially similar complaint against certain former and current directors of Clark Fork in U.S. District Court in Montana, but Magten seeks compensatory and punitive damages for breaches of fiduciary duties by such directors. We anticipate those directors will request Clark Fork and us to indemnify them for their legal fees and costs in defending against the lawsuit and any settlement and/or judgment in such lawsuit. At this time, we cannot predict the impact or resolution of any of these lawsuits or reasonably estimate a range of possible loss, which could be material. The resolution of these lawsuits could harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization. We intend to vigorously defend against the adversary proceeding and any subsequently filed similar litigation.

Harbert Management Corporation (Harbert) and Wilmington Trust Company (Wilmington) have filed a motion in NorthWestern's bankruptcy proceeding seeking the bankruptcy court's approval to file certain pleadings with the SEC and participate any proceedings before the SEC to allege certain violations of the Public Utility Company Holding Act of 1935, 15 U.S.C. §79a, et seq. (PUCHA). Harbert and Wilmington allege that NorthWestern at the time of its acquisition of the electric and natural gas transmission and distribution assets from The Montana Power Company could not seek an exemption from the requirements of PUCHA and thus certain senior unsecured and senior secured debt issued after seeking the exemption was void. At this time, we cannot predict the impact or resolution of this motion or if an SEC proceeding is initiated or reasonably estimate a range of possible loss, which could be material. The resolution of these matters could harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization. We intend to vigorously defend against the motion and or any proceeding initiated by Harbert and Wilmington.

Expanets has been named in an investigation brought by the New York City Comptroller's office based on five complaints of former employees of Expanets for alleged violations of the New York City prevailing wage laws. Expanets and NorthWestern have been named defendants in two complaints filed with the Supreme Court of the State of New York, County of Bronx, alleging violations of New York's prevailing wage laws, breach of contract, unjust enrichment, willful failure to pay wages, race, ethnicity, national origin and/or age discrimination and retaliation. NorthWestern has been dismissed from both actions through a voluntary dismissal filed by the plaintiffs. In the complaint entitled *Felix Adames et al. v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, Bronx County, Index No. 8664-04*, which has not yet been served upon Expanets, 14 former employees of Expanets seek damages in the amount of $27,750,000, plus interest, penalties, punitive damages, costs, and attorney's fees. In the complaint entitled *Wayne Belnavis and David Daniels v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, Bronx County, Index No. 8729-04*, which has not yet been served upon Expanets, two former employees of Expanets seek damages in the amount of $12,500,000, plus interest, penalties, punitive damages, costs, and attorney's fees. We intend to vigorously defend against the allegations made in these complaints. Though the investigation and complaints may be subject to the automatic stay provisions of the US Bankruptcy Code and the claims by the former Expanets employees may be subject to the claims process of the Netexit bankruptcy proceeding, we cannot currently predict the impact or resolution of these claims or reasonably estimate a range of possible loss, which could be material, and the resolution of these claims may harm our business and have a material adverse impact on our financial condition.

We are one of several defendants in a class action lawsuit entitled *McGreevey, et al. v. The Montana Power Company, et al*, now pending in U.S. District Court in Montana. The lawsuit, which was filed by former shareholders of The Montana Power Company (most of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company were void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern is named as a defendant due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. On November 6, 2003, the Bankruptcy Court approved a stipulation between NorthWestern and the plaintiffs in *McGreevey, et al. v. The Montana Power Company, et al.* The stipulation provides that litigation, as against NorthWestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey, shall be temporarily stayed for 180 days from the date of the stipulation. Upon an agreed upon motion, the automatic stay has been lifted for the limited purpose of conducting a mediation with all parties to the case to seek a resolution. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In *NorthWestern Corporation vs. PPL Montana, LLC vs. NorthWestern Corporation and Clark Fork and Blackfoot, LLC*, No. CV-02-94-BU-SHE, (D. MT), the Company is pursuing claims against PPL Montana, LLC (PPL) due to its refusal to purchase the Colstrip transmission assets which under the Asset Purchase Agreement (APA) executed by and between The Montana Power Company (MPC) and PP&L Global, Inc. (PPL Global), NorthWestern claims PPL (PPL Global's successor-in-interest under the APA) is required to purchase the Colstrip transmission assets for $97.1 million. PPL has also asserted a number of counterclaims against NorthWestern and Clark Fork based in large part upon PPL's claim that MPC and/or NorthWestern Energy breached two Wholesale Transition Service Agreements and certain indemnification obligations under the APA in the approximate amount of $40 million. PPL also filed a proof of claim against NorthWestern's bankruptcy estate which asserts substantially the same claims as the PPL counterclaim. PPL moved the Bankruptcy Court for relief

51

from the automatic stay to pursue its counterclaims. NorthWestern objected to PPL's motion to lift the automatic stay and has also filed a motion to transfer the venue of the entire litigation to the United States District Court for the District of Delaware. On March 19, 2004 the federal court in Montana denied our motion to transfer the entire case. We intend to vigorously defend against the PPL claims in the Bankruptcy Court and the counterclaims in federal court as well as vigorously prosecute our claims against PPL. We cannot currently predict the impact or resolution of the claims or this litigation or reasonably estimate a range of possible loss on the counterclaims, which could be material.

We are also one of several defendants in a class action lawsuit entitled *In Re Touch America ERISA Litigation*, which is currently pending in U.S. District Court in Montana. The lawsuit was filed by participants in the former Montana Power Company retirement savings plan and alleges that there was a breach of fiduciary duty in connection with the employee stock ownership aspects of the plan. The court has recently entered orders indefinitely staying the ERISA litigation because of Touch America Holdings Inc.'s bankruptcy filing. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We, and certain of our former officers and directors, were named as defendants in certain complaints filed against CornerStone Propane Partners, LP and other defendants purporting to be class actions filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, LP. Certain former officers and directors of NorthWestern who are named as defendants in certain of these actions have also been sued in their capacities as directors of the managing general partner. These complaints allege that defendants sold units of CornerStone Propane Partners based upon false and misleading statements and failed to disclose material information about CornerStone Propane Partners' financial condition and future prospects, including overpayment for acquisitions, overstating earnings and net income, and that it lacked adequate internal controls. All of the lawsuits have now been consolidated and Gilbert H. Lamphere has been named as lead plaintiff. The actions have been stayed as to NorthWestern due to its bankruptcy filing. On October 27, 2003, the plaintiffs filed an amended consolidated class action complaint. The new complaint does not name NorthWestern as a defendant, although it alleges facts relating to NorthWestern's conduct. Certain of our former officers and directors are named as defendants in the amended consolidated complaint. The plaintiffs seek compensatory damages, prejudgment and postjudgment interest and costs, injunctive relief, and other relief. We intend to vigorously defend against these lawsuits. On November 6, 2003, the Bankruptcy Court entered an order approving a stipulation between NorthWestern and plaintiffs in this litigation. The stipulation provides that litigation as against NorthWestern shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to NorthWestern, the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We were named in a complaint filed against us, CornerStone Propane GP, Inc., CornerStone Propane Partners LP and other defendants in a lawsuit entitled *Leonard S. Mewhinney, Jr. v. NorthWestern Corporation, et al.* in the circuit court of the city of St. Louis, state of Missouri. The complaint alleges that the plaintiff purchased units of Cornerstone Propane Partners, LP between March 13, 1998 and November 29, 2001 and that NorthWestern owned and controlled all or the

52

majority of stock or other indicia of ownership of Cornerstone Propane, GP, Inc. and all other entities that were the general partners of Cornerstone Propane Partners, LP. According to the plaintiff, NorthWestern, Cornerstone Propane GP, Inc., Coast Gas, Inc. and Cornerstone Propane Partners, LP breached fiduciary duties to the plaintiff by engaging in certain misconduct, including mismanaging Cornerstone Propane Partners, LP and transferring its assets for less than market value and other activities. The complaint further alleges that the defendants fraudulently failed to disclose material information regarding the value of units of Cornerstone Propane Partners, LP and violated the Florida Securities Act in connection with the sale of such units. The plaintiff seeks compensatory damages, punitive damages and costs. The complaint was amended to add a state class action claim. All defendants filed a petition to remove the case to the federal court in St. Louis, Missouri, but the federal court granted plaintiff's motion to remand. The case has now been stayed against NorthWestern due to its bankruptcy filing. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

Certain of our present and former officers and directors, and CornerStone Propane Partners, LP, as a nominal defendant, are among other defendants named in two derivative actions commenced in the Superior Court for the State of California, County of Santa Cruz, entitled *Adelaide Andrews v. Keith G. Baxter, et al.*, Case No. CV146662 and *Ralph Tyndall v. Keith G. Baxter, et al.*, Case No. CV146661. These derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal unitholder suits. The plaintiffs seek unspecified compensatory damages, treble damages pursuant to the California Corporations Code, injunctive relief, restitution, disgorgement, costs, and other relief. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

On April 30, 2003, Mr. Richard Hylland, our former President and Chief Operating Officer, filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortious interference and a claim for punitive damages. Mr. Hylland is seeking relief in the amount of $25 million, plus interest, attorney's fees, costs, and punitive damages. Mr. Hylland has also filed claims in our bankruptcy case similar to the claims in his arbitration demand. We dispute Mr. Hylland's claims and intend to vigorously defend the arbitration and object to Mr. Hylland's claims in our bankruptcy case. On May 6, 2003, based on the recommendations of the Special Committee of the NorthWestern Board of Directors formed to evaluate Mr. Hylland's performance and conduct in connection with the management of NorthWestern and its subsidiaries, the Board determined that Mr. Hylland's performance and conduct as President and Chief Operating Officer warranted termination under his employment contract. Though this arbitration has been stayed due to our bankruptcy filing, Mr. Hylland sought to lift the automatic stay to pursue the arbitration. The Bankruptcy Court denied his motion and he appealed the court's order. We have responded and anticipate a ruling from the US District Court for the District of Delaware soon.

On August 12, 2003, the Montana Consumer Counsel (MCC) filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the Montana Public Service Commission (MPSC). On August 22, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would

prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. A procedural schedule was set in January 2004 with a hearing tentatively scheduled for June 2004. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, then we may become subject to material monetary penalties and fines. We are working with the MCC to provide requested information, but we have reserved the right to contest whether this proceeding is stayed as a result of our bankruptcy filing.

On March 17, 2004, certain minority shareholders of Netexit filed a lawsuit against Avaya Inc., Netexit, NorthWestern Growth Corporation, and Merle Lewis, Dick Hylland and Dan Newell entitled *Cohen et al. v Avaya Inc., et al.* in U.S. District Court in Sioux Falls, South Dakota contending that (i) the defendants fraudulently induced the shareholders to sell their businesses to Expanets during 1998 and 1999 in exchange for Expanets stock which would have value only if Expanets went public, when in fact no IPO was intended, and (ii) the defendants and NorthWestern (a) hid the true financial condition of NorthWestern, NorthWestern Growth and Expanets, (b) permitted internal controls to lapse, (c) failed to document loans by NorthWestern to Expanets, and (d) allowed the individual defendants to realize millions of dollars in bonus payments at the expense of Expanets and its minority shareholders. The lawsuit alleges federal and state securities laws violations and breaches for fiduciary duties. The plaintiffs have recently filed an amended complaint that reflects one less plaintiff and a clarification on the damages that they seek. In addition, Avaya Inc. has sent NorthWestern a notice seeking indemnification and defense for this lawsuit under the terms of the asset purchase agreement. As a result of the filing by Netexit for bankruptcy protection, the complaint as to Netexit will be subject to the automatic stay provisions of the US Bankruptcy Code. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material.

Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P. (CornerStone), a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor. In November 2002, we divested our economic equity interests in CornerStone and deconsolidated CornerStone and its affiliates from our financial statements. CornerStone has filed a number of claims against our estate, the most significant of which attempts to assert a claim in the approximate amount of $130 million for an alleged capital account deficiency either existing prior to or resulting from the deconsolidation of our interests in CornerStone. We dispute that there was any capital account deficiency with respect to CornerStone that will result in any claim for which we are responsible. CornerStone also has asserted that the entire deconsolidation transaction should be "unwound" and that we, as a result of our asserted improper dominion and control over CornerStone and its operations, should be responsible for certain of CornerStone's obligations. CornerStone further asserts any claim we have against them should be offset against CornerStone's claims as to our estate. We intend to object to the CornerStone claim and to vigorously defend any efforts to unwind the deconsolidation transaction or to deny recovery on our claims against CornerStone. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We are also subject to various other legal proceedings and claims that arise in the ordinary course of business. In the opinion of management, the amount of ultimate liability with respect to these actions will not materially affect our financial position or results of operations or ability to timely confirm a plan of reorganization.

**ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K**

    (a)   Exhibits

Exhibit 31.1—Certification of chief executive officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002.

Exhibit 31.2—Certification of chief financial officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002.

Exhibit 32.1—Certification of chief executive officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

Exhibit 32.2—Certification of chief financial officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

    (b)   Reports on Form 8-K

We filed a Current Report on Form 8-K with the SEC on March 12, 2004, to disclose under Item 5 of the Report that we issued a press release announcing that we had filed a plan of reorganization and disclosure statement with the U.S. Bankruptcy Court for the District of Delaware. The press release also discussed our capital expenditures estimate for 2004 through 2008, certain contributions we intend to make to certain qualified pension plans we maintain for our employees and certain settlements with respect to Milltown Dam and certain securities litigation.

We filed a Current Report on Form 8-K with the SEC on March 15, 2004, to disclose under Item 12 of the Report that we issued a press release discussing results of operations and financial condition for the fiscal year ended December 31, 2003. The press release also discussed information regarding asset sales.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

NORTHWESTERN CORPORATION

Date: May 7, 2004                    By: /s/  BRIAN B. BIRD

Brian B. Bird
Chief Financial Officer
Duly Authorized Officer and Principal Financial Officer

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| *31.1 | Certification of chief executive officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002. |
| *31.2 | Certification of chief financial officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| *32.1 | Certification of chief executive officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| *32.2 | Certification of chief financial officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

---

*    Filed herewith

**EXHIBIT 31.1**

**CERTIFICATION PURSUANT TO**
**17 CFR 240. 13a-14**
**PROMULGATED UNDER**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Gary G. Drook, certify that:

1. I have reviewed this quarterly report on Form 10-Q of NorthWestern Corporation;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: **May 7, 2004**

/s/ GARY G. DROOK
_____
Gary G. Drook
*President and Chief Executive Officer*

**Exhibit 31.2**

## CERTIFICATION PURSUANT TO
## 17 CFR 240. 13a-14
## PROMULGATED UNDER
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Brian B. Bird, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of NorthWestern Corporation;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: **May 7, 2004**

/s/ BRIAN B. BIRD
_____

Brian B. Bird
*Chief Financial Officer*

EXHIBIT 32.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of NorthWestern Corporation (the "Company") on Form 10-Q for the period ended March 31, 2004, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Gary G. Drook, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1) The Report fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ GARY G. DROOK
_____

Gary G. Drook
*President and Chief Executive Officer*

Date: May 7, 2004

**Exhibit 32.2**

### CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO
### 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of NorthWestern Corporation (the "Company") on Form 10-Q for the period ended March 31, 2004, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian B. Bird, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1) The Report fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ BRIAN B. BIRD
_____

Brian B. Bird
*Chief Financial Officer*

Date: May 7, 2004

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# Form 10-K

**(Mark One)**

☑    **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2003**
**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from        to        .**

**Commission File Number: 0-692**

---

# NORTHWESTERN CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-0172280** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **125 S. Dakota Avenue, Sioux Falls, South Dakota** | **57104** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **605-978-2908**

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act:
**Common Stock, $1.75 par value, and related Common Stock Purchase Rights**
**Preferred Stock, Par Value $100**
**Company Obligated Mandatorily Redeemable Security of Trust Holding Solely Parent Debentures, $25.00 liquidation**
(Title of Class)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

As of June 30, 2003, the aggregate market value of the voting common stock held by nonaffiliates of the registrant was $75,360,190, computed using the last sales price of $2.00 per share of the registrant's common stock on June 30, 2003, the last business day of the registrant's most recently completed second fiscal quarter, as reported by the New York Stock Exchange.

As of March 12, 2004, 37,680,095 shares of the registrant's common stock, par value $1.75 per share, were outstanding.

Indicate by check mark whether the registrant has filed all documents required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☑ No ☐

**Documents Incorporated by Reference**
None

**INDEX**

**Part I.**                                                                                                                    Page
Item 1.     Business                                                                                                             5
Item 2.     Properties                                                                                                          21
Item 3.     Legal Proceedings                                                                                                   21
Item 4.     Submission of Matters to a Vote of Security Holders                                                                 24

**Part II.**                                                                                                                    25
Item 5.     Market for Registrant's Common Equity and Related Shareholder Matters                                              25
Item 6.     Selected Financial Data                                                                                            27
Item 7.     Management's Discussion and Analysis of Financial Condition and Results of Operations                              28
Item 7A.    Quantitative and Qualitative Disclosures About Market Risk                                                          48
Item 8.     Financial Statements and Supplementary Data                                                                         48
Item 9.     Changes In and Disagreements With Accountants on Accounting and Financial Disclosure                               48
Item 9A.    Controls and Procedures                                                                                            48

**Part III.**                                                                                                                   50
Item 10.    Directors and Executive Officers of the Registrant                                                                 50
Item 11.    Executive Compensation                                                                                             52
Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters                      59
Item 13.    Certain Relationships and Related Transactions                                                                     60
Item 14.    Principal Accountants Fees and Services                                                                            60

**Part IV.**                                                                                                                    61
Item 15.    Exhibits, Financial Statement Schedules and Reports on Form 8-K                                                    61
Signatures                                                                                                                     72
Index to Financial Statements                                                                                                  F-1

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

On one or more occasions, we may make statements in this Annual Report on Form 10-K regarding our assumptions, projections, expectations, targets, intentions or beliefs about future events. All statements other than statements of historical facts, included or incorporated by reference herein relating to management's current expectations of future financial performance, continued growth, changes in economic conditions or capital markets and changes in customer usage patterns and preferences are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. On September 14, 2003, NorthWestern Corporation filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Our subsidiaries, including Netexit, Inc. (f/k/a Expanets Inc.) and Blue Dot Services, Inc., (Blue Dot) are not party to the Chapter 11 case.

Words or phrases such as "anticipates," "may," "will," "should," "believes," "estimates," "expects," "intends," "plans," "predicts," "projects," "targets," "will likely result," "will continue" or similar expressions identify forward-looking statements. Forward-looking statements involve risks and uncertainties which could cause actual results or outcomes to differ materially from those expressed. We caution that while we make such statements in good faith and we believe such statements are based on reasonable assumptions, including without limitation, management's examination of historical operating trends, data contained in records and other data available from third parties, we cannot assure you that our projections will be achieved. Factors that may cause such differences include but are not limited to:

(i)     our common stock will be cancelled and our trust preferred securities will likely be restructured in a manner that will eliminate or very substantially reduce any remaining value. We have previously stated that the planned sale of noncore assets is not expected to change our view that our common stock has no value. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities;

(ii)    our ability to successfully develop, prosecute, confirm and consummate a plan of reorganization, emerge from bankruptcy as a going concern and avoid liquidation under the U.S. Bankruptcy Code;

(iii)   risks associated with third parties seeking and obtaining Bankruptcy Court approval for the appointment of a Chapter 11 trustee or to convert the case to a Chapter 7 proceeding;

(iv)    our ability to operate pursuant to the terms of our $85 million debtor-in-possession financing facility arranged by us with Bank One, N.A. (the DIP Facility) and other financing and contractual arrangements;

(v)     our ability to obtain Bankruptcy Court approval with respect to material motions in the Chapter 11 proceeding from time to time;

(vi)    our ability to obtain the support of the official committee of unsecured creditors and other stakeholders of the company for a plan of reorganization, which may be difficult in light of our likely inability to preserve any material value in our common equity and our trust preferred securities, or satisfy a material amount of our current unsecured debt, in a plan of reorganization;

(vii)   our ability to offset the negative effects that the filing for reorganization under Chapter 11 has had, or may have, on our business, management and employees including constraints placed on available capital;

(viii)  our ability to obtain and maintain normal terms with vendors and service providers;

(ix)    our ability to maintain contracts, including leases, that are critical to our operations;

(x)     the potential adverse impact of the Chapter 11 case on our liquidity or results of operations;

(xi)    our ability to develop a long-term strategy and our ability to fund and execute our business plan;

(xii)   our ability to avoid or mitigate material uninsured monetary judgments, or other adverse judgments, against us in (1) the shareholder class action lawsuit relating to the disposition of the generating and energy-related assets by The Montana Power Company, excluding our acquisition of the electric and natural gas transmission and distribution business formerly held by The Montana Power Company, together with ERISA litigation regarding The Montana Power Company ESOP and 401(k) plan and (2) existing shareholder and derivative litigation or any additional litigation and regulatory action, including the initiation by the Securities and Exchange Commission (SEC) of a formal investigation, in connection with the restatement of our 2002 quarterly financial statements, any of which could have a material adverse affect on our liquidity, results of operations and financial condition;

General Factors

(xiii)    our ability to fully address and correct weaknesses in our internal controls and to thereafter maintain an effective internal controls structure;

(xiv)    our ability to attract, motivate and/or retain key employees;

(xv)    potential additional adverse federal, state, or local legislation or regulation or adverse determinations by regulators, including the final order of the Montana Public Service Commission (MPSC) disallowing the recovery of $6.2 million of natural gas costs we incurred during the past tracker year, and an interim order fixing the recovery price during the next tracker year, which has had and could continue to have a material adverse affect on our liquidity, results of operations and financial condition;

(xvi)    unscheduled generation outages, maintenance or repairs which may reduce revenues and increase cost of sales or may require additional capital expenditures or other increased operating costs;

(xvii)    unanticipated changes in commodity prices or in fuel supply costs or availability due to higher demand, shortages, weather conditions, transportation problems or other developments, in combination with reduced availability of trade credit, may reduce revenues or may increase operating costs, each of which would adversely affect our liquidity;

(xviii)    increases in interest rates will increase our cost of borrowing;

(xix)    adverse changes in general economic and competitive conditions in our service territories; and

(xx)    certain other business uncertainties related to the occurrence of natural disasters, war, hostilities and the threat of terrorist actions.

We have attempted to identify, in context, certain of the factors that we believe may cause actual future experience and results to differ materially from our current expectation regarding the relevant matter or subject area. In addition to the items specifically discussed above, our business and results of operations are subject to the uncertainties described under the caption "Risk Factors" which is a part of the disclosure included in Item 7 of this Report entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations."

From time to time, oral or written forward-looking statements are also included in our reports on Forms 10-K, 10-Q and 8-K, Proxy Statements on Schedule 14A, press releases and other materials released to the public. Although we believe that at the time made, the expectations reflected in all of these forward-looking statements are and will be reasonable, any or all of the forward-looking statements in this report on Form 10-K, our reports on Forms 10-Q and 8-K, our Proxy Statements on Schedule 14A and any other public statements that are made by us may prove to be incorrect. This may occur as a result of inaccurate assumptions or as a consequence of known or unknown risks and uncertainties. Many factors discussed in this Annual Report on Form 10-K, certain of which are beyond our control, will be important in determining our future performance. Consequently, actual results may differ materially from those that might be anticipated from forward-looking statements. In light of these and other uncertainties, you should not regard the inclusion of a forward-looking statement in this Annual Report on Form 10-K or other public communications that we might make as a representation by us that our plans and objectives will be achieved, and you should not place undue reliance on such forward-looking statements.

We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. However, your attention is directed to any further disclosures made on related subjects in our subsequent annual and periodic reports filed with the SEC on Forms 10-K, 10-Q and 8-K and Proxy Statements on Schedule 14A.

*Unless the context requires otherwise, references to "we," "us," "our," "NorthWestern Corporation" and "NorthWestern" refer specifically to NorthWestern Corporation and its subsidiaries.*

Part I

## ITEM 1. BUSINESSES

### OVERVIEW

NorthWestern Corporation is one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving approximately 608,000 customers in Montana, South Dakota and Nebraska. We have generated and distributed electricity in South Dakota and distributed natural gas in South Dakota and Nebraska since 1923 through our energy division, NorthWestern Energy. In February 2002, we completed the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company for $478.0 million in cash and the assumption of $511.1 million in existing debt and mandatorily redeemable preferred securities of subsidiary trusts of The Montana Power Company, net of cash received. As a result of the acquisition, from February 15, 2002, the closing date of the acquisition, through November 15, 2002, we distributed electricity and natural gas in Montana through our wholly owned subsidiary, NorthWestern Energy LLC. Effective November 15, 2002, we transferred all of the energy and natural gas transmission and distribution operations of NorthWestern Energy LLC to NorthWestern Corporation, and since that date, we have operated that business as part of our NorthWestern Energy division. We are operating our utility business under the common name "NorthWestern Energy" in all our service territories. The former NorthWestern Energy, LLC has been renamed "Clark Fork and Blackfoot, LLC." Our utility operations are regulated primarily by the Montana Public Service Commission, or MPSC, the Nebraska Public Service Commission, or NPSC, the South Dakota Public Utilities Commission or SDPUC, and the Federal Energy Regulatory Commission, or FERC.

On September 14, 2003 (the "Petition Date"), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court) under case number 03-12872 (CGC). Pursuant to Chapter 11, we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court. Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. See additional discussion related to our bankruptcy filing under Item 7, Management's Discussion and Analysis.

We operate our business in three reporting segments:

- electric utility operations;

- natural gas utility operations;

- all other, which primarily consists of our other miscellaneous service activities that are not included in the other identified segments, together with the unallocated corporate costs and investments, and any eliminating amounts.

For additional information related to our industry segments, see Note 24 of "Notes to Consolidated Financial Statements," included in Item 8 herein.

We also have made significant investments in three nonenergy businesses, which have adversely impacted our overall results of operations, financial condition and liquidity. We have divested of substantially all of the assets of, or our interest in, these businesses:

- Expanets, a provider of networked communications and data services and solutions to medium sized businesses;

- Blue Dot, a provider of air conditioning, heating, plumbing and related services; and

- CornerStone Propane Partners, LP, or CornerStone, a publicly traded limited partnership (OTC: CNPP.PK) that is a retail propane and wholesale energy-related commodities distributor.

We were incorporated in Delaware in November 1923. Our principal office is located at 125 S. Dakota Avenue, Sioux Falls, South Dakota 57104 and our telephone number is (605) 978-2908. We maintain an internet site at *http://www.northwestern.com* which contains information concerning us and our subsidiaries. During the fourth quarter of 2002, we began making available our Annual Report on Form 10-K, our Quarterly Reports on Form 10-Q, our Current Reports on Form 8-K and amendments to such reports filed or furnished pursuant to section 13(a) or 15(d) of the Securities and Exchange Act of 1934, as amended, along with our annual report to shareholders and other information related to us, free of charge, on this site as soon as reasonably practicable after we electronically file those documents with, or otherwise furnish them to, the SEC. Our internet Website and those of our subsidiaries and the information contained therein or connected thereto are not intended to be incorporated into this Annual Report on Form 10-K and should not be considered a part of this Annual Report on Form 10-K.

**ENERGY BUSINESSES**

**Electric Operations**

*Services, Service Areas and Customers*

*Montana*

We operate a regulated electric utility business in Montana through our NorthWestern Energy division. Our Montana electric utility business consists of an extensive electric transmission and distribution network. Our Montana service territory covers approximately 107,600 square miles, representing approximately 73% of Montana's land area, as of December 31, 2003, and includes approximately 786,000 people according to the 2000 census. We also transmit electricity for nonregulated entities owning generation facilities, other utilities and power marketers in Montana. In 2003, by category, residential, commercial and industrial, wholesale, and other sales accounted for approximately 28%, 36%, 12%, and 24% of our Montana electric revenue, respectively.

Our Montana electric transmission system consists of approximately 7,000 miles of transmission lines, ranging from 50 to 500 kilovolts, 260 circuit segments and 125,000 transmission poles with associated transformation and terminal facilities as of December 31, 2003, and extends throughout the western two-thirds of Montana from Colstrip in the east to Thompson Falls in the west. Our 230 kilovolt and 161 kilovolt facilities form the backbone of our Montana transmission system. Lower voltage systems, which range from 50 kilovolts to 115 kilovolts, provide for local area service needs. We also jointly own a 500 kilovolt transmission system that is part of the Colstrip Transmission System, which transfers Colstrip generation to markets within the state and west of Montana. The system has interconnections with five major nonaffiliated transmission systems located in the Western Electricity Coordinating Council area, as well as one interconnection to a system that connects with the Mid-Continent Area Power Pool region. With these interconnections, we transmit power to and from diverse interstate transmission systems, including those operated by Avista Corporation; Idaho Power Company, a division of Idacorp, Inc.; PacifiCorp; the Bonneville Power Administration; and the Western Area Power Administration.

As of December 31, 2003, we delivered electricity to approximately 305,000 customers in 191 communities and their surrounding rural areas in Montana, including Yellowstone National Park. We also delivered electricity to rural electric cooperatives in Montana that served approximately 76,000 customers as of December 31, 2003. Our Montana electric distribution system consisted of approximately 19,700 miles of overhead and underground distribution lines and approximately 334 transmission and distribution substations as of December 31, 2003.

*South Dakota*

We operate our regulated electric utility business in South Dakota through our NorthWestern Energy division as a vertically integrated generation, transmission and distribution utility. We have the exclusive right to serve an assigned service area in South Dakota comprised of 25 counties with a combined population of approximately 99,500 people according to the 2000 census. We provided retail electricity to more than 57,600 customers in 108 communities in South Dakota as of December 31, 2003. In 2003, by category, residential commercial and industrial, wholesale, and other sales accounted for approximately 38%, 50%, 9% and 3% of our South Dakota electric utility revenue, respectively.

Residential, commercial and industrial services are generally bundled packages of generation, transmission, distribution, meter reading, billing and other services. In addition, we provide wholesale transmission of electricity to a number of South Dakota municipalities, state government agencies and agency buildings. For these sales, we are responsible for the transmission of contracted electricity to a substation or other distribution point, and the purchaser is responsible for further distribution, billing, collection and other related functions. We also provide sales of electricity to resellers, primarily including power pool or other utilities. Power pool sales fluctuate from year to year depending on a number of factors, including the availability of excess short-term generation and the ability to sell excess power to other utilities in the power pool.

Our transmission and distribution network in South Dakota consists of approximately 3,100 miles of overhead and underground transmission and distribution lines across South Dakota as well as 120 substations as of December 31, 2003. We have interconnection and pooling arrangements with the transmission facilities of Otter Tail Power Company, a division of Otter Tail Corporation; Montana-Dakota Utilities Co., a division of MDU Resources Group, Inc.; Xcel Energy Inc.; and the Western Area Power Administration. We have emergency interconnections with the transmission facilities of East River Electric Cooperative, Inc. and West Central Electric Cooperative. These interconnection and pooling arrangements enable us to arrange purchases or sales of substantial quantities of electric power and energy with other pool members and to participate in the benefits of pool arrangements.

*Competition and Demand*

Although Montana customers have a choice with regard to electricity suppliers, we do not currently face material competition in the transmission and distribution of electricity within our Montana service territory. Direct competition does not presently exist within our South Dakota service territory for the supply and delivery of electricity. The SDPUC, pursuant to the South Dakota Public Utilities Act, assigned the South Dakota service territory to us effective March 1976. Pursuant to that law, we have the exclusive right to provide fully bundled services to all present and future electric customers within our assigned territory for so long as the service provided is adequate. There have been no allegations of inadequate service since assignment in 1976. The assignment of a service territory is perpetual under current South Dakota law.

We sell a portion of the electricity generated in facilities that we own jointly into the wholesale market. We face competition from other electricity suppliers with respect to our wholesale sales. However, we make such wholesale sales with respect to electricity in excess of our load requirements and such sales are not a material part of our business or operating strategy.

Competition for various aspects of electric services is being introduced throughout the country that will open utility markets to new providers of some or all traditional utility services. Competition in the utility industry is likely to result in the further unbundling of utility services as has occurred in Montana. Separate markets may emerge for generation, transmission, distribution, meter reading, billing and other services currently provided by utilities as a bundled service. At present, it is unclear when or to what extent further unbundling of utility services will occur. We do not expect deregulation in South Dakota in the near future, but it is unclear if and when such competition will begin to affect our other territories. Some competition currently exists within our Montana and South Dakota service territories with respect to the ability of some customers to self-generate or by-pass parts of the electric system, but we do not believe that such competition is material to our operations. Potential competitors may also include various surrounding providers as well as national providers of electricity.

In our Montana service territory, the total control area peak demand was approximately 1,442 megawatts, the average daily load was approximately 972 megawatts, and more than 8,355,978 megawatt hours were supplied to choice and default supply customers during the year ended December 31, 2003. In our South Dakota service territory, peak demand was approximately 272 megawatts, the average daily load was approximately 136 megawatts, and more than 1,192,772 megawatt hours were supplied during the year ended December 31, 2003.

*Electricity Supply*

*Montana*

Pursuant to Montana Law, we are obligated to provide default supply electric service to those customers not allowed to choose their electricity supplier. In this role, we purchase substantially all of the capacity and 5.9 million megawatt hours of energy requirements for the default supply from third parties. We have power-purchase agreements with PPL Montana for 300 megawatts of firm base-load and 150 megawatts of unit-contingent on peak energy. We also purchase power from 13 "qualifying facility" contracts that The Montana Power Company was required to enter into under the Public Utility Regulatory Policies Act of 1978, which provide a total of 101 megawatts of winter peak capacity. We have secured additional contracts from Thompson River Co-gen, LLC for up to 14 megawatts of base-load coal/waste-coal supply and Tiber Montana for 5 megawatts of seasonal base-load hydro supply. NorthWestern has recently submitted an Electric Default Supply Resource Procurement Plan, which fully details the resource requirements, analysis and proposed resources to meet the default supply load requirements. The resources include gas-fired generation from Basin Creek Power Services, LLC of 50 megawatts, 130 megawatts with Montana First Megawatts, our affiliate, and approximately 140 megawatts from two wind projects. In addition, we have entered into short-term fixed price energy purchases to fulfill the default obligation and provide rate stability. These contracted and proposed projects are sufficient to meet the default supply load requirements through June 30, 2007, with minimal price volatility. For more information about our obligations as a result of deregulation in Montana during the statutory transition period, see "Utility Regulation—Montana."

The MPSC approved base-load supply, along with open market purchases is being recovered through a monthly electricity cost tracking process pursuant to which rates are based on estimated electricity loads and electricity costs for the upcoming tracking period and are reviewed and adjusted by the MPSC for any differences in the previous tracking year's estimates to actual information. This process is similar in many respects to the cost recovery process that has been utilized in Montana, South Dakota and other states for natural gas purchases for residential and commercial customers. The MPSC reviews our ongoing responsibility to prudently administer our supply contracts and the energy procured pursuant to those contracts for the benefit of ratepayers.

On March 27, 2001, we announced our plan to construct Montana First Megawatts, a 260 megawatt, natural gas-fired, combined-cycle electric generation facility. We commenced construction of the facility, located in Great Falls, Montana, in early November 2001. In light of the uncertainties regarding regulatory review of the Montana First Megawatts' power sales contract with NorthWestern Energy, and resulting difficulties in funding the project due to such uncertainties, we suspended construction on the project in June 2002. The facility is fully permitted, and we estimate that a buyer of such facility could complete the project in approximately 12 to

15 months following the recommencement of construction activities. We estimate total construction, development and related costs will be approximately $180 million inclusive of our existing investment. As part of our restructuring, we are attempting to sell this project. In an effort to facilitate the timely sale of the Montana First Megawatts project, we filed the power sales agreement with the Federal Energy Regulatory Commission (FERC) on August 18, 2003, requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NorthWestern Energy. A late motion to intervene and protest was filed by the MPSC and The Montana Consumer Counsel, or MCC. On October 17, 2003, the FERC issued an order conditionally accepting the power sales agreement, subject to suspension for a designated period, to permit resolution of certain concerns voiced by the MPSC and MCC in their filing. We are currently working with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve the documented MPSC and MCC concerns in a timely manner. We have written our investment in this project down to an estimated salvage value of $30 million. Due to adverse changes to the independent power generation development market, absent receipt of necessary regulatory approvals of the power sales contract, there is no assurance that we will be able to sell this asset at a favorable price, if at all, and therefore, we may be required to take additional charges. To the extent a dispatchable resource component is included in the planned default supply procurement plan and the Montana First Megawatts project is never completed, we will likely fill the portion of the supply portfolio through a formal Request For Proposal (RFP) process.

On June 19, 2002, our power marketing affiliate entered into two five-year power supply contracts to supply a total of approximately 20 megawatts of electricity to customers located in Montana. These supply obligations commenced on July 1, 2002, and continue through June 30, 2007. Due to our financial condition, our affiliate was unable to secure a source of power to cover its contractual obligation subsequent to June 30, 2003. Based on the uncertainty of supply, as of July 1, 2003, the two customers elected to secure their power supply needs from the Montana default supply. Shortly thereafter, the customers notified our affiliate that they would seek damages to compensate them for their increased power supply costs. Our affiliate reached a settlement with its two customers on October 27, 2003, and subsequently paid $1.5 million in full settlement of its remaining contractual obligations.

We lease a 30% share of Colstrip Unit 4, a 750 megawatt gross-capacity coal-fired power plant located in southeastern Montana through our unregulated Colstrip Unit 4 Lease Management Division. A long-term coal supply contract with Western Energy Company provides the coal necessary to run the plant. We sell our leased share of Colstrip Unit 4 generation, representing approximately 222 megawatts at full load, principally to Duke Energy Trading and Marketing and to Puget Sound Energy under agreements expiring December 20, 2010. On January 23, 2004, we entered into Amendment #2 to the Duke Energy Power Purchase Agreement, which modified the economic terms of the power sales arrangement to our benefit. This amendment was approved by the Bankruptcy Court on February 23, 2004.

8

*South Dakota*

Most of the electricity that we supply to customers in South Dakota is generated by power plants that we own jointly with unaffiliated parties. In addition, we have several wholly owned peaking/standby generating units that are installed at nine locations throughout our service territory. Details of our generating facilities are described further in the chart below. Each of the jointly owned plants is subject to a joint management structure. Except as otherwise noted, we are entitled to a proportionate share of the electricity generated in our jointly owned plants and are responsible for a proportionate share of the operating expenses, based upon our ownership interest. Most of the power allocated to us from these facilities is distributed to our South Dakota customers, although in 2003, approximately 19% of the power was sold in the wholesale market. Our facilities had a total net summer peaking capacity in 2003 of approximately 312 megawatts.

| Name and Location of Plant | Fuel Source | Our Ownership Interest | Our Share of 2003 Peak Summer Demonstrated Capacity | % of Total 2003 Peak Summer Demonstrated Capacity |
|---|---|---|---|---|
| Big Stone Generating Station, located near Big Stone City in northeastern South Dakota.......... | Sub-bituminous coal | 23.4% | 106.58 megawatts | 34.2% |
| Coyote I Electric Generating Plant, located near Beulah, North Dakota ............................................ | Lignite coal | 10% | 42.70 megawatts | 13.7% |
| Neal Electric Generating Unit No. 4, located near Sioux City, Iowa .... | Sub-bituminous coal | 8.7% | 55.90 megawatts | 17.9% |
| Miscellaneous combustion turbine units and small diesel units (used only during peak periods)............ | Combination of fuel oil and natural gas | 100% | 106.65 megawatts | 34.2% |
| Total Capacity ................................... | | | 311.83 megawatts | 100% |

We have entered into an agreement with MidAmerican Energy Company to supply firm capacity energy as follows during the years 2004-2006: 32 megawatts in 2004; 36 megawatts in 2005; and 40 megawatts in 2006. In addition, we are a member of the Midcontinent Area Power Pool, which is an area power pool arrangement consisting of utilities and power suppliers having transmission interconnections located in a nine-state area in the North Central region of the United States and in two Canadian provinces. The terms and conditions of the Midcontinent Area Power Pool agreement and transactions between Midcontinent Area Power Pool members are subject to the jurisdiction of the FERC.

The 2003 peak demand in our South Dakota service areas was approximately 272 megawatts, and the average daily load in South Dakota during 2003 was approximately 136 megawatts. The 2003 Midcontinent Area Power Pool accredited capacity including the required 15% reserve margins was approximately 293 megawatts. We believe we have adequate supplies through our share of generation from jointly owned plants, existing supply contracts, Midcontinent Area Power Pool power swap availability, and capacity for sale in the current market to meet our power supply needs during the next few years.

We have a resource plan that includes estimates of customer usage and programs to provide for economic, reliable and timely supplies of energy. We continue to update our load forecast to identify the future electric energy needs of our customers, and we evaluate additional generating capacity requirements on an ongoing basis. This forecast shows customer peak demand growing modestly, which will result in the need to add peaking capacity in the future. However, we have adequate base-load generation capacity to meet customer supply needs in the foreseeable future.

*Electricity Generation Costs*

Coal was used to generate approximately 95% of the electricity utilized for South Dakota operations for the year ended December 31, 2003. Our natural gas and fuel oil peaking units provided the balance of generating capacity. We have no interests in nuclear generating plants. The fuel for our jointly owned base-load generating plants is provided through supply contracts of various lengths with several coal companies. There remains upward pressure on coal prices, which may result in modest increases in costs to our customers due to fuel adjustments in our rates. The average cost by type of fuel burned is shown below for the periods indicated:

| Fuel Type | Cost per Million BTU for the Year Ended December 31, | | | Percent of 2003 Megawatt Hours Generated |
|---|---|---|---|---|
| | 2003 | 2002 | 2001 | |
| Sub-bituminous-Big Stone......... | $ 1.34 | $ 1.24 | $ 1.07 | 54.40% |
| Lignite-Coyote*............................ | .79 | .66 | .75 | 18.23 |
| Sub-bituminous-Neal.................. | .77 | .80 | .71 | 27.22 |
| Natural Gas ................................... | 6.68 | 6.68 | 4.26 | 0.075 |
| Oil.................................................. | 2.04 | 2.04 | 5.16 | 0.075 |

* Includes pollution control reagent.

During the year ended December 31, 2003, the average delivered cost per ton of fuel for our base-load plants was $25.77 at Big Stone, $14.76 at Coyote and 13.22 at Neal. Changes in our fuel costs are passed on to customers through the operation of the fuel adjustment clause in our South Dakota tariffs. For a discussion of federal regulations regarding the use of coal to produce electricity, see "Utility Regulation—Environmental." Also see "Risk Factors—Changes in commodity prices may increase our cost of producing and distributing electricity and distributing natural gas or decrease the amount we receive from selling electricity and natural gas, adversely affecting our financial performance and condition" included in Item 7 hereof.

The Big Stone facility currently burns Wyoming sub-bituminous coal from the Powder River Basin supplied under contracts that continue through the end of 2004. The Coyote facility has a contract for the delivery of lignite coal that expires in 2016 and provides for an adequate fuel supply for Coyote's estimated economic life. Neal receives Wyoming sub-bituminous coal under multiple firm and spot contracts with terms of up to several years in duration.

The South Dakota Department of Environment and Natural Resources has given approval for Big Stone to burn a variety of alternative fuels, including tire-derived fuel and refuse-derived fuel. In 2003, approximately 3.0% of the fuel consumption at Big Stone was derived from alternative fuels.

Although we have no firm contract for diesel fuel or natural gas for our electric peaking units, we have historically been able to purchase diesel fuel requirements from local suppliers and currently have enough diesel fuel in storage to satisfy our current requirements. We have been able to use excess capacity from our natural gas operations as the fuel source for our gas peaking units.

We must pay fees to third parties to transmit the power generated at our Big Stone and Neal plants to our South Dakota transmission system. In 2001, we entered into a new 10-year agreement with the Western Area Power Administration for transmission services, including transmission of electricity from Big Stone and Neal to our South Dakota service areas through seven points of interconnection on the Western Area Power Administration's system. Transmission services under this agreement, and our costs for such services, are variable and depend upon a number of factors, including the respective parties' system peak demand and the amount of our transmission as sets that are integrated into the Western Area Power Authority's system. In 2003, our costs for services under this contract totaled approximately $3.62 million. Our tariffs in South Dakota generally allow us to pass costs with respect to power purchased, including transmission costs from other suppliers, to our customers.

10

**Natural Gas Operations**

*Services, Service Areas and Customers*

Our regulated natural gas utility operations purchase, transport, distribute and store natural gas for approximately 245,000 commercial and residential customers in Montana, South Dakota and Nebraska as of December 31, 2003. Natural gas service generally includes fully bundled services consisting of natural gas supply and interstate pipeline transmission services and distribution services to our customers, although certain large commercial and industrial customers, as well as wholesale customers, may buy the natural gas commodity from another provider and utilize our utility's transportation and distribution service.

*Montana*

We distribute natural gas to nearly 163,000 customers located in 109 Montana communities as of December 31, 2003. The MPSC does not assign service territories in Montana. However, we have nonexclusive municipal franchises to purchase, transport, distribute and store natural gas in the Montana communities we serve. The terms of the franchises vary by community, but most are for 30 to 50 years. During the next four years, one of our municipal franchises, which accounts for approximately 4,000 customers, is scheduled to expire. We also serve several smaller distribution companies that provide service to approximately 28,000 customers as of December 31, 2003. Our natural gas distribution system consists of approximately 3,500 miles of underground distribution pipelines as of December 31, 2003.

We also transmit natural gas in Montana from production receipt points and storage facilities to distribution points and other nonaffiliated transmission systems. We transported natural gas volumes of approximately 55 billion cubic feet in the year ended December 31, 2003. NorthWestern Energy's Montana peak capacity was approximately 300 million cubic feet per day during the year ended December 31, 2003. Our Montana natural gas transmission system consisted of more than 2,000 miles of pipeline, which vary in diameter from two inches to 20 inches, and served more than 130 city gate stations as of December 31, 2003. NorthWestern Energy has connections in Montana with five major, nonaffiliated transmission systems: Williston Basin Interstate Pipeline, NOVA Gas Transmission Ltd., Colorado Interstate Gas, Encana and Havre Pipeline. Seven compressor sites provide more than 42,000 horsepower, capable of moving approximately 300 million cubic feet per day during the year ended December 31, 2003. In addition, we own and operate a pipeline border crossing through our wholly owned subsidiary, Canadian-Montana Pipe Line Corporation.

We own and operate three working natural gas storage fields in Montana with aggregate storage capacity of approximately 16.2 billion cubic feet and maximum aggregate working gas capacity of approximately 185 million cubic feet per day. We own a fourth storage field that is being depleted at approximately 0.03 million cubic feet per day with approximately 71 million cubic feet of remaining reserves as of December 31, 2003.

*South Dakota and Nebraska*

We provide natural gas to approximately 82,000 customers in 59 South Dakota communities and four Nebraska communities as of December 31, 2003. The state regulatory agencies in South Dakota and Nebraska do not assign service territories. We have nonexclusive municipal franchises to purchase, transport, distribute and store natural gas in the South Dakota and Nebraska communities we serve. The maximum term permitted under Nebraska law for these franchises is 25 years while the maximum term permitted under South Dakota law is 20 years. Our policy is to seek renewal of a franchise in the last year of its term. During the next five years, five of our South Dakota and Nebraska municipal franchises, which account for approximately 36,000 customers, are scheduled to expire. We have never been denied the renewal of any of these franchises. Included in the five franchises mentioned above is the City of Kearney, Nebraska. Our franchise with Kearney was scheduled to expire in the fall of 2003 but was extended, and we are negotiating a new franchise with the City. We have approximately 2,100 miles of distribution gas mains in South Dakota and Nebraska as of December 31, 2003. We also transport natural gas for other gas suppliers and marketers in South Dakota and Nebraska, and in South Dakota provide natural gas sales to a number of large volume customers delivered through the distribution system of an unaffiliated natural gas utility company.

*Competition and Demand*

Montana's Natural Gas Utility Restructuring and Customer Choice Act, which was passed in 1997, provides that a natural gas utility may voluntarily offer its customers their choice of natural gas suppliers and provide open access in Montana. Although we have opened access to our Montana gas transmission and distribution systems and gas supply choice is available to all of our natural gas customers in Montana, we currently do not face material competition in the transmission and distribution of natural gas in our Montana service areas. We also provide default supply service under cost-based rates to customers in our Montana service territories that have not chosen other suppliers.

In South Dakota and Nebraska, we are subject to competition for natural gas supply. In addition, competition currently exists for

11

commodity sales to large volume customers and for delivery in the form of system by-pass, alternative fuel sources such as propane and fuel oil, and, in some cases, duplicate providers. We do not face material competition from alternative natural gas supply companies in the communities in which we serve in South Dakota and Nebraska. We are currently the largest provider of natural gas in our South Dakota service territory based on MMBTU sold. In South Dakota, we also transport natural gas for two gas-marketing firms currently serving 160 customers through our distribution systems. In Nebraska, we transport natural gas for one customer, whose supply is contracted from another gas company. We delivered approximately 6.7 million MMBTU of third-party transportation volume on our South Dakota distribution system and approximately 0.93 million MMBTU of third-party transportation volume on our Nebraska distribution system.

Competition in the natural gas industry may result in the further unbundling of natural gas services. Separate markets may emerge for the natural gas commodity, transmission, distribution, meter reading, billing and other services currently provided by utilities. At present, it is unclear when or to what extent further unbundling of utility services will occur. To remain competitive in the future, we must provide top-quality services at reasonable prices. To prepare for the future, we must ensure that all aspects of our natural gas business are efficient, reliable, economical and customer-focused.

Natural gas is used primarily for residential and commercial heating. As a result, the demand for natural gas depends upon weather conditions. Natural gas is a commodity that is subject to market price fluctuations. Purchase adjustment clauses contained in South Dakota and Nebraska tariffs allow us to reflect increases or decreases in gas supply and interstate transportation costs on a timely basis, so we are generally allowed to pass these higher natural gas prices through to our customers.

### *Natural Gas Supply*

Like most utilities, our natural gas supply requirements are fulfilled through third-party fixed-term purchase contracts, natural gas storage services contracts and short-term market purchases. This supply flexibility or portfolio approach enables us to maintain a diversified supply of natural gas sufficient to meet our supply requirements. We benefit from direct access to suppliers in the major natural gas producing regions in the United States, primarily the Rockies (Colorado), Mid-Continent, Pan-handle (Texas/Oklahoma), Montana, and Alberta, Canada. These suppliers also provide us with market insight, which assists us in making procurement decisions.

In Montana, our natural gas supply requirements for the year ended December 31, 2003, were approximately 21.3 million MMBTU. We have contracted with more than seven major producers and marketers with varying contract durations for natural gas supply in Montana.

Our South Dakota natural gas supply requirements for the year ended December 31, 2003, were approximately 5.4 million MMBTU. We have contracted with Tenaska Marketing Ventures, Inc. in South Dakota to manage transportation, storage and procurement of supply in order to minimize cost and price volatility to our customers.

Our Nebraska natural gas supply requirements for the year ended December 31, 2003, were approximately 5.7 million MMBTU. Our Nebraska natural gas supply, storage and pipeline requirements are fulfilled primarily through a third-party contract with ONEOK Energy Marketing and Trading, LP

To supplement firm gas supplies in South Dakota and Nebraska, we also contract for firm natural gas storage services to meet the heating season and peak day requirements of our natural gas customers. We also maintain and operate two propane-air gas peaking units with a peak daily capacity of approximately 6,400 MMBTU. These plants provide an economic alternative to pipeline transportation charges to meet the peaks caused by customer demand on extremely cold days. We believe that our Montana, South Dakota and Nebraska natural gas supply, storage and distribution facilities and agreements are sufficient to meet our ongoing supply requirements.

### *Employees*

As of December 31, 2003, we had 1,269 employees in our energy division, NorthWestern Energy. Of these, our Montana operations had 960 employees in its electric and gas utilities business, 374 of whom were covered by collective bargaining agreements involving six unions. In addition, our South Dakota and Nebraska operations had 309 employees in its electric gas and utilities business, 179 of whom were covered by the System Council U-26 of the IBEW.

**Utility Regulation**

*Electric Operations*

Our utility operations are subject to various federal, state and local laws and regulations affecting businesses generally, such as laws and regulations concerning service areas, tariffs, issuances of securities, employment, occupational health and safety, protection of the environment and other matters.

*Federal*

We are a "public utility" within the meaning of the Federal Power Act. Accordingly, we are subject to the jurisdiction of, and regulation by, the FERC with respect to the issuance of securities, the transmission of electric energy in interstate commerce and the setting of wholesale electric rates. As such, we are required to submit annual filings of certain financial information on the FERC Form No. 1 Annual Report of Major Electric Utilities, Licensees and Others. In addition, on December 23, 2003, FERC issued Order 2001-E, requiring quarterly filings of certain financial information on the FERC Form No. 3-Q, Quarterly Financial Report of Electric Companies, Licensees, and Natural Gas Company's, effective beginning with the first quarter 2004 filing.

In April 1996, the FERC issued Order No. 888 and Order No. 889 requiring utilities to allow open use of their transmission systems by other utilities and power marketers. We and other jurisdictional utilities filed open access transmission tariffs, or OATTs, with the FERC in compliance with Order No. 888. NorthWestern Public Service and The Montana Power Company included OATTs in their filings which conform to the "Pro Forma" tariff in Order No. 888 in which eligible transmission service customers can choose to purchase transmission services from a variety of options ranging from full use of the transmission network on a firm long-term basis to a fully interruptible service available on an hourly basis. These tariffs also include a full range of ancillary services necessary to support the transmission of energy while maintaining reliable operations of our transmission system. NorthWestern Energy LLC, and subsequently, NorthWestern, succeeded to The Montana Power Company's OATTs.

In Montana, NorthWestern Energy sells transmission service across its system under terms, conditions and rates defined in its OATT, which became effective in July 1996. NorthWestern Energy is required to provide retail transmission service in Montana under tariffs for customers still receiving "bundled" service and under the OATT for "choice" customers.

In South Dakota, the FERC has approved our request for waiver of the requirements of FERC Order No. 889 as it relates to the "Standards of Conduct," exempting us as a small public utility. Without the waiver, the "Standards of Conduct" would have required us to physically separate our transmission operations and reliability functions from our marketing and merchant functions.

On December 20, 1999, the FERC issued Order No. 2000, its most recent order regarding Regional Transmission Organizations, or RTOs. An RTO is an organization that attempts to capture efficiencies created by combining individually operated transmission systems into a single operation, focusing on operational and strategic transmission issues. Pursuant to Order No. 2000, utilities that own, operate or control interstate transmission facilities were required to file a proposal with the FERC by October 15, 2000, describing the utilities' efforts to participate in an RTO expected to be operational by December 15, 2001.

The Montana Power Company was a co-sponsor of a filing at the FERC that proposed to form RTO West. RTO West would be a nonprofit organization with an independent board that would act as the independent system operator for the aggregated transmission systems of participating transmission owners. If RTO West is implemented and we participate, then we would execute a transmission operating agreement with RTO West prior to startup of the RTO West operation. We do not anticipate that the transmission operating agreement would include any of our transmission assets other than those used in NorthWestern Energy's Montana operations. RTO West would not be permitted to own transmission assets pursuant to its charter, so the transmission operating agreement would not convey ownership of the assets to RTO West but would grant RTO West the right to operate the assets consistent with the obligation to provide services pursuant to applicable tariffs. NorthWestern Energy and other participating transmission owners would likely retain the right and obligation to maintain the facilities that RTO West has authority to operate pursuant to the transmission operating agreements. Participation in RTO West would create a new commercial arrangement for the transmission of the energy we distribute in Montana, but we do not anticipate any material change in the size or timing of the transmission-related revenue stream as a result of participation in RTO West. At this time, it is uncertain when or if RTO West will begin operations.

With respect to our South Dakota transmission operations, we filed in October 2000 our Order No. 2000 Compliance Filing with the FERC detailing options we are pursuing in order to participate in an RTO, including participation in the investigation of the formation of a regional transmission entity as well as the pursuit of various options associated with joining the Midwest Independent System Operator.

On July 31, 2002, the FERC issued its Notice of Proposed Rulemaking in Docket No. RM01-12-000, Remedying Undue

Discrimination through Open Access Transmission Service and Standard Electricity Market Design, or the SMD NOPR. In April 2003, FERC issued a white paper related to the SMD NOPR, which paper reflected some of the comments made to FERC in the NOPR process. This paper proposed certain changes, but did not materially alter the proposed rules. The proposed rules set forth in the SMD NOPR would require, among other things, that:

- all transmission-owning utilities transfer control of their transmission facilities to an independent third party;

- transmission service to bundled retail customers be provided under the FERC-regulated transmission tariff rather than state-mandated terms and conditions; and

- new terms and conditions for transmission service be adopted nationwide, including new provisions for pricing transmission in the event of transmission congestion.

Furthermore, the SMD NOPR presents several uncertainties, including what percentage of our investments in RTO West would be recovered, how the elimination of transmission charges, as proposed in the SMD NOPR, would impact us, and what amount of capital expenditures would be necessary to create a new wholesale market.

We cannot predict when the FERC will issue final rules on SMD NOPR, or in what form, or the effect that they may have on the current RTO West proceedings. We do know that the SMD NOPR was very unpopular across substantial portions of the country, in particular in the Pacific Northwest where we operate. In the energy bill anticipated to be considered by Congress, there is language prohibiting FERC from finalizing the SMD rules before the end of 2006. We cannot predict with certainty the impact the future SMD-related proceedings will have on the Company's earnings, revenues or prices.

On July 24, 2003, FERC issued Order 2003 on Standardization of Generation Interconnection Procedures and Agreements. The final rule, which was effective January 20, 2004, requires public utilities that own, control or operate facilities used for transmitting electric energy in interstate commerce to have on file standard procedures and a standard agreement for interconnecting generators larger than 20 MW. FERC believes that Order 2003 will prevent undue discrimination, preserve reliability, increase energy supply, and lower prices for customers by increasing the number and variety of new generators that will compete in the wholesale electricity market. While the Order requires that new generators fund the cost of transmission system upgrades needed to integrate their new generation, the generator will receive a credit over five years equal to the funding it advances for any transmission upgrades. That ultimately places the burden of the new transmission investment on us. It is reasonable to assume that regulators will allow recovery of such investment from customers, but that is not certain. The impact this order will have on the Company's earnings, revenues or prices will depend on the number of new generators that interconnect to the Company's system in the future, the extent of the transmission upgrades required by those generators, and ultimate regulatory treatment of those investments.

On November 25, 2003, FERC issued Order 2004 on Standards of Conduct. In Order 2004, FERC adopts standards of conduct that apply uniformly to interstate gas pipelines and public utilities (jointly referred to as Transmission Providers) that are currently subject to the gas and electric standards of conduct in Part 161 and Part 37 of FERC's regulations respectively. The new standards of conduct will govern the relationship between regulated Transmission Providers and their Energy Affiliates, and they will eliminate the loop hole in the current regulations that do not cover a Transmission Provider's relationship with Energy Affiliates that are not marketers of merchant affiliates. The Company is a Transmission Provider because it is a public utility currently subject to Part 37 of FERC's regulations. We do, however, appear to meet the definition of Energy Affiliate in the new standards of conduct. Because of the burden of the bankruptcy and certain other regulatory proceedings, the Company has been granted a 60-day extension to file its plan for compliance and to be in compliance with the new standards of conduct. It is possible that compliance with Order 2004 may require some level of reorganization of certain Company operations. Although we cannot predict with certainty the impact Order 2004 may have on the Company's earnings, revenues or prices, management believes that in the aggregate, our earnings and revenues would not be materially affected.

The Montana Power Company provided wholesale power to two electric cooperatives, but the two cooperatives have chosen to obtain their power supply from another source, and we provide only transmission services to the Montana cooperatives. In order to recover the transition costs associated with power that would have been supplied to these two cooperatives, The Montana Power Company made a filing with the FERC in April 2000, seeking recovery of approximately $13.9 million in transition costs associated with serving both of the wholesale electric cooperatives. On November 1, 2002, the FERC granted the electric cooperatives' motion for summary judgment and determined that The Montana Power Company had failed to meet its burden of showing that it was entitled to recover the transition costs at issue. We, as successor to The Montana Power Company, appealed but a FERC decision issued on January 28, 2004, affirmed the original decision.

The limited liability company that formerly held our Montana transmission and distribution assets has been renamed "Clark Fork and Blackfoot, LLC." This entity operates the Milltown Dam, a two-megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license granted by the FERC. The current license for operation of the dam would have expired but for extensions received from the FERC. The Montana Power Company received an extension of its FERC license to operate the dam until 2008, and we

are currently seeking to extend that license until 2009. Generally, under FERC rules, notice of intent to renew a license must be filed five years prior to its expiration. Accordingly, Clark Fork and Blackfoot, LLC gave the FERC its notice to seek renewal of the license in 2003. In the event the FERC license was terminated, the FERC may require that the dam be removed. If Clark Fork and Blackfoot, LLC does not receive the license extension, then it might be required to relinquish the license, cease operating the dam and remove the structures as early as 2008. Based on estimates received from our environmental consultants, management believes that the cost of such removal would be approximately $10 million.

One of the principal legislative initiatives of the Bush administration is the adoption of comprehensive federal energy legislation. In 2003, an energy bill was passed by the U.S. House of Representatives but was not voted on by the U.S. Senate. The energy bill, as currently written, would repeal the Public Utility Holding Company Act of 1935 (PUHCA), create incentives for the construction of transmission infrastructure, encourage but not mandate standardized competitive markets and expand the authority of the FERC to include overseeing the reliability of the bulk power system. We cannot predict whether comprehensive energy legislation will be adopted and, if adopted, the final form of that legislation. We would expect that comprehensive energy legislation would, if adopted, significantly affect the electric utility industry and its businesses.

### Montana

Our Montana operations are subject to the jurisdiction of the MPSC with respect to electric service territorial issues, rates, terms and conditions of service, accounting records and other aspects of its operations. As a public utility, we are also subject to MPSC jurisdiction when we issue, assume, or guarantee securities, or when we create liens on our Montana properties. As such, we are required to submit annual filings of certain financial information on the MPSC Annual Report of Electric, Natural Gas, and Propane Utilities.

In August 2000, The Montana Power Company filed a combined request for increased natural gas and electric rates with the MPSC. The Montana Power Company requested increased annual electric revenues of approximately $38.5 million, with a proposed interim annual increase of approximately $24.9 million. On November 28, 2000, the MPSC granted the former owner an interim electric rate increase of $14.5 million. On May 8, 2001, The Montana Power Company received a final order from the MPSC resulting in an annual electric service revenue increase of $16.0 million.

Montana law required that the MPSC determine the value of net unmitigable transition costs associated with the transformation of the utility business from a vertically integrated electric service company to a utility providing only default supply and transmission and distribution services. The MPSC was also obligated to set a competitive transition charge to be included in distribution rates to collect those net transition costs. The majority of these transition costs relate to out-of-market power purchase contracts, which run through 2032, that The Montana Power Company was required to enter into with certain "qualifying facilities" as established under the Public Utility Regulatory Policies Act of 1978. The Montana Power Company estimated the pretax net present value of its transition costs to be approximately $304.7 million in a filing with the MPSC on October 29, 2001.

On January 31, 2002, the MPSC approved a stipulation among The Montana Power Company, us and a number of other parties, which, among other things, conclusively established the pretax net present value of the retail transition costs relating to out-of-market power purchase contracts recoverable in retail rates to be approximately $244.7 million, approximately $60 million less than the QF costs in The Montana Power Company's filing with the MPSC. In addition, the stipulation set a fixed annual recovery for the retail transition costs beginning at $14.9 million in the first year after implementation and increasing up to $25.6 million through 2029. On June 12, 2003, the MPSC approved the next annual tracking period amount of $17.4 million to be effective July 1, 2003. Because the recovery stream as finalized by the stipulation is less than the total payments due under the out-of-market power purchase contracts, the difference must be mitigated or covered from other revenue sources. Qualifying Facilities Contracts, or QFs, require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our gross contractual obligation related to the QFs is approximately $1.8 billion through 2029. A portion of the costs incurred to purchase this energy is recoverable through rates authorized by the MPSC, totaling approximately $1.4 billion through 2029. Upon completion of the purchase price allocation related to our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, we established a liability of $134.3 million, based on the net present value of the difference between our obligations under the QFs and the related amount recoverable. Although we believe that we have opportunities to mitigate the impact of these differences through improved management of our obligations under these contracts and by negotiating buyouts of certain of these contracts, we cannot assure you that our actions will be successful.

The stipulation also required The Montana Power Company and us to contribute $30 million to an account which funded credits to Montana electric distribution customers. The account was applied on a per kilowatt hour basis which began on July 1, 2002, with a term of one year. On June 12, 2003, the MPSC approved the elimination of the Electric Sale Credit effective July 1, 2003.

Montana's Electric Utility Restructuring Act enabled larger customers in Montana to choose their supplier of commodity electricity beginning on July 1, 1998, and provided that all other Montana customers would be able to choose their electric supplier during a transition period through June 30, 2007. Under this legislation, during this transition period, we were designated to serve as the "default

supplier" for customers who have not chosen an alternate supplier. The Montana Restructuring Act provided for the full recovery of costs incurred in procuring default supply contracts during this transition period. In its 2001 session, the Montana Legislature passed House Bill 474, which, among other things, reaffirmed full cost recovery for the default supplier by mandating that the MPSC use an electric cost recovery mechanism providing for full recovery of prudently incurred electric energy supply costs and extended the transition period through July 1, 2007. In November 2002, Referendum 117 was passed, repealing HB 474 and reinstating a transition period ending on June 30, 2007. Two new electric energy bills, HB 509 and SB 247, were passed by the 2003 Montana Legislature. Collectively, these two bills establish us as the permanent default supplier, extend the transition period to July 1, 2027, require smaller customers to remain default supply customers, and establish a specific set of requirements and procedures that guide power supply procurements and their cost recovery. Compliance with these procurement procedures should mitigate the risk of nonrecovery of our costs of acquiring electric supply.

On October 29, 2001, The Montana Power Company filed with the MPSC its initial default supply portfolio, containing a mix of long and short-term contracts from new and existing power suppliers and generators. On April 25, 2002, the MPSC approved NorthWestern Energy LLC's proposed "cost recovery mechanism" in the form filed. On June 21, 2002, the MPSC issued a final order approving contracts meeting approximately 60% of the default supply winter peak load and approximately 73% of the annual energy requirements, principally covered by PPL Montana and QF supply contracts. On January 23, 2004, NorthWestern filed with the MPSC its first biannual Electric Default Supply Resource Procurement Plan, which fulfills the requirements established by law and describes the planning we are performing on behalf of its electric default supply customers to acquire a balanced, cost-effective resource portfolio. The immediate needs are for resources that address the variable portion of the load. We plan to present several contracts to the MPSC for approval in 2004, which meet these variable requirements. For further discussion of this risk, see "Risk Factors—We may not be able to fully recover transition costs, which could adversely affect our net income and financial condition" and "Risk Factors—If the MPSC disallows the recovery of the costs incurred in entering into default supply portfolio contracts while we are required to act as the "default supplier," we may be required to seek alternative sources of supply and may not be able to fully recover the costs incurred in procuring default supply contracts, which could adversely affect our net income and financial condition" included in Item 7 hereof.

On June 16, 2003, we filed an annual electric supply cost tracker request with the MPSC for actual electric supply costs for the 12-month period ended June 30, 2003, and for projected costs for the 12-month period ended June 30, 2004. On July 15, an interim order was approved by the MPSC for the projected electric supply cost.

### South Dakota

We are subject to the SDPUC with respect to electric service territorial issues, rates, terms and conditions of service, accounting records and other aspects of our operations. Under the South Dakota Public Utilities Act, a requested rate increase may be implemented 30 days after the date of its filing unless its effectiveness is suspended by the SDPUC and, in such event, can be implemented subject to refund with interest six months after the date of filing, unless authorized sooner by the SDPUC. Our electric rate schedules provide that we may pass along to all classes of customers qualified increases or decreases in costs related to fuel used in electric generation, purchased power, energy delivery costs and ad valorem taxes.

Our retail electric rates, approved by the SDPUC, provide several options for residential, commercial and industrial customers, including dual-fuel, interruptible, special all-electric heating, and other special rates, as well as various incentive riders to encourage business development. An adjustment clause provides for quarterly adjustment based on differences in the delivered cost of energy, delivered cost of fuel, ad valorem taxes paid and commission-approved fuel incentives. The adjustment goes into effect 10 days after the information filing unless the SDPUC staff requests changes during that period.

The states of South Dakota, North Dakota and Iowa have enacted laws with respect to the siting of large electric generating plants and transmission lines. The SDPUC, the North Dakota Public Service Commission and the Iowa Utilities Board have been granted authority in their respective states to issue site permits for nonexempt facilities.

16

*Natural Gas Operations*

### Federal

FERC Order 636 requires that all companies with interstate natural gas pipelines separate natural gas supply and production services from interstate transportation service and underground storage services. The effect of the order was that natural gas distribution companies, such as NorthWestern, and individual customers purchase natural gas directly from producers, third parties and various gas-marketing entities and transport it through interstate pipelines. We have established transportation rates on our transmission and distribution systems to allow customers to have supply choices. Our transportation tariffs have been designed to make us economically indifferent as to whether we sell and transport natural gas or merely deliver it for the customer.

Our natural gas transportation pipelines are generally not subject to the jurisdiction of the FERC, although we are subject to state regulation. We conduct limited interstate transportation in Montana that is subject to FERC jurisdiction, but the FERC has allowed the MPSC to set the rates for this interstate service.

### Montana

Our Montana operations are subject to the jurisdiction of the MPSC with respect to natural gas rates, terms and conditions of service, accounting records, and other aspects of its operations. As a public utility, we are also subject to MPSC jurisdiction when we issue, assume or guarantee securities, or when we create liens on our Montana properties.

Rates for our Montana natural gas supply are set by the MPSC. We use a monthly gas tracking mechanism in Montana for the recovery of gas supply costs, which we prepare and file monthly with the MPSC. The filing sets gas cost rates based on estimated gas loads and gas costs for the upcoming tracking period and adjusts for any differences in the rolling 12-month period's estimates to actual cost information.

We filed an annual gas cost tracker request in Montana in December 2001 for actual gas costs for the 12-month period ended October 31, 2001, and for projected costs for the 12-month period ended October 31, 2002. Our December 2001 request was finalized by order of the MPSC on October 10, 2002. On November 1, 2002, we filed an annual gas cost tracker request for actual gas costs for the 12-month period ended October 31, 2002, and for projected costs for the eight-month period ended June 30, 2003. In our 2002 filing, we proposed to change the tracking year to July 1 through June 30 and therefore estimated our gas costs from November 1, 2002 through June 30, 2003. That request was finalized by order of the MPSC on July 3, 2003, with the exception of disallowing $6.2 million of our purchased gas costs as having been imprudently incurred. We filed a motion for reconsideration regarding the disallowance of purchased gas cost with the MPSC on July 14, 2003, which was denied. We filed suit in Montana state court on July 28, 2003, seeking to overturn the MPSC's decision to disallow recovery of these costs. At this time, no briefing schedule has been set in this matter.

On June 2, 2003, we filed an annual gas cost tracker request with the MPSC for the projected gas costs for the 12-month period ending June 30, 2004. The MPSC granted an interim order on July 3, 2003, for the projected gas cost adjusted for 4,200 MDKT at a fixed price of $3.50 as opposed to the market price submitted in the original filing, which was at a higher price. If our average forecast price over the next 6 months actually occurs, the disallowance on a 4,200 MDKT at market price would result in the Company undercollecting approximately $4.5 million for the period July 1, 2003 through June 30, 2004.

In January 2001, The Montana Power Company submitted to the MPSC an annual gas cost tracker requesting an increase of approximately $51.0 million. At that time, the former owner also submitted a compliance filing for a credit of approximately $32.5 million associated with a sharing of the proceeds from the sale of gathering and production properties previously included in the natural gas utility's rate base. As a result, effective February 1, 2001, The Montana Power Company began collecting a net amount of $18.5 million in revenues over a one-year period. In September 2001, after all testimony addressing the amount of sharing had been filed with the MPSC, The Montana Power Company reached an agreement with intervening parties to increase the amount of the credit to $56.3 million. This $23.8 million increase, along with $4.0 million in interest from the date of sale, was credited to customers' bills over approximately a two-year period, which began February 1, 2002. This customer credit was fully refunded by December 2003.

### South Dakota

We are subject to the jurisdiction of the SDPUC with respect to rates, terms and conditions of service, accounting records and other aspects of our natural gas distribution operations in South Dakota. Under the South Dakota Public Utilities Act, a requested rate increase may be implemented 30 days after the date of its filing unless its effectiveness is suspended by the SDPUC and, in such event, can be implemented subject to refund with interest six months after the date of filing, unless authorized sooner by the SDPUC. A purchased gas adjustment provision in our natural gas rate schedules permits the monthly adjustment of charges to customers to reflect increases or decreases in purchased gas, gas transportation and ad valorem taxes.

Our retail natural gas tariffs, approved by the SDPUC, include gas transportation rates for transportation through our distribution systems by customers and natural gas marketers from the interstate pipelines at which our systems take delivery to the end-user's premises. Such transporting customers nominate the amount of natural gas to be delivered daily and telemetric equipment installed for each customer monitors daily usage.

### Nebraska

Beginning in the spring of 2003, our natural gas rates and terms and conditions of service for residential and smaller commercial customers are regulated in the State of Nebraska by the Nebraska Public Service Commission (NPSC). High volume customers are not subject to such regulation but can file complaints if they allege discriminatory treatment. Under the State Natural Gas Regulation Act, effective May 30, 2003, for a regulated natural gas utility, like NorthWestern, to propose a change in rates to its regulated customers, it is required to file an application for a rate increase with the NPSC and with the communities in which it serves customers. The utility may negotiate with those communities for a settlement with regard to the rate change, or it may proceed to have the NPSC review the filing and make a determination. While the utility and the communities are negotiating a settlement, the utility can commence charging the requested rate, as interim rates subject to refund, 60 days after the filing of the increase request. If the utility and the communities are unable to reach a settlement, then the matter is transferred to the NPSC for its review and further proceedings. The interim rates become final and no longer subject to refund if the NPSC has not taken final action within 210 days after the matter is referred to the NPSC.

Since enactment of the State Natural Gas Regulation Act, our initial tariffs, representing rates in effect at the time the law was approved, have been accepted by the NPSC, and the NPSC has adopted certain rules governing the terms and conditions of service of regulated natural gas utilities. Additional rulemaking proceedings will be undertaken in 2004. Our retail natural gas tariffs provide residential, general service and commercial and industrial options, as well as firm and interruptible transportation service. A purchased gas adjustment clause provides for adjustments based on changes in gas supply and interstate pipeline transportation costs.

### Seasonality and Cyclicality

Our electric and gas utility businesses are seasonal businesses, and weather patterns can have a material impact on their operating performance. Because natural gas is used primarily for residential and commercial heating, the demand for this product depends heavily upon weather patterns throughout our market areas, and a significant amount of natural gas revenues are recognized in the first and fourth quarters related to the heating season. Demand for electricity is often greater in the summer and winter months associated with cooling and heating. Accordingly, our operations have historically generated less revenues and income when weather conditions are milder in the winter and cooler in the summer. In the event that we experience unusually mild winters or summers in the future, our results of operations and financial condition could be adversely affected.

### Environmental

Our electric, natural gas and other business sectors are subject to extensive regulation imposed by federal, state and local government authorities in the ordinary course of day-to-day operations with regard to the environment, including air and water quality, solid waste disposal and other environmental considerations. The application of government requirements to protect the environment involves, or may involve review, certification, issuance of permits or other similar actions by government agencies or authorities, including but not limited to the United States Environmental Protection Agency, or the EPA, the Bureau of Land Management, the Bureau of Reclamation, the South Dakota Department of Environment and Natural Resources, the North Dakota State Department of Health, the Nebraska Department of Environmental Quality, the Iowa Department of Environmental Quality and the Montana Department of Environmental Quality, or the MDEQ, as well as compliance with court orders and decisions.

We did not incur any material environmental expenditures in 2003. We are committed to remaining in compliance with all state and federal environmental laws and regulations and taking reasonable precautions to prevent any incidents that would violate any of these rules.

The Clean Air Act Amendments of 1990, which prescribe limitations on sulfur dioxide and nitrogen oxide emissions from coal-fired power plants, required reductions in sulfur dioxide emissions at our Big Stone plant beginning in the year 2000. We currently satisfy this requirement through the purchase of sub-bituminous coal, which contains lower sulfur content. In 2000, the wall-fired boiler at our Neal 4 plant and the cyclone boilers located at our Big Stone and Coyote plants became subject to nitrogen oxide emission limitations. To satisfy these limits, the Neal 4 and Big Stone facilities purchase and burn sub-bituminous coal from the Powder River Basin, and the Coyote facility purchases and burns lignite coal. Low nitrogen oxide burners have been identified as additional possible control technology; however, installation of such burners has not yet been required. The Clean Air Act also contains a requirement for future studies to determine what, if any, limitations and controls should be imposed on coal-fired boilers to control emissions of certain air toxics, including mercury. Because of the uncertain nature of the air toxic emission limits and the potential for development of more stringent emission standards in general, we cannot reasonably determine the additional costs we may incur under the Clean Air Act. Legislation has been introduced in the Congress to amend the Clean Air Act, including legislation that implements President Bush's "Clear Skies"

proposal, or would otherwise affect the regulatory programs applicable to emissions of sulfur oxide, nitrogen oxide, mercury, and possibly carbon dioxide. These proposals are all subject to the normal legislative process, and we cannot make any prediction about whether the proposals will pass, or the final terms of the legislation if it were to pass. Any such legislation, if passed, would likely require the adoption of administrative regulations. We cannot reasonably determine whether any proposals would impose additional costs, or if so, the timing or magnitude of those costs.

The EPA is conducting an enforcement initiative at a number of coal-fired power plants across the United States in an effort to determine whether modifications at those facilities were subject to New Source Review requirements or New Source Performance Standards under the Clean Air Act. In connection with this initiative, the EPA has requested information from us regarding certain of our South Dakota operations under Section 114(a) of the Clean Air Act (Section 114). The EPA has issued similar requests to certain power plants previously owned by the Montana Power Company, including the Corrette and Colstrip power plants, the latter of which we continue to lease a 30% interest in Unit #4. The Section 114 information requests required that we provide responses to specific EPA questions regarding certain projects and maintenance activities that the EPA believes could have violated the New Source Performance Standard and New Source Review requirements of the Clean Air Act. The EPA contends that power plants are required to update emission controls at the time of major maintenance or capital activity. We believe that maintenance and capital activities performed at our power plants are generally routine in nature and are typical for the industry. We have complied and continue to comply with these information requests and the EPA has not filed an enforcement action against us, but we cannot predict the outcome of this investigation at this time. Should the EPA determine to take action, the resulting additional costs to comply could be material.

We have met or exceeded the removal and disposal requirements for all equipment containing polychlorinated biphenyls, or PCBs, as required by state and federal regulations. We will continue to use certain PCB-contaminated equipment for its remaining useful life and will, thereafter, dispose of the equipment according to pertinent regulations that govern the use and disposal of such equipment.

The Comprehensive Environmental Response Compensation and Liability Act, or CERCLA, and some of its state counterparts require that we remove or mitigate adverse environmental effects resulting from the disposal or release of certain substances at sites that we own or previously owned or operated, or at sites where these substances were disposed. As previously disclosed in our third quarter 10-Q, we engaged the services of a third-party environmental consulting firm to perform a comprehensive evaluation of our historical and current utility operations. Based upon the results of this evaluation, we have increased our environmental reserve by $7.4 million. Based upon information available to our consultants at this time, we believe that the current environmental reserve properly reflects our remediation exposure for the sites currently and previously owned by us. The portion of our environmental reserve applicable to site remediation, however, may be subject to change as a result of the following uncertainties:

- We and our third-party consultant may not know all sites for which we are alleged or will be found to be responsible for remediation; and

- Absent performance of certain testing at sites where we have been identified as responsible for remediation, we cannot estimate with a reasonable degree of certainty the total costs of remediation.

For sites where we currently are required to investigate and or clean up contamination, we do not expect the unknown costs to have a material adverse effect on our consolidated operations, financial position or cash flows.

Two formerly operated manufactured gas plants located in Aberdeen and Mitchell, South Dakota, have been identified on the Federal Comprehensive Environmental Response, Compensation, and Liability Information System, or CERCLIS, list as contaminated with coal tar residue. We are currently investigating these sites pursuant to work plans approved by the EPA and the South Dakota Department of Environment and Natural Resources. At this time, we know that no material remediation is necessary at the Mitchell location. However, at this time we, anticipate that remediation will likely be necessary at the Aberdeen site in the future. We also own sites in North Platte, Kearney and Grand Island, Nebraska on which former manufactured gas facilities were located. The EPA has conducted site screening investigations at these sites for alleged soil and groundwater contamination. At present, we cannot estimate with a reasonable degree of certainty the total costs of any cleanup at these sites. However, based upon our investigations to date, our current environmental liability reserves, applicable insurance coverage, and our belief that we will be able to recoup prudently incurred costs in rates, we do not expect cleanup costs at these sites to be material.

The Montana Power Company was identified as a Potentially Responsible Party, or a PRP, at the Silver Bow Creek/Butte Area Superfund Site. The Montana Power Company settled most of its liability in a Consent Decree approved by the United States District Court for the District of Montana and received contribution protection in the event other PRPs claim contribution for cleanup costs they incur. The Atlantic Richfield Company, or ARCO, continues to address contamination of the site. The Montana Power Company transferred approximately 30 acres of property owned by it and included within the boundary of the Silver Bow Creek/Butte Area Superfund Site to NorthWestern Energy, LLC, the entity that was acquired by NorthWestern in February 2002. We continue to operate a maintenance center on this property. We cannot estimate with a reasonable degree of certainty whether additional clean up will be required, but we do not expect any residual cleanup costs to be material. Any subsequent remediation costs for contaminants not covered by the

settlement will be subject to the indemnification provisions between TouchAmerica Holdings, Inc. and NorthWestern, which are described below.

Toxic heavy metals in the silts resting in Milltown Reservoir, which sits behind Milltown Dam, caused the EPA to identify Milltown Reservoir on its Superfund National Priority List. ARCO, as successor to the Anaconda Company, was named as the party with responsibility for completing the remedial investigation and feasibility studies and conducting site cleanup, under the EPA's direction. The Montana Power Company did not undertake any direct responsibility in that regard, in light of a statutory exemption from liability under CERCLA provided to the holder of the Milltown Dam license. By virtue of its acquisition of The Montana Power Company's electric and natural gas transmission and distribution business and the Milltown Dam, Clark Fork and Blackfoot, LLC succeeded to similar protection under this statutory exemption. ARCO, however, has argued that the owner of the Milltown Dam should be considered a PRP and threatened to challenge Clark Fork and Blackfoot, LLC's exempt status. ARCO and The Montana Power Company entered into a confidential settlement agreement to limit The Montana Power Company's and now Clark Fork and Blackfoot, LLC's potential liability under such a challenge and limit costs and ongoing operating expenditures, provided that the EPA selects a remedy that leaves the dam and sediments in place in its final Record of Decision. The EPA formally released for public comment a proposed remedial plan for the Milltown Reservoir, which would require us to voluntarily agree to take down the Milltown Dam and remove the related power generation facility as part of an overall remedy to address heavy metal contamination in the Milltown Reservoir. The EPA plans to issue its final Record of Decision in spring 2004. In light of the EPA's stated position, we executed a confidential settlement agreement with ARCO on September 10, 2003, which, among other things, caps our maximum contribution towards the remediation of the Milltown Reservoir superfund site. Previously, NorthWestern and ARCO executed a settlement agreement which caps our potential liability for remediation of the Milltown site at no more than $10 million. We are currently seeking approval of this settlement agreement from the Bankruptcy Court. The amount of our expected contribution has been fully accrued in the accompanying financial statements. Commencing the month following Bankruptcy Court approval and each month thereafter, we will pay $500,000 into an escrow account until our total agreed upon amount is funded. No interest will accrue on the unpaid balance due ARCO. The escrow account will remain funded until a final, nonappealable consent decree is entered by the United States District Court. If, however, we are unable to negotiate an acceptable consent decree with the interested parties, we may terminate the settlement agreement with ARCO, which will trigger the return of the escrowed funds to us. The settlement agreement provides us with appropriate ARCO releases and indemnifications. There can be no assurance that the Bankruptcy Court will approve the proposed settlement with ARCO. Moreover, the settlement agreement does not affect or impact any rights, claims, or causes of action that the United States or the State of Montana may have against us arising from our ownership and operation of the Milltown Dam facility. The Company also secured a 10-year, $100 million environmental insurance policy, effective May 31, 2002, to mitigate the risk of future environmental liabilities arising from a catastrophic failure of the Milltown Dam caused by an act of God.

In 1985 and 1986, researchers found elevated levels of heavy metals in sediments in the reservoir behind the Thompson Falls Dam. The EPA declared the site a "No Further Action" site for purposes of CERCLA, but the MDEQ listed the reservoir as a Comprehensive Environmental Cleanup and Responsibility Act site, or a CECRA site, Montana's state equivalent of a CERCLA National Priority List site. The MDEQ identified the site as a "Low Priority Site" and because of the low probability of direct human contact and the lack of evidence of migration to groundwater supplies, no action has been required. Given the low priority designation for this site, we believe that the risk of material remediation is low. As discussed below, The Montana Power Company retained preclosing environmental liability relating to this CECRA listing when it sold the Thompson Falls Dam to PPL Montana. We cannot estimate with a reasonable degree of certainty the total costs, if any, of cleanup at this site. We do not expect cleanup costs to be material.

The Montana Power Company voluntarily cleaned up two sites in Butte and Helena, Montana where it formerly operated manufactured gas plants and had investigated a third in Missoula, Montana at the time of our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company. Only the Butte and Helena, Montana sites were placed into the MDEQ's voluntary remediation program for cleanup due to the existence of minor exceedences in groundwater of regulated pollutants. We believe that natural attenuation should address the problems at these sites. The investigation conducted at the Missoula site did not require entry into the MDEQ voluntary remediation program, but required preparation of a groundwater monitoring plan. Monitoring of groundwater continues at all of the Montana manufactured gas plant sites. Closure of the Butte and Missoula sites is expected shortly. Recent monitoring of groundwater at the Helena manufactured gas plant site suggests that groundwater remediation may become necessary in the future to prevent contamination from migrating offsite. Therefore, continued monitoring of groundwater at this site is necessary for an extended time. At this time, we cannot estimate with a reasonable degree of certainty what the costs of additional cleanup will be for such groundwater remediation at Helena, or whether additional cleanup will be required at the Butte and Missoula sites. However, based upon the information available to date, our current environmental liability reserves and applicable insurance coverage, we do not expect cleanup costs at these sites to be material.

In April 1998, the Montana Power Company identified and reported a release of hydrocarbons during the replacement of a dispensing unit associated with an underground storage tank located at its Helena Operating Center. Impacted soils were removed and groundwater monitoring wells were installed. With the acquisition of the Montana Power Company, we succeeded to the liability associated with the site. To date, hydrocarbons remain detectable at low levels in groundwater and soil vapor extraction efforts are underway to remove the contaminants. We do not expect the outstanding cleanup costs to be material.

As described above, The Montana Power Company retained certain environmental liabilities in connection with its sale of assets

to PPL Montana. Under the terms of our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, we assumed the first $50 million of NorthWestern Energy LLC's preclosing environmental liabilities, including these retained environmental liabilities. Touch America Holdings, Inc. assumed the next $25 million in costs. NorthWestern Energy LLC and Touch America Holdings, Inc. agreed to equally split costs that fall between $75 and $150 million. In light of the bankruptcy filing by Touch America, we do not believe Touch America will be able to satisfy its contractual indemnification obligation.

Environmental laws and regulations require us to incur certain costs, which could be substantial, to operate existing facilities, construct and operate new facilities and mitigate or remove the effect of past operations on the environment. Governmental regulations establishing environmental protection standards are continually evolving, and, therefore, the character, scope, cost and availability of the measures we may be required to take to ensure compliance with evolving laws or regulations cannot be accurately predicted. However, we believe that we accrue an appropriate amount of costs and estimate reasonably foreseeable potential costs related to such environmental regulation and cleanup requirements. As of December 31, 2003, we have a reserve of approximately $43.9 million to cover all estimated environmental liabilities. We anticipate that as environmental costs become fixed and determinable we will seek insurance coverage and/or rate recovery, therefore we do not expect these costs to have a material adverse effect on our consolidated financial position, ongoing operations, or cash flows.

**Intellectual Property**

NorthWestern utilizes a variety of registered and unregistered trademarks and service marks for their respective products and services. Common law and state unfair competition laws govern unregistered marks. We regard our trademarks and service marks and other proprietary rights as valuable assets and believe that they are associated with a high level of quality and have significant value in the marketing of our products. Our policy is to protect our intellectual property and oppose any infringement of our trademarks and service marks. NorthWestern's success is also dependent in part on our trade secrets and information technology, some of which is proprietary to NorthWestern, and other intellectual property rights. We rely on a combination of nondisclosure and other contractual arrangements, technical measures, and trade secret and trademark laws to protect our proprietary rights. Where appropriate, we enter into confidentiality agreements with our employees and attempt to limit access to and distribution of proprietary information.

**ITEM 2. PROPERTIES**

NorthWestern's executive offices are located at 125 S. Dakota Avenue, Sioux Falls, South Dakota 57104, where we lease approximately 35,300 square feet of office space, pursuant to a lease that expires on June 30, 2005.

NorthWestern Energy's principal corporate office is owned and located at 600 Market Street W., Huron, South Dakota 57350. Substantially all of NorthWestern Energy's South Dakota and Nebraska facilities are owned. NorthWestern Energy's Montana executive offices are located at 40 East Broadway Street, Butte, Montana 59701. NorthWestern Energy leases other offices throughout the state of Montana, including a 20,000 square foot facility in Butte, Montana, where we provide call center customer support services and conduct customer billing and other functions.

**ITEM 3. LEGAL PROCEEDINGS**

On September 14, 2003, we filed a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware under case number 03-12872 (CGC). We will continue to manage our properties and operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with Sections 1107(a) and 1108 of Chapter 11. As a result of the Chapter 11 filing, attempts to collect, secure or enforce remedies with respect to most prepetition claims against us are subject to the automatic stay provisions of Section 362(a) of Chapter 11. The description of our bankruptcy proceedings appearing in this Report at Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations—Overview, is incorporated herein by reference.

We, and certain of our present and former officers and directors, were named as defendants in numerous complaints purporting to be class actions which were filed in the United States District Court for the District of South Dakota, Southern Division, alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaints contained varying allegations, including that the defendants misrepresented and omitted material facts with respect to our 2000, 2001, and 2002 financial results and operations included in its filings with the SEC, press releases, and registration statements and prospectuses disseminated in connection with certain offerings of debt, equity, and trust preferred securities. The complaints seek unspecified compensatory damages, rescission, and attorneys' fees and costs as well as accountants' and experts' fees. In June 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Securities Litigation*, Case No. 03-4049, and Carpenters Pension Trust for Southern California, Oppenheim Investment Management, LLC, and Richard C. Slump were named as co-lead plaintiffs (the "Lead Plaintiffs"). In July 2003, the Lead Plaintiffs filed a consolidated amended class action complaint naming NorthWestern, NorthWestern Capital Financing II and III, Blue Dot, Expanets, certain of our present and former officers and directors, along with a number of investment banks that participated in the

securities offerings. The amended complaint alleges that the defendants misrepresented and omitted material facts concerning the business operations and financial performance of NorthWestern, Expanets, Blue Dot and CornerStone, overstated NorthWestern's revenues and earnings by, among other things, maintaining insufficient reserves for accounts receivable at Expanets, failing to disclose billing problems and lapses and data conversion problems, failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system, concealing losses at Expanets and Blue Dot by improperly allocating losses to minority interest shareholders, maintaining insufficient internal controls, and profiting from improper related-party transactions. We, and certain of our present and former officers and directors, were also named as defendants in two complaints purporting to be class actions which were filed in the United States District Court for the Southern District of New York, entitled *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.*, Case No. 03CV3223, and *Arthur Laufer v. Merle Lewis, et al.*, Case No. 03CV3716, which were brought on behalf of the purchasers of our 7.20%, 8.25%, and 8.10% trust preferred securities which were offered and sold pursuant to our registration statement on Form S-3 filed on July 12, 1999. The plaintiffs' claims are based on similar allegations of material misrepresentations and omissions of fact relating to the registration statement in violation of Sections 11 and 12 of the Securities Act of 1933 and they seek unspecified compensatory damages, rescission and attorneys', accountants' and experts' fees. In July 2003, *Arthur Laufer v. Merle Lewis, et al.* was transferred to the District of South Dakota and consolidated with the consolidated actions pending in that court. In September 2003, *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.* was also transferred to the District of South Dakota. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. In October 2003, Expanets, Blue Dot, and certain of NorthWestern's present and former officers and directors filed motions to dismiss the consolidated amended class action complaint for failure to state a claim, which are currently pending in the District of South Dakota.

Certain of our present and former officers and directors and NorthWestern, as a nominal defendant, have been named in two shareholder derivative actions commenced in the United States District Court for the District of South Dakota, Southern Division, entitled *Deryl Lusty, et al. v. Richard R. Hylland, et al.*, Case No. CIV034091 and *Jerald and Betty Stewart, et al. v. Richard R. Hylland, et al.*, Case No. CIV034114. These shareholder derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal shareholder suits. The plaintiffs seek unspecified compensatory damages, restitution of improper salaries, insider trading profits and payments from NorthWestern, and disgorgement under the Sarbanes-Oxley Act of 2002. In July 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091. In October 2003, the action was stayed pending a ruling on defendants' motions to dismiss in the related securities class action, *In re NorthWestern Corporation Securities Litigation*. On November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining the plaintiffs in *In re NorthWestern Corporation Derivative Litigation* from prosecuting the litigation against NorthWestern, its subsidiaries and its current and former officers and directors until further order of the Bankruptcy Court.

On February 7, 2004, the parties to the above consolidated securities class actions and consolidated derivative litigation, together with certain other affected persons and parties, reached a tentative settlement of the litigation. Among the terms of the proposed settlement, we, Expanets, Blue Dot and other parties and persons will be released from all claims relating to these cases, a settlement fund in the amount of $41 million (of which approximately $37 million would be contributed by our directors and officers liability insurance carriers, and $4 million would be contributed from other persons and parties) will be established for the benefit of class members, and, if Netexit seeks bankruptcy protection, the plaintiffs would have a $20 million liquidated securities claim against Netexit. The proposed settlement is subject to the occurrence of several conditions, including approval of the proposed settlement by the Bankruptcy Court in our bankruptcy proceeding, approval of the proposed settlement by the federal District Court for the District of South Dakota, where the consolidated class actions are pending, and approval by the Bankruptcy Court of our plan of reorganization. If for any reason these conditions do not occur and the settlement is not approved, we intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In December 2003, the SEC notified NorthWestern that it had issued a formal order of private investigation and subsequently subpoenaed documents from NorthWestern, NorthWestern Communications Solutions, Expanets and Blue Dot. This action follows the SEC's requests for information made in connection with the previously disclosed SEC informal inquiry into questions regarding the restatements and other accounting and financial reporting matters. In addition, a NorthWestern director was interviewed by representatives of the Federal Bureau of Investigation (FBI) concerning certain of the allegations made in the class action securities and derivative litigation matters. Northwestern has not been contacted by the FBI and has not been advised that NorthWestern is the target of its investigation. We are cooperating with the SEC's investigation and intend to cooperate with the FBI if we are contacted in connection with its investigation. We understand that the FBI or the Internal Revenue Service (IRS) may have contacted former and current employees of ours or of our subsidiaries. As of the date hereof, we are not aware of any other governmental inquiry or investigation related to these matters. We cannot predict whether or not any other governmental inquiry or investigation will be commenced, nor can we predict the outcome of the SEC, FBI, IRS or any other governmental inquiry or investigation or related litigation or proceeding.

In January 2004, two of the QFs – Colstrip Electric Limited Partnership (CELP) and Yellowstone Electric Limited Partnership (YELP) – initiated adversary proceedings against NorthWestern in its Chapter 11 proceedings. In the CELP adversary proceeding, CELP seeks additional payment for capacity contracted to be provided to NorthWestern under its existing power purchase agreement. In the YELP adversary proceeding, YELP seeks a determination of when and who has the right to determine the scheduling of maintenance on

the power facility. We intend to vigorously defend against these adversary proceedings. In the opinion of management, the amount of ultimate liability with respect to these adversary proceedings will not materially affect our financial position or results of operations or our ability to timely confirm a plan of reorganization.

Expanets and NorthWestern have been named defendants in two complaints filed with the Supreme Court of the State of New York, County of Bronx, alleging violations of New York's prevailing wage laws, breach of contract, unjust enrichment, willful failure to pay wages, race, ethnicity, national origin and/or age discrimination and retaliation. In the complaint entitled *Felix Adames et al. v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, County of Bronx, Index No. 8664-04,* which has not yet been served upon Expanets, fourteen former employees of Expanets seek damages in the amount of $27,750,000, plus interest, penalties, punitive damages, costs, and attorney's fees. In the complaint entitled *Wayne Belnavis and David Daniels v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, County of Bronx, Index No. 8729-04,* which has not yet been served upon Expanets, two former employees of Expanets seek damages in the amount of $12,500,000, plus interest, penalties, punitive damages, costs, and attorney's fees. We intend to vigorously defend against the allegations made in these complaints. Though the filing of the complaint may violate the automatic stay provisions of the U.S. Bankruptcy Code and maybe subject to the claims process of the bankruptcy proceeding, we cannot currently predict the impact or resolution of these claims or reasonably estimate a range of possible loss, which could be material, and the resolution of these claims may harm our business and have a material adverse impact on our financial condition.

We are one of several defendants in a class action lawsuit entitled *McGreevey, et al. v. The Montana Power Company, et al,* now pending in federal court in Montana. The lawsuit, which was filed by the former shareholders of The Montana Power Company (most of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company were void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern Corporation is named as a defendant due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. On November 6, 2003, the Bankruptcy Court approved a stipulation between NorthWestern and the plaintiffs in *McGreevey, et al. v. The Montana Power Company, et al.* The stipulation provides that litigation, as against Northwestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey, shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to Northwestern, the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

*In Northwestern Corporation vs. PPL Montana, LLC vs. Northwestern Corporation and Clark Fork and Blackfoot, LLC,* No. CV-02-94-BU-SHE, (D. MT), the Company is pursuing claims against PPL Montana, LLC due to its refusal to purchase the Colstrip transmission assets which under the Asset Purchase Agreement ("APA") executed by and between The Montana Power Company ("MPC") and PP&L Global, Inc. ("PPL Global"), NorthWestern claims PPL Montana, LLC ("PPL") (PPL Global's successor-in-interest under the APA) is required to purchase the Colstrip transmission assets for $97.1 million. PPL has also asserted a number of counterclaims against NorthWestern and Clark Fork based in large part upon PPL's claim that MPC and/or NorthWestern Energy breached two Wholesale Transition Service Agreements and certain indemnification obligations under the APA in the approximate amount of $40 million. PPL has moved the Bankruptcy Court for relief from the automatic stay to pursue its counterclaims. PPL also filed a proof of claim against NorthWestern's bankruptcy estate. NorthWestern has objected to PPL's motion to lift the automatic stay and has also filed a motion to transfer the venue of the entire litigation to the United States District Court for the District of Delaware, where it would ultimately be referred to the United States Bankruptcy Court for the District of Delaware so as to resolve the litigation as part of NorthWestern's pending bankruptcy reorganization. PPL has objected to such motion and a hearing is scheduled on NorthWestern's motion in March 2004.

We are also one of several defendants in a class action lawsuit entitled *In Re Touch America ERISA Litigation,* which is currently pending in federal court in Montana. The lawsuit was filed by participants in the former Montana Power Company retirement savings plan and alleges that there was a breach of fiduciary duty in connection with the employee stock ownership aspects of the plan. The federal court has recently entered orders indefinitely staying the ERISA litigation because of Touch America Holdings Inc.'s bankruptcy filing. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We, and certain of our former officers and directors, were named as defendants in certain complaints filed against CornerStone Propane Partners, LP and other defendants purporting to be class actions filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Through November 1, 2002, we held an economic equity interest

in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, LP. Certain former officers and directors of NorthWestern who are named as defendants in certain of these actions have also been sued in their capacities as directors of the managing general partner. These complaints allege that defendants sold units of CornerStone Propane Partners based upon false and misleading statements and failed to disclose material information about CornerStone Propane Partners' financial condition and future prospects, including overpayment for acquisitions, overstating earnings and net income, and that it lacked adequate internal controls. All of the lawsuits have now been consolidated and Gilbert H. Lamphere has been named as lead plaintiff. The actions have been stayed as to NorthWestern Corporation due to our bankruptcy filing. On October 27, 2003, the plaintiffs filed an amended consolidated class action complaint. The new complaint does not name NorthWestern as a defendant, although it alleges facts relating to NorthWestern's conduct. Certain of our former officers and directors are named as defendants in the amended consolidated complaint. The plaintiffs seek compensatory damages, prejudgment and post judgment interest and costs, injunctive relief, and other relief. We intend to vigorously defend against these lawsuits. On November 6, 2003, the Bankruptcy Court entered an order approving a stipulation between NorthWestern and plaintiffs in this litigation. The stipulation provides that litigation as against NorthWestern shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to Northwestern, the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition

23

or ability to timely confirm a plan of reorganization.

We were named in a complaint filed against CornerStone Propane GP, Inc., CornerStone Propane Partners LP and other defendants in a lawsuit entitled *Leonard S. Mewhinney, Jr. v. Northwestern Corporation* in the circuit court of the city of St. Louis, state of Missouri. The complaint alleges that the plaintiff purchased units of Cornerstone Propane Partners, LP between March 13, 1998 and November 29, 2001, and that NorthWestern owned and controlled all or the majority of stock or other indicia of ownership of Cornerstone Propane, GP, Inc. and all other entities that were the general partners of Cornerstone Propane Partners, LP. According to the plaintiff, NorthWestern, Cornerstone Propane GP, Inc., Coast Gas, Inc. and Cornerstone Propane Partners, LP breached fiduciary duties to the plaintiff by engaging in certain misconduct, including mismanaging Cornerstone Propane Partners, LP and transferring its assets for less than market value and other activities. The complaint further alleges that the defendants fraudulently failed to disclose material information regarding the value of units of Cornerstone Propane Partners, LP and violated the Florida Securities Act in connection with the sale of such units. The plaintiff seeks compensatory damages, punitive damages and costs. The complaint was amended to add a state class action claim. All defendants filed a petition to remove the case to the federal court in St. Louis, Missouri, but the federal court granted plaintiffs motion to remand. The case has now been stayed against NorthWestern due to our bankruptcy filing. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

Certain of our former officers and directors, and CornerStone Propane Partners, LP, as a nominal defendant, are among other defendants named in two derivative actions commenced in the Superior Court for the State of California, County of Santa Cruz, entitled *Adelaide Andrews v. Keith G. Baxter, et al.*, Case No. CV146662 and *Ralph Tyndall v. Keith G. Baxter, et al.*, Case No. CV146661. These derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal unitholder suits. The plaintiffs seek unspecified compensatory damages, treble damages pursuant to the California Corporations Code, injunctive relief, restitution, disgorgement, costs, and other relief. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

On April 30, 2003, Mr. Richard Hylland, our former President and Chief Operating Officer, filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortuous interference and a claim for punitive damages. Mr. Hylland is seeking relief in an amount of $25 million, plus interest, attorney's fees, costs, and punitive damages. Mr. Hylland has also filed claims in our bankruptcy case similar to the claims in his arbitration demand. We dispute Mr. Hylland's claims and intend to vigorously defend the arbitration and object to Mr. Hylland's claims in our bankruptcy case. On May 6, 2003, based on the recommendations of the Special Committee of the Board formed to evaluate Mr. Hylland's performance and conduct in connection with the management of NorthWestern and its subsidiaries, the Board determined that Mr. Hylland's performance and conduct as President and Chief Operating Officer warranted termination under his employment contract. This arbitration has been stayed due to our bankruptcy filing.

On August 12, 2003, the MCC filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the MPSC. On August 22, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices, and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. A procedural schedule was set in January 2004 with a hearing tentatively scheduled for June 2004. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, then we may become subject to material monetary penalties and fines. We are working with the MCC to provide requested information in a timely manner, but we have reserved the right to contest whether this proceeding is stayed as a result of our bankruptcy filing.

We are also subject to various other legal proceedings and claims that arise in the ordinary course of business. In the opinion of management, the amount of ultimate liability with respect to these actions will not materially affect our financial position or results of operations or ability to timely confirm a plan of reorganization.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of our security holders during the quarter ended December 31, 2003.

Part II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS

On September 15, 2003, in connection with our Chapter 11 filing, the New York Stock Exchange (NYSE) suspended trading in and subsequently delisted our common stock and all five series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the NYSE to delis t our common stock and trust preferred securities. We now participate in the Over-the-Counter Bulletin Board Quotation Service maintained by National Association of Securities Dealers, Inc., or the OTCBB. The OTCBB is an electronic quotation medium for securities traded outside of the Nasdaq Stock Market, and prices for our common stock are published on the OTCBB under the trading symbol NTHWQ.PK. The first trade of our common stock on the OTCBB occurred on October 6, 2003. The OTCBB market is extremely limited and the prices quoted are not a reliable indication of the value of our common stock. We do not believe that our common stock currently has any value.

The following table sets forth the high and low bid prices for our common stock for each quarter during the last two fiscal years and the cash dividends paid per share during each period. The quotations set forth below reflect interdealer prices, without retail mark-up, mark-downs, or commissions and may not represent actual transactions:

### QUARTERLY COMMON STOCK DATA

| | Prices | | Cash Dividends |
| | High | Low | Paid |
|---|---|---|---|
| *2002* | | | |
| First Quarter | $ 23.64 | $ 20.35 | $ .3175 |
| Second Quarter | 22.30 | 14.20 | $ .3175 |
| Third Quarter | 16.90 | 8.40 | $ .3175 |
| Fourth Quarter | 9.79 | 4.30 | $ .3175 |
| *2003* | | | |
| First Quarter | 6.18 | 1.41 | — |
| Second Quarter | 3.09 | 1.65 | — |
| Third Quarter | 2.12 | 0.15 | — |
| Fourth Quarter | 0.32 | 0.08 | |

On March 8, 2004, the last reported sale price on the OTCBB for our common stock was $0.12.

We terminated the historical practice of paying cash dividends during the first quarter of 2003. Our existing common stock will be cancelled in connection with the adoption of our plan of reorganization.

We have established four wholly owned, special-purpose business trusts, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II and NorthWestern Capital Financing III, to issue common and preferred securities and hold subordinated debentures that we issue, and The Montana Power Company established Montana Power Capital I (Trust) as a wholly owned business trust to issue common and preferred securities and hold subordinated debentures that it issued. The sole assets of these trusts are the investments in subordinated debentures, which are interest bearing. In connection with our bankruptcy filing, these trusts were terminated pursuant to their terms and the subordinated debentures are subject to compromise.

### Holders

As of March 8, 2004, there were 7,465 holders of record of 37,680,095 outstanding shares of our common stock.

### Securities Authorized for Issuance under Equity Compensation Plans

The following table presents summary information about our equity compensation plans, including our employee stock ownership plan, our stock option and incentive plan and any individual stock option arrangements not arising under any plan. Our outstanding stock options and restricted stock have no value and will be cancelled in connection with the adoption of our plan of reorganization. The table presents the following data on plans approved by shareholders and plans not so approved, all as of the close of business on December 31, 2003 (treating all employee stock purchase plan transactions occurring on such date on an as-settled basis):

(i)      the aggregate number of shares of our common stock subject to outstanding stock options, warrants and rights;

(ii)     the weighted average exercise price of those outstanding stock options, warrants and rights; and

(iii)    the number of shares that remain available for future option grants, excluding the number of shares to be issued upon the exercise of outstanding options, warrants and rights described in (a) above.

For additional information regarding our stock option plans and the accounting effects of our stock-based compensation, please see Notes 4 and 19 to our Financial Statements included in Item 8 herein.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (1) (c) |
|---|---|---|---|
| **Equity compensation plans approved by security holders** | | | |
| (1) Stock Option and Incentive Plan..... | 1,359,188 | $ 15.81 | 1,782,074 |
| Restricted Stock ........................................ | 283,333 | 4.40 | — |
| **Equity compensation plans not approved by security holders** | | | |
| None .......................................................... | N/A | N/A | N/A |
| **Total** .......................................................... | 1,642,521 | | 1,782,074 |

---

(1)    The Stock Option and Incentive Plan, as amended, provides that 12.5% of the outstanding shares of Common Stock of the Company, as of January 1st of each year, are available for issuance under the plan.

26

**ITEM 6.  SELECTED FINANCIAL DATA**

The following selected financial data has been derived from our consolidated financial statements and should be read in conjunction with the consolidated financial statements and notes thereto and with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and other financial data included elsewhere in this report.  The historical results are not necessarily indicative of results to be expected for any future period.  During 2003 we committed to a plan to sell or liquidate our interest in Expanets and Blue Dot and accounted for our interest in these subsidiaries as discontinued operations.  In 2002 we disposed of our interest in CornerStone and accounted for the disposal as discontinued operations.  Accordingly, the financial data below has been restated for fiscal years 1999 through 2002.

<div align="center">

**FIVE-YEAR FINANCIAL SUMMARY**

</div>

|  | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
|  | (in thousands except per share data) | | | | |
| **Financial Results** | | | | | |
| Operating revenues | $ 1,027,437 | $ 783,744 | $ 255,151 | $ 188,390 | $ 161,708 |
| Income (loss) from continuing operations.... | (71,582) | (9,356) | 4,175 | 3,349 | 13,581 |
| Basic earnings (loss) per share from continuing operations | (2.31) | (1.29) | (.11) | (.15) | .29 |
| Diluted earnings (loss) per share from continuing operations | (2.31) | (1.29) | (.12) | (.15) | .29 |
| Dividends paid per common share | — | 1.27 | 1.21 | 1.13 | 1.05 |
| **Financial Position (as of December 31)** | | | | | |
| Total assets | $ 2,444,511 | $ 2,785,061 | $ 2,641,685 | $ 2,898,070 | $ 1,956,761 |
| Long-term debt, including current portion and amount subject to compromise | 1,784,236 | 1,668,431 | 583,651 | 514,347 | 316,406 |
| Preferred stock not subject to mandatory redemption | — | — | 3,750 | 3,750 | 3,750 |
| Preferred stock subject to mandatory redemption | 365,550 | 370,250 | 187,500 | 87,500 | 87,500 |
| Ratio of earnings to fixed charges (1) | — | — | — | — | 1.38 |

(1)    The fixed charges exceeded earnings, as defined by this ratio, by $86.6 million, $77.8 million, $9.5 million and $4.1 million in 2003, 2002, 2001 and 2000 respectively.

<div align="center">

27

</div>

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis should be read in conjunction with "Item 6 Selected Financial Data" and our consolidated financial statements and related notes contained elsewhere in this Annual Report on Form 10-K. For additional information related to our industry segments, see Note 24 of "Notes to Consolidated Financial Statements" of our consolidated financial statements, which are included in Item 8 herein. For information regarding our revenues, profits/losses and assets, see our consolidated financial statements included in Item 8 hereof.

## OVERVIEW

Our financial condition has been significantly and negatively affected by the poor performance of our nonenergy businesses and our significant indebtedness. In early 2003, we undertook a series of steps designed to refinance, reduce and extend the maturities of our debt. Notwithstanding these efforts, our financial position continued to deteriorate, principally due to the poor performance of our non-utility subsidiaries and our leveraged condition. As a result of these developments, in June 2003, we announced that we would seek to fundamentally restructure our capital, and announced that we had retained legal and financial advisors to assist us in these efforts. We ultimately decided to seek to reorganize under Chapter 11 of the Federal Bankruptcy Code.

On September 14, 2003 (Petition Date), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code in the Bankruptcy Court under case number 03-12872 (CGC). Pursuant to Chapter 11, we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court. Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. The assets and liabilities of such nondebtor subsidiaries are not considered to be material to the consolidated financial statements or are included in discontinued operations.

In connection with any plan of reorganization, our common stock will be cancelled and our mandatorily redeemable preferred securities of subsidiary trusts (trust preferred securities) will be restructured in a manner that will eliminate or very substantially reduce any remaining value with respect to such trust preferred securities. We have previously stated that the planned sale of noncore assets, including Expanets and Blue Dot, is not expected to change our view that our common stock has no value. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities.

On September 15, 2003, in connection with our Chapter 11 filing, the New York Stock Exchange (NYSE) suspended trading and subsequently delisted our common stock and all series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the NYSE to delist our common stock and trust preferred securities. As a result of the delisting of our securities, there can be no assurance that a liquid trading market for those securities will continue.

As a result of our Chapter 11 filing, we operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable court orders. All vendors are being paid for all goods furnished and services provided after the Petition Date under the supervision of the Bankruptcy Court. As a debtor-in-possession, we are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Court, after notice and an opportunity for a hearing.

Our ability to continue as a going concern is predicated upon numerous issues, including our ability to achieve the following:

- having a plan of reorganization confirmed by the Bankruptcy Court in a timely manner;

- being able to successfully implement our business plans and otherwise offset the negative effects that the Chapter 11 filing has had and may continue to have on our business, including the impairment of vendor relations;

- operating within the framework of our DIP Facility, including limitations on capital expenditures and financial covenants, our ability to generate cash flows from operations or seek other sources of financing and the availability of projected vendor credit terms; and

- attracting, motivating and/or retaining key executives and associates.

These challenges are in addition to those operational, regulatory and other challenges that we face in connection with our business as a regional utility.

On September 16, 2003, following first day hearings held on September 15, 2003, the Bankruptcy Court entered orders granting

28

us authority to, among other things, pay prepetition and postpetition employee wages, salaries, benefits and other employee obligations, pay selected vendors and other providers for the postpetition delivery of goods and services, continue bank accounts and existing cash management system, and continue existing forward power contracts and enter into additional similar contracts in the ordinary course of business. On November 7, 2003, the Bankruptcy Court entered a final order to approve access of up to $85 million of the $100 million debtor-in-possession financing facility arranged by the company with Bank One, N.A. (DIP Facility). In December 2003, we reduced the commitment to $85 million under this facility. The DIP Facility expires on September 12, 2004, and bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility will provide a source of liquidity during the course of our bankruptcy, but requires that we maintain certain other financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments and sales of assets. As of December 31, 2003, we had $15.2 million in letters of credit outstanding and no borrowings under the DIP Facility.

We reached an agreement with the lenders holding claims under our senior credit facility agented by Credit Suisse First Boston (CSFB) in October 2003 to reduce the interest rate of our $390 million prepetition credit facility. The amended credit facility provides advantages to NorthWestern, including lower interest expense and allowing reinstatement upon NorthWestern's emergence from Chapter 11. At NorthWestern's option, the amended credit facility bears interest at a variable rate tied to the Eurodollar rate, plus a spread of 5.50%, or at an alternate base rate, as defined by the amended credit facility, plus a spread of 3.50%. There is no longer a minimum floor for the Eurodollar rate or the alternate base rate. As a result of this amendment, we estimate annualized interest expense will be reduced by approximately $6 million to $8 million.

The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations. As such, we have classified all of our secured debt as current as of December 31, 2003. Subject to certain exceptions under the Bankruptcy Code, our Chapter 11 filing automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against us or our property to recover on, collect or secure a claim arising prior to the Petition Date. Thus, for example, creditor actions to obtain possession of our property, or to create, perfect or enforce any lien against our property, or to collect on or otherwise exercise rights or remedies with respect to a prepetition claim are enjoined unless and until the Bankruptcy Court lifts the automatic stay.

On November 4, 2003, we filed our schedules and statements of financial affairs with the Bankruptcy Court, setting forth, among other things, the assets and liabilities of the Company. These schedules were amended on December 2, 2003. In October 2003, the Bankruptcy Court set January 15, 2004 as the deadline for all of our creditors, except governmental units, to file proofs of claim against our estate. The Bankruptcy Court set April 15, 2004 as the deadline for all of our governmental unit creditors to file proofs of claim against our estate. Any holder of a claim that fails to file a timely proof of claim on or before the applicable bar date is forever barred from asserting such claim against us, our successors or our property, and shall not be treated as a creditor for purposes of voting on or receiving distributions or notices under a plan of reorganization. A total of approximately 1,031 claims were scheduled and filed against our estate with an aggregate asserted liability of approximately $8.8 billion as of January 15, 2004. The foregoing claims may include, among other things, invalid, overstated, objectionable and duplicative claims. We also have numerous executory contracts and other agreements that could be assumed or rejected during the Chapter 11 proceedings. In the event we choose to reject an executory contract or unexpired lease, parties affected by these rejections may file claims with the court-appointed claims agent as proscribed by the Bankruptcy Code and/or orders of the Bankruptcy Court. Unless otherwise agreed, the assumption of an executory contract or unexpired lease will require us to cure all prior defaults under such executory contract or lease, including all prepetition liabilities, some of which may be significant. We expect that liabilities that will be subject to compromise through the Chapter 11 process will arise in the future as a result of the rejection of additional executory contracts and/or unexpired leases, and from the determination of the Bankruptcy Court (or agreement by parties in55558 interest) of allowed claims for items that we now claim as contingent or disputed. Conversely, we would expect that the assumption of additional executory contracts may convert some liabilities shown on our financial statements as subject to compromise to postpetition liabilities.

In January 2004, we filed a motion to approve amendments to an existing Employee Incentive Plan. We believe that the commencement of the Chapter 11 case engendered uncertainty among our employees, particularly our critical senior and mid-level management employees. Accordingly, to prevent the departure of management and its employees, and possible disruption of our operations and reorganization efforts, we amended our existing Employee Incentive Plan to provide incentives to employees and to reduce costs. The Bankruptcy Court approved the amendments to our Employee Incentive Plan in February 2004.

To successfully exit Chapter 11, we will need to propose, and obtain confirmation by the Bankruptcy Court of a plan of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would resolve, among other things, the debtor's prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for its corporate governance subsequent to exit from bankruptcy. Under the Chapter 11 proceedings, the rights of and ultimate payments to prepetition creditors, rejection damage claimants and equity investors may be substantially altered. This could result in claims being allowed and/or satisfied in the Chapter 11 proceedings at less (possibly substantially less) than 100% of their face value, and we anticipate the interests of our equity investors will be cancelled. Substantially all prepetition liabilities are subject to settlement under a plan of reorganization to be voted upon by our prepetition creditors and approved by the

Bankruptcy Court. In January 2004, the Bankruptcy Court extended our exclusive period to file a plan of reorganization through and including March 12, 2004, and extended the time to solicit votes on our plan of reorganization through and including May 11, 2004. We filed our initial plan of reorganization on March 12, 2004. Although our plan of reorganization provides for our emergence from bankruptcy as a going concern, there can be no assurance at this time our plan of reorganization will be confirmed by the Bankruptcy Court or that any such plan will be implemented successfully. We have incurred, and will continue to incur pending emergence, significant costs associated with the reorganization.

The United States Trustee for the Bankruptcy Court has appointed an official committee of unsecured creditors (Creditors' Committee). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court and may take positions on matters that come before the Bankruptcy Court. There can be no assurance that the Creditors' Committee will support our positions or our plan of reorganization, and disagreements between us and the Creditors' Committee could protract the Chapter 11 case, could negatively impact our ability to operate during the Chapter 11 case and could prevent our emergence from Chapter 11.

As a result of the Chapter 11 filing, the liquidation of liabilities are subject to uncertainty. While operating as a debtor-in-possession under the protection of the Bankruptcy Code, and while subject to Bankruptcy Court approval or otherwise as permitted in the normal course of business, we may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

In October 2003, we were authorized to complete the sale of Expanets' assets. On November 25, 2003, Expanets closed on an Asset Purchase and Sale Agreement to sell substantially all the assets and business of Expanets to Avaya, Inc. (Avaya) and retained certain specified liabilities. Thereafter, Expanets was renamed Netexit, Inc. (Netexit), which will continue as a non-operating company until it affairs can be wound down in accordance with its lending agreements, its corporate charter and provisions of Delaware law. Under the terms of the agreement, a $4 million "break-up fee" was paid to a third party originally involved in the transaction and Avaya paid Netexit cash of approximately $50.8 million, and assumed debt of approximately $38.1 million. In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not assumed by Avaya, and certain indemnification obligations of Netexit, respectively. Avaya also reduced cash paid at closing by approximately $44.6 million as a working capital adjustment, pending the determination of a final closing balance sheet. On February 24, 2004, Avaya submitted its proposed final calculation of the working capital adjustment asserting that there was a working capital shortfall at Expanets of approximately $48.8 million at closing, and claiming that Avaya should retain the entire holdback amount plus an additional $4.2 million. Netexit disputes this calculation and believes that pursuant to the terms of the asset purchase agreement Netexit is owed additional cash ranging from $10 million to $20 million (resulting in potential net cash proceeds to Netexit of $60.8 million to $70.8 million). The dispute over the working capital adjustment is subject to an arbitration process, which is expected to be decided in May 2004. Pending resolution of the final balance sheet, the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit. If Netexit cannot wind-down its affairs in an orderly manner pursuant to applicable provisions of Delaware law, it may be forced to file bankruptcy. We have recognized an estimated loss on disposal of approximately $49.3 million based on the terms of the sale and our expectation of the additional amount to be received from Avaya. An additional loss may arise based on the results of the arbitration process and other claims discussed above.

Blue Dot sold 48 businesses during 2003, repaid its credit facility from sales proceeds and terminated the facility. As of December 31, 2003, Blue Dot had 14 remaining businesses. (Subsequent to December 31, 2003, Blue Dot has sold 6 additional businesses as of March 1, 2004.) Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004. We hope to receive in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided however, this assumes satisfactory resolutions to remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation. Furthermore, it assumes that the remaining businesses produce their projected cash proceeds and receivables from various sold locations are collectible.

We are also attempting to sell the Montana First Megawatts generation project. In an effort to facilitate the timely sale of the Montana First Megawatts project and its ultimate development at its current location in Great Falls, Montana, we filed the power sales agreement with the FERC on August 18, 2003, requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NorthWestern Energy. A late motion to intervene and protest was filed by the MPSC and the MCC. On October 17, 2003, the FERC issued an order conditionally accepting the power sales agreement, subject to suspension for a designated period, to permit resolution of certain concerns voiced by the MPSC and MCC in their filing. We are currently working with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve the documented MPSC and MCC concerns in a timely manner.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Management's discussion and analysis of financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. We base our estimates on historical experience and other assumptions that are believed to be proper and reasonable under the circumstances. We continually evaluate the appropriateness of our estimates and assumptions, including those related to goodwill, qualifying facilities liabilities, impairment of long-lived assets and revenue recognition, among others. Actual results could differ from those estimates.

We have identified the policies and related procedures below as critical to understanding our historical and future performance, as these polices affect the reported amounts of revenue and the more significant areas involving management's judgments and estimates.

### Goodwill

We believe that the accounting estimate related to determining the fair value of goodwill, and thus any impairment, is a "critical accounting estimate" because: (i) it is highly susceptible to change from period to period since it requires company management to make cash flow assumptions about future revenues, operating costs and discount rates over an indefinite life; and (ii) recognizing an impairment has had a significant impact on the assets reported on our balance sheet and our operating results. Management's assumptions about future sales margins and volumes require significant judgment because actual margins and volumes have fluctuated in the past and are expected to continue to do so. In estimating future margins, we use our internal budgets.

SFAS No. 142 was issued during 2001 and is effective for all fiscal years beginning after December 15, 2001. According to the guidance set forth in SFAS No. 142, we are required to evaluate our goodwill and indefinite-lived intangible assets for impairment at least annually (October 1) and more frequently when indications of impairment exist. Accounting standards require that if the fair value of a reporting unit is less than its carrying value including goodwill, an impairment charge for goodwill must be recognized in the financial statements. To measure the amount of the impairment loss to recognize, we compare the implied fair value of the reporting unit's goodwill with its carrying value.

### Qualifying Facilities Liability

Certain Qualifying Facilities, or QFs, require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. As of December 31, 2003, our gross contractual obligation related to the QFs is approximately $1.8 billion through 2029. A portion of the costs incurred to purchase this energy is recoverable though rates authorized by the MPSC, totaling approximately $1.4 billion though 2029. Upon completion of the purchase price allocation related to our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, we established a liability of $134.3 million, based on the net present value of the difference between our obligations under the QFs and the related amount recoverable. The determination of the discount rate used to establish this liability was a significant assumption. We determined the appropriate discount rate to be 8.75%, in accordance with Statement of Financial Accounting Concepts No. 7, *Using Cash Flow Information and Present Value in Accounting Measures*. We believe that 8.75% approximates the rate we could have negotiated with an independent lender for a similar transaction under comparable terms and conditions as of the acquisition date. In computing the liability, we have also had to make various estimates in relation to contract costs, capacity utilization, and recoverable amounts. Actual utilization and regulatory changes may significantly impact our results of operations. In light of the executory nature of the QF power sales agreements and certain out-of-market pricing and escalation terms, we are evaluating our options with respect to continued purchases under these contracts.

### Long-lived Assets

We evaluate our property, plant and equipment for impairment whenever indicators of impairment exist. SFAS No. 144 requires that if the sum of the undiscounted cash flows from a company's asset, without interest charges that will be recognized as expenses when incurred, is less than the carrying value of the asset, impairment must be recognized in the financial statements. If an asset is deemed to be impaired, then the amount of the impairment loss recognized represents the excess of the asset's carrying value as compared to its estimated fair value, based on management's assumptions and projections.

During the second quarter of 2003, we recorded an additional impairment charge of $12.4 million due to further decline in the estimated realizable value of our investment in our Montana First Megawatts project. We had previously recorded an impairment charge of $35.7 million during the fourth quarter of 2002.

### Revenue Recognition

Revenues are recognized differently depending on the various jurisdictions. For our South Dakota and Nebraska operations, as

31

prescribed by the respective regulatory authorities, electric and natural gas utility revenues are based on billings rendered to customers. Customers are billed on a monthly cycle basis. For our Montana operations, as prescribed by the MPSC, operating revenues are recorded monthly on the basis of consumption or services rendered. To match revenues with associated expenses, we accrue unbilled revenues for electric and natural gas services delivered to the customers but not yet billed at month-end.

### Regulatory Assets and Liabilities

Our regulated operations are subject to the provisions of SFAS No. 71, *Accounting for the Effects of Certain Types of Regulations.* Our regulatory assets are the probable future revenues associated with certain costs to be recovered from customers through the ratemaking process, including our estimate of amounts recoverable for natural gas and default electric supply purchases. Regulatory liabilities are the probable future reductions in revenues associated with amounts to be credited to customers through the ratemaking process. If any part of our operations become no longer subject to the provisions of SFAS No. 71, the probable future recovery of or reduction in revenue with respect to the related regulatory assets and liabilities would need to be evaluated. In addition, we would need to determine if there was any impairment to the carrying costs of deregulated plant and inventory assets.

While we believe that our assumption regarding future regulatory actions is reasonable, different assumptions could materially affect our results.

### Pension and Postretirement Benefit Plans

Our reported costs of providing pension and other postretirement benefits are dependent upon numerous factors resulting from actual plan experience and assumptions of future experience.

Pension and other postretirement benefit costs, for example, are impacted by actual employee demographics (including age and compensation levels), the level of contributions we make to the plans, earnings on plan assets, and health care cost trends. Changes made to the provisions of the plans may also impact current and future pension and other postretirement benefit costs. Pension and other postretirement benefit costs may also be significantly affected by changes in key actuarial assumptions, including anticipated rates of return on plan assets and the discount rates used in determining the postretirement benefit obligation and postretirement costs.

As a result of the factors listed above, significant portions of pension and other postretirement benefit costs recorded in any period do not reflect (and are generally greater than) the actual benefits provided to plan participants.

Our pension and other postretirement benefit plan assets are primarily made up of equity and fixed income investments. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased pension and other postretirement benefit costs in future periods. Likewise, changes in assumptions regarding current discount rates and expected rates of return on plan assets could also increase or decrease recorded pension and other postretirement benefit costs.

## RESULTS OF OPERATIONS

The following is a summary of our results of operations in 2003, 2002 and 2001. Our consolidated results include the results of our divisions and subsidiaries constituting each of our business segments. This discussion is followed by a more detailed discussion of operating results by segment. The results of operations for the year ended December 31, 2002, include the results of our Montana operations since February 1, 2002, the effective date of the acquisition.

### Overall Consolidated Results

### Year Ended December 31, 2003 Compared with Year Ended December 31, 2002

Consolidated losses on common stock in 2003 were $128.7 million compared to $892.9 million in 2002. This decrease is primarily due to impairment and other charges of $878.5 million and decreased losses after impairment and other charges from our discontinued communications segment of approximately $32.0 million. This was offset by a $31.0 million increase in operating expenses, primarily due to increased legal and other professional fees related to our reorganization efforts and bankruptcy filing along with a $49.6 million increase in interest expense.

### Year Ended December 31, 2002 Compared with Year Ended December 31, 2001

Consolidated losses on common stock in 2002 were $892.9 million compared to earnings on common stock of $37.5 million in 2001. The loss is primarily due to impairment and other charges of $878.5 million and increased interest expense of $70.3 million, offset

by an approximately $29.3 million increase in earnings related to the addition of our Montana operations.

*Electric Utility Segment Operations.*

### Year Ended December 31, 2003 Compared with Year Ended December 31, 2002

Revenues in 2003 were $673.1 million, an increase of $139.1 million, or 26.1%, from 2002 results. The January 2003 results of our Montana operations contributed approximately $47.8 million of this increase. In addition, revenues from February through December 2003, as compared to the same period in 2002, increased approximately $91.3 million, primarily due to an $80.2 million increase in revenue recovered for purchased power supply costs. As these costs are also reflected in cost of sales, there is no gross margin impact. Also contributing to the increase was $10.8 million due to a 3.8% increase in retail volumes and the addition of Montana customers that moved back to retail from customer choice. In addition, wholesale revenues increased $1.8 million due to a 0.7% increase in wholesale volumes and a 43.1% increase in average wholesale price from our South Dakota operations. A $1.4 million decrease in other revenue primarily due to Montana choice customers moving back to retail partially offset these increases.

Cost of sales in 2003 was $312.8 million, an increase of $107.1 million, or 52.1%, from 2002 results. The January 2003 results of our Montana operations contributed approximately $23.9 million of this increase. Purchased power supply costs, which are recovered in rates, increased for February through December 2003, as compared to 2002, by $80.2 million as a result of new power supply agreements effective July 1, 2002. In addition, retail and wholesale costs increased $2.2 million due to the increased volumes discussed above.

Gross margin in 2003 was $360.3 million, an increase of $32.0 million, or 9.7%, over the 2002 gross margin of $328.3 million. The January 2003 results of our Montana operations contributed $23.9 million of this increase. Higher retail and wholesale volume sales and higher average wholesale price resulted in an increase of $8.0 million, or 2.5%, for the period of February through December of 2003 as compared to 2002. Margins as a percentage of revenues decreased to 53.5% for 2003, from 61.5% for 2002. Gross margin as a percentage of revenue is impacted by the fluctuations that occur in power supply costs, which are collected in rates from customers. While these fluctuations impact gross margin as a percentage of revenue, they have no actual impact on gross margin amounts.

Operating, general and administrative expenses for 2003 were $184.5 million, an increase of $14.8 million, or 8.7%, over 2002. The January 2003 results of our Montana operations contributed approximately $12.2 million of this increase. The additional increase of $2.6 million was primarily due to higher property taxes and increased employee benefit costs, partially offset by a reduction in our environmental reserve. Depreciation for 2003 was $54.5 million, an increase of $5.6 million over 2002. The January 2003 results of our Montana operations contributed approximately $3.7 million of this increase.

Operating income in 2003 was $121.4 million, an increase of $11.7 million, or 10.6%, from 2002. The January 2003 results of our Montana operations contributed approximately $8.1 million of this increase. The remaining increase was primarily attributable to the increased margins discussed above.

### Year Ended December 31, 2002 Compared with Year Ended December 31, 2001

Revenues in 2002 were $533.9 million, an increase of $426.9 million, or 399.0%, from 2001 results. This increase was almost exclusively attributable to the addition of our Montana operations, effective February 1, 2002, which contributed $441.4 million of revenues for the year. The volume of wholesale and retail megawatt hours sold in 2002 for our Montana operations were 1.4 million and 6.7 million, respectively. In addition, our South Dakota operations contributed revenues of $92.5 million for 2002, which was a decrease of $14.5 million, or 13.5%, from 2001. This decrease in revenues was principally the result of a decrease of $16.1 million in wholesale electric revenues within the South Dakota operations due to market price declines. The volume of wholesale megawatt hours sold in 2002 for our Montana operations decreased by 6.2%, however, the volume of retail megawatt hours sold increased by 0.3%.

Cost of sales in 2002 was $205.6 million, an increase of $182.6 million, or 791.9%, from 2001 results. This increase was nearly all due to the addition of our Montana operations, which increased costs by $182.0 million. In addition, our South Dakota operations experienced a $0.6 million increase in costs related to the increase in sales volume.

Gross margin in 2002 was $328.3 million, an increase of $244.4 million, or 291.1%, over the 2001 gross margin of $83.9 million. This increase was primarily due to the contribution of $259.4 million in gross margin from our Montana operations. Partially offsetting this increase was a decrease in gross margin by our South Dakota operations of $15.0 million, or 17.9%, as a result of a substantial decrease in market prices for wholesale electricity as compared to the unusually high market prices in 2001. Overall gross margin as a percentage of revenues in 2002 was 61.5%, as compared to 78.5% in 2001. This decrease was the result of the substantial decline in wholesale electric margins from market price fluctuations and the influence of lower margin Montana operations as compared to our South Dakota operations.

Operating, general and administrative expenses were $169.7 million in 2002, an increase of $142.0 million, or 512.0%, over the

33

2001 results. This increase was nearly all due to the addition of our Montana operations. Depreciation for 2002 was $48.9 million, an increase of $35.7 million primarily due to the addition of our Montana operations.

Operating income in 2002 was $109.7 million, an increase of $70.0 million, or 176.4%, over 2001. The increase was attributable to the addition of approximately $81.8 million in operating income from our Montana operations, while the South Dakota operations experienced a decrease of $11.8 million in operating income, primarily from the absence of unusually high margin wholesale electric sales in 2002.

### *Natural Gas Utility Segment Operations*

### Year Ended December 31, 2003 Compared with Year Ended December 31, 2002

Revenues in 2003 were $344.8 million, an increase of $105.0 million, or 43.8%, from 2002 results. The January 2003 results of our Montana operations contributed approximately $20.4 million of this increase. Revenues for February through December 2003, as compared to the same period in 2002, increased $84.6 million due in part to a $25.3 million increase in gas supply costs. As these costs are also reflected in cost of sales, there is no gross margin impact. Also contributing to this increase was a $59.9 million increase in wholesale and retail revenues. Wholesale revenues increased due to a 10% increase in volumes resulting from the addition of ethanol plant customers and a 43.4% increase in gas prices in Nebraska. Retail revenues increased as a result of sales to other utilities, partially offset by a 1% decrease in volumes. As the revenue from sales to other utilities benefits our general business customers, these sales are also included in cost of sales, thereby having no impact on gross margin.

Cost of sales in 2003 was $235.0 million, an increase of $101.9 million, or 76.5%, from 2002 results. The January 2003 results of our Montana operations contributed approximately $19.5 million of this increase. Cost of sales for February through December 2003, as compared to the same period in 2002, increased $92.4 million. Gas supply costs increased $33.3 million, including a $6.2 million write-off of supply costs as a result of a July 3, 2003, interim order from the MPSC disallowing the recovery of certain gas supply costs. The MPSC also rejected a motion for reconsideration filed by us on July 14, 2003. We filed suit in Montana state court on July 28, 2003, seeking to overturn the MPSC's decision to disallow recovery of these costs. Assuming our average forecast price over the next six months occurs, the disallowance on the volumes at the imputed price compared to market price would be approximately $2.8 million for the period July 1, 2003, through June 30, 2004. In addition, wholesale and retail costs increased $59.1 million due to the increased wholesale volumes and the higher retail sales for resale discussed above.

Gross margins for 2003 were $109.7 million, or $3.1 million higher as compared to 2002. The January 2003 results of our Montana operations contributed approximately $10.9 million of this increase. Margins for February through December 2003, as compared to the same period in 2002, decreased $7.8 million primarily due to the MPSC's disallowance of $6.2 million in gas supply costs. Margins as a percentage of revenues decreased to 31.8% for 2003 from 44.5% for 2002. Gross margin as a percentage of revenue is impacted by the fluctuations that occur in retail costs, which are collected from customers through rates.

Operating, general and administrative expenses for 2003 were $72.7 million, an increase of $12.5 million, or 20.7%, from results in 2002. The January 2003 results of our Montana operations contributed approximately $3.5 million of this increase. The remaining increase was primarily due to an increase in our environmental reserve based on the results of a third-party evaluation. Depreciation expense increased $1.5 million over depreciation for 2002. The January 2003 results of our Montana operations contributed approximately $1.0 million of this increase.

Operating income in 2003 was $23.0 million, compared to income of $33.9 million in the same period 2002. The January 2003 results of our Montana operations contributed an increase of approximately $6.4 million, which was offset by the MPSC's disallowance of $6.2 million in gas supply costs and an increase to our environmental reserve.

### Year Ended December 31, 2002 Compared with Year Ended December 31, 2001

Revenues in 2002 were $239.8 million, an increase of $95.6 million, or 66.3%, from 2001 results. Revenues for the period reflect the inclusion of our Montana operations, which contributed $119.6 million in revenues. In addition, our South Dakota operations contributed revenues of $120.2 million for 2002, which was a decrease of $24.0 million, or 16.7%, from 2001. This decrease was principally the result of a drop in commodity prices reflected within the South Dakota operations during 2002 compared to 2001, and a decrease in volumes as a result of warmer weather in the Nebraska and South Dakota service territories in 2002 than in 2001.

Cost of sales in 2002 was $133.1 million, an increase of $14.1 million, or 11.8%, from the 2001 results. Cost of sales for the period reflect the inclusion of our Montana operations, which contributed $38.9 million in cost of sales, and a decrease in cost of sales from our South Dakota business of $24.9 million, or 20.9%. This decrease occurred primarily as a result of lower commodity prices and reduced retail volumes from warmer weather in 2002 than in 2001.

Gross margin in 2002 was $106.7 million, an increase of $81.5 million, or 324.1%, over the 2001 gross margin of $25.2 million. This increase was nearly all due to the contribution of $80.7 million in gross margin by our Montana operations. In addition, our South Dakota operations experienced a $0.8 million increase in margins due to increased volumes in the nonregulated gas segment. Overall gross margin as a percentage of revenues in 2002 was 44.5%, as compared to 17.4% in 2001, resulting primarily from the higher margin impact from the Montana operations. The higher margins from the Montana operations are principally due to NorthWestern owning the natural gas transmission system in Montana on which we collect tariff revenues and margins, as compared to South Dakota and Nebraska operations where third parties own the transmission systems and NorthWestern pays these costs which are then passed on to ratepayers as a component of the natural gas costs.

Operating, general and administrative expenses in 2002 were $60.2 million, an increase of $45.7 million, or 314.0%, over 2001 results primarily due to the addition of our Montana operations. Depreciation expense was $12.6 million in 2002, an increase of $9.3 million over 2001. This increase was also primarily due to the addition of our Montana operations.

Operating income in 2002 was $33.9 million, an increase of $27.7 million, or 446.7%, from 2001, primarily due to the addition of our Montana operations, which contributed $30 million in operating income, while operating income from the South Dakota operations declined by $2.3 million.

### All Other Operations

All Other primarily consists of our other miscellaneous service activities that are not included in the other identified segments, together with the unallocated corporate costs and investments, and any eliminating amounts. The miscellaneous service activities principally include unregulated businesses offering a portfolio of services to residential and business customers, including product sales and maintenance contracts in areas such as home monitoring devices and appliances.

### Year Ended December 31, 2003 Compared with Year Ended December 31, 2002

Revenues for the segment in 2003 were $9.6 million compared to $10.0 million in 2002. Cost of sales in 2003 was $2.8 million, which was consistent with 2002. Gross margin in 2003 was $6.8 million compared to $7.2 million in 2002.

Operating expenses in 2003 were $72.5 million, a decrease of $3.3 million, or 4.4%, from 2002. The decrease was primarily due to lower asset impairment charges of $23.3 million with respect to the investment in the Montana First Megawatts project offset by an increase in legal and professional fees of approximately $11.7 million and reorganization expenses of $8.3 million.

Operating losses in 2003 were $65.7 million, a decrease of $2.9 million, or 4.2%, from 2002. The change was primarily due to the changes in operating expenses discussed above.

### Year Ended December 31, 2002 Compared with Year Ended December 31, 2001

Revenues for the segment in 2002 were $10.0 million compared to $3.9 million in 2001. Cost of sales in 2002 was $2.8 million, a decrease of $0.7 million from 2001. Gross margin in 2002 was $7.2 million compared to $0.5 million in 2001. The increase in revenues and gross margin is due to the addition of the unregulated portions of our Montana operations.

Operating expenses in 2002 were $75.8 million, an increase of $47.3 million from 2001. The increase was primarily due to a $35.7 million asset impairment charge related to the investment in the Montana First Megawatts project, increased expenses related to employee benefit plans, and additional operating expenses due to the addition of our Montana operations, offset by a restructuring charge in 2001.

Operating losses in 2002 were $68.6 million, an increase of $40.6 million from 2001. The increase was primarily due to the previously mentioned asset impairment charges.

### Discontinued Communications Segment Operations

In October 2003, we were authorized to complete the sale of Expanets' assets. On November 25, 2003, Expanets closed on an Asset Purchase and Sale Agreement to sell substantially all the assets and business of Expanets to Avaya, Inc. (Avaya) and retained certain specified liabilities. Thereafter, Expanets was renamed Netexit, Inc. (Netexit), which will continue as a non-operating company until its affairs can be wound down in accordance with its lending agreements, its corporate charter and provisions of Delaware law. Under the terms of the agreement, a $4 million "break-up fee" was paid to a third party originally involved in the transaction and Avaya paid Netexit cash of approximately $50.8 million and assumed debt of approximately $38.1 million.

In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not assumed by Avaya, and certain indemnification obligations of Netexit, respectively. Avaya also reduced cash paid at closing by approximately $44.6 million as a working capital adjustment, pending the determination of a final closing balance sheet. On February 24, 2004, Avaya submitted its proposed final calculation of the working capital adjustment asserting that there was a working capital shortfall at Expanets of approximately $48.8 million at closing, and claiming that Avaya should retain the entire holdback amount plus an additional $4.2 million. Netexit disputes this calculation and believes that pursuant to the terms of the asset purchase agreement Netexit is owed additional cash ranging from $10 million to $20 million (resulting in potential net cash proceeds to Netexit of $60.8 million to $70.8 million). The dispute over the working capital adjustment is subject to an arbitration process, which is expected to be decided in May 2004.  Pending resolution of the final balance sheet, the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit.  If Netexit cannot wind-down its affairs in an orderly manner pursuant to applicable provisions of Delaware law, it may be forced to file bankruptcy.  We have recognized an estimated loss on disposal of approximately $49.3 million based on the terms of the sale and our expectation of the amount to be received from Avaya.  An additional loss may arise based on the results of the arbitration process discussed above.

Summary financial information for the discontinued Expanets operations is as follows (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Revenues | $ 541,211 | $ 710,452 | $ 1,032,033 |
| Income (Loss) before income taxes and minority interests | $ 1,360 | $ (422,802) | $ (119,198) |
| Estimated loss on disposal | (49,250) | — | — |
| Minority interests | — | 11,152 | 127,893 |
| Income tax benefit (provision) | — | (22,780) | 32,190 |
| Loss from discontinued operations, net of income taxes and minority interests | $ (47,890) | $ (434,430) | $ 40,885 |

Expanets' income before income taxes and minority interests for the year ended December 31, 2003, includes a gain on debt extinguishment of $27.3 million.

### Discontinued HVAC Segment Operations

Blue Dot sold 48 businesses during 2003, repaid its credit facility from sales proceeds and terminated the facility. As of December 31, 2003, Blue Dot has 14 remaining businesses. (Subsequent to December 31, 2003, Blue Dot has sold 6 additional businesses as of March 1, 2004.) Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004. We hope to receive in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided however, this assumes satisfactory resolutions to remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation. Furthermore, it assumes that the remaining businesses produce their projected cash proceeds and receivables from various sold locations are collectible.

Summary financial information for the discontinued Blue Dot operations is as follows (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Revenues | $ 400,679 | $ 471,824 | $ 423,803 |
| Income (Loss) before income taxes and minority interests | $ (3,356) | $ (311,674) | $ (17,392) |
| Gain on disposal | 14,352 | — | — |
| Minority interests | — | 3,762 | 13,555 |
| Income tax benefit (provision) | — | (9,071) | 3,830 |
| Income (Loss) from discontinued operations, net of income taxes | $ 10,996 | $ (316,983) | $ (7) |

## LIQUIDITY AND CAPITAL RESOURCES

Our financial condition has been significantly and negatively affected by the poor performance of our nonenergy businesses and our significant indebtedness.

On September 14, 2003, the Bankruptcy Court gave interim approval for access of up to $50 million of our $100 million DIP Facility.  On November 7, 2003, the Bankruptcy Court entered a final order to approve the DIP Facility and our access increased to $85 million under this facility.  In December 2003, we reduced the commitment to $85 million under this facility.  The DIP Facility expires on

September 12, 2004, and bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility requires that we maintain certain other financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments and sales of assets. As of December 31, 2003, we had $15.2 million in letters of credit outstanding and no borrowings under the DIP Facility.

We reached an agreement with the lenders holding claims under our senior credit facility agented by CSFB in October 2003 to reduce the interest rate of our $390 million prepetition credit facility. In January 2004, the Bankruptcy Court entered a final order authorizing the amendment of the credit facility and granting protection in connection therewith. The amended credit facility provides advantages to NorthWestern, including lower interest expense and allowing reinstatement upon NorthWestern's emergence from Chapter 11. At NorthWestern's option, the amended credit facility bears interest at a variable rate tied to the Eurodollar rate, plus a spread of 5.50%, or at an alternate base rate, as defined by the amended credit facility, plus a spread of 3.50%. There is no longer a minimum floor for the Eurodollar rate or the alternate base rate. As a result of this amendment, we estimate annualized interest expense will be reduced by approximately $6 million to $8 million.

## Cash Flows

Cash used in continuing operations totaled $105.7 million during 2003, compared to cash provided of $125.6 million in 2002 and $16.4 million in 2001. Cash flows from operations decreased significantly during 2003, primarily due to our deteriorating financial condition, reduced vendor credit terms (including requirement of deposits), increased legal and professional fees, and increased interest expense. As a result of our bankruptcy filing, we anticipate our cash flows from operations will improve during 2004, primarily due to our inability to pay interest on unsecured debt. Cash provided by continuing operations increased during 2002, compared with 2001, primarily due to the addition of our Montana operations.

Cash provided by investing activities totaled $4.9 million during 2003, compared to cash used of $641.1 million in 2002 and $80.7 million in 2001. Cash provided in 2003 was primarily due to proceeds from investment sales offset by property additions. Cash used in 2002 was principally due to the acquisition of our Montana operations, which accounted for approximately $502.8 million. Cash used in 2001 was almost entirely due to property, plant and equipment additions.

Cash provided by financing activities totaled $77.6 million during 2003, compared to $732.6 million in 2002 and $200.2 million in 2001. During 2003 we received proceeds of $390.0 million under a new senior secured term loan, which was used to repay $255.0 million on our credit facility. During 2002, we received proceeds of $720.0 million from the issuance of senior notes, which was used to acquire our Montana operations and repay existing debt. During 2001, we received proceeds of $74.9 million and $100.0 million from the issuance of common stock and trust preferred securities, respectively.

## Capital Requirements

Our capital expenditures program is subject to continuing review and modification. Actual utility construction expenditures may vary from estimates due to changes in electric and natural gas projected load growth, changing business operating conditions and other business factors. We anticipate funding capital expenditures through cash flows from operations and available credit sources. Our estimated cost of capital expenditures for the next five years is as follows (in thousands):

| Year | Amount |
|------|--------|
| 2004 | $ 77,000 |
| 2005 | 71,000 |
| 2006 | 71,500 |
| 2007 | 72,000 |
| 2008 | 72,500 |

**Contractual Obligations and Other Commitments**

NorthWestern has a variety of contractual obligations and other commercial commitments that represent prospective requirements in addition to expense. The following table shows our contractual cash obligations and commercial commitments as of December 31, 2003, without regard to the reclassification of long-term debt to current. See additional discussion in Note 9 to the Consolidated Financial Statements.

| | Total | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | |
| **Debt Not Subject to Compromise:** | | | | | | | |
| Senior Secured Term Loan(1) | $ 386,100 | $ 3,900 | $ 3,900 | $ 378,300 | $ — | $ — | $ — |
| South Dakota Mortgage Bonds, 7.00% and 7.10% | 115,000 | — | 60,000 | — | — | — | 55,000 |
| South Dakota Pollution Control Obligations, 5.85% and 5.90% | 21,350 | — | — | — | — | — | 21,350 |
| Montana First Mortgage Bonds, 7.00%, 7.30%, 8.25% and 8.95% | 157,197 | — | 5,386 | 150,000 | 365 | | 1,446 |
| Discount on Montana First Mortgage Bonds | (3,483 ) | — | — | — | — | — | (3,483) |
| Montana Pollution Control Obligations, 6.125% and 5.90% | 170,205 | — | — | — | — | — | 170,205 |
| Montana Secured Medium Term Notes, 7.25% | 13,000 | — | — | — | — | 13,000 | — |
| Montana Natural Gas Transition Bonds, 6.20% | 46,502 | 4,052 | 4,744 | 4,712 | 5,248 | 5,391 | 22,355 |
| Other debt, various | 1,122 | 320 | 343 | 221 | 238 | — | — |
| Capital leases(2) | 12,399 | 3,371 | 2,146 | 1,798 | 1,194 | 738 | 3,152 |
| **Total Debt Not Subject to Compromise** | 919,392 | 11,643 | 76,519 | 535,031 | 7,045 | 19,129 | 270,025 |
| **Debt Subject to Compromise:** | | | | | | | |
| Senior Unsecured Notes, 7.875% and 8.75% | 720,000 | — | — | — | 250,000 | — | 470,000 |
| Senior Unsecured Debt, 6.95% | 105,000 | — | — | — | — | — | 105,000 |
| Montana Unsecured Medium Term Notes, 7.07%, 7.96% and 7.875% | 40,000 | — | — | 15,000 | — | — | 25,000 |
| Discount on Montana Unsecured Medium Term Notes | (156 ) | — | — | — | — | — | (156) |
| **Total Debt Subject to Compromise** | 864,844 | — | — | 15,000 | 250,000 | — | 599,844 |
| **Total Mandatorily Redeemable Preferred Securities of Subsidiary Trusts** | 365,550 | — | — | — | — | — | 365,550 |
| **Future minimum operating lease payments(3)** | 227,562 | 33,133 | 32,849 | 32,572 | 32,288 | 32,268 | 64,452 |
| **Estimated Pension and Other Postretirement Obligations(4)** | 116,000 | 16,000 | 25,000 | 25,000 | 25,000 | 25,000 | N/A |
| **Qualifying Facilities(5)** | 1,818,673 | 54,823 | 56,579 | 58,468 | 60,634 | 62,931 | 1,525,238 |
| **Power Purchase Contracts(6)** | 1,235,826 | 250,983 | 227,693 | 164,953 | 98,383 | 45,333 | 448,481 |
| **Interest payments on existing secured debt** | 439,327 | 61,440 | 58,613 | 52,557 | 18,646 | 17,418 | 230,653 |
| **Total Commitments** | $ 5,987,174 | $ 428,022 | $ 477,253 | $ 883,581 | $ 491,996 | $ 202,079 | $ 3,504,243 |

(1)  This facility was used to repay our $280 million credit facility on February 10, 2003.

(2)  The capital lease obligations are principally used to finance equipment purchases.

(3)  While not included on this schedule, NorthWestern has a residual value guarantee related to certain vehicles under operating leases by Blue Dot in the event of default and subsequent failure to cure such default. At December 31, 2003, the amount of this financial guarantee was approximately $5.2 million.  In connection with the various sales of Blue Dot businesses, the vehicle lessor has agreed to terminate the NorthWestern guarantee of Blue Dot's performance under the vehicle leases.

(4)  We have only estimated cash obligations related to our pension and other postretirement benefit programs for five years, as it is not practicable to estimate thereafter.

38

(5)  With the acquisition of our Montana operations, we assumed a liability for expenses associated with certain Qualifying Facilities Contracts, or QFs. The QFs require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our estimated gross contractual obligation related to the QFs is approximately $1.8 billion. A portion of the costs incurred to purchase this energy is recoverable through rates authorized by the MPSC, totaling approximately $1.4 billion. The obligation and payments reflected on this schedule represent the estimated gross contractual obligation.

(6)    We have entered into various purchase commitments, largely purchased power, coal and natural gas supply, electric generation construction and natural gas transportation contracts. These commitments range from one to 30 years.

### *Performance Bonds and Letters of Credit*

We have various letter of credit requirements and other collateral obligations of approximately $16.4 million and $48.1 million as of December 31, 2003 and 2002, respectively.

Blue Dot and Expanets have obtained various license, bid and performance bonds in place to secure the performance of contracts and the adequate provision of services. The total amount of outstanding surety bonds obtained by Blue Dot and Expanets is approximately $59.5 million as of December 31, 2003.  Due to completion of work and as a result of the sale of Expanets and certain Blue Dot businesses, we estimate the amount of the underlying obligations that such bonds secure is $3.5 million and $14.3 million as of December 31, 2003 and 2002, respectively.

The surety bonds obtained by Blue Dot and Expanets are supported by indemnity agreements that we entered into for the benefit of Blue Dot and Expanets and are secured by various letters of credit obtained by Blue Dot, Expanets or us. Approximately $10 million and $18.6 million of these letter of credit and other collateral obligations as of December 31, 2003 and 2002, respectively, serve to support performance bonds primarily related to Blue Dot and Expanets. In addition, included in other assets at December 31, 2003, is $7.1 million of deposits that support performance bonds related to Blue Dot and Expanets. No such amounts existed at December 31, 2002.

### *Defined Benefit Pension and Postretirement Benefit Plans.*

With the acquisition of our Montana operations, our pension and other postretirement benefit obligations significantly increased. Our reported costs of providing pension and other postretirement benefits, as described in Note 15 of "Notes to the Consolidated Financial Statements" contained in Item 8, are dependent upon numerous factors resulting from actual plan experience and assumptions of future experience.

Pension and other postretirement benefit costs are impacted by actual employee demographics, including age and compensation levels, the level of contributions we make to the plan, earnings on plan assets, and health care cost trends. Changes made to the provisions of such plans may also impact current and future benefit costs. Benefit costs may also be significantly affected by changes in key actuarial assumptions, including anticipated rates of return on plan assets and the discount rates used in determining the postretirement benefit obligation and postretirement costs.

As a result of the factors listed above, significant portions of pension and other postretirement benefit costs recorded in any period do not reflect, and are generally greater than, the actual benefits provided to plan participants.

Our pension and other postretirement benefit plan assets are primarily made up of equity and fixed income investments. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased pension and other postretirement benefit costs in future periods. Likewise, changes in assumptions regarding current discount rates and expected rates of return on plan assets could also increase or decrease recorded pension and other postretirement benefit costs.

At December 31, 2003, our accumulated benefit obligation exceeded plan assets by approximately $116.2 million for our pension plans. In addition, our projected benefit obligation for other postretirement benefit plans exceeded plan assets by $61.5 million. Additional contributions may be required in the near future to meet the requirements of the plan to pay benefits to plan participants. To the extent such additional contributions are reflected in the ratemaking process to determine the rates billed to customers, such amounts will be treated as regulatory assets. For the years ended December 31, 2003 and 2002, contributions to our pension and other postretirement benefit plans were $46.8 million and $7.4 million. No contributions were made during 2001. The increase in contributions for fiscal 2003 was the result of the acquisition of our Montana operations and the excess of our accumulated benefit obligations over plan assets.

**Capital Sources**

During 2003 and 2002, we raised cash proceeds from the following offerings of our securities and new debt facilities.

In February 2003, we closed and received funds from a $390.0 million senior secured term loan. The net proceeds of $366.0 million, after payment of financing costs and fees, were used to repay $259.6 million outstanding under the existing $280.0 million bank credit facility and existing outstanding letters-of-credit. The remaining proceeds of the term loan were used to fund working capital and other general corporate purposes.

On October 8, 2002, we completed a 10 million share common stock offering. The offering raised $81.0 million of net proceeds, after expenses and commissions. The net proceeds were used for general corporate purposes, including reducing amounts drawn under our credit facility.

On March 13, 2002, we issued $250 million of our 7.875% senior notes due March 15, 2007, and $470 million of our 8.75% senior notes due March 15, 2012, which resulted in net proceeds to us of $713.9 million. We applied these net proceeds together with available cash to fully repay and terminate the $720 million term loan portion of our credit facility. On March 28, 2002, we entered into two fair value hedge agreements, each of $125.0 million, to effectively swap the fixed interest rate on our $250 million five-year senior notes to floating interest rates at the three month London Interbank Offered Rate plus spreads of 2.32% and 2.52%, effective as of April 3, 2002. These fair value hedge agreements were settled on September 17, 2002, resulting in $17.0 million of proceeds and an unrecognized gain to us. The unrecognized gain is recorded in Other Noncurrent Liabilities and will be recognized as a reduction of interest expense over the remaining life of the notes. On the nine remaining coupon payments on the five-year notes, the amortization of the gain equates to a $1.9 million interest savings per coupon payment, effectively lowering the annual interest rate on the five-year notes to 6.3%.

On February 15, 2002, in connection with the completed acquisition of The Montana Power Company's energy distribution and transmission business, we assumed $511.1 million of debt and preferred stock net of cash received from The Montana Power Company, and we entered into a $720.0 million term loan and drew down a $19.0 million swing line commitment under our $280.0 million revolving credit facility to fund our acquisition costs and repay borrowings of $132.0 million outstanding under our existing recourse bank credit facility. The $511.1 million of assumed debt and preferred stock includes various series of mortgage bonds, pollution control bonds and notes that bear interest rates between 5.90% and 8.95%. These include both secured and unsecured obligations with maturities that range from 2003 to 2026.

On January 31, 2002, NorthWestern Capital Financing III sold 4.0 million shares of its 8.10% trust preferred securities, and on February 5, 2002, sold an additional 440,000 shares of its 8.10% trust preferred securities pursuant to an overallotment option. We received approximately $107.4 million in net proceeds from the offering, which we used for general corporate purposes and to repay a portion of the amounts outstanding under our old credit facility.

**NEW ACCOUNTING STANDARDS**

See Note 4 of "Notes to Consolidated Financial Statements," included in Item 8 herein for a discussion of new accounting standards.

**RISK FACTORS**

You should carefully consider the risk factors described below, as well as other information included in this Annual Report on Form 10-K, before making an investment in our common stock or other securities. The risks and uncertainties described below are not the only ones facing our company. Additional risks and uncertainties not presently known or that we currently believe to be less significant may also adversely affect us.

**Bankruptcy Related Risks**

**Our Plan of Reorganization may not be confirmed by the Bankruptcy Court and may not be successfully consummated.**

Our future results are dependent upon successfully obtaining approval, confirmation and implementation of our plan of reorganization. There can be no assurance that our plan of reorganization will be confirmed by the Bankruptcy Court. Section 1129 of Chapter 11 requires, among other things, a showing that confirmation of the plan will not be followed by liquidation or the need for further financial reorganization, and that the value of distributions to dissenting holders of claims and interests may not be less than the value such holders would receive if the Company were liquidated under Chapter 7 of the United States Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude the plan satisfies the requirements of Section 1129. Conversely, the Bankruptcy Court may confirm a plan even though it was not accepted by one or more impaired classes of creditors, if certain requirements of Chapter 11 are met. Currently, it is not possible to predict with certainty the length of time we will operate under the protection of Chapter 11, the outcome of the Chapter 11 proceedings in general, or the effect of the proceedings on our business or on the interests of the various creditors and stakeholders.

In January 2004, the Bankruptcy Court extended our exclusive period to file a plan of reorganization through and including March 12, 2004, and extended the time to solicit votes on our plan of reorganization through and including May 11, 2004. We filed our initial plan of reorganization on March 12, 2004. Even if the Bankruptcy Court confirms our plan, consummation of the plan will likely be dependent upon a number of other conditions. There can be no assurance that any or all of the conditions in the plan will be met (or waived) or that the other conditions to consummation of the plan, if any, will be satisfied. Accordingly, we can provide no assurances that the plan will be consummated and the restructuring completed. If a plan is not timely consummated, it could result in our Chapter 11 proceedings becoming protracted or being converted into Chapter 7 liquidation proceedings, either of which could substantially erode the value of our enterprise to the detriment of all stakeholders.

**The Creditors' Committee and other parties in interest may not support our positions in the Chapter 11 proceedings.**

The Creditors' Committee appointed in the bankruptcy proceedings has the right to be heard on all matters that come before the Bankruptcy Court. We are also subject to regulation by FERC and the state public service or utility commissions in the states we serve. There can be no assurance that the Creditors' Committee, our equity holders other parties in interest or our primary regulators will support our positions in the bankruptcy proceeding or the plan of reorganization once proposed, and disagreements between us and such entities could protract the bankruptcy proceedings, could negatively impact our ability to operate during bankruptcy, and could delay our emergence from bankruptcy.

**Our Chapter 11 proceedings may result in a negative public perception of us that may adversely affect our relationships with customers and suppliers, as well as our business, results of operations and financial condition.**

Even if we submit a plan of reorganization that is confirmed by the Bankruptcy Court and consummated by us, our Chapter 11 filing and the resulting uncertainty regarding our future prospects may hinder our ongoing business activities and its ability to operate, fund and execute our business plan by (i) impairing relations with existing and potential customers; (ii) negatively impacting our ability to attract, retain and compensate key executives and associates and to retain employees generally; (iii) limiting our ability to obtain trade credit; and (iv) impairing present and future relationships with vendors and service providers.

**Holders of certain claims and interests will receive no distributions under our proposed Plan of Reorganization.**

Under Chapter 11, the rights and treatment of prepetition creditors and equity security holders may be substantially altered. At this time, it is not certain what effect the Chapter 11 proceedings will have on our creditors and common shareholders. Under the priority rules established by Chapter 11, certain postpetition liabilities and prepetition liabilities need to be satisfied before shareholders are entitled to receive any distribution. The ultimate recovery to our creditors and common shareholders, if any, will not be determined until confirmation of a plan of reorganization. No assurance can be given as to what values, if any, ultimately will be ascribed in the Chapter 11 proceedings to each of these constituencies. Under any plan of reorganization in the Chapter 11 proceedings, management of NorthWestern expects that unsecured claims against us will be satisfied at a fraction of their face value, and that there will be no value available for distribution to our common shareholders. Because of this, any investment in our common stock is highly speculative. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our equity or debt securities.

**We have incurred, and expect to continue to incur, significant costs associated with the Chapter 11 proceedings.**

We have incurred and will continue to incur significant costs associated with the reorganization. The amount of these costs, which are being expensed as incurred, are expected to have a significant adverse affect on the results of operations and cash flows.

**We must replace our debtor-in-possession credit facility (DIP Facility) in order to emerge from bankruptcy and continue normal operations.**

Our DIP Facility is intended to provide us with financing during our reorganization. We will need a replacement financing, known as an exit facility, to provide financing following our recapitalization. We may use our DIP Facility to provide the cash for our daily operations and to finance our capital expenditures. If we do not obtain a replacement facility in a timely fashion, then we may not be able to implement our recapitalization.

**Our ability to raise capital and the liquidity of our stock may be adversely affected by the fact that our shares are not listed on the New York Stock Exchange or another major exchange.**

On September 15, 2003, in connection with our Chapter 11 filing the NYSE suspended trading on our common stock and all series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the NYSE to delist our common stock and trust preferred securities. Our common shares are now quoted on Nasdaq's OTC Bulletin Board. The fact that our common stock and all series of our trust preferred securities are not listed on the NYSE or any other major exchange could reduce the

41

liquidity of such securities and make it more difficult for a shareholder to obtain accurate quotations as to the market price of such securities. Reduced liquidity of our common stock and all series of our trust preferred securities also may reduce our ability to access the capital markets in the future. In addition, under our proposed plan of reorganization in the Chapter 11 proceedings, our existing equity securities will be cancelled and we will issue new equity securities to certain of our creditors upon our emergence from Chapter 11 in full or partial satisfaction of creditor claims. There can be no assurance that any of our new equity securities issued under the plan of reorganization will be listed on any major exchange.

**Our ability to continue as a going concern is dependent on a number of factors.**

The accompanying financial statements have been prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. As a result of the bankruptcy filing and related events, there is no assurance that the carrying amounts of assets will be realized or that liabilities will be liquidated or settled for the amounts recorded. In addition, a plan of reorganization, or rejection thereof, could change the amounts reported in the financial statements. As a result, there is substantial doubt about our ability to continue as a going concern. Our liquidity generally depends on cash provided by operating activities and access to the DIP Facility. Our ability to continue as a going concern (including our ability to meet postpetition obligations) and the continued appropriateness of using the going concern basis for our financial statements are dependent upon, among other things, (i) our ability to comply with the covenants of the DIP Facility, (ii) our ability to maintain adequate cash on hand, (iii) our ability to continue to generate cash from operations, (iv) confirmation of a plan of reorganization under the Bankruptcy Code and the terms of such plan, (v) our ability to attract, retain and compensate key executives and associates and to retain employees generally, and (vi) our ability to achieve profitability following such confirmation.

**Our Chapter 11 filings triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations.**

At December 31, 2003, we had a significant common shareholders' deficit and currently have approximately $2.2 billion in debt and trust preferred instruments outstanding. After failing to implement an out-of-court turnaround plan, we filed a petition with the Bankruptcy Court in order to reorganize our capital and debt structure under Chapter 11 of the Bankruptcy Code. The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations. However, under Chapter 11, actions by creditors to collect claims on prepetition debt are stayed or deferred unless specifically ordered by the Bankruptcy Court.

We may, under certain circumstances, file motions with the Bankruptcy Court to assume or reject our executory contracts. An executory contract is one in which the parties have mutual obligations to perform (e.g., contracts of affreightment, charters, equipment leases and real property leases). Unless otherwise agreed, the assumption of a contract will require that we cure all prior defaults under the related contract, including all prepetition liabilities. Unless otherwise agreed, the rejection of a contract is deemed to constitute a breach of the agreement as of the moment immediately preceding the Chapter 11 filing, giving the other party to the contract a right to assert a general unsecured claim for damages arising out of the breach. Additional liabilities subject to the proceedings may arise in the future as a result of the rejection of executory contracts, including leases, and from the determination of the Bankruptcy Court (or agreement by parties in interest) of allowed claims for contingencies and other disputed amounts. Conversely, the assumption of executory contracts and unexpired leases may convert liabilities shown as subject to compromise to postpetition liabilities. Due to the uncertain nature of many of the potential claims, we are unable to project the magnitude of such claims with any degree of certainty.

**If we are unable to successfully sell our noncore assets, then the amount of proceeds we receive from such sales could be significantly less than anticipated and adversely affect our liquidity.**

As part of our efforts to restructure our business, we are attempting to divest certain noncore assets, including Expanets, Blue Dot and our Montana First Megawatts generation project in Montana. If the sales price for such assets is less than anticipated, or we encounter unexpected liabilities in connection with such sales, such as an unfavorable resolution of our purchase price dispute with Avaya regarding the sale of Expanets or costs relating to the wind-down of such operations, including termination of benefit plans and payment of other liabilities, our liquidity could be adversely affected. Further, we cannot assure you that we will be able to consummate such asset sales or that any asset sales will be at or greater than the current net book value of such assets.

**Company Specific Risks**

**We are one of several defendants in a class action lawsuit brought in connection with the sale of generating and energy-related assets by The Montana Power Company. If we do not successfully resolve this lawsuit, the insurance coverage does not pay for any damages we are found liable for, or our indemnification claims against TouchAmerica Holdings, Inc. cannot be enforced and reimbursed, then our business will be harmed and there will be material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.**

We are one of several defendants in a class action lawsuit entitled *McGreevey, et al. v. The Montana Power Company, et al*., now pending in federal court in Montana. The lawsuit, which was filed by the former shareholders of The Montana Power Company (many of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company was void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern Corporation is named as a defendant due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. On November 6, 2003, the Bankruptcy Court approved a stipulation between NorthWestern and the plaintiffs in *McGreevey, et al. v. The Montana Power Company, et al.* The stipulation provides that litigation, as against Northwestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey, shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to Northwestern, the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material. If the stay is lifted, then we intend to vigorously defend against these lawsuits. In that event, we cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

**We are the subject of a formal investigation by the Securities and Exchange Commission relating to the restatement of our 2002 quarterly financial statements and other accounting and financial reporting matters. If the investigation was to result in a regulatory proceeding or action against us, then our business and financial condition could be harmed.**

In December 2003, the SEC notified NorthWestern that it had issued a formal order of private investigation and subsequently subpoenaed documents from NorthWestern, NorthWestern Communications Solutions, Expanets and Blue Dot. This action follows the SEC's requests for information made in connection with the previously disclosed SEC informal inquiry into questions regarding the restatements and other accounting and financial reporting matters. In addition, a NorthWestern director was interviewed by a representative of the Federal Bureau of Investigation (FBI) concerning certain of the allegations made in the class action securities and derivative litigation matters. We have not been contacted by the FBI and have not been advised that NorthWestern is the target of its investigation. We are cooperating with the SEC's investigation and intend to cooperate with the FBI if we are contacted in connection with its investigation. We understand that the FBI or the Internal Revenue Service (IRS) may have contacted former employees of ours or our subsidiaries. As of the date hereof, we are not aware of any other governmental inquiry or investigation related to these matters. We cannot predict whether or not any other governmental inquiry or investigation will be commenced, nor can we predict the outcome of the SEC, FBI, IRS or any other governmental inquiry or investigation or related litigation or proceeding.

**The impact of ongoing class action litigation and shareholder derivative actions may be material. We are also subject to the risk of additional litigation and regulatory action in connection with the restatement of our 2002 quarterly financial statements and the potential liability from any such litigation or regulatory action could materially harm our business and may have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.**

We, and certain of our present and former officers and directors, have been named in several class action lawsuits and shareholder derivative actions commenced in or removed to federal court and described in detail above. A tentative settlement has been reached in the consolidated securities class action and consolidated derivative litigation as described earlier. Among the terms of the proposed settlement, we, Expanets, Blue Dot and other parties and persons will be released from all claims relating to these cases, a settlement fund in the amount of $41 million (of which approximately $37 million will be contributed by our directors and officers liability insurance carriers, and $4 million would be contributed from other persons and parties) will be established, and, if Netexit seeks bankruptcy protection, the plaintiffs would have a $20 million liquidated securities claim against Netexit. However, that proposed settlement is subject to several conditions, such as approval by the Bankruptcy Court and the Federal District Court in South Dakota, which may or may not occur. If the proposed settlement of the consolidated class actions and derivative litigation is not consummated, then we intend to vigorously defend against these lawsuits. In that event, we cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

As a result of the restatement of our quarterly results for the first three quarters of 2002, we could become subject to additional shareholder derivative actions or other securities litigation. In addition, federal, state or local regulatory agencies, such as the FERC, state public utilities commissions, and/or the NYSE, could commence a formal investigation relating to the restatement of our quarterly results. The initiation of any additional securities litigation, together with the pending securities and shareholder derivative lawsuits described in this Annual Report, has had a material adverse affect on our business and financial condition. Until such inquiries, investigations, proceedings and litigation are resolved, it will be more difficult to raise additional capital or favorably refinance or restructure our debt or other obligations. If an unfavorable result occurred in any such action, our business and financial condition could be further harmed and there could be an adverse impact on our ability to timely confirm a plan of reorganization. In addition, we have incurred substantial expenses and are likely to incur additional substantial expenses in connection with such litigation and regulatory inquiries and investigations, including substantial fees for attorneys and other professional advisors. We may also be obligated to indemnify officers and directors named as defendants in such action. These expenses, to the extent not covered by available insurance, have and will continue to adversely affect our cash position.

**If the MPSC disallows the recovery of the costs incurred in entering into default supply portfolio contracts while we are required to act as the "default supplier," then we may not be able to fully recover the costs incurred in procuring default supply contracts, which could adversely affect our net income and financial condition.**

The 1997 Montana Restructuring Act, as amended, provides that certain customers be able to choose their electricity supplier during a transition period ending on June 30, 2027. NorthWestern Energy is required to act as the "default supplier" for customers who have not chosen an alternate supplier. The Restructuring Act provides for full recovery of prudently incurred costs for procuring a default supply portfolio of electric power. The default supplier was required to propose a "cost recovery mechanism" for electrical supply procurement costs before March 30, 2002. On April 25, 2002, the MPSC approved our proposed "cost recovery mechanism". Annual filings under this mechanism will address the recovery and tracking of all future electric default supply costs.

On June 21, 2002, the MPSC issued a final order approving contracts meeting approximately 60% of the default supply winter peak load and approximately 73% of the annual energy requirements. As a result of the order, NorthWestern Energy has implemented a procurement strategy that involves supplying the remainder of the default supply portfolio through open market purchases. Currently, NorthWestern Energy is making short-term purchases to fill intermediate and peak electricity needs. These short-term purchases, along with the MPSC approved base load supply, are being fully recovered through our annual electricity cost tracking process pursuant to which rates are based on estimated electricity loads and electricity costs for the upcoming tracking period and are annually reviewed and adjusted by the MPSC for any differences in the previous tracking year's estimates to actual information. This process is similar in many respects to the cost recovery process that has been utilized in Montana, South Dakota and other states for natural gas purchases for residential and commercial customers. The MPSC further stated that NorthWestern Energy has an ongoing responsibility to prudently administer its supply contracts and the energy procured pursuant to those contracts for the benefit of ratepayers. The MPSC could, in any particular year, disallow the recovery of a portion of the default supply costs if it makes a determination that NorthWestern Energy acted imprudently with respect to implementation of its open market purchase strategy or that the approved supply contracts were not prudently administered. A failure to recover such costs could adversely affect our net income and financial condition. On July 3, 2003, the MPSC issued an order disallowing the recovery of certain gas supply costs. The MPSC also granted an interim order on July 3, 2003, for the projected gas cost adjusted for a portion of the gas portfolio at a fixed price of $3.50 per MMBTU as opposed to the market price submitted in the original filing, which was higher. Assuming our average forecast price over the next 6 months occurs, the disallowance on the volumes at the imputed price compared to market price would be approximately $4.5 million for the period July 1, 2003 through June 30, 2004.

**We are subject to extensive governmental regulations that could impose significant costs or change rates of our operations and changes in existing regulations and future deregulation may have a detrimental effect on our business and could increase competition.**

Our operations and the operations of our subsidiary entities are subject to extensive federal, state and local laws and regulations concerning taxes, service areas, tariffs, issuances of securities, employment, occupational health and safety, protection of the environment and other matters. In addition, we are required to obtain and comply with a wide variety of licenses, permits and other approvals in order to operate our facilities. In the course of complying with these requirements, we may incur significant costs. If we fail to comply with these requirements, we could be subject to civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws, regulations, and interpretations thereof may be adopted or become applicable to us or our facilities and future changes in laws and regulations may have a detrimental effect on our business.

Our utility businesses are regulated by certain state commissions, including as of May 30, 2003, the Nebraska Public Service Commission, with regard to our natural gas businesses in that state. As a result, these commissions have the ability to review the regulated utility's books and records. This ability to review our books and records could result in prospective negative adjustments to our rates.

The United States electric utility and natural gas industries are currently experiencing increasing competitive pressures as a result of consumer demands, technological advances, deregulation, greater availability of natural gas-fired generation and other factors.

Competition for various aspects of electric and natural gas services is being introduced throughout the country that will open these markets to new providers of some or all of traditional electric utility and natural gas services. Competition is likely to result in the further unbundling of electric utility and natural gas services as has occurred in Montana for electricity and Montana, South Dakota and Nebraska for natural gas. Separate markets may emerge for generation, transmission, distribution, meter reading, billing and other services currently provided by electric utility and natural gas providers as a bundled service. As a result, significant additional competitors could become active in the generation, transmission and distribution segments of our industry.

Proposals have been introduced in Congress to repeal the Public Utility Holding Company Act of 1935, or PUHCA. To the extent regulatory barriers to entry are eliminated, competitive pressures increase, or the pricing and sale of transmission or distribution services or electricity or fuel assume more characteristics of a commodity business, we could face increased competition adverse to our business.

**We may not be able to fully recover transition costs, which could adversely affect our net income and financial condition.**

Montana law required the MPSC to determine the value of net unmitigable transition costs associated with the transformation of the former The Montana Power Company utility business from a vertically integrated electric service company to a utility providing only default supply and transmission and distribution services. The MPSC was also obligated to set a competitive transition charge, or CTC, to be included in distribution rates to collect those net transition costs. The majority of these transition costs relate to out-of-market power purchase contracts, which run through 2032, that the former owner of our Montana transmission and distribution business was required to enter into with certain "qualifying facilities" (QF) as established under the Public Utility Regulatory Policies Act of 1978. The former owner estimated the pretax net present value of its transition costs over the approximate 30-year period to be approximately $304.7 million in a filing with the MPSC on October 29, 2001. On January 31, 2002, the MPSC issued an Order establishing a CTC that would recover $244.7 million on a net present value basis. As a result of this Order, we will under collect approximately $60 million on a net present value basis over the remaining terms of the QF power supply contracts. While the CTC is designed to adjust and compensate for future changes in sales volumes or other factors affecting actual cost recoveries, the CTC runs through the year 2029, and therefore, we cannot predict with certainty the actual recovery of transition costs. Changes in the recovery of transition costs could adversely affect our net income and financial condition by increasing the current under collection amount.

**We are subject to risks associated with a changing economic environment.**

In general, the financial markets have been weak, and the availability and cost of capital for our business and that of our competitors has been adversely affected. Events such as the bankruptcy of several large energy and telecommunications companies have specifically contributed to this weak environment. Such economic environment, if sustained, could constrain the capital available to our industry and would adversely affect our access to funding for our operations, including the funding necessary to refinance or restructure our substantial indebtedness.

**Our electric and natural gas distribution systems are subject to municipal condemnation.**

The government of each of the municipalities in which we provide electric or natural gas service has the right to condemn our facilities in that community and to establish a municipal utility distribution system to serve customers by use of such facilities, subject to the approval of the voters of the community and the payment to NorthWestern of fair market value for our facilities, including compensation for the cancellation of our service rights. While there are currently no proceedings pending to undertake such condemnation, a few of the communities served by NorthWestern in South Dakota and Montana have taken steps to begin evaluation of the feasibility of such actions.

**Our revenues and results of operations are subject to risks that are beyond our control, including but not limited to future terrorist attacks or related acts of war.**

The cost of repairing damage to our facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events, in excess of reserves established for such repairs, may adversely impact our results of operations, financial condition and cash flows. Generation and transmission facilities, in general, have been identified as potential terrorist targets. The occurrence or risk of occurrence of future terrorist activity may impact our results of operations, financial condition and cash flows in unpredictable ways. These actions could also result in adverse changes in the insurance markets and disruptions of power and fuel markets. The availability of insurance covering risks we and our competitors typically insure against may decrease. In addition, the insurance we are able to obtain may have higher deductibles, higher premiums and more restrictive policy terms. In addition, our electric transmission and distribution, electric generation, natural gas distribution and pipeline and gathering facilities could be directly or indirectly harmed by future terrorist activity.

The occurrence or risk of occurrence of future terrorist attacks or related acts of war could also adversely affect the United States economy. A lower level of economic activity could result in a decline in energy consumption, which could adversely affect our revenues and margins and limit our future growth prospects. Also, these risks could cause instability in the financial markets and adversely affect our ability to access capital.

**Our operating results fluctuate on a seasonal and quarterly basis.**

Our electric and gas utility business is seasonal and weather patterns can have a material impact on their operating performance. Demand for electricity is often greater in the summer and winter months associated with cooling and heating. Because natural gas is heavily used for residential and commercial heating, the demand for this product depends heavily upon weather patterns throughout our market areas, and a significant amount of natural gas revenues are recognized in the first and fourth quarters related to the heating season. Accordingly, our operations have historically generated less revenues and income when weather conditions are milder in the winter and cooler in the summer. In the event that we experience unusually mild winters or summers in the future, our results of operations and financial condition could be adversely affected. In addition, exceptionally hot summer weather could add significantly to working capital needs to fund higher than normal power purchases to meet customer demand for electricity.

**Changes in commodity prices and availability of supply may increase our cost of producing and distributing electricity and distributing natural gas or decrease the amount we receive from selling electricity and natural gas, adversely affecting our financial performance and condition.**

Our wholesale costs for electricity and natural gas are recovered through various pass-through mechanisms in each of the states we serve. The rates are established based upon projected market prices or contract obligations. As these variables change, we adjust our rate through our monthly tracker. To the extent our adjusted rate is deemed inappropriate by the applicable state regulatory commission, we could under recover our costs during the relevant period. While the tracker mechanisms are designed to allow a timely recovery of costs, a rapid increase in commodity costs may create a temporary, material under recovery situation. As a result, we may not be able to immediately pass on to our retail customers rapid increases in our energy supply costs, which could reduce our liquidity.

We do not own any natural gas reserves and do not own electric generation assets to service our Montana operations. As a result, we are required to procure our entire natural gas supply and all of our Montana electricity supply pursuant to contracts with third party suppliers. In light of this reliance on third-party suppliers, we are exposed to certain risks in the event a third-party supplier is unable to satisfy its contractual obligation. Such risk is not present in our South Dakota electric operation because we own interests in generation assets that substantially cover our electric supply requirement in South Dakota.

**If we are unable to obtain investment grade ratings upon exit from bankruptcy, then our working capital could be adversely affected by trade vendors reducing or eliminating customary credit terms.**

In order to fulfill our obligations to supply electrical power and natural gas supply in our service territories, we enter into power and fuel purchase agreements of varying lengths. If we are unable to obtain investment grade ratings upon exit from bankruptcy, under customary contract terms, the power or fuel vendor would have the right to reduce or eliminate credit terms and/or demand credit enhancement, including the posting of letters of credit, bonds, cash deposits or requiring prepayments. If we are required to provide such credit enhancements, then our liquidity will be adversely affected.

**Our utility business is subject to extensive environmental regulations and potential environmental liabilities, which could result in significant costs and liabilities.**

Our utility business is subject to extensive regulations imposed by federal, state and local government authorities in the ordinary course of operations with regard to the environment, including environmental regulations relating to air and water quality, solid waste disposal and other environmental considerations. Many of these environmental laws and regulations create permit and license requirements and provide for substantial civil and criminal fines which, if imposed, could result in material costs or liabilities. We cannot predict with certainty the occurrence of a private tort allegation or government claim for damages associated with specific environmental conditions. We may be required to make significant expenditures in connection with the investigation and remediation of alleged or actual spills, personal injury or property damage claims, and the repair and upgrade of our facilities in order to meet future requirements and obligations under environmental laws.

Environmental laws and regulations require us to incur certain costs, which could be substantial, to operate existing facilities, construct and operate new facilities, and mitigate or remove the effect of past operations on the environment. Governmental regulations establishing environmental protection standards are continually evolving, and, therefore, the character, scope, cost and availability of the measures we may be required to take to ensure compliance with evolving laws or regulations cannot be predicted. Our range of exposure for environmental remediation obligations is estimated to be $43.9 million to $82.7 million. We have an environmental reserve of $43.9 million at December 31, 2003. This reserve was established in anticipation of future remediation activities at our various environmental sites and does not factor in any exposure to us arising from private tort actions or government claims for damages allegedly associated with specific environmental conditions. To the extent that our environmental liabilities are greater than our reserves or we are unsuccessful in recovering anticipated insurance proceeds under the relevant policies, our results of operations and financial condition could be adversely affected.

**Certain subsidiaries may be subject to potential rescission rights held by their minority shareholders.**

In connection with acquisitions in prior years, Expanets and Blue Dot issued shares of their capital stock as part of the consideration offered to owners of various companies that they acquired. None of these shares were registered under the Securities Act of 1933, as amended, in the belief that the issuance of these shares was exempt from the registration requirements of the Securit ies Act. It is possible that the exemptions from registration on which Expanets and Blue Dot relied were not available, and that these shares may have been issued in violation of the Securities Act. As a result, the persons who received these shares upon the sale of their companies to Expanets or Blue Dot may have the right to seek recovery from Expanets or Blue Dot damages as prescribed by applicable securities laws.

47

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK**

We are exposed to the impact of market fluctuations associated with commodity prices and interest rates.

*Interest Rate Risk*

We use fixed and variable rate long-term debt to partially finance capital expenditures and mandatory debt retirements. These debt agreements expose us to market risk related to changes in interest rates. We manage this risk by taking advantage of market conditions when timing the placement of long-term or permanent financing. We have historically used interest rate swap agreements to manage a portion of out interest rate risk and may take advantage of such agreements in the future to minimize such risk. As of December 31, 2003, we also have outstanding mandatorily redeemable preferred securities with various fixed interest rates. All of our debt has fixed interest rates, with the exception of our senior secured term loan which bears interest at a variable rate tied to the Eurodollar rate. Effective with the amendment of this loan, the current rate is approximately 6.75%. A 1% increase in the Eurodollar rate would increase annual interest expense by approximately $3.8 million. Our new DIP Facility also bears interest at a variable rate tied to the Eurodollar rate, however, we have no outstanding borrowings as of March 12, 2004.

**Commodity Price Risk**

The fair value of fixed-price commodity contracts is estimated based on market prices of commodities covered by the contracts. As of December 31, 2003, we have outstanding call obligations for physical delivery of 3.3 million MMBTU of natural gas during February and March of 2004. We have recorded a liability related to these obligations of $1.8 million based on the market value of natural gas as of December 31, 2003. We settled these calls during January and February, resulting in a gain of $526,000.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The consolidated financial information, including the reports of independent accountants, the quarterly financial information, and the financial statement schedules, required by this Item 8 is set forth on pages F-1 to F-44 of this Annual Report on Form 10-K and is hereby incorporated into this Item 8 by reference.

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None

**ITEM 9A. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

As reported in our December 2002 annual report on Form 10-K, management and our independent auditors advised our Audit Committee that during the course of the 2002 audit, deficiencies in internal controls were noted relating to:

- The evaluation of appropriate reserves for accounts receivable and billing adjustments specifically at Expanets;

- Timely evaluation and substantiation of material account balances; and

- Supervision, staffing and training of accounting personnel.

These internal control deficiencies existing at the time constituted reportable conditions and, collectively, a material weakness as defined in Statement on Auditing Standards No. 60.

During 2003, we implemented substantial corrective actions to address these issues including, but not limited to, the following:

- Retained outside legal counsel and a consulting firm to evaluate and improve our existing internal and disclosure controls;

- Hired a Vice President-Audit and Controls, reporting directly to our chief executive officer, to monitor and review internal controls at our utility division, NorthWestern Energy;

- Advised all employees of our corporate code of conduct in a form and content complying with the Sarbanes-Oxley Act;

- Adopted improved accounting policies, procedures and internal controls for the consolidated financial closing process, including closer management review of subsidiary financial information, and documentation of intercompany transactions;

- Improved communication between operating, financial and management functions and expanded our formal reporting procedures;

- Strengthened our base control environment including: establishment of weekly senior management and cash review meetings, issued capital and expense approval levels; defined strategic initiatives, company objectives and core values, as well as management and employee conduct guidelines;

- Established a Project Office to manage a 3-phase process (evaluation, remediation, testing) for the implementation of improved controls to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act;

- Provided education to management as to their responsibilities for the evaluation of the effectiveness of internal controls and their assessment and demonstration of the asserted effectiveness;

- Conducted performance evaluations of all members of internal financial staff and undertook appropriate action resulting from these evaluations.

We will continue to evaluate the effectiveness of our internal controls and procedures on an ongoing basis.  We have discussed our corrective actions and plans with the Audit Committee and our independent auditors and, as of the date of this report, we believe the actions outlined have corrected the deficiencies in internal controls that were considered to be a material weakness. Further, our management, including the Chief Executive Officer and Chief Financial Officer, have conducted an evaluation of the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective.

**Changes in Internal Control Over Financial Reporting**

As described above, there have been significant changes in our internal controls and in other factors that we believe will significantly improve the control environment.

**Part III**

## ITEM 10.    DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The following information is furnished with respect to the executive officers of NorthWestern Corporation:

| Executive Officer | Current Title and Prior Employment | Age on March 1, 2004 |
|---|---|---|
| Gary G. Drook | Chief Executive Officer since January 2003 and President since August 2003; Chairman of the Board and formerly President and Chief Executive Officer and Director of AFFINA, The Customer Relationship Company (formerly Ruppman Marketing Technologies, Inc.), a provider of customer services programs, since 1997; formerly President of Network Services (1994-1995) for Ameritech Corporation, a communications services provider. Mr. Drook also serves as Chairman of NorthWestern Growth Corporation, Netexit, Inc. and Blue Dot Services Inc. (each of which are NorthWestern subsidiaries). | 59 |
| Michael J. Hanson | Chief Operating Officer since August 2003; formerly President and Chief Executive Officer of NorthWestern Energy division (1998-2003). Prior to joining the Company, Mr. Hanson was General Manager and Chief Executive of Northern States Power Company South Dakota and North Dakota in Sioux Falls, South Dakota (1994-1998). | 45 |
| William M. Austin | Chief Restructuring Officer since April 2003. Prior to joining the Company, Mr. Austin served as Chief Executive Officer of Cable & Wireless/Exodus Communications US, Executive Vice President and Chief Financial Officer of Exodus (2001-2002), Senior Vice President and Chief Financial Officer of BMC Software (1997-2001). Mr. Austin also serves as a member of the boards of directors of NorthWestern Growth Corporation, Netexit, Inc. and Blue Dot Services Inc. | 57 |
| Brian B. Bird | Chief Financial Officer since December 2003. Prior to joining the Company, Mr. Bird was Chief Financial Officer and Principal of Insight Energy, Inc., a Chicago-based independent power generation development company (2002-2003). Previously, he was Vice President and Treasurer of NRG Energy, Inc., in Minneapolis (1997-2002). Mr. Bird serves as a member on the board of directors of Netexit, Inc. | 41 |
| Eric R. Jacobsen | Senior Vice President since February 2002; General Counsel and Chief Legal Officer since February 1999; formerly Vice President (1999-2002); Mr. Jacobsen also serves as Chief Operating Officer of NorthWestern Growth Corporation (since 2001); formerly Principal and General Counsel of NorthWestern Growth Corporation (1998-2001). Mr. Jacobsen also is a member of the boards of directors of NorthWestern Growth Corporation and Netexit, Inc. Prior to joining the Company, Mr. Jacobsen was Vice President-General Counsel and Secretary of LodgeNet Entertainment Corporation (1995-1998). Previously Mr. Jacobsen was a partner (1988-1995) with the law firm Manatt, Phelps & Phillips in Los Angeles, California. | 47 |
| Maurice H. Worsfold | Vice President-Audit and Controls since April 2003 and Chief Risk Officer since December 2003. Prior to joining the Company, Mr. Worsfold served as Vice President and Chief Financial Officer of VimpelCom (NYSE: VIP) a Russian telecommunications company (2000-2002), Chief Financial Officer of ClearWater-Moscow (1999) and Corporate Director Finance of RIG Restaurants Ltd.-Moscow (1995-1998). | 68 |
| Roger P. Schrum | Vice President – Human Resources and Communications since December 2003; formerly Vice President – External Communications (2001-2003). Prior to joining the Company, Mr. Schrum was General Manager, Marketing Communications and Public Affairs of SCANA Corporation, a Columbia, South Carolina-based utility company (1993-2001). | 48 |

The Chief Executive Officer, the President, the Corporate Secretary and the Treasurer are elected annually by the Board of Directors. Other officers may be elected or appointed by the Board of Directors at any meeting but are generally also elected annually by the Board. All officers serve at the pleasure of the Board of Directors.

The following information is furnished with respect to the directors in Class I whose terms will expire at the 2004 annual meeting of the Board .

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2004 |
|---|---|---|---|
| Randy G. Darcy | Senior Vice President, Operations of General Mills, Inc. (NYSE: GIS) a consumer foods company, since 1987. | 1998 | 53 |
| Gary G. Drook | Chief Executive Officer of NorthWestern since January 2003 and President since August 2003; Chairman of the Board of AFFINA, The Customer Relationship Company (formerly Ruppman Marketing Technologies, Inc.), a provider of customer services programs, formerly President and Chief Executive Officer and Director of AFFINA (1997-2003) , President of Network Services (1994-1995) for Ameritech Corporation, a communications services provider. | 1998 | 59 |
| Bruce I. Smith | Attorney and partner in the law firm of Leininger, Smith, Johnson, Baack, Placzek, Steele & Allen since 1978. | 1989 | 62 |

The following information is furnished with respect to directors in Class II whose terms will expire in May 2005:

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2004 |
|---|---|---|---|
| Jerry W. Johnson | Dean Emeritus and Professor Emeritus, School of Business, University of South Dakota; formerly Visiting Scholar, Congressional Budget Office, U.S. Congress (2002-2003). Dean and Professor of Economics (1990-2001), School of Business, University of South Dakota; Member of the Boards of Directors of Citibank (S.D.), N.A., Citibank FSB (West) and Citibank USA. | 1994 | 63 |
| Larry F. Ness | Chairman and Chief Executive Officer of First Dakota Financial Corp., a bank holding company, and of First Dakota National Bank since 1996; formerly Vice Chairman and Chief Executive Officer of that bank (1993-1996). | 1991 | 58 |

The following information is furnished with respect to directors in Class III whose terms will expire in May 2006:

| Director | Principal Occupation or Employment | Director Since | Age on March 1, 2004 |
|---|---|---|---|
| Marilyn R. Seymann | Interim Chairman of the NorthWestern Board of Directors since January 2003; President and Chief Executive Officer of M ONE, Inc., a financial services consulting firm, since 1991; Member of the Boards of Directors of Beverly Enterprises, Inc. (NYSE: BEV), a healthcare service provider; Community First Bankshares, a financial institution; EOS International, a holding company of direct sellers; and Maximus, Inc. (NYSE: MMS) a firm providing program management, information technology, and consulting services to the government agencies. | 2000 | 61 |
| Lawrence J. Ramaekers | Self-employed consultant since 2001; forme rly Chief Operating Officer for MicroWarehouse, Inc., a computer equipment seller (2003-2004); member of AlixPartners (1982-2000), a turnaround management firm. | 2003 | 66 |

## Audit Committee

The Audit Committee is composed of four nonemployee directors who are financially literate in financial and auditing matters and are "independent" as defined by the SEC and the NYSE. The members of the Audit Committee are Chairman Jerry W. Johnson, Lawrence J. Ramaekers, Bruce I. Smith and Larry F. Ness. The Company's Board of Directors has determined that the Company has at least one audit committee financial expert, as defined in Item 401(h)(2) of Regulation S-K, serving on its Audit Committee, namely, Jerry W. Johnson. Mr. Johnson is independent as that term is used in Item 7(d)(3)(iv) of Schedule 14A under the 1934 Act. The Audit Committee held 18 meetings during 2003. The functions of the Audit Committee are to oversee the integrity of NorthWestern's financial statements, NorthWestern's compliance with legal and regulatory requirements, the independent public accountant's qualifications and independence, the performance of NorthWestern's internal audit function and independent auditors, and preparation of this report and the financial statement and notes included herein, and all other reports required under the Securities Exchange Act.

## Section 16(a) Beneficial Ownership Reporting Compliance

Based solely upon a review of reports on Forms 3, 4 and 5 and any amendments thereto furnished to NorthWestern pursuant to Section 16 of the Securities Exchange Act of 1934, as amended, and written representations from the executive officers and directors that no other reports were required, NorthWestern believes that all of such reports were filed on a timely basis by executive officers and directors during 2003.

## Code of Ethics

Our Board of Directors adopted our Code of Business Conduct and Ethics ("Code of Ethics") on August 26, 2003. Our Code of Ethics sets forth standards of conduct for all officers, directors and employees of NorthWestern and its subsidiary companies, including all full and part-time employees and certain persons that provide services on our behalf, such as agents. Copies of our Code of Ethics are available on NorthWestern's Web site at *http://www.northwestern.com*. We intend to post on our Web site any amendments to, or waivers from, our Code of Ethics. In addition, our Board of Directors adopted a code of ethics that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions on August 26, 2003.

## ITEM 11.    EXECUTIVE COMPENSATION

## Compensation of Directors and Executive Officers

We are required by the SEC to disclose compensation earned during the last three fiscal years by (i) our Chief Executive Officer; (ii) our four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2003; and (iii) up to two additional individuals for whom such disclosure would have been provided under clause (i) and (ii) above but for the fact that the individual was not serving as an executive officer at the end of fiscal 2003; provided, however, that no disclosure need be provided for any executive officer, other than the Chief Executive Officer, whose total annual salary and bonus does not exceed $100,000.

Accordingly, the following sections disclose information regarding compensation earned during the last three fiscal years by (i) Gary G. Drook, our President and Chief Executive Officer; (ii) Michael J. Hanson, Eric R. Jacobsen, William M. Austin and John R. Van Camp, the four most highly-compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal 2003 and whose salary and bonus exceeded $100,000 ,and (iii) Daniel K. Newell, former Senior Vice President of the Company. All of these officers are referred to in this Form 10-K as the "Named Executive Officers."

**Summary Compensation Table**

The following table sets forth the compensation earned during the fiscal years indicated for services in all capacities by the Named Executive Officers in 2003:

| Name and Principal Position1 | Year | Salary (7)$ | Bonus (1)$ | Restricted Stock Awards (2)($) | Awards (Securities Underlying Options)(3)(#) | LTIP Payouts (4)($) | All Other Compensation(5) ($) |
|---|---|---|---|---|---|---|---|
| Gary G. Drook | 2003 | $ 544,355 | $ 600,000 | $ 1,143,332 | 335,643 | $ — | $ 216,744 |
| President & Chief Executive | 2002 | 88,384 | N/A | N/A | 4,000 | N/A | N/A |
| Officer | 2001 | 68,140 | N/A | N/A | 4,000 | N/A | N/A |
| | | | | | | | |
| Michael J. Hanson | 2003 | 355,609 | — | — | — | — | 27,916 |
| Chief Operating Officer | 2002 | 345,833 | 540,000 | — | 29,000 | — | 25,817 |
| | 2001 | 323,750 | 635,914 | — | 9,000 | — | 19,684 |
| | | | | | | | |
| Eric R. Jacobsen | 2003 | 314,967 | — | — | — | 41,960 | 31,261 |
| Senior Vice President, General | 2002 | 304,791 | 400,000 | — | 44,000 | — | 28,829 |
| Counsel & Chief Legal Officer | 2001 | 280,416 | 150,000 | — | 28,000 | 430,757 | 17,491 |
| | | | | | | | |
| William M. Austin | 2003 | 284,615 | — | 102,500 | 119,980 | — | 16,280 |
| Chief Restructuring Officer | 2002 | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2001 | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | |
| John R. Van Camp | 2003 | 248,926 | — | — | — | — | 38,750 |
| Vice President-Organization & | 2002 | 245,000 | — | — | 30,000 | — | 24,105 |
| Staffing | 2001 | 241,875 | 55,000 | — | 28,000 | — | 12,274 |
| | | | | | | | |
| Daniel K. Newell (6) | 2003 | 328,215 | — | — | — | — | 34,366 |
| President & Chief Executive | 2002 | 354,000 | — | — | 36,000 | 42,979 | 19,541 |
| Officer | 2001 | 347,333 | 80,000 | — | 44,500 | 861,346 | 21,600 |
| Blue Dot Services Inc. | | | | | | | |

(1)    Bonuses shown were earned in the year shown and paid in the following year except that Mr. Drook received a bonus at employment of $600,000.

(2)    The restricted stock awards for Mr. Drook and Mr. Austin have no value and will be cancelled in connection with the adoption of our plan of reorganization. Mr. Drook was awarded 233,333 shares of restricted stock in 2003, which had a value of $21,000 at December 31, 2003.  Mr. Austin was awarded 50,000 shares of restricted stock in 2003, which had a value of $4,500 at December 31, 2003.

(3)    We anticipate all outstanding options will be cancelled in connection with the adoption of our plan of reorganization. Awards for Mr. Drook and Mr. Austin in 2003 include awards of stock options of 335,643 and 119,980. For 2002, the awards shown represent stock options for Mr. Drook, Mr. Hanson, Mr. Jacobsen, Mr. Van Camp and Mr. Newell. For 2001, the awards include stock options for Mr. Hanson, Mr. Jacobsen, Mr. Van Camp and Mr. Newell, as well as phantom stock unit awards of 3,000; 2,819; 3,172; and 4,714 units, respectively (these phantom stock unit awards were terminated as of December 31, 2003, when the Company failed to meet the performance targets required for vesting.)

(4)    For 2002 and 2001, the amounts included for Mr. Newell include $42,979 and $30,970, respectively, for the cash payout from the company's former phantom stock long-term incentive compensation plan at the end of the five-year period following the date of the award.  The remaining 2001 distribution for Mr. Newell and the 2001 distribution for Mr. Jacobsen represent vested interests in the former NorthWestern Growth Corporation long-term incentive plan. The 2003 distribution to Mr. Jacobsen represents a final liquidation payment upon termination of the NorthWestern Growth plan.

(5)    The amounts include employer contributions, as applicable, for medical, dental, vision, employee assistance program (EAP), term life, group term life, 401(k), supplemental 401(k), Employee Stock Option Purchase (ESOP), and contributions to postretirement benefit plans as well as an airplane allowance for Mr. Drook, vehicle lease or car allowance, association and club dues, relocation expenses and tax gross up payments (where provided).

(6)     Mr. Newell served as Senior Vice President for NorthWestern Corporation until November 2003.

(7)     For 2002 and 2001, Mr. Drook's compensation shown represents cash fees and common stock received as a nonemployee member of the Board of Directors.

**Information on Options**

### Option Grants in Last Fiscal Year

| | Individual Grants | | | | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term(3)($) | |
| Name | No. of Securities Underlying Options Granted (#)(1) | Percent of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price ($/Sh)(2) | Expiration Date | At 5% ($0.13 Stock Price) | At 10% ($0.21 Stock Price) |
|---|---|---|---|---|---|---|
| Gary G. Drook .......................... | 335,643 | 67% $ | 4.90 | 2/5/2013 | 0 | 0 |
| Michael J. Hanson ..................... | 0 | 0 | N/A | N/A | N/A | N/A |
| Eric R. Jacobsen ......................... | 0 | 0 | N/A | N/A | N/A | N/A |
| William M. Austin ....................... | 119,980 | 24% $ | 2.05 | 4/16/2013 | 0 | 0 |
| John R. VanCamp ...................... | 0 | 0 | N/A | N/A | N/A | N/A |
| Daniel K. Newell ....................... | 0 | 0 | N/A | N/A | N/A | N/A |

(1)  Mr. Drook's options vest 1/3 on 12/31/03, 12/31/04 and 12/31/05. Any shares acquired cannot be sold for 12 months except to satisfy tax obligations. Mr. Austin's options vest 1/3 on 3/1/04, 12/31/05 and 12/31/06; any shares acquired cannot be sold for 12 months except to satisfy tax obligations.

(2)  All options were granted at market value (the closing price of the Common Stock on the NYSE as reported in the Midwest Edition of The Wall Street Journal) on the date of grant.

(3)  The hypothetical potential gains (reported net of exercise price) are based entirely on assumed annual growth rates of 5% and 10% in the value of NorthWestern's stock price over the 10-year life of the options (which would equal a total increase in stock price of 63% and 159%, respectively). These assumed rates of growth are mandated by rules of the SEC for illustration purposes only and are not intended to predict future stock price. All stock options will be cancelled in connection with the adoption of our plan of reorganization.

### Fiscal Year-End Option Values

| | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options At Fiscal Year-End ($)(1) | |
| Name | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|
| Gary G. Drook.......................................................... | 117,181 | 235,762 | $ 0 | $ 0 |
| Michael J. Hanson.................................................... | 15,362 | 42,290 | 0 | 0 |
| Eric R. Jacobsen........................................................ | 43,985 | 95,158 | 0 | 0 |
| William M. Austin..................................................... | 0 | 119,980 | 0 | 0 |
| John R. Van Camp ................................................... | 36,857 | 80,161 | 0 | 0 |
| Daniel K. Newell ...................................................... | 47,746 | 118,114 | 0 | 0 |

(1)     There were no in-the-money options at December 31, 2003.

54

**Employment Contracts**

Mr. Hanson entered into an employment agreement as of March 1, 2001, which was terminated in March 2004, and Messrs. Jacobsen and Van Camp entered into employment agreements as of March 1, 2001, which terminated on the last day of February 2004. Under the agreements, Messrs. Hanson, Jacobsen and Van Camp were entitled to receive a base salary that was subject to annual increases based on the median of comparable companies and a discretionary bonus. They each were also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans included, among other things, options to purchase shares of NorthWestern common stock. They were also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance. Mr. Jacobsen had the right under his contract to participate in long-term incentive plans which held minority investments in or were otherwise tied to the performance of NorthWestern's nonregulated subsidiaries.

The former agreements provided for the payment of accrued salary and termination benefits if employment was terminated by NorthWestern for any reason other than Cause, due to death or by the employee due to a "fundamental change." A fundamental change generally occurs if there is a diminution in the employee's responsibilities or compensation, NorthWestern relocates its primary offices more than 30 miles or there is a change in control or major transaction involving NorthWestern (each as defined in the agreement). The termination benefits included a lump sum payment equal to (1) the sum of (a) base salary, (b) the higher of either the employee's most recent bonuses and short-term incentive awards or the average of such bonuses and awards over the preceding three calendar years and (c) the higher of either the value of the employee's most recent options, long-term incentive awards and private equity investment returns or the average value of such options, awards and returns over the preceding three calendar years, multiplied by (2) the remaining term of the agreement plus one year. The termination benefits also included lump sum payments equal to the employee's interests under NorthWestern's benefit plans. The Executive had the right to defer receipt of certain of these termination benefits rather than receiving them as a lump sum. All equity awards granted to him accelerated in full upon termination of the agreement (other than for Cause) and remained exercisable in accordance with their terms. NorthWestern had agreed to make gross-up payments to him to the extent that termination benefits would be subject to the excise tax on excess "parachute payments" following a change of control. The termination benefits under these agreements were to be provided regardless of whether the employee is able to obtain other employment. The agreements contained provisions requiring the Executive to maintain the confidentiality of NorthWestern proprietary information and restricted him from competing with NorthWestern or soliciting NorthWestern employees, suppliers and customers for a period of two years following termination. NorthWestern has agreed, pursuant to the agreement, to indemnify him to the fullest extent permitted by law.

We have contractual arrangements with two other executive officers, Chief Restructuring Officer William M. Austin, one of the named executives, and Chief Financial Officer Brian B. Bird.

We have a Memorandum of Engagement with Mr. Austin, which, as amended and approved by the Bankruptcy Court in its Order dated October 10, 2003, terminates on the earlier of 18 months or the effective date of a confirmed reorganization plan, unless extended by mutual agreement. Under the agreement Mr. Austin, as he serves as Chief Restructuring Officer, is entitled to a base salary of $400,000, a time-based addition, and an incentive-based addition. The agreement provides that if an effective date of a reorganization plan occurs before scheduled completion of the above distributions, the payments not yet made will be fully earned and paid on the effective date. The agreement also provides for severance if Mr. Austin is involuntarily terminated or otherwise as a result of the bankruptcy proceedings and indemnification by us for claims made in connection with his engagement as Chief Restructuring Officer.

We also have an Employment Agreement with Mr. Bird, which, as amended and approved by the Bankruptcy Court in its Order dated January 13, 2004, provides for him to serve as Chief Financial Officer, commencing December 1, 2003, and extends until the earlier of his termination of employment or December 1, 2005. Mr. Bird's compensation package consists of a sign-on bonus, a base salary of $275,000 and performance-based incentive of up to his annual salary. Mr. Bird is also entitled to participate in our benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits. The agreement provides that if an effective date of a reorganization plan, or the consummation of a sale of NorthWestern occurs before scheduled completion of the above distributions, then payments not yet made will be fully earned and paid on the effective date. The agreement also provides for severance if Mr. Bird is terminated for any reason other than Cause.

Blue Dot President and Chief Executive Officer Daniel K. Newell, one of the named executives, has a Memorandum of Engagement with Blue Dot, dated November 6, 2003, and effective for a term beginning September 1, 2003, and extending until September 1, 2004, or his earlier termination of employment. Under the agreement, Mr. Newell is provided a base salary, incentive-based additional compensation related to Blue Dot's success in completing the sale of its operations, a severance benefit if his employment is involuntarily terminated by Blue Dot, reasonable out-of-pocket expense reimbursement, and indemnification by Blue Dot for claims made in connection with his engagement as President and Chief Executive Officer. Pursuant to such agreement, Mr. Newell was paid $1.42 million of incentive-based compensation in February 2004 related to the receipt of targeted net proceeds from the sales of businesses. He may be entitled to an additional $180,000 bonus upon termination of his employment if certain sales proceeds goals are met.

**Retirement Plans**

NorthWestern has two retirement plans, with one applicable to its Montana NorthWestern Energy employees and one applicable to its South Dakota and Nebraska NorthWestern Energy and all NorthWestern Corporation employees. All of the named executives participate in the latter plan. For that plan, effective January 1, 2000, NorthWestern offered its employees two alternatives with regard to its retirement plan. An employee could convert his or her existing accrued benefit from the existing plan into an opening balance in a hypothetical account under a new cash balance formula, or that team member could continue under the existing defined benefit formula. All employees hired after January 1, 2000, participate in the cash balance formula. The beginning balance in the cash balance account for a converting team member was determined based on the employee's accrued benefit, age and service as of January 1, 2000, 2000 eligible pay, and a conversion interest rate of 6%. Under the cash balance formula a participant's account grows based upon (1) contributions by NorthWestern made once per year, and (2) by annual interest credits based on the average Federal 30-year Treasury bill rate for November of the preceding year (6.15% for 2000). Contribution rates were determined on January 1, 2000, based on the participant's age and years of service on that date. They range from 3%-7.5% (3% for all new employees) for compensation below the taxable wage base and are doubled for compensation above the taxable wage base. Upon termination of employment with NorthWestern, an employee, or if deceased, his or her beneficiary, receives the cash balance in the account paid in a lump sum or in other permitted annuity forms of payment.

To be eligible for the retirement plan, an employee must be 21 years of age and have worked at least one year for NorthWestern, working at least 1,000 hours in that year. Nonemployee Directors are not eligible to participate. Benefits for employees who chose not to convert to the cash balance formula will continue to be part of the defined benefit formula, which provides an annual pension benefit upon normal retirement at age 65 or earlier (subject to benefit reduction). Under this formula, the amount of the annual pension is based upon average annual earnings for the 60 consecutive highest paid months during the 10 years immediately preceding retirement. Upon retirement on the normal retirement date, the annual pension to which an eligible employee becomes entitled under the formula amounts to 1.34% of average annual earnings up to the Covered Compensation base plus 1.75% of such earnings in excess of the Covered Compensation base, multiplied by all years of credited service.

As of December 31, 2003, Mr. Drook and Mr. Austin, among the named executives, were not vested participants in either retirement plan. Mr. Hanson, Mr. Jacobsen, Mr. Van Camp, and Mr. Newell were participants in the retirement plan applicable to South Dakota and Nebraska employees. Those four named executives also have participated in a supplemental excess retirement plan related to both of the pension formulas, which provides benefits based on those formulas but with respect to compensation which exceeds the limits under the Code. In addition, NorthWestern has agreed to assure Mr. Hanson a pension benefit equivalent to that which would be provided by the Retirement Plan if he were given credit for his 17 years of prior service with another utility company in addition to his years of service with NorthWestern. As a result, he was credited with those additional years of service under the supplemental excess retirement plan.

Assuming the named executives reach the normal retirement age of 65, the projected annual life annuity benefits for the named executives would be: Mr. Hanson, $162,483; Mr. Jacobsen, $57,731; Mr. Van Camp, $67,218; and Mr. Newell, $95,240. In 2003, NorthWestern contributed the following amounts for those four named executive officers, through interest credits and pay credits under the retirement plan and the supplemental excess retirement plan: Mr. Hanson, $42,263; Mr. Jacobsen, $19,298; Mr. Van Camp, $14,240; and Mr. Newell, $29,004. As of December 31, 2003, the cash balance accounts for those four named executive officers were as follows: Mr. Hanson, $92,433; Mr. Jacobsen, $16,280; Mr. Van Camp, $15,060; and Mr. Newell, $39,133.

**Other Benefits**

NorthWestern currently maintains a variety of benefit plans and programs, which are generally available to all NorthWestern employees, including executive officers, such as the 401(k) Retirement Plan under which an employee may contribute up to 13% of his or her salary (with NorthWestern matching up to 4% of the first 6% contributed by the employee), a term life and supplemental life insurance coverage, long-term disability plan, and other general employee benefits such as emergency personal leave and educational assistance. In 2003, the Board of Directors terminated certain benefit plans, including the Supplemental Variable Investment Plan (a nonqualified Supplemental 401(k) plan available to the extent participation in the 401(k) is limited by the Internal Revenue Code), a Team Member Stock Purchase Plan (Section 423 Plan) approved by shareholders and instituted in 1999, under which an employee may contribute up to $3,000 per year for the purchase of NorthWestern Common Stock (at a discount of up to 15% of market value), and the NorthWestern Employee Stock Ownership Plan (ESOP).

**Salary Continuation Plan**

NorthWestern has a nonqualified salary continuation plan for directors and selected management employees (the Supplemental Income Security Plan). In 2003, the Board of Directors amended the plan to terminate any new participation in it and to authorize the payment to plan participants, other than nonemployee directors, of the discounted present value of the future benefits under the plan, or the refund of employees' personal contributions to the plan for those employees whose interest in the plan had not become vested, based on the participant's election. NorthWestern utilized the cash value of the life insurance policies held by NorthWestern, in part, to make such

56

payments to those participants electing such payout.

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee is composed of not less than three nonemployee directors. The members of the Compensation Committee are Chairman Randy G. Darcy, Marilyn R. Seymann, Larry F. Ness and Lawrence J. Ramaekers. None of the persons who served as members of the Compensation Committee of the Board during fiscal year 2003 are officers or employees or former employees of NorthWestern or any of its subsidiaries.

**Director Compensation**

Nonemployee Directors are paid $2,500 each quarter for serving on the Board, and receive an attendance fee of $4,000 for attendance at each regular or special meeting of the Board. Directors are also paid $1,700 for each meeting of a committee on which such director serves and $500 for each quarter during which they serve as chairman of a committee of the Board. Directors receive one-half of the meeting fee for telephonic conference board or committee meetings. In addition, as Chairman of the Board, Ms. Seymann receives $18,750 per quarter. Because he is an executive officer, Mr. Drook is not separately compensated for his services as a director on NorthWestern's Board.

Directors may elect to defer receipt of their cash compensation as directors until they cease to be directors. The deferred compensation may be invested in (1) an account which earns interest at the same rate as accounts in the employees savings plan or (2) a deferred compensation unit account in which the deferred compensation is converted into deferred compensation units on the basis that each unit is at the time of investment equal in value to the fair market value of one share of NorthWestern's Common Stock, sometimes referred to as "phantom stock units." Additional units based on the dividends paid on NorthWestern's Common Stock are added to the director's deferred compensation unit account. Following the director's retirement, the value of the deferred compensation is paid in cash to the former director within a period of five years.

<div align="center">

**REPORT OF COMPENSATION COMMITTEE
ON EXECUTIVE COMPENSATION**

</div>

The Compensation Committee (the Committee) of the Board furnishes the following report on executive compensation.

**Procedures and Policies**

The Committee is comprised of four independent directors, Chairman Randy G. Darcy, Marilyn R. Seymann, Larry F. Ness and Lawrence J. Ramaekers. The Committee has overall responsibility to nominate persons to serve as executive officers and to review and to approve annual and long-term compensation plans and awards for the members of the Board and for the executive officers. The Committee also reviews and recommends to the full Board any welfare benefit and retirement plans for officers and employees. The Compensation Committee Charter is reviewed at least annually. The Committee met seven times during 2003.

In 2003, the Committee engaged Towers Perrin, a compensation and benefits consulting firm, to assess the current executive officer compensation plans and employment protections and to offer recommendations that would support our business strategy. Towers Perrin representatives interviewed members of the Board, compared the compensation of our executive officers and directors to comparable companies, and presented their findings to the Committee. The Board has implemented various recommendations from the Towers Perrin analysis which are designed to align investor and executive officer interests; to compensate executives for improvement in our performance; to focus on long-term performance and the creation of enterprise value; and to attract and retain key executives and other key employees.

The Committee approved in February 2003 a compensation program which positioned total direct executive compensation (including base salary, annual incentives and long-term incentives) at between the median and 75th percentile based on benchmarking of comparable companies in the energy industry when performance is consistent with that comparative group. In addition to utilizing external benchmarking as a guidepost, any adjustments to base salary levels or incentive targets and payments of incentives for executive officers are based on assessment of individual officer performance and require Committee approval. Each officer minimally receives a formal performance assessment and review on an annual basis; such assessment is based on the achievement of specific individual and department goals and the degree to which it is determined the officer has contributed to the achievement of our overall goals. On September 14, 2003, we filed for relief under Chapter 11 of the federal Bankruptcy Code and continue to operate our business as a debtor-in-possession, subject to the jurisdiction of the Bankruptcy Court. As described below, the Committee adopted, and the Bankruptcy Court has approved, a new incentive compensation and severance plan that replaces prior incentive and severance programs.

Section 162(m) of the Internal Revenue code of 1986 generally disallows a tax deduction to public companies for compensation over $1,000,000 paid to their chief executive officer and the four other most highly compensated executive officers unless certain tests are

met. The Committee's general objective is to design and administer NorthWestern's compensation programs in a manner that will preserve the deductibility of compensation payments to executive officers but also will consider such programs in light of the importance of achieving NorthWestern's compensation objectives discussed above.

**Base Salary**

Base salary levels for executive officers are reviewed annually and are generally targeted within a range around the median of the comparative group with adjustments based on individual officer performance and market data.

**Annual Incentive Compensation**

The philosophy for all of our incentive compensation plans is to provide rewards when financial, operational and other objectives are achieved, and to provide reduced or no benefits when the objectives are not achieved. These objectives are designed to further our goals and to increase our enterprise value.

Our Board of Directors has adopted, and the Bankruptcy Court has approves, an incentive compensation and severance plan to motivate and to retain key employees who support our continued and successful operations, and who can help lead us through a successful Chapter 11 reorganization. This plan modifies and supersedes any and all prior incentive compensation and severance policies, plans and programs. Under this plan, for which funding has been established at approximately 50% of historic total targeted annual incentives, participants, including the named executives, become eligible to receive incentive compensation upon determination that the associated performance-based milestones approved by the Bankruptcy Court have b een achieved. For executive officers, such milestones include the Bankruptcy Court approval of a disclosure statement, the effective date of a plan of reorganization and a time based component. For all other officers and eligible employees, the milestones are essentially time-based to encourage retention. A participant must remain employed to receive such an incentive payment. The plan further provides that participants are eligible to receive certain specified severance benefits if their employment terminates, except under specified circumstances, including resignation and discharge for cause.

**Long-Term Incentive Compensation**

As a complement to our annual incentive plans, the Board has determined that long-term incentive programs that tie executive compensation to increases in enterprise value are important. The Board and the shareholders of NorthWestern adopted the NorthWestern Stock Option and Incentive Plan (Plan) to strengthen the link between compensation and the market value of NorthWestern's stock. The Plan was intended to recognize employee contributions, to provide such persons with additional incentive to devote themselves to our future success, and to improve our ability to attract, retain and motivate individuals upon whom our future growth and financial success is dependant. Similarly, the Plan was intended as an additional incentive to directors who are not employees to serve on the Board and to devote themselves to our future success. In 2003, a limited number of executive officers, including Mr. Drook and Mr. Austin, among the named executives, received option grants, and in 2003 no options were granted to directors who are not employees. All such grants were to vest in equal installments over a three-year period. All stock options are expected to be cancelled prior to emergence from bankruptcy.

**Compensation of the Chief Executive Officer**

Upon his appointment as interim Chief Executive Officer in January 2003, Mr. Drook's compensation included a base salary of $565,000 and he received grants of 233,333 shares of restricted stock, incentive stock options covering 61,224 shares, and nonqualified stock options covering 274,419 shares, all based upon a per share price of $4.90. All such restricted shares and option grants are expected to be cancelled prior to emergence from bankruptcy. Mr. Drook also received a cash payment of $600,000 which must be repaid in full should he serve less than 12 months in that position, and for which $250,000 must be repaid should he serve less than 24 months in that position. In addition, we agreed to provide reasonable use of our aircraft for an interim period of 12 months for Mr. Drook to travel to our corporate office from his home. Mr. Drook, who was elected President and Chief Executive Officer in August 2003, has since moved to Sioux Falls, S.D. Mr. Drook's salary, as he continues in his position, will be based upon his success in achieving the goals and objectives the Committee has recommended, and the Board of Directors has approved. These goals and objectives include liquidating our investments in Expanets, Blue Dot and other noncore assets; reorganizing and restructuring to a utility only business; instituting appropriate internal audit controls and external financial reporting controls; maximizing operating cash flows; restoring community, regulatory and governmental confidence; and leading us to complete our reorganization and emerge from bankruptcy.

Randy G. Darcy, Chairman
Marilyn R. Seymann
Larry F. Ness
Lawrence J. Ramaekers

**ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS**

**Security Ownership by Certain Beneficial Owners and Management**

The following table sets forth information, as of March 1, 2004, with respect to the beneficial ownership of shares of NorthWestern's Common Stock owned by the directors, nominees for director, the "Named Executive Officers" of NorthWestern, as described below, and by all directors and executive officers of NorthWestern as a group. Except under special circumstances, NorthWestern's Common Stock is the only class of voting securities. There are no persons known to NorthWestern who own more than 5% of the outstanding shares of Common Stock.

The "Named Executive Officers" include NorthWestern's (a) Chief Executive Officer; (b) its four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2003; and (c) up to two additional individuals for whom such disclosure would have been provided under clause (a) and (b) above but for the fact that the individual was not serving as an executive officer of NorthWestern at the end of fiscal year 2003; provided, however, that no disclosure need be provided for any executive officer, other than the CEO, whose total annual salary and bonus does not exceed $100,000.

Accordingly, NorthWestern's Named Executive Officers include (a) Gary G. Drook, its President and Chief Executive Officer; and (b) Michael J. Hanson, Eric R. Jacobsen, William M. Austin, and John R. Van Camp, the four most highly compensated executive officers, other than the Chief Executive Officer, who were serving as executive officers at the end of fiscal year 2003 and whose salary and bonus exceeded $100,000, and (c) former Senior Vice President Daniel K. Newell.

Except as otherwise noted, the persons or entities in this table have sole voting and investing power with respect to all the shares of NorthWestern's Common Stock beneficially owned by them subject to community property laws, where applicable. The information with respect to each person specified is as supplied or confirmed by such person, based upon statements filed with the SEC, or based upon the actual knowledge of NorthWestern.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership (1) | Percent of Common Stock |
|---|---|---|
| | Shares of Common Stock Beneficially Owned | |
| Randy G. Darcy | 5,811 | * |
| Jerry W. Johnson | 11,326 | * |
| Larry F. Ness | 12,407 | * |
| Lawrence J. Ramaekers | 0 | * |
| Marilyn R. Seymann | 4,106 | * |
| Bruce I. Smith | 15,024 | * |
| Gary G. Drook | 238,943(3) | * |
| Michael J. Hanson | 13,146(2) | * |
| Eric R. Jacobsen | 8,676 | * |
| William M. Austin | 50,000(3) | * |
| John R. Van Camp | 7,008 | * |
| Daniel K. Newell | 32,631 | * |
| All directors and executive officers | 399,078 | 1% |

_____

\*       Less than 1%.

(1)     Shares shown represent both record and beneficial ownership, including shares held in the employee's account in NorthWestern's 401(k) Retirement Plan.  The address of each person is 125 S. Dakota Ave., Sioux Falls, SD 57104.

(2)     Includes 4,316 shares in an Individual Retirement Account.

(3)     Includes restricted stock shares of 233,333 for Mr. Drook and 50,000 for Mr. Austin.

Information regarding equity compensation plans required by this Item 12 is included in Item 5 of Part II of this report and is incorporated into this Item 12 by reference.

## ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Prior to his employment by us as our Chief Financial Officer, Brian B. Bird owned a 50% member interest in a limited liability company that derived a portion of its revenue from consultant introduction fees. In this regard, Mr. Bird's company earned such fees by assisting two utility property tax consultants, Thomas Hamilton and George Karvel, in the development of their consulting practice. During 2003, well in advance of our hiring of Mr. Bird, we engaged the services of Messers. Hamilton and Karvel to evaluate our South Dakota and Montana utility property tax situation and make recommendations on ways to optimize property tax refunds and planning opportunities. We have paid no compensation to Messers. Hamilton and Karvel for services provided to date, as their compensation is entirely contingent upon our realizing property tax savings or refunds directly related to their recommendations. In the event Messers. Hamilton and Karvel are paid fees by us, Mr. Bird has disclaimed any right to receive his allocated share of the introduction fee earned and distributed by his company.

## ITEM 14.    PRINCIPAL ACCOUNTANTS FEES AND SERVICES

The following table is a summary of the fees billed to us by Deloitte & Touche, LLP (Deloitte) for professional services for the fiscal years ended December 31, 2003 and December 31, 2002:

| Fee Category | | Fiscal 2003 Fees | | Fiscal 2002 Fees |
|---|---|---|---|---|
| Audit Fees | $ | 2,300,000 | $ | 4,117,000 |
| Audit-Related Fees | | 101,000 | | 169,000 |
| Tax Fees | | 1,372,000 | | 680,000 |
| All Other Fees | | — | | — |
| Total Fees | $ | 3,773,000 | $ | 4,966,000 |

## Audit Fees

Consists of fees billed for professional services rendered for the audit of our financial statements and review of the interim financial statements included in quarterly reports and services that are normally provided by Deloitte in connection with statutory and regulatory filings or engagements.  Audit fees billed in fiscal 2002 related to both the re-audit of 2001 financial statements and the audit of our 2002 financial statements.

## Audit-Related Fees

Consists of fees billed for assurance and related services that are reasonably related to the performance of the audit or review of our consolidated financial statements and are not reported under "Audit Fees." These services include employee benefit plan audits, accounting consultations in connection with acquisitions, attest services that are not required by statute or regulation, and consultations concerning financial accounting and reporting standards.

## Tax Fees

Consists of fees billed for professional services for tax compliance, tax advice and tax planning. These services include assistance regarding federal and state tax compliance, tax audit defense, acquisitions, and bankruptcy tax planning.

## All Other Fees

Consists of fees for products and services other than the services reported above. In fiscal 2003 and 2002, there were no other fees.

## Preapproval Policies and Procedures

Pursuant to the provisions of the Audit Committee Charter, before Deloitte is engaged to render audit or nonaudit services, the Audit Committee must preapprove such engagement. In 2003, the Audit Committee approved all such services undertaken by Deloitte before engagement for such services.

**Part IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENTS AND REPORTS ON FORM 8-K**

a)  **The following documents are filed as part of this report:**

(1)  Financial Statements.

The following items are included in Part II, Item 8 of this annual report on Form 10-K:

*FINANCIAL STATEMENTS:*

| | Page |
|---|---|
| Independent Auditors' Report | F-2 |
| Consolidated Statements of Income (Loss) for the Years Ended December 31, 2003, 2002 and 2001 | F-3 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2003, 2002 and 2001 | F-4 |
| Consolidated Balance Sheets as of December 31, 2003 and 2002 | F-5 |
| Consolidated Statement of Shareholders' Equity (Deficit) for the Years Ended December 31, 2003, 2002 and 2001 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |
| Quarterly Unaudited Financial Data for the Two Years Ended December 31, 2003 | |
| (2)  Financial Statement Schedules | |
| Independent Auditors' Report | F-43 |
| Schedule II. Valuation and Qualifying Accounts | F-44 |

Schedule II, Valuation and Qualifying Accounts, is included in Part II, Item 8 of this annual report on Form 10-K. All other schedules are omitted because they are not applicable or the required information is shown in the Financial Statements or the Notes thereto.

(3)  Exhibits.

The exhibits listed below are hereby filed with the SEC, as part of this annual report on Form 10-K. Certain of the following exhibits have been previously filed with the SEC pursuant to the requirements of the Securities Act of 1933 or the Securities Exchange Act of 1934. Such exhibits are identified by the parenthetical references following the listing of each such exhibit and are incorporated by reference. We will furnish a copy of any exhibit upon request, but a reasonable fee will be charged to cover our expenses in furnishing such exhibit.

| Exhibit Number | Description of Document |
|---|---|
| 2.1(a)* | Unit Purchase Agreement, dated as of September 29, 2000, among NorthWestern Corporation, Touch America Holdings, Inc. and The Montana Power Comp any with respect to all outstanding membership interests in The Montana Power, LLC (incorporated by reference to Exhibit (10)(a)(1) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |
| 2.1(b)* | Amendment No. 1 to the Unit Purchase Agreement, dated as of June 21, 2001 (incorporated by reference to Exhibit (10)(a)(2) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |
| 3.1* | Restated Certificate of Incorporation of NorthWestern Corporation, dated November 9, 2000 (incorporated by reference to Exhibit 3(a) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692). |
| 3.2** | By-Laws of NorthWestern Corporation, as amended, dated August 26, 2003. |
| 4.1(a)* | General Mortgage Indenture and Deed of Trust, dated as of August 1, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(a) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(b)* | Supplemental Indenture, dated as of August 15, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(c)* | Supplemental Indenture, dated as of August 1, 1995, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.1(d)* | Supplemental Indenture, dated as of February 1, 2003, from NorthWestern Corporation to JPMorgan Chase Bank, as Trustee (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 4.2(a)* | Preferred Securities Guarantee Agreement, dated as of August 3, 1995, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 1(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.2(b)* | Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.2(c)* | Amended and Restated Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.2(d)* | Preferred Securities Guarantee Agreement, dated as of November 18, 1998, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623). |
| 4.2(e)* | Certificate of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(b)(11) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491). |
| 4.2(f)* | Amended and Restated Declaration of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623). |

| Exhibit Number | Description of Document |
|---|---|
| 4.2(g)* | Preferred Securities Guarantee Agreement, dated as of December 21, 2001, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.7 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843). |
| 4.2(h)* | Restated Certificate of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4(b)(12) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491). |
| 4.2(i)* | Amended and Restated Declaration of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4.4 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843). |
| 4.2(j)* | Preferred Securities Guarantee Agreement, dated as of January 31, 2002, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229). |
| 4.2(k)* | Restated Certificate of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4(b)(13) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491). |
| 4.2(l)* | Amended and Restated Declaration of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-16843). |
| 4.2(m)* | Form of Guarantee Agreement, between The Montana Power Company and The Bank of New York, as trustee (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369). |
| 4.2(n)* | Assumption of Guarantee Agreement, dated as of February 13, 2002, by The Montana Power, LLC in favor of The Bank of New York, as trustee (incorporated by reference to Exhibit 4.2(n) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.2(o)* | Assumption Agreement (QUIPs Guarantee), dated as of November 15, 2002, by between NorthWestern Energy, LLC, as assignor, and NorthWestern Corporation, as assignee (incorporated by reference to Exhibit 4.2(o) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.2(p)* | Form of Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(a) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369). |
| 4.2(q)* | Assignment and Assumption Agreement (QUIPs Agreements), dated as of November 15, 2002, by between NorthWestern Energy, LLC, as assignor, and NorthWestern Corporation, as assignee (incorporated by reference to Exhibit 4.2(q) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.2(r)* | Form of Amended and Restated Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(b) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369). |
| 4.2(s)* | Subordinated Debt Securities Indenture, dated as of August 1, 1995, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(f) of the Company's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |

63

| Exhibit Number | Description of Document |
|---|---|
| 4.2(t)* | First Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of August 1, 1995 (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.2(u)* | Second Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of November 15, 1998 (incorporated by reference to Exhibit 4(f) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623). |
| 4.2(v)* | Third Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of December 21, 2001 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843). |
| 4.2(w)* | Fourth Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of January 31, 2002 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229). |
| 4.2(x)* | Form of Indenture, between The Montana Power Company and The Bank of New York, as Trustee (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369). |
| 4.2(y)* | First Supplemental Indenture to the Indenture, dated as of February 13, 2002, between The Montana Power, LLC and The Bank of New York, as trustee (incorporated by reference to Exhibit 4.2(y) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.2(z)* | Second Supplemental Indenture to the Indenture, dated as of August 13, 2002, between The Montana Power, LLC and The Bank of New York, as trustee (incorporated by reference to Exhibit 4.2(z) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.2(aa)* | Third Supplemental Indenture to the Indenture, dated as of November 15, 2002, between NorthWestern Corporation (successor to NorthWestern Energy, LLC, formerly known as The Montana Power, LLC) and The Bank of New York, as trustee (incorporated by reference to Exhibit 4.2(aa) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.3(a)* | Indenture, dated as of November 1, 1998, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(b)(8) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707). |
| 4.3(b)* | First Supplemental Indenture to the Indenture, dated as of November 1, 1998 (incorporated by reference to Exhibit 4(b)(9) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707). |
| 4.3(c)* | Second Supplemental Indenture to the Indenture, dated as of March 13, 2002 (filed as Exhibit 4(f)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692). |
| 4.4(a)* | Sale Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Mercer County, North Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993 (incorporated by reference to Exhibit 4(b)(1) of Northwestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692). |

64

| Exhibit Number | Description of Document |
|---|---|
| 4.4(b)* | Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993A (incorporated by reference to Exhibit 4(b)(2) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692). |
| 4.4(c)* | Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993B (incorporated by reference to Exhibit 4(b)(3) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692). |
| 4.4(d)* | Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and the City of Salix, Iowa, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993 (incorporated by reference to Exhibit 4(b)(4) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692). |
| 4.4(e)* | Loan Agreement, dated as of May 1, 1993, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023 (incorporated by reference to Exhibit 4.4(e) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.4(f)* | 1993A First Supplemental Loan Agreement, dated as of September 21, 2001, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023 (incorporated by reference to Exhibit 4.4(f) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.4(g)* | Assumption Agreement of The Montana Power, LLC to Bank One, as Trustee, dated as of February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023 (incorporated by reference to Exhibit 4.4(g) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.4(h)* | Assignment and Assumption Agreement (PCRB 1993A Loan Agreement), between NorthWestern Energy, LLC, as Assignor, and NorthWestern Corporation, as Assignee, dated as of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023 (incorporated by reference to Exhibit 4.4(h) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.4(i)* | Loan Agreement, dated as of December 1, 1993, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993B due 2023 (incorporated by reference to Exhibit 4.4(i) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.4(j)* | 1993B First Supplemental Loan Agreement, dated as of September 21, 2001, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023 (incorporated by reference to Exhibit 4.4(j) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.4(k)* | Assumption Agreement of The Montana Power, LLC to Bank One, as Trustee, dated as of February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993B due 2023 (incorporated by reference to Exhibit 4.4(k) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.4(l)* | Assignment and Assumption Agreement (PCRB 1993B Loan Agreement), between NorthWestern Energy, LLC, as Assignor, and NorthWestern Corporation, as Assignee, dated as of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023 (incorporated by reference to Exhibit 4.4(l) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |

| Exhibit Number | Description of Document |
|---|---|
| 4.5(a)* | First Mortgage and Deed of Trust, dated as of October 1, 1945, by The Montana Power Company in favor of Guaranty Trust Company of New York and Arthur E. Burke, as trustees (incorporated by reference to Exhibit 7(e) of The Montana Power Company's Registration Statement, Commission File No. 002-05927). |
| 4.5(b)* | Thirteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1991 (incorporated by reference to Exhibit 4(a)—14 of The Montana Power Company's Registration Statement on Form S-3, dated December 16, 1992, Commission File No. 033-55816). |
| 4.5(c)* | Fourteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of January 1, 1993 (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576). |
| 4.5(d)* | Fifteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of March 1, 1993 (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576). |
| 4.5(e)* | Sixteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of May 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated September 13, 1993, Commission File No. 033-50235). |
| 4.5(f)* | Seventeenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739). |
| 4.5(g)* | Eighteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of August 5, 1994 (incorporated by reference to Exhibit 99(b) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739). |
| 4.5(h)* | Nineteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 16, 1999 (incorporated by reference to Exhibit 99 of The Montana Power Company's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 001-04566). |
| 4.5(i)* | Twentieth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 1, 2001 (incorporated by reference to Exhibit 4(u) of NorthWestern Energy, LLC's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276). |
| 4.5(j)* | Twenty-first Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 13, 2002 (incorporated by reference to Exhibit 4(v) of NorthWestern Energy, LLC's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276). |
| 4.5(k)* | Twenty-second Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 15, 2002 (incorporated by reference to Exhibit 4.1 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |

| Exhibit Number | Description of Document |
|---|---|
| 4.5(l)* | Twenty-third Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 1, 2002 (incorporated by reference to Exhibit 4.2 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 4.6(a)* | Form of Indenture, dated as of December 1, 1989, between The Montana Power Company and Citibank, N.A., as Trustee (incorporated by reference to Exhibit 4-A to The Montana Power Company's Registration Statement on Form S-3, dated November 24, 1989, Commission File No. 033-32275). |
| 4.6(b)* | First Supplemental Indenture to the Indenture, dated as of February 13, 2002 (incorporated by reference to Exhibit 4.6(b) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.6(c)* | Second Supplemental Indenture to the Indenture, dated as of November 15, 2002 (incorporated by reference to Exhibit 4.6(c) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.7(a)* | Natural Gas Funding Trust Indenture, dated as of December 22, 1998, between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee (incorporated by reference to Exhibit 4.7(a) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.7(b)* | Natural Gas Funding Trust Agreement, dated as of December 11, 1998, among The Montana Power Company, Wilmington Trust Company, as trustee, and the Beneficiary Trustees party thereto (incorporated by reference to Exhibit 4.7(b) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.7(c)* | Transition Property Purchase and Sale Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company (incorporated by reference to Exhibit 4.7(c) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.7(d)* | Transition Property Servicing Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company (incorporated by reference to Exhibit 4.7(d) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.7(e)* | Assumption Agreement regarding the Transition Property Purchase Agreement and the Transition Property Servicing Agreement, dated as of February 13, 2002, by The Montana Power, LLC to MPC Natural Gas Funding Trust (incorporated by reference to Exhibit 4.7(e) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.7(f)* | Assignment and Assumption Agreement (Natural Gas Transition Documents), dated as of November 15, 2002, by and between NorthWestern Energy, LLC, as assignor, and NorthWestern Corporation, as assignee (incorporated by reference to Exhibit 4.7(f) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 4.8(a)* | Rights Agreement, dated as of December 11, 1996, between NorthWestern Corporation and Norwest Bank Minnesota, N.A. as Rights Agent (incorporated by reference to Exhibit 4(c)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692). |
| 4.8(b)* | First Amendment to Rights Agreement, dated as of August 21, 2000, between NorthWestern Corporation and Wells Fargo Bank Minnesota, N.A., (formerly Norwest Bank Minnesota, N.A.), as Rights Agent (incorporated by reference to Exhibit 4(c)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000). |
| 10.1(a)†* | NorthWestern Corporation Traditional Pension Equalization Plan, as amended and restated, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692). |
| 10.1(b)†* | NorthWestern Corporation Cash Balance Supplemental Executive Retirement Plan, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(3) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692). |

| Exhibit Number | Description of Document |
|---|---|
| 10.1(c)†* | NorthSTAR Annual Incentive Plan, for all eligible employees, as amended as of May 4, 1999 (incorporated by reference to Exhibit 10(a)(4) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692). |
| 10.1(d)†* | NorthWestern Executive Performance Plan, effective as of May 2, 2000 (incorporated by reference to Exhibit 10(a)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692). |
| 10.1(e)†* | NorthWestern Stock Option and Incentive Plan, as amended as of January 16, 2001 (incorporated by reference to Exhibit 10(a)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692). |
| 10.1(f)†* | Deferred Compensation Plan for Non-employee Directors, adopted as of November 6, 1985 (incorporated by reference to Exhibit 10(g)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1988, Commission File No. 0-692). |
| 10.1(g)†* | Supplemental Variable Investment Plan, as amended and restated as of January 1, 2000 (filed as Exhibit 10(a)(7) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692). |
| 10.1(h)†* | Retirement Agreement, effective as of December 31, 2002, by and between NorthWestern Corporation and Merle D. Lewis (incorporated by reference to Exhibit 10.1(i) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 10.1(i)†* | Comprehensive Employment Agreement and Equity Plan Participation Program for Richard R. Hylland, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.2 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692). |
| 10.1(j)†* | Comprehensive Employment Agreement and Equity Plan Participation Program for Michael J. Hanson, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.4 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692). |
| 10.1(k)†* | Supplemental Income Security Plan for Directors, Officers and Managers, as amended and restated effective as of July 1, 1999 (incorporated by reference to Exhibit 10.8 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692). |

| Exhibit Number | Description of Document |
|---|---|
| 10.1(l)†* | Form of "Tier 1" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(a) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566). |
| 10.1(m)†* | Form of "Tier 2" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(b) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566). |
| 10.1(n)†* | Form of "Tier 3" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(c) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566). |
| 10.1(o) †** | Memorandum of Engagement with William M Austin as Chief Restructuring Officer, as amended and approved by the Bankruptcy Court in its Order dated October 10, 2003. |
| 10.1(p) †** | Employment Agreement with Brian B. Bird as Chief Financial Officer, as amended and approved by the Bankruptcy Court in its Order dated January 13, 2004. |
| 10.1(q) †** | Memorandum of Engagement between Daniel K. Newell and Blue Dot Services Inc., dated November 6, 2003. |
| 10.1(r) †** | NorthWestern Corporation Incentive Compensation and Severance Plan. |
| 10.1(s)†* | NorthWestern Capital Partners LLC Limited Liability Company Agreement, dated as of September 30, 1999 (incorporated by reference to Exhibit 10.1(r) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 10.1(t)†* | Form of Put Option Agreement, dated as of September 30, 1999 (incorporated by reference to Exhibit 10.1(s) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 10.2(a)* | Credit Agreement, dated as of January 14, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (filed as Exhibit 10(b)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692). |
| 10.2(b)* | Amendment No. 1 to Credit Agreement, dated as of June 20, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.2(c) of Amendment No. 1 to NorthWestern Corporation's Registration Statement on Form S-4, dated July 12, 2002, Commission File No. 333-86888). |
| 10.2(c)* | Amendment No. 2 to Credit Agreement, dated as of August 13, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.1 of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, Commission File No. 0-692.) |
| 10.2(d)* | Credit Agreement, dated as of December 17, 2002, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.2 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 10.2(e)* | Amendment No. 1 to Credit Agreement, dated as of January 8, 2003, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |

| Exhibit Number | Description of Document |
|---|---|
| 10.2(f)* | Amendment No. 2 to Credit Agreement, dated as of February 10, 2003, among NorthWestern Corporation, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 99.4 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 10.2(g)* | Bond Collateral Agreement, dated as of February 10, 2003, between NorthWestern Corporation and Credit Suisse First Boston, acting through its Cayman Islands Branch, as collateral agent (incorporated by reference to Exhibit 99.5 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 10.2(h)** | Secured Superpriority Debtor in Possession Credit and Guaranty Agreement, dated September 19, 2003, among NorthWestern Corporation a Debtor and Debtor in Possession, as Borrower, and the Other Loan Parties as Guarantors, the Lenders herein from time to time, and Bank One N.A. and Banc One Capital Markets, Inc. as Lead Arranger and Sole Book Runner. |
| 10.2(i)** | Amended and Restated Credit Agreement among NorthWestern Corporation, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto, dated January 13, 2004. |
| 10.3(a)* | Credit and Security Agreement, dated as of March 31, 2001, between Expanets, Inc. and Avaya Inc. (and NorthWestern Corporation with respect to Section 7.3 only) (filed as Exhibit 10(d)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001 Commission File No. 0-692). |
| 10.3(b)* | First Amendment to Credit and Security Agreement, dated as of August 1, 2001, between Expanets, Inc. and Avaya Inc. (acknowledged by NorthWestern Corporation) (filed as Exhibit 10(d)(2) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001. Commission File No. 0-692). |
| 10.3(c)* | Second Amendment to Credit and Security Agreement; Amendment to Collateral Agreements, dated as of March 5, 2002, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1(h) and 7 only) (filed as Exhibit 10(d)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692). |
| 10.3(d)* | Third Amendment to Credit and Security Agreement, dated as of March 5, 2003, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1 and 6 only) (incorporated by reference to Exhibit 10.3(d) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 10.3(e)** | Asset Purchase and Sale Agreement, dated October 29, 2003, Agreement among Expanets, Inc., NorthWestern Corporation, NorthWestern Growth Corporation, NorthWestern Capital Corporation and Avaya, Inc. |
| 10.3(f)** | Amendment No. 1 to Asset Purchase and Sale Agreement dated October 29, 2003, Agreement among Expanets, Inc., NorthWestern Corporation, NorthWestern Growth Corporation, NorthWestern Capital Corporation and Avaya, Inc. |
| 10.4(a)* | Credit and Security Agreement, dated as of August 30, 2002, between Blue Dot Services Inc. and U.S. Bank, N.A. (incorporated by reference to Exhibit 10.4(a) of the Company's Report on Form 10-K for the year ended December 31, 2002, Commission File No. 0-692). |
| 12.1** | Statement Regarding Computation of Earnings to Fixed Charges. |
| 21** | Subsidiaries of NorthWestern Corporation. |
| 23.1** | Independent Auditors' Consent |
| 24** | Power of Attorney (included on the signature page of this Annual Report on Form 10-K) |
| 31.1** | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 |
| 31.2** | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 |
| 32.1** | Certification of Gary G. Drook pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Brian B. Bird pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

†        Management contract or compensatory plan or arrangement.

*        Incorporated by reference.

**       Filed herewith.

All schedules for which provision is made in the applicable accounting regulations of the SEC are not required under the related instructions or are not applicable, and, therefore, have been omitted.

**(b)**    **Reports on Form 8-K**

We filed a Current Report on Form 8-K with the SEC on October 30, 2003, to disclose under Item 5 of the Report that we issued a press release announcing that we had entered into a sale agreement with Avaya, Inc.(NYSE: AV) for substantially all of the assets of our Expanets communications services unit.

We filed a Current Report on Form 8-K with the SEC on November 13, 2003, to disclose under Item 5 of the Report that we issued a press release announcing that Daniel K. Newell has resigned as senior vice president of NorthWestern.

We filed a Current Report on Form 8-K with the SEC on November 14, 2003, to disclose under Item 5 of the Report that we issued a press release discussing operating results for the third quarter of 2003. The press release also discussed NorthWestern's previously announced Chapter 11 filing and provided an update on recent sales of assets by Expanets, Inc. and Blue Dot Services, Inc., subsidiaries of NorthWestern.

We filed a Current Report on Form 8-K with the SEC on November 20, 2003, to disclose under Item 5 of the Report that we issued a press release announcing that Brian B. Bird has been named our Chief Financial Officer, effective December 1, 2003.

We filed a Current Report on Form 8-K with the SEC on November 26, 2003, to disclose under Item 5 of the Report that we issued a press release announcing that we had completed the sale of substantially all of the assets of our Expanets communications services unit to Avaya, Inc. (NYSE: AV).

We filed a Current Report on Form 8-K with the SEC on December 18, 2003, to disclose under Item 5 of the Report that we issued a press release announcing that Roger P. Schrum had been elected Vice President of Human Resources and Communications.

We filed a Current Report on Form 8-K with the SEC on December 31, 2003, to disclose under Item 5 of the Report that we issued a press release announcing that the U.S. Securities and Exchange Commission had issued subpoenas to Blue Dot Services Inc. and Expanets, Inc. requesting the production of documents as part of a now formal investigation of NorthWestern.

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

**NORTHWESTERN CORPORATION**

Dated: **March 15, 2004**     By:     /s/ GARY G. DROOK

Gary G. Drook
*President and Chief Executive Officer*

# POWER OF ATTORNEY

We, the undersigned directors and/or officers of NorthWestern Corporation, hereby severally constitute and appoint Gary G. Drook and Eric R. Jacobsen, and each of them with full power to act alone, our true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution and revocation, for each of us and in our name, place, and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file or cause to be filed the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, and hereby grant unto such attorneys-in-fact and agents, and each of them, the full power and authority to do each and every act and thing requisite and necessary to be done in and about the foregoing, as fully to all intents and purposes as each of us might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their respective substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ MARILYN R. SEYMANN<br>Marilyn R. Seymann | Chairman of the Board | March 15, 2004 |
| /s/ GARY G. DROOK<br>Gary G. Drook | President and Chief Executive Officer and Director<br>(Principal Executive Officer) | March 15, 2004 |
| /s/ BRIAN B. BIRD<br>Brian B. Bird | Chief Financial Officer<br>(Principal Financial Officer) | March 15, 2004 |
| /s/ KENDALL G. KLIEWER<br>Kendall G. Kliewer | Chief Accountant and Director of Financial Reporting<br>(Principal Accounting Officer) | March 15, 2004 |

| Signature | Title | Date |
|---|---|---|
| /s/ RANDY G. DARCY<br>Randy G. Darcy | Director | March 15, 2004 |
| /s/ JERRY W. JOHNSON<br>Jerry W. Johnson | Director | March 15, 2004 |
| /s/ LARRY F. NESS<br>Larry F. Ness | Director | March 15, 2004 |
| /s/ BRUCE I. SMITH<br>Bruce I. Smith | Director | March 15, 2004 |
| /s/ LAWRENCE J. RAMAEKERS<br>Lawrence J. Ramaekers | Director | March 15, 2004 |

73

### INDEX TO FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES

| | Page |
|---|---|
| *Financial Statements* | |
| Independent Auditors' Report | F-2 |
| Consolidated statements of income (loss) for the years ended December 31, 2003, 2002 and 2001 | F-3 |
| Consolidated statements of cash flows for the years ended December 31, 2003, 2002 and 2001 | F-4 |
| Consolidated balance sheets as of December 31, 2003 and 2002 | F-5 |
| Consolidated statements of common shareholders' equity (deficit) for the years ended December 31, 2003, 2002 and 2001 | F-6 |
| Notes to consolidated financial statements | F-8 |
| *Financial Statement Schedules* | |
| Independent Auditors' Report | F-43 |
| Schedule II. Valuation and Qualifying Accounts | F-44 |

F - 1

## INDEPENDENT AUDITORS' REPORT

To the Shareholders and Board of Directors of NorthWestern Corporation:

We have audited the accompanying consolidated balance sheets of NORTHWESTERN CORPORATION (a Delaware corporation) (Debtor-in-Possession) AND SUBSIDIARIES as of December 31, 2003 and 2002, and the related consolidated statements of income (loss), common shareholders' equity (deficit) and cash flows for each of the three years in the period ended December 31, 2003. These financial statements are the responsibility of NorthWestern Corporation management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of NorthWestern Corporation and Subsidiaries as of December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1, NorthWestern Corporation filed for reorganization under Chapter 11 of the Federal Bankruptcy Code on September 14, 2003. The accompanying financial statements do not purport to reflect or provide for the consequences of the bankruptcy proceedings. In particular, such financial statements do not purport to show (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to prepetition liabilities, the amounts that may be allowed for claims or contingencies, or the status and priority thereof; (c) as to shareholder accounts, the effect of any changes that may be made in the capitalization of NorthWestern Corporation and Subsidiaries; or (d) as to operations, the effect of any changes that may be made in its business.

The accompanying financial statements have been prepared assuming that NorthWestern Corporation and Subsidiaries will continue as a going concern. As discussed in Note 3, NorthWestern Corporation and Subsidiaries' recurring losses from operations, negative working capital, shareholders' deficit, and defaults under terms of its long-term debt agreements raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 3. The financial statements do not include adjustments that might result from the outcome of this uncertainty.

As discussed in Note 4, NorthWestern Corporation and Subsidiaries changed its methods of accounting for asset retirement obligations and its company obligated mandatorily redeemable preferred securities in 2003 and, as discussed in Note 6, changed its method of accounting for goodwill and other intangible assets in 2002.

/s/ DELOITTE & TOUCHE LLP

Minneapolis, Minnesota
March 15, 2004

F - 2

**NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION**
**CONSOLIDATED STATEMENTS OF INCOME (LOSS)**
**(in thousands, except per share amounts)**

| | YEAR ENDED DECEMBER 31 | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| OPERATING REVENUES | $ 1,027,437 | $ 783,744 | $ 255,151 |
| COST OF SALES | 550,589 | 341,526 | 145,568 |
| GROSS MARGIN | 476,848 | 442,218 | 109,583 |
| OPERATING EXPENSES | | | |
| Operating, general and administrative | 307,258 | 268,218 | 61,730 |
| Impairment on assets held for sale | 12,399 | 35,729 | — |
| Depreciation | 70,252 | 63,240 | 17,923 |
| Amortization of goodwill and other intangibles | — | 19 | 269 |
| Restructuring charge | — | — | 11,771 |
| Reorganization professional fees and expenses | 8,280 | — | — |
| TOTAL OPERATING EXPENSES | 398,189 | 367,206 | 91,693 |
| OPERATING INCOME | 78,659 | 75,012 | 17,890 |
| Interest Expense (contractual interest of $176,926 for the year ended 12/31/03) | (147,626) | (98,010) | (27,709) |
| Gain (Loss) on Debt Extinguishment | 3,300 | (20,688) | — |
| Investment Income and Other | (5,977) | (5,481) | 7,134 |
| Reorganization Interest Income | 14 | — | — |
| Loss From Continuing Operations Before Income Taxes | (71,630) | (49,167) | (2,685) |
| Benefit for Income Taxes | 48 | 39,811 | 6,860 |
| Income (Loss) From Continuing Operations | (71,582) | (9,356) | 4,175 |
| Discontinued Operations, Net of Taxes and Minority Interests | (42,143) | (854,586) | 40,357 |
| Net Income (Loss) | (113,725) | (863,942) | 44,532 |
| Minority Interests on Preferred Securities of Subsidiary Trusts | (14,945) | (28,610) | (6,827) |
| Dividends and Redemption Premium on Preferred Stock | — | (391) | (191) |
| Earnings (Losses) on Common Stock | $ (128,670) | $ (892,943) | $ 37,514 |
| | | | |
| Average Common Shares Outstanding | 37,397 | 29,726 | 24,390 |
| Basic Earnings (Loss) per Average Common Share | | | |
| Continuing operations | $ (2.31) | $ (1.29) | $ (0.11) |
| Discontinued operations | (1.13) | (28.75) | 1.65 |
| Basic | $ (3.44) | $ (30.04) | $ 1.54 |
| | | | |
| Diluted Earnings (Loss) per Average Common Share | | | |
| Continuing operations | $ (2.31) | $ (1.29) | $ (0.12) |
| Discontinued operations | (1.13) | (28.75) | 1.65 |
| Diluted | $ (3.44) | $ (30.04) | $ 1.53 |
| | | | |
| Dividends Declared per Average Common Share | — | $ 1.27 | $ 1.21 |

See Notes to Consolidated Financial Statements

F - 3

**NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | YEAR ENDED DECEMBER 31 | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| **Operating Activities:** | | | |
| Net Income (Loss) | $ (113,725) | $ (863,942) | $ 44,532 |
| Items not affecting cash: | | | |
| Depreciation and amortization | 70,252 | 63,259 | 18,192 |
| Amortization of debt issue costs | 13,935 | 6,655 | 314 |
| (Gain) Loss on debt extinguishment | (3,300) | 20,688 | — |
| Impairment on assets held for sale | 12,399 | 35,729 | — |
| (Income) Loss on discontinued operations, net of taxes | 42,143 | 854,586 | (40,357) |
| Impairment of note receivable | 9,073 | — | — |
| Deferred income taxes | 10,334 | (8,761) | (20,891) |
| (Gain) Loss on property, plant and equipment and investments | (1,468) | 13,984 | (2,256) |
| Changes in current assets and liabilities, net of acquisitions: | | | |
| Restricted cash | 996 | 4,330 | (2,369) |
| Accounts receivable | (14,636) | 4,864 | 8,624 |
| Inventories | (614) | 12,545 | 55 |
| Prepaid energy supply costs | (62,445) | — | — |
| Other current assets | 7,804 | 19,233 | 954 |
| Accounts payable | 22,443 | 6,384 | (16,815) |
| Accrued expenses | (303) | (1,816) | 35,901 |
| Changes in regulatory assets | (3,069) | (74,095) | (369) |
| Changes in regulatory liabilities | (23,557) | (31,276) | — |
| Other noncurrent liabilities | (55,364) | 34,708 | 20,437 |
| Other, net | (16,571) | 28,482 | (29,530) |
| **Cash flows (used in) provided by continuing operations** | (105,673) | 125,557 | 16,422 |
| Change in net assets of discontinued operations | 11,813 | (195,421) | (141,751) |
| **Cash flows used in operating activities** | (93,860) | (69,864) | (125,329) |
| **Investing Activities:** | | | |
| Property, plant, and equipment additions | (70,737) | (147,847) | (80,295) |
| Proceeds from sale of assets | 2,743 | 8,579 | — |
| Sale (purchase) of noncurrent investments and assets, net | 72,926 | 899 | (433) |
| Acquisitions, net of cash received | — | (502,765) | — |
| **Cash flows provided by (used in) investing activities** | 4,932 | (641,134) | (80,728) |
| **Financing Activities:** | | | |
| Dividends on common and preferred stock | — | (38,081) | (29,956) |
| Minority interest on preferred securities of subsidiary trusts | (9,720) | (28,610) | (6,827) |
| Redemption of preferred stock | — | (4,028) | — |
| Proceeds from issuance of common stock | — | 81,031 | 74,868 |
| Issuance of long term debt | 397,200 | 721,970 | — |
| Issuance of preferred securities of subsidiary trust, net | — | 117,750 | 100,000 |
| Repayment of long-term debt | (26,979) | (213,587) | (5,259) |
| Line of credit borrowings, net | (255,000) | 123,000 | 74,303 |
| Repayment of discontinued operations debt | — | (26,059) | — |
| Treasury stock activity | — | 121 | — |
| Financing costs | (27,944) | (25,813) | (6,936) |
| Proceeds from termination of hedge | — | 24,898 | — |
| **Cash flows provided by financing activities** | 77,557 | 732,592 | 200,193 |
| **Increase (Decrease) in Cash and Cash Equivalents** | (11,371) | 21,594 | (5,864) |
| Cash and Cash Equivalents, beginning of period | 26,554 | 4,960 | 10,824 |
| **Cash and Cash Equivalents, end of period** | $ 15,183 | $ 26,554 | $ 4,960 |

See Notes to Consolidated Financial Statements

**NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share data)**

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 15,183 | $ 26,554 |
| Restricted cash | 27,043 | 28,039 |
| Accounts receivable, net | 106,443 | 91,807 |
| Inventories | 26,521 | 25,907 |
| Regulatory assets | 23,145 | 28,096 |
| Prepaid energy supply | 63,108 | 663 |
| Other | 32,838 | 40,642 |
| Assets held for sale | 30,000 | 42,665 |
| Current assets of discontinued operations | 106,197 | 275,549 |
| **Total current assets** | **430,478** | **559,922** |
| **Property, Plant, and Equipment, Net** | **1,362,749** | **1,353,543** |
| **Goodwill** | **375,798** | **375,798** |
| **Other:** | | |
| Investments | 11,027 | 85,236 |
| Regulatory assets | 202,174 | 194,154 |
| Other | 61,979 | 51,438 |
| Noncurrent assets of discontinued operations | 306 | 164,970 |
| **Total assets** | **$ 2,444,511** | **$ 2,785,061** |
| | | |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Liabilities Not Subject to Compromise** | | |
| **Current Liabilities:** | | |
| Current maturities of long-term debt | $ 919,392 | $ 25,909 |
| Accounts payable | 67,602 | 49,704 |
| Accrued expenses | 104,594 | 161,224 |
| Regulatory liabilities | 702 | 33,536 |
| Current liabilities of discontinued operations | 44,496 | 243,551 |
| **Total current liabilities** | **1,136,786** | **513,924** |
| **Long-term Debt** | **—** | **1,642,522** |
| **Deferred Income Taxes** | **10,536** | **202** |
| **Noncurrent Regulatory Liabilities** | **152,851** | **143,574** |
| **Other Noncurrent Liabilities** | **210,094** | **487,162** |
| **Noncurrent Liabilities and Minority Interests of Discontinued Operations** | **1,998** | **83,003** |
| **Total liabilities not subject to compromise** | **1,512,265** | **2,870,387** |
| **Liabilities Subject to Compromise** | | |
| Financing Debt | 864,844 | — |
| Trade Creditors | 287,803 | — |
| Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts | 365,550 | — |
| **Total liabilities subject to compromise** | **1,518,197** | **—** |
| **Total liabilities** | **3,030,462** | **2,870,387** |
| **Minority Interests** | **—** | **500** |
| **Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts** | **—** | **370,250** |
| **Shareholders' Deficit:** | | |
| Common stock, par value $1.75; authorized 50,000,000 shares; issued and outstanding 37,680,095 and 37,396,762 | 65,940 | 65,444 |
| Paid-in capital | 301,455 | 304,781 |
| Treasury stock, at cost | — | (3,560) |
| Retained deficit | (947,274) | (818,604) |
| Accumulated other comprehensive loss | (6,072) | (4,137) |
| **Total shareholders' deficit** | **(585,951)** | **(456,076)** |
| **Total liabilities and shareholders' deficit** | **$ 2,444,511** | **$ 2,785,061** |

See Notes to Consolidated Financial Statements

F - 5

**NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION**
**CONSOLIDATED STATEMENTS OF COMMON SHAREHOLDERS' EQUITY (DEFICIT)**
**(in thousands)**

| | Number of Common Shares | Number of Treasury Shares | Common Stock | Paid in Capital | Treasury Stock | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | |
| **Balance at December 31, 2000** ................................................ | 23,411 | — | $ 40,968 | $ 165,932 | $ — | $ 111,355 | $ 1,294 | $ 319,549 |
| Net income ................................... | — | — | $ — | $ — | $ — | $ 44,532 | $ — | $ 44,532 |
| Other comprehensive income (loss), net of tax: | | | | | | | | |
| Unrealized loss on marketable securities net of reclassification adjustment... | — | — | — | — | — | — | (2,081) | (2,081) |
| Issuances of common stock...... | 3,714 | — | 6,498 | 68,370 | — | — | — | 74,868 |
| Cashless exercise of warrants .. | 272 | — | 476 | 6,321 | — | (6,797) | — | — |
| Amortization of unearned restricted stock compensation ................................................ | — | — | — | 174 | — | — | — | 174 |
| Treasury stock activity.............. | — | 156 | — | — | (3,681) | — | — | (3,681) |
| Distributions on minority interests in preferred securities of subsidiary trusts ................ | — | — | — | — | — | (6,827) | — | (6,827) |
| Dividends on preferred stock... | — | — | — | — | — | (191) | — | (191) |
| Dividends on common stock..... | — | — | — | — | — | (29,765) | — | (29,765) |
| **Balance at December 31, 2001** ................................................ | 27,397 | 156 | $ 47,942 | $ 240,797 | $ (3,681) | $ 112,307 | $ (787) | $ 396,578 |
| Net loss........................................ | — | — | $ — | $ — | $ — | $ (863,942) | $ — | $ (863,942) |
| Other comprehensive income (loss), net of tax: | | | | | | | | |
| Unrealized gain on marketable securities net of reclassification adjustment... | — | — | — | — | — | — | 1,139 | 1,139 |
| Foreign currency translation adjustments............................ | — | — | — | — | — | — | 5 | 5 |
| Gain on hedge termination...... | — | — | — | — | — | — | 5,072 | 5,072 |
| Amortization of hedge gain...... | — | — | — | — | — | — | (807) | (807) |
| Minimum pension liability....... | — | — | — | — | — | — | (8,759) | (8,759) |
| Issuances of common stock...... | 10,000 | — | 17,502 | 63,529 | — | — | — | 81,031 |
| Amortization of unearned restricted stock compensation ................................................ | — | — | — | 455 | — | — | — | 455 |
| Treasury stock activity.............. | — | 18 | — | — | 121 | — | — | 121 |
| Distributions on minority interests in preferred securities of subsidiary trusts ................ | — | — | — | — | — | (28,610) | — | (28,610) |
| Dividends on preferred stock... | — | — | — | — | — | (112) | — | (112) |
| Redemption premium on preferred stock...................... | — | — | — | — | — | (278) | — | (278) |
| Dividends on common stock..... | — | — | — | — | — | (37,969) | — | (37,969) |
| **Balance at December 31, 2002** ................................................ | 37,397 | 174 | $ 65,444 | $ 304,781 | $ (3,560) | $ (818,604) | $ (4,137) | $ (456,076) |

| | Number of Common Shares | Number of Treasury Shares | Common Stock | Paid in Capital | Treasury Stock | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | |
| **Balance at December 31, 2002** .................................................. | 37,397 | 174 | $ 65,444 | $ 304,781 | $ (3,560) | $ (818,604) | $ (4,137) | $ (456,076) |
| Net loss......................................... | — | — | $ — | $ — | $ — | $ (113,725) | $ — | $ (113,725) |
| Other comprehensive income (loss), net of tax: | | | | | | | | |
| Unrealized loss on marketable securities net of reclassification adjustment... | — | — | — | — | — | — | (352) | (352) |
| Foreign currency translation adjustments............................... | — | — | — | — | — | — | 298 | 298 |
| Amortization of hedge gain ...... | — | — | — | — | — | — | (416) | (416) |
| Minimum pension liability ....... | — | — | — | — | — | — | (1,465) | (1,465) |
| Issuances of restricted stock..... | 283 | — | 496 | (496) | | | | — |
| Amortization of unearned restricted stock compensation .................................................. | — | — | — | 266 | — | — | — | 266 |
| Treasury stock activity............. | — | (174) | — | (3,096) | 3,560 | — | — | 464 |
| Distributions on minority interests in preferred securities of subsidiary trusts .................................................. | — | — | — | — | — | (14,945) | — | (14,945) |
| **Balance at December 31, 2003** .................................................. | 37,680 | — | $ 65,940 | $ 301,455 | $ — | $ (947,274) | $ (6,072) | $ (585,951) |

See Notes to Consolidated Financial Statements

F - 7

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(1)    Management's Statement**

The consolidated financial statements for the periods included herein have been prepared by NorthWestern Corporation (the "Corporation", "Debtor" or "we"), a debtor-in-possession, pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that may affect the reported amounts of assets, liabilities, revenues and expenses during the reporting period. Actual results could differ from those estimates.

On September 14, 2003 (the "Petition Date"), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court). Pursuant to Chapter 11 (as discussed further in Note 3), we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court.  Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. The assets and liabilities of such nondebtor subsidiaries are not considered to be material to the consolidated financial statements or are included in discontinued operations.

Beginning in the third quarter of 2003, the consolidated financial statements have been prepared in accordance with the American Institute of Certified Public Accountants' Statement of Position (SOP) 90-7, *Financial Reporting by Entities in Reorganization Under the Bankruptcy Code*, and on a going-concern basis, which contemplates continuity of operation, realization of assets, and liquidation of liabilities in the ordinary course of business.  As a result of our Chapter 11 filing, the realization of assets and liquidation of liabilities are subject to uncertainty. Under SOP 90-7, certain liabilities existing prior to the Chapter 11 filing are classified as Liabilities Subject to Compromise on the Consolidated Balance Sheets. Additionally, professional fees and expenses directly related to the Chapter 11 proceeding and interest income on funds accumulated during the Chapter 11 proceedings are reported separately as reorganization items. Finally, the extent to which our reported interest expense differs from the stated contractual interest is disclosed on the Consolidated Statements of Income (Loss).

**(2)    Nature of Operations and Basis of Consolidation**

We are one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving approximately 608,000 customers in Montana, South Dakota and Nebraska. We have generated and distributed electricity in South Dakota and distributed natural gas in South Dakota and Nebraska since 1923 through our energy division, NorthWestern Energy. On February 15, 2002, we completed the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, or Montana Power. As a result of the acquisition, from February 15, 2002 through November 15, 2002, we distributed electricity and natural gas in Montana through our wholly owned subsidiary, NorthWestern Energy, LLC. Effective November 15, 2002, we transferred the electric and natural gas transmission and distribution operations of NorthWestern Energy, LLC to NorthWestern Corporation, and since that date, we have operated its business as part of our NorthWestern Energy division. We are operating our utility business under the common name "NorthWestern Energy" in all our service territories. The former NorthWestern Energy, LLC has been renamed "Clark Fork and Blackfoot, LLC."

We also have made investments in three primary nonenergy businesses: Netexit, Inc., (f/k/a Expanets, Inc.,) or Expanets, a provider of networked communications and data services and solutions to small to mid-sized businesses; Blue Dot Services Inc., or Blue Dot, a provider of air conditioning, heating, plumbing and related services; and, through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, LP, or CornerStone, a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor.

The accompanying consolidated financial statements include our accounts together with those of our wholly and majority-owned or controlled subsidiaries. The financial statements of Expanets, Blue Dot and CornerStone (CornerStone is only through November 1, 2002) are included in the accompanying consolidated financial statements by virtue of the voting and control rights, and therefore included in references to "subsidiaries." Expanets and Blue Dot are not party to our Chapter 11 case. All significant intercompany balances and transactions have been eliminated from the consolidated financial statements. The operations of Expanets, Blue Dot and CornerStone and our interest in these subsidiaries have been reflected in the consolidated financial statements as Discontinued Operations (see Note 8 for further discussion). On November 25, 2003, we completed the sale of substantially all the assets and business of Expanets, and the assumption of specified liabilities, to Avaya, Inc. At that time, Expanets was renamed Netexit, Inc.

**(3)      Chapter 11 Filing**

As a result of our Chapter 11 filing, we operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable court orders. All vendors are being paid for all goods furnished and services provided after the Petition Date while under the supervision of the bankruptcy court. As a debtor-in-possession, we are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Court, after notice and an opportunity for a hearing.

On September 16, 2003, following first day hearings held on September 15, 2003, the Bankruptcy Court entered orders granting us authority to, among other things, pay prepetition and postpetition employee wages, salaries, benefits and other employee obligations, pay selected vendors and other providers for the postpetition delivery of goods and services, continue bank accounts and existing cash management system, and continue existing forward power contracts and enter into additional similar contracts in the ordinary course of business. On November 7, 2003, the Bankruptcy Court entered a final order to approve access of up to $85 million of the $100 million debtor-in-possession financing facility arranged by the company with Bank One, N.A. In December 2003, we reduced the commitment to $85 million under this Facility. The DIP Facility expires on September 12, 2004, and bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility will provide a source of liquidity during the course of our bankruptcy, but requires that we maintain certain other financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments and sales of assets. As of December 31, 2003, there were $15.2 million in letters of credit outstanding and no borrowings under the DIP Facility.

In January 2004, the Bankruptcy Court extended our exclusive period to file a plan of reorganization through and including March 12, 2004, and extended the time to solicit votes on our plan of reorganization through and including May 11, 2004.  We filed our initial plan of reorganization on March 12, 2004.

The consolidated financial statements have been prepared on a "going concern" basis in accordance with GAAP. The "going concern" basis of presentation assumes that we will continue in operation for the foreseeable future and will be able to realize our assets and discharge our liabilities in the normal course of business. Because of the Chapter 11 case and the circumstances leading to the filing thereof, our ability to continue as a "going concern" is subject to substantial doubt and is dependent upon, among other things, confirmation of a plan of reorganization, our ability to comply with the terms of the DIP Facility, and our ability to generate sufficient cash flows from operations, asset sales and financing arrangements to meet our obligations. There can be no assurance that this can be accomplished and if it were not, our ability to realize the carrying value of our assets and discharge our liabilities would be subject to substantial uncertainty. Therefore, if the "going concern" basis were not used for the Financial Statements, then significant adjustments could be necessary to the carrying value of assets and liabilities, the revenues and expenses reported, and the balance sheet classifications used.

The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations.  As such, we have classified all of our secured debt as current as of December 31, 2003.  Subject to certain exceptions under the Bankruptcy Code, our Chapter 11 filing automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against us or our property to recover on, collect or secure a claim arising prior to the Petition Date.  Thus, for example, creditor actions to obtain possession of our property, or to create, perfect or enforce any lien against our property, or to collect on or otherwise exercise rights or remedies with respect to a prepetition claim are enjoined unless and until the Bankruptcy Court lifts the automatic stay.

**(4)      Significant Accounting Policies**

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates are used for such items as long-lived asset values and impairment charges, long-lived asset useful lives, tax provisions, uncollectible accounts, environmental costs, unbilled revenues and actuarially determined benefit costs. We revise the recorded estimates when we get better information or when we can determine actual amounts. Those revisions can affect operating results.

**Revenue Recognition**

For our South Dakota and Nebraska operations, as prescribed by the respective regulatory authorities, electric and natural gas utility revenues are based on billings rendered to customers. For our Montana operations, as prescribed by the MPSC, operating revenues are recorded monthly on the basis of consumption or services rendered. Customers are billed monthly on a cycle basis.

**Cash Equivalents**

We consider all highly liquid investments with maturities of three months or less at the time of purchase to be cash equivalents.

**Restricted Cash**

Restricted cash consists primarily of funds held in trust accounts to satisfy the requirements of certain stipulation agreements and insurance reserve requirements.

**Accounts Receivable, Net**

Accounts receivable are net of $2.0 million and $1.8 million of allowances for uncollectible accounts at December 31, 2003 and 2002. Receivables include accrued unbilled revenues of $40.7 million and $30.6 million at December 31, 2003 and 2002.

**Inventories**

Inventories are stated at the lower of cost or market, with cost determined using the average cost method.

**Regulatory Assets and Liabilities**

Our regulated operations are subject to the provisions of Statement of Financial Accounting Standards No. 71, *Accounting for the Effects of Certain Types of Regulations* (SFAS No. 71). Regulatory assets represent probable future revenue associated with certain costs, which will be recovered from customers through the ratemaking process. Regulatory liabilities represent probable future reductions in revenues associated with amounts that are to be credited to customers through the ratemaking process.

If all or a separable portion of our operations becomes no longer subject to the provisions of SFAS No. 71, an evaluation of future recovery of the related regulatory assets and liabilities would be necessary. In addition, we would determine any impairment to the carrying costs of deregulated plant and inventory assets.

**Investments**

Investments consisted of the following at December 31 (in thousands):

| | | |
|---|---|---:|
| **December 31, 2003** | | |
| Life insurance contracts and other investments........................................................................... | $ | 11,027 |
| | | |
| **December 31, 2002** | | |
| Preferred stocks............................................................................................................... | $ | 19,692 |
| Fixed Income securities........................................................................................................ | | 27,548 |
| Life insurance contracts and other investments........................................................................... | | 37,996 |
| | $ | 85,236 |

Life insurance contracts are carried at their cash surrender value. We also have investments in various money market accounts and other items. Investments in life insurance contracts of $3.6 million and $22.2 million are held in trust and restricted for postretirement benefits as of December 31, 2003 and 2002, respectively. Investments in money market accounts of $3.6 million and $3.8 million are restricted to satisfy certain debt requirements as of December 31, 2003 and 2002, respectively. Fixed income securities and preferred stocks are carried at market value, which approximates cost at December 31, 2002. Approximately $30 million of our fixed income securities and preferred stock investments are restricted as collateral for letters of credit as of December 31, 2002.

We use the specific identification method for determining the cost basis of our investments in available-for-sale securities. Realized gains and (losses) on our available-for-sale securities were $0.4 million, $(7.5) million and $2.3 million in 2003, 2002 and 2001, respectively.

**Derivative Financial Instruments**

We manage risk using derivative financial instruments for changes in electric and natural gas supply prices and interest rate fluctuations.

We periodically use commodity futures contracts to reduce the risk of future price fluctuations for electric and natural gas

contracts. Increases or decreases in contract values are reported as gains and losses in our Consolidated Statements of Income (Loss) unless the commodities are specifically subject to supply tracking mechanisms within the regulatory environment.

The fair value of fixed-price commodity contracts is estimated based on market prices of commodities covered by the contracts. As of December 31, 2003, we have outstanding call obligations for physical delivery of 3.3 million MMBTU of natural gas during February and March of 2004.  We have recorded a liability related to these obligations of $1.8 million based on the market value of natural gas as of December 31, 2003. We settled these calls during January and February 2004, resulting in a gain of approximately $526,000.

On March 28, 2002, we entered into two fair value hedge agreements, each of $125.0 million, to effectively swap the fixed interest rate on our $250 million five-year original notes to floating interest rates at the three-month LIBOR plus spreads of 2.32% and 2.52% effective as of April 3, 2002. These fair value hedge agreements were settled on September 17, 2002, resulting in $17.0 million proceeds and a deferred gain to the Company. The deferred gain is recorded in Other Noncurrent Liabilities. As the deferred gain relates to unsecured notes, we have suspended recognition pending outcome of the bankruptcy.

On March 8, 2002, we settled a cash flow hedge agreement related to an interest rate swap instrument. The settlement resulted in proceeds of $7.9 million, and a deferred gain to the Company. The deferred gain is recorded in Other Comprehensive Income and recognition has been suspended pending outcome of the bankruptcy.

**Property, Plant and Equipment**

Property, plant and equipment are stated at cost. We include in property, plant and equipment external and incremental internal costs associated with computer software developed for use in the businesses. Capitalization begins when the preliminary design stage of the project is completed. These costs are amortized on a straight-line basis over the project's estimated useful life once the installed software is ready for its intended use. There were no costs capitalized in 2003 for internally developed software. During 2002 and 2001, we capitalized costs for internally developed software of $3.1 million and $2.0 million, respectively. Internal labor and overhead costs capitalized for other property, plant and equipment were $29.2 million, $33.6 million and $15.5 million during 2003, 2002 and 2001, respectively.  Fixed assets under capital lease were $12.6 million and $7.6 million as of December 31, 2003 and 2002, respectively.

Depreciation rates include a provision for our share of the estimated costs to decommission three coal-fired generating plants  at the end of the useful life of each plant. The annual provision for such costs is included in depreciation expense, while the accumulated provisions are included in noncurrent regulatory liabilities. (See "New Accounting Standards" in this Note 4 regarding our asset retirement obligation and amounts collected in the rate-making process for costs of removal of regulated utility property.)

All expenditures for maintenance and repairs of utility property, plant and equipment are charged to the appropriate maintenance expense accounts. A betterment or replacement of a unit of property is accounted for as an addition and retirement of utility plant. At the time of such a retirement, the accumulated provision for depreciation is charged with the original cost of the property retired and also for the net cost of removal.

Property, plant and equipment at December 31 consisted of the following (in thousands):

| | 2003 | 2002 |
|---|---|---|
| Land and improvements.............................................................................. | $ 37,912 | $ 30,708 |
| Building and improvements......................................................................... | 110,117 | 102,882 |
| Storage, distribution, transmission and generation....................................... | 1,729,045 | 1,706,622 |
| Construction work in process..................................................................... | 19,989 | 22,172 |
| Other equipment ...................................................................................... | 199,362 | 181,422 |
| | 2,096,425 | 2,043,806 |
| Less accumulated depreciation................................................................... | (733,676 ) | (690,263 ) |
| | $ 1,362,749 | $ 1,353,543 |

We capitalize the cost of plant additions and replacements, including an allowance for funds used during construction (AFUDC) of utility plant. We determine the rate used to compute AFUDC in accordance with a formula established by the FERC. This rate averaged 8.9% and 8.7% for Montana for 2003 and 2002, and 10.7%, 6.6% and 6.9% for South Dakota for 2003, 2002 and 2001, respectively. Interest capitalized totaled $0.9 million and $1.1 million in 2003 and 2002, respectively, for Montana and South Dakota combined. Interest capitalized was not significant in 2001.

We record provisions for depreciation at amounts substantially equivalent to calculations made on a straight-line method by applying various rates based on useful lives of the various classes of properties (ranging from three to forty years) determined from engineering studies. As a percentage of the depreciable utility plant at the beginning of the year, our provision for depreciation of utility

plant was approximately 3.5%, 3.4% and 3.3% for 2003, 2002 and 2001, respectively.

We recorded a $12.4 million impairment charge in 2003 and a $35.7 million charge in 2002 in our All Other segment related to our construction of a 260-megawatt natural gas-fired generation project located in Great Falls, Montana. The remaining assets of this project have been classified as Assets Held For Sale on the Consolidated Balance Sheets. The remaining investment in this project was $30.0 million at December 31, 2003.

## Other Noncurrent Liabilities

Other noncurrent liabilities as of December 31 consisted of the following (in thousands):

| | 2003 | 2002 |
|---|---|---|
| Pension and other postretirement benefit liability | $ 133,668 | $ 196,521 |
| Future QF obligation, net (1) | — | 143,515 |
| Environmental liability (1) | — | 36,505 |
| Deferred revenue | 14,317 | 22,866 |
| Customer advances | 22,841 | 21,996 |
| Other | 39,268 | 65,759 |
| | $ 210,094 | $ 487,162 |

(1)  These amounts were reclassified to liabilities subject to compromise as of December 31, 2003.

## Liabilities Subject to Compromise

Trade creditor liabilities subject to compromise as of December 31, 2003, consisted of the following (in thousands):

| | |
|---|---|
| Future QF obligation, net | $ 142,815 |
| Accrued interest and preferred dividends | 46,869 |
| Environmental liabilities | 43,927 |
| Pension and other postretirement benefit liabilities | 23,168 |
| Hedge gain | 13,247 |
| Accounts payable and other | 17,777 |
| | $ 287,803 |

## Stock-based Compensation

At December 31, 2003, we have a nonqualified stock option plan, as described more fully in Note 19. We apply the intrinsic value based method of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for our stock option plan. No compensation cost is recognized as the option exercise price is equal to the market price of the underlying stock on the date of grant. Our pro forma net income and earnings per share would have been as indicated below had the fair value of option grants been charged to compensation expense in accordance with SFAS No. 123 (in thousands except per share amounts):

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Earnings (losses) on common stock | | | |
| As reported | $ (128,670) | $ (892,943) | $ 37,514 |
| Less: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | — | (409) | (633) |
| Pro forma | $ (128,670) | $ (893,352) | $ 36,881 |
| Diluted earnings per share | | | |
| As reported | $ (3.44) | $ (30.04) | $ 1.54 |
| Pro forma | $ (3.44) | $ (30.05) | $ 1.51 |

## Insurance Subsidiary

Risk Partners Assurance, Ltd is a wholly owned non-United States insurance subsidiary established in 2001 to insure worker's compensation, general liability and automobile liability risks.  Blue Dot was insured by Risk Partners through August 31, 2003.  While

historical claims are covered by Risk Partners, on September 1, 2003, Blue Dot withdrew from the Risk Partners insurance plan and obtained new insurance from a third party. At December 31, 2003, Netexit (f/k/a Expanets) was insured through Risk Partners. In addition, NorthWestern Energy was insured through Risk Partners for automobile liability risks at December 31, 2003. Reserve requirements are established based on actuarial projections of ultimate losses. Any losses estimated to be paid within one year from the balance sheet date are classified as accrued expenses, while losses expected to be payable in later periods are included in other long-term liabilities. Risk Partners has purchased reinsurance policies through a third-party reinsurance company to transfer a portion of the insurance risk. Restricted cash related to this subsidiary was $13.1 million at December 31, 2003.

**Income Taxes**

Deferred income taxes relate primarily to the difference between book and tax methods of depreciating property, amortizing tax-deductible goodwill, the difference in the recognition of revenues and expenses for book and tax purposes, certain natural gas costs, which are deferred for book purposes but expensed currently for tax purposes, and net operating loss carry forwards.

**Environmental Costs**

We record environmental costs when it is probable we are liable for the costs and we can reasonably estimate the liability. We may defer costs as a regulatory asset based on our expectation that we will recover these costs from customers in future rates. Otherwise, we expense the costs. If an environmental expense is related to facilities we currently use, such as pollution control equipment, we capitalize and depreciate the costs over the life of the plant, assuming the costs are recoverable in future rates or future cash flow.

We record estimated remediation costs, excluding inflationary increases and probable reductions for insurance coverage and rate recovery. The estimates are based on our experience, our assessment of the current situation and the technology currently available for use in the remediation. We regularly adjust the recorded costs as we revise estimates and as remediation proceeds. If we are one of several designated responsible parties, we estimate and record only our share of the cost. We treat any future costs of restoring sites where operation may extend indefinitely as a capitalized cost of plant retirement. The depreciation expense levels we can recover in rates include a provision for these estimated removal costs.

**New Accounting Standards**

In June 2001, the Financial Accounting Standards Board issued SFAS No. 143, *Accounting for Asset Retirement Obligations,* which was effective January 1, 2003. The statement provides accounting and disclosure requirements for retirement obligations associated with long-lived assets. The statement requires the present value of future asset retirement costs for which the Corporation has a legal obligation be recorded as liabilities with an equivalent amount added to the asset cost and depreciated over the asset life.

We have completed an assessment of the specific applicability and implications of SFAS No. 143. We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by us. The easements are generally perpetual and only require remediation action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. These amounts do not represent SFAS No. 143 legal retirement obligations. As of December 31, 2003 and 2002, we have estimated accrued removal costs of $124.9 million and $115.5 million, respectively, which are included in regulatory liabilities.

For our generation properties, we have accrued decommissioning costs since the generating units were first put into service in the amount of $11.9 million and $11.4 million as of December 31, 2003 and 2002, respectively, which is classified as a noncurrent regulatory liability.  These amounts also do not represent SFAS No. 143 legal retirement obligations.

SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections*, was issued in April 2002. SFAS No. 145 eliminates the requirement that gains and losses from the extinguishments of debt be aggregated and classified as extraordinary items, net of the related income tax. It also requires sale-leaseback treatment for certain modifications of a capital lease that result in the lease being classified as an operating lease. We adopted SFAS No. 145 on January 1, 2003. As a result of the adoption, effective January 1, 2003, we reclassified the recognition of deferred costs related to interim financing of $20.7 million, incurred for the three months ended March 31, 2002, from an extraordinary loss to loss on debt extinguishment on the Consolidated Statement of Income (Loss). The related tax benefit of $7.2 million has been reclassified from an extraordinary loss to benefit for income taxes on the Consolidated Statement of Income (Loss).

SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*, was issued in June 2002. SFAS No. 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan, including lease termination costs and certain employee termination benefits that are associated with a restructuring, discontinued operation, plant closing or other exit or disposal activity. SFAS No. 146 is being applied prospectively and is effective for exit or disposal activities that are initiated after December 31, 2002. We adopted SFAS No. 146 on January 1, 2003. The adoption of SFAS No. 146 did not have a material impact on our consolidated results of operations, financial position, or cash flows.

FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), was issued in January 2003 and was revised in December 2003. This interpretation changes the method of determining whether certain entities, including securitization entities, should be included in a company's consolidated financial statements. An entity that is subject to FIN 46 is called a variable interest entity, or VIE, if it has equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, or equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation in accordance with SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. The requirements of FIN 46 are applicable to NorthWestern Corporation in the fourth quarter of 2003. Had we not filed for bankruptcy, we would have been required to deconsolidate our Subsidiary Trusts, which hold our Company Obligated Mandatorily Redeemable Preferred Securities (TPS), upon adoption of FIN 46. However, upon filing for bankruptcy, the Subsidiary Trusts were terminated and the TPS became direct obligations of NorthWestern Corporation. In February 2004, we became aware that certain long-term purchase power and tolling contracts may be considered variable interests under FIN No. 46R. We have various long-term purchase power contracts with other utilities and certain qualifying facility plants. We believe the counterparties to these contracts are not special-purpose entities and, therefore, FIN No. 46R would not apply to these contracts until March 31, 2004. We have not yet completed our evaluation of these contracts to determine if we need to consolidate these counterparties under FIN No. 46R and will continue to monitor developing practice in this area.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*, which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. SFAS No. 149 is effective prospectively for contracts entered into or modified after June 30, 2003, and for hedging relationships designated after June 30, 2003. The exception to these requirements are the provisions of SFAS No. 149 related to SFAS No. 133 implementation issues that have been effective for fiscal quarters that began prior to June 15, 2003, should continue to be applied in accordance with their respective effective dates. In addition, paragraphs 7(a) and 23(a), which relate to forward purchases or sales of when-issued securities or other securities that do not yet exist, should be applied to both existing contracts and new contracts entered into after June 30, 2003. The adoption of SFAS No. 149 did not have a material impact on our consolidated results of operations, financial condition or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Instruments with Characteristics of Both Liabilities and Equity*, which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope, which may have previously been reported as equity, as a liability or an asset in some circumstances. SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. In accordance with SFAS No. 150, we have presented our Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts as liabilities as of December 31, 2003, and the respective dividends accrued after June 30, 2003, of approximately $6.2 million have been reflected as interest expense through the date of our filing for bankruptcy. Prior period amounts have not been reclassified.

**Related-Party Transaction**

*Long-Term Incentive Program to Key Executives*

In order to provide a recruitment and retention incentive, we adopted a long-term equity incentive program in September 1999 in which certain of our key executives and key employees of NorthWestern Growth Corporation, which initiates strategic investments for us, were provided the opportunity to make personal investments. The investment entity was structured as a limited liability company, was controlled and substantially owned by us, and enabled the investors to participate in long-term capital appreciation resulting from increases in the value of our interests in Blue Dot, Expanets and CornerStone above benchmark rates of return to us approved by the independent Compensation Committee of our Board of Directors. Participants would benefit in any such capital appreciation on a pro rata basis with the other holders of equity interests in such entities after achievement of the benchmark rate of return to us. The interests of our executives in the limited liability company upon formation collectively represented a less than .05% interest in each of Blue Dot, Expanets and CornerStone. The limited liability company had no indebtedness and was consolidated in our financial statements. In the year ended December 31, 2002, there were no distributions to any of our executive officers, and in the year ended December 31, 2001, the following executive officers received distributions in respect of the transfer to us of a portion of their vested interests relating to the performance of

F - 14

certain entities acquired in 1998, 1999 and 2000, each of which exceeded target performance benchmarks during the 12 month period following the date of acquisition: M. Lewis, then chief executive officer, $1.1 million; R. Hylland, then president, $0.8 million; D. Newell, then senior vice president, $0.8 million; E. Jacobsen, senior vice president, $0.4 million; and K. Orme, then chief financial officer, $0.1 million. This limited liability company was terminated and dissolved in March 2003 pursuant to a plan of dissolution and liquidation. In connection with the winding up of the entity, four participants received final liquidation payments, one of which was a named executive officer, E. Jacobsen, who received a final payment of $41,960.

**Reclassifications**

Certain 2001 and 2002 amounts have been reclassified to conform to the 2003 presentation. Such reclassifications had no impact on net income (loss) or shareholders' equity (deficit) as previously reported.

**Supplemental Cash Flow Information**

| | | 2003 | | 2002 | | 2001 |
|---|---|---|---|---|---|---|
| | | | | (in thousands) | | |
| Cash paid (received) for | | | | | | |
| Income taxes | $ | (13,038) | $ | (17,572) | $ | 6,436 |
| Interest | | 101,778 | | 163,045 | | 41,229 |
| Reorganization interest income | | (14) | | — | | — |
| Reorganization professional fees and expenses | | 1,371 | | — | | — |
| Noncash transactions for | | | | | | |
| Fair value of notes receivable received in exchange for sales of discontinued operations | $ | 1,600 | $ | — | $ | — |
| Assets acquired in exchange for debt | | 193 | | — | | — |
| Exchange of warrants for common stock | | — | | — | | 6,797 |
| Issuance of restricted stock | | — | | — | | 760 |
| Debt and preferred securities assumed in acquisitions | | — | | 511,100 | | — |

**(5) Acquisitions**

On February 15, 2002, we completed the asset acquisition of Montana Power's energy transmission and distribution business for $478.0 million in cash and the assumption of $511.1 million in existing debt and mandatorily redeemable preferred securities of subsidiary trusts (net of cash received). Acquisition costs were approximately $24.8 million. We completed this acquisition to expand our presence in the energy market. As a result of the acquisition, we are now a provider of natural gas and electricity to approximately 608,000 customers in Montana, South Dakota and Nebraska. Results of our Montana operations have been included in the accompanying consolidated financial statements since the effective date of the acquisition.

The following unaudited pro forma results of consolidated operations for the years ended December 31, 2002 and 2001, give effect as if the acquisition had occurred as of January 1, 2001 (in thousands, except per share amounts):

| | | December 31, 2002 | | December 31, 2001 |
|---|---|---|---|---|
| Revenues | $ | 846,593 | $ | 958,936 |
| Net Loss | | (854,723) | | 1,534 |
| Diluted loss per share | $ | (29.74) | $ | (.38) |

The pro forma results are not necessarily indicative of what actually would have occurred if the acquisition had been completed as of the beginning of the period, nor are they necessarily indicative of future consolidated results.

**(6) Goodwill**

We adopted the provisions of SFAS No. 142 effective January 1, 2002, and goodwill is no longer amortized. According to the guidance set forth in SFAS No. 142, we are required to evaluate our goodwill and indefinite-lived intangible assets for impairment at least annually (October 1) and more frequently when indications of impairment exist. Accounting standards require that if the fair value of a reporting unit is less than its carrying value including goodwill, an impairment charge for goodwill must be recognized in the financial statements. To measure the amount of the impairment loss to recognize, we compare the implied fair value of the reporting unit's goodwill with its carrying value. This methodology differs from our previous policy, as permitted under previous accounting standards, of using undiscounted cash flows on an enterprise wide basis to determine if goodwill is recoverable.

We determined that our Chapter 11 bankruptcy filing constitutes an event that may reduce the fair value of our reporting unit below its carrying value. Therefore we retained a third party to assist us in completing a goodwill impairment test as required by SFAS No. 142. Fair value was determined using a discounted cash flow approach and a guideline company market approach. Completion of the testing indicated that no impairment charge was required.

There were no changes in our goodwill during the 12 months ended December 31, 2003. Goodwill relates entirely to the Montana operations acquired in 2002 included in our Electric and Natural Gas segment and totals $375.8 million as of December 31, 2003 and 2002.

## (7) Restructuring Reserve

We recognized a restructuring charge in the fourth quarter of 2001 related to certain cost savings initiatives. We summarize the activity in accrued expenses related to the restructuring charge in our Consolidated Balance Sheets in the following table (in thousands):

|  | December 31, 2002 | | Payments | | December 31, 2003 |
|---|---|---|---|---|---|
| Employee termination benefits | $ | 1,783 | $ | (1,783) | $ — |

## (8) Discontinued Operations

During the second quarter of 2003, we committed to a plan to sell or liquidate our interest in Expanets and Blue Dot. In accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* we classified the results of operations of Expanets and Blue Dot as discontinued operations.

In October 2003, we were authorized to complete the sale of Expanets' assets. On November 25, 2003, Expanets closed on an Asset Purchase and Sale Agreement to sell substantially all the assets and business of Expanets to Avaya, Inc. (Avaya) and retain certain specified liabilities. Thereafter, Expanets was renamed Netexit, Inc. (Netexit), which will continue as a non-operating company until its affairs can be wound-down in accordance with its lending agreements, its corporate charter and provisions of Delaware law. Under the terms of the agreement, a $4 million "break-up fee" was paid to a third party originally involved in the transaction and Avaya paid Netexit cash of approximately $50.8 million, and assumed debt of approximately $38.1 million. In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not assumed by Avaya, and certain indemnification obligations of Netexit, respectively. Avaya also reduced cash paid at closing by approximately $44.6 million as a working capital adjustment, pending the determination of a final closing balance sheet. On February 24, 2004, Avaya submitted its proposed final calculation of the working capital adjustment asserting that there was a working capital shortfall at Expanets of approximately $48.8 million at closing, and claiming that Avaya should retain the entire holdback amount plus an additional $4.2 million. Netexit disputes this calculation and believes that pursuant to the terms of the asset purchase agreement Netexit is owed additional cash ranging from $10 million to $20 million (resulting in potential net cash proceeds to Netexit of $60.8 million to $70.8 million). The dispute over the working capital adjustment is subject to an arbitration process, which is expected to be decided in May 2004. Pending resolution of the final balance sheet, the determination of the expenses that Netexit must pay in connection with the sale, and the resolution of open claims to Netexit creditors, the proceeds from the sale remain at Netexit. If Netexit cannot wind-down its affairs in an orderly manner pursuant to applicable provisions of Delaware law, it may be forced to file bankruptcy. We have recognized an estimated loss on disposal of approximately $49.3 million based on the terms of the sale and our expectation of the amount to be received from Avaya. An additional loss may arise based on the results of the arbitration process discussed above.

F - 16

Summary financial information for the discontinued Expanets operations is as follows (in thousands):

| | December 31, 2003 | | December 31, 2002 | |
|---|---|---|---|---|
| Accounts receivable, net | $ | — | $ | 101,990 |
| Other current assets | | 59,949 | | 72,170 |
| Current assets of discontinued operations | $ | 59,949 | $ | 174,160 |
| | | | | |
| Other noncurrent assets of discontinued operations | $ | — | $ | 155,781 |
| | | | | |
| Accounts payable | $ | 11,795 | $ | 34,735 |
| Other current liabilities | | — | | 125,066 |
| Current liabilities of discontinued operations | $ | 11,795 | $ | 159,801 |
| | | | | |
| Other noncurrent liabilities of discontinued operations | $ | — | $ | 71,971 |

| | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| Revenues | $ | 541,211 | $ | 710,452 | $ | 1,032,033 |
| Income (Loss) before income taxes and minority interests | $ | 1,360 | $ | (422,802) | $ | (119,198) |
| Estimated loss on disposal | | (49,250) | | | | |
| Minority interests | | — | | 11,152 | | 127,893 |
| Income tax benefit (provision) | | — | | (22,780) | | 32,190 |
| Loss from discontinued operations, net of income taxes and minority interests | $ | (47,890) | $ | (434,430) | $ | 40,885 |

Expanets' income before income taxes and minority interests for the year ended December 31, 2003, includes a gain on debt extinguishment of $27.3 million.

Blue Dot sold 48 businesses during 2003, repaid its credit facility from sales proceeds and terminated the facility. As of December 31, 2003, Blue Dot had 14 remaining businesses. Subsequent to December 31, 2003, Blue Dot sold 6 additional businesses as of March 1, 2004. Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004. We hope to receive in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided however, this assumes satisfactory resolutions to remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation. Furthermore, it assumes that the remaining businesses produce their projected cash proceeds and receivables from various sold locations are collectible.

| | December 31, 2003 | | December 31, 2002 | |
|---|---|---|---|---|
| Accounts receivable, net | $ | 27,588 | $ | 56,393 |
| Other current assets | | 18,660 | | 36,668 |
| Current assets of discontinued operations | $ | 46,248 | $ | 93,061 |
| | | | | |
| Other noncurrent assets of discontinued operations | $ | 306 | $ | 185 |
| | | | | |
| Accounts payable | $ | 11,486 | $ | 18,945 |
| Other current liabilities | | 21,215 | | 61,266 |
| Current liabilities of discontinued operations | $ | 32,701 | $ | 80,211 |
| | | | | |
| Other noncurrent liabilities of discontinued operations | $ | 1,998 | $ | 10,611 |

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Revenues | $ 400,679 | $ 471,824 | $ 423,803 |
| | | | |
| Income (Loss) before income taxes and minority interests | $ (3,356) | $ (311,674) | $ (17,392) |
| Gain on disposal | 14,352 | — | — |
| Minority interests | — | 3,762 | 13,555 |
| Income tax benefit (provision) | — | (9,071) | 3,830 |
| Income (Loss) from discontinued operations, net of income taxes | $ 10,996 | $ (316,983) | $ (7) |

During the second and third quarters of 2003, we also sold our interest in two other subsidiaries. The sale of One Call Locators, Ltd., was completed in June for consideration of $6.6 million in cash and a note receivable of $4.7 million. We recorded the carrying value of the note receivable based on the fair value of our trust preferred securities at the date of the transaction, and we recognized a loss of approximately $3.4 million on this sale. The acquiring entity elected to prepay the note receivable on August 25, 2003, by presenting trust preferred obligated securities of NorthWestern, which were accepted at face value. We recognized a gain of $3.3 million on the extinguishment of trust preferred obligated securities during the third quarter of 2003. We sold assets of the other subsidiary in July for $0.2 million in cash and a note receivable of $0.3 million. We recognized a loss of approximately $2.2 million on this sale. We have classified the results of these subsidiaries and CornerStone Propane Partners, LP (see discussion below) in discontinued operations and summary financial information is as follows (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Revenues | $ 19,493 | $ 422,816 | $ 2,526,768 |
| | | | |
| Income (Loss) before income taxes, net of minority interests | $ 456 | $ (21,584) | $ (5,021) |
| Loss on disposal | (5,705) | (97,055) | — |
| Income tax benefit (provision) | — | 15,466 | 4,500 |
| Loss from discontinued operations, net of income taxes and minority interests | $ (5,249) | $ (103,173) | $ (521) |

Effective November 1, 2002, we relinquished our direct and indirect equity interests in CornerStone Propane Partners, LP and CornerStone Propane, LP. We do, however, own a noneconomic voting interest in a limited liability company, which owns 100 percent of the stock of the managing general partner of CornerStone. As a result, the assets and liabilities of CornerStone are no longer included in our Consolidated Balance Sheets subsequent to November 1, 2002. The results for CornerStone's operations and impairments related to our investments in and advances to CornerStone for the year ended December 31, 2002 and 2001, have been presented as discontinued operations in the Consolidated Statements of Income (Loss).

On August 20, 2002, NorthWestern purchased the lenders' interest in approximately $19.9 million of CornerStone short-term debt outstanding under CornerStone's credit facility together with approximately $6.1 million in letters of credit, which NorthWestern had previously guaranteed. No further drawings may be made under this facility. In addition, NorthWestern is owed $13.5 million from CornerStone and NorthWestern also had $9.2 million in letters of credit outstanding on behalf of CornerStone. In October 2003, the $9.2 million in letters of credit outstanding on behalf of CornerStone were drawn by their respective beneficiaries. During the third quarter of 2003, we recorded an impairment charge of $9.1 million to reduce our note receivable to an estimated recoverable amount. As of December 31, 2003, the net recorded value of our receivables from CornerStone was $11 million.

F - 18

## (9) Long-Term Debt

Long-term debt at December 31 consisted of the following (in thousands):

| | Due | 2003 | 2002 |
|---|---|---|---|
| **Debt Not Subject to Compromise:** | | | |
| Senior Secured Term Loan | 2006 | $    386,100 | $           — |
| Bank credit facility | — | — | 255,000 |
| Mortgage bonds— | | | |
| South Dakota—7.10% | 2005 | 60,000 | 60,000 |
| South Dakota—7.00% | 2023 | 55,000 | 55,000 |
| Montana—7.30% | 2006 | 150,000 | 150,000 |
| Montana—8.25% | 2007 | 365 | 365 |
| Montana—8.95% | 2022 | 1,446 | 1,446 |
| Montana—7.00% | 2005 | 5,386 | 5,386 |
| Pollution control obligations— | | | |
| South Dakota—5.85% | 2023 | 7,550 | 7,550 |
| South Dakota—5.90% | 2023 | 13,800 | 13,800 |
| Montana—6.125% | 2023 | 90,205 | 90,205 |
| Montana—5.90% | 2023 | 80,000 | 80,000 |
| Secured medium term notes— | | | |
| 7.23% | 2003 | — | 15,000 |
| 7.25% | 2008 | 13,000 | 13,000 |
| Montana Natural Gas Transition Bonds | 2012 | 46,502 | 50,866 |
| Capital leases | Various | 12,399 | 8,422 |
| Other term debt | Various | 1,122 | 1,419 |
| Discount on Notes and Bonds | — | (3,483) | (3,867) |
| | | 919,392 | 803,592 |
| **Debt Subject to Compromise:** | | | |
| Senior Unsecured Notes—7.875% | 2007 | $    250,000 | $    250,000 |
| Senior Unsecured Notes—8.75% | 2012 | 470,000 | 470,000 |
| Senior Unsecured debt—6.95% | 2028 | 105,000 | 105,000 |
| Unsecured medium term notes — | | | |
| 7.07% | 2006 | 15,000 | 15,000 |
| 7.875% | 2026 | 20,000 | 20,000 |
| 7.96% | 2026 | 5,000 | 5,000 |
| Discount on Notes and Bonds | — | (156) | (161) |
| | | 864,844 | 864,839 |
| Less current maturities | | (1,784,236) | (25,909) |
| | | $           — | $   1,642,522 |

As discussed in Note 3, the Chapter 11 filing triggered defaults and we have classified our secured debt as current as of December 31, 2003. Although 2002 debt was not subject to compromise, it has been presented in the above table as such for comparability.

On September 14, 2003, the Bankruptcy Court gave interim approval for access of up to $50 million of our $100 million DIP Facility.  On November 7, 2003, the Bankruptcy Court entered a final order to approve the DIP Facility and, in doing so, increased our access under this facility to $85 million. In December 2003, we reduced the commitment to $85 million under this facility. The DIP Facility expires on September 12, 2004, and bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility requires that we maintain certain other financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments and sales of assets.  As of December 31, 2003, we had $15.2 million in letters of credit outstanding and no borrowings under the DIP facility.

We have reached an agreement with the lenders holding claims under our senior credit facility agented by CSFB to amend the terms of our $390 million prepetition credit facility. In January 2004, the Bankruptcy Court entered a final order authorizing the amendment of the credit facility and granting protection in connection therewith. The amended credit facility provides advantages to NorthWestern, including lower interest expense allowing reinstatement upon NorthWestern's emergence from Chapter 11. At NorthWestern's option, the amended credit facility bears interest at a variable rate tied to the Eurodollar rate, plus a spread of 5.50%, or at

an alternate base rate, as defined by the amended credit facility, plus a spread of 3.50%. There is no longer a minimum floor for the Eurodollar rate or the alternate base rate. As a result of this amendment, we estimate annualized interest expense will be reduced by approximately $6 million to $8 million.

Our senior secured term loan expires on December 1, 2006, and requires quarterly amortization payments equal to $975,000. The credit agreement contains financial covenants related to minimum EBITDAR(1), maximum capital expenditures and a number of other representations and warranties. We are in compliance with these debt covenants at December 31, 2003.

In January 2003, in connection with executing the new senior secured term loan facility, we applied to the MPSC for authorization to issue up to $280 million aggregate principal amount of First Mortgage Bonds secured by Montana utility assets as security for our new senior secured term loan facility. In granting its approval, the MPSC placed the following conditions on the approval of the First Mortgage Bonds:

- We must apply all proceeds from the sale of nonutility assets, specifically including Blue Dot and Expanets, to debt reduction;

- We must commit to fully funding the operation, maintenance, repair and replacement of our public utility infrastructure in Montana, and we were required to file a maintenance plan and budget with the MPSC by March 13, 2003;

- We may not provide more than an additional $10 million in aggregate in capital to any nonutility entity without the prior approval of the MPSC;

- We must report all advances to nonutility companies to the MPSC within 5 business days of such advance; and

- if the existing credit agreements for Blue Dot or Expanets are terminated, we may file an application with the MPSC seeking approval to provide secured loans of up to $20 million to Blue Dot and up to $30 million to Expanets.

The South Dakota Mortgage Bonds are two series of general obligation bonds we issued under our South Dakota indenture, and the South Dakota Pollution Control Obligations are three obligations under our South Dakota indenture. All of such bonds are secured by substantially all of our South Dakota and Nebraska electric and natural gas assets.

The Montana First Mortgage Bonds are four series of bonds that The Montana Power Company issued. The Montana Pollution Control Obligations, and the Secured Medium Term Notes are obligations that The Montana Power Company issued. The Montana Natural Gas Transition Bonds were issued by The Montana Power Company. All of these obligations are secured by substantially all of our Montana electric and natural gas assets.

The Senior Notes are two series of unsecured notes that we issued in 2002 in connection with our acquisition of NorthWestern Energy LLC. Proceeds were used for the acquisition and for general corporate purposes.

The Senior Unsecured Debt is a general obligation that we issued in November 1998. The proceeds were used to repay short-term indebtedness and for general corporate purposes.

The Unsecured Medium Term Notes are general obligations issued by The Montana Power Company.

The aggregate minimum principal maturities of long-term debt, absent accelerations due to default, during the next five years are $11.6 million in 2004, $76.5 million in 2005, $550.0 million in 2006, $257.0 million in 2007 and $19.1 million in 2008.

---

(1) EBITDAR is earnings before interest, taxes, depreciation, amortization and non-recurring restructuring expenses. EBITDAR is a non-GAAP financial measure and as such, we have not used it in describing our results of operations. We have used EBITDAR in this section specifically to show compliance with our debt covenants, and we do not refer to EBITDAR for any other purpose herein.

(10) Comprehensive Income (Loss)

The Financial Accounting Standards Board defines comprehensive income as all changes to the equity of a business enterprise during a period, except for those resulting from transactions with owners. For example, dividend distributions are excepted. Comprehensive income consists of net income and other comprehensive income. Net income may include such items as income from continuing operations, discontinued operations, extraordinary items, and cumulative effects of changes in accounting principles. Other comprehensive income may include foreign currency translations, adjustments of minimum pension liability, and unrealized gains and losses on certain investments in debt and equity securities. Comprehensive income (loss) is calculated as follows (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net income (loss) | $ (113,725) | $ (863,942) | $ 44,532 |
| Other comprehensive income: | | | |
| Net unrealized gain (loss) on available-for-sale securities, net of tax of $(188), $713, and $(1,303) in 2003, 2002, and 2001, respectively | (352) | 1,139 | (2,081) |
| Net unrealized gain on derivative instruments qualifying as hedges, net of tax of $(224) and $2,757 in 2003 and 2002, respectively | (416) | 4,265 | — |
| Minimum pension liability adjustment | (1,465) | (8,759) | — |
| Foreign currency translation adjustment | 298 | 5 | — |
| Total other comprehensive loss | (1,935) | (3,350) | (2,081) |
| Total comprehensive income (loss) | $ (115,660) | $ (867,292) | $ 42,451 |

The after tax components of accumulated other comprehensive loss for the years ended December 31, 2003 and 2002, were as follows (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| **Balance at December 31,** | | |
| Net unrealized gain (loss) on available-for-sale securities | $ — | $ 352 |
| Unrealized gain on derivative instruments qualifying as hedges | 3,849 | 4,265 |
| Minimum pension liability adjustment | (10,224) | (8,759) |
| Foreign currency translation adjustment | 303 | 5 |
| Accumulated other comprehensive loss | $ (6,072) | $ (4,137) |

**(11) Financial Instruments**

The following disclosure of the estimated fair value of financial instruments is made in accordance with the requirements of SFAS No. 107, *Disclosures About Fair Value of Financial Instruments*. The estimated fair-value amounts have been determined using available market information and appropriate valuation methodologies. However, considerable judgment is necessarily required in interpreting market data to develop estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that we would realize in a current market exchange.

The following methods and assumptions were used to estimate the fair value of each class of financial instruments for which it is practicable to estimate that value:

- The carrying amounts of cash and cash equivalents, restricted cash and investments approximate fair value due to the short maturity of the instruments. The fair value of life insurance contracts is based on cash surrender value.

- Fair values for debt were determined based on interest rates that are currently available to us for issuance of debt with similar terms and remaining maturities, except for publicly traded debt, which is based on market prices.

- The fair value of preferred securities of subsidiary trusts is based on current market prices.

- The fair-value estimates presented herein are based on pertinent information available to us as of December 31, 2003. Although we are not aware of any factors that would significantly affect the estimated fair-value amounts, such amounts have not been comprehensively revalued for purposes of these financial statements since that date, and current estimates of fair value may differ significantly from the amounts presented herein.

The estimated fair value of financial instruments at December 31 is summarized as follows (in thousands):

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Assets: | | | | |
| Cash and cash equivalents | $    15,183 | $    15,183 | $    26,554 | $    26,554 |
| Restricted cash | 27,043 | 27,043 | 28,039 | 28,039 |
| Investments | 11,027 | 11,027 | 85,236 | 85,236 |
| Liabilities: | | | | |
| Long-term debt (including current portion) | 1,784,236 | 1,704,392 | 1,668,431 | 1,345,012 |
| Company obligated mandatorily redeemable preferred securities of subsidiary trusts | 365,550 | 130,682 | 370,250 | 248,094 |

**(12)  Income Taxes**

Income tax benefit applicable to continuing operations before minority interests for the years ended December 31 is comprised of the following (in thousands):

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Federal: | | | |
| Current | $    (9,838) | $    (30,333) | $    14,882 |
| Deferred | 10,334 | (8,761) | (20,891) |
| Investment tax credits | (544) | 535 | 535 |
| State | — | (182) | (316) |
| | $    (48) | $    (39,811) | $    (6,860) |

The following table reconciles our effective income tax rate to the federal statutory rate:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Federal statutory rate | (35.0)% | (35.0)% | (35.0)% |
| State income, net of federal provisions | (3.9) | (0.4) | (11.8) |
| Amortization of investment tax credit | (0.8) | (1.1) | (19.9) |
| ESOP dividends paid | — | — | (26.1) |
| Municipal bond interest | — | — | (4.1) |
| Affiliated stock loss on disposition | (163.2) | (60.6) | — |
| Nondeductible reserve activity | — | — | (44.9) |
| Minority interest preferred stock | (7.3) | (20.2) | (91.7) |
| Dividends received deduction and other investments | (0.1) | (1.2) | (23.7) |
| Prior year tax return refund | (8.5) | — | — |
| Valuation allowance | 221.8 | 36.1 | — |
| Prior year permanent return to accrual adjustments | (7.3) | — | — |
| Prior year permanent IRS examination adjustments | 2.0 | — | — |
| Other, net | 2.2 | 1.4 | 1.7 |
| | (0.1)% | (81.0)% | (255.5)% |

F - 22

The components of the net deferred income tax liability recognized in our Consolidated Balance Sheets are related to the following temporary differences at December 31 (in thousands):

| | 2003 | 2002 |
|---|---|---|
| Excess tax depreciation | $ (80,784) | $ (49,246) |
| Regulatory assets | (6,867) | (3,327) |
| Regulatory liabilities | 4,040 | 2,664 |
| Unbilled revenue | 1,276 | 861 |
| Unamortized investment tax credit | 2,751 | 2,375 |
| Compensation accruals | (3,790) | (328) |
| Reserves and accruals | 26,958 | 6,395 |
| Goodwill impairment/amortization | (11,071) | — |
| Net operating loss carryforward (NOL) | 210,382 | 37,591 |
| AMT credit carryforward | 228 | 1,577 |
| Deferred revenue | 25,534 | 26,463 |
| Other, net | 2,394 | (7,494) |
| Valuation allowance | (181,587) | (17,733) |
| | $ (10,536) | $ (202) |

Realization of deferred tax assets is dependent upon generating sufficient taxable income. Accordingly, a valuation allowance of $181.6 million and $17.7 million has been recorded as of December 31, 2003 and 2002, as it is more likely than not that these assets will not be realized.

As of December 31, 2003, we have a total NOL carry forward of $563.1 million. Of this amount, $102.9 million will expire in the year 2022 and $460.2 million will expire in the year 2023.

The IRS audit of our federal income tax returns for 1996 through 1999 was completed in 2003 with no material impact to our financial position or results of operations. Additionally, an IRS audit of our federal income tax returns for the years 2000 through 2002 was commenced in October 2003. Management believes that the final results of these audits will not have a material adverse effect on our financial position or results of operations.

## (13) Jointly Owned Plants

We have an ownership interest in three electric generating plants, all of which are coal fired and operated by other utility companies. We have an undivided interest in these facilities and are responsible for our proportionate share of the capital and operating costs while being entitled to our proportionate share of the power generated. Our interest in each plant is reflected in the Consolidated Balance Sheets on a pro rata basis and our share of operating expenses is reflected in the Consolidated Statements of Income (Loss). The participants each finance their own investment.

Information relating to our ownership interest in these facilities at December 31, is as follows (in thousands):

| | Big Stone (S.D.) | Neal #4 (Iowa) | Coyote I (N.D.) |
|---|---|---|---|
| **2003** | | | |
| Ownership percentages | 23.4% | 8.7% | 10.0% |
| Plant in service | $ 49,619 | $ 28,037 | $ 42,441 |
| Accumulated depreciation | $ 30,916 | $ 16,858 | $ 21,354 |
| | | | |
| **2002** | | | |
| Ownership percentages | 23.4% | 8.7% | 10.0% |
| Plant in service | $ 47,802 | $ 28,081 | $ 41,957 |
| Accumulated depreciation | $ 30,644 | $ 16,025 | $ 20,796 |

F - 23

**(14)  Operating Leases**

In connection with the purchase of our Montana Power operations, we have seven years remaining under an operating lease agreement to lease generation facilities, which requires lease payments of $32.2 million annually. We also lease vehicles, office equipment and office and warehouse facilities under various long-term operating leases. At December 31, 2003, future minimum lease payments under noncancelable lease agreements are as follows (in thousands):

| | | |
|---|---|---|
| 2004 | $ | 33,133 |
| 2005 | | 32,849 |
| 2006 | | 32,572 |
| 2007 | | 32,288 |
| 2008 | | 32,268 |
| Thereafter | | 64,452 |

Lease and rental expense incurred was $40.1 million, $39.9 million and $1.9 million in 2003, 2002 and 2001, respectively.

**(15)  Employee Benefit Plans**

We sponsor and/or contribute to pension and postretirement health care and life insurance benefit plans for employees of the corporation and regulated utility division. In addition, we also sponsor nonqualified, unfunded defined benefit pension plans for certain officers and other employees. With the acquisition of Montana Power, we assumed their pension and postretirement health care plans. These plans are reflected in the 2003 and 2002 columns of the tables below.

Net periodic cost for our pension and other postretirement plans consists of the following for the year ended December 31 (in thousands):

| | Pension Benefits | | | Other Postretirement Benefits | |
|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2003** | **2002** |
| Components of Net Periodic Benefit Cost (Income) | | | | | |
| Service cost | $  5,165 | $  4,821 | $  891 | $  1,350 | $  3,068 |
| Interest cost | 21,080 | 19,315 | 3,421 | 5,455 | 10,044 |
| Expected return on plan assets | (16,329) | (18,737) | (4,738) | (261) | (405) |
| Amortization of transitional obligation | 155 | 155 | 155 | 675 | 1,350 |
| Amortization of prior service cost | 505 | 626 | 626 | — | — |
| Recognized actuarial (gain) loss | 2,724 | 28 | (225) | 467 | 161 |
| | 13,300 | 6,208 | 130 | 7,686 | 14,218 |
| Additional (income) or loss recognized: | | | | | |
| Curtailment | — | 833 | — | 13,511 | — |
| Special termination benefits | 785 | 5,858 | — | — | 168 |
| Settlement cost | — | — | — | (13,586) | — |
| Net Periodic Benefit Cost | $  14,085 | $  12,899 | $  130 | $  7,611 | $  14,386 |

The prior service costs are amortized on a straight-line basis over the average remaining service period of active participants. Gains and losses in excess of 10% of the greater of the benefit obligation or the market-related value of assets are amortized over the average remaining service period of active participants.

F - 24

Following is a reconciliation of the changes in plan benefit obligations and fair value and a statement of the funded status as of December 31 (in thousands):

| | Pension Benefits | | | | Other Postretirement Benefits | | | |
| | 2003 | | 2002 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|---|---|
| **Reconciliation of Benefit Obligation** | | | | | | | | |
| Obligation at January 1 | $ | 329,980 | $ | 50,527 | $ | 103,352 | $ | 33,303 |
| Purchased obligation—Montana Power | | — | | 251,370 | | — | | 55,888 |
| Service cost | | 5,165 | | 4,821 | | 1,350 | | 3,068 |
| Interest cost | | 21,080 | | 19,315 | | 5,455 | | 10,044 |
| Actuarial loss | | 23,446 | | 17,147 | | (387) | | 9,219 |
| Plan amendments | | — | | 56 | | (4,164) | | — |
| Curtailments | | — | | (368) | | (3,077) | | — |
| Settlement cost | | — | | — | | (16,566) | | — |
| Special termination benefits | | 785 | | 5,858 | | — | | 168 |
| Gross benefits paid | | (24,083) | | (18,746) | | (19,015) | | (8,338) |
| Benefit obligation at end of year | $ | 356,373 | $ | 329,980 | $ | 66,948 | $ | 103,352 |
| | | | | | | | | |
| **Reconciliation of Fair Value of Plan Assets** | | | | | | | | |
| Fair value of plan assets at January 1 | $ | 201,202 | $ | 48,871 | $ | 4,794 | $ | 6,344 |
| Actual return on plan assets | | 41,727 | | (25,147) | | 385 | | (647) |
| Purchased assets—Montana Power | | — | | 196,223 | | — | | — |
| Employer contributions | | 10,925 | | 1 | | 35,836 | | 7,435 |
| Settlements | | — | | — | | (16,566) | | — |
| Gross benefits paid | | (24,083) | | (18,746) | | (19,015) | | (8,338) |
| Fair value of plan assets at end of year | $ | 229,771 | $ | 201,202 | $ | 5,434 | $ | 4,794 |

The total projected benefit obligation and fair value of plan assets for the pension plans with projected benefit obligations in excess of plan assets were $356.4 million and $229.8 million, respectively, as of December 31, 2003. The total accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $346.0 million and $229.8 million, respectively, as of December 31, 2003. The total projected benefit obligation and fair value of plan assets for the pension plans with projected benefit obligations in excess of plan assets were $330.0 million and $201.2 million, respectively, as of December 31, 2002. The total accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $320.3 million and $201.2 million, respectively, as of December 31, 2002.

In January 2004, the Financial Accounting Standards Board issued FASB Staff Position No. FAS 106-1, *Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003* (FSP 106-1). While we have elected to defer recognition of the effects of FSP 106-1 until guidance on the accounting for the federal subsidy is issued, we do not expect the effects of FSP 106-1 to be material to the measurement of our APBO or our net periodic postretirement benefit cost.

The accrued pension and other postretirement benefit obligations recognized in the accompanying Consolidated Balance Sheets are computed as follows for the years ended December 31 (in thousands):

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Funded Status | $ (126,602) | $ (128,778) | $ (61,514) | $ (98,558) |
| Unrecognized transition amount | 309 | 464 | — | 18,350 |
| Unrecognized net actuarial loss | 60,808 | 65,484 | 17,549 | 8,018 |
| Unrecognized prior service cost | 1,288 | 1,793 | — | — |
| Accrued benefit cost | $ (64,197) | $ (61,037) | $ (43,965) | $ (72,190) |
| | | | | |
| Prepaid benefit cost | $ 2,683 | $ 5,251 | $ — | $ — |
| Accrued benefit cost | (66,880) | (66,288) | (43,965) | (72,190) |
| Additional minimum liability | (52,055) | (58,043) | — | — |
| Intangible asset | 1,597 | 2,257 | — | — |
| Regulatory asset | 40,234 | 42,696 | — | — |
| Accumulated other comprehensive income | 10,224 | 13,090 | — | — |
| Net amount recognized | $ (64,197) | $ (61,037) | $ (43,965) | $ (72,190) |

The weighted-average assumptions used in calculating the preceding information are as follows:

| | Pension Benefits | | | Other Postretirement Benefits | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2003 | 2002 |
| Discount rate | 6.00% | 6.50% | 7.00% | 6.0-6.75% | 6.0-6.75% |
| Expected rate of return on assets | 8.50% | 8.50% | 8.50% | 8.5% | 8.5% |
| Long-term rate of increase in compensation levels (nonunion) | 3.97% | 4.00% | 3.50% | 4.0% | 4.0% |
| Long-term rate of increase in compensation levels (union) | 3.50% | 3.50% | 3.50% | 4.0% | 3.5% |

The expected long-term rate of return assumption on plan assets for both the NorthWestern Energy and NorthWestern Corporation pension and postretirement plans was determined based on the historical returns and the future expectations for returns for each asset class, as well as the target asset allocation of the pension and postretirement portfolios. Over the 15-year period ending December 31, 2002, the returns on these portfolios, assuming they were invested at the current target asset allocation in prior periods, would have been a compound annual average of approximately 10.1%. Considering this information and the potential for lower future returns due to a generally lower interest rate environment, we selected an 8.5% long-term rate of return on assets assumption.

Our investment goals with respect to managing the pension and other postretirement assets is to achieve and maintain a fully funded status for the pension plans, improve the status of the health and welfare plan, minimize contribution requirements, and seek long-term growth by placing primary emphasis on capital appreciation and secondary emphasis on income, while minimizing risk.

Pension funding is based upon annual actuarial studies prepared for each plan. For our postretirement welfare benefits, our policy is to contribute an amount equal to the annual actuarially determined cost that is also recoverable in rates. We generally fund our 401(h) and VEBA trusts monthly, subject to our liquidity needs and the maximum deductible amounts allowed for income tax purposes.

The company's investment policy for fixed income investments are oriented toward risk adverse, investment-grade securities rated "A" or higher and are required to be diversified among individual securities and sectors (with the exception of U.S. Government securities, in which the plan may invest the entire fixed income allocation) and there is no limit on the maximum maturity of securities held. In addition, the NorthWestern Corporation pension plan assets also includes a participating group annuity contract in the John Hancock General Investment Account, which consists primarily of fixed-income securities, reflected at current market values with a market adjustment.

Equity investments per the investment policy can include convertible securities, and are required to be diversified among industries and economic sectors. Limitations are placed on the overall allocation to any individual security at both cost and market value and international equities investments are diversified by country. In addition, there are limitations on investments in emerging markets.

Our investment policy prohibits short sales, margin purchases and similar speculative transactions as well as any transactions that would threaten tax exempt status of the fund, actions that would create a conflict of interest or transactions between fiduciaries and parties in interest as defined under ERISA. With respect to international investments, foreign currency hedging is allowed under the policy for the purpose of hedging currency risk and to effect securities transactions. Permissible investments include foreign currencies in both spot and forward markets, options, futures, and options on futures in foreign currencies.

The target asset allocation percentages are as follows, within an allowable range of plus or minus 5%:

|  | Pension Benefits | Other Benefits |
|---|---|---|
| Cash and cash equivalents ................................................. | — | — |
| Debt securities............................................................... | 30.0% | 30.0% |
| Domestic equity securities............................................... | 60.0% | 60.0% |
| International equity securities ......................................... | 10.0% | 10.0% |
| Other.............................................................................. | — | — |

The percentage of fair value of plan assets held in the following investment types by the NorthWestern Energy pension plan, NorthWestern Corporation pension plan and NorthWestern Energy Health and Welfare Plan as of December 31, 2003 and 2002, are as follows:

|  | NorthWestern Energy Pension | | NorthWestern Corporation Pension | | NorthWestern Energy Health and Welfare | |
|---|---|---|---|---|---|---|
|  | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
| Cash and cash equivalents ............... | 1.4% | 7.2% | 0.6% | — | 2.8% | 4.0% |
| Debt securities.................................... | 28.5% | 33.4% | 11.6% | — | 27.5% | 30.4% |
| Domestic equity securities................ | 58.9% | 54.2% | 38.7% | 53.0% | 68.3% | 64.7% |
| International equity securities .......... | 11.2% | 5.2% | 4.5% | — | 1.4% | 0.9% |
| Participating group annuity contracts ......................................................... | — | — | 44.6% | 47.0% | — | — |
|  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

At December 31, 2002, the NorthWestern Energy pension plan investment portfolio was undergoing a change in investment managers, Domestic equity investments were liquidated and pending reinvestment by the new investment manager. This was completed and the portfolio was again rebalanced to bring it within the target asset allocation during 2003. We also began the process of transitioning NorthWestern Corporation's pension plan assets over to comply with the new investment policy asset target guidelines adopted in 2002. At December 31, 2003, this process was partially completed with the liquidation and diversified reinvestment of part of the plan assets. We are evaluating the potential for liquidating and reinvesting the assets held in participating group annuity contracts as rebalancing and diversification opportunities are currently limited with respect to this portion of plan assets.

We estimate contributions to our pension and other benefit plans in 2004 to be approximately $16.0 million in total.

The rate of increase in per capita costs of covered health care benefits is assumed to be 11% in 2004, decreasing gradually to 5% by the year 2009. The following table sets forth the sensitivity of retiree welfare results (in thousands):

| | | |
|---|---|---|
| Effect of a one percentage point increase in assumed health care cost trend | | |
| on total service and interest cost components ........................................................................................... | $ | 239 |
| on postretirement benefit obligation........................................................................................................... | | 2,488 |
| Effect of a one percentage point decrease in assumed health care cost trend | | |
| on total service and interest cost components ........................................................................................... | $ | (191) |
| on postretirement benefit obligation........................................................................................................... | | (1,943) |

Pension costs in Montana and other postretirement benefit costs in South Dakota are included in rates on a pay as you go basis for regulatory purposes. Pension costs in South Dakota and other postretirement benefit costs in Montana are included in rates on an accrual basis for regulatory purposes. (See Note 17, Regulatory Assets and Liabilities, for the regulatory assets related to our pension and other postretirement benefit plans.)

During 2003 and 2002, we made available to select employees an early retirement program. The impact of that reduction in participants resulted in the special termination benefits presented in the above table.

Two nonqualified postretirement defined benefit plans were amended effective May 6, 2003 to permit vested participants the option of continuing the current benefits level or take a present value lump sum distribution. A third nonqualified postretirement defined benefit plan was terminated effective May 6, 2003. The impact of the amendments and termination are presented in the table above.

In May 2003, our Board of Directors adopted a resolution to terminate or amend various employee benefit plans. We terminated our nonqualified supplemental 401(k) plan effective May 6, 2003. Any investment elections in our common stock were presented as Treasury Stock, other investments as part of Investments, and an offsetting liability for both as part of Other Noncurrent Liabilities in the Consolidated Balance Sheets. In June 2003, plan assets were distributed to participants and no further liability remains. Our contributions to the plan were $11,000, $713,000 and $64,000 in 2003, 2002 and 2001, respectively. Our employee stock purchase plan was also terminated, with no impact to our operating results.

We provide various employee savings plans, which permit employees to defer receipt of compensation as provided in Section 401(k) of the Internal Revenue Code. Under the Plans, the employees may elect to direct a percentage of their gross compensation to be contributed to the Plans. We contribute up to a maximum of 4.0% of the employee's gross compensation contributed to the Plan. Costs incurred under these plans were $3.1 million, $3.4 million and $0.8 million in 2003, 2002 and 2001, respectively.

**(16) Employee Stock Ownership Plan**

Our Employee Stock Ownership Plan ("ESOP") was terminated effective July 19, 2003, and the shares were distributed to participants during 2003. Due to the suspension of our common stock dividend and the declining stock price, we accrued $5.9 million as of December 31, 2002, to satisfy the ESOP loan requirement. This loan was paid off in the second quarter of 2003 and no further liability remains. Shares held by the plan were included in the number of average shares outstanding when computing our basic and diluted earnings per share, therefore the termination has no impact on these calculations. The number, classification and fair value of shares held by the plan at December 31 are as follows:

|  | 2003 | | 2002 | |
| --- | --- | --- | --- | --- |
|  | Allocated | Unallocated | Allocated | Unallocated |
| Number of shares ................................. | — | — | 668,617 | 226,883 |
| Fair value ................................. | — | — | $ 3,396,574 | $ 1,152,566 |

**(17) Regulatory Assets and Liabilities**

We prepare our financial statements in accordance with the provisions of SFAS No. 71, as discussed in Note 4 to the Financial Statements. Pursuant to this pronouncement, certain expenses and credits, normally reflected in income as incurred, are recognized when included in rates and recovered from or refunded to the customers. Accordingly, we have recorded the following major classifications of regulatory assets and liabilities that will be recognized in expenses and revenues in future periods when the matching revenues are collected or refunded. We have specific orders to cover approximately 98% of our regulatory assets and approximately 98% of our regulatory liabilities.

|  | Note Ref. | Remaining Amortization Period | 2003 | 2002 |
| --- | --- | --- | --- | --- |
| Pension................................ | 15 | Undetermined | $ 95,260 | $ 92,739 |
| Competitive transition charges............................. | | 10 Years | 40,921 | 44,809 |
| SFAS No. 106 purchase obligation.................................. | 15 | Undetermined | 27,150 | 28,951 |
| Income taxes................................ | 12 | Plant lives | 28,832 | 28,181 |
| Unrecovered supply costs................................ | | 1 Year | 18,490 | 12,666 |
| Other................................ | | Various | 14,666 | 14,904 |
| Total regulatory assets................................ | | | $ 225,319 | $ 222,250 |
| Removal cost................................ | | Various | $ 136,791 | $ 126,881 |
| Gas storage sales................................ | | 36 Years | 15,036 | 15,456 |
| Proceeds from oil and gas sale................................ | | — | — | 15,982 |
| Utility sale stipulation agreement ................................ | | — | — | 16,254 |
| Other................................ | | Various | 1,726 | 2,537 |
| Total regulatory liabilities................................ | | | $ 153,553 | $ 177,110 |

A pension regulatory asset has been recognized upon the purchase of Montana Power for the obligation that will be included in future cost of service. Pension costs in Montana are recovered in rates on a cash basis. Competitive transition charges relate to natural gas properties and earn a rate of return sufficient to meet the debt service requirements of the Montana natural gas transition bonds. A regulatory asset has been recognized for the SFAS No. 106 purchase obligation upon the purchase of Montana Power. The MPSC allows recovery of SFAS No. 106 costs on an accrual basis. A regulatory asset has been recorded to reflect the future recovery of energy supply costs through the ratemaking process. Tax assets and liabilities primarily reflect the effects of plant related temporary differences such as removal costs, capitalized interest and contributions in aid of construction that we will recover or refund in future rates.

A regulatory liability has been recognized to reflect payments our customers have prepaid for future plant removal costs. During 2000 and 2001, Montana Power made sales of natural gas from its storage field at prices in excess of its original cost, creating a regulatory liability. This gain is being flowed to customers over a period that matches the depreciable life of surface facilities that were added to maintain deliverability from the field after the withdrawal of the gas and was fully amortized through rates in 2003. Montana Power also has a regulatory liability related to oil and gas proceeds that was credited to customer bills on a monthly basis. In connection with the acquisition of Montana Power, a stipulation agreement was signed that required a contribution by the previous owner and us to fund credits to Montana electric distribution customers. The account was applied on a kilowatt hour basis beginning July 1, 2002 for one year.

## (18) Deregulation and Regulatory Matters

### Deregulation

The electric and natural gas utility businesses in Montana are operating in a competitive market in which commodity energy products and related services are sold directly to wholesale and retail customers.

### Electric

Montana's Electric Utility Industry Restructuring and Customer Choice Act (Electric Act), was passed in 1997. Various energy-related legislation revised and refined the Act during the legislative sessions that followed. The 2003 Legislature established us as the permanent default supplier and set the transition period for all customers to be able to choose their electric supplier to end July 1, 2027. As default supplier, we are obligated to continue to supply electric energy to customers in our service territory who have not chosen, or have not had an opportunity to choose, other power suppliers. The 2003 legislation also requires smaller customers to remain as default supply customers and established a specific set of requirements and procedures that guide power supply procurements and their cost recovery. This provides adequate assurances of recovering our costs of acquiring electric supply.

On January 23, 2003, we filed our first biannual Electric Default Supply Resource Procurement Plan with the PSC, which fulfills the requirements established by law and describes the planning we are doing on behalf of our electric default supply customers to acquire a balanced and well designed resource portfolio. We have a substantial portion of the portfolio covered by the existing PPL Montana base-load contracts and the QF contracts.

### Natural Gas

Montana's Natural Gas Utility Restructuring and Customer Choice Act, also passed in 1997, provides that a natural gas utility may voluntarily offer its customers choice of natural gas suppliers and provide open access. We have opened access on our gas transmission and distribution systems, and all of our natural gas customers have the opportunity of gas supply choice. We are also the default supplier for the remaining natural gas customers.

### Regulatory Matters

The MPSC, the SDPUC, and the Nebraska Public Service Commission (NPSC) regulate our bundled transmission and distribution, services and approves the rates that we charge for these services, while the FERC regulates our transmission services. There have been no significant regulatory issues in South Dakota or Nebraska during the past three years. Current regulatory issues are discussed below.

On August 12, 2003, the MCC filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the MPSC. On August 22, 2003, the MPSC issued an order initiating an investigation of us relating to, among others, finances, corporate structure, capital structure, cash management practices, and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to us including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. A procedural schedule was set in January 2004 with a hearing tentatively scheduled for June 2004. We

cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, we may become subject to material monetary penalties and fines. We are cooperating with the MCC in the discovery process, but have retained the right to argue that the investigation is stayed as a result of our Chapter 11 filing.

### Electric Rates

On June 12, 2003, the MPSC approved the next annual tracking period for the stipulated competitive transition charges Qualifying Facilities Contracts, or CTC-QFs in the amount of $17.4 million to be effective July 1, 2003. On June 16, 2003, we filed our annual electric supply cost tracker request with the MPSC for any unrecovered actual electric supply costs for the 12-month period ended June 30, 2003, and for projected costs for the 12-month period ended June 30, 2004. On July 15, an interim order was approved by MPSC for the projected electric supply cost.

### Natural Gas Rates

On June 2, 2003, we filed an annual gas cost tracker request with the MPSC for any unrecovered actual gas costs for the eight-month period ended June 30, 2003, and for the projected gas costs for the 12-month period ending June 30, 2004.  On July 3, 2003, the MPSC issued two separate orders, a final order and an interim order, with respect to our recovery of gas costs.

The final order issued by the MPSC disallowed recovery of $6.2 million of actual natural gas costs we incurred during the past eight months. The MPSC also rejected a motion for reconsideration filed by us. We filed suit in district court on July 28, 2003, seeking to overturn the MPSC's decision to disallow recovery of these costs. Included in other current assets was $6.2 million, which was written off during June 2003 to comply with the final order. In the event the MPSC's decision is overturned, we will reinstate the asset.

The MPSC also granted an interim order on July 3, 2003, for the projected gas cost adjusted for a portion of the gas portfolio at a fixed price of $3.50 per MMBTU as opposed to the market price submitted in the original filing, which was higher. Assuming our average forecast price over the next six months occurs, the impact of this disallowance on the volumes at the imputed price compared to market price would be approximately $4.5 million for the period July 1, 2003 through June 30, 2004.

In Nebraska, where natural gas companies have been regulated by the municipalities in which they serve, the 2003 Nebraska Unicameral Legislature enacted a new law during the second quarter of 2003, shifting the regulation to the NPSC. Under the new law, the NPSC regulates rates and terms and conditions of service for natural gas companies, however, the law provides that a natural gas company and the cities in which it serves have the ability to negotiate rates for natural gas service when the natural gas company files an application for increased rates. If the cities and the company choose not to negotiate or they are unable to reach an agreement, then the NPSC will review the rate filing. Our initial tariffs, including our rates, terms and conditions for service consistent with those formerly filed with the municipalities, were filed with and accepted by the NPSC.

### FERC

Through a filing with FERC in April 2000, we sought recovery of transition costs associated with serving two wholesale electric cooperatives. On July 15, 2002, a FERC administrative judge issued a summary judgment dismissing the company's claim primarily on the grounds that the filing did not use FERC methodology. On December 2, 2002, we filed a "Brief on Exceptions to the Initial Decision" aimed at reversing the initial decision. A decision by FERC was received on January 28, 2004, which affirmed the original summary judgment decision.

## (19)  Stock Options and Warrants

Under the NorthWestern Stock Option and Incentive Plan ("Plan"), we have reserved 3,424,595 shares for issuance to officers, key employees and directors as either incentive-based options or nonqualified options. The Compensation Committee ("Committee") of our Board of Directors administers the Plan. Unless established differently by the Committee, the per-share option exercise price shall be the fair market value of our common stock at the grant date. The options expire 10 years following the date of grant and options issued during 2003 and prior to 2002 vest over a three-year period beginning in the third year. Options issued during 2002 vest ratably over four years from the date of grant.

In addition, in 1998, we registered 1,279,476 warrants to nonemployees to purchase shares of NorthWestern common stock at $18.225 per share in connection with a previous acquisition. During 2001, all of the remaining warrants were extinguished through a cashless exchange whereby holders received shares of our common stock equivalent to the difference between the warrant price and the market price of our common stock on the date of the exchange. 271,949 shares of common stock were issued in association with these transactions.

A summary of the activity of stock options is as follows:

| | Shares | Option Price Per Share | Weighted Average Option Price |
|---|---|---|---|
| Balance December 31, 2000 | 1,391,521 | $ 21.19-$26.13 | $ 23.31 |
| Issued | 536,100 | 22.70-25.00 | 23.03 |
| Canceled | (43,129) | 21.19-23.31 | 22.31 |
| Balance December 31, 2001 | 1,884,492 | 21.19-26.13 | 23.26 |
| Issued | 786,200 | 15.26-20.70 | 20.61 |
| Canceled | (1,132,527) | 20.30-26.13 | 22.45 |
| Balance December 31, 2002 | 1,538,165 | 15.26-26.13 | 22.49 |
| Issued | 500,623 | 2.05-4.90 | 3.97 |
| Canceled | (679,600) | 20.30-26.13 | 22.23 |
| Balance December 31, 2003 | 1,359,188 | | 15.81 |

Options Exercisable as of:

| | Shares | Option Price Per Share | Weighted Average Option Price |
|---|---|---|---|
| December 31, 2001 | 72,488 | $ 21.19-$26.13 | $ 23.11 |
| December 31, 2002 | 245,421 | 20.70-26.13 | 23.73 |
| December 31, 2003 | 315,404 | 20.70-26.13 | 23.53 |

We follow Accounting Principles Board Opinion 25, *Accounting for Stock Issued to Employees*' to account for stock option plans. No compensation cost is recognized because the option exercise price is equal to the market price of the underlying stock on the date of grant.

An alternative method of accounting for stock options is SFAS No. 123, *Accounting for Stock -Based Compensation*. Under SFAS No. 123, stock options are valued at grant date using the Black-Scholes valuation model and compensation cost is recognized ratably over the vesting period. SFAS No. 123 also requires disclosure of pro forma net income and earnings per share had the estimated value of option grants on their grant date been charged to compensation expense. The weighted average Black-Scholes fair value of the options granted under the stock option plan during 2003, 2002 and 2001 was $1.63, $8.45 and $3.17, respectively. The weighted average remaining contractual life of the options outstanding at December 31, 2003, was 7.63 years. The table in Note 4 illustrates the effect on net income and earnings per share had the fair value of option grants been charged to compensation expense in the Consolidated Statements of Income (Loss).

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted average assumptions:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Expected life (years) | 8 | 8 | 8 |
| Interest rate | 4.0% | 4.0% | 5.1% |
| Volatility | 26.5% | 26.5% | 18.8% |
| Dividend yield | — | — | 5.2% |

We issued 283,333 shares of common stock in 2003 under a restricted stock plan with a fair value at date of issuance of $1.2 million. The stock vests over a three-year period and compensation expense is recognized ratably over the vesting period. We previously issued 33,480 shares of common stock in 2001 under this restricted stock plan with a fair value at date of issuance of $0.7 million. In 2003 the 2001 shares were forfeited and year-to-date compensation expense reversed. Compensation expense for the years ended December 31, 2003, 2002, and 2001, of $0.3 million, $0.5 million and $0.2 million, respectively, has been recognized.

## (20) Earnings (Loss) Per Share

Basic earnings per share is computed on the basis of the weighted average number of common shares outstanding. Diluted

earnings per share is computed on the basis of the weighted average number of common shares outstanding plus the effect of the outstanding stock options and warrants. Average shares used in computing the basic and diluted earnings per share for 2003, 2002 and 2001 were as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Basic computation ............................................. | 37,396,762 | 29,725,529 | 24,390,184 |
| *Dilutive effect of*............................................. |  |  |  |
| Stock options ............................................. | — | — | 19,364 |
| Stock warrants............................................. | — | — | 45,760 |
| Diluted computation....................................... | 37,396,762 | 29,725,529 | 24,455,308 |

Certain outstanding antidilutive options and warrants have been excluded from the earnings per share calculations. These options and warrants total 1,359,188 shares, 1,538,165 shares and 1,221,876 shares in 2003, 2002 and 2001, respectively.

## (21) Guarantees, Commitments and Contingencies

### Qualifying Facilities Liability

With the acquisition of our Montana operations, we assumed a liability for expenses associated with certain Qualifying Facilities Contracts, or QFs. The QFs require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our gross contractual obligation related to the QFs is approximately $1.8 billion through 2029. A portion of the costs incurred to purchase this energy is recoverable through rates and payments from the MPSC, totaling approximately $1.4 billion through 2029. Upon completion of the purchase price allocation related to our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, we established a liability of $134.3 million, based on the net present value (using an 8.75% discount factor) of the difference between our obligations under the QFs and the related amount recoverable. At December 31, 2003, the liability was $142.8 million.

The following summarizes the estimated gross contractual obligation less amounts recoverable through rates (in thousands):

|  | Gross obligation | Recoverable amounts | Net |
|---|---|---|---|
| 2004.................................................................. | $ 54,823 | ($44,652) | $ 10,171 |
| 2005.................................................................. | 56,579 | (52,647) | 3,932 |
| 2006.................................................................. | 58,468 | (52,681) | 5,787 |
| 2007.................................................................. | 60,634 | (53,222) | 7,412 |
| 2008.................................................................. | 62,931 | (53,750) | 9,181 |
| Thereafter......................................................... | 1,525,238 | (1,138,340) | 386,898 |
| Total................................................................. | $ 1,818,673 | ($1,395,292) | $ 423,381 |

### Long Term Power Purchase Obligations

We have entered into various commitments, largely purchased power, coal and natural gas supply, electric generation construction and natural gas transportation contracts. These commitments range from one to 30 years. The commitments under these contracts as of December 31, 2003, were $251.0 million in 2004, $227.7 million in 2005, $165.0 million in 2006, $98.4 million in 2007, $45.3 million in 2008 and $448.5 million thereafter. These commitments are not reflected in our Consolidated Financial Statements.

### Employment Contracts

Mr. Hanson entered into an employment agreement as of March 1, 2001, which was terminated in March 2004, and Messrs. Jacobsen and Van Camp entered into employment agreements as of March 1, 2001, which terminated on the last day of February 2004. Under the agreements, Messrs. Hanson, Jacobsen and Van Camp were entitled to receive a base salary that was subject to annual increases based on the median of comparable companies and a discretionary bonus. They each were also eligible to participate in NorthWestern's annual short-term cash incentive plans and long-term cash and stock incentive plans tied to the success of the organization. These long-term incentive plans included, among other things, options to purchase shares of NorthWestern common stock. They were also entitled to participate in NorthWestern benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits as well as an automobile allowance. Mr. Jacobsen had the right under his contract to participate in long-term incentive plans which held minority investments in or were otherwise tied to the performance of NorthWestern's nonregulated subsidiaries.

The former agreements provided for the payment of accrued salary and termination benefits if employment was terminated by NorthWestern for any reason other than Cause, due to death or by the employee due to a "fundamental change." A fundamental change generally occurs if there is a diminution in the employee's responsibilities or compensation, NorthWestern relocates its primary offices more than 30 miles or there is a change in control or major transaction involving NorthWestern (each as defined in the agreement). The termination benefits included a lump sum payment equal to (1) the sum of (a) base salary, (b) the higher of either the employee's most recent bonuses and short-term incentive awards or the average of such bonuses and awards over the preceding three calendar years and (c) the higher of either the value of the employee's most recent options, long-term incentive awards and private equity investment returns or the average value of such options, awards and returns over the preceding three calendar years, multiplied by (2) the remaining term of the agreement plus one year. The termination benefits also included lump sum payments equal to the employee's interests under NorthWestern's benefit plans. The Executive had the right to defer receipt of certain of these termination benefits rather than receiving them as a lump sum. All equity awards granted to him accelerated in full upon termination of the agreement (other than for Cause) and remained exercisable in accordance with their terms. NorthWestern had agreed to make gross-up payments to him to the extent that termination benefits would be subject to the excise tax on excess "parachute payments" following a change of control. The termination benefits under these agreements were to be provided regardless of whether the employee is able to obtain other employment. The agreements contained provisions requiring the Executive to maintain the confidentiality of NorthWestern proprietary information and restricted him from competing with NorthWestern or soliciting NorthWestern employees, suppliers and customers for a period of two years following termination. NorthWestern had agreed, pursuant to the agreement, to indemnify him to the fullest extent permitted by law.

We have contractual arrangements with two other executive officers, Chief Restructuring Officer William M. Austin, one of the named executives, and Chief Financial Officer Brian B. Bird.

We have a Memorandum of Engagement with Mr. Austin, which, as amended and approved by the Bankruptcy Court in its Order dated October 10, 2003, terminates on the earlier of 18 months or the effective date of a confirmed reorganization plan, unless extended by mutual agreement. Under the agreement Mr. Austin, as he serves as Chief Restructuring Officer, is entitled to a base salary, a time-based addition, and an incentive-based addition. The agreement provides that if an effective date of a reorganization plan occurs before scheduled completion of the above distributions, the payments not yet made will be fully earned and paid on the effective date. The agreement also provides for severance if Mr. Austin is involuntarily terminated or otherwise as a result of the bankruptcy proceedings and indemnification by us for claims made in connection with his engagement as Chief Restructuring Officer.

We also have an Employment Agreement with Mr. Bird, which, as amended and approved by the Bankruptcy Court in its Order dated January 13, 2004, provides for him to serve as Chief Financial Officer, commencing December 1, 2003, and extends until the earlier of his termination of employment or December 1, 2005. Mr. Bird's compensation package consists of a sign-on bonus, a base salary and performance-based incentive of up to his annual salary. Mr. Bird is also entitled to participate in our benefit plans available to executives, including, among other things, health, retirement, disability and life insurance benefits. The agreement provides that if an effective date of a reorganization plan, or the consummation of a sale of NorthWestern occurs before scheduled completion of the above distributions, then payments not yet made will be fully earned and paid on the effective date. The agreement also provides for severance if Mr. Bird is terminated for any reason other than Cause.

Blue Dot President and Chief Executive Officer Daniel K. Newell, one of the named executives, has a Memorandum of Engagement with Blue Dot, dated November 6, 2003, and effective for a term beginning September 1, 2003, and extending until September 1, 2004, or his earlier termination of employment. Under the agreement, Mr. Newell is provided a base salary, incentive-based additional compensation related to Blue Dot's success in completing the sale of its operations, a severance benefit if his employment is involuntarily terminated by Blue Dot, reasonable out-of-pocket expense reimbursement, and indemnification by Blue Dot for claims made in connection with his engagement as President and Chief Executive Officer.

### *Residual Value Guarantees*

We have residual value guarantees related to certain vehicles under operating leases by Blue Dot, in the event of default and subsequent failure to cure such default. At December 31, 2003, the maximum exposure under the residual value guarantees is approximately $5.2 million.

*Performance Bonds and Letters of Credit*

We have various letter of credit requirements and other collateral obligations of approximately $16.4 million and $48.1 million as of December 31, 2003 and 2002, respectively.

Blue Dot and Expanets have obtained various license, bid and performance bonds in place to secure the performance of contracts and the adequate provision of services. The total amount of outstanding surety bonds obtained by Blue Dot and Expanets is approximately $59.5 million as of December 31, 2003. Due to the completion of work and as a result of the sale of Expanets and certain Blue Dot businesses, we estimate the amount of the underlying obligations that such bonds secure is $3.5 million and $14.3 million as of December 31, 2003 and 2002, respectively.

The surety bonds obtained by Blue Dot and Expanets are supported by indemnity agreements that we entered into for the benefit of Blue Dot and Expanets and are secured by various letters of credit obtained by Blue Dot, Expanets, or us. Approximately $10 million and $18.6 million of these letter of credit and other collateral obligations as of December 31, 2003 and 2002, respectively, serve to support performance bonds primarily related to Blue Dot and Expanets. In addition, included in other assets at December 31, 2003, is $7.1 million of deposits that support performance bonds related to Blue Dot and Expanets. No such amounts existed at December 31, 2002.

*Environmental Liabilities*

We are subject to numerous state and federal environmental regulations. Because laws and regulations applicable to our businesses are continually developing and are subject to amendment, reinterpretation and varying degrees of enforcement, we may be subject to, but can not predict with certainty the nature and amount of future environmental liabilities. The Clean Air Act Amendments of 1990 (the Act) stipulate limitations on sulfur dioxide and nitrogen oxide emissions from coal-fired power plants. We believe we can comply with such sulfur dioxide emission requirements at our generating plants and that we are in compliance with all presently applicable environmental protection requirements and regulations. We also are subject to other environmental statutes and regulations including those that related to former manufactured gas plant sites and other past and present operations and facilities. In addition, we may be subject to financial liabilities related to the investigation and remediation from activities of previous owners or operators of our industrial and generating facilities. The range of exposure for environmental remediation obligations at present is estimated to range between $43.9 million to $82.7 million.

During the third quarter of 2003, we engaged the services of an environmental consulting firm to perform a comprehensive evaluation of our historical and current utility operations and facilities. Based upon the results of the evaluation, we increased our environmental reserve by $7.4 million. Our environmental reserve accrual is $43.9 as of December 31, 2003. This reserve was established and adjusted during the current year in anticipation of future remediation activities at our various South Dakota, Nebraska and Montana environmental sites and does not factor in any exposure arising from private tort actions or government claims for damages allegedly associated with specific environmental conditions.

In light of the Environmental Protection Agency's public announcement in April 2003, favoring removal of the Milltown Dam structure as part of the remedy to address heavy metals contamination in the Milltown Reservoir, we commenced negotiations with The Atlantic Richfield Company, or ARCO, to prevent a challenge from ARCO to our statutorily exempt status under the Comprehensive Environmental Response Compensation and Liability Act as a potentially responsible party. On September 10, 2003, we executed a confidential settlement agreement with ARCO which, among other things, caps our maximum contribution towards remediation of the Milltown Reservoir superfund site. Previously, NorthWestern and ARCO executed a settlement agreement which caps our potential liability for remediation of the Milltown site at no more than $10 million. We are currently seeking approval of this settlement agreement from the Bankruptcy Court. The amount of our expected contribution has been fully accrued in the accompanying financial statements. Commencing in the month following Bankruptcy Court approval of the ARCO settlement agreement and each month thereafter, we will pay $500,000 into an escrow account managed by a third party until our total agreed upon amount is funded. No interest will accrue on the unpaid balance due ARCO. The escrow account will remain funded until a final, nonappealable consent decree is entered by the United States District Court. If, however, we are unable to negotiate an acceptable consent decree with the interested parties, then we can terminate the settlement agreement with ARCO, which will trigger the return of the escrowed funds to us. The settlement agreement, which is subject to Bankruptcy Court approval, provides us with appropriate ARCO releases and indemnifications.

*Legal Proceedings*

On September 14, 2003, we filed a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware under case number 03-12872 (CGC). We will continue to manage our properties and operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with Sections 1107(a) and 1108 of Chapter 11. As a result of the Chapter 11 filing, attempts to collect, secure or enforce remedies with respect to most prepetition claims against us are subject to the automatic stay provisions of Section 362(a) of Chapter 11. The description of our bankruptcy proceedings is summarized in Note 3, Chapter 11.

We, and certain of our present and former officers and directors, were named as defendants in numerous complaints purporting to

be class actions which were filed in the United States District Court for the District of South Dakota, Southern Division, alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaints contained varying allegations, including that the defendants misrepresented and omitted material facts with respect to our 2000, 2001, and 2002 financial results and operations included in its filings with the SEC, press releases, and registration statements and prospectuses disseminated in connection with certain offerings of debt, equity, and trust preferred securities. The complaints seek unspecified compensatory damages, rescission, and attorneys' fees and costs as well as accountants' and experts' fees. In June 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Securities Litigation*, Case No. 03-4049, and Carpenters Pension Trust for Southern California, Oppenheim Investment Management, LLC, and Richard C. Slump were named as co-lead plaintiffs (the "Lead Plaintiffs"). In July 2003, the Lead Plaintiffs filed a consolidated amended class action complaint naming NorthWestern, NorthWestern Capital Financing II and III, Blue Dot, Expanets, certain of our present and former officers and directors, along with a number of investment banks that participated in the securities offerings. The amended complaint alleges that the defendants misrepresented and omitted material facts concerning the business operations and financial performance of NorthWestern, Expanets, Blue Dot and CornerStone, overstated NorthWestern's revenues and earnings by, among other things, maintaining insufficient reserves for accounts receivable at Expanets, failing to disclose billing problems and lapses and data conversion problems, failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system, concealing losses at Expanets and Blue Dot by improperly allocating losses to minority interest shareholders, maintaining insufficient internal controls, and profiting from improper related-party transactions. We, and certain of our present and former officers and directors, were also named as defendants in two complaints purporting to be class actions which were filed in the United States District Court for the Southern District of New York, entitled *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.*, Case No. 03CV3223, and *Arthur Laufer v. Merle Lewis, et al.*, Case No. 03CV3716, which were brought on behalf of the purchasers of our 7.20%, 8.25%, and 8.10% trust preferred securities which were offered and sold pursuant to our registration statement on Form S-3 filed on July 12, 1999. The plaintiffs' claims are based on similar allegations of material misrepresentations and omissions of fact relating to the registration statement in violation of Sections 11 and 12 of the Securities Act of 1933 and they seek unspecified compensatory damages, rescission and attorneys', accountants' and experts' fees. In July 2003, *Arthur Laufer v. Merle Lewis, et al.* was transferred to the District of South Dakota and consolidated with the consolidated actions pending in that court. In September 2003, *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.* was also transferred to the District of South Dakota. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. In October 2003, Expanets, Blue Dot, and certain of NorthWestern's present and former officers and directors filed motions to dismiss the consolidated amended class action complaint for failure to state a claim, which are currently pending in the District of South Dakota.

Certain of our present and former officers and directors and NorthWestern, as a nominal defendant, have been named in two shareholder derivative actions commenced in the United States District Court for the District of South Dakota, Southern Division, entitled *Deryl Lusty, et al. v. Richard R. Hylland, et al.*, Case No. CIV034091 and *Jerald and Betty Stewart, et al. v. Richard R. Hylland, et al.*, Case No. CIV034114. These shareholder derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal shareholder suits. The plaintiffs seek unspecified compensatory damages, restitution of improper salaries, insider trading profits and payments from NorthWestern, and disgorgement under the Sarbanes-Oxley Act of 2002. In July 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091. In October 2003, the action was stayed pending a ruling on defendants' motions to dismiss in the related securities class action, *In re NorthWestern Corporation Securities Litigation*. On November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining the plaintiffs in *In re NorthWestern Corporation Derivative Litigation* from prosecuting the litigation against NorthWestern, its subsidiaries and its current and former officers and directors until further order of the Bankruptcy Court.

On February 7, 2004, the parties to the above consolidated securities class actions and consolidated derivative litigation, together with certain other affected persons and parties, reached a tentative settlement of the litigation. Among the terms of the proposed settlement, we, Expanets, Blue Dot and other parties and persons will be released from all claims to these cases, a settlement fund in the amount of $41 million (of which approximately $37 million would be contributed by our directors and officers liability insurance carriers, and $4 million would be contributed from other persons and parties) will be established, and, if Netexit seeks bankruptcy protection, the plaintiffs would have a $20 million liquidated securities claim against Netexit. The proposed settlement is subject to the occurrence of several conditions, including approval of the proposed settlement by the Bankruptcy Court in our bankruptcy proceeding, approval of the proposed settlement by the federal District Court for the District of South Dakota, where the consolidated class actions are pending, and approval by the Bankruptcy Court of our plan of reorganization. If for any reason these conditions do not occur and the settlement is not approved, we intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In December 2003, the SEC notified NorthWestern that it had issued a formal order of private investigation and subsequently subpoenaed documents from NorthWestern, NorthWestern Communications Solutions, Expanets and Blue Dot. This action follows the SEC's requests for information in connection with the previously disclosed SEC informal inquiry into questions regarding the restatements and other accounting and financial reporting matters. In addition, a NorthWestern director was interviewed by representatives of the Federal Bureau of Investigation (FBI), concerning certain of the allegations made in the class action securities and

derivative litigation matters. Northwestern has not been contacted by the FBI and has not been advised that NorthWestern is the target of its investigation. We are cooperating with the SEC's investigation and intend to cooperate with the FBI if we are contacted in connection with its investigation. We understand that the FBI or the Internal Revenue Service (IRS) may have contacted current and former employees of ours or of our subsidiaries. As of the date hereof, we are not aware of any other governmental inquiry or investigation related to these matters. We cannot predict whether or not any other governmental inquiry or investigation will be commenced, nor can we predict the outcome of the SEC, FBI, IRS or any other governmental inquiry or investigation or related litigation or proceeding.

In January 2004, two of the QFs – Colstrip Electric Limited Partnership (CELP) and Yellowstone Electric Limited Partnership (YELP) – initiated adversary proceedings against NorthWestern in its Chapter 11 proceedings. In the CELP adversary proceeding, CELP seeks additional payment for capacity contracted to be provided to NorthWestern under its existing power purchase agreement. In the YELP adversary proceeding, YELP seeks a determination of when and who has the right to determine the scheduling of maintenance on the power facility. We intend to vigorously defend against these adversary proceedings. In the opinion of management, the amount of ultimate liability with respect to these adversary proceedings will not materially affect our financial position or results of operations or our ability to timely confirm a plan of reorganization.

Expanets and NorthWestern have been named defendants in two complaints filed with the Supreme Court of the State of New York, County of Bronx, alleging violations of New York's prevailing wage laws, breach of contract, unjust enrichment, willful failure to pay wages, race, ethnicity, national origin and/or age discrimination and retaliation. In the complaint entitled *Felix Adames et al. v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, County of Bronx, Index No. 8664-04*, which has not yet been served upon Expanets, fourteen former employees of Expanets seek damages in the amount of $27,750,000, plus interest, penalties, punitive damages, costs, and attorney's fees. In the complaint entitled *Wayne Belnavis and David Daniels v. Avaya, Expanets, NorthWestern et al., Supreme Court of the State of New York, County of Bronx, Index No. 8729-04*, which has not yet been served upon Expanets, two former employees of Expanets seek damages in the amount of $12,500,000, plus interest, penalties, punitive damages, costs, and attorney's fees. We intend to vigorously defend against the allegations made in these complaints. Though the filing of the complaint may violate the automatic stay provisions of the U.S. Bankruptcy Code and maybe subject to the claims process of the bankruptcy proceeding, we cannot currently predict the impact or resolution of these claims or reasonably estimate a range of possible loss, which could be material, and the resolution of these claims may harm our business and have a material adverse impact on our financial condition.

We are one of several defendants in a class action lawsuit entitled *McGreevey, et al. v. The Montana Power Company, et al*, now pending in federal court in Montana. The lawsuit, which was filed by the former shareholders of The Montana Power Company (most of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company were void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern Corporation is named as a defendant due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. On November 6, 2003, the Bankruptcy Court approved a stipulation between NorthWestern and the plaintiffs in *McGreevey, et al. v. The Montana Power Company, et al.* The stipulation provides that litigation, as against Northwestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey, shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to Northwestern, the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In *Northwestern Corporation vs. PPL Montana, LLC vs. Northwestern Corporation and Clark Fork and Blackfoot, LLC*, No. CV-02-94-BU-SHE, (D. MT), the Company is pursuing claims against PPL Montana, LLC due to its refusal to purchase the Colstrip transmission assets which under the Asset Purchase Agreement ("APA") executed by and between The Montana Power Company ("MPC") and PP&L Global, Inc. ("PPL Global"), NorthWestern claims PPL Montana, LLC ("PPL") (PPL Global's successor-in-interest under the APA) is required to purchase the Colstrip transmission assets for $97.1 million. PPL has also asserted a number of counterclaims against NorthWestern and Clark Fork based in large part upon PPL's claim that MPC and/or NorthWestern Energy breached two Wholesale Transition Service Agreements and certain indemnification obligations under the APA in the approximate amount of $40 million. PPL has moved the Bankruptcy Court for relief from the automatic stay to pursue its counterclaims. PPL also filed a proof of claim against NorthWestern's bankruptcy estate. NorthWestern has objected to PPL's motion to lift the automatic stay and has also filed a motion to transfer the venue of the entire litigation to the United States District Court for the District of Delaware, where it will ultimately be referred to the United States Bankruptcy Court for the District of Delaware so as to resolve the litigation as part of NorthWestern's pending bankruptcy reorganization. PPL has objected to such motion and a hearing is scheduled on NorthWestern's motion in March 2004.

We are also one of several defendants in a class action lawsuit entitled *In Re Touch America ERISA Litigation*, which is

currently pending in federal court in Montana. The lawsuit was filed by participants in the former Montana Power Company retirement savings plan and alleges that there was a breach of fiduciary duty in connection with the employee stock ownership aspects of the plan. The federal court has recently entered orders indefinitely staying the ERISA litigation because of Touch America Holdings Inc.'s bankruptcy filing. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We, and certain of our former officers and directors, were named as defendants in certain complaints filed against CornerStone Propane Partners, LP and other defendants purporting to be class actions filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, LP. Certain former officers and directors of NorthWestern who are named as defendants in certain of these actions have also been sued in their capacities as directors of the managing general partner. These complaints allege that defendants sold units of CornerStone Propane Partners based upon false and misleading statements and failed to disclose material information about CornerStone Propane Partners' financial condition and future prospects, including overpayment for

F-36

acquisitions, overstating earnings and net income, and that it lacked adequate internal controls. All of the lawsuits have now been consolidated and Gilbert H. Lamphere has been named as lead plaintiff. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. On October 27, 2003, the plaintiffs filed an amended consolidated class action complaint. The new complaint does not name NorthWestern as a defendant, although it alleges facts relating to NorthWestern's conduct. Certain of our former officers and directors are named as defendants in the amended consolidated complaint. The plaintiffs seek compensatory damages, prejudgment and post judgment interest and costs, injunctive relief, and other relief. We intend to vigorously defend against these lawsuits. On November 6, 2003, the Bankruptcy Court entered an order approving a stipulation between NorthWestern and plaintiffs in this litigation. The stipulation provides that litigation as against NorthWestern shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to Northwestern, the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

We were named in a complaint filed against CornerStone Propane GP, Inc., CornerStone Propane Partners LP and other defendants in a lawsuit entitled *Leonard S. Mewhinney, Jr. v. Northwestern Corporation* in the circuit court of the city of St. Louis, state of Missouri. The complaint alleges that the plaintiff purchased units of Cornerstone Propane Partners, LP between March 13, 1998 and November 29, 2001 and that NorthWestern owned and controlled all or the majority of stock or other indicia of ownership of Cornerstone Propane, GP, Inc. and all other entities that were the general partners of Cornerstone Propane Partners, LP. According to the plaintiff, NorthWestern, Cornerstone Propane GP, Inc., Coast Gas, Inc. and Cornerstone Propane Partners, LP breached fiduciary duties to the plaintiff by engaging in certain misconduct, including mismanaging Cornerstone Propane Partners, LP and transferring its assets for less than market value and other activities. The complaint further alleges that the defendants fraudulently failed to disclose material information regarding the value of units of Cornerstone Propane Partners, LP and violated the Florida Securities Act in connection with the sale of such units. The plaintiff seeks compensatory damages, punitive damages and costs. The complaint was amended to add a state class action claim. All defendants filed a petition to remove the case to the federal court in St. Louis, Missouri, but the federal court granted plaintiffs motion to remand. The case has now been stayed against NorthWestern due to its bankruptcy filing. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

Certain of our present and former officers and directors, and CornerStone Propane Partners, LP, as a nominal defendant, are among other defendants named in two derivative actions commenced in the Superior Court for the State of California, County of Santa Cruz, entitled *Adelaide Andrews v. Keith G. Baxter, et al.*, Case No. CV146662 and *Ralph Tyndall v. Keith G. Baxter, et al.*, Case No. CV146661. These derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal unitholder suits. The plaintiffs seek unspecified compensatory damages, treble damages pursuant to the California Corporations Code, injunctive relief, restitution, disgorgement, costs, and other relief. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

On April 30, 2003, Mr. Richard Hylland, our former President and Chief Operating Officer, filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortious interference and a claim for punitive damages. Mr. Hylland is seeking relief in an amount of $25 million, plus interest, attorney's fees, costs, and punitive damages. Mr. Hylland has also filed claims in our bankruptcy case similar to the claims in his arbitration demand. We dispute Mr. Hylland's claims and intend to vigorously defend the arbitration and object to Mr. Hylland's claims in our bankruptcy case. On May 6, 2003, based on the recommendations of the Special Committee of the Board formed to evaluate Mr. Hylland's performance and conduct in connection with the management of NorthWestern and its subsidiaries, the Board determined that Mr. Hylland's performance and conduct as President and Chief Operating Officer warranted termination under his employment contract. This arbitration has been stayed due to our bankruptcy filing.

On August 12, 2003, the MCC filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the MPSC. On August 22, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices, and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. A procedural schedule was set in January 2004 with a hearing tentatively scheduled for June 2004. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, then we may become subject to material monetary penalties and fines. We are working with the MCC to provide requested information in a timely manner, but we have reserved the right to contest whether this

proceeding is stayed as a result of our bankruptcy filing.

We are also subject to various other legal proceedings and claims that arise in the ordinary course of business. In the opinion of management, the amount of ultimate liability with respect to these actions will not materially affect our financial position or results of operations or ability to timely confirm a plan of reorganization.

### Other Contractual Obligations

On June 19, 2002, NorthWestern Energy Marketing, LLC (NEM), our power marketing subsidiary, entered into two five-year power supply contracts to supply a total of approximately 20 megawatts of electricity to customers located in Montana. These supply obligations commenced on July 1, 2002, and continue through June 30, 2007. NEM secured supply to cover these contractual obligations through June 30, 2003. Due to our financial condition, NEM has been unable to secure a source of power to cover its contractual obligation subsequent to June 30, 2003. Based on the uncertainty of supply, as of July 1, 2003, the two customers elected to secure their power supply needs from the Montana default supply. Shortly thereafter, the customers notified NEM that they would seek damages to compensate them for their increased power supply costs. NEM reached a settlement with its two customers on October 27, 2003, and subsequently paid $1.5 million in full settlement of its obligations.

The maximum aggregate amount of payments that may be required of NorthWestern under various Blue Dot minority shareholder agreements is approximately $2.3 million as of December 31, 2003, of which approximately $0.4 million may be required within the next 12 months.

## (22)  Capital Stock

In December 1996, our Board of Directors declared, pursuant to a shareholders' rights plan, a dividend distribution of one Right on each outstanding share of our common stock. Each Right becomes exercisable, upon the occurrence of certain events, at an exercise price of $50 per share, subject to adjustment. The Rights are currently not exercisable and will be exercisable only if a person or group of affiliated or associated persons ("Acquiring Person") either acquires ownership of 15% or more of our common stock or commences a tender or exchange offer that would result in ownership of 15% or more. In the event we are acquired in a merger or other business combination transaction or 50% or more of our consolidated assets or earnings power are sold, each Right entitles the holder to receive such number of shares of common stock of the Acquiring Person having a market value of two times the then current exercise price of the Right. The Rights, which expire in December 2006, are redeemable in whole, but not in part, at a price of $.005 per Right, at our option at any time until any Acquiring Person has acquired 15% or more of our common stock.

In October 2002, we completed a common stock offering of 10,000,000 shares. The offering resulted in net proceeds of $81.0 million and the funds were used to reduce short-term debt. In October 2001 we completed a common stock offering of 3,680,000 shares. The offering resulted in net proceeds of $74.9 million and the funds were used to redeem certain subsidiary equity arrangements and for general corporate purposes, including reducing debt. We also issued 283,333 shares of common stock in 2003 under the stock option and incentive plan. (See Note 19, Stock Options and Warrants, for further details.). Our common stock will be cancelled in connection with the adoption of our plan of reorganization.

We are authorized to issue 1,000,000 shares of $100 par cumulative preferred stock. As of December 31, 2001, there were 37,500 shares outstanding of which 26,000 were $4^1/_2$% Series and 11,500 were $6^1/_2$% Series, all of the shares of which were redeemed during 2002.

We are authorized to issue a maximum of 1,000,000 shares of preference stock at a par value of $50 per share. No preference shares have been issued.

Treasury stock previously held by us represented shares held by our deferred compensation plan. This plan was terminated in 2003 and all treasury stock was distributed. (See Note 15, Employee Benefit Plans for further discussion.)

**(23)    Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts**

| Series | Par Value | | Shares | 2003 | 2002 |
|---|---|---|---|---|---|
| | | | | (in thousands) | |
| 8.125% ................................................. | $ | 25 | 1,294,200 | $ 32,355 | $ 32,500 |
| 7.20% ................................................... | $ | 25 | 2,157,300 | 53,932 | 55,000 |
| 8.25% ................................................... | $ | 25 | 4,228,400 | 105,710 | 106,750 |
| 8.10% ................................................... | $ | 25 | 4,342,100 | 108,553 | 111,000 |
| 8.45% Montana Power.......................... | $ | 25 | 2,600,000 | 65,000 | 65,000 |
| | | | 14,622,000 | $ 365,550 | $ 370,250 |

We have established four wholly owned, special-purpose business trusts, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II and NorthWestern Capital Financing III, to issue common and preferred securities and hold Subordinated Debentures that we issue. Montana Power had established Montana Power Capital I (Trust) as a wholly owned business trust to issue common and preferred securities and hold Junior Subordinated Deferrable Interest Debentures. The sole assets of these trusts are the investments in Subordinated Debentures. The trusts use the interest payments received on the Subordinated Debentures to make quarterly cash distributions on the preferred securities. These Subordinated Debentures are unsecured and subordinated to all of our other liabilities and rank equally with the guarantees related to the other trusts.

As discussed in Note 4, under New Accounting Standards, these securities are now presented as liabilities on our December 31, 2003 Consolidated Balance Sheet. Pursuant to our bankruptcy filing, these trusts were terminated pursuant to their terms and the preferred securities became direct obligations of NorthWestern Corporation. These preferred securities are subject to compromise and they will be cancelled or converted to equity at a substantially reduced value upon emergence from bankruptcy.

**(24)    Segment and Related Information**

We currently operate our business in three reporting segments: (i) electric utility operations, (ii) natural gas utility operations, and (iii) all other, which primarily consists of our other miscellaneous service and nonenergy-related operations and activities that are not included in the other identified segments, together with the unallocated corporate costs and investments, and any eliminating amounts. Items below operating income are not allocated between our electric and natural gas segments.

The results of operations of our electric and natural gas utility segments and all other operations for the year ended December 31, 2002, include the results of our Montana operations since February 1, 2002, the effective date of our acquisition. The operations of Expanets, Blue Dot and CornerStone, which were formerly additional reporting segments, and our interest in these subsidiaries has been reflected in the consolidated financial statements as Discontinued Operations (see Note 8 for further discussion).

F-39

The accounting policies of the operating segments are the same as the parent except that the parent allocates some of its operating expenses and interest expense to the operating segments according to a methodology designed by management for internal reporting purposes and involves estimates and assumptions. Financial data for the business segments, excluding discontinued operations, are as follows (in thousands):

| 2003 | Electric | Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Operating revenues | $ 673,078 | $ 344,766 | $ 1,017,844 | $ 9,593 | $ 1,027,437 |
| Cost of sales | 312,756 | 235,019 | 547,775 | 2,814 | 550,589 |
| Gross margin | 360,322 | 109,747 | 470,069 | 6,779 | 476,848 |
| Operating, general, and administrative ... | 184,496 | 72,713 | 257,209 | 50,049 | 307,258 |
| Impairment on assets held for sale | — | — | — | 12,399 | 12,399 |
| Depreciation | 54,456 | 14,037 | 68,493 | 1,759 | 70,252 |
| Reorganization expenses | — | — | — | 8,280 | 8,280 |
| Operating income (loss) | 121,370 | 22,997 | 144,367 | (65,708) | 78,659 |
| Interest expense | N/A | N/A | (95,556) | (52,070) | (147,626) |
| Gain on debt extinguishment | N/A | N/A | — | 3,300 | 3,300 |
| Investment income and other | N/A | N/A | 2,970 | (8,947) | (5,977) |
| Reorganization interest income | N/A | N/A | — | 14 | 14 |
| Income (loss) before taxes and minority interests | N/A | N/A | 51,781 | (123,411) | (71,630) |
| Benefit (provision) for taxes | N/A | N/A | (15,681) | 15,729 | 48 |
| Income (loss) before minority interests | N/A | N/A | $ 36,100 | $ (107,682) | $ (71,582) |
| Total assets | N/A | N/A | $ 2,058,248 | $ 279,760 | $ 2,338,008 |
| Capital expenditures | N/A | N/A | $ 70,653 | $ 84 | $ 70,737 |

| 2002 | Electric | Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Operating revenues | $ 533,929 | $ 239,799 | $ 773,728 | $ 10,016 | $ 783,744 |
| Cost of sales | 205,607 | 133,124 | 338,731 | 2,795 | 341,526 |
| Gross margin | 328,322 | 106,675 | 434,997 | 7,221 | 442,218 |
| Operating, general, and administrative ... | 169,729 | 60,237 | 229,966 | 38,252 | 268,218 |
| Impairment on assets held for sale | — | — | — | 35,729 | 35,729 |
| Depreciation | 48,888 | 12,551 | 61,439 | 1,801 | 63,240 |
| Amortization | — | — | — | 19 | 19 |
| Operating income (loss) | 109,705 | 33,887 | 143,592 | (68,580) | 75,012 |
| Interest expense | N/A | N/A | (81,149) | (16,861) | (98,010) |
| Loss on debt extinguishment | N/A | N/A | — | (20,688) | (20,688) |
| Investment income and other | N/A | N/A | 2,709 | (8,190) | (5,481) |
| Income (loss) before taxes and minority interests | N/A | N/A | 65,152 | (114,319) | (49,167) |
| Benefit (provision) for taxes | N/A | N/A | (10,190) | 50,001 | 39,811 |
| Income (loss) before minority interests | N/A | N/A | $ 54,962 | $ (64,318) | $ (9,356) |
| Total assets | N/A | N/A | $ 2,186,817 | $ 157,725 | $ 2,344,542 |
| Capital expenditures | N/A | N/A | $ 119,664 | $ 28,183 | $ 147,847 |

| 2001 | Electric | Gas | Total Electric and Natural Gas | All Other | Total |
|---|---|---|---|---|---|
| Operating revenues | $ 106,995 | $ 144,213 | $ 251,208 | $ 3,943 | $ 255,151 |
| Cost of sales | 23,052 | 119,060 | 142,112 | 3,456 | 145,568 |
| Gross margin | 83,943 | 25,153 | 109,096 | 487 | 109,583 |
| Operating, general, and administrative ... | 27,734 | 14,550 | 42,284 | 19,446 | 61,730 |
| Depreciation | 13,193 | 3,235 | 16,428 | 1,495 | 17,923 |
| Amortization of goodwill and other intangibles | — | — | — | 269 | 269 |
| Restructuring charge | 3,329 | 1,170 | 4,499 | 7,272 | 11,771 |
| Operating income (loss) | 39,687 | 6,198 | 45,885 | (27,995) | 17,890 |
| Interest expense | N/A | N/A | (8,692) | (19,017) | (27,709) |
| Investment income and other | N/A | N/A | 306 | 6,828 | 7,134 |
| Income (loss) before taxes and minority interests | N/A | N/A | 37,499 | (40,184) | (2,685) |
| Benefit (provision) for taxes | N/A | N/A | (11,857) | 18,717 | 6,860 |
| Income (loss) before minority interests | N/A | N/A | $ 25,642 | $ (21,467) | $ 4,175 |
| Capital expenditures | N/A | N/A | $ 17,676 | $ 62,619 | $ 80,295 |

## (25) Quarterly Financial Data (Unaudited)

The following table sets forth certain unaudited financial data for each of the quarters within fiscal 2003 and 2002. During the second quarter of 2003 we committed to a plan to sale or liquidate our interest in Expanets and Blue Dot and accounted for our interest in these subsidiaries as discontinued operations. Accordingly, the amounts below have been restated to reflect these subsidiaries as discontinued operations. The operating results for any quarter are not necessarily indicative of results for any future period. Amounts presented are in thousands, except per share data:

| 2003 | First | Second | Third | Fourth |
|---|---|---|---|---|
| | (in thousands except per share amounts) | | | |
| Operating revenues | $ 288,723 | $ 235,529 | $ 235,388 | $ 267,797 |
| Gross margin | 133,564 | 106,231 | 114,302 | 122,751 |
| Operating income | 43,026 | 1,342 | 17,527 | 16,764 |
| Net income (loss) | $ 17,392 | $ (50,337) | $ (52,740) | $ (28,040) |
| Average common shares outstanding | 37,397 | 37,397 | 37,397 | 37,397 |
| Loss per average common share (basic and diluted): | | | | |
| Net income (loss) from continuing operations | $ (.17) | $ (1.20) | $ (.79) | $ (.15) |
| Discontinued operations | .44 | (.35) | (.62) | (.60) |
| Net income | .47 | (1.35) | (1.41) | (.75) |
| Earnings (loss) on common stock | .27 | (1.55) | (1.41) | (.75) |
| Dividends per share | — | — | — | — |
| Stock price: | | | | |
| High | $ 6.18 | $ 3.09 | $ 2.12 | $ .32 |
| Low | 1.41 | 1.65 | .15 | .08 |
| Quarter-end close | 2.10 | 2.00 | .30 | .08 |

F-41

| 2002 | | First | | Second | | Third | | Fourth |
|---|---|---|---|---|---|---|---|---|
| | | | | **(in thousands except per share amounts)** | | | | |
| Operating revenues | $ | 176,066 | $ | 177,411 | $ | 184,265 | $ | 246,002 |
| Gross margin | | 94,749 | | 108,360 | | 113,578 | | 125,531 |
| Operating income (loss) | | 38,165 | | 27,631 | | 30,588 | | (21,372) |
| Net loss | $ | (46,130) | $ | (13,893) | $ | (55,362) | $ | (748,557) |
| Average common shares outstanding | | 27,397 | | 27,397 | | 27,397 | | 36,636 |
| Loss per average common share (basic and diluted): + | | | | | | | | |
|    Net income (loss) from continuing operations | $ | (.28) | $ | (.24) | $ | (.40) | $ | (.37) |
|    Discontinued operations | | (1.63) | | (.55) | | (1.90) | | (20.27) |
|    Net loss | | (1.68) | | (.51) | | (2.02) | | (20.43) |
|    Loss on common stock | | (1.91) | | (.79) | | (2.30) | | (20.64) |
| Dividends per share | $ | .3175 | $ | .3175 | $ | .3175 | $ | .3175 |
| Stock price: | | | | | | | | |
| High | $ | 23.64 | $ | 22.30 | $ | 16.90 | $ | 9.79 |
| Low | $ | 20.35 | $ | 14.20 | $ | 8.40 | $ | 4.30 |
| Quarter-end close | $ | 22.00 | $ | 16.95 | $ | 9.76 | $ | 5.08 |

---

+     The quarterly per share amounts do not total to the annual per share amounts due to the effect of common stock issuances during the year.

## INDEPENDENT AUDITORS' REPORT

To the Shareholders and Board of Directors of NorthWestern Corporation

     We have audited the consolidated financial statements of NorthWestern Corporation (a Delaware corporation) (Debtor-in-Possession) and Subsidiaries as of December 31, 2003 and 2002, and for each of the three years in the period ended December 31, 2003, and have issued our report thereon dated March 15, 2004, which expresses an unqualified opinion and includes explanatory paragraphs relating to the bankruptcy proceedings and going concern uncertainty described in Note 3, the change in the methods of accounting for asset retirement obligations and company obligated mandatorily redeemable preferred securities in 2003 described in Note 4, and the change in the method of accounting for goodwill and other intangible assets in 2002 described in Note 6. Such consolidated financial statements and report are included elsewhere in this 2003 Annual Report on Form 10-K. Our audits also included the financial statement schedules of NorthWestern Corporation, listed in Item 15(a)(2). These financial statement schedules are the responsibility of the Corporation's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedules, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

/s/ DELOITTE & TOUCHE LLP

Minneapolis, Minnesota
March 15, 2004

<div align="center">F-43</div>

## SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS

## NORTHWESTERN CORPORATION AND SUBSIDIARIES

| Column A | Column B | Column C | | Column D | Column E |
|---|---|---|---|---|---|
| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts(1) | Deductions(2) | Balance End of Period |
| **FOR THE YEAR ENDED DECEMBER 31, 2003** (in thousands) | | | | | |
| RESERVES DEDUCTED FROM APPLICABLE ASSETS | | | | | |
| Uncollectible accounts................................... | $ 1,837 | $ 5,010 | — | $ (4,871) | $ 1,976 |
| ACCRUED EXPENSES ................................ | | | | | |
| Restructuring liability................................... | $ 1,783 | — | — | $ (1,783) | — |
| **FOR THE YEAR ENDED DECEMBER 31, 2002** (in thousands) | | | | | |
| RESERVES DEDUCTED FROM APPLICABLE ASSETS | | | | | |
| Uncollectible accounts................................... | $ 444 | $ 3,883 | $ 1,675 | $ (4,165) | $ 1,837 |
| ACCRUED EXPENSES ................................ | | | | | |
| Restructuring liability................................... | $ 10,401 | — | — | $ (8,618) | $ 1,783 |
| **FOR THE YEAR ENDED DECEMBER 31, 2001** (in thousands) | | | | | |
| RESERVES DEDUCTED FROM APPLICABLE ASSETS | | | | | |
| Uncollectible accounts................................... | $ 536 | $ 1,052 | — | $ (1,144) | $ 444 |
| ACCRUED EXPENSES ................................ | | | | | |
| Restructuring liability................................... | — | $ 11,770 | — | $ (1,369) | $ 10,401 |

(1)     Recorded via allocation of purchase price to fair value of assets and liabilities of acquired businesses.

(2)     Utilization of previously recorded balances.

Exhibit 3.2

## NORTHWESTERN CORPORATION

## BY-LAWS

### (As Amended to and Including August 26, 2003)

### ARTICLE I

Section 1.  **Principal Office**.  The principal office of the Company shall be located in the City of Wilmington, County of New Castle, and State of Delaware, and the name of the agent therein and in charge thereof, and upon whom legal process against the corporation may be served (until otherwise determined by the Board of Directors) is the CORPORATION TRUST COMPANY OF AMERICA.

Section 2.  **Other Offices**.  Offices of the Company where meetings of the stockholders and directors may be held, shall be and are hereby, established in the City of Sioux Falls, Minnehaha County, South Dakota, or such other places within or without the State of Delaware, as may from time to time be established by the Board of Directors.

### ARTICLE II

Section 1.  **Annual Meeting**.  The annual meeting of stockholders for the election of directors and for such other business as may properly be conducted at such meeting shall be held at such time and date as the Board of Directors shall designate from time to time and set forth in the notice of the meeting. Such meeting shall be held at the office of the corporation in the City of Wilmington, Delaware, or at the office of the corporation in the City of Sioux Falls, South Dakota, or at such other place within or without the State of Delaware, as may be designated in the notice of the meeting.

Section 2.  **Special Meetings**.  Special meetings of the stockholders may be called by the Chairman of the Board, the Chief Executive Officer, the President or any Vice President, or by order of the Board of Directors whenever they deem it necessary, and it shall be their duty to order and call such meetings whenever persons holding a majority of the outstanding capital stock of the corporation entitled to be voted at such meeting, shall in writing request the same. Such special meetings shall be held at the office of the corporation in the City of Wilmington, Delaware, or at the office of the corporation in the City of Sioux Falls, South Dakota, or at such other place within or without the State of Delaware, as may be designated in the notice of the meeting, and the business of such special meeting shall be confined to the objects stated in the notice thereof.

Section 3.  **Notice of Meetings**.  Notice of the time and place of the annual, and of any special meeting of the stockholders, shall be given by the Corporate Secretary to each of the stockholders entitled to vote at such meetings by posting the same in postage prepaid letters, addressed to each such stockholder at the address left with the Corporate Secretary of the Corporation, or at his last known address, or by delivering same personally, at least ten days prior to such meeting.  The notice of a special meeting shall also set forth the objects of the meeting. Any or all of the stockholders may waive notice of the annual or any special meeting, and the presence of a stockholder at any meeting, in person, by proxy, or remote communication, shall be deemed a waiver of notice thereof by him. Meetings of the stockholders may be held at any time and place and for any purpose wi thout notice, when all of the stockholders entitled to vote at such meetings are present in person or by proxy, or when all of such stockholders waive notice and consent to the holding of such meeting.

Section 4.  **Voting at Stockholders' Meetings**.  At all meetings of stockholders each holder of stock having voting power or entitled to vote at such meetings shall be entitled to one vote for each share of stock held by him at the time of the closing of the transfer books for said meeting, or on the record date fixed by the Board of Directors for that purpose as provided in Section 2 of Article VI of these By-laws, and if such transfer books shall not have been closed or any record date fixed, then for each share of stock standing registered in his name at the time of the meeting; provided, always, that except when the transfer books have been closed or a record date fixed, as aforesaid, no share of stock shall be voted at any election which has been transferred on the books of the corporation within twenty days next preceding such election. Such vote may be given personally or by proxy authorized in writing. Only the persons in whose names shares of stock shall stand on the books of the corporation at the time aforesaid shall be entitled to vote in person or by proxy upon the shares of stock standing in their name. No proxy shall be voted on after three years from its date.

Section 5.  **Quorum**.  The holders for the time being of a majority of the total number of shares of stock issued and outstanding and entitled to be voted at any meetings represented in person, by proxy, or remote communication, shall constitute a quorum for the transaction of business at such meetings unless the representation of a larger number shall be required by law. In the absence of a quorum, the stockholders attending or represented at the time and place at which a meeting shall have been called, may adjourn the meeting from time to time until a quorum shall be present. At any such adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted by a quorum of the stockholders at the meeting as originally convened.

Section 6.  **Presiding Officer and Secretary**.  The Chairman of the Board, or in the Chairman's absence the Chief Executive Officer, or in the Chief Executive Officer's absence the President, or in the President's absence a Vice President, shall call meetings of the stockholders to order and shall act as chairman of such meetings. The Board of Directors may appoint any stockholder to act as chairman at any meeting in the absence of the Chairman of the Board, the Chief Executive Officer, the President and Vice Presidents, and, in default of

any appointment by the Board of Directors of a chairman, the stockholders may elect a chairman to preside at the meeting. The Corporate Secretary, or an Assistant Corporate Secretary, of the corporation shall act as Secretary at all meetings of the stockholders, but in their absence the stockholders or presiding officer may appoint any person to act as Secretary of the meeting.

Section 7. **Business at Annual Meeting**. No business may be transacted at an annual meeting of stockholders, other than business that is either (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors (or any duly authorized committee thereof), (b) otherwise properly brought before the annual meeting by or at the direction of the Board of Director (or any duly authorized committee thereof) or (c) otherwise properly brought before the annual meeting by any stockholder of the corporation (i) who is a stockholder of record on the date of the giving of the notice provided for in this Section 7 of this Article and on the record date for the determination of stockholders entitled to vote at such annual meeting and (ii) who complies with the notice procedure set forth in this Section 7.

In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Corporate Secretary.

To be timely, a stockholder's notice to the Corporate Secretary must be delivered to or mailed and received at the principal office of the Company not less than 90 days nor more than 120 days prior to the date of the annual meeting of stockholders, provided, however, that in the event that less than 100 days' notice or prior public disclosure of the date of the meeting is given to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the annual meeting was mailed or such public disclosure of the date of the annual meeting was made, whichever first occurs.

To be in proper written form, a stockholder's notice to the Corporate Secretary must set forth as to each matter such stockholder proposes to bring before the annual meeting (i) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (ii) the name and record address of such stockholder, (iii) the class or series and number of shares of capital stock of the Company that are owned beneficially or of record by such stockholder, (iv) a description of all arrangements or understandings between such stockholder and any other person or persons (including their names) in connection with the proposal of such business by such stockholder and any material interest of such stockholder in such business and (v) a representation that such stockholder intends to appear in person or by proxy at the annual meeting to bring such business before the meeting.

No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 7, provided, however, that, once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 7 shall be deemed to preclude discussion by any stockholder of any such business. If the chairman of an annual meeting determines that business was not properly brought before the annual meeting in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

## ARTICLE III

## BOARD OF DIRECTORS

Section 1. **Election, Qualification and Filling of Vacancies**. The business and affairs of the Company shall be managed by or under the direction of a Board of Directors. The number of Directors shall be no less than nine (9) and no greater than twelve (12). Within the limits specified above, the number of Directors constituting the Board of Directors of the Company shall be fixed from time to time by or pursuant to a resolution passed by the Board of Directors. However, no decrease in the number of Directors shall have the effect of shortening the term of any incumbent Director. The number of Directors of the Company may exceed twelve (12) when and to the extent needed to permit the holders of shares of the New Preferred Stock to elect a majority of Directors under subdivision 5 of Division A of Article Fourth of the Company's Restated Certificate of Incorporation.

The Board of Directors shall be and is divided into three classes, Class I, Class II and Class III, which shall be as nearly equal in number as possible. Each Director shall serve for a term ending on the date of the third annual meeting of stockholders following the annual meeting of stockholders at which such Director was elected; provided, however, that each initial Director in Class I shall hold office until the annual meeting of stockholders in 1986; each initial Director in Class II shall hold office until the annual meeting of stockholders in 1987; and each initial Director in Class III shall hold office until the annual meeting of stockholders in 1988. Directors elected at the annual meeting of stockholders shall be elected by a plurality of the votes cast for election of Directors. In the event of any increase or decrease in the number of Directors, (i) each Director then serving as such shall nevertheless continue as a Director of the class of which he is a member until the expiration of his current term, or his prior death, retirement, resignation, or removal, and (ii) the newly created or eliminated directorships resulting from such increase or decrease shall be apportioned by the Board of Directors among the three classes of Directors so as to maintain such classes as nearly equal in number as possible.

Notwithstanding any of the foregoing provisions of this Section, each Director shall serve until his successor is elected and qualified or until his death, resignation or removal. Should a vacancy occur or be created, whether arising through death, resignation or removal of a Director or through an increase in the number of Directors, such vacancy shall be filled by a majority vote of the remaining Directors of all classes though less than a quorum of the Board of Directors. A Director so elected to fill a vacancy shall serve for the remainder of the then

Any Director or the entire Board of Directors may be removed; however, such removal must be for cause and must be approved as set forth in this paragraph. Removal for cause must be approved by at least a majority of the total number of Directors or by at least a majority vote of the shares of the corporation then entitled to be voted at an election for that Director. For purposes of this paragraph, the total number of Directors will not include the Director who is the subject of the removal determination, nor will such Director be entitled to vote thereon.

Section 1A.  **Chairman of the Board**.  The Chairman of the Board shall preside at all meetings of stockholders and of the Board of Directors. Except as otherwise provided in these By-laws or ordered by the Board of Directors, the Chairman shall appoint all committees of the Board of Directors.

Section 2.  **Place of Meeting**.  Any meetings of the Board of Directors may be held either within or without the State of Delaware.

Section 3.  **Annual, Regular and Special Meetings**.  The annual meeting of the Board of Directors shall be held in each year in conjunction with the annual meeting of stockholders, for the transaction of such business as may come before the Board; and regular meetings of the Board shall be held at least quarterly during the first two weeks of the months of February, August and November in each year at the office of the Company in the City of Sioux Falls, South Dakota, or such other place and at such time and date as may from time to time be established by resolution of the Board or as may be specified by the Chairman of the Board or the Chief Executive Officer with respect to each such meeting. Special meetings of the Board may be called by the Chairman of the Board, the Chief Executive Officer, the President, or any two Directors, and shall be held at such time and place as may be specified by the officer or Directors calling the meeting, or in the absence of such specification as to place, at the office of the Company in the City of Sioux Falls, South Dakota. Notice stating the place, date, and hour of each meeting of the Board (other than the annual meeting, as to which no notice need be given) shall be given to each Director either by mail to his residence or place of business not less than forty-eight (48) hours before the date of the meeting, or personally by telephone, telegram, telecopy, electronic mail, or similar means of communication on twenty-four (24) hours' notice. All or any of the Directors may waive notice of any meeting, and the presence of a Director at any meeting of the Board shall be deemed a waiver of notice thereof by him.

Section 3A.  **Action on Consent Without Meetings**.  Unless otherwise restricted by the Certificate of Incorporation or these By-laws, any action required or permitted to be taken at any meeting of the Board of Directors or of any Committee thereof may be taken without a meeting, if all members of the Board or Committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing, writings, electronic transmission, or electronic transmissions are filed with the minutes of the proceedings of the Board or Committee.

Section 4.  **Quorum and Adjournment**.  A majority of the Directors in office at a meeting regularly called, shall constitute a quorum. In the absence of a quorum, the Directors present at the time and place at which a meeting shall have been duly called, may adjourn the meeting from time to time and place to place until a quorum shall be present.

Section 5.  **Submission of Acts to Approval of Stockholders**.  The Board of Directors, in its discretion, may submit any contract of act for approval or ratification at any annual meeting of the stockholders, or at any special meeting of the stockholders called for that purpose, and any contract or act that shall be approved or ratified by the vote of the holders of a majority of the capital stock of the Company which is represented in person or by proxy at such meeting, provided that a lawful quorum of stockholders be there represented in person or by proxy shall be as valid and binding upon the corporation and upon all the stockholders as if it had been approved or ratified by every stockholder of the Company.

Section 6.  **Compensation**.  Directors shall be entitled to receive such fees and expenses, if any, for attendance at meetings of the Board of Directors, and/or such fixed salaries for services as Directors, as may be fixed from time to time by resolution of the Board. Nothing herein contained shall be construed to preclude any Director from serving the Company in any other capacity as an officer, committee member, agent or otherwise, and receiving compensation therefor.

Section 7. **Nomination of Directors**.  Only persons who are nominated in accordance with the following procedures shall be eligible for election as Directors of the Company except as may be otherwise expressly provided in the Restated Certificate of Incorporation of the Company with respect to the right of the holders of New Preferred Stock and Preference Stock to nominate and elect a specified number of directors in certain circumstances. Nominations of persons for election to the Board of Directors may be made at any annual meeting of stockholders (a) by or at the direction of the Board of Directors (or any duly authorized committee thereof) or (b) by any stockholder of the Company (i) who is a stockholder of record on the date of the giving of the notice provided for in this Section 7 and on the record date for the determination of stockholders entitled to vote at such annual meeting and (ii) who complies with the notice procedures so forth in this Section 7.

In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Corporate Secretary.

To be timely, a stockholder's notice to the Corporate Secretary must be delivered to or mailed and received at the principal office of the Company not less than 90 days nor more than 120 days prior to the date of the annual meeting of stockholders; provided, however, that in the event that less than 100 days' notice or prior public disclosure of the date of the meeting is given to stockholders, notice by the

notice of the date of the annual meeting was mailed or such public disclosure of the date of the annual meeting was made, whichever first occurs.

To be in proper written form, a stockholder's notice to the Corporate Secretary must set forth (a) as to each person whom the stockholder proposes to nominate for election as a Director (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class or series and number of shares of capital stock of the Company that are owned beneficially or of record by the person and (iv) any other information relating to the person that would be required to be disclosed in proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder; and (b) as to the stockholder giving this notice (i) the name and record address of such stockholder, (ii) the class or series and number of shares of capital stock of the Company that are owned beneficially or of record by such stockholder, (iii) a description of all arrangements or understandings between such stockholder and each proposed nominee and any other persons (including their names) pursuant to which the nomination(s) are to be made by such stockholder, (iv) a representation that such stockholder intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (v) any other information relating to such stockholder that would be required to be disclosed in a proxy statement or other filings required to be made in connection with the solicitations of proxies for election of Directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

No person shall be eligible for election as a Director of the Company unless nominated in accordance with the procedures set forth in this Section 7. If the chairman of the meeting determines that a nomination was not made in accordance with the foregoing procedures, the chairman shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

## ARTICLE IV

## OFFICERS

Section 1. **Designation, Term and Vacancies**. The officers of the corporation shall be a Chief Executive Officer, a President, a Chief Operating Officer, one or more Vice Presidents, a Corporate Secretary and a Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may elect one or more Executive Vice Presidents, Senior Vice Presidents, or Assistant Vice Presidents, who shall have such authority and shall perform such duties as may from time to time be prescribed by the Board. The Board of Directors may appoint one or more Assistant Corporate Secretaries and one or more Assistant Treasurers, and such other officers as may be deemed necessary, who shall have such authority and shall perform such duties as may from time to time be prescribed by the Board. Vacancies occurring among the officers of the corporation shall be filled by the Board of Directors. Officers elected by the Board shall hold office until the next annual election of such officers by the Directors and until their successors are elected and qualified, provided that any officer may be removed at any time by the affirmative vote of a majority of the whole Board. All other officers, agents and employees shall hold office during the pleasure of the Board or the officer appointing them. Any two or more offices may be held by the same person, with the exception that the Chief Executive Officer and President shall not also hold the office of Secretary or Treasurer.

Section 1A. **Chief Executive Officer**. The Chief Executive Officer shall be a member of the Board and shall have general charge of the affairs and business of the Company and general charge and supervision of all the officers, agents, and employees of the Company. He may sign, with the Corporate Secretary or an Assistant Corporate Secretary, any or all certificates for shares of stock of the Company. He may sign and execute in the name of the Company all deeds, mortgages, bonds, contracts, powers of attorney, or other instruments authorized by the Board, except in cases where the signing and execution thereof shall be expressly delegated by the Board or by these By-laws to some other officer or agent of the Company, and he may, without previous authority of the Board, make, in the name of the Company, such contracts, leases, and other agreements as the ordinary conduct of the Company's business requires. He may sign and endorse notes, drafts, and checks. He shall have power to select and appoint all necessary officers and servants, except those elected or appointed or required to be elected or appointed by the Board, and he shall also have power to remove all such officers and servants and to make appointments to fill the vacancies. In general, he shall exercise all powers and perform all duties incident to the principal executive office of the Company and such other powers and duties as may from time to time be assigned to him by the Board or be prescribed by these By-laws. Also in the absence or inability of the Chairman to act, he shall preside at all meetings of stockholders and of the Board of Directors. He may delegate any of his powers to the President or the Chief Operating Officer of the Company.

Section 2. **President**. The President shall perform such duties and have such powers as may from time to time be assigned by the Board of Directors.

Section 2A. **Chief Operating Officer**. The Chief Operating Officer of the Company shall have general and active management of and exercise general supervision over the business and property of the Company and shall have such other power and duties as usually appertain to the office of the Chief Operating Officer and as may be assigned to him by the Board of Directors. In the absence or inability of the Chief Executive Officer to act, he shall be the chief executive officer of the Company. He may delegate any of his powers to any Vice President of the Company.

Section 3. **Vice Presidents**. Each Vice President shall exercise such powers and perform such duties as may from time to time be assigned to him by the Board of Directors or the President. In the absence or disability of the President a Vice President shall exercise the powers and perform the duties of the President.

Section 4. **Treasurer**. The Treasurer shall have custody of such funds and securities of the Company as may come to his hands or be committed to his care by the Board of Directors. When necessary or proper, he shall endorse on behalf of the Company, for collection, checks, notes, or other obligations, and shall deposit the same to the credit of the Company, in such bank or banks or depositories as the Board of Directors, the Chief Executive Officer, the President, or the Chief Operating Officer may designate. He may sign receipts or vouchers for payments made to the Company, and the Board of Directors may require that such receipts or vouchers shall also be signed by some other officer to be designated by them. Whenever required by the Board of Directors, he shall render a statement of his cash accounts and such other statements respecting the affairs of the Company as may be requested. He shall keep proper and accurate accounts of receipts and disbursements and other matters pertaining to his office. He shall perform all acts incident to the office of Treasurer, subject to the control of the Board. In the discretion of the Board of Directors, he may be required to give a bond in such amount and containing such conditions as the Board of Directors may approve, and such bond may be the undertaking of a surety company, and the premium therefor may be paid by the Company.

Section 5. **Corporate Secretary**. The Corporate Secretary shall be sworn to the faithful discharge of his duties. He shall record the votes and proceedings of the stockholders and of the Board of Directors in a book or books kept for that purpose, and shall attend all meetings of the Directors and stockholders. He shall keep in safe custody the seal of the Company, and, when required by the Board of Directors, or when any instrument shall have been signed by the Chief Executive Officer, the President, the Chief Operating Officer, or any other officer duly authorized to sign the same, or when necessary to attest any proceedings of the stockholders or Directors, shall affix it to any instrument requiring the same, and shall attest the same with his signature. He shall attend to the giving and serving of notices of meetings. He shall have charge of such books and papers as properly belong to his office or as may be committed to his care by the Board of Directors. He shall perform such other duties as appertain to his office or as may be required by the Board of Directors. In the absence of the Corporate Secretary, or an Assistant Corporate Secretary, from any meeting of the Board, the proceedings of such meeting shall be recorded by such other person as may be appointed at the meeting for that purpose.

Section 5A. **Assistant Vice President**. Each Assistant Vice President shall exercise such powers and perform such duties as may be assigned to him by the Board of Directors.

Section 6. **Assistant Corporate Secretary**. Each Assistant Corporate Secretary shall be vested with the same powers and duties as the Corporate Secretary, and any act may be done or duty performed by an Assistant Corporate Secretary with like effect as though done or performed by the Corporate Secretary. He shall have such other powers and perform such other duties as may be assigned to him by the Board of Directors.

Section 7. **Assistant Treasurer**. Each Assistant Treasurer shall be vested with the same powers and duties as the Treasurer, and any act may be done or duty performed by an Assistant Treasurer with like effect as though done or performed by the Treasurer. He shall have such other powers and perform such other duties as may be assigned to him by the Board of Directors.

Section 8. **Execution of Checks, etc**. The funds of the Company shall be deposited in such banks or trust companies as the Board of Directors from time to time shall designate and shall be withdrawn only on checks or drafts of the Company for the purposes of the Company. All checks, drafts, notes, acceptances and endorsements of the Company shall be signed in such manner and by such officer or officers or such individual or individuals as the Board of Directors from time to time by resolution shall determine. If and to the extent so authorized by the Board of Directors, such signature or signatures may be facsimile. Only checks, drafts, notes, acceptances and endorsements signed in accordance with such resolution or resolutions shall be the valid checks, drafts, notes, acceptances or endorsements of the Company.

## ARTICLE V

## INDEMNIFICATION OF DIRECTORS, OFFICERS AND EMPLOYEES

The corporation shall, to the fullest extent to which it is empowered to do so by the General Corporation Law of Delaware, or any other applicable laws, as from time to time in effect, and in the manner therein provided, indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, against all expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding.

Expenses incurred by an officer or director of the corporation in defending a civil or criminal action, suit or proceeding shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount of it shall ultimately be determined that he or she is not entitled to be indemnified as authorized by the General Corporation Law of the State of Delaware. Expenses incurred in defending a civil or criminal action, suit or proceeding by any other person entitled to claim indemnification under the preceding paragraph may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon such terms and conditions as the Board of Directors of the corporation deems appropriate.

The provisions of this Article shall be deemed to be a contract between the corporation and each director or officer who serves in any such capacity at any time while this Article and the relevant provisions of the General Corporation Law of Delaware, or other applicable

any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

Persons who are not covered by the foregoing provisions of this Article and who are employees or agents of the corporation, or are serving at the request of the corporation as employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified to the extent authorized at any time or from time to time by the Board of Directors of the corporation.

The indemnification and advancement of expenses provided or p ermitted by this Article shall not be deemed exclusive of any other rights to which those indemnified or entitled to advancement of expenses may be entitled under any other by -law or any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

The corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity or arising out of his status as such, whether or not the corporation would have the power to indemnify him against such liability under the provisions of this Article.

## ARTICLE VI

## SHARES OF STOCK

Section 1. **Certificates of Stock**. All certificates for shares of the capital stock of the Company shall be in such form, not inconsistent with the Certificate of Incorporation of the Company, as shall be approved by the Board of Directors, and shall be signed by the Chief Executive Officer, the President, or a Vice President, and Treasurer or an Assistant Treasurer, or the Corporate Secretary or an Assistant Corporate Secretary of the Company, and shall not be valid unless so signed; provided, however, that where such certificate is signed (1) by a transfer agent or an assistant transfer agent or (2) by a transfer clerk acting on behalf of the Company and a registrar, the signature of any such Chief Executive Officer, President, Vice President, Treasurer, Assistant Treasurer, Corporate Secretary or Assistant Corporate Secretary, may be facsimile. In case any officer or officers who shall have signed, or whose facsimile signature or signatures shall have been used on, any such certificate or certificates, shall cease to be such officer or officers of the Company, whether because of death, resignation, or otherwise, before such certificate or certificates shall have been delivered by the Company, such certificate or certificates may nevertheless be adopted by the Company and be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures shall have been used thereon had not ceased to be such officer or officers of the Company. All certificates shall be consecutively numbered and the name of the person owning the shares represented thereby, with the number of such shares, and the date of issue, shall be entered on the Company's books.  All certificates surrendered shall be cancelled, and no new certificates issued until the former certificates for the same number of shares shall have been surrendered and cancelled, except in cases provided for in Section 4 of this Article.

Section 2. **Transfer of Shares**.  (a) Transfers of stock shall be made upon the books of the Company by the holder in person or by attorney, upon the surrender and cancellation of the certificate or certificates for such shares. But the Board of Directors may appoint one or more suitable banks and/or trust companies as transfer agents and/or registrars of transfers, for facilitating transfers of any class of stock of the Company by the holders thereof under such regulations as the Board of Directors may from time to time prescribe. Upon such appointment being made, all certificates of stock of such class thereafter issued shall be countersigned by one of such transfer agents and/or one of such registrars of transfer, and shall not be valid unless so countersigned. (b) The stock transfer books may be closed, by order of the Board of Directors, for a period not exceeding fifty (50) days preceding the date of any meeting of stockholders or the date for the payment of any dividend or the date for the allotment of rights or the date when any change or conversion or exchange of capital stock shall go into effect or for a period of not exceeding fifty (50) days in connection with obtaining the consent of stockholders for any purpose; provided, however that, in lieu of closing the stock transfer books as aforesaid, the Board of Directors, in its discretion, may fix and is hereby authorized to fix in advance a date, not exceeding sixty (60) days preceding the date of any meeting of stockholders or the date for the payment of any dividend or the date for the allotment of rights or the date when any change or conversion or exchange of capital stock shall go into effect or a date in connection with obtaining such consent, as a record date, for the determination of the stockholders entitled to notice of and to vote at any such meeting and any adjournment thereof, or entitled to receive payment of any such dividend, or to any such allotment of rights, or to exercise the rights in respect of any such change, conversion or exchange of capital stock, or to give such consent, and in such case such stockholders and only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to such notice of and to vote at such meeting and any adjournment thereof, or to receive payment of such dividend, or to receive such allotment of rights, or to exercise such rights, or to give such consent, as the case may be, notwithstanding any transfer of any stock on the books of the corporation after any such record date fixed as aforesaid.

Section 3. **Addresses of Stockholders**.  Every stockholder shall furnish the Corporate Secretary with an address to which notices of meetings and all other notices may be served upon or mailed to him, and in default thereof notices may be addressed to him at his last known address or at the office of the Company in Huron, South Dakota.

Section 4. **Lost and Destroyed Certificates**.  The Board of Directors may direct that a new certificate or certificates may be issued

Directors, when authorizing the issuance of such new certificate or certificates, may, in their discretion, and as a condition precedent thereto, require the owner of such lost or destroyed certificate or certificates or his legal representatives to give to the Company a bond in such sum as they may direct, as indemnity against any claim that may be made against the Company.

Section 5.  **Regulations**.  The Board of Directors shall have power and authority to make all such rules and regulations as they may deem expedient concerning the issue, transfer and registration of certificates for shares of the capital stock of the Company.

## ARTICLE VII

## DIVIDENDS AND WORKING CAPITAL

The Board of Directors may declare dividends from the surplus or net profits of the corporation over and above the amount which from time to time may be fixed by the Board of Directors as the amount to be reserved as a working capital, as they may in their discretion, from time to time determine.  Such dividends may be declared by the Board at any meeting, either regular or special, at which a quorum is present.  The dividends upon the preferred stock, if and when declared, shall be payable quarterly on the first days of December, March, June and September in each year.  Any dividends so declared upon the common stock shall be payable upon such dates as may from time to time be fixed by the Board.  The power to fix the working capital of the corporation shall be, and is hereby conferred upon the Board of Directors, and the Board of Directors may from time to time fix the sum which shall be set aside or reserved, over and above the corporation's capital stock paid in, as a working capital for the corporation, and from time to time may increase, diminish and vary the same in their absolute discretion.

## ARTICLE VIII

## SEAL

The common corporate seal is, and until otherwise ordered, and directed by the Board of Directors shall be, an impression upon paper or wax, bearing the name of the corporation and the words "Corporate Seal - Delaware."  One or more duplicate dies for impressing such seal may be kept and used.

## ARTICLE IX

## AMENDMENT TO BY-LAWS

These By-laws may be altered, amended or repealed by a vote of a majority of all the Directors at any regular or special meeting of the Board, provided notice of such proposed alteration, amendment or repeal shall have been included in the notice of such meeting or shall have been waived by all the Directors.  These By-laws may also be altered, amended or repealed at any annual meeting of the stockholders, or at any special meeting of the stockholders, provided notice of the proposed alteration, amendment or repeal shall have been included in the notice of such special meeting or shall have been waived by all the stockholders.

**Exhibit 10.1(O)**

MEMORANDUM OF ENGAGEMENT
William ("Bill") M. Austin
NorthWestern Corporation

This memorandum outlines the general terms and conditions of NorthWestern Corporation's ("NorthWestern" or the "Company") continued retention during the course of its pending Chapter 11 case (the "Chapter 11 Case") of William ("Bill") M. Austin ("Austin") in the capacity of Chief Restructuring Officer as follows:

1. <u>Services</u>:

Austin shall continue to serve as NorthWestern's Chief Restructuring Officer providing advice and information to the Company in connection with the Chapter 11 Case. Austin's primarily responsibility is to advise on the operational and financial restructuring of the Company as is normal and customary in chapter 11 cases for chief restructuring officers, such services to include, but not be limited to, management of operational bankruptcy "task forces" established within NorthWestern, developing a long-term business strategy and business plan, overseeing the financial balance sheet restructuring of the Company, and overseeing the disposition of assets of non-core businesses such as Expanets, Inc. and Blue Dot, inc., assisting in the formulation and presentation of a reorganization plan for confirmation in the Chapter 11 Case, obtaining and negotiating debtor-in-possession financing for the Company in the Chapter 11 Case and, as necessary, obtaining, negotiating and implementing exit financing.

2. <u>Term</u>: For a period of the earlier of eighteen (18) months from September 15, 2003 or effective date of confirmed reorganization plan for NorthWestern, unless extended by mutual agreement between NorthWestern and Austin.

3. <u>Compensation</u>:

(A) Base salary – $400,000 per year;

(B) Time-based addition – $400,000, to be paid in three installments of $133.333 on each of March 15, 2004, September 15, 2004 and March 15, 2005;

(C) Incentive-based addition – $800,000, to be paid as follows:

(i) $233,333 upon execution of restructure term sheer with Official Committee of Unsecured Creditors appointed in the Chapter 11 Case or those holders of at least 55% of NorthWestern's senior unsecured bonds;

(ii) $233,333 upon entry of Order approving a disclosure statement in the Chapter 11 Case; and

(iii)     $233,333 upon the effective date of a confirmed reorganization plan in the Chapter 11 Case;

(D)     If effective date of reorganization plan occurs before completion of distributions to be made under (A), (B) and (C) above, then distributions and payments not yet made will be fully earned and will be paid on effective date.

(E)     To receive the compensation provided for in (A), (B), (C) and (D) above, Austin must remain engaged as Chief Restructuring Officer for the Company.  If and to the extent that Austin's continued engagement as Chief Restructuring Officer of NorthWestern has been involuntary terminated by the Company or otherwise as a result of the Chapter 11 Case, Austin shall receive payments required to be made to him under this Section 3 and not yet made, plus shall receive severance in the amount of $400,000 to be paid in equal monthly installments over a period of one year following the effective date of his termination.

4.     <u>Expense Reimbursement:</u>

In addition to the compensation paid as outlined in Section 3 above, NorthWestern agrees to reimburse Austin for all reasonable out-of -pocket expenses incurred by Austin in carrying out the terms of his engagement as Chief Restructuring Officer, including communication charges, travel expenses, copy expenses, delivery and distribution charges and such other reasonable costs and expenses incurred by Austin in the performance of his duties as Chief Restructuring Officer.  All reimbursements shall be made promptly after such payments accrue and are submitted to NorthWestern with appropriate documentation for the payment hereunder.

5.     <u>Termination and Severance:</u>

NorthWestern or Austin may, at any time, terminate Austin's continued engagement as Chief Restructuring Officer without liability or continuing obligation, by provid ing thirty (30) days prior written notice thereof to the other party; provided, however, that except as otherwise provided in Section 3 of this Memorandum of Engagement, no termination of Austin's continued engagement as Chief Restructuring Officer shall affect Austin's right to receive, and the Company's obligation to pay, (a) any claims for indemnification as provided for under this Memorandum of engagement or (b) the compensation to be paid to Austin as provided for in Section 3 of this Memorandum of Engagement.

6.     <u>Indemnification:</u>

NorthWestern agrees to indemnify and hold harmless Austin against losses, claims, damages or liabilities (or actions or proceedings in respect thereof) in connection with Austin's engagement as Chief Reconstruction Officer and will reimburse Austin for all

reasonable and other expenses as incurred in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding; provided, however, that NorthWestern will not be liable in any such case for losses, claims, damages, liabilities or expenses which are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of Austin.

7.    <u>Survival</u>:

The provisions of Sections 3 and 7 of this Memorandum of Engagement shall survive the termination or expiration of Austin's continued engagement as Chief Restructuring Officer.

<div style="margin-left:50%">

NORTHWESTERN CORPORATION

By:    /s/ Gary Drook
      Gary Drook
      Chief Executive Officer
Date:  September 29, 2003


/s/
WILLIAM M. AUSTIN
Chief Restructuring Officer
Date: September    , 2003

</div>

3

**ORIGINAL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | Ref. Docket No. 102 |
| | : | |
| | : | |

**ORDER AUTHORIZING DEBTOR TO RETAIN WILLIAM
<u>AUSTIN AS ITS CHIEF RESTRUCTURING OFFICER</u>**

     **UPON** the Motion Pursuant to §§ 105(a) and 363 of the Bankruptcy Code for Approval of Agreement to Retain William Austin as Chief Restructuring Officer of the Debtor (the "Motion") filed by the above-captioned debtor (the "Debtor") and the Court having reviewed the Motion; and having heard the statements of counsel regarding the relief requested in the Motion at a hearing with respect to the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been given under the circumstances; and it appearing that no other or further notice of the Motion is necessary or required; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties-in-interest; and after due deliberation and sufficient cause appearing therefor, it is hereby

     **ORDERED,** that the Motion is **GRANTED**; and it is further

**ORDERED,** that the Debtor is hereby authorized to retain William Austin as its chief restructuring officer on the terms set forth in the Agreement(1), as such Agreement is modified herein; and it is further

**ORDERED,** that the Incentive-based compensation provided for in the Agreement shall be payable to William Austin on an interim basis subject to final application and review pursuant to Section 330 of the Bankruptcy Code; and it is further

**ORDERED,** that notwithstanding Section 3(C) of the Agreement, the Incentive-based additional compensation shall be paid as follows: (1) $400,000 upon entry of an order approving a disclosure statement in the Debtor's Chapter 11 case; and (2) $400,000 upon the effective date of a confirmed reorganization plan in the Debtor's Chapter 11 case; and it is further

**ORDERED,** that notwithstanding Section 3(E) of the Agreement, the severance payments described therein shall be in addition to payments required to be made under Section 3 to the extent that the triggering events related thereto have occurred; and it is further

**ORDERED,** that this order shall take effect immediately upon its entry; and it is further

**ORDERED,** that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated:  Wilmington, Delaware
        October 10, 2003

                                                        /s/ [ILLEGIBLE]

_____

(1)      Any capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Motion.

**Exhibit 10.1(P)**

EMPLOYMENT AGREEMENT
Brian B. Bird
NorthWestern Corporation

This agreement (the "Employment Agreement") outlines the general terms and conditions of NorthWestern Corporation's ("NorthWestern" or the "Company") employment of Brian B. Bird ("Bird") in the capacity of Chief Financial Officer ("CFO") of NorthWestern as follows:

1.      Position and Duties:

Bird shall serve as the Chief Financial Officer ("CFO") of NorthWestern and shall perform such duties as are customarily associated with the position of CFO, consistent with the bylaws and policies of NorthWestern and as required by NorthWestern's Board of Directors.  Such services shall specifically include, but not be limited to, supporting the restructuring of NorthWestern's operations and disposal of those assets and operations that are deemed to be necessary, in the business judgment of NorthWestern and its Board.

2.      Term:

The term ("Term") of this Employment Agreement shall be for the period commencing December 1, 2003 and ending on the earlier of Bird's termination or the second anniversary of the effective date.

3.      Compensation:

(A)      Sign-on bonus of $150,000, subject to bankruptcy court approval, to be paid in two equal installments of $75,000 each, onto such installment on the first regular payroll date upon obtaining court approval and the other such installment on June 30, 2004.

(B)      Base salary – $275,000 per year,

(C)      Performance-based incentive – $275,000, subject to bankruptcy court approval, to be paid as follows:

(i)      $91,666.67 upon submittal of a formal restructuring plan for court consideration; and

(ii)      $91,666.67 upon court approval of the company's restructuring plan; and

(iii)      $91,666.67 upon the effective date of the reorganization plan.

(D)    If the effective date of the reorganization plan, or a sale of the company, occurs before completion of distributions to be made under (C) above, then such distributions and payments not yet made will be fully earned and will be paid on such effective date.

(E)    To receive the compensation provided for in (A), (B) and (C) above, Bird must remain engaged as CFO of the Company.  If and to the ext ent that Bird's engagement as CFO of NorthWestern has been involuntary terminated by the Company or otherwise as a result of the Chapter 11 case, Bird shall receive payments not yet made as of the termination date under Section 3(C), plus he shall receive severance in the amount of $275,000 plus the cost of insurances to be paid in equal monthly installments over a period of one year following the effective date of his termination.

4.    Expense Reimbursement:

In addition to the compensation paid as outlined in Section 3 above, NorthWestern agrees to reimburse Bird for all reasonable out-of-pocket expenses incurred by Bird in carrying out the terms of his engagement as CFO, including communication charges, travel expenses, copy expenses, delivery and distribution charges and such other reasonable costs and expenses incurred by Bird in the performance of his duties as CFO.  All reimbursements shall be made promptly after such payments accrue and are submitted to NorthWestern with appropriate documentation for the payment hereunder.

5.    Benefits:

During the Term, Bird shall be entitled to all of the following benefits offered by NorthWestern to senior executives generally; (a) participate in the Company's benefits plan in existence as of October 1, 2003; (b) participate in or receive benefits under any other employee benefit plan or other arrangement made available by NorthWestern to any similarly situated senior management employees including long term incentives consistent with those provided to similarly situated executives and based on market comparable date for the CFO position; and (c) a relocation payment equivalent to the lesser of $20,000 (not) or reimbursement of actual expenses incurred (grossed up) in connection with costs associated with temporary living and commuting not otherwise covered by company relocation policy, all subject to and on a basis consistent with the terms, conditions and overall administration of such plans or arrangements.  In no event shall any benefits be duplicated.  In the event NorthWestern terminates any of these benefits, the Company shall provide to Bird an alternative plan with substantially equivalent benefits in all material respects.

2

6.     <u>Termination and Severance</u>:

North Western or Bird may, at any time, terminate Bird's continued engagement as CFO without liability or continuing obligation, by providing thirty (30) days prior written notice thereof to the other party; <u>provided</u>, <u>however</u>, that except as otherwise provided in Section 3 of this Employment Agreement, no termination of Bird's continued engagement as CFO shall affect Bird's right to receive, and the Company's obligation to pay, (a) any claims for indemnification as provided for under this Employment Agreement or (b) the compensation to be paid to Bird as provided for in Section 3 of this Employment Agreement.

7.     <u>Indemnification</u>:

NorthWestern agrees to indemnify and hold harmless Bird against losses, claims, damages or liabilities (or actions or proceedings in respect thereof) in connection with Bird's engagement as CFO and will reimburse Bird for all reasonable and other expenses as incurred in connection with investigating or defending my such loss, claim, damage, liability, action or proceeding; provided, however, that NorthWestern will not be liable in any such case for losses, claims, damages, liabilities or expenses which are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of Bird.

8.     <u>Survival</u>:

The provisions of Sections [ILLEGIBLE] and 7 of this Employment Agreement shall survive the termination or expiration of Bird's continued engagement as CFO.

9.     <u>Government Law</u>:

This Employment Agreement shall be interpreted, administered and enforced in accordance with the laws of the State of Delaware, except to the extent pre-empted by Federal law.

NORTHWESTERN CORPORATION

By:   /s/ Gary Drook
      Gary Drook
      Chief Executive Officer

Date: November 12, 2003


    /s/ Brian B. Bird
Brian B. Bird

Date: November 12, 2003

4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |
| | : | |

**ORDER AUTHORIZING DEBTOR TO EMPLOY BRIAN B. BIRD
AS ITS CHIEF FINANCIAL OFFICER**

**UPON** the Motion Pursuant to §§ 105(a) and 363 of the Bankruptcy Code for Approval of Agreement to Employ Brian B. Bird as Chief Financial Officer of the Debtor (the "Motion") filed by the above-captioned debtor (the "Debtor") and the Court having reviewed the Motion; and having heard the statements of counsel regarding the relief requested in the Motion at a hearing with respect to the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been given under the circumstances; and it appearing that no other or further notice of the Motion is necessary or required; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties-in-interest; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED,** that all objections to the Motion have been overruled and the Motion(1) is **GRANTED;** and it is further

**ORDERED,** that the Debtor is hereby authorized to employ Brian B. Bird as its chief financial officer on the terms set forth in that certain Amended and Restated Employment

---

(1)    Any capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Motion.

Agreement, attached hereto as <u>Exhibit A</u> (the "Amended and Restated Agreement"); and it is further.

      **ORDERED,** that entry of this Order is not intended to and does not affect the jurisdiction of the Montana Public Service Commission (the "MPSC") to the extent such jurisdiction exists and any determination that the MPSC may make with respect to the subject matter of this Order pursuant to its jurisdiction, including but not limited to any treatment of the compensation for rate-making purposes; and it is further

      **ORDERED,** that this order shall take effect immediately upon its entry; and it is further

      **ORDERED,** that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated:     Wilmington, Delaware
            Jan 13, 2004

                                     /s/ [ILLEGIBLE]
                              UNITED STATES BANKRUPTCY JUDGE

**Exhibit 10.1(Q)**

MEMORANDUM OF ENGAGEMENT
Daniel K. Newell
Blue Dot Services. Inc.

This memorandum outlines the general terms and conditions of Blue Dot Services, Inc. ("Blue Dot" or the "Company") continued retention of Daniel K. Newell ("Newell") in the capacity of Chief Executive Officer of Blue Dot as follows:

1.     Position and Duties:

Newell shall continue to serve as the Chief Executive Officer ("CEO") and a Director of Blue Dot and shall continue to perform such duties as are customarily associated with such positions, consistent with the bylaws and policies of Blue Dot and as required by Blue Dot's Board of Directors. Such services shall specifically include, but not be limited to, restructuring Blue Dot's operations and disposing of those assets and operations which are deemed to be necessary in the business judgment of Blue Dot and its Board, exclusive of the operations and assets located in Minneapolis, Minnesota which shall be retained by the Company.

Except as set forth in this Memorandum of Engagement and except with respect to his position as a director of Cornerstone Propane GP, Newell shall resign as an officer, director and any other position that he may hold at NorthWestern Corporation and any of its subsidiaries which resignations shall be automatically effective upon the execution of this agreement. NorthWestern, Blue Dot and Newell agree to issue a joint press release regarding Newell's resignation promptly after his resignation as shall be mutually agreed upon by NorthWestern, Blue Dot and Newell. NorthWestern, Blue Dot and Newell all acknowledge that a) Newell's resignation is to accommodate NorthWestern; b) is a direct result of the bankruptcy filing by NorthWestern; c) NorthWestern does not need the services of Newell as a result of such bankruptcy filing except as set forth herein with respect to Blue Dot; and d) Newell's resignation results from his Termination without Cause from NorthWestern as a result of its bankruptcy filing. The continuing claims Newell has against NorthWestern are governed by paragraphs 5 and 10 below.

2.     Term:

The term ("Term") of this Memorandum of Engagement shall be for the period commencing on September 1, 2003 and ending on the earlier of Newell's termination or the first anniversary of the effective date.

3.    Compensation:

(A)    Base salary – $366,000 per year plus an amount equal to the annual dues owed to a country club where he is a member and any other mutually agreed upon amounts;

(B)    Incentive-based addition – (i) $700,000 payable immediately upon the receipt by Blue Dot of $30,000,000 of Net Proceeds from the completion of the sale or disposition any and all transactions with respect to the Company's operations that are to be sold, liquidated or otherwise disposed of determined on an aggregate basis taking into account the Net Proceeds of any and all such transactions (the "Net Proceeds"), plus (ii) 6.0% (up to a maximum of $900,000) of all Net Proceeds received by Blue Dot in excess of $20,000,000. As used herein the term "Net Proceeds" shall mean cash and cash equivalents ("Cash") received from the sale of assets and/or stock of Blue Dot and its subsidiaries plus the total of any Blue Dot corporate-level liabilities assumed by buyers, less payments arising from securities including Class C stock, preferred stock and "earnout" claims.  Cash shall also include notes receivable and contingent consideration receivable if and when converted to cash or cash equivalents. It has been decided that Standard Heating & Air Conditioning Co. ("SHACC") will not be sold, but, nonetheless, the parties hereto agree that $4,000,000 of Net Proceeds shall be taken into account as if SHACC had been sold. If senior management of Blue Dot decides not to sell other businesses, facilities or other assets, Net Proceeds shall include additional amounts with respect to such other businesses, facilities or assets determined on a basis consistent with the amount determined for SHACC. Net Proceeds will not include normal working capital or payments arising from working capital adjustments to Blue Dot arising in connection with the sale, liquidation or disposition of Blue Dot's business and assets. Net Proceeds will be calculated beginning after June 30, 2003.

The payment of any amounts earned under subsection (ii) of this Section 3.(B) shall be paid upon the earlier of (1) the closing of the sale, liquidation or disposition of Blue Dot's business and assets for which Newell shall be responsible (disregarding SHACC and any other businesses or assets which senior management has decided not to sell); or (2) the receipt by Blue Dot of $40,000,000 in Net Proceeds.

(C)    The maximum amount to be paid with respect to Items (i) and (ii) of Section 3.(B), above, shall not exceed $1,600,000 in the aggregate.

(D)    To receive the compensation provided for in subsections (A) and (B) of this Section 3.  Newell must remain engaged as CEO of the Company. If and to the

2

extent that Newell's engagement as CEO of Blue Dot has been involuntary terminated by the Company, Newell shall receive payments based upon the Net Proceeds received by Blue Dot as of the termination date under this Section 3 and including as Net Proceeds, even though payment has not yet made, all amounts specified in any letter of intent or agreement to sell any business or assets of Blue Dot executed on or before such termination date or within thirty (30) days after such termination including any note receivables or contingent consideration receivable as Cash even though such amounts have not been converted to cash or cash equivalents. In addition, Newell shall receive severance in the amount of $350,000 to be paid in equal monthly installments over a period of one year following the effective date of his termination; provided however, if Newell voluntarily terminates his employment prior to completing the disposition, sale or liquidation of Blue Dot's assets or business for which he shall be responsible, he must repay to Blue Dot any compensation paid to him with respect to subsection (B) of this Section 3.

(E)     If Blue Dot involuntarily terminates Newell's employment before the end of the Term and Newell is not offered continued employment by a successor of Blue Dot, Newell shall receive six (6) months of executive outplacement services to be provided and paid for directly by Blue Dot in an amount not to exceed $10,000 for such services. Blue Dot will, at its sole discretion, determine the provider and nature of such services to be provided to Newell.

(F)     Upon any termination of employment or in any event at the end of the Term, Newell shall be allowed to retain all computer equipment and cell phone but will be responsible for all monthly bills associated therewith going forward.

(G)     Blue Dot may terminate Newell's employment in the event Newell suffers a disability that renders Newell unable to perform the essential functions of his position, even with reasonable accommodation, for nine (9) months within in any twelve (12) month period and within thirty (30) days after written notice of termination is thereafter given by Blue Dot or Newell shall not have returned to substantially full-time performance of his duties ("Disability"). In the event Newell has a Termination for Disability, Newell shall be paid the cash payments provided in and in accordance with paragraph (D) of Section 3 above.

(H)     If Newell dies prior to the expiration of the term of this Agreement, Newell's representative shall be paid the cash payments provided in and in accordance with paragraph (D) of Section 3 above.

3

4.    Expense Reimbursement:

In addition to the compensation paid as outlined in Section 3 above, Blue Dot agrees to reimburse Newell for all reasonable out-of-pocket expenses incurred by Newell in carrying out the terms of his engagement as CEO, including communication charges, travel expenses, copy expenses, delivery and distribution charges and such other reasonable costs and expenses incurred by Newell in the performance of his duties as CEO. In addition, Blue Dot agrees to reimburse Newell for all reasonable legal expenses incurred by him for the preparation and negotiation of this Memorandum of Engagement. All reimbursements shall be made promptly after such payments accrue and are submitted to Blue Dot with appropriate documentation for the payment hereunder.

5.    Benefits:

During the Term, Newell shall be entitled to all of the following benefits and prerequisites offered by Blue Dot to senior executives generally: (a) participate in the Company's benefits plan in existence as of September 1, 2003 which shall include, but not be limited to, all the benefit plans listed on Schedule A attached hereto; and (b) participate in or receive benefits under any other employee benefit plan or other arrangement made available by Blue Dot to any similarly situated senior management employees, subject to and on a basis consistent with the terms, conditions and overall administration of such plan or arrangement. In no event shall any benefits be duplicated. In the event Blue Dot terminates any of these benefits, the Company shall provide to Newell an alternative plan with substantially equivalent benefits in all material respects. Blue Dot agrees to reimburse Newell for any COBRA premium payments that he pays for health care coverage for his family in the event Newell makes a COBRA election to obtain medical and health care benefits from the medical plan maintained by NorthWestern Corporation. On or before December 31, 2003, Blue Dot agrees to pay Newell for his accrued vacation benefits for calendar year 2003 under the NorthWestern vacation plan unless NorthWestern has made such payment on or before said date.

6.    Termination and Severance:

Blue Dot or Newell may, at any time, terminate Newell's continued engagement as CEO without liability or continuing obligation, by providing thirty (30) days prior written notice thereof to the other party; provided, however, that except as otherwise provided in Section 3 of this Memorandum of Engagement, no termination of Newell's continued engagement as CEO shall affect Newell's right to receive, and the Company's obligation to pay, (a) any claims for indemnification as provided for under this Memorandum of Engagement or (b) the compensation to be paid to Newell as provided for in Section 3 of this Memorandum of Engagement.

4

7.    <u>Bankruptcy</u>:

In the event that Newell or anyone engaged by Newell is required to directly or indirectly return, refund or remit all or a portion of any payments made or funds paid by NorthWestern to Newell or anyone engaged by Newell (a "Remittance"), for any reason including, without limitation, to a trustee in bankruptcy pursuant to an order of a bankruptcy court declaring any portion of the Remittance to be a preference under the United States bankruptcy laws or a fraudulent transfer, then Blue Dot shall make payment of any such amounts within five (5) days of such Remittance.

8.    <u>Indemnification</u>:

Blue Dot shall, to the fullest extent to which it is empowered to do so by the General Corporation Law of Delaware, or any other applicable laws, as from time to time in effect, and in the manner therein provided, indemnify and hold harmless Newell, through the duration of all statutory periods during which any such claim may be brought or asserted, from and against any actual, threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise, to which Newell is or is threatened to be made a party by reason of the fact that he is or was a director, officer, employee or agent of Blue Dot, or is or was serving at the request of Blue Dot as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against all expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding. Expenses incurred by Newell in defending a civil, criminal, administrative, investigative or other action, suit or proceeding shall be paid by Blue Dot in advance of the final disposition of such action, suit or proceeding upon receipt of an agreement by or on behalf of Newell to repay such amount if it is ultimately determined that Blue Dot is entitled to recover such expenses. The indemnification and advancement provisions set forth in this Agreement shall not be deemed exclusive but shall be cumulative with all other rights to indemnification or expense advancement to which Newell may be entitled.

9.    <u>Survival</u>:

The provisions of Sections 3 and 8 of this Memorandum of Engagement shall survive the termination or expiration of Newell's continued engagement as CEO.

10.    <u>Supercedes Prior Agreement</u>:

This Memorandum of Engagement supersedes and replaces that certain Employment and Severance Agreement executed by and among Blue Dot, Newell and NorthWestern Corporation dated as of July 1, 2003 in all respects and Newell relinquishes and releases any claim thereunder, except that paragraphs 5, 6, 14, 15, 17 and 21 of such Employment

and Severance Agreement shall remain applicable and continue to be binding upon NorthWestern, Blue Dot and Newell through the Term of this Memorandum of Engagement.

11.     <u>Government Law</u>:

This Memorandum of Engagement shall be interpreted, administered and enforced in accordance with the laws of the State of Delaware, except to the extent pre-empted by Federal law.

BLUE DOT SERVICES, INC.

By: /s/  Gary Drook
       Gary Drook
       Chairman of the Board
Date:     November 6, 2003

/s/ Daniel K. Newell

DANIEL K. NEWELL

Date:     November 6, 2003

**Schedule A**

**<u>Participation in Benefit Plans</u> -** During the term hereof, Newell shall be entitled to participate in the plans and programs of Blue Dot available to employees of Newell's level as generally listed below (copies or summaries of the plans are incorporated by reference and are available to Newell upon request):

- Health Plans

- 401(k) Plan

- Short-Term and Long-Term Disability Plans

- Standard Life Insurance Plan

- Standard Vacation Plan

- Standard Executive Reimbursement Program for Business Expenses

A-1

**Exhibit 10.1(R)**

## NORTHWESTERN CORPORATION

Incentive Compensation and Severance Plan
and
Summary Plan Description

It is of utmost importance to NorthWestern Corporation and its affiliates (collectively, "**NorthWestern**") to motivate and to retain employees who support its continued, successful operation of and who will lead NorthWestern through a successful Chapter 11 reorganization (the "Chapter 11 Case"). Accordingly, NorthWestern has adopted this Incentive Compensation and Severance Plan (the "**Plan**") to determine both –

- the incentive compensation that participating employees will receive pursuant to Section 3 of the Plan for calendar years 2003 and 2004 ("Incentive Payments"); and

- the severance benefits that participating employees will receive pursuant to Section 4 of the Plan in the event their employment with the Company terminates for any reason.

Throughout this Plan, the term "**Company**" is used when NorthWestern is acting, through its employees and Directors, in its corporate interest as employer, as Plan sponsor, or as settlor with respect to the Plan and any successor-in-interest to NorthWestern in such capacity. The Plan uses the term "**Plan Administrator**" whenever the Company is acting in the limited capacity of making determinations, decisions, and interpretations associated with administering the Plan.

This Plan modifies and supersedes any and all prior incentive compensation and severance policies, plans and programs with respect to the Company's employees. To the extent any of such incentive compensation and severance policies, plans and programs conflict or differ in any way with this Plan, the provisions of this Plan governs except with respect to the severance provisions of the UPA. The Plan is an "employee welfare benefit plan" as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), is not intended to be a "pension plan" as defined in Section 3(2)(A) of ERISA, and shall be administered so as not to be an ERISA pension plan.

1.  **Plan Eligibility**

You will be eligible to collect incentive compensation and severance benefits pursuant to Sections 3 and 4 of the Plan only if (i) the Company makes the discretionary decision in writing to include you in the Plan, and (ii) if required by the Company, you enroll in the Plan through execution of an agreement (the "**Enrollment Agreement**") substantially in the form attached and made a part of this Plan.

## 2.  Ineligibility for Plan Benefits

(a)  *Incentive Compensation.*  You will become ineligible to receive incentive compensation pursuant to Section 3 of the Plan immediately upon terminating your employment with the Company for any reason.  This means that to qualify to collect Incentive Payments, you must remain an employee of the Company through the respective performance dates provided in the Plan.

(b)  *Severance Benefits.*  You will be ineligible to receive severance benefits pursuant to Section 4 of the Plan if at the time your employment terminates, you are either ineligible pursuant to subsection (c) of this Section or classified by the Company as being in one or more of the following ineligible categories:

    i.   *Foreign Employees*, i.e., persons who are not on a U.S. payroll of the Company.

    ii.   *Leased Employees*, i.e., persons who are the Company's leased employees, within the meaning of Internal Revenue Code Section 414(n).

    iii.   *Persons Waiving Participation*, i.e., persons to whom the Company did not extend the opportunity of participating in this Plan.

    iv.   *Persons on Indefinite Unpaid Leaves of Absence*, i.e., persons who are absent from work on indefinite unpaid leaves of absence expected to exceed thirty days, except leaves during which regular pay continues or to the extent eligibility is required by applicable law.

    v.   *Employees with Individual Agreements*, i.e., persons who have a right to collect severance benefits pursuant to a separate written agreement entered into with the Company after the date on which NorthWestern adopts this Plan, unless such an agreement provides expressly to the contrary.

    vi.   *Employees who Resign, etc.*, i.e., persons whose employment terminates voluntarily, or due to Cause, retirement, death, or disability.

    vii.   *Persons Discharged for Cause*, i.e., persons whose employment is terminated for **Cause**, as determined by the Plan Administrator in its sole discretion based on the following types of misconduct:

        1.   willful failure to comply with written policies or lawful directives on material business matters;

        2.   willful statements or conduct adversely affecting the Company or causing (or being reasonably likely to cause) injury to the reputation, business or business relationships of the Company; or

        *3.*   illegal conduct, gross misconduct or, dishonesty, in each case which is willful and results (or is reasonably likely to result) in material damage to the Company.

    viii.   *Changed Decisions,* i.e., persons for whom NorthWestern cancels a pending termination of employment at any time before employment actually terminates.

(c)  *Successor Employment, and Comparable Employment.*  You will not be entitled to severance benefits under this Plan, if the Plan Administrator determines that a Successor Employer has offered you an Equivalent or Better Position to commence promptly

following your termination of employment with NorthWestern, whether you accept the position or not.  A "**Successor Employer**" is:

    i.   any entity that assumes operations or functions formerly carried out by the Company (such as the buyer of a facility or any entity to which a Company operation or function has been outsourced);

    ii.   any affiliate of the Company; or

    iii.   any entity making the job offer at the request of the Company (such as a joint venture of which the Company or an affiliate is a member).

"**Equivalent or Better Position**" means employment that does not involve either a material reduction in compensation or benefits, a material reduction in responsibilities, duties or support, or relocation to a primary place of employment of greater than fifty (50) miles from the current primary place of employment.

**3.   Eligible Employees Incentive Payments**

In general, Incentive Payments will be approximately 60% of normal, total targeted cumulative incentives for all participants for each of Plan Years 2003 and 2004.

   *(a)   Officers*

An Incentive Payment will be provided to each Officer equal to a fixed multiple of the Officer's targeted, annual incentive.  The following amounts are payable upon the Company's determination that the associated performance-based milestones have been achieved while the Officer is an active employee of the Company:

    i.   One-third of the total amount listed in the Plan with respect to the Officer shall be paid as soon as practicable following the entry of any order by the Court approving a disclosure statement.

    ii.   The second one-third of the total amount listed in the Plan with respect to the Officer shall be paid as soon as practicable following the effective date of the Debtor's confirmed reorganization plan.

    iii.   The final one-third of the total amount listed in the Plan with respect to the Officer shall be paid as of January 31, 2005.

If an Officer voluntarily resigns from employment with the Company before the effective date of the Company's reorganization plan, the Officer will both forfeit any future right to collect benefits pursuant to the Plan, and will promptly return to the Company the full amount of any benefits previously paid to the Officer pursuant to the Plan.

   *(b)   Group 1 Employees*

An Incentive Payment will be provided to each employee eligible for Group 1 Incentive Payments as described in the Plan. Incentive Payments will vest on June 1, 2004 and will be paid on or after September 30, 2004 with respect to 2003 incentives. Incentive Payments with respect to 2004 incentives will vest on January 1, 2005 and will be paid not later than January 31, 2005.

   *(c)   Group 2 Employees – All Other Employees*

An Incentive Payment will be provided for all employees (other than Officers and Group 1 Employees), for calendar years 2003 and 2004, and will be funded at 40% of the cumulative, targeted annual incentive level for all such participants for each year. Individual Incentive Payments will be based on individual performance and will be made not later than June 30, 2004 with respect to 2003 incentives and not later than January 31, 2005 with respect to 2004 incentives.(1)

4.     **Severance Benefits**

If the Company terminates the employment of an eligible employee without Cause (as defined in Section 2) directly in connection with NorthWestern's post-petition corporate restructuring process, the Company, upon a properly executed release of claims, shall –

- make a lump sum cash severance payment to the employee in an amount determined pursuant to the guidelines set forth in the remainder of this Section; and
- provide the employee with healthcare and similar Company-provided group insurance, at no cost to the employee, for the number of months that serves as the multiple for calculating the employee's cash severance payment.

Unless otherwise set forth in the release of claims, any cash payment due under this Section will be made within seven (7) business days from the date of an employee's termination of employment.

*(a)     Officers*

If an employee is an officer and qualifies for severance benefits under this Section, the Company will provide the employee with severance benefits. The Company, without the mutual, written consent of the qualified officer, may not reduce the right to and amount of such severance benefits.

*(b)     Group 1 Employees*

If an employee qualifies for severance benefits under this Section, the Company will provide the employee with severance benefits determined under the Plan. The Company, without the mutual, written consent of the qualified employee, may not reduce the right to and amount of such severance benefits.

*(c)     Group 2 (All other employee)*

---

(1) The right to these Incentive Payments shall be in addition to any pre-petition contractual rights that a Group 2 Employee may have to collect cash-based payments (which the Company shall pay in the ordinary course of business during the post-petition corporate restructuring process)

If an employee qualifies for severance benefits under this Section due to a termination of employment without Cause, the Company will provide such employees with severance benefits equal to the greater of –

      i.   1-week of salary for every full year of service with the Company, with a minimum of 4 weeks and a maximum of 26 weeks, or

      ii.   if applicable, the severance benefits that such employee would be entitled to receive pursuant to the terms of UPA.(2)

**5.**      **Reemployment**

If you are re-employed by NorthWestern or a Successor Employer while severance benefits are still payable under the Plan, all such benefits will cease, except as otherwise specified by NorthWestern or the Successor Employer, as the case may be. If you receive severance benefits after your eligibility ceases under the Plan due to reemployment, you must promptly repay any such severance benefits.

**6.**      **Taxes**

Taxes will be withheld from benefits under the Plan to the extent required by law.

**7.**      **Relation to Other Plans**

Any prior incentive compensation, severance, or similar plan of the Company that might apply to you is hereby modified as to you while you are eligible for Plan benefits. Severance benefits under this Plan will not be counted as "compensation" for purposes of determining benefits under any other benefit plan, pension plan, or similar arrangement. All such plans or similar arrangements, to the extent inconsistent with this Plan, are hereby so amended except the severance provisions of the UPA.

**8.**      **Amendment or Termination**

Acting through its Board of Directors, NorthWestern Corporation or any successor-in-interest to NorthWestern Corporation has the right, in its nonfiduciary settlor capacity, to amend the Plan or to terminate it at any time, prospectively, for any reason, without notice, including to discontinue or eliminate benefits; provided, however, any vested right to Incentive Payments under this Plan may not be eliminated. No person has any right to Incentive Payments under this Plan until those Incentive Payments vest in accordance with the terms of the Plan. Unless expressly provided otherwise herein, the Company may amend the Plan to provide greater or lesser benefits to particular employees by sending affected employees a letter or other notice setting forth the applicable benefit modification.

**9.**      **Claims Procedures**

      *(a)*      *Claims Normally Not Required*

Normally, you do not need to present a formal claim to receive benefits payable under this Plan.

---

(2) The severance benefits portion of the Unit Purchase Agreement between Touch America Holdings, Inc., Montana Power Company and NorthWestern dated September 29, 2000 as amended ("UPA") applies until it expires on February 15, 2004, at which time those employees covered by the UPA will be eligible for severance benefits only under the Plan.

*(b)*     *Disputes*

If any person (Claimant) believes that benefits are being denied improperly, that the Plan is not being operated properly, that fiduciaries of the Plan have breached their duties, or that the Claimant's legal rights are being violated with respect to the Plan, the Claimant must file a formal claim with the Plan Administrator. This requirement applies to all claims that any Claimant has with respect to the Plan, including claims against fiduciaries and former fiduciaries, except to the extent the Plan Administrator determines, in its sole discretion, that it does not have the power to grant all relief reasonably being sought by the Claimant.

*(c)*     *Time for Filing Claims*

A formal claim must be filed within 90 days after the date the Claimant first knew or should have known of the facts on which the claim is based, unless the Plan Administrator in writing consents otherwise.

*(d)*     *Procedures*

The Plan Administrator has adopted the procedures for considering claims, which it may amend from time to time, as it sees fit. These procedures shall comply with all applicable legal requirements. The right to receive benefits under this Plan is contingent on a Claimant using the prescribed claims procedures to resolve any claim. Therefore, if a Claimant (or his or her successor or assign) seeks to resolve any claim by any means other than the prescribed claims provisions, he or she must repay all benefits received under this Plan and shall not be entitled to any further Plan benefits.

**10.     Plan Administration**

*(a)*     *Discretion*

The Plan Administrator is responsible for the general administration and management of the Plan and shall have all powers and duties necessary to fulfill its responsibilities, including, but not limited to, the discretion to interpret and apply the Plan and to determine all questions relating to eligibility for benefits. The Plan shall be interpreted in accordance with its terms and their intended meanings. However, the Plan Administrator and all Plan fiduciaries shall have the discretion to interpret or construe ambiguous, unclear, or implied (but omitted) terms in any fashion they deem to be appropriate in their sole discretion, and to make any findings of fact needed in the administration of the Plan. The validity of any such interpretation, construction, decision, or finding of fact shall not be given de novo review if challenged in court, by arbitration, or in any other forum, and shall be upheld unless clearly arbitrary or capricious.

*(b)*     *Finality of Determinations*

All actions taken and all determinations made in good faith by the Plan Administrator or by Plan fiduciaries will be final and binding on all persons claiming any interest in or under the Plan. To the extent the Plan Administrator or any Plan fiduciary has been granted discretionary authority under the Plan, the Plan Administrator's or Plan fiduciary's prior exercise of such authority shall not obligate it to exercise its authority in a like fashion thereafter.

*(c)*     *Drafting Errors*

If, due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent,

or as determined by the Plan Administrator in its sole discretion, the provision shall be considered ambiguous and shall be interpreted by the Plan Administrator and all Plan fiduciaries in a fashion consistent with its intent, as determined in the sole discretion of the Plan Administrator.  The Plan Administrator shall amend the Plan retroactively to cure any such ambiguity.

(d)    *Fiduciary Disclosure Authority*
No Plan fiduciary shall have the authority to answer questions about any pending or final business decision of the Company or any affiliate that has not been officially announced, to make disclosures about such matters, or even to discuss them, and no person shall rely on any unauthorized, unofficial disclosure. Thus, before a decision is officially announced, no fiduciary is authorized to tell any person, for example, that he or she will or will not be terminated or that the Company will or will not offer severance benefits in the future. Nothing in this subsection shall preclude any fiduciary from fully participating in the consideration, making, or official announcement of any business decision.

(e)    *Scope*
This Section may not be invoked by any person to require the Plan to be interpreted in a manner inconsistent with its interpretation by the Plan Administrator or other Plan fiduciaries.

## 11.    Costs and Indemnification

All costs of administering the Plan and providing Plan benefits will be paid by the Company, with one exception: Any expenses (other than arbitrator fees) incurred in resolving disputes with mu ltiple Claimants concerning their entitlement to the same benefit may be charged against the benefit, which will be reduced accordingly, to the extent permitted by law.  To the extent permitted by applicable law and in addition to any other indemnities or insurance provided by the Company, the Company shall indemnify and hold harmless its (and its affiliates') current and former officers, Directors, and employees against all expenses, liabilities, and claims (including legal fees incurred to defend against such liabilities and claims) arising out of their discharge in good faith of their administrative and fiduciary responsibilities with respect to the Plan.  Expenses and liabilities arising out of willful misconduct will not be covered under this indemnity.

## 12.    Limitation on Employee Rights

This Plan shall not give any employee the right to be retained in the service of the Company or interfere with or restrict the right of the Company to discharge or retire the employee.

## 13.    Governing Law

This Plan is a welfare plan subject to ERISA, and it shall be interpreted, administered, and enforced in accordance with that law. To the extent that state law is applicable, the statutes and common law of the State of South Dakota (excluding any that mandate the use of another jurisdiction's laws) shall apply.

## 14.    Miscellaneous

Where the context so indicates, the singular will include the plural and vice versa.  Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of the Plan.  Unless the context clearly indicates to the

contrary, a reference to a statute or document shall be construed as referring to any subsequently enacted, adopted, or executed counterpart.

**15.     Statement of ERISA Rights**

The following information required by ERISA is furnished by the Plan Administrator.

    *(a)     General Plan Information*

| | |
|---|---|
| Name of Plan: | NorthWestern Corporation Incentive Compensation and Severance Plan |
| Plan Administrator's Name: | NorthWestern Corporation |
| Address and Phone Number: | 125 South Dakota Avenue |
| | Sioux Falls, South Dakota 57104 |
| | Telephone: **605-978-2835** |
| Employer Identification Number assigned by IRS: | 46-0172280 |
| Plan Number of the Plan: | **<ASSIGN PLAN NUMBER>** |
| Type of Plan: | Incentive Compensation and Severance Pay Plan |
| Type of Administration: | Employer Administration |
| Name and Address of Registered Agent for Service of Legal Process | Plan Administrator |
| Source of Contribution to the Plan: | General assets of NorthWestern Corporation |
| Funding Medium: | General assets of NorthWestern Corporation |
| Plan Fiscal Year Ends On: | December 31st |

    *(b)     Plan Modification, Amendment, And Termination*

The Plan Administrator has the right to amend or terminate the Plan at any time in accordance with Section 8 above, with or without notice.  The consent of any employee is not required to terminate, modify, amend, or change the plan.

    *(c)     Your Rights under ERISA*

As a participant in the plan, you are entitled to certain rights and protections under ERISA.  Your rights include the following:

    1.     Right to Examine Plan Documents:

You have the right to examine all plan documents, including the annual reports and plan descriptions filed with the U.S. Department of Labor. The Plan Administrator will tell you where the plan documents are available for examination. There will be no charge for examining plan documents.

2.    Right to Obtain Copies of Plan Documents:

You have the right to obtain copies of all plan documents. You should make your request in writing to the Plan Administrator. There may be a reasonable charge for the copies.

3.    Right to Written Explanation of Denial:

If your claim for benefits under the plan is denied in whole or in part, you must be given a written explanation of the reason for denial.

4.    Right to Review:

You have the right to request a review and reconsideration of any denial of your claim for plan benefits.

5.    Other ERISA Rights:

You can protect your rights under ERISA. For example, ERISA gives you the right to file suit in a state or federal court if your claim for benefits under the plan is denied or ignored. You can also file suit in a federal court if you request plan documents and do not receive them within 30 days. In such a case, the court will require the Plan Administrator to give you the plan documents you requested. In some cases, the court could also require the Plan Administrator to pay you up to $110 a day until you receive the requested materials.

ERISA gives you rights and protections. ERISA also imposes special obligations on the people (called "fiduciaries") who operate this employee benefit plan. The fiduciaries have a duty to protect the plan's money and the interests of plan participants. The named fiduciary is NorthWestern Corporation. ERISA prohibits anyone from discriminating against you in any way to prevent you from receiving a plan benefit or from exercising your rights under ERISA.

If you believe that the fiduciaries have misused the plan's money, or that you have been discriminated against for asserting your rights, you can ask for help from the U.S. Department of Labor. You can also file suit in a federal court. If you file a suit, the court will decide who must pay the court costs and legal fees. If your suit is successful, the court may require the fiduciary to pay those costs and fees.

If you have any questions about your plan, you should contact the Plan Administrator.

If you have any questions about this statement of your rights under ERISA, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**<u>Adopted and Approved</u>**

**NORTHWESTERN CORPORATION**

By: _____          _____
       Signature                                                    Date

Title: _____
       Chairman and Chief Executive Officer

**Exhibit 10.2(h)**

**SECURED SUPERPRIORITY DEBTOR IN POSSESSION**

**CREDIT AND GUARANTY AGREEMENT**

**DATED AS OF SEPTEMBER 19, 2003**

**AMONG**

**NORTHWESTERN CORPORATION**
**A DEBTOR AND DEBTOR IN POSSESSION,**
**AS BORROWER,**

**THE OTHER LOAN PARTIES**
**PARTY HERETO AS GUARANTORS,**

**THE LENDERS PARTY HERETO FROM TIME TO TIME,**

**AND**

**BANK ONE, NA**
*(with its main office in Chicago, Illinois)*,
**AS INITIAL LENDER, AGENT AND LC ISSUER**

**BANC ONE CAPITAL MARKETS, INC.,**
**AS LEAD ARRANGER AND SOLE BOOK RUNNER**

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS                                                                                              2

ARTICLE II THE FACILITY                                                                                           25

    2.1    The Facility                                                                                    25

        2.1.1    Revolving Loans                                                                   25

        2.1.2    Facility LCs                                                                       26

        2.1.3    Non-Ratable Loans                                                               31

        2.1.4    Term Loans                                                                        31

    2.2    Ratable Loans; Risk Participation                                                    32

    2.3    Payment of the Obligations                                                           32

    2.4    Minimum Amount of Each Advance                                                       32

    2.5    Funding Account                                                                      32

    2.6    Reliance Upon Authority; No Liability                                                32

    2.7    Conversion and Continuation of Outstanding Advances                                  33

    2.8    Telephonic Notices                                                                   33

    2.9    Notification of Advances, Interest Rates, Prepayments and Commitment Reductions      33

    2.10    Fees                                                                                33

    2.11    Interest Rates                                                                      34

    2.12    Eurodollar Advances Post Default; Default Rates                                     34

    2.13    Interest Payment Dates; Interest and Fee Basis                                      34

    2.14    Voluntary Prepayments                                                               35

    2.15    Mandatory Prepayments                                                               35

    2.16    Termination of the Facility; Reduction of Commitments                               36

    2.17    Method of Payment                                                                   37

    2.18    Apportionment, Application, and Reversal of Payments                                37

    2.19    Settlement                                                                          38

    2.20    Indemnity for Returned Payments                                                     38

    2.21    Noteless Agreement; Evidence of Indebtedness                                        38

    2.22    Lending Installations                                                               39

    2.23    Non Receipt of Funds by the Agent                                                   39

    2.24    Limitation of Interest                                                              40

    2.25    Priority and Liens                                                                  40

    2.26    Security Interest in Facility LC Collateral Account                                 41

    2.27    No Discharge; Survival of Claims                                                    41

ARTICLE III YIELD PROTECTION; TAXES                                                42

    3.1    Yield Protection                                        42

    3.2    Changes in Capital Adequacy Regulations                 42

    3.3    Availability of Types of Advances                       43

    3.4    Funding Indemnification                                 43

    3.5    Taxes                                                   43

    3.6    Lender Statements; Survival of Indemnity                44

ARTICLE IV CONDITIONS PRECEDENT                                                    45

    4.1    Closing Date                                            45

    4.2    Term Loan Commitment Effective Date                     48

    4.3    Each Credit Extension                                   50

ARTICLE V REPRESENTATIONS AND WARRANTIES                                           50

    5.1    Existence and Standing                                  50

    5.2    Authorization and Validity                              51

    5.3    No Conflict; Government Consent                         51

    5.4    Security Interest in Collateral                         51

    5.5    Financial Statements                                    52

    5.6    Material Adverse Change                                 52

    5.7    Taxes                                                   52

    5.8    Litigation and Contingent Obligations                   52

    5.9    Capitalization and Subsidiaries                         52

    5.10    ERISA                                                  53

    5.11    Accuracy of Information                                 53

    5.12    Names; Prior Transactions                              53

    5.13    Regulation U                                           53

    5.14    Compliance With Laws                                   53

    5.15    Ownership of Properties                                53

    5.16    Plan Assets; Prohibited Transactions                   53

    5.17    Environmental Matters                                  54

    5.18    Investment Company Act                                 54

    5.19    Public Utility Holding Company Act; State Utility Regulation    54

    5.20    Bank Accounts                                          54

    5.21    Indebtedness                                           54

    5.22    Affiliate Transactions                                 54

    5.23    Intellectual Property Rights                           55

| 5.24 | Insurance | 55 |
|------|-----------|-----|
| 5.25 | Post Retirement Benefits | 55 |
| 5.26 | Common Enterprise | 55 |
| 5.27 | Reportable Transaction | 55 |
| 5.28 | Labor Disputes | 55 |
| 5.29 | Orders | 56 |
| 5.30 | No Default | 56 |
| 5.31 | Montana Megawatts I, LLC; Turbine Collateral | 56 |
| 5.32 | Borrowing Base Inventory | 56 |
| 5.33 | Principal Real Properties | 56 |
| **ARTICLE VI COVENANTS** | | **57** |
| 6.1 | Financial and Collateral Reporting | 57 |
| 6.2 | Use of Proceeds | 60 |
| 6.3 | Notices | 60 |
| 6.4 | Conduct of Business | 62 |
| 6.5 | Taxes | 62 |
| 6.6 | Payment of Indebtedness and Other Liabilities | 63 |
| 6.7 | Insurance | 63 |
| 6.8 | Compliance with Laws | 65 |
| 6.9 | Maintenance of Properties and Intellectual Property Rights | 65 |
| 6.10 | Inspection | 65 |
| 6.11 | Appraisals | 65 |
| 6.12 | Communications with Accountants | 66 |
| 6.13 | Collateral Access Agreements and Real Estate Purchases | 66 |
| 6.14 | Control Agreements | 66 |
| 6.15 | Additional Collateral; Further Assurances | 66 |
| 6.16 | Dividends | 67 |
| 6.17 | Indebtedness | 67 |
| 6.18 | Capital Structure | 68 |
| 6.19 | Merger | 68 |
| 6.20 | Sale of Assets | 68 |
| 6.21 | Investments and Acquisitions | 68 |
| 6.22 | Liens | 69 |
| 6.23 | Change of Corporate Name or Location; Change of Fiscal Year | 69 |
| 6.24 | Affiliate Transactions | 69 |

| | | |
|---|---|---|
| 6.25 | Amendments to Agreements | 69 |
| 6.26 | Intentionally omitted | 69 |
| 6.27 | Financial Contracts | 69 |
| 6.28 | Capital Expenditures | 69 |
| 6.29 | Minimum EBITDAR | 70 |
| 6.30 | [Intentionally omitted.] | 70 |
| 6.31 | Real Property Purchases | 70 |
| 6.32 | Sale of Accounts | 70 |
| 6.33 | Contingent Obligations | 70 |
| 6.34 | Chapter 11 Claims | 70 |
| 6.35 | [Intentionally omitted] | 70 |
| 6.36 | Bankruptcy Court | 70 |
| 6.37 | Operating Leases; Sale and Leaseback Transactions | 70 |
| 6.38 | Prepayment of Indebtedness | 71 |
| 6.39 | Turbine Collateral | 71 |
| 6.40 | Rating | 71 |
| 6.41 | Certain Post-Closing Covenants | 71 |
| ARTICLE VII DEFAULTS | | 72 |
| ARTICLE VIII REMEDIES; WAIVERS AND AMENDMENTS | | 76 |
| 8.1 | Remedies | 76 |
| 8.2 | Waivers by Loan Parties | 78 |
| 8.3 | Amendments | 78 |
| 8.4 | Preservation of Rights | 79 |
| ARTICLE IX GENERAL PROVISIONS | | 79 |
| 9.1 | Survival of Representations | 79 |
| 9.2 | Governmental Regulation | 79 |
| 9.3 | Headings | 79 |
| 9.4 | Entire Agreement | 80 |
| 9.5 | Several Obligations; Benefits of this Agreement | 80 |
| 9.6 | Expenses; Indemnification | 80 |
| 9.7 | Numbers of Documents | 82 |
| 9.8 | Accounting | 82 |
| 9.9 | Severability of Provisions | 82 |
| 9.10 | Nonliability of Lenders | 82 |
| 9.11 | Confidentiality | 82 |

9.12    Nonreliance                                                          83

9.13    Disclosure                                                           83

ARTICLE X THE AGENT                                                          83

10.1    Appointment; Nature of Relationship                                  83

10.2    Powers                                                               83

10.3    General Immunity                                                     83

10.4    No Responsibility for Credit Extensions, Recitals, etc.             84

10.5    Action on Instructions of the Lenders                                84

10.6    Employment of Agents and Counsel                                     84

10.7    Reliance on Documents; Counsel                                       84

10.8    Agent's Reimbursement and Indemnification                           84

10.9    Notice of Default                                                    85

10.10   Rights as a Lender                                                   85

10.11   Lender Credit Decision                                               85

10.12   Successor Agent                                                      85

10.13   Delegation to Affiliates                                             86

10.14   Execution of Loan Documents                                         86

10.15   Collateral Matters                                                   86

10.16   Co-Agents, Documentation Agent, Syndication Agent, etc.             88

ARTICLE XI SETOFF; RATABLE PAYMENTS                                          88

11.1    Setoff                                                               88

11.2    Ratable Payments                                                     89

ARTICLE XII BENEFIT OF AGREEMENT; ASSIGNMENTS; PARTICIPATIONS                89

12.1    Successors and Assigns                                               89

12.2    Participations                                                       89

12.3    Assignments                                                          90

12.4    Dissemination of Information                                         92

12.5    Tax Treatment                                                        92

12.6    Assignment by LC Issuer                                              92

ARTICLE XIII NOTICES                                                         92

13.1    Notices; Effectiveness; Electronic Communication                    92

13.2    Change of Address, Etc.                                              93

ARTICLE XIV COUNTERPARTS                                                     93

ARTICLE XV GUARANTY                                                          93

15.1    Guaranty                                                             93

| 15.2 | Guaranty of Payment | 94 |
|---|---|---|
| 15.3 | No Discharge or Diminishment of Guaranty | 94 |
| 15.4 | Defenses Waived | 95 |
| 15.5 | Rights of Subrogation | 95 |
| 15.6 | Reinstatement; Stay of Acceleration | 96 |
| 15.7 | Information | 96 |
| 15.8 | Termination | 96 |
| 15.9 | Taxes | 96 |
| 15.10 | Severability | 96 |
| 15.11 | Contribution | 96 |
| 15.12 | Lending Installations | 97 |
| 15.13 | Liability Cumulative | 97 |

ARTICLE XVI CHOICE OF LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL; CONFLICT WITH ORDERS — 97

| **16.1** | **CHOICE OF LAW** | 97 |
|---|---|---|
| **16.2** | **WAIVER OF JURY TRIAL** | 97 |
| **16.3** | **CONSENT TO JURISDICTION** | 98 |
| **16.4** | **CONFLICT WITH ORDERS** | 98 |

7

<u>Attachments</u>

Commitment Schedule

<u>Exhibits</u>

| | | |
|---|---|---|
| Exhibit A | — | Form of Borrowing Notice |
| Exhibit B | — | Form of Conversion/Continuation Notice |
| Exhibit C-1 | — | Form of Revolving Note |
| Exhibit C-2 | — | Form of Term Note |
| Exhibit D | — | Form of Compliance Certificate |
| Exhibit E | — | Form of Assignment Agreement |
| Exhibit F | — | Form of Borrowing Base Certificate |

<u>Schedules</u>

| | | |
|---|---|---|
| Schedule 1(a) | — | Liens |
| Schedule 1(b) | — | Pre-Petition Payments - Indebtedness |
| Schedule 5.7 | — | Taxes |
| Schedule 5.9 | — | Capitalization and Subsidiaries |
| Schedule 5.12 | — | Fictitious Names; Mergers; Acquisitions |
| Schedule 5.15 | — | Exceptions to Title |
| Schedule 5.17 | — | Environmental Matters |
| Schedule 5.19 | — | Restrictions on Incurrence of Indebtedness |
| Schedule 5.21 | — | Indebtedness |
| Schedule 5.22 | — | Affiliate Transactions |
| Schedule 5.23 | — | Intellectual Property |
| Schedule 5.28 | — | Labor Matters |
| Schedule 5.32 | — | Borrowing Base Inventory |
| Schedule 5.33 | — | Principal Real Properties |
| Schedule 6.20 | — | Asset Sales |
| Schedule 6.21 | — | Permitted Investments |

8

## SECURED SUPERPRIORITY DEBTOR IN POSSESSION
## CREDIT AND GUARANTY AGREEMENT

This Secured Superpriority Debtor in Possession Credit and Guaranty Agreement, dated as of September 19, 2003, is among NorthWestern Corporation, a Delaware corporation, as debtor and debtor in possession under chapter 11 of the Bankruptcy Code (together with its successors and assigns, the "Borrower"), the other Loan Parties party hereto as Guarantors, the Lenders and Bank One, NA, a national banking association having its principal office in Chicago, Illinois, as LC Issuer, Initial Lender and as Agent.

## RECITALS

On September 14, 2003 (the "Petition Date"), the Borrower filed a voluntary petition with the Bankruptcy Court initiating the Case and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Borrower has applied to the Lenders for (i) a revolving credit and letter of credit facility in an aggregate principal amount not to exceed $100,000,000 and (ii) term loans in an aggregate principal amount not to exceed $390,000,000.  All of the Borrower's obligations hereunder and under the other Loan Documents are to be guaranteed by the Guarantors.

The proceeds of the Revolving Loans will be used solely for working capital, to make certain Permitted Pre-Petition Payments and other general corporate purposes of the Borrower and the other Loan Parties (to the extent permitted by this Agreement).  The proceeds of the Term Loans, if made available, will be used by the Borrower solely to repay the CSFB Loan in full.

To provide guarantees and security for the repayment of the Loans, the reimbursement of any draft drawn under a Letter of Credit and the payment of the other obligations of the Borrower and the Guarantors hereunder and under the other Loan Documents, the Borrower and the Guarantors (as applicable) will provide to the Agent, the LC Issuer and the Lenders the following (each as more fully described herein, in the Interim Order and the Final Order (when entered), and in the other Loan Documents):

(a)        a guaranty from each of the Guarantors of the due and punctual payment and performance of the obligations of the Borrower hereunder and under the other Loan Documents;

(b)        an allowed administrative expense claim in the Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower, whether heretofore or hereafter incurred, including but not limited to the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 1112 or 1114 of the Bankruptcy Code;

(c)        a perfected first priority Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon all unencumbered property of the Borrower (excluding the Borrower's rights in respect of avoidance actions and the proceeds thereof under the Bankruptcy Code) and on all cash and cash equivalents, provided that following the Termination Date, amounts in any account maintained with the Agent, the LC Issuer or any Lender (including the Facility LC Collateral Account) shall not be subject to the Carve-Out hereinafter referred to;

1

(d)        a perfected best available Lien upon substantially all property of the Guarantors, including cash and cash equivalents, including, without limitation, a first priority security interest on (i) 100% of any Capital Stock owned by any Guarantor and (ii) the Turbine Collateral; and

(e)        a perfected Lien, pursuant to Section 364(c)(3) of the Bankruptcy Code, upon all property of the Borrower that is subject to valid and perfected Liens in existence on the Petition Date or that is subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code or that is subject to Permitted Liens, junior to such valid and perfected Liens.

In addition, without limiting the Liens described in clauses (b), (c) and (e) above, on and after the Term Loan Commitment Effective Date the obligations of the Borrower to repay the Obligations will be secured by a perfected Lien, pursuant to Section 364(d)(1) of the Bankruptcy Code, upon all property (including after-acquired property) of the Borrower that secures (x) the Montana Bonds (the "Montana Collateral") and (y) the South Dakota Bonds (the "South Dakota Collateral"), which Lien shall have the same priority vis a vis each other Lien on the same collateral as the Lien which secured the Montana Bonds and the South Dakota Bonds, respectively, immediately prior to the repayment in full of the CSFB Loans on the Term Loan Commitment Effective Date and to any Liens granted after the Petition Date to provide adequate protection in respect thereof; provided that (i) the proceeds of the Montana Collateral shall only be available to the Secured Parties in respect of Obligations not to exceed the Montana Maximum Amount and (ii) the proceeds of the South Dakota Collateral shall only be available to the Secured Parties in respect of Obligations not to exceed the South Dakota Maximum Amount (the limitation contained in the foregoing proviso will only apply to the proceeds of the collateral secured by the Liens described in this paragraph).

All of the claims and the Liens granted hereunder in the Case to the Agent, the LC Issuer and the Lenders will be subject to the Carve-Out to the extent provided in Section 2.25.

NOW THEREFORE, in consideration of these premises and the terms and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I

DEFINITIONS

As used in this Agreement:

"Account" shall have the meaning given to such term in the Security Agreement.

"Account Debtor" means any Person obligated on an Account.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Closing Date, by which the Borrower or any Subsidiary (other than Excluded Subsidiaries) (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Capital Stock of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Capital Stock having such power only by reason of the happening of a contingency) or a majority of the outstanding Capital Stock of a Person.

"Advance" means a borrowing hereunder (a) made by some or all of the Lenders on the same Borrowing Date or (b) converted or continued by the Lenders on the same date of conversion or continuation, consisting, in either case, of the aggregate amount of the several Loans of the same Type and, in the case of Eurodollar Loans, for the same Interest Period.  The term Advance shall include Non-Ratable Loans unless otherwise expressly provided.

"Affiliate" of any Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person.  A Person shall be deemed to control another Person if the controlling Person owns 10% or more of any class of the voting Capital Stock of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of Capital Stock, by contract or otherwise.

"Agent" means Bank One in its capacity as contractual representative of the Lenders pursuant to Article X, and not in its individual capacity as a Lender, and any successor Agent appointed pursuant to Article X.

"Aggregate Commitment" means the aggregate of the Commitments of all the Lenders, as increased or reduced from time to time in accordance with the terms hereof, which Aggregate Commitment shall initially be in the amount of $100,000,000.

"Aggregate Credit Exposure" means, at any time, the aggregate of the Credit Exposure of all the Lenders.

"Aggregate Revolving Exposure" means, at any time, the aggregate Revolving Exposure of all the Lenders.

"Agreement" means this Secured Superpriority Debtor in Possession Credit and Guaranty Agreement, as it may be amended or modified and in effect from time to time.

"Alternate Base Rate" means, for any day, a rate of interest per annum equal to the higher of (a) the Prime Rate for such day and (b) the sum of the Federal Funds Effective Rate for such day plus 1/2% per annum.

"Applicable Margin" means (a) (i) with respect to Revolving Loan Advances that are Eurodollar Advances, 3.00% per annum and (ii) with respect to Revolving Loan Advances that are Floating Rate Advances, 1.00% per annum, and (b) (i) with respect to Term Loans that are Eurodollar Advances, 3.50% per annum and (ii) with respect to Term Loans that are Floating Rate Advances, 1.50% per annum.

"Appraised Assets FMV" means the fair market value of the assets of the Loan Parties as determined by an appraisal to be conducted by an appraiser satisfactory to the Required Lenders, such appraisal to be satisfactory in form and substance in all respects to the Agent and the Required Lenders.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arranger" means Banc One Capital Markets, Inc., a Delaware corporation, and its successors, in its capacity as Lead Arranger and Sole Book Runner.

"Article" means an article of this Agreement unless another document is specifically referenced.

"Assignment Agreement" is defined in Section 12.3(a).

3

"Authorized Officer" means any of the Chief Executive Officer, Chief Financial Officer, Chief Restructuring Officer, Treasurer or Chief Accountant of the Borrower (or such other officer of the Borrower designated by the Borrower and acceptable to the Agent), acting singly.

"Availability" means, at any time, an amount equal to the lesser of (a) the Revolving Commitment and (b) the Borrowing Base, in each case *minus* the Aggregate Revolving Exposure.

"Available Revolving Commitment" means, at any time, the Revolving Commitment then in effect minus the Aggregate Revolving Exposure at such time.

"Bank One" means Bank One, NA, a national banking association, in its individual capacity, and its successors.

"Banking Services" means each and any of the following bank services provided to any Loan Party by Bank One or any of its Affiliates: (a) commercial credit cards, (b) stored value cards and (c) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Banking Services Obligations" of the Loan Parties means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"Banking Services Reserves" means all Reserves which the Agent from time to time establishes in its Permitted Discretion for Banking Services then provided or outstanding.

"Bankruptcy Code" means Title 11 of the U.S. Code (11 U.S.C. § 101 et seq.) as amended, reformed, or otherwise modified from time to time, and any rule or regulation issued thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Case from time to time.

"Blue Dot" means Blue Dot Services Inc., a Delaware corporation.

"Borrower" is defined in the preamble to this Agreement.

"Borrowing Base" means (a) at any time prior to the occurrence of the Term Loan Commitment Effective Date, the sum of (i) 85% of the Borrower's cumulative Eligible Billed Accounts at such time, *plus* (ii) 70% of the Borrower's cumulative Eligible Unbilled Accounts at such time, *plus* (iii) the lesser of (A) $35 million and (B) 80% of the Borrower's Eligible Stored Gas Inventory, valued at the lower of cost or market, determined on a first in first out basis, *plus* (iv) 80% of the Borrower's Eligible Working Gas and Fuel Inventory, valued at the lower of cost or market, determined on a first in first out basis, *plus* (v) the lesser of (X) $10 million and (Y) 30% of the Borrower's Eligible Materials and Supplies Inventory, valued at the lower of cost or market, determined on a first in first out basis, *plus* (vi) 75% of the Net Orderly Liquidation Value of Eligible Turbine Collateral, *less* (vii) Reserves; and (b) at any time on or after the occurrence of the Term Loan Commitment Effective Date, (i) 55% of the Borrower's aggregate Appraised Assets FMV, *less* (ii) Reserves, *less* (iii) the outstanding amount of the Borrower's and its Subsidiaries' (other than Excluded Subsidiaries) outstanding secured Indebtedness (pre-petition or post-petition) other than Indebtedness incurred pursuant to this Agreement. The Agent may, in its Permitted Discretion, modify one or more of the elements used in computing the Borrowing Base and/or reduce the

4

advance rates stated herein. If the Term Loan Commitment Effective Date does not occur on or before October 31, 2003, the Borrowing Base shall be determined by reference to clause (a) above.

"Borrowing Base Certificate" means a certificate, signed by an Authorized Officer of the Borrower, in the form of Exhibit F or another form which is acceptable to the Agent in its sole discretion.

"Borrowing Base Inventory" is defined in Section 6.1(h)(ii).

"Borrowing Date" means a date on which an Advance or a Loan is made hereunder.

"Borrowing Notice" is defined in Section 2.1.1(b).

"Business Day" means (a) with respect to any borrowing, payment or rate selection of Eurodollar Advances, a day (other than a Saturday or Sunday) on which banks generally are open in Chicago and New York City for the conduct of substantially all of their commercial lending activities, interbank wire transfers can be made on the Fedwire system and dealings in U.S. dollars are carried on in the London interbank market and (b) for all other purposes, a day (other than a Saturday or Sunday) on which banks generally are open in Chicago for the conduct of substantially all of their commercial lending activities and interbank wire transfers can be made on the Fedwire system.

"Capital Expenditures" means, without duplication, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP.

"Capital Stock" means any and all corporate stock, units, shares, partnership interests, membership interests, equity interests, rights, securities, or other equivalent evidences of ownership (howsoever designated) issued by any Person, and any and all warrants or options to purchase (or any similar right) any of the foregoing.

"Capitalized Lease" of a Person means any lease of Property by such Person as lessee which would be capitalized on a balance sheet of such Person prepared in accordance with GAAP.

"Capitalized Lease Obligations" of a Person means the aggregate amount of the obligations of such Person under Capitalized Leases which would be shown as a liability on a balance sheet of such Person prepared in accordance with GAAP.

"Carve-Out" means, with respect to the Case, (i) the unpaid fees of the clerk of the Bankruptcy Court and the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) the unpaid fees and expenses of professionals incurred by the Borrower and any statutory committees appointed in the Case disclosed to the Agent prior to the occurrence of a Default or an Unmatured Default and allowed by an order of the Bankruptcy Court, whether paid prior to or after the occurrence of a Default or an Unmatured Default and (iii) payment of any unpaid fees and expenses of professionals incurred by the Borrower and any statutory committees appointed in the Case and disclosed to the Agent after the occurrence of a Default or an Unmatured Default and allowed by an order of the Bankruptcy Court not to exceed $5,000,000 in the aggregate, in each case exclusive of any retainers received by such professionals in connection with the Case.

"Case" means the bankruptcy case commenced by the voluntary petition for relief under chapter 11 of the Bankruptcy Code filed by the Borrower in the Bankruptcy Court on September 14, 2003.

"Cash Equivalent Investments" means (a) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of one year or less from the date of acquisition and overnight bank deposits of any Lender and certificates of deposit with maturities of one year or less from the date of acquisition and overnight bank deposits of any other commercial bank having capital and surplus in excess of $500,000,000, (c) commercial paper of any issuer rated at least A-2 by S&P or P-2 by Moody's, (d) additional money market investments with maturities of one year or less from the date of acquisition rated at least A1 or AA by S&P or P-1 or Aa by Moody's and (e) tax-exempt debt obligations of any State of the United States or of any county or other municipal government subdivision of any State of the United States with maturities of one year or less from the date of acquisition rated at the highest investment grade rating by S&P or by Moody's, or publicly traded or open-end bond funds that invest exclusively in such tax-exempt debt obligations.

"Change in Control" means the occurrence of any of the following: (a) any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934) (i) shall have acquired beneficial ownership of 40% or more of the aggregate outstanding classes of Capital Stock having voting power in the election of directors of the Borrower or (ii) shall obtain the power (whether or not exercised) to elect a majority of the Borrower's directors; (b) a majority of the persons who comprised the Board of Directors of the Borrower on the date hereof shall be replaced, unless such replacement shall have been approved by at least two-thirds of the Board of Directors of the Borrower then still in office who either were members of such Board of Directors on the date hereof or whose election as a member of such Board of Directors was previously so approved; or (c) the Borrower shall be liquidated or dissolved.

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, reformed or otherwise modified from time to time, and any rule or regulation issued thereunder.

"Collateral" means any and all Property covered by the Collateral Documents and any and all other Property of any Loan Party, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent, on behalf of itself and the other Secured Parties, to secure the Secured Obligations.

"Collateral Access Agreement" means any landlord waiver or other agreement, in form and substance satisfactory to the Agent, between the Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any Loan Party for any real Property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"Collateral Documents" means, collectively, the Security Agreement, the Mortgages, any Deposit Account Control Agreements, any securities account control agreements and any other documents granting a Lien upon the Collateral as security for payment of the Secured Obligations.

"Collateral Shortfall Amount" is defined in Section 2.1.2(l).

"Commitment" means, for each Lender, the obligation of such Lender to make Loans to, and participate in Facility LCs issued upon the application of, the Borrower in an aggregate amount not exceeding the amount set forth in the applicable column of the Commitment Schedule or as set forth in any Assignment Agreement that has become effective pursuant to Section 12.3(c), as such amount may be modified from time to time pursuant to the terms hereof, including with respect to the occurrence of the Term Loan Commitment Effective Date.

6

"<u>Commitment Schedule</u>" means the Schedule attached hereto identified as such.

"<u>Compliance Certificate</u>" is defined in <u>Section 6.1(e)</u>.

"<u>Consolidated Capital Expenditures</u>" means, with reference to any period, the Capital Expenditures of the Borrower and its Subsidiaries calculated on a consolidated basis for such period.

"<u>Consolidated EBITDAR</u>" means Consolidated Net Income *plus*, to the extent deducted from revenues in determining Consolidated Net Income, (a) Consolidated Interest Expense, (b) expense for taxes paid or accrued net of tax refunds received during the covenant computation period or expected to be received within sixty days thereafter, (c) depreciation, (d) amortization and other non-cash charges, (e) extraordinary losses (as determined in accordance with GAAP) incurred other than in the ordinary course of business and (f) fees, expenses and non-recurring restructuring charges related to the Case and this Agreement, *minus*, to the extent included in Consolidated Net Income, extraordinary gains (as determined in accordance with GAAP) realized other than in the ordinary course of business, all calculated for the Borrower and its Subsidiaries on a consolidated basis.

"<u>Consolidated Interest Expense</u>" means, with reference to any period, the interest expense of the Borrower and its Subsidiaries calculated on a consolidated basis for such period.

"<u>Consolidated Net Income</u>" means, with reference to any period, the net income (or loss) of the Borrower and its Subsidiaries calculated on a consolidated basis for such period.

"<u>Contingent Obligation</u>" of a Person means any agreement, undertaking or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including, without limitation, any comfort letter, operating agreement, take or pay contract or the obligations of any such Person as general partner of a partnership with respect to the liabilities of the partnership.

"<u>Controlled Group</u>" means all members of a controlled group of corporations or other business entities and all trades or businesses (whether or not incorporated) under common control which, together with the Borrower or any Subsidiary, are treated as a single employer under Section 414 of the Code.

"<u>Conversion/Continuation Notice</u>" is defined in <u>Section 2.7</u>.

"<u>Copyrights</u>" shall have the meaning given to such term in the Security Agreement.

"<u>Credit Exposure</u>" means, as to any Lender at any time, the sum of (a) such Lender's Revolving Exposure at such time *plus* (b) an amount equal to the aggregate principal amount of its Term Loans outstanding at such time.

"<u>Credit Extension</u>" means the making of an Advance or the issuance of a Facility LC hereunder.

"<u>Credit Extension Date</u>" means the Borrowing Date for an Advance or the issuance date for a Facility LC.

"<u>CSFB Credit Agreement</u>" means that certain Credit Agreement, dated as of December 17, 2002, among the Borrower, the several lenders from time to time party thereto, and Credit Suisse First Boston,

7

as Administrative Agent, Lead Arranger, and Sole Book Runner, as amended, supplemented, or otherwise modified from time to time.

"CSFB Loan" means, at any date of determination, all outstanding principal, interest, fees and other obligations of the Borrower and its Subsidiaries under the CSFB Credit Agreement and related loan documents.

"Default" means an event described in Article VII.

"Deposit Account Control Agreement" means an agreement, in form and substance satisfactory to the Agent, among any Loan Party, a banking institution holding such Loan Party's funds, and the Agent with respect to collection and control of all deposits and balances held in a deposit account maintained by any Loan Party with such banking institution.

"Document" shall have the meaning given to such term in the Security Agreement.

"Domestic Subsidiary" means any Subsidiary which is organized under the laws of the U.S. or any state of the U.S.

"Easement" is defined in Section 5.33.

"Effective Date" means the date that the conditions precedent set forth in Sections 4.1 and 4.3 are satisfied.

"Eligible Billed Accounts" means, at any time, the Accounts of the Borrower actually billed to customers which the Agent determines in its Permitted Discretion are eligible as the basis for Credit Extensions hereunder.  Without limiting the Agent's discretion provided herein, Eligible Billed Accounts shall not include any Account:

(a)    which is not subject to a first priority perfected security interest in favor of the Agent;

(b)    which is subject to any Lien other than a Lien in favor of the Agent, or the proceeds of which are required to be segregated for the benefit of any Person other than the Agent;

(c)    with respect to which the scheduled due date is more than thirty days after the original billing date, more than ninety days have elapsed since the date of the original bill therefor or which is more than sixty days past the due date for payment;

(d)    which is owing by an Account Debtor for which more than 25% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(e)    which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to the Borrower and its Subsidiaries taken as a whole exceeds 25% of the aggregate Eligible Billed Accounts and Eligible Unbilled Accounts;

(f)    with respect to which any covenant, representation, or warranty contained in this Agreement or in the Security Agreement has been breached or is not true;

(g)    which does not arise from the sale of goods or performance of services in the ordinary course of business;

8

(h)     with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(i)     which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(j)     which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(k)     which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or (ii) is not organized under applicable law of the U.S. or any state of the U.S. unless, in either case, such Account is backed by a Letter of Credit acceptable to the Agent which is in the possession of the Agent;

(l)     which is owed in any currency other than U.S. dollars;

(m)     which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to the Agent which is in the possession of the Agent or (ii) the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the Lien of the Agent in such Account have been complied with to the Agent's satisfaction;

(n)     which, for any Account Debtor, exceeds a credit limit determined by the Agent, to the extent of such excess;

(o)     which is owed by an Account Debtor or any Affiliate of such Account Debtor to which the Borrower or any Subsidiary is indebted, but only to the extent of such indebtedness;

(p)     which is subject to any counterclaim, deduction, defense, setoff or dispute;

(q)     which is evidenced by any promissory note, chattel paper, or instrument;

(r)     which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit the Borrower to seek judicial enforcement in such jurisdiction of payment of such Account, the Borrower has filed such report or qualified to do business in such jurisdiction;

(s)     with respect to which the Borrower or any Subsidiary has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business; or

9

(t)       which the Agent determines may not be paid by reason of the Account Debtor's inability to pay or which the Agent otherwise determines is unacceptable for any reason whatsoever.

In the event that an Account which was previously an Eligible Billed Account ceases to be an Eligible Billed Account hereunder, the Borrower shall notify the Agent thereof (i) within three (3) Business Days of the date the Borrower has obtained knowledge thereof if any such Account is in excess of $100,000 in the aggregate and (ii) on and at the time of submission to the Agent of the next Borrowing Base Certificate in all other cases.

"Eligible Materials and Supplies Inventory" means Materials and Supplies Inventory of the Borrower which the Agent determines in its Permitted Discretion is eligible as the basis for Credit Extensions hereunder.  Without limiting the Agent's discretion provided herein, Eligible Material and Supplies Inventory shall not include any Materials and Supplies Inventory not meeting the criteria set forth in any of clauses (a) through (i) of the definition of "Eligible Stored Gas Inventory."  In the event that Materials and Supplies Inventory which was previously Eligible Materials and Supplies Inventory ceases to be Eligible Materials and Supplies Inventory hereunder, the Borrower shall notify the Agent thereof (i) within three (3) Business Days of the date the Borrower has obtained knowledge thereof if any such Materials and Supplies Inventory has a value (based on the lower of cost, determined on a first-in, first-out basis, or market) in excess of $100,000 in the aggregate and (ii) on and at the time of submission to the Agent of the next Borrowing Base Certificate in all other cases.

"Eligible Stored Gas Inventory" means, at any time, the Stored Gas Inventory of the Borrower which the Agent determines in its Permitted Discretion is eligible as the basis for Credit Extensions hereunder.  Without limiting the Agent's discretion provided herein, Eligible Stored Gas Inventory shall not include any Stored Gas Inventory:

(a)       which is not subject to a first priority perfected Lien in favor of the Agent;

(b)       which is subject to any Lien other than a Lien in favor of the Agent;

(c)       which is, in the Agent's opinion, unmerchantable, unfit for sale or not salable at prices approximating at least the cost of such Inventory in the ordinary course of business;

(d)       with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true;

(e)       which does not conform to all standards imposed by any governmental authority;

(f)       which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers;

(g)       as to which the Borrower has not delivered a Collateral Access Agreement, if requested by the Agent;

(h)       which is not reflected in a current perpetual inventory report of the Borrower; or

(i)       which the Agent otherwise determines is unacceptable for any reason whatsoever.

In the event that Stored Gas Inventory which was previously Eligible Stored Gas Inventory ceases to be Eligible Stored Gas Inventory hereunder, the Borrower shall notify the Agent thereof (i) within three

(3) Business Days of the date the Borrower has obtained knowledge thereof if any such Stored Gas Inventory has a value (based on the lower of cost, determined on a first-in, first-out basis, or market) in excess of $100,000 in the aggregate and (ii) on and at the time of submission to the Agent of the next Borrowing Base Certificate in all other cases.

"Eligible Turbine Collateral" means, at any time, the Turbine Collateral which the Agent determines in its Permitted Discretion is eligible as the basis for Credit Extensions hereunder. Without limiting the Agent's discretion provided herein, Eligible Turbine Collateral shall not include any Turbine Collateral:

      (a)      which is not subject to a first priority perfected Lien in favor of the Agent;

      (b)      which is subject to any Lien other than a Lien in favor of the Agent;

      (c)      which has partially or in full been installed or affixed in any manner to any Property or which is otherwise not in the original condition as delivered from the manufacturer;

      (d)      with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true;

      (e)      which is not located in the U.S. or is in transit with a common carrier;

      (f)      as to which any Loan Party has not delivered a Collateral Access Agreement, if requested by the Agent; or

      (g)      which the Agent otherwise determines is unacceptable for any reason whatsoever.

In the event that Turbine Collateral which was previously Eligible Turbine Collateral ceases to be Eligible Turbine Collateral hereunder, the Borrower shall notify the Agent thereof within three (3) Business Days of the date the Borrower has obtained knowledge thereof.

"Eligible Unbilled Accounts" means, at any time, the Accounts of the Borrower not yet billed to customers which the Agent determines in its Permitted Discretion are eligible as the basis for Credit Extensions hereunder. Without limiting the Agent's discretion provided herein, Eligible Unbilled Accounts shall not include any Account not meeting the criteria set forth in any of clauses (a) through (t) (excluding clause (c)) of the definition of "Eligible Billed Accounts." In addition, "Eligible Unbilled Accounts" shall exclude any unbilled Account which remains unbilled for thirty days or more after the date such unbilled Account was created. In the event that an Account which was previously an Eligible Unbilled Account ceases to be an Eligible Unbilled Account hereunder, the Borrower shall notify the Agent thereof (i) within three (3) Business Days of the date the Borrower has obtained knowledge thereof if any such Account is in excess of $100,000 in the aggregate and (ii) on and at the time of submission to the Agent of the next Borrowing Base Certificate in all other cases.

"Eligible Working Gas and Fuels Inventory" means, at any time, the Working Gas and Fuels Inventory of the Borrower which the Agent determines in its Permitted Discretion is eligible as the basis for Credit Extensions hereunder. Without limiting the Agent's discretion provided herein, Eligible Working Gas and Fuels Inventory shall not include any Working Gas and Fuels Inventory not meeting the criteria set forth in any of clauses (a) through (i) of the definition of "Eligible Stored Gas Inventory." In the event that Working Gas and Fuels Inventory which was previously Eligible Working Gas and Fuels Inventory ceases to be Eligible Working Gas and Fuels Inventory hereunder, the Borrower shall notify the Agent thereof (i) within three (3) Business Days of the date the Borrower has obtained knowledge thereof

if any such Working Gas and Fuels Inventory has a value (based on the lower of cost, determined on a first-in, first-out basis, or market) in excess of $100,000 in the aggregate and (ii) on and at the time of submission to the Agent of the next Borrowing Base Certificate in all other cases.

"Environmental Laws" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements and other governmental restrictions relating to (a) the protection of the environment, (b) the effect of the environment on human health, (c) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water or land or (d) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof.

"Equipment" has the meaning specified in the Security Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any rule or regulation issued thereunder.

"Eurodollar Advance" means an Advance which, except as otherwise provided in Section 2.12, bears interest at the applicable Eurodollar Rate.

"Eurodollar Base Rate" means, with respect to a Eurodollar Advance for the relevant Interest Period, the applicable British Bankers' Association LIBOR rate for deposits in U.S. dollars as reported by any generally recognized financial information service as of 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, and having a maturity equal to such Interest Period, provided that, if no such British Bankers' Association LIBOR rate is available to the Agent, the applicable Eurodollar Base Rate for the relevant Interest Period shall instead be the rate determined by the Agent to be the rate at which Bank One or one of its Affiliate banks offers to place deposits in U.S. dollars with first class banks in the interbank market at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, in the approximate amount of Bank One's relevant Eurodollar Loan and having a maturity equal to such Interest Period.

"Eurodollar Loan" means a Loan which, except as otherwise provided in Section 2.12, bears interest at the applicable Eurodollar Rate.

"Eurodollar Rate" means, with respect to a Eurodollar Advance for the relevant Interest Period, the sum of (a) the quotient of (i) the Eurodollar Base Rate applicable to such Interest Period, *divided by* (ii) one *minus* the Reserve Requirement (expressed as a decimal) applicable to such Interest Period, *plus* (b) the Applicable Margin.

"Excluded Subsidiaries" means Clark Fork and Blackfoot, LLC, Expanets and its Subsidiaries, Blue Dot and its Subsidiaries and Cornernorth, LLC and its Subsidiaries,

"Excluded Taxes" means, in the case of each Lender or applicable Lending Installation and the Agent, (i) taxes imposed on its overall net income, and franchise taxes imposed in lieu thereof, by (a) the jurisdiction under the laws of which such Lender or the Agent is incorporated or organized or (b) the jurisdiction in which the Agent's or such Lender's principal executive office or such Lender's applicable Lending Installation is located, in each case, other than net income or franchise taxes imposed on or with respect to Taxes or Other Taxes, (ii) U.S. federal withholding taxes at the rate (and only at the rate) imposed on payments to a Non-U.S. Lender or the Agent at the time such Lender or the Agent becomes a party to this Agreement, other than to the extent that such Person's predecessor in interest was entitled to

12

indemnification or increased amounts with respect to such taxes and (iii) U.S. federal withholding taxes, imposed on payments to a Non-U.S. Lender, that would not have been imposed but for such Non-U.S. Lender's failure to comply with its obligations under <u>Section 3.5(d)</u>.

"<u>Exhibit</u>" refers to an exhibit to this Agreement, unless another document is specifically referenced.

"<u>Expanets</u>" means Expanets, Inc., a Delaware corporation and a Subsidiary.

"<u>Facility</u>" means the credit facility described in <u>Section 2.1</u> to be provided to the Borrower on the terms and conditions set forth in this Agreement.

"<u>Facility LC</u>" is defined in <u>Section 2.1.2(a)</u>.

"<u>Facility LC Application</u>" is defined in <u>Section 2.1.2(c)</u>.

"<u>Facility LC Collateral Account</u>" is defined in <u>Section 2.1.2(j)</u>.

"<u>Facility Termination Date</u>" means the earliest to occur of (a) the Scheduled Termination Date, (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Reorganization Plan that is confirmed pursuant to a final, non-appealable order entered by the Bankruptcy Court or any other court having jurisdiction in the Case, but in no event shall such date be later than the effective date of such Reorganization Plan, (c) the date of the voluntary termination of the Commitments by the Borrower and (d) any earlier date on which the Aggregate Commitment is reduced to zero or otherwise terminated pursuant to the terms of the Loan Documents including without limitation pursuant to <u>Section 8.1</u>.

"<u>Federal Funds Effective Rate</u>" means, for any day, an interest rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published for such day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations at approximately 10:00 a.m. (Chicago time) on such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by the Agent in its sole discretion.

"<u>Fee Letter</u>" is defined in <u>Section 2.10(c)</u>.

"<u>Final Order</u>" means either (i) an order of the Bankruptcy Court in the Case of the type contemplated by clause (n) of <u>Section 4.2</u> or (ii) an order of the Bankruptcy Court in the Case, entered in any event not later than forty-five days following the Petition Date, acceptable in all respects to the Agent and the Lenders on an application or motion by the Borrower, such motion to be satisfactory in form and substance to the Lenders, which order shall have been entered on such notice to such parties as may be satisfactory to the Agent and the Lenders, approving the Facility and borrowing under the Facility up to $100,000,000 with respect to Revolving Loans on a final basis and confirming the granting of the Liens described in <u>Section 2.25</u>, <u>2.26</u> and the other Loan Documents, and in each of (i) and (ii) above which order has not been stayed, reversed, modified, vacated or overturned.

"<u>Financial Contract</u>" of a Person means (a) any exchange-traded or over-the-counter futures, forward, swap or option contract or other financial instrument with similar characteristics or (b) any Rate Management Transaction.

13

"Fiscal Month" means any of the monthly accounting periods of the Borrower and its Subsidiaries.

"Fiscal Quarter" means any of the quarterly accounting periods of the Borrower and its Subsidiaries, ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of the Borrower and its Subsidiaries ending on December 31 of each year.

"Fixtures" has the meaning specified in the Security Agreement.

"Flex-Pricing Provision" means any term or provision of any fee letter, commitment letter or term sheet delivered in connection with the transaction which is the subject of this Agreement which purports to permit the Agent or the Arranger to change any or all of the structure, terms or pricing of the credit facility evidenced by this Agreement either before or after the closing of this Agreement in order to allow the Agent and/or Arranger to successfully syndicate such credit facility either before or after the closing of this Agreement.

"Floating Rate" means, for any day, a rate per annum equal to (a) the Alternate Base Rate for such day plus (b) the Applicable Margin, in each case changing when and as the Alternate Base Rate changes.

"Floating Rate Advance" means an Advance which, except as otherwise provided in Section 2.12, bears interest at the Floating Rate.

"Floating Rate Loan" means a Loan which, except as otherwise provided in Section 2.12, bears interest at the Floating Rate.

"Foreign Subsidiary" means any Subsidiary which is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funding Account" is defined in Section 2.5.

"Gas Storage Facilities" is defined in Section 5.33.

"GAAP" means generally accepted accounting principles as in effect from time to time, applied in a manner consistent with that used in preparing the financial statements referred to in Section 5.5.

"Guaranteed Obligations" is defined in Section 15.1.

"Guarantor" means each Subsidiary guarantying the obligations of the Borrower under the Loan Documents pursuant to a Guaranty or otherwise, and the successors and assigns of each of the foregoing.

"Guaranty" means Article XV of this Agreement.

"Indebtedness" of a Person means such Person's (a) obligations for borrowed money, (b) obligations representing the deferred purchase price of Property or services (other than accounts payable arising in the ordinary course of such Person's business payable on terms customary in the trade), (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from

14

Property now or hereafter owned or acquired by such Person, (d) obligations which are evidenced by notes, acceptances, or other instruments, (e) obligations of such Person to purchase securities or other Property arising out of or in connection with the sale of the same or substantially similar securities or Property or any other Off-Balance Sheet Liabilities, (f) Capitalized Lease Obligations, (g) Contingent Obligations for which the underlying transaction constitutes Indebtedness under this definition, (h) the maximum available stated amount of all letters of credit or bankers' acceptances created for the account of such Person and, without duplication, all reimbursement obligations with respect to letters of credit, (i) Rate Management Transactions/Net Mark-to-Market Exposure under all Rate Management Transactions, (j) obligations of such Person under any Sale and Leaseback Transaction, (k) obligations under any liquidated earn-out and (l) any other obligation for borrowed money or other financial accommodation which in accordance with GAAP would be shown as a liability on the consolidated balance sheet of such Person.

"Intellectual Property Rights" means, with respect to any Person, all of such Person's Patents, Copyrights, Trademarks, and Licenses, all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations and continuations-in-part of any of the foregoing, and all rights to sue for past, present, and future infringement of any of the foregoing.

"Interest Period" means, with respect to a Eurodollar Advance, a period of one, two, three or six months commencing on a Business Day selected by the Borrower pursuant to this Agreement.  Such Interest Period shall end on the day which corresponds numerically to such date one, two, three or six months thereafter, provided however, that if there is no such numerically corresponding day in such next, second, third or sixth succeeding month, such Interest Period shall end on the last Business Day of such next, second, third or sixth succeeding month.  If an Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next succeeding Business Day, provided however, that if said next succeeding Business Day falls in a new calendar month, such Interest Period shall end on the immediately preceding Business Day.

"Interim Order" is defined in Section 4.1(bb).

"Investment" of a Person means any (a) loan, advance, extension of credit (other than accounts receivable arising in the ordinary course of business on terms customary in the trade) or contribution of capital by such Person, (b) stocks, bonds, mutual funds, partnership interests, notes, debentures, securities or other Capital Stock owned by such Person, (c) any deposit accounts and certificate of deposit owned by such Person and (d) structured notes, derivative financial instruments and other similar instruments or contracts owned by such Person.

"ISO" means any "Independent System Operator" or similar entity approved by the Federal Energy Regulatory Energy Commission to manage transmission systems owned by the Borrower and its Subsidiaries.

"LC Fee" is defined in Section 2.10(b).

"LC Issuer" means Bank One (or any subsidiary or Affiliate of Bank One designated by Bank One) in its capacity as an issuer of Facility LCs hereunder.

"LC Obligations" means, at any time, the sum, without duplication, of (a) the aggregate undrawn stated amount under all Facility LCs outstanding at such time plus (b) the aggregate unpaid amount at such time of all Reimbursement Obligations.

"LC Payment Date" is defined in Section 2.1.2(d).

"Lenders" means the lending institutions listed on the signature pages of this Agreement and their respective successors and assigns.

"Lending Installation" means, with respect to a Lender, the LC Issuer or the Agent, the office, branch, subsidiary or Affiliate of such Lender, LC Issuer or the Agent listed on the signature pages hereof or on a Schedule or otherwise selected by such Lender, the LC Issuer or the Agent pursuant to Section 2.22.

"Letter of Credit" of a Person means a letter of credit or similar instrument which is issued upon the application of such Person or upon which such Person is an account party or for which such Person is in any way liable.

"Licenses" shall have the meaning given to such term in the Security Agreement.

"Lien" means any lien (statutory or other), mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, Capitalized Lease or other title retention agreement).

"Loan Documents" means this Agreement, any Notes, the Facility LC Applications, the Collateral Documents, any guaranties other than the one contained in Article XV of this Agreement, and all other agreements, instruments, documents and certificates identified in Article IV executed and delivered to, or in favor of, the Agent or any Lenders and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written matter whether now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent or any Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Parties" means the Borrower, each Guarantor and any other Person (other than the Agent, the LC Issuer or any Lender) who becomes a party to this Agreement or who becomes a party to any other Loan Document.

"Loans" means, with respect to a Lender, such Lender's loans made pursuant to Article II (or any conversion or continuation thereof), including Non-Ratable Loans.

"Material Adverse Effect" means a material adverse effect on (a) the business, Property, condition (financial or otherwise), results of operations or prospects of the Borrower and its Subsidiaries taken as a whole, (b) the ability of any Loan Party to perform its obligations under the Loan Documents to which it is a party, (c) the Collateral, or the Agent's Liens (on behalf of itself and the other Secured Parties) on the Collateral or the priority of such Liens or (d) the validity or enforceability of any of the Loan Documents or the rights or remedies of the Agent, the LC Issuer or the Lenders thereunder.

"Material and Supplies Inventory" means materials and supplies used for ongoing utility maintenance including circuit breakers and wires.

"Material Indebtedness" means Indebtedness in an outstanding principal amount of $1,000,000 or more in the aggregate (or the equivalent thereof in any currency other than U.S. dollars).

16

"<u>Material Indebtedness Agreement</u>" means any agreement under which any Material Indebtedness was created or is governed or which provides for the incurrence of Indebtedness in an amount which would constitute Material Indebtedness (whether or not an amount of Indebtedness constituting Material Indebtedness is outstanding thereunder).

"<u>Maximum Rate</u>" is defined in <u>Section 2.24</u>.

"<u>MM I</u>" means Montana Megawatts I, LLC (f/k/a Merchant Energy Ventures LLC), a Delaware limited liability company and a Wholly-Owned Subsidiary of the Borrower.

"<u>Modify</u>" and "<u>Modification</u>" are defined in <u>Section 2.1.2(a)</u>.

"<u>Montana Bonds</u>" means the First Mortgage Bonds, Credit Agreement (2002) Series, due 2006, authenticated and delivered under that certain Mortgage and Deed of Trust dated as of October 1, 1945 from the Borrower (as successor thereunder to NorthWestern Energy, L.L.C., in turn successor thereunder to The Montana Power Company) to the trustees named therein, as supplemented and amended, including by the Twenty-third Supplemental Indenture, dated as of February 1, 2003, to such Mortgage and Deed of Trust.

"<u>Montana Collateral</u>" is defined in the Recitals to this Agreement.

"<u>Montana Maximum Amount</u>" means the aggregate principal amount outstanding on the Montana Bonds, together with accrued and unpaid interest thereon and all other obligations with respect thereto, immediately prior to the funding of the Term Loans and the repayment in full of the CSFB Loan as contemplated by <u>Section 2.4</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Mortgages</u>" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Agent, for the benefit of the Agent and the other Secured Parties, on real Property of a Loan Party, including any amendment, modification or supplement thereto.

"<u>Multiemployer Plan</u>" means a Plan maintained pursuant to a collective bargaining agreement or any other arrangement to which the Borrower or any member of the Controlled Group is a party to which more than one employer is obligated to make contributions.

"<u>Net Cash Proceeds</u>" means, if in connection with (a) an asset disposition, cash proceeds net of (i) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by such Loan Party in connection therewith (in each case, paid to non-Affiliates), (ii) transfer taxes, (iii) amounts payable to holders of senior Liens on such asset (to the extent such Liens constitute Permitted Liens hereunder), if any, and (iv) amounts payable to holders of equal Liens on such asset to the extent of such Lien holder's applicable pro rata share in such cash proceeds (to the extent such Liens constitute Permitted Liens hereunder), if any, (b) the issuance or incurrence of Indebtedness, cash proceeds net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith, (c) an equity issuance, cash proceeds net of underwriting discounts and commissions and other reasonable costs paid to non-Affiliates in connection therewith and (d) with respect to any other mandatory prepayment event described in <u>Section 2.15</u>, the cash proceeds thereof.

"<u>Net Mark-to-Market Exposure</u>" of a Person means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from Rate Management

17

Transactions.  As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Rate Management Transaction as of the date of determination (assuming the Rate Management Transaction were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Rate Management Transaction as of the date of determination (assuming such Rate Management Transaction were to be terminated as of that date).

"Net Orderly Liquidation Value" means, with respect to Turbine Collateral, the orderly liquidation value thereof as determined in a manner reasonably acceptable to the Agent, net of all costs of liquidation thereof, such Net Orderly Liquidation Value initially $37,500,000.

"NG I" means Northwestern Generation I, LLC, a Delaware limited liability company and a Wholly-Owned Subsidiary of the Borrower.

"Non-Ratable Loan" and "Non-Ratable Loans" are defined in Section 2.1.3.

"Non-U.S. Lender" is defined in Section 3.5(d).

"Notes" means, collectively, the Revolving Notes and the Term Notes.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all LC Obligations, all accrued and unpaid fees and all expenses, guaranty obligations, reimbursements, indemnities and other obligations of the Loan Parties to the Lenders or to any Lender, the Agent, the LC Issuer or any indemnified party arising under the Loan Documents.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any Sale and Leaseback Transaction which is not a Capitalized Lease, (c) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person or (d) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person, but excluding from this clause (d) Operating Leases.

"Operating Lease" of a Person means any lease of Property (other than a Capitalized Lease) by such Person as lessee which has an original term (including any required renewals and any renewals effective at the option of the lessor) of one year or more.

"Operating Lease Obligations" means, as at any date of determination, the amount obtained by aggregating the present values, determined in the case of each particular Operating Lease by applying a discount rate (which discount rate shall equal the discount rate which would be applied under GAAP if such Operating Lease were a Capitalized Lease) from the date on which each fixed lease payment is due under such Operating Lease to such date of determination, of all fixed lease payments due under all Operating Leases of the Borrower and its Subsidiaries.

"Orders" shall mean the Interim Order and the Final Order.

"Other Taxes" is defined in Section 3.5(b).

"Participants" is defined in Section 12.2(a).

"Patents" shall have the meaning given to such term in the Security Agreement.

"<u>Payment Date</u>" means (a) with respect to interest payments due on any Floating Rate Loan, the first day of each calendar month and the Facility Termination Date, (b) with respect to interest payments due on any Eurodollar Loan, (i) the last day of the applicable Interest Period and (ii) in the case of any Interest Period in excess of three months, the day which is three months after the first day of such Interest Period, and (iii) the Facility Termination Date and (c) with respect to any payment of LC Fees or Unused Commitment Fees, the first day of each calendar quarter and the Facility Termination Date.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"<u>Permitted Discretion</u>" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"<u>Permitted Financial Contracts</u>" means Financial Contracts consisting of contracts to purchase or sell natural gas or electricity entered into by the Borrower in the ordinary course of business consistent with past practice and not for speculative purposes.

"<u>Permitted Liens</u>" means (i) Liens imposed by law (other than Environmental Liens and any Lien imposed under ERISA) for taxes, assessments or charges of any governmental authority for claims not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained in accordance with GAAP; (ii) Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and other Liens (other than Environmental Liens and any Lien imposed under ERISA) in existence on the Petition Date or thereafter imposed by law and created in the ordinary course of business; (iii) Liens (other than any Lien imposed under ERISA) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations; (iv) easements (including, without limitation, reciprocal easement agreements and utility agreements), rights-of-way, covenants, consents, reservations, encroachments, variations and zoning and other restrictions, charges or encumbrances (whether or not recorded) and interest of ground lessors, which do not interfere materially with the ordinary conduct of the business of the Borrower or any Subsidiary (other than Excluded Subsidiaries) and which do not materially detract from the value of the property to which they attach or materially impair the use thereof to the Borrower or any Subsidiary (other than Excluded Subsidiaries); (v) letters of credit or deposits in the ordinary course to secure leases; (vi) Liens which were existing on the Petition Date as reflected on <u>Schedule 1(a)</u>; (vii) adequate protection Liens approved by the Bankruptcy Court and not inconsistent with the Orders on any asset of the Borrower which replaces an asset that was, on the Petition Date, subject to a valid, enforceable, perfected, and nonavoidable Lien, <u>provided</u> such Lien is in favor of the Person holding such pre-petition Lien, is of the same priority as the Lien being replaced and secures a claim in an amount not exceeding the claim secured by such pre-petition Lien; (viii) Liens in favor of the Agent and the Secured Parties securing the Obligations; and (ix) Liens securing purchase money Indebtedness or Capitalized Lease Obligations permitted by <u>Section 6.17</u>.

"<u>Permitted Pre-Petition Payments</u>" means Pre-Petition Payments by the Borrower on account of pre-petition claims against the Borrower with respect to critical vendors, employee wages and benefits, taxes and payments of regularly scheduled principal and interest on the senior secured Indebtedness of the Borrower set forth on <u>Schedule 1(b)</u>, such payments to be approved by the Agent or the Bankruptcy Court.

"Person" means any natural person, corporation, firm, joint venture, partnership, limited liability company, association, enterprise, trust or other entity or organization, or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" is defined in the recitals to this Agreement.

"Plan" means an employee pension benefit plan which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code as to which the Borrower or any member of the Controlled Group may have any liability.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payable or other pre-petition claims against the Borrower.

"Prime Rate" means a rate per annum equal to the prime rate of interest announced from time to time by Bank One or its parent (which is not necessarily the lowest rate charged to any customer), changing when and as said prime rate changes.

"Projections" is defined in Section 6.1(t).

"Property" of a Person means any and all property, whether real, personal, tangible, intangible, or mixed, of such Person, or other assets owned, leased or operated by such Person.

"Pro Rata Share" means, with respect to any Lender, (a) with respect to Revolving Loans, LC Obligations, or Non-Ratable Loans, a portion equal to a fraction the numerator of which is such Lender's Revolving Commitment and the denominator of which is the aggregate Revolving Commitment of all Revolving Lenders and (b) with respect to Term Loans, a portion equal to a fraction the numerator of which is such Lender's outstanding principal amount of the Term Loan and the denominator of which is the aggregate outstanding amount of the Term Loans of all Term Lenders.

"Purchasers" is defined in Section 12.3(a).

"Rate Management Obligations" of a Person means any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Rate Management Transactions and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Rate Management Transactions.

"Rate Management Transaction" means any transaction (including an agreement with respect thereto) now existing or hereafter entered by the Borrower or any Subsidiary (other than Excluded Subsidiaries) which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor thereto or other regulation or official interpretation of said

20

Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by banks for the purpose of purchasing or carrying margin stocks applicable to member banks of the Federal Reserve System.

"Reimbursement Obligations" means, at any time, the aggregate of all obligations of the Borrower then outstanding under Section 2.1.2 to reimburse the LC Issuer for amounts paid by the LC Issuer in respect of any one or more drawings under Facility LCs.

"Reorganization Plan" means a plan of reorganization in the Case.

"Reportable Event" means a reportable event as defined in Section 4043 of ERISA and the regulations issued under such section, with respect to a Plan, excluding, however, such events as to which the PBGC has by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within thirty days of the occurrence of such event, provided however, that a failure to meet the minimum funding standard of Section 412 of the Code and of Section 302 of ERISA shall be a Reportable Event regardless of the issuance of any such waiver of the notice requirement in accordance with either Section 4043(a) of ERISA or Section 412(d) of the Code.

"Reports" is defined in Section 9.6(a)(i).

"Required Lenders" means Lenders in the aggregate having at least a majority of the Aggregate Commitment or, if the Aggregate Commitment has been terminated, Lenders in the aggregate holding at least a majority of the Aggregate Credit Exposure.

"Required Revolving Lenders" means Revolving Lenders in the aggregate having at least a majority of the Revolving Commitment or, if the Revolving Commitment has been terminated, Revolving Lenders in the aggregate holding at least a majority of the Aggregate Revolving Exposure.

"Reserve Requirement" means, with respect to an Interest Period, the maximum aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed under Regulation D on Eurocurrency liabilities.

"Reserves" means any and all reserves which the Agent deems necessary, in its Permitted Discretion, to maintain (including, without limitation, reserves for accrued and unpaid interest on the Secured Obligations, Banking Services Reserves, reserves for rent at locations leased by any Loan Party and for warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Rate Management Transactions, reserves for contingent liabilities of the Borrower that could constitute administrative claims in the Case, reserves for uninsured losses of any Loan Party, reserves for taxes, fees, assessments, and other governmental charges and reserves with respect to the Carve-Out) with respect to the Collateral, the Carve-Out, the condition (financial or otherwise) of any Loan Party or the Case.

"Revolving Commitment" means (a) as to any Revolving Lender, the aggregate commitment of such Revolving Lender to make Revolving Loans or incur LC Obligations as set forth in the Commitment Schedule or in the most recent Assignment Agreement executed by such Revolving Lender and (b) as to all Revolving Lenders, the aggregate commitment of all Revolving Lenders to make Revolving Loans or incur LC Obligations, which aggregate commitment shall be One Hundred Million Dollars

21

($100,000,000) on the Effective Date, as such amount may be adjusted, if at all, from time to time in accordance with this Agreement.

"Revolving Exposure" means, as to any Lender at any time, the sum of (a) an amount equal to its Pro Rata Share of the aggregate principal amount of the Revolving Loans outstanding at such time, *plus* (b) an amount equal to its Pro Rata Share of any LC Obligations at such time, *plus* (c) an amount equal to its Pro Rata Share of the aggregate principal amount of Non-Ratable Loans outstanding at such time.

"Revolving Lenders" means, as of any date of determination, Lenders having a Revolving Commitment.

"Revolving Loans" is defined in Section 2.1.1(a).

"Revolving Note" is defined in Section 2.21(d).

"S&P" means Standard and Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"Sale and Leaseback Transaction" means any sale or other transfer of Property by any Person with the intent to lease such Property as lessee.

"Schedule" refers to a specific schedule to this Agreement, unless another document is specifically referenced.

"Scheduled Termination Date" means September 12, 2004.

"Section" means a numbered section of this Agreement, unless another document is specifically referenced.

"Secured Obligations" means, collectively, (i) the Obligations, (ii) all Banking Services Obligations and (iii) all Rate Management Obligations owing to Bank One or any Affiliate of Bank One.

"Secured Parties" means each of the Lenders, the LC Issuer, the Agent, the beneficiaries of each indemnification or reimbursement obligation undertaken by any of the Loan Parties under any of the Loan Documents, and the successors and assigns of each of the foregoing.

"Security Agreement" means that certain Pledge and Security Agreement, dated as of the date hereof, among the Borrower, the Guarantors and the Agent, for the benefit of the Secured Parties, as the same may be amended, restated or otherwise modified from time to time.

"Single Employer Plan" means a Plan maintained by the Borrower or any member of the Controlled Group for employees of the Borrower or any member of the Controlled Group.

"South Dakota Bonds" means the New Mortgage Bonds, Credit Agreement (2002) Series, authenticated and delivered under that certain General Mortgage Indenture and Deed of Trust dated as of August 1, 1993 between the Borrower and The Chase Manhattan Bank (National Association) (JPMorgan Chase Bank, as successor), as trustee, as supplemented and amended, including by that certain Supplemental Indenture thereto dated as of February 1, 2003.

"South Dakota Collateral" is defined in the Recitals to this Agreement.

22

"South Dakota Maximum Amount" means the aggregate principal amount outstanding on the South Dakota Bonds, together with accrued and unpaid interest thereon and all other obligations with respect thereto, immediately prior to the funding of the Term Loans and the repayment in full of the CSFB Loan as contemplated by Section 2.4.

"Stored Gas Inventory" means natural gas required to maintain the pressure of the gas storage facilities owned by the Borrower.

"Subsidiary" of a Person means any corporation, partnership, limited liability company, association, joint venture or similar business organization more than 50% of the outstanding Capital Stock having ordinary voting power of which shall at the time be owned or controlled by such Person.  Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"Substantial Portion" means Property which represents more than 5% of the consolidated assets of the Borrower and its Subsidiaries or property which is responsible for more than 5% of the consolidated net sales or of the consolidated net income of the Borrower and its Subsidiaries, in each case, as would be shown in the consolidated financial statements of the Borrower and its Subsidiaries as at the beginning of the twelve-month period ending with the month in which such determination is made (or if financial statements have not been delivered hereunder for that month which begins the twelve-month period, then the financial statements delivered hereunder for the quarter ending immediately prior to that month).

"Superpriority Claim" means a claim against the Borrower in the Case which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Supporting Letter of Credit" is defined in Section 2.1.2(l).

"Taxes" means any and all present or future taxes, duties, levies, imposts, deductions, charges or withholdings, and any and all liabilities with respect to the foregoing, but excluding Excluded Taxes and Other Taxes.

"Term Lenders" means, as of any date of determination, Lenders having a Term Loan Commitment.

"Term Loan Commitment" means (a) (i) as to any Term Lender prior to the Term Loan Commitment Effective Date, $0, and (ii) as to any Term Lender on and after the Term Loan Commitment Effective Date, the aggregate commitment of such Term Lender to make Term Loans on the Term Loan Commitment Effective Date as set forth in the Commitment Schedule under the heading "Term Loan Commitment" or in the most recent Assignment Agreement executed by such Term Lender and (b) as to all Term Lenders, the aggregate commitment of all Term Lenders to make Term Loans.  After advancing the Term Loan, each reference to a Lender's Term Loan Commitment shall refer to that Lender's Pro Rata Share.

"Term Loan Commitment Effective Date" means the date that the conditions precedent set forth in Sections 4.1, 4.2 and 4.3 are satisfied.

"Term Loans" means the term loans extended by the Lenders to the Borrower pursuant to Section 2.1.4.

23

"Term Note" is defined in Section 2.21(d).

"Trademarks" shall have the meaning given to such term in the Security Agreement.

"Transferee" is defined in Section 12.4.

"Turbine Collateral" means each item of equipment identified as the subject of the sales contemplated by (a) that certain Contract for Sale of Equipment & Services, dated December 4, 2001, by and between MM I and General Electric Company, (b) that certain sale agreement, dated December 3, 2001, between Northwestern Generation I, LLC, and GE-Prolec, (c) that certain Agreement, dated as of May 31, 2000, by and between MM I (as assignee of LJM2-Turbine, LLC), and General Electric Company and (d) that certain Bill of Sale, dated September 14, 2001, from E-Next Generation LLC to MM I.

"Type" means, with respect to any Advance, its nature as a Floating Rate Advance or a Eurodollar Advance and with respect to any Loan, its nature as a Floating Rate Loan or a Eurodollar Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, the Agent's or any Secured Party's Lien on the Collateral.

"Unfunded Liabilities" means the amount (if any) by which the present value of all vested and unvested accrued benefits under all Single Employer Plans exceeds the fair market value of all such Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plans using PBGC actuarial assumptions for single employer plan terminations.

"Unliquidated Secured Obligations" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (i) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (ii) any other obligation (including any guarantee) that is contingent in nature at such time; or (iii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"Unmatured Default" means an event which but for the lapse of time or the giving of notice, or both, would constitute a Default.

"Unused Commitment Fee" is defined in Section 2.10(a).

"U.S." means the United States of America.

"Wholly-Owned Subsidiary" of a Person means any Subsidiary all of the outstanding Capital Stock of which shall at the time be owned or controlled, directly or indirectly, by such Person or one or more Wholly Owned Subsidiaries of such Person, or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Working Gas and Fuel Inventory" means natural gas owned by the Borrower and held for sale by the Borrower in the ordinary course of business.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

24

# ARTICLE II

# THE FACILITY

2.1    <u>The Facility</u>.  Each Lender severally agrees, on the terms and conditions set forth in this Agreement, to (a) make Loans to the Borrower as set forth below and (b) participate in Facility LCs issued upon the request of the Borrower; <u>provided that</u>, after giving effect to the making of each such Loan and the issuance of each such Facility LC, such Lender's Credit Exposure shall not exceed its Commitment; <u>provided further</u>, that the Aggregate Credit Exposure shall not exceed the Aggregate Commitment in effect from time to time. The LC Issuer will issue Facility LCs hereunder on the terms and conditions set forth in <u>Section 2.1.2</u>. The Facility shall be composed of Revolving Loans, Non-Ratable Loans, Facility LCs and Term Loans as set forth below:

2.1.1    <u>Revolving Loans</u>.

(a)    <u>Amount</u>. From and including the Effective Date and prior to the Facility Termination Date, each Revolving Lender severally agrees, on the terms and conditions set forth in this Agreement, to make revolving loans (the "<u>Revolving Loans</u>") to the Borrower and participate in Facility LCs issued to the Borrower as set forth in Section 2.1.2, in amounts not to exceed such Lender's Pro Rata Share.  If any Advance of a Revolving Loan or participation in a Facility LC would exceed Availability, the Revolving Lenders will refuse to make or may otherwise restrict the making of Revolving Loans or refuse to issue or otherwise restrict the issuance of Facility LCs as the Required Revolving Lenders determine until such excess has been eliminated. The Revolving Loans may consist of Floating Rate Advances or Eurodollar Advances, or a combination thereof, selected by the Borrower in accordance with <u>Sections 2.1.1(b)</u> and <u>2.7</u>. Subject to the terms of this Agreement, the Borrower may borrow, repay and reborrow Revolving Loans at any time prior to the Facility Termination Date. The Commitments to extend credit under this <u>Section 2.1.1(a)</u> shall expire on the Facility Termination Date.

(b)    <u>Borrowing Procedures</u>.  The Borrower shall select the Type of Advance and, in the case of each Eurodollar Advance, the Interest Period applicable thereto, from time to time. The Borrower shall give the Agent irrevocable notice (a "<u>Borrowing Notice</u>") not later than 11:00 a.m. (Chicago time) on the Borrowing Date of each Floating Rate Advance and three Business Days before the Borrowing Date for each Eurodollar Advance, specifying (in the form of <u>Exhibit A</u> for Eurodollar Advances): (1) the Borrowing Date, which shall be a Business Day, of such Advance, (2) the aggregate amount of such Advance, (3) the Type of Advance selected; <u>provided that</u>, if the Borrower fails to specify the Type of Advance requested, such request shall be deemed a request for a Floating Rate Advance; and (4) the duration of the Interest Period if the Type of Advance requested is a Eurodollar Advance; <u>provided that</u>, if the Borrower fails to select the duration of the Interest Period for the requested Eurodollar Advance, the Borrower shall be deemed to have requested that such Eurodollar Advance be made with an Interest Period of one month.

(c)    <u>The Agent's Election</u>. Promptly after receipt of a Borrowing Notice (or telephonic notice in lieu thereof) of a requested Floating Rate Advance, the Agent shall elect in its discretion to have the terms of <u>Section 2.1.1(d)</u> (pro rata advance by all Revolving Lenders) or <u>Section 2.1.3</u> (advance by Agent, in the form of a Non-Ratable Loan, on behalf of the Revolving Lenders) apply to such requested Advance.

(d)    <u>Pro Rata Advance</u>.  Unless the Agent elects to have the terms of <u>Section 2.1.3</u> apply to a requested Floating Rate Advance or if a requested Advance is for a Eurodollar Advance, then promptly after receipt of a Borrowing Notice or telephonic notice in lieu thereof as permitted by <u>Section 2.8</u>, the Agent shall notify the Revolving Lenders by telecopy, telephone, or e-mail of the requested Advance.  Not later than noon (Chicago time) on each Borrowing Date, each Revolving Lender shall make available its Revolving Loan in funds immediately available in Chicago to the Agent and the Agent will make the funds so received from the Revolving Lenders available to the Borrower at the Borrower's Funding Account as set forth in <u>Section 2.5</u>.

(e)    <u>Special Limitations on Aggregate Revolving Exposure</u>.  Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the Borrower covenants and agrees that (i) until such time as (W) the Borrower shall have satisfied the requirement to deliver a business plan as set forth in <u>Section 6.41(c)</u>, (X) the Borrower and the Required Lenders shall have agreed on the EBITDAR financial covenant as contemplated by <u>Section 6.29</u>, (Y) the Loan Parties shall have satisfied the covenants set forth in <u>Section 6.41(d)</u> and <u>(h)</u> and (Z) the Agent shall have notified the Borrower that it is satisfied with respect to its review of Lien search reports and Lien perfection with respect to the Turbine Collateral, Aggregate Revolving Exposure shall not exceed $20,000,000, (ii) until such time as (X) the conditions set forth in clause (i) above have been satisfied and (Y) the Final Order is entered by the Bankruptcy Court, Aggregate Revolving Exposure shall not exceed $50,000,000 and (iii) until such time as (X) the conditions set forth in clauses (i) and (ii) above have been satisfied, (Y) the Loan Parties shall have obtained all regulatory approvals (if any) necessary to consummate the Facility and to execute, deliver and perform their respective obligations under this Agreement and each other Loan Document (including but not limited to approvals from the relevant state public utility commissions) as determined by the Agent and (Z) the Loan Parties shall have delivered opinions of counsel addressed to the Agent and the Lenders and satisfactory in form and substance to the Agent with respect to any governmental approvals or orders, the Aggregate Revolving Exposure shall not exceed $85,000,000.

    2.1.2    <u>Facility LCs</u>.

(a)    <u>Issuance</u>.  The LC Issuer hereby agrees, on the terms and conditions set forth in this Agreement, to issue standby and commercial Letters of Credit (each, a "<u>Facility LC</u>") and to renew, extend, increase, decrease or otherwise modify Facility LCs ("<u>Modify</u>," and each such action a "<u>Modification</u>"), from time to time from and including the Effective Date and prior to the Facility Termination Date upon the request and for the account of the Borrower; <u>provided that</u>, the maximum face amount of the Facility LC to be issued or Modified does not exceed the lesser of (i) $50,000,000 <u>*minus*</u> the sum of (1) the aggregate undrawn amount of all outstanding Facility LCs at such time and, without duplication, (2) the aggregate unpaid Reimbursement Obligations with respect to all Facility LCs outstanding at such time and (ii) Availability.  No Facility LC shall have an expiry date later than the tenth (10th) Business Day prior to the Scheduled Termination Date.

(b)    <u>Participations</u>.  Upon the issuance or Modification by the LC Issuer of a Facility LC in accordance with this <u>Section 2.1.2</u>, the LC Issuer shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably sold to each Revolving Lender, and each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the LC Issuer, a

participation in such Facility LC (and each Modification thereof) and the related LC Obligations in proportion to its Pro Rata Share.

(c)  <u>Notice</u>.  Subject to <u>Section 2.1.2(a)</u>, the Borrower shall give the LC Issuer notice prior to 11:00 a.m. (Chicago time) at least three Business Days prior to the proposed date of issuance or Modification of each Facility LC, specifying the beneficiary, the proposed date of issuance (or Modification) and the expiry date of such Facility LC, and describing the proposed terms of such Facility LC and the nature of the transactions proposed to be supported thereby.  Upon receipt of such notice, the LC Issuer shall promptly notify the Agent, and the Agent shall promptly notify each Revolving Lender, of the contents thereof and of the amount of such Revolving Lender's participation in such proposed Facility LC.  The issuance or Modification by the LC Issuer of any Facility LC shall, in addition to the conditions precedent set forth in <u>Sections 4.1</u> and <u>4.3</u> (the satisfaction of which the LC Issuer shall have no duty to ascertain), be subject to the conditions precedent that such Facility LC shall be satisfactory to the LC Issuer and that the Borrower shall have executed and delivered such application agreement and/or such other instruments and agreements relating to such Facility LC as the LC Issuer shall have reasonably requested (each, a "<u>Facility LC Application</u>").  In the event of any conflict between the terms of this Agreement and the terms of any Facility LC Application, the terms of this Agreement shall control.

(d)  <u>Administration; Reimbursement by Revolving Lenders</u>.  Upon receipt from the beneficiary of any Facility LC of any demand for payment under such Facility LC, the LC Issuer shall notify the Agent and the Agent shall promptly notify the Borrower and each other Revolving Lender as to the amount to be paid by the LC Issuer as a result of such demand and the proposed payment date (the "<u>LC Payment Date</u>").  The responsibility of the LC Issuer to the Borrower and each Revolving Lender shall be only to determine that the documents (including each demand for payment) delivered under each Facility LC in connection with such presentment shall be in conformity in all material respects with such Facility LC.  The LC Issuer shall endeavor to exercise the same care in the issuance and administration of the Facility LCs as it does with respect to letters of credit in which no participations are granted, it being understood that in the absence of any gross negligence or willful misconduct by the LC Issuer, each Revolving Lender shall be unconditionally and irrevocably liable without regard to the occurrence of any Default or any condition precedent whatsoever, to reimburse the LC Issuer on demand for (i) such Revolving Lender's Pro Rata Share of the amount of each payment made by the LC Issuer under each Facility LC to the extent such amount is not reimbursed by the Borrower pursuant to <u>Section 2.1.2(e)</u>, <u>*plus*</u> (ii) interest on the foregoing amount to be reimbursed by such Revolving Lender, for each day from the date of the LC Issuer's demand for such reimbursement (or, if such demand is made after 11:00 a.m. (Chicago time) on such date, from the next succeeding Business Day) to the date on which such Revolving Lender pays the amount to be reimbursed by it, at a rate of interest per annum equal to the Federal Funds Effective Rate for the first three days and, thereafter, at a rate of interest equal to the rate applicable to Floating Rate Advances.

(e)  <u>Reimbursement by Borrower</u>.  The Borrower shall be irrevocably and unconditionally obligated to reimburse the LC Issuer on or before the applicable LC Payment Date for any amounts to be paid by the LC Issuer upon any drawing under any Facility LC, without presentment, demand, protest or other formalities of any kind; <u>provided that</u>, neither the Borrower nor any Revolving Lender shall hereby be precluded from asserting any claim for direct (but not consequential) damages suffered by the Borrower or such

27

Revolving Lender to the extent, but only to the extent, caused by (i) the willful misconduct or gross negligence of the LC Issuer in determining whether a request presented under any Facility LC issued by it complied with the terms of such Facility LC or (ii) the LC Issuer's failure to pay under any Facility LC issued by it after the presentation to it of a request strictly complying with the terms and conditions of such Facility LC. All such amounts paid by the LC Issuer and remaining unpaid by the Borrower shall bear interest, payable on demand, for each day until paid at a rate per annum equal to (x) the rate applicable to Floating Rate Advances for such day if such day falls on or before the applicable LC Payment Date and (y) the sum of 2% *plus* the rate applicable to Floating Rate Advances for such day if such day falls after such LC Payment Date. The LC Issuer will pay to each Revolving Lender ratably in accordance with its Pro Rata Share all amounts received by it from the Borrower for application in payment, in whole or in part, of the Reimbursement Obligation in respect of any Facility LC issued by the LC Issuer, but only to the extent such Revolving Lender has made payment to the LC Issuer in respect of such Facility LC pursuant to Section 2.1.2(d). Subject to the terms and conditions of this Agreement (including without limitation the submission of a Borrowing Notice in compliance with Section 2.1.1(b) and the satisfaction of the applicable conditions precedent set forth in Section 4.1 and 4.3), the Borrower may request an Advance hereunder for the purpose of satisfying any Reimbursement Obligation.

(f)     Obligations Absolute. The Borrower's obligations under this Section 2.1.2 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower may have or have had against the LC Issuer, any Revolving Lender or any beneficiary of a Facility LC. The Borrower further agrees with the LC Issuer and the Revolving Lenders that the LC Issuer and the Revolving Lenders shall not be responsible for, and the Borrower's Reimbursement Obligation in respect of any Facility LC shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, fraudulent or forged, or any dispute between or among the Borrower, any of its Affiliates, the beneficiary of any Facility LC or any financing institution or other party to whom any Facility LC may be transferred or any claims or defenses whatsoever of the Borrower or of any of its Affiliates against the beneficiary of any Facility LC or any such transferee. The LC Issuer shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Facility LC. The Borrower agrees that any action taken or omitted by the LC Issuer or any Revolving Lender under or in connection with each Facility LC and the related drafts and documents, if done without gross negligence or willful misconduct, shall be binding upon the Borrower and shall not put the LC Issuer or any Revolving Lender under any liability to the Borrower. Nothing in this Section 2.1.2(f) is intended to limit the right of the Borrower to make a claim against the LC Issuer for damages as contemplated by the proviso to the first sentence of Section 2.1.2(e).

(g)     Actions of LC Issuer. The LC Issuer shall be entitled to rely, and shall be fully protected in relying, upon any Facility LC, draft, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by the LC Issuer. The LC Issuer shall be fully justified in failing or refusing to take any action under this

28

Agreement unless it shall first have received such advice or concurrence of the Required Revolving Lenders as it reasonably deems appropriate or it shall first be indemnified to its reasonable satisfaction by the Revolving Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Notwithstanding any other provision of this <u>Section 2.1.2</u>, the LC Issuer shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement in accordance with a request of the Required Revolving Lenders, and such request and any action taken or action to act pursuant thereto shall be binding upon the Revolving Lenders and any future holders of a participation in any Facility LC.

(h)     <u>Indemnification</u>.  The Borrower hereby agrees to indemnify and hold harmless each Revolving Lender, the LC Issuer and the Agent, and their respective directors, officers, agents and employees, from and against any and all claims and damages, losses, liabilities, costs or expenses which such Revolving Lender, the LC Issuer or the Agent may incur (or which may be claimed against such Revolving Lender, the LC Issuer or the Agent by any Person whatsoever) by reason of or in connection with the issuance, execution and delivery or transfer of or payment or failure to pay under any Facility LC or any actual or proposed use of any Facility LC, including, without limitation, any claims, damages, losses, liabilities, costs or expenses which the LC Issuer may incur by reason of or in connection with (i) the failure of any other Revolving Lender to fulfill or comply with its obligations to the LC Issuer hereunder (but nothing herein contained shall affect any rights the Borrower may have against any defaulting Revolving Lender) or (ii) by reason of or on account of the LC Issuer issuing any Facility LC which specifies that the term "Beneficiary" included therein includes any successor by operation of law of the named Beneficiary, but which Facility LC does not require that any drawing by any such successor Beneficiary be accompanied by a copy of a legal document, satisfactory to the LC Issuer, evidencing the appointment of such successor Beneficiary; <u>provided that</u>, the Borrower shall not be required to indemnify any Revolving Lender, the LC Issuer or the Agent for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by (x) the willful misconduct or gross negligence of the LC Issuer in determining whether a request presented under any Facility LC complied with the terms of such Facility LC or (y) the LC Issuer's failure to pay under any Facility LC after the presentation to it of a request strictly complying with the terms and conditions of such Facility LC. Nothing in this <u>Section 2.1.2(h)</u> is intended to limit the obligations of the Borrower under any other provision of this Agreement.

(i)     <u>Revolving Lenders' Indemnification</u>. Each Revolving Lender shall, ratably in accordance with its Pro Rata Share, indemnify the LC Issuer, its Affiliates and their respective directors, officers, agents and employees (to the extent not reimbursed by the Borrower) against any cost, expense (including reasonable counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from such indemnitees' gross negligence or willful misconduct or the LC Issuer's failure to pay under any Facility LC after the presentation to it of a request strictly complying with the terms and conditions of the Facility LC) that such indemnitees may suffer or incur in connection with this <u>Section 2.1.2</u> or any action taken or omitted by such indemnitees hereunder.

(j)     <u>Facility LC Collateral Account</u>.  The Borrower agrees that it will, during the continuance of an Unmatured Default or a Default, upon the request of the Agent or the Required Revolving Lenders and until the final expiration date of any Facility LC and thereafter as long as any amount is payable to the LC Issuer or the Revolving Lenders in respect of any Facility LC, maintain a special collateral account pursuant to arrangements

29

satisfactory to the Agent (the "Facility LC Collateral Account") at the Agent's office at the address specified pursuant to Article XIII, in the name of the Borrower but under the sole dominion and control of the Agent, for the benefit of the Secured Parties and in which the Borrower shall have no interest other than as set forth in Section 8.1. Nothing in this Section 2.1.2(j) shall either obligate the Agent to require the Borrower to deposit any funds in the Facility LC Collateral Account or limit the right of the Agent to release any funds held in the Facility LC Collateral Account in each case other than as required by Section 8.1.  The Agent will invest any funds on deposit from time to time in the Facility LC Collateral Account in certificates of deposit of Bank One having a maturity not exceeding thirty days.

(k)     Rights as a Lender.  In its capacity as a Lender, the LC Issuer shall have the same rights and obligations as any other Lender.

(l)     Termination of the Facility.  If, notwithstanding the provisions of this Section 2.1.2, any Facility LC is outstanding upon the earlier of (x) the termination of this Agreement and (y) the Facility Termination Date, then upon such termination the Borrower shall deposit with the Agent, for the benefit of the Agent and the Secured Parties, with respect to all LC Obligations, as the Agent in its discretion shall specify, either (i) a standby letter of credit (a "Supporting Letter of Credit"), in form and substance satisfactory to the Agent, issued by an issuer satisfactory to the Agent, in a stated amount, equal to 105% of the difference of (x) the amount of LC Obligations at such time, less (y) the amount on deposit in the Facility LC Collateral Account at such time which is free and clear of all rights and claims of third parties and has not been applied against the Obligations (such difference, the "Collateral Shortfall Amount"), under which Supporting Letter of Credit the Agent is entitled to draw amounts necessary to reimburse the Agent, the LC Issuer and the Revolving Lenders for payments to be made by the Agent, the LC Issuer and the Lenders under any such Facility LC and any fees and expenses associated with such Facility LC, or (ii) cash, in immediately available funds, in an amount equal to 105% of the Collateral Shortfall Amount to be held in the Facility LC Collateral Account.  Such Supporting Letter of Credit or deposit of cash shall be held by the Agent, for the benefit of the Secured Parties, as security for, and to provide for the payment of, the aggregate undrawn amount of such Facility LC remaining outstanding.

30

2.1.3    Non-Ratable Loans. Subject to the restrictions set forth in Section 2.1.1(a), the Agent may elect to have the terms of this Section 2.1.3 apply to any requested Floating Rate Advance and Bank One shall thereafter make an Advance, on behalf of the Revolving Lenders and in the amount requested, available to the Borrower on the applicable Borrowing Date by transferring same day funds to the Funding Account.  Each Advance made solely by the Agent pursuant to this Section 2.1.3 is referred to in this Agreement as a "Non-Ratable Loan," and such Advances are collectively referred to as the "Non-Ratable Loans."  Each Non-Ratable Loan shall be subject to all the terms and conditions applicable to other Advances funded by the Revolving Lenders, except that all payments thereon shall be payable to Bank One solely for its own account.  The aggregate amount of Non-Ratable Loans outstanding at any time  shall not exceed $5,000,000.  The Agent shall not make any Non-Ratable Loan if the requested Non-Ratable Loan exceeds Availability (before giving effect to such Non-Ratable Loan).  Non-Ratable Loans may be made even if a Default or Unmatured Default exists, but may not be made if the other conditions precedent set forth in Section 4.3 have not been satisfied.  The Non-Ratable Loans shall be secured by the Liens granted to the Agent in and to the Collateral and shall constitute Obligations hereunder.  All Non-Ratable Loans shall be Floating Rate Advances and are subject to the settlement provisions set forth in Section 2.19.

2.1.4    Term Loans.

(a)    Amounts of Term Loans.  Each Term Lender severally agrees to make a term loan (any such term loan being referred to as a "Term Loan" and such term loans being referred to collectively as the "Term Loans") to the Borrower on the Term Loan Commitment Effective Date upon the satisfaction of the conditions precedent set forth in Sections 4.1, 4.2 and 4.3, in an amount not to exceed such Term Lender's Pro Rata Share of the Term Loan Commitment; provided, however, that if the Term Loan Commitment Effective Date shall not have occurred on or before the date which is forty-five days after the Petition Date, then the obligation of each Term Lender to extend Term Loans hereunder shall immediately terminate and the Term Loan Commitment of each Term Lender shall be automatically reduced to $0.  The Term Loans shall initially be Floating Rate Advances but may be converted into Eurodollar Advances in accordance with Section 2.7.  All Term Loan proceeds shall be used to repay the amount of the CSFB Loan outstanding on the Term Loan Commitment Effective Date and for no other purpose.  In addition, in no event shall the Term Loan Commitment Effective Date be deemed to have occurred unless the Borrower shall have provided the Agent with a written notice on or before the date which is thirty days after the Petition Date stating its intention that, upon satisfaction of the applicable conditions precedent, the Borrower desires to have the Term Loan Commitment Effective Date occur.

(b)    Funding by Lenders.  Each Term Lender shall make the amount of such Term Lender's Term Loan available to the Agent in immediately available funds at Agent's designated account, not later than noon (Chicago time) on the Term Loan Commitment Effective Date.  After the Agent's receipt of the proceeds of such Term Loans from the Lenders, the Borrower shall instruct the Agent to transfer the proceeds of the Term Loan in immediately available funds (up to the amount required to repay in full the CSFB Loan) as required by the CSFB Credit Agreement to repay in full the CSFB Loan.

(c)    Term Loan Payment; No Reborrowing. The entire principal balance of the Term Loans shall be payable on the Facility Termination Date.  Such payment shall be payable to the Agent for the account of the applicable Term Lender.  Payments or prepayments of the Term Loans may not be reborrowed.

2.2     <u>Ratable Loans; Risk Participation</u>.  Except as otherwise provided below, each Advance made in connection with a Revolving Loan or a Term Loan shall consist of Loans made by each Lender in an amount equal to such Lender's Pro Rata Share. Upon the making of an Advance by the Agent in connection with a Non-Ratable Loan (whether before or after the occurrence of a Default or an Unmatured Default and regardless of whether the Agent has requested a Settlement with respect to such Non-Ratable Loan), the Agent shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably sold to each Revolving Lender and each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Agent, without recourse or warranty, an undivided interest and participation in such Non-Ratable Loan in proportion to its Pro Rata Share of the Revolving Commitment. From and after the date, if any, on which any Lender is required to fund its participation in any Non-Ratable Loan purchased hereunder, the Agent shall promptly distribute to such Lender, such Lender's Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by the Agent in respect of such Loan.

2.3     <u>Payment of the Obligations</u>. The Borrower shall repay the outstanding principal balance of the Loans, together with all other Obligations, including all accrued and unpaid interest thereon, on the Facility Termination Date.

2.4     <u>Minimum Amount of Each Advance</u>. Each Eurodollar Advance shall be in the minimum amount of $5,000,000 and in multiples of $1,000,000 if in excess thereof.  Floating Rate Advances may be in any amount.

2.5     <u>Funding Account</u>.  The Borrower shall deliver to the Agent, on the Effective Date, a notice setting forth the deposit account of the Borrower (the "<u>Funding Account</u>") to which the Agent is authorized by the Borrower to transfer the proceeds of any Advances requested pursuant to this Agreement.  The Borrower may designate a replacement Funding Account from time to time by written notice to the Agent.  Any designation by the Borrower of the Funding Account must be reasonably acceptable to the Agent.

2.6     <u>Reliance Upon Authority; No Liability</u>.  The Agent is entitled to rely conclusively on any individual's request for Advances hereunder, so long as the proceeds thereof are to be transferred to the Funding Account.  The Agent shall have no duty to verify the identity of any individual representing himself or herself as a person authorized by the Borrower to make such requests on its behalf.  The Agent shall not incur any liability to the Borrower as a result of acting upon any notice referred to in <u>Section 2.1</u> which the Agent reasonably believes to have been given by an officer or other Person duly authorized by the Borrower to request Advances on its behalf or for otherwise acting under this Agreement.  The crediting of Advances to the Funding Account shall conclusively establish the obligation of the Borrower to repay such Advances as provided herein.

2.7     <u>Conversion and Continuation of Outstanding Advances</u>. Floating Rate Advances shall continue as Floating Rate Advances unless and until such Floating Rate Advances are converted into Eurodollar Advances pursuant to this <u>Section 2.7</u> or are repaid in accordance with this Agreement.  Each Eurodollar Advance shall continue as a Eurodollar Advance until the end of the then applicable Interest Period therefor, at which time such Eurodollar Advance shall be automatically converted into a Floating Rate Advance unless (x) such Eurodollar Advance is or was repaid in accordance with this Agreement or (y) the Borrower shall have given the Agent a Conversion/Continuation Notice (as defined below) requesting that, at the end of such Interest Period, such Eurodollar Advance continue as a Eurodollar Advance for the same or another Interest Period.  Subject to the terms of <u>Section 2.4</u>, the Borrower may elect from time to time to convert all or any part of a Floating Rate Advance into a Eurodollar Advance.  The Borrower shall give the Agent irrevocable notice in the form of <u>Exhibit B</u> (a "<u>Conversion/Continuation Notice</u>") of each conversion of a Floating Rate Advance into a Eurodollar Advance or continuation of a Eurodollar Advance not later than 11:00 a.m. (Chicago time) at least three Business Days prior to the date of the requested conversion or continuation, specifying (i) the requested date, which shall be a Business Day, of such conversion or continuation, (ii) the aggregate amount and Type of the Advance which is to be converted or continued and (iii) the amount of such Advance which is to be converted into or continued as a Eurodollar Advance and the duration of the Interest Period applicable thereto.

2.8     <u>Telephonic Notices</u>.  The Borrower hereby authorizes the Lenders and the Agent to extend, convert or continue Advances, effect selections of Types of Advances and to transfer funds based on telephonic notices made by any person or persons the Agent or any Lender in good faith believes to be acting on behalf of the Borrower, it being understood that the foregoing authorization is specifically intended to allow Borrowing Notices and Conversion/Continuation Notices to be given telephonically.  The Borrower agrees to deliver promptly to the Agent a written confirmation, if such confirmation is requested by the Agent or any Lender, of each telephonic notice signed by an Authorized Officer. If the written confirmation differs in any material respect from the action taken by the Agent and the Lenders, the records of the Agent and the Lenders shall govern absent manifest error.

2.9     <u>Notification of Advances, Interest Rates, Prepayments and Commitment Reductions</u>.  Promptly after receipt thereof, the Agent will notify each Lender of the contents of each Borrowing Notice, Conversion/Continuation Notice, repayment notice and Commitment reduction notice received by it hereunder.  Promptly after notice from the LC Issuer, the Agent will notify each Revolving Lender of the contents of each request for issuance of a Facility LC hereunder or any Modification.  The Agent will notify each Lender of the interest rate applicable to each Eurodollar Advance promptly upon determination of such interest rate and will give each Lender prompt notice of each change in the Alternate Base Rate.

2.10     <u>Fees</u>.

(a)     <u>Unused Commitment Fee</u>.  The Borrower agrees to pay to the Agent, for the account of each Revolving Lender in accordance with such Lender's Pro Rata Share, an unused commitment fee at a per annum rate equal to 0.50% on the average daily Available Revolving Commitment, payable on each Payment Date hereafter and on the Facility Termination Date (the "<u>Unused Commitment Fee</u>").

(b)     <u>LC Fees</u>.  The Borrower shall pay to the Agent, for the account of the Revolving Lenders ratably in accordance with their respective Pro Rata Shares, a letter of credit fee at a per annum rate equal to 3.00% on the average daily undrawn stated amount under each Facility LC, such fee to be payable in arrears on each Payment Date (the "<u>LC Fee</u>").  The Borrower shall also pay to the LC Issuer for its own account (x) at the time of issuance of

33

each Facility LC, a fronting fee of 0.25% of the face amount of the Facility LC, and (y) documentary and processing charges in connection with the issuance or Modification of and draws under Facility LCs in accordance with the LC Issuer's standard schedule for such charges as in effect from time to time.

(c)     <u>Agent and Arranger Fees</u>. The Borrower agrees to pay to the Agent and the Arranger such additional fees as are specified in the fee letter dated as of the date hereof, among the Agent, the Arranger and the Borrower (the "<u>Fee Letter</u>").

2.11     <u>Interest Rates</u>. Each Floating Rate Advance shall bear interest on the outstanding principal amount thereof, for each day from and including the date such Advance is made or is automatically converted from a Eurodollar Advance into a Floating Rate Advance pursuant to <u>Section 2.7</u>, to but excluding the date it is paid or is converted into a Eurodollar Advance pursuant to <u>Section 2.7</u>, at a rate per annum equal to the Floating Rate for such day. Changes in the rate of interest on that portion of any Advance maintained as a Floating Rate Advance will take effect simultaneously with each change in the Alternate Base Rate. Each Eurodollar Advance shall bear interest on the outstanding principal amount thereof from and including the first day of the Interest Period applicable thereto to (but not including) the last day of such Interest Period at the interest rate determined by the Agent as applicable to such Eurodollar Advance based upon the Borrower's selections under <u>Sections 2.1.1</u> and <u>2.7</u> and otherwise in accordance with the terms hereof. No Interest Period may end after the Facility Termination Date. If at any time Loans are outstanding with respect to which the Borrower has not delivered a notice to the Agent specifying the basis for determining the interest rate applicable thereto, those Loans shall bear interest at the Floating Rate.

2.12     <u>Eurodollar Advances Post Default; Default Rates</u>. Notwithstanding anything to the contrary contained hereunder, during the continuance of a Default or Unmatured Default the Agent or the Required Lenders may, at their option, by notice to the Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of <u>Section 8.3</u> requiring unanimous consent of the Lenders to reductions in interest rates), declare that no Advance may be made as, converted into or continued as a Eurodollar Advance. During the continuance of a Default, the Agent or the Required Lenders may, at their option, by notice to the Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of <u>Section 8.3</u> requiring unanimous consent of the Lenders to reductions in interest rates), declare that (i) each Eurodollar Advance shall bear interest for the remainder of the applicable Interest Period at the rate otherwise applicable to such Interest Period plus 2% per annum, (ii) each Floating Rate Advance shall bear interest at a rate per annum equal to the Floating Rate in effect from time to time *plus* 2% per annum and (iii) the LC Fee shall be increased by 2% per annum.

2.13     <u>Interest Payment Dates; Interest and Fee Basis</u>. Interest accrued on each Floating Rate Advance shall be payable on each Payment Date, commencing with the first such date to occur after the date hereof and at maturity. Interest accrued on each Eurodollar Advance shall be payable on the last day of its applicable Interest Period, on any date on which the Eurodollar Advance is prepaid, whether by acceleration or otherwise, and at maturity. Interest accrued on each Eurodollar Advance having an Interest Period longer than three months shall also be payable on the last day of each three month interval during such Interest Period. Interest on all Advances, unused commitment fees and LC Fees shall be calculated for actual days elapsed on the basis of a 360 day year. Interest shall be payable for the day an Advance is made but not for the day of any payment on the amount paid if payment is received prior to noon (local time) at the place of payment. If any payment of principal of or interest on an Advance shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and, in the case of a principal payment, such extension of time shall be included in computing interest in connection with such payment. After giving effect to any Loan, Advance,

34

continuation, or conversion of any Eurodollar Rate Loan, there may not be more than five different Interest Periods in effect hereunder.

      2.14   <u>Voluntary Prepayments</u>.  The Borrower may prepay all or any portion of the outstanding Floating Rate Advances at any time without penalty or premium upon prior written notice in a minimum amount of $500,000.  The Borrower may also from time to time prepay, subject to the payment of any funding indemnification amounts required by <u>Section 3.4</u> but without penalty or premium, all outstanding Eurodollar Advances, or, in a minimum aggregate amount of $5,000,000 or any integral multiple of $1,000,000 in excess thereof, any portion of the outstanding Eurodollar Advances upon three Business Days' prior notice to the Agent.

      2.15   <u>Mandatory Prepayments</u>.

      (a)   <u>Borrowing Base Compliance</u>.  The Borrower shall immediately repay Revolving Loans, Reimbursement Obligations, Non-Ratable Loans or Term Loans if at any time the Aggregate Credit Exposure exceeds the lesser of (i) the Aggregate Commitment and (ii) the Borrowing Base, to the extent required to eliminate such excess.  If any such excess remains after repayment in full of all outstanding Loans, Reimbursement Obligations and Non-Ratable Loans, the Borrower shall provide cash collateral or a Supporting Letter of Credit for the LC Obligations in the manner set forth in <u>Section 2.1.2(l)</u> to the extent required to eliminate such excess.

      (b)   <u>Sale of Assets</u>.  Immediately upon receipt by the Borrower or any Subsidiary (other than Excluded Subsidiaries) of the Net Cash Proceeds of any asset disposition, the Borrower shall prepay the Obligations in an amount equal to all such Net Cash Proceeds.  Any such prepayment shall be applied <u>first</u>, to repay Term Loans, <u>second</u>, to pay the principal of the Non-Ratable Loans, <u>third</u>, to pay the principal of the Revolving Loans without a concomitant reduction in the Revolving Commitment and <u>fourth</u>, if any Unmatured Default or Default shall have occurred and be continuing, to cash collateralize outstanding Facility LCs.

      (c)   <u>Issuance of Debt or Equity; Receipt of Other Proceeds</u>.  If the Borrower or any Subsidiary (other than Excluded Subsidiaries) (i) issues Capital Stock to any Person, (ii) issues Indebtedness (other than Indebtedness permitted by <u>Section 6.17</u>, it being understood that compliance with this <u>Section 2.15(c)</u> shall not be deemed to be a waiver of any other provision or covenant contained herein), (iii) receives any dividend or distribution from any Person (other than any Loan Party) or (iv) receives any proceeds in respect of any Investment (other than (x) Cash Equivalent Investments and (y) collection of Accounts generated in the ordinary course of business), no later than the Business Day following the date of receipt of any Net Cash Proceeds of such issuance or receipt of such dividend, distribution, loan, advance or other proceeds, the Borrower shall prepay the Obligations in an amount equal to all such Net Cash Proceeds, dividends, distributions, loans, advances or other proceeds. Any such prepayment shall be applied <u>first</u>, to repay Term Loans, <u>second</u>, to pay the principal of the Non-Ratable Loans, <u>third</u>, to pay the principal of the Revolving Loans without a concomitant reduction in the Revolving Commitment and <u>fourth</u>, if any Unmatured Default or Default shall have occurred and be continuing, to cash collateralize outstanding Facility LCs.

      (d)   <u>Insurance/Condemnation Proceeds</u>.  Any insurance or condemnation proceeds to be applied to the Obligations in accordance with <u>Section 6.7(c)</u> shall be applied as follows: (i) insurance proceeds from casualties or losses to cash shall be applied, <u>first</u>, to the Non-Ratable

35

Loans, <u>second</u>, to the Revolving Loans without a concomitant reduction in the Revolving Commitment, <u>third</u>, to cash collateralize outstanding Facility LCs and <u>fourth</u>, to repay Term Loans; and (ii) insurance or condemnation proceeds (net of amounts payable to holders of senior Liens on the asset(s) subject to casualty or condemnation (to the extent such Liens constitute Permitted Liens hereunder), if any, and net of amounts payable to holders of equal Liens on the asset(s) subject to casualty or condemnation to the extent of such Lien holder's applicable pro rata share in such proceeds (to the extent such Liens constitute Permitted Liens hereunder), if any) from casualties or losses to Equipment, Fixtures, real Property or other assets (other than cash) shall be applied <u>first</u>, to repay Term Loans, <u>second</u>, to pay the principal of the Non-Ratable Loans, <u>third</u>, to pay the principal of the Revolving Loans with a concomitant reduction in the Revolving Commitment and <u>fourth</u>, if any Unmatured Default or Default shall have occurred and be continuing, to cash collateralize outstanding Facility LCs.

(e)     <u>General</u>.  Without in any way limiting the foregoing, immediately upon receipt by any Loan Party of proceeds of any sale of any Collateral, the Borrower shall cause such Loan Party to deliver such proceeds to the Agent, or deposit such proceeds in a deposit account subject to a Deposit Account Control Agreement.  All of such proceeds shall be applied as set forth above or otherwise as provided in <u>Section 2.18</u>.  Nothing in this <u>Section 2.15</u> shall be construed to constitute Agent's or any Lender's consent to any transaction that is not permitted by other provisions of this Agreement or the other Loan Documents.

2.16     <u>Termination of the Facility; Reduction of Commitments</u>.

(a)     Without limiting <u>Section 2.3</u> or <u>Section 8.1</u> or any other provision of this Agreement, (i) the Aggregate Commitments shall expire on the Facility Termination Date and (ii) the Aggregate Credit Exposure and all other unpaid Obligations shall be paid in full by the Borrower on the Facility Termination Date.

(b)     The Borrower may terminate the Commitments in full upon at least 10 Business Days' prior written notice thereof to the Agent and the Lenders, with such termination to be effective upon (i) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (ii) the cancellation and return of all outstanding Facility LCs (or alternatively, with respect to each such Facility LC, the furnishing to the Agent of a cash deposit or Supporting Letter of Credit as required by <u>Section 2.1.2(l)</u>), (iii) the payment in full of all reimbursable expenses and other Obligations together with accrued and unpaid interest thereon and (iv) the payment in full of any amount due under <u>Section 3.4</u>.

(c)     Upon at least two Business Days' prior written notice to the Agent, the Borrower may at any time and from time to time permanently reduce, in part but not in full, the Revolving Commitment.  Each such partial reduction of the Revolving Commitments shall be in the principal amount of $5,000,000 or any integral multiple thereof.  Simultaneously with each reduction or termination of the Revolving Commitments, the Borrower shall pay to the Agent for the account of each Revolving Lender the Unused Commitment Fee accrued and unpaid on the amount of the Revolving Commitment of such Revolving Lender so terminated or reduced through the date thereof.  Any reduction of the Revolving Commitment pursuant to this <u>Section 2.16(c)</u> shall be applied pro rata to reduce the Commitment of each Lender.

36

2.17    <u>Method of Payment</u>.

(a)     All payments of the Obligations hereunder shall be made, without setoff, deduction, or counterclaim, in immediately available funds to the Agent at the Agent's address specified pursuant to <u>Article XIII</u>, or at any other Lending Installation of the Agent specified in writing by the Agent to the Borrower, by noon (local time) on the date when due and shall be applied ratably by the Agent among the Lenders. Any payment received by the Agent after such time shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue. Each payment delivered to the Agent for the account of any Lender shall be delivered promptly by the Agent to such Lender in the same type of funds that the Agent received at its address specified pursuant to <u>Article XIII</u> or at any Lending Installation specified in a notice received by the Agent from such Lender.

(b)     At the election of the Agent, all payments of principal, interest, reimbursement obligations in connection with Facility LCs, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees and expenses pursuant to <u>Section 9.6</u>), and other sums payable under the Loan Documents, may be paid from the proceeds of Advances made hereunder whether made following a request by the Borrower pursuant to <u>Section 2.1</u> or a deemed request as provided in this <u>Section 2.17</u> or may be deducted from the Funding Account or any other deposit account of the Borrower maintained with the Agent. The Borrower hereby irrevocably authorizes (i) the Agent to make an Advance for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Loans (including Non-Ratable Loans) and that all such Advances shall be deemed to have been requested pursuant to <u>Section 2.1</u> and (ii) the Agent to charge the Funding Account or any other deposit account of the Borrower maintained with Bank One for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

2.18    <u>Apportionment, Application, and Reversal of Payments</u>. Except as otherwise required pursuant to <u>Section 2.19</u>, principal and interest payments shall be apportioned ratably among the Lenders as set forth in this <u>Article II</u> and payments of the fees shall, as applicable, be apportioned ratably among the Lenders, except for fees payable solely to the Agent or the LC Issuer and except as provided in <u>Section 2.10(c)</u>. All payments shall be remitted to the Agent and all such payments not relating to principal or interest of specific Loans or not constituting payment of specific fees as specified by the Borrower, and all proceeds of any Collateral received by the Agent, shall be applied, ratably, subject to the provisions of this Agreement, <u>first</u>, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Agent from the Borrower (other than in connection with Banking Services or Rate Management Obligations), <u>second</u>, to pay any fees or expense reimbursements then due to the Lenders from the Borrower (other than in connection with Banking Services or Rate Management Obligations), <u>third</u>, to interest then due and payable on the Term Loans, <u>fourth</u>, to prepay Term Loans, <u>fifth</u>, to pay interest due in respect of the Non-Ratable Loans, <u>sixth</u>, to pay interest due in respect of the Revolving Loans (other than Non-Ratable Loans), <u>seventh</u>, to pay or prepay principal of the Non-Ratable Loans, <u>eighth</u>, to pay or prepay principal of the Revolving Loans (other than Non-Ratable Loans) and unpaid reimbursement obligations in respect of Facility LCs, <u>ninth</u>, to pay an amount to the Agent equal to one hundred five percent (105%) of the aggregate undrawn face amount of all outstanding Facility LCs and the aggregate amount of any unpaid reimbursement obligations in respect of Facility LCs, to be held as cash collateral for such Obligations, <u>tenth</u>, to payment of any amounts owing with respect to Banking Services and Rate Management Obligations owed by a Loan Party to Bank One or its Affiliates and

37

eleventh, to the payment of any other Secured Obligation due to the Agent or any Secured Party by the Borrower. Notwithstanding anything to the contrary contained in this Agreement, unless so directed by the Borrower, or unless a Default is in existence, neither the Agent nor any Lender shall apply any payment which it receives to any Eurodollar Loan, except (a) on the expiration date of the Interest Period applicable to any such Eurodollar Loan or (b) in the event, and only to the extent, that there are no outstanding Floating Rate Loans and, in any event, the Borrower shall pay the Eurodollar breakage losses in accordance with Section 3.4. The Agent and the Lenders shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

2.19    Settlement. Each Revolving Lender's funded portion of the Loans is intended by the Revolving Lenders to be equal at all times to such Revolving Lender's Pro Rata Share of the outstanding Loans. Notwithstanding such agreement, the Agent, Bank One, and the Lenders agree (which agreement shall not be for the benefit of or enforceable by the Loan Parties) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among them as to the Loans, including the Non-Ratable Loans shall take place on a periodic basis as follows. The Agent shall request settlement (a "Settlement") with the Lenders on at least a weekly basis, or on a more frequent basis at the Agent's election, by notifying the Lenders of such requested Settlement by telecopy, telephone, or e-mail no later than 12:00 noon (Chicago, Illinois time) on the date of such requested Settlement (the "Settlement Date"). Each Revolving Lender (other than the Agent, in the case of the Non-Ratable Loans) shall transfer the amount of such Revolving Lender's Pro Rata Share of the outstanding principal amount of the applicable Loan with respect to which Settlement is requested to the Agent, to such account of the Agent as the Agent may designate, not later than 2:00 p.m. (Chicago, Illinois time), on the Settlement Date applicable thereto. Settlements may occur during the existence of a Default or an Unmatured Default and whether or not the applicable conditions precedent set forth in Section 4.3 have then been satisfied. Such amounts transferred to the Agent shall be applied against the amounts of the applicable Loan and, together with Bank One's Pro Rata Share of such Non-Ratable Loan, shall constitute Revolving Loans of such Lenders, respectively. If any such amount is not transferred to the Agent by any Lender on the Settlement Date applicable thereto, the Agent shall be entitled to recover such amount on demand from such Lender together with interest thereon as specified in Section 2.23.

2.20    Indemnity for Returned Payments. If after receipt of any payment which is applied to the payment of all or any part of the Obligations, the Agent or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Agent or such Lender and the Borrower shall be liable to pay to the Agent and the Lenders, and the Borrower hereby indemnifies the Agent and the Lenders and holds the Agent and the Lenders harmless for the amount of such payment or proceeds surrendered. The provisions of this Section 2.20 shall be and remain effective notwithstanding any contrary action which may have been taken by the Agent or any Lender in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Agent's and the Lenders' rights under this Agreement and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable. The provisions of this Section 2.20 shall survive the termination of this Agreement.

2.21    Noteless Agreement; Evidence of Indebtedness.

(a)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan

38

made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b)     The Agent shall also maintain accounts in which it will record (i) the amount of each Loan extended hereunder, the Type thereof and the Interest Period with respect thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, (iii) the original stated amount of each Facility LC and the amount of LC Obligations outstanding at any time and (iv) the amount of any sum received by the Agent hereunder from the Borrower and each Lender's share thereof.

(c)     The entries maintained in the accounts maintained pursuant to paragraphs (a) and (b) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; provided however, that the failure of the Agent or any Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Obligations in accordance with their terms.

(d)     Any Lender may request that its Revolving Loans be evidenced by a promissory note in substantially the form of Exhibit C-1 (a "Revolving Note") and that its Term Loans be evidenced by a promissory note in substantially the form of Exhibit C-2 attached hereto (a "Term Note").  In such event, the Borrower shall prepare, execute and deliver to such Lender such Note payable to the order of such Lender.  Thereafter, the Revolving Loans evidenced by such Revolving Note or the Term Loans evidenced by such Term Note and interest thereon shall at all times (prior to any assignment pursuant to Section 12.3) be represented by one or more Notes payable to the order of the payee named therein, except to the extent that any such Lender subsequently returns any such Note for cancellation and requests that such Revolving Loans or Term Loans once again be evidenced as described in Sections 2.21(a) and (b).

2.22     Lending Installations.  Each Lender may book its Loans and its participation in any LC Obligations and the LC Issuer may book the Facility LCs at any Lending Installation selected by such Lender or the LC Issuer, as the case may be, and may change its Lending Installation from time to time.  All terms of this Agreement shall apply to any such Lending Installation and the Loans, Facility LCs, participations in LC Obligations and any Notes issued hereunder shall be deemed held by each Lender or the LC Issuer, as the case may be, for the benefit of any such Lending Installation.  Each Lender and the LC Issuer may, by written notice to the Agent and the Borrower in accordance with Article XIII, designate replacement or additional Lending Installations through which Loans will be made by it or Facility LCs will be issued by it and for whose account Loan payments or payments with respect to Facility LCs are to be made.

2.23     Non Receipt of Funds by the Agent.  Unless the Borrower or a Lender, as the case may be, notifies the Agent prior to the date on which it is scheduled to make payment to the Agent of (i) in the case of a Lender, the proceeds of a Loan or (ii) in the case of the Borrower, a payment of principal, interest or fees to the Agent for the account of the Lenders, that it does not intend to make such payment, the Agent may assume that such payment has been made.  The Agent may, but shall not be obligated to, make the amount of such payment available to the intended recipient in reliance upon such assumption.  If such Lender or the Borrower, as the case may be, has not in fact made such payment to the Agent, the recipient of such payment shall, on demand by the Agent, repay to the Agent the amount so made available together with interest thereon in respect of each day during the period commencing on the date such amount was so made available by the Agent until the date the Agent recovers such amount at a rate per annum equal to (x) in the case of payment by a Lender, the Federal Funds Effective Rate for such day

39

for the first three days and, thereafter, the interest rate applicable to the relevant Loan or (y) in the case of payment by the Borrower, the interest rate applicable to the relevant Loan.

2.24    <u>Limitation of Interest</u>. The Borrower, the Agent and the Lenders intend to strictly comply with all applicable laws, including applicable usury laws.  Accordingly, the provisions of this <u>Section 2.24</u> shall govern and control over every other provision of this Agreement or any other Loan Document which conflicts or is inconsistent with this <u>Section 2.24</u>, even if such provision declares that it controls.  Notwithstanding anything to the contrary contained in any Loan Document, the interest and fees paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "<u>Maximum Rate</u>").  If any Lender shall receive interest or a fee in an amount that exceeds the Maximum Rate, the excessive interest or fee shall be applied to the principal of the Loans or, if it exceeds the unpaid principal, refunded to the Borrower.  In determining whether the interest or a fee contracted for, charged, or received by the Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (i) characterize any payment that is not principal as an expense or fee or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof and (iii) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Loans.

2.25    <u>Priority and Liens</u>.

(a)    The Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order and the Final Order (when entered), the Obligations of the Borrower hereunder and under the other Loan Documents: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed administrative expense claims in the Case having priority over all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower, whether heretofore or hereafter incurred, including but not limited to the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 1112 or 1114 of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all unencumbered property of the Borrower (excluding the Borrower's rights in respect of avoidance actions and the proceeds thereof under the Bankruptcy Code) and on all of the Borrower's cash and cash equivalents; (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all property of the Borrower that is subject to valid and perfected Liens in existence on the Petition Date or to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code or to Permitted Liens, junior to such valid and perfected Liens; and (iv) without limiting the scope of the Liens described in clauses (ii) and (iii) above, pursuant to Section 364(d)(1) of the Bankruptcy Code, the obligations of the Borrower to repay the Obligations shall be secured by a perfected Lien, pursuant to Section 364(d)(1) of the Bankruptcy Code, upon all property of the Borrower that secures (x) the Montana Collateral and (y) the South Dakota Collateral, which Lien shall have the same priority vis a vis each other Lien on the same collateral as the Lien which secured the Montana Bonds and the South Dakota Bonds, respectively, immediately prior to the repayment in full of the CSFB Loans on the Term Loan Commitment Effective Date and to any Liens granted after the Petition Date to provide adequate protection in respect thereof; <u>provided that</u> (i) the proceeds of the Montana Collateral shall only be available to the Secured Parties in respect of Obligations not to exceed the Montana Maximum Amount and (ii) the proceeds of the South Dakota Collateral shall only be available to the Secured Parties in respect of Obligations not to exceed the South Dakota Maximum Amount (the limitation contained in the foregoing proviso will only apply to the proceeds

40

of the collateral secured by the Liens described in this clause(iv) and not to any other Liens in favor of the Secured Parties), subject in each of clauses (i), (ii), (iii) and (iv) only to the Carve-Out.  Notwithstanding anything in any Loan Document, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Loan Parties owing to the Agent, the LC Issuer or the Lenders or to the Collateral.  The Agent, the LC Issuer and the Lenders agree that (a) so long as no Default or Unmatured Default shall have occurred, the Borrower shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out and (b) the amount of any retainers received by any professionals retained in the Case shall not reduce the Carve-Out.  In addition, each Loan Party acknowledges and agrees that each Guarantor is granting Liens to the Agent for the benefit of the Secured Parties pursuant to the Security Agreement and the Mortgages (if any) to which such Guarantor is or may become a party.

(b)       Subject to the priorities set forth in <u>Section 2.25(a)</u> and to the Carve-Out, as to all real property the title to which is held by the Borrower, or the possession of which is held by the Borrower pursuant to leasehold interest, the Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Agent on behalf of the Secured Parties all of the right, title and interest of the Borrower in all of such owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Borrower in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof.  The Borrower acknowledges that, pursuant to the Interim Order and the Final Order (when entered), the Liens in favor of the Agent for the benefit of the Secured Parties in all of such real property and leasehold instruments shall be perfected without the recordation of any instruments of mortgage or assignment.  The Borrower further agrees that, upon the request of the Agent, the Borrower shall enter into separate fee and leasehold mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the Agent.

2.26      <u>Security Interest in Facility LC Collateral Account</u>.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, the Borrower hereby assigns and pledges to the Agent, for its benefit and for the ratable benefit of the Secured Parties, and hereby grants to the Agent, for its benefit and for the ratable benefit of the Secured Parties, a first priority security interest, senior to all other Liens, if any, in all of the Borrower's right, title and interest in and to the Facility LC Collateral Account and any direct investment of the funds contained therein.  Cash held in the Facility LC Collateral Account shall not be available for use by any Loan Party, whether pursuant to Section 363 of the Bankruptcy Code or otherwise, until the indefeasible repayment in full of the Obligations and the termination of all Commitments.

2.27      <u>No Discharge; Survival of Claims</u>.  Each Loan Party agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Agent, the LC Issuer and the Lenders pursuant to the Orders and described in <u>Section 2.25</u> and the Liens granted to the Agent for the benefit of the Secured Parties pursuant to the Orders and described in <u>Sections 2.25</u> and <u>2.26</u> shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

41

# ARTICLE III

# YIELD PROTECTION; TAXES

3.1     Yield Protection.  If, on or after the Closing Date, the adoption of any law or any governmental or quasi governmental rule, regulation, policy, guideline or directive (whether or not having the force of law), or any change in the interpretation or administration thereof by any governmental or quasi-governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender or applicable Lending Installation or the LC Issuer with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(a)     subjects any Lender or any applicable Lending Installation or the LC Issuer to any taxes, or changes the basis of taxation of payments (other than with respect to Excluded Taxes) to any Lender or the LC Issuer in respect of its Eurodollar Loans, Facility LCs or participations therein, or

(b)     imposes or increases or deems applicable any reserve, assessment, insurance charge, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any applicable Lending Installation or the LC Issuer (other than reserves and assessments taken into account in determining the interest rate applicable to Eurodollar Advances), or

(c)     imposes any other condition the result of which is to increase the cost to any Lender or any applicable Lending Installation or the LC Issuer of making, funding or maintaining its Eurodollar Loans, or of issuing or participating in Facility LCs, or reduces any amount receivable by any Lender or any applicable Lending Installation or the LC Issuer in connection with its Eurodollar Loans, Facility LCs or participations therein, or requires any Lender or any applicable Lending Installation or the LC Issuer to make any payment calculated by reference to the amount of Eurodollar Loans, Facility LCs or participations therein held or interest or LC Fees received by it, by an amount deemed material by such Lender or the LC Issuer as the case may be, and the result of any of the foregoing is to increase the cost to such Lender or applicable Lending Installation or the LC Issuer, as the case may be, of making or maintaining its Eurodollar Loans or Commitment or of issuing or participating in Facility LCs or to reduce the return received by such Lender or applicable Lending Installation or the LC Issuer, as the case may be, in connection with such Eurodollar Loans, Commitment, Facility LCs or participations therein, then, within fifteen days of demand by such Lender or the LC Issuer, as the case may be, the Borrower shall pay such Lender or the LC Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the LC Issuer, as the case may be, for such increased cost or reduction in amount received.

3.2     Changes in Capital Adequacy Regulations.  If a Lender or the LC Issuer determines the amount of capital required or expected to be maintained by such Lender or the LC Issuer, any Lending Installation of such Lender or the LC Issuer, or any corporation controlling such Lender or the LC Issuer is increased as a result of a Change, then, within fifteen days of demand by such Lender or the LC Issuer, the Borrower shall pay such Lender or the LC Issuer the amount necessary to compensate for any shortfall in the rate of return on the portion of such increased capital which such Lender or the LC Issuer determines is attributable to this Agreement, its Credit Exposure or its Commitment to make Loans and issue or participate in Facility LCs, as the case may be, hereunder (after taking into account such Lender's or the LC Issuer's policies as to capital adequacy).  "Change" means (i) any change after the date of this

42

Agreement in the Risk Based Capital Guidelines (as defined below) or (ii) any adoption of or change in any other law, governmental or quasi governmental rule, regulation, policy, guideline, interpretation, or directive (whether or not having the force of law) after the date of this Agreement which affects the amount of capital required or expected to be maintained by any Lender or the LC Issuer or any Lending Installation or any corporation controlling any Lender or the LC Issuer. "Risk-Based Capital Guidelines" means (i) the risk based capital guidelines in effect in the U.S. on the date of this Agreement, including transition rules, and (ii) the corresponding capital regulations promulgated by regulatory authorities outside the U.S. implementing the July 1988 report of the Basle Committee on Banking Regulation and Supervisory Practices Entitled "International Convergence of Capital Measurements and Capital Standards," including transition rules, and any amendments to such regulations adopted prior to the date of this Agreement.

3.3    Availability of Types of Advances . If any Lender determines that maintenance of its Eurodollar Loans at a suitable Lending Installation would violate any applicable law, rule, regulation, or directive, whether or not having the force of law, or if the Required Lenders determine that (i) deposits of a type and maturity appropriate to match fund Eurodollar Advances are not available or (ii) the interest rate applicable to Eurodollar Advances does not accurately reflect the cost of making or maintaining Eurodollar Advances, then the Agent shall suspend the availability of Eurodollar Advances and require any affected Eurodollar Advances to be repaid or converted to Floating Rate Advances, subject to the payment of any funding indemnification amounts required by Section 3.4.

3.4    Funding Indemnification. If any payment of a Eurodollar Advance occurs on a date which is not the last day of the applicable Interest Period, whether because of acceleration, prepayment or otherwise, or a Eurodollar Advance is not made on the date specified by the Borrower for any reason other than default by the Lenders, the Borrower will indemnify each Lender for any loss or cost incurred by it resulting therefrom, including, without limitation, any loss or cost in liquidating or employing deposits acquired to fund or maintain such Eurodollar Advance.

3.5    Taxes .

(a)    All payments to or for the account of any Lender, the LC Issuer, the Agent or any other Secured Party hereunder or under any Loan Document shall be made free and clear of and without deduction or withholding of or for any and all Taxes, unless required by applicable law.  If Taxes shall be required by law to be deducted or withheld from or in respect of any sum payable hereunder to any Lender, the LC Issuer, the Agent or other Secured Party, (i) the Borrower shall increase the sum payable as necessary so that such Lender, the LC Issuer, the Agent or other Secured Party (as the case may be) receives and retains an amount equal to the sum it would have received and retained had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall pay the full amount deducted to the relevant authority in accordance with applicable law and (iv) the Borrower shall furnish to the Agent the original or a certified copy of a receipt evidencing payment thereof within thirty days after such payment is made.

(b)    In addition, the Borrower hereby agrees to pay any present or future stamp or documentary taxes and any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or under any Loan Document or from the execution or delivery of, or otherwise with respect to, any Loan Document (" Other Taxes ").

(c)    The Borrower hereby agrees to indemnify the Agent, the LC Issuer, each Lender and each other Secured Party for the full amount of Taxes and Other Taxes (including,

43

without limitation, any Taxes and Other Taxes imposed on amounts payable under this <u>Section 3.5</u>) paid by the Agent, the LC Issuer, such Lender or such other Secured Party as a result of its Commitment, any Loans made by it hereunder, any Facility LC issued hereunder or otherwise in connection with its participation in any Loan Document and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto.  Payments due under this indemnification shall be made within thirty days of the date the Agent, the LC Issuer, such Lender or such other Secured Party makes demand therefor pursuant to <u>Section 3.6</u>.

(d)     Each Lender that is not incorporated under the laws of the U.S. or a state thereof (each a "<u>Non-U.S. Lender</u>") and that is legally entitled to do so agrees that it will, not more than ten Business Days after the date on which it becomes a party to this Agreement, (i) deliver to the Agent two duly completed copies of the applicable U.S. Internal Revenue Service Form W-8.  Each Non-U.S. Lender further undertakes to deliver to each of the Borrower and the Agent (x) renewals or additional copies of such form (or any successor form) on or before the date that such form expires or becomes obsolete, and (y) after the occurrence of any event requiring a change in the most recent forms so delivered by it, such additional forms or amendments thereto as may be reasonably requested by the Borrower or the Agent.

(e)     Should a Non-U.S. Lender which is otherwise exempt from or subject to a reduced rate of withholding tax become subject to Taxes because of its failure to deliver a form required under <u>Section 3.5(d)</u>, the Borrower shall take such steps as such Non-U.S. Lender shall reasonably request to assist such Non-U.S. Lender to recover such Taxes.

(f)     Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments under this Agreement or any Note pursuant to the law of any relevant jurisdiction or any treaty shall deliver to the Borrower and the Agent, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate or withholding.

(g)     If the U.S. Internal Revenue Service or any other governmental authority of the U.S. or any other country or any political subdivision of any of the foregoing asserts a claim that the Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered or properly completed, because such Lender failed to notify the Agent of a change in circumstances which rendered its exemption from withholding ineffective, or for any other reason), such Lender shall indemnify the Agent fully for all amounts paid, directly or indirectly, by the Agent as tax, withholding therefor, or otherwise, including without limitation penalties, interest and additions to tax, and including taxes imposed by any jurisdiction on amounts payable to the Agent under this subsection, together with all costs and expenses related thereto (including without limitation attorneys fees and time charges of attorneys for the Agent, which attorneys may be employees of the Agent).  The obligations of the Lenders under this <u>Section 3.5(g)</u> shall survive the payment of the Obligations and termination of this Agreement.

3.6     <u>Lender Statements; Survival of Indemnity</u>. To the extent reasonably possible, each Lender shall designate an alternate Lending Installation with respect to its Eurodollar Loans to reduce any liability of the Borrower to such Lender under <u>Sections 3.1</u>, <u>3.2</u> and <u>3.5</u> or to avoid the unavailability of Eurodollar Advances under <u>Section 3.3</u>, so long as such designation is not, in the judgment of such

44

Lender, disadvantageous to such Lender. Each Lender shall deliver a written statement of such Lender to the Borrower (with a copy to the Agent) as to the amount due, if any, under Section 3.1, 3.2, 3.4 or 3.5. Such written statement shall set forth in reasonable detail the calculations upon which such Lender determined such amount and shall be final, conclusive and binding on the Borrower in the absence of manifest error. Determination of amounts payable under Sections 3.1, 3.2 or 3.3 in connection with a Eurodollar Loan shall be calculated as though each Lender funded its Eurodollar Loan through the purchase of a deposit of the type and maturity corresponding to the deposit used as a reference in determining the Eurodollar Rate applicable to such Loan, whether in fact that is the case or not. Unless otherwise provided herein, the amount specified in the written statement of any Lender shall be payable on demand after receipt by the Borrower of such written statement. The obligations of the Borrower under Sections 3.1, 3.2, 3.4 and 3.5 shall survive payment of the Obligations and termination of this Agreement.

<div align="center">

**ARTICLE IV**

**CONDITIONS PRECEDENT**

</div>

4.1    Closing Date. This Agreement will not become effective unless the Loan Parties have satisfied each of the following conditions in a manner satisfactory to the Agent, the LC Issuer and the Lenders, and with respect to any condition requiring delivery of any agreement, certificate, document, or instrument, the Loan Parties shall have furnished to the Agent sufficient copies of any such agreement, certificate, document, or instrument for distribution to the Lenders:

(a)    This Agreement or counterparts hereof shall have been duly executed by each Loan Party, the Agent, the LC Issuer and the Lenders; and the Agent shall have received duly executed copies of the Loan Documents and such other documents, instruments and agreements as the Agent shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, each in form and substance reasonably satisfactory to the Agent;

(b)    Each Loan Party shall have delivered copies of its articles or certificate of incorporation or organization, together with all amendments, and a certificate of good standing, each certified by the appropriate governmental officer in its jurisdiction of incorporation or organization;

(c)    Each Loan Party shall have delivered copies, certified by its Secretary or Assistant Secretary, of its by-laws or operating, management or partnership agreement and of its Board of Directors' resolutions or the resolutions of its members and of resolutions or actions of any other body authorizing the execution of the Loan Documents to which such Loan Party is a party;

(d)    Each Loan Party shall have delivered an incumbency certificate, executed by its Secretary or Assistant Secretary, which shall identify by name and title and bear the signatures of the Authorized Officers and any other officers such Loan Party authorized to sign the Loan Documents to which such Loan Party is a party, upon which certificate the Agent and the Lenders shall be entitled to rely until informed of any change in writing by such Loan Party;

(e)    The Borrower shall have delivered a certificate, signed by the Chief Financial Officer, Chief Restructuring Officer or Chief Accountant of the Borrower, on the initial Credit Extension Date (i) stating that no Default or Unmatured Default has occurred and is

<div align="center">45</div>

continuing, (ii) stating that the representations and warranties contained in <u>Article V</u> are true and correct as of such Credit Extension Date, (iii) specifying the deposit account at Bank One which shall be used as the Funding Account and (iv) certifying any other factual matters as may be reasonably requested by the Agent or any Lender;

(f)     The Loan Parties shall have delivered written opinions of the Loan Parties' counsel, addressed to the Agent, the LC Issuer and the Lenders, such opinions to be in form and substance satisfactory to the Agent and its legal counsel;

(g)     The Borrower shall have delivered the initial Lender a Revolving Note;

(h)     The Borrower shall have delivered money transfer authorizations as the Agent may have reasonably requested;

(i)     The Agent shall have received all Lien and other searches that the Agent deems necessary (except with respect to fixed assets and real estate), the Agent shall have been authorized to file any UCC financing statements that the Agent deems necessary to perfect its Liens in the Collateral and Liens creating the security interest in the Collateral with the priority required by the Interim Order and the Loan Documents and in favor of the Agent shall have been perfected;

(j)     The Borrower shall have delivered a Borrowing Base Certificate which calculates the Borrowing Base as of the end of the Business Day immediately preceding the Effective Date;

(k)     [intentionally omitted];

(l)     [intentionally omitted];

(m)     The Loan Parties shall have delivered to the Agent and the Lenders a schedule of projected thirteen week cash receipts and cash disbursements approved and accepted by the Agent and the Lenders for the period commencing on the Petition Date;

(n)     [intentionally omitted];

(o)     All legal (including tax implications) and regulatory matters, including, but not limited to compliance with applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System, shall be satisfactory to the Agent and the Lenders;

(p)     The Loan Parties shall have received all regulatory approvals (if any) necessary to consummate the Facility and to execute, deliver and perform their respective obligations under, this Agreement and each other Loan Document, including but not limited to approvals from the relevant state public utility commissions and from the Federal Energy Regulatory Commission;

(q)     The Borrower shall have delivered evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Agent and otherwise in compliance with the terms of <u>Section 6.7;</u>

46

(r)     The Borrower shall have delivered each Collateral Access Agreement required to be provided by the Agent;

(s)     [intentionally omitted];

(t)     [intentionally omitted];

(u)     [intentionally omitted];

(v)     [intentionally omitted];

(w)     The Borrower shall have paid all of the fees and expenses owing to the Agent, the Arranger, the LC Issuer and the Lenders pursuant to Section 2.10 and Section 9.6(a), as invoiced;

(x)     The Effective Date shall occur on or before October 31, 2003;

(y)     Except as reflected or disclosed in the Borrower's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q filed with the Securities Exchange Commission, or as otherwise disclosed to the Agent and the Lenders in writing prior to September 12, 2003, there shall exist no unstayed action, suit, investigation, litigation or proceeding (other than the Case) pending or, to the knowledge of the Loan Parties, threatened in any court or before any arbitrator or governmental instrumentality that has a reasonable probability of having a Material Adverse Effect;

(z)     All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Agent and the Lenders;

(aa)    All first-day and related orders entered into by the Bankruptcy Court in the Case shall be in form and substance reasonably satisfactory to the Agent and the Lenders;

(bb)    The Bankruptcy Court shall have entered an order (the "Interim Order"), in any event not later than ten Business Days following the Petition Date, acceptable in all respects to the Agent and the Lenders on an application or motion by the Borrower, such motion to be satisfactory in form and substance to the Lenders, which Interim Order shall have been entered on such notice to such parties as may be reasonably satisfactory to the Agent and the Lenders, approving borrowing under the Facility up to $50,000,000 of Revolving Loans and granting the Liens and priority described in Section 2.25, which Interim Order shall, among others, (i) approve the Credit Extensions under the Revolving Loans in amounts up to $100,000,000, (ii) approve the payment by the Borrower of all fees provided for in the Loan Documents and any related fee letters (including those payable by the Borrower upon execution of a commitment letter with respect to the aggregate Term Loan Commitment of $390,000,000 and any other fees contemplated in such commitment letter or other fee letter), (iii) lift the automatic stay to permit the Borrower to perform its obligations, and the Agent and the Secured Parties to exercise their rights and remedies with respect to, the Facility and (iv) have not been reversed, vacated, modified, amended or stayed; and

(cc)    The Loan Parties shall have delivered such other documents as the Agent, the LC Issuer, any Lender or their respective counsel may have reasonably requested.

47

4.2    <u>Term Loan Commitment Effective Date</u>.  The Term Loan Commitment Effective Date shall not occur or be deemed to occur unless the Loan Parties have satisfied each of the following conditions in a manner satisfactory to the Agent, the LC Issuer and the Term Lenders, and with respect to any condition requiring delivery of any agreement, certificate, document, or instrument, the Loan Parties shall have furnished to the Agent sufficient copies of any such agreement, certificate, document, or instrument for distribution to the Term Lenders:

(a)    The Effective Date shall have occurred;

(b)    Each of the conditions precedent contained in <u>Section 4.3</u> shall have been met on the Term Loan Commitment Effective Date;

(c)    The Borrower shall have provided the Agent with a written notice on or before the date which is thirty days after the Petition Date stating its intention that, upon satisfaction of the applicable conditions precedent contained in this <u>Section 4.2</u> and in <u>Section 4.3</u>, the Borrower desires to have the Term Loan Commitment Effective Date occur;

(d)    The Term Loan Commitment Effective Date shall occur on or before the date which is forty-five days after the Petition Date;

(e)    The Agent shall have determined that (i) since the Closing Date, there is an absence of any material adverse change or disruption in primary or secondary loan syndication markets, financial markets or in capital markets generally that would likely impair syndication of the Credit Extensions hereunder and (ii) the Loan Parties shall have fully cooperated with the Agent's syndication efforts including, without limitation, by providing the Agent with information regarding the Loan Parties' operations and prospects and such other information as the Agent deems necessary to successfully syndicate the Credit Extensions hereunder;

(f)    The Borrower shall have delivered a certificate, signed by the Chief Financial Officer, Chief Restructuring Officer or Chief Accountant of the Borrower, on the Term Loan Commitment Effective Date (i) stating that no Default or Unmatured Default has occurred and is continuing, (ii) stating that the representations and warranties contained in <u>Article V</u> are true and correct as of such Credit Extension Date and (iii) certifying any other factual matters as may be reasonably requested by the Agent or any Term Lender;

(g)    The Agent shall have received all Lien and other searches that the Agent deems necessary, the Agent shall have been authorized to file any UCC financing statements that the Agent deems necessary to perfect its Liens in the Collateral and Liens creating a security interest in the Collateral having the priority set forth in the Orders, <u>Section 2.25</u> and in the other Loan Documents in favor of the Agent shall have been perfected;

(h)    The Agent and the Term Lenders shall have completed their additional business due diligence (including additional field audits and appraisals) and the Borrower's and its Subsidiaries' (other than Excluded Subsidiaries) corporate structure, capital structure, material accounts and governing documents shall be acceptable to the Agent and the Term Lenders;

(i)    All legal (including tax implications) and regulatory matters, including, but not limited to compliance with applicable requirements of Regulations U, T and X of the Board of

48

Governors of the Federal Reserve System, shall be satisfactory to the Agent and the Term Lenders;

(j)     The Loan Parties shall have received all regulatory approvals (if any) necessary with respect to the occurrence of the Term Loan Commitment Effective Date and the related increase in Commitments, including but not limited to approvals from the relevant state public utility commissions and from the Federal Energy Regulatory Commission;

(k)     The Agent and each Term Lender shall have received internal credit or investment committee approval with respect to the occurrence of the Term Loan Commitment Effective Date, it being understood that the decision of the Agent or any Term Lender whether to approve the occurrence of the Term Loan Commitment Effective Date (and the related increase in Term Loan Commitments) shall be within the sole discretion of the Agent or such Term Lender (as applicable);

(l)     The Agent and the Term Lenders shall have received (at Borrower's expense) and be satisfied with an independent valuation of the business of the Borrower and its Subsidiaries.  The valuation firm shall be engaged directly by the Agent and shall have no direct or indirect interest, financial or otherwise, in the Loan Parties, the Collateral or otherwise;

(m)     The Agent and the Term Lenders shall have received and be satisfied with an engineering report on the state of the Loan Parties' infrastructure;

(n)     The Bankruptcy Court shall have entered an order, in any event not later than forty-five days following the Petition Date, acceptable in all respects to the Agent and the Term Lenders on an application or motion by the Borrower, such motion to be satisfactory in form and substance to the Term Lenders, which order shall have been entered on such notice to such parties as may be satisfactory to the Agent and the Term Lenders, approving the Facility, borrowing of the Revolving Loans up to the full $100,000,000 and borrowing of the Term Loans up to the full $390,000,000 Term Loan Commitment on a final basis and confirming the granting of the Liens and priority described in Section 2.25, and which order shall approve the repayment of the CSFB Loan;

(o)     The Loan Parties shall have delivered each Mortgage (if any) required to be provided by the Agent;

(p)     The Loan Parties shall have delivered any requested environmental review reports from firm(s) satisfactory to the Agent, which review reports shall be acceptable to the Agent. Any environmental hazards or liabilities identified in any such environmental review reports shall indicate the Loan Parties' plans with respect thereto;

(q)     The Loan Parties shall have delivered each Collateral Access Agreement required to be provided by the Agent;

(r)     The Borrower shall have delivered any Term Notes requested by a Term Lender pursuant to Section 2.21 payable to the order of each such requesting Term Lender;

(s)     The Loan Parties shall have delivered resolutions which are in full force and effect authorizing the Advance of the Term Loans together with legal opinions with respect to

49

corporate authorization and related matters, such resolutions and opinions to be in form and substance satisfactory to the Agent; and

(t)      The Loan Parties shall have delivered such other documents and legal opinions as the Agent, the LC Issuer, any Term Lender or their respective counsel may have reasonably requested.

4.3      <u>Each Credit Extension</u>.  Except as otherwise expressly provided herein, the Lenders shall not be required to make any Credit Extension if on the applicable Credit Extension Date:

(a)      There exists any Default or Unmatured Default or any Default or Unmatured Default shall result from any such Credit Extension and the Agent or the Required Lenders shall have determined not to make any Credit Extension as a result of such Default or Unmatured Default;

(b)      Any representation or warranty contained in <u>Article V</u> is untrue or incorrect as of such Credit Extension Date except to the extent any such representation or warranty is stated to relate solely to an earlier date, and the Agent or the Required Lenders shall have determined not to make any Credit Extension as a result of the fact that such representation or warranty is untrue or incorrect;

(c)      After giving effect to any Credit Extension, Availability would be less than zero;

(d)      The making of such Credit Extension violates any requirement of law or is enjoined, temporarily, preliminarily or permanently;

(e)      The Loan Parties shall have failed to deliver any other document reasonably requested by the Agent, the LC Issuer or any Lender; or

(f)      If in the case of each Credit Extension on or after the date the Bankruptcy Court enters the Final Order, such state regulatory approvals as the Required Lenders deem necessary (including, without limitation, approval of the public utility commissions for the State of Montana and the State of Nebraska) shall not have been obtained and entered and remain in full force and effect.

Each Borrowing Notice or request for issuance of Facility LC with respect to each such Credit Extension shall constitute a representation and warranty by the Borrower that the conditions contained in <u>Sections 4.3(a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(f)</u> (if <u>(f)</u> is applicable) have been satisfied.  The Agent may require a duly completed Compliance Certificate as a condition to making a Credit Extension.

<div align="center">

**ARTICLE V**

<u>REPRESENTATIONS AND WARRANTIES</u>

</div>

Each Loan Party represents and warrants to the Agent, the LC Issuer and the Lenders as follows:

5.1      <u>Existence and Standing</u>.  Each Loan Party is a corporation or limited liability company duly and properly incorporated or organized, as the case may be, validly existing and (to the extent such concept applies to such entity) in good standing under the laws of its jurisdiction of incorporation or organization and has all requisite authority to conduct its business in each jurisdiction in which its

<div align="center">

50

</div>

business is conducted (with respect to the Borrower, subject to the entry by the Bankruptcy Court of the Interim Order or the Final Order (when entered)).

5.2    <u>Authorization and Validity</u>.  Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when entered) with respect to the Borrower, each Loan Party has the power and authority and legal right to execute and deliver the Loan Documents to which it is a party and to perform its obligations thereunder.  The execution and delivery by each Loan Party of the Loan Documents to which it is a party and the performance of its obligations thereunder have been duly authorized by proper proceedings, and, with respect to the Borrower subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when entered), the Loan Documents to which such Loan Party is a party constitute legal, valid and binding obligations of such Loan Party enforceable against such Loan Party in accordance with their terms and the Orders.

5.3    <u>No Conflict; Government Consent</u>.  Neither the execution and delivery by any Loan Party of the Loan Documents to which it is a party, nor the consummation of the transactions therein contemplated, nor compliance with the provisions thereof will violate (i) any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on such Loan Party or (ii) any Loan Party's articles or certificate of incorporation, partnership agreement, certificate of partnership, articles or certificate of organization, by laws, or operating or other management agreement, as the case may be, (iii) with respect to the Borrower, subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when entered), the provisions of any indenture, instrument or agreement to which the Borrower is a party or is subject entered into after the Petition Date or assumed by the Borrower in the Case, or by which it, or its Property, is bound, or conflict with or constitute a default thereunder, or result in, or require, the creation or imposition of any Lien in, of or on the Property of the Borrower pursuant to the terms of any such indenture, instrument or agreement or (iv) with respect to any Guarantor, the provisions of any indenture, instrument or agreement to which any Loan Party is a party or is subject, or by which it, or its Property, is bound, or conflict with or constitute a default thereunder, or result in, or require, the creation or imposition of any Lien in, of or on the Property of such Loan Party pursuant to the terms of any such indenture, instrument or agreement.  Other than the Orders, no order, consent, adjudication, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, or other action in respect of any governmental or public body or authority, or any subdivision thereof, which has not been obtained by a Loan Party, is required to be obtained by any Loan Party in connection with the execution and delivery of the Loan Documents, the borrowings under this Agreement, the granting of Liens under this Agreement, the Orders or any other Loan Document, the payment and performance by the Loan Parties of the Obligations or the legality, validity, binding effect or enforceability of any of the Loan Documents.

5.4    <u>Security Interest in Collateral</u>.  The provisions of the Interim Order (or the Final Order, when entered), this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral owned by the Loan Parties in favor of the Agent, for the benefit of the Agent and the other Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the Loan Parties and all third parties, and having the priority set forth in the Orders, <u>Sections 2.25</u> and <u>2.26</u> and the other Loan Documents.

5.5    <u>Financial Statements</u>.

(a)    The audited consolidated financial statements of the Borrower and its Subsidiaries for the period ending on December 31, 2002 heretofore delivered to the Lenders were prepared in accordance with GAAP (as in effect on the date such statements were prepared) and fairly present the consolidated financial condition and operations of the Borrower and its Subsidiaries at such date and the consolidated results of their operations for the period

51

then ended.  The unaudited consolidated financial statements of the Borrower and its Subsidiaries for the Fiscal Quarter ended June 30, 2003 heretofore delivered by the Borrower to the Lenders were prepared in accordance with GAAP (as in effect on the date such statements were prepared except for the presentation of footnotes and for applicable normal year-end audit adjustments) and fairly present the consolidated financial condition and operations of the Borrower and its Subsidiaries at such date and the consolidated results of their operations for the period then ended.

(b)    The Projections delivered pursuant to clause (m) of <u>Section 4.1</u> and dated September 14, 2003, the business plan delivered pursuant to <u>Section 6.41(c)</u> and the most recent Projections delivered to the Agent and the Lenders pursuant to <u>Section 6.1(t)</u>, represent the Borrower's good faith estimate of the future financial performance of the Borrower and its Subsidiaries (other than Excluded Subsidiaries) for the period set forth therein.

5.6    <u>Material Adverse Change</u>.  Other than changes which customarily occur as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Case, since December 31, 2002 there has been no change in the business, Property, prospects, condition (financial or otherwise) or results of operations of the Borrower and its Subsidiaries (other than Excluded Subsidiaries) which could reasonably be expected to have a Material Adverse Effect.

5.7    <u>Taxes</u>.  Except as set forth on <u>Schedule 5.7</u>, each Loan Party has filed all U.S. federal tax returns and all other tax returns which are required to be filed and have paid all taxes due pursuant to said returns or pursuant to any assessment received by any such Person, except such taxes, if any, as are being contested in good faith and as to which adequate reserves have been provided in accordance with GAAP and as to which no Lien exists or except to the extent non-payment is permitted by the Bankruptcy Code. The U.S. income tax returns of each Loan Party have been audited by the Internal Revenue Service through the Fiscal Year ended December 31, 1999.  No tax liens have been filed and no claims are being asserted with respect to any such taxes.  The charges, accruals and reserves on the books of the Loan Parties in respect of any taxes or other governmental charges are adequate.

5.8    <u>Litigation and Contingent Obligations</u>.  Other than the Case and except as disclosed in the Borrower's public filings filed with the Securities and Exchange Commission prior to the date hereof, there is no litigation, arbitration, governmental investigation, proceeding or inquiry pending or, to the knowledge of any of their officers, threatened against or affecting the Borrower or its Subsidiaries (other than Excluded Subsidiaries) which could reasonably be expected to have a Material Adverse Effect or which seeks to prevent, enjoin or delay the making of any Credit Extensions.  Other than any liability incident to any litigation, arbitration or proceeding which (i) could not reasonably be expected to have a Material Adverse Effect or (ii) is disclosed in the Borrower's public filings filed with the Securities and Exchange Commission prior to the date hereof, neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) has any material contingent obligations not provided for or disclosed in the financial statements referred to in <u>Section 5.5</u>.

5.9    <u>Capitalization and Subsidiaries</u>.  Schedule 5.9 sets forth (a) a correct and complete list of the name and relationship to the Borrower of each other Loan Party, (b) the location of the chief executive office of the Loan Parties and each other location where any of them have maintained their chief executive office in the past five years, (c) a true and complete listing of each class of each Loan Party's authorized Capital Stock, of which all of such issued shares are validly issued, outstanding, fully paid and non-assessable and (d) the type of entity of each Loan Party. With respect to each Loan Party, <u>Schedule 5.9</u> also sets forth the employer or taxpayer identification number of each Loan Party and the organizational identification number issued by each Loan Party's jurisdiction of organization or a

statement that no such number has been issued.  All of the issued and outstanding Capital Stock owned by any Loan Party has been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and is fully paid and nonassessable.

5.10    <u>ERISA</u>.  The Unfunded Liabilities of all Single Employer Plans do not in the aggregate exceed $120,000,000. Neither the Borrower nor any other member of the Controlled Group has incurred, or is reasonably expected to incur, any withdrawal liability to Multiemployer Plans in excess of $500,000 in the aggregate.  Each Plan complies in all material respects with all applicable requirements of law and regulations, no Reportable Event has occurred with respect to any Plan, neither the Borrower nor any other member of the Controlled Group has withdrawn from any Plan or initiated steps to do so, and no steps have been taken to reorganize or terminate any Plan.

5.11    <u>Accuracy of Information</u>.  No information, exhibit or report furnished by any Loan Party to the Agent or to any Lender in connection with the negotiation of, or compliance with, the Loan Documents contained any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained therein not misleading.

5.12    <u>Names; Prior Transactions</u>.  Except as set forth on <u>Schedule 5.12</u>, each Loan Party has not, during the past five years, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any Acquisition.

5.13    <u>Regulation U</u>.  No Loan Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "<u>Margin Stock</u>").  No Loan Party owns any Margin Stock, and none of the proceeds of the Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board.  No Loan Party will take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.

5.14    <u>Compliance With Laws</u>.  The Borrower and its Subsidiaries (other than Excluded Subsidiaries) have complied with all applicable statutes, rules, regulations, orders and restrictions of any domestic or foreign government or any instrumentality or agency thereof having jurisdiction over the conduct of their respective businesses or the ownership of their respective Property, except for any failure to comply with any of the foregoing which could not reasonably be expected to have a Material Adverse Effect.

5.15    <u>Ownership of Properties</u>.  Except as set forth on <u>Schedule 5.15</u>, on the date of this Agreement, each Loan Party will have good title, free of all Liens other than Permitted Liens, to all of the Property and assets reflected in the Borrower and its Subsidiaries' most recent consolidated financial statements provided to the Agent as owned by the Loan Parties.

5.16    <u>Plan Assets; Prohibited Transactions</u>.  The Borrower is not an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code), and neither the execution of this Agreement nor the making of Credit Extensions hereunder gives rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.

5.17    Environmental Matters.  In the ordinary course of its business, the officers of the Borrower and its Subsidiaries (other than Excluded Subsidiaries) consider the effect of Environmental Laws on the business of the Borrower and its Subsidiaries (other than Excluded Subsidiaries), in the course of which they identify and evaluate potential risks and liabilities accruing to such Persons due to Environmental Laws.  On the basis of this consideration, the Borrower does not reasonably expect that Environmental Laws will have a Material Adverse Effect.  Except as set forth on Schedule 5.17 or as disclosed in the Borrower's public filings filed with the Securities and Exchange Commission prior to the date hereof, no Loan Party has received any notice to the effect that its operations are not in material compliance with any of the requirements of applicable Environmental Laws or has received notice that it is the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment.

5.18    Investment Company Act.  No Loan Party is an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

5.19    Public Utility Holding Company Act; State Utility Regulation.  Except as set forth on Schedule 5.19, no Loan Party is subject to regulation under any Federal or state statute, regulation, decree or order which limits its ability to incur Indebtedness or conditions such ability upon any act, approval or consent of any governmental authority or ISO.  Notwithstanding any disclosure set forth on Schedule 5.19, no approval, authorization or consent of any governmental authority or ISO is required in connection with the execution and delivery of this Agreement, the other Loan Documents, the borrowings under this Agreement, the granting of Liens under this Agreement or any other Loan Document.  Each Loan Party is either (i) not a "holding company", a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company", as each such term is defined in the Public Utility Holding Company Act of 1935, as amended, or (ii) exempt from registration as a holding company under the Public Utility Holding Company Act of 1935, as amended, by reason of filing an application on Form U-1 in good faith seeking an order of exemption pursuant to Section 3(a)(3) of that Act, and no Loan Party has received notice from the U.S. Securities and Exchange Commission challenging or otherwise calling into question such exemption.

5.20    Bank Accounts.  As of the Closing Date, Exhibit B to the Security Agreement contains a complete and accurate list of all bank accounts maintained by each Loan Party with any bank or other financial institution.

5.21    Indebtedness.  As of the Closing Date and after giving effect to the Credit Extensions to be made on the Closing Date (if any), the Borrower and its Subsidiaries (other than Excluded Subsidiaries) have no Indebtedness, except for (i) the Obligations and (ii) any Indebtedness described on Schedule 5.21.  Schedule 5.21 sets forth a complete and accurate listing of all Indebtedness or other obligations secured by the Montana Collateral and the South Dakota Collateral.

5.22    Affiliate Transactions.  Except as set forth on Schedule 5.22, as of the Closing Date there are no existing or proposed agreements, arrangements, understandings, or transactions between the Borrower or any Subsidiary (other than Excluded Subsidiaries) and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates of any such Person or any members of such Person's immediate families, other than in the ordinary course of business and upon fair and reasonable terms no less favorable to such Person than such Person would have obtained in a comparable arms length transaction, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of the Borrower or any Subsidiary (other than Excluded Subsidiaries) or any Person with which the Borrower or any Subsidiary has a business relationship or which competes with the Borrower or any

54

Subsidiary (other than Excluded Subsidiaries) (except that any such Persons may own stock in (but not exceeding 2.0% of the outstanding Capital Stock of) any publicly traded company that may compete with the Borrower or any Subsidiary).

5.23    Intellectual Property Rights. As of the Closing Date: (a) Schedule 5.23 sets forth a correct and complete list of all material Intellectual Property Rights of each Loan Party; (b) none of the Intellectual Property Rights listed in Schedule 5.23 is subject to any licensing agreement or similar arrangement except as set forth in Schedule 5.23; (c) the Intellectual Property Rights described in Schedule 5.23 constitute all of the property of such type necessary to the current and anticipated future conduct of each Loan Party's business; (d) to the best of each Loan Party's knowledge, no slogan or other advertising device, product, process, method, substance, part, or other material now employed, or now contemplated to be employed, by any Loan Party infringes in any material respect upon any rights held by any other Person; and (e) no claim or litigation regarding any of the foregoing is pending or threatened, and no patent, invention, device, application, principle or any statute, law, rule, regulation, standard, or code is pending or, to the knowledge of any Loan Party, proposed, which, in either case, could reasonably be expected to have a Material Adverse Effect.

5.24    Insurance. The properties, business and operations of the Loan Parties are insured or reinsured with financially sound and reputable insurance companies not affiliated with the Borrower or any Subsidiary, in such amounts, with such deductibles and covering such risks as are insured against and carried in accordance with applicable law and prudent industry practice by companies engaged in similar businesses as the Loan Parties and owning or operating similar properties.

5.25    Post Retirement Benefits. The present value of the expected cost of post retirement medical and insurance benefits payable by the Loan Parties to its employees and former employees, as estimated by the Borrower in accordance with procedures and assumptions deemed reasonable by the Required Lenders, does not exceed $70 million.

5.26    Common Enterprise. The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrower hereunder, both in their separate capacities and as members of the group of companies. Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

5.27    Reportable Transaction. The Borrower does not intend to treat the Advances and related transactions as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4). In the event the Borrower determines to take any action inconsistent with such intention, it will promptly notify the Agent thereof.

5.28    Labor Disputes. Except as set forth on Schedule 5.28, as of the Closing Date (a) no collective bargaining agreement or other labor contract covering employees of any Loan Party is scheduled to expire during the term of this Agreement, (b) no union or other labor organization is seeking to organize, or to be recognized as, a collective bargaining unit of employees of any Loan Party or for any similar purpose and (c) there is no pending or (to the best of the Borrower's knowledge) threatened, strike, work stoppage, material unfair labor practice claim, or other material labor dispute against or affecting any Loan Party or its employees.

5.29    <u>Orders</u>.  The Interim Order and the Final Order, as applicable, and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Agent.

5.30    <u>No Default</u>.  There exists no Default or Unmatured Default.

5.31    <u>Montana Megawatts I, LLC; Turbine Collateral</u>.  MM I does not own, and has never owned, any assets other than the Turbine Collateral. MM I does not have, and has never had, any liability of any kind, contingent or otherwise, since its formation, other than (i) ordinary course administrative expenses not exceeding $1,000,000 in the aggregate and (ii) obligations assumed under and pursuant to that certain Assignment and Assumption Agreement, dated as of September 14, 2001, among MM I, Enron North America Corp., and E-Next Generation LLC.  MM I and NG I have collectively purchased and accepted each item of Turbine Collateral, no rights of return or rejection exist with respect to any Turbine Collateral under the applicable original purchase agreements, and as of the Effective Date the Turbine Collateral is covered by the applicable warranties from the manufacturer contained in the applicable original purchase agreements, and such warranties have not expired, been breached by any Loan Party or otherwise invalidated.  MM I and NG I are collectively the owners of the full, legal and beneficial title to all of the Turbine Collateral, free and clear of all Liens.  The Turbine Collateral has not been placed in service or affixed or installed on any Property and is in the same condition as when received from the manufacturer, without wear and tear of any kind.

5.32    <u>Borrowing Base Inventory</u>.  The Borrower has good title to all of the Borrowing Base Inventory, free and clear of all Liens.  All of the Borrowing Base Inventory (other than Material and Supplies Inventory) is stored at real Property locations identified on <u>Schedule 5.32</u> which are owned or leased by the Borrower, free and clear of all Liens (other than Permitted Liens).  Upon the occurrence and during the continuance of a Default, the Agent on behalf of the Secured Parties will be entitled to freely sell, transfer or otherwise dispose of the Borrowing Base Inventory included in the Collateral without restriction of any kind.

5.33    <u>Principal Real Properties</u>.  As of the Closing Date, <u>Schedule 5.33</u> sets forth a correct and complete list (categorized by owned or leased Property) of all (i) power generating Property owned or leased by any Loan Party, (ii) electrical transmission Property owned or leased by any Loan Party and having a book value in excess of $1,000,000 and (iii) natural gas storage facilities Property owned or leased by any Loan Party (collectively, the "<u>Gas Storage Facilities</u>") and having a book value in excess of $1,000,000.  Each of the leases and subleases of real Property described on <u>Schedule 5.33</u> is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists, except for defaults resulting from the filing of the Case.  Each Loan Party has good and indefeasible title to the real Property identified on <u>Schedule 5.33</u> as owned by such Loan Party, or valid leasehold interests in all real Property designated therein as "leased" by such Loan Party. No natural gas is stored upon or within Gas Storage Facilities except pursuant to the applicable Loan Party's fee or leasehold Property interests.  Each Loan Party possesses all material certificates, licenses, authorizations, registrations, permits and/or approvals necessary for the ownership, operating, leasing and management of the Gas Storage Facilities, all of which are in full force and effect and not the subject of any revocation proceedings, undisclosed amendment, release, suspension, forfeiture and the like.  All material easements, rights of way, leasehold, and other property interests (collectively, the "<u>Easements</u>"), all utility and other services (including electrical, telephone, water and sewage services and facilities), means of transportation, ingress and egress, facilities, other materials and other rights that are reasonably necessary for the operation of the Gas Storage Facilities have been procured or are commercially available to the Gas Storage Facilities at commercially reasonable rates and, to the extent appropriate, arrangement have been made on commercially reasonable terms for such Easements, interests, services, means of transportation and access, facilities, materials and rights.  Each of the

Easements is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any Easement exists.

## ARTICLE VI

## COVENANTS

Each Loan Party executing this Agreement jointly and severally agrees as to all Loan Parties that from and after the date hereof and until the Facility Termination Date:

6.1    Financial and Collateral Reporting.  The Borrower will maintain, for itself and each Subsidiary (other than Excluded Subsidiaries), a system of accounting established and administered in accordance with GAAP, and will furnish to the Lenders:

(a)    within n inety days after the close of each Fiscal Year of the Borrower and its Subsidiaries (other than Excluded Subsidiaries), an unqualified (other than with respect to the Case or a going concern qualification) audit report certified by independent certified public accountants acceptable to the Required Lenders, prepared in accordance with GAAP on a consolidated and consolidating basis (consolidating statements need not be certified by such accountants), including balance sheets as of the end of such Fiscal Year, related profit and loss and reconciliation of surplus statements, and a statement of cash flows, accompanied by (i) any management letter prepared by said accountants and (ii) a certificate of said accountants that, in the course of their examination necessary for their certification of the foregoing, they have obtained no knowledge of any Default or Unmatured Default with respect to the covenant set forth in Section 6.29, or if, in the opinion of such accountants, such a Default or Unmatured Default shall exist, stating the nature and status thereof;

(b)    within forty-five days after the close of the first three quarterly periods of each Fiscal Year of the Borrower and its Subsidiaries (other than Excluded Subsidiaries), consolidated and consolidating unaudited balance sheets as at the close of each such Fiscal Quarter and consolidated and consolidating profit and loss and reconciliation of surplus statements and a statement of cash flows for the period from the beginning of the applicable Fiscal Year to the end of such Fiscal Quarter, all certified by its Chief Financial Officer or Chief Accountant and prepared in accordance with GAAP (except for exclusion of footnotes and subject to normal year-end audit adjustments);

(c)    within twenty days after the close of each Fiscal Month of the Borrower and its Subsidiaries (other than Excluded Subsidiaries), consolidated and consolidating unaudited balance sheets as at the close of each such Fiscal Month and consolidated and consolidating profit and loss and reconciliation of surplus statements and a statement of cash flows for the period from the beginning of the applicable Fiscal Year to the end of such Fiscal Month, all prepared in accordance with GAAP (except for exclusion of footnotes and subject to normal year-end audit adjustments) and certified by its Chief Financial Officer or Chief Accountant;

(d)    [intentionally omitted];

(e)    together with each of the financial statements required under clauses (a), (b) and (c) of this Section 6.1, a compliance certificate in substantially the form of Exhibit D (a "Compliance Certificate") signed by the Chief Financial Officer or Chief Accountant of

57

the Borrower showing the calculations necessary to determine compliance with this Agreement and stating that no Default or Unmatured Default exists, or if any Default or Unmatured Default exists, stating the nature and status thereof;

(f)     (i) until such time as the initial Credit Extension shall have occurred, not later than the seventh Business Day after the end of each calendar month, as of the period then ended, a Borrowing Base Certificate and supporting information in connection therewith and (ii) at all times after the initial Credit Extension shall have occurred, as soon as available but in any event within three Business Days of the end of each calendar week, as of the period then ended, a Borrowing Base Certificate and supporting information in connection therewith (provided that the weekly Borrowing Base Certificate required by this clause (ii) shall be updated weekly with respect to invoicing and collection of cash, and monthly with respect to ineligible Accounts and Borrowing Base Inventory);

(g)     as soon as available but in any event within seven Business Days after the end of each calendar month, as of the period then ended, a detailed aged trial balance of the Borrower's Accounts (reported separately by billed and unbilled Account category type) reconciled to the most recently delivered Borrowing Base Certificate and the weekly "rollforwards" for the previous month delivered pursuant to clause (h) below, prepared in a manner reasonably acceptable to the Agent;

(h)     as soon as available but in any event within three Business Days of the end of each calendar week, as of the period then ended:

     (i)     a "rollforward" of the Borrower's Accounts from the previously delivered month-end aged trial balance delivered pursuant to clause (g) above, such "rollforward" to consist of a sales journal, a collection journal and a credit journal reflecting activity for the most recent calendar week (reported separately by billed and unbilled Account category type) in a manner reasonably acceptable to the Agent;

     (ii)     a worksheet of calculations prepared by the Borrower to determine Eligible Billed Accounts, Eligible Unbilled Accounts, Eligible Stored Gas Inventory, Eligible Working Gas and Fuel Inventory, Eligible Materials and Supplies Inventory and Eligible Turbine Collateral, such worksheet detailing the Accounts (reported separately by billed and unbilled Account category type), Borrowing Base Inventory and Turbine Collateral excluded from Eligible Billed Accounts, Eligible Unbilled Accounts, Eligible Stored Gas Inventory, Eligible Working Gas and Fuel Inventory, Eligible Materials and Supplies Inventory and Eligible Turbine Collateral, respectively, and the reason for such exclusion; provided that until the first Credit Extension shall have occurred the Borrower shall only be required to deliver the information required by this clause (ii) on or before the seventh Business Day after the end of each calendar month; and

     (iii)     a reconciliation of the Borrower's Accounts, Borrowing Base Inventory and Turbine Collateral between the amounts shown in the Borrower's and its Subsidiaries' books and financial statements and the reports delivered pursuant to clause (i) above;

(i)     as soon as available but in any event within seven Business Days after the end of each calendar month, a schedule detailing the Stored Gas Inventory, Working Gas and Fuel Inventory and Materials and Supplies Inventory (collectively, the "Borrowing Base

58

Inventory") in form satisfactory to the Agent, (1) by location, product type, and volume on hand, which Borrowing Base Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Agent has previously indicated to the Borrower are deemed by the Agent to be appropriate, (2) including a report of any variances or other results of Borrowing Base Inventory measurements performed by the Loan Parties since the last Borrowing Base Inventory schedule (including information regarding sales or other reductions, additions, depletions, credits issued by any Loan Party and complaints and claims made against any Loan Party) and (3) reconciled to the Borrowing Base Certificate delivered as of such date;

(j)      as soon as available but in any event not later than the seventh Business Day after the end of each calendar month, as of the month then ended, a schedule and aging of the Borrower's and its Subsidiaries (other than Excluded Subsidiaries) accounts payable;

(k)      promptly upon the Agent's request:

        (i)      access to invoices in connection with the invoices issued by the Borrower in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

        (ii)     copies of purchase orders, invoices, and shipping and delivery documents in connection with any Borrowing Base Inventory, Equipment or other assets purchased by any Loan Party; and

        (iii)    a schedule detailing the balance of all intercompany accounts of the Borrower and its Subsidiaries;

(l)      on the first Business Day of the month of January and June, a certificate of good standing for each Loan Party from the appropriate governmental officer in its jurisdiction of incorporation, formation, or organization;

(m)     as soon as possible and in any event within five Business Days of filing thereof, copies of all tax returns filed by the Borrower or any Subsidiary (other than Excluded Subsidiaries) with the U.S. Internal Revenue Service;

(n)      as soon as possible and in any event within two-hundred and seventy days after the close of the Fiscal Year of the Borrower, a statement of the Unfunded Liabilities of each Single Employer Plan, certified as correct by an actuary enrolled under ERISA;

(o)      as soon as possible and in any event within ten days after the Borrower knows that any Reportable Event has occurred with respect to any Plan, a statement, signed by the Chief Financial Officer or Chief Accountant of the Borrower, describing said Reportable Event and the action which the Borrower proposes to take with respect thereto;

(p)      as soon as possible and in any event within five Business Days of filing therewith with the PBGC, the U.S. Internal Revenue Service or any other governmental entity, a copy of each annual report or other filing with respect to any Plan;

(q)      as soon as possible and in any event within five Business Days after receipt by any Loan Party, a copy of (i) any notice or claim to the effect that any Loan Party is or may be liable to any Person as a result of the release by any Loan Party, or any other Person of

59

any toxic or hazardous waste or substance into the environment and (ii) any notice alleging any violation of any federal, state or local environmental, health or safety law or regulation by any Loan Party;

(r)        concurrently with the furnishing thereof to the shareholders of the Borrower, copies of all financial statements, reports and proxy statements so furnished;

(s)        promptly upon the filing thereof, copies of all registration statements and annual, quarterly, monthly or other regular reports which the Borrower or any Subsidiary (other than Excluded Subsidiaries) files with the Securities and Exchange Commission;

(t)        not later than 5:00 p.m. Chicago time on each Wednesday, the unaudited weekly cash flow reports of the Borrower and its Subsidiaries (other than Excluded Subsidiaries) on a consolidated basis and as of the end of such week, and on a cumulative basis from September 15, 2003 (the "Projections");

(u)        not later than 5:00 p.m. Chicago time on each Wednesday, the Borrower's forecast of cash receipts and disbursements for the Borrower and its Subsidiaries (other than Excluded Subsidiaries) for the ensuing 13-week period; and

(v)        such other information (including nonfinancial information) as the Agent or any Lender may from time to time reasonably request.

6.2        <u>Use of Proceeds</u>.

(a)        The Borrower will use the proceeds of Credit Extensions under the Revolving Commitment solely for working capital, other general corporate purposes of the Borrower and the other Loan Parties (not otherwise prohibited by this Agreement) and for Permitted Pre-Petition Payments.  The Borrower will use the proceeds of Term Loans solely to repay the CSFB Loan in full.

(b)        The Borrower will not, nor will it permit any Loan Party to, use any of the proceeds of the Credit Extensions to (i) purchase or carry any Margin Stock in violation of Regulation U, (ii) repay or refinance any Indebtedness of any Person incurred to buy or carry any Margin Stock, (iii) acquire any security in any transaction that is subject to Section 13 or Section 14 of the Securities Exchange Act of 1934 (and the regulations promulgated thereunder) or (iv) make any Acquisition.

6.3        <u>Notices</u>.  Each Loan Party will give prompt notice in writing to the Agent and the Lenders of:

(a)        the occurrence of any Default or Unmatured Default;

(b)        any other development, financial or otherwise, which could reasonably be expected to have a Material Adverse Effect;

(c)        the assertion by the holder of any post-petition Indebtedness of the Borrower or Indebtedness of the Borrower assumed in the Case, in each case in excess of $250,000, that any default exists with respect thereto or that any Loan Party is not in compliance therewith;

(d)    the assertion by the holder of any Indebtedness of any Subsidiary (other than Excluded Subsidiaries) in excess of $250,000 that any default exists with respect thereto or that any Subsidiary (other than Excluded Subsidiaries) is not in compliance therewith;

(e)    receipt of any written notice that the Borrower or any Subsidiary (other than Excluded Subsidiaries) is subject to any investigation by any governmental entity with respect to any potential or alleged violation of any applicable Environmental Law or of imposition of any Lien against any Property of any such Person for any liability with respect to damages arising from, or costs resulting from, any violation of any Environmental Laws;

(f)    receipt of any notice of litigation commenced or threatened against the Borrower and not stayed as part of the Case that (i) seeks damages in excess of $250,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by the Borrower, (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Laws or (vi) challenges the validity or enforceability of this Agreement or any other Loan Document;

(g)    receipt of any notice of litigation commenced or threatened against any Subsidiary (other than Excluded Subsidiaries) that (i) seeks damages in excess of $250,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any such Person or (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Laws;

(h)    any Lien (other than Permitted Liens) or claim made or asserted against any of the Collateral;

(i)    the decision to change, (i) the Borrower's or any Subsidiary's (other than Excluded Subsidiaries) name or type of entity, (ii) the Borrower's or any Subsidiary's (other than Excluded Subsidiaries) articles or certificate of incorporation, partnership agreement, certificate of partnership, articles or certificate of organization, by laws, or operating or other management agreement and (iii) the location where any Collateral is held or maintained; provided that, in no event shall the Agent receive notice of such change less than thirty days prior thereto;

(j)    commencement of any proceedings against the Borrower or any Subsidiary (other than Excluded Subsidiaries) contesting any tax, fee, assessment, or other governmental charge in excess of $250,000;

(k)    the opening of any new deposit account by the Borrower or any Subsidiary (other than Excluded Subsidiaries) with any bank or other financial institution;

(l)    any loss, damage or destruction to the Collateral in the amount of $250,000 or more, whether or not covered by insurance;

(m)    any and all default notices received under or with respect to any leased location or public warehouse where Collateral is located or with respect to any Easements (which shall be delivered within two Business Days after receipt thereof);

(n)    all material amendments to material real estate leases, together with a copy of each such amendment;

61

(o)    immediately after becoming aware of any pending or threatened strike, work stoppage, unfair labor practice claim, or other labor dispute affecting the Borrower or any Subsidiary (other than Excluded Subsidiaries) in a manner which could reasonably be expected to have a Material Adverse Effect;

(p)    the fact that the Borrower or any Subsidiary (other than Excluded Subsidiaries) has entered into a Rate Management Transaction or an amendment to a Rate Management Transaction, together with copies of all agreements evidencing such Rate Management Transactions or amendments thereto (which shall be delivered within two Business Days); and

(q)    any other matter as Agent may reasonably request.

6.4    Conduct of Business.  Each Loan Party will, and will cause its Subsidiaries (other than Excluded Subsidiaries), to:

(a)    carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted;

(b)    do all things necessary to remain duly incorporated or organized, validly existing and (to the extent such concept applies to such entity) in good standing as a domestic corporation, partnership or limited liability company in its jurisdiction of incorporation or organization, as the case may be, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted;

(c)    keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements previously delivered to the Agent in connection with the Effective Date;

(d)    at all times maintain, preserve and protect all of its assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices; and

(e)    transact business only in its name and such corporate and trade names as are set forth in Schedule 5.12.

6.5    Taxes.  Each Loan Party will, and will cause its Subsidiaries (other than Excluded Subsidiaries) to, timely file complete and correct U.S. Federal and applicable foreign, state and local tax returns required by law, except if non-filing is permitted by the Bankruptcy Code for the period during which such non-filing is permitted by the Bankruptcy Code.  The Borrower will pay when due all taxes, assessments and governmental charges and levies upon it or its income, profits, Property or Collateral, arising after the Petition Date or ordered to be paid by the Bankruptcy Court, except those which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP.  Each Subsidiary (other than Excluded Subsidiaries) will pay when due all taxes, assessments and governmental charges and levies upon it or its income, profits, Property or Collateral, except those which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP.

6.6       Payment of Indebtedness and Other Liabilities.  (i) The Borrower will pay or discharge when due all Material Indebtedness arising after the Petition Date owed by the Borrower under executory contracts assumed in the Case or entered into after the Petition Date, and all other liabilities and obligations due and ordered by the Bankruptcy Court to be paid to materialmen, mechanics, carriers, warehousemen, and landlords, except that the Borrower may in good faith contest, by appropriate proceedings diligently pursued, any such obligations and (ii) each Subsidiary (other than Excluded Subsidiaries) will pay or discharge when due all Material Indebtedness owed by such Person, and all other liabilities and obligations due to be paid to materialmen, mechanics, carriers, warehousemen, and landlords, except that in each of (i) and (ii) above the applicable Person may in good faith contest, by appropriate proceedings diligently pursued, any such obligations; provided that (a) adequate reserves have been set aside for such liabilities in accordance with GAAP, (b) such liabilities would not result in aggregate liabilities in excess of $250,000, (c) no Lien shall be imposed to secure payment of such liabilities that is superior to the Agent's Liens securing the Secured Obligations, (d) none of the Collateral becomes subject to forfeiture or loss as a result of the contest and (e) such Person shall promptly pay or discharge such contested liabilities, if any, and shall deliver to the Agent evidence reasonably acceptable to the Agent of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Person or the conditions set forth in this proviso are no longer met.

6.7       Insurance.

(a)       The Borrower and its Subsidiaries (other than Excluded Subsidiaries) shall at all times maintain, with financially sound and reputable carriers having a Financial Strength rating of at least A+ by A.M. Best Company, insurance against: (i) loss or damage by fire and loss in transit; (ii) theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; (iii) business interruption; (iv) general liability and (v) and such other hazards, as is customary in the business of such Person.  All such insurance shall be in amounts, cover such assets and be under policies acceptable to the Agent in its Permitted Discretion.  In the event any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", the applicable Person shall purchase and maintain flood insurance on such Collateral (including any personal Property which is located on any real Property leased by such Loan Party within a "Special Flood Hazard Area").  The amount of all insurance required by this Section shall at a minimum comply with applicable law, including the Flood Disaster Protection Act of 1973, as amended.  All premiums on such insurance shall be paid when due by the applicable Person, and copies of the policies delivered to the Agent.  Unless the Borrower provides the Agent with evidence of the insurance coverage required by this Agreement, the Agent may purchase insurance at the Borrower's expense to protect the Agent's and the Secured Parties' interests in the Collateral.  This insurance may, but need not, protect the Borrower's and its Subsidiaries interests.  The coverage that the Agent purchases may not pay any claim that the Borrower or its Subsidiaries make or any claim that is made against such Person in connection with the Collateral.  The Borrower may later cancel any insurance purchased by the Agent, but only after providing the Agent with evidence that the Borrower or the applicable Subsidiary has obtained insurance as required by this Agreement.  If the Agent purchases insurance for the Collateral, the Borrower will be responsible for the costs of that insurance, including interest and any other charges the Agent may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the Borrower's total outstanding balance or obligation.  The costs of the insurance may be more than the cost of insurance the Borrower may be able to obtain on its own.  By purchasing such insurance, the Agent shall not be deemed to have waived any Default or Unmatured Default arising from any

Person's failure to maintain such insurance or pay any premiums therefor. Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will use or permit any Property to be used in violation of applicable law or in any manner which might render inapplicable any insurance coverage.

(b)     All insurance policies required under Section 6.7(a) shall name the Agent (for the benefit of the Agent and the other Secured Parties) as an additional insured or as loss payee (with respect to Property on which the Agent has the first priority Lien), as applicable, and shall provide that, or contain loss payable clauses or mortgagee clauses, in form and substance satisfactory to the Agent, which provide that:

    (i)     all proceeds thereunder with respect to any Collateral shall be payable to the Agent (with respect to Property on which the Agent has the first priority Lien);

    (ii)    no such insurance shall be affected by any act or neglect of the insured or owner of the Property described in such policy; and

    (iii)   such policy and loss payable clauses may be canceled, amended, or terminated only upon at least thirty days prior written notice given to the Agent.

(c)     Notwithstanding the foregoing, any insurance or condemnation proceeds received by the Borrower and its Subsidiaries (other than Excluded Subsidiaries) shall be immediately forwarded to the Agent (unless the Borrower or such Subsidiary is contractually obligated to forward such proceeds to another secured party having a Permitted Lien which is senior to the Lien of the Agent granted pursuant to the Collateral Documents) and the Agent may, at its option, apply any such proceeds to the reduction of the Obligations in accordance with Section 2.15(d), provided that in the case of insurance proceeds pertaining to any Person other than the Borrower, such insurance proceeds shall be applied to the Loans owing by the Borrower. The Agent may permit or require the Borrower or any Subsidiary (other than Excluded Subsidiaries) to use such money, or any part thereof, to replace, repair, restore or rebuild the Collateral in a diligent and expeditious manner with materials and workmanship of substantially the same quality as existed before the loss, damage or destruction. Notwithstanding the foregoing, if (i) no Default or Unmatured Default has occurred and is continuing, (ii) the casualty giving rise to such insurance proceeds could not reasonably be expected to have a Material Adverse Effect and (iii) such insurance proceeds do not exceed $250,000 in the aggregate, upon the Borrower's or the applicable Subsidiary's request, the Agent shall permit the Borrower or such Subsidiary to replace, restore, repair or rebuild the property; provided that, if the Borrower or such Subsidiary has not completed or entered into binding agreements to complete such replacement, restoration, repair or rebuilding within 90 days of such casualty, the Agent may apply such insurance proceeds to the Obligations in accordance with Section 2.15. All insurance proceeds that are to be made available to the Borrower or a Subsidiary to replace, repair, restore or rebuild the Collateral shall be applied by the Agent to reduce the outstanding principal balance of the Revolving Loans (which application shall not result in a permanent reduction of the Revolving Commitment) and upon such application, the Agent shall establish a Reserve against the Borrowing Base in an amount equal to the amount of such proceeds so applied. All insurance proceeds made available to any Subsidiary to replace, repair, restore or rebuild Collateral shall be deposited in a cash collateral account. In either case, thereafter, such funds shall be made available to the Borrower or the applicable Subsidiary to provide funds to replace, repair, restore or rebuild the Collateral as follows:

64

(i)     Borrower shall request a Revolving Loan or the applicable Subsidiary shall request a release from the cash collateral account be made in the amount needed;

(ii)    so long as the conditions set forth in <u>Section 4.3</u> have been met, the Revolving Lenders shall make such Revolving Loan or the Agent shall release funds from the cash collateral account; and

(iii)   in the case of insurance proceeds applied against the Revolving Loan, the Reserve established with respect to such insurance proceeds shall be reduced by the amount of such Revolving Loan.

6.8     <u>Compliance with Laws</u>.  The Borrower and its Subsidiaries (other than Excluded Subsidiaries) will comply with all laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject including, without limitation, all Environmental Laws.

6.9     <u>Maintenance of Properties and Intellectual Property Rights</u>.  The Borrower and its Subsidiaries (other than Excluded Subsidiaries) will do all things necessary to (i) maintain, preserve, protect and keep its Property in good repair, working order and condition, and make all necessary and proper repairs, renewals and replacements so that its business carried on in connection therewith may be properly conducted at all times and (ii) obtain and maintain in effect at all times all material franchises, governmental authorizations, Intellectual Property Rights, licenses and permits, which are necessary for it to own its Property or conduct its business as conducted on the Closing Date.  The Borrower and its Subsidiaries (other than Excluded Subsidiaries) shall timely and fully pay and perform its obligations under all Easements.

6.10    <u>Inspection</u>.  Each Loan Party will, and will cause each other Subsidiary (other than Excluded Subsidiaries) to, permit the Agent and the Lenders, by their respective employees, representatives and agents, from time to time upon two Business Days' prior notice as frequently as Agent reasonably determines to be appropriate, to (a) inspect any of the Property, the Collateral, and the books and financial records of such Person, (b) examine, audit and make extracts or copies of the books of accounts and other financial records of such Person, (c) have access to its properties, facilities, the Collateral and its advisors, officers, directors and employees to discuss the affairs, finances and accounts of such Person and (d) review, evaluate and make test verifications and counts of the Accounts and other Collateral of such Person.  If a Default or an Unmatured Default has occurred and is continuing, each Loan Party shall, and shall cause each other Subsidiary (other than Excluded Subsidiaries) to, provide such access to the Agent and to each Lender at all times and without advance notice.  Furthermore, so long as any Default has occurred and is continuing, each Loan Party shall, and shall cause each other Subsidiary (other than Excluded Subsidiaries) to, provide the Agent and each Lender with access to its suppliers.  Each Loan Party shall, and shall cause each other Subsidiary (other than Excluded Subsidiaries) to, promptly make available to the Agent and its counsel originals or copies of all books and records that the Agent may reasonably request. The Loan Parties acknowledge that from time to time the Agent may prepare and may distribute to the Lenders certain audit reports pertaining to the Borrower and its Subsidiaries assets for internal use by the Agent and the Lenders from information furnished to it by or on behalf of the Borrower and its Subsidiaries, after the Agent has exercised its rights of inspection pursuant to this Agreement.

6.11    <u>Appraisals</u>.  Whenever a Default or Unmatured Default exists, and at such other times as the Agent requests, the Loan Parties shall, at their sole expense, provide the Agent with appraisals or updates thereof of their Borrowing Base Inventory, Turbine Collateral, other Equipment, real Property or other Collateral from an appraiser, and prepared on a basis, satisfactory to the Agent, such appraisals and

65

updates to include, without limitation, information required by applicable law and regulations and by the internal policies of the Lenders.

6.12    <u>Communications with Accountants</u>.  Each Loan Party executing this Agreement authorizes (a) Agent and (b) so long as a Default has occurred and is continuing, each Lender, to communicate directly with its independent certified public accountants and authorizes and shall instruct those accountants and advisors to communicate to the Agent and each Lender information relating to any Loan Party with respect to the business, results of operations and financial condition of any Loan Party; <u>provided</u> <u>that</u>, so long as no Default shall have occurred and be continuing the Borrower shall be provided with the opportunity to be present during any such communication.

6.13    <u>Collateral Access Agreements and Real Estate Purchases</u>.  Upon request from the Agent, each Loan Party shall use commercially reasonable efforts to obtain a Collateral Access Agreement from the lessor of each leased property, mortgagee of owned property or bailee with respect to any warehouse, processor or converter facility or other location where Collateral is stored or located, which agreement or letter shall provide access rights, contain a waiver or subordination of all Liens or claims that the landlord, mortgagee or bailee may assert against the Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to the Agent.  After the Closing Date, no real property or warehouse space shall be leased by any Loan Party unless and until, if requested by the Agent, a satisfactory Collateral Access Agreement shall first have been obtained with respect to such location and if it has not been obtained, any Collateral at that location shall be excluded from the Borrowing Base subject to such Reserves as may be established by the Agent. Each Loan Party shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or third party warehouse where any Collateral is or may be located.  To the extent permitted hereunder, if any Loan Party proposes to acquire a fee ownership interest in real Property after the Closing Date, it shall if requested by the Agent first provide to the Agent a mortgage or deed of trust granting Agent a first priority Lien on such real Property, together with environmental audits, mortgage title insurance commitment, real property survey, local counsel opinion(s), and, if required by the Agent, supplemental casualty insurance and flood insurance, and such other documents, instruments or agreements reasonably requested by Agent, in each case, in form and substance reasonably satisfactory to the Agent.

6.14    <u>Control Agreements</u>.  Not later than (i) the date which is thirty days after the Closing Date or (ii) the date the Bankruptcy Court enters the Final Order, whichever occurs first, the Loan Parties will provide to the Agent a Deposit Account Control Agreement or a securities account control agreement (each such securities account control agreement to be in form and substance reasonably satisfactory to the Agent), as applicable, duly executed on behalf of each financial institution holding a deposit account or securities account of a Loan Party as set forth in the Security Agreement; <u>provided</u> <u>that</u>, the Agent may, in its discretion, defer delivery of any such Deposit Account Control Agreement or securities account control agreement, establish a Reserve with respect to any deposit account or securities account for which the Agent has not received such an agreement, and require the Loan Party to open and maintain a new deposit account with a financial institution subject to a Deposit Account Control Agreement or securities account control agreement.  Until such time as the Loan Parties shall have provided the Agent with Deposit Account Control Agreements and securities account control agreements as required by this <u>Section 6.14</u>, the Borrower shall cause Availability to at all times equal or exceed $25,000,000.

6.15    <u>Additional Collateral; Further Assurances</u>.  Upon the request of the Agent, each Loan Party shall (i) grant Liens to the Agent, for the benefit of the Agent and the Secured Parties, pursuant to such documents as the Agent may reasonably deem necessary and deliver such property, documents, and instruments as the Agent may request to perfect the Liens of the Agent in any Property of such Loan Party which constitutes Collateral, including any parcel of real Property located in the U.S. owned by any Loan

66

Party and (ii) in connection with the foregoing requirements, or either of them, deliver to the Agent all items of the type required by <u>Section 4.1</u> (as applicable).

(a)    Each Loan Party will cause 100% of the issued and outstanding Capital Stock of any Person owned by such Loan Party to be subject at all times to a first priority, perfected Lien in favor of the Agent pursuant to the terms and conditions of the Orders and the Loan Documents or other security documents as the Agent shall reasonably request; <u>provided that</u> with the written approval of the Agent upon request of the Borrower (such approval to be in the Agent's discretion) the pledge of Capital Stock with respect to any Foreign Subsidiary may be limited to 65% (or such greater percentage that in the Agent's determination and discretion, due to a change in an applicable law after the date hereof, (1) could not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for U.S. federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's U.S. parent and (2) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Capital Stock entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Capital Stock not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2) in each Foreign Subsidiary directly owned by the Borrower or any Domestic Subsidiary.

(b)    Without limiting the foregoing, each Loan Party shall execute and deliver, or cause to be executed and delivered, to the Agent such documents and agreements, and shall take or cause to be taken such actions as the Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents.

6.16    <u>Dividends</u>.

(a)    Neither the Borrower nor any Subsidiaries (other than Excluded Subsidiaries) will declare or pay any dividends or make any distributions on its Capital Stock or redeem, repurchase or otherwise acquire or retire any of its Capital Stock at any time outstanding, except that any such Person may declare and pay dividends or make distributions to the Borrower.

(b)    Neither the Borrower nor any Subsidiaries (other than Excluded Subsidiaries) shall directly or indirectly enter into or become bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions or the making or repayment of intercompany loans by such Person to the Borrower or any other Loan Party.

6.17    <u>Indebtedness</u>.  The Borrower will not, nor will it permit any Subsidiary (other than Excluded Subsidiaries) to, create, incur or suffer to exist any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness existing on the date hereof and described in <u>Schedule 5.21</u>;

(c)    purchase money Indebtedness incurred in connection with the purchase of any Fixed Assets; <u>provided that</u>, the amount of such purchase money Indebtedness shall be limited to an amount not in excess of the purchase price of such Equipment and the aggregate of

all such purchase money Indebtedness incurred after the Closing Date shall not exceed $1,000,000; and

(d)     Capitalized Lease Obligations not in excess of $15,000,000 during the term of this Agreement (inclusive of any Capitalized Lease Obligations set forth on Schedule 5.21).

6.18     Capital Structure.  If all or any part of a Loan Party's Capital Stock has been pledged to the Agent, that Loan Party shall not issue additional Capital Stock. Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall engage in any business other than the businesses currently engaged in by it or businesses reasonably related thereto.

6.19     Merger.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will merge or consolidate with or into any other Person, except that any Loan Party (other than the Borrower) may merge with any other Loan Party (other than the Borrower).

6.20     Sale of Assets.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will lease, sell or otherwise dispose of its Property (including any Capital Stock owned by it) to any other Person, except:

(a)     sales of inventory in the ordinary course of business;

(b)     the sale or other disposition of Equipment that is obsolete or no longer useful in such Person's business and having a book value not exceeding $5,000,000 in the aggregate for the Borrower and its Subsidiaries (other than Excluded Subsidiaries) since the Closing Date;

(c)     sale of the assets described on Schedule 6.20;

(d)     sales of assets to the extent any such sale is expressly approved by an order of the Bankruptcy Court which has not been stayed, vacated or reversed; and

(e)     the sale or disposition of other assets having a book value not exceeding $5,000,000 in the aggregate for the Borrower and its Subsidiaries (other than Excluded Subsidiaries) since the Closing Date;

provided that all sales or other dispositions permitted hereby shall be made for fair value and (other than those permitted by clause (a) above) shall be for consideration consisting of at least 85% cash; provided further that sales of assets of Expanets or Blue Dot shall not be subject to the 85% cash consideration requirement if such sales are approved by an order of the Bankruptcy Court which has not been stayed, vacated or reversed.  The Net Cash Proceeds of any sale or disposition permitted pursuant to this Section 6.20 (other than pursuant to clause (a) above) shall be delivered to the Agent as required by Section 2.15 and applied to the Obligations as set forth therein.

6.21     Investments and Acquisitions.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will (a) make or suffer to exist any Investments (including without limitation, loans and advances to, and other Investments in, Subsidiaries), or commitments therefor, (b) create any Subsidiary, (c) become or remain a partner in any partnership or joint venture or (d) make any Acquisition, except:

(i)     Cash Equivalent Investments;

68

(ii)    Investments in Subsidiaries other than Loan Parties existing as of the Closing Date (but excluding any additional capital contribution or other additional Investment in such Subsidiary);

(iii)   Investments in Subsidiaries that are Loan Parties in the ordinary course of business and consistent with past practice; and

(iv)    other Investments in existence on the Closing Date and described in <u>Schedule 6.21</u> (but excluding any additional capital contribution or other additional Investment in such Person or with respect to such Investment).

6.22    <u>Liens</u>.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will create, incur, or suffer to exist any Lien in, of, or on the Property of such Person, other than Permitted Liens.

6.23    <u>Change of Corporate Name or Location; Change of Fiscal Year</u>.  No Loan Party shall (a) change its name as it appears in official filings in the state of its incorporation or organization, (b) change its chief executive office, principal place of business, mailing address, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral as set forth in the Security Agreement, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization or (e) change its state of incorporation or organization, in each case, unless (1) the Agent shall have received at least thirty days prior written notice of such change and (2) the Agent shall have either determined that such change will not adversely affect the validity, perfection or priority of the Agent's security interest in the Collateral, or the Agent shall have acknowledged in writing that any reasonable action requested by the Agent in connection therewith has been completed or taken (including any action to continue the perfection of any Liens in favor of the Agent, on behalf of Lenders, in any Collateral), <u>provided</u> <u>that</u>, any new location shall be in the continental U.S.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall change its Fiscal Year.

6.24    <u>Affiliate Transactions</u>.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will enter into any transaction (including, without limitation, the purchase or sale of any Property or service) with, or make any payment or transfer (including, without limitation, any payment or transfer with respect to any fees or expenses for management services) to, any Affiliate except in the ordinary course of business and pursuant to the reasonable requirements of such Person's business and upon fair and reasonable terms no less favorable to such Person than such Person would obtain in a comparable arms length transaction.

6.25    <u>Amendments to Agreements</u>.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will terminate its articles of incorporation, charter, certificate of formation, by-laws, operating, management or partnership agreement or other organizational document in a manner materially adverse to the Lenders.

6.26    <u>Intentionally omitted</u>.

6.27    <u>Financial Contracts</u>.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall enter into or remain liable upon any Financial Contract except Permitted Financial Contracts.

6.28    <u>Capital Expenditures</u>.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall expend, or be committed to expend, in excess of $82,500,000 for Capital Expenditures

in the aggregate for the Borrower and its Subsidiaries (other than Excluded Subsidiaries) for the period commencing on the Closing Date and continuing through the term of this Agreement.

6.29    Minimum EBITDAR.  On or before the date which is the earlier of (i) thirty days after the Effective Date and (ii) the entry of the Final Order by the Bankruptcy Court, the Borrower and the Required Lenders shall agree on a monthly minimum EBITDAR financial covenant test, such covenant test to be measured at the end of each Fiscal Month commencing with the Fiscal Month ended October 31, 2003, for the period commencing on September 1, 2003 and ending on the last day of the applicable Fiscal Month.  Each Loan Party acknowledges and agrees that the agreement of the Required Lenders to the minimum EBITDAR financial covenant shall be at the sole and absolute discretion of the Required Lenders and that any failure to agree on such financial covenant by the date set forth above shall be an immediate Default.

6.30    [Intentionally omitted.].

6.31    Real Property Purchases.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall purchase a fee simple ownership, easement, right of way or similar interest in real Property except in the ordinary course of business consistent with past practice.

6.32    Sale of Accounts.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall sell or otherwise dispose of any notes receivable or accounts receivable (other than the Colstrip Accounts (as defined the Security Agreement)), with or without recourse, except for the write-off or settlement of accounts in the ordinary course of business consistent with past practice.

6.33    Contingent Obligations.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) will incur any Contingent Obligations except (i) for any guaranty of Indebtedness or other obligations of the Borrower or any Subsidiary (other than Excluded Subsidiaries) if such Person could have incurred such Indebtedness or obligations under this Agreement and (ii) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

6.34    Chapter 11 Claims.  The Borrower will not incur, create, assume, suffer to exist or permit any other Superpriority Claim which is pari passu with or senior to the claims of the Agent and the Secured Parties against the Borrower, except the Carve-Out.

6.35    [Intentionally omitted].

6.36    Bankruptcy Court.  The Borrower will use commercially reasonable efforts to obtain the approval of the Bankruptcy Court of this Agreement and the other Loan Documents.  The Borrower will deliver to the Agent, the Agent's counsel and the Lenders all material pleadings, motions and other documents filed on behalf of all of the Loan Parties with the Bankruptcy Court.

6.37    Operating Leases; Sale and Leaseback Transactions.

(a)    Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall become liable or remain liable as lessee or guarantor or other surety with respect to any operating lease except that the Borrower and any Subsidiary (other than Excluded Subsidiaries) may (i) remain liable with respect to any operating lease entered into prior to the Petition Date and (ii) become and remain liable with respect to operating leases entered into on or after the Petition Date so long as the aggregate amount of all rents paid or accrued under all such operating leases entered into after the Petition Date shall not exceed $1,000,000 in the aggregate since the Closing Date.

70

(b)    Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall enter into any Sale and Leaseback Transaction.

6.38    Prepayment of Indebtedness.  Neither the Borrower nor any Subsidiary (other than Excluded Subsidiaries) shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations, (ii) Permitted Pre-Petition Payments and (iii) Indebtedness secured by a Permitted Lien if the asset securing such Indebtedness has been sold or otherwise disposed of in accordance with Section 6.20.

6.39    Turbine Collateral.  The Borrower shall at all times (i) cause the Turbine Collateral to be free from any Lien (other than the Lien in favor of the Agent for the benefit of the Secured Parties), (ii) keep the Turbine Collateral located at a location owned by the Borrower in fee simple on real Property not subject to any Liens unless the Borrower shall have caused to be delivered to the Agent such Collateral Access Agreements as the Agent may request and (iii) cause the Turbine Collateral to be maintained in its original condition as delivered to MM I from the manufacturer (and not placed in service in any manner).  In addition, the Borrower shall not, and shall not permit any other Person to, allow the Turbine Collateral to become installed or affixed in any manner, in part or whole, to any other Property.

6.40    Rating.  The Borrower shall use its best efforts to obtain a rating for the Revolving Loans and the Term Loans from, at the Agent's option, Moody's, S&P and/or Fitch prior to the Term Loan Commitment Effective Date, and in any event shall continue to use such best efforts until the rating(s) are obtained.

6.41    Certain Post-Closing Covenants

(a)    On or before the date the Final Order is entered, the Borrower shall cause each of Canadian-Montana Pipe Line Company and Risk Partners Assurance, Ltd. to guarantee the Obligations and pledge substantially all of its assets to secure such Guaranty; provided that the Borrower shall not be so obligated if, in the reasonable determination of the Agent in its sole discretion, such guarantee or pledge shall cause a material cash tax liability for the Borrower and its Subsidiaries (other than Excluded Subsidiaries) taken as a whole or otherwise impose a material regulatory or other material economic burden on the Borrower and its Subsidiaries (other than Excluded Subsidiaries).

(b)    On or before October 3, 2003, the Borrower shall (i) take or cause to be taken such action as is requested by the Agent to cause the Capital Stock of any Subsidiary pledged as Collateral that is represented by an "uncertificated security" for purposes of the UCC to be represented by a "certificated security" for purposes of the UCC and (ii) cause such certificate or instrument to be delivered to the Agent, indorsed in blank by an "effective indorsement" (as defined in Section 8-107 of the UCC), regardless of whether such certificate constitutes a "certificated security" for purposes of the UCC, and otherwise comply with the terms of the Security Agreement with respect to such Capital Stock.

(c)    On or before September 23, 2003, the Agent and the Lenders shall have received the business plan of the Borrower and its Subsidiaries (other than Excluded Subsidiaries), which business plan shall include a financial history on a monthly basis for the Borrower and its Subsidiaries (other than Excluded Subsidiaries) for the fiscal period ending June 30, 2004 and projections on a monthly basis for the Fiscal Years ending December 31, 2003 and 2004 (with the projections for Fiscal Year 2003 to be from September 1

71

through December 31, 2003), prepared by the Loan Parties and in form and substance acceptable to the Agent and the Lenders.

(d)    On or before September 26, 2003, the Borrower shall deliver, or cause to be delivered, all original stock certificates, notes and instruments, together with blank undated stock powers (in form reasonably acceptable to the Agent), with respect to all Pledged Collateral (as defined in the Security Agreement).

(e)    On or before October 3, 2003, the Borrower shall cause the Capital Stock of Risk Partners Assurance, Ltd. to be pledged to the Agent for the benefit of the Secured Parties pursuant to Collateral Documents (including, without limitation, a charge or other pledge agreement pursuant to Bermuda law) in form and substance reasonably satisfactory to the Agent.

(f)    The Loan Parties will cooperate with the Agent in connection with the completion of all Lien searches reasonably requested by the Agent.

(g)    The Loan Parties shall promptly, but in any event within sixty days of the Effective Date, take all actions necessary to ensure that all material Patents, Trademarks, and Copyrights pledged pursuant to the Security Agreement, including, without limitation, those set forth on Exhibit D thereto, are submitted for registration with the Patent and Trademark Officer under the current names of the respective entities owning such Patents, Trademarks, and Copyrights.

(h)    (i) On or before September 26, 2003, the Loan Parties shall deliver to the Agent Schedules 1(a), 5.21 and 6.21 to this Agreement and Exhibit G to the Security Agreement and (ii) on or before October 3, 2003, the Loan Parties shall deliver to the Agent Schedule 5.32 and 5.33 to this Agreement and Exhibits A and F to the Security Agreement, each of such schedules and exhibits to be in form and substance acceptable to the Agent in its sole discretion, such schedules and exhibits to be annexed to this Agreement and the Security Agreement pursuant to amendments to this Agreement and the Security Agreement (such amendments to be in form and substance satisfactory to the Agent).

## ARTICLE VII

### DEFAULTS

The occurrence of any one or more of the following events shall constitute a "Default" hereunder:

(a)    any representation or warranty made or deemed made by or on behalf of any Loan Party to any Lender or the Agent under or in connection with this Agreement, any other Loan Document, any Credit Extension, or any certificate or information delivered in connection with any of the foregoing shall be materially false on the date as of which made;

(b)    nonpayment, when due (whether upon demand or otherwise), of any principal, interest, fee, Reimbursement Obligation or any other obligation owing under any of the Loan Documents;

(c)        the breach by any Loan Party of any of the terms or provisions of Section 6.1, 6.2, 6.3(a), 6.7, 6.15 through 6.23 or 6.25 through 6.41;

(d)        the breach by any Loan Party (other than a breach which constitutes a Default under another Section of this Article VII) of any of the terms or provisions of (i) Section 6.3 (other than Section 6.3(a)), 6.4 through 6.6, 6.8 through 6.14 or 6.24 of this Agreement which is not remedied within five days after the earlier of such breach or written notice from the Agent or any Lender or (ii) any other Section of this Agreement which is not remedied within fifteen days after the earlier of such breach or written notice from the Agent or any Lender;

(e)        the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document in any material respect (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(f)        the Borrower shall breach any provision of the Interim Order or the Final Order;

(g)        any Subsidiary (other than Excluded Subsidiaries) shall (i) have an order for relief entered with respect to it under the Bankruptcy Code as now or hereafter in effect, (ii) make an assignment for the benefit of creditors, (iii) apply for, seek, consent to, or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any Substantial Portion of its Property, (iv) institute any proceeding seeking an order for relief under the Bankruptcy Code as now or hereafter in effect or seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (v) take any corporate, limited liability company or partnership action to authorize or effect any of the foregoing actions set forth in this clause (g) or (vi) fail to contest in good faith any appointment or proceeding described in clause (h) of this Article VII;

(h)        a receiver, trustee, examiner, liquidator or similar official shall be appointed for any Subsidiary (other than Excluded Subsidiaries) or any Substantial Portion of its Property, or a proceeding described in clause (g)(iv) of this Article VII shall be instituted against any Subsidiary (other than Excluded Subsidiaries) and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of sixty consecutive days;

(i)        any court, government or governmental agency shall condemn, seize or otherwise appropriate, or take custody or control of, all or any portion of the Property of the Borrower or any Subsidiary (other than Excluded Subsidiaries) which, when taken together with all other Property of any such Person so condemned, seized, appropriated, or taken custody or control of, during the twelve month period ending with the month in which any such action occurs, constitutes a Substantial Portion;

(j)        any loss, theft, damage or destruction of any item or items of Collateral or other property of the Borrower or any Subsidiary (other than Excluded Subsidiaries) occurs which could reasonably be expected to cause a Material Adverse Effect;

73

(k)     any judgment or order as to a post-petition liability or debt for the payment of money in excess of $1,000,000 not fully covered by insurance shall be rendered against the Borrower and the enforcement thereof shall not have been stayed, or any non-monetary judgment or order with respect to a post-petition event shall be rendered against the Borrower which does or could reasonably be expected to result in a Material Adverse Effect, and there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(l)     any Subsidiary (other than Excluded Subsidiaries) shall fail within thirty days to pay, bond or otherwise discharge one or more (i) judgments or orders for the payment of money in excess of $1,000,000 (or the equivalent thereof in currencies other than U.S. Dollars) in the aggregate, or nonmonetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(m)     the Borrower shall fail to make any payment on any post-petition Indebtedness (other than the Obligations) or any post-petition Contingent Obligations in respect of Indebtedness of any other Person, and, in each case, such failure relates to Indebtedness having a principal amount of $1,000,000 or more (individually or in the aggregate with other Indebtedness to which this clause (m) would otherwise apply), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise); or (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to any such post-petition Indebtedness, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of such Indebtedness; or (iii) any such post-petition Indebtedness shall become or be declared to be due and payable, or required to be prepaid or repurchased (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof;

(n)     failure of any Subsidiary (other than Excluded Subsidiaries) to pay when due any Material Indebtedness or a default, breach or other event occurs under any term, provision or condition contained in any Material Indebtedness Agreement of any Subsidiary (other than Excluded Subsidiaries), the effect of which default, event or condition is to cause, or to permit the holder(s) of such Material Indebtedness or the lender(s) under any Material Indebtedness Agreement to cause, such Material Indebtedness to become due prior to its stated maturity or any commitment to lend under any Material Indebtedness Agreement to be terminated prior to its stated expiration date; any Material Indebtedness of any Subsidiary (other than Excluded Subsidiaries) shall be declared to be due and payable or required to be prepaid or repurchased (other than by a regularly scheduled payment) prior to the stated maturity thereof; or any Subsidiary (other than Excluded Subsidiaries) shall not pay, or admit in writing its inability to pay, its debts generally as they become due;

(o)     any Change in Control shall occur;

(p)     the Unfunded Liabilities of all Single Employer Plans shall exceed in the aggregate $120,000,000 or any Reportable Event shall occur in connection with any Plan;

(q)     the Borrower or any other member of the Controlled Group shall have been notified by the sponsor of a Multiemployer Plan that it has incurred withdrawal liability to such

74

Multiemployer Plan in an amount which, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Borrower or any other member of the Controlled Group as withdrawal liability (determined as of the date of such notification), exceeds $5,000,000 or requires payments exceeding $1,000,000 per annum;

(r)    the Borrower or any other member of the Controlled Group shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, if as a result of such reorganization or termination the aggregate annual contributions of the Borrower and the other members of the Controlled Group (taken as a whole) to all Multiemployer Plans which are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the respective plan years of each such Multiemployer Plan immediately preceding the plan year in which the reorganization or termination occurs by an amount exceeding $5,000,000;

(s)    it shall be determined (whether by the Bankruptcy Court or by any other judicial or administrative forum) that the Borrower or any Subsidiary (other than Excluded Subsidiaries) is liable for the payment of claims arising out of any failure to comply (or to have complied) with applicable environmental laws or regulations the payment of which will have a Material Adverse Effect, and the enforcement thereof shall not have been stayed;

(t)    any Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Guaranty, or any Guarantor shall fail to comply in any material respect with any of the terms or provisions of the Guaranty to which it is a party, or any Guarantor shall deny that it has any further liability under the Guaranty to which it is a party, or shall give notice to such effect;

(u)    any Collateral Document shall for any reason fail to create a valid and perfected security interest in any Collateral purported to be covered thereby with the priority required by the Loan Documents and the Orders, except as permitted by the terms of any Collateral Document, or any Collateral Document shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document (including with respect to any bankruptcy or insolvency proceeding instituted by or against any issuer of Capital Stock constituting Collateral), or any Loan Party shall fail to comply with any of the terms or provisions of any Collateral Document;

(v)    any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing (including, without limitation, in any pleading filed in any court), or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(w)    the Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy

75

Code shall be appointed in the Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty days after the entry thereof; or an application shall be filed by the Borrower for the approval of any other Superpriority Claim (other than the Carve-Out) in the Case which is <u>pari passu</u> with or senior to the claims of the Agent and the Lenders against the Borrower, or there shall arise or be granted any such <u>pari passu</u> or senior Superpriority Claim;

(x)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower which have a value in excess of $100,000 in the aggregate;

(y)    an order of the Bankruptcy Court shall be entered reversing, staying for a period in excess of five days, vacating or (without the written consent of the Agent) otherwise amending, supplementing or modifying any of the Orders;

(z)    the Borrower shall make any Pre-Petition Payment other than Permitted Pre-Petition Payments;

(aa)    the Final Order shall not have been entered by the Bankruptcy Court on or before the date which is forty-five days after the Petition Date;

(bb)    (i) the Borrower shall fail to pay when due any Operating Lease Obligation arising after the Petition Date or which has been assumed in the Case or (ii) any Subsidiary (other than Excluded Subsidiaries) shall fail to pay when due any Operating Lease Obligation in excess of $1,000,000;

(cc)    nonpayment by the Borrower or any Subsidiary (other than Excluded Subsidiaries) of any Rate Management Obligation when due or the breach by the Borrower or any Subsidiary (other than Excluded Subsidiaries) in any material respect of any term, provision or condition contained in any Rate Management Transaction or any transaction of the type described in the definition of "Rate Management Transactions," whether or not any Lender or Affiliate of a Lender is a party thereto; or

(dd)    any order, judgment, decree, ruling or similar binding action is taken by any governmental authority having jurisdiction over the Borrower or any Subsidiary (other than Excluded Subsidiaries) which lowers, or has the effect of, lowering the tariff rates charged by the Borrower and its Subsidiaries (other than Excluded Subsidiaries) to their customers to the extent any such action could in the reasonable determination of the Required Lenders have a Material Adverse Effect.

## ARTICLE VIII

## <u>REMEDIES; WAIVERS AND AMENDMENTS</u>

8.1    <u>Remedies</u>.

(a)    If any Default occurs, the Agent may in its discretion (and at the written request of the Required Lenders, shall), and in every such event and at any time thereafter during the

continuance of such event, and without further order of or application to the Bankruptcy Court (but subject to any requirement to give notice by the terms of the Interim Order or the Final Order, as applicable), the Agent may, and at the request of the Required Lenders, shall, by notice to the Borrower (with a copy to counsel to the Borrower, counsel for the Official Unsecured Creditors' Committee appointed in the Case and to the United States Trustee for the District of Delaware), take one or more of the following actions, at the same or different times: (i) terminate or reduce forthwith the Aggregate Commitment or the Revolving Commitment; (ii) terminate or suspend the obligations of the Lenders to make Loans hereunder and the obligation and power of the LC Issuer to issue Facility LCs, (iii) declare all or any portion of the Obligations to be due and payable, whereupon such Obligations shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which the Borrower hereby expressly waives, (iv) upon notice to the Borrower and in addition to the continuing right to demand payment of all amounts payable under this Agreement, the Agent may either (1) make demand on the Borrower to pay, and the Borrower will, forthwith upon such demand and without any further notice or act, pay to the Agent an amount, in immediately available funds (which funds shall be held in the Facility LC Collateral Account), equal to 105% of the Collateral Shortfall Amount or (2) deliver a Supporting Letter of Credit as required by Section 2.1.2(l), whichever the Agent may specify in its sole discretion, (v) increase the rate of interest applicable to the Loans and the LC Fees as set forth in this Agreement and (vi) exercise any rights and remedies provided to the Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC. In addition, subject solely to any requirement to give notice by the terms of the Interim Order or the Final Order, as applicable, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Agent and the other Secured Parties may exercise any and all remedies under the Loan Documents and under applicable law available to the Agent and the other Secured Parties.

(b)     If, within thirty days after acceleration of the maturity of the Obligations or termination of the obligations of the Lenders to make Loans and the obligation and power of the LC Issuer to issue Facility LCs hereunder as a result of any Default, the Required Lenders (in their sole discretion) shall so direct, the Agent shall, by notice to the Borrower, rescind and annul such acceleration and/or termination.

(c)     If at any time while any Default is continuing, the Agent determines that the Collateral Shortfall Amount at such time is greater than zero, the Agent may make demand on the Borrower to pay, and the Borrower will, forthwith upon such demand and without any further notice or act, pay to the Agent an amount equal to 105% of the Collateral Shortfall Amount, which funds shall be deposited in the Facility LC Collateral Account.

(d)     The Agent may at any time or from time to time after funds are deposited in the Facility LC Collateral Account, apply such funds to the payment of the Obligations and any other amounts as shall from time to time have become due and payable by the Borrower to the Lenders or the LC Issuer under the Loan Documents.

(e)     At any time while any Default is continuing, neither the Borrower nor any Person claiming on behalf of or through the Borrower shall have any right to withdraw any of the funds held in the Facility LC Collateral Account. After all of the Secured Obligations have been indefeasibly paid in full and the Aggregate Commitment has been terminated,

77

any funds remaining in the Facility LC Collateral Account shall be returned by the Agent to the Borrower or paid to whomever may be legally entitled thereto at such time.

8.2    <u>Waivers by Loan Parties</u>.  Except as otherwise provided for in this Agreement, by applicable law or by the Interim Order or Final Order, as applicable, each Loan Party waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which any Loan Party may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard, (b) all rights to notice and a hearing prior to the Agent's taking possession or control of, or to the Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the Agent to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

8.3    <u>Amendments</u>.

(a)    Subject to the provisions of this <u>Section 8.3</u>, no amendment, waiver or modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or the Agent with the consent in writing of the Required Lenders) and the Loan Parties and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)    Notwithstanding <u>Section 8.3(a)</u>, no such amendment, waiver or other modification with respect to this Agreement shall, without the consent of all of the Lenders affected thereby:

(i)    extend the final maturity of any Loan to a date after the Facility Termination Date;

(ii)    postpone any regularly scheduled payment of principal of any Loan or reduce or forgive all or any portion of the principal amount of any Loan or any Reimbursement Obligation or reduce the amount or extend the payment date for, the mandatory payments required under <u>Article II</u>;

(iii)    reduce the rate or extend the time of payment of interest or fees payable to the Lenders pursuant to any Loan Document;

(iv)    reduce the percentage or number of Lenders specified in the definition of Required Lenders;

(v)    extend the Facility Termination Date;

(vi)    increase the amount of the Aggregate Commitment or the Commitment of any Lender hereunder (other than pursuant to <u>Section 12.3</u> or as a result of the occurrence of the Term Loan Commitment Effective Date in accordance with the terms and conditions of this Agreement);

78

(vii)    increase the advance rates set forth in the definition of Borrowing Base; permit any Loan Party to assign its rights under this Agreement;

(viii)    amend this Section 8.3;

(ix)    release any material guarantor of any Credit Extension, except as otherwise permitted herein or in the other Loan Documents; or

(x)    except as provided in Section 10.15 or any Collateral Document, release all or substantially all of the Collateral.

(c)    No amendment of any provision of this Agreement relating to the Agent or to the Non-Ratable Loans shall be effective without the written consent of the Agent. No amendment of any provision relating to the LC Issuer shall be effective without the written consent of the LC Issuer. The Agent may (i) amend the Commitment Schedule to reflect assignments entered into pursuant to Section 12.3, (ii) waive payment of the fee required under Section 12.3(c) and (iii) implement any Flex-Pricing Provision contained in any commitment letter delivered in connection with the transaction which is the subject of this Agreement without obtaining the consent of any other party to this Agreement so long as, in the case of any implementation of any Flex-Pricing Provisions, the Agent's actions would not require consent of all of the Lenders pursuant to the foregoing provisions of this Section.

8.4    Preservation of Rights. No delay or omission of the Lenders, the LC Issuer or the Agent to exercise any right under the Loan Documents shall impair such right or be construed to be a waiver of any Default or an acquiescence therein, and the making of a Credit Extension notwithstanding the existence of a Default or the inability of the Borrower to satisfy the conditions precedent to such Credit Extension shall not constitute any waiver or acquiescence. Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right, and no waiver, amendment or other variation of the terms, conditions or provisions of the Loan Documents whatsoever shall be valid unless in writing signed by the Lenders required pursuant to Section 8.3, and then only to the extent in such writing specifically set forth. All remedies contained in the Loan Documents or by law afforded shall be cumulative and all shall be available to the Agent, the LC Issuer and the Lenders until the Obligations have been paid in full.

## ARTICLE IX

## GENERAL PROVISIONS

9.1    Survival of Representations. All representations and warranties of the Loan Parties contained in this Agreement and the other Loan Documents shall survive the execution and delivery of the Loan Documents and the making of the Credit Extensions herein contemplated.

9.2    Governmental Regulation. Anything contained in this Agreement to the contrary notwithstanding, neither the LC Issuer nor any Lender shall be obligated to extend credit to the Borrower in violation of any limitation or prohibition provided by any applicable statute or regulation.

9.3    Headings. Section headings in the Loan Documents are for convenience of reference only, and shall not govern the interpretation of any of the provisions of the Loan Documents.

9.4    <u>Entire Agreement</u>. The Loan Documents embody the entire agreement and understanding among the Loan Parties, the Agent, the LC Issuer and the Lenders and supersede all prior agreements and understandings among the Loan Parties, the Agent and the Lenders relating to the subject matter thereof other than those contained in the Fee Letter and any Flex-Pricing Provisions or "cooperation with syndication" provisions contained in any commitment letter entered into in connection with the transaction which is the subject of this Agreement, all of which shall survive and remain in full force and effect during the term of this Agreement.

9.5    <u>Several Obligations; Benefits of this Agreement</u>. The respective obligations of the Lenders hereunder are several and not joint and no Lender shall be the partner or agent of any other Lender (except to the extent to which the Agent is authorized to act as administrative agent for the Lenders hereunder). The failure of any Lender to perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder. This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns, <u>provided</u> <u>however</u>, that the parties hereto expressly agree that the Arranger shall enjoy the benefits of the provisions of <u>Sections 9.6</u>, <u>9.10</u> and <u>10.11</u> to the extent specifically set forth therein and shall have the right to enforce such provisions on its own behalf and in its own name to the same extent as if it were a party to this Agreement.

9.6    <u>Expenses; Indemnification</u>.

(a)    <u>Expenses</u>. The Borrower shall reimburse the Agent and the Arranger for any costs, internal charges and out of pocket expenses (including reasonable attorneys' fees and time charges of attorneys for the Agent, which attorneys may be employees of the Agent) paid or incurred by the Agent or the Arranger in connection with the preparation, negotiation, execution, delivery, syndication, distribution (including, without limitation, via the internet or through a service such as Intralinks), review, amendment, modification, and administration of the Loan Documents. The Borrower also agrees to reimburse the Agent, the Arranger, the LC Issuer and the Lenders for any costs, internal charges and out of pocket expenses (including reasonable attorneys' fees and time charges of attorneys for the Agent, the Arranger, the LC Issuer and the Lenders, which attorneys may be employees of the Agent, the Arranger, the LC Issuer or the Lenders) paid or incurred by the Agent, the Arranger, the LC Issuer or any Lender in connection with the collection and enforcement of the Loan Documents. Expenses being reimbursed by the Borrower under this Section include, without limitation, costs and expenses incurred in connection with:

(i)    appraisals of all or any portion of the Collateral, each parcel of real Property or interest in real Property described in any Collateral Document, which appraisals shall be in conformity with the applicable requirements of any law or any governmental rule, regulation, policy, guideline or directive (whether or not having the force of law), or any interpretation thereof, including, without limitation, the provisions of Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended, reformed or otherwise modified from time to time, and any rules promulgated to implement such provisions (including travel, lodging, meals and other out of pocket expenses for inspections of the Collateral and the Borrower's operations by the Agent) plus the Agent's then customary charge for field examinations and audits and the preparation of certain reports (reports showing the results of appraisals, field examinations or audits, and are herein referred to as the "<u>Reports</u>") which the Borrower acknowledges may be prepared by Bank One or another Person from

time to time and which the Borrower agrees may be distributed to the Lenders by Bank One pertaining to the Borrower's assets from information furnished to it by or on behalf of the Borrower, after Bank One has exercised its rights of inspection pursuant to this Agreement (such charge is currently $750 per day (or portion thereof) for each Person retained or employed by the Agent with respect to each field examination or audit);

(ii)    any amendment, modification, supplement, consent, waiver or other documents prepared with respect to any Loan Document and the transactions contemplated thereby;

(iii)    lien and title searches and title insurance;

(iv)    taxes, fees and other charges for recording the Mortgages, filing financing statements and continuations, and other actions to perfect, protect, and continue the Agent's Liens (including costs and expenses paid or incurred by the Agent in connection with the consummation of the Agreement);

(v)    sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take;

(vi)    any litigation, contest, dispute, proceeding or action (whether instituted by Agent, the LC Issuer, any Lender, any Loan Party or any other Person and whether as to party, witness or otherwise) in any way relating to the Collateral, the Loan Documents or the transactions contemplated thereby; and

(vii)    costs and expenses of forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the Funding Account and lock boxes, and costs and expenses of preserving and protecting the Collateral.

The foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by the Borrower. All of the foregoing costs and expenses may be charged to the Borrower's Loan Account as Revolving Loans or to another deposit account, all as described in Section 2.17(b).

(b)    Indemnification. The Borrower hereby further agrees to indemnify the Agent, the Arranger, the LC Issuer, each Lender, their respective Affiliates, and each of their directors, officers and employees, on an after-tax basis, against all losses, claims, damages, penalties, judgments, liabilities and expenses (including, without limitation, all expenses of litigation or preparation therefor whether or not the Agent, the Arranger, the LC Issuer any Lender or any Affiliate is a party thereto) which any of them may pay or incur arising out of or relating to this Agreement, the other Loan Documents, the transactions contemplated hereby or the direct or indirect application or proposed application of the proceeds of any Credit Extension hereunder except to the extent that they are determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the party seeking indemnification. The obligations of the Borrower under this Section 9.6 shall survive the termination of this Agreement.

81

9.7     <u>Numbers of Documents</u>.  All statements, notices, closing documents, and requests hereunder shall be furnished to the Agent with sufficient counterparts so that the Agent may furnish one to each of the Lenders.

9.8     <u>Accounting</u>.  Except as provided to the contrary herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP in a manner consistent with that used in preparing the financial statements referred to in <u>Section 5.5</u>. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and the Borrower, the Agent or the Required Lenders shall so request the Agent, the Lenders and the Loan Parties shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders), <u>provided</u> that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and the Borrower shall provide to the Agent and the Lenders reconciliation statements showing the difference in such calculation, together with the delivery of monthly, quarterly and annual financial statements required hereunder.

9.9     <u>Severability of Provisions</u>.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of all Loan Documents are declared to be severable.

9.10     <u>Nonliability of Lenders</u>.  The relationship between any Loan Party on the one hand and the Lenders, the LC Issuer and the Agent on the other hand shall be solely that of debtor and creditor.  Neither the Agent, the Arranger, the LC Issuer nor any Lender shall have any fiduciary responsibilities to any Loan Party.  Neither the Agent, the Arranger, the LC Issuer nor any Lender undertakes any responsibility to any Loan Party to review or inform such Loan Party of any matter in connection with any phase of any Loan Party's business or operations.  The Loan Parties agree that neither the Agent, the Arranger, the LC Issuer nor any Lender shall have liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to, the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought.  Neither the Agent, the Arranger, the LC Issuer nor any Lender shall have any liability with respect to, and each Loan Party hereby waives, releases and agrees not to sue for, any special, indirect, consequential or punitive damages suffered by any Loan Party in connection with, arising out of, or in any way related to the Loan Documents or the transactions contemplated thereby.

9.11     <u>Confidentiality</u>.  Each Lender agrees to hold any confidential information which it may receive from any Loan Party in connection with this Agreement in confidence, except for disclosure (a) to its Affiliates and to other Lenders and their respective Affiliates, (b) to legal counsel, accountants, and other professional advisors to such Lender or to a Transferee, (c) to regulatory officials, (d) to any Person as requested pursuant to or as required by law, regulation, or legal process, (e) to any Person in connection with any legal proceeding to which such Lender is a party, (f) to such Lender's direct or indirect contractual counterparties in swap agreements or to legal counsel, accountants and other professional advisors to such counterparties, (g) permitted by <u>Section 12.4</u> and (h) to rating agencies if requested or required by such agencies in connection with a rating relating to the Credit Extensions hereunder.  Without limiting <u>Section 9.4</u>, the Borrower agrees that the terms of this <u>Section 9.11</u> shall set forth the entire agreement between the Borrower and each Lender (including the Agent) with respect to any confidential information previously or hereafter received by such Lender in connection with this

Agreement, and this Section 9.11 shall supersede any and all prior confidentiality agreements entered into by such Lender with respect to such confidential information. Notwithstanding anything contained in any Loan Document to the contrary, confidential information shall not include, and each party hereto (and each employee, representative or other agent of any party hereto) may disclose to any and all Persons, without limitation of any kind, the U.S. federal income tax treatment and U.S. federal income tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are or have been provided to such party relating to such tax treatment or tax structure, and it is hereby confirmed that each party hereto has been authorized to make such disclosures since the commencement of discussions regarding the transactions contemplated hereby.

9.12    Nonreliance. Each Lender hereby represents that it is not relying on or looking to any Margin Stock for the repayment of the Credit Extensions provided for herein.

9.13    Disclosure. Each Loan Party and each Lender hereby acknowledges and agrees that Bank One and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

# ARTICLE X

## THE AGENT

10.1    Appointment; Nature of Relationship. Bank One, NA is hereby appointed by each of the Lenders as its contractual representative (herein referred to as the "Agent") hereunder and under each other Loan Document, and each of the Lenders irrevocably authorizes the Agent to act as the contractual representative of such Lender with the rights and duties expressly set forth herein and in the other Loan Documents. The Agent agrees to act as such contractual representative upon the express conditions contained in this Article X. Notwithstanding the use of the defined term "Agent," it is expressly understood and agreed that the Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement or any other Loan Document and that the Agent is merely acting as the contractual representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents. In its capacity as the Lenders' contractual representative, the Agent (a) does not hereby assume any fiduciary duties to any of the Lenders, (b) is a "representative" of the Lenders within the meaning of the term "secured party" as defined in the New York Uniform Commercial Code and (c) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents. Each of the Lenders hereby agrees to assert no claim against the Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims each Lender hereby waives.

10.2    Powers. The Agent shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Agent by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Agent shall have no implied duties to the Lenders, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Agent.

10.3    General Immunity. Neither the Agent nor any of its directors, officers, agents or employees shall be liable to the Borrower, any other Loan Party, the LC Issuer or any Lender for any action taken or omitted to be taken by it or them hereunder or under any other Loan Document or in connection herewith or therewith except to the extent such action or inaction is determined in a final non-appealable judgment by a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of such Person.

10.4     No Responsibility for Credit Extensions, Recitals, etc.  Neither the Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into, or verify (a) any statement, warranty or representation made in connection with any Loan Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements of any obligor under any Loan Document, including, without limitation, any agreement by an obligor to furnish information directly to each Lender; (c) the satisfaction of any condition specified in Article IV, except receipt of items required to be delivered solely to the Agent; (d) the existence or possible existence of any Default or Unmatured Default; (e) the validity, enforceability, effectiveness, sufficiency or genuineness of any Loan Document or any other instrument or writing furnished in connection therewith; (f) the value, sufficiency, creation, perfection or priority of any Lien in any Collateral; or (g) the financial condition of any Loan Party or any Affiliate of any Loan Party.  The Agent shall have no duty to disclose to the Lenders information that is not required to be furnished by the Loan Parties to the Agent at such time, but is voluntarily furnished by any Loan Party to the Agent (either in its capacity as the Agent or in its individual capacity).

10.5     Action on Instructions of the Lenders.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder and under any other Loan Document in accordance with written instructions signed by the Required Lenders, and such instructions and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders.  The Lenders hereby acknowledge that the Agent shall be under no duty to take any discretionary action permitted to be taken by it pursuant to the provisions of this Agreement or any other Loan Document unless it shall be requested in writing to do so by the Required Lenders.  The Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Loan Document unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action.

10.6     Employment of Agents and Counsel.  The Agent may execute any of its duties as Agent hereunder and under any other Loan Document by or through employees, agents, and attorneys in fact and shall not be answerable to the Lenders, except as to money or securities received by the Agent or its authorized agents, for the default or misconduct of any such agents or attorneys in fact selected by it with reasonable care.  The Agent shall be entitled to advice of counsel concerning the contractual arrangement between the Agent and the Lenders and all matters pertaining to the Agent's duties hereunder and under any other Loan Document.

10.7     Reliance on Documents; Counsel.  The Agent shall be entitled to rely upon any Note, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex, electronic mail message, statement, paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and, in respect to legal matters, upon the opinion of counsel selected by the Agent, which counsel may be employees of the Agent.  For purposes of determining compliance with the conditions specified in Article IV, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the applicable date specifying its objection thereto.

10.8     Agent's Reimbursement and Indemnification.  The Lenders agree to reimburse and indemnify the Agent ratably in proportion to their respective Commitments (or, if the Commitments have been terminated, in proportion to their Commitments immediately prior to such termination) (a) for any amounts not reimbursed by the Borrower or any other Loan Party for which the Agent is entitled to reimbursement by the Borrower or such other Loan Party under the Loan Documents, (b) for any other expenses incurred by the Agent on behalf of the Lenders, in connection with the preparation, execution, delivery, administration and enforcement of the Loan Documents (including, without limitation, for any

84

expenses incurred by the Agent in connection with any dispute between the Agent and any Lender or between two or more of the Lenders) and (c) for any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind and nature whatsoever which may be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of the Loan Documents or any other document delivered in connection therewith or the transactions contemplated thereby (including, without limitation, for any such amounts incurred by or asserted against the Agent in connection with any dispute between the Agent and any Lender or between two or more of the Lenders), or the enforcement of any of the terms of the Loan Documents or of any such other documents, provided that, (i) no Lender shall be liable for any of the foregoing to the extent any of the foregoing is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Agent and (ii) any indemnification required pursuant to Section 3.5(g) shall, notwithstanding the provisions of this Section 10.8, be paid by the relevant Lender in accordance with the provisions thereof. The obligations of the Lenders under this Section 10.8 shall survive payment of the Obligations and termination of this Agreement.

10.9    Notice of Default. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Unmatured Default hereunder unless the Agent has received written notice from a Lender or the Borrower referring to this Agreement describing such Default or Unmatured Default and stating that such notice is a "notice of default." In the event that the Agent receives such a notice, the Agent shall give prompt notice thereof to the Lenders; provided, that, the Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to the Agent's gross negligence or willful misconduct.

10.10    Rights as a Lender. In the event the Agent is a Lender, the Agent shall have the same rights and powers hereunder and under any other Loan Document with respect to its Commitment and its Credit Extensions as any Lender and may exercise the same as though it were not the Agent, and the term "Lender" or "Lenders" shall, at any time when the Agent is a Lender, unless the context otherwise indicates, include the Agent in its individual capacity. The Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of trust, debt, equity or other transaction, in addition to those contemplated by this Agreement or any other Loan Document, with any Loan Party in which such Loan Party is not restricted hereby from engaging with any other Person, all as if Bank One were not Agent and without any duty to account therefor to Lenders. Bank One and its Affiliates may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders. The Agent in its individual capacity, is not obligated to remain a Lender.

10.11    Lender Credit Decision. Each Lender acknowledges that it has, independently and without reliance upon the Agent, the Arranger or any other Lender and based on the financial statements prepared by the Loan Parties and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Loan Documents. Each Lender also acknowledges that it will, independently and without reliance upon the Agent, the Arranger or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents.

10.12    Successor Agent. The Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower, such resignation to be effective upon the appointment of a successor Agent or, if no successor Agent has been appointed, forty-five days after the retiring Agent gives notice of its intention to resign. The Agent may be removed at any time with or without cause by written notice received by the Agent from the Required Lenders, such removal to be effective on the date specified by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right

85

to appoint, on behalf of the Borrower and the Lenders, a successor Agent. If no successor Agent shall have been so appointed by the Required Lenders within thirty days after the resigning Agent's giving notice of its intention to resign, then the resigning Agent may appoint, on behalf of the Borrower and the Lenders, a successor Agent. Notwithstanding the previous sentence, the Agent may at any time without the consent of the Borrower, any other Loan Party or any Lender, appoint any of its Affiliates which is a commercial bank as a successor Agent hereunder. If the Agent has resigned or been removed and no successor Agent has been appointed, the Lenders may perform all the duties of the Agent hereunder and the Borrower shall make all payments in respect of the Obligations to the applicable Lender and for all other purposes shall deal directly with the Lenders. No successor Agent shall be deemed to be appointed hereunder until such successor Agent has accepted the appointment. Any such successor Agent shall be a commercial bank having capital and retained earnings of at least $100,000,000. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Agent. Upon the effectiveness of the resignation or removal of the Agent, the resigning or removed Agent shall be discharged from its duties and obligations hereunder and under the Loan Documents. After the effectiveness of the resignation or removal of an Agent, the provisions of this Article X shall continue in effect for the benefit of such Agent in respect of any actions taken or omitted to be taken by it while it was acting as the Agent hereunder and under the other Loan Documents. In the event that there is a successor to the Agent by merger, or the Agent assigns its duties and obligations to an Affiliate pursuant to this Section 10.12, then the term "Prime Rate" as used in this Agreement shall mean the prime rate, base rate or other analogous rate of the new Agent.

10.13    Delegation to Affiliates. Each of the Borrower, the other Loan Parties and the Lenders agree that the Agent may delegate any of its duties under this Agreement to any of its Affiliates. Any such Affiliate (and such Affiliate's directors, officers, agents and employees) which performs duties in connection with this Agreement shall be entitled to the same benefits of the indemnification, waiver and other protective provisions to which the Agent is entitled under Articles IX and X.

10.14    Execution of Loan Documents. The Lenders hereby empower and authorize the Agent, on behalf of the Agent and the Lenders, to execute and deliver to the Loan Parties the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents. Each Lender agrees that any action taken by the Agent or the Required Lenders in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Agent or the Required Lenders of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders. The Lenders acknowledge that all of the Obligations hereunder constitute one debt, secured pari passu by all of the Collateral.

10.15    Collateral Matters.

(a)    The Lenders hereby irrevocably authorize the Agent, at its option and in its sole discretion, to release any Liens granted to the Agent by the Loan Parties on any Collateral (i) upon the termination of the Aggregate Commitment, payment and satisfaction in full in cash of all Obligations (other than Unliquidated Secured Obligations), and the cash collateralization of all Unliquidated Secured Obligations in a manner satisfactory to each affected Lender, (ii) constituting Property being sold or disposed of if the Loan Party disposing of such Property certifies to the Agent that the sale or disposition is made in compliance with the terms of this Agreement (and the Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting Property in which no Loan Party has at any time during the term of this Agreement owned any interest, (iv) constituting property leased to a Loan Party under a lease which has expired or been

86

terminated in a transaction permitted under this Agreement, (v) owned by or leased to a Loan Party which is subject to a purchase money security interest or which is the subject of a Capitalized Lease, in either case, entered into by such Loan Party pursuant to <u>Section 6.17(c)</u> or (vi) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Agent and the Lenders pursuant to <u>Section 8.1</u>.  Upon request by the Agent at any time, the Lenders will confirm in writing the Agent's authority to release any Liens upon particular types or items of Collateral pursuant to this <u>Section 10.15</u>.  Except as provided in the preceding sentence, the Agent will not release any Liens on Collateral without the prior written authorization of the Required Lenders or if required pursuant to <u>Section 8.3(b)(x)</u> all of the Lenders; <u>provided</u> <u>that</u>, the Agent may in its discretion, release its Liens on Collateral valued in the aggregate not in excess of $5,000,000 during the term of this Agreement without the prior written authorization of any Lender.

(b)       Upon receipt by the Agent of any authorization required pursuant to <u>Section 10.15(a)</u> from the Required Lenders or pursuant to <u>Section 8.3(b)(x)</u> from all of the Lenders of the Agent's authority to release any Liens upon particular types or items of Collateral, and upon at least five Business Days prior written request by the Loan Parties, the Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of its Liens upon such Collateral; <u>provided</u> <u>that</u>, (i) the Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty and (ii) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(c)       The Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected, or insured or has been encumbered, or that the Liens granted to the Agent therein have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion given the Agent's own interest in the Collateral in its capacity as one of the Lenders and that the Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing.

(d)       Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

(e)       Each Lender hereby agrees as follows: (i) such Lender is deemed to have requested that the Agent furnish such Lender, promptly after it becomes available, a copy of each

Report prepared by or on behalf of the Agent; (ii) such Lender expressly agrees and acknowledges that neither Bank One nor the Agent (A) makes any representation or warranty, express or implied, as to the completeness or accuracy of any Report or any of the information contained therein or (B) shall be liable for any information contained in any Report; (iii) such Lender expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent, Bank One, or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel and that Bank One undertakes no obligation to update, correct or supplement the Reports; (iv) such Lender agrees to keep all Reports confidential and strictly for its internal use, not share the Report with any Loan Party and not to distribute any Report to any other Person except as otherwise permitted pursuant to this Agreement; and (v) without limiting the generality of any other indemnification provision contained in this Agreement, such Lender agrees (W) that neither Bank One nor the Agent shall be liable to such Lender or any other Person receiving a copy of the Report for any inaccuracy or omission contained in or relating to a Report, (X) to conduct its own due diligence investigation and make credit decisions with respect to the Loan Parties based on such documents as such Lender deems appropriate without any reliance on the Reports or on the Agent or Bank One, (Y) to hold the Agent and any such other Person preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Loan Parties, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, any Obligations and (Z) to pay and protect, and indemnify, defend, and hold the Agent and any such other Person preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney fees) incurred by the Agent and any such other Person preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

10.16   Co-Agents, Documentation Agent, Syndication Agent, etc.   Neither any of the Lenders identified in this Agreement as a "co-agent" (if any) nor the Documentation Agent or the Syndication Agent (in each case, if any) shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such.  Without limiting the foregoing, none of such Lenders shall have or be deemed to have a fiduciary relationship with any Lender.  Each Lender hereby makes the same acknowledgments with respect to such Lenders as it makes with respect to the Agent in Section 10.11.

## ARTICLE XI

## SETOFF; RATABLE PAYMENTS

11.1   Setoff.  In addition to, and without limitation of, any rights of the Agent, the LC Issuer or the Lenders under applicable law, upon the occurrence and during the continuance of any Default, each of the Agent, the LC Issuer and each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law and without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Agent, the LC Issuer and each such Lender to or for the credit or the account of the Borrower or any Guarantor against any and all of the obligations of such Borrower or Guarantor now or hereafter existing under the Loan Documents, irrespective of whether or not such Bank shall have made any demand under any Loan Document and although such obligations

may not have been accelerated. The rights of the Agent, the LC Issuer and each Lender under this Section 11.1 are in addition to other rights and remedies which such Agent, LC Issuer or Lender may have upon the occurrence and during the continuance of any Default.

11.2 <u>Ratable Payments</u>. If any Lender, whether by setoff or otherwise, has payment made to it upon its Credit Exposure (other than payments received pursuant to <u>Section 3.1</u>, <u>3.2</u>, <u>3.4</u> or <u>3.5</u>) in a greater proportion than that received by any other Lender, such Lender agrees, promptly upon demand, to purchase a portion of the Aggregate Credit Exposure held by the other Lenders so that after such purchase each Lender will hold its Pro Rata Share of the Aggregate Credit Exposure. If any Lender, whether in connection with setoff or amounts which might be subject to setoff or otherwise, receives collateral or other protection for its Secured Obligations or such amounts which may be subject to setoff, such Lender agrees, promptly upon demand, to take such action necessary such that all Lenders share in the benefits of such collateral ratably in proportion to respective Pro Rata Share of the Aggregate Credit Exposure. In case any such payment is disturbed by legal process, or otherwise, appropriate further adjustments shall be made.

<div align="center">

**ARTICLE XII**

BENEFIT OF AGREEMENT; ASSIGNMENTS; PARTICIPATIONS

</div>

12.1 <u>Successors and Assigns</u>. The terms and provisions of the Loan Documents shall be binding upon and inure to the benefit of the Loan Parties and the Lenders and their respective successors and assigns permitted hereby, except that (a) the Loan Parties shall not have the right to assign their rights or obligations under the Loan Documents without the prior written consent of each Lender, (b) any assignment by any Lender must be made in compliance with <u>Section 12.2</u>, and (c) any transfer by Participation must be made in compliance with <u>Section 12.2</u>. Any attempted assignment or transfer by any party not made in compliance with this <u>Section 12.1</u> shall be null and void, unless such attempted assignment or transfer is treated as a participation in accordance with <u>Section 12.2</u>. The parties to this Agreement acknowledge that clause (b) of this <u>Section 12.1</u> relates only to absolute assignments and this <u>Section 12.1</u> does not prohibit assignments creating security interests, including, without limitation, (x) any pledge or assignment by any Lender of all or any portion of its rights under this Agreement and any Note to a Federal Reserve Bank or (y) in the case of a Lender which is a Fund, any pledge or assignment of all or any portion of its rights under this Agreement and any Note to its trustee in support of its obligations to its trustee; <u>provided</u> <u>however</u>, that no such pledge or assignment creating a security interest shall release the transferor Lender from its obligations hereunder unless and until the parties thereto have complied with the provisions of <u>Section 12.3</u>. The Agent may treat the Person which made any Credit Extension or which holds any Note as the owner thereof for all purposes hereof unless and until such Person complies with <u>Section 12.3</u>; <u>provided</u> <u>however</u>, that the Agent may in its discretion (but shall not be required to) follow instructions from the Person which made any Credit Extension or which holds any Note to direct payments relating to such Credit Extension or Note to another Person. Any assignee of the rights to any Credit Extension or any Note agrees by acceptance of such assignment to be bound by all the terms and provisions of the Loan Documents. Any request, authority or consent of any Person, who at the time of making such request or giving such authority or consent is the owner of the rights to any Credit Extension (whether or not a Note has been issued in evidence thereof), shall be conclusive and binding on any subsequent holder or assignee of the rights to such Credit Extension.

12.2 <u>Participations</u>.

(a) <u>Permitted Participants; Effect</u>. Any Lender may at any time sell to one or more banks or other entities ("<u>Participants</u>") participating interests in any Credit Exposure of such Lender, any Note held by such Lender, any Commitment of such Lender or any other

<div align="center">89</div>

interest of such Lender under the Loan Documents.  In the event of any such sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, such Lender shall remain the owner of its Credit Exposure and the holder of any Note issued to it in evidence thereof for all purposes under the Loan Documents, all amounts payable by the Borrower under this Agreement shall be determined as if such Lender had not sold such participating interests, and the Borrower and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents.

(b)     Voting Rights.  Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the Loan Documents other than any amendment, modification or waiver with respect to any Credit Extension or Commitment in which such Participant has an interest which would require consent of all of the Lenders pursuant to the terms of Section 8.3 or of any other Loan Document.

(c)     Benefit of Certain Provisions.  Each Loan Party agrees that each Participant shall be deemed to have the right of setoff provided in Section 11.1 in respect of its participating interest in amounts owing under the Loan Documents to the same extent as if the amount of its participating interest were owing directly to it as a Lender under the Loan Documents, provided that, each Lender shall retain the right of setoff provided in Section 11.1 with respect to the amount of participating interests sold to each Participant.  The Lenders agree to share with each Participant, and each Participant, by exercising the right of setoff provided in Section 11.1, agrees to share with each Lender, any amount received pursuant to the exercise of its right of setoff, such amounts to be shared in accordance with Section 11.2 as if each Participant were a Lender.  The Borrower further agrees that each Participant shall be entitled to the benefits of Sections 3.1, 3.2, 3.4 and 3.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.3, provided that, (i) a Participant shall not be entitled to receive any greater payment under Section 3.1, 3.2 or 3.5 than the Lender who sold the participating interest to such Participant would have received had it retained such interest for its own account, unless the sale of such interest to such Participant is made with the prior written consent of the Borrower, and (ii) any Participant not incorporated under the laws of the U.S. or any state thereof agrees to comply with the provisions of Section 3.5 to the same extent as if it were a Lender.

12.3     Assignments.

(a)     Permitted Assignments.  Any Lender may at any time assign to one or more banks or other entities ("Purchasers") all or any part of its rights and obligations under the Loan Documents.  Such assignment shall be substantially in the form of Exhibit E (an "Assignment Agreement").  Each such assignment with respect to a Purchaser which is not a Lender or an Affiliate of a Lender or an Approved Fund shall either be in an amount equal to the entire applicable Commitment and Credit Extensions of the assigning Lender or  (unless the Agent otherwise consents) be in an aggregate amount not less than $5,000,000 in the case of any assignment of a Revolving Commitment and $1,000,000 in the case of any assignment of a Term Loan or Term Loan Commitment.  The amount of the assignment shall be based on the Commitment or outstanding Credit Extensions (if the Commitment has been terminated) subject to the assignment, determined as of the

90

date of such assignment or as of the "Trade Date," if the "Trade Date" is specified in the assignment.

(b)    <u>Consents</u>.  No consent of the Borrower shall be required prior to an assignment becoming effective.  The consent of the Agent shall be required prior to an assignment becoming effective unless the Purchaser is a Lender with a Revolving Commitment (in the case of an assignment of a Revolving Commitment) or is a Lender, an Affiliate of a Lender or an Approved Fund (in the case of an assignment of any other Commitment or Loans).  The consent of the LC Issuer shall be required prior to an assignment of a Revolving Commitment becoming effective unless the Purchaser is a Lender with a Revolving Commitment.  Any consent required under this <u>Section 12.3(b)</u> shall not be unreasonably withheld or delayed.

(c)    <u>Effect; Effective Date</u>.  Upon (i) delivery to the Agent of a duly executed Assignment Agreement, together with any consents required by <u>Sections 12.3(a)</u> and <u>12.3(b)</u>, and (ii) payment of a $3,500 fee to the Agent for processing such assignment (unless such fee is waived by the Agent), such Assignment Agreement shall become effective on the effective date specified by the Agent in such Assignment Agreement.  The Assignment Agreement shall contain a representation by the Purchaser to the effect that none of the consideration used to make the purchase of the Commitment and Credit Exposure under the applicable Assignment Agreement constitutes "plan assets" as defined under ERISA and that the rights and interests of the Purchaser in and under the Loan Documents will not be "plan assets" under ERISA.  On and after the effective date of such Assignment Agreement, such Purchaser shall for all purposes be a Lender party to this Agreement and any other Loan Document executed by or on behalf of the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party thereto, and the transferor Lender shall be released with respect to the Commitment and Credit Exposure assigned to such Purchaser without any further consent or action by the Borrower, the Lenders or the Agent.  In the case of an Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a Lender hereunder but shall continue to be entitled to the benefits of, and subject to, those provisions of this Agreement and the other Loan Documents which survive payment of the Obligations and termination of the applicable agreement.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 12.3</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 12.2</u>.  Upon the consummation of any assignment to a Purchaser pursuant to this <u>Section 12.3(c)</u>, the transferor Lender, the Agent and the Borrower shall, if the transferor Lender or the Purchaser desires that its Loans be evidenced by Notes, make appropriate arrangements so that new Notes or, as appropriate, replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such Purchaser, in each case in principal amounts reflecting their respective Commitments, as adjusted pursuant to such assignment.

(d)    <u>Register</u>.  The Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in the U.S. a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Credit Extensions and interest thereon owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive, and the Borrower, the Agent and the

91

Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

12.4    <u>Dissemination of Information</u>.  Each Loan Party authorizes each Lender to disclose to any Participant or Purchaser or any other Person acquiring an interest in the Loan Documents by operation of law (each a "<u>Transferee</u>") and any prospective Transferee any and all information in such Lender's possession concerning the creditworthiness of the Borrower and its Subsidiaries, including without limitation any information contained in any Reports; <u>provided</u> that, each Transferee and prospective Transferee agrees to be bound by <u>Section 9.11</u> of this Agreement.

12.5    <u>Tax Treatment</u>.  If any interest in any Loan Document is transferred to any Transferee which is not incorporated under the laws of the U.S. or any state thereof, the transferor Lender shall cause such Transferee, concurrently with the effectiveness of such transfer, to comply with the provisions of <u>Section 3.5(d)</u>.

12.6    <u>Assignment by LC Issuer</u>.  Notwithstanding anything contained herein, if at any time Bank One assigns all of its Revolving Commitment and Revolving Loans pursuant to <u>Section 12.3</u>, Bank One may, upon thirty days' notice to the Borrower and the Lenders, resign as LC Issuer.  In the event of any such resignation as LC Issuer, the Borrower shall be entitled to appoint from among the Lenders a successor LC Issuer hereunder; <u>provided</u> <u>however</u>, that no failure by the Borrower to appoint any such successor shall affect the resignation of Bank One as LC Issuer.  If Bank One resigns as LC Issuer, it shall retain all the rights and obligations of the LC Issuer hereunder with respect to the Facility LCs outstanding as of the effective date of its resignation as LC Issuer and all LC Obligations with respect thereto (including the right to require the Lenders to make Revolving Loans or fund risk participations in outstanding Reimbursement Obligations pursuant to <u>Section 2.1.2(d)</u>).

## ARTICLE XIII

### NOTICES

13.1    <u>Notices; Effectiveness; Electronic Communication</u>.

(a)    <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)      if to any Loan Party, at its address or telecopier number set forth on the signature page hereof;

(ii)     if to the Agent, at its address or telecopier number set forth on the signature page hereof;

(iii)    if to the LC Issuer, at its address or telecopier number set forth on the signature page hereof;

(iv)    if to a Lender, at its address or telecopier number set forth in its Administrative Questionnaire.

92

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in Section 13.1(b) shall be effective as provided in said Section 13.1(b).

      (b)      <u>Electronic Communications</u>.  Notices and other communications to the Lenders and the LC Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by the Agent or as otherwise determined by the Agent, <u>provided that</u>, the foregoing shall not apply to notices to any Lender or the LC Issuer pursuant to Article II if such Lender or the LC Issuer, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent or any Loan Party may, in its respective discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it or as it otherwise determines, <u>provided that</u> such determination or approval may be limited to particular notices or communications. Notwithstanding the foregoing, in every instance, the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.1(e) to the Agent.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided that</u> if such notice or other communication is not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

      13.2      <u>Change of Address, Etc</u>.  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

<div align="center">

**ARTICLE XIV**

<u>COUNTERPARTS</u>

</div>

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  This Agreement shall be effective when it has been executed by the Loan Parties, the Agent, the LC Issuer and the Lenders, and each party has notified the Agent by facsimile transmission or telephone that it has taken such action.

<div align="center">

**ARTICLE XV**

<u>GUARANTY</u>

</div>

      15.1      <u>Guaranty</u>.  Each Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to the Secured

<div align="center">93</div>

Parties the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by any such Secured Parties in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.

15.2    Guaranty of Payment. This Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require any Secured Party to sue the Borrower, any Guarantor, any other guarantor, or any other person obligated for all or any part of the Guaranteed Obligations, or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

15.3    No Discharge or Diminishment of Guaranty.

(a)    Except as otherwise provided for herein and to the extent provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including:

      (i)    any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise;

      (ii)    any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of or other person liable for any of the Guaranteed Obligations;

      (iii)    any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower, any Guarantor, or any other guarantor of or other person liable for any of the Guaranteed Obligations, or their assets or any resulting release or discharge of any obligation of the Borrower, any Guarantor, or any other guarantor of or other person liable for any of the Guaranteed Obligations; or

      (iv)    the existence of any claim, setoff or other rights which any Guarantor may have at any time against the Borrower, any Guarantor, any other guarantor of the Guaranteed Obligations, the Agent, the LC Issuer, any Lender, or any other person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by the Borrower, any Guarantor or any other guarantor of or other person liable for any of the Guaranteed Obligations, of the Guaranteed Obligations or any part thereof.

94

(c)     Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by:

     (i)     the failure of any Secured Party to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations;

     (ii)     any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations;

     (iii)     any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations;

     (iv)     any action or failure to act by any Secured Party with respect to any collateral securing any part of the Guaranteed Obligations; or

     (v)     any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

    15.4     <u>Defenses Waived</u>.  To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against the Borrower, any Guarantor, any other guarantor of any of the Guaranteed Obligations, or any other person.  The Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with the Borrower, any Guarantor, any other guarantor or any other person liable on any part of the Guaranteed Obligations or exercise any other right or remedy available to it against the Borrower, any Guarantor, any other guarantor or any other person liable on any of the Guaranteed Obligations, without affecting or impairing in any way the liability of such Guarantor under this Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower, any other guarantor or any other person liable on any of the Guaranteed Obligations, as the case may be, or any security.

    15.5     <u>Rights of Subrogation</u>.  No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against

the Borrower, any Guarantor, any person liable on the Guaranteed Obligations, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to the Secured Parties.

15.6    Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise, each Guarantor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Secured Parties are in possession of this Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by any Secured Party.

15.7    Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that no Secured Party shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

15.8    Termination.  The Lenders may continue to make loans or extend credit to the Borrower based on this Guaranty until five days after it receives written notice of termination from any Guarantor.  Notwithstanding receipt of any such notice, each Guarantor will continue to be liable to the Secured Parties for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of that Guaranteed Obligations.

15.9    Taxes.  The obligations of the Borrower set forth in Section 3.5 shall apply to each Guarantor as if it were the Borrower.

15.10    Severability.  The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or any Secured Party, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability").  This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Secured Parties to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximu m Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Secured Parties hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

15.11    Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "Non-Paying

96

Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Pro Rata Share" of such payment or payments made, or losses suffered, by such Paying Guarantor. For purposes of this Article XV, each Non-Paying Guarantor's "Pro Rata Share" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the date hereof (whether by loan, capital infusion or by other means). Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability). Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations. This provision is for the benefit of the Secured Parties and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

15.12    Lending Installations. The Guaranteed Obligations may be booked at any Lending Installation. All terms of this Guaranty apply to and may be enforced by or on behalf of any Lending Installation.

15.13    Liability Cumulative. The liability of each Loan Party as a Guarantor under this Article XV is in addition to and shall be cumulative with all liabilities of each Loan Party to the Secured Parties under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations of liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## ARTICLE XVI

### CHOICE OF LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL; CONFLICT WITH ORDERS

16.1    **CHOICE OF LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

16.2    **WAIVER OF JURY TRIAL. EACH LOAN PARTY, THE AGENT, THE LC ISSUER AND EACH LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY LOAN DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.**

16.3     **CONSENT TO JURISDICTION.  EACH GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS AND EACH GUARANTOR HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.  NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE AGENT, THE LC ISSUER OR ANY LENDER TO BRING PROCEEDINGS AGAINST ANY GUARANTOR IN THE COURTS OF ANY OTHER JURISDICTION.  ANY JUDICIAL PROCEEDING BY ANY GUARANTOR AGAINST THE AGENT, THE LC ISSUER OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR IN CONNECTION WITH ANY LOAN DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN NEW YORK, NEW YORK.**

16.4     **CONFLICT WITH ORDERS**.  In the event of any conflict between the Loan Documents and the Orders, the term of the Orders shall control (unless otherwise provided therein).

98

IN WITNESS WHEREOF, the Loan Parties, the Lenders, the LC Issuer and the Agent have executed this Agreement as of the date first above written.

BORROWER:

NORTHWESTERN CORPORATION

By: _____
Name:
Title:

GUARANTORS:

NORTHWESTERN SERVICES CORPORATION

By: _____
Name:
Title:

NORTHWESTERN GROWTH CORPORATION

By: _____
Name:
Title:

NORCOM ADVANCED TECHNOLOGIES, INC.

By: _____
Name:
Title:

NORTHWESTERN CAPITAL CORPORATION

By: _____
Name:
Title:

99

NORTHWESTERN ENERGY DEVELOPMENT, LLC


By: _____
Name:
Title:


NEKOTA RESOURCES, INC.


By: _____
Name:
Title:


NORTHWESTERN GENERATION I, LLC


By: _____
Name:
Title:


MONTANA MEGAWATTS I, LLC


By: _____
Name:
Title:


NORTHWESTERN ENERGY MARKETING, LLC


By: _____
Name:
Title:

100

**NOTICE ADDRESS FOR ALL LOAN PARTIES:**

c/o NorthWestern Corporation
Address:  125 S. Dakota Avenue
            Sioux Falls, South Dakota  57104

Attention:  Chief Restructuring Officer
Facsimile:  (605) 978-2845

with copies to:

Eric Jacobsen, Esq.
NorthWestern Corporation
125 S. Dakota Avenue
Sioux Falls, South Dakota  57104
Facsimile:  (605) 978-2963

and

Jesse H. Austin, III, Esq.
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia  30308
Facsimile:  (404) 815-2424

101

**AGENT, LC ISSUER AND LENDER:**

BANK ONE, NA
Individually, as Agent, Lender and LC Issuer


By: _____
Name:  Joseph R. Lehrer
Title:    Managing Director

Address:  120 South LaSalle Street, 20th Floor
               Chicago, Illinois  60603
Attention:  Andrew D. Hall
Facsimile: (312) 661-6929

with copies to:

Skadden, Arps, Slate,
   Meagher & Flom (Illinois)
333 West Wacker Drive
Chicago, Illinois  60606
Attention:  Timothy R. Pohl, Esq.
                  Seth E. Jacobson, Esq.
Facsimile: (312) 407-0411

102

## COMMITMENT SCHEDULE

| Lender | | Revolving Commitment | | Term Loan Commitment | | Aggregate Commitment |
|---|---|---|---|---|---|---|
| Bank One, NA .......................................... | $ | 100,000,000.00 | $ | 390,000,000.00 | $ | 490,000,000.00 |
| **Total**................................................... | **$** | **100,000,000.00** | **$** | **390,000,000.00** | **$** | **490,000,000.00** |

Note:  Pursuant to the terms of the Agreement, until the Term Loan Commitment Effective Date, the Term Loan Commitment shall be $0.

**EXHIBIT A**
**FORM OF EURODOLLAR BORROWING NOTICE**

Date:                                    , 20
To:        Bank One, NA, as Agent for the Lenders

This Borrowing Notice is furnished pursuant to Section 2.1.1(b) of that certain Secured Superpriority Debtor in Possession Credit and Guaranty Agreement dated as of September 19, 2003 (as amended, modified, renewed or extended from time to time, the "Agreement") among NorthWestern Corporation, a Delaware corporation and debtor and debtor in possession (the "Borrower"), the other Loan Parties, the lenders party thereto and Bank One, NA, as Agent for the Lenders and as LC Issuer.  Unless otherwise defined herein, capitalized terms used in this Borrowing Notice have the meanings ascribed thereto in the Agreement.
The Borrower hereby notifies the Agent of its request of the following Eurodollar Advance:

   (a)        Borrowing Date of Eurodollar Advance (must be a Business Day):

   (b)        Aggregate Amount of the Eurodollar Advance: $

   (c)        Duration of Interest Period:

            (i)        One Month

            (ii)       Two Months

            (iii)      Three Months

            (iv)       Six Months

The Borrower hereby represents that, as of the date of this Borrowing Notice:

   (a)        There exists no Default or Unmatured Default and no Default or Unmatured Default shall result from this Credit Extension.

   (b)        The representations and warranties contained in Article V of the Agreement are true and correct, except to the extent any such representation or warranty is stated to relate solely to an earlier date.

                        NORTHWESTERN CORPORATION


                        By:   _____
                        Name: _____
                        Title: _____

**EXHIBIT B**
**FORM OF CONVERSION/CONTINUATION NOTICE**

Date:                              , 20

To:     Bank One, NA, as Agent for the Lenders

This Conversion/Continuation Notice is furnished pursuant to Section 2.7 of that certain Secured Superpriority Debtor in Possession Credit and Guaranty Agreement dated as of September 19, 2003 (as amended, modified, renewed or extended from time to time, the "Agreement") among NorthWestern Corporation, a Delaware corporation and debtor and debtor in possession (the "Borrower"), the other Loan Parties, the lenders party thereto and Bank One, NA, as Agent for the Lenders and as LC Issuer.  Unless otherwise defined herein, capitalized terms used in this Borrowing Notice have the meanings ascribed thereto in the Agreement.

The Borrower hereby notifies the Agent of its request to [SELECT ONE]:

   (a)   convert the Floating Rate Advance in the amount of $                    into a Eurodollar Advance with an Interest Period duration of:

              month(s)

   (b)   continue the Eurodollar Advance described below:

         (i)   Date of Continuation (must be a Business Day):

         (ii)  Aggregate Amount of Advance: $

         (iii) The duration of the Interest Period applicable thereto:

              month(s)

The Borrower hereby represents that, as of the date of this Conversion/Continuation Notice:

   (a)        There exists no Default or Unmatured Default and no Default or Unmatured Default shall result from this Credit Extension.

   (b)        The representations and warranties contained in Article V of the Agreement are true and correct, except to the extent any such representation or warranty is stated to relate solely to an earlier date.

                         NORTHWESTERN CORPORATION


                         By:   _____
                         Name: _____
                         Title: _____

**EXHIBIT C-1**
**FORM OF REVOLVING NOTE**

[Date]

NORTHWESTERN CORPORATION, a Delaware corporation and debtor and debtor in possession under chapter 11 of the Bankruptcy Code (the "Borrower"), promises to pay to                                    or its registered assigns (the "Lender") the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the main office of Bank One, NA, as Agent, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of and accrued and unpaid interest on the Revolving Loans and Reimbursement Obligations in full on the Facility Termination Date.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Loan and the date and amount of each principal payment hereunder.

This Note is one of the Notes issued pursuant to, and is entitled to the benefits of, the Secured Superprio rity Debtor in Possession Credit and Guaranty Agreement dated as of September 19, 2003 (which, as it may be amended or modified and in effect from time to time, is herein called the "Agreement"), among the Borrower, the other Loan Parties, the lenders party thereto, including the Lender, the LC Issuer and Bank One, NA, as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Note, including the terms and conditions under which this Note may be prepaid or its maturity date accelerated. This Note is secured pursuant to the Collateral Documents and guaranteed pursuant to the Guaranty, as more specifically described in the Agreement, and reference is made thereto for a statement of the terms and provisions thereof. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

NORTHWESTERN CORPORATION

By: _____
Print Name: _____
Title: _____

**SCHEDULE OF LOANS AND PAYMENTS OF PRINCIPAL**
**TO**
**NOTE OF NORTHWESTERN CORPORATION,**
**DATED          ,**

| Date | Principal Amount Of Loan | Period | Maturity of Interest Paid | Principal Amount Balance | Unpaid |
|------|--------------------------|--------|---------------------------|--------------------------|--------|
| | | | | | |

**EXHIBIT C-2**
**FORM OF TERM NOTE**

[Date]

NORTHWESTERN CORPORATION, a Delaware corporation and debtor and debtor in possession under chapter 11 of the Bankruptcy Code (the "Borrower"), promises to pay to                           or its registered assigns (the "Lender") the aggregate unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to Article II of the Agreement (as hereinafter defined), in immediately available funds at the main office of Bank One, NA, as Agent, together with interest on the unpaid principal amount hereof at the rates and on the dates set forth in the Agreement. The Borrower shall pay the principal of and accrued and unpaid interest on the Term Loans in full on the Facility Termination Date and shall make such mandatory prepayments as are required to be made under the terms of Article II of the Agreement.

The Lender shall, and is hereby authorized to, record on the schedule attached hereto, or to otherwise record in accordance with its usual practice, the date and amount of each Loan and the date and amount of each principal payment hereunder.

This Note is one of the Notes issued pursuant to, and is entitled to the benefits of, the Senior Secured Superpriority Debtor in Possession Credit and Guaranty Agreement dated as of September 19, 2003 (which, as it may be amended or modified and in effect from time to time, is herein called the "Agreement"), among the Borrower, the other Loan Parties, the lenders party thereto, including the Lender, the LC Issuer and Bank One, NA, as Agent, to which Agreement reference is hereby made for a statement of the terms and conditions governing this Note, including the terms and conditions under which this Note may be prepaid or its maturity date accelerated. This Note is secured pursuant to the Collateral Documents and guaranteed pursuant to the Guaranty, as more specifically described in the Agreement, and reference is made thereto for a statement of the terms and provisions thereof. Capitalized terms used herein and not otherwise defined herein are used with the meanings attributed to them in the Agreement.

NORTHWESTERN CORPORATION

By: _____
Print Name:_____
Title: _____

**SCHEDULE OF LOANS AND PAYMENTS OF PRINCIPAL**
**TO**
**NOTE OF NORTHWESTERN CORPORATION,**
**DATED          ,**

| Date | Principal Amount of Loan | Maturity Of Interest Period | Principal Amount Paid | Unpaid Balance |
|------|--------------------------|------------------------------|------------------------|-----------------|
|      |                          |                              |                        |                 |

**EXHIBIT D**
**FORM OF COMPLIANCE CERTIFICATE**

To:     The Lenders parties to the
        Credit Agreement Described Below

This Compliance Certificate is furnished pursuant to that certain Secured Superpriority Debtor in Possession Credit and Guaranty Agreement dated as of September 19, 2003 (as amended, modified, renewed or extended from time to time, the "Agreement") among NorthWestern Corporation as debtor and debtor in possession (the "Borrower"), the other Loan Parties, the Lenders party thereto and Bank One, NA, as Agent for the Lenders and as an LC Issuer.  Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.      I am the duly elected                          of the Borrower;

2.      I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Borrower and its Subsidiaries during the accounting period covered by the attached financial statements;

3.      The examinations described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes a Default or Unmatured Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth below;

4.      I hereby certify that no Loan Party has changed (i) its name, (ii) its chief executive office, (iii) principal place of business, (iv) the type of entity it is or (v) its state of incorporation or organization without having given the Agent the notice required by Section 6.23 of the Agreement;

5.      Schedule I attached hereto sets forth financial data and computations evidencing the Borrower's compliance with certain covenants of the Agreement, all of which data and computations are true, complete and correct;  and

6.      Schedule II attached hereto sets forth the various reports and deliveries which are required at this time under the Agreement and the other Loan Documents and the status of compliance.

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this          day of                    ,     .

NORTHWESTERN CORPORATION


By: _____
Name: _____
Title: _____

**SCHEDULE I TO COMPLIANCE CERTIFICATE**

Compliance as of              ,          with
Provisions of        and        of
the Agreement

**SCHEDULE II TO COMPLIANCE CERTIFICATE**

Reports and Deliveries Currently Due

**EXHIBIT E**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between *[Insert name of Assignor]* (the "Assignor") and *[Insert name of Assignee]* (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Secured Superpriority Debtor in Possession Credit and Guaranty Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including without limitation any letters of credit, guaranties and swingline loans included in such facilities and, to the extent permitted to be assigned under applicable law, all claims (including without limitation contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity), suits, causes of action and any other right of the Assignor against any Person whether known or unknown arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.　Assignor:

2.　Assignee:　　　　　　　　　　　　　　　　　　　　*[and is an Affiliate/Approved Fund of *identify Lender*](1)*

3.　Borrower(s):　NorthWestern Corporation, a Delaware corporation and a debtor and debtor in possession

4.　Agent:　Bank One, NA, as the agent under the Credit Agreement

5.　Credit Agreement:　The Secured Superpriority Credit and Guaranty Agreement dated as of September 19, 2003 among NorthWestern Corporation, the other Loan Parties party thereto, the Lenders party thereto and Bank One, NA, as Agent

---

(1) Select as applicable.

6.     Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/ Credit Exposure for all Lenders(1) | Amount of Commitment/ Credit Exposure Assigned(2) | Percentage Assigned of Commitment/ Credit Exposure(3) |
|---|---|---|---|
| Revolving Commitment............................................. | $ | $ | % |
| Term Loan Commitment ......................................... | $ | $ | % |

7.     Trade Date:                                   (4)

Effective Date:                     , 20   [TO BE INSERTED BY AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER BY THE AGENT.]

        The terms set forth in this Assignment and Assumption are hereby agreed to:

                                           ASSIGNOR
                                           [NAME OF ASSIGNOR]

                                         By: _____
                                               Title:

                                         ASSIGNEE
                                         [NAME OF ASSIGNEE]

                                         By: _____
                                               Title:

Consented to and Accepted:

BANK ONE, NA, as Agent and LC Issuer

By: _____
Title:

_____

*(1) Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.*
*(2) Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.*
*(3) Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.*
*(4) Insert if satisfaction of minimum amounts is to be determined as of the Trade Date.*

**ANNEX 1**
**TERMS AND CONDITIONS FOR**
**ASSIGNMENT AND ASSUMPTION**

1.  Representations and Warranties.

1.1  Assignor.  The Assignor represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby.  Neither the Assignor nor any of its officers, directors, employees, agents or attorneys shall be responsible for (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency, perfection, priority, collectibility, or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document, (v) inspecting any of the property, books or records of the Borrower, or any guarantor, or (vi) any mistake, error of judgment, or action taken or omitted to be taken in connection with the Loans or the Loan Documents.

1.2.  Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iii) agrees that its payment instructions and notice instructions are as set forth in Schedule 1 to this Assignment and Assumption, (iv) confirms that none of the funds, monies, assets or other consideration being used to make the purchase and assumption hereunder are "plan assets" as defined under ERISA and that its rights, benefits and interests in and under the Loan Documents will not be "plan assets" under ERISA, (v) agrees to indemnify and hold the Assignor harmless against all losses, costs and expenses (including, without limitation, reasonable attorneys' fees) and liabilities incurred by the Assignor in connection with or arising in any manner from the Assignee's non-performance of the obligations assumed under this Assignment and Assumption, (vi) it has received a copy of the Credit Agreement, together with copies of financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Agent or any other Lender, and (vii) attached as Schedule 1 to this Assignment and Assumption is any documentation required to be delivered by the Assignee with respect to its tax status pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.  Payments.   The Assignee shall pay the Assignor, on the Effective Date, the amount agreed to by the Assignor and the Assignee.  From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.  <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**ADMINISTRATIVE QUESTIONNAIRE**

(Schedule to be supplied by Closing Unit or Trading Documentation Unit)

(For Forms call          at          )

**US AND NON-US TAX INFORMATION REPORTING REQUIREMENTS**

(Schedule to be supplied by Closing Unit or Trading Documentation Unit)

(For Forms call                at                )

EXHIBIT F

## FORM OF BORROWING BASE CERTIFICATE
(to be used prior to the occurrence of the Term Loan Commitment Effective Date)

## BORROWING BASE REPORT

Rpt #

Obligor Number:

Date:

Loan Number:

Period Covered:

| COLLATERAL CATEGORY | Billed Accounts | Unbilled Accounts | Stored Gas Inventory | Working Gas and Fuel | Materials and Supplies | Turbine Collateral | Total |
|---|---|---|---|---|---|---|---|
| *Description* | | | | | | | |
| 1 Beginning Balance (Previous report - Line 8)............... | | | | | | | |
| 2 Additions to Collateral (Gross Sales or Purchases)........ | | | | | | | |
| 3 Other Additions (Add back any non-A/R cash in line 3) | | | | | | | |
| 4 Deductions to Collateral (Cash Received) ...................... | | | | | | | |
| 5 Deductions to Collateral (Discounts)............................ | | | | | | | |
| 6 Deductions to Collateral (Credit Memos)...................... | | | | | | | |
| 7 Other non-cash credits to A/R........................................ | | | | | | | |
| 8 **Total Ending Collateral Balance** ................................. | | | | | | | |
| 9 Less Ineligible Billed Accounts (Itemized on attached Schedule 1)...................................................... | | | | | | | |
| 10 Less Ineligible Unbilled Accounts (Itemized on attached Schedule 2)....................................... | | | | | | | |
| 11 Less Ineligible Stored Gas Inventory (Itemized on attached Schedule 3)............................................. | | | | | | | |
| 12 Less Ineligible Working Gas and Fuel (Itemized on attached Schedule 5)............................................. | | | | | | | |
| 13 Less Ineligible Materials and Supplies (Itemized on attached Schedule 5)............................................. | | | | | | | |
| 14 Less Ineligible Turbine Collateral (Itemized on attached Schedule 6)............................................... | | | | | | | |
| 15 **Total Ineligibles**........................................................... | | | | | | | |
| 16 **Total Eligible Collateral** ............................................ | | | | | | | |
| 17 Advance Rate Percentage................................................ | | | | | | | |
| 18 **Borrowing Base Value** ................................................ | | | | | | | |
| 19 Reserves (Letters of Credit, Other) ................................ | | | | | | | |
| 20 **Total Borrowing Base Value** ....................................... | | | | | | | |
| 21 **CAPS/Loan Limits** ....................................................... | | | | | | | |
| 22 **Maximum Borrowing Limit (Lesser of 20 and 21)** .. | | | | | | | |

**LOAN STATUS**

| | | |
|---|---|---|
| 23 Previous Loan Balance (Previous Report Line 26)........................................................................ | 0 |
| 24 Less: ...... | A. Net Collections (Same as line 4).............................................................. | 0 |
| | B. Adjustments/Other | |
| 25 Add: | A. Request for Funds............................................................................... | 0 |
| | B. Adjustments/Other | |
| 26 New Loan Balance........................................................................................................ | 0 |
| 27 Availability Not Borrowed (Lines 22 less 26)................................................................. | 0 |
| 28 Term Loan................................................................................................................. | 0 |
| 29 OVERALL EXPOSURE (lines 27 & 28)............................................................................ | 0 |

Pursuant to, and in accordance with, the terms and provisions of that certain Secured Superpriority Debtor in Possession Credit and Guaranty Agreement (the "Credit Agreement"), among NorthWestern Corporation, a Delaware corporation, as debtor and debtor in possession under chapter 11 of the Bankruptcy Code ("Borrower"), the other Loan Parties party thereto as Guarantors, the Lenders and Bank One, NA, as LC Issuer and as Agent, Borrower is executing and delivering to Agent this Borrowing Base Report accompanied by supporting data (collectively referred to as the "Report"). Borrower represents and warrants to Agent that this Report is true and correct, and is based on information contained in Borrower's own financial accounting records. Borrower, by the execution of this Report, hereby ratifies, confirms and affirms all of the terms, conditions and provisions of the Credit Agreement, and further certifies on this        day of              , 20     , that the Borrower is in compliance with said Credit Agreement.

BORROWER NAME:                          AUTHORIZED SIGNATURE:

Northwestern Corporation

SCHEDULE 1 TO BORROWING BASE REPORT

INELIGIBLE BILLED ACCOUNTS

Past Due A/R * ......................................................................................................................................... $

Governmental A/R....................................................................................................................................... $

Accounts in Bankruptcy A/R....................................................................................................................... $

Accounts Evidenced by Promissory Notes ................................................................................................. $

Cross Aged ** .............................................................................................................................................. $ _____

Total ............................................................................................................................................................. $

_____

* Greater than 90 days from invoice date

** If greater than 90 day balance for anyone customer exceeds 25% of the total customers outstanding bill, then the total customer balance is excluded

SCHEDULE 2 TO BORROWING BASE REPORT

INELIGIBLE UNBILLED ACCOUNTS

Unbilled over 30 days ................................................................................................................................................ $ _____

Total ............................................................................................................................................................................ $

SCHEDULE 3 TO BORROWING BASE REPORT

INELIGIBLE STORED GAS INVENTORY

SCHEDULE 4 TO BORROWING BASE REPORT

INELIGIBLE WORKING GAS AND FUEL

SCHEDULE 5 TO BORROWING BASE REPORT

INELIGIBLE MATERIALS AND SUPPLIES

SCHEDULE 6 TO BORROWING BASE REPORT

INELIGIBLE TURBINE COLLATERAL

**SCHEDULE 1(a)**

*Permitted Liens*

Schedule to be delivered within five Business Days and subject to Agent's satisfaction, in its sole discretion.

**Schedule 1(b)**

**Permitted Pre-Petition Payments**

**1.      Secured Debt:**

Regularly scheduled payments when due in respect of the secured debt of the Borrower identified in the table below:

A. Montana Mortgage Bonds
*The Borrower owns utility assets in the State of Montana which are subject to a (First) Mortgage and Deed of Trust originally executed by Montana Power in 1945 and supplemented from time to time to reflect the various bond issuances made pursuant thereto. The following series remain outstanding listed in order of maturity:*

| Description | Amount Outstanding |
|---|---|
| 7% Series Due 2005 ..................................................... | $        5.4 million |
| 7.30% Series Due 2006................................................ | $        150 million |
| Credit Agreement (2002) Series Due 2006 (Security for CSFB Facility)...................................................... | $        280 million |
| 8.25% Series Due 2007................................................ | $        0.4 million |
| 7.25% Secured Medium Term Notes Due 2008........ | $        13 million |
| 8.95% Series Due 2022................................................ | $        1.5 million |
| *TOTAL* ..................................................... | *$     450.3 million* |

B. South Dakota Mortgage Bonds
*The Borrower owns utility assets in the State of South Dakota which are subject to a General Mortgage Indenture and Deed of Trust originally executed by the Borrower in 1993 and supplemented from time to time to reflect the various bond issuances made pursuant thereto. The following series remain outstanding listed in order of maturity:*

| Description | Amount Outstanding |
|---|---|
| 7.10% Series Due 2005................................................ | $        60 million |
| Credit Agreement (2002) Series Due 2006 (Security for CFSB Facility)...................................................... | $        110 million |
| 7.00% Series Due 2023................................................ | $        55 million |
| *TOTAL* ..................................................... | *$     225 million* |

*C. CSFB Facility*
*On December 17, 2002, the Borrower entered into a $390 million secured term loan credit facility with a syndicate of banks led by Credit Suisse First Boston. $280 million of this facility is secured by mortgage bonds issued under the Montana Mortgage Indenture described above and $110 million is secured by mortgage bonds under the South Dakota Mortgage Indenture described above.*

D. Pollution Control Revenue Bonds
*The Borrower assumed certain obligations of Montana Power regarding pollution control revenue bonds. The pollution control bonds are issued by various county and municipalities, although they are secured by isolated electric generating facilities owned by the Borrower, subject to the rights of the outstanding bondholders under the Montana Mortgage Indenture and the South Dakota Mortgage Indenture. The following pollution control bonds remain outstanding:*

| Description | Amount Outstanding |
|---|---|
| Grant County, South Dakota Series 1993A Revenue Bonds Due 2023 ........................................................ | $        6.4 million |
| Grant County, South Dakota Series 1993B Revenue Bonds Due 2023 ........................................................ | $        3.4 million |

1

| | | |
|---|---|---|
| City of Salix, Iowa Series 1993 Revenue Bonds Due 2023, ................................................. | $ | 4.0 million |
| Mercer County, Nebraska Series 1993 Revenue Bonds Due 2023 ....................................... | $ | 7.55 million |
| City of Forsyth, Montana Series 1993A Revenue Bonds Due 2023 ....................................... | $ | 90.2 million |
| City of Forsyth, Montana Series 1993B Revenue Bonds Due 2023 ....................................... | $ | 80 million |
| *TOTAL* ............................................................. | *$* | *191.55 million* |

**E. Gas Transition Bonds**

*The Borrower assumed certain obligations of Montana Power, as grantor and servicer of the MPC Natural Gas Funding Trust, issuer of the $48.3 million of the 6.2% Transition Bonds Due 2012 which are secured by a pledge of certain utility related revenues (the Gas Transition Bonds utilized a trust structure in connection with a conveyance of certain revenue rights, but if not deemed a true sale would be treated as a secured transaction).*

*TOTAL SECURED:        $915.15 million*

**2.        Pre-Petition Real Property Taxes:**

The amounts set forth in Schedule 5.7 below with respect to pre-petition real property taxes owing to various counties in the State of Montana.

**3.        Payments Approved by Bankruptcy Court:**

Payments approved by the Bankruptcy Court in the following orders, except as otherwise limited by this Credit Agreement (e.g. §§ 5.10 and 6.27): (a) Order Authorizing Payment of Certain Pre-Petition Payroll and Related Employee Obligations, dated September 15, 2003; (b) Order Authorizing Debtor to Continue Insurance and Insurance Financing Program and Granting Related Relief, dated September 15, 2003; (c) Interim Order Authorizing the Debtor to (i) Comply with Terms of Pre-Petition Trading Contracts, (ii) Enter into Post-Petition Trading Contracts in the Ordinary Course of Business, and (iii) Setting a Final Hearing to Consider the Entry of a Final Order Affirming Interim Order and Authorizing Assumption of Pre-Petition Trading Contracts, dated September 15, 2003; (d) Interim Order Authorizing the Debtors to Obtain Post-Petition Credit Card Financing and Scheduling a Final Hearing, dated September 15, 2003; and (e) Order Authorizing Debtor to Continue and Maintain Its (A) Consolidated Cash Management System; (B) Existing Bank Accounts; (C) Existing Business Forms; (D) Public Purpose Programs; and (E) to Pay on an Interim Basis Certain Limited Intercompany Obligations; and Granting Related Relief and Scheduling a Final Hearing, dated September 15, 2003.

2

## Schedule 5.7

**Taxes**

The Borrower is delinquent in the payment of real property taxes owing to the following counties in Montana in the amounts set forth below:

| County: | | Amount Due: |
|---|---|---|
| Carbon | $ | 443,446.71 |
| Choteau | $ | 242,755.53 |
| Fergus | $ | 291,898.51 |
| Gallatin | $ | 1,742,352.51 |
| Hill | $ | 439,960.93 |
| Madison | $ | 488,386.28 |
| Park | $ | 741,395.35 |
| Pondera | $ | 231,732.73 |
| Toole | $ | 354,093.32 |

The amounts listed assume payment is made on September 30 and include interest and penalties through that date. If the payments are made prior to September 30, the amounts due would be slightly less than what is listed. If payments are made after September 30, the amounts due would be slightly more due to additional interest and penalties.

1

Schedule 5.9

Capitalization and Subsidiaries

A.  Organizational Chart



1

**B. Chief Executive Office**

**125 S. Dakota Ave.; Sioux Falls, SD 57104**

NorthWestern Corporation
NorthWestern Growth Corporation
NorthWestern Capital Corporation
NorthWestern Energy Development, LLC
NorthWestern Energy Marketing, LLC
NorthWestern Generation I, LLC
Montana Megawatts I, LLC

**600 Market Street West, Huron, SD 57350**

NorCom Advanced Technologies, Inc.
NorthWestern Services Corporation
Nekota Resources, Inc.

2

## C. Capital Stock

| Company | Class of Stock | Total Authorized | Total Issued and Outstanding |
|---|---|---|---|
| NorthWestern Corporation ....................................... | Common | 50,000,000 | 37,680,095 |
| | Cum. Preferred Stock | 1,000,000 | 0 |
| | Preference Stock | 1,000,000 | 0 |
| NorthWestern Capital Corporation ....................... | NW Capital Group Stock | 1,000,000 | 425,000 |
| | Blue Dot Group Stock | 500,000 | 212,500 |
| | Expanets Group Stock | 500,000 | 212,500 |
| | New Strategies Group Stock | 2,000,000 | 18,500 |
| NorCom Advanced Technologies, Inc. ................. | Common | 1,000 | 1,000 |
| NorthWestern Growth Corporation ..................... | Common | 1,000 | 1,000 |
| NorthWestern Services Corporation.................... | Common | 1,000 | 1,000 |
| Nekota Resources, Inc. ........................................... | Common | 1,000 | 1,000 |
| NorthWestern Energy Development, LLC .......... | Membership Interests | N/A | N/A |
| NorthWestern Energy Marketing, LLC ............... | Membership Interests | N/A | N/A |
| NorthWestern Generation I, LLC ......................... | Membership Interests | N/A | N/A |
| Montana Megawatts I, LLC ................................... | Membership Interests | N/A | N/A |

3

**D. Type of Entity**

| [ILLEGIBLE] | [ILLEGIBLE] | [ILLEGIBLE] | [ILLEGIBLE] | [ILLEGIBLE] |
|---|---|---|---|---|
| NorthWestern Corporation ........................... | Corporation | Delaware | 0161208 | 46-0172280 |
| NorthWestern Capital Corporation ............. | Corporation | Delaware | 3104805 | 94-3354173 |
| NorthWestern Energy Development, LLC | Limited Liability Company | Delaware | 3379713 | 50-0007307 |
| NorthWestern Energy Marketing, LLC ..... | Limited Liability Company | Delaware | 3401220 | N/A |
| NorthWestern Generation I, LLC .............. | Limited Liability Company | Delaware | 3379710 | 52-2309787 |
| Montana Megawatts I, LLC ........................ | Limited Liability Company | Delaware | 3372054 | N/A |
| NorthWestern Growth Corporation ............ | Corporation | South Dakota | DB034740 | 46-0433431 |
| NorthWestern Services Corporation........... | Corporation | South Dakota | DB038612 | 46-0445399 |
| Nekota Resources, Inc. ................................ | Corporation | South Dakota | DB037809 | 91-1764039 |
| NorCom Advanced Technologies, Inc........ | Corporation | South Dakota | DB039062 | 46-0445871 |

4

## Schedule 5.12

### *Fictitious Names; Mergers; Acquisitions*

**NorthWestern Corporation**

Prior Name
- NorthWestern Public Service Company (changed 05/06/98)

Trade Name
- NorthWestern Energy (Montana, Wyoming)

Fictitious Names
- NW Corporation (Wyoming)
- Northwestern (Montana – cancelled 9/12/02)

Acquisition
- Unit Purchase Agreement dated as of September 29, 2000 among NorthWestern Corporation, Touch America Holdings, Inc., and The Montana Power Company for the acquisition of electric and natural gas transmission and distribution utility assets of The Montana Power Company through the acquisition of membership units in The Montana Power, L.L.C.

Consolidation
- The assets of NorthWestern Energy, L.L.C. (other than Milltown hydroelectric dam) were transferred to NorthWestern Corporation in late 2002 and operate as the NorthWestern Energy Division
- NorthWestern Energy, L.L.C. retained the Milltown hydroelectric dam and changed its name to The Clark Fork and Blackfoot, L.L.C. in October 2002

**NorthWestern Energy Marketing, LLC**

Prior Name
- NorthWestern Power Marketing, LLC (changed 10/24/01)

**Montana Megawatts I, LLC**

Prior Name
- Merchant Energy Ventures, LLC (changed 09/14/01)

**NorthWestern Services Corporation**

Consolidation
- NorthWestern Energy Corporation, Grant, Inc., and NorthWestern Services Group, Inc. merged into NorthWestern Services Corporation (09/11/03)

**NorthWestern Capital Corporation**

Consolidation
- NorthWestern Capital Ventures LLC merged into NorthWestern Services Corporation (09/10/03)

1

**<u>Schedule 5.15</u>**

***Exceptions to Title***

None

1

**Schedule 5.17**

**Environmental Matters**

1.    During informal conversations in the summer of 2003 on other matters, the Montana Attorney General indicated that the State of Montana reserved any right that it might have to file a natural resource damages claim based on the existence of contaminated sediment located behind the Thompson Falls Dam, which area is habitat for the Bull Trout, and that it was taking the matter under consideration.

2.    In light of the United States Environmental Protection Agency's proposal to require dam and sediment removal in its final remedy for with the Milltown Reservoir, and in consideration of other circumstances, the Borrower and Atlantic Richfield Company ("ARCO") have entered into a settlement that would assure ARCO access for removal of sediments, and limit The Clark Fork and Blackfoot, L.L.C.'s ("CFB") and the Borrower's liability for costs of dam removal, sediment removal, natural resource damage claims, and upland disposal area remediation efforts to no more than $10MM. CFB remains the licensee and operator of the dam, responsible for compliance with the Federal Energy Regulatory Commission ("FERC") requirements.

1

**Schedule 5.19**

**Restrictions on Incurrence of Indebtedness**

1.     The Borrower is subject to Section 204 of the Federal Power Act and the implementing regulations of the Federal Energy Regulatory Commission ("FERC") which require approval of FERC prior to the issuance of securities by entities subject to the regulation of FERC. However, approval is not required for securities maturing not more than one (1) year after the date of issuance and aggregating not more than five percent (5%) of the par value of the other securities of the public utility then outstanding.

2.     The Montana Public Service Commission ("MPSC") takes the position that its approval is required in connection with the issuance of debt by entities subject to the regulation and oversight of the MPSC. The Borrower is subject to the regulation and oversight of the MPSC in connection with its conduct of the utility business formerly owned by The Clark Fork and Blackfoot, L.L.C. (f/k/a NorthWestern Energy, L.L.C.) ("CFB"), including, without limitation, with respect to the issuance of debt securities specifically relating to such business. The debt subject to regulation by the MPSC, however, does not include debt having a maturity less than one (1) year and constituting less than five percent (5%) of the total par value of the securities of the issuer.

3.     The Nebraska State Natural Gas Regulation Act (LB 790) was enacted on May 30, 2003 (the "Act"). Section 21.(1) of the Act states: "A jurisdictional utility shall not subject property used in its intrastate natural gas utility business in this state to encumbrance for the purpose of securing payment of any new indebtedness or replacement indebtedness in an amount exceeding one hundred million dollars attributable to this state unless first approved by the commission. Approval or disapproval by the commission shall be by formal written order, which shall be issued within forty-five day of the filing of the application."

1

**SCHEDULE 5.21**

**INDEBTEDNESS**

Schedule to be delivered within five Business Days and subject to Agent's satisfaction, in its sole discretion.

**<u>Schedule 5.22</u>**

**Affiliate Transactions**

See intercompany support obligations identified on Schedule 5.21

1

**Schedule 5.23**

**Intellectual Property**

The inclusion of any item of Intellectual Property on this schedule shall not serve as a representation that such item of Intellectual Property is necessarily material to the business of any grantor.

**Trade Names**

| Owner | Trade Name | State | Application Date |
|---|---|---|---|
| NorthWestern Corporation | NorthWestern Energy | Wyoming | 10/16/02 |
| NorthWestern Corporation | NorthWestern Energy | Montana | 10/16/02 (amendment to change owner from NorthWestern Energy, L.L.C. to NorthWestern Corporation |

1

**Trademarks**

**Trademark Applications and Registrations Owned by Northwestern Corporation**
**This Group of Files are Maintained by Leonard, Street and Deinard**
**Updated on August 27, 2003**

| Trademark Name | Appl. No. | Filing Date | Reg. No. | Reg. Date | Class/Goods | Status/Next Action Due |
|---|---|---|---|---|---|---|
| NORTHWESTERN PLUS<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/979,348 | 12-Nov-1997 | 2,374,004 | 01-Aug-2000 | Class 35: Consultation services in the field of energy management; Class 37: Appliance, telephone, and security system installation maintenance and repair services; Class 42: Design for others of air quality management systems, lighting systems, heating, ventilating and air conditioning systems, and standby electrical generation systems; consultation services in the field of air quality, energy use, conservation, and energy use auditing, security system monitoring. | Registered. File Affidavit of Use between 01-Aug-2005 and before 01-Aug-2006. |
| NORTHWESTERN PUBLIC SERVICE<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,319 | 07-Mar-2000 | 2,449,042 | 08-May-2001 | Class 39 - Public utility services in the nature of transmission of electricity and electricity distribution; public utility services in the nature of natural gas gathering and distribution, transmission of gas though pipelines for others. | Registered. File Affidavit of Use between 08-May-2006 and before 08-May-2007. |

2

**Trademark Applications and Registrations Owned by Northwestern Corporation**
**This Group of Files are Maintained by Leonard, Street and Deinard**
**Updated on August 27, 2003**

| Trademark Name | Appl. No. | Filing Date | Reg. No. | Reg. Date | Class/Goods | Status/Next Action Due |
|---|---|---|---|---|---|---|
| NorthWestern<br><br>Mark is lined for colors red and blue.<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,318 | 07-Mar-2000 | 2,429,935 | 20-Feb-2001 | Class 42 - Design for others of air quality management systems, lighting systems, heating, ventilating and air conditioning systems, and standby electrical generation systems; consultation services in the field of air quality, energy use, conservation, and energy use auditing, security system monitoring. | Registered.<br>File Affidavit of Use between 20-Feb-2006 and before 20-Feb-2007. |
| NorthWestern<br><br>Mark is lined for colors red and blue.<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,317 | 07-Mar-2000 | 2,431,531 | 27-Feb-2001 | Class 37 - Appliance, telephone, and security system Installation maintenance and repair services. | Registered.<br>File Affidavit of Use between 27-Feb-2006 and before 27-Feb-2007. |
| NorthWestern<br><br>Mark is lined for colors red and blue.<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,316 | 07-Mar-2000 | 2,541,470 | 19-Feb-2002 | Class 38 - Local and long distance telephone services and providing telecommunications connections to global computer network cable and satellite television transmission services. | Registered.<br>File Affidavit of Use between 19-Feb-2007 and before 19-Feb-2008. |

3

**Trade Applications and Registrations Owned by Northwestern Corporation**
**This Group of File are Maintained by Leonard, Street and Deinard**
**Updated on August 27, 2003**

| Trademark Name | Appl. No. | Filing Date | Reg. No. | Reg. Date | Class/Goods | Status/Next Action Due |
|---|---|---|---|---|---|---|
| NorthWestern<br><br>Mark is lined for colors red and blue. | 75/937,315 | 07-Mar-2000 | 2,429,934 | 20-Feb-2001 | Class 39 - Public utility services in the nature of transmission of electricity and electricity distribution; public utility services in the nature of natural gas gathering and distribution, transmission of gas through pipelines for others. | Registered. File Affidavit of Use between 20-Feb-2006 and before 20-Feb-2007. |
| NorthWestern<br><br>Mark is lined for colors red and blue.<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,314 | 07-Mar-2000 | 2,440,778 | 03-Apr-2001 | Class 42 - Design for others of air quality management systems, lighting systems, heating, ventilating and air conditioning systems, and standby electrical generation systems; consultation services in the field of air quality, energy use, conservation, and energy use auditing, security system monitoring. | Registered. File Affidavit of Use between 03-Apr-2006 and before 03-Apr-2007. |
| NorthWestern<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,313 | 07-Mar-2000 | 2,429,933 | 20-Feb-2001 | Class 42 - Design for others of air quality management systems, lighting systems, heating, ventilating and air conditioning systems, and standby electrical generation systems; consultation services in the field of air quality, energy use, conservation, and energy use auditing, security system monitoring. | Registered. File Affidavit of Use between 20-Feb-2006 and before 20-Feb-2007. |

**Trademark Applications and Registrations Owned by Northwestern Corporation**
**This Group of Files are Maintained by Leonard, Street and Deinard**
**Updated on August 27, 2003**

| Trademark Name | Appl. No. | Filing Date | Reg. No. | Reg. Date | Class/Goods | Status/Next Action Due |
|---|---|---|---|---|---|---|
| NorthWestern<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,312 | 07-Mar-2000 | 2,431,530 | 27-Feb-2001 | Class 37 - Appliance, telephone, and security installation maintenance and repair services. | Registered. File Affidavit of Use between 27-Feb-2006 and before 27-Feb-2007. |
| NorthWestern<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,311 | 07-Mar-2000 | 2,537,252 | 05-Feb-2002 | Class 38 - Local and long distance telephone services and providing telecommunications connections to global computer network cable and satellite television transmission services. | Registered. File Affidavit of Use between 05-Feb-2007 and before 05-Feb-2008. |
| NorthWestern<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,310 | 07-Mar-2000 | 2,429,932 | 20-Feb-2001 | Class 39 - Public utility services in the nature of transmission of electricity and electricity distribution; public utility services in the nature of natural gas gathering and distribution, transmission of gas through pipelines for others. | Registered. File Affidavit of Use between 20-Feb-2006 and before 20-Feb-2007. |

5

**Trademark Applications and Registrations Owned by Northwestern Corporation**
**This Group of Files are Maintained by Leonard, Street and Deinard**
**Updated on August 27, 2003**

| Trademark Name | Appl. No. | Filing Date | Reg. No. | Reg. Date | Class/Goods | Status/Next Action Due |
|---|---|---|---|---|---|---|
| NorthWestern<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,309 | 07-Mar-2000 | 2,431,529 | 27-Feb-2001 | Class 42 - Design for others of air quality management systems, lighting systems, heating, ventilating and air conditioning systems, and standby electrical generation systems; consultation services in the field of air quality, energy use, conservation, and energy use auditing, security system monitoring. | Registered. File Affidavit of Use between 27-Feb-2006 and before 27-Feb-2007. |
| TeamWorks<br><br>Mark is lined for colors red and blue.<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,320 | 07-Mar-2000 | 2,429,936 | 20-Feb-2001 | Class 16 – A magazine for Northwestern Corporation partner companies. | Registered. File Affidavit of Use between 20-Feb-2006 and before 20-Feb-2007. |
| TeamWorks<br><br>**This File Maintained by Leonard, Street and Deinard** | 75/937,308 | 07-Mar-2000 | 2,431,528 | 27-Feb-2001. | Class 16 – A magazine for Northwestern Corporation partner companies. | Registered. File Affidavit of Use between 27-Feb-2006 and before 27-Feb-2007. |

**IP Addresses**

NORTHWESTERN COMM SOLUTIONS NORTHWES53-55-16
(NET-12-104-55-16-1) 12.104.55.16 - 12.104.55.31
NORTHWESTERN COMM SOLUTIONS NORTHWES62-205-160
(NET-12-26-205-160-1) 12.26.205.160 - 12.26.205.191
NORTHWESTERN COMMUNICATION NETWORK NORTHWES94-236
(NET-12-160-236-0-1) 12.160.236.0 - 12.160.236.255
NORTHWESTERN COMMUNICATION SOLUTIONS NORTHWES74-144-128
(NET-12-155-144-128-1) 12.155.144.128 - 12.155.144.255
NORTHWESTERN COMMUNICATIONS NORTHWES64-208-184
(NET-12-44-208-184-1) 12.44.208.184 - 12.44.208.191
NORTHWESTERN COMMUNICATIONS NORTHWES66-132-48
(NET-12-27-132-48-1) 12.27.132.48 - 12.27.132.55

| OrgName: | The Hontana Power Company |
|---|---|
| OrgID: | THEMON |
| Address: | 40 E. Broadway |
| City: | Butte |
| StateProv: | MT |
| PostalCode: | 59701 |
| Country: | US |

| NetRange: | 199.96.16.0 - 199.96.27.255 |
|---|---|
| CIDR: | 199.96.15.0/21, 199.96.24.0/22 |
| NetName: | NETBLK-MONTANA POWER |
| NotHandle: | NET-199-96-16-0-1 |
| Parent: | NET-199-0-0-0-0 |
| NetType: | Direct Assignment |
| Comment: | |
| RegDate: | 1993-12-29 |
| Updated: | 2001-03-09 |

| TechHandle: | ZM81-ARIN |
|---|---|
| TechName: | Montana Power Company |
| TechPhone: | +1-406-497-3000 |
| TechEmail: | inaccess@mtpower.com |

| OrgTechHandle: | SC1244-ARIN |
|---|---|
| OrgTechName: | Cleverly, Sean |
| OrgTechPhone: | +1-406-497-4131 |
| OrgTechEmail: | Sean.Cleverly@northwestern.com |

Sprint NETBLK-SPRINT-BLKG (NET-206-104-0-0-1)
                                    206.104.0.0 - 206.107.255.255
NORTHWESTERN CORPORATION SPRINT-CE6BEB5 (NET-206-107-235-0-1)
                                    206.107.235.0 - 206.107.235.255

Montana Power Company (MONTAN)
Montana Power Company Colstrip Project (MPCCP)
Montana Power Company (ZM81-ARIN)     inaccess@mtpower.com + 1-406-497-3000
Montana Power Company MONTANAPOWER

NET-192-58-136-0-1) 192.68.136.0 - 192.68.136.255
Montana Power Company MONTANAPWR2 (NET-192-175-2-0-1)
192.175.2.0 - 192.175.2.255
Montana Power Company MONTANAPWR3 (NET-192-175-3-0-1)
192.175.3.0 - 192.175.3.255
Montana Power Company MONTANAPWR4 (NET-192-175-4-0-1)
192.175.4.0 - 192.175.4.255
Montana Power Company MONTANAPWR5 (NET-192-175-5-0-1)
192.175.5.0 - 192.175.5.255
Montana Power Company MONTANAPWR1 (NET-192-175-1-0-1)
192.175.1.0 - 192.175.1.255
Montana Power Company Colstrip Project COLSTRIP (NET-199-5-162-0-1)
199.5.162.0 - 199.5.162.255

**Domain Names**

| | |
|---|---|
| 10/15/2001 | bluedotdirect.com |
| 10/15/2001 | bluedotservices.com |
| 12/7/2001 | northwestern.com |
| 11/22/2000 | northwesterncommunications.com |
| 11/22/2000 | northwesterncommuity.com |
| 12/2/1999 | northwesternenergy.com |
| 8/25/2000 | northwesterngrowth.com |
| 5/9/2000 | northwesternonline.com |
| 5/9/2000 | northwesternonline.net |
| 12/2/1999 | northwesternpublic.com |
| 12/2/1999 | northwesternservice.com |
| 12/2/1999 | northwesternservices.com |
| 12/2/1999 | northwesternsucks.com |
| 9/23/2001 | norworld.com |
| 8/25/2001 | nwecs.com |
| 4/4/2001 | nwps.com |
| 3/30/2001 | teamnor.com |
| 5/9/2000 | teamnor.net |

8

**NorthWestern Energy Division of NorthWestern Corporation**

**SCHEDULE A**

**TRADEMARKS**

**Federal Registrations**

| MARK | REGISTRATION NUMBER | REGISTRATION DATE |
|------|---------------------|-------------------|
| EFFICIENCY E+PLUS and Design | 2,513,688 | 12/04/2001 |
| MPC THE SMART CHOICE | 2,284,443 | 10/12/1999 |

**Montum Registrations**

| MARK | REGISTRATION NUMBER | REGISTRATION DATE |
|------|---------------------|-------------------|
| ENERGIZING MONTANA | T021722 | 7/12/2001 |
| MTENERGY.COM | T021323 | 1/10/2001 |
| MONTANAENERGYCHOICE.COM | T021322 | 1/10/2001 |
| E+EFFICIENCY PLUS | T017293 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017292 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017291 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017290 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017289 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017288 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017287 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017286 | 3/1/1993 |

9

| | | |
|---|---|---|
| E+EFFICIENCY PLUS | T017285 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017284 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017283 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017282 | 3/1/1993 |
| E+EFFICIENCY PLUS | T017281 | 3/1/1993 |

10

**SCHEDULE B**

**COPYRIGHTS**

| TITLE | REGISTRATION NO. | DATE |
|---|---|---|
| Montana Power Company, September 1982. | TX 1-009-882 | 11/9/1982 |
| Safety Invader, an Electric Safety Education Kit | TX 1-068-989 | 2/22/1983 |
| Safety Invader | TX 1-368-702 | 6/4/1984 |
| Safety Invader Pretest | TX 1-368-678 | 6/4/1984 |
| Safety Invader Teacher's Guide | TX 1-362-883 | 6/4/1984 |
| Safety Invader Pretest | TX 1-667-197 | 10/8/1985 |
| Safety Invader Student Workbook: Get the Current Shooking Facts About Electrical Safety | TX 1-676-313 | 10/8/1985 |
| Safety Invader Protest | TX 1-709-175 | 10/8/1985 |
| Safety Invader: Teacher's Guide | TX 1-745-865 | 10/8/1985 |
| Safety Invader | TX 1-760-839 | 10/8/1985 |
| Remembering | VA 261-786 | 4/14/1987 |
| Hazardous Waste Management Plan | TX 2-094-913 | 5/28/1987 |
| The Missouri-Madison Hydroelectric Project: Initial Stage of Consultation, Application for a New License | TX 2-637-423 | 8/14/1989 |
| Kenny's Curious Adventure | TXu 465-823 | 3/19/1991 |
| Kenny's Curious Adventure Poster, Col. Drawing | VAu 209-062 | 6/27/1991 |
| Heghen Development Plan, Elevation & Sections: Missouri-Madison Project | TX 3-167-335 | 10/2/1991 |
| Draft Application for A New License: The Missouri-Madison Hydroelectric Project (FERC project no. 2188) | TX 3-370-505 | 4/23/1992 |
| Missouri-Madison Hydroelectric Project (FERC project no. 2188): cultural resource management | TX 3-376-190 | 8/7/1992 |
| Missouri-Madison Hydroelectric Project Report on Intensive Pedestrian Survey for Cultural Resources and Recommendations for Testing | TX 3-376-351 | 8/7/1992 |

11

| | | |
|---|---|---|
| Testing and Evaluation of Prehistoric and Historic Archaeological Properties on the Hegben, Madison, Holter and Ryan Developments | TX 3-390-144 | 8/7/1992 |
| Missouri-Madison Hydroelectric Project Report on Survey Stage 1 for Cultural Resources and Recommendations for Stage II | TX 3-395-446 | 8/7/1992 |
| Missouri-Madison Hydroelectric Project Report on Culture Resource Assessment Studies on the Morony Development, 1992 Field Season | TX 3-424-450 | 10/20/1992 |
| 1991 Missouri-Madison Hydroelectric Project Report on Resource Inventory and Assessment Studies on the Morony, Hegben and Holter Developments | TX 3-424-451 | 10/20/1992 |
| The Missouri-Madison Hydroelectric Project (FERC project no. 2188) | TX 3-524-068 | 3/16/1993 |
| Emergency Home Preparedness Guide | TX 3-778-016 | 3/10/1994 |
| Plugging into Montana's Electrical Future | TX 3-742-414 | 3/16/1994 |
| LeaderScan | Txu 794-643 | 4/29/1997 |

## COPYRIGHTS – Prior to 1978

| TITLE | REGISTRATION NO. | DATE |
|---|---|---|
| The Montana Power Company. Center Special V-87629, laydown from v-77582. Sheet $2^1/_2$" x 6'. Lithograph. | Registered in the name of American Bank Note Co., under K 3154 following publication June 3, 1946 | 6/13/1946 |
| The Montana Power Company; laydown from V-87629A and V-68880 (Center special V-91689) | Registered in the name of American Bank Note Company, under K 20893 following publication May 24, 1949 | 5/24/1949 |
| The Montana Power Company (MTP); research information report, October 7, 1974 | Registered in the name of Baker, Weeks and Company, Inc. under A 601575 following publication 10/7/1974 | 10/7/1974 |

12

| | | |
|---|---|---|
| The Montana Power Company (MTP) July 9, 1975 | Registered in the name of Baker, Weeks and Company, Inc. Under A 687071 following publication July 9, 1975 | 7/9/1975 |
| The Montana Power Company: The Habitat Diversity and Utilization Analysis of the Major Wildlife Species on a Portion of the Colstrip; 10x20 area, 1973-75, Project 122-30-A, June 30, 1976. | Registered in the name of Boon Inc., under A 8131856 following publication 7/16/1976 | 7/16/1976 |
| The Montana Power Company; action recommendation, December 1977. By James Mason McCabe. Appl. author: Donaldson, Lufkin and Jenrette Securities Corporation. | Registered in the name of Donaldson, Luflkin and Jenrette Securities Corporation, under A 930093 following publication 12/20/1977 | 12/20/1977 |
| Montana Power Co. and Subsidiary Companies. Properties and power developments. Size 7½ by 21½ inches | Registered in the name of Geo. H. Ellis Co., under F 24210 following publication 1/20/1914 | 1/20/1914 |
| Montana Power Co. Properties and power developments. Sheet, map, printed on both sides, 8½ by 14 inches. | Registered in the name of Geo. H. Ellis Co., under A 395780 following publication 3/13/1915 | 3/13/1915 |
| Montana Power Co. Properties and power developments, Sheet, col. map, printed on both sides, 14 x 8½ inches. | Registered in the name of Geo. H. Ellis Co., under A 495063 following publication 3/7/1918 | 3/7/1918 |

13

**SCHEDULE C**

PATENTS

| Patent No. | Description | Filed Date | Issued Date |
|---|---|---|---|
| US 4,441,135 | Three-phase power transmission line phase-to-ground fault responder | Aug. 6, 1982 | Apr. 3, 1984 |
| US 4,513,340 | Power transmission line protective apparatus | Dec. 13, 1982 | Apr. 23, 1985 |
| US 4,670,956 | Tool for high voltage transmission lines | Mar. 3, 1986 | Jun. 9, 1987 |
| US 5,183,102 | Heating and cooling system | Nov. 15, 1991 | Feb. 2, 1993 |

14

**SCHEDULE D**

**DOMAIN NAMES**

**MTPOWER.COM**

15

**Trademark Application Owned by Northwestern Energy Development, LLC**
**These Files are Maintained by Leonard, Street and Deinard**
**Updated on August 27, 2003**

| Trademark Name | Appl. No. | Filing Date | Reg. No. | Reg. Date | Class/Goods | Status/Next Action Due |
|---|---|---|---|---|---|---|
| MONTANA FIRST MEGAWATTS<br><br>**This File Maintained by Leonard, Street and Deinard** | 78/071,522 | 28-Jun-2001 | | | Class 39: Utility services, namely, transmission of electricity; Class 40: Generation and production of electricity. | Pending. Notice of Allowance date 12-Nov-2002. **File Statement of Use and/or 2nd Extension Request before 12-Nov-2003.** |
| NORTHWESTERN ENERGY<br><br>**This File Maintained by Leonard, Street and Deinard** | 78/071,535 | 28-Jun-2001 | | | Class 39: Utility services, namely, generation, production and distribution of electricity, natural gas, propane and fuel oil; Class 40: Generation and production of electricity, natural gas, propane and fuel oil. | Pending. Application published for opposition on 03-Jun-2003. |

16

**Schedule 5.28**

**Labor Matters**

| Title Agreement | Union | Employees Covered | Term |
|---|---|---|---|
| Collective Bargaining Agreement (CBA)/ Labor Agreement (The Montana Power Company), as amended pursuant to September 2001 Labor Negotiations (as set forth in Transmittal Letter dated 9/25/01) | Local 41 and 459 of the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada | All employees of the Company in or in the immediate vicinity of towns: Anaconda, Deer Lodge, Butte, Dillion, Whitehall & Helena, MT who are classified on the Company payroll as Plumbers, Steam Fitters, Gas Fitters, Gas Servicemen and Gas Apprentices who are members of Local No. 41 or the same types of employees in Missoula and Hamilton, MT who are members of Local No. 459. | 6/1/98 – 5/30/01 (original) 6/1/01 – 5/31/04 (as amended) |
| Collective Bargaining Agreement (CBA)/Labor Agreement (The Montana Power Company), as amended pursuant to June 2001 Labor Negotiations  (as set forth in Transmittal Letter dated 6/20/01) | Local Union No. 44 (Butte, Montana) of the International Brotherhood of Electrical Workers, AFL-CIO | | 5/1/98 – 4/30/01 (original) 5/1/01 – 4/30/04 (as amended) |
| Collective Bargaining Agreement/Labor Agreement (The Montana Power Company), as amended by August 2001 Labor Negotiations (as set forth in the Transmittal Letter dated 8/30/01) | Butte Teamsters' Union, Local No. 2 (Affiliated with the International Brotherhood of Teamsters and Joint Council of Teamsters #3) | Employees in Silver Bow County, MT, classified as Truck Drivers, Garagemen, Warehousemen, and Gas Meter Repairmen | 7/1/98 – 6/30/01 (original) 7/1/01 – 6/30/04 (as amended) |
| Collective Bargaining Agreement (CBA)/Labor Agreement (The Montana Power Company), as amended by the August 2001 Labor Negotiations (as set forth in the Transmittal Letter dated 8/30/01) | International Association of Machinists and Aerospace Workers District Lodge Local Union No. 88, No. 86 (Union) | All employees of The Montana Power Company performing machinists work in Silver Bow County and Missoula, MT, shall be members of the Butte Machinist' Union, No. 88, District Lodge No. 86, in good standing | 7/1/98 – 6/30/01 (original) 7/1/01 – 6/30/04 (as amended) |

1

| Title Agreement | Union | Employees Covered | Term |
|---|---|---|---|
| Collective Bargaining Agreement (CBA)/ Labor Agreement (The Montana Power Company), as amended by July 2001 Labor Negotiations (as set forth in the Transmittal Letter dated 8/1/01) | Paper, Allied Chemical and Energy Workers' International Union AFL-CIO, CLC (Union), Local No. 2-493, Cut Bank, MT | Production (operation) and maintenance employees of the Company within the enlarged unit determined by the National Labor Relations Board in Case No. 19-RC-1586 but excluding certain employees as pursuant to the National Labor Relations Act, as amended | 6/21/98 – 6/20/01 (original)  6/21/01 – 6/20/04 (as amended) |
| Collective Bargaining Agreement (CBA)/Labor Agreement (The Montana Power Company), as amended by October 2001 Labor Negotiations (as set forth in the Transmittal Letter dated 10/17/01) | Kalispell Unit of Hourly Gas Employees (Union) | All employees of the Company in Kalispell District who are employed in natural gas work and who are classified on the Company payroll as Steam Fitters, Gas Fitters, Gas Servicemen, Ga s Apprentices, and Installers | 9/1/98 – 8/31/01 (original)  9/1/01 – 8/31/04 (as amended) |
| Plumbers and Pipefitters National Pension Fund Revised Standard Form of Participation Agreement dated May 15, 2002 (NorthWestern Energy, LLC) | Plumbers and Pipefitters National Pension Fund Local Union No 41 & 459 United Association | Journeyman, Apprentice, Foreman and other | 3/02 – 5/31/04 |

2

**Schedule 5.32**

**Borrowing Base Inventory**

Schedule to be delivered within ten Business Days and subject to Agent's satisfaction, in its sole discretion.

**<u>Schedule 5.33</u>**

**Principal Real Properties**

Schedule to be delivered within ten Business Days and subject to Agent's satisfaction, in its sole discretion.

**SCHEDULE 6.20**

1.    Expanets and its Subsidiaries, Blue Dot and its Subsidiaries, and other Excluded Subsidiaries

2.    The real estate listed on the attached page

1

EXCESS PROPERTIES - TO BE RELEASED FROM LIEN OF MORTGAGE INDENTURES

| Property Name | County | Purchaser |
|---|---|---|
| **MONTANA** | | |
| Townsend Shop/Office | Benchwater | Robert C & Gaylena [ILLEGIBLE] |
| Red Lodge Northside Substation | Carbon | City of Red Lodge |
| Land in Cascade County | Cascade | King Properties |
| McGregor Meadows | Flathead | Clark D. & Sharon M. [ILLEGIBLE] |
| Kalispell Service Center | Flathead | Montana Department of Transportation (MDOT) |
| Boroman [ILLEGIBLE] Substation Site | Gallatin | Douglas Lance Smith |
| Jack Rabbit Substation MDOT Highway Proj | Gallatin | Montana Department of Transportation (MDOT) |
| Boroman Northside Substation land | Gallatin | Tengelsan Family Limited Partnership |
| Marysville Substation | Lewis and Clark | Nick A. & Darcy A. [ILLEGIBLE] |
| Helena Service Center Land | Lewis and Clark | Montana Department of Transportation (MDOT) |
| Alberton Gorge | [ILLEGIBLE] | Currently None |
| Grant Creek Substation | Missoula | Dennis R. Washington |
| Missoula Service Center excess parcel | Missoula | Currently None |
| Livingston Indoor Substation excess parcel | Park | Fred J & F Thomas Shellerberg |
| Thompson Falls House and Land | Sanders | Elvia [ILLEGIBLE] |
| Buffalo Rapids [ILLEGIBLE] | Sanders | Confederated, [ILLEGIBLE] & [ILLEGIBLE] (CSKT) |
| Columbus substation site | Stillwater | Lance Hogan |
| Glasgow polo yard | Valley | John [ILLEGIBLE] Constructions |
| Billings Service Center excess parcel | [ILLEGIBLE] | [ILLEGIBLE] Kreitzberg |
| **Montana Subtotal** | | |

| Property Name | County | Purchaser |
|---|---|---|
| **SOUTH DAKOTA** | | |
| Former Corporate Office, Huron | Bendle | Currently None |
| Excess Property Adjacent to Frank Avenue Substation | Bendle | [ILLEGIBLE] and [ILLEGIBLE] |
| Former Pole Storage Yard | Bendle | State of South Dakota (South Dakota State Fair) |
| Excess Property Adjacent to Kansas Avenue Substation | Bendle | Currently None |
| Former [ILLEGIBLE] Air Plant Property | Brookings | Currently None |
| Former Armour Substation Property | Charties Mix | Currently None |
| Former Webster Office | Day | City of Webster |
| **South Dakota Subtotal** | | |

| Property Name | County | Purchaser |
|---|---|---|
| **NEBRASKA** | | |
| Former [ILLEGIBLE] Air Plant Property | Buffalo | Currently None |
| **Nebraska Subtotal** | | |

**Total of All Three States**

**SCHEDULE 6.21**

**PERMITTED INVESTMENTS**

Schedule to be delivered within five Business Days and subject to Agent's satisfaction, in its sole discretion.

Exhibit 10.2 (i)

**EXECUTION COPY**

**AMENDED AND RESTATED CREDIT AGREEMENT**

among

**NORTHWESTERN CORPORATION,**
as Borrower,

**The Several Lenders from Time to Time Parties Hereto,**

and

**CREDIT SUISSE FIRST BOSTON,**
acting through its Cayman Islands Branch,
as Administrative Agent,
Lead Arranger and Sole Book Runner

Originally Dated as of December 17, 2002

And Amended and Restated as of November 10, 2003

**TABLE OF CONTENTS**

ARTICLE 1.          DEFINITIONS

    1.1     Defined Terms

    1.2     Other Definitional Provisions

ARTICLE 2.          AMOUNT AND TERMS OF COMMITMENTS

    2.1     Commitments and Loans

    2.2     Evidence of Indebtedness

    2.3     [Intentionally Omitted]

    2.4     [Intentionally Omitted]

    2.5     Repayment of Loans

    2.6     Optional and Mandatory Prepayments

    2.7     Interest Rate Conversion and Continuation Options

    2.8     Maximum Amounts of Eurodollar Tranches

    2.9     Interest Rates; Default Rate Payment Dates

    2.10    Computation of Interest

    2.11    Inability to Determine Interest Rate

    2.12    Pro Rata Treatment and Payments; Funding Reliance

    2.13    Illegality

    2.14    Requirements of Law

    2.15    Taxes

    2.16    Indemnity

    2.17    Discretion of Lender as to Manner of Funding

    2.18    Change of Lending Office; Replacement Lender

    2.19    Ratification of Collateral Documents; Priority

    2.20    No Discharge; Survival of Claims

ARTICLE 3.          REPRESENTATIONS AND WARRANTIES

    3.1     Financial Condition

    3.2     No Change

    3.3     Corporate Existence; Compliance with Law

    3.4     Corporate Power; Authorization; Enforceable Obligations

i

3.5        No Legal Bar

3.6        No Material Litigation

3.7        No Default

3.8        Ownership of Property; Liens

3.9        [Intentionally Omitted]

3.10       Intellectual Property

3.11       No Burdensome Restrictions

3.12       Taxes

3.13       Margin Stock

3.14       ERISA

3.15       Holding Company; Investment Company Act; Other Regulations

3.16       Purpose of Loans

3.17       Environmental Matters

3.18       Insurance

3.19       Accuracy and Completeness of Information

3.20       Leaseholds, Permits, etc

3.21       No Restrictive Covenants

3.22       [Intentionally Omitted]

3.23       Montana First Mortgage Indenture

3.24       South Dakota First Mortgage Indenture

3.25       Subsidiaries

ARTICLE 4.        CONDITIONS PRECEDENT

4.1        Conditions to Closing Date

4.2        [Intentionally Omitted]

4.3        [Intentionally Omitted]

ARTICLE 5.        AFFIRMATIVE COVENANTS

5.1        Financial Statements

5.2        Certificates; Other Information

5.3        Payment and Performance of Obligations

5.4        Maintenance of Existence

5.5        Maintenance of Property; Insurance

5.6        Inspection of Property; Books and Records; Discussions

5.7        Notices

5.8        Environmental Laws

5.9        ERISA

5.10       Use of Proceeds

5.11       Margin Stock

5.12       Maintain Ownership of the Utility Business

5.13       Bankruptcy Court

5.14       Credit Ratings

5.15       Excluded Subsidiaries

5.16       Bank One Credit Documents

ARTICLE 6.        NEGATIVE COVENANTS

6.1        Financial Covenants

6.2        Limitation on Fundamental Changes

6.3        Limitation on Transactions with Affiliates

6.4        Limitation on Liens

6.5        Amendments of Organizational Documents

6.6        Limitation on Guarantee Obligations

6.7        Limitation on Sale of Assets

6.8        Limitation on Investments, Loans and Advances

6.9        Limitation on Dividends and Stock Repurchases

6.10       Limitation on Indebtedness or Mandatory Redeemable Stock

6.11       Limitation on Sales and Leasebacks and Operating Leases

6.12       Limitation on Negative Pledge Clauses; Payment Restrictions

6.13       Limitation on Businesses

6.14       Limitation on Certain Prepayments and Amendments

6.15       Limitations on Subsidiaries' Equity Interests

6.16       Limitation on Release of Mortgaged Property; Limitation in Respect of Insurance

6.17       Limitation on Subjecting Property, or Other Assets to the Lien of the Other Indenture

6.18       Prohibition on Designating Class "A" Mortgages or Permitting Qualified Lien Bonds to Exist

6.19       Limitation on Amendments or Supplements to the Indentures

6.20       Prohibition on Second Mortgage Bonds

| | | |
|---|---|---|
| 6.21 | Financial Contracts | |
| 6.22 | Chapter 11 Claims | |
| 6.23 | Bank One Credit Documents | |
| ARTICLE 7. | EVENTS OF DEFAULT | |
| 7.1 | Events of Default | |
| ARTICLE 8. | THE AGENTS | |
| 8.1 | Appointment | |
| 8.2 | Delegation of Duties | |
| 8.3 | Exculpatory Provisions | |
| 8.4 | Reliance by Agents | |
| 8.5 | Notice of Default | |
| 8.6 | Non-Reliance on Agents and Other Lenders | |
| 8.7 | Indemnification | |
| 8.8 | Agent in Its Individual Capacity | |
| 8.9 | Successor Administrative Agent | |
| ARTICLE 9. | MISCELLANEOUS | |
| 9.1 | Amendments and Waivers | |
| 9.2 | Notice | |
| 9.3 | No Waiver; Cumulative Remedies | |
| 9.4 | Survival of Representations and Warranties | |
| 9.5 | Payment of Expenses and Taxes; Indemnification | |
| 9.6 | Successors and Assigns; Participations and Assignments | |
| 9.7 | Adjustments; Setoff | |
| 9.8 | Confidentiality | |
| 9.9 | Effectiveness | |
| 9.10 | Counterparts | |
| 9.11 | Severability | |
| 9.12 | Integration | |
| 9.13 | GOVERNING LAW | |
| 9.14 | Submission To Jurisdiction Waivers | |
| 9.15 | Acknowledgments | |
| 9.16 | Waivers of Jury Trial | |
| 9.17 | Conflict with Orders | |

9.18      Waiver of Defaults under Original Loan Agreement

EXHIBITS AND SCHEDULES

Exhibit A-1      Form of Term Note
Exhibit A-2      Form of QFL Note
Exhibit B        Form of Notice of Interest Rate Conversion
Exhibit C        Form of Closing Certificate
Exhibit D        Form of Assignment and Assumption Agreement


Schedule I       Lending Offices and Commitments of Lenders
Schedule P       Permitted Pre-Petition Payments
Schedule 3.4a    First Mortgage Approvals
Schedule 3.4b    Required Consents of Governmental Authorities
Schedule 3.8     Exceptions to Title to Borrower's Properties
Schedule 3.12    Taxes
Schedule 3.14    ERISA
Schedule 3.15    Regulations Limiting Indebtedness
Schedule 3.17    Environmental Matters
Schedule 3.25    Subsidiaries
Schedule 6.3     Transactions with Affiliates
Schedule 6.4     Liens Securing Debt for Borrowed Money
Schedule 6.6     Guarantee Obligations
Schedule 6.7     Asset Sales
Schedule 6.8     Investments
Schedule 6.10    Indebtedness, Mandatory Redeemable Stock and Preferred Stock

AMENDED AND RESTATED CREDIT AGREEMENT, dated as of November 10, 2003, among NORTHWESTERN CORPORATION, a Delaware corporation, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (together with its successors and assigns, the "Borrower"), the several banks and other financial institutions from time to time party hereto (the "Lenders"), and CREDIT SUISSE FIRST BOSTON, acting through its Cayman Islands Branch, as Administrative Agent (in such capacity the "Administrative Agent"), Lead Arranger and Sole Book Runner.

<div align="center">PRELIMINARY STATEMENTS</div>

1.    The Borrower, the Administrative Agent and certain lenders are parties to a Credit Agreement dated as of December 17, 2002, as amended (the "Original Loan Agreement"), pursuant to which the Lenders extended credit to the Borrower in the form of term loans in an aggregate principal amount of $390,000,000. The Loans are secured by certain first mortgage bonds to, and registered in the name of, the Collateral Agent for the ratable benefit of the Lenders (it being understood that payments on the Loans shall be deemed payments on such first mortgage bonds and payments on such first mortgage bonds shall be applied to the payment of the Loans).

2.    On September 14, 2003 (the "Petition Date"), the Borrower filed a voluntary petition with the Bankruptcy Court initiating the Case and has continued in possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.    In connection with the commencement of the Case, the parties hereto desire to assume, amend, restate and modify, but not extinguish, the Original Loan Agreement in its entirety as hereinafter set forth, and waive any Defaults or Events of Default that may exist under the Original Loan Agreement arising solely from the commencement of the Case.

4.    In consideration of the foregoing premises and the mutual covenants herein contained and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree to amend and restate the Original Loan Agreement as follows:

## ARTICLE 1.  DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Administrative Agent" shall have the meaning ascribed thereto in the heading hereto and shall include such other Lender or financial institution as shall have subsequently been appointed as the successor Administrative Agent pursuant to Section 8.9.

"Affected Lender" shall have the meaning ascribed thereto in Section 2.18.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of (including all directors and officers of such Person), is controlled by, or is under

common control with, such Person.  For purposes of this definition, "control" of a Person shall mean the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting securities, by contract or otherwise.

"Agents" shall have the meaning ascribed thereto in Section 8.1.

"Agreement" shall mean this Amended and Restated Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, on any particular date, a rate of interest per annum equal to the higher of

(a)    the rate of interest most recently announced by CSFB as its prime rate in effect at its principal office in New York City (which rate is not necessarily intended to be the lowest rate of interest charged by CSFB in connection with extensions of credit); and

(b)    the Federal Funds Rate for such date plus 0.50%.

"Alternate Base Rate Loans" shall mean Loans the rate of interest applicable to which is based upon the Alternate Base Rate.

"Applicable Prepayment Premium" shall mean, as of any date of determination, an amount equal to (a) during the period from and after the Closing Date up to the date that is the first anniversary of the Closing Date, 1.00% *times* the outstanding principal balance of the Loans on the date immediately prior to the date of determination, and (b) during the period from and including the date that is the first anniversary of the Closing Date up to the Maturity Date, 0.50% *times* the outstanding principal balance of the Loans on the date immediately prior to the date of determination.

"Approved Fund" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in commercial loans, any other fund that invests in commercial loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Arranger" shall mean CSFB and its successors.

"Asset Disposition" shall mean (i) any sale, lease or other disposition (including (x) any such transaction effected by way of merger or consolidation and (y) any sale-leaseback transaction, whether or not involving a Financing Lease) (any such transaction, a "disposition"), by the Borrower or any of its Subsidiaries, of any asset subject to the Lien of an Indenture (other than any disposition of any asset released from the Lien of an Indenture as described in clause (i), (ii) or (iv) of Section 6.16), and (ii) receipt by the Borrower or any of its Subsidiaries of any proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any equipment, fixed asset, real property or other asset subject to the Lien of an Indenture (other than as permitted in clause (iv) of Section 6.16).

2

"<u>Assignee</u>" shall have the meaning ascribed thereto in <u>Section 9.6(c)</u>.

"<u>Assignment and Assumption Agreement</u>" shall have the meaning ascribed thereto in <u>Section 9.6(c)</u>.

"<u>Bank One Claim</u>" shall mean the claim, in an aggregate principal amount not to exceed $100,000,000, together with all interest, fees and other amounts due with respect thereto pursuant to the Bank One Credit Documents (as modified and amended to the extent permitted under this Agreement), without the prior written consent of the Administrative Agent and the Required Lenders, of the secured parties under the Bank One Credit Documents, which claim shall be senior to the Superpriority Claim of the Administrative Agent and the Lenders against the Borrower.

"<u>Bank One Credit Agreement</u>" shall mean the Secured Superpriority Debtor in Possession Credit and Guaranty Agreement dated as of September 19, 2003, among NorthWestern Corporation, a debtor and debtor in possession, as borrower, the other loan parties party thereto as guarantors, the lenders party thereto, Bank One, N.A., as initial lender, agent and LC issuer, and Banc One Capital Markets, Inc., as lead arranger and sole book runner, as the same may be amended, modified or supplemented from time to time.

"<u>Bank One Credit Documents</u>" shall mean the Bank One Credit Agreement and all other documents, instruments and agreements from time to time delivered in accordance with or otherwise relating to the Bank One Credit Agreement.

"<u>Bank One Debt</u>" shall mean Indebtedness under the Bank One Credit Documents.

"<u>Bankruptcy Code</u>" shall mean Title 11 of the U.S. Code (11 U.S.C. § 101 <u>et</u> <u>seq.</u>), as amended, reformed, or otherwise modified from time to time, and any rule or regulation issued thereunder.

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Case from time to time.

"<u>Benefited Lender</u>" shall have the meaning ascribed thereto in <u>Section 9.7(a)</u>.

"<u>Blue Dot</u>" shall mean, collectively, Blue Dot Services, Inc., a Delaware corporation and an indirect wholly owned subsidiary of the Borrower, and its Subsidiaries.

"<u>Bond Collateral Agreement</u>" shall mean a bond collateral agreement between the Borrower and the Collateral Agent for the benefit of the Secured Parties (as therein defined) in form and substance reasonably satisfactory to the Borrower and the Collateral Agent.

"<u>Borrower</u>" shall have the meaning ascribed thereto in the heading hereto.

"<u>Business</u>" shall have the meaning ascribed thereto in <u>Section 3.17(a)</u>.

"<u>Business Day</u>" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; <u>provided</u>,

3

however, that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollars in the interbank market in London, England.

"Capital Expenditures" of any Person shall mean, for any period, without duplication, all expenditures (whether paid in cash or other consideration) during such period that, in accordance with GAAP, are or should be included in additions to property, plant and equipment or similar items reflected in the statement of cash flows for such period for such Person.

"Capital Stock" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

"Carve-Out" shall mean, with respect to the Case, (a) the unpaid fees of the clerk of the Bankruptcy Court and the United States Trustee pursuant to 28 U.S.C. § 1930, (b) the unpaid fees and expenses of professionals incurred by the Borrower and any statutory committees appointed in the Case disclosed to the Administrative Agent prior to the occurrence of a Default or an Event of Default and allowed by an order of the Bankruptcy Court, whether paid prior to or after the occurrence of a Default or an Event of Default, and (c) payment of any unpaid fees and expenses of professionals incurred by the Borrower and any statutory committees appointed in the Case and disclosed to the Administrative Agent after the occurrence of a Default or an Event of Default and allowed by an order of the Bankruptcy Court not to exceed $5,000,000 in the aggregate, in each case exclusive of any retainers received by such professionals in connection with the Case (it being understood and agreed that the Carve-Out shall not constitute in any manner a carve-out with respect to the security interests of the Administrative Agent and the Secured Parties in the Collateral granted pursuant to the Loan Documents).

"Case" shall mean the bankruptcy case commenced by the voluntary petition for relief under Chapter 11 of the Bankruptcy Code filed by the Borrower in the Bankruptcy Court on September 14, 2003, and assigned Case No. 03-12872(CGC).

"Cash Equivalents" shall mean (a) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of one year or less from the date of acquisition and overnight bank deposits of any Lender and certificates of deposit with maturities of one year or less from the date of acquisition and overnight bank deposits of any other commercial bank having capital and surplus in excess of $500,000,000, (c) commercial paper of any issuer rated at least A-2 by Standard & Poor's or P-2 by Moody's, (d) additional money market investments with maturities of one year or less from the date of acquisition rated at least A1 or AA by Standard & Poor's or P-1 or Aa by Moody's and (e) tax-exempt debt obligations of any State of the United States or of any county or other municipal government subdivision of any State of the United States with maturities of one year or less from the date of acquisition rated at the highest investment grade rating by Standard & Poor's or by Moody's, or publicly traded or open-end bond funds that invest exclusively in such tax-exempt debt obligations.

"Change of Control" shall mean the occurrence of any of the following:

      (a)      except in connection with the issuance of any Capital Stock pursuant to a Permitted Reorganization Plan, any Person or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934) (i) shall have acquired beneficial ownership of 40% or more of the aggregate outstanding classes of Capital Stock having voting power in the election of directors of the Borrower or (ii) shall obtain the power (whether or not exercised) to elect a majority of the Borrower's directors;

      (b)      except in connection with a Permitted Reorganization Plan, a majority of the persons who comprised the Board of Directors of the Borrower on the Original Signing Date shall be replaced, unless such replacement shall have been approved by at least two-thirds of the Board of Directors of the Borrower then still in office who either were members of such Board of Directors on the Original Signing Date or whose election as a member of such Board of Directors was previously so approved; or

      (c)      the Borrower shall be liquidated or dissolved.

"Closing Date" shall mean the date on which the conditions precedent set forth in Section 4.1 shall be satisfied or waived by the Required Lenders.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning ascribed thereto in the Collateral Documents.

"Collateral Agent" shall mean CSFB as collateral agent under the Bond Collateral Agreement.

"Collateral Documents" shall mean a collective reference to the First Mortgage Bonds, the Bond Collateral Agreement, the Supplemental Indentures and such other documents executed and delivered in connection with the attachment and perfection of the Collateral Agent's security interest and liens arising thereunder, including, without limitation, UCC financing statements filed in connection therewith.

"Commitment" shall mean, as to any Lender, the obligation of such Lender to make a Loan to the Borrower in a principal amount not to exceed the amount set forth opposite such Lender's name on Schedule I.  As of the Original Closing Date, the aggregate amount of the Commitments was $390,000,000.

"Commitment Percentage" shall mean, as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the aggregate Commitments (or, at any time after the Original Closing Date, the percentage which the aggregate principal amount of such Lender's Loans then outstanding constitutes of the aggregate principal amount of the Loans then outstanding).

"Commonly Controlled Entity" shall mean an entity, whether or not incorporated, which is under common control with the Borrower and/or any Subsidiary within the meaning of Section

4001(a)(14) of ERISA or is part of a group which includes the Borrower and which is treated as a single employer under Section 414 of the Code.

"Compliance Certificate" shall have the meaning ascribed thereto in Section 5.2(b).

"Consolidated EBITDAR" shall mean, with reference to any period, Consolidated Net Income (provided, however, that Consolidated Net Income shall not include the amount of insurance proceeds received in reimbursement of attorney and other professional fees incurred in respect of securities litigation involving the Borrower and its Subsidiaries (including the Excluded Subsidiaries)) plus, to the extent deducted from revenues in determining Consolidated Net Income, (a) Consolidated Interest Expense, (b) expense for taxes paid or accrued net of tax refunds received during such period or expected to be received within 60 days thereafter, (c) depreciation, (d) amortization and other non-cash charges, (e) extraordinary losses (as determined in accordance with GAAP) incurred other than in the ordinary course of business and (f) fees, expenses and non-recurring restructuring charges related to the Case and this Agreement in an aggregate amount not to exceed $40,000,000, minus, to the extent included in Consolidated Net Income, extraordinary gains (as determined in accordance with GAAP) realized other than in the ordinary course of business, all calculated for the Borrower and its Subsidiaries on a consolidated basis for such period (unless otherwise stated).

"Consolidated Group" shall mean the Borrower and its Consolidated Subsidiaries.

"Consolidated Interest Expense" shall mean, with reference to any period, the interest expense of the Consolidated Group calculated on a consolidated basis for such period.

"Consolidated Net Income" shall mean, with reference to any period, the net income (or loss) of the Consolidated Group calculated on a consolidated basis for such period.

"Consolidated Recourse Interest Expense" shall mean, for any period, the aggregate amount of interest expense of the Consolidated Group in respect of Debt for Borrowed Money *minus*, to the extent included therein, (a) the aggregate amount of interest accrued on Non-Recourse Debt, (b) non-cash charges, determined on a consolidated basis in accordance with GAAP and (c) payments made in the form of dividends under existing mandatorily redeemable preference securities of any trust which is a Subsidiary (or under any refinancing thereof on substantially similar terms).

"Consolidated Subsidiary" shall mean, at any time, any Subsidiary or other Person the accounts of which are consolidated with the Borrower in its consolidated financial statements as of such time; provided that in any event, other than in connection with the determination of Consolidated EBITDAR, the term "Consolidated Subsidiary" shall not include any Excluded Subsidiary.

"Contractual Obligation" shall mean as to the Borrower or any Subsidiary, any provision of any security issued by the Borrower or any Subsidiary or of any agreement, instrument or other undertaking to which the Borrower or any Subsidiary is a party or by which it or any of its property is bound.

"Cornernorth" shall mean, collectively, Cornernorth, LLC and its Subsidiaries.

6

"<u>CSFB</u>" shall mean Credit Suisse First Boston.

"<u>Debt for Borrowed Money</u>" shall mean, as to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all Financing Lease obligations of such Person, and (d) all obligations of such Person under synthetic leases, tax retention operating leases, off-balance sheet loans or other off-balance sheet financing products that, for tax purposes, are considered indebtedness for borrowed money of the lessee but are classified as operating leases under GAAP.

"<u>Default</u>" shall mean any of the events specified in <u>Section 7.1</u>, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"<u>Dollars</u>" and "<u>$</u>" shall mean dollars in lawful currency of the United States of America.

"<u>Domestic Lending Office</u>" shall mean, initially, the office of each Lender designated as such in <u>Schedule I</u> (or the office of an Assignee designated pursuant to an Assignment and Assumption Agreement), and thereafter, such other office of such Lender, if any, which shall be making or maintaining Alternate Base Rate Loans as may be designated from time to time by notice from such Lender to the Borrower and the Administrative Agent.

"<u>Emergence Time</u>" shall mean the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Permitted Reorganization Plan that is confirmed pursuant to a final, non-appealable order entered by the Bankruptcy Court, but in no event shall such date be later than the effective date of such Permitted Reorganization Plan.

"<u>Environmental Laws</u>" shall mean any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, judgments, permits, licenses, registrations or authorizations or requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning the health and safety of humans and other living organisms as it relates to exposures to Materials of Environmental Concern, protection of natural resources or the environment, including the manufacture, distribution in commerce, and use of, or Release to the environment of, Materials of Environmental Concern, as now or may at any time hereafter be in effect.

"<u>Equity Issuance</u>" shall mean the issuance of any Capital Stock by the Borrower other than (i) Capital Stock issued in the ordinary course of business in connection with director or employee stock purchase plans and arrangements and other director or employee compensation arrangements and (ii) Capital Stock issued in the ordinary course of business under any dividend reinvestment and stock purchase plan maintained by the Borrower.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>Eurodollar Base Rate</u>" shall mean, with respect to any Eurodollar Loan for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m.

(London time) on the date which is two Business Days prior to the beginning of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date which is two Business Days prior to the beginning of such Interest Period. Each determination by the Administrative Agent pursuant to this definition shall be conclusive absent manifest error.

"Eurodollar Loans" shall mean Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Office" shall mean, initially, the office of each Lender designated as such in Schedule I (or the office of an Assignee designated pursuant to an Assignment and Assumption Agreement), and thereafter, such other office of such Lender, if any, which shall be making or maintaining Eurodollar Loans as may be designated from time to time by notice from such Lender to the Borrower and the Administrative Agent.

"Eurodollar Rate" shall mean with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurodollar Reserve Requirements}}$$

"Eurodollar Reserve Requirements" shall mean, for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the rates (expressed as a decimal) of reserve requirements in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of the Board of Governors of the Federal Reserve System or other Governmental Authority having jurisdiction with respect thereto) dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of such System.

"Eurodollar Tranche" shall mean all Loans which consist of Eurodollar Loans incurred on the Original Closing Date (or which result from continuations or conversions on a given date after the Original Closing Date) and have the same Interest Period.

"Event of Default" shall mean any of the events specified in Section 7.1; provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Excluded Subsidiaries" shall mean, collectively, Blue Dot, Cornernorth, Expanets and Clark Fork and Blackfoot, LLC.

"Expanets" shall mean, collectively, Expanets, Inc., a Delaware corporation and an indirect subsidiary of the Borrower, and its Subsidiaries.

"Facility" shall mean the credit facility provided to the Borrower on the terms and conditions set forth in this Agreement.

"Federal Funds Rate" shall mean for any particular date, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent (in its individual capacity) on such day on such transactions as determined by the Administrative Agent.

"FERC" shall mean the Federal Energy Regulatory Commission.

"Final Order" shall mean an order of the Bankruptcy Court in the Case, entered in any event not later than December 11, 2003, acceptable in all respects to the Administrative Agent and the Lenders on an application or motion by the Borrower, such motion to be satisfactory in form and substance to the Lenders, which order shall have been entered on such notice to such parties as shall be satisfactory to the Administrative Agent and the Lenders, approving the Facility on a final basis and confirming the granting of the Liens described in Section 2.19 and the other Loan Documents, and which order has not been stayed, reversed, modified, vacated or overturned.

"Financial Contract" of a Person shall mean (a) any exchange-traded or over-the-counter futures, forward, swap or option contract or other financial instrument with similar characteristics or (b) any Rate Management Transaction.

"Financing Lease" shall mean any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with GAAP to be capitalized on a balance sheet of the lessee.

"Financing Lease Obligations" of any Person shall mean the aggregate amount of the obligations of such Person under Financing Leases which would be shown as a liability on a balance sheet of such Person prepared in accordance with GAAP.

"First Mortgage Approvals" shall have the meaning ascribed thereto in Section 3.4.

"First Mortgage Bonds" shall mean the first mortgage bonds issued, pursuant to the Indentures, to and registered in the name of the Collateral Agent.

"Foreign Subsidiaries" shall mean, collectively, Risk Partners Assurance, Ltd., a Bermuda company, and Canadian-Montana Pipe Line Corporation, a Canadian company.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time consistent with those utilized in preparing the audited financial statements referred to in Section 3.1; provided that, after the Emergence Time, in the event that any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions) results in a change in the calculation of any of the financial covenants hereunder, the Required Lenders and the Borrower will in good faith enter into negotiations in order to reevaluate such financial covenants in light of such change; and provided, further, that this provision shall not operate as a waiver of any right, remedy, power or privilege available to any Lender under any provision of any Loan Document or pursuant to any applicable law.

"Governmental Authority" shall mean any national government (United States or foreign), any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any agency, authority, instrumentality, or regulatory body of any thereof.

"Granting Lender" shall have the meaning ascribed thereto in Section 9.6(f).

"Guarantee Obligation" shall mean as to any Person (the "guaranteeing person"), any obligation of the guaranteeing person (including, without limitation, any reimbursement, counter-indemnity or similar obligation), guaranteeing or in effect guaranteeing any Indebtedness, lease, dividend or other similar obligation (the "primary obligation") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth, liquidity or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person as of any date of determination shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Indebtedness" of any Person at any date shall mean, without duplication, (a) Debt for Borrowed Money of such Person, (b) all indebtedness of such Person for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of

10

business and payable in accordance with customary practices), (c) all outstanding reimbursement obligations of such Person in respect of outstanding letters of credit, acceptances and similar obligations issued or created for the account of such Person, (d) all liabilities secured by any Lien on any property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof, (e) liabilities arising under Rate Management Transactions (other than interest rate caps) of such Person and (f) all Guarantee Obligations of such Person.

"Indentures" shall mean collectively the Montana First Mortgage Indenture and the South Dakota First Mortgage Indenture.

"Insolvency" shall mean with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"insolvent" shall mean pertaining to a condition of Insolvency.

"Intellectual Property" shall have the meaning set ascribed thereto in Section 3.10.

"Interest Payment Date" shall mean (a) as to any Alternate Base Rate Loan, the last Business Day of each March, June, September and December to occur while such Loan is outstanding, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, and (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day which is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period.

"Interest Period" with respect to any Eurodollar Loan shall mean:

> (a)  initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its Notice of Interest Rate Conversion given with respect thereto; and

> (b)  thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto;

provided that, the foregoing provisions relating to Interest Periods are subject to the following:

> (i)    if any Interest Period pertaining to a Eurodollar Loan would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day (and, with respect to payments of principal and interest thereon, shall be payable at the then applicable rate during such extension) unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)      no Interest Period shall be selected which would extend beyond the Maturity Date;

(iii)      any Interest Period pertaining to a Eurodollar Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(iv)      the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"<u>Interim Order</u>" shall have the meaning set forth in <u>Section 4.1(b)</u>.

"<u>Investment</u>" shall have the meaning ascribed thereto in <u>Section 6.8</u>.

"<u>ISO</u>" shall mean any "Independent System Operator" or similar entity approved by FERC to manage transmission systems owned by the Borrower.

"<u>Lender</u>" shall have the meaning ascribed thereto in the heading hereto.

"<u>Lien</u>" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any Financing Lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, other than any such filing in connection with any true lease or operating lease).

"<u>Loan Documents</u>" shall mean collectively, this Agreement, the Collateral Documents, the Notes and each other agreement, instrument or certificate issued, executed and delivered to the Administrative Agent, the Collateral Agent, or the Lenders hereunder or thereunder or pursuant hereto or thereto (in each case as the same may be amended, restated, supplemented, extended, renewed or replaced from time to time), and "<u>Loan Document</u>" means any one of them.

"<u>Loans</u>" shall mean the loans made by the Lenders to the Borrower pursuant to this Agreement.

"<u>Mandatory Redeemable Stock</u>" shall mean, with respect to any Person, any share of such Person's Capital Stock, to the extent that it is (a) redeemable, payable or required to be purchased or otherwise retired or extinguished, or convertible into any Indebtedness or other liability, obligation, covenant or duty of or binding upon, or any term or condition to be observed by or binding upon such Person or any of its assets, (i) at a fixed or determinable date, whether by operation of a sinking fund or otherwise, (ii) at the option of any other Person or (iii) upon the occurrence of a condition not solely within the control of such Person

such as a redemption required to be made utilizing future earnings, or (b) convertible into Capital Stock which has the features set forth in clause (a).

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Consolidated Subsidiaries (taken as a whole), (b) the validity or enforceability of this Agreement, any of the Notes, any of the First Mortgage Bonds, any of the other Loan Documents or either Indenture, or the rights or remedies of the Administrative Agent, the Collateral Agent, or the Lenders hereunder or thereunder (or the trustee under an Indenture), (c) the property (taken as a whole) subject to the Lien of an Indenture, or (d) the perfection, priority or enforceability of the Lien of the Montana First Mortgage Indenture, the South Dakota Indenture or any other Collateral Document.

"<u>Materials of Environmental Concern</u>" shall mean any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any other pollutant, contaminant, hazardous substance, hazardous waste, special waste, toxic substance, radioactive material, or other compound, element, material or substance in any form whatsoever (including products) regulated, restricted or addressed by or under any Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"<u>Maturity Date</u>" shall mean December 1, 2006.

"<u>Montana First Mortgage Indenture</u>" shall mean the Mortgage and Deed of Trust dated October 1, 1945 from the Borrower (as successor to Montana Power) to the trustee named therein, as supplemented and amended to the date hereof.

"<u>Montana Power</u>" shall mean The Montana Power, L.L.C., a Montana limited liability company, acquired by the Borrower on February 15, 2002.

"<u>Montana Utility Business</u>" shall mean the regulated electric and natural gas transmission and distribution assets and businesses owned and operated by the Borrower in the State of Montana or otherwise subject to the Lien of the Montana First Mortgage Indenture.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc.

"<u>Multiemployer Plan</u>" shall mean a plan which is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>" shall mean, with respect to any Reduction Event, an amount equal to the cash proceeds received by the Borrower from or in respect of such Reduction Event (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received), less (a) any investment banking and underwriting fees and any other fees and expenses reasonably incurred by such Person in respect of such Reduction Event, and (b) if such Reduction Event is a disposition of assets, (i) the amount of any Debt for Borrowed Money secured by a Lien on any asset disposed of in such Reduction Event to the extent such Lien is senior to the Lien of the applicable Indenture and discharged from the proceeds thereof and (ii) any taxes actually paid or to be payable by such Person (as estimated by a senior financial or accounting officer of the Borrower, giving effect to

13

the overall tax position of the Borrower) in respect of such Reduction Event; <u>provided</u> that the term Net Cash Proceeds shall not include any cash proceeds to the extent such cash proceeds are (and remain) subject to the Lien of an Indenture or a Lien granted under the Orders.

"<u>Net Worth</u>" shall mean, as of any time of determination, the sum of shareholders' equity and preferred stock (including mandatorily redeemable preferred stock of subsidiary trusts), preference stock and preferred securities of the Borrower and its Consolidated Subsidiaries on the last day of the fiscal quarter immediately preceding such time of determination.

"<u>Non-Excluded Taxes</u>" shall have the meaning ascribed thereto in <u>Section 2.15(a)</u>.

"<u>Non-Material Foreign Subsidiary</u>" shall mean (a) prior to the Emergence Time, any Foreign Subsidiary and (b) from and after the Emergence Time, as at any time of determination, a Foreign Subsidiary which, in the aggregate, as at the end of the fiscal quarter immediately preceding such time of determination, shall have a net worth (calculated as the stockholder's equity of such Foreign Subsidiary disregarding any liabilities of such Foreign Subsidiary to an Affiliate) less than 10% of the Net Worth of the Borrower and its Consolidated Subsidiaries as at the end of such fiscal quarter, and net income less than 10% of the Consolidated Net Income for the four fiscal quarter period ending at the end of such fiscal quarter, as determined in accordance with GAAP.

"<u>Non-Recourse Debt</u>" shall mean any Indebtedness as to which the Borrower has no direct or indirect liability whether as primary obligor, guarantor, surety, provider of collateral security or through any other right or arrangement of any nature (including any election by the holder of such Indebtedness) providing direct or indirect assurance of payment or performance of any such obligations in whole or in part (other than direct or indirect liability which by its terms may be payable solely in Capital Stock (other than Mandatory Redeemable Stock) of the Borrower).

"<u>NorthWestern Energy</u>" shall mean the regulated electric and natural gas transmission and distribution assets and businesses owned and operated by the Borrower (formerly known as NorthWestern Public Service and including, without limitation, the regulated electric and natural gas transmission and distribution assets and business formerly owned and operated by Montana Power), historically reported under the headings titled "Electric" and "Natural Gas" on the SEC Reports of the Borrower filed annually with the SEC.

"<u>Note</u>" shall mean, as applicable, a Term Note or a QFL Note.

"<u>Notice of Interest Rate Conversion</u>" shall have the meaning ascribed thereto in <u>Section 2.7</u>.

"<u>Obligations</u>" shall mean the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower or any Subsidiary, as applicable, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding and whether the Administrative Agent, for the benefit of the Lenders, is oversecured or undersecured with respect to such Loans) the Notes and all other obligations and liabilities of the Borrower to the Administrative Agent,

the Collateral Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, the Notes, the other Loan Documents or any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, fees, indemnities, costs, expenses (including, without limitation, all fees and disbursements of counsel to the Administrative Agent, the Collateral Agent or the Lenders that are required to be paid by the Borrower pursuant to the terms of this Agreement or any other Loan Document) or otherwise.

"Orders" shall mean the Interim Order and the Final Order.

"Original Closing Date" shall mean the closing date under the Original Loan Agreement.

"Original Loan Agreement" shall have the meaning ascribed thereto in the preamble hereto.

"Original Signing Date" shall mean December 17, 2002.

"Participant" shall have the meaning ascribed thereto in Section 9.6(b).

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor thereto.

"Pension Plan" shall mean any single-employer plan, as defined in Section 4001(a)(15) of ERISA, which the Borrower, any Subsidiary or any Commonly Controlled Entity maintains, administers, contributes to or is required to contribute to, or under which the Borrower, any Subsidiary or any Commonly Controlled Entity has any liability.

"Permitted Financial Contracts" shall mean Financial Contracts consisting of contracts to purchase or sell natural gas or electricity entered into by the Borrower in the ordinary course of business consistent with past practice and not for speculative purposes.

"Permitted Liens" shall mean, collectively, the following:

       (a)       Liens for taxes, assessments, governmental charges or levies not yet due or which are being contested in good faith by appropriate proceedings; provided that adequate reserves with respect thereto are maintained on the books of the Borrower or its Consolidated Subsidiaries, as the case may be, in conformity with GAAP;

       (b)       Landlord liens for rent not yet due and payable and statutory Liens of carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar nonconsensual Liens imposed by law arising in the ordinary course of business securing obligations which, after the Emergence Time, are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings;

15

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations;

(d)     letters of credit or deposits securing liability to insurance carriers under insurance or self- insurance arrangements, and letters of credit or deposits to secure true operating leases in the ordinary course;

(e)     easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower;

(f)     any attachment or judgment Lien not constituting an Event of Default under Section 7.1(h);

(g)     Liens solely on assets of a Subsidiary incurring Indebtedness, which Liens secure such Indebtedness;

(h)     the Lien of each Indenture, as such Indenture may be amended or supplemented from time to time in accordance with the terms hereof, securing first mortgage bonds permitted to be outstanding pursuant to clause (b) of Section 6.10;

(i)     Liens on accounts receivables or inventory of the Borrower and its Subsidiaries (provided such assets are not subject to the Lien of either Indenture) securing Indebtedness permitted to be outstanding pursuant to clause (j) of Section 6.10;

(j)     Liens on assets of the Borrower not subject to the Lien of either Indenture securing Indebtedness permitted to be outstanding pursuant to clause (k) of Section 6.10;

(k)     any Lien vested in any licensor or permitter for obligations or acts to be performed, the performance of which obligations or acts is required under licenses or permits, so long as the performance of such obligations or acts is not delinquent or is being contested in good faith and by appropriate proceedings;

(l)     any controls, restrictions, obligations, duties or other burdens imposed by any federal, state, municipal or other law, or by any rule, regulation or order of any Governmental Authority, upon any property of the Borrower or the operation or use thereof or upon the Borrower with respect to any of its property or the operation or use thereof or with respect to any franchise, grant, license, permit or public purpose requirement, or any rights reserved

16

to or otherwise vested in any Governmental Authority to impose any such controls, restrictions, obligations, duties or other burdens;

(m)     any right which any Governmental Authority may have by virtue of any franchise, license, contract or statute to purchase, or designate a purchaser of or order the sale of, any property of the Borrower upon payment of cash or reasonable compensation therefor or to terminate any franchise, license or other rights or to regulate the property and business of the Borrower;

(n)     party-wall agreements and agreements, in each case existing on the date hereof, for and obligations relating to the joint or common use of property owned solely by the Borrower or owned by the Borrower in common or jointly with one or more parties;

(o)     Liens existing on the date hereof securing Indebtedness incurred by a Person, other than the Borrower which Indebtedness has been neither assumed nor guaranteed by the Borrower nor on which it customarily pays interest, existing on property which the Borrower owns jointly or in common with such Person or such Person and others, if there is a bar against partition of such property which would preclude the sale of such property by such other Person or the holder of such Lien without the consent of the Borrower;

(p)     cash or cash equivalent collateral in an aggregate amount not to exceed $40,000,000 at any time securing reimbursement and other obligations of the type permitted under clause (g) of Section 6.10 (and related fee and expense indemnity obligations);

(q)     prior to the Emergence Time, Liens securing Indebtedness under the Bank One Credit Agreement in an aggregate principal amount not to exceed $100,000,000, together with all interest, fees and other amounts due with respect thereto pursuant to the Bank One Credit Documents (as modified and amended to the extent permitted under this Agreement);

(r)     adequate protection Liens approved by the Bankruptcy Court and not inconsistent with the Orders on any asset of the Borrower which replaces an asset that was, on the Petition Date, subject to a valid, enforceable, perfected, and nonavoidable Lien, provided such Lien is in favor of the Person holding such pre-petition Lien, is of the same priority as the Lien being replaced and secures a claim in an amount not exceeding the claim secured by such pre-petition Lien;

(s)     Liens in favor of the Collateral Agent and the other Secured Parties securing the Obligations;

(t)     Liens existing on the date hereof securing Debt for Borrowed Money as set forth in Schedule 6.4 hereto;

17

        (u)        Liens securing purchase money Indebtedness or Financing Lease Obligations permitted by <u>Section 6.10</u>; and

        (v)        other Liens not securing Indebtedness existing on the date hereof.

"<u>Permitted Pre-Petition Payments</u>" shall mean Pre-Petition Payments by the Borrower on account of pre-petition claims against the Borrower with respect to critical vendors, employee wages and benefits, taxes and payment of regularly scheduled principal, interest and other recoverable costs and expenses on the senior secured Indebtedness of the Borrower set forth on <u>Schedule P</u>, such payments to be approved by the Administrative Agent or the Bankruptcy Court, and any other Pre-Petition Payments authorized by the Orders.

"<u>Permitted Reorganization Plan</u>" shall mean a Reorganization Plan that either (a) provides for the conversion of all or substantially all of the senior unsecured and subordinated Indebtedness of the Borrower and its Subsidiaries to equity and does not provide for any other Change of Control or for a liquidation of the Borrower, or (b) is otherwise reasonably acceptable to the Administrative Agent and the Required Lenders (provided that the approval of the Administrative Agent and the Required Lenders shall not be unreasonably withheld), and, in the case of both clauses (a) and (b), such Reorganization Plan does not alter, amend or modify in any way the terms of this Agreement.

"<u>Person</u>" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority, ISO or other entity of whatever nature.

"<u>Petition Date</u>" shall have the meaning ascribed thereto in the preamble hereto.

"<u>Plan</u>" shall mean at a particular time, any employee benefit plan which is defined in Section 3(2) of ERISA and in respect of which the Borrower or any Subsidiary is, an "employer" as defined in Section 3(5) of ERISA.

"<u>Pre-Petition Payment</u>" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payable or other pre-petition claims against the Borrower.

"<u>Properties</u>" shall have the meaning ascribed thereto in <u>Section 3.17(a)</u>.

"<u>QFL Note</u>" shall have the meaning ascribed thereto in <u>Section 2.15(c)</u>.

"<u>Qualified Foreign Lender</u>" shall have the meaning ascribed thereto in <u>Section 2.15(c)</u>.

"<u>Rate Management Obligations</u>" of a Person shall mean any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions, and modifications thereof and substitutions therefor), under (a) any and all Rate Management Transactions and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Rate Management Transactions.

18

"Rate Management Transaction" shall mean any transaction (including an agreement with respect thereto) now existing or hereafter entered into by the Borrower or any of its Subsidiaries (other than Excluded Subsidiaries) which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

"Reduction Event" shall mean any Asset Disposition or Equity Issuance; provided that in any event the term "Reduction Event" shall not include any Asset Disposition or Equity Issuance effected in connection with a Permitted Reorganization Plan.

"Register" shall have the meaning ascribed thereto in Section 9.6(d).

"Regulation D, T, U or X" shall mean Regulation D, T, U or X, respectively, of the Board of Governors of the Federal Reserve System as in effect from time to time, or any successor regulation.

"Release" shall mean any release, pumping, pouring, emptying, injecting, escaping, leaching, migrating, dumping, seepage, spill, leak, flow, discharge, disposal or emission.

"Reorganization" shall mean with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reorganization Plan" shall mean a Chapter 11 plan of reorganization in the Case.

"Replaced Note" shall have the meaning ascribed thereto in Section 2.15(c).

"Replacement Lender" shall have the meaning ascribed thereto in Section 2.18.

"Reportable Event" shall mean any of the events set forth in Section 4043(c) of ERISA other than those events for which the notice requirement has been waived under applicable regulations.

"Required Lenders" shall mean, at any time, Lenders having Loans representing 51% or more of the aggregate of all Loans outstanding at such time.

"Requirement of Law" as to any Person shall mean the articles of organization and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority (including, without limitation, the Public Utility Holding Company Act of 1935, as amended, any of the foregoing relating to employee health and safety or public utilities and any Environmental Law), in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" shall mean, with respect to a Person, the chairman of the board of directors, the chief executive officer, the chief restructuring officer or the president of such Person or, with respect to financial matters, the chief financial officer, the treasurer or the chief accountant of such Person, or any other officer of such Person designated as a Responsible Officer by any of the foregoing.

"Restricted Payment" shall have the meaning ascribed thereto in Section 6.9.

"SEC" shall mean the Securities and Exchange Commission.

"SEC Reports" shall mean the reports filed by the Borrower with the SEC on Form 10-K, Form 10-Q or Form 8-K or any successor Form.

"Secured Parties" shall mean the Administrative Agent, the Collateral Agent and the Lenders.

"Single Employer Plan" shall mean a Plan maintained by the Borrower or any Commonly Controlled Entity for employees of the Borrower or any Commonly Controlled Entity.

"South Dakota First Mortgage Indenture" shall mean the General Mortgage Indenture and Deed of Trust dated as of August 1, 1993 between the Borrower and The Chase Manhattan Bank, as trustee, as supplemented and amended to the date hereof.

"South Dakota Utility Business" shall mean the regulated electric and natural gas transmission and distribution assets and businesses owned and operated by the Borrower in the States of South Dakota and Nebraska or otherwise subject to the Lien of the South Dakota First Mortgage Indenture.

"SPC" shall have the meaning ascribed thereto in Section 9.6(f).

"Special Purpose Subsidiary" shall mean a direct or indirect Subsidiary of the Borrower, formed solely for the purpose of acquiring and owning certain assets and issuing Indebtedness which is secured solely by such assets (or the assets of one or more other Special Purpose Subsidiaries) and as to which the Borrower and each other Subsidiary (other than any Special Purpose Subsidiary) has no Guarantee Obligation or other liability or obligation to contribute additional equity or for which the Borrower or any other Subsidiary (other than a Special Purpose Subsidiary) has general partner liability or other derivative liability by operation of law or contract.  The term "Special Purpose Subsidiary" shall also include any Subsidiary whose assets consist solely of equity interests in another Special Purpose Subsidiary and, other than having general partner liability, otherwise meets the requirements of the preceding sentence.

"Standard & Poor's" shall mean Standard & Poor's Rating Group, a division of The McGraw-Hill Companies, Inc.

"Subsidiary" shall mean, as to any Person, a corporation, company, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the occurrence of a contingency) to elect a majority of the board of directors or other managers of such

20

corporation, company, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise expressly stated herein all references to any Subsidiary are to direct or indirect subsidiaries of the Borrower; provided that in no event, other than in connection with the determination of Consolidated EBITDAR, shall any Excluded Subsidiary or any Non-Material Foreign Subsidiary be deemed a Subsidiary of the Borrower.

"Superpriority Claim" shall mean a claim against the Borrower in the Case which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Supplemental Indentures" shall mean collectively the supplemental indentures to the Indentures pursuant to which, among other things, the First Mortgage Bonds are issued.  The Supplemental Indentures are sometimes called, as applicable, the  Montana Supplemental Indenture and the South Dakota Supplemental Indenture herein.

"Term Note" shall have the meaning ascribed thereto in Section 9.6(h).

"Transactions" shall mean, collectively, (a) borrowings hereunder, (b) the authorization, issuance and delivery of the First Mortgage Bonds to the Collateral Agent, (c) the granting of security interests pursuant to the Collateral Documents and (d) any other transactions related or entered into in connection with any of the foregoing or otherwise in connection with any of the Loan Documents.

"Transferee" shall have the meaning ascribed thereto in Section 9.6(g).

"Type" shall mean as to any Loan, its nature as an Alternate Base Rate Loan or a Eurodollar Loan, as the context may require.

"Unfunded Liabilities" shall mean the amount (if any) by which the present value of all vested and unvested accrued benefits under all Single Employer Plans exceeds the fair market value of all such Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan using PBGC actuarial assumptions for single employer plan terminations.

"Utility Business" shall mean the utility business and operations of the Borrower conducted through NorthWestern Energy.

"Wholly-Owned Subsidiary" of any Person shall mean any Subsidiary 100% of whose Capital Stock is at the time owned by such Person directly or indirectly through other Wholly Owned Subsidiaries (other than qualifying directors' shares).

        1.2    Other Definitional Provisions.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Notes or any certificate or other document made or delivered pursuant hereto.

        (b)    As used herein, in the Notes and in any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Borrower or any Subsidiary not

defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "or" shall not be exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall".

(f)    Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, and (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE 2. AMOUNT AND TERMS OF COMMITMENTS

2.1    Commitments and Loans. This Agreement shall become effective on the Closing Date and shall operate as an assumption of, and to amend, restate and modify, but not extinguish, the Original Loan Agreement. The Commitments of the Lenders as of the Closing Date are set forth in full on Schedule I hereto. The Loans (i) at the option of the Borrower may be maintained as, or converted into, Alternate Base Rate Loans or Eurodollar Loans in accordance with the provisions hereof and (ii) shall be repaid in accordance with the provisions hereof, but once repaid, may not be reborrowed.

2.2    Evidence of Indebtedness. (a) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from the Loan made by such Lender, including, without limitation, the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(b)    The Administrative Agent shall maintain the Register pursuant to Section 9.6(d) and a subaccount therein for each Lender, in which shall be recorded (i) the amount of the Loan made by each Lender through the Administrative Agent hereunder, the type thereof and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

22

(c)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 9.6(d) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amount of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans actually made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.3     [Intentionally Omitted]

2.4     [Intentionally Omitted].

2.5     Repayment of Loans.  On the last Business Day of each March, June, September and December prior to the Maturity Date, the Borrower shall make quarterly principal payments on the Loans, each quarterly payment in an amount equal to one quarter of one percent (0.25%) of the original aggregate principal amount of the Loans.  The Borrower shall repay the then outstanding aggregate principal amount of the Loans on the Maturity Date, together with accrued and unpaid interest thereon as provided herein.  Any prepayments of the Loans pursuant to Section 2.6 shall be applied in inverse chronological order to the principal amounts due pursuant to this Section.

2.6     Optional and Mandatory Prepayments.  (a)  Optional Prepayment.  The Borrower may, upon written notice delivered to the Administrative Agent at least 10 days (but not more than 30 days) prior to the proposed date of prepayment (which notice shall state the date of such proposed prepayment, the aggregate principal amount of the Loans to be prepaid and the prepayment price thereof), prepay the outstanding principal amounts of all of the Loans in whole (but not in part), together with accrued interest to the date of such prepayment on the principal amount prepaid and any Applicable Prepayment Premium.  Except as provided in this Section 2.6(a), the Borrower shall not have the right to optionally prepay the Loans.

(b)     [Intentionally Omitted]

(c)     Mandatory Offer of Prepayment.  If the Borrower or any of its Subsidiaries shall at any time, or from time to time, after the Closing Date receive Net Cash Proceeds in respect of any Reduction Event which, individually or in the aggregate for all prior Reduction Events not the subject of a mandatory offer of prepayment, exceeds $10,000,000, then, on the first Business Day immediately succeeding the date of such receipt, such Net Cash Proceeds shall be applied to the prepayment of any Loans then outstanding to the extent and in the manner as provided below in this Section 2.6(c).  At least 10 days (but not more than 30 days) prior to any proposed Reduction Event, the Borrower shall give written notice to the Administrative Agent stating the date of the proposed Reduction Event together with a certificate signed by a Responsible Officer of the Borrower setting forth in reasonable detail the calculation of the Net Cash Proceeds therefrom and shall offer to prepay the outstanding principal amounts of the Loans comprising part of the same borrowing in an amount equal to, in the case of an Asset Disposition, 100% of the Net Cash Proceeds therefrom or, in the case of an Equity Issuance, 50% of the Net Cash Proceeds therefrom, as applicable, together with accrued interest to the date of such prepayment on the principal amount prepaid; provided, however, that no

23

Lender shall be obligated to accept such offer.  Any Lender may in its discretion accept such offer by written notice to the Administrative Agent (which notice shall also state the maximum principal amount of prepayment such Lender is willing to accept). To the extent one or more Lenders accepts any such offer and one or more Lenders rejects such offer, the amounts that would have been allocable to the rejecting Lenders may (if and to the extent accepted by the accepting Lenders) be paid to accepting Lenders in accordance with their Commitment Percentages.  Any Lender that shall have failed to respond to an offer described in this Section 2.6(c) shall be deemed to have rejected such offer.  If for any reason the proposed Reduction Event is delayed by more than 15 days, the Borrower shall resend the notice and offer provided for in this Section 2.6(c).

(d)     [Intentionally Omitted]

(e)     Additional Amounts .  Each prepayment of Loans pursuant to this Section 2.6 shall be accompanied by payment in full of all accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing pursuant to Section 2.16 and any outstanding fees and expenses due and owing with respect to the amount prepaid.

2.7     Interest Rate Conversion and Continuation Options.  (a)  The Borrower may elect from time to time to convert Eurodollar Loans to Alternate Base Rate Loans by giving the Administrative Agent prior irrevocable notice of such election substantially in the form of Exhibit B (a "Notice of Interest Rate Conversion") (which notice must be received by the Administrative Agent by at least 10:00 a.m., New York City time, two Business Days prior to such election); provided that any such conversion of Eurodollar Loans may be made only on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to convert Alternate Base Rate Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election (which notice must be received by the Administrative Agent by at least 10:00 a.m., New York City time, three Business Days prior to such election).  Any such Notice of Interest Rate Conversion to Eurodollar Loans shall specify the length of the initial Interest Period or Interest Periods therefor.  Upon receipt of any such notice, the Administrative Agent shall promptly notify each Lender thereof.  All or any part of the outstanding Eurodollar Loans and Alternate Base Rate Loans may be converted as provided herein; provided that (i) no Loan may be converted into a Eurodollar Loan when any Default has occurred and is continuing, (ii) no Loan may be converted into a Eurodollar Loan after the date that is one month prior to the Maturity Date and (iii) such conversion shall be in an aggregate principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof.

(b)     Any Eurodollar Loans may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1 of the length of the next Interest Period to be applicable to such Loans; provided that (i) no Eurodollar Loan may be continued as such when any Default has occurred and is continuing and (ii) no Eurodollar Loan which is a Loan may be continued as a Eurodollar Loan after the date that is one month prior to the Maturity Date; provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph, or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be automatically converted to Alternate Base Rate Loans on the last day of such then expiring

24

Interest Period.  The Administrative Agent agrees to notify the Lenders of any notice of continuation referred to herein received by the Administrative Agent.

        2.8    <u>Maximum Amounts of Eurodollar Tranches</u>.  All borrowings, conversions and continuations of Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and shall be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Loans comprising each Eurodollar Tranche shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof.  There shall not be more than five Eurodollar Tranches at any one time outstanding.

        2.9    <u>Interest Rates; Default Rate Payment Dates</u>.  (a)  Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for the first day of such Interest Period (subject to daily adjustments, if any, required by changes in the Eurodollar Reserve Requirements) <u>plus</u> 5.50%.

        (b)    Each Alternate Base Rate Loan shall bear interest at a rate per annum equal to the Alternate Base Rate <u>plus</u> 3.50%.

        (c)    If an Event of Default has occurred and is continuing, the Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section <u>plus</u> 2% from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived (after as well as before judgment).  In addition, should any interest on such Loans or any fees or other amount (other than principal) payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate per annum as determined pursuant to the preceding sentence which would be applicable to an Alternate Base Rate Loan, in each case, from the date of such nonpayment until such amount is paid in full (after as well as before judgment).

        (d)    Interest shall be payable in arrears on each Interest Payment Date; <u>provided</u> that interest accruing pursuant to <u>Section 2.9(c)</u> shall be payable from time to time on demand.

        2.10    <u>Computation of Interest</u>.  (a)  The Alternate Base Rate interest (when calculated based upon the prime rate) shall be calculated on the basis of a 365/366 day year and all other interest shall be calculated on the basis of a 360-day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the Alternate Base Rate or the Eurodollar Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall, as soon as practicable, notify the Borrower and the Lenders of the effective date and the amount of each such change in interest rate.

        (b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower

and the Lenders in the absence of manifest error. The Administrative Agent, at the request of the Borrower, shall deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to <u>Section 2.10(a)</u>.

       2.11   <u>Inability to Determine Interest Rate</u>. If prior to the first day of any Interest Period:

       (a)   the Administrative Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

       (b)   the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining its affected Loans during such Interest Period, the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the Lenders as soon as practicable thereafter. If such notice is given, (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as Alternate Base Rate Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as Alternate Base Rate Loans and (z) any outstanding Eurodollar Loans shall be converted, on the first day of such Interest Period, to Alternate Base Rate Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Alternate Base Rate Loans to Eurodollar Loans.

       2.12   <u>Pro Rata Treatment and Payments; Funding Reliance</u>. (a) The borrowing by the Borrower of Loans from the Lenders hereunder and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Commitment Percentages of the Lenders. Except as provided in <u>Section 2.6</u>, each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans of any one Type shall (except as may be required as a result of <u>Section 2.16</u>) be made pro rata according to the respective outstanding principal amounts of the Loans of such Type then held by the Lenders. All payments (including prepayments) to be made by the Borrower hereunder and under the Notes, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Administrative Agent's office specified in <u>Section 9.2</u>, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal and interest thereon, shall be payable at the then applicable rate during such extension.

       (b)   Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make available to the Administrative Agent the amount that would constitute its Commitment Percentage of such borrowing, the

Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If the Administrative Agent makes such amount available to the Borrower and if such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such borrowing. If such Lender's Commitment Percentage of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to the applicable Loan, on demand, from the Borrower. The obligations of the Lenders hereunder are several and no Lender shall be responsible for any other Lender's failure to make Loans as required hereunder.

        2.13    <u>Illegality</u>. Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law after the Original Signing Date or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, continue Eurodollar Loans as such and convert Alternate Base Rate Loans to Eurodollar Loans shall forthwith be suspended until such condition shall cease to exist and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to Alternate Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law. If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to <u>Section 2.16</u>.

        2.14    <u>Requirements of Law</u>. (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Original Signing Date:

        (i)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, its Notes, any Eurodollar Loan, or its obligation to make Eurodollar Loans, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by <u>Section 2.15</u> and changes in the rate of tax on the overall net income of such Lender);

        (ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any

office of such Lender which is not otherwise included in the determination of the Eurodollar Rate hereunder; or

(iii)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify the Borrower through the Administrative Agent, of the event by reason of which it has become so entitled.  A certificate as to any additional amounts payable pursuant to this Section submitted by such Lender through the Administrative Agent to the Borrower shall be in writing and accompanied by calculations in reasonable detail demonstrating the basis for such Lender's claim and shall be considered conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Obligations hereunder.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the Original Signing Date has or shall have the effect of reducing the rate of return on such Lender's or the corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time , after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor accompanied by calculations in reasonable detail demonstrating the basis for such Lender's claims, the Borrower shall pay to such Lender the additional amount or amounts as will compensate such Lender for such reduction.  This covenant shall survive the termination of this Agreement and the payment of the Obligations hereunder.

2.15    Taxes.  (a)  Any and all payments made by the Borrower to or for the account of the Administrative Agent or any Lender under this Agreement, the Notes or the other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, and all liabilities with respect thereto, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Administrative Agent or any Lender by a jurisdiction under the Laws of which such Lender or its applicable lending office, or the Administrative Agent, as the case may be, is organized or maintained.  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions, withholdings or liabilities ("Non-Excluded Taxes") are required to be deducted or withheld from or in respect of any amounts payable to the Administrative Agent or any Lender hereunder or

28

under the Notes, (i) the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary, so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 2.15), the Administrative Agent or such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower shall make such deductions or withholdings, and (iii) the Borrower shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law; provided that the Borrower shall not be required to increase any such amounts payable to any Lender if such Lender fails to comply with the applicable requirements of paragraph (b) of this Section.  Whenever any Non-Excluded Taxes are payable by the Borrower, as promptly as possible thereafter, the Borrower shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof.  The Borrower agrees to indemnify and hold harmless each Lender and the Administrative Agent from the full amount of Non-Excluded Taxes (including, without limitation, any such taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.15) paid or incurred by such Lender or the Administrative Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto.  The covenants in this Section shall survive the termination of this Agreement and the payment of the Notes and payment of the Obligations hereunder.

       (b)       Each Lender shall:

       (i)       deliver to the Borrower and the Administrative Agent (A) in the case of a Lender that is not incorporated under the laws of the United States or any state thereof, either (x) two duly completed copies of United States Internal Revenue Service Form W-8BEN or W-8ECI, as applicable, or successor applicable forms, as the case may be, or, (y) if such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and intends to claim exemption from U.S.  Federal withholding tax under Section 871(h) or Section 881(c) of the Code with respect to payments of "portfolio interest", a Form W-8BEN, or any subsequent versions thereof or successors thereto together with a certificate executed by such Lender representing that (1) such Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10 percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower and is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code), and claiming complete exemption from U.S.  Federal withholding tax on payments of interest by the Borrower under this Agreement, the Notes and the other Loan Documents and (2) the Lender has received in replacement of any Note held by or assigned to it, a QFL Note in accordance with Section 2.15(c), and (B) in the case of any other Lender, an Internal Revenue Service Form W-9, as applicable, or successor applicable form, as the case may be;

       (ii)       deliver to the Borrower and the Administrative Agent two further copies of any such form or certification on or before the date that any such form or certification expires or becomes obsolete and after the

<div align="center">29</div>

occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower; and

(iii)    obtain such extensions of time for filing and complete such forms or certifications as may reasonably be requested by the Borrower or the Administrative Agent;

unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders such form inapplicable or which would prevent such Lender from duly completing and delivering any such form with respect to it and such Lender so advises the Borrower and the Administrative Agent.  Such Lender shall certify (i) in the case of a Form W-8BEN or W-8ECI, as applicable, that it is entitled to receive payments under this Agreement at a reduced rate of withholding, or without deduction or withholding, as the case may be, of any United States federal income taxes and (ii) in the case of a Form W-9, that it is entitled to an exemption from United States backup withholding tax. Each Person that shall become a Lender or a Participant pursuant to Section 9.6 shall, upon the effectiveness of the related transfer, be required to provide all the applicable forms and statements required pursuant to this Section; provided that, in the case of a Participant, such Participant shall furnish all such required forms and statements to the Lenders from which the related participation shall h ave been purchased.

(c)    Any Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and satisfies the requirements of Section 2.15(b)(i)(A)(y) (a "Qualified Foreign Lender") shall, upon receipt of the written request of the Administrative Agent or the Borrower and may, upon its own written request to the Administrative Agent, exchange any Note held by or assigned to it for a qualified foreign lender note (a "QFL Note").  A QFL Note shall be substantially in the form attached hereto as Exhibit A-2 and shall contain the following legend, "This Note is a QFL Note, and as such, ownership of the obligation represented by such QFL Note may be transferred only in accordance with Section 2.15 of the Credit Agreement." Any QFL Note issued in replacement of any existing Note pursuant to this Section 2.15(c) shall be (1) dated the Original Closing Date, (ii) issued in the name of the entity in whose name such existing Note was issued and (iii) issued in the same principal amount as such existing Note.  Any Note replaced pursuant to this Section is sometimes referred to herein as a "Replaced Note".

(d)    The Borrower agrees that, upon the request of, or delivery of a request to, a Qualified Foreign Lender pursuant to paragraph (c) of this Section, it shall execute and deliver a QFL Note to the Administrative Agent in replacement of the Replaced Note surrendered in connection with such request conforming to the requirements of this paragraph. Each Qualified Foreign Lender shall surrender its Note in connection with any replacement pursuant to this Section 2.15.  Upon receipt by the Administrative Agent, in connection with any replacement, of a QFL Note and the existing Note to be replaced by such QFL Note in accordance with this paragraph, the Administrative Agent shall forward the QFL Note to the Lender which has surrendered its Note for replacement by such QFL Note and shall forward the surrendered Note to the Borrower marked "canceled".  Once issued, QFL Notes (i) shall be deemed to and shall be "Notes" for all purposes under the Loan Documents, (ii) may not be exchanged for Notes which are not QFL Notes, notwithstanding anything to the contrary in the Loan Documents and (iii)

30

shall at all times thereafter be QFL Notes, including, without limitation, following any transfer or assignment thereof.

(e)    Notwithstanding anything to the contrary in the Loan Documents, the QFL Notes are registered obligations as to both principal and interest with the Borrower and transfer of the obligations underlying such QFL Note may be effected only by surrender of the QFL Note to the Borrower and either reissuance by the Borrower of such QFL Note to the transferee or issuance by the Borrower of a new QFL Note to the transferee.  A QFL Note shall only evidence the Lender's or an assignee's right, title and interest in and to the related obligation, and in no event is a QFL Note to be considered a bearer instrument or obligation.  This Section 2.15 shall be construed so that the obligations underlying the QFL Notes are at all times maintained in "registered form" within the meaning of Sections 871(h)(2) and 881(c)(2) of the Code.

2.16    Indemnity.  The Borrower agrees to indemnify each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of (a) default by the Borrower in payment when due of the principal amount of or interest on any Eurodollar Loan, (b) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same, (c) default by the Borrower in making any prepayment after the Borrower has given a notice thereof or (d) the making of a prepayment or conversion of Eurodollar Loans on a day which is not the last day of an Interest Period with respect thereto including, without limitation, in each case, any such loss or expense arising from the redeployment of funds obtained by it or from fees payable to terminate the deposits from which such funds were obtained.  This covenant shall survive the termination of this Agreement and the payment of the Obligations hereunder.

2.17    Discretion of Lender as to Manner of Funding.  Notwithstanding any other provisions of this Agreement (but subject to Section 2.18), each Lender shall be entitled to fund and maintain its funding of all or any part of its Loans in any manner it sees fit, it being understood that for the purposes of this Agreement all determinations hereunder shall be made assuming each Lender had actually funded and maintained each Eurodollar Loan through the purchase of deposits of Dollars in the London interbank market having a maturity corresponding to each Loan's Interest Period and bearing an interest rate equal to the Eurodollar Rate for such Interest Period.

2.18    Change of Lending Office; Replacement Lender.  (a)  Each Lender agrees that if it makes any demand for payment under Section 2.14 or Section 2.15 or if any adoption or change of the type described in Section 2.13 shall occur with respect to it, such Lender will use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it as determined in its sole discretion) to designate a different lending office if the making of such a designation would reduce or obviate the need for the Borrower to make payments under Section 2.14 or Section 2.15, or would eliminate or reduce the effect of any adoption or change described in Section 2.13.

(b)    In determining the amount of any claim for reimbursement or compensation hereunder, each Lender will use reasonable methods of calculation consistent with such methods customarily employed by such Lender in similar situations.

31

(c)     Each Lender will notify the Borrower and the Administrative Agent of any event giving rise to a claim under <u>Sections 2.13</u>, <u>2.14</u>, <u>2.15</u> or <u>2.16</u> promptly after the occurrence thereof, which notice shall be accompanied by a certificate of such Lender setting forth in reasonable detail the circumstances of such claim.

(d)     If any Lender, other than (in its capacity as a Lender) the Administrative Agent (an "<u>Affected Lender</u>"), seeks payment or indemnification from the Borrower pursuant to <u>Section 2.14</u> or <u>Section 2.15(a)</u> (without prejudice to any amounts then due to such Lender under such Sections) that are not applicable to all Lenders, then the Borrower may designate another Lender or another bank or financial institution acceptable to the Administrative Agent to assume, in accordance with <u>Section 9.6</u>, all (but not less than all) the Commitments, Loans and other rights and obligations of such Affected Lender hereunder (a "<u>Replacement Lender</u>"), in each case, on a date mutually acceptable to the Replacement Lender, the Affected Lender, the Borrower and the Administrative Agent, without recourse upon, warranty by, or expense to, such Affected Lender or the Administrative Agent, for a purchase price equal to the outstanding principal amount of the Loans of such Affected Lender <u>plus</u> all interest accrued thereon and all other amounts owing to such Affected Lender hereunder, or such other purchase price as may be mutually agreed upon between the Affected Lender and the Replacement Lender, upon such assumption and purchase by the Replacement Lender, such Replacement Lender shall be deemed a "Lender" for purposes of this Agreement and the other Loan Documents and such Affected Lender shall cease to be a "Lender" fo r such purposes and shall no longer have any obligations hereunder.

2.19     <u>Ratification of Collateral Documents; Priority</u>.  The Borrower hereby ratifies and confirms that the Collateral Agent, on behalf of the Secured Parties, has a continuing security interest in all of the collateral granted to the Collateral Agent and described in the Collateral Documents.  In addition, the Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order and the Final Order (when entered), at all times after the Petition Date through the Emergence Time, the Obligations of the Borrower hereunder and under the Loan Documents, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed administrative expense claims in the Case having priority over all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower, whether heretofore or hereafter incurred, including but not limited to the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1112 or 1114 of the Bankruptcy Code, subject only to the priority of the Carve-Out and the Bank One Claim. Notwithstanding anything in any Loan Document, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Borrower owing to the Admin istrative Agent or the Lenders or to the Collateral.  The Administrative Agent and the Lenders agree that (a) so long as no Default or Event of Default shall have occurred, the Borrower shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out and (b) the amount of any retainers received by any professionals retained in the Case shall not reduce the Carve-Out.

2.20    No Discharge; Survival of Claims . The Borrower hereby agrees that (a) its obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Collateral Agent and the other Secured Parties pursuant to the Orders and described in <u>Section 2.19</u> and the Liens granted to the Collateral Agent for the benefit of the Secured Parties pursuant to the Loan Documents and the Orders and described in <u>Section 2.19</u> shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

## ARTICLE 3.  REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make or participate in extensions of credit hereunder, the Borrower hereby represents and warrants to the Administrative Agent and each Lender as of the date hereof:

3.1    Financial Condition.  (a)  The consolidated balance sheets of the Borrower and its Consolidated Subsidiaries as of December 31, 2002 and the related consolidated statements of income, retained earnings and cash flows for the fiscal year ended on such date, and the unaudited consolidated balance sheets of the Borrower and its Consolidated Subsidiaries as of June 30, 2003; and the related consolidated statements of income, retained earnings and cash flows for the period ending as of such date, reported on, in the case of the 2002 annual audited financial statements, by Deloitte & Touche LLP, copies of which have heretofore been furnished to the Lenders, present fairly the consolidated financial condition of the Borrower and its Consolidated Subsidiaries as at such date, and the results of their operations and their retained earnings and cash flows for each of the fiscal periods then ended.  All such financial statements, including the related schedules and notes thereto relating to the audited financials, have been prepared in accordance with GAAP applied consistently throughout the periods involved.

(b)    All balance sheets, all statements of income and shareholders equity and of cash flows and all other financial information which shall hereafter be furnished by or on behalf of or the Borrower to the Administrative Agent for the purposes of, or in connection with, this Agreement or any transaction contemplated hereby have been or will be prepared in accordance with GAAP consistently applied throughout the periods involved (except as disclosed therein) and do or will present fairly (subject to normal year-end adjustment and the absence of footnotes in the case of financial statements for any fiscal quarter) the financial condition of the Borrower and its Consolidated Subsidiaries, as the case may be, as at the dates thereof and the results of their operations and their shareholders equity and cash flows for the periods then ended.

3.2    No Change.  Other than changes which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Case, since December 31, 2002, there has been no development or event which has had, or could reasonably be expected to have, a Material Adverse Effect.

3.3    Corporate Existence; Compliance with Law.  Each of the Borrower and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the

33

jurisdiction of its organization, (b) has the corporate or limited liability company power and authority, and the legal right to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or limited liability company and (to the extent such concept applies to such entity) in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect (in the case of each of clauses (a) through (d), with respect to the Borrower, subject to the entry by the Bankruptcy Court of the Interim Order or the Final Order (when entered)).

       3.4      <u>Corporate Power; Authorization; Enforceable Obligations</u>.  The Borrower has the corporate power and authority, and the legal right, to make, deliver and perform the Indentures and the Loan Documents and to authorize the execution, delivery and performance of the Loan Documents, and to borrow hereunder (in each case, subject to the entry by the Bankruptcy Court of the Interim Order or the Final Order (when entered)).  The Borrower has taken all necessary corporate action to authorize the borrowings on the terms and conditions set forth in this Agreement and in the Notes and to execute, deliver and perform its obligations under the Indentures and the Loan Documents (in each case, subject to the entry by the Bankruptcy Court of the Interim Order or the Final Order (when entered)).  As of the Original Closing Date, set forth on <u>Schedule 3.4a</u> are all consents or authorizations of, filings with, notices to or other acts by or in respect of, any Governmental Authority or any other Person required in connection with the authorization, execution, or issuance of any First Mortgage Bond, the authorization, delivery, performance or validity of any Supplemental Indenture, or the execution, delivery, performance, validity or enforceability of the Bond Collateral Agreement or any Collateral Document related thereto, and in each case any application therefor (collectively, the "<u>First Mortgage Approvals</u>").  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the borrowings hereunder, or with the execution, delivery, performance, validity or enforceability of the Loan Documents other than (w) the Interim Order and the Final Order (when entered), (x) First Mortgage Approvals, (y) as set forth on <u>Schedule 3.4b</u>, or (z) any consents, authorizations and filings in connection with the foregoing that, if not obtained, could not reasonably be expected to have a Material Adverse Effect.  On or before the Original Closing Date, the Administrative Agent and each Lender had received complete and current copies of all consents, authorizations and filings listed on <u>Schedule 3.4b</u>  and complete and current copies of all First Mortgage Approvals.  No such consent, authorization or filing is or shall be conditioned upon or otherwise imposes any materially burdensome or adverse condition.  This Agreement and the Indentures have been, and each other Loan Document when executed and delivered will be, duly executed and delivered on behalf of the Borrower (in each case, subject to the entry by the Bankruptcy Court of the Interim Order and the Final Order (when entered)).  This Agreement and the Indentures constitute, and each other Loan Document when executed and delivered will constitute, a legal, valid and binding obligation of the Borrower enforceable against the Borrower, in accordance with their respective terms and the Orders (in each case, subject to the entry by the Bankruptcy Court of the Interim Order and the Final Order (when entered)), except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization,

moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

3.5     No Legal Bar.  The execution, delivery and performance of the Loan Documents, the borrowings hereunder and the use of the proceeds thereof, will not violate any Requirement of Law or Contractual Obligation of the Borrower or any Subsidiary which violation could reasonably be expected to have a Material Adverse Effect, will not accelerate or result in the acceleration of any payment obligations of the Borrower or such Subsidiary and will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of the Borrower or any such Subsidiary pursuant to any such Requirement of Law or Contractual Obligation (other than Liens pursuant to the Indentures or the Collateral Documents) (in each case, with respect to the Borrower, subject to the entry by the Bankruptcy Court of the Interim Order or the Final Order).

3.6     No Material Litigation.  Other than the Case and except as disclosed in the Borrower's public filings filed with the SEC prior to the date hereof, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against the Borrower, any of its Subsidiaries, any Excluded Subsidiary or any Foreign Subsidiary or against any of the respective properties or revenues of the Borrower, any of its Subsidiaries, any Excluded Subsidiary or any Foreign Subsidiary which could reasonably be expected to have a Material Adverse Effect.

3.7     No Default.  From and after the Closing Date after giving effect to the waivers contained in this Agreement, no Default or Event of Default has occurred and is continuing.

3.8     Ownership of Property; Liens.  Except as set forth in Schedule 3.8, each of the Borrower and its Subsidiaries has good record and marketable title in fee simple to, or a valid leasehold interest in, all its material real property, and good title to, or a valid leasehold interest in, all its other material property.  None of such property is subject to any Lien other than Permitted Liens.

3.9     [Intentionally Omitted].

3.10     Intellectual Property.  Each of the Borrower and its Subsidiaries owns, or is licensed to use, all patents, trademarks, trade names, copyrights, technology, know-how, processes, logos and insignia necessary for the conduct of its business as currently conducted except for those which the failure to own or license could not reasonably be expected to have a Material Adverse Effect (the "Intellectual Property").  No claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property which could reasonably be expected to have a Material Adverse Effect, nor does the Borrower or any Consolidated Subsidiary know of any valid basis for any such claim.  The use of such Intellectual Property by the Borrower or any Subsidiary does not infringe on the rights of any Person, except for such claims and infringements that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

35

3.11    No Burdensome Restrictions.  No Requirement of Law or Contractual Obligation of the Borrower, any Subsidiary or any Excluded Subsidiary could reasonably be expected to have a Material Adverse Effect after the Emergence Time.

3.12    Taxes.  Except as set forth in Schedule 3.12, each of the Borrower and the Subsidiaries has filed or caused to be filed all federal, state and other material tax returns which are required to be filed and has paid all taxes (including interest and penalties) shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any tax, fee or other charge the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower or such Subsidiary, as the case may be, or, with respect to the Borrower prior to the Emergence Time, except to the extent non-payment is permitted by the Bankruptcy Code); and no tax Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge.

3.13    Margin Stock.  (a)  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U), and no proceeds of any extension of credit hereunder will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock, except in compliance with applicable law and regulations.

(b)    Following application of the proceeds of each extension of credit hereunder, not more than 25% of the value of the consolidated assets of the Borrower and its Consolidated Subsidiaries that are subject to the provisions of Section 6.3 will be comprised of margin stock.

3.14    ERISA.  Except as disclosed in Schedule 3.14, neither the Borrower nor any Subsidiary maintains, contributes to or has material obligations with respect to, any welfare plan (as defined in Section(3)(1) of ERISA) which provides benefits to employees after termination of employment other than as required by Part 6 of Title I of ERISA or similar state laws regarding continuation of benefits.  Each Plan has complied and is in compliance in all respects with the applicable provisions of ERISA and the Code except where failure to do so could not reasonably be expected to have a Material Adverse Effect.  The Borrower and each Subsidiary have not breached any of the responsibilities, obligations or duties imposed on it by ERISA, the Code, or regulations promulgated thereunder with respect to any Plan, which breach could reasonably be expected to have a Material Adverse Effect.  Neither the Borrower nor any Subsidiary nor any fiduciary of any Plan who is an officer or an employee of the Borrower or any Subsidiary has engaged in a nonexempt prohibited transaction described in Section 406 of ERISA or 4975 of the Code with respect to a Plan which could reasonably be expected to have a Material Adverse Effect.  With respect to any employee benefit plan (as defined in Section 3(3) of ERISA) currently or formerly maintained or contributed to by any Commonly Controlled Entity, no liability exists and no event has occurred which could subject the Borrower or any Subsidiary to any liability which could reasonably be expected to have a Material Adverse Effect, except as disclosed in Schedule 3.14.  Except as disclosed in Schedule 3.14, none of the Borrower or any Subsidiary has any liability, direct or indirect, contingent (including, without

36

limitation, any such liability in connection with a Multiemployer Plan) or otherwise, under Title IV of ERISA or under Section 412 of the Code which could reasonably be expected to have a Material Adverse Effect.

3.15    <u>Holding Company; Investment Company Act; Other Regulations</u>.  The Borrower is not (a) an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended, or (b) except as described on <u>Schedule 3.15</u>, subject to regulation under any Federal or state statute, regulation, decree or order which limits its ability to incur Indebtedness or conditions such ability upon any act, approval or consent of any Governmental Authority or an ISO.  The Borrower is either (i) not a "holding company", a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company", as each such term is defined in the Public Utility Holding Company Act of 1935, as amended, or (ii) exempt from registration as a holding company under the Public Utility Holding Company Act of 1935, as amended, by reason of filing an application on Form U-1 in good faith seeking an order of exemption pursuant to Section 3(a)(3) of that Act, and the Borrower has not received notice from the SEC challenging or otherwise calling into question such exemption.

3.16    <u>Purpose of Loans</u>.  The proceeds of Loans have been used solely for general corporate purposes of the Borrower, its Subsidiaries, the Excluded Subsidiaries and the Foreign Subsidiaries as permitted hereunder (in compliance with all applicable legal and regulatory requirements), including, without limitation, the refinancing of certain Indebtedness.

3.17    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.17</u> or as disclosed in the Borrower's public filings filed with the SEC prior to the date hereof,

(a)    The facilities and properties owned, leased or operated by the Borrower, its Subsidiaries, any Excluded Subsidiary or any Foreign Subsidiary (the "<u>Properties</u>") and all operations at the Properties are in, and have been in, compliance in all material respects with all applicable Environmental Laws, and there is no contamination in, at, under, from or about the Properties or violation of any Environmental Law or other circumstance or condition, with respect to the Properties or the business operated by the Borrower, its Subsidiaries, any Excluded Subsidiary or any Foreign Subsidiary, or, to the Borrower's knowledge, any predecessor of any of them (the "<u>Business</u>") which in either case could reasonably be expected to result in any claims, liability, investigation or cost pursuant to any Environmental Law and to have a Material Adverse Effect.

(b)    None of the Borrower, any Subsidiary, any Excluded Subsidiary, or any Foreign Subsidiary, or, to the Borrower's knowledge, any predecessor of any of them, has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the Business which remains unresolved or outstanding, nor do the Borrower or any such Subsidiary have knowledge or reason to believe that any such notice will be received or is being threatened, in each case which could reasonably be expected to have a Material Adverse Effect.

37

(c)      There has been no Release or threat of Release of Materials of Environmental Concern at or from any of the Properties, or arising from or related to the operations of the Borrower, any Subsidiary, any Excluded Subsidiary, or any Foreign Subsidiary, or any predecessor of any of them, in connection with any of the Properties or otherwise in connection with the Business that could reasonably be expected to have a Material Adverse Effect.

3.18      Insurance.  All policies of insurance of any kind or nature currently maintained by or issued to the Borrower or any Subsidiary, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, worker's compensation, employee health and welfare, title, property and liability insurance, are in full force and effect in all material respects and are of a nature and provide such coverage as is sufficient and as is customarily carried by companies of similar size and character.

3.19      Accuracy and Completeness of Information.  All information, reports and other papers and data (other than projections) with respect to the Borrower, any of its Subsidiaries or any Excluded Subsidiary furnished to the Lenders by the Borrower, or on behalf of the Borrower, and all SEC Reports were, at the time furnished, complete and correct in all material respects, or have been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lenders a true and accurate knowledge of the subject matter in all material respects.  All projections with respect to the Borrower or any of its Subsidiaries furnished by the Borrower, were prepared and presented in good faith by the Borrower based upon facts and assumptions that the Borrower believed to be reasonable in light of current and foreseeable conditions, it being understood that projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and that no assurance can be given that the financial results set forth in such projections will actually be realized and the Borrower shall be under no obligation to update such projections.  No document furnished or statement made in writing to the Lenders by or on behalf of the Borrower in connection with the negotiation, preparation or execution of this Agreement and no SEC Report contains any untrue statement of a material fact, or omits to state any such material fact necessary in order to make the statements contained therein not misleading, in either case which has not been corrected, supplemented or remedied by subsequent documents furnished or statements made in writing to the Lenders.

3.20      Leaseholds, Permits, etc.  The Borrower possesses or has the right to use, all leaseholds, easements, franchises and permits and all authorizations and other rights which are material to and necessary for the conduct of the Business and its business.  All the foregoing are in full force and effect, and each of the Borrower and the Subsidiaries is in substantial compliance with the foregoing without any known conflict with the valid rights of others, except for such noncompliance with the foregoing which could not reasonably be expected to have a Material Adverse Effect and except for defaults arising solely from events customarily leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code or the commencement of the Case itself.  No event has occurred which permits, or after notice or lapse of time or both would permit, the revocation or termination of any such leasehold, easement, franchise, license or other right, which termination or revocation, considered as a whole, could reasonably be expected to have a Material Adverse Effect, except for events

38

customarily leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code or the commencement of the Case itself.

        3.21    No Restrictive Covenants.  No Subsidiary of the Borrower is party to, or otherwise bound by, any agreement or other arrangement that prohibits such Subsidiary from making any payments, directly or indirectly, to the Borrower, by way of dividends, advances, repayment of loans or advances, reimbursements of management or other intercompany charges, expenses and accruals or other returns on investment, or any other agreement or arrangement that restricts the ability of such Subsidiary to make any payment, directly or indirectly, to the Borrower, other than prohibitions and restrictions permitted to exist under Section 6.12 or under the Bank One Credit Documents.

        3.22    [Intentionally Omitted]

        3.23    Montana First Mortgage Indenture.

        (a)    The First Mortgage Bonds issued under the Montana First Mortgage Indenture, as supplemented prior to the Original Closing Date and as further supplemented by the Twenty-Third Supplemental Indenture (the "Montana Supplemental Indenture"), have been duly executed, authenticated, issued and delivered, and constitute valid and legally binding obligations of the Borrower, entitled to the security and benefits provided by the lien of such Indenture (except to the extent that enforceability of such lien may be limited by the effect of certain laws of the jurisdictions in which the physical properties covered thereby are located upon the remedies provided in such Indenture, which limitations, however, do not make the remedies afforded inadequate for the realization of the security and benefits provided by such Indenture, and except as enforceability of such lien may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights).

        (b)    The Montana First Mortgage Indenture, as heretofore supplemented, constitutes a legally valid and directly enforceable first mortgage lien for the equal and proportionate security of the first mortgage bonds issued or to be issued thereunder, upon substantially all of the physical properties and franchises of the Borrower which are specifically described therein as subject to the lien thereof and which are used or useful in the conduct of the Montana Utility Business, free from all prior liens, charges or encumbrances (except to the extent that enforceability of such lien may be limited by the effect of certain laws of the jurisdictions in which the physical properties covered thereby are located upon the remedies provided in such Indenture, as heretofore supplemented, which limitations, however, do not make the remedies afforded inadequate for the realization of the security and benefits provided by such Indenture, and except as enforceability of such lien may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights or except as expressly permitted by the terms of the Montana First Mortgage Indenture) and the after-acquired property clause in such Indenture subjects to the lien thereof all after-acquired utility property of the Montana Utility Business as provided therein (except such thereof as is expressly excepted from the lien of such Indenture).

        (c)    The Montana First Mortgage Indenture, as heretofore supplemented (including any necessary related financing statements), has been filed and recorded wherever and

39

to the extent necessary to perfect the lien thereof upon the properties now owned by the Borrower and intended to be subject thereto; all fees or taxes in connection therewith have been paid and no other filing or recordation is presently necessary in order to perfect the lien of such Indenture on such properties.

(d)        No filing or recording of the Montana Supplemental Indenture is necessary to perfect the lien of the Montana First Mortgage Indenture upon the properties now owned by the Borrower and intended to be subject thereto or to extend such lien for the benefit of the First Mortgage Bonds issued thereunder; no re-recording or refiling of such Indenture or any other instruments or documents (except for periodic filings which extend the effectiveness of financing statements) is required to preserve and protect the lien of such Indenture; and under the present laws of the States in which the property intended to be subject to the lien of such Indenture is located, no further supplemental indentures or other instruments or documents are required to be executed, filed and/or recorded to extend the lien of such Indenture to after-acquired property other than as may be required by applicable real property laws.

(e)        The Borrower has good and marketable title to all properties owned by it which are subject to the Montana First Mortgage Indenture, subject only (a) to the lien of such Indenture, (b) to Excepted Encumbrances (as defined in such Indenture) which are Permitted Liens hereunder and (c) to minor exceptions and defects which do not, in the aggregate, materially interfere with the use by the Borrower of such properties for the purposes for which they are held, materially detract from the value of said properties or in any material way impair the security afforded by such Indenture.

3.24        South Dakota First Mortgage Indenture.

(a)        The First Mortgage Bonds issued under the South Dakota First Mortgage Indenture, as supplemented prior to the Original Closing Date and as further supplemented by a Supplemental Indenture creating the South Dakota First Mortgage Bonds (the "South Dakota Supplemental Indenture"), have been duly executed, authenticated, issued and delivered, and constitute valid and legally binding obligations of the Borrower, entitled to the security and benefits provided by the lien of such Indenture (except to the extent that enforceability of such lien may be limited by the effect of certain laws of the jurisdictions in which the physical properties covered thereby are located upon the remedies provided in such Indenture, which limitations, however, do not make the remedies afforded inadequate for the realization of the security and benefits provided by such Indenture, and except as enforceability of such lien may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights).

(b)        The South Dakota First Mortgage Indenture, as heretofore supplemented, constitutes a legally valid and directly enforceable first mortgage lien for the equal and proportionate security of the first mortgage bonds issued or to be issued thereunder, upon substantially all of the physical properties and franchises of the Borrower which are specifically described therein as subject to the lien thereof and which are used or useful in the conduct of the South Dakota Utility Business, free from all prior liens, charges or encumbrances (except to the extent that enforceability of such lien may be limited by the effect of certain laws of the jurisdictions in which the physical properties covered thereby are located upon the remedies

40

provided in such Indenture, as heretofore supplemented, which limitations, however, do not make the remedies afforded inadequate for the realization of the security and benefits provided by such Indenture, and except as enforceability of such lien may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights or except as expressly permitted by the terms of the South Dakota First Mortgage Indenture) and the after-acquired property clause in such Indenture subjects to the lien thereof all after-acquired property of the South Dakota Utility Business as provided therein (except such thereof as is expressly excepted from the lien of such Indenture).

(c)      The South Dakota First Mortgage Indenture, as heretofore supplemented (including any necessary related financing statements), has been filed and recorded wherever and to the extent necessary to perfect the lien thereof upon the properties now owned by the Borrower and intended to be subject thereto; all fees or taxes in connection therewith have been paid and no other filing or recordation is presently necessary in order to perfect the lien of such Indenture on such properties.

(d)      No filing or recording of the South Dakota Supplemental Indenture is necessary to perfect the lien of the South Dakota First Mortgage Indenture upon the properties now owned by the Borrower and intended to be subject thereto or to extend such lien for the benefit of the First Mortgage Bonds to be issued thereunder; no re-recording or refiling of such Indenture or any other instruments or documents (except for periodic filings which extend the effectiveness of financing statements) is required to preserve and protect the lien of such Indenture; and under the present laws of the States in which the property intended to be subject to the lien of such indenture is located, no further supplemental indentures or other instruments or documents are required to be executed, filed and/or recorded to extend the lien of such Indenture to after-acquired property other than as may be required by applicable real property law.

(e)      The Borrower has good and marketable title to all properties owned by it which are subject to the South Dakota First Mortgage Indenture, subject only (a) to the lien of such Indenture, (b) to Permitted Liens (as defined in such Indenture) which are Permitted Liens hereunder and (c) to minor exceptions and defects which do not, in the aggregate, materially interfere with the use by the Borrower of such properties for the purposes for which they are held, materially detract from the value of said properties or in any material way impair the security afforded by such Indenture.

3.25     Subsidiaries.  Set forth on Schedule 3.25 are all of the Subsidiaries of the Borrower, which schedule correctly sets forth, as of the date hereof, the percentage ownership (direct and indirect) of the Borrower in each class of capital stock or other equity interests of each of its Subsidiaries and also identifies the direct owner thereof.  All outstanding shares of capital stock of each Subsidiary of the Borrower has been duly and validly issued, are fully paid and non-assessable and have been issued free of any preemptive rights.  No Subsidiary of the Borrower has outstanding any securities convertible into or exchangeable for its Capital Stock or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase or, or any agreement providing for the issuance (contingent or otherwise) of or any tails, commitments or claims of any character relating to, its Capital Stock or any stock appreciation or similar rights.

41

**ARTICLE 4.  CONDITIONS PRECEDENT**

4.1    <u>Conditions to Closing Date</u>.  The occurrence of the Closing Date is subject to the satisfaction of the following conditions precedent:

(a)    <u>Documents</u>.  The Administrative Agent shall have received each of the following documents, each of which shall be satisfactory to the Administrative Agent (and to the extent specified below, to each Lender) in form and substance:

(i)    <u>Executed Counterparts</u>.  From each party hereto either (i) multiple counterparts of this Agreement, signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page to this Agreement) that such party has signed a counterpart of this Agreement);

(ii)    <u>Corporate Documents</u>.  Such documents and certificates as the Administrative Agent or its counsel may reasonably request, certified as of the Closing Date as complete and correct copies thereof by the Secretary or an Assistant Secretary of the Borrower, relating to (i) the organization, existence and good standing of the Borrowe r, (ii) the authorization of the execution, delivery and performance by the Borrower of this Agreement, and of the borrowings hereunder by the Borrower, and (iii) certificates as to the incumbency and signature of each individual signing this Agreement and any other agreement or document contemplated hereby on behalf of the Borrower; and and

(iii)    <u>Other Documents</u>.  Such other documents as the Administrative Agent or any Lender or counsel to CSFB may reasonably request.

(b)    <u>Bankruptcy Court Approvals</u>.    The Bankruptcy Court shall have entered an order (the "<u>Interim Order</u>"), in any event not later than November 15, 2003, acceptable in all respects to the Administrative Agent and the Lenders on an application or motion by the Borrower, such motion to be satisfactory in form and substance to the Lenders, which Interim Order shall have been entered on such notice to such parties as may be satisfactory to the Administrative Agent and the Lenders, approving the Facility and granting the priority described in <u>Section 2.19</u> and the other Loan Documents, which Interim Order shall, among other things, (i) approve the Facility, (ii) lift the automatic stay to permit the Borrower to perform its obligations, and the Administrative Agent and the Secured Parties to exercise their rights and remedies with respect to, the Facility, and (iii) have not been reversed, vacated, modified, amended or stayed; and all motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)    <u>Closing Expenses</u>.  The Administrative Agent shall have received reimbursement of all costs and expenses (including the fees and expenses of counsel to the Administrative Agent to the extent invoiced).

(d)      <u>Closing Certificate</u>.  The Administrative Agent shall have received a closing certificate of the Borrower substantially in the form of <u>Exhibit C</u>, dated as of the Closing Date and satisfactory in form and substance to the Administrative Agent.

(e)      <u>Outside Closing Date</u>.  The Closing Date shall have occurred and each of the conditions precedent set forth in this <u>Section 4.1</u> shall have been satisfied on or prior to November 30, 2003.

(f)      <u>Representations and Warranties</u>.  Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents (except to the extent applicable to an earlier date) shall be true and correct in all material respects on and as of such date as if made on and as of such date (both before and after giving effect to such Transactions as shall be required to occur on or prior to the Closing Date).

(g)      <u>No Default</u>.  After giving effect to the waivers contained in this Agreement, no Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Transactions to be consummated on such date.

(h)      <u>Schedules to this Agreement</u>.  The Borrower shall have delivered to the Administrative Agent and the Lenders updated Schedules to this Agreement, and the Administrative Agent and the Lenders shall be reasonably satisfied in form and substance with such updated Schedules.

(i)      <u>Additional Matters</u>.  All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions and the other transactions contemplated by this Agreement, and the other Loan Documents shall be reasonably satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received such other documents, instruments and legal opinions in respect of any aspect or consequence of the Transactions and the other transactions contemplated hereby or thereby as it shall reasonably request.

4.2      [Intentionally Omitted]

4.3      [Intentionally Omitted].

## ARTICLE 5.  AFFIRMATIVE COVENANTS

The Borrower hereby agrees that for so long as any of the Commitments remains in effect, any Note remains outstanding and unpaid or any Obligation is owing to any Lender, the Collateral Agent or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall and shall cause each of its Subsidiaries to:

5.1      <u>Financial Statements</u>.  Furnish to each Lender:

(a)      as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower, a copy of the consolidated balance sheet of the Borrower and the

43

Consolidated Subsidiaries as at the end of such year and the related consolidated and consolidating statements of income, retained earnings and cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit (other than, at any time after the Petition Date through the Emergence Time, with respect to the Case or a "going concern" or like qualification or exception), by Deloitte & Touche LLP or other independent certified public accountants of nationally recognized standing; provided that the submission of the Borrower's report on Form 10-K shall satisfy the foregoing requirements;

(b)        as soon as available, but in any event not later than 45 days after the end of each quarterly period for each of the first three (3) fiscal quarters of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and the Consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income, retained earnings and cash flows of the Borrower and the Subsidiaries for such quarter and the portion of the fiscal year through the end of such quarter and setting forth the actual figures for the corresponding date or period in the previous year, certified by the chief financial officer, treasurer or chief accountant of the Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments); provided that the submission of the Borrower's report on Form 10-Q shall satisfy the foregoing requirements; and

(c)        prior to the Emergence Time, as soon as available, but in any event not later than 20 days after the end of each fiscal month of the Borrower, the unaudited consolidated balance sheet of the Borrower and the Consolidated Subsidiaries as at the end of such month and the related unaudited consolidated profit and loss and reconciliation of surplus statements and a statement of cash flows of the Borrower and the Subsidiaries for the period from the beginning of the applicable fiscal year of the Borrower to the end of such fiscal month, certified by the chief financial officer, treasurer or chief accountant of the Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments),

all such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

5.2     Certificates; Other Information.  Furnish to each Lender:

(a)        concurrently with the delivery of the financial statements referred to in Section 5.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default with respect to the covenants set forth in Section 6.1, except as specified in such certificate, together with any management letter prepared by said accountants;

(b)        concurrently with the delivery of the financial statements referred to in Section 5.1(a) or (b), a compliance certificate of the chief financial officer, treasurer or chief accountant of the Borrower, in form and substance satisfactory to the Administrative Agent (the

44

"<u>Compliance Certificate</u>"), (i) showing compliance by the Borrower and the Subsidiaries with the covenants contained in <u>Section 6.1</u> and (ii) setting forth the description of any Reduction Event occurring during such period and the aggregate amount of Net Cash Proceeds received during such period with respect to any Reduction Event;

(c)    within five (5) Business Days after the filing thereof, copies of all reports which the Borrower sends to any of its stockholders, and copies of all registration statements, reports on Form 10-K, Form 10-Q or Form 8-K (or, in each case, any successor form) and other material reports which the Borrower or any Subsidiary files with the SEC or any successor or analogous Governmental Authority (other than public offerings of securities under employee benefit plans or dividend reinvestment plans);

(d)    within five (5) days after either of Moody's or Standard & Poor's has raised or lowered its credit rating of any of the First Mortgage Bonds or the credit facility evidenced by the Loan Documents a notice to the Administrative Agent as to such effect;

(e)    concurrently with the delivery thereof or promptly after receipt thereof, a copy of all notices to the trustee or the Borrower under either Indenture;

(f)    prior to the Emergence Time, on the first Business Day of the month of January and June, a certificate of good standing for the Borrower from the appropriate governmental officer in its jurisdiction of incorporation;

(g)    as soon as possible and in any event within five Business Days of filing thereof, copies of all tax returns filed by the Borrower or any of its Subsidiaries (other than Excluded Subsidiaries) with the U.S. Internal Revenue Service;

(h)    as soon as possible and in any event within 270 days after the close of the fiscal year of the Borrower, a statement of the Unfunded Liabilities of each Single Employer Plan, certified as correct by an actuary enrolled under ERISA;

(i)    as soon as possible and in any event within 10 days after the Borrower knows that any Reportable Event has occurred with respect to any Plan, a statement, signed by the chief financial officer, treasurer or chief accountant of the Borrower, describing said Reportable Event and the action which the Borrower proposes to take with respect thereto;

(j)    as soon as possible and in any event within five (5) Business Days of filing therewith with the PBGC, the U.S. Internal Revenue Service or any other governmental entity, a copy of each annual report or other filing with respect to any Plan;

(k)    as soon as possible and in any event within five (5) Business Days after receipt by the Borrower or any of its Subsidiaries, a copy of (i) any notice or claim to the effect that the Borrower or any such Subsidiary is or may be liable to any Person as a result of the release by the Borrower or any such Subsidiary, or any other Person, of any toxic or hazardous waste or substance into the environment, and (ii) any notice alleging any violation of any federal, state or local environmental, health or safety law or regulation by the Borrower or any such Subsidiary;

45

(l)      prior to the Emergence Time, not later than 6:00 p.m., New York City time, on each Wednesday, the unaudited weekly cash flow reports of the Borrower and its Subsidiaries on a consolidated basis and as of the end of such week, the forecast of cash receipts and disbursements for the Borrower and its Subsidiaries for the ensuing 13-week period, and the Borrower's explanations, reasonably acceptable to the Administrative Agent, of the variances between the items set forth on such unaudited weekly cash flow reports and the prior week's forecast for such week; and

(m)      promptly, such additional financial and other information as the Administrative Agent or any Lender may from time to time reasonably request.

5.3      <u>Payment and Performance of Obligations</u>.  Perform in all respects, material to the Borrower and its Subsidiaries taken as a whole, all of its obligations under the terms of all material agreements, indentures, mortgages, security agreements and other debt instruments to which it is party or bound, including, without limitation, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all taxes, fees or other charges imposed on it or on any of its properties by any Governmental Authority and all its other obligations of whatever nature, material to the Borrower and its Subsidiaries taken as a whole, except, in each case, (a) where the amount or validity thereof is currently being diligently contested in good faith and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or any of its Subsidiaries, as the case may be (and, with respect to the Borrower, except as such non-performance is permitted by the Bankruptcy Code), (b) with respect to the Borrower, the foregoing shall only apply with respect to obligations arising after the Petition Date under executory contracts assumed in the Case or entered into after the Petition Date or ordered by the Bankruptcy Court to be paid, and (c) prior to the Emergence Time, with respect to the Borrower, as such non-performance is permitted by the Bankruptcy Code.

5.4      <u>Maintenance of Existence</u>.  Renew and keep in full force and effect its corporate existence, take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business except to the extent such failure to maintain could not, in the aggregate, reasonably be expected to have a Material Adverse Effect (subject, in the case of the Borrower, to the Interim Order or the Final Order (when entered)) and comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect or except, with respect to the Borrower, during the period after the Petition Date through the Emergence Time, as such non-compliance is permitted by the Bankruptcy Code.

5.5      <u>Maintenance of Property; Insurance</u>.  Keep all property useful and necessary in its business in good working order and condition (ordinary wear and tear, and casualties, excepted), maintain with financially sound and reputable insurance companies, having a Financial Strength rating of at least A by A.M. Best Company, insurance on all its property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business, and furnish to the Administrative Agent, upon request, full information as to the insurance carried including

46

certified copies of policies and certificates of insurance from a recognized insurance broker reasonably acceptable to the Required Lenders.

          5.6    <u>Inspection of Property; Books and Records; Discussions</u>.  Keep proper books of records and accounts, in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and permit after reasonable notice representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired, and to discuss the business, operations, properties and financial and other condition of the Borrower and each Subsidiary with officers and employees of the Borrower and such Subsidiary and with their independent certified public accountants (<u>provided</u> that, so long as no Default shall have occurred and be continuing, the Borrower shall be provided with the opportunity to be present during any such communication with its accountants).

          5.7    <u>Notices</u>.  (a) Promptly give notice to the Administrative Agent of:

          (i)    the occurrence of any Default or Event of Default (which notice shall be delivered within five (5) days after the Borrower knows of any such Default or Event of Default);

          (ii)    the assertion by the holder of any post-petition Indebtedness of the Borrower or Indebtedness of the Borrower assumed in the Case, in each case in excess of $250,000, that any default exists with respect thereto or that the Borrower is not in compliance therewith;

          (iii)    the assertion by the holder of any Indebtedness of any Subsidiary of the Borrower in excess of $250,000 that any default exists with respect thereto or that any such Subsidiary is not in compliance therewith;

          (iv)    receipt of any written notice that the Borrower or any of its Subsidiaries is subject to any investigation by any Governmental Authority with respect to any potential or alleged violation of any applicable Environmental Law or of imposition of any Lien against any property of any such Person for any liability with respect to damages arising from, or costs resulting from, any violation of any Environmental Laws;

          (v)    any default or event of default under any Contractual Obligation of the Borrower or any of its Subsidiaries, which, if not cured, could reasonably be expected to have a Material Adverse Effect (which notice shall be delivered within 10 days after the Borrower knows of any such default or event of default);

          (vi)    receipt of any notice of any litigation, investigation or proceeding commenced or threatened against the Borrower (to the extent not stayed during the pendency of the Case) or any Subsidiary of the

Borrower, which (A) seeks damages in excess of $250,000, (B) seeks injunctive relief, (C) is asserted or instituted against any Plan, its fiduciaries or its assets, (D) alleges criminal misconduct by any such Person or (E) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Laws;

(vii)     any Lien (other than Permitted Liens) or claim made or asserted against any of the Collateral;

(viii)     commencement of any proceedings against the Borrower or any Subsidiary of the Borrower contesting any tax, fee, assessment, or other governmental charge in excess of $250,000;

(ix)     the fact that the Borrower or any Subsidiary of the Borrower has entered into a Rate Management Transaction or an amendment to a Rate Management Transaction, together with copies of all agreements evidencing such Rate Management Transaction or amendments thereto (which shall be delivered within two Business Days);

(x)     any material labor dispute to which the Borrower or any Subsidiary may become a party and which involves any group of employees, any strikes or walkouts relating to any of its plants or facilities and the expiration or termination of any labor contract to which the Borrower or such Subsidiary is a party or by which the Borrower or such Subsidiary is bound and which dispute could reasonably be expected to have a Material Adverse Effect on the operations of the Borrower or such Subsidiary (which notice shall be delivered within 10 days after the Borrower knows of any such events); or

(xi)     any other development, financial or otherwise, which could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto. For the purposes of this Section 5.7(a), the Borrower shall be deemed to have knowledge when any officer of the Borrower charged with responsibility for any matter that is the subject of such notice requirement knows or should have known that such notice was required.

(b)     At least ten (10) days prior to such event, give notice to the Administrative Agent of the occurrence of any Reduction Event (i) the Net Cash Proceeds of which are (or are scheduled to be) in excess of $5,000,000 or (ii) together with any other concurrent or prior Reduction Event for which notice has not been given hereunder the aggregate Net Cash Proceeds of which are (or are scheduled to be) in excess of $10,000,000.

5.8     Environmental Laws. (a) Comply and cause its Subsidiaries to comply in all material respects with all applicable Environmental Laws and obtain and comply and cause its Subsidiaries to obtain and comply in all material respects with and maintain and cause its

48

Subsidiaries to maintain any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws except to the extent that failure to do so could not be reasonably expected to have a Material Adverse Effect.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws except to the extent that the same are being contested in good faith by appropriate proceedings and the pendency of such proceedings could not reasonably be expected to have a Material Adverse Effect.

(c)    Defend, indemnify and hold harmless the Administrative Agent, the Collateral Agent and the Lenders, and their respective parents, subsidiaries, affiliates, employees, agents, officers and directors, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature (whether arising under theories of negligence, strict or absolute liability, or otherwise) known or unknown, contingent or otherwise, arising out of, or in any way relating to the violation of, noncompliance with or liability under any Environmental Laws in each instance occurring at, or involving the operation of any facility by the Borrower or its Subsidiaries, or arising out of, or relating to the operations of the Borrower or any Subsidiary, or the Business or the Properties, applicable to the operations of the Borrower or any Subsidiary or the Business or the Properties, or any orders, requirements or demands of Governmental Authorities related thereto, including, without limitation, reasonable attorney's and consultant's fees, investigation and laboratory fees, response costs, court costs and litigation expenses, except to the extent that any of the foregoing arise out of the gross negligence or willful misconduct of the party seeking indemnification therefor. This indemnity shall continue in full force and effect regardless of the termination of this Agreement.

5.9    <u>ERISA</u>. Establish, maintain and operate and cause each of its Subsidiaries to establish, maintain and operate all Plans to comply in all material respects with the applicable provisions of ERISA, the Code, and all other applicable laws, and the regulations and interpretations thereunder and the respective requirements of the governing documents for such Plans except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.10    <u>Use of Proceeds</u>. Use the proceeds of the Loans solely for the purposes set forth in <u>Section 3.16</u>.

5.11    <u>Margin Stock</u>. Not permit the aggregate value of margin stock (as defined in Regulation U) at any time owned or held by the Borrower or any of its Subsidiaries to exceed an amount equal to 25% of the value of all consolidated assets subject at such time to any "arrangement" (as such term is used in the definition of "indirectly secured" in Section 221.2 of Regulation U).

5.12    <u>Maintain Ownership of the Utility Business</u>. (a) Maintain ownership, directly (and not through any Subsidiary), of all or substantially all of the assets of the Utility Business, (b) maintain the Lien of the Montana First Mortgage Indenture on all or substantially all of the assets of the Montana Utility Business and (c) maintain the Lien of the South Dakota

49

First Mortgage Indenture on all or substantially all of the assets of the South Dakota Utility Business.

        5.13    <u>Bankruptcy Court</u>.  Use commercially reasonable efforts to obtain the approval of the Bankruptcy Court of this Agreement and the other Loan Documents.  The Borrower will deliver to the Administrative Agent, the Administrative Agent's counsel and the Lenders all material pleadings, motions and other documents filed on behalf of the Borrower or any of its Subsidiaries with the Bankruptcy Court.

        5.14    <u>Credit Ratings</u>.  Use its best efforts to obtain a re-rating for the Facility from, at the Administrative Agent's option, Moody's, Standard & Poor's and/or Fitch, Inc. prior to January 3, 2004, and in any event continue to use such best efforts until the re-rating(s) are obtained, and thereafter to maintain such re-rating(s).

        5.15    <u>Excluded Subsidiaries</u>.  (i) Maintain, and cause to be maintained, the books and records and bank accounts of the Consolidated Group separate from the books and records and bank accounts of the Excluded Subsidiaries, and at all times present the Excluded Subsidiaries to the public as separate and distinct legal entities; (ii) maintain, and cause to be maintained, financial statements of the Excluded Subsidiaries separate from those of the Consolidated Group; (iii) cause the Excluded Subsidiaries to hold title to any assets they own in their own respective name, and deposit all of their respective funds in checking accounts, saving accounts, time deposits or certificates of deposit in their respective names or invest such funds in their respective names; (iv) cause the Excluded Subsidiaries to observe all corporate formalities under Requirements of Law necessary to maintain their identity as entities separate and distinct from the Consolidated Group; and (v) not commingle the assets of Borrower or any Consolidated Subsidiary with assets of any Excluded Subsidiary.

        5.16    <u>Bank One Credit Documents</u>.  Promptly provide the Administrative Agent with true and complete copies of any and all documents and other information delivered to any Person pursuant to, or in connection with, the Bank One Credit Documents.

## ARTICLE 6.  NEGATIVE COVENANTS

The Borrower hereby agrees that for so long as the Commitments remain in effect, any Note remains outstanding and unpaid or any Obligation is owing to any Lender, the Collateral Agent or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall not:

        6.1    <u>Financial Covenants</u>.  (a) <u>Consolidated EBITDAR</u>.  Permit Consolidated EBITDAR on the last day of any fiscal month to be less than the amount set forth below for the applicable period:

| Applicable Amount | Applicable Period |
|---|---|
| $       17,000,000 | For the 2 fiscal month period ending October 31, 2003 |
| $       30,000,000 | For the 3 fiscal month period ending November 30, 2003 |
| $       45,000,000 | For the 4 fiscal month period ending December 31, 2003 |
| $       63,000,000 | For the 5 fiscal month period ending January 31, 2004 |
| $       80,000,000 | For the 6 fiscal month period ending February 29, 2004 |
| $       94,000,000 | For the 7 fiscal month period ending March 31, 2004 |
| $     107,500,000 | For the 8 fiscal month period ending April 30, 2004 |
| $     120,000,000 | For the 9 fiscal month period ending May 31, 2004 |
| $     128,000,000 | For the 10 fiscal month period ending June 30, 2004 |
| $     140,000,000 | For the 11 fiscal month period ending July 31, 2004 |
| $     152,000,000 | For the 12 fiscal month period ending each month thereafter |

(b)     Capital Expenditures.  Neither the Borrower nor any Subsidiary shall expend, or be committed to expend, in excess of the amount set forth below for the applicable period for Capital Expenditures in the aggregate for the Borrower and its Subsidiaries:

| Applicable Amount | Applicable Period |
|---|---|
| $       82,500,000 | For the period commencing on the Closing Date and continuing through the term of the Bank One Credit Agreement |
| $       85,000,000 | For each fiscal year thereafter |

51

(c)    Interest Coverage Ratio.  From and after the date that is 91 days after the Emergence Time, permit the ratio of (i) Consolidated EBITDAR to (ii) Consolidated Recourse Interest Expense, in each case on the last day of any fiscal quarter of the Borrower for the period of four fiscal quarters then ending, to be less than an amount to be agreed upon between the Borrower, on the one hand, and the Administrative Agent and Required Lenders, on the other hand, based upon good faith negotiations and a review of the business plan of the Borrower, which Borrower shall be required to deliver to the Administrative Agent on or before January 31, 2004; provided, that, notwithstanding the foregoing, this Section 6.1(c) shall no longer be applicable if and when the Borrower obtains a rating of at least Baa3, BBB- and/or BBB- from Moody's, Standard & Poor's and/or Fitch, Inc., respectively (such rating agencies to be the same as determined by the Administrative Agent in its option in accordance with Section 5.14), so long as such rating(s) is(are) obtained within 180 days after the Emergence Time.

6.2    Limitation on Fundamental Changes.  Except in connection with a Permitted Reorganization Plan, enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all its property, business or assets or all or substantially all of the mortgaged property under an Indenture, acquire any Capital Stock of another Person, or acquire assets of another Person (other than any Subsidiary having Non-Recourse Debt, any Excluded Subsidiary or any Non-Material Foreign Subsidiary) constituting all or a material part of a business (or all or substantially all of the assets of such Person), except (a) during the pendency of the Case, any Subsidiary of the Borrower may merge or consolidate with or into any other Subsidiary of the Borrower, (b) at any time after the Emergence Time, any Person (other than any Excluded Subsidiary) may be merged or consolidated with or into the Borrower, or (c) the Borrower may acquire assets or Capital Stock of another Person (other than any Excluded Subsidiary) constituting all or a material part of a business (or all or substantially all the assets of such Person), in each of cases (b) and (c) provided that (i) the Borrower shall be the continuing or surviving corporation, (ii) as of the consummation of, and after giving effect to, such transaction, no Default or Event of Default shall then exist, (iii) the Borrower shall not acquire, directly or indirectly, any Capital Stock or assets of an Excluded Subsidiary (except as expressly permitted pursuant to Section 6.8) nor any assets of a Subsidiary subject to a Lien securing Non-Recourse Debt, (iv) such transaction relates solely to the acquisition of domestic regulated utility businesses and assets, (v) if the Borrower shall acquire Capital Stock of another Person, such Person shall thereupon be a Subsidiary, and (vi) the aggregate principal amount of Indebtedness incurred or assumed by the Borrower and the Subsidiaries in connection with such transaction (together with the aggregate principal amount of Indebtedness of such acquired Person) shall not exceed sixty percent (60%) of the lesser of the fair value or cost of such acquired assets (and, to the extent such Indebtedness is incurred in connection with such transaction or in contemplation of such transaction, such Indebtedness shall not have a scheduled maturity, or require any principal payment, prior to six months after the Maturity Date).

6.3    Limitation on Transactions with Affiliates.  Except as described on Schedule 6.3 and except for transactions providing services (including, without limitation, group purchases of equipment or energy) at cost to any Subsidiary, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is upon fair and reasonable terms no

52

less favorable to the Borrower than it would have obtained in a comparable arm's-length transaction with a Person which is not an Affiliate.

6.4    <u>Limitation on Liens</u>.  Create, incur, assume or suffer to exist, and shall not permit any Subsidiary to create, incur, assume or suffer to exist, any Lien upon any of its properties, assets or revenues, whether now owned or hereafter acquired, except for Permitted Liens.

6.5    <u>Amendments of Organizational Documents</u>.  Amend, modify or change its articles of incorporation or bylaws that could reasonably be expected to result in a Material Adverse Effect.

6.6    <u>Limitation on Guarantee Obligations</u>.  Create, incur, assume or suffer to exist, and shall not permit any Subsidiary to create, incur, assume or suffer to exist, any Guarantee Obligation except:

(a)    guarantees of obligations to third parties made in the ordinary course of business in connection with relocation of employees of the Borrower or any of its Subsidiaries;

(b)    Guarantee Obligations existing on the date hereof and described in <u>Schedule 6.6</u>;

(c)    Guarantee Obligations which by their terms (either mandatorily or at the unfettered option of the Borrower) are payable solely in Capital Stock (other than Mandatory Redeemable Stock) of the Borrower <u>provided</u> that the Borrower agrees to cause any payment under any such outstanding obligation to be made only in such Capital Stock; and

(d)    Guaranteed Obligations permitted pursuant to <u>Section 6.10</u>, <u>6.8(k)(y)</u> or <u>6.8(k)(z)</u>, or issued in connection with Indebtedness permitted pursuant to <u>Section 6.10</u> so long as such Guaranteed Obligations are not secured by the assets of the Borrower or any of its Subsidiaries (except to the extent that the Indebtedness being guaranteed is permitted to be secured by the assets of the Borrower or any of its Subsidiaries).

6.7    <u>Limitation on Sale of Assets</u>.  Other than in connection with a Permitted Reorganization Plan, convey, sell, lease, assign, transfer or otherwise dispose of, and shall not permit any Subsidiary (other than any Special Purpose Subsidiary) to convey, sell, lease, assign, transfer or otherwise dispose of any of, its property, business or assets (including, without limitation, tax benefits, receivables and leasehold interests but excluding the Capital Stock of any Special Purpose Subsidiary), whether now owned or hereafter acquired except (a) for the sale or other disposition of any property that, in the reasonable judgment of the Borrower, has become uneconomic, obsolete or worn out and, to the extent such sale or disposition is consummated prior to the Emergence Time, having a book value not exceeding $5,000,000 in the aggregate for the Borrower and its Subsidiaries since the Closing Date, and which is disposed of in the ordinary course of business (<u>provided</u> that, to the extent applicable, the Borrower shall have complied with <u>Section 6.16</u>); (b) for sales of inventory and receivables made in the ordinary course of business or in connection with an accounts receivable securitization facility; (c) that

53

any Subsidiary of the Borrower may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or, subject to Section 5.12, a Wholly-Owned Subsidiary of the Borrower and any Subsidiary of the Borrower may sell or otherwise dispose of, or part with control of any or all of, the stock of any Subsidiary to a Wholly-Owned Subsidiary of the Borrower or a Subsidiary of the Borrower may merge with the Borrower (so long as the Borrower is the surviving corporation) or, subject to Section 5.12, another Subsidiary; (d) for fair market arm's-length sales or other dispositions of (i) the Colstrip transmission system (consisting of two 500kv transmission lines extending from the Colstrip generating stations to an interconnection with Bonneville Power Administration near Townsend, Montana, together with switchyard facilities in Colstrip and Broadview, Montana, and substation facilities in Colstrip, Montana, and certain related real property interests, easements and rights of way, permits and appurtenances that permit the construction, operation and maintenance of the Colstrip transmission lines), and (ii) the assets of, or Capital Stock in, Montana Megawatts I, LLC and other entities formed for the Montana First Megawatts Project; (e) for the sale or other disposition by the Borrower or any of its Subsidiaries of other assets consummated after the Closing Date; provided that (i) such sale or other disposition shall be made for fair value on an arm's-length basis, (ii) the aggregate fair market value of all such assets sold or disposed of under this clause (e) together with assets sold or disposed of under Section 6.11 shall not exceed 10% of the consolidated tangible assets of the Borrower and its Subsidiaries as of the Original Closing Date, (iii) prior to the Emergence Time, the aggregate book value of all such assets sold or disposed of under this clause (e) shall not have a book value exceeding $5,000,000 since the Closing Date, and (iv) the Borrower shall comply with Section 2.6, if applicable; (f) sales of assets described on Schedule 6.7; and (g) for sales of assets to the extent any such sale is expressly approved by an order of the Bankruptcy Court which has not been stayed, vacated or reversed; provided, that, prior to the Emergence Time, all sales or other dispositions permitted hereby shall be made for fair value and (other than those permitted by clause (b) above and other than the sale of the Alberton Gorge property referenced on Schedule 6.7) shall be for consideration of at least 85% cash; provided, further, that sales of assets of Expanets or Blue Dot shall not be subject to the 85% cash consideration requirement if such sales are approved by an order of the Bankruptcy Court which has not been stayed, vacated or reversed.

6.8    Limitation on Investments, Loans and Advances.  Make, and shall not permit any Subsidiary to make, any advance, loan, extension of credit (excluding Guarantee Obligations but including any payment by a guarantor thereunder) or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of, or make any other investment in, any Person (any of the foregoing, an "Investment"), except;

(a)    extensions of trade credit in the ordinary course of business;

(b)    Investments of the Borrower or any Subsidiary existing on the date hereof in any Subsidiary and (other than capital contributions) described in Schedule 6.8;

(c)    Investments of the Borrower after the Closing Date that are acquisitions permitted pursuant to and made in accordance with Section 6.2;

(d)    the Borrower and its Subsidiaries may invest in, acquire and hold Cash Equivalents;

54

(e)         the Borrower or any of its Subsidiaries may make travel and entertainment advances, relocation loans and payroll advances in the ordinary course of business to officers and employees of the Borrower or any such Subsidiary;

(f)         Investments of the Borrower or any Subsidiary existing on the date hereof and described in <u>Schedule 6.8</u> including, without limitation, the receipt of any additional securities constituting payments in kind on such existing Investments;

(g)         Investments in obligations arising out of bankruptcy of customers and suppliers;

(h)         Investments arising out of non-cash consideration received in connection with sales of assets as permitted by <u>Section 6.7</u>;

(i)         Investments of the Borrower or any Subsidiary after the Closing Date of not more than $10,000,000 in the aggregate in Subsidiaries to the extent that such investments are in the ordinary course of business and consistent with past practice;

(j)         Investments in any of the Excluded Subsidiaries existing as of the date hereof and (other than capital contributions) described in <u>Schedule 6.8</u> (including, without limitation, the receipt of any additional securities constituting payments in kind on such existing Investments); and

(k)         Investments permitted pursuant to clause (y) or (z) below;

<u>provided</u> that, notwithstanding the foregoing, the Borrower shall not, and shall not permit any Subsidiary to, make any Investment in any Excluded Subsidiary nor create, incur, assume or suffer to exist any Guarantee Obligation with respect to any Excluded Subsidiary, except:

(x)         Investments or Guarantee Obligations of the Borrower or any Subsidiary existing on the date hereof in or with respect to any Excluded Subsidiary described in <u>Schedule 6.8</u> and the receipt of any additional securities constituting payments in kind on such existing investments;

(y)         any advance, loan, extension of credit or Guarantee Obligations of the Borrower or any Subsidiary to or for the benefit of Blue Dot in an aggregate principal amount (whether outstanding, written down or written off but net of any actual cash returns on capital) of not more than $25 million; <u>provided</u> that such advance, loan, extension of credit or Guarantee Obligation shall be used to honor Guarantee Obligations, for working capital, or to refinance on a secured basis the existing secured working capital credit facility of Blue Dot; and

(z)         Investments or Guarantee Obligations of the Borrower or any Subsidiary in or for the benefit of Expanets in an aggregate principal amount (whether outstanding, written or written off but net of any actual cash returns on capital) of not more than $75 million; <u>provided</u> that such advance, loan, extension of credit or Guarantee Obligation shall be used to honor Guarantee Obligations, for working capital, or to refinance on a secured basis the existing secured working capital credit facility of Expanets.

55

6.9 <u>Limitation on Dividends and Stock Repurchases</u>. Other than in connection with a Permitted Reorganization Plan, declare, and shall not permit any Subsidiary to declare, any dividends on any shares of any class of Capital Stock, or make, and shall not permit any Subsidiary to make, any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement or other acquisition of any shares of any class of Capital Stock (including the outstanding Capital Stock of the Borrower), whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any of its Subsidiaries (all of the foregoing being referred to herein as "<u>Restricted Payments</u>"); except that Subsidiaries may pay dividends directly or indirectly to the Borrower and except that at any time after the Emergence Time:

(a) Subsidiaries may pay dividends directly or indirectly to the Borrower's Subsidiaries which are directly or indirectly Wholly-Owned by the Borrower;

(b) any Subsidiary may redeem or repurchase shares of its Capital Stock to the extent required to do so pursuant to, and upon the terms provided in, any put agreement existing on the date hereof between such Subsidiary and any holder of such Capital Stock; <u>provided</u> that if permitted pursuant to the terms of such agreement, the sole consideration for such Capital Stock shall be Capital Stock (other than Mandatory Redeemable Stock) of the Borrower; and

(c) the Borrower or any Subsidiary may make Restricted Payments (other than redemption or repurchase of Capital Stock with respect to such agreements existing as of the date hereof as set forth in clause (b) above) on or with respect to its Capital Stock so long as, after giving effect to such Restricted Payments, no Default or Event of Default shall have occurred and be continuing or shall result therefrom.

6.10 <u>Limitation on Indebtedness or Mandatory Redeemable Stock</u>. Create, incur, issue, assume or suffer to exist, and shall not permit any Subsidiary to create, incur, issue, assume or suffer to exist, any Indebtedness or Mandatory Redeemable Stock (including any Indebtedness or Mandatory Redeemable Stock of any of its Subsidiaries), except:

(a) Indebtedness of the Borrower under this Agreement;

(b) Indebtedness and Mandatory Redeemable Stock outstanding on the date hereof as set forth on <u>Schedule 6.10</u> hereto (but not including the Indebtedness permitted under clause (c) below);

(c) prior to the Emergence Time, Indebtedness outstanding under the Bank One Credit Agreement in an aggregate principal amount not to exceed $100,000,000, together with all interest, fees and other amounts due with respect thereto pursuant to the Bank One Credit Documents (as modified and amended to the extent permitted under this Agreement);

(d) purchase money Indebtedness incurred in connection with the purchase of any fixed assets; <u>provided</u>, that the amount of such purchase money Indebtedness shall be limited to an amount not in excess of the purchase price of such equipment and the aggregate of all such purchase money Indebtedness incurred during any twelve-month period ending after the Closing

Date shall not exceed (i) prior to the Emergence Time, $1,000,000, and (ii) from and after the Emergence Time, $3,000,000;

        (e)     Financing Lease Obligations not in excess of $25,000,000 during any twelve-month period ending prior to the Emergence Time (inclusive of any Financing Lease Obligations set forth on Schedule 6.10), provided that the Borrower will not, nor will it permit its Subsidiaries to make payments in respect of Financing Leases in excess of $6,000,000 in the aggregate during any twelve-month period ending prior to the Emergence Time;

        (f)     letters of credit to replace those letters of credit existing on the date hereof and described in Schedule 6.10; provided however, such new letters of credit shall not be (i) in an amount greater than the existing letters of credit being replaced or (ii) on terms materially worse than those of the existing letters of credit being replaced;

        (g)     after the Emergence Time, Indebtedness consisting of reimbursement obligations under surety, indemnity, performance, release and appeal bonds and guarantees thereof and letters of credit required in the ordinary course of business or in connection with the enforcement of rights or claims of the Borrower or its Subsidiaries;

        (h)     after the Emergence Time, Indebtedness of Montana Megawatts I, LLC (or any related Special Purpose Subsidiary) in an aggregate amount not to exceed $100,000,000, which proceeds of such Indebtedness are used to finance construction and related costs of the Montana First Megawatts project, so long as such Indebtedness constitutes Non-Recourse Debt (except to the extent included in the amounts permitted pursuant to clause (m) below);

        (i)     after the Emergence Time, Non-Recourse Debt of any Subsidiary;

        (j)     after the Emergence Time, Debt for Borrowed Money of the Borrower or any of its Subsidiaries secured only by accounts receivable or inventory of the Borrower or any of its Subsidiaries in an aggregate outstanding principal amount not to exceed $75,000,000 at any one time, and unsecured Debt for Borrowed Money of the Borrower or any of its Subsidiaries to fund their general working capital needs in an aggregate outstanding principal amount not to exceed $100,000,000;

        (k)     after the Emergence Time, Debt for Borrowed Money incurred or assumed in connection with a transaction expressly permitted pursuant to Section 6.2; provided such Indebtedness complies with the terms of clause (vi) of Section 6.2;

        (l)     after the Emergence Time, refinancings, replacements and extensions by the obligor thereof of any Debt for Borrowed Money under clause (b), (h), (i), or (k) above so long as (i) the principal of the Debt for Borrowed Money so refinanced, replaced or extended is not increased as a result thereof, (ii) in the case of any refinancing or replacement of Non-Recourse Debt, after giving effect thereto, such Indebtedness constitutes Non-Recourse Debt, (iii) in the case of any refinancing or replacement of secured Indebtedness, after giving effect thereto, the Lien (other than the Lien of an Indenture) with respect thereto is not extended to any other assets, and (iv) in the case of any refinancing or replacement of unsecured Indebtedness, after giving effect thereto, such Indebtedness remains unsecured; and

(m)    after the Emergence Time, Indebtedness not otherwise permitted by the preceding clauses of this Section 6.10 not exceeding $50 million in aggregate principal amount at any one time outstanding which Indebtedness shall not be secured by a Lien on any assets of the Borrower (and which may include Guaranteed Obligations of the Borrower with respect to Indebtedness of a Subsidiary);

provided that, notwithstanding the foregoing, the Borrower shall not incur, issue or assume any Debt for Borrowed Money or Mandatory Redeemable Stock after the date hereof pursuant to clauses  (k) (to the extent required pursuant to Section 6.2), or (l) above which has a scheduled maturity, or requires any principal payment, prior to six (6) months after the Maturity Date.

6.11    Limitation on Sales and Leasebacks and Operating Leases.  (a) Enter into any arrangement with any Person providing for the leasing by the Borrower of real or personal property which has been or is to be sold or transferred by the Borrower to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrower; or (b) become liable or remain liable as lessee or guarantor or other surety with respect to any operating lease except that the Borrower and any of its Subsidiaries may (i) remain liable with respect to any operating lease entered into prior to the Petition Date and (ii) become and remain liable with respect to operating leases entered into on or after the Petition Date so long as, prior to the Emergence Time, the aggregate amount of all such rents paid or accrued under all such operating leases entered into after the Petition Date shall not exceed $1,000,000 in the aggregate during any twelve-month period ending after the Closing Date.

6.12    Limitation on Negative Pledge Clauses; Payment Restrictions.  Enter into or suffer to exist, and shall not permit any Subsidiary to enter into or suffer to exist, any agreement or other consensual encumbrance or restriction which prohibits or limits the ability of the Borrower or any of its Subsidiaries to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or prohibits or limits the ability of the Borrower or any of its Subsidiaries to make loans, payments or dividends to or investments in, or to transfer assets to, the Borrower or any of its Subsidiaries, other than (a) any such agreement, encumbrance or restriction contained in this Agreement, the Indentures or the Bond Collateral Agreement, (b) any such agreement, encumbrance or restriction (including any negative pledge) contained in any industrial revenue bonds, purchase money mortgages, development financing, operating leases entered into in the ordinary course of business, acquisition agreements or Financing Leases, in each case permitted by this Agreement (in which cases, any prohibition or limitation shall only be effective against the assets financed, acquired or leased thereby), or contained in the Bank One Credit Documents, (c) any such agreement, encumbrance or restriction contained in any loan agreement or other financing document entered into with respect to Debt for Borrowed Money of Subsidiaries (other than industrial revenue bonds, purchase money mortgages, development financing or Financing Leases) permitted to be incurred pursuant to Section 6.10, (d) customary provisions in any contract entered into in the ordinary course of business (including any licensing agreement, management agreement or franchise agreement) restricting assignments of such contract, (e) in connection with a Permitted Reorganization Plan, or (f) any such agreement, encumbrance or restriction (including any negative pledge) contained in the lease financing documents for the Colstrip 4 generating unit and any amendments, modifications or restructuring thereof entered

58

into after the date hereof and, prior to the Emergence Time, approved by an order of the Bankruptcy Court.

6.13    Limitation on Businesses .  Enter into or engage in any business, either directly or through any Subsidiary, except for businesses of the same general type as those in which the Borrower and its Subsidiaries are engaged on the Closing Date or other business activities reasonably incidental or related to any of the foregoing.

6.14    Limitation on Certain Prepayments and Amendments .  (a) Make any optional payment or prepayment on or redemption, defeasance or purchase of such Person's Debt for Borrowed Money (other than with respect to (i) Indebtedness hereunder or under the First Mortgage Bonds, (ii) any Indebtedness to the extent such Indebtedness by the terms thereof would otherwise have become due and payable within three months of such payment, redemption, defeasance or purchase, (iii) any refinancing or replacement of such Indebtedness in accordance with Section 6.10, (iv) prepayments of Debt for Borrowed Money in an aggregate principal amount not to exceed the aggregate principal amount of Net Cash Proceeds of Reduction Events offered to the Lenders but not accepted as prepayments of the Loans pursuant to Section 2.6, (v) Permitted Pre-Petition Payments), (vi) Indebtedness secured by a Permitted Lien if the asset securing such Indebtedness has been sold or otherwise disposed of to the extent permitted hereby, and, in no event, greater than the fair market value of such asset, or (vii) prepayments of the Indebtedness outstanding under the Bank One Credit Documents, or (b) amend, modify or change, or consent to any amendment, modification or change to any of the terms relating to the payment or prepayment of principal of or interest on, any such Indebtedness, other than any amendment, modification or change which would extend the maturity or reduce the amount of any payment or prepayment of principal thereof or which would reduce the rate or extend the date for payment of interest thereon or which would not be adverse to the Lenders.

6.15    Limitations on Subsidiaries' Equity Interests .  Other than in connection with a Permitted Reorganization Plan, permit any Subsidiary to issue any preferred Capital Stock or any redeemable common stock other than (a) issuances of preferred Capital Stock in payment of regularly accruing dividends on theretofore outstanding shares of such preferred Capital Stock, (b) issuances of preferred Capital Stock issued to and, so long as thereafter outstanding, held by the Borrower and (c) issuances in consideration of acquisitions permitted under Section 6.8 of preferred Capital Stock which ranks junior, as to the payment of dividends and as to the distribution of assets upon any liquidation, dissolution or winding up of such Subsidiary, to all preferred Capital Stock held by the Borrower in such Subsidiary.

6.16    Limitation on Release of Mortgaged Property; Limitation in Respect of Insurance .  Release Mortgaged and Pledged Property (as defined in the Montana First Mortgage Indenture) from the lien of the Montana First Mortgage Indenture or Mortgaged Property (as defined in the South Dakota First Mortgage Indenture) from the lien of the South Dakota First Mortgage Indenture, other than (i) releases of such Mortgaged and Pledged Property pursuant to and in accordance with Sections 58 and 60 of the Montana First Mortgage Indenture; (ii) releases of such Mortgaged Property pursuant to and in accordance with Section 8.02 of the South Dakota First Mortgage Indenture other than clause (f) thereof; (iii) releases of property or other assets that are disposed of in accordance with Section 6.7(d) or (e) and, if in connection with any such

disposition and the related release, the Borrower deposits with the trustee under an Indenture cash that would otherwise constitute Net Cash Proceeds, releases of such cash pursuant to and in accordance with such Indenture; and (iv) releases of proceeds of insurance (and/or moneys of the Borrower in lieu thereof or in addition thereto and for the purposes thereof) held under either Indenture in accordance with such Indenture which reimburse the Borrower for amounts spent in the rebuilding or renewal of property destroyed or damaged (including, without limitation, for property rebuilt, restored or replaced) and, if following the completion of any such rebuilding or renewal, any of such insurance proceeds (and/or such moneys of the Borrower) remain unspent, releases of such unspent proceeds (and/or such unspent money of the Borrower) pursuant to and in accordance with such Indenture; provided, however, that the Borrower shall not request or receive any proceeds of any insurance or of any alternative method or plan of protection of the Borrower relating to such Mortgaged Property otherwise payable to it pursuant to Section 6.07(b) of the South Dakota First Mortgage Indenture, and so long as any First Mortgage Bonds are outstanding, no effect shall be given to (x) Section 6.07(b) of the South Dakota First Mortgage Indenture, (y) the language in Section 6.07(c) of the South Dakota First Mortgage Indenture which precedes clause (i) of such Section, or (z) the reference to Section 6.07(b) of the South Dakota First Mortgage Indenture which appears in Section 6.07(d) of the South Dakota First Mortgage Indenture.

6.17    Limitation on Subjecting Property, or Other Assets to the Lien of the Other Indenture.  Subject any property or other assets to the lien of the Montana First Mortgage Indenture or the lien of the South Dakota First Mortgage Indenture if such property or other assets are subject to the lien of the other Indenture.

6.18    Prohibition on Designating Class "A" Mortgages or Permitting Qualified Lien Bonds to Exist.  Designate any Class "A" Mortgage under the South Dakota First Mortgage Indenture or permit any Qualified Lien Bonds to exist under the Montana First Mortgage Indenture.

6.19    Limitation on Amendments or Supplements to the Indentures .  Amend, modify or supplement the Montana First Mortgage Indenture or the South Dakota First Mortgage Indenture, except to (a) supplement such Indenture to establish the terms of any series of first mortgage bonds to be issued thereunder that are permitted to be issued under Section 6.10(f), (b) amend or supplement such Indenture for the purpose of conveying, transferring or assigning to the trustee thereunder additional property for the purpose of subjecting such property to the lien of such Indenture, subject to the terms of Section 6.17, or (c) amend or supplement such Indenture, in the case of the Montana First Mortgage Indenture, pursuant to and as permitted by Section 120 thereof or, in the case of the South Dakota First Mortgage Indenture, pursuant and as permitted by Section 14.01 thereof, provided that in each such case such amendment or supplement will not adversely affect the First Mortgage Bonds.

6.20    Prohibition on Second Mortgage Bonds.  Issue any bonds (or other Debt for Borrowed Money) that is secured by a lien (subordinate to the lien of either Indenture) on the property or other assets subject to the lien of such Indenture.

6.21    Financial Contracts.  Enter into or remain liable upon any Financial Contract except Permitted Financial Contracts.

6.22    <u>Chapter 11 Claims</u>.  Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is <u>pari</u> <u>passu</u> with or senior to the claims of the Administrative Agent and the Lenders against the Borrower (other than the Bank One Claim and the Carve-Out).

6.23    <u>Bank One Credit Documents</u>.  Amend, modify, supplement or waive any term or provision of any of the Bank One Credit Documents in any way without obtaining the prior written consent of the Administrative Agent and the Required Lenders so as to provide for (a) any increase in the non-default rate of interest chargeable thereunder with respect to the Bank One Debt or the default rate of interest chargeable thereunder as in effect on the date hereof, (b) any increase in the amount of any of the Bank One Debt or any installment due thereunder, (c) any reduction or acceleration of the maturity date of any payment of the Bank One Debt or interest (other than as expressly provided in the Bank One Credit Documents as in effect of the date hereof), (d) any increase in the amount of fees payable under the Bank One Credit Documents, or (e) the granting or obtaining of any collateral security or obtaining any lien on any collateral.

## ARTICLE 7.  EVENTS OF DEFAULT

7.1    <u>Events of Default</u>.  If any of the following events shall occur and be continuing:

(a)    The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any fee or any other amount payable hereunder or any other Loan Document, within three (3) days after any such interest, fee or other amount becomes due in accordance with the terms thereof or hereof; or

(b)    Any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)    The Borrower shall default in the observance or performance of any agreement contained in Article 6 (other than <u>Section 6.12</u>) or <u>Section 5.7</u>; or

(d)    The Borrower shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of 30 days; or

(e)    The Borrower or any Subsidiary shall (A) default in any payment (regardless of amount) of principal of, premium, if any, or interest on any Indebtedness (except, with respect to the Borrower, at any time after the Petition Date through the Emergence Time, any amounts for which the Borrower is not required to pay pursuant to an order of the Bankruptcy Court) having an aggregate principal amount in excess of $1,000,000 (or following the Emergence Time, $10,000,000) (other than the Notes) beyond the period of grace (not to exceed 30 days), if any, provided in the instrument or agreement under which such Indebtedness was created or (B) default in the observance or performance of any other agreement or condition

61

(x) contained in the Bank One Credit Documents as in effect on the date hereof or as modified and amended to the extent permitted under this Agreement, (y) relating to any such Indebtedness or (z) contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit, under the terms of the Bank One Credit Documents as in effect on the date hereof or under the terms of such Indebtedness, the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice, if required, such Indebtedness to become due prior to its stated maturity; provided that any such default by the Borrower or any Subsidiary under Non-Recourse Debt will not constitute an Event of Default unless such default also constitutes a default under other recourse Indebtedness of the Borrower or such Subsidiary in an aggregate outstanding principal amount of $1,000,000 (or following the Emergence Time, $10,000,000) or more; or

(f)    After the Emergence Time (with respect to the Borrower) and at any time (with respect to any Subsidiary), (i) the Borrower or any Subsidiary shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any such Subsidiary shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any such Subsidiary any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or un-bonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any such Subsidiary any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any such Subsidiary shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any such Subsidiary shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)    (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Pension Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower, any Subsidiary or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Pension Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such plan for purposes of Title IV of ERISA, (iv) any Pension Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower, any Subsidiary or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or

62

the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Pension Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(h)    One or more judgments or decrees shall be entered against the Borrower or any Subsidiary involving in the aggregate a liability (to the extent not covered by third-party insurance as to which the insurer has acknowledged coverage) of $1,000,000 (or following the Emergence Time, $5,000,000) or more and sufficient judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 10 days from the entry thereof to reduce such amount to less than $1,000,000 (or following the Emergence Time, $5,000,000); or

(i)    The Bond Collateral Agreement, either Indenture or either Supplemental Indenture shall cease, for any reason, to be in full force and effect, other than pursuant to the terms thereof and hereof, (x) the Lien created thereby shall cease to be enforceable and of the same effect as to perfection and priority purported to be created thereby with respect to any significant portion of the collateral thereunder, (y) there shall occur an "Event of Default" under either Indenture, or (z) any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or the Borrower or any of its Subsidiaries that are party thereto shall challenge the enforceability of any Loan Document or shall assert in writing (including, without limitation, in any pleading filed in any court), or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms); or

(j)    A Change of Control shall occur; or

(k)    The Borrower shall breach any provision of the Interim Order or the Final Order; or

(l)    The Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof; or an application shall be filed by the Borrower for the approval of any other Superpriority Claim (other than the Bank One Claim and the Carve-Out) in the Case which is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Borrower, or there shall arise or be granted any such pari passu or senior Superpriority Claim; or

(m)    The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower which have a value in excess of $100,000 in the

aggregate, other than in connection with any orders approving the Bank One Credit Documents; or

(n)     An order of the Bankruptcy Court shall be entered reversing, staying for a period in excess of five days, vacating or (without the written consent of the Administrative Agent and the Required Lenders) otherwise amending, supplementing or modifying any of the Orders; or

(o)     The Borrower shall make any Pre-Petition Payment other than Permitted Pre-Petition Payments; or

(p)     Nonpayment by the Borrower or any of its Subsidiaries (other than Excluded Subsidiaries) of any Rate Management Obligation when due or the breach by the Borrower or any of its Subsidiaries (other than Excluded Subsidiaries) in any material respect of any term, provision or condition contained in any Rate Management Transaction or any transaction of the type described in the definition of Rate Management Transaction, whether or not any Lender or any Affiliate of a Lender is a party thereto; or

(q)     Any order, judgment, decree, ruling or similar binding action is taken by any Governmental Authority having jurisdiction over the Borrower or any of its Subsidiaries (other than Excluded Subsidiaries) which lowers, or has the effect of lowering, the tariff rates charged by the Borrower and its Subsidiaries (other than Excluded Subsidiaries) to their customers to the extent any such action could in the reasonable determination of the Required Lenders have a Material Adverse Effect; or

(r)     The Final Order shall not have been entered by the Bankruptcy Court on or before December 11, 2003,

then, and in any such event, without further order of or application to the Bankruptcy Court (but subject to any requirement to give notice by the terms of the Interim Order or the Final Order, as applicable) (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the Notes shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, by notice to the Borrower (during the period after the Petition Date through the Emergence Time, with a copy to counsel for the Official Unsecured Creditors' Committee appointed in the Case and to the United States Trustee for the District of Delaware), declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder and the Notes to be due and payable forthwith, whereupon the same shall immediately become due and payable.  In addition, subject solely to any requirement to give notice by the terms of the Interim Order or the Final Order, as applicable, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Administrative Agent and the other Secured Parties may exercise any

64

and all remedies under the Loan Documents and under applicable law available to the Administrative Agent and the other Secured Parties.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

## ARTICLE 8.  THE AGENTS

8.1    Appointment.  Each Lender hereby irrevocably designates and appoints CSFB as Administrative Agent and as Collateral Agent (for purposes of this Article 8, collectively, the "Agents"), and to act as its agent under this Agreement and the other Loan Documents.  Each such Lender irrevocably authorizes each Agent, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to each Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Each Lender further authorizes and directs each Agent to execute and deliver releases (or similar agreements) to give effect to the provisions of this Agreement and the other Loan Documents, including specifically, without limitation, the provisions of Section 6.7 hereof.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein or in therein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against either Agent.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Bond Collateral Agreement.

8.2    Delegation of Duties.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

8.3    Exculpatory Provisions.  No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except for its own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties, made by the Borrower or any officer or any of them contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by either Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or the Notes or any other Loan Document or for any failure of the Borrower to perform its obligations hereunder or thereunder.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to

65

inspect the properties, books or records of the Borrower, any Subsidiary or any Excluded Subsidiary.

8.4    Reliance by Agents .  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any Note, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower), independent accountants and other experts selected by such Agent.  Each Agent may deem and treat the payee of any Note or any loan account in the Register as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement, the Notes and the other Loan Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the amounts owing hereunder.

8.5    Notice of Default .  No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  Each Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

8.6    Non-Reliance on Agents and Other Lenders .  Each Lender expressly acknowledges that no Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by either Agent hereafter taken, including any review of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by either Agent to any Lender.  Each Lender represents to each Agent that it has, independently and without reliance upon either Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon either Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the

business, operations, property, financial and other condition and creditworthiness of the Borrower.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder or furnished to the Administrative Agent for the account of, or with a counterpart or copy for, each Lender, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower, any of its Subsidiaries or any Excluded Subsidiary which may come into the possession of either Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

8.7    <u>Indemnification</u>.  The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) and their respective directors, officers, employees and agents, ratably according to their respective Commitment Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their Commitment Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including, without limitation, at any time following the payment of all amounts owing hereunder) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from such Agent's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Obligations hereunder.

8.8    <u>Agent in Its Individual Capacity</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower, any Subsidiary and any Excluded Subsidiary as though such Agent were not an Agent hereunder and under the other Loan Documents.  With respect to Loans made or renewed by it and any Note issued to it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity,

8.9    <u>Successor Administrative Agent</u>.  The Administrative Agent may resign as Administrative Agent upon ten days' notice to the Lenders and the Borrower.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall, with the consent of the Borrower (which consent shall not be unreasonably withheld and shall not be required if an Event of Default shall have occurred that is continuing) appoint a successor administrative agent, whereupon such successor Administrative Agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor Administrative Agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated,

67

without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of any amounts payable hereunder.  After any retiring or terminated Administrative Agent's resignation or termination, as the case may be, as Administrative Agent, the provisions of this Section shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

## ARTICLE 9.  MISCELLANEOUS

9.1    <u>Amendments and Waivers</u>.  Neither this Agreement, any Note or any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section.  The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent may, from time to time, (a) enter into with the Borrower written amendments, supplements or modifications hereto for the purpose of adding any provisions to this Agreement or changing in any manner the rights of the Lenders or of the Borrower hereunder, (b) enter into with the Borrower written amendments, supplements or modifications to the Note and the other Loan Documents for the purpose of adding provisions to the Notes or such other Loan Documents or changing in any manner the rights of the Lenders or the Borrower thereunder or (c) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement, the Notes or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided</u> that no such waiver and no such amendment, supplement or modification (i) shall reduce the amount or extend the scheduled date of maturity of the Note or Loan of any Lender or of any installment thereof, or reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof or increase the amount or extend the expiration date of any Lender's Commitment, in each case, without the consent of such Lender, (ii) shall amend, modify or waive any provision of this Section, <u>Section 2.12</u> in a manner that would alter the pro rata sharing payments required by <u>Section 2.12</u>, <u>Section 2.6</u> or <u>2.12</u> in a manner that would eliminate or limit a Lender's right to reject prepayments under <u>Section 2.6</u>, or vary any provision of this Agreement or any other Loan Document which specifically by its terms requires the approval or consent of all the Lenders or reduce the percentage specified in the definition of Required Lenders, or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement, the Notes and the other Loan Documents, or release any material portion of the Collateral (other than in accordance with the terms of the Loan Documents), in each case, without the written consent of all the Lenders, or (iii) shall amend, modify or waive any provision of <u>Article 8</u> or any other provision in any Loan Document governing the rights or obligations of the Administrative Agent or the Collateral Agent without the written consent of the then Administrative Agent and the Collateral Agent.  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Administrative Agent and all future holders of the Notes.  In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the outstanding Notes and any other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

68

9.2     <u>Notice</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or, in the case of notice by mail, when received, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower or the Administrative Agent, and as set forth in <u>Schedule I</u> in the case of any Lender, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the amounts payable hereunder:

Borrower:                        NorthWestern Corporation
                                 125 S. Dakota Avenue, Suite 1100
                                 Sioux Falls, South Dakota 57104
                                 Attention: William A. Austin, Chief Restructuring Officer
                                 Facsimile: (605) 978-2845

with a copy to:                  NorthWestern Corporation
                                 125 S. Dakota Avenue, Suite 1100
                                 Sioux Falls, South Dakota 57104
                                 Attention: Eric R. Jacobsen, Senior Vice President and General Counsel
                                 Facsimile: (605) 978-2963, and

                                 Paul, Hastings, Janofsky & Walker LLP
                                 600 Peachtree Street, N.E., Suite 2400
                                 Atlanta, Georgia 30308
                                 Attention: Jesse H. Austin, III, Esq.
                                 Facsimile: (404) 815-2424

Administrative Agent:            Credit Suisse First Boston
                                 Eleven Madison Avenue
                                 New York, New York 10010-3629
                                 Attention:  Agency Department Manager
                                 Facsimile: (212) 743-2155

with a copy to:                  Morrison & Foerster LLP
                                 1290 Avenue of the Americas, 41st Floor
                                 New York, New York 10104-0050
                                 Attn:  Mark B. Joachim, Esq.
                                 Facsimile: (212) 468-7900

<u>provided</u> that any notice, request or demand to or upon the Administrative Agent made under this Agreement may be made by telephone, with prompt written confirmation thereafter of such telephonic notice, and the Administrative Agent shall be entitled to rely on such telephonic

69

notice; provided, further, that any notice, request or demand to or upon the Administrative Agent and the Lenders pursuant to Section 2.3, Section 2.6, or Section 2.7, shall not be effective until received.

        9.3     No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

        9.4     Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Notes and the making of the Loans hereunder.

        9.5     Payment of Expenses and Taxes; Indemnification. The Borrower agrees (a) to pay or reimburse each of (i) the Administrative Agent, (ii) the Collateral Agent and (iii) solely with respect to the amendment and restatement effected on the Closing Date, in an aggregate amount not to exceed $25,000 for all of the Lenders, the Lenders, in each case for all its reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement, the Notes and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements of counsel to the Administrative Agent and the Collateral Agent, (b) to pay or reimburse the Administrative Agent, the Collateral Agent and each Lender for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the Notes, the other Loan Documents and any such other documents, including, without limitation, the fees and disbursements of counsel (including allocated costs of internal counsel) to the Administrative Agent, the Collateral Agent and each Lender, (c) to pay, and indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender from, any and all present or future stamp, documentary or excise taxes or similar charges, any and all recording and filing fees, and any and all liabilities with respect thereto, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or payment under, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the Notes, the other Loan Documents and any such other documents, and (d) to pay, and indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender (including each of their respective parents, subsidiaries, officers, directors, employees, agents and affiliates) from and against, any and all claims, demands, liabilities, obligations, losses, damages, penalties, actions, judgments, suits (regardless of whether such Person is a party thereto), costs, settlements, expenses or disbursements of whatever kind or nature arising from, in connection with or with respect to (i) the execution, delivery, enforcement, performance and administration of this Agreement, the Notes, the other Loan Documents, or any other documents, (ii) the proposed or actual use of the proceeds of the Loans

<div align="center">70</div>

or (iii) any other Transaction or any transaction or document related thereto or in connection therewith (all the foregoing in this clause (d), collectively, the "indemnified liabilities"); provided that the Borrower shall not have any obligation hereunder to any Lender with respect to indemnified liabilities arising from the gross negligence or willful misconduct of the Administrative Agent, the Collateral Agent or such Lender.  The agreements in this Section 9.5 shall survive repayment of the Obligations hereunder.

       9.6      Successors and Assigns; Participations and Assignments.  (a)  This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lenders, the Administrative Agent, all future holders of the amounts owing hereunder and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.

      (b)      Any Lender may, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time sell to one or more banks or other entities ("Participants") participating interests in any Loan owing to such Lender, any Note held by such Lender, any Commitment of such Lender or any other interest hereunder and under the other Loan Documents.  In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Note for all purposes under this Agreement and the other Loan Documents, the Borrower and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and other obligations owing to such Lender and to approve any amendment, modification, or waiver of any provision of this Agreement (other than amendments, modifications, or waivers (i) decreasing the amount of principal of or the rate at which interest is payable on such Loans or Notes, (ii) extending any scheduled principal payment date or date fixed for the payment of interest on such Loans or Notes, (iii) extending its Commitment, (iv) permitting any assignment or transfer of any of the Borrower's rights or obligations under this Agreement) or (v) releasing all or substantially all of the Collateral.  The Borrower agrees that if amounts outstanding under this Agreement and the Notes are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement and any Note to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement or any Note; provided that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 9.7(a) as fully as if it were a Lender hereunder.  The Borrower also agrees that each Participant shall be entitled to the benefits of Section 2.14, Section 2.15 and Section 2.16 with respect to its participation in the Commitments and the Loans outstanding from time to time as if it were a Lender; provided that, in the case of Section 2.15, such Participant shall have complied with the requirements of said Section; and provided, further, that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

71

(c)    Any Lender, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time and from time to time may, with the consent of the Administrative Agent (which consent shall not be unreasonably withheld and which consent shall not be required in the case of an assignment to an affiliate or Approved Fund of such Lender), assign to any Lender or any affiliate or Approved Fund thereof, an additional bank, financial institution, fund or commingled investment vehicle, or other Person (an "Assignee") all or any part of its rights and obligations under this Agreement and the Notes pursuant to an assignment agreement, substantially in the form of Exhibit D (or such other form approved by the Administrative Agent's in its sole discretion) (an "Assignment and Assumption Agreement"), executed by such Assignee, such assigning Lender and, in the case of an Assignee that is not then a Lender or an affiliate or Approved Fund thereof, by the Administrative Agent and delivered to the Administrative Agent for its acceptance and recording in the Register; provided that (i) any such assignment must be in a minimum amount equal to the lesser of (x) $1,000,000 and (y) the aggregate Commitments and outstanding Loans of such Lender then in effect, and (ii) after giving effect to any such assignment, such Lender shall have either (x) sold all its rights and obligations hereunder and under the Notes or (y) retained at least $1,000,000 of the aggregate Commitments and outstanding Loans.  Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Assumption Agreement, (1) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder with a Commitment and Loans as set forth therein and (2) the assigning Lender thereunder, to the extent provided in such Assignment and Assumption Agreement, shall be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption Agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such assigning Lender shall cease to be a party hereto; provided that the provisions of Section 2.14, Section 2.15, Section 2.16 and Section 9.5 shall continue to benefit such assigning Lender to the extent required by such Sections).  On or prior to the effective date determined pursuant to such Assignment and Assumption Agreement, (i) appropriate entries shall be made in the accounts of the assigning Lender and the Register evidencing such assignment and releasing the Borrower from any and all obligations to the assigning Lender in respect of the assigned Loan or Loans and (ii) appropriate entries evidencing the assigned Loan or Loans shall be made in the accounts of the Assignee and the Register as required by Section 9.6(d).  In the event that any Notes have been issued in respect of the assigned Loan or Loans, such Notes shall be marked "cancelled" and surrendered by the assigning Lender to the Administrative Agent for return to the Borrower.

(d)    The Administrative Agent shall maintain, at its address referred to in Section 9.2, a copy of each Assignment and Assumption Agreement delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time.  To the extent permitted by applicable law, the entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower and the Administrative Agent may (and, in the case of any Loan not evidenced by a Note, shall) treat each Person whose name is recorded in the Register as the owner of the Loan recorded therein as the owner thereof for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary.  Any assignment of any Loan or other obligation hereunder not evidenced by a Note shall be effective only upon appropriate entries with respect thereto being made in the Register.  The Register shall

72

be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of an Assignment and Assumption Agreement executed by the assigning Lender and an Assignee (and, in the case of an Assignee that is not then a Lender or an affiliate or Approved Fund thereof, by the Administrative Agent ) together with payment by the assigning Lender or by the Assignee to the Administrative Agent of a registration and processing fee of $3,500 (such fee only to be required for an Assignee that is not then a Lender or an affiliate or Approved Fund thereof), the Administrative Agent shall promptly accept such Assignment and Assumption Agreement and, on the effective date determined pursuant thereto, shall record the information contained therein in the Register and give notice of such acceptance and recordation to the Borrower.

(f)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (a "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any advance hereunder, (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the applicable Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 9.6(f), any SPC may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.

(g)     The Borrower authorizes the Lenders to disclose to any Participant or Assignee (each, a "Transferee") and any prospective Transferee, any and all financial information in the Lenders' possession concerning the Borrower and its respective Affiliates which has been delivered to the Administrative Agent or the Lenders by or on behalf of the Borrower pursuant to this Agreement or which has been delivered to the Administrative Agent or the Lenders by or on behalf of the Borrower in connection with the Lender's credit evaluation of

73

the Borrower and its respective Affiliates prior to becoming a party to this Agreement; <u>provided</u> that each such Transferee and prospective Transferee agrees in writing to be bound by the provisions of <u>Section 9.8</u>.

(h)     Nothing herein shall prohibit any Lender from pledging or assigning any Note to any Federal Reserve Bank in accordance with applicable law.  In order to facilitate such pledge or assignment, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note in substantially the form of <u>Exhibit A-1</u> (a "<u>Term Note</u>").

9.7    <u>Adjustments; Setoff</u>.  (a)  If any Lender (a "<u>Benefited Lender</u>") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in <u>Section 7.1(f)</u>, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; <u>provided</u> that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     Upon the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, (without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law), upon any amount becoming due and payable by the Borrower hereunder or under the Notes (whether at the stated maturity, by acceleration or otherwise), to setoff and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

9.8    <u>Confidentiality</u>.  Each Lender agrees to exercise all reasonable efforts (consistent with its customary methods for keeping information confidential) to keep any information delivered or made available by the Borrower confidential from anyone other than persons employed or retained by such Lender who are or are expected to become engaged in evaluating, approving, structuring or administering the Loans; <u>provided</u> that nothing herein shall prevent any Lender from disclosing such information (a) to any Affiliate of such Lender or to any other Lender, (b) upon the order of any court or administrative agency, (c) upon the request or demand of any regulatory agency or authority having jurisdiction over such Lender, (d) that has been publicly disclosed, (e) in connection with any litigation relating to the Loans, this

74

Agreement or any transaction contemplated hereby to which any Lender or the Administrative Agent may be a party, (f) to the extent reasonably required in connection with the exercise of any remedy hereunder, (g) to such Lender's legal counsel and independent auditors, and (h) to any actual or proposed participant or assignee of all or any part of its Loans hereunder, if such other Person, prior to such disclosure, agrees, in writing, for the benefit of the Borrower to comply with the provisions of this Section 9.8. Notwithstanding anything contained herein or in any other Loan Document to the contrary, confidential information shall not include, and each party hereto (and each employee, representative or other agent of any party hereto) may disclose to any and all Persons, without limitation of any kind, the U.S. federal income tax treatment and U.S. federal income tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are or have been provided to such party relating to such tax treatment or tax structure, and it is hereby confirmed that each party hereto has been authorized to make such disclosures since the commencement of discussions regarding the transactions contemplated hereby.

9.9     Effectiveness.  This Agreement shall become effective on the date when counterparts hereof executed on behalf of the Borrower, the Administrative Agent and each Lender shall have been received by the Administrative Agent and notice thereof shall have been given by the Administrative Agent to the Borrower.

9.10    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with each of the Borrower and the Administrative Agent.

9.11    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.12    Integration.  This Agreement and the other Loan Documents represent the agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to subject matter hereof or thereof not expressly set forth or referred to herein or in the other Loan Documents.

9.13    GOVERNING LAW.  **THIS AGREEMENT AND THE NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK.**

75

9.14    <u>Submission To Jurisdiction Waivers</u>.  The Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be, at its address set forth in <u>Section 9.2</u> or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

9.15    <u>Acknowledgments</u>.  The Borrower hereby acknowledges that:

(a)    Neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and the Lenders, on the one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of creditor and debtor; and

(b)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby between the Administrative Agent, the Lenders and the Borrower.

9.16    <u>Waivers of Jury Trial</u>.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

9.17    <u>Conflict with Orders</u>.  In the event of any conflict between the Loan Documents and the Orders, the terms of the Orders shall control (unless otherwise provided therein).

9.18    <u>Waiver of Defaults under Original Loan Agreement</u>.  The Administrative Agent and the Lenders hereby waive any Default or Event of Default arising under the Original Loan Agreement solely as a result of (a) the commencement of the Case itself, (b) the Borrower's failure to maintain the credit ratings required pursuant to <u>Section 5.14</u> of the Original Loan Agreement, and (c) the Borrower's breach of representations and warranties due to incomplete disclosure schedules delivered in connection with the closing of the Original Loan Agreement to the extent that such disclosure schedules are corrected and true and complete disclosure schedules are delivered in  connection with the closing of this Amended and Restated Credit Agreement, and, in each case, waive their respective rights and remedies under the Original Loan Agreement arising as a result thereof, including the right to payment of any default interest pursuant to <u>Section 2.9(c)</u> of the Original Loan Agreement.  The waiver effected pursuant to this <u>Section 9.18</u> is limited as specified and shall not operate as a modification, acceptance or waiver of any provision of the Original Loan Agreement, this Agreement or any other Loan Document, except as specifically set forth herein.

77

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

BORROWER:

NORTHWESTERN CORPORATION

By: _____
    Name:  William A. Austin
    Title: Chief Restructuring Officer


ADMINISTRATIVE AGENT:

CREDIT SUISSE FIRST BOSTON,
  CAYMAN ISLANDS BRANCH

By: _____
    Name: _____
    Title: _____


LENDERS:

A3 FUNDING LP
By: A3 Fund Management LLC, its General
Partner

By: _____
    Name: _____
    Title: _____

[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

ABLECO FINANCE LLC

By: _____
    Name: _____
    Title: _____


AG CAPITAL FUNDING PARTNERS, L.P.

By: _____
    Name: _____
    Title: _____


AMERICAN EXPRESS CERTIFICATE COMPANY

By: _____
    Name: _____
    Title: _____


ANCHORAGE CAPITAL PARTNERS, L.P.

By:  Anchorage Capital Group, L.L.C., its
General Partner

By: _____
    Name: _____
    Title: _____


BEAL BANK, S.S.B.

By: _____
    Name: _____
    Title: _____


[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

BEAR STEARNS INVESTMENT
PRODUCTS

By: _____
    Name: _____
    Title: _____


BLACK DIAMOND 1998-1, LTD

By: _____
    Name: _____
    Title: _____


BLACK DIAMOND CLO 2000-1, LTD

By: _____
    Name: _____
    Title: _____


BLACK DIAMOND INTERNATIONAL
FUNDING, LTD

By: _____
    Name: _____
    Title: _____


BROOKVILLE CAPITAL MASTER
FUND LP

By: _____
    Name: _____
    Title: _____


CASPIAN CAPITAL

By: _____
    Name: _____
    Title: _____


[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

COLUMBIA FLOATING RATE
ADVANTAGE FUND
By: Columbia Management Advisors, Inc.,
as Advisor

By: _____
    Name: _____
    Title: _____


COLUMBIA FLOATING RATE LIMITED
LIABILITY COMPANY
By: Columbia Management Advisors, Inc.,
as Advisor

By: _____
    Name: _____
    Title: _____


DBNO CAYMAN L.P.
By: DBN GP Ltd., its General Partner

By: _____
    Name: _____
    Title: _____


ELF FUNDING TRUST I
By: Highland Capital Management, L.P.
As Collateral Manager

By: _____
    Name: _____
    Title: _____


EVENT PARTNERS DEBT
ACQUISITION, L.L.C.

By: _____
    Name: _____
    Title: _____


[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

FIDELITY ADVISORS SERIES II:
FIDELITY ADVISOR FLOATING RATE
HIGH INCOME FUND

By: _____
    Name: _____
    Title: _____


FIRST DOMINION FUNDING I

By: _____
    Name: _____
    Title: _____


FOOTHILL INCOME TRUST, L.P.

By: _____
    Name: _____
    Title: _____


GOLDMAN SACHS CREDIT PARTNERS
LP

By: _____
    Name: _____
    Title: _____


GREENWICH INTERNATIONAL, LTD

By: _____
    Name: _____
    Title: _____


HIGHLAND LEGACY LIMITED
By:  Highland Capital Management, L.P.
As Collateral Manager

By: _____
    Name: _____
    Title: _____


[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

IDS LIFE INSURANCE COMPANY

By: _____
    Name: _____
    Title: _____


KZH CYPRESSTREE-1 LLC

By: _____
    Name: _____
    Title: _____


KZH ING-2 LLC

By: _____
    Name: _____
    Title: _____


KZH STERLING LLC

By: _____
    Name: _____
    Title: _____


LONG LANE MASTER TRUST IV
By:  Fleet National Bank as Trust
Administrator

By: _____
    Name: _____
    Title: _____

[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

MARINER LDC

By: _____
    Name: _____
    Title: _____


MARINER OPPORTUNITIES FUND, L.P.

By: _____
    Name: _____
    Title: _____


MORGAN STANLEY SENIOR FUNDING INC.

By: _____
    Name: _____
    Title: _____


PERRY PRINCIPALS LLC

By: _____
    Name: _____
    Title: _____


REDWOOD MASTER FUND, LTD.

By: _____
    Name: _____
    Title: _____


RESTORATION FUNDING CLO, LTD.
By: Highland Capital Management, L.P.
As Collateral Manager

By: _____
    Name: _____
    Title: _____


[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

SEMINOLE FUNDING LLC

By: _____
    Name: _____
    Title: _____


SPIRET IV LOAN TRUST 2003-A
By:  Wilmington Trust Company, not in its
individual capacity but solely as trustee

By: _____
    Name: _____
    Title: _____


SRF 2000, INC.

By: _____
    Name: _____
    Title: _____


SUNAMERICA LIFE INSURANCE
COMPANY
By:  AIG Global Investment Corp., its
Investment Adviser

By: _____
    Name: _____
    Title: _____


TACONIC CAPITAL PARTNERS L.P.

By: _____
    Name: _____
    Title: _____


[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

**TRS THEBE LLC**

By: _____
    Name: _____
    Title: _____


**TRS1 LLC**

By: _____
    Name: _____
    Title: _____


[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT]

**DISCLOSURE SCHEDULES**
**TO**
**AMENDED AND RESTATED CREDIT AGREEMENT**

These Disclosure Schedules have been prepared for the closing of the NorthWestern Corporation Amended and Restated Credit Agreement.

**Schedule P to Amended and Restated Credit Agreement**
**Permitted Pre-Petition Payments**

**1.    Secured Debt:**

Regularly scheduled payments when due in respect of the secured debt of the Borrower identified in the table below:

**A. Montana Mortgage Bonds**
*The Borrower owns utility assets in the State of Montana which are subject to a (First) Mortgage and Deed of Trust originally executed by Montana Power in 1945 and supplemented from time to time to reflect the various bond issuances made pursuant thereto. The following series remain outstanding listed in order of maturity:*

| Description | | Amount Outstanding |
|---|---|---|
| 7% Series Due 2005 | $ | 5.4 million |
| 7.30% Series Due 2006 | $ | 150 million |
| Credit Agreement (2002) Series Due 2006 (Security for CSFB Facility) | $ | 277.9 million |
| 8.25% Series Due 2007 | $ | 0.4 million |
| 7.25% Secured Medium Term Notes Due 2008 | $ | 13 million |
| 8.95% Series Due 2022 | $ | 1.5 million |
| *TOTAL* | *$* | *448.2 million* |

**B. South Dakota Mortgage Bonds**
*The Borrower owns utility assets in the State of South Dakota which are subject to a General Mortgage Indenture and Deed of Trust originally executed by the Borrower in 1993 and supplemented from time to time to reflect the various bond issuances made pursuant thereto. The following series remain outstanding listed in order of maturity:*

| Description | | Amount Outstanding |
|---|---|---|
| 7.10% Series Due 2005 | $ | 60 million |
| Credit Agreement (2002) Series Due 2006 (Security for CFSB Facility) | $ | 109.2 million |
| 7.00% Series Due 2023 | $ | 55 million |
| *TOTAL* | *$* | *224.2 million* |

**C. CSFB Facility**
*On December 17, 2002, the Borrower entered into a $390 million secured term loan credit facility with a syndicate of banks led by Credit Suisse First Boston. $280 million of this facility is secured by mortgage bonds issued under the Montana Mortgage Indenture described above and $110 million is secured by mortgage bonds under the South Dakota Mortgage Indenture described above.*

**D. Pollution Control Revenue Bonds**
*The Borrower assumed certain obligations of Montana Power regarding pollution control revenue bonds. The pollution control bonds are issued by various counties and municipalities, although they are secured by isolated electric generating facilities owned by the Borrower, subject to the rights of the outstanding bondholders under the Montana Mortgage Indenture and the South Dakota Mortgage Indenture. The following pollution control bonds remain outstanding:*

| Description | | Amount Outstanding |
|---|---|---|
| Grant County, South Dakota Series 1993A Revenue Bonds Due 2023 | $ | 6.4 million |
| Grant County, South Dakota Series 1993B Revenue Bonds Due 2023 | $ | 3.4 million |
| City of Salix, Iowa Series 1993 Revenue Bonds Due 2023, | $ | 4.0 million |
| Mercer County, Nebraska Series 1993 Revenue Bonds Due 2023 | $ | 7.6 million |
| City of Forsyth, Montana Series 1993A Revenue Bonds Due 2023 | $ | 90.2 million |
| City of Forsyth, Montana Series 1993B Revenue Bonds Due 2023 | $ | 80 million |
| *TOTAL* | *$* | *191.6 million* |

**E. Gas Transition Bonds**
*The Borrower assumed certain obligations of Montana Power, as grantor and servicer of the MPC Natural Gas Funding Trust, issuer of the $46.5 million of the 6.2% Transition Bonds Due 2012 which are secured by a pledge of certain utility related revenues (the Gas Transition Bonds utilized a trust structure in connection with a conveyance of certain revenue rights, but if not deemed a true sale would be treated as a secured transaction).*

*TOTAL SECURED:        $910.5 million*

**2.        Payments Approved by Bankruptcy Court:**

Payments approved by the Bankruptcy Court as of September 15, 2003 in the following orders, except as otherwise limited by this Agreement:  (a) Order Authorizing Payment of Certain Pre-Petition Payroll and Related Employee Obligations, dated September 15, 2003; (b) Order Authorizing Debtor to Continue Insurance and Insurance Financing Program and Granting Related Relief, dated September 15, 2003; (c) Final Order Authorizing the Debtor to (i) Comply with Terms of Pre-Petition Trading Contracts, (ii) Enter into Post-Petition Trading Contracts in the Ordinary Course of Business, and (iii) Setting a Final Hearing to Consider the Entry of a Final Order Affirming Interim Order and Authorizing Assumption of Pre-Petition Trading Contracts, dated September 15, 2003; (d) Final Order Authorizing the Debtors to Obtain Post-Petition Credit Card Financing and Scheduling a Final Hearing, dated September 15, 2003; and (e) Interim Order Authorizing Debtor to Continue and Maintain Its (i) Consolidated Cash Management System, (ii) Existing Bank Accounts, (iii) Existing Business Forms, (iv) Public Purpose Programs, and (v) to Pay on an Interim Basis Certain Limited Intercompany Obligations; and Granting Related Relief and Scheduling a Final Hearing, dated September 15, 2003.

Additional payments approved by the Bankruptcy Court in orders entered subsequent to September 15, 2003 following appropriate notice and hearing.

**Schedule 3.4a to Amended and Restated Credit Agreement**
**First Mortgage Approvals**

1.       The Borrower is subject to Section 204 of the Federal Power Act.  The Borrower applied to the Federal Energy Regulatory Commission ("FERC") for authority to issue securities of the Borrower pursuant to its Application for Authorization of the Issuance of Securities and Authorization for Exemption from Competitive Bidding and Negotiated Offer Requirements and Expedited Treatment dated October 31, 2001, Docket No. ES02-6, as supplemented by the Borrower on November 15, 2001, and pursuant to its Application for Authorization of the Issuance of Securities and Authorization for Exemption from Competitive Bidding and Negotiated Offer Requirements dated April 3, 2001, Docket No. ES01-28.  The Borrower obtained authorization from the FERC pursuant to Section 204 with respect to the First Mortgage Bonds consistent with the foregoing applications pursuant to the FERC's letter order dated November 30, 2001, Docket No. ES02-6 (NorthWestern Corporation, 97 FERC ¶ 62,187 (2001)), authorizing the issuance of debt by the Borrower in an amount not to exceed $1,100,000,000, and pursuant to the FERC's letter order dated May 7, 2001, Docket No. ES01-28 (NorthWestern Corporation, 95 FERC ¶ 62,089 (2001)), authorizing the issuance of debt by the Borrower in an amount not to exceed $300,000,000.

2.       The Montana Public Service Commission ("MPSC") takes the position that its approval is required in connection with the issuance of debt by entities subject to the regulation and oversight of the MPSC.  The Borrower is subject to the regulation and oversight of the MPSC in connection with its conduct of the utility business formerly owned by The Clark Fork and Blackfoot, L.L.C. (f/k/a NorthWestern Energy, L.L.C.) ("CFB"), including, without limitation, with respect to the issuance of debt securities specifically relating to such business.

**Schedule 3.4b to Amended and Restated Credit Agreement**
**Required Consents of Governmental Authorities**

See item 1 of Schedule 3.4a

**Schedule 3.8 to Amended and Restated Credit Agreement**
**Exceptions to Title to Borrower's Properties**

None.

**Schedule 3.12 to Amended and Restated Credit Agreement**
**Taxes**

None.

**<u>Schedule 3.14 to Amended and Restated Credit Agreement</u>**
**<u>ERISA</u>**

1. Welfare Plans providing benefits to former employees, including retirees (see item #2 below for Unfunded Liabilities):

| | |
|---|---|
| (a) | Northwestern Energy Active Employee Medical Plan |
| (b) | Northwestern Energy Active Employee Life Insurance Plan |
| (c) | Northwestern Energy Medicare Supplemental Benefit Plan |
| (d) | Northwestern Corp. Basic Life Insurance Plan (frozen – no additional participants) |
| (e) | Northwestern Corp. Family Protector Plan (frozen – no additional participants) |
| (f) | Northwestern Corp. Retiree Medical Plan (benefit offered to retirees and retirees pay all costs) |
| (g) | Northwestern Energy Long-term Disability Plan |
| (h) | Northwestern Corp. Long-term Disability Plan |

2. The Unfunded Liabilities of all Single Employer Plans do not in the aggregate exceed $142,000,000 (based on financial statements as of January 1, 2003, which have not to Borrower's knowledge materially increased in 2003).

3. The Unfunded Liabilities referenced in item #2 above include the following Unfunded Liabilities associated with Single Employer Plans subject to Title IV of ERISA or to Section 412 of the Code:

(a) $97,000,000 under the Northwestern Energy Employee Retirement Plan
(b) $ 5,000,000 under the Northwestern Corp. Pension Plan

**Schedule 3.15 to Amended and Restated Credit Agreement**
**Regulations Limiting Indebtedness**

1.      The Borrower is subject to Section 204 of the Federal Power Act.  The Borrower has obtained authorization from the FERC pursuant to Section 204 with respect to the Credit Agreement to which this Schedule relates, and the Borrower's issuance of the Notes and incurrence of debt thereunder as more fully described in Item 1 on Schedule 3.4a.

2.      See Item 2 of Schedule 3.4a.

3.      The Borrower has filed with the SEC an application on Form U-1, seeking an exemption under Section 3(a)(3) of PUHCA, which was effective upon a good faith filing.

**Schedule 3.17 to Amended and Restated Credit Agreement**
**Environmental Matters**

1.      During informal conversations in the summer of 2003 on other matters, the Montana Attorney General indicated that the State of Montana reserved any right that it might have to file a natural resource damages claim based on the existence of contaminated sediment located behind the Thompson Falls Dam, which area is habitat for the Bull Trout, and that it was taking the matter under consideration.

2.      In light of the United States Environmental Protection Agency's proposal to require dam and sediment removal in its final remedy for the Milltown Reservoir, and in consideration of other circumstances, the Borrower and Atlantic Richfield Company ("ARCO") have entered into a settlement that would assure ARCO access for removal of sediments, and limit The Clark Fork and Blackfoot, L.L.C.'s ("CFB") and the Borrower's liability for costs of dam removal, sediment removal, natural resource damage claims, and upland disposal area remediation efforts to no more than $10MM.  CFB remains the licensee and operator of the dam, responsible for compliance with the FERC requirements.

**Schedule 3.25 to Amended and Restated Credit Agreement**
**Subsidiaries**

A.  **Organizational Chart**



**B. Capital Stock**

| Company | Class of Stock | Total Authorized | Total Issued and Outstanding |
|---|---|---|---|
| NorthWestern Corporation | Common | 50,000,000 | 37,680,095 |
| | Cum. Preferred Stock | 1,000,000 | 0 |
| | Preference Stock | 1,000,000 | 0 |
| NorthWestern Capital Corporation | NW Capital Group Stock | 1,000,000 | 500,000 |
| | Blue Dot Group Stock | 500,000 | 250,000 |
| | Expanets Group Stock | 500,000 | 250,000 |
| | New Strategies Group Stock | 2,000,000 | 20,000 |
| NorCom Advanced Technologies, Inc. | Common | 1,000 | 1,000 |
| NorthWestern Growth Corporation | Common | 1,000 | 1,000 |
| NorthWestern Services Corporation | Common | 1,000 | 1,000 |
| Nekota Resources, Inc. | Common | 1,000 | 1,000 |
| NorthWestern Energy Development, LLC | Membership Interests | N/A | N/A |
| NorthWestern Energy Marketing, LLC | Membership Interests | N/A | N/A |
| NorthWestern Generation I, LLC | Membership Interests | N/A | N/A |
| Montana Megawatts I, LLC | Membership Interests | N/A | N/A |

**Schedule 6.3 to Amended and Restated Credit Agreement**
**Transactions with Affiliates**

Intercompany Support Obligations

**Montana Megawatts I, LLC**

The Borrower currently provides suspended construction support for the Montana First Megawatts power plant project (the "Project"), including security, caretaker, warehousing and other costs in order to protect and preserve the equipment and related warranties until the project can be sold. The annual funding requirement is approximately $860,000, or $72,000 per month, which is paid directly to the Project vendors by the Borrower.

**NorthWestern Services Corporation**

The Borrower currently makes monthly support payments on an interim and emergency basis to its wholly-owned, non-debtor subsidiary, NorthWestern Services Corporation ("NSC") pursuant to written agreements between the Borrower and the predecessor-in- interest to NSC (the "NSC Support Agreements").(1) Pursuant to each of these agreements, the Borrower advances funds to NSC for the bulk purchases of gas. Upon NSC's sale of the gas, the Borrower is reimbursed for funds advanced under the NSC Support Agreements. In the preceding twelve months, the Borrower has been fully reimbursed for all funds advanced to NSC under the Support Agreements and received revenues of approximately $50,000.

**Canadian-Montana Pipeline Corporation**

The Borrower funds an account with Royal Bank General held by the Canadian-Montana Pipeline Corporation ("CMP"), a non-debtor affiliate of the Borrower, used for disbursing Canadian dollar payments on behalf of CMP, primarily for property and income tax payments. Over the past 12 months, the Borrower has not transferred any funds into the CMP account.

**Clark Fork and Blackfoot, LLC**

The Borrower is party to the Environmental Liabilities Support Agreement (the "Environmental Agreement") and the Maintenance and Operating Costs Support Agreement (the "Maintenance Agreement") with Clark Fork & Blackfoot ("CFB"), which require the Borrower to pay any costs and expenses that arise in connection with the operation and maintenance of the Milltown Dam. Under the terms of the Environmental Agreement, the Borrower is obligated to make funds available to CFB in the event that it runs short of cash and other liquid assets it needs in order to meet any obligation to make payments in respect of environmental liabilities. To date, the Borrower has not been required to pay any funds to CFB under the terms of the Environmental Agreement. Under the terms of the Maintenance Agreement, the Borrower is required to make funds available to CFB in the event that it is

---

(1) The three agreements are the Management Services Agreement dated November 29, 1999, the Gas Supply Sales and City-Gate Management Services Agreement dated July 24, 1997, and the Aberdeen City-Gate Transportation Services Agreement dated November 29, 1999.

unable to pay its trade accounts arising out of its ordinary course of business, or to pay any other costs and expenses (other than environmental liabilities covered by the Environmental Agreement) that arise in connection with the operation or maintenance of the Milltown Dam.  Since January 1, 2003, the Borrower has paid approximately $270,000 per month to fulfill its obligations under the terms of the Maintenance Agreement.  The Borrower reasonably anticipates that under the terms of this agreement it will be required to pay the sum of approximately $370,000 per month through December 31, 2003.

**Schedule 6.4 to Amended and Restated Credit Agreement**
**Liens Securing Indebtedness for Borrowed Money**

The following sets forth Liens which are in existence on the date hereof and does not purport to reflect all UCC financing statements that may be on file in any jurisdiction with respect to the Borrower and its Subsidiaries.

| DEBTOR | SECURED PARTY | DESCRIPTION OF COLLATERAL |
|---|---|---|
| **NorthWestern Corporation** | Bankers Trust Company (now known as Deutsche Bank Trust Company) | Debtor's right, title and interest in and to (a) an undivided 32.14285% interest in (i) the Existing Contracts, (ii) all Accounts and General Intangibles, all moneys due under any Existing Contract, any damages arising out of any such Existing Contract or Account, the right of Debtor to terminate any Existing Contract; (b) an undivided 64.2857% interest in (i) the Power Sales Agreements and (ii) all Accounts and General Intangibles relating to the Power Sales Agreements and with respect to the Power Sales Agreements, all moneys due, any damages arising out of any contract or Account, the right of Debtor to terminate the contracts, as more specifically disclosed in Part 2 of Schedule 1 attached to Delaware UCC file number 22923088, as filed on November 20, 2002 in connection with the transaction evidenced by the documents described in Item F.1. of Schedule 6.10. |
| | Bankers Trust Company (now known as Deutsche Bank Trust Company | Debtor's right, title and interest in and to (a) and undivided 17.85715% interest in (i) the Existing Contracts, (ii) all Accounts and General Intangibles, all moneys due under any Existing Contract, any damages arising out of any such Existing Contract or Account, the right of Debtor to terminate any Existing Contract; (b) an undivided 35.7413% interest in (i) the Power Sales Agreements and (ii) all Accounts and General Intangibles relating to the Power Sales Agreements and with respect to the Power Sales Agreements, all moneys due, any damages arising out of any contract or Account, the right of Debtor to terminate the contracts, as more specifically disclosed in Part 2 of Schedule 1 attached to Delaware UCC file number 22923237, as filed on November 20, 2002 in connection with the transaction evidenced by the documents described in Item F.1. of Schedule 6.10. |
| | The Bank of New York, as Trustee under the Mortgage | All collateral described in the First Mortgage and Deed of Trust, dated as of October 1, 1945 as more specifically identified in Item A.2. of Schedule 6.10 and as more specifically disclosed in Part 2 of Schedule 1 attached to Delaware UCC file number 22923286, as filed on November 20, 2002. |
| | General Electric Capital Corporation | One 1990 Cessna Citation V aircraft Model 560 (Serial No. 560-0068), along with Pratt & Whitney Engines Model JT15D-5A (Serial Nos. PCE-108140 and PCE-108139), all present and future proceeds, profits, attachments, accessories, parts, and equipment thereto as further described on the schedule attached thereto and to be hangared at Huron Regional Airport, Hangar #3. |
| | JPMorgan Chase Bank, as Trustee | All collateral described in the General Mortgage, Indenture and Deed of Trust, dated as of August 1, 1993 as more specifically identified in Item A.1. of Schedule 6.10 and as more specifically disclosed in Exhibit A attached to Delaware UCC file number 30353915, as filed on February 10, 2003. |

| DEBTOR | SECURED PARTY | DESCRIPTION OF COLLATERAL |
|---|---|---|
| | Credit Suisse First Boston, Cayman Islands Branch, as Collateral Agent | All of Borrower's right, title and interest in, to and under the following: (i) the $278,600,000 aggregate principal amount of Borrower's First Mortgage Bonds, Credit Agreement (2002) Series, due 2006, authenticated and delivered under the Mortgage and Deed of Trust dated as of October 1, 1945 (ii) the $109,500,000 aggregate principal amount of the Borrower's New Mortgage Bonds, Credit Agreement (2002) Series, due 2006, authenticated and delivered under the General Mortgage Indenture and Deed of Trust, dated August 1, 1993, and (iii) all proceeds of the foregoing and as more specifically disclosed in Delaware UCC file number 30368301, as filed on February 11, 2003. |
| | Wells Fargo Bank Minnesota, N.A., as Trustee | All of Borrower's interest (amounting to an undivided 23.4% share) in the cooling pond, precipitator and monitoring, fly ash collection, bottom ash disposal, dust collection, active coal storage building, additional chimney height, weather station, sewage treatment plant, fuel storage dike in Grant County, SD as more specifically described in Schedule A to Delaware UCC file number 31989261, as filed on July 11, 2003. |
| | Wells Fargo Bank Minnesota, N.A., as Trustee | All of Borrower's right, title and interest (amounting to an undivided 23.4% share) in the Waste Water Management System located in Grant County, South Dakota, together with all rights thereto as more specifically described in Schedule A, Exhibit A, and Exhibit 2 to Delaware UCC file number 31989279, as filed on July 11, 2003. |
| | Wells Fargo Bank Minnesota, N.A., as Trustee | All of Borrower's right, title and interest in and to electrostatic precipitator, wastewater management system, air quality monitoring system, coal dust collection system, bottom ash disposal system and additional stack height in connection with Unit No. 4 of the George Neal Generating Station as more specifically described in Schedule A, to Delaware UCC file number 31989287, as filed July 11, 2003. |
| | Wells Fargo Bank Minnesota, National Association, as Trustee | All of Borrower's right, title and interest (amounting to an undivided 10% share) to a Flue-Gas System, a Coal Dust Collection System, Sanitary Sewage Treatment Facilities and Waste Water Treatment Facilities in Mercer County, ND as more specifically described in Exhibit 1 and Exhibit 2, to Delaware UCC file number 31989600, as filed July 11, 2003. |
| | The Bank of Commerce and Trust Company | Equipment (where permitted by the Areawide Contract Delivery Order No. 43-03R6-8-0071 by USDA Forest Service, Lolo National Forest related to the Areawide Public Utility Contract No. GS-00P-96BSD-0012 between the US and Montana Power Company) and payments associated with Energy Management Services ordered by USDA Forest Service, Lolo National Forest along with all present and future attachments and accessories thereto and replacements and proceeds thereof, including, but not limited to, amounts payable in event of termination or under any insurance policies. |
| | Wells Fargo Bank | Cash collateral held in stand-by Letter of Credit Collateral Accounts 2391749021 and 4945060515 securing the Borrower's obligations in respect of the Letters of Credit issued for its account and described in Item F of Schedule 6.10. |

| DEBTOR | SECURED PARTY | DESCRIPTION OF COLLATERAL |
|---|---|---|
| **Nekota Resources, Inc.** | Northern Border Pipeline Company | All collateral described in the Mortgage-Collateral Real Estate Mortgage, dated as of July 21, 2003 between the Borrower and Northern Border Pipeline Company as more specifically disclosed the document attached to South Dakota UCC file number 032131001168, as filed on August 1, 2003. |
| **NorthWestern Growth Corporation** | UBS | Cash collateral held in UBS Account CP-29119-16 securing NorthWestern Growth Corporation's obligations in respect of the Letters of Credit issued for its account and described in Item F of Schedule 6.10. |

**Schedule 6.6 to Amended and Restated Credit Agreement**
**Guarantee Obligations**

See Section D of Schedule 6.10

**Schedule 6.7 to Amended and Restated Credit Agreement**
**Sale of Assets**

1.       Expanets and its Subsidiaries, Blue Dot and its Subsidiaries, and the stock or assets of other Excluded Subsidiaries.

2.       The real estate listed below

### EXCESS PROPERTIES -TO BE RELEASED FROM LIEN OF MORTGAGE INDENTURES

| Property Name | County | Purchaser |
|---|---|---|
| **MONTANA** | | |
| Townsend Shop/Office | Broadwater | Robert C & Gaylene Curtis |
| Red Lodge Northside Substation | Carbon | City of Red Lodge |
| Land in Cascade County | Cascade | King Properties |
| McGregor Meadows | Flathead | Clark D. & Sharon M. Bronson |
| Kalispell Service Center | Flathead | Montana Department of Transportation (MDOT) |
| Bozeman Durston Substation Site | Gailatin | Douglas Lance Smith |
| Jack Rabbit Substation MDOT Highway Proj | Gailatin | Montana Department of Transportation (MDOT) |
| Bozeman Northside Substation land | Gailatin | Tengelsen Family Limited Partnership |
| Marysville Substation | Lewis and Clark | Nick A. & Darcy A. Pipinich |
| Helena Service Center Land | Lewis and Clark | Montana Department of Transportation (MDOT) |
| Alberton Gorge | Mineral | Currently None |
| Grant Creek Substation | Missoula | Dennis R. Washington |
| Missoula Service Center excess parcel | Missoula | Currently None |
| Livingston Indoor Substation excess parcel | Park | Fred J & F Thomas Shellenberg |
| Thompson Falls House and Land | Sanders | Elvin Fitzhugh |
| Buffalo Rapids lands | Sanders | Confederated, Salish & Kootenai Tribes(CSKT) |
| Columbus substation site | Stillwater | Lance Hogan |
| Glasgow pole yard | Valley | John Arneson, d/b/a Plains Construction |
| Billings Service Center excess parcel | Yellowstone | Darrell Kreitzberg |
| **Montana Subtotal** | | |

| Property Name | County | Purchaser |
|---|---|---|
| **SOUTH DAKOTA** | | |
| Former Corporate Office, Hurce | Beadle | Currently None |
| Excess Property Adjacent to Frank Avenue SubStation | Beadle | Matt and Lori Rathjen |
| Former Pole Storage Yard | Beadle | State of South Dakota (South Dakota State Fair) |
| Excess Property Adjacent to Kansas Avenue SubStation | Beadle | Currently None |
| Former Propane Air Plant Property | Brookings | Currently None |
| Former Armour Substation Property | Charles Mix | Currently None |
| Former Webster Office | Day | City of Webster |
| South Dakota Subtotal | | |
| | | |
| **NEBRASKA** | | |
| Former Propane Air Plant Property | Buffalo | Currently None |
| **Nebraska Subtotal** | | |
| | | |
| **Total of All Three States** | | |

**Schedule 6.8 to Amended and Restated Credit Agreement**
**Investments**

| Investment | | Book Value as of August 31, 2003 |
|---|---|---|
| **NorthWestern Corporation** | | |
| An Assignment and Assumption Agreement, dated as of August 20, 2002 among Credit Suisse First Boston, CIBC, Inc. and Barclays Bank PLC as assignors (collectively, the "Assignors") and Borrower as assignee, pursuant to which the Borrower purchased the Assignors' interest in their Credit Agreement, dated as of November 30, 2001 among Cornerstone Propane, L.P. and the Assignors(1) | $ | 20,072,518 |
| Note Receivable ($300,000 face amount) from Prairie Fire Internet Technologies, L.L.C. (originally issued to NorthWestern Services Group, Inc. which was consolidated into NorthWestern Corporation in September 2003) | $ | 0 |
| Promissory Note due December 1, 2005 from South Dakota Rural Enterprises, Inc. | $ | 100,000 |
| **North Western Growth Corporation** | | |
| Sioux Empire Housing Equity Fund & Dakota Equities L.P. (low income housing investment) | $ | 1,535,243 |
| Blue Stream Series B Preferred Stock (1.79% of stock) | $ | 0 |

(1) Gross value of $26,197,508, offset by $1,024,990 in cash proceeds received, and a $5,100,000 reserve taken in the fourth quarter of 2002 based on estimated recoverable value.

| OTHER SECURITIES | # OF SHARES | COST | VALUE |
|---|---|---|---|
| **As of 9/14/03:** | | | |
| | | | |
| **UBS Account No. CP 29119 16 (NorthWestern Growth Corporation)** | | | |
| Duke Power Co 6.75% Preferred Series X............................................... | 119 | 12,452 | 12,346 |
| Duke Power 7.04 Preferred Series Y....................................................... | 260 | 27,303 | 26,910 |
| | | | |
| *Other investment – Life Insurance* | | | |
| *CSV-Life Insurance-BenRest Plan*......................................................... | | | *3,582,774* |
| *CSV-Life Insurance-FPP/SISP*.............................................................. | | | *1,769,725* |
| | | | |
| **Other investments (NorthWestern Corporation)**...................................... | | | |
| Restricted investments in Gas Funding Trust............................................ | | | 3,847,939 |
| | | | |
| **Other Investments NPS Account No. 189000 (NorthWestern Corporation)** | | | |
| Freeman Hospitality Inc. ........................................................................ | | | 20,000 |
| Kearney Industrial Park Bonds................................................................ | | | 4,000 |
| Riverside Golf Club – Grand Island......................................................... | | | 1,000 |

**Schedule 6.10 to Amended and Restated Credit Agreement
Indebtedness, Mandatory Redeemable Stock and Preferred Stock**

Following is a description of the Indebtedness owing by NorthWestern Corporation setting forth the outstanding principal amount of such Indebtedness as of the date hereof (other than in Section D (Guaranteed Indebtedness) and in Section F (Operating and Capitalized Leases)):

### A.    SECURED SENIOR DEBT

1.  General Mortgage Indenture and Deed of Trust dated August 1, 1993 between The Chase Manhattan Bank (National Association), as Trustee and NorthWestern Public Service Company (now known as the Borrower), as Issuer, as amended, pursuant to which the following have been issued:

    (a)    $60.0 Million of 7.10% New Mortgage Bonds of the Borrower due 2005;

    (b)    $55.0 Million of 7.00% Mortgage Bonds of the Borrower due 2023; and

    (c)    $109.2 Million of New Mortgage Bonds, Credit Agreement (2002) Series, due 2006.

2.  First Mortgage and Deed of Trust, dated as of October 1, 1945, by and between The Montana Power Company (predecessor to Clark Fork and Blackfoot, L.L.C. (formerly known as NorthWestern Energy, L.L.C. and formerly known as The Montana Power Company, L.L.C.)), as Issuer, and Guaranty Trust Company of NY and Arthur E. Burke, as trustees, as amended, with respect to the following First Mortgage Bonds originally issued by The Montana Power Company pursuant to which the following have been issued:

    (a)    $0.4 million of 8.25% First Mortgage Bonds of The Montana Power Company due 2007;

    (b)    $1.5 million of 8.95% First Mortgage Bonds of The Montana Power Company due 2022;

    (c)    $13.0 million of 7.25% Secured Medium Term Notes of The Montana Power Company due 2008;

    (d)    $5.4 million of 7.00% First Mortgage Bonds of The Montana Power Company due 2005;

    (e)    $90.2 million of 6.125% First Mortgage Bonds of The Montana Power Company due 2023 were issued to secure the obligations of The Montana Power Company under a Loan Agreement, dated as of May 1, 1993, between The Montana Power Company and the City of Forsyth, pursuant to which the City of Forsyth loaned

an aggregate amount of $90,205,000 to The Montana Power Company, received from the proceeds of the City of Forsyth Pollution Control Revenue Bonds Series 1993A, 6.125% series, due 2023;

(f)    $80.0 million of 5.90% First Mortgage Bonds of The Montana Power Company due 2023 were issued to secure the obligations of The Montana Power Company under a Loan Agreement, dated as of December 1, 1993, between The Montana Power Company and the City of Forsyth, pursuant to which the City of Forsyth loaned an aggregate amount of $80.0 million to The Montana Power Company, received from the proceeds of the City of Forsyth Pollution Control Revenue Bonds Series 1993B, 5.90% series, due 2023;

(g)    $150.0 million of 7.30% First Mortgage Bonds of The Montana Power Company due 2006; and

(h)    $277.9 million of New Mortgage Bonds, Credit Agreement (2002) Series, due 2006.

3.    Loan Agreement, dated as of June 1, 1993, by and between Grant County and the Borrower, pursuant to which Grant County loaned an aggregate amount of $6.4 million to the Borrower, received from the proceeds of the 5.90% Grant County Series 1993A Pollution Control Revenue Bonds, due 2023.

4.    Loan Agreement, dated as of June 1, 1993, by and between Grant County and the Borrower, pursuant to which Grant County loaned an aggregate amount of $3.4 million to the Borrower, received from the proceeds of the 5.90% Grant County Series 1993B Pollution Control Revenue Bonds, due 2023.

5.    Loan Agreement, dated as of June 1, 1993, by and between the City of Salix and the Borrower, pursuant to which the City of Salix loaned an aggregate amount of $4.0 million to the Borrower, received from the proceeds of the 5.90% City of Salix Series 1993 Pollution Control Revenue Bonds, due 2023.

6.    Sale Agreement, dated as of June 1, 1993, by and between Mercer County and the Borrower, pursuant to which Mercer County loaned an aggregate amount of $7,600,000 to the Borrower, received from the proceeds of the 5.85% Mercer County Series 1993 Pollution Control Revenue Bonds, due 2023.

7.    Assumption of certain obligations of Montana Power, as grantor and servicer of MPC Natural Gas Funding Trust, issuer of $46.5 million of 6.2% Transition Bonds Due 2012 which are secured by a pledge of certain utility related revenues.

8.    NorthWestern Growth Corporation – Sioux Empire Housing Equity Fund Limited Partnership and/or Dakota Equities Limited – housing loans of $1.1 million due 2007, secured by a security interest in the limited partner interest.

9.     Assumption of Federal Lease Finance Agreement between Montana Power Company and Municipal Leasing Credit Corporation dated as of July 6, 1999 pursuant to which Montana Power Company granted a first security interest in energy conservation measures ordered by the USDA Forest Services, Lolo National Forest as permitted by the Areawide Public Utility Contract No. GS-00P-96-BSD-0012, Delivery Order No. 43-03R6-8-0071 (the "Equipment"), all Equipment proceeds, Lease Payments, and/or Buy-out Amounts (currently $50,723.45).

## B.    UNSECURED SENIOR DEBT

1.    Indenture, dated as of November 1, 1998, between the Borrower, as Issuer, and The Chase Manhattan Bank, as Trustee, as amended, pursuant to which the following have been issued:

    (a)    $105.0 million of 6.95% unsecured Senior Debentures of the Borrower due 2028;

    (b)    $250.0 million of 7.875% unsecured registered Senior Notes of the Borrower due 2007; and

    (c)    $470.0 million of 8.75% unsecured registered Senior Notes of the Borrower due 2012.

2.    Indenture, dated December 1, 1989, between The Montana Power Company, as Issuer, and Citibank, N.A., as Trustee, relating to the following issuances of The Montana Power Company's Unsecured Medium Term Notes:

    (a)    7.875% series, due 2026 ($20.0 million);

    (b)    7.07% series, due 2006 ($15.0 million); and

    (c)    7.96% series, due 2026 ($5.0 million).

## C.     SUBORDINATED DEBT

1.     $32,500,000 of 8.125% of Subordinated Debt Securities due 2025, issued pursuant to a First Supplemental Indenture, dated as of August 1, 1995, to the Subordinated Debt Securities Indenture, dated August 1, 1995, between NorthWestern Public Service Company (now known as NorthWestern Corporation), as Issuer, and The Chase Manhattan Bank (National Association), as Trustee.

2.     $55,000,000 of 7.20% of Junior Subordinated Debt Securities due 2038, issued pursuant to a Second Supplemental Indenture, dated as of November 18, 1995, to the Subordinated Debt Securities Indenture, dated August 1, 1995, between NorthWestern Public Service Company (now known as NorthWestern Corporation), as Issuer, and The Chase Manhattan Bank (National Association), as Trustee.

3.     $106,750,000 of 8.25% of Junior Subordinated Debt Securities due 2031, issued pursuant to a Third Supplemental Indenture, dated as of December 21, 2001, to the Subordinated Debt Securities Indenture, dated August 1, 1995, between NorthWestern Public Service Company (now known as NorthWestern Corporation), as Issuer, and The Chase Manhattan Bank (National Association), as Trustee.

4.     $111,000,000 of 8.10% of Junior Subordinated Debt Securities due 2032, issued pursuant to a Fourth Supplemental Indenture, dated as of January 31, 2002, to the Subordinated Debt Securities Indenture, dated August 1, 1995, between NorthWestern Public Service Company (now known as NorthWestern Corporation), as Issuer, and The Chase Manhattan Bank (National Association), as Trustee.

5.     $65,000,000 of 8.45% of Junior Subordinated Debt Securities of The Montana Power Company due 2036, issued pursuant to a QUIP Indenture for Unsecured Subordinated Debt Securities, dated as of November 1, 1996 (as amended), between The Montana Power Company, as Obligor, and The Bank of New York, as Trustee.

## D.    **GUARANTEED INDEBTEDNESS**

**1.    Unsecured Subordinated Guarantee Obligations in Respect of Trust Securities**

(a)    Preferred Securities Guarantee Agreement, dated as of August 1, 1995, between NorthWestern Public Service Company (now known as NorthWestern Corporation), as Guarantor, Wilmington Trust Company, as Trustee, and NWPS Capital Financing I, as Issuer, with respect to the Preferred Capital Securities described in Item E.1 below.

(b)    Common Securities Guarantee Agreement, dated as of August 1, 1995, executed by NorthWestern Public Service Corporation (now known as NorthWestern Corporation) for the benefit of the holders of the Common Securities of NWPS Capital Financing I.

(c)    Preferred Securities Guarantee Agreement, dated as of November 18, 1998, by and between the Borrower, as Guarantor, Wilmington Trust Company, as Trustee, and NorthWestern Capital Financing I, as Issuer, with respect to the Preferred Capital Securities described in Item E.2 below.

(d)    Common Securities Guarantee Agreement, dated as of November 18, 1998, executed by NorthWestern Public Service Corporation (now known as NorthWestern Corporation) for the benefit of the holders of the Common Securities of NorthWestern Capital Financing I.

(e)    Preferred Securities Guarantee Agreement, dated as of December 21, 2001, by and between the Borrower, as Guarantor, Wilmington Trust Company, as Trustee, and NorthWestern Capital Financing II, as Issuer, with respect to the Preferred Capital Securities described in Item E.3 below.

(f)    Common Securities Guarantee Agreement, dated as of December 21, 2001, executed by the Borrower for the benefit of the holders of the Common Securities NorthWestern Capital Financing II.

(g)    Preferred Securities Guarantee Agreement, dated as of January 31, 2002, by and between the Borrower, as Guarantor, Wilmington Trust Company, as Trustee, and NorthWestern Capital Financing III, as Issuer, with respect to the Preferred Capital Securities described in Item E.4 below.

(h)    Common Securities Guarantee Agreement, dated as of January 31, 2002, executed by the Borrower for the benefit of the holders of the Common Securities NorthWestern Capital Financing III.

**2.    Other Guarantees**

(a)    Contingent Assignment obligations in respect of the Credit and Security Agreement, dated as of March 31, 2001 (as amended), by and between Expanets,

Inc. and Avaya, Inc.  Upon the occurrence of a default thereunder, Avaya, Inc. shall have the option to require the Borrower to repay the outstanding balance (which is capped at $27.1 Million).

(b)    Guarantee Agreement, dated as of November 1, 1996, between The Montana Power Company (predecessor to CFB, formerly known as NorthWestern Energy, L.L.C. and formerly known as The Montana Power, L.L.C.)), as guarantor, and The Bank of New York, as guarantee trustee, as supplemented by the Side Letter, dated as of February 13, 2002, from CFB (formerly known as NorthWestern Energy, L.L.C.) to The Bank of New York, and as amended by the Amendment to Guarantee Agreement, dated as of August 13, 2002, among CFB (formerly known as NorthWestern Energy, L.L.C.), the Borrower, as additional guarantor, and The Bank of New York, for the benefit of the holders from time to time of the $65,000,000 aggregate liquidation amount of the 8.45% Cumulative Quarterly Income Preferred Securities, Series A, of Montana Power Capital I.

(c)    Purchase obligations in respect of (i) the Purchase Agreement, dated as of April 24, 2002, by and between the Borrower and Automotive Rentals, Inc ("ARI"), (ii) the Purchase Agreement, dated as of June 27, 2002, by and between the Borrower and ARI and (iii) the Purchase Agreement, dated as of September 23, 2002, by and between the Borrower and ARI.  Upon the occurrence of a default, ARI shall have option to require the Borrower to purchase all leased vehicles (currently $24,159,000).

(d)    (i) Guaranty, dated as of May 2003 from NorthWestern Energy Corporation to Tetra Financial Group U.S. in respect of certain Master Lease Agreement No. TFG/NR 052303 dated May 23, 2003 between Tetra Financial Group, L.L.C. and Nekota Resources, Inc. and (ii) Guaranty, dated as of July 21, 2003 from Nekota Resources, Inc. to Northern Border Pipeline Company in respect of  that certain Shippers Service Agreement and that certain T-1B Service Agreement (as amended and supplemented from time to time, collectively the "Agreements") with NorthWestern Energy Corporation, a South Dakota corporation.

**E.**      **Subordinated Debt Securities Held by Subsidiary Trusts and Preferred Capital Securities of Such Trusts**

1.      1,300,000 shares of 8.125% Trust Preferred Capital Securities of NWPS Capital Financing I, issued pursuant to an Amended and Restated Declaration of Trust of NWPS Capital Financing I, dated as of August 1, 1995, between NorthWestern Public Service Company (now known as NorthWestern Corporation), as Trust Sponsor, Merle D. Lewis, Richard R. Hylland, Wilmington Trust Company, as Trustees, and the holders from time to time of beneficial interests in the assets of the Trust.

2.      2,200,000 shares of 7.20% Trust Preferred Capital Securities of NorthWestern Capital Financing I, issued pursuant to an Amended and Restated Declaration of Trust of NorthWestern Capital Financing I, dated as of November 18, 1998, among the Borrower, as Trust Sponsor, Merle D. Lewis, Richard R. Hylland, Wilmington Trust Company, as Trustees, and the holders from time to time of beneficial interests in the assets of the Trust.

3.      4,270,000 shares of 8.25% Trust Preferred Capital Securities of NorthWestern Capital Financing II, issued pursuant to an Amended and Restated Declaration of Trust of NorthWestern Capital Financing II, dated as of December 21, 2001, among the Borrower, as Trust Sponsor, Merle D. Lewis, Richard R. Hylland, Wilmington Trust Company, as Trustees, and the holders from time to time of beneficial interests in the assets of the Trust.

4.      4,440,000 shares of 8.10% Trust Preferred Capital Securities of NorthWestern Capital Financing III, issued pursuant to an Amended and Restated Declaration of Trust of NorthWestern Capital Financing III, dated as of January 31, 2002, among the Borrower, as Trust Sponsor, Merle D. Lewis, Richard R. Hylland, Wilmington Trust Company, as Trustees, and the holders from time to time of beneficial interests in the assets of the Trust.

5.      2,600,000 shares of 8.45% Trust Preferred Capital Securities of Montana Power Capital I, issued pursuant to an Amended and Restated Trust Agreement of Montana Power Capital I, dated as of November 1, 1996, among The Montana Power Company (predecessor to CFB (formerly known as NorthWestern Energy, L.L.C. and formerly known as The Montana Power, L.L.C.)), The Bank of New York (NY), as Property Trustee, The Bank of New York (DE), as Delaware Trustee and Ellen M. Senechal, Jerrold P. Pederson and Pamela K. Merrell, as Administrative Trustees.

## F.     Operating and Capitalized Leases

1.     **Operating Lease**

(a)     Indebtedness outstanding in respect of the Sale and Leaseback Transaction evidenced by (i) that certain Colstrip 4 Participation Agreement, dated December 16, 1985, by and among United States Trust Company of New York and Louis P. Young, as Owner Trustee, SGE (New York) Associates, as Owner Participant, Certain Institutions, as Loan Participants, NorthWestern Corporation (successor to The Montana Power Company), as Lessee, and Bankers Trust Company, as Indenture Trustee and Lease Agreement, dated as of December 16, 1985, between United States Trust Company of New York and Louis P. Young, as Lessor, and NorthWestern Corporation (successor to The Montana Power Company), as Lessee and (ii) that certain Participation Agreement, dated December 16, 1985 among United States Trust Company of New York and Louis P. Young, as Owner Trustee, Burnham Leasing Corporation, as Owner Participant, Certain Institutions, as Loan Participations, NorthWestern Corporation (successor to The Montana Power Company), as Lessee and Bankers Trust Company, as Indenture Trustee.  The annual lease payments are approximately $32.0 million.

2.     **Capitalized Lease Obligations (Amounts as of September 30, 2003)**

| | | |
|---|---|---:|
| (a) | Cisco equipment lease | $ 179,326 |
| (b) | Cisco software lease | $ 32,236 |
| (c) | Dell Equipment lease | $ 47,991 |
| (d) | IBM AS 400 lease | $ 1,347,519 |
| (e) | SAP servers lease | $ 144,469 |
| (f) | Fleet lease referenced in Item D.2(c) above | $ 4,686,822 |
| (g) | Airplane sale/leaseback | $ 3,245,170 |
| (h) | Tetra financing lease referenced in Item D.2(d) above | $ 1,292,490 |
| (i) | Tetra financing lease referenced in Item D.2(d) above | $ 2,178,121 |
| | | $ 13,154,144 |

**G.      Letters of Credit**

| Loan Party | Applicant | Name of Beneficiary | Purpose of LOC | Expiration Date | LOC Amount |
|---|---|---|---|---|---|
| NorthWestern Growth Corporation | Blue Dot | Zurich | Insurance Program Collateral for policy period February 2000/2001 | 01/31/04 | $ 1,000,000 |
| NorthWestern Growth Corporation | NorthWestern Growth Corp | United States Fidelity & Guaranty Co. | Insurance Program Collateral for Workers Compensation policies prior to 2001 | 05/21/04 | $ 250,000 |
| Borrower | Borrower | Insurance Company of North America, et al. | Held as general surety program collateral for Expanets bid and performance bonds issued by Ace/Westchester | 03/06/04 | $ 5,000,000 |
| Borrower | Borrower | Westchester Fire Insurance Company | Held as general surety program collateral for Blue Dot bid and performance bonds issued by Ace/Westchester | 03/21/04 | $ 4,000,000 |
| Borrower | Borrower | State of Montana | Secures the Self-Insured Workers Compensation program in the State of Montana | 08/05/04 | $ 5,000,000 |
| Borrower | Borrower | Northern Border Pipeline Company | Two month pipeline capacity payment | 08/30/04 | $ 285,000 |
| Borrower | NorthWestern Services Corporation | Northern Border Pipeline Company | Prefunding of three month capacity for pipeline construction project | 09/04/04 | $ 500,000 |

**EXHIBIT A-l**
TO CREDIT AGREEMENT

FORM OF TERM NOTE

$                                                                   New York, New York
[          ], 200

　　　　FOR VALUE RECEIVED, the undersigned, NORTHWESTERN CORPORATION, a Delaware corporation, with its principal place of business at 125 South Dakota Avenue, Suite 1100, Sioux Falls, South Dakota 57104-6403 (the "Borrower"), hereby unconditionally promises to pay to the order of              , with a place of business at                     (the "Lender"), by wire transfer to the account of Credit Suisse First Boston, as Administrative Agent (as defined in the Credit Agreement referred to below), with [ACCOUNT BANK], ABA NO. [•], Account No. [•], Attn: Agency, Reference: [•], or at such other place or places and to such account or accounts as the Administrative Agent, may direct from time to time by notice to the Borrower in accordance with the Credit Agreement (as hereinafter defined), in lawful money of the United States of America and in immediately available funds, the principal amount of the lesser of (a)                     DOLLARS ($            ) and (b) the aggregate unpaid principal amount of all Loans (as defined in the Credit Agreement) made by the Lender to the undersigned pursuant to the Credit Agreement, payable, subject to the fourth paragraph hereof, on or before the Maturity Date (as defined in the Credit Agreement).

　　　　The Borrower hereby unconditionally further agrees to pay interest in like money on the unpaid principal amount hereof from time to time outstanding from the date hereof, and, to the extent permitted by applicable law, on any unpaid interest payable hereon, from the date such interest is due hereunder, at the applicable rates per annum and on the dates specified in Section 2.9 of the Credit Agreement until such principal amount and interest, as applicable, is paid in full (both before and after judgment). The Borrower agrees to pay costs and expenses, including reasonable attorneys' fees, incurred in connection with the interpretation or enforcement of this Term Note in accordance with the Credit Agreement.

　　　　This Term Note is one of the Term Notes referred to in the Credit Agreement, dated as of December 17, 2002 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; terms defined therein being used herein as defined therein), among the Borrower, the several banks and other financial institutions parties thereto (including the Lender), and the Administrative Agent, and is entitled to the benefits thereof and of the other Loan Documents referred to therein, and is subject to optional and mandatory prepayment in whole or in part as provided therein. This Term Note is secured as provided in the Loan Documents. Reference is hereby made to the Loan Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security, the terms and conditions upon which the security interests were granted and the rights of the holder of this Term Note in respect thereof.

A-1-1

Upon the occurrence of any one or more of the Events of Default specified in the Credit Agreement, all amounts remaining unpaid on this Term Note shall become, or may be declared to be, immediately due and payable all as provided therein.

The Lender may proceed against the Borrower in such manner as it deems desirable in accordance with the Credit Agreement. None of the rights or remedies of the Lender hereunder are to be deemed waived or affected by failure or delay on the part of the Lender to exercise the same. All remedies conferred upon the Lender by this Term Note or any other instrument or agreement or by applicable law, shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

All parties now and hereafter liable with respect to this Term Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand of payment, notice of protest, notice of dishonor and all other notices of any kind.

**THIS TERM NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

NORTHWESTERN CORPORATION

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

FORM OF OFL NOTE

$                                                                    New York, New York
                                                                    [        ], 200

FOR VALUE RECEIVED, the undersigned, NORTHWESTERN CORPORATION, a Delaware corporation, with its principal place of business at 125 South Dakota Avenue, Suite 1100, Sioux Falls, South Dakota 57104-6403 (the "Borrower"), hereby unconditionally promises to pay to the order of                      , with a place of business at                      (the "Lender"), by wire transfer to the account of Credit Suisse First Boston, as Administrative Agent (as defined in the Credit Agreement referred to below), with [ACCOUNT BANK], ABA NO. [•], Account No. [•], Attn: Agency, Reference: [•], or at such other place or places and to such account or accounts as the Administrative Agent, may direct from time to time by notice to the Borrower in accordance with the Credit Agreement (as hereinafter defined), in lawful money of the United States of America and in immediately available funds, the principal amount of the lesser of (a)                      DOLLARS ($                      ) and (b) the aggregate unpaid principal amount of all Loans (as defined in the Credit Agreement) made by the Lender to the undersigned pursuant to the Credit Agreement, payable, subject to the fourth paragraph hereof, on or before the Maturity Date (as defined in the Credit Agreement).

The Borrower hereby unconditionally further agrees to pay interest in like money on the unpaid principal amount hereof from time to time outstanding from the date hereof, and, to the extent permitted by applicable law, on any unpaid interest payable hereon, from the date such interest is due hereunder, at the applicable rates per annum and on the dates specified in Section 2.9 of the Credit Agreement until such principal amount and interest, as applicable, is paid in full (both before and after judgment). The Borrower agrees to pay costs and expenses, including reasonable attorneys' fees, incurred in connection with the interpretation or enforcement of this Term Note in accordance with the Credit Agreement.

This Term Note is one of the Term Notes referred to in the Credit Agreement, dated as of December 17, 2002 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; terms defined therein being used herein as defined therein), among the Borrower, the several banks and other financial institutions parties thereto (including the Lender), and the Administrative Agent, and is entitled to the benefits thereof and of the other Loan Documents referred to therein, and is subject to optional and mandatory prepayment in whole or in part as provided therein. This Term Note is secured as provided in the Loan Documents. Reference is hereby made to the Loan Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the

A-2-1

security, the terms and conditions upon which the security interests were granted and the rights of the holder of this Term Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default specified in the Credit Agreement, all amounts remaining unpaid on this Term Note shall become, or may be declared to be, immediately due and payable all as provided therein.

The Lender may proceed against the Borrower in such manner as it deems desirable in accordance with the Credit Agreement. None of the rights or remedies of the Lender hereunder are to be deemed waived or affected by failure or delay on the part of the Lender to exercise the same. All remedies conferred upon the Lender by this Term Note or any other instrument or agreement or by applicable law, shall be cumulative and none is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

All parties now and hereafter liable with respect to this Term Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand of payment, notice of protest, notice of dishonor and all other notices of any kind.

This Term Note is a QFL Note under the Credit Agreement, and as such, ownership of the obligation represented by this Term Note may be transferred only in accordance with <u>Section 2.15</u> of the Credit Agreement.

**THIS TERM NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

NORTHWESTERN CORPORATION

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

A-2-2

**EXHIBIT B-2**
<u>TO CREDIT AGREEMENT</u>

<u>FORM OF NOTICE OF INTEREST RATE CONVERSION</u>

Date:

Credit Suisse First Boston,
    as Administrative Agent
Eleven Madison Street
New York, New York 10010-3629
Attention: Agency Department Manager

      Re:      Credit Agreement dated as of December 17, 2002 among Northwestern Corporation, a Delaware corporation (the "<u>Borrower</u>"), the Lenders from time to time party thereto, and the Administrative Agent (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>").

Ladies and Gentlemen:

      The Borrower hereby gives notice pursuant to Section 2.7 of the Credit Agreement that it requests a continuation or conversion of Loans outstanding under the Credit Agreement, and in connection therewith sets forth below the terms on which such continuation or conversion is requested to be made; capitalized terms used and not defined herein shall have the meanings provided in the Credit Agreement:

      The Borrower hereby requests that on          ,     :(1)

      (1)      $          of the currently outstanding principal amount of the Loans currently being maintained as [Alternate Base Rate Loans] [[one] [two] [three] [six] month Eurodollar Loans](2),

      (2)      be [converted into] [continued as],

      (3)      [Eurodollar Loans having an Interest Period of [one] [two] [three] [six] months, which Interest Period will expire on       ,     ](3) [Alternate Base Rate Loans].

---

(1) Conversion of Eurodollar Loans may be made only on the last day of the applicable Interest Period. A Notice of Conversion must be received by the Administrative Agent prior to 10:00 a.m. (New Yo rk City time), (x) with respect to Alternate Base Rate Loans, at least three Business Days, and (y) with respect to Eurodollar Loans, at least two Business Days, prior to the date of Borrower's election.

    (2) Select appropriate option.

    (3) Insert appropriate interest rate option and, if applicable, number of months (for Eurodollar Loans).

[In the event that such Loans are to be converted into, or continued as, Eurodollar Loans, the Borrower hereby certifies in accordance with Section 2.7 of the Credit Agreement that no Default or Event of Default has occurred and is continuing as of the date of this Notice of Interest Rate Conversion.]

IN WITNESS WHEREOF, the Borrower has caused this Notice of Interest Rate Conversion to be executed and delivered, and the certification contained herein to be made, by an authorized officer this         day of                ,        .

NORTHWESTERN CORPORATION

By: _____
    Name:
    Title:

B-2-2

**EXHIBIT C**
<u>TO CREDIT AGREEMENT</u>

<u>FORM OF CLOSING CERTIFICATE</u>

**NORTHWESTERN CORPORATION**

Pursuant to Section 4.1(e) of the Credit Agreement dated as of December 17, 2002 among Northwestern Corporation, a Delaware corporation (the "<u>Borrower</u>"), the several banks and other financial institutions from time to time parties thereto (the "<u>Lenders</u>"), and Credit Suisse First Boston, as administrative agent for the Lenders (the "<u>Credit Agreement</u>"; terms defined therein shall have their defined meanings when used herein), the undersigned hereby certifies that [he or she] is the of the Borrower and in such capacity further certifies as follows:

1.      The representations and warranties of the Borrower set forth in the Credit Agreement and each of the other Loan Documents to which the Borrower is a party, are true and correct in all material respects on and as of the date hereof.

2       The Borrower has received all documents and instruments, including all consents, authorizations and filings, required or advisable under any Requirement of Law or Contractual Obligation of the Borrower in connection with the execution, delivery, performance, validity and enforceability of the Credit Agreement, the Notes and the other Loan Documents except as expressly set forth in each document. I have examined <u>Schedule 3.4b</u> to the Credit Agreement and attached hereto are copies of all consents, authorizations and filings referred to in <u>Schedule 3.4b</u> of the Credit Agreement, which consents, authorizations and filings are in full force and effect as of the date hereof.

3.      No Default or Event of Default has occurred and is continuing as of the date hereof or after giving effect to the making of the Loans on the date hereof.

4.      There are no liquidation or dissolution proceedings pending or to my knowledge threatened against the Borrower, nor has any other event occurred affecting or threatening the existence of the Borrower.

C-1

IN WITNESS WHEREOF, the undersigned has hereunto set his name.

_____
Name:
Title:

Date: [•], 2002

**EXHIBIT D**
TO CREDIT AGREEMENT

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities,[          ]) (the "Assigned Interest").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

1. Assignor:

2. Assignee:                                                      [and is an Affiliate/Approved Fund(1)]

3. Borrower:                    NorthWestern Corporation, a Delaware corporation.

4. Administrative Agent:        Credit Suisse First Boston, as the administrative agent under the Credit Agreement

5. Credit Agreement:            Credit Agreement, dated as of December 17, 2002 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; terms defined therein being used herein as defined therein), among the Borrower, the several banks and other financial institutions parties thereto (including the Lender), and the Administrative Agent

_____

(1)  Select as applicable.

D-1

6.     Assigned Interest:

| Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans(2) | |
|---|---|---|---|
| $ | $ | | % |
| $ | $ | | % |

[Name of Assignor]

Revised Commitment amount: ...................................................................... $

Revised Commitment Percentage:                                                          %

Revised Loan amount: ............................................................................ $

Fees Assigned (if any): ......................................................................... $

[Name of Assignee]

New Commitment amount: ...................................................................... $

New Commitment Percentage:                                                             %

New Loan amount: ................................................................................ $

Address for Notices for Assignee:

[Address]
Attention: _____
Telephone: _____
Telecopy: _____
Telephone
Confirmation: _____


Eurodollar Lending Office:


_____

      (2)  Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

D-2

Domestic Lending Office:


Effective Date:                    , 20      [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

       The terms set forth in this Assignment are hereby agreed to:

<div align="right">

ASSIGNOR
[NAME OF ASSIGNOR]


By: _____
    Name:
    Title:

ASSIGNEE
[NAME OF ASSIGNEE]


By: _____
    Name:
    Title:

</div>

<div align="center">D-3</div>

Consented to and Accepted:

CREDIT SUISSE FIRST BOSTON, as
  Administrative Agent

By _____
   Name:
   Title:


By _____
   Name:
   Title:

ANNEX 1

NORTHWESTERN CORPORATION CREDIT AGREEMENT
DATED AS OF DECEMBER 17, 2002

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1. Representations and Warranties.

1.1. Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2. Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 3.1 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Foreign Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the

D-5

Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

       3. <u>General Provisions</u>. This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the law of the State of New York.

<div align="center">D-6</div>

**Exhibit 10.3(e)**

ASSET PURCHASE AND SALE AGREEMENT

dated as of

October 29, 2003,

among

EXPANETS, INC.,

NORTHWESTERN CORPORATION,

NORTHWESTERN GROWTH CORPORATION,

NORTHWESTERN CAPITAL CORPORATION,

and

AVAYA, INC.

Table of Contents

ARTICLE I

Defined Terms

Section 1.01.  Definitions

ARTICLE II

The Transaction

Section 2.01.  Purchase and Sale of the Purchased Assets
Section 2.02.  Excluded Assets
Section 2.03.  Assumption of Assumed Liabilities
Section 2.04.  Excluded Liabilities
Section 2.05.  Employees
Section 2.06.  Benefit Plans

ARTICLE III

Consideration; Adjustments

Section 3.01.  Consideration.
Section 3.02.  Calculation of the Initial Cash Payment Amount
Section 3.03.  Post-Closing Adjustment to Purchase Price
Section 3.04.  Allocation of Purchase Price for Tax Purposes

ARTICLE IV

The Closing; Conditions of Closing

Section 4.01.  The Closing
Section 4.02.  Conditions Precedent to the Obligations of the Shareholders and the Company
Section 4.03.  Conditions Precedent to the Obligations of the Purchaser
Section 4.04.  Efforts to Close

ARTICLE V

Representations and Warranties of the Company

Section 5.01.  Existence and Power
Section 5.02.  Authorization; Binding Effect
Section 5.03.  Contravention
Section 5.04.  Consents

Section 5.05.  Capitalization
Section 5.06.  Subsidiaries and Other Securities
Section 5.07.  Financial Information
Section 5.08.  Taxes
Section 5.09.  Litigation
Section 5.10.  Permits; Compliance with Laws
Section 5.11.  Absence of Certain Changes or Events
Section 5.12.  Assets
Section 5.13.  Real Property and Leaseholds
Section 5.14.  Equipment, Fixtures and Inventory
Section 5.15.  Material Contracts
Section 5.16.  Intellectual Property
Section 5.17.  Insurance
Section 5.18.  Books and Records; Company Names; Bank Accounts; Officers and Directors
Section 5.19.  Customers and Suppliers
Section 5.20.  Environmental Matters
Section 5.21.  Employees;  ERISA
Section 5.22.  Certain Business Relationships with the Company or its Subsidiaries
Section 5.23.  Warranties
Section 5.24.  Brokers, Finders
Section 5.25.  Solvency of the Company
Section 5.26.  Misstatements
Section 5.27.  Full Disclosure

ARTICLE VI

Representations and Warranties of the Shareholders

Section 6.01.  Existence and Power
Section 6.02.  Authorization; Binding Effect
Section 6.03.  Contravention
Section 6.04.  Consents
Section 6.05.  Litigation
Section 6.06.  Title to Securities

ARTICLE VII

Representations and Warranties of the Purchaser

Section 7.01.  Existence and Power
Section 7.02.  Authorization; Binding Effect
Section 7.03.  Contravention
Section 7.04.  Consents
Section 7.05.  Litigation
Section 7.06.  Financing
Section 7.07.  No Other Representations or Warranties

ARTICLE VIII

<u>Pre-Closing Covenants of the Shareholders, the Company and the Purchaser</u>

Section 8.01.  Conduct of Business Pending Closing
Section 8.02.  Access to Information; Cooperation
Section 8.03.  Disclosure Schedules
Section 8.04.  Reporting Requirements
Section 8.05.  Resignations
Section 8.06.  Certain Agreements

ARTICLE IX

<u>Covenants of the Shareholders, the Company and the Purchaser</u>

Section 9.01.  Public Announcements; Confidentiality
Section 9.02.  Certain Tax Disclosures
Section 9.03.  Non-Competition
Section 9.04.  Reserved
Section 9.05.  Release
Section 9.06.  Use of Proceeds
Section 9.07.  Certain Leases
Section 9.08.  Bankruptcy Proceedings
Section 9.09.  Financial Statements

ARTICLE X

<u>Termination</u>

Section 10.01.  Termination
Section 10.02.  Effect of Termination
Section 10.03.  Fees and Expenses

ARTICLE XI

<u>Indemnification</u>

Section 11.01.  Indemnification
Section 11.02.  Notice and Opportunity to Defend
Section 11.03.  Survival of Indemnification
Section 11.04.  Threshold; Limitation on Liability
Section 11.05.  Fraud Exception
Section 11.06.  Set-Off
Section 11.07.  Escrow

ARTICLE XII

<u>Miscellaneous</u>

Section 12.01.  Notices
Section 12.02.  Counterparts
Section 12.03.  Amendment of Agreement
Section 12.04.  Successors and Assigns; Assignability
Section 12.05.  Governing Law
Section 12.06.  Integration
Section 12.07.  Severability
Section 12.08.  Further Assurances
Section 12.09.  No Third-Party Rights
Section 12.10.  Enforcement
Section 12.11.  Submission to Jurisdiction;
Section 12.12.  Waiver of Jury Trial
Section 12.13.  No Waiver; Remedies
Section 12.14.  Ambiguities
Section 12.15.  Incorporation of Schedules and Exhibits

<u>Schedules</u>

| | |
|---|---|
| Schedule 2.01(a)(i) | Company Real Property |
| Schedule 2.01(a)(ii) | Company Leaseholds |
| Schedule 2.01(b)(i) | Equipment |
| Schedule 2.01(b)(ii) | Fixtures |
| Schedule 2.01(b)(iii) | Inventory |
| Schedule 2.01(c) | Assigned Agreements |
| Schedule 2.01(f) | Securities |
| Schedule 2.01(g) | Intellectual Property |
| Schedule 2.01(h) | Benefit Plans |
| Schedule 2.03(a)(iv) | Capitalized Leases |
| Schedule 2.05(a) | Employment Offer Persons |
| Schedule 2.05(c) | Certain Other Employees |
| Schedule 3.04 | Allocation of Purchase Price |
| Schedule 4.02(i) | Certain Collateral |
| Schedule 4.03(i)(i) | Employment Agreement Persons |
| Schedule 4.03(i)(ii) | Non-Competition Agreement Persons |
| Schedule 5.04 | Company Consents |
| Schedule 5.05(a) | Capitalization |
| Schedule 5.05(b) | Rights, Options and Warrants |
| Schedule 5.05(c) | Shareholder Agreements |
| Schedule 5.06(a) | Subsidiaries |
| Schedule 5.07(a) | Balance Sheets |
| Schedule 5.07(b) | Other Financial Statements |
| Schedule 5.07(e) | Guarantees |
| Schedule 5.07(f) | Certain Accounts Payable and Accounts Receivable |
| Schedule 5.07(g) | Certain Accounting Changes |
| Schedule 5.07(h) | Non-Recurring Items |

| | |
|---|---|
| Schedule 5.08(c) | Audits |
| Schedule 5.08(f) | Tax Liens |
| Schedule 5.09 | Litigation |
| Schedule 5.10(a) | Required Permits |
| Schedule 5.10(c) | Certain Permit Notices |
| Schedule 5.11 | Absence of Certain Changes or Events |
| Schedule 5.13(b) | Certain Real Property Liens |
| Schedule 5.13(d) | Condemnation or Eminent Domain |
| Schedule 5.13(e) | Company Leases |
| Schedule 5.15(a) | Material Contracts |
| Schedule 5.15(d) | Liens |
| Schedule 5.15(e) | Debt |
| Schedule 5.15(f) | Certain Maintenance Contracts |
| Schedule 5.16(d) | Certain Intellectual Property Matters |
| Schedule 5.17 | Insurance |
| Schedule 5.18(a) | Certain Books and Records |
| Schedule 5.18(b) | Chief Executive Office |
| Schedule 5.18(c) | Bank Accounts |
| Schedule 5.18(d) | Officers and Directors |
| Schedule 5.19(a) | Customers |
| Schedule 5.19(b) | Suppliers |
| Schedule 5.20 | Environmental Matters |
| Schedule 5.21(a) | Employees |
| Schedule 5.21(b) | Employment Agreements |
| Schedule 5.21(c) | Employee Benefit Plans |
| Schedule 5.21(e) | Certain Labor Matters |
| Schedule 5.21(g) | Transaction Entitlements |
| Schedule 5.22(a) | Certain Transactions |
| Schedule 5.22(b) | Related Party Transactions |
| Schedule 5.22(c) | Transactions with the Shareholders |
| Schedule 5.23 | Warranties |
| Schedule 6.04 | Seller Consents |
| Schedule 8.06(c) | Vendor Deposits |
| Schedule 9.07 | Certain Leases |
| Schedule 11.07(c) | Specified Liabilities |

<u>Exhibits</u>

| | |
|---|---|
| Exhibit 3.01 | Form of Purchaser Note |

v

ASSET PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of October 29, 2003 among (a) EXPANETS, INC., a Delaware corporation (the "Company"), (b) NORTHWESTERN CORPORATION (the "Parent"), (c) NORTHWESTERN GROWTH CORPORATION ("NGC"), (d) NORTHWESTERN CAPITAL CORPORATION ("NCC", and collectively with the Parent and NGC, each a "Shareholder", and collectively, the "Shareholders"), and (e) AVAYA INC., a Delaware corporation (the "Purchaser").

<div align="center">RECITALS</div>

A.  The Parent owns all of the outstanding capital stock of NGC.

B.  NGC owns all of the outstanding (i) shares of Series B, Series C, Series F and Series G preferred stock of the Company, and (ii) capital stock of NCC.

C.  NCC owns all of the outstanding shares of Class B common stock of the Company.

D.  Collectively, NGC and NCC control approximately 99% of the voting rights allocated to all classes of equity of the Company.

E.  The Company owns the Purchased Assets (as defined below).

F.  On the terms and subject to the conditions set forth in this Agreement, the Purchaser desires to acquire from the Company, and the Company wishes to sell to the Purchaser, the Purchased Assets, as set forth herein.

<div align="center">AGREEMENT</div>

In consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">Defined Terms</div>

Section 1.01.  Definitions.  As used in this Agreement, the following terms have the meanings stated:

"2001 Audited Financial Statements" means the audited consolidated balance sheet, statement of operations, statements of changes in shareholders' equity and statements of cash flows of the Company and its Subsidiaries as of, and for the 12-month period ending, December 31, 2001, in the forms attached hereto as Schedule 5.07(a) and 5.07(b) hereof.

"Accounts Receivable" has the meaning stated in Section 2.01(d).

"Action" means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing or other proceeding, whether civil, criminal, administrative, investigative

or appellate, in law or equity before any arbitrator or Governmental Body, and any settlement or compromise of any of the foregoing.

"Additional Assumed Liabilities" has the meaning stated in Section 2.04(c).

"Affiliate" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person or any of its Subsidiaries.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Alternative Transaction" means any transaction involving the sale of all or substantially all of the Purchased Assets by the Company and the assumption of all or substantially all of the Assumed Liabilities by the purchaser, in substantially the same manner as the Transactions, but does not include the Transactions.

"Assets " has the meaning stated in Section 5.12(c).

"Assigned Agreements" has the meaning stated in Section 2.01(c).

"Assignment and Assumption Agreement" has the meaning stated in Section 4.03(d)(ii).

"Assumed Liabilities" has the meaning stated in Section 2.03.

"Assumption Agreement" has the meaning stated in Section 4.02(e).

"Avaya" means Avaya Inc.

"Avaya Credit Agreement" means the Credit and Security Agreement, dated as of March 31, 2001, between the Company and Avaya, as amended up through the date of this Agreement.

"Avaya Debt" means all Debt, including without limitation, letters of credit, and other amounts, including, without limitation, principal, interest, fees, costs, indemnification payments and any other amounts, outstanding (whether or not then due or owing) under the Avaya Credit Agreement as of the Closing Date.

"Benefit Plan" means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code, and any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, stock purchase, restricted stock, stock appreciation rights, phantom stock, retirement, supplemental retirement, vacation, severance, termination, disability, death benefit, hospitalization, retiree medical or other plan, program, insurance, arrangement, agreement, commitment or understanding

7

(whether or not legally binding) providing benefits to any current or former employee, officer, director or shareholder of the Company or any of its Subsidiaries, including any such plan or program maintained outside the United States.

"<u>Bill of Sale</u>" has the meaning stated in Section 4.03(d)(i).

"<u>Board</u>" means the Board of Directors of the Company.

"<u>Business</u>" means the business and operations of the Company and its Subsidiaries as conducted by the Company and its Subsidiaries on the date of this Agreement and as proposed to be conducted by the Company and its Subsidiaries as of the date of this Agreement.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized by Law to be closed in New York.

"<u>Capitalized Lease</u>" means any lease that in accordance with GAAP is capitalized and appears on the balance sheet of the lessee.

"<u>Capitalized Lease Amount</u>" means the aggregate dollar amount of all Capitalized Leases of the Company and its Subsidiaries as of the Closing Date.

"<u>Cash Amount</u>" means an amount equal to $112,500,000, minus the aggregate dollar amount of the Additional Assumed Liabilities, if any.

"<u>Cash Proceeds</u>" means an aggregate amount equal to the sum of (a) the Cash Purchase Price, plus (b) the aggregate amount of cash payments made by the Purchaser to the Company under the Purchaser Note (including for this purpose any amounts that would have been paid by the Purchaser to the Company under the Purchaser Note but are set-off against by the Purchaser pursuant to Section 11.06 of this Agreement), plus (c) the aggregate amount of Non-Compete Payments made by the Purchaser to the Company pursuant to Section 9.03(e) of this Agreement (including for this purpose any Non-Compete Payments that would have been paid by the Purchaser to the Company under Section 9.03 (e) of this Agreement but are set-off against by the Purchaser pursuant to Section 11.06 of this Agreement).

"<u>Cash Purchase Price</u>" means an amount equal to (a) the Cash Amount, minus (b) the Final Company Debt Amount (as finally determined pursuant to Section 3.03), minus (c) the excess, if any, of Required Net Current Assets, over Final Net Current Assets (as finally determined pursuant to Section 3.03).

"<u>Claims</u>" has the meaning stated in Section 9.05.

"<u>Closing</u>" has the meaning stated in Section 4.01.

"<u>Closing Balance Sheet</u>" has the meaning stated in Section 3.03(a).

8

"Closing Date" has the meaning stated in Section 4.01.

"Code" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations thereunder.

"Common Stock" means the Class A, Class B and Class C common stock of the Company.

"Company" means Expanets, Inc., a Delaware corporation.

"Company Debt Amount" means the sum of (a) the Capitalized Lease Amount, plus (b) the Avaya Debt, plus (c) the Congress Debt.

"Company Indemnified Person" means the Company, the Shareholders and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents and Affiliates.

"Company Lease" has the meaning stated in Section 5.13(e).

"Company Leaseholds" has the meaning stated in Section 5.13(a).

"Company Outside Date" means December 15, 2003.

"Company Parties" means the Company's Subsidiaries, Affiliates, directors, officers, employees or agents or any investment banker, financial advisor, attorney, accountant, representative, or any other Person acting on behalf of the Company or any of its Subsidiaries.

"Company Real Property" has the meaning stated in Section 5.13(a).

"Company Required Consents" means the Consents set forth on Schedule 5.04 and Schedule 6.04, in each case, that are marked with an asterisk.

"Company's Accountants" means Deloitte & Touche LLP.

"Competing Business" means any business one or more of whose products or services, including, without limitation, products or services in the planning or development stage during the Non-Compete Period, compete, directly or indirectly, in whole or in part, with one or more of the products or services, including, without limitation, products or services in the planning or development stage during the Non-Compete Period, produced, provided or engaged in by the Company or any of its Subsidiaries at any time during the Non-Compete Period.

"Competing Transaction" means any transaction or series of transactions including, without limitation, an Alternative Transaction involving a sale or other

9

Transfer of securities or assets, or merger or other combination, whereby at the conclusion of such transaction or transactions the Parent either directly or indirectly does not own (a) at least 75% of the outstanding economic and voting interests of the Company (on a fully-diluted basis) and (b) at least 75% of the assets of the Company and its Subsidiaries, taken as a whole, as constituted on the date of this Agreement, other than the Transactions.

"Confidential Information" means all information, data, "know-how", documents, reports, agreements, interpretations, plans, studies, forecasts and records (whether in oral or written form, electronically stored or otherwise) containing or otherwise reflecting information concerning the Purchaser, the Company, any of their respective Subsidiaries or Affiliates, the Business, the Assets or the Transactions, including, without limitation, "know-how", trade secrets and information not available to the public generally, but does not include (a) information that is not related to the Purchaser, the Business, the Purchased Assets or the Assumed Liabilities, (b) information which is or becomes generally available to the public other than as a result of a disclosure by the Shareholders or the Company in violation of this Agreement, and (c) information that was or becomes available to the Shareholders or the Company on a non-confidential basis from a Person other than the Purchaser or any other Person who is not otherwise bound by any obligation not to transmit or disclose the information to the Shareholders or the Company.

"Confidentiality Agreement" means the existing confidentiality agreement, if any, among the Parent, the Company and the Purchaser.

"Congress" means Congress Financial Corporation (Western).

"Congress Credit Agreement" means the Credit Agreement, dated as of June 13, 2003, between the Company and Congress, as amended as of the date of this Agreement.

"Congress Debt" means all Debt, including without limitation, letters of credit, and other amounts, including, without limitation, principal, interest, fees, costs, indemnification payments and any other amounts, outstanding (whether or not then due or owing) under the Congress Credit Agreement as of the Closing Date; provided, however, that for purposes of calculating Cash Purchase Price and Estimated Cash Purchase Price, letters of credit up to $7,325,000 shall not be included in the definition of Company Debt Amount.

"Consents" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"Contract" means any agreement, contract, license, lease, instrument, document, note, bond, mortgage, indenture, guarantee, purchase order, letter of credit, undertaking, obligation, commitment, or other legally binding commitment or obligation, whether or not written, each as amended or modified from time to time.

"<u>Controlled Group</u>" for any Person at any date means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Person, are treated as a single employer under Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

"<u>Credit Agreements</u>" means the Avaya Credit Agreement and the Congress Credit Agreement.

"<u>Current Assets</u>" of the Company and its Subsidiaries at any date means all assets of the Company and its Subsidiaries that would properly be classified in accordance with GAAP as current assets as of such date, which for purposes of the Sale Documents (a) shall not include any payment received after June 30, 2003 on or in respect of any employee or shareholder notes owed to the Company or any of its Subsidiaries, but (b) shall include the Company's or its Subsidiaries' cash deposits (but not letters of credit) with vendors to secure future performance to the extent that such cash deposits are not otherwise included in Current Assets as of such date, after deducting adequate reserves in each case where a reserve is proper, determined as of such date.

"<u>Current Property</u>" means all sites, facilities, locations, Real Property and Leaseholds presently owned, leased, used or operated by the Company or any of its Subsidiaries.

"<u>Debt</u>" of a Person at any date means, without duplication (a) all obligations of the Person (i) for borrowed money, (ii) evidenced by bonds, debentures, notes or other similar instruments, (iii) under conditional sale, title retention, installment payment or other similar agreements or arrangements creating an obligation with respect to the payment of the deferred purchase price of property or services, (iv) as lessee under Capitalized Leases, (v) under letters of credit or Guarantees issued for the account of the Person and (vi) arising under acceptance facilities, (b) all obligations of the type referred to in clause (a) above of others Guaranteed by the Person, (c) all obligations of the type referred to in clause (a) above of others secured by a Lien on any asset of the Person whether or not such obligation is assumed or Guaranteed by the Person, (d) interest rate, currency and total return swaps, hedges and similar arrangements, and (e) the aggregate Unfunded Vested Liabilities under each Benefit Plan of the Person.

"<u>Deed</u>" has the meaning stated in Section 4.03(d)(iv).

"<u>Dollars</u>" and "<u>$</u>" refer to United States dollars and other lawful currency of the United States of America from time to time in effect.

"<u>Effective Time</u>" means the time when the Company actually receives the Initial Cash Payment Amount.

"<u>Environmental Claims</u>" means any complaint, summons, citation, notice, directive, order, Action, notice of violation, judicial or administrative proceeding,

11

judgment, letter or other communication from any Governmental Body, or any third party involving violations of Environmental Laws or Releases of Hazardous Materials from (a) any assets, properties or businesses of the Company, any of its Subsidiaries or any predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by the Company, any of its Subsidiaries or any predecessors in interest.

"Environmental Laws" means all federal, state, local and foreign Laws relating to pollution, human health, safety or protection of the environment and all similar Laws.

"Environmental Liabilities" means any monetary obligations, losses, liabilities (including strict liability), damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable out-of-pocket fees, disbursements and expenses of counsel, out-of-pocket expert and consulting fees and out-of-pocket costs for environmental site assessments, remedial investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Environmental Claim filed by any Governmental Body or any third party which relate to any violations of Environmental Laws, Remedial Actions, Releases or threatened Releases of Hazardous Materials from or onto (a) any property presently or formerly owned by the Company or any of its Subsidiaries or a predecessor in interest, or (b) any facility which received Hazardous Materials generated by the Company or any of its Subsidiaries or a predecessor in interest.

"Environmental Reports" means all written reports, studies, analyses, tests or monitoring in the possession of or initiated by the Company or any of its Subsidiaries pertaining to Hazardous Materials in, on, beneath or adjacent to any Relevant Property, or regarding the Company's or any of its Subsidiaries' compliance with applicable Environmental Laws.

"Equipment" means all tangible personal property of a Person, including, without limitation, all equipment and machinery in all of its forms, wherever located, now or hereafter existing.

"Equity Securities" of a Person means (a) shares of capital stock, limited liability company membership interests, joint venture interests, partnership interests or other equity securities, stock or shares of any kind of such Person, (b) securities directly or indirectly convertible into or exercisable or exchangeable for any of the securities referred to in (a) above, (c) rights, warrants, options, calls, subscriptions or commitments of any kind or character relating to, or entitling any Person directly or indirectly to purchase or otherwise acquire, any of the securities or rights referred to in (a) or (b) above, and (d) equity equivalents, interests in the ownership or earnings of, or equity appreciation, phantom stock or other similar rights of, or with respect to, such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the related regulations and published interpretations.

12

"Escrow Agent" means JPMorgan Chase Bank, a New York corporation, or such other Person as may be mutually acceptable to the Shareholders, the Company and the Purchaser.

"Escrow Agreement" has the meaning stated in Section 4.03(d)(v).

"Escrow Amount" has the meaning stated in Section 11.07(c).

"Estimated Balance Sheet" has the meaning stated in Section 3.02(a).

"Estimated Cash Purchase Price" means an amount equal to (a) the Cash Amount, minus (b) the Estimated Company Debt Amount, minus (c) the excess, if any, of Required Net Current Assets, over Estimated Net Current Assets.

"Estimated Company Debt Amount" has the meaning stated in Section 3.02(a).

"Estimated Net Current Assets" has the meaning stated in Section 3.02(a).

"Excluded Assets" has the meaning stated in Section 2.02.

"Excluded Liabilities" has the meaning stated in Section 2.04(a).

"Expense Amount" has the meaning stated in Section 10.03(c).

"Extended Term" has the meaning stated in Section 9.03(e).

"Extinguished Liability" has the meaning stated in Section 11.07(c).

"Fees and Expenses" has the meaning stated in Section 10.03(a).

"Final Closing Balance Sheet" has the meaning stated in Section 3.03(c).

"Final Company Debt Amount" has the meaning stated in Section 3.03(c).

"Final Net Current Assets" has the meaning stated in Section 3.03(c).

"Fixtures" means, to the extent not covered by the definition of Equipment, all fixtures appurtenant to Real Property or Leaseholds in all of their forms, wherever located.

"Fundamental Representations" means the representations and warranties set forth in Sections 5.01, 5.02, 5.03, 5.04, 5.05(a), 5.07, 5.12, 5.15(d) and (e), 6.01, 6.02, 6.03 and 6.04.

"Fundamental Representation Indemnification" means the indemnification under Section 11.01(a)(i) with respect to the Fundamental Representations.

13

"GAAP" means (a) with respect to the 2001 Audited Financial Statements, generally accepted accounting principles in the United States and (b) other than with respect to the 2001 Audited Financial Statements, generally accepted accounting principles in the United States as applied by the Company in the preparation of the 2001 Audited Financial Statements, except as otherwise specifically set forth on Schedule 5.07(g); provided, however, to the extent the 2001 Audited Financial Statements were not prepared in accordance with generally accepted accounting principles in the United States, "GAAP" means generally accepted accounting principles in the United States.

"General Escrow Amount" has the meaning stated in Section 11.07(c).

"Governmental Body" means any government or any agency, bureau, commission, court, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign.

"Guarantee" means any guarantee, assurance of performance, standby letter of credit, or other obligation by which any Person agrees to pay, perform or be responsible for, in whole or in part, the obligations or Liabilities of any other Person, whether or not contingent upon any other event or circumstance.

"Hazardous Materials" means, without regard to amount and/or concentration (a) any element, compound, or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substances, extremely hazardous substance or chemical, hazardous waste, medical waste, biohazardous or infectious waste, special waste, or solid waste under Environmental Laws, (b) petroleum, petroleum-based or petroleum-derived products, (c) polychlorinated biphenyls, (d) any substance exhibiting a hazardous waste characteristic including but not limited to corrosivity, ignitibility, toxicity or reactivity as well as any radioactive or explosive materials, and (e) any raw materials, building components, including but not limited to asbestos-containing materials and manufactured products containing Hazardous Materials.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

"Indemnification Notice" has the meaning stated in Section 11.02(a).

"Indemnitee" has the meaning stated in Section 11.02(a).

"Indemnitor" has the meaning stated in Section 11.02(a).

"Indemnity Payment" has the meaning stated in Section 11.07.

"Independent Accounting Firm" means PriceWaterhouseCoopers, LLP.

"<u>Initial Cash Payment Amount</u>" means an amount equal to (a) the Estimated Cash Purchase Price, minus (b) the Escrow Amount.

"<u>Intellectual Property</u>" means all copyrights, uncopyrighted works, trademarks, trademark rights, trademark registrations, patents, including, without limitation, all reissues, divisions, continuations and extensions thereof, patent rights, unpatented inventions, service marks, logos, trade names, trade name rights, corporate names, computer software licenses, data, software, permits, trade secrets, know-how, protected models, designs, methods, concepts, plans, specifications, schematics, formulas, inventions, technology, processes and intellectual property rights and other proprietary rights, whether or not subject to statutory registration, together with applications and licenses for, and the goodwill of the Business relating to, any of the foregoing.

"<u>Intellectual Property Assignment Agreement</u>" has the meaning stated in Section 4.03(d)(iii).

"<u>Inventory</u>" means all finished products, work in process, raw materials, goods in transit, goods at customer sites and other inventory or goods held for sale of a Person in all of its forms, wherever located, now or hereafter existing.

"<u>Knowledge of the Company</u>" means the knowledge, after reasonable inquiry and review of such person's own files and inquiry of those other officers and employees of the Company who would reasonably be expected to have knowledge of the specific matter at issue, of any of Marty Snella, Christopher Younger, Lonnie Clark, Regina Vegliante, Tim Atkinson, and the Company's and its Subsidiaries' directors and executive officers, Regional Presidents and the Company's Director of Human Resources.

"<u>Law</u>" means each applicable treaty, statute, law, rule, regulation or order by any Governmental Body and each judgment, injunction, order, writ, decree or award of any Governmental Body.

"<u>Leaseholds</u>" means all real property interests as lessee, together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to those interests and improvements and Fixtures on or to those interests.

"<u>Liability</u>" of any Person means any Debt, liability, commitment, or obligation of any kind or character, whether or not arising under any Guarantee or other Contract, whether or not secured by any Lien, and whether or not accrued, fixed, absolute, contingent, matured, unmatured, liquidated, unliquidated, due or to become due.

"<u>Lien</u>" means any security interest, lien (statutory or otherwise), claim, pledge, mortgage, deed of trust, hypothecation, charge, easement, deposit arrangement, preference, priority, license, lease, conveyance of any right, option, right of first refusal or offer, conditional sales or other title retention agreement, restriction, covenant, condition or encumbrance of any kind, including, without limitation, any restriction on

15

use, voting, transfer, receipt of income or exercise of any other attribute of ownership, and the filing of or agreement to give any financing statement under the uniform commercial code or comparable law of any jurisdiction to evidence any of the foregoing.

"Losses" means any and all liabilities, obligations, losses, damages, costs, expenses, claims, penalties, Actions, judgments, diminution in value, disbursements of any kind or nature whatsoever, interest, fines, cleanup costs, settlements, costs of preparation and investigation, costs incurred in enforcing any of the Sale Documents and reasonable attorneys' fees and expenses, including without limitation, any Taxes arising out of or resulting from any payment under Article XI hereof.

"Maintenance Fee Agreement" means the Maintenance Fee Agreement, dated as of March 31, 2000, between the Company and Avaya (as successor to Lucent Technologies Inc.), as amended by Amendment No. 1 effective as of March 31, 2001.

"Material Adverse Effect" means (a) a material adverse effect upon any of (i) the Business, management, employees, results, operations, the Assets, the liabilities, condition (financial or otherwise), or prospects of the Company and its Subsidiaries taken as a whole, or (ii) the legality, validity or enforceability of the Sale Documents, or (b) the impairment, hindrance or adverse effect in any material respect upon the ability of the Company, any of its Subsidiaries or the Shareholders to perform any of their obligations under the Sale Documents.

"Material Contract" has the meaning stated in Section 5.15(a).

"Net Current Assets" means an amount equal to the aggregate dollar amount of (a) the Current Assets of the Company and its Subsidiaries included in the Purchased Assets as of the Closing Date, minus (b) the Total Liabilities of the Company and its Subsidiaries as of the Closing Date.

"Newly-Hired Employees" means any employee of the Company as of the Closing Date who becomes an employee of the Purchaser as of the Closing Date.

"Newly-Hired Employees' Liabilities" has the meaning stated in Section 2.05(b).

"Non-Compete Payments" has the meaning stated in Section 9.03(e).

"Non-Compete Period" means the three-year period beginning on the Closing Date.

"Other Employees" has the meaning stated in Section 2.05(c).

"Other Employees' Liabilities" has the meaning stated in Section 2.05(c).

"Other Leases" has the meaning stated in Section 9.07.

16

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance, variance or other authorization issued, granted or given by or under the authority of any Governmental Body or pursuant to any federal, state, local or foreign Law.

"Permitted Liens" means (a) Liens for Taxes incurred in the ordinary course of business consistent with past practice, if a specific reserve shall have been made therefor on the Closing Balance Sheet (as finally agreed upon pursuant to Section 3.03), (b) statutory Liens of landlords, Liens of carriers, warehouse persons, mechanics and material persons and other Liens imposed by Law incurred in the ordinary course of business consistent with past practice, if a specific reserve shall have been made therefor on the Final Closing Balance Sheet, (c) purchase money Liens incurred in the ordinary course of business, consistent with past practice, provided that such Liens (i) do not exceed the value of the Equipment or Inventory so acquired and (ii) were not incurred in violation of any representation, warranty, covenant or agreement contained in the Sale Documents, (d) easements, rights-of-way, restrictions and other similar covenants or encumbrances which, in the aggregate, do not materially interfere with the normal and ordinary operation of the Business, and (e) Liens securing the Company Debt Amount.

"Person" means any individual, corporation, partnership, limited liability company, association, joint venture, trust or any other entity or organization, including, without limitation, any Governmental Body.

"Personnel" means all former and current employees, agents, consultants and independent contractors of the Company and its Subsidiaries who have contributed to or participated in the conception or development of any of the Required Intellectual Property.

"Post-Closing Extinguished Liability Amount" has the meaning stated in Section 11.07(e).

"Pre-Closing Extinguished Liability Amount" has the meaning stated in Section 11.07(c).

"Preferred Stock" means the Series A, Series B, Series C, Series D, Series E, Series F and Series G preferred stock of the Company.

"Prohibited Transaction" means any transaction described in Section 406 of ERISA or Section 4975 of the Code, for which an exemption does not apply.

17

"Purchase Price" means the sum of (a) the Cash Purchase Price, plus (b) the aggregate principal amount of the Purchaser Note, plus (c) the sum of all of the Non-Compete Payments.

"Purchased Assets" has the meaning stated in Section 2.01.

"Purchaser" has the meaning stated in the heading of this Agreement, and its successors and permitted assigns.

"Purchaser Indemnified Person" means the Purchaser and its Affiliates and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents and Affiliates.

"Purchaser Note" has the meaning stated in Section 3.01.

"Purchaser Outside Date" means December 15, 2003.

"Purchaser Required Consents" means the Consents set forth on Schedule 7.04.

"Purchaser's Accountants" means PricewaterhouseCoopers LLC.

"Real Property" means all real property interests, other than as lessee, together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to those interests and improvements and fixtures on or to those interests.

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other closed receptacles containing Hazardous Materials) into the environment.

"Relevant Property" means all sites, facilities, locations, Real Property and Leaseholds (a) presently or formerly owned, leased, used or operated by the Company or any of its Subsidiaries (whether or not such properties are currently owned, leased, used or operated by the Company or any of its Subsidiaries), (b) at which any Hazardous Material has been transported, disposed, treated, stored or released by or on behalf of the Company or any of its Subsidiaries, or (c) that are directly adjacent to any sites, facilities, locations, Real Property or Leaseholds presently or formerly owned, leased, used or operated by the Company or any of its Subsidiaries.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities, or (d) any other actions authorized by Environmental Laws.

18

"<u>Reportable Event</u>" means any event stated in Section 4043 of ERISA for which reporting has not been waived by the Department of Labor.

"<u>Required Intellectual Property</u>" has the meaning stated in Section 5.16(a).

"<u>Required Leases</u>" has the meaning stated in Section 9.07.

"<u>Required Net Current Assets</u>" means (a) $51,000,000.00, minus (b) the Vendor Deposit Reduction Amount as of the Closing Date.

"<u>Required Permits</u> " has the meaning stated in Section 5.10(a).

"<u>Restricted Payment</u>" means (a) any dividend or other distribution of any kind on or in respect of any Equity Securities, and (b) any payments in cash or otherwise, on account of the purchase, redemption, retirement or acquisition of (i) any Equity Securities, or (ii) any option, warrant or other right to acquire any Equity Securities.

"<u>Sale Documents</u>" means this Agreement, the Purchaser Note, the Transitional Services Agreement, each other document, agreement and instrument to be executed and delivered by any of the Shareholders, the Company, any of the Company's Subsidiaries or the Purchaser pursuant to Article IV of this Agreement, and all other documents and instruments by which the Purchased Assets are transferred by the Company to the Purchaser and the Confidentiality Agreement and the Escrow Agreement.

"<u>Schedule Updates</u>" has the meaning stated in Section 8.03(a).

"<u>Securities</u>" means (a) Equity Securities, (b) notes, bonds, debentures, certificates of deposit and all other evidences of indebtedness or Debt, (c) securities directly or indirectly convertible into or exercisable or exchangeable for any of the securities referred to in (b) above, (d) rights, warrants, options, calls, subscriptions or commitments of any kind or character relating to, or entitling any Person to purchase or otherwise acquire, any of the securities or rights referred to in (b) or (c) above, and (d) all other securities of any type.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the related regulations and published interpretations.

"<u>Solvent</u>" means, with respect to the Company, that as of the date of determination (a) the sum of the Company's Debt (including contingent liabilities, but excluding Liabilities to the Shareholders and their Affiliates) does not exceed all of the Company's property, at a fair valuation, (b) the present fair saleable value of the property of the Company is not less than the amount that will be required to pay the probable Liabilities of the Company's then existing Debts (excluding Liabilities to the Shareholders and their Affiliates) as they become absolute, and matured, and (c) the Company does not intend to incur, or believe (nor should it reasonably believe) that it

19

will incur, Debt beyond its ability to pay such Debt as it becomes due. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified Liability Amount" has the meaning stated in Section 11.07(c).

"Specified Liability Escrow Amount" has the meaning stated in Section 11.07(c).

"Subsidiary" of any Person means any Person (a) of which such first Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, more than 50% of the Equity Securities of such other Person, the holders of which are generally entitled to vote for the election of the board of directors, general partner, the manager or other governing body of, or otherwise control the business and affairs of, such other Person, or (b) the operations of which are consolidated with such first Person, pursuant to GAAP, for financial reporting purposes. Unless the context otherwise requires, references to one or more Subsidiaries are references to Subsidiaries of the Company.

"Subsidiary Assets" has the meaning stated in Section 5.12(b).

"Target Date" means the date which is five Business Days after October 29, 2003, and if such date is not a Business Day, the next succeeding Business Day after such date.

"Tax" or "Taxes" means all taxes, charges, fees, levies, duties, imposts, deposits, withholdings, restrictions, fines, interests, penalties, additions to tax or other tax, assessment or charge of any kind, including, without limitation, income, excise, personal property, real property, withholding, sales, use, gross receipts, value added, franchise, profits, capital, premium, occupational, production, severance, ad valorem, occupancy, stamp, transfer, employment, payroll, unemployment insurance, social security, disability, workers compensation, custom duties, license recording, documentation and registration fees imposed by any Governmental Body, and all interest and penalties thereon and additions thereto.

"Tax Indemnification" means the indemnification under Section 11.01(a)(iv).

"Tax Return" means any federal, state, local or foreign return, report, claim for refund, declaration, statement or other form relating to Taxes, including, without limitation, any schedule thereto or amendment thereof.

"Termination Fee" has the meaning stated in Section 10.03(d).

"Third Party Claim" has the meaning stated in Section 11.02(b).

20

"Threshold Amount" means an amount equal to $1,000,000.

"Total Liabilities" means an amount equal to the aggregate dollar amount of all Liabilities of the Company and its Subsidiaries as of the Closing Date included in Assumed Liabilities, but not including the Company Debt Amount.

"Transactions" means the transactions contemplated by, or described in, the Sale Documents, including, without limitation, the sale, transfer, assignment, conveyance and delivery of the Purchased Assets by the Company to the Purchaser.

"Transfer" means a direct or indirect offer, transfer, sale, assignment, pledge, conveyance, hypothecation, license, sublicense or other disposition of all or any interest.

"Transitional Services Agreement" has the meaning stated in Section 4.03(d).

"Unfunded Vested Liabilities" of a Person means, with respect to any Benefit Plan at any time, the excess, if any, of (a) the present value of all vested nonforfeitable benefits under the Benefit Plan, over (b) the fair market value of all Benefit Plan assets allocable to those benefits, all determined as of the then most recent valuation date for the Benefit Plan, but only to the extent that the excess represents a potential liability of the Person or any member of its Controlled Group to the PBGC or the Benefit Plan under Title IV of ERISA.

"Vendor Deposit Reduction Amount" has the meaning stated in Section 8.06(c).

"Vendor Deposits" has the meaning stated in Section 8.06(c).

"WARN Act" means the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §2101, et. seq.

ARTICLE II

The Transaction

Section 2.01.  Purchase and Sale of the Purchased Assets .  Upon the terms and subject to the conditions of this Agreement, at the Closing, for the consideration payable by the Purchaser to the Company in accordance with Article III, the Company will, and the Shareholders, jointly and severally, will cause the Company and its Subsidiaries to, sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser will purchase, accept and acquire from the Company and all of its Subsidiaries, all of the Company's and its Subsidiaries' right, title and interest in, to and under all of the Purchased Assets, free and clear of Liens, except for Permitted Liens.

The term "Purchased Assets " means all the business, goodwill, operations as a going concern, assets, properties, interests and rights owned, leased, licensed or used by, or relating to or arising out of the business or operations of, the Company and all of its Subsidiaries, of every kind and character, real, personal and mixed, tangible and intangible, and wherever situated as of

the Effective Time, including, without limitation, the following, but excluding only the Excluded Assets:

(a)  all (i) Real Property and (ii) Leaseholds in which the Company or one of its Subsidiaries has an interest, including, without limitation, those set forth on Schedule 2.01(a)(i) and Schedule 2.01(a)(ii), respectively;

(b)  all (i) Equipment, (ii) Fixtures and (iii) Inventory in which the Company or one of its Subsidiaries has an interest or which relates to, is used in the business or operations of, or arises out of the business or operations of, the Company or its Subsidiaries, whether owned, rented or leased by, or on loan to the Company or one of its Subsidiaries, including, without limitation, those set forth on Schedule 2.01(b)(i), Schedule 2.01(b)(ii) and Schedule 2.01(b)(iii), respectively;

(c)  all right, title and interest of the Company and its Subsidiaries now or hereafter existing, in, to and under any Contracts, including, without limitation, all Material Contracts and those Contracts set forth on Schedule 2.01(c) (collectively, the "Assigned Agreements"), as each of the Assigned Agreements may have been amended or otherwise modified prior to the date of this Agreement;

(d)  the accounts receivable of the Company and its Subsidiaries, including, without limitation, (i) invoiced accounts receivable, (ii) accrued but uninvoiced accounts receivable, and (iii) all other rights to payment for goods or services sold, delivered or performed, in each case other than any accounts receivable from the Shareholders or any Affiliate of the Shareholders (collectively, the "Accounts Receivable");

(e)  all security deposits, refunds, deposits and prepaid expenses of the Company and its Subsidiaries and all vendor rebate accounts and prospective rebates, whether soft dollar or hard dollar;

(f)  all Securities in which the Company or one of its Subsidiaries has an interest, including, without limitation, the Securities set forth on Schedule 2.01(f), but not including any Equity Securities which represent an interest in any of the Company's Subsidiaries;

(g)  all Intellectual Property in which the Company or one of its Subsidiaries has an interest, including, without limitation, the Intellectual Property set forth on Schedule 2.01(g) and the Company's and its Subsidiaries' names and all trade names (and associated marks, logos and styles) used at any time by the Company or any of its Subsidiaries;

(h)  all right, title and interest of the Company and its Subsidiaries in, to and under, and all assets of, the Benefit Plans set forth on Schedule 2.01(h);

(i)  all other rights, assets and goodwill of the Company and its Subsidiaries, including, without limitation, all (i) buildings, (ii) tangible and intangible personal

22

property, (iii) Permits, (iv) the right to carry on the Business, (v) books of account, general, financial and accounting records, files, invoices and customer's and supplier's lists, and (vi) causes of action, claims and demands of whatever nature arising from or in connection with the business and operation of the Company and its Subsidiaries; and

(j)  all proceeds and products of any and all of the foregoing Purchased Assets.

Section 2.02.  Excluded Assets.  The Company and its Subsidiaries will retain (and the Purchased Assets will not include) the following (collectively, the "Excluded Assets"):

(a)  all of the Company's rights under the Sale Documents;

(b)  the Purchase Price payable to the Company pursuant to Article III;

(c)  the articles of incorporation, minute books, and stock books of the Company and its Subsidiaries;

(d)  all Tax-related assets of the Shareholders, the Company and their respective Subsidiaries ; and

(e)  all Equity Securities which represent an interest in any Subsidiary of the Company.

Section 2.03.  Assumption of the Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Purchaser will execute and deliver to the Company the Assumption Agreement, pursuant to which the Purchaser will, effective as of the Effective Time, assume only the Assumed Liabilities.

The term "Assumed Liabilities" means:

(a)  the (i) accounts payable of the Company and its Subsidiaries arising out of the purchase of goods and services by the Company in the ordinary course of business, but only to the extent such Liabilities are specifically and expressly set forth on the Closing Balance Sheet (subject to adjustment pursuant to Section 3.03), (ii) accrued Liabilities of the Company and its Subsidiaries for employee compensation, including Liabilities for accrued and unpaid employee bonuses for 2003, but excluding unpaid employee bonuses (whether or not accrued) arising out of or relating to any period prior to January 1, 2003, lease payments and other Liabilities of the Company and its Subsidiaries arising in the ordinary course of business, but only to the extent such Liabilities are specifically and expressly set forth on the Closing Balance Sheet (subject to adjustment pursuant to Section 3.03), (iii) payments relating to the agreement by the Company to reimburse employees of Lucent that became employees of the Company in connection with the GEM acquisition for pension benefits that such employees forfeited in connection with such transaction, but only with respect to Newly-Hired Employees, and only to the extent such Liabilities are specifically and expressly set forth on the Closing Balance Sheet (subject to adjustment pursuant to Section 3.03), (iv) the Liabilities assumed by the

23

Purchaser under Section 2.05(c), and (v) obligations of the Company and its Subsidiaries under the Assigned Agreements arising after the Effective Time, in each case, excluding Liabilities not paid in the ordinary course of business consistent with past practice;

(b)  the Company's obligations (i) for the Avaya Debt and the Congress Debt, and (ii) under the Capitalized Leases set forth on Schedule 2.03(b), in an amount not to exceed the Capitalized Lease Amount used for purposes of calculating the Final Company Debt Amount in Section 3.03 hereof; and

(c)  the Additional Assumed Liabilities, if any, elected to be assumed by the Purchaser pursuant to Section 2.04(c) below,

in each case, only if and to the extent the same have not been paid or discharged prior to the Closing Date.

Section 2.04.  Excluded Liabilities.

(a)  Purchaser Not Assuming Excluded Liabilities.  Notwithstanding any provision of the Sale Documents to the contrary, the Purchaser will not accept, acquire, assume or become liable to pay, perform or discharge, the Excluded Liabilities.

The term "Excluded Liabilities" means any of the following Liabilities:

(i)  any Liability owed to either of the Shareholders or any of their Affiliates or any other inter-company Debt, Liabilities or other obligations, including, without limitation, any accrued or declared dividends, distributions or other obligations;

(ii)  any Liability with respect to any Debt of the Company or any of its Subsidiaries, except as expressly provided in Section 2.03(b) above;

(iii)  any Liability of the Company or any of its Subsidiaries arising out of, based upon, relating to or otherwise attributable to any Action (A) that is pending, threatened or completed on or prior to the Effective Time, or (B) that arises out of or is based upon any act, omission, event, condition or circumstance (actual or alleged) taking place or existing prior to the Effective Time, including, without limitation, (aa) the Settlement Agreement and General Release dated as of March 1, 2003, between the Company and Joel A. Schleicher, (bb) the settlement with respect to the termination of Jim Walker's employment with the Company, (cc) any securities law Actions or class action lawsuits, (dd) litigation involving the Company's and its Subsidiaries' trade creditors, and (ee) discrimination and sexual harassment claims;

(iv)  any Liability related to or arising out of any obligation to repurchase, redeem or otherwise acquire any Common Stock or other Securities of the Company, any of its Subsidiaries or any other Person, whether arising out of a "put" option, right of rescission or otherwise, or to pay any dividends or make any distributions in respect of the Common Stock or other Equity Securities of the Company;

(v)  any Tax Liability of the Shareholders, the Company, their Subsidiaries or any of their Affiliates, or Liabilities due to the failure (or alleged failure) of any Shareholder, the Company, their Subsidiaries or any of their Affiliates to timely and fully pay such Taxes;

(vi)  any Liability (A) which arises out of, relates to or results from any income, sales, use or other Tax or any expense arising from or associated with the conveyance and transfer to the Purchaser of the Purchased Assets, or (B) with respect to Taxes related to the operation of the Business by the Company and its Subsidiaries or ownership by the Company or its Subsidiaries of their assets, or otherwise relates to any period of time prior to the Closing Date, including without limitation, any Liability relating to or resulting from, any state sales Tax audit of the Company and its Subsidiaries;

(vii)  any Liability of the Company, any of its Subsidiaries, the Shareholders or any of their Affiliates arising out of or in connection with any generation, use, storage, transportation, disposal, cleanup or release of any Hazardous Materials or violation of Environmental Laws which occurred or exists on or prior to the Effective Time, regardless of whether it was discovered or was capable of discovery on or prior to the Effective Time;

(viii)  any Liability which arises out of, relates to, or is otherwise attributable to any of the Excluded Assets, or arises out of or results from any income, sales, use or other Tax or any expense arising from the distribution to, or ownership by, the Company, any of its Subsidiaries or the Shareholders of any of the Excluded Assets or associated with the realization of the benefits of any of the Excluded Assets;

(ix)  any Liability (A) of the Company or any of its Subsidiaries which is inconsistent with any representation or warranty of the Company, any of its Subsidiaries or either of the Shareholders contained in the Sale Documents or which was incurred in violation of any covenant, agreement or condition contained in the Sale Documents, or (B) for breach or violation of any Law on or prior to the Effective Time;

(x)  any Liability of the Company incurred on or after the Effective Time;

(xi)  any Liability (A) for breach or non performance of any Contract on or prior to the Effective Time, including, without limitation, the Assigned Agreements, (B) under any Contract which is not set forth on Schedule 2.01(c), (C) under any Contract which the Purchaser shall not have received a correct and complete copy of prior to the date of this Agreement, except for the Company's maintenance Contracts that are substantially similar to the standard form of agreement provided to the Purchaser prior to the date of this Agreement, (D) except as may expressly be agreed to by the Purchaser in writing, under any Contract (I) with any Shareholder or any Affiliate of the Company or any Shareholder, or (II) relating to any foreign exchange or similar transactions, (E) relating to the disgorgement, refund or reimbursement of any payments under the Maintenance Fee Agreement, including, without limitation, any such Liabilities arising out of the audit

25

of the payments due under the Maintenance Fee Agreement, or (F) with respect to leases for unoccupied facilities;

(xii)  any Liability (A) under or in connection with any Benefit Plan, (B) arising out of or by reason of a complete or partial withdrawal from a multi-employer pension plan within the meaning of ERISA or termination or withdrawal from any other Benefit Plan, as of a date prior to or as of the Effective Time by any Shareholder, the Company or any other Person who is part of a Controlled Group with the Company, (C) that constitutes an Unfunded Vested Liability, (D) that constitutes the Other Employees' Liabilities, (E) for stay bonuses, change of control payments or other similar items, including, without limitation, any retention payments to Chris Younger or Marty Snella, or (F) for unpaid employee bonuses (whether or not accrued) arising out of or relating to any period prior to January 1, 2003;

(xiii)  any Liability relating to the employees of the Company or any of its Subsidiaries or the employment or termination of any employee, including, without limitation, any Liability relating to compensation, salary, bonus, vacation, benefits, severance, pensions, unemployment insurance and related Taxes accruing, arising, or based on or relating to facts, issues or circumstances occurring, prior to the Effective Time , other than for Newly-Hired Employees' Liabilities and the Liabilities assumed by the Purchaser under Section 2.05(c);

(xiv)  any Liability in respect of any claim, regardless of when made or asserted, which arises from, out of or is based upon the negligence, strict liability of, or any express or implied representation, warranty, agreement or guarantee made by, the Company or any of its Subsidiaries, or alleged to have been made, or which is imposed or asserted to be imposed by operation of law, in connection with any product sold, shipped or manufactured by or on behalf of the Company or any of its Subsidiaries, or any service provided or sold by or on behalf of the Company or any of its Subsidiaries, including, without limitation, any claim relating to the repair or replacement of any such product and any claim seeking recovery for property damage, consequential damage, lost revenue or income or personal injury, except to the extent included in accounts payable or accrued liabilities as set forth on the Closing Balance Sheet (subject to adjustment pursuant to Section 3.03);

(xv)  any Liability arising out of, relating to, or for any rebate, refund, return of product sold, or Inventory consignment, except to the extent included in accounts payable or accrued liabilities as set forth on the Closing Balance Sheet (subject to adjustment pursuant to Section 3.03); and

(xvi)  any other Liability not expressly included in the Assumed Liabilities.

(b)  Company and Shareholders to Perform Excluded Liabilities.  The Purchaser will acquire the Purchased Assets free and clear of all Liabilities except for the Assumed Liabilities.  The Shareholders and the Company, jointly and severally, will remain responsible for and will, subject to any defenses, claims, set-offs or other rights or mutual agreements the Company or the

26

Shareholders may have, duly and timely pay, perform and discharge in full all Excluded Liabilities; provided, however, that neither (i) the exercise by the Shareholders and/or the Company of any or all such defenses, claims, set-offs or other rights or agreements, nor (ii) the failure of the Shareholders and the Company to fully satisfy any or all of the Excluded Liabilities, shall in any way impose any Liability on the Purchaser, its Subsidiaries or Affiliates.

(c)  Additional Assumed Liabilities.  Notwithstanding the provisions of Sections 2.04(a) and (b) above, on the date which is at least one Business Day prior to the Closing Date, the Purchaser may, but shall not be obligated to, without the consent of the Company or the Shareholders, elect in writing to (i) assume any Excluded Liabilities relating to, owed to, or in respect of, current or former employees of the Company and its Subsidiaries (such assumed liabilities being the "Additional Assumed Liabilities"), and (ii) reduce the Cash Amount, and consequently the Purchase Price, dollar-for-dollar by the aggregate dollar amount of the Additional Assumed Liabilities assumed by the Purchaser.  In such an event, the Additional Assumed Liabilities shall (x) be considered to be "Assumed Liabilities", and (y) not be considered to be "Excluded Liabilities".  Nothing in this Section 2.04(c) shall confer any rights or remedies under or by reason of this Agreement or any other Sale Document on any Person, and no third party shall have any right to enforce any provision of this Section 2.04(c).

Section 2.05.  Employees.

(a)  Employment Offers.  The Purchaser will make employment offers to substantially all of the employees of the Company listed on Schedule 2.05(a) hereto.  Except as listed on Schedule 2.05(a), such employment offers will be offers of at will employment at substantially the same compensation for each employee as such employee receives as of the date of this Agreement.  The Purchaser may, in its sole discretion, modify or amend any employment offer or any employment terms or benefits at any time after the Closing Date for any reason.

(b)  Newly-Hired Employees.  With respect to all Newly-Hired Employees, the Purchaser will be responsible for, and shall pay, all liabilities and obligations to the Newly-Hired Employees, but only to the extent that such liabilities and obligations either (i) relate to the period after the Effective Time, or (ii) represent accrued salaries and wages from the date of the last regular payroll date of the Company prior to the Closing Date through the Closing Date and, as such, are specifically, accurately and fully reserved for and included in Current Liabilities on the Closing Balance Sheet (as deemed final under Article III) (such liabilities and obligations being the "Newly-Hired Employees' Liabilities").  Except (A) for the Newly-Hired Employees' Liabilities, (B) for the Purchaser's liabilities and obligations expressly set forth in Section 2.06 below with respect to the Benefit Plans referred to therein, or (C) for accrued salaries and wages referred to in clause (ii) above that are specifically, accurately and fully reserved for and included in Current Liabilities on the Closing Balance Sheet (as deemed final under Article III), the Company will be responsible for, and shall duly and timely pay, perform and discharge, all liabilities and obligations to the Newly-Hired Employees, including, without limitation, all bonus or similar payments accrued (or that should be accrued) with respect to the portion of the Company's fiscal year completed prior to the Closing Date under the Company's bonus plans and employment policies in effect as of the date hereof, which accrued bonuses shall be set aside and paid to the Newly-Hired Employees entitled thereto on the Closing Date.

27

(c) <u>Other Employees</u>. The Purchaser will not assume or become responsible for any Liability (the "<u>Other Employees' Liabilities</u>") to any current or former employees of the Company and its Subsidiaries other than the Newly-Hired Employees (all such employees being the "<u>Other Employees</u>"), except that the Purchaser shall assume and be responsible for severance payable to the Other Employees (except for the Other Employees set forth on <u>Schedule 2.05(c)</u> to this Agreement) due to such Other Employees' termination of employment with the Company on the Closing Date in connection with the consummation of the Transactions. The Company will be responsible for, and shall duly and timely pay, perform and discharge, all liabilities and obligations to the Other Employees.

(d) <u>No Rights of Officers or Employees</u>. The parties hereto expressly acknowledge and agree that the matters and agreements set forth in Section 2.05 and Section 2.06 of this Agreement are strictly agreements among the Shareholders, the Company and the Purchaser and no present or former officer or employee of the Company or any of its Subsidiaries has any rights (directly, as a third party beneficiary or otherwise) under Section 2.05 and Section 2.06 and shall not have any right to enforce any of the agreements set forth in such Sections.

(e) <u>COBRA</u>. The Parent or a member of its Controlled Group shall provide continuation coverage mandated by Part 6 of Title I of ERISA or Section 49080B of the Code or state Laws for Other Employees who are not Newly-Hired Employees, including for all "M&A Qualified Beneficiaries" and neither the Purchaser nor any member of its Controlled Group shall have any responsibility or obligation to provide such coverage, unless required pursuant to applicable Law.

(f) <u>WARN</u>. In the event that the termination of Other Employees who are not Newly-Hired Employees results in an event that is subject to the WARN Act, the Purchaser shall provide payment to the Parent or a member of the Controlled Group, as applicable, for any resulting wage and/or benefits liabilities under the WARN Act relating to such termination(s). Purchaser shall bear no responsibility for any other liabilities or responsibilities under the WARN Act with respect to such termination(s) other than that stated above.

Section 2.06. <u>Benefit Plans</u>. As of the Effective Time, the Purchaser will have in effect Benefit Plans providing benefits to the Newly-Hired Employees which are consistent (taken as a whole) with the benefits provided to employees of similarly situated companies operating in the same business and in the same geographic location as the Company. Each Newly-Hired Employee participating in the Company's Benefit Plans as of the Effective Time will become a participant in the Purchaser's Benefit Plans as of the Effective Time with credit for service with the Company for participation, eligibility purposes and vesting, but not for accrual of benefits. The Purchaser may, in its sole discretion, modify or amend any such Benefit Plan or the terms or benefits provided thereunder at any time after the Closing.

ARTICLE III

Consideration; Adjustments

Section 3.01.  Consideration.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, as payment in full of the Purchase Price for the purchase of the Purchased Assets, which Purchase Price shall be subject to adjustment after the Closing Date as provided in this Article III, the Purchaser will:

(a)  pay, or cause to be paid, to the Company, by wire transfer of immediately available funds, an amount in cash equal to the Initial Cash Payment Amount;

(b)  issue to the Company a promissory note, in the aggregate principal amount of $27,500,000, in substantially the form of, and having the terms set forth on, Exhibit 3.01 attached hereto (the "Purchaser Note");

(c)  pay, or cause to be paid, to the Escrow Agent, by wire transfer of immediately available funds, an amount in cash equal to the Escrow Amount; and

(d)  assume the Assumed Liabilities.

Section 3.02.  Calculation of the Initial Cash Payment Amount.

(a)  Preparation of Estimated Balance Sheet.  On or prior to the date which is two Business Days prior to the Closing Date, the Purchaser, after consulting with the Company, shall prepare and deliver to the Company a detailed balance sheet (the "Estimated Balance Sheet") which reasonably estimates the financial position of the Company and its Subsidiaries as of the Closing Date in conformity with GAAP and sets forth a detailed calculation of the Purchaser's estimate of (i) the Company Debt Amount as of the Closing Date (the "Estimated Company Debt Amount"), and (ii) the Net Current Assets as of the Closing Date (the "Estimated Net Current Assets").

(b)  Calculation of Initial Cash Payment Amount.  Simultaneously with the delivery of the Estimated Balance Sheet to the Company, the Purchaser shall prepare and deliver to the Company a statement setting forth the calculation of the Estimated Cash Purchase Price and the Initial Cash Payment Amount using the Estimated Company Debt Amount and the Estimated Net Current Assets shown on the Estimated Balance Sheet and the Escrow Amount.

Section 3.03.  Post-Closing Adjustment to Cash Purchase Price.

(a)  Preparation of Closing Balance Sheet.  As promptly as practicable, but in any event within 90 calendar days following the Closing Date, the Purchaser will deliver to the Company a balance sheet (the "Closing Balance Sheet"), certified by the Purchaser as fairly presenting the financial position of the Company and its Subsidiaries on the Closing Date in conformity with GAAP and setting forth a calculation of the Company Debt Amount and the Net Current Assets as of the Closing Date.  Subject to Section 3.03(c), the Closing Balance Sheet and the calculation of Company Debt Amount and Net Current Assets delivered by the Purchaser to the Company will be deemed to be and will be final, binding and conclusive on the parties hereto.

29

(b)  Calculation of Cash Purchase Price.  Simultaneously with the delivery of the Closing Balance Sheet to the Company, the Purchaser shall prepare and deliver to the Company a written statement (the "Purchase Price Statement") setting forth the calculation of the Cash Purchase Price using the Company Debt Amount and the Net Current Assets shown on the Closing Balance Sheet.

(c)  Right to Review and Dispute.

(i)  During the 30 calendar day period following the Company's receipt of the Closing Balance Sheet and the Purchase Price Statement, the Company will be permitted to review the working papers of the Purchaser relating to the preparation of the Closing Balance Sheet and the Purchase Price Statement and the calculation of Company Debt Amount and Net Current Assets and the Cash Purchase Price shown on the Purchase Price Statement.

(ii)  The Company may dispute the preparation of the Closing Balance Sheet, the Purchase Price Statement and/or the determination of Company Debt Amount and Net Current Assets and the Cash Purchase Price set forth thereon; provided, however, that the Company must notify the Purchaser in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within 30 calendar days of the Purchaser's delivery of the Closing Balance Sheet and the Purchase Price Statement to the Company.  In the event written notice of such a dispute is received by the Purchaser in a timely manner, such a dispute will be resolved in accordance with the provisions of Section 3.03(d) below.

(iii)  The Closing Balance Sheet, the Purchase Price Statement and the calculation of Company Debt Amount, Net Current Assets and the Cash Purchase Price will be deemed final for the purposes of this Article III upon the earliest to occur of (A) the failure of the Company to notify the Purchaser of a dispute in accordance with this Agreement within 30 calendar days of the Purchaser's delivery of the Closing Balance Sheet and the Purchase Price Statement to the Company, (B) the resolution of all disputes in writing by the Company and the Purchaser, (C) the resolution of all disputes pursuant to Section 3.03(d) by the Purchaser's Accountants and the Company's Accountants, and (D) the resolution of all disputes pursuant to Section 3.03(d) by the Independent Accounting Firm. The Closing Balance Sheet, the Company Debt Amount and Net Current Assets, as deemed final pursuant to this Section 3.03(c)(iii), are referred to herein as the "Final Closing Balance Sheet", the "Final Company Debt Amount" and the "Final Net Current Assets", respectively.

(d)  Resolution of Disputes Under This Section 3.03.  In the event that written notice of a dispute is received by the Purchaser under Section 3.03(c) in a timely manner, the Purchaser and the Company shall attempt in good faith to resolve their dispute for a period of 15 calendar days.  In the event that the Purchaser and the Company are unable to resolve such dispute within such period, the Purchaser's Accountants and the Company's Accountants will attempt to reconcile their differences, and any resolution by them as to any disputed amounts will be final, binding and conclusive on the parties hereto.  If the Purchaser's Accountants and the Company's Accountants are unable to reach a resolution with such effect within 30 calendar days after receipt of such written notice of dispute under Section 3.03(c), the Purchaser's Accountants and

the Company's Accountants will submit the items (together with their respective positions thereon and reasons therefor) remaining in dispute for resolution to the Independent Accounting Firm.  The Independent Accounting Firm will be instructed to determine the appropriate amount of each disputed item in accordance with GAAP and render a report to the Purchaser and the Company within 20 calendar days after such submission; provided, however, that in no case may such determination of any such disputed item be outside the range established by the respective positions of the Purchaser's Accountants and the Company's Accountants.  The report of the Independent Accounting Firm as to the disputed items will be conclusive as to each disputed item and will be final and binding on the parties hereto.  The fees and expenses of the Independent Accounting Firm for such determination shall be paid by the parties based upon the degree to which the Independent Accounting Firm accept the respective positions of the parties.  For example, if it is Purchaser's position that the adjustment owed is $300, the Company's position that the adjustment owed is $100 and the Independent Accounting Firm's finding that the adjustment owed is $150, then Purchaser shall pay 75% (300-150 / 300-100) of the Independent Accounting Firm's fees and expenses and the Company shall pay 25% (150-100 / 300-100) of the Independent Accounting Firm's fees and expenses.  Other than the expense of retaining the Independent Accounting Firm, the expense of preparing the Closing Balance Sheet and the Purchase Price Statement shall be borne by the Purchaser and the expense of the Company's review shall be borne by the Company and the Shareholders.

(e)  Adjustment of Cash Purchase Price and Payment of Adjustment Amount.  In the event that the Cash Purchase Price set forth in the Purchase Price Statement (as finally determined in accordance with this Article III) is (i) less than the Estimated Cash Purchase Price, the Purchaser shall have the right to withdraw an amount in cash equal to the shortfall from the Escrow Amount pursuant to the provisions of Section 11.07 hereof, and if the amount of such shortfall exceeds the Escrow Amount, then the Company and the Shareholders, jointly and severally agree promptly to pay to the Purchaser the amount of such excess, in cash in immediately available funds, and (ii) greater than the Estimated Cash Purchase Price, the Company shall have the right to withdraw an amount in cash equal to the amount of such excess from the Escrow Amount, and if the amount of such excess exceeds the Escrow Amount, then the Purchaser agrees promptly to pay to the Company the amount of such excess, in cash in immediately available funds; provided, however, that in no event shall the Cash Purchase Price exceed the Cash Amount, and in no event shall the sum of (aa) the amount of such withdrawal by the Company from the Escrow Amount, plus (bb) Purchaser's payment of any such excess set forth in clause (ii) above, plus (cc) the Initial Cash Payment Amount, exceed an amount equal to the Cash Amount minus the Company Debt Amount.

Section 3.04.  Allocation of Purchase Price for Tax Purposes.  On or before the Closing Date, the Company and the Purchaser will agree upon an allocation of the Purchase Price covering the Purchased Assets for federal, state and local Tax purposes.  Upon reaching such agreement, such allocation will be set forth on Schedule 3.04 hereto.  The Company and its Subsidiaries and the Purchaser will implement, report and accept the allocation set forth on Schedule 3.04 for federal, state and local Tax purposes.  The parties agree that such allocations will not in any way limit their respective rights and obligations under the Sale Documents in respect of representations, warranties, covenants and agreements and the breach thereof or damages therefor.

31

ARTICLE IV

The Closing; Conditions to Closing

Section 4.01.  <u>The Closing</u>.

(a)  <u>Time and Place of Closing</u>.  The consummation of the Transactions (the "<u>Closing</u>"), will take place at the offices of Sidley Austin Brown & Wood LLP, 787 Seventh Avenue, New York, New York 10019, at 10:00 a.m. (New York City time), on the Target Date, or at such other location or time as the parties may agree in writing; <u>provided</u>, <u>however</u>, that if any of the conditions to Closing contained in the Sale Documents (except for conditions which can only be satisfied at Closing) are not satisfied or effectively waived as of the Target Date or such other agreed-upon date, the Closing shall take place on the second Business Day after the date on which all of the conditions to Closing contained in the Sale Documents (except for conditions which can only be satisfied at Closing) are satisfied or effectively waived (the date of the Closing being hereinafter referred to as the "<u>Closing Date</u>").

(b)  <u>Effective Time and Risk of Loss</u>.  The sale, transfer, assignment, conveyance and delivery of the Purchased Assets and the assumption of the Assumed Liabilities described in the Sale Documents will be effective as of the Effective Time.  Until the Effective Time, any loss of or damage to any of the Purchased Assets from fire, casualty or any other occurrence will be the sole responsibility of the Company.

Section 4.02.  <u>Conditions Precedent to the Obligations of the Shareholders and the Company</u>. The obligations of the Shareholders and the Company to consummate the Transactions under the Sale Documents are expressly subject to the fulfillment of each of the following conditions, unless waived by the Company and the Parent in writing, at or before the Closing:

(a)  <u>Representations and Warranties; Performance of Agreements</u>.  (i)  All of the representations and warranties of the Purchaser set forth in the Sale Documents that are qualified as to materiality shall be true and correct in all respects and all of the representations and warranties of the Purchaser set forth in the Sale Documents that are not qualified as to materiality shall be true and correct in all material respects, in each case, on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.  (ii)  The Purchaser shall have performed and complied in all material respects with all of its covenants and other obligations set forth in the Sale Documents required to be performed or complied with by the Purchaser at or before the Closing.  (iii)  The Company shall have received a certificate of the president or a vice president of the Purchaser as to the fulfillment of the conditions set forth in clauses (i) and (ii) above, which certificate shall have the effect of a representation and warranty of the Purchaser as to the matters set forth therein.

(b)  <u>Purchaser Required Consents</u>.  The Company shall have received copies of all of the Purchaser Required Consents, and all such Purchaser Required Consents shall be in

form and substance reasonably satisfactory to the Company and shall be in full force and effect as of the Closing Date.  In addition, the applicable waiting period required under the HSR Act and all similar Laws with respect to the Transactions shall have expired or have been terminated early.

(c)  <u>No Actions</u>.  There shall be no (i) Action by any Governmental Body or by any other Person (A) challenging or seeking to restrain or prohibit the Transactions or (B) seeking to obtain from any Shareholder, the Company or any of their Affiliates in connection with the Transactions any damages that are material in relation to any Shareholder, the Company, their Affiliates or the Purchase Price, or (ii) Law in effect that has had or could reasonably be expected to have any of the consequences referred to in clause (i) above.

(d)  <u>Consideration</u>.  The Company shall have received (i) the Initial Cash Payment Amount by wire transfer of immediately available funds, and (ii) the Purchaser Note, in each case, in accordance with the provisions of Section 3.01 hereof.  The Purchaser shall have delivered the Escrow Amount to the Escrow Agent by wire transfer of immediately available funds in accordance with the provisions of Section 3.01 hereof.

(e)  <u>Ancillary Agreements</u>.  The Company shall have received the following, each dated the Closing Date and in full force and effect as of the Closing Date, in form and substance satisfactory to the Company and its counsel:

(i)  the Assumption Agreement, duly executed by the Purchaser, in the form previously agreed to by the Shareholders, the Company and the Purchaser (the "<u>Assumption Agreement</u>"); and

(ii)  the Escrow Agreement, duly executed by the Purchaser; and

(iii)  the Transitional Services Agreement, duly executed by the Purchaser.

(f)  <u>Secretary's Certificate</u>.  The Company shall have received a certificate of the secretary of the Purchaser with respect to (i) the certificate of incorporation of the Purchaser, (ii) the bylaws of the Purchaser, (iii) the resolutions of the board of directors of the Purchaser approving each Sale Document to which the Purchaser is a party and the other documents to be delivered by the Purchaser under the Sale Documents and the performance of the obligations of the Purchaser thereunder and (iv) the names and true signatures of the officers of the Purchaser authorized to sign each Sale Document to which it is a party and the other documents to be delivered by it under the Sale Documents.

(g)  <u>Good Standing Certificate</u>.  The Company shall have received a certificate of the Secretary of State of the jurisdiction in which the Purchaser is organized, dated as of a recent date, as to the good standing of the Purchaser.

(h) <u>Opinion of Counsel</u>.  If reasonably requested by the Company, the Company shall have received an opinion of Sidley Austin Brown & Wood LLP, counsel for the Purchaser, in the form agreed to by the Shareholders, the Company and the Purchaser.

(i) <u>Certain Collateral</u>.  The Company shall have received evidence reasonably satisfactory to the Company that the Purchaser has replaced any performance bonds, letters of credit or deposits, or provided substitute collateral in connection therewith, for any performance bonds, letters of credit or deposits reflected on <u>Schedule 4.02(i)</u>.

Section 4.03.  <u>Conditions Precedent to the Obligations of the Purchaser</u>.  The obligations of the Purchaser to consummate the Transactions under the Sale Documents are expressly subject to the fulfillment of each of the following conditions, unless waived by the Purchaser in writing, at or before the Closing:

(a) <u>Representations and Warranties; Performance of Agreements</u>.  (i)  All of the representations and warranties of the Company and the Shareholders set forth in the Sale Documents that are qualified as to materiality shall be true and correct in all respects and all of the representations and warranties of the Company and the Shareholders set forth in the Sale Documents that are not qualified as to materiality shall be true and correct in all material respects, in each case, on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.  (ii)  The Shareholders and the Company shall have performed and complied in all material respects with all of their covenants and other obligations contained in the Sale Documents required to be performed or complied with by them at or before the Closing.  (iii)  The Purchaser shall have received a certificate of the president or a vice president of each Shareholder and the Company as to the fulfillment of the conditions set forth in clauses (i) and (ii) above, which certificate shall have the effect of a representation and warranty of the Company and the Shareholders as to the matters set forth therein.

(b) <u>Company Required Consents</u>.  The Purchaser shall have received copies of all of the (i) Company Required Consents and (ii) the Required Permits and all such Company Required Consents and Required Permits shall be in form and substance reasonably satisfactory to the Purchaser and shall be in full force and effect as of the Closing Date.  All of the Required Leases shall have been assigned to the Purchaser.  In addition, the applicable waiting period required under the HSR Act and all similar Laws with respect to the Transactions shall have expired or have been terminated early; <u>provided</u>, <u>however</u>, that if the applicable waiting period necessary to comply with the HSA Act and all similar Laws with respect to the Transactions exceeds 30 days from the date of this Agreement, the Company shall have the right to terminate this Agreement.

(c) <u>No Actions</u>.  There shall be no (i) Action by any Governmental Body or by any other Person (A) challenging or seeking to restrain or prohibit the Transactions, or (B) seeking to obtain from the Purchaser or any of its Affiliates in connection with the Transactions any damages that are material in relation to the Purchaser or any of its Affiliates, or (ii) Law in effect that has had or could reasonably be expected to have any of the consequences referred to in clause (i) above.

(d) <u>Ancillary Agreements</u>.  The Purchaser shall have received the following, each dated the Closing Date and in full force and effect as of the Closing Date, in each case, in the form agreed to by the Shareholders, the Company and the Purchaser:

(i)  one or more Bills of Sale, duly executed by the Company and its Subsidiaries, as applicable (each, a "<u>Bill of Sale</u>");

(ii)  one or more Assignment and Assumption Agreements, duly executed by the Company and its Subsidiaries, as applicable (each, an "<u>Assignment and Assumption Agreement</u>");

(iii)  one or more Intellectual Property Assignment Agreements, duly executed by the Company and its Subsidiaries, as applicable (each, an "<u>Intellectual Property Assignment Agreement</u>");

(iv)  one or more Special Warranty or Bargain and Sale Deeds, duly executed by the Company and its Subsidiaries, as applicable (each, a "<u>Deed</u>");

(v)  an Escrow Agreement, duly executed by each of the Shareholders, the Company and the Escrow Agent (the "<u>Escrow Agreement</u>");

(vi)  a Transitional Services Agreement, duly executed by the Parent (the "<u>Transitional Services Agreement</u>");

(vii)  all other instruments of transfer, duly executed by the Company and its Subsidiaries, as applicable, as shall be necessary or appropriate to vest in the Purchaser good title to the Purchased Assets and to permit the Purchaser to conduct the Business without interruption;

(viii)  checks or drafts payable to the order of the Purchaser, or some other method of delivering to the Purchaser the benefit of, or credit for, all funds of the Company on deposit with banks, financial institutions or other Persons, subject to the rights of Congress pursuant to the Congress Credit Agreement; and

(ix)  such affidavits as reasonably required by the Purchaser's title insurance company in connection with the Company Real Property.

(e) <u>Shareholder Approval</u>.  The holders of the requisite number of each class of the Company's Securities shall have approved the Sale Documents and the Transactions.

(f) <u>Secretary's Certificate</u>.  The Purchaser shall have received a certificate of the secretary, manager or general partner, as the case may be, of the Company, each of its Subsidiaries and each of the Shareholders with respect to (i) the articles of incorporation, certificate of formation or certificate of limited partnership, as the case may be, of the Company, its Subsidiaries and each of the Shareholders, (ii) the bylaws, operating

agreement or limited partnership agreement, as the case may be, of the Company, each of its Subsidiaries and each of the Shareholders, (iii) the resolutions of the board of directors and shareholders, managers, members and partners, as the case may be, of the Company and each of the Shareholders approving each Sale Document to which the Company or any Shareholder is a party and the other documents to be delivered by them under the Sale Documents and the performance of the obligations of the Company or the Shareholders thereunder, and (iv) the names and true signatures of the officers, managers, members or partners, as the case may be, of the Company and each Shareholder authorized to sign each Sale Document to which they are parties and the other documents to be delivered by them under the Sale Documents.

(g) <u>Good Standing Certificate</u>. The Purchaser shall have received a certificate of the Secretary of State of the jurisdiction in which the Company, each of its Subsidiaries and each Shareholder is organized, dated as of a recent date, as to the good standing of the Company, each of its Subsidiaries and each Shareholder, and as to the charter documents of the Company, each of its Subsidiaries and each Shareholder on file in the office of the Secretary of State.

(h) <u>Opinion of Counsel</u>. If reasonably requested by the Purchaser, the Purchaser shall have received an opinion of (i) Paul, Hastings, Janofsky & Walker LLP, counsel for the Shareholders, and (ii) Leonard, Street and Deinard Professional Association, counsel for the Company, in each case, in the form agreed to by the Shareholders, the Company and the Purchaser.

(i) <u>Employment and Non-Competition Agreements</u>. (i) Substantially all of the Persons set forth on Schedule 4.03(i)(i) shall have entered into written employment agreements with the Purchaser in form and substance reasonably satisfactory to the Purchaser and such agreements shall be in full force and effect on the Closing Date. In addition, substantially all of the Persons set forth on Schedule 4.03(i)(ii) shall have entered into non-competition, non-raiding and confidentiality agreements with the Purchaser in form and substance reasonably satisfactory to the Purchaser and such agreements shall be in full force and effect as of the Closing Date, unless the Parent and Purchaser agree, with or without the consent of the Person who entered into such employment or non-competition, non-raiding and confidentiality agreement with the Purchaser, to terminate such agreement prior to the Closing Date.

(j) <u>Resignations</u>. The officers (and the members of the board of directors) of each of the Company's Subsidiaries designated by the Purchaser pursuant to Section 8.05 hereof shall have resigned from the Company's Subsidiaries and the board of directors of each of the Company's Subsidiaries.

(k) [Intentionally Omitted]

(l) <u>FIRPTA</u>. The Purchaser shall have received from the Company a certificate executed by the Company that, as of the Closing Date, the Company is not a "foreign

36

person" within the meaning of Section 1445 of the Code, in form and substance acceptable to counsel for the Purchaser.

(m) <u>Material Adverse Effect</u>.  Since June 30, 2003, no fact, circumstance, event or change shall have occurred, or be reasonably likely to occur, which has had, or could reasonably be expected to have, a Material Adverse Effect.

(n) <u>Order</u>.  The Delaware Bankruptcy Court shall have entered the Parent Order in the Parent's bankruptcy proceedings, and with respect to each Filing Entity, the bankruptcy court in which such Filing Entity's bankruptcy or similar proceedings are filed shall have entered the Filing Entity Order, and each of the Parent Order, the Filing Entity Order or Filing Entity Orders (if more than one Filing Entity exists); <u>provided</u>, <u>however</u>, that if the Parent Order and the Filing Entity Orders shall not have been entered within 30 days of the date of this Agreement, the Company shall have the right to terminate this Agreement.

Section 4.04.  <u>Efforts to Close</u>.

(a) <u>Purchaser's Efforts</u>.  The Purchaser will use its commercially reasonable best efforts to cause (i) the conditions to Closing set forth in Section 4.02 which are within the Purchaser's control to be satisfied on or prior to the Target Date, and (ii) the Transactions to be consummated on the Target Date.  The Purchaser will obtain the Purchaser Required Consents at its expense.

(b) <u>Shareholders' and the Company's Efforts</u>.  Each of the Shareholders, jointly and severally, will, and will cause each of the Company and its Subsidiaries to, the Company will, and the Company will cause each of its Subsidiaries to, use its respective commercially reasonable best efforts to cause (i) the conditions to Closing set forth in Section 4.03 which are within such parties' control to be satisfied on or prior to the Target Date, and (ii) the Transactions to be consummated on the Target Date.  In addition, each of the Shareholders and the Company, jointly and severally, will obtain all Company Required Consents at the sole cost and expense of the Shareholders.

ARTICLE V

Representations and Warranties of the Company

The Company hereby represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows:

Section 5.01.  <u>Existence and Power</u>.  Each of the Company and its Subsidiaries (a) is a corporation, limited liability company or limited partnership, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) is duly qualified under the laws of, or is licensed to do business as a foreign company in good standing in, each jurisdiction in which such qualification or license is required to own, lease or license the Assets or to operate or carry on the Business, except where the failure to be so qualified or licensed, individually or in the aggregate, would not reasonably be expected to have

37

a Material Adverse Effect, and (c) has all necessary corporate, limited liability company or partnership, as the case may be, power and authority required to own, lease or license the Assets, to operate and carry on the Business and to execute and deliver each of the Sale Documents, to consummate the Transactions and to perform their obligations under the Sale Documents. The Company has previously delivered to the Purchaser correct and complete copies of the certificates of incorporation, certificates of formation, certificates of limited partnership, by-laws, operating agreements, partnership agreements and other organizational documents, as the case may be, of each of the Company and its Subsidiaries.

Section 5.02. <u>Authorization; Binding Effect</u>. The execution and delivery by each of the Company and its Subsidiaries of each of the Sale Documents to which they are parties, the performance by each of the Company and its Subsidiaries of their respective obligations under such Sale Documents and the consummation of the Transactions by each of the Company and its Subsidiaries has been duly authorized by all necessary corporate, limited liability company or partnership, as the case may be, action on the part of each of the Company and its Subsidiaries. Each of the Sale Documents to which each of the Company and its Subsidiaries is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, legal, valid and binding obligations of each of the Company and its Subsidiaries, enforceable against each of the Company and its Subsidiaries in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 5.03. <u>Contravention</u>. Neither the execution, delivery and performance of the Sale Documents by each of the Company and it Subsidiaries nor the consummation of the Transactions by each of the Company and its Subsidiaries will (with or without notice or lapse of time or both) (a) violate or breach any provision of the Company's or any of their Subsidiaries' certificate of incorporation, by-laws, certificate of formation, operating agreement, certificate of limited partnership, partnership agreement or other similar organizational documents, (b) assuming the receipt of all of the Company Required Consents prior to the Closing, violate or breach any material Law by which the Company, any of their Subsidiaries, the Business or any of the Assets may be bound or affected, (c) assuming the receipt of all of the Company Required Consents prior to the Closing, breach or result in a default under, result in the acceleration of, or give rise to a change in the terms of or a right of termination, cancellation, modification or acceleration or require any notice under, any Material Contract, (d) result in or require the creation or imposition of any Lien on any of the Assets, or (e) otherwise result in a Material Adverse Effect.

Section 5.04. <u>Consents</u>. Except for the Consents set forth on <u>Schedule 5.04 and any Consents required under the HSR Act</u>, no material Consents are required or advisable on behalf of the Company or any of its Subsidiaries in connection with (a) the due execution and delivery by each of the Company and its Subsidiaries of the Sale Documents and the performance of each of the Company's and its Subsidiaries' obligations thereunder, (b) the consummation of the Transactions by each of the Company and its Subsidiaries, (c) the exercise by the Purchaser of its rights and remedies under the Sale Documents, and (d) the (i) conduct of the Business and (ii) ownership or use of the Assets, by the Purchaser and its Subsidiaries immediately following the

38

Closing Date.  As of the Closing Date, all of the Company Required Consents will have been obtained and will be in full force and effect.

Section 5.05.  Capitalization.

(a)  Authorized, Issued and Outstanding Shares.  Schedule 5.05(a) sets forth a correct and complete list and description of the authorized, issued and outstanding capital stock of the Company as of the date of this Agreement and as of the Closing Date.  All of the issued and outstanding shares of Common Stock and Preferred Stock have been duly authorized, validly issued and are fully paid and non-assessable.  Schedule 5.05(a) sets forth a correct and complete list of (i) the number of issued and outstanding shares of each class of the Company's Equity Securities, and (ii) the number of each class of Equity Securities of the Company owned or held by each such owner.  Except as set forth on Schedule 5.05(a), there are no Equity Securities of the Company (i) authorized, issued or outstanding, (ii) held in the Company's treasury or held by any of the Company's Subsidiaries, or (iii) reserved for issuance.

(b)  Rights, Options, Warrants, Etc.  Except as set forth on Schedule 5.05(b), there are no (i) Securities of the Company or any of its Subsidiaries, (ii) statutory or contractual preemptive rights, subscriptions, conversion rights, rights of first refusal or other similar rights, or (C) Contracts, commitments or understandings of any character, in each case, that obligate the Company or any of its Subsidiaries contingently or otherwise, to (A) issue, sell or Transfer, any Securities of the Company or any of its Subsidiaries, (B) purchase, redeem, retire, defease or otherwise acquire any Securities of the Company or any of its Subsidiaries, or (C) that give any Person the right to receive any benefits or rights substantially similar to any enjoyed by or accruing to holders of any Securities of the Company or any of its Subsidiaries, and no authorization for any of the foregoing has been given.

(c)  No Other Agreements.  Except as set forth on Schedule 5.05(c), there are no voting trusts, stockholder agreements, investor rights agreements, proxies or any other Contracts or understandings in effect with respect to the voting or Transfer of any Securities of the Company or any of its Subsidiaries or with respect to the management or governance of the Company or any of its Subsidiaries.

Section 5.06.  Subsidiaries and Other Securities.

(a)  Subsidiaries.  Schedule 5.06(a) sets forth a correct and complete list of each Subsidiary of the Company, showing for each Subsidiary (i) such Subsidiary's name and the address of its principal place of business, (ii) the jurisdiction of its organization and all jurisdictions in which it is qualified to do business, (iii) the number of Equity Securities of each class (A) authorized and (B) issued and outstanding, (iv) the percentage of the outstanding Equity Securities owned directly or indirectly by the Company, and (v) the names of the record and beneficial holders of each class of outstanding Equity Securities and the number of such Equity Securities held by each such holder.

(b)  Subsidiary Securities.  All outstanding Equity Securities of each Subsidiary of the Company have been duly authorized, validly issued and are fully paid and non-assessable and

39

are free of any preemptive rights and, except as set forth on Schedule 5.06(a), are owned, directly or indirectly, beneficially and of record by the Company free and clear of all Liens, except for Permitted Liens, and any options, warrants and other rights. None of the Company's Subsidiaries' has violated the Securities Act or any applicable Law in connection with the offer, sale or issuance of any of their Securities. Except as set forth on Schedule 5.06(a) there are no Equity Securities of any of the Company's Subsidiaries (i) authorized, issued or outstanding, (ii) held in any such Subsidiary's treasury, or (iii) reserved for issuance.

(c) Other Securities. Except for the Securities set forth on Schedule 5.06(a), neither the Company nor any of its Subsidiaries owns (beneficially or of record), holds or has any interest in, any Securities.

Section 5.07. Financial Information.

(a) Balance Sheets. The audited consolidated balance sheets of the Company and its Subsidiaries dated as of December 31, 2001 and December 31, 2000 (including the footnotes thereto) and the unaudited consolidated balance sheet of the Company and its Subsidiaries dated as of December 31, 2002 and June 30, 2003, copies of which are attached hereto as Schedule 5.07(a), were prepared in accordance with GAAP and fairly present the financial position of the Company and its Subsidiaries as of their respective dates. Except as and to the extent set forth on the face of such balance sheets (as opposed to the notes thereto), as of the respective dates thereof, neither the Company nor any Subsidiary had any Liability. Since June 30, 2003, neither the Company nor any Subsidiary has incurred, assumed, or otherwise become liable for any Liability, except for accounts payable and accrued liabilities incurred in the ordinary course of business, all of which will be fully set forth as Liabilities on the Final Closing Balance Sheet.

(b) Other Financial Statements. The audited consolidated statements of operations, statements of changes in shareholder's equity and statements of cash flows of the Company and its Subsidiaries for the 12-month periods ended on December 31, 2001 and December 31, 2000 (including the footnotes thereto) and the unaudited consolidated statement of operations, statement of changes in shareholder's equity and statement of cash flows of the Company and its Subsidiaries for the twelve-month period ended December 31, 2002 and the six-month period ended June 30, 2003, copies of which are attached hereto as Schedule 5.07(b), were prepared in accordance with GAAP (except with respect to the unaudited statements, for the absence of footnotes and subject to normal recurring year end adjustments in accordance with GAAP which were not and will not be material in amount) and fairly present the results of operations, changes in shareholder's equity and cash flows of the Company and its Subsidiaries for such periods.

(c) Interim Financial Statements. The monthly and quarterly unaudited consolidated and consolidating balance sheets, statements of operations, statements of changes in shareholder's equity and statements of cash flows (both summary and detailed) of the Company and its Subsidiaries heretofore provided to the Purchaser or its representatives were, and those to be provided to the Purchaser pursuant to Section 8.04 will be, prepared in accordance with GA AP (except for (i) the monthly statements, and (ii) the absence of footnotes and subject to normal recurring year end adjustments in accordance with GAAP which were not and will not be material in amount) and fairly present the information purported to be set forth therein on a basis

40

consistent with the preparation of the other financial statements referred to in clauses (a) and (b) above.

(d)  [Reserved]

(e)  <u>No Guarantees</u>.  Except as set forth on <u>Schedule 5.07(e)</u>, none of the Liabilities shown on any of the balance sheets referred to in this Section 5.07 were Guaranteed by any Person other than the Company or a Subsidiary, and none of the Liabilities incurred or assumed by the Company or a Subsidiary after June 30, 2003 and before the Closing Date will have been Guaranteed by any Person other than the Company or a Subsidiary.

(f)  <u>Accounts Payable and Accounts Receivable</u>.  (i)  Except as set forth on <u>Schedule 5.07(f)</u>, all of the accounts payable of the Company and its Subsidiaries, whether reflected in the balance sheets referred to in Section 5.07(a), on the Closing Balance Sheet or otherwise on the books of the Company and its Subsidiaries on the Closing Date, (A) were (or will have been as of the Closing Date) incurred in the ordinary course of the Company's business consistent with past practice, (B) arose or will arise from the purchase of goods or services on customary trade terms in the ordinary course of business, (C) accurately reflect all amounts owed by the Company and its Subsidiaries with respect to trade accounts due and other payables as of the respective dates thereof or the Closing Date, as the case may be, and (D) are not secured by any Lien, except for Permitted Liens.  The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of the accounts payable were calculated in a manner consistent with GAAP and are adequate.  Since June 30, 2003, neither the Company nor any of its Subsidiaries has paid any of its accounts payable after the date on which the Company or such Subsidiary would have paid such account payable in the ordinary course of the Company's business consistent with past practice.

(ii)  Except as set forth on <u>Schedule 5.07(f)</u>, all Accounts Receivable of the Company and its Subsidiaries, whether reflected in the balance sheets referred to in Section 5.07(b) or otherwise on the books of the Company and its Subsidiaries on the Closing Date, (A) have arisen (or will have arisen as of the Closing Date) from bona fide transactions in the ordinary course of business of the Company and its Subsidiaries consistent with past practice, (B) arose or will arise from the sale of goods or services on customary trade terms in the ordinary course of business, and (C) are and will be, as of the Closing Date, current and collectible and will be collected in full within 90 calendar days after the Closing Date net of any reserves specifically set forth on the Closing Balance Sheet (which reserves will be adequate and calculated consistent with past practice).  Since December 31, 2002, neither the Company nor any of its Subsidiaries has collected any of its accounts receivable prior to the earlier of (i) the date on which such Account Receivable is due in accordance with its terms, and (ii) the date on which the Company or such Subsidiary would have collected such Account Receivable in the ordinary course of the Company's business consistent with past practice.  The entries for discounts, allowances and returns on the statements of operations included in the financial statements referred to in Section 5.07(b) are adequate to reflect in full the respective amounts of the discounts, allowances, credits, rebates, provisions for returns, and incentive programs relating to sales or deliveries of Inventory or services recognized during the respective periods covered by such statements (whether such amounts arose out of Inventory or services sold, delivery or performed prior or

41

subsequent to such periods), and all such discounts, allowances, credits, rebates, and provisions for returns as of the date of any balance sheet included in the financial statements referred to in Section 5.07(b) and as of the Closing Date will be classified on such balance sheets, on the Estimated Closing Balance Sheet and the Final Closing Balance Sheet Working Capital Schedule as an offset to gross Accounts Receivable as shown thereon.

(g) <u>Accounting Changes</u>.  Except as set forth on <u>Schedule 5.07(g)</u>, since the date of the 2001 Audited Financial Statements, neither the Company nor any of its Subsidiaries has (i) in the preparation of any internal financial statements or any of the audited or unaudited financial statements referred to in this Section 5.07, applied any accounting principles or methodologies other than GAAP, (ii) changed any accounting methods or principles used in recording transactions on their books or in preparing their financial statements, or (iii) modified its general ledger or internal financial records by changing, adding or deleting any classifications in which transactions are recorded or by allocating similar transactions to different classifications therein.

(h) <u>Non-Recurring Items</u>.  <u>Schedule 5.07(h)</u> sets forth a complete and correct list of (i) all releases from any or reversals of any reserve account made for accounting or financial reporting purposes and recognized in or otherwise affecting the statement of operations for the six months ended June 30, 2003 included in the financial statements referred to in Section 5.07(a) and (b), and (ii) all other extraordinary, non-recurring, or non-operating items (including any write-up or revaluation of, or gain recognized upon the sale of, any asset other than sale of Inventory in the ordinary course of business, and any reversal of or credit corresponding to any charge or expense recognized in a previous accounting period) recognized in or otherwise affecting such statement of operations.

Section 5.08.  <u>Taxes</u>.

(a) <u>Filing of Tax Returns and Payment of Taxes</u>.  Each of the Company and its Subsidiaries have timely filed all Tax Returns that are required to be filed by them and have timely paid all Taxes due and owing by them (whether or not such Taxes are required to be shown on a Tax Return) or has made adequate provision for the payment of all Taxes which are due and payable.  All such Tax Returns were correct and complete in all respects when filed.  The Company has delivered to the Purchaser correct and complete copies of the Company's and its Subsidiaries' United States federal income Tax Returns for the last three complete fiscal years prior to the date of this Agreement.  The charges, accruals and reserves on the books of the Company and each of its Subsidiaries in respect of Taxes were calculated in the ordinary course of the Company's and its Subsidiaries' businesses consistent with past practice in accordance with GAAP and F.A.S.B. and are accurate and adequate.  The Company has established a Tax reserve or account payable in an amount sufficient for all accrued and unpaid federal, state, local and foreign Taxes of the Company and its Subsidiaries, whether or not disputed, including any penalties, interest and related charges and fees in connection therewith, for all complete fiscal periods of the Company.

(b) <u>Withholding Taxes</u>.  All Taxes that the Company or any of its Subsidiaries are required to withhold or collect have been withheld or collected and, to the extent required, have been paid over to the proper Governmental Body on a timely basis.  Proper amounts have been

42

withheld by each of the Company and its Subsidiaries from their employees for all periods in compliance with Tax withholding provisions of applicable federal, state, local, domestic and foreign Laws.

(c)  Audits.  Schedule 5.08(c) sets forth a correct and complete list of all audits of the Company and its Subsidiaries by any Taxing authority in the past three years.  Except as set forth on Schedule 5.08(c), no such audit is in progress.  Except for adjustments disclosed to the Purchaser related to the 1998 and 1999 taxable years, there were no material adjustments to the Company's Tax Returns as a result of any such audit.  All deficiencies proposed as a result of such examinations or audits have been paid, settled or fully reserved for on the Final Closing Balance Sheet.  Neither the Company nor any of its Subsidiaries has received any notice of any pending or threatened audit by the Internal Revenue Service or any state, local or foreign Taxing authority related to the Company's Tax Returns or Tax liability for any period and no claim for special assessment or collection of Taxes has been asserted against the Company or any of its Subsidiaries.

(d)  Waivers.  Except for waivers for the 1998 and 1999 taxable years previously disclosed to the Purchaser, the Company has not entered into any agreements for any waiver or for the extension of any statute of limitations governing the time of assessment or collection of any federal, state or local Taxes or the filing of any Tax Return.

(e)  Claims by Certain Jurisdictions.  No claim has been made by any Taxing authority in a jurisdiction where neither the Company nor any of its Subsidiaries files any Tax Returns that the Company or one of its Subsidiaries is or may be subject to taxation in that jurisdiction.

(f)  Tax Liens.  Except as set forth on Schedule 5.08(f), no Tax Liens, other than Permitted Liens, have been filed with respect to any Taxes of the Company, any of its Subsidiaries or any of their Affiliates.

Section 5.09.  Litigation.  Except as set forth on Schedule 5.09, there is no Action pending, or to the Knowledge of the Company, threatened (a) against the Company or any of its Subsidiaries, or (b) that questions the validity of any of the Sale Documents or that involves or relates to any of the Transactions, or (c) affecting any of the Assets or the Business, or (d) that could reasonably be expected to materially adversely affect the Purchaser's and its Subsidiaries' ability to conduct the Business after the Closing or the ownership or use by the Purchaser and its Subsidiaries of the Assets after the Closing.  Except for the matters listed on Schedule 5.09 that are marked with an asterisk, none of the matters disclosed on Schedule 5.09 has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.10.  Permits; Compliance with Laws.

(a)  Permits.  Schedule 5.10(a) sets forth a correct and complete list and description of all material Permits necessary to entitle or permit the Company and each of its Subsidiaries to use its corporate name, to own, lease, operate and use the Assets, and to carry on and conduct the Business at full capacity (such Permits being the "Required Permits").  The Company and each of its Subsidiaries, as the case may be, owns, holds or possesses all Required Permits and all

43

such Required Permits are validly held and are in full force and effect and to the Knowledge of the Company, all Required Permits were validly issued. To the Knowledge of the Company, no Required Permit will be subject to suspension, modification, limitation, revocation, cancellation or non-renewal as a result of the consummation of the Transactions. To the Knowledge of the Company, no fact, issue or circumstance exists which could reasonably be expected to cause any of the Required Permits not to be renewed in the ordinary course of the Company's business.

(b) Compliance with Laws. The Company, its Subsidiaries, their operations, the Business and the Assets are and at all times have been in compliance with each Required Permit and each Law applicable to the Company, its Subsidiaries, their operations, the Business or the Assets. Neither the Company nor any of its Subsidiaries, nor any director, officer or employee of the Company or any of its Subsidiaries acting on behalf of the Company or one of its Subsidiaries, has at any time made any bribes, kickback payments or other illegal payments.

(c) Certain Notices. Except as set forth on Schedule 5.10(c), neither the Company nor any of its Subsidiaries has received any written notice (a) concerning the revocation, suspension, modification, limitation, cancellation or non-renewal of any Required Permit, or (b) of a violation of or default with respect to, any Required Permit or Law applicable to the Company, its Subsidiaries, their operations, the Business or the Assets.

Section 5.11. Absence of Certain Changes or Events. Since June 30, 2003, except as specifically set forth on Schedule 5.11 hereto, (a) there has not occurred any event, fact, circumstance or change that has had or which could reasonably be expected to have, a Material Adverse Effect, (b) the Company and each of its Subsidiaries has conducted its business only in the ordinary course consistent with past practice, and (c) neither the Company nor any of its Subsidiaries:

(i) has (A) Transferred any of the Assets, except for Inventory in the ordinary course of business consistent with past practice or obsolete Inventory, (B) caused or permitted any of the Assets to become subject to any Liens, other than Permitted Liens, (C) purchased or acquired any Securities or otherwise made or acquired any investment in any Person, or (D) incorporated or formed any Subsidiary, or merged or consolidated with or into, or entered into any business combination with any Person;

(ii) has (A) issued any notes, bonds or other Debt Securities, incurred any Debt or Guaranteed any obligation of any Person, (B) waived, released, canceled, settled, written off or compromised any material Debt, obligation, claim or other right owed to the Company or any of its Subsidiaries, or (C) made any loan or advance to any Person;

(iii) has (A) entered into any Contract or transaction with any of its Affiliates, or (B) made or declared any Restricted Payment;

(iv) has (A) paid or agreed to pay any bonus, extra compensation, pension or severance pay, (B) increased the benefits payable under the Company's or its Subsidiaries' Benefit Plans, or (C) otherwise increased the wage, salary or compensation (of any nature) or benefits to any of its directors, officers or employees;

44

(v)  has made (A) any single capital expenditure in excess of $250,000, or (B) aggregate capital expenditures in excess of $500,000;

(vi)  has (A) disclosed any confidential Required Intellectual Property or other confidential proprietary information of the Company or its Subsidiaries to any Person (other than to the Purchaser), or (B) Transferred or permitted to lapse any Required Intellectual Property;

(vii)  has (A) written down or written up (or failed to write down or write up in accordance with GAAP) the value of any Inventory or accounts receivable, (B) revalued any of the Assets, or (C) increased or changed any assumptions underlying, or methods of calculating, any bad debt, contingency or other reserves;

(viii)  has (A) made any material change in its customary methods of operation, including, without limitation, practices and policies relating to purchasing, inventories, marketing, selling and pricing, or (B) entered into any other material transaction other than in the ordinary course of business consistent with past practice;

(ix)  has suffered any material damage, destruction or casualty loss (whether or not covered by insurance) or any material operating or other loss or any taking of any of the Assets, by condemnation or eminent domain;

(x)  has allowed any Required Permit to lapse or terminate or failed to renew any Required Permit that is scheduled to terminate or expire within 60 calendar days after the Closing Date; or

(xi)  has entered into, or authorized, any Contract to do any of the foregoing.

Section 5.12.  <u>Assets</u>.

(a)  <u>Purchased Assets; Transfer of Title to Purchased Assets</u>.  The Company has good title to or leasehold interest in all of the Purchased Assets, free and clear of all Liens, except for Permitted Liens.  Assuming the receipt of all of the Company Required Consents prior to the Closing, the Company has good right, full power and lawful authority to sell, bargain, convey, transfer, deliver and assign to Purchaser all its right, title and interest in, to and under each of the Purchased Assets.  Assuming the receipt of all of the Company Required Consents prior to the Closing, upon delivery to the Purchaser at the Closing by the Company of the agreements, documents and instruments set forth in Section 4.03(d) and upon the Company's receipt of the Initial Cash Payment Amount in accordance with Article III of this Agreement, good title to the Purchased Assets will pass to the Purchaser, free and clear of any Liens, except for Permitted Liens.

(b)  <u>Subsidiary Assets; No Adverse Impact on Subsidiary Assets</u>.  The Company's Subsidiaries have good title to or leasehold interest in and have the legal and valid right to use all of the properties and assets, tangible or intangible, including, without limitation, all Real

45

Property, Leaseholds, Equipment, Fixtures, Inventory, Contract rights, Intellectual Property and personal property (such properties and assets being the "Subsidiary Assets"), which, when taken together with the Purchased Assets, constitute all of the properties and assets used in or necessary for the conduct of the Business free and clear of all Liens, except for Permitted Liens.  Assuming the receipt of all of the Company Required Consents prior to the Closing, each of the Company's Subsidiaries has good right, full power and lawful authority to sell, bargain, convey, transfer, deliver and assign to Purchaser all its right, title and interest in, to and under each of the Subsidiary Assets.  Assuming the receipt of all of the Company Required Consents prior to the Closing, upon delivery to the Purchaser at the Closing by the Company's Subsidiaries of the agreements, documents and instruments set forth in Section 4.03(d) and upon the Company's receipt of the Initial Cash Payment Amount in accordance with Article III of this Agreement, good title to the Subsidiary Assets will pass to the Purchaser, free and clear of any Liens, except for Permitted Liens.

(c)  <u>Sufficiency and Condition of the Assets</u>.  The Purchased Assets and the Subsidiary Assets (together, the "<u>Assets</u>") comprise all of the properties and assets reflected in the financial statements referred to in Section 5.07, except for (i) the Excluded Assets, and (ii) Inventory sold or otherwise disposed of since the respective dates thereof in the ordinary course of business consistent with past practice.  The Assets include all of the assets, properties, rights and interests used or useful in the conduct of the business and operations of the Company and its Subsidiaries, and no assets, properties, rights or interests, other than the Assets, are required for the Company and its Subsidiaries to conduct their business and operations as currently conducted or as proposed to be conducted.  The Assets (i) are in good condition and repair, except for ordinary wear and tear, and (ii) are suitable and adequate for the uses for which they are used and to carry on the Business.

Section 5.13.  <u>Real Property and Leaseholds</u>.

(a)  <u>Schedules</u>.  <u>Schedule 2.01(a)(i)</u> sets forth a correct and complete list, legal description and location, including, without limitation, street addresses and tax map designations of all Real Property (all such Real Property being the "<u>Company Real Property</u>") and <u>Schedule 2.01(a)(ii)</u> sets forth a correct and complete list, including location, street address, name and contact information of the lessor, rents (and paid through dates), security deposits and additional rent, of all Leaseholds (all such Leaseholds being the "<u>Company Leaseholds</u>"), respectively, in which the Company or any of its Subsidiaries has an interest.

(b)  <u>Title to Real Property; Leasehold Interests</u>.  The Company or one of its Subsidiaries, as the case may be, has good title in fee simple to all of the Company Real Property, free and clear of all Liens, except for Permitted Liens.  Except as set forth on <u>Schedule 2.01(a)(i)</u>, none of the Company Real Property is subject to any lease, sublease or other similar Contract or arrangement. The Company or one of its Subsidiaries, as the case may be, has good leasehold interest to all of the Company Leaseholds.  Except as set forth on <u>Schedule 2.01(a)(ii)</u>, each of the Company Leaseholds is the subject of a written lease agreement, and there are no oral terms inconsistent with the written terms thereof.  Except as set forth on <u>Schedule 5.13(b)</u>, no work has been performed on, or materials supplied to, any of the Company Real Property or Company

46

Leaseholds within the applicable statutory period which would give rise to any mechanic's or materialmen's Liens.

(c) <u>No Restrictions</u>.  The Company or one of its Subsidiaries, as the case may be, enjoys peaceful and undisturbed possession of the Company Real Property and the Company Leaseholds.  No instrument of record, easement, license, use restriction, grant or applicable zoning, building or urban redevelopment Law or other impediment of any kind prohibits or materially limits, impairs or interferes with, the use, operation, maintenance of, or access to, or affects the value of, the Company Real Property or Company Leaseholds or any item of personal property related to the Company Real Property or the Company Leaseholds.   Except as set forth on <u>Schedule 2.01(a)(i)</u> or <u>Schedule 2.01(a)(ii)</u>, there are no recorded easements or encroachments by improvements on adjoining premises with respect to any of the Company Real Property or Company Leaseholds that could reasonably be expected to materially affect the ability of the Company and its Subsidiaries to conduct the Business.

(d) <u>Condemnation and Eminent Domain</u>.  Except as set forth on <u>Schedule 5.13(d)</u>, there is no pending or, to the Knowledge of the Company, threatened condemnation or eminent domain proceeding with respect to any of the Company Real Property or Company Leaseholds.

(e) <u>Company Leaseholds</u>.  Except as set forth on <u>Schedule 5.13(e)</u>:

(i)  the Company has delivered correct, and complete copies of each lease evidencing a Company Leasehold described on <u>Schedule 2.01(a)(ii)</u>, together with all amendments, modifications, assignments, assumptions and subleases thereof (each a "<u>Company Lease</u>");

(ii)  all Company Required Consents shall be delivered with respect to all Required Leases;

(iii)  each Company Lease is valid and in full force and effect on the date hereof; except as set forth on <u>Schedule 5.13(e)</u>, the Company or one of its Subsidiaries is currently in occupancy of the premises demised under each Company Lease and all obligations required to have been performed by the tenant under each Company Lease have been performed by the Company or one of its Subsidiaries, including payment of any rent due and payable on or prior to the date hereof;

(iv)  no event or condition exists that constitutes or, with the giving of notice or passage of time or both, would constitute a default or breach of any Company Lease by the Company or one of its Subsidiaries, or, to the Knowledge of the Company, any other party thereto, and no notice of default has been received or issued by any Company or Subsidiary with respect to any such the Company Lease that has not been waived or cured;

(v)  there are no mortgages, deeds of trusts, security deeds or other encumbrances or any other Liens on any Company Leasehold that have been granted by the Company or

47

one of its Subsidiaries, as a result of a breach by any of the Company or one of its Subsidiaries of any contractual obligation, or otherwise; and

(vi)  to the Knowledge of the Company, except as set forth on <u>Schedule 5.13(e)</u>, the current use of the Company Leasehold or its Subsidiaries is in compliance with the uses permitted under the applicable Company Lease.

(f)  <u>Company Real Property</u>.  Other than this Agreement, neither the Company nor any of its Subsidiaries is a party to any Contract for the sale or other disposition of any portion of the Company Real Property.  The Company has not received written notification of any violation of any applicable Law relating to any Company Real Property, including, without limitation, any Law regarding the generation, storage, migration, disposal or existence of any hazardous waste on any Company Real Property.

(g)  <u>Casualty</u>.  (i)  If all or any part of the Company Real Property or the Company Leaseholds (excluding Inventory) is damaged or destroyed by fire or other casualty occurring following the date hereof and prior to the Closing Date and such fire or other casualty is fully insured by the Company's casualty insurance policies, neither party shall have the right to terminate this Agreement and the parties shall nonetheless consummate the Transactions in accordance with the Sale Documents, without any abatement of the Purchase Price or any liability or obligation on the part of the Company by reason of said destruction or damage other than an assignment to Purchaser of all the Company's rights to make a claim for and to retain any casualty insurance proceeds received under such casualty insurance policies in effect with respect to such damaged Company Real Property or Company Leasehold (excluding Inventory) and Purchaser shall receive a credit from the Cash Purchase Price due at Closing for the amount of the deductible on such casualty insurance policy.

(ii)  If all or any part of the Company Real Property or the Company Leaseholds (excluding Inventory) is damaged or destroyed by fire or other casualty occurring following the date hereof and prior to the Closing Date and such fire or other casualty is not fully insured by the Company's casualty insurance policies, neither party shall have the right to terminate this Agreement and the parties shall nonetheless consummate the Transactions in accordance with the Sale Documents, without any abatement of the Purchase Price or any liability or obligation on the part of the Company by reason of said destruction or damage other than either (i) restoring and/or rebuilding or replacing such damaged property to substantially the same condition as it existed prior to the occurrence of such fire or other casualty or (ii) providing Purchaser with a credit from the Cash Purchase Price due at Closing in an amount equal to the estimated cost of such repair or restoration.

Section 5.14.  <u>Equipment, Fixtures and Inventory</u>.

(a)  <u>Schedules and Possession</u>.  <u>Schedule 2.01(b)(i)</u>, <u>Schedule 2.01(b)(ii)</u> and <u>Schedule 2.01(b)(iii)</u> set forth a correct and complete list and description of all Equipment, Fixtures and Inventory, respectively, in which the Company or one of its Subsidiaries has an interest, and the Company or one of its Subsidiaries has exclusive possession and control of all such Equipment, Fixtures and Inventory.

48

(b)  Inventory.  All Inventory classified as such in the consolidated balance sheet of the Company and its Subsidiaries dated as of June 30, 2003, and all additions to Inventory since June 30, 2003, consist of items of a quantity and quality which are usable or saleable in the ordinary course of the business of the Company or one of its Subsidiaries consistent with GAAP and are carried on the financial records of the Company at the lower of cost or market value, except for obsolete or slow moving Inventory, which has been written off or written down to net realizable value.  The charges, accruals and reserves on the consolidated balance sheet of the Company and its Subsidiaries dated as of June 30, 2003 and on the books of the Company in respect of obsolete and slow moving Inventory are, and such charges, accruals and reserves on the Closing Balance Sheet will be, adequate and calculated consistent with GAAP.  Neither the Company nor any of its Subsidiaries is under any obligation nor do they have any liability with respect to accepting returns of items of Inventory in the possession of their customers.

Section 5.15.  Material Contracts.

(a)  Schedule of Material Contracts.  Schedule 5.15(a) sets forth a correct and complete list and description of all of the Material Contracts.

The term "Material Contracts" means all of the following Contracts to which the Company or any of its Subsidiaries is a party or by which they or any of their properties, assets or rights, including, without limitation, the Business and the Assets, are or may be bound or subject:

(i)  deposit agreements, indentures, mortgages, pledge agreements, security agreements, deeds of trust, conditional sale agreements or other Contracts granting a Lien on any of the Assets to any Person;

(ii)  credit agreements, guarantees, indentures, loan agreements, purchase agreements, bonds, Capitalized Leases, bonds, debentures, notes, foreign exchange or other hedging arrangements, interest rate swaps, investments and other evidences of Debt providing for or relating to Debt in respect of which the Company or any of its Subsidiaries is in any manner directly or contingently obligated or liable;

(iii)  Contracts under which the Company or any of its Subsidiaries has, directly or indirectly, purchased or acquired any Securities or otherwise made any advance, loan, extension of credit or capital contribution to, or other investment in, any Person, and all joint venture, partnership and limited liability company Contracts;

(iv)  Contracts under which the Company or any of its Subsidiaries (A) is lessee of, or holds or operates, any Equipment, vehicle or other tangible personal property, or (B) has a Leasehold interest or (C) is the lessor or sublessor of Real Property;

(v)  Contracts (A) for the sale or for the purchase or other acquisition by the Company or any Subsidiary of, or the sale or other Transfer by the Company or any Subsidiary of, any tangible or intangible property or assets, or any services, (I) under

49

which the Company and its Subsidiaries are obligated to pay or entitled to receive, in the aggregate, more than $250,000 in cash or the fair market value of other consideration, assuming the exercise of all options or extensions under any such Contract, or (II) except for maintenance Contracts entered into in the ordinary course of the Company's and its Subsidiaries' business consistent with past practice, which by their terms, assuming the exercise of all options and extensions thereunder, have a term of greater than one year from the date they were entered into, (B) granting any Person any right of first refusal, right of first offer, buy-sell or economically preferential right or other similar rights, to purchase any of the Assets, and (C) with respect to any warranty program of the Company or its Subsidiaries;

(vi)  Contracts relating in whole or in part to the Required Intellectual Property or providing for any license, sublicense, assignment, or other Transfer of any of the Required Intellectual Property (whether as licensor, licensee, sublicensor, sublicensee, assignor, assignee, Transferor, Transferee, or otherwise);

(vii)  Contracts which (A) require the Company or any of its Subsidiaries to deal on an exclusive basis with any Person, (B) restrict or purport to restrict the Company or any of its Subsidiaries from doing any kind of business or from doing business with any Person or in any geographic area or from competing with any Person, (C) require the Company or any of its Subsidiaries to maintain the confidentiality of any matter, except for maintenance and/or sales Contracts entered into in the ordinary course of the Company's and its Subsidiaries' business consistent with past practice, and (D) require the Company or any of its Subsidiaries to indemnify any Person, except for maintenance Contracts entered into in the ordinary course of the Company's and its Subsidiaries' business consistent with past practice;

(viii)  (A) employment, retainer, severance, separation, non-competition, non-solicitation and consulting Contracts with current and former employees officers, directors, consultants and independent contractors, and Contracts with any labor union or other collective bargaining group, (B) Contracts setting forth the terms of or otherwise relating to Benefit Plans, (C) sales agency, dealer, distribution, brokerage or franchise Contracts, (D) Contracts with any shareholder, member, manager, director, officer or other Affiliate of the Company or any of its Subsidiaries, (E) shareholders' agreements, investor rights agreements, registration rights agreements, voting agreements and other similar agreements relating to the Company's or any of its Subsidiary's Equity Securities, and (F) proxies, voting trusts, or powers of attorney to act on behalf of the Company or any of its Subsidiaries;

(ix)  to the extent not covered above, Contracts with suppliers of goods and services to distribute or resell products, or receive commissions for acting as a sales agent for such supplier, under which the Company or any of its Subsidiaries has, in the prior 24 months, made purchases in excess of $250,000 or received commissions in excess of $250,000, including, without limitation, Contracts with Cisco, Siemens and NEC America;

50

(x)  maintenance Contracts; provided, however, that Schedule 5.15 will only include a standard form of such maintenance Contracts and a list of substantially all of the parties who have executed such maintenance Contracts in substantially the form of such standard form agreement;

(xi)  Contracts not made in the ordinary course of business consistent with past practice.

(b)  Copies of Material Contracts.  The Company has provided to the Purchaser correct and complete copies of all written Material Contracts, except for the maintenance Contracts referred to in clause (a)(x) above, for which the Company has provided a standard form of Contract.

(c)  Enforceability.  (i)  Each of the Material Contracts (A) has been duly authorized, executed and delivered by the Company or one of its Subsidiaries, and to the Knowledge of the Company, the other parties thereto, and is in full force and effect and (B) constitutes the legal, valid and binding obligation of the Company or one of its Subsidiaries, and to the Knowledge of the Company, the other parties thereto, enforceable against the Company or one of its Subsidiaries, and to the Knowledge of the Company, the other parties thereto in accordance with the terms of each such Material Contract, except that such enforcement (x) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (y) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought; provided, however, that with respect to the maintenance Contracts referred to in clause (a)(x) above, this representation and warranty shall be true and correct with respect to all maintenance Contracts which individually, or in the aggregate involve payments of $100,000 during any 12-month period.

(ii)  There exists no breach or default (or event which with or without the lapse of time or the giving of notice, or both would constitute a breach or default) under the Material Contracts by the Company or one of its Subsidiaries, or to the Knowledge of the Company, the other parties thereto, and neither the Company nor any of its Subsidiaries nor any other party to any Material Contract has given or received any written notice of breach or default thereunder; provided, however, that with respect to the maintenance Contracts referred to in clause (a)(x) above, this representation and warranty shall be true and correct with respect to all maintenance Contracts which individually or in the aggregate involve payments of $100,000 during any 12-month period.  Neither the Company nor any of its Subsidiaries has given or received any notice that any party to any Material Contract intends to terminate or materially amend or modify any Material Contract; provided, however, that with respect to the maintenance Contracts referred to in clause (a)(x) above, this representation and warranty shall be true and correct with respect to all maintenance Contracts which individually or in the aggregate involve payments of $100,000 during any 12-month period.

(iii)  The consummation of the Transactions will not cause (A) any of the Material Contracts to cease to be in full force and effect, (B) the material breach of any terms or conditions of any Material Contract, (C) the forfeiture or impairment of any material rights under any Material Contract or (D) any material penalty or other material adverse consequence under

any Material Contract; provided, however, that with respect to the maintenance Contracts referred to in clause (a)(x) above, this representation and warranty shall be true and correct with respect to all maintenance Contracts which individually or in the aggregate involve payments of $100,000 during any 12-month period.

(d)  Liens.  Schedule 5.15(d) sets forth a correct and complete list and description of all of the Liens affecting or attaching to the Assets.

(e)  Debt.  Schedule 5.15(e) sets forth a correct and complete list and description of the Debt outstanding or which may be outstanding under each of the Material Contracts described in Section 5.15(a)(ii).

(f)  Certain Contracts.  (i) The maintenance Contracts entered into since August 1, 2003 have a weighted average life of not less than 33 months, (ii) since August 1, 2003, all maintenance Contracts were entered into in the ordinary course of business consistent with past practice, (iii) except as set forth on Schedule 5.15(f), since August 1, 2003, neither the Company nor any of its Subsidiaries has entered into any maintenance Contracts, providing for special incentives, rebates or excessive up-front payments or other non-ordinary course incentives, and (iv) except as set forth on Schedule 5.15(f), neither the Company nor any of its Subsidiaries offered any member of their sales force any special incentives, commissions or other similar items to sell maintenance Contracts.

Section 5.16.  Intellectual Property.

(a)  Ownership or Right to Use.  Schedule 2.01(f) sets forth a correct and complete list and description of (i) all Intellectual Property (whether or not owned by the Company or any of its Subsidiaries) used by the Company or any of its Subsidiaries or which is necessary to conduct the Business, (ii) all Intellectual Property which has been developed by or arisen out of the conduct of the Business, and (iii) all other Intellectual Property (whether or not currently used in the Business) in which the Company or any of its Subsidiaries has an interest, whether as owner, licensee, licensor, sublicensee, sublicensor or otherwise (the Intellectual Property referred to in clauses (i) and (ii) being the "Required Intellectual Property"), in each case (except where the Company or a Subsidiary is a licensee or sublicensee), including, without limitation, a correct and complete list of all jurisdictions in which all trademarks, copyrights and patents (whether owned or licensed) are registered, issued or applied for and all registration, grant and application numbers.  The Company or one of its Subsidiaries owns or has the legal and valid right to use, all Required Intellectual Property, free and clear of all Liens, except for Permitted Liens.  All Required Intellectual Property is valid, enforceable and in good standing.

(b)  No Infringement.  Neither the ownership or use of the Required Intellectual Property nor the operation of the Business has infringed, misappropriated or conflicted with in any material respect and does not infringe, misappropriate or conflict with in any material respect any Intellectual Property of any other Person.  To the Knowledge of the Company, no unauthorized Person is using or engaging in any unauthorized use of any of the Required Intellectual Property.

52

(c) <u>Loss of Rights</u>.  There have been no claims made within the five years immediately preceding the Closing Date (whether currently pending or resolved) against the Company or any of its Subsidiaries asserting the invalidity, misuse or unenforceability of any Required Intellectual Property and, to the Knowledge of the Company, there are no grounds for any of the foregoing.  To the Knowledge of the Company, at no time during the conception or reduction of any of the Required Intellectual Property to practice was any developer, inventor or other contributor to such Required Intellectual Property subject to any employment agreement or invention assignment or non-disclosure agreement or other obligation with any third party that could reasonably be expected to materially and adversely affect the Company's or its Subsidiary's rights in the Required Intellectual Property.

(d) <u>Confidentiality of Intellectual Property</u>.  (i)  The Required Intellectual Property has been maintained in confidence in accordance with protection procedures customarily used in the industry of the Company and its Subsidiaries to protect rights of like importance and, to the extent that any portion of the Required Intellectual Property would otherwise qualify as a "trade secret", which would be necessary to preserve its status as trade secrets under applicable Laws. The Company and its Subsidiaries have taken all reasonably necessary actions to maintain and protect the Required Intellectual Property.

(ii)  Except as set forth on <u>Schedule 5.16(d)</u>, all Personnel have executed and delivered to the Company or one of its Subsidiaries (A) a proprietary information agreement restricting such Person's right to disclose proprietary information of the Company and its Subsidiaries, and (B) appropriate instruments of assignment in favor of the Company or one of its Subsidiaries as assignee that have conveyed to the Company or one of its Subsidiaries exclusive ownership of all Intellectual Property conceived or developed by such Personnel while they were employed or otherwise working for the Company or one of its Subsidiaries.

Section 5.17.  <u>Insurance</u>.

(a) <u>Insurance</u>.  The Company, its Subsidiaries, all of the Assets and the Business are covered by valid and currently effective insurance policies or binders of insurance, including, without limitation, general liability insurance, property insurance, workers' compensation insurance and business interruption insurance, issued in favor of the Company or one of its Subsidiaries, in each case, in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations substantially similar to those of the Company and its Subsidiaries.  Neither the Company nor any of its Subsidiaries is in material default or breach with respect to its obligations under any insurance policy maintained by any of them, and all premiums thereunder will be timely paid in full for all periods up to and through the Effective Time.   Neither the Company nor any of its Subsidiaries has received any notice of cancellation or non-renewal of any such policy or arrangement.  There is no claim pending against the Company or any of its Subsidiaries under any of such policies or arrangements as to which coverage has been denied or disputed by the underwriters of such policies or arrangements.  <u>Schedule 5.17</u> sets forth a correct and complete list and description of all such policies of insurance, including (i) the name of the insurer and the names of the principal insured and each named insured, (ii) the period of coverage, (iii) the type and amount of coverage, and (iv) a list of the material claims paid out under such policies during

the past three years and claims that are pending.  Schedule 5.17 sets forth a correct and complete list of all risks against which the Company or any of its Subsidiaries is insured under a program of self insurance.

(b)  Bonding.  The Company and its Subsidiaries have as of the date of this Agreement, and will have, as of the Closing Date, posted all necessary employee malfeasance, performance or liability bonds in connection with the operation of the Business, and neither the Company nor any of its Subsidiaries has, nor will they have as of the Closing Date, any Liability under any such bonds.

Section 5.18.  Books and Records; Company Names; Bank Accounts; Officers and Directors.

(a)  Books and Records.  Except as set forth on Schedule 5.18(a), the books and records and other financial records of the Company and each of its Subsidiaries are in all material respects accurate, correct and complete, have been maintained in accordance with good business practices, including the maintenance of an adequate system of financial controls, accurately reflect the transactions and other information purported to be contained therein, and are reflected accurately in all material respects in the financial statements referred to in Section 5.07.  Correct and complete copies of all such books and records of the Company and each of its Subsidiaries will have been provided to, or made available to, the Purchaser or its representatives prior to the Due Diligence Termination Date.  The minute books of the Company and each of its Subsidiaries, copies of which will have been delivered to the Purchaser or its representatives prior to the Due Diligence Termination Date, contain materially accurate records of all meetings and accurately reflect all corporate action of the shareholders and the board of directors (including committees) of the Company and each of its Subsidiaries, as the case may be.  The stock books and ledgers of the Company and its Subsidiaries, copies of which will have been delivered to the Purchaser or the Purchaser's representatives, correctly record all transfers and issuances of all Securities of the Company and each of its Subsidiaries.

(b)  Company Names; Chief Executive Office.  Neither the Company nor any of its Subsidiaries has operated or conducted any business under any name other than the name ascribed to the Company in this Agreement and for each Subsidiary on Schedule 5.05(a).  The location of the chief executive office and chief place of business of the Company and its Subsidiaries is set forth on Schedule 5.18(b).

(c)  Bank Accounts .  Schedule 5.18(c) sets forth a correct and complete list and description of (i) all bank and savings accounts, certificates of deposit and safe deposit boxes of the Company's Subsidiaries and (ii) all corporate borrowing, depository and transfer resolutions and those Persons entitled to act thereunder.

(d)  Officers and Directors .  Schedule 5.18(d) sets forth a correct and complete list of all officers and directors of the Company's Subsidiaries.

54

Section 5.19.  <u>Customers and Suppliers</u>.

(a)  <u>Customers</u>.  (i)  <u>Schedule 5.19(a)</u> sets forth a correct and complete list and description, including, without limitation, the names and addresses, of the twenty most significant customers (by revenue to the Company and its Subsidiaries) of the Company and its Subsidiaries for the twelve-month period ended December 31, 2002 and for the six-month period ended on June 30, 2003, and the amount for which each such customer was invoiced during such period.  To the Knowledge of the Company, each such customer intends to use the products, equipment, goods and services sold to it as an end user, and none of such customers intends to act as a distributor or reseller thereof.

(ii)  Except as set forth on <u>Schedule 5.19(a)</u>, since June 30, 2003, there has not been (A) any material adverse change in the business relationship of the Company or any of its Subsidiaries with any customer set forth on <u>Schedule 5.19(a)</u>, including, without limitation, any such customer ceasing to purchase or use the products, equipment, goods or services of the Company or its Subsidiaries or reducing the purchase or use of such products, equipment, goods or services, or (B) any material change in any term (including credit terms) of the purchase Contracts, purchase orders or related arrangements with any such customer.  Since December 31, 2002, neither the Company nor any of its Subsidiaries has received any notice from any customer set forth on <u>Schedule 5.19(a)</u> that such customer intends to take any of the actions set forth in clauses (A) or (B) above.

(iii)  Since June 30, 2003, neither the Company nor its Subsidiaries has shipped or sold to any customer any products, equipment, goods or services (A) to the Knowledge of the Company, in excess of the amount thereof that such customer is reasonably expected to use during its ordinary course of business, (B) on terms that include any volume discount, right of return, rights to rebate, or consignment, or (C) to the Knowledge of the Company, on terms that provided such customer with an incentive to take delivery of or pay for such products, equipment, goods or services prior to the date that such customer would otherwise have taken delivery of or paid for the same.

(b)  <u>Suppliers</u>.  <u>Schedule 5.19(b)</u> (i) sets forth a correct and complete list and description, including, without limitation, the names and addresses, of the twenty most significant vendors and suppliers (by amounts billed to the Company and its Subsidiaries) of the Company and its Subsidiaries for the twelve-month period ended December 31, 2002 and for the six-month period ended June 30, 2003.

(ii)  Since June 30, 2003, there has not been (A) any material adverse change in the business relationship of the Company or any of its Subsidiaries with any supplier of goods, supplies, Inventory or merchandise or (B) any material change in any term (including credit terms) of the supply Contracts or related arrangements with any such supplier.  Since June 30, 2003, neither the Company nor any of its Subsidiaries has received any notice from any vendor or supplier set forth on <u>Schedule 5.19(b)</u> that such supplier intends to take any of the actions set forth in clauses (A) or (B) above.

55

Section 5.20.  Environmental Matters.  Except as set forth in Schedule 5.20 or with respect to any Recognized Environmental Condition contained in a report obtained by Purchaser prior to the Closing Date:

(a)  The operations of the Company and its Subsidiaries are in full compliance with Environmental Laws;

(b)  The Company and/or its Subsidiaries have obtained and are in compliance with all necessary Permits that are required under Environmental Laws to operate the facilities, Assets and Business of the Company and it Subsidiaries;

(c)  There has been no Release at any of the Relevant Properties owned or operated by the Company, its Subsidiaries or a predecessor in interest, or to the Knowledge of the Company, at any Relevant Property which received Hazardous Materials generated by the Company or its Subsidiaries or any predecessor in interest which is reasonably likely to result in Environmental Liabilities;

(d)  No Environmental Claims have been asserted against the Company, its Subsidiaries or, to the Knowledge of the Company, any predecessor in interest, nor to the Knowledge of the Company are any Environmental Claims threatened or pending against the Company, any of its Subsidiaries or any predecessor in interest which is reasonably likely to result in Environmental Liabilities;

(e)  To the Knowledge of the Company, no Environmental Claims have been asserted against any Relevant Properties that may have received Hazardous Materials generated by the Company, any of its Subsidiaries or any predecessor in interest which is reasonably likely to result in Environmental Liabilities that have an Material Adverse Effect;

(f)  The Company has delivered to Purchaser correct and complete copies of (A) all Environmental Reports, or correspondence regarding any Environmental Liabilities of the Seller at any of the Relevant Properties which are in possession of the Shareholders, Company, its Subsidiaries or their agents or (B) any Recognized Environmental Conditions (as defined by the American Society of Testing and Materials ("ASTM") E 1527-00(Standard Practice for ESA Phase I Environmental Site Assessment Process)) at any of the Current Properties which are in possession of the Shareholders, Company, its Subsidiaries or their agents;

(g)  To the Knowledge of the Company, no environmental Liens have been filed against any Real Property owned by the Company or any of its Subsidiaries; and

(h)  To the Knowledge of the Company, Schedule 5.20 sets forth a correct and complete list and description of all instances where any Relevant Property of the Company, any of its Subsidiaries or any predecessor in interest are not in compliance with Environmental Laws or give rise to Environmental Liabilities.

Section 5.21.  Employees; ERISA.

(a)  Schedule of Employees.  Schedule 5.21(a) sets forth a correct and complete list and description of all of the employees of, and consultants and independent contractors to, the Company and its Subsidiaries and each employee's place of employment, compensation, bonuses, deferred or contingent compensation, pension, accrued vacation, accrued sick pay, severance, "golden parachute" and other like benefits and term of employment, in effect as of the date of this Agreement.  Since December 31, 2002, none of the employees listed on Schedule 5.21(a) has spent less than 75% of his active business hours on matters involving the Business; and since December 31, 2002 there has been no officer or employee of, or consultant or independent contractor to, the Company, any of its Subsidiaries, any Shareholder, or any of their Affiliates, other than those listed on Schedule 5.21(a), who has spent more than 25% of his active business hours on matters involving the Business.

(b)  Employment Agreements.  Except as set forth on Schedule 5.21(b), neither the Company nor any of its Subsidiaries has entered into and is not bound by any (i) employment, consulting or severance Contract with any of its directors, officers or employees, or (ii) collective bargaining agreements with its employees.  None of the Company's or its Subsidiaries' employees is subject to any non-compete, non-disclosure, confidentiality, employment, consulting or similar agreements relating to, affecting or in conflict with the Company's and its Subsidiaries' conduct of the Business.  Except as set forth on Schedule 5.21(b), the Company and its Subsidiaries have entered into normal and customary non-competition and non-solicitation agreements with all former officers and other members of management of the Company and its Subsidiaries.  Correct and complete copies of all agreements set forth on Schedule 5.21(b) and a copy of each normal and customary non-competition and non-solicitation agreement have been delivered to Purchaser or its representatives prior to the date of this Agreement.

(c)  Plans.  Schedule 5.21(c) sets forth a correct and complete list of all Benefit Plans of the Company and its Subsidiaries correct and complete copies of which and all summary plan descriptions, summaries of material modifications, most recent Form 5500 (and schedules) and actuarial reports of which have been delivered to the Purchaser or its representatives prior to the date of this Agreement.

(d)  Plan Qualifications.  Each of the Company's Benefit Plans which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) and intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service that the Plan is qualified and that its related trust has been determined to be exempt from taxation under Section 501(a) of the Code.  To the Knowledge of the Company, no events or circumstances have occurred (other than changes for which the remedial amendment period under Section 401(b) of the Code has not expired) since the date of such letters that will materially adversely affect the qualification or exemption of such Plan.  Except as set forth on Schedule 5.21(d), no Benefit Plan sponsored by the Company is under audit, nor, to the Knowledge of the Company, is any such audit pending.  Schedule 5.21(d) lists each employee pension benefit plan covered under Title IV of ERISA that is maintained, contributed to or required to be contributed to by a member of the Company's Controlled Group and each

57

"multiemployer plan" as defined under Section 3(37) of ERISA that covers employees of the Company.

(e)  Labor Relations.  (i)  Except as specifically set forth on Schedule 5.21(e), none of the Company's or its Subsidiaries' employees currently are covered by a unit which has been certified by the National Labor Relations Board as a unit for purposes of collective bargaining, nor are they represented by any labor union or organization.  To the Knowledge of the Company, no labor union or organization currently is engaged in any efforts to organize or represent any of the Company's or its Subsidiaries' employees.  The Company and each Subsidiary are in substantial compliance with all Laws respecting employment, employment practices, labor, terms and conditions of employment and wages and hours, in each case, with respect to employees.

(ii)  There is no unfair labor practice complaint against the Company or any of its Subsidiaries pending before any Governmental Body or other Person.  There is no labor strike, dispute, slowdown or stoppage at any Company or Subsidiary location and no such strike, dispute, slowdown or stoppage has ever occurred.  The Company and its Subsidiaries have timely prepared and filed all appropriate forms (including Immigration and Naturalization Service Form I-9) required by any relevant Governmental Body.

(iii)  To the Knowledge of the Company, no executive or key employee of the Company or any of its Subsidiaries nor any group of employees of the Company or its Subsidiaries has any plans to terminate their employment with the Company or its Subsidiary, as the case may be.

(f)  Compliance with Benefit Laws.  Neither a Reportable Event nor a Prohibited Transaction has occurred or is continuing with respect to any Plan of the Company or any of its Subsidiaries.  No notice of intent to terminate a Benefit Plan subject to Title IV of ERISA has been filed nor except as listed on Schedule 5.21 has any Benefit Plan been terminated.  To the Knowledge of the Company, no circumstances exist which constitute grounds under Section 4042 of ERISA entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administrate, a Benefit Plan, nor has the PBGC instituted any such proceedings.  None of the Shareholders, the Company, any of the Company's Subsidiaries or other members of a Controlled Group with the Company or any Shareholder has completely or partially withdrawn under Section 4201 or 4204 of ERISA from a multi-employer pension plan (or is liable for any complete or partial withdrawal which occurred prior to or as of the Closing Date).  Each of the Company, its Subsidiaries and the other members of a Controlled Group has met its minimum funding requirements under ERISA with respect to all of their Plans and none of them has an Unfunded Vested Liability.  None of the Company, its Subsidiaries or other members of a Controlled Group has incurred any liability to the PBGC under ERISA, other than liability for premiums which have been paid.  None of the Company, its Subsidiaries or any of member of their Controlled Group has used the services of workers provided by contract labor suppliers, temporary employees, "leased employees" (as that term is defined in Section 414(n) of the Code), or persons who have provided services as independent contractors, to an extent that could reasonably be expected to result in the disqualification of any Benefit Plan under applicable Law, or the imposition of penalties or excise Taxes with respect to any Benefit Plan by the Internal Revenue Service, the U.S. Department of Labor, the PBGC or any other Governmental Body.

Other than claims for benefits under the claims procedures of any Benefit Plans, there are no pending or, to the Knowledge of the Company, threatened in writing, actions, claims or proceedings against the Company, a Subsidiary or any member of their Controlled Group or any Benefit Plan or its assets with respect to such plan.  Correct and complete copies of any agreement entered into with the PBGC, U.S. Department of Labor or Internal Revenue Service have been delivered to the Purchaser or its representatives prior to the date of this Agreement.  All contributions required to be made, and claims to be paid, under the terms of any Benefit Plan maintained or contributed by the Company or any Subsidiary have been timely made or reserves therefor on the balance sheet of the Company have been established, which reserves are adequate in all material respects.  None of the Parent's or Company's purpose for engaging in the transactions contemplated by this Agreement is for the evasion of liability under Section 4069 of ERISA.

(g)  <u>Absence of Transaction Entitlements</u>.  Except as set forth on <u>Schedule 5.21(g)</u>, the consummation of the Transactions will not (i) entitle any current or former director, officer or employee of the Company or any of its Subsidiaries or any group of such Persons to any payment from the Company or any of its Subsidiaries, (ii) increase the amount of compensation due to any such director, officer or employee, (iii) accelerate the time of vesting of any compensation, stock incentive or other benefit of any such directors, officer or employee or (iv) result in any "parachute payment" under Section 280G of the Code, whether or not such payment is considered to be reasonable compensation for services rendered.

(h)  <u>No Post-Retirement Benefits</u>.  Except with respect to the Benefit Plans set forth on <u>Schedule 5.21(c)</u>, neither the Company nor any of its Subsidiaries has any liability with respect to an obligation to provide benefits, including death or medical benefits (whether or not insured) with respect to any Person beyond their retirement or other termination of service with the Company or one of its Subsidiaries other than (i) coverage mandated by Part 6 of Title I of ERISA or Section 4980B of the Code or state Laws, (ii) retirement or death benefits under any employee pension plan, (iii) disability benefits under any employee welfare plan that have been fully provided for by insurance or otherwise, (iv) deferred compensation benefits accrued as liabilities on the books of the Company, or (v) benefits in the nature of severance pay.  The obligations set forth on <u>Schedule 5.21(c)</u> have been accrued for in the financial statements attached hereto as <u>Schedule 5.07(a)</u> and <u>Schedule 5.07(b)</u> in accordance with past practice.

(i)  <u>Workers' Compensation</u>.  There are no liabilities to any of the Company's employees relating to workers' compensation benefits that are not fully insured against by third-party insurance carriers.

(j)  <u>WARN Act</u>.  Except as set forth on <u>Schedule 5.21(j)</u>, neither the Company nor any of its Subsidiaries has laid off or involuntarily dismissed (other than for cause) any employees within the six months immediately prior to the Closing Date.  Neither the Company nor any of its Subsidiaries, has, within the 90 days immediately prior to the Closing Date, taken any action or actions which would, independently of the Transactions, result in a plant closing or mass layoff within the meaning of the WARN Act.

59

Section 5.22.  Certain Business Relationships with the Company or its Subsidiaries.

(a)  Certain Transactions or Arrangements.  Except as set forth on Schedule 5.22(a), no partner, shareholder, member, manager, officer, director, employee or other Affiliate of any Shareholder, the Company or any of its Subsidiaries, nor any spouse, former spouse, parent, sibling or child of any such Person or Affiliate thereof, (i) is, or has been during the 12-month period immediately preceding the date of this Agreement, involved in any business arrangement, relationship or transaction with the Company or any of its Subsidiaries, other than an employment relationship, (ii) is, or has been during the 12-month period immediately preceding the date of this Agreement, a party to Contract with the Company or any of its Subsidiaries, or (iii) will after the Closing have any interest in any of the Assets.

(b)  No Other Related Party Transactions.  Except as set forth on Schedule 5.22(b), no partner, shareholder, member, manager, officer, director, employee or other Affiliate of any Shareholder, the Company or any of its Subsidiaries, nor any spouse, former spouse, parent, sibling or child of any such Person or Affiliate thereof, owns, holds or possesses, directly or indirectly, any material financial or other interest in, or is a partner, shareholder, member, manager, officer, director, employee or other Affiliate of (i) any Person that is a supplier, vendor, customer, lessor, lessee, or competitor of the Company, any of its Subsidiaries or the Business, or (ii) any other business which engages in any transactions or other business relationships with the Company or any of its Subsidiaries.

(c)  Transactions with the Shareholders and Their Affiliates.  Schedule 5.22(c) sets forth a correct and complete list and description of all transactions between, among, involving or relating to any Shareholder or any of their Affiliates (other than the Company) on the one hand, and the Company or any of its Subsidiaries, on the other hand, including, without limitation, any Guarantees, credit support or other similar transactions, and all transactions entered into by the Company or any of its Subsidiaries that provided a benefit to either of the Shareholders or any of their Affiliates (other than the Company).

Section 5.23.  Warranties.  Schedule 5.23 sets forth a correct and complete list and description of all oral and written warranty programs offered by the Company or any of is Subsidiaries.  The Company has delivered to the Purchaser correct and complete copies or descriptions of each such warranty program.  No material claim for breach of any express or implied warranty with respect to any of the Company's or its Subsidiaries' products or services has been made or, or to the Knowledge of the Company, is threatened.  Neither the Company nor any of its Subsidiaries is contemplating the recall of any products sold by them and there are no material defects in any such products.  The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of any and all warranties given by the Company and its Subsidiaries were calculated in a manner consistent with GAAP and are adequate.

Section 5.24.  Brokers, Finders.  Except for Bear, Stearns & Co. Incorporated, the fees and expenses of which will be paid entirely by the Shareholders, neither the Shareholders, the Company nor any of their Subsidiaries has retained any broker or finder in connection with the Transactions, and is not obligated and has not agreed to pay any brokerage or finder's commission, fee or similar compensation.

60

Section 5.25.  Solvency of the Company.  As of the date of this Agreement, and as of the Effective Time, before and after giving effect to the Transactions, the Company is, and will be, Solvent.

Section 5.26.  Misstatements.

(a)  No Material Misstatements or Omissions.  No information, certificate, schedule or report furnished or to be furnished (as of the date furnished) by any Shareholder, the Company or any of its Subsidiaries (or by their employees, representatives, counsel, accountants or other professionals) to the Purchaser or to its representatives in connection with (i) the Transactions, (ii) the preparation or negotiation of any Sale Document or (iii) the satisfaction of any conditions set forth in any Sale Document and no representation or warranty contained in the Sale Documents, contains or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading; provided, however, that this Section 5.26(a) shall not apply to any projections or forward-looking financial data covered by Section 5.26(b) hereof.

(b)  Projections.  All projections and forward-looking financial data provided to the Purchaser or its representatives by or on behalf of the Company or any of its Subsidiaries (or by their employees, representatives, counsel, accountants or other professionals) were prepared in good faith and are based on underlying assumptions which the Shareholders and the Company reasonably believe provide a reasonable basis for the projections contained therein.  Such projections have been prepared on the basis of the assumptions set forth therein, which the Shareholders and the Company reasonably believe are fair and reasonable.

Section 5.27.  Full Disclosure.  There are no facts pertaining to the Company, its Subsidiaries, the Assets or the Business which could reasonably be expected to have a Material Adverse Effect and which have not been disclosed in this Agreement.  There is no information which would materially contradict or is inconsistent in any material respect with any representation or warranty of the Shareholders or the Company contained in the Sale Documents.

ARTICLE VI

Representations and Warranties of the Shareholders

The Shareholders, jointly and severally, hereby represent and warrant to the Purchaser as of the date hereof and as of the Closing Date as follows:

Section 6.01.  Existence and Power.  Each Shareholder (a) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and (b) has all necessary corporate power and authority to execute and deliver each of the Sale Documents and to consummate the Transactions and to perform its obligations under the Sale Documents.

61

Section 6.02. <u>Authorization; Binding Effect</u>.  The execution and delivery by each Shareholder of each of the Sale Documents to which any Shareholder is a party, the performance by the Shareholders of their obligations under such Sale Documents and the consummation of the Transactions by the Shareholders has been duly authorized by all necessary corporate action on the part of the Shareholders.  Each of the Sale Documents to which any Shareholder is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, legal, valid and binding obligations of the Shareholders enforceable against the Shareholders in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 6.03. <u>Contravention</u>.  Neither the execution, delivery and performance of the Sale Documents by each Shareholder nor the consummation of the Transactions by the Shareholders will (with or without notice or lapse of time or both) (a) violate or breach any provision of any Shareholder's organizational or governing documents, (b) assuming the receipt of all of the Company Required Consents prior to the Closing, violate or breach any material Law by which any Shareholder or any of their material assets or properties may be bound or affected, or (c) assuming the receipt of all of the Company Required Consents prior to the Closing, breach or result in a default under, result in the acceleration of, or give rise to a change in the terms of or a right of termination, cancellation, modification or acceleration or require any notice under, any material Contract to which any Shareholder is a party or by which any Shareholder or any of their material assets or properties, may be bound or affected.

Section 6.04. <u>Consents</u>.  Except for the Consents set forth on <u>Schedule 6.04 and any Consents required under the HSR Act</u>, no material Consents are required or advisable on behalf of the Shareholders in connection with (a) the due execution and delivery by the Shareholders of the Sale Documents and the performance of the Shareholders' obligations thereunder, (b) the consummation of the Transactions by the Shareholders, (c) the exercise by the Purchaser of its rights and remedies under the Sale Documents, and (d) the (i) conduct of the Business and (ii) ownership or use of the Assets, by the Purchaser and its Subsidiaries immediately following the Closing Date.  As of the Closing Date, all of the Company Required Consents will have been obtained and will be in full force and effect.

Section 6.05. <u>Litigation</u>.  There is no Action against any Shareholder or, to the Knowledge of the Company, any other Person (not including the Purchaser), that involves any of the Transactions that, individually or in the aggregate, if determined adversely to any Shareholder, could reasonably be expected to have a Material Adverse Effect.

Section 6.06. <u>Title to Securities</u>.  The Parent is the sole record, legal and beneficial owner of 100% of the outstanding shares of capital stock of NGC.  The Parent's right, title and interest in such capital stock of NGC is free and clear of all Liens, voting trusts, voting Contracts and restrictions of any nature whatsoever.  Except as set forth on Schedule 6.06, NGC is the sole record, legal and beneficial owner of (i) 100% of the outstanding shares of Series B, Series C, Series F and Series G preferred stock of the Company, and (ii) 100% of the outstanding capital

62

stock of NCC.  NCC is the sole record, legal and beneficial owner of all of the outstanding shares of Class B common stock of the Company, of which 3% of such Class B common stock is subject to a warrant in favor of a third party.  NGC's and NCC's respective rights, title and interest in such capital stock of the Company, and NGC's right, title and interest in the capital stock of NCC, are each free and clear of all Liens, voting trusts, voting Contracts and restrictions of any nature whatsoever other than as set forth above.  Such shares of Preferred Stock and Common Stock are all the Securities of any kind, debt or equity, of the Company owned by NGC and NCC other than intercompany loans payable by the Company to any of the Shareholders.

<div align="center">ARTICLE VII</div>

<div align="center">Representations and Warranties of the Purchaser</div>

The Purchaser represents and warrants to the Shareholders and the Company as of the date hereof and as of the Closing Date as follows:

Section 7.01.  <u>Existence and Power</u>.  The Purchaser (a) is a corporation, validly existing and in good standing under the laws of the jurisdiction of its organization, and (b) has all necessary corporate power to execute and deliver each of the Sale Documents and to consummate the Transactions and to perform its obligations under the Sale Documents.

Section 7.02.  <u>Authorization; Binding Effect</u>.  The execution and delivery by the Purchaser of each of the Sale Documents to which the Purchaser is a party, the performance by the Purchaser of its obligations under such Sale Documents and the consummation of the Transactions by the Purchaser has been duly authorized by all necessary corporate action on the part of the Purchaser.  Each of the Sale Documents to which the Purchaser is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, legal, valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 7.03.  <u>Contravention</u>.  Neither the execution, delivery and performance of the Sale Documents by the Purchaser nor the consummation of the Transactions by the Purchaser will (with or without notice or lapse of time or both) (a) violate or breach any provision of the Purchaser's organizational or governing documents, (b) assuming the receipt of all of the Purchaser Required Consents prior to the Closing, violate or breach any material Law by which the Purchaser or any of its material assets or properties, may be bound or affected, or (c) assuming the receipt of all of the Purchaser Required Consents prior to the Closing, conflict with, breach or result in a default under, any material Contract to which the Purchaser is a party or by which the Purchaser or any of its material assets or properties, may be bound or affected.

Section 7.04.  <u>Consents</u>.  No material Consents are required on behalf of the Purchaser in connection with (a) the due execution and delivery by the Purchaser of the Sale Documents and the performance of the Purchaser's obligations thereunder, and (b) the consummation of the

<div align="center">63</div>

Transactions by the Purchaser. As of the Closing Date, all of the Purchaser Required Consents will have been obtained and will be in full force and effect.

Section 7.05. <u>Litigation</u>. There is no Action against the Purchaser or, to the Purchaser's knowledge, any other Person (not including the Company or the Shareholders), that involves any of the Transactions that, individually or in the aggregate, if determined adversely to the Purchaser, could reasonably be expected to materially and adversely affect the ability of the Purchaser to perform its obligations under the Sale Documents or to consummate the Transactions.

Section 7.06. <u>Financing</u>. As of the date of this Agreement, and as of the Closing Date, the Purchaser has, or has readily available pursuant to binding commitments, funds in an amount sufficient to enable the Purchaser to pay the Cash Purchase Price.

Section 7.07. <u>No Other Representations or Warranties</u>. The Purchaser acknowledges that neither the Company, any of the Shareholders nor any of their Affiliates is making any representation or warranty, express or implied, about or with respect to the Company, its Subsidiaries, the Assets, the Business or the Shareholders, except for the representations and warranties set forth in the Sale Documents and in the exhibits, annexes and schedules thereto, and in any certificates delivered thereunder.

<div align="center">ARTICLE VIII</div>

<div align="center"><u>Pre-Closing Covenants of the Shareholders, the Company and the Purchaser</u></div>

Section 8.01. <u>Conduct of Business Pending Closing</u>. Each of the Shareholders and the Company, jointly and severally, agree that, from the date of this Agreement through the earlier to occur of (x) the Closing Date, and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.01 hereof, the Company will, the Shareholders will cause the Company and its Subsidiaries to, and the Company will cause its Subsidiaries to:

(a) <u>Conduct of Business</u>. Conduct the business of the Company and its Subsidiaries in a manner consistent with the past practices of the Company and its Subsidiaries and neither the Company nor any of its Subsidiaries will engage in any transactions out of the ordinary course of business consistent with past practice.

(b) <u>Payment of Obligations</u>. Subject to Section 8.01(g) hereof, cause the Company and its Subsidiaries to promptly and timely pay and discharge in the ordinary course of the Company's business consistent with past practice, all Taxes and other material obligations assessed, levied or imposed upon, or required to be withheld by, or otherwise owing by, the Company, its Subsidiaries or with respect to the Assets or the Business and shall not incur, assume, guarantee or otherwise become liable for any additional Debt, except for Capitalized Leases and Debt under the Congress Credit Agreement.

<div align="center">64</div>

(c) <u>Material Contracts</u>.  Perform and observe all of the material terms and provisions of each Material Contract to be performed or observed by it, enforce each Material Contract in accordance with its terms and not enter into or terminate any Material Contracts or make any material amendments or modifications to any Material Contracts.  Notwithstanding the foregoing, (i) from the date of this Agreement through the Closing Date, the maintenance Contracts entered into by the Company and its Subsidiaries shall have a weighted average life of not less than 33 months, (ii) all maintenance Contracts shall be entered into in the ordinary course of business consistent with past practice, (iii) neither the Company nor any of its Subsidiaries shall enter into any maintenance Contracts, providing for special incentives, rebates or excessive up-front payments or other non-ordinary course incentives, and (iv) without the prior written consent of the Purchaser (which consent shall not be unreasonably withheld or delayed) neither the Company nor any of its Subsidiaries shall offer any member of their sales force any special incentives, commissions or other similar items to sell maintenance Contracts.  In addition, neither the Company nor any of its Subsidiaries shall amend or modify any terms or provisions of their organizational or governing documents.

(d) <u>Representations and Warranties; Conditions</u>.  Not engage in any practice, take any action, fail to take any action or enter into any transaction that could reasonably be expected to (i) cause any of the representations and warranties of the Shareholders or the Company contained in the Sale Documents, including, without limitation, those contained in Section 5.11 hereof, to be untrue, inaccurate or incorrect in any material respect at any time, or (ii) result in any of the conditions set forth in Section 4.03 not being satisfied on or prior to the Purchaser Outside Date.

(e) <u>Sale of Assets; Liens</u>.  Not (i) Transfer any of the Assets, except Inventory sold or disposed of in the ordinary course of business consistent with past practice, (ii) dispose of, or trade in, any of the Equipment or Fixtures, or (iii) create, incur, assume, or suffer to exist any Lien upon or with respect to any of the Assets, except for Permitted Liens.

(f) <u>Compensation</u>.  Not increase the aggregate amount of compensation or benefits of the directors, officers or employees of the Company or any of its Subsidiaries, including, without limitation, base salaries and bonuses of all types, whether paid or accrued.

(g) <u>Restricted Payments; Affiliate Transactions; Securities</u>.  Not (i) declare or make any Restricted Payment, (ii) issue, sell or grant any Securities of the Company or any of its Subsidiaries; <u>provided</u>, <u>however</u>, that during the period from the date of this Agreement up to the Closing Date, the Company may issue additional Equity Securities representing not more than 25% of the outstanding Equity Securities of the Company in the aggregate, (iii) sell, acquire, redeem, repurchase or amend the terms of any Securities of the Company or any of its Subsidiaries, except in each case, in connection with the termination of the Company's stock option plan, (iv) loan or advance any funds, or any goods or property to, any Shareholder or any of their Affiliates, (v) make any payments or otherwise Transfer any consideration to any Shareholder or any of their Affiliates,

65

whether on account of any Liability or otherwise, or permit any Shareholder or any of their Affiliates to, (vi) engage in any transaction with any Shareholder or any of their Affiliates, (vii) engage in any transaction for the benefit of either of the Shareholders or any of their Affiliates (other than the Company), or (viii) purchase or acquire any Securities of any Person; provided, however, that notwithstanding the foregoing, from the date of this Agreement through the Closing Date, the Company may make an aggregate of $2,000,000 of payments to the Shareholders.

Section 8.02.  Access to Information; Cooperation.

(a)  Access to Information.  (i)  Each Shareholder and the Company, jointly and severally, understand and acknowledge that the Purchaser has not completed its examination of the Company, its Subsidiaries, the Assets and the Business and therefore requires continuous reasonable access to the Company, its Subsidiaries, the Assets and the Business, from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.01 hereof.

(ii)  Each Shareholder and the Company, jointly and severally, agree that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.01 hereof, the Company will, the Shareholders will (only with respect to information relating to the Company and its Subsidiaries), the Parent will cause NGC and NCC (only with respect to information relating to the Company and its Subsidiaries) to, NGC and NCC will cause the Company and its Subsidiaries to, the Company will cause its Subsidiaries to, and the Company and each of the Shareholders will cause their respective Affiliates, directors, officers, employees, accountants, counsel, consultants, investment bankers and other representatives to:

(A)  upon reasonable notice to the Company, give the Purchaser and its authorized representatives, including, without limitation, investors, lenders, environmental consultants and advisors, and respective authorized employees, accountants, counsel and other representatives of any of the foregoing (I) during normal business hours, reasonable access to all plants, offices, personnel (including the Persons responsible for the preparation of Tax Returns), warehouses, facilities, properties, books, Contracts, commitments and records (including accountant's work papers) of or relating to the Company and its Subsidiaries, including, without limitation, the Assets and the Business, and (II) such financial and operating data and other information with respect to the Business and the Assets as any of them may from time to time reasonably request; and

(B)  permit the Purchaser and its authorized representatives, including, without limitation, investors, lenders, environmental consultants and advisors, and respective authorized employees, accountants, counsel and other representatives of any of the foregoing to make such inspections thereof as any of them may reasonably request, including, without limitation, the real estate and facility audit that is currently in progress and an Environmental Site Assessment of the Current Properties and environmental compliance audits.

66

(b)  Cooperation. Each Shareholder and the Company, jointly and severally, agree that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.01 hereof, the Company will, the Shareholders will, the Parent will cause NGC to, NGC will cause the Company and its Subsidiaries to, the Company will cause its Subsidiaries to, and the Company and each Shareholder will cause their respective Affiliates, directors, officers, employees, accountants, counsel, consultants, investment bankers and other representatives to cooperate with the Purchaser and its representatives in carrying out the Transactions.

Section 8.03.  Disclosure Schedules.

(a)  Updating of Disclosure Schedules.  Each Shareholder and the Company, jointly and severally, agree that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.01 hereof, the Company will promptly notify the Purchaser of (i) any and all information, facts, events, circumstances, issues or other matters that existed as of the date of this Agreement that should have been set forth or described in the schedules to this Agreement required or provided for under Articles V or VI of this Agreement as of the date of this Agreement by delivery of appropriate updates to the Schedules attached to this Agreement setting forth such information, facts, events, circumstances, issues or other matters, and (ii) any and all information, facts, events, circumstances, issues or other matters arising after the date of this Agreement which, if existing on the date of this Agreement, would have been required to be set forth or described in the schedules to this Agreement required or provided for under Articles V and VI hereof, in each case, by delivery of appropriate updates to the Schedules attached to this Agreement setting forth such information, facts, events, circumstances, issues or other matters, in each case, no later than two Business Days prior to the scheduled Closing Date (any such updates to the Schedules being referred to herein as "Schedule Updates").

(b)  Effect of Schedule Updates.  Notwithstanding anything to the contrary set forth herein, no delivery of the Schedule Updates by the Company shall limit, restrict, or otherwise affect the schedules previously delivered under this Agreement, nor shall such delivery of the Schedule Updates affect the rights of the Purchaser or the obligations or liability of the Company or the Shareholders hereunder with respect to the schedules previously delivered under this Agreement.

Section 8.04.  Reporting Requirements.  Each Shareholder and the Company, jointly and severally, agree that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.01 hereof, the Company will prepare and promptly (and in any event not later than 15 Business Days following the end of the month to which a statement relates) deliver to the Purchaser monthly financial statements for the Company and its Subsidiaries, on a consolidated basis, as well as detailed back-up schedule therefor.  These monthly financial statements will be prepared in accordance with GAAP and in a manner consistent with the basis of presentation used in the financial statements referred to in Section 5.07.

67

Section 8.05.  <u>Resignations</u>.  On the Closing Date, the Company and the Shareholders shall cause to be delivered to the Purchaser duly signed resignations, effective as of the Effective Time, of all of the directors and officers of each of the Company's Subsidiaries set forth on a list delivered to the Company prior to the Closing Date, and shall take such other actions as are necessary to accomplish the foregoing.

Section 8.06.  <u>Certain Agreements</u>.

(a)  <u>Agreement</u>.  The Shareholders, the Company and the Purchaser agree to accept the form, terms and provisions of the Assumption Agreement, the Escrow Agreement, the Transitional Services Agreement, the Bills of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the legal opinions and the Deeds as provided to them with such changes as they shall mutually agree upon.

(b)  <u>Transitional Services Agreement</u>.  The Parent agrees that it will enter into the Transitional Services Agreement with the Purchaser, pursuant to which the Parent will agree to provide the Purchaser with certain insurance and tax services and such other services as may mutually be agreed by the Purchaser and the Parent.

(c)  <u>Vendor Deposits</u>.  The Purchaser agrees, during the period from the date of this Agreement, through the Closing Date, to use its reasonable best efforts to reduce or eliminate the Vendor Deposits, and for every dollar of Vendor Deposits for which the Purchaser receives reasonably satisfactory evidence that such Vendor Deposits will be reduced or eliminated by the Purchaser during such period, the Required Net Current Asset Amount shall be reduced by an amount (such amount being the "<u>Vendor Deposit Reduction Amount</u>") equal to the product of (i) 80%, multiplied by (ii) the aggregate dollar amount of Vendor Deposits reduced or eliminated by the Purchaser during such period.  For purposes of this Agreement the term "<u>Vendor Deposit</u>" means the letters of credit set forth on <u>Schedule 8.06(c)</u>.

<div align="center">ARTICLE IX</div>

<div align="center"><u>Covenants of the Shareholders, the Company and the Purchaser</u></div>

Section 9.01.  <u>Public Announcements; Confidentiality</u>.

(a)  <u>Public Announcements</u>.  The Shareholders, the Company and the Purchaser agree that except as required by applicable Laws or a listing agreement with a national securities exchange, without the prior written consent of the other parties hereto, the Parent will not, NGC will not, the Company will not, the Parent will cause NGC not to, NGC will cause the Company and the Company Parties not to, the Company will cause its Subsidiaries not to, nor will the Purchaser or any manager, member, partner, shareholder, director, officer, employee or other agent or representative of the Purchaser, make (i) any press release or any similar public announcement concerning the Transactions, or (ii) any general communication to any of the Shareholders', the Company's or any of its Subsidiaries' employees, customers, suppliers, lenders, creditors, distributors or others having business or financial relationships with the

<div align="center">68</div>

Shareholders, the Company or any of its Subsidiaries, or any other public statement, pertaining to the Sale Documents or the Transactions.

(b) Confidentiality. The Shareholders, the Company and the Purchaser agree that the Confidentiality Agreement shall survive the execution and delivery of this Agreement and remain in full force and effect; provided, however, that such Confidentiality Agreement shall terminate and be of no further force or effect as of the Effective Time; and provided, further, however, that notwithstanding any provision of the Confidentiality Agreement to the contrary, until the termination of this Agreement pursuant to the provisions of Section 10.01:

(i) the Purchaser shall have the right to meet with and interview the customers, clients, suppliers and vendors of the Company and its Subsidiaries so long as (A) the Purchaser provides the Company with prior notice of any such meeting relating to the Transactions or the Company and offers a representative of the Company the opportunity to participate in such meeting, and (B) in the event of an unsolicited call from a customer, client, supplier or vendor, the Purchaser may discuss the Transaction and the Company with such Person so long as promptly after such calls the Purchaser promptly informs the Company of the substance of such calls; and

(ii) the Purchaser shall be entitled to meet with, and make any necessary disclosures to, any Governmental Body in order to obtain any Consents or Permits necessary to (A) consummate the Transactions or (B) allow the Company and its Subsidiaries to operate the Business immediately following the Closing without interruption.

Section 9.02. Certain Tax Disclosures. Notwithstanding anything to the contrary set forth in the Sale Documents the obligations of confidentiality contained herein or in any other agreement to which the parties hereto are parties, as they relate to the Transactions, shall not apply to the tax structure or tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all Persons, without limitation of any kind, the tax structure and tax treatment of the Transactions and all materials of any kind (including, without limitation, opinions or other tax analyses) that are provided to such Persons relating to such tax treatment or tax structure; provided, that such disclosure may not be made until the earliest of (x) the date of the public announcement of discussions relating to the Transactions, (y) the date of the public announcement of the Transactions, and (z) the date of the execution of this Agreement. The preceding sentence is intended to cause the Transactions to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Code, and shall be construed in a manner consistent with such purpose.

Section 9.03. Non-Competition.

(a) Acknowledgment. In order to induce the Purchaser to purchase the Purchased Assets and assume the Assumed Liabilities as provided in the Sale Documents and to consummate the Transactions and in consideration of the payments made or to be made by the Purchaser to the

Company under the Sale Documents and to protect the goodwill of the Business, each of the Company and the Shareholders (i) agrees to be bound by the terms and provisions of this Section, (ii) agrees, represents and warrants that the Company and the Shareholders have read and given careful consideration to all of the terms and provisions of this Section, and agrees that the terms and provisions of this Section are reasonable with respect to the subject matter thereof and necessary for the reasonable and proper protection of the Confidential Information, legitimate business interests and goodwill of the Purchaser, its Subsidiaries, the Business and the Assets, and (iii) acknowledges that the Purchaser agreed to enter into the Sale Documents in reliance on the representations, agreements and covenants of the Company and the Shareholders to abide by and be bound by the terms and provisions of this Section.

(b) <u>Confidential Information</u>.  Except as may be required by applicable Law or required by any legal proceeding, each of the Company and the Shareholders, jointly and severally, agrees during the Non-Compete Period, not to, and agrees to cause its Affiliates, directors, officers, employees or agents or any investment banker, financial advisor, attorney, accountant, representative, and any other Person acting on behalf of the Company or the Shareholders not to, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known any of the Confidential Information to any Person for any reason or purpose whatsoever, or use any of the Confidential Information for any reason or purpose whatsoever at any time from and after the Effective Time.  In addition, and subject to the foregoing, each of the Company and the Shareholders, jointly and severally, agrees during the Non-Compete Period, to treat the Confidential Information as confidential at all times.  Each of the Company and the Shareholders, jointly and severally, agrees to be fully responsible for any breach of this Section by any of its Affiliates, directors, officers, employees or agents or any investment banker, financial advisor, attorney, accountant, representative, or any other Person acting on behalf of such the Company or the Shareholders.

(c) <u>Restrictive Covenant</u>.  Each of the Company and the Shareholders, jointly and severally, agrees that during the Non-Compete Period, neither the Company nor any Shareholder, nor any Affiliate thereof will, except in connection with the discharge of any Excluded Liabilities, engage, or hold any direct or indirect financial interest in any Person that engages, or assist any Person in engaging, either directly or indirectly, individually, or as a director, officer, employee, shareholder, manager, member, partner, owner, trustee, agent, consultant, independent contractor, investor, lender or principal, or in any other capacity, in any Competing Business in any city, county, state, country or other territory or jurisdiction anywhere in North America; <u>provided</u>, <u>however</u>, that the passive ownership by the Company or any Shareholder of not more than 3.0% of any class of equity securities of any corporation that engages in a Competing Business, if such equity securities are listed on a national securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended, will not be deemed to be a breach of this Section.

(d) <u>Non-Solicitation</u>.  Each of the Company and the Shareholders, jointly and severally, agrees that during the Non-Compete Period, neither the Company nor any Shareholder, nor any Affiliate thereof will, in any manner, directly or indirectly:

70

(i)  solicit, induce or attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any employee, contractor, consultant or agent of the Purchaser or any of its Subsidiaries to either (A) leave his or her employment, consulting or other position or business relationship with the Purchaser or any of its Subsidiaries, or (B) breach his or her employment, consulting or other agreement with the Purchaser or any of its Subsidiaries; provided, however, that the foregoing provision shall not prohibit the Company or the Shareholders from hiring any such employee, contractor, consultant or agent (x) through general advertising that is not targeted directly at the Purchaser or any of its Subsidiaries, or (y) whose employment or business relationship with the Purchaser or any of its Subsidiaries is terminated by the Purchaser or any of its Subsidiaries, as the case may be; or

(ii)  solicit, induce or attempt to induce or assist others to solicit, induce or attempt to induce, any customer, supplier, vendor, contractor or client associated with the Purchaser's or its Subsidiaries' businesses to terminate its, his or her business relationship or association with the Purchaser or any of its Subsidiaries, or make any disparaging, derogatory or detrimental comments about the Purchaser, any of its Subsidiaries, any of their employees, directors, officers or Affiliates, any customer or client or other Person having a business relationship with the Purchaser or any of the Purchaser's Subsidiaries.

(e)  Non-Compete Payments.  (i)  As partial consideration for the agreements and covenants of the Shareholders and the Company set forth in this Section 9.03, upon the terms and subject to the conditions of this Agreement, if the term of the Maintenance Fee Agreement is extended beyond March 31, 2005 (the portion of the extended term beginning on April 1, 2005 through the newly-extended termination date of the Maintenance Fee Agreement being the "Extended Term"), then the Purchaser shall make payments to the Company as follows.  During the Extended Term, within 30 days after a payment received by the Purchaser from Avaya under the Maintenance Fee Agreement with respect to services provided by the Purchaser during the Extended Term becomes non-refundable and non-disgorgeable by the Purchaser, the Purchaser shall pay to the Company (each such payment being a "Non-Compete Payment"), by wire transfer of immediately available funds, an amount equal to 20% of each such payment that is actually received by the Purchaser.  For the avoidance of doubt, no Non-Compete Payments shall be made in respect of any payments received by the Purchaser for services or maintenance provided outside of the Extended Term, even if such payments are actually received by the Purchaser during the Extended Term.

(ii)  If for any reason, the Purchaser is required to set-off, refund, reimburse or disgorge to Avaya any payment for which the Purchaser has made a Non-Compete Payment, the Shareholders and the Company shall immediately refund to the Purchaser the Non-Compete Payment made in respect of such set-off, refunded, reimbursed or disgorged payment.  Alternatively, the Purchaser shall have the right to set off such Non-Compete Payment against any other Non-Compete Payment that may be due hereunder, or against any other payment that may be due under any of the Sale Documents, including, without limitation, the Purchaser Note.

(iii)   During the Extended Term and for a period of six months thereafter, upon reasonable notice to the Purchaser, the Purchaser shall permit the Company and its representatives reasonable access to the Purchaser's books and records relating to the Non-Compete Payments and the Maintenance Fee Agreement, for the purpose of confirming the Purchaser's calculations of the Non-Compete Payments hereunder.

(f)   Enforcement.   Notwithstanding any other provision of the Sale Documents, if, at the time of enforcement of any provision of this Section, a court should hold that the duration or scope restrictions stated herein are unreasonable or unenforceable under circumstances then existing, the parties agree that the maximum duration or scope permitted by applicable Law under such circumstances will be substituted for the stated duration or scope.   Whenever possible, each provision of this Section will be interpreted in such manner as to be effective and valid under applicable law.   If the provisions of this Section are held unenforceable to any extent in any jurisdiction, such holding shall not impair the enforceability of this Section in any other jurisdiction.

(g)   Name Change.   Immediately following the Closing, and at all times thereafter, the Company, its Subsidiaries and the Shareholders will cease using any corporate names or tradenames that include "Expanets" (or any substantially similar names). Immediately following the Closing, the Shareholders will change the corporate name of the Company and each of its Subsidiaries to names that do not include "Expanets" (or any substantially similar names).

Section 9.04. [Reserved]

Section 9.05.   Release.   Each Shareholder, on behalf of itself and its Subsidiaries and Affiliates, hereby agrees, effective upon the Closing and without the need of any further notice or action, that (a) the Purchaser and its Subsidiaries and Affiliates are hereby released and forever discharged from any and all Liabilities, obligations, claims, demands, proceedings, Actions, Contracts, agreements, Debt and Guarantees whatsoever, whether known or unknown, suspected or unsuspected, both in law and in equity, that any Shareholder, or any of their Subsidiaries or Affiliates now have, have ever had or may hereafter have arising contemporaneously with or prior to the Closing Date or on account of or arising out of any Debt or Liability owed by the Company or any of its Subsidiaries to any of the Shareholders or any of their Subsidiaries or any of their Affiliates (collectively, "Claims"), and (b) any and all Liens, if any, which any Shareholder or any of its Subsidiaries or Affiliates may have on the assets of the Purchaser or any of its Subsidiaries and Affiliates in respect of the Claims are hereby automatically and irrevocably released; provided, however, that, notwithstanding the foregoing, this release does not cover, and the Shareholders shall not be deemed to release the Purchaser from, any and all Claims the Shareholders may have or be entitled to, under any of the Sale Documents. Each Shareholder, on behalf of itself and its Subsidiaries and Affiliates, hereby represents and warrants to the Purchaser that neither the Shareholders nor any of their Subsidiaries or Affiliates has Transferred or purported to Transfer to any Person all or any portion of any Claim released by the Shareholders and their Subsidiaries and Affiliates herein.   This Section 9.05 shall not prohibit or in any way restrict the Shareholders' rights and ability to make a Claim or demand for payment directly against the Company or its Subsidiaries of the amounts or claims owed by the Company or its Subsidiaries to the Shareholders.

72

Section 9.06.  <u>Use of Proceeds</u>.  The Company and the Shareholders, jointly and severally, hereby agree that the Parent will cause NGC to, NGC will cause the Company to, and the Company will use the proceeds from the Transactions to, subject to any defenses, claims, set-offs or other rights or mutual agreements the Company and the Shareholders may have, repay the Company's creditors in accordance with applicable Laws and the terms of any agreements the Company may have with such creditors.

Section 9.07.  <u>Certain Leases</u>.  The Shareholders and the Company will cause the leases set forth on <u>Schedule 9.07</u> that are marked with an asterisk (each such lease being a "<u>Required Lease</u>") to be assigned (including all security deposits in connection with such leases) to the Purchaser at the Closing.  With respect to all other leases (such other lease being the "<u>Other Leases</u>") set forth on <u>Schedule 9.07</u> (other than the Required Leases), the Shareholders and the Company will use their respective reasonable best efforts to cause such Other Leases to be assigned (including all security deposits in connection with such leases) to the Purchaser at the Closing; <u>provided</u>, <u>however</u>, that the failure of the Shareholders and the Company to cause all of the Other Leases to be assigned to the Purchaser shall not be considered to be a breach of this Agreement.  In any event, the Company will cause all of the Other Leases to be assigned to the Purchaser within 60 days following the Closing.

Section 9.08.  <u>Bankruptcy Proceedings</u>.

(a)  [Intentionally Omitted]

(b)  <u>Additional Orders</u>.  In the event of a bankruptcy or similar proceeding with respect to NCC or NGC (either such entity being the "Filing Entity"), the Shareholders and the Company, jointly and severally, agree (i) to file as promptly as practicable a motion in form and substance reasonably satisfactory to the Purchaser with the bankruptcy court in which such bankruptcy or similar proceeding is filed, seeking an order in form and substance reasonably satisfactory to the Purchaser, providing for the approval of all of such Filing Entity's obligations under this Agreement and the authorization of such Filing Entity to perform all of its obligations under this Agreement as promptly as practicable, (ii) to use their commercially reasonable best efforts to cause as promptly as practicable a hearing on such motion to be held as promptly as practicable and (iii) to use their commercially reasonable best efforts to cause as promptly as practicable such bankruptcy court to approve such Filing Entity's obligations under this Agreement as promptly as practicable, but in no event later than the earlier to occur of (x) the date which is twenty days after the date of such bankruptcy filing, and (y) the date which is three Business Days prior to the Closing Date (such earlier date being the "Filing Entity Order Date").

(c)  <u>Parent Order</u>.  The Shareholders and the Company, jointly and severally, agree that they shall (i) file with the Delaware Bankruptcy Court in connection with the Parent's bankruptcy proceedings a motion (the "Parent Motion"), in form and substance reasonably satisfactory to the Purchaser, seeking an order (the "Parent Order") in form and substance reasonably satisfactory to the Purchaser, providing for the approval of all of the Parent's obligations under the Sale Documents and the authorization of the Parent to perform all of its obligations under the Sale Documents, (ii) use their commercially reasonable best efforts to

73

cause a hearing on the Parent Motion to be held as promptly as practicable on or prior to the Closing Date and (iii) use their commercially reasonable best efforts to cause the Delaware Bankruptcy Court to approve the Parent Motion and enter the Parent Order as promptly as practicable on or prior to the Closing Date.

(d)  Subsequent Filing Entity Order.  The Shareholders and the Company, jointly and severally, agree that they shall with respect to each Filing Entity (i) file with the bankruptcy court in which each such Filing Entity's bankruptcy or similar proceedings are filed a motion (the "Filing Entity Motion"), in form and substance reasonably satisfactory to the Purchaser, seeking an order (the "Filing Entity Order") in form and substance reasonably satisfactory to the Purchaser, providing for the approval of all of such Filing Entity's obligations under the Sale Documents and the authorization of such Filing Entity to perform all of its obligations under the Sale Documents, (ii) use their commercially reasonable best efforts to cause a hearing on the Filing Entity Motion to be held as promptly as practicable on or prior to the Closing Date and (iii) use their commercially reasonable best efforts to cause such bankruptcy court to approve the Filing Entity Motion and enter the Filing Entity Order as promptly as practicable on or prior to the Closing Date.

Section 9.09.  Financial Statements.   After the date hereof, the Company and the Parent will (a) request Deloitte & Touche LLP to prepare and deliver for the benefit of Purchaser all material financial statements required by Purchaser to satisfy its obligations under Rule 3.05 of Regulations S-X with respect to filings to be made by it with the Securities and Exchange Commission, including, without limitation, (i) audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2002, 2001 and 2000 and (ii) audited consolidated statements of operations, statements of changes in shareholders' equity and statements of cash flows of the Company and its Subsidiaries for the twelve-month periods ended December 31, 2002, 2001 and 2000, and (b) deliver an unaudited consolidated balance sheet of the Company and its Subsidiaries as at September 30, 2003 and an unaudited consolidated statement of operations, statement of changes in shareholders' equity and statement of cash flows for the period ended September 30, 2003.  The Company, the Shareholders and the Parent shall use commercially reasonable efforts to have delivered to Purchaser an unqualified opinion of Deloitte & Touche LLP with respect to the foregoing audited financial statements.  The Company will engage Deloitte & Touche LLP to commence the foregoing audit within five days of the execution of this Agreement and will request Deloitte & Touche LLP to proceed diligently with such audit.  Each of the Company, the Shareholders and the Parent will make its representatives and representatives of Deloitte & Touche LLP available to Purchaser and its representatives to answer questions with respect to such financial statements; provided, that all reasonable costs, expenses and fees of Deloitte & Touche LLP in connection with such audit shall be for Purchaser's account.

ARTICLE X

Termination and Expenses

Section 10.01.  Termination.  The obligations of the parties under the Sale Documents to consummate the Transactions may be terminated at any time prior to the Closing:

74

(a)  by the mutual consent of the Company and the Purchaser;

(b)  by the Company, if (i) the Closing shall not have occurred on or prior to the Company Outside Date, unless such failure to consummate the Transactions is the result of a material breach of any Sale Document by the Company or the Shareholders, or (ii) the Purchaser shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in the Sale Documents, which breach (A) would give rise to the failure of a condition set forth in Section 4.02, and (B) cannot be or has not been cured by the earlier to occur of (x) the date which is 30 days after the giving of written notice by the Company to the Purchaser specifying such breach, and (y) the Company Outside Date; provided, however, that if the Purchaser shall have breached the representation and warranty in Section 7.06, or the covenants and agreements set forth in Sections 3.01(a), (b) or (c), the Purchaser shall not be entitled to any cure right;

(c)  by the Purchaser, if (i) the Closing shall not have occurred on or prior to the Purchaser Outside Date, unless such failure to consummate the Transactions is the result of a material breach of any Sale Document by the Purchaser, or (ii) the Company or any Shareholder shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in the Sale Documents, which breach (A) would give rise to the failure of a condition set forth in Section 4.03, and (B) cannot be or has not been cured by the earlier to occur of (x) the date which is 30 days after the giving of written notice by the Purchaser to the Company specifying such breach, and (y) the Purchaser Outside Date;

(d)  by the Purchaser if (i) any Law shall have been enacted, adopted, issued or promulgated which, prohibits the Transactions, or (ii) any Governmental Body shall have issued an order, decree or ruling or taken any other action, which permanently restrains, enjoins or otherwise prohibits the Transactions, and such order, decree, ruling or other action shall have become final and non-appealable; or

(e)  by the Purchaser, if the conditions set forth in Section 4.03(n) is not satisfied prior to the Purchaser Outside Date ;

(f)  by the Purchaser, if with respect to each Filing Entity, the bankruptcy court in which such Filing Entity's bankruptcy or similar proceedings are filed shall not have approved such Filing Entity's obligations under this Agreement and the other Sale Documents on or prior to the Filing Entity Order Date, or (iii) by the Purchaser, if any of the Shareholders or the Company shall (A) reject any of the Sale Documents in connection with a bankruptcy or similar proceeding with respect to any of the Shareholders, the Company or any of their Subsidiaries, (B) convert such proceeding into a Chapter 7 proceeding or other liquidation proceeding, or (C) file a Plan of Reorganization that excludes, prohibits or does not provide for the consummation of the Transactions.

75

Any such termination shall be in writing delivered to the other parties hereto in accordance with the provisions of Section 12.01 hereof.

Section 10.02.  <u>Effect of Termination</u>.  In the event of a termination of this Agreement under Section 10.01, this Agreement will become void and of no further force or effect, except for the provisions of (a) Section 9.01 relating to public disclosures, (b) Section 10.03 relating to the payment of fees and expenses, and (c) this Section 10.02.  Except as provided in Section 10.03(e), notwithstanding any provision of the Sale Documents to the contrary, neither the termination of this Agreement, nor anything contained in this Section 10.02, will be deemed to release any party from any liability due to, or prevent the other party from exercising their rights and remedies under the Sale Documents with respect to, (i) the breach or inaccuracy of any representation or warranty of such party set forth in the Sale Documents, or (ii) the breach by any such party of the covenants or agreements of such party in the Sale Documents, in each case, prior to the date of such termination.

Section 10.03.  <u>Fees and Expenses</u>.

(a)  <u>Payment of Fees and Expenses</u>.  Subject to clauses (b), (c) and (d) below, each of the parties hereto will be responsible for and pay its own, and prior to the Effective Time, the Shareholders, jointly and severally, will pay or reimburse the Company and each of its Subsidiaries for, legal, accounting, engineering, environmental, survey and title charges and other fees and expenses, including, without limitation, reasonable attorneys' and accountants' fees and expenses and the fees and expenses of financial consultants, investment bankers, lenders and environmental consultants, incurred in connection with the Transactions, including, without limitation, the due diligence review, and the negotiation, preparation and execution of the Sale Documents (collectively, all such fees and expenses being the "<u>Fees and Expenses</u>").  Without limiting the generality of the foregoing, prior to the Closing, the Company shall obtain final invoices from its accountants, attorneys, investment bankers, financial advisors and other similar professionals reflecting all Fees and Expenses payable by the Company and its Subsidiaries in connection with the Transactions.  Prior to the Closing, the Company shall have paid in full all such Fees and Expenses and delivered to the Purchaser invoices from each such accountant, attorney, investment banker, financial advisor and other professional marked "paid in full".  The Shareholders agree that any Fees and Expenses not paid by the Company and its Subsidiaries prior to the Closing shall be the sole responsibility of, and shall be timely paid by, the Shareholders.

(b)  <u>Transaction Fees and Taxes</u>.  The Company will be responsible for and will duly and timely pay any and all (i) filing fees, including, without limitation, HSR Act filing fees, recording charges, registration costs and expenses, and (ii) Taxes, including, without limitation, stock transfer Taxes, sales and use Taxes and real property gains and transfer Taxes, in each case, directly or indirectly attributable to the Transactions.  Except as otherwise required by applicable Law, the Company will be responsible for filing any Tax Returns and complying with any procedures required in connection with all Taxes resulting from such Transfer.

(c)  <u>Expense Reimbursement</u>.  On the date of the Shareholders' execution of this Agreement, the Parent shall cause NGC to, and NGC will cause the Company to, and the

Company shall, pay to the Purchaser (to an account designated by the Purchaser) by wire transfer of immediately available funds, an amount equal to $250,000 (which amount, when added to the $250,000 previously paid by the Company to the Purchaser pursuant to the Letter of Intent, shall be the "Expense Amount") as reimbursement for the Purchaser's Fees and Expenses incurred and to be incurred in connection with the Transactions.

(d)  Termination Fee.  In the event that either (i) this Agreement is terminated pursuant to Section 10.01(e) or (f), or (ii) both (A) this Agreement is terminated pursuant to Section 10.01(c) or the Transactions are not consummated on or prior to the Purchaser Outside Date for any reason other than as a result of a material breach of this Agreement by the Purchaser, and (B) within twelve months after the date of termination of this Agreement, NGC, NCC or the Company shall consummate any Competing Transaction (whether such Competing Transaction was proposed, contemplated or announced before or after the date of termination of this Agreement), then in the case of (i) or (ii) above, in addition to the Expense Amount payable to the Purchaser pursuant to Section 10.01(c) above, the Shareholders and the Company, jointly and severally, shall pay to the Purchaser on the first business day after the termination of this Agreement, an amount in cash equal to $4,000,000 by wire transfer of immediately available funds (the payment made to the Purchaser under (x) or (y) above being the "Termination Fee").  Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be entitled to receive the Termination Fee more than one time.

(e)  Acknowledgement.  The parties acknowledge and agree that the payment of the Expense Amount and Termination Fee shall constitute the sole remedy to which the Purchaser shall be entitled in the circumstance set forth in Section 10.03(d).

ARTICLE XI

Indemnification

Section 11.01.  Indemnification.

(a)  Indemnification by the Shareholders and the Company.  Each of the Shareholders and the Company, jointly and severally, will indemnify and defend the Purchaser Indemnified Persons against and hold each Purchaser Indemnified Person harmless from any and all Losses that the Purchaser Indemnified Persons may incur, suffer, sustain or become subject to arising out of, relating to, based upon, in connection with or due to:

(i)  any inaccuracy or breach of any of the representations and warranties (other than the representations and warranties set forth in Section 5.08 and 5.20 which are covered separately in clauses (iv) and (iii) below, respectively) of the Shareholders or the Company contained in any Sale Document or in any certificate delivered thereunder;

(ii)  the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation (other than the covenants and agreements set forth in Section 10.03(b) which

77

are covered separately in clause (iv) below) of the Shareholders or the Company contained in any Sale Document or in any certificate delivered thereunder;

(iii) (A) any inaccuracy or breach of any of the representations and warranties set forth in Section 5.20 of this Agreement or in any certificate delivered thereunder, (B) any of the information, facts, events, circumstances, issues or other matters set forth on Schedule 5.20 of this Agreement, whether or not referred to as presenting an actual, alleged or contingent liability or violation of Environmental Law, or (C) any Recognized Environmental Condition identified in any Environmental Site Assessment conducted by the Purchaser;

(iv) (A) any inaccuracy or breach of any of the representations and warranties set forth in Section 5.08 of this Agreement or in any certificate delivered thereunder, (B) any nonfulfillment of any covenant, undertaking, agreement or other obligation of the Shareholders or the Company contained in Section 10.03(b), or (C) any Taxes related to (I) the operation of the Business by the Company and its Subsidiaries prior to the Closing, (II) the ownership by the Company and its Subsidiaries of the Assets prior to the Closing, or (III) any distributions, dividends or other payments from the Company or any of its Subsidiaries to any Shareholder, or (IV) the transfer of the Purchased Assets to the Purchaser;

(v) the Excluded Assets;

(vi) the Excluded Liabilities, except for the Liabilities referred to in Section 2.04(a)(ix) which are covered by clause (i) and (ii) above, including, without limitation, the Company's or any Shareholder's failure to pay or discharge the Excluded Liabilities as and when they become due, and including any claim, Action, allegation or threat by any third party that, if upheld or granted, would result in any Purchaser Indemnified Person having any Liability in respect of any Excluded Liability; and

(vii) the Transfer or Transfers by the Company or any of its Subsidiaries prior to the Effective Time, of any businesses, operations, assets or properties, including, without limitation, Liabilities related to representations, warranties, covenants, agreements and indemnities given by the Shareholders, the Company or any of their Subsidiaries in connection with any such Transfer, or any broker's, finder's or similar fees payable in connection with any such Transfers.

(b) Indemnification by the Purchaser. The Purchaser will indemnify and defend the Company Indemnified Persons against and hold each Company Indemnified Person harmless from any and all Losses that the Company Indemnified Persons may incur, suffer, sustain or become subject to arising out of, relating to, based upon, in connection with or due to:

(i) any inaccuracy or breach of any of the representations and warranties of the Purchaser contained in any Sale Document or in any certificate delivered thereunder; or

78

(ii)  the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation of the Purchaser contained in any Sale Document or in any certificate delivered thereunder.

(c)  <u>Right to Assign and Delegate</u>.  The parties hereto agree that the Purchaser shall have the right to assign its rights to indemnification, and delegate its obligations, under this Section 11.01 to any Person that acquires the Purchased Assets or the Business from the Purchaser, or substantially all of the assets of the Purchaser or the Equity Securities of the Purchaser, whether by sale, merger, consolidation or otherwise, in each case, so long as either (i) such Person has a net worth at least equal to the net worth of the Purchaser as of the time of such assignment, or (ii) the Purchaser remains liable for its obligations under this Agreement.

Section 11.02.  <u>Notice and Opportunity to Defend</u>.

(a)  <u>Delivery of Indemnification Notice</u>.  (i)  If there occurs an event which a party hereto asserts is an indemnifiable event pursuant to Section 11.01 hereof, the party seeking indemnification (the "<u>Indemnitee</u>") will promptly notify the party obligated to provide indemnification hereunder (the "<u>Indemnitor</u>") in writing (such written notice being an "<u>Indemnification Notice</u>").  Such Indemnification Notice shall specify (A) the nature of the claim or Loss, (B) the facts, circumstances, issues and events with respect to such claim or Loss in reasonable detail, and (C) the amount of such claim or Loss, if determined.  Delay or failure to deliver an Indemnification Notice to the Indemnitor will only relieve the Indemnitor of its indemnification obligations hereunder to the extent, if at all, that the Indemnitor is actually prejudiced by reason of such delay or failure.

(ii)  The Indemnitor will have a period of 10 calendar days following the Indemnitor's receipt of the Indemnification Notice (such period to be 20 calendar days if the event specified in the Indemnification Notice involves a claim or a Loss by a Person other than a Purchaser Indemnified Person or a Company Indemnified Person (a "<u>Third Party Claim</u>")), in which to either (A) accept responsibility for such claim, Loss or Third Party Claim or (B) deny or dispute responsibility for such claim, Loss or Third Party Claim (which dispute may be as to the validity of such claim or Loss, the amount thereof or both).

(b)  <u>Third Party Claims</u>.  (i)  Subject to the provisions of clause (iii)(B) below, if the Indemnitor accepts responsibility for a Third Party Claim in writing within such 20 calendar day period, the Indemnitor will be obligated to defend, compromise or settle such Third Party Claim and, subject to the terms, conditions and limitations set forth in this Article, the Indemnitor will be liable for the Losses in connection with such Third Party Claim, including, without limitation, the fees and expenses of counsel incurred by the Indemnitor in defending, compromising or settling such Third Party Claim; <u>provided</u>, <u>however</u>, that in such an event, the Indemnitee will have the right to participate in the defense of such Third Party Claim and employ counsel, at the Indemnitee's expense, separate from the counsel employed by the Indemnitor, it being understood that the Indemnitor will control such defense.

(ii)  If (A) the Indemnitor fails to accept responsibility for such Third Party Claim within such 20 calendar day period or the Indemnitor does not respond within such 20 calendar day

79

period, or (B) either (x) the Indemnitee is advised by counsel that in connection with such Third Party Claim there may be one or more legal defenses available to the Indemnitee that are not available to the Indemnitor or conflict with or are different from those available to the Indemnitor, (y) the Third Party Claim seeks an order, injunction or other relief other than money damages against the Indemnitee, or (z) the Indemnitor does not promptly provide the Indemnitee with its financial statements or other information demonstrating the Indemnitor's ability to discharge its obligations under this Article XI in full, then in any such case, the Indemnitor will not be entitled to assume the defense of such Third Party Claim and the Indemnitee shall have the right to undertake the defense, compromise or settlement of such Third Party Claim and, subject to the terms, conditions and limitations set forth in this Article, the Indemnitor will be liable for the Losses in connection with such Third Party Claim, including, without limitation, the fees and expenses of counsel incurred by the Indemnitee in defending, compromising or settling such Third Party Claim; provided, however, that in such an event, the Indemnitor will have the right to participate in the defense of such matter and employ counsel, at the Indemnitor's expense (provided, that such expenses shall not count towards any limitations on the Indemnitor's obligations hereunder), separate from the counsel employed by the Indemnitee, it being understood that the Indemnitee will control such defense.

(iii)  The Indemnitor will not be liable for any settlement of any Action effected without the Indemnitor's written consent (which consent shall not be unreasonably withheld or delayed), but if settled with the Indemnitor's written consent or if there be a final judgment for the plaintiff in any such Action, the Indemnitor agrees, subject to the terms, conditions and limitations set forth in this Article, to indemnify and hold harmless the Indemnitee from and against any Loss by reason of such settlement or judgment.

(c)  Non-Third Party Claims .  (i)  If the Indemnitor accepts responsibility for a claim or Loss which does not involve a Third Party Claim in writing within such 10 calendar day period, or the Indemnitor does not respond within such 10 calendar day period, such claim or Loss specified by the Indemnitee in the Indemnification Notice will conclusively be deemed a liability of the Indemnitor under Section 11.01 and the Indemnitor will pay the amount of such liability to the Indemnitee on demand.

(ii)  If the Indemnitor has timely disputed its liability with respect to such claim or Loss within such 10 calendar day period, the Indemnitor and the Indemnitee will proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute will be resolved by litigation in an appropriate court of competent jurisdiction.

(d)  Contribution.  If the indemnification provided for in this Article XI is prohibited under applicable Laws to an Indemnitee (other than by reason of the exceptions, limitations and conditions set forth in this Article) then the Indemnitor, in lieu of indemnifying the Indemnitee, will contribute to the amount paid or payable by the Indemnitee as a result of the Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor, on the one hand, and of the Indemnitee, on the other, in connection with the events or circumstances which resulted in the Losses as well as any other relevant equitable considerations.  The relative fault of the Indemnitor, on the one hand, and of the Indemnitee, on the other, will be determined by

reference to, among other things, such Persons' relative intent, knowledge, access to information and opportunity to correct or prevent the events or circumstances resulting in the Losses.

Section 11.03.  Survival of Indemnification.  The representations, warranties, covenants and agreements of the parties contained in the Sale Documents or in any document delivered pursuant thereto and the rights to indemnification under this Agreement with respect thereto will survive the Closing Date and any investigation at any time made by or on behalf of the Purchaser or any other party; provided, however, that the representations and warranties set forth in the Sale Documents and the indemnification under Section 11.01(a) and (b) shall expire on the second anniversary of the Closing Date, unless prior to such date, an Indemnification Notice or other notice of the inaccuracy or breach thereof has been given; provided, however, that:

(a)  Fundamental Indemnification.  The (i) Fundamental Representations and the Fundamental Representation Indemnification and (ii) the rights to indemnification under Section 11.01(a)(ii), (v), (vi) and (vii), will survive the Closing for a period ending on the fifth anniversary of the Closing Date, and will be effective with respect to any inaccuracy therein, breach thereof or claims made thereunder, notice of which has been given within such period; and

(b)  Tax Indemnification.  The representations and warranties set forth in Section 5.08, the covenants and agreements set forth in Section 10.03(b), and the Tax Indemnification will survive the Closing for a period ending six months after the termination of the statute of limitations (or any extension thereof) on any Law applicable to the matters covered therein, and will be effective with respect to any inaccuracy therein, breach thereof or claims made thereunder, notice of which has been given within such period.

Section 11.04.  Threshold; Limitation on Liability; Release of Company.

(a)  Threshold.  No Purchaser Indemnified Person or Company Indemnified Person will be entitled to indemnification for any Losses under Section 11.01(a)(i) or 11.01(b)(i), unless and until the aggregate amount of Losses suffered, sustained, or incurred by all of the Purchaser Indemnified Persons or the Company Indemnified Persons, as the case may be, due to the inaccuracy or breach of any representations or warranties or in any certificate delivered thereunder, exceeds the Threshold Amount, calculated on a cumulative basis and not per item basis , and then such party will be entitled to recover such Losses from the first dollar of such Losses and not merely the excess of such Losses above the Threshold Amount; provided, however, that with respect to indemnification pursuant to the Fundamental Representation Indemnification, the Tax Indemnification and indemnification under Section 11.01(a)(ii), (v), (vi) and (vii), the Purchaser Indemnified Persons shall be entitled to recover any such Losses from the first dollar of such Losses without any threshold, basket or deductible of any kind, and any such payments shall count towards the Threshold Amount.

(b)  Limitations on Liability of the Shareholders and the Company.  The aggregate liability of the Shareholders and the Company for indemnification under Section 11.01(a) of this Agreement shall not exceed an aggregate amount equal to the Cash Proceeds.

81

(c)  Limitations on Liability of the Purchaser.  The aggregate liability of the Purchaser for indemnification under Section 11.01(b) of this Agreement shall not exceed an aggregate amount equal to 10% of the Cash Proceeds.

(d)  Release of the Company.  Notwithstanding any provision of this Agreement to the contrary, except for the provisions of Section 11.05 below which shall apply to this Section 11.04(d), effective from and after the first anniversary of the Closing Date, the Company shall have no further obligation to indemnify the Purchaser under this Article XI, except with respect to any Losses or claims made for which the Purchaser or any Purchaser Indemnified Person shall have given the Company notice on or prior to such first anniversary; provided, however, that such release of the Company shall not in any way eliminate, restrict, affect or impair the Purchaser's and the Purchaser Indemnified Person's rights to (i) be indemnified by the Shareholders under this Article XI for Losses related to inaccuracies or breaches of representations, warranties, covenants and agreements of the Company set forth in the Sale Documents to the extent and during the period that the Company or the Shareholders were obligated to indemnify the Purchaser or the Purchaser Indemnified Persons, (ii) be indemnified for each type of Claim by the Shareholders under this Article XI during the relevant entire periods for each type of Claim provided in Section 11.03 above, and (iii) claim against and withdraw amounts from the Escrow Amount as provided in Section 11.07(d) below.

Section 11.05.  Fraud Exception.

(a)  Purchaser Indemnified Persons.  Notwithstanding any provision contained in Article XI to the contrary, in the event any Loss or failure to discover a fact or condition by a Purchaser Indemnified Person, is due to, arises from, or is in connection with, fraud, intentional misrepresentation, grossly negligent misrepresentation or willful misconduct by any Shareholder, the Company, any of their Subsidiaries or any Person acting or purporting to act on their behalf, such Purchaser Indemnified Person will be entitled to recover any such Losses from the Shareholders and the Company, jointly and severally, without regard to any of the time limitations, dollar thresholds or dollar limitations set forth above, and will be entitled to recover the full amount of such Losses from the first dollar of any such Loss, together with any punitive, exemplary and other damages that may be assessed by any court of competent jurisdiction.

(b)  Company Indemnified Persons.  Notwithstanding any provision contained in Article XI to the contrary, in the event any Loss or failure to discover a fact or condition by a Company Indemnified Person, is due to, arises from, or is in connection with, fraud, intentional misrepresentation, grossly negligent misrepresentation or willful misconduct by the Purchaser, any of its Subsidiaries or any Person acting or purporting to act on their behalf, such Company Indemnified Person will be entitled to recover any such Losses from the Purchaser without regard to any of the time limitations, dollar thresholds or dollar limitations set forth above, and will be entitled to recover the full amount of such Losses from the first dollar of any such Loss, together with any punitive, exemplary and other damages that may be assessed by any court of competent jurisdiction.

Section 11.06.  Set-Off.  Each of the parties hereto expressly acknowledges and agrees that in the event that a Purchaser Indemnified Person is entitled to indemnification under Section 11.01(a), the Purchaser will be entitled to set-off the amount of such Losses incurred by such Purchaser Indemnified Person against and retain such amount from any obligations or payments due to any Shareholder or the Company under any Sale Document, including, without limitation, under the Purchaser Note.

Section 11.07.  Escrow.

(a)  Escrow Agreement.  On or prior to the Closing Date, the Purchaser, the Shareholders and the Company will enter into the Escrow Agreement with the Escrow Agent.

(b)  Escrow Deposit.  In order to secure the obligations of the Shareholders and the Company to (i) pay to the Purchaser any amount under Section 3.03(e) hereof, and (ii) indemnify the Purchaser Indemnified Persons under Section 11.01(a) hereof, on the Closing Date, the Purchaser will deposit the Escrow Amount with the Escrow Agent, to be held by the Escrow Agent in accordance with the Escrow Agreement.  Such Escrow Amount will be deposited into an account to be managed and paid out by the Escrow Agent in accordance with the terms of the Escrow Agreement.

(c)  Escrow Amount.  (i)  The term "Escrow Amount" means an amount in cash equal to the sum of (A) $7,500,000.00 (the "General Escrow Amount"), plus (B) the Specified Liability Escrow Amount (as defined below).

(ii)  The "Specified Liability Escrow Amount" means (i) as of the date of this Agreement, an amount equal to the sum of all of the Liabilities set forth on Schedule 11.07(c) hereof, which the parties agree is $19,024,000.00 (such amount being the "Specified Liability Amount"), and (ii) as of the Closing Date, an amount equal to (A) the Specified Liability Amount, minus (B) the Pre-Closing Extinguished Liability Amount (as defined below).

(iii)  The "Pre-Closing Extinguished Liability Amount" means, with respect to all of the Liabilities set forth on Schedule 11.07(c) for which the Company shall have received (and delivered to the Purchaser) a full, unconditional and irrevocable release of the Company, its Subsidiaries, the Purchaser and their respective successors and assigns in form and substance reasonably satisfactory to the Purchaser prior to the Closing Date (each such Liability being an "Extinguished Liability"), the aggregate amount of such Extinguished Liabilities as set forth on Schedule 11.07(c), provided, however, that in no event shall the Pre-Closing Extinguished Liability Amount exceed the Specified Liability Escrow Amount.

(d)  Right to Withdraw.  In the event that either (i) (A) the Purchaser is entitled to any amount under Section 3.03(e) hereof, or (ii) a Purchaser Indemnified Person is entitled to indemnification pursuant to Section 11.01(a), then the Purchaser, or such Purchaser Indemnified Person, as the case may be, will have the right to withdraw such amounts from the balance of the Escrow Amount pursuant to the Escrow Agreement, or (ii) the Company is entitled to any amount under Section 3.03(e) hereof, then the Company will have the right to withdraw such amount from the balance of the Escrow Amount pursuant to the Escrow Agreement.  In such an

83

event, the Purchaser or the Company, as the case may be, will instruct the Escrow Agent in writing pursuant to the terms of the Escrow Agreement to pay the Purchaser, such Purchaser Indemnified Person or the Company, as the case may be, from the Escrow Amount the amount that is due the Purchaser, such Purchaser Indemnified Person or the Company, as the case may be.

(e) <u>Release of Escrow</u>.

(i) <u>Post-Closing Extinguished Liabilities</u>.  After the Closing Date, in the event that the Company shall receive (and deliver to the Purchaser) a full, unconditional and irrevocable release of the Company, its Subsidiaries, the Purchaser and their respective successors and assigns in form and substance reasonably satisfactory to the Purchaser in respect of an Extinguished Liability (except for Liabilities that are included within the definition of Pre-Closing Extinguished Liability Amount), then (A) the Escrow Amount shall be reduced by the amount of such Extinguished Liability as set forth on <u>Schedule 11.07(c)</u>, and (B) the Escrow Agent will pay to the Company from the Escrow Amount, an aggregate amount equal to the amount of such Extinguished Liability as set forth on <u>Schedule 11.07(c)</u> (the sum of all such amounts being the "<u>Post-Closing Extinguished Liability Amount</u>"); <u>provided</u>, <u>however</u>, that in no event shall the sum of the Pre-Closing Extinguished Liability Amount, plus the Post-Closing Extinguished Liability Amount exceed the Specified Liability Escrow Amount, and <u>provided</u>, <u>further</u>, <u>however</u>, that in no event shall the Escrow Amount held by the Escrow Agent be reduced below the General Escrow Amount, except to the extent funds in the Escrow Account have theretofore been used to satisfy Losses or claims under Section 11.01(a).

(ii) <u>Second Anniversary</u>.  On the second anniversary of the Closing Date, the Escrow Agent will pay to the Company an aggregate amount equal to the excess, if any, of (i) the amount held by the Escrow Agent in the escrow account on the second anniversary of the Closing Date, over (ii) the aggregate dollar amount of all claims made (but not paid as of the second anniversary of the Closing Date) by the Purchaser or the Purchaser Indemnified Persons under Section 3.03(c) or Section 11.01(a); <u>provided</u>, <u>however</u>, that such payment or release shall not limit or affect the rights of the Purchaser or any other Purchaser Indemnified Persons under this Article XI or otherwise.

<div align="center">ARTICLE XII</div>

<div align="center"><u>Miscellaneous</u></div>

Section 12.01.  <u>Notices</u>.  All notices, requests, demands and other communications to any party or given under any Sale Document will be in writing and delivered personally, by overnight delivery or courier, by registered mail or by telecopier (with confirmation received) to the parties at the address or telecopy number specified for such parties on the signature pages hereto (or at such other address or telecopy number as may be specified by a party in writing given at least five Business Days prior thereto).  All notices, requests, demands and other communications will be deemed delivered when actually received.

Section 12.02.  <u>Counterparts</u>.  This Agreement may be executed simultaneously in one or more counterparts, and by different parties hereto in separate counterparts, each of which when executed will be deemed an original, but all of which taken together will constitute one and the same instrument.

Section 12.03.  <u>Amendment of Agreement</u>.  This Agreement may not be amended, modified or waived except by an instrument in writing signed on behalf of each of the parties hereto.

Section 12.04.  <u>Successors and Assigns; Assignability</u>.  This Agreement will be binding upon and inures to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  This Agreement may not be assigned by any party hereto without the prior written consent of all other parties hereto, except for the assignment of all or any part of the rights and obligations of the Purchaser under this Agreement, which may be freely assigned by the Purchaser to an Affiliate of the Purchaser either prior to or after the Closing Date, in any case, so long as either (i) such Affiliate has a net worth at least equal to the net worth of the Purchaser as of the time of such assignment, or (ii) the Purchaser remains liable for its obligations under this Agreement.  Any assignment or attempted assignment in contravention of this Section will be void <u>ab</u> <u>initio</u> and will not relieve the assigning party of any obligation under this Agreement.

Section 12.05.  <u>Governing Law</u>.  This Agreement will be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts executed in and to be performed entirely within that state, without reference to conflicts of laws provisions.

Section 12.06.  <u>Integration</u>.  The Sale Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 12.07.  <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 12.08.  <u>Further Assurances</u> .  Promptly upon the reasonable request by the Purchaser, the parties hereto (with the expenses paid by the party responsible as provided in this Agreement) shall (a) correct any defect or error that may be discovered in any Sale Document or in the execution, delivery, acknowledgment or recordation of any Sale Document and (b) execute, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, estoppel certificates, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments, in each case, as such requesting party may require from time to time.

Section 12.09. <u>No Third-Party Rights</u>.  This Agreement is not intended, and will not be construed, to create any rights in any parties other than the Shareholders, the Company, and the Purchaser, and no Person may assert any rights as third-party beneficiary hereunder, including, without limitation, the directors, officers and employees of the Company or any of its Subsidiaries, except (a) that any rights, obligations or remedies of the Purchaser hereunder may be exercised by an Affiliate of the Purchaser in accordance with Section 12.04 and (b) as provided in Article XI, except that the directors, officers and employees of the Company and its Subsidiaries are not parties to this Agreement, are not third-party beneficiaries of this Agreement or any other Sale Document and are not entitled to enforce any of the provisions of this Agreement or the other Sale Documents.

Section 12.10. <u>Enforcement</u>.

(a) <u>Shareholders and the Company</u>.  Each of the Company and the Shareholders hereby acknowledges and agrees that the provisions of this Agreement are of a special and unique nature, the loss of which cannot be accurately compensated for in damages by an action at law, and that the breach or threatened breach of the provisions of this Agreement would cause the Purchaser irreparable harm and that money damages would not be an adequate remedy for any breach or threatened breach of the provisions of this Agreement by the Company or the Shareholders.  Therefore, the parties hereto agree that the Purchaser shall be entitled to equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond or other security or any similar requirement or proving actual damages) to prevent breaches or threatened breaches of this Agreement, including, without limitation, the provisions of Section 9.03 hereof, by the Company or the Shareholders and to specifically enforce the terms and provisions of this Agreement, including, without limitation, Section 9.03 hereof, this being in addition to any other remedy to which the Purchaser is or may be entitled at law or in equity.

(b) <u>Purchaser</u>.  The parties hereto agree that the Company and the Shareholders shall be entitled to equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond or other security or any similar requirement or proving actual damages) to prevent breaches or threatened breaches of this Agreement by the Purchaser and to specifically enforce the terms and provisions of this Agreement, this being in addition to any other remedy to which the Company and the Shareholders are or may be entitled at law or in equity.

Section 12.11. <u>Submission to Jurisdiction</u>.  Each of the Shareholders, the Company, and the Purchaser hereby (a) agrees that any Action with respect to any Sale Document may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, (b) accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of such courts, (c) irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of <u>forum</u> <u>non</u> <u>conveniens</u>, which it may now or hereafter have to the bringing of any Action in those jurisdictions, and (d) irrevocably consents to the service of process of any of the courts referred to above in any Action by the mailing of copies of the process to the parties

86

hereto as provided in Section 12.01.  Service effected as provided in this manner will become effective ten calendar days after the mailing of the process.

Section 12.12.  <u>Waiver of Jury Trial</u>.  EACH OF THE PARENT, THE COMPANY, AND THE PURCHASER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION TO ENFORCE OR DEFEND ANY RIGHT UNDER ANY SALE DOCUMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH ANY SALE DOCUMENT AND AGREES THAT ANY ACTION WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Section 12.13.  <u>No Waiver; Remedies</u>.  No failure or delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of the right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies provided in the Sale Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.14.  <u>Ambiguities</u>.  This Agreement was negotiated between legal counsel for the parties and any ambiguity in this Agreement shall not be construed against the party who drafted this Agreement.

Section 12.15.  <u>Incorporation of Schedules and Exhibits</u>.  The Schedules and Exhibits hereto are incorporated into this Agreement and will be deemed a part hereof as if set forth herein in full.  References to "this Agreement" and the words "herein", "hereof" will words of similar import refer to this Agreement (including the Schedules and Exhibits) as an entirety.  In the event of any conflict between the provisions of this Agreement and any Schedule or Exhibit, the provisions of this Agreement will control.  Capitalized terms used in the Schedules have the meanings assigned to them in this Agreement.  The Section references referred to in the Schedules are to Sections of this Agreement, unless otherwise expressly indicated.  The term "including", as used herein, shall be deemed to be followed by the words "without limitation".

87

In witness whereof, the parties have executed and delivered this Agreement as of the date first written above.


COMPANY:

Address for Notices:                                    EXPANETS, INC.
9780 Mt. Pyramid Court, Suite 400
Englewood, Colorado 80112
Attention:  Christopher J. Younger
Telephone No.: 303-300-6111                    By _____
Facsimile No.: 303-300-6125                        Name:
                                                                  Title:


With a copy to:
        Leonard, Street and Deinard Professional Association
        150 South Fifth Street, Suite 2300
        Minneapolis, Minnesota 55402
        Attention:  Michael G. Taylor, Esq.
        Telephone No.:  612-335-1589
        Facsimile No.: 612-335-1657

88

<u>SHAREHOLDERS</u>:

<u>Address for Notices</u>:                                    NORTHWESTERN CORPORATION
125 South Dakota Avenue, Suite 1100
Sioux Falls, South Dakota 57104
Attention: Eric Jacobsen
Telephone No.:  605-978-2908              By: _____
Facsimile No.:  605-978-2963                   Name:
                                               Title:


<u>With a copy to</u>:
        Paul, Hastings, Janofsky & Walker LLP
        75 East 55th Street
        New York, New York 10022
        Attention:  Marie Censoplano, Esq.
        Telephone No.:  212-318-6000
        Facsimile No.: 212-319-4090

<u>Address for Notices</u>:                                    NORTHWESTERN GROWTH CORPORATION
125 South Dakota Avenue, Suite 1100
Sioux Falls, South Dakota 57104
Attention: Eric Jacobsen
Telephone No.:  605-978-2908              By: _____
Facsimile No.: 605-978-2963                    Name:
                                               Title:


<u>With a copy to</u>:
        Paul, Hastings, Janofsky & Walker LLP
        75 East 55th Street
        New York, New York 10022
        Attention:  Marie Censoplano, Esq.
        Telephone No.:  212-318-6000
        Facsimile No.: 212-319-4090

Address for Notices:

125 South Dakota Avenue, Suite 1100
Sioux Falls, South Dakota 57104
Attention: Eric Jacobsen
Telephone No.:  605-978-2908
Facsimile No.: 605-978-2963

With a copy to:

      Paul, Hastings, Janofsky & Walker LLP
      75 East 55th Street
      New York, New York 10022
      Attention:  Marie Censoplano, Esq.
      Telephone No.:  212-318-6000
      Facsimile No.: 212-319-4090

NORTHWESTERN CAPITAL CORPORATION

By: _____
    Name:
    Title:

90

PURCHASER:

Address for Notices:                              AVAYA INC.
c/o Avaya Inc.
211 Mount Airy Road
Basking Ridge, New Jersey 07920
Attention:  Justin Choi, Vice President           By: _____
Telephone:  908 953-6000                          Name:  Garry McGuire
Facsimile:    908 953-4912                         Title:    Chief Financial Officer

With copies to:

Sidley Austin Brown & Wood LLP
787 Seventh Avenue
New York, New York  10019
Attention:  Irving Rotter
Telephone:  212 839-5300

Facsimile :   212 839-5599

91

**Exhibit 10.3(f)**

AMENDMENT NO. 1 TO ASSET PURCHASE AND SALE AGREEMENT, dated as of October 29, 2003 (this "Amendment No. 1"), among Expanets, Inc. (the "Company"), NorthWestern Corporation (the "Parent"), NorthWestern Growth Corporation ("NGC"), NorthWestern Capital Corporation ("NCC," and collectively with the Parent and NGC, each a "Shareholder," and collectively, the "Shareholders") and Avaya Inc. (the "Purchaser").

<div align="center">RECITALS</div>

A.  The Company, the Shareholders and the Purchaser are parties to an Asset Purchase and Sale Agreement, dated as of October 29, 2003 (the "Purchase Agreement"), pursuant to which the Company agreed, and the Shareholders agreed to cause the Company and its Subsidiaries to, sell to the Purchaser, and the Purchaser agreed to purchase from the Company and all of its Subsidiaries, the Purchased Assets.  Capitalized terms used but not defined herein shall have the meanings given to them in the Purchase Agreement.

B.  The Company, the Shareholders and the Purchaser now desire to further amend the Purchase Agreement on the terms and subject to the conditions set forth in this Amendment No. 1.

C.  The Company, the Shareholders and the Purchaser are permitted to amend the Purchase Agreement pursuant to the terms of Section 12.03 thereof.

<div align="center">AGREEMENT</div>

In consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto do hereby agree as follows:

1.  Amendments to Purchase Agreement.

(a)  Article I.  The parties hereto hereby agree that the definition of "Cash Amount" set forth in Article I of the Purchase Agreement is amended and restated in its entirety to read as follows:

""Cash Amount" means an amount equal to $152,000,000.00, minus the aggregate dollar amount of the Additional Assumed Liabilities, if any."

The parties hereto hereby agree that the definition of "Cash Proceeds" set forth in Article I of the Purchase Agreement is amended and restated in its entirety to read as follows:

""Cash Proceeds" means an aggregate amount equal to the sum of (a) the Cash Purchase Price, plus (b) [Intentionally Omitted], plus (c) the aggregate amount of Non-Compete Payments made by the Purchaser to the Company pursuant to Section 9.03(e) of this Agreement (including for this purpose any Non-Compete Payments that would have been paid by the Purchaser to the Company under Section 9.03 (e) of this Agreement but are set-off against by the Purchaser pursuant to Section 11.06 of this Agreement)."

The parties hereto hereby agree that the definition of "Fundamental Representations" set forth in Article I of the Purchase Agreement, and all references thereto in any Sale Document, are deleted in their entirety.

The parties hereto hereby agree that the definition of "Fundamental Representation Indemnification" set forth in Article I of the Purchase Agreement, and all references thereto in any Sale Document, are deleted in their entirety.

The parties hereto hereby agree that the definition of "Purchase Price" set forth in Article I of the Purchase Agreement is amended and restated in its entirety to read as follows:

"<u>Purchase Price</u>" means the sum of (a) the Cash Purchase Price, plus (b) [Intentionally Omitted], plus (c) the sum of all of the Non-Compete Payments."

The parties hereto hereby agree that the definition of "Purchaser Note" set forth in Article I of the Purchase Agreement, and all references thereto in any Sale Document, including, but not limited to, in the list of Exhibits to the Purchase Agreement, are deleted in their entirety.

The parties hereto hereby agree that the definition of "Sale Documents" set forth in Article I of the Purchase Agreement is amended and restated in its entirety to read as follows:

"<u>Sale Documents</u>" means this Agreement, the Transitional Services Agreement, each other document, agreement and instrument to be executed and delivered by any of the Shareholders, the Company, any of the Company's Subsidiaries or the Purchaser pursuant to Article IV of this Agreement, and all other documents and instruments by which the Purchased Assets are transferred by the Shareholders, the Company or any of the Company's Subsidiaries to the Purchaser and the Confidentiality Agreement and the Escrow Agreement."

The parties hereto hereby agree that the definition of "Target Date" set forth in Article I of the Purchase Agreement is amended and restated in its entirety to read as follows:

"<u>Target Date</u>" means the earlier of November 28, 2003 and the day that is five Business Days after the date that the Purchaser receives early termination of the applicable waiting period under the HSR Act."

The parties hereto hereby agree that the definition of "Threshold Amount" set forth in Article I of the Purchase Agreement, and all references thereto in any Sale Document, are deleted in their entirety.

(b)  <u>Section 2.04(a)</u>.  The parties hereto hereby agree that clause (ix) of the definition of "Excluded Liabilities" contained in Section 2.04(a) of the Purchase Agreement is amended and restated in its entirety to read as follows:

2

"(ix)  any Liability (A) of the Company or any of its Subsidiaries which was incurred in violation of any covenant, agreement or condition contained in the Sale Documents, or (B) for breach or violation of any Law on or prior to the Effective Time"

(c)  Section 3.01.  The parties hereto hereby agree that Section 3.01 of the Purchase Agreement is amended and restated in its entirety to read as follows:

"Section 3.01.  Consideration.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, as payment in full of the Purchase Price for the purchase of the Purchased Assets, which Purchase Price shall be subject to adjustment after the Closing Date as provided in this Article III, the Purchaser will:

(a)  pay, or cause to be paid, to the Company, by wire transfer of immediately available funds, an amount in cash equal to the unpaid portion of the Initial Cash Payment Amount;

(b)  [Intentionally Omitted]

(c)  pay, or cause to be paid, to the Escrow Agent, by wire transfer of immediately available funds, an amount in cash equal to the Escrow Amount; and

(d)  assume the Assumed Liabilities.

The parties acknowledge that on or prior to the date hereof, the Purchaser has paid to the Company a portion of the Initial Cash Payment Amount in the amount of $4,000,000.

(d)  Section 4.02(d).  The parties hereto hereby agree that Section 4.02(d) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(d)  Consideration.  The Company shall have received the Initial Cash Payment Amount by wire transfer of immediately available funds in accordance with the provisions of Section 3.01 hereof.  The Purchaser shall have delivered the Escrow Amount to the Escrow Agent by wire transfer of immediately available funds in accordance with the provisions of Section 3.01 hereof."

(e)  Section 4.03(a)(i).  The parties hereto hereby agree that Section 4.03(a)(i) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(i)  All of the representations and warranties of the Company and the Shareholders set forth in the Sale Documents shall be true and correct in all respects, except for such failure to be true and correct which would, individually or in the aggregate, not have a Material Adverse Effect, in each case, on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date."

(f)  Section 4.03(b).  The parties hereto hereby agree that Section 4.03(b) of the Purchase Agreement is amended and restated in its entirety to read as follows:

3

"(b)  <u>Company Required Consents</u>.  The Purchaser shall have received copies of all of the (i) Company Required Consents and (ii) the Required Permits, except for such Company Required Consents and Required Permits the failure of which to obtain, individually or in the aggregate, would not have a Material Adverse Effect, and all such Company Required Consents and Required Permits shall be in form and substance reasonably satisfactory to the Purchaser and shall be in full force and effect as of the Closing Date.  All of the Required Leases shall have been assigned to the Purchaser.  In addition, the applicable waiting period required under the HSR Act and all similar Laws with respect to the Transactions shall have expired or have been terminated early; <u>provided</u>, <u>however</u>, that if the applicable waiting period necessary to comply with the HSR Act and all similar Laws with respect to the Transactions exceeds 30 days from the date of this Agreement, the Company shall have the right to terminate this Agreement."

(g)  <u>Section 4.03(i)</u>.  The parties hereto hereby agree that Section 4.03(i) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(i)  [Intentionally Omitted]"

(h)  <u>Section 4.03(m)</u>.  The parties hereto hereby agree that Section 4.03(m) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(m)  <u>Material Adverse Effect</u>.  Since September 30, 2003, no fact, circumstance, event or change shall have occurred, or be reasonably likely to occur, which has had, or could reasonably be expected to have, a Material Adverse Effect."

(i)  <u>Section 8.06(a)</u>.  The parties hereto hereby agree that Section 8.06(a) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(a)  <u>Agreement</u>.  The Shareholders, the Company and the Purchaser accept the form, terms and provisions of the Assumption Agreement, the Escrow Agreement, the Transitional Services Agreement, the Bills of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the legal opinions and the Deeds as previously agreed."

(j)  <u>Section 9.03(e)(ii)</u>.  The parties hereto hereby agree that Section 9.03(e)(ii) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(ii)  If for any reason, the Purchaser is required to set-off, refund, reimburse or disgorge to Avaya any payment for which the Purchaser has made a Non-Compete Payment, the Shareholders and the Company shall immediately refund to the Purchaser the Non-Compete Payment made in respect of such set-off, refunded, reimbursed or disgorged payment.  Alternatively, the Purchaser shall have the right to set off such Non-Compete Payment against any other Non-Compete Payment that may be due hereunder, or against any other payment that may be due under any of the Sale Documents."

(k)  <u>Section 10.03(c)</u>. The parties hereby agree that Section 10.03(c) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(c)  [Intentionally Omitted]"

(l)  <u>Section 11.01(a)</u>. The parties hereby agree that Section 11.01(a) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(a)  <u>Indemnification by the Shareholders and the Company</u>.  Each of the Shareholders and the Company, jointly and severally, will indemnify and defend the Purchaser Indemnified Persons against and hold each Purchaser Indemnified Person harmless from any and all Losses that the Purchaser Indemnified Persons may incur, suffer, sustain or become subject to arising out of, relating to, based upon, in connection with or due to:

(i)  [Intentionally Omitted]

(ii)  the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation (other than the covenants and agreements set forth in Section 10.03(b) which are covered separately in clause (iv) below) of the Shareholders or the Company contained in any Sale Document or in any certificate delivered thereunder;

(iii)  (A) [Intentionally Omitted], (B) any of the information, facts, events, circumstances, issues or other matters set forth on <u>Schedule 5.20</u> of this Agreement, whether or not referred to as presenting an actual, alleged or contingent liability or violation of Environmental Law, or (C) any Recognized Environmental Condition identified in any Environmental Site Assessment conducted by the Purchaser;

(iv)  (A) [Intentionally Omitted], (B) any nonfulfillment of any covenant, undertaking, agreement or other obligation of the Shareholders or the Company contained in Section 10.03(b), or (C) any Taxes related to (I) the operation of the Business by the Company and its Subsidiaries prior to the Closing, (II) the ownership by the Company and its Subsidiaries of the Assets prior to the Closing, or (III) any distributions, dividends or other payments from the Company or any of its Subsidiaries to any Shareholder, or (IV) the transfer of the Purchased Assets to the Purchaser;

(v)  the Excluded Assets;

(vi)  the Excluded Liabilities, except for the Liabilities referred to in Section 2.04(a)(ix) which are covered by clause (ii) above, including, without limitation, the Company's or any Shareholder's failure to pay or discharge the Excluded Liabilities as and when they become due, and including any claim, Action, allegation or threat by any third party that, if upheld or granted, would

5

result in any Purchaser Indemnified Person having any Liability in respect of any Excluded Liability; and

      (vii)  the Transfer or Transfers by the Company or any of its Subsidiaries prior to the Effective Time, of any businesses, operations, assets or properties, including, without limitation, Liabilities related to representations, warranties, covenants, agreements and indemnities given by the Shareholders, the Company or any of their Subsidiaries in connection with any such Transfer, or any broker's, finder's or similar fees payable in connection with any such Transfers."

(m)  <u>Section 11.01(b)(i)</u>. The parties hereby agree that Section 11.01(b)(i) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(i)  [Intentionally Omitted]"

(n)  <u>Section 11.03</u>. The parties hereby agree that Section 11.03 of the Purchase Agreement is amended and restated in its entirety to read as follows:

"Section 11.03.  <u>Survival of Indemnification</u>.  Notwithstanding anything contained herein to the contrary, the representations and warranties of the Shareholders, the Company, the Purchaser or any of their respective Subsidiaries contained in the Sale Documents or in any document delivered pursuant thereto shall not survive the Closing.  The covenants and agreements of the parties contained in the Sale Documents or in any document delivered pursuant thereto and the rights to indemnification under this Agreement with respect thereto will survive the Closing Date and any investigation at any time made by or on behalf of the Purchaser or any other party; <u>provided</u>, <u>however</u>, that the indemnification under Section 11.01(a) and (b) shall expire on the date which is 18 months after the Closing Date, unless prior to such date, an Indemnification Notice has been given; <u>provided</u>; <u>however</u>, that:

(a)  <u>Fundamental Indemnification</u>.  The (i) [Intentionally Omitted] and (ii) the rights to indemnification under Section 11.01(a)(ii), (v), (vi) and (vii), will survive the Closing for a period ending on the fifth anniversary of the Closing Date, and will be effective with respect to any claim made thereunder, notice of which has been given within such period; and

(b)  <u>Tax Indemnification</u>.  The covenants and agreements set forth in Section 10.03(b) and the Tax Indemnification will survive the Closing for a period ending six months after the termination of the statute of limitations (or any extension thereof) on any Law applicable to the matters covered therein, and will be effective with respect to claims made thereunder, notice of which has been given within such period."

(o)  <u>Section 11.04(a)</u>. The parties hereby agree that the heading of Section 11.04 of the Purchase Agreement is amended and restated in its entirety to read as follows:

"Section 11.04.  <u>Limitation on Liability; Release of Company</u>."

The parties hereby agree that Section 11.04(a) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(a)  [Intentionally Omitted]"

(p)  <u>Section 11.06</u>. The parties hereby agree that Section 11.06 of the Purchase Agreement is amended and restated in its entirety to read as follows:

"Section 11.06.  <u>Set-Off</u>.  Each of the parties hereto expressly acknowledges and agrees that in the event that a Purchaser Indemnified Person is entitled to indemnification under Section 11.01(a), the Purchaser will be entitled to set-off the amount of such Losses incurred by such Purchaser Indemnified Person against and retain such amount from any obligations or payments due to any Shareholder or the Company under any Sale Document."

(q)  <u>Section 11.07(c)</u>. The parties hereby agree that Section 11.07(c) of the Purchase Agreement is amended and restated in its entirety to read as follows:

"(c)  <u>Escrow Amount</u>.  (i)  The term "<u>Escrow Amount</u>" means an amount in cash equal to the sum of (A) $976,000.00 (the "<u>General Escrow Amount</u>"), plus (B) the Specified Liability Escrow Amount (as defined below)."

(r)  <u>Table of Contents</u>.  The parties hereto hereby agree that words "Exhibits," "Exhibit 3.01" and "Form of Purchaser Note" are hereby deleted from the Table of Contents of the Purchase Agreement.

2.  <u>Ratification and Confirmation of the Purchase Agreement; No Other Changes</u>.  Except as modified by this Amendment No. 1, the Purchase Agreement is hereby ratified and confirmed in all respects.  Nothing herein shall be held to alter, vary or otherwise affect the terms, conditions and provisions of the Purchase Agreement, other than as contemplated herein.

3.  <u>Effectiveness</u>.  Notwithstanding the date on which the parties actually execute and deliver this Amendment No. 1, the parties hereto agree that this Amendment No. 1 shall be effective as of immediately prior to the close of business on October 29, 2003.

4.  <u>Governing Law</u>.  This Amendment No. 1 shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed entirely within that state, without reference to conflicts of laws provisions.

5.  <u>Counterparts</u>.  This Amendment No. 1 may be executed simultaneously in one or more counterparts, and by different parties hereto in separate counterparts, each of which when executed will be deemed an original, but all of which taken together will constitute one and the same instrument.

6.  <u>Severability</u>.  If any term or other provision of this Amendment No. 1 is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Amendment No. 1 will nevertheless remain in full force and effect.  Upon

7

such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Amendment No. 1 so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

       7.  <u>Notices</u>.  All notices, requests, demands and other communications to any party given under this Amendment No. 1 shall be in writing and delivered personally by telecopier (with confirmation received) to the parties at the telecopy number specified for such parties in the Agreement (or at such other telecopy number as may be specified by a party in writing given at least five Business Days prior thereto).  All notices, requests, demands and other communications will be deemed delivered when actually received.

<div align="center">8</div>

IN WITNESS WHEREOF, the parties hereto have executed this Amendment No. 1 as of the date first written above.

EXPANETS, INC.

By: _____
     Name:
     Title:

NORTHWESTERN CORPORATION

By: _____
     Name:
     Title:

NORTHWESTERN GROWTH CORPORATION

By: _____
     Name:
     Title:

NORTHWESTERN CAPITAL CORPORATION

By: _____
     Name:
     Title:

AVAYA INC.

By: _____
     Name:
     Title:

9

**Exhibit 12.1**

**NorthWestern Corporation**
**Computation of Ratio of Consolidated Earnings to Consolidated Fixed Charges**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2002** | **2001** | **2000** | **1999** |
| | (in thousands, except ratios) | | | | |
| **Earnings:** | | | | | |
| Income (loss) before income taxes | $ (71,630) | $ (49,167) | $ (2,685) | $ 2,519 | $ 16,046 |
| Add: Fixed charges as below | 162,571 | 126,620 | 34,536 | 35,502 | 24,817 |
| Less: Distributions on preferred securities of subsidiary trust | (14,945) | (28,610) | (6,827) | (6,601) | (6,601) |
| Total | $ 75,996 | $ 48,843 | $ 25,024 | $ 31,420 | $ 34,262 |
| **Fixed Charges:** | | | | | |
| Interest charges | $ 147,626 | $ 98,010 | $ 27,709 | $ 28,901 | $ 18,216 |
| Distributions on redeemable preferred securities of subsidiary trust | 14,945 | 28,610 | 6,827 | 6,601 | 6,601 |
| Total | $ 162,571 | $ 126,620 | $ 34,536 | $ 35,502 | $ 24,817 |
| **Ratio of earnings to fixed charges** | — | — | — | — | 1.38 |
| **Earnings to fixed charges deficit** | (86,575) | (77,777) | (9,512) | (4,082) | 9,445 |

**Exhibit 21**

### SUBSIDIARIES OF THE REGISTRANT

| Name | State or Jurisdiction of Incorporation or Limited Partnership |
|------|--------------------------------------------------------------|
| NorthWestern Corporation | Delaware |
| NorthWestern Growth Corporation | South Dakota |
| NorthWestern Capital Corporation | Delaware |
| Blue Dot Services Inc. | Delaware |
| Netexit, Inc. | Delaware |
| Clark Fork and Blackfoot, L.L.C. | Montana LLC |
| NorthWestern Services Corporation | South Dakota |
| Nekota Resources, Inc. | South Dakota |
| NorCom Advanced Technologies, Inc. | South Dakota |
| NorthWestern Energy Development, LLC | Delaware LLC |
| NorthWestern Generation I, LLC | Delaware LLC |
| Montana Megawatts I, LLC | Delaware LLC |
| NorthWestern Energy Marketing, LLC | Delaware LLC |
| CornerNorth LLC | Delaware LLC |
| Canadian-Montana Pipe Line Corporation | Canada |
| Risk Partners Assurance, Ltd. | Bermuda |

**Exhibit 23.1**

INDEPENDENT AUDITORS' CONSENT

We consent to the incorporation by reference in Registration Statements No. 333-11843, No. 333-18991, No. 333-80817 and No. 333-80819 on Form S-8, No. 333-50479, No. 333-58491, and No. 333-82707 on Form S-3, and No. 333-64113 on Form S-2 of NorthWestern Corporation (a Delaware corporation) and Subsidiaries of our report dated March 15, 2004, relating to the consolidated financial statements and financial statement schedule of the Corporation (which report expresses an unqualified opinion and includes explanatory paragraphs relating to the bankruptcy proceedings and going concern uncertainty described in Note 3, the change in the methods of accounting for asset retirement obligations and company obligated mandatorily redeemable preferred securities in 2003 described in Note 4, and the change in the method of accounting for goodwill and other intangible assets in 2002 described in Note 6) appearing in this Annual Report on Form 10-K of the Corporation for the year ended December 31, 2003.

/s/ DELOITTE & TOUCHE LLP
Minneapolis, Minnesota
March 15, 2004

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO
17 CFR 240. 13a-14
PROMULGATED UNDER
SECTION 302 OF THE SARBANES -OXLEY ACT OF 2002**

I, Gary G. Drook, certify that:

1.        I have reviewed this annual report on Form 10-K of NorthWestern Corporation;

2.        Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.        Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.        The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

      (a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

      (b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

      (a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting; and

Date: **March 15, 2004**

/s/ GARY G. DROOK
Gary G. Drook
*President and Chief Executive Officer*

**Exhibit 31.2**

### CERTIFICATION PURSUANT TO
### 17 CFR 240. 13a-14
### PROMULGATED UNDER
### SECTION 302 OF THE SARBANES -OXLEY ACT OF 2002

I, Brian B. Bird, certify that:

1.      I have reviewed this annual report on Form 10-K of NorthWestern Corporation;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d 15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d- 15(f)) for the registrant and have:

    (a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    (a)     all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information ; and

    (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting; and

Date: **March 15, 2004**

 /s/ BRIAN B. BIRD
Brian B. Bird
*Chief Financial Officer*

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of NorthWestern Corporation (the "Company") on Form 10-K for the fiscal year ended December 31, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Gary G. Drook, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1) The Report fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 15, 2004

/s/ GARY G. DROOK

Gary G. Drook
*President and Chief Executive Officer*

**Exhibit 32.2**

### CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of NorthWestern Corporation (the "Company") on Form 10-K for the fiscal year ended December 31, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian B. Bird, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1)  The Report fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 15, 2004

/s/ BRIAN B. BIRD
Brian B. Bird
*Chief Financial Officer*