# APP. 7 PT 3

**CLOSE WINDOW**          **PRINT PAGE**

**NORTHWESTERN CORP filed this 10-Q on 11/14/2003.**

QuickLinks -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-Q

**(Mark One)**

☒      **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2003**

or

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from                    to**

**Commission File No. 0-692**



| **Delaware** | **46-0172280** |
|---|---|
| (State of Incorporation) | IRS Employer Identification No. |

**125 South Dakota Avenue
Sioux Falls, South Dakota 57104**
(Address of principal office)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer. Yes ☒    No ☐

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

Common Stock, Par Value $1.75
37,680,095 outstanding at November 14, 2003

**NORTHWESTERN CORPORATION**
**FORM 10-Q**

**INDEX**

|  |  | Page |
|---|---|---|
| **SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS** |  | 3 |
| **PART I. FINANCIAL INFORMATION** |  | 6 |
| Item 1. | Financial Statements (Unaudited) | 6 |
|  | Consolidated Balance Sheets—September 30, 2003 and December 31, 2002 | 6 |
|  | Consolidated Statements of Loss—Three and nine months ended September 30, 2003 and 2002 | 7 |
|  | Consolidated Statements of Cash Flows—Nine months ended September 30, 2003 and 2002 | 8 |
|  | Notes to Consolidated Financial Statements | 9 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 3. | Quantitative and Qualitative Disclosure about Market Risk | 60 |
| Item 4. | Controls and Procedures | 61 |
| **PART II. OTHER INFORMATION** |  | 64 |
| Item 1. | Legal Proceedings | 64 |
| Item 6. | Exhibits and Reports on Form 8-K | 67 |
| **SIGNATURES** |  | 69 |

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

On one or more occasions, we may make statements in this Quarterly Report on Form 10-Q regarding our assumptions, projections, expectations, targets, intentions or beliefs about future events. All statements other than statements of historical facts, included or incorporated by reference herein relating to management's current expectations of future financial performance, continued growth, changes in economic conditions or capital markets and changes in customer usage patterns and preferences are forward looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. On September 14, 2003, NorthWestern Corporation filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Our subsidiaries, including

Expanets Inc. and Blue Dot Services, Inc., are not party to the Chapter 11 case.

Words or phrases such as "anticipates," "may," "will," "should," "believes," "estimates," "expects," "intends," "plans," "predicts," "projects," "targets," "will likely result," "will continue" or similar expressions identify forward-looking statements. Forward-looking statements involve risks and uncertainties, which could cause actual results or outcomes to differ materially from those expressed. We caution that while we make such statements in good faith and we believe such statements are based on reasonable assumptions, including without limitation, management's examination of historical operating trends, data contained in records and other data available from third parties, we cannot assure you that our projections will be achieved. Factors that may cause such differences include but are not limited to:

(i)     our common equity and our trust preferred securities will likely be restructured in a manner that will eliminate or very substantially reduce any remaining value. We have previously stated that the planned sale of non-core assets, including Expanets and Blue Dot, is not expected to change our view that our common stock has no value. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities;

(ii)    our ability to successfully develop, prosecute, confirm and consummate a plan of reorganization, emerge from bankruptcy as a going concern and avoid liquidation under the U.S. Bankruptcy Code;

(iii)   risks associated with third parties seeking and obtaining Bankruptcy Court approval to terminate or shorten the exclusivity period that we have to propose and confirm a plan of reorganization, for the appointment of a Chapter 11 trustee or to convert the case to a Chapter 7 case;

(iv)    our ability to operate pursuant to the terms of the $100 million debtor-in-possession financing facility arranged by the company with Bank One, N.A. (the DIP Facility) and other financing and contractual arrangements;

(v)     our ability to obtain Bankruptcy Court approval with respect to material motions in the Chapter 11 proceeding from time to time;

(vi)    our ability to obtain the support of the official committee of unsecured creditors and other stakeholders of the company for a plan of reorganization, which may be difficult in light of our likely inability to preserve any material value in our common equity and our trust preferred securities, or satisfy a material amount of our current unsecured debt, in a plan of reorganization;

(vii)   our ability to offset the negative effects that the filing for reorganization under Chapter 11 has had, or may have, on our business, management and employees including constraints placed on available capital;

3

(viii)  our ability to obtain and maintain normal terms with vendors and service providers;

(ix)    our ability to maintain contracts, including leases, that are critical to our operations;

(x)     the potential adverse impact of the Chapter 11 case on our liquidity or results of operations;

(xi)    our ability to develop a long-term strategy and our ability to fund and execute our business plan;

(xii)   our ability to avoid or mitigate material uninsured monetary judgments, or other adverse judgments, against us in (1) the shareholder class action lawsuit relating to the disposition of the generating and energy-related assets by The Montana Power Company, excluding our acquisition of the electric and natural gas transmission and distribution business formerly held by The Montana Power Company, together with ERISA litigation regarding The Montana Power Company ESOP and 401(k) plan and (2) existing shareholder and derivative litigation or in any additional litigation and regulatory action,

including the possible initiation by the SEC of a formal investigation, in connection with the restatement of our 2002 quarterly financial statements, the resolution of which could have a material adverse affect on our financial condition or our ability to timely confirm a plan of reorganization;

(xiii)  our ability to consummate the sale of Expanets' assets, Blue Dot's sale of its businesses and the sale of other material non-core assets;

(xiv)  the instructions, orders and decisions of the bankruptcy court and cost and other effects of legal and administrative proceedings, settlements, investigation and claims;

## General Factors

(xv)  our ability to fully address and correct inadequacies or material weaknesses in our internal controls and to thereafter maintain an effective internal controls structure;

(xvi)  our ability to attract, motivate and/or retain key employees;

(xvii)  potential additional adverse federal, state, or local legislation or regulation or adverse determinations by regulators, including the recent final order of the Montana Public Service Commission (MPSC) disallowing the recovery of $6.2 million of natural gas costs we incurred during the past year, and an interim order fixing the recovery price during the next year, which has had and could continue to have a material adverse affect on our liquidity, results of operations and financial condition;

(xviii)  unscheduled generation outages, maintenance or repairs which may reduce revenues or may require additional capital expenditures or other increased operating costs;

(xix)  unanticipated changes in commodity prices or in fuel supply costs or availability due to higher demand, shortages, weather conditions, transportation problems or other developments, in combination with reduced availability of trade credit, may reduce revenues or may increase operating costs, each of which would adversely affect our liquidity;

(xx)  increases in interest rates will increase our cost of borrowing;

(xxi)  adverse changes in general economic and competitive conditions in our service territories; and

(xxii)  certain other business uncertainties related to the occurrence of natural disasters, war, hostilities and the threat of terrorist actions.

We have attempted to identify, in context, certain of the factors that we believe may cause actual future experience and results to differ materially from our current expectation regarding the relevant matter or subject area. In addition to the items specifically discussed above, our business and results of

---

operations are subject to the uncertainties described under the caption "Risk Factors" which is a part of the disclosure included in Item 2 of this Report entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations."

From time to time, oral or written forward-looking statements are also included in our reports on Forms 10-K, 10-Q and 8-K, Proxy Statements on Schedule 14A, press releases and other materials released to the public. Although we believe that at the time made, the expectations reflected in all of these forward-looking statements are and will be reasonable, any or all of the forward-looking statements in this report on Form 10-Q, our reports on Forms 10-K and 8-K, our Proxy Statements on Schedule 14A and any other public statements that are made by us may prove to be incorrect. This may occur as a result of inaccurate assumptions or as a consequence of known or unknown risks and uncertainties. Many factors discussed in this Quarterly Report on Form 10-Q, certain of which are beyond our control,

will be important in determining our future performance. Consequently, actual results may differ materially from those that might be anticipated from forward-looking statements. In light of these and other uncertainties, you should not regard the inclusion of a forward-looking statement in this Quarterly Report on Form 10-Q or other public communications that we might make as a representation by us that our plans and objectives will be achieved, and you should not place undue reliance on such forward-looking statements.

We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. However, your attention is directed to any further disclosures made on related subjects in our subsequent annual and periodic reports filed with the Commission on Forms 10-K, 10-Q and 8-K and Proxy Statements on Schedule 14A.

*Unless the context requires otherwise, references to "we," "us," "our," "NorthWestern Corporation" and "NorthWestern" refer specifically to NorthWestern Corporation and its subsidiaries.*

5

## PART 1. FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

### NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION
### CONSOLIDATED BALANCE SHEETS
#### (Unaudited)
#### (in thousands, except per share amounts)

| | September 30, 2003 | December 31, 2002 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 28,196 | $ 26,554 |
| Restricted cash | 46,673 | 28,039 |
| Accounts receivable, net | 90,753 | 91,807 |
| Inventories | 35,866 | 25,907 |
| Regulatory assets | 10,221 | 15,430 |
| Other | 87,132 | 53,971 |
| Assets held for sale | 30,000 | 42,665 |
| Current assets of discontinued operations | 226,732 | 275,549 |
| **Total current assets** | **555,573** | **559,922** |
| **Property, Plant, and Equipment, Net** | **1,237,553** | **1,238,050** |
| **Goodwill** | **375,798** | **375,798** |
| **Other:** | | |
| Investments | 12,146 | 85,236 |
| Regulatory assets | 198,821 | 201,075 |
| Other | 65,044 | 51,438 |
| Noncurrent assets of discontinued operations | 98,635 | 164,970 |
| **Total assets** | $ **2,543,570** | $ **2,676,489** |

## LIABILITIES AND SHAREHOLDERS' DEFICIT
**Liabilities Not Subject to Compromise**
**Current Liabilities:**

|  |  |  |
|---|---:|---:|
| Current maturities of long-term debt | $ 920,890 | $ 25,909 |
| Accounts payable | 34,713 | 49,704 |
| Accrued expenses | 116,150 | 162,524 |
| Regulatory liabilities | 4,204 | 32,236 |
| Current liabilities of discontinued operations | 218,821 | 243,551 |
| **Total current liabilities** | 1,294,778 | 513,924 |
| **Long-term Debt** | — | 1,642,522 |
| **Deferred Income Taxes** | 8,601 | 202 |
| **Noncurrent Regulatory Liabilities** | 31,642 | 35,002 |
| **Other Noncurrent Liabilities** | 239,125 | 487,163 |
| **Noncurrent Liabilities and Minority Interests of Discontinued Operations** | 17,720 | 83,003 |
| **Total liabilities not subject to compromise** | 1,591,866 | 2,761,816 |
| **Liabilities Subject to Compromise** | | |
| Financing Debt | 865,000 | — |
| Trade Creditors | 277,793 | — |
| Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts | 365,550 | — |
| **Total liabilities subject to compromise** | 1,508,343 | — |
| **Total liabilities** | 3,100,209 | 2,761,816 |
| **Minority Interests** | — | 500 |
| **Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts** | — | 370,250 |
| **Shareholders' Deficit:** | | |
| Common stock, par value $1.75; authorized 50,000,000 shares; issued and outstanding 37,680,095 and 37,396,762 | 65,940 | 65,444 |
| Paid-in capital | 301,348 | 304,781 |
| Treasury stock, at cost | — | (3,560) |
| Retained deficit | (919,235) | (818,605) |
| Accumulated other comprehensive loss | (4,692) | (4,137) |
| **Total shareholders' deficit** | (556,639) | (456,077) |
| **Total liabilities and shareholders' deficit** | $ 2,543,570 | $ 2,676,489 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

6

---

**NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION**
**CONSOLIDATED STATEMENTS OF LOSS**
**(Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| --- | --- | --- | --- | --- |
| | 2003 | 2002 | 2003 | 2002 |
| OPERATING REVENUES | $ 235,388 | $ 184,265 | $ 759,640 | $ 537,772 |
| COST OF SALES | 121,086 | 70,687 | 405,543 | 221,085 |
| GROSS MARGIN | 114,302 | 113,578 | 354,097 | 316,687 |
| OPERATING EXPENSES | | | | |
| Operating, general and administrative | 78,653 | 66,401 | 226,826 | 174,038 |
| Impairment on assets held for sale | — | — | 12,399 | |
| Depreciation | 17,948 | 16,589 | 52,803 | 46,265 |
| Reorganization professional fees and expenses | 174 | — | 174 | — |
| TOTAL OPERATING EXPENSES | 96,775 | 82,990 | 292,202 | 220,303 |
| OPERATING INCOME | 17,527 | 30,588 | 61,895 | 96,384 |
| Interest Expense (contractual interest of $48,026 and $129,207 for the three and nine months ended 9/30/2003) | (44,854) | (33,585) | (126,035) | (82,769) |
| Gain (Loss) on Debt Extinguishment | 3,300 | | 3,300 | (20,688) |
| Investment Income and Other | (7,306) | 1,063 | (6,151) | (914) |
| Income (Loss) From Continuing Operations Before Income Taxes | (31,333) | (1,934) | (66,991) | (7,987) |
| Benefit (Provision) for Income Taxes | 1,646 | (1,500) | 1,145 | 4,281 |
| Income (Loss) from Continuing Operations | (29,687) | (3,434) | (65,846) | (3,706) |
| Discontinued Operations, Net of Taxes and Minority Interests | (23,053) | (51,927) | (19,839) | (111,678) |
| Net Loss | (52,740) | (55,361) | (85,685) | (115,384) |
| Minority Interests on Preferred Securities of Subsidiary Trusts | — | (7,474) | (14,945) | (21,173) |
| Dividends on Preferred Stock | — | (295) | — | (391) |
| Loss on Common Stock | $ (52,740) | $ (63,130) | $ (100,630) | $ (136,948) |
| Average Common Shares Outstanding | 37,397 | 27,397 | 37,397 | 27,397 |
| Earnings (Loss) per Average Common Share: | | | | |
| Continuing operations | $ (0.79) | $ (0.40) | $ (2.16) | $ (0.92) |
| Discontinued operations | (0.62) | (1.90) | (0.53) | (4.08) |
| Basic | $ (1.41) | $ (2.30) | $ (2.69) | $ (5.00) |
| Diluted Earnings (Loss) per Average Common Share: | | | | |
| Continuing operations | $ (0.79) | $ (0.40) | $ (2.16) | $ (0.92) |
| Discontinued operations | (0.62) | (1.90) | (0.53) | (4.08) |
| Diluted | $ (1.41) | $ (2.30) | $ (2.69) | $ (5.00) |

The accompanying notes to consolidated financial statements are an integral part of these statements.

### NORTHWESTERN CORPORATION, A DEBTOR-IN-POSSESSION
### CONSOLIDATED STATEMENTS OF CASH FLOWS
#### (Unaudited)
#### (in thousands)

| | Nine Months Ended September 30 | |
| --- | --- | --- |
| | 2003 | 2002 |
| **Operating Activities:** | | |
| Net Loss | $ (85,685) | $ (115,384) |
| Items not affecting cash: | | |
| Depreciation | 52,803 | 46,265 |
| Loss on discontinued operations | 19,839 | 111,678 |
| (Gain) Loss on debt extinguishment | (3,300) | 20,688 |
| Deferred income taxes | 8,399 | (9,053) |
| Impairment on assets held for sale | 12,399 | — |
| Impairment of note receivable | 9,073 | — |
| Changes in current assets and liabilities: | | |
| Restricted cash | (18,634) | (18,766) |
| Accounts receivable | 1,054 | 30,926 |
| Inventories | (9,959) | 12,953 |
| Other current assets | (33,161) | 8,639 |
| Accounts payable | (7,469) | (4,536) |
| Accrued expenses | 24,150 | 31,674 |
| Change in regulatory assets | 7,463 | 1,391 |
| Change in regulatory liabilities | (31,392) | (2,746) |
| Other, net | (50,320) | (34,861) |
| **Cash flows provided by (used in) continuing operations** | (104,740) | 78,868 |
| Change in net assets of discontinued operations | (1,303) | (211,921) |
| **Cash flows used in operating activities** | (106,043) | (133,053) |
| **Investment Activities:** | | |
| Property, plant and equipment additions | (52,693) | (48,936) |
| Proceeds from sale of assets | 1,834 | 663 |
| Purchase of investments | (43,300) | (12,641) |
| Proceeds from sale of investments | 115,238 | — |
| Acquisitions, net of cash received | —- | (502,765) |
| Proceeds from sale of discontinued operation | 6,800 | — |
| **Cash flows provided by (used in) investing activities** | 27,879 | (563,679) |
| **Financing Activities:** | | |
| Dividends on common and preferred stock | — | (26,206) |
| Minority interest on preferred securities of subsidiary trusts | (9,721) | (21,173) |
| Issuance of long-term debt | 396,938 | 719,118 |

| | | | | |
|---|---|---:|---|---:|
| Issuance of preferred securities of subsidiary trusts | | — | | 117,750 |
| Repayment of long-term debt | | (24,986) | | (158,687) |
| Line of credit (repayments) borrowings, net | | (255,000) | | 99,000 |
| Financing costs | | (27,425) | | (35,266) |
| Proceeds from termination of hedge | | — | | 24,898 |
| **Cash flows provided by financing activities** | | 79,806 | | 719,434 |
| **Increase in Cash and Cash Equivalents** | | 1,642 | | 22,702 |
| Cash and Cash Equivalents, beginning of period | | 26,554 | | 5,619 |
| **Cash and Cash Equivalents, end of period** | $ | 28,196 | $ | 28,321 |
| **Supplemental Cash Flow Information:** | | | | |
| Cash paid (received) during the period for: | | | | |
| Income taxes | $ | (10,199) | $ | (16,325) |
| Interest | | 84,065 | | 63,965 |
| Reorganization professional fees and expenses | | 24 | | — |
| Non-cash transactions: | | | | |
| Debt and preferred securities of subsidiary trusts assumed in acquisition | $ | — | $ | 511,104 |
| Fair value of note receivable received in exchange for sale of discontinued operation | | 1,400 | | — |
| Assets acquired in exchange for debt | | 193 | | 463 |
| Discount on subordinated note | | — | | 2,230 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

8

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(Reference is made to Notes to Financial Statements
included in NorthWestern Corporation's Annual Report)**

## (1) Management's Statement

The consolidated financial statements for the interim periods included herein have been prepared by NorthWestern Corporation (the "Corporation", "Debtor" or "we"), a debtor-in-possession, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that may affect the reported amounts of assets, liabilities, revenues and expenses during the reporting period. Actual results could differ from those estimates. Results of operations for the interim periods are not necessarily indicative of the results to be expected for the full year, and these financial statements do not contain the detail or footnote disclosure concerning accounting policies and other matters that would be included in full fiscal year financial statements. Therefore, these financial statements should be read in conjunction with the financial statements and the notes thereto included in the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002.

On September 14, 2003 (the "Petition Date"), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Federal Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court). Pursuant to Chapter 11 (as discussed further in Note 3), we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court. Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. The assets and liabilities of such non-debtor subsidiaries are not considered to be

material to the consolidated financial statements or are included in discontinued operations.

Beginning in the third quarter of 2003, the consolidated financial statements have been prepared in accordance with the American Institute of Certified Public Accountants' Statement of Position (SOP) 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," and on a going-concern basis, which contemplates continuity of operation, realization of assets, and liquidation of liabilities in the ordinary course of business. As a result of our Chapter 11 filing, the realization of assets and liquidation of liabilities are subject to uncertainty. Under SOP 90-7, certain liabilities existing prior to the Chapter 11 filing are classified as Liabilities Subject to Compromise on the Consolidated Balance Sheets. Additionally, professional fees and expenses directly related to the Chapter 11 proceeding and interest income on funds accumulated during the Chapter 11 proceedings are reported separately as reorganization items. Finally, the extent to which our reported interest expense differs from the stated contractual interest is disclosed on the Consolidated Statements of Loss.

## (2) Basis of Consolidation and Nature of Operations

The accompanying consolidated financial statements include our accounts together with those of our wholly and majority-owned or controlled subsidiaries. The financial statements of Expanets, Blue Dot and CornerStone (CornerStone is only through November 1, 2002) are included in the accompanying consolidated financial statements by virtue of the voting and control rights, and therefore included in references to "subsidiaries". Expanets and Blue Dot are not party to our Chapter 11 case. All significant intercompany balances and transactions have been eliminated from the consolidated financial statements. The operations of Expanets, Blue Dot and CornerStone and our interest in these subsidiaries have been reflected in the consolidated financial statements as Discontinued Operations (see Note 6 for further discussion).

9

We are one of the largest providers of electricity and natural gas in the Upper Midwest and Northwest, serving approximately 598,000 customers in Montana, South Dakota and Nebraska. We have generated and distributed electricity in South Dakota and distributed natural gas in South Dakota and Nebraska since 1923 through our energy division, NorthWestern Energy. On February 15, 2002, we completed the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, or Montana Power. As a result of the acquisition, from February 15, 2002 through November 15, 2002, we distributed electricity and natural gas in Montana through our wholly owned subsidiary, NorthWestern Energy, L.L.C. Effective November 15, 2002, we transferred the electric and natural gas transmission and distribution operations of NorthWestern Energy, L.L.C. to NorthWestern Corporation, and since that date, we have operated its business as part of our NorthWestern Energy division. We are operating our utility business under the common name "NorthWestern Energy" in all our service territories. The former NorthWestern Energy, L.L.C. has been renamed "Clark Fork and Blackfoot, L.L.C."

We also have made investments in three primary non-energy businesses: Expanets, Inc., or Expanets, a provider of networked communications and data services and solutions to small to mid-sized businesses nationwide; Blue Dot Services Inc., or Blue Dot, a nationwide provider of air conditioning, heating, plumbing and related services; and, through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P., or CornerStone, a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor. The operations of Expanets, Blue Dot and CornerStone and our interest in these subsidiaries have been reflected in the consolidated financial statements as Discontinued Operations (see Note 6 for further discussion).

## (3) Chapter 11 Filing and Recent Developments

As a result of our Chapter 11 filing, we operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable court orders. All vendors are being paid for all goods furnished and services provided after the Petition Date while under the supervision of the bankruptcy court. As a debtor-in-possession, we are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Court, after notice and an opportunity for a hearing.

On September 16, 2003, following first day hearings held on September 15, 2003, the Court entered orders granting us authority to, among other things, pay pre-petition and post-petition employee wages, salaries, benefits and other employee obligations, pay selected vendors and other providers for the post-petition delivery of goods and services, continue bank accounts and existing cash management system, and continue existing forward power contracts and enter into additional similar contracts in the ordinary course of business. Additionally, the court approved, under interim order, access of up to $50 million of the $100 million debtor-in-possession financing facility arranged by the company with Bank One, N.A. (the DIP Facility). Following hearings held on November 6, 2003, the Bankruptcy Court gave final approval to the DIP Facility and our access will increase to $85 million under this facility. A final order to evidence the Court's oral ruling is in the process of being entered. Access to the balance is subject to obtaining necessary regulatory approvals. The DIP facility bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility expires on September 18, 2004. The DIP Facility will provide a source of liquidity during the course of our bankruptcy, but requires that we maintain certain financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments, sales of assets, investments and acquisitions. As of November 13, 2003, there were no amounts outstanding under the DIP facility, however we have issued letters of credit in the approximate amount of $6 million. At a hearing held on November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining prosecution of *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091 as against

10

NorthWestern, its subsidiaries and its current and former officers and directors. The Bankruptcy Court also approved the following two stipulations (i) stipulation staying the *McGreevey, et al. v. The Montana Power Company, et al.* litigation as against NorthWestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey for 180 days from the date of the stipulation and (ii) stipulation staying the complaints filed against CornerStone Propane Partners LP, and other defendants purporting to be class actions which were filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder as against NorthWestern for 180 days from the date of the stipulation.

We have reached an agreement with Credit Suisse First Boston, or CSFB, and a group of lenders, to amend and restate the terms of our $390 million pre-petition credit facility, or the Amended Credit Facility. The Amended Credit Facility has been approved by the Bankruptcy Court on an interim basis and we anticipate the Bankruptcy Court will enter final approval in December 2003. The Amended Credit Facility will provide advantages to NorthWestern, including, among other things, lower interest expense and may remain outstanding upon NorthWestern's emergence from the Chapter 11 proceedings. At NorthWestern's option, the Amended Credit Facility bears interest at a variable rate tied to the Eurodollar rate, as defined in the Amended Credit Facility, plus a spread of 5.50%, or at an alternate base rate, as defined by the Amended Credit Facility, plus a spread of 3.50%. There is no longer a minimum floor for the Eurodollar rate or the alternate base rate. As a result of this amendment, we estimate annualized interest expense will be reduced by approximately $6 million.

The consolidated financial statements have been prepared on a "going concern" basis in accordance with GAAP. The "going concern" basis of presentation assumes that we will continue in operation for the foreseeable future and will be able to realize our assets and discharge our liabilities in the normal course of business. Because of the Chapter 11 case and the circumstances leading to the filing thereof, our ability to continue as a "going concern" is subject to substantial doubt and is dependent upon, among other things, confirmation of a plan of reorganization, our ability to comply with the terms of the DIP Facility, and our ability to generate sufficient cash flows from operations, asset sales and financing arrangements to meet our obligations. There can be no assurance that this can be accomplished and if it were not, our ability to realize the carrying value of our assets and discharge our liabilities would be subject to substantial uncertainty. Therefore, if the "going concern" basis were not used for the Financial Statements, then significant adjustments could be necessary to the carrying value of assets and liabilities, the revenues and expenses reported, and the balance sheet classifications used.

The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations. As such, we have classified all of our secured debt as current as of September 30, 2003. Subject to certain exceptions under the Bankruptcy Code, our Chapter 11 filing automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against us or our property to recover on, collect or secure a claim arising prior to the Petition Date. Thus, for example, creditor actions to

obtain possession of our property, or to create, perfect or enforce any lien against our property, or to collect on or otherwise exercise rights or remedies with respect to a pre-petition claim are enjoined unless and until the Bankruptcy Court lifts the automatic stay.

On November 4, 2003, we filed our schedules and statements of financial affairs with the Bankruptcy Court, setting forth, among other things, the assets and liabilities of the Company. Our schedules, which were prepared by management and are unaudited, list total assets of approximately $1.7 billion and total liabilities of approximately $2.4 billion, as of September 14, 2003. However, the amount of the claims to be filed against us by our creditors could be significantly different than the amount of the liabilities that we have recorded. We also have numerous executory contracts and other agreements that could be assumed or rejected during the Chapter 11 proceedings. In the event we

11

choose to reject an executory contract or unexpired lease, parties affected by these rejections may file claims with the court-appointed claims agent as proscribed by the Bankruptcy Code and/or orders of the Bankruptcy Court. Unless otherwise agreed, the assumption of an executory contract or unexpired lease will require us to cure all prior defaults under such executory contract or lease, including all pre-petition liabilities, some of which may be significant. We expect that liabilities that will be subject to compromise through the Chapter 11 process will arise in the future as a result of the rejection of additional executory contracts and/or unexpired leases, and from the determination of the Bankruptcy Court (or agreement by parties in interest) of allowed claims for items that we now claim as contingent or disputed. Conversely, we would expect that the assumption of additional executory contracts may convert some liabilities shown on our financial statements as subject to compromise to post-petition liabilities.

We have not yet proposed a plan of reorganization. Our "exclusivity period," during which we are the only party permitted to file a plan of reorganization extends to January 12, 2004. Absent an order of the Bankruptcy Court, substantially all pre-petition liabilities are subject to settlement under a plan of reorganization to be voted upon by our pre-petition creditors and equity investors and approved by the Bankruptcy Court. Although we expect to file a plan of reorganization that provides for our emergence from bankruptcy as a going concern, there can be no assurance at this time that a plan of reorganization will be confirmed by the Bankruptcy Court or that any such plan will be implemented successfully. We have incurred, and will continue to incur pending emergence, significant costs associated with the reorganization.

The United States Trustee for the Bankruptcy Court has appointed an official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court. We will engage in negotiations with the Creditors' Committee over the terms of our ultimate plan of reorganization. There can be no assurance that the Creditors' Committee will support our positions or our ultimate plan of reorganization, once proposed, and disagreements between us and the Creditors' Committee could protract the Chapter 11 case, could negatively impact our ability to operate during the Chapter 11 case, and could prevent our emergence from Chapter 11.

At this time, it is not possible to predict accurately the effect of the Chapter 11 reorganization process on our business or when we may emerge from Chapter 11. The potential adverse publicity associated with the Chapter 11 filing and the resulting uncertainty regarding our future may hinder our ongoing business activities and our ability to operate, fund and execute our business plan. Such potential negative publicity may impair our relations with existing and potential customers, negatively impact our ability to attract and retain key employees, limit our ability to obtain trade credit and impair present and future relationships with vendors and service providers.

As a result of the Chapter 11 filing, the realization of assets and liquidation of liabilities are subject to uncertainty. While operating as a debtor-in-possession under the protection of the Bankruptcy Code, and while subject to Bankruptcy Court approval or otherwise as permitted in the normal course of business, we may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

Our future results depend on the timely and successful confirmation and implementation of a plan of reorganization. Under the system of priorities of claim established by the Bankruptcy Code, unless creditors agree

otherwise, pre- and post-petition liabilities must be satisfied in full before shareholders are entitled to receive any distribution or retain any property under a plan. The ultimate recovery to creditors and/or holders of our common stock and trust preferred securities, if any, will not be

12

determined until confirmation of a plan of reorganization. No assurance can be given as to what values, if any, will be ascribed in the bankruptcy proceedings to each of these constituencies, and it is probable that our common equity and trust preferred securities will be restructured in a manner that will eliminate or substantially reduce any remaining value. The value of these securities, therefore, is highly speculative. We have previously stated that our planned sale of non-core assets is not expected to change our view that our common stock has no value as a result of our bankruptcy filing and that the interests of our equity investors will be cancelled in connection with our reorganization. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities.

On September 15, 2003, in connection with our Chapter 11 filing the New York Stock Exchange (NYSE) suspended trading and subsequently delisted our common stock and all series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the New York Stock Exchange ("NYSE") to delist our common stock and trust preferred securities. As a result of the delisting of our securities, there can be no assurance that a liquid trading market for those securities will continue.

NorthWestern, Expanets, NorthWestern Growth Corporation and NorthWestern Capital Corporation have entered into an Asset Purchase and Sale Agreement, dated as of October 29, 2003, with Avaya, Inc. (NYSE: AV) in connection with the sale of substantially all of the assets and business of Expanets. Under the terms of the agreement, Avaya will purchase substantially all of the Expanets assets for $152 million in cash, less payment of an outstanding note of approximately $27 million to a third party, certain working capital adjustments, the payment of transaction costs and certain other excluded liabilities. We currently estimate that we will receive net cash proceeds ranging between $70 and $80 million. Expanets engaged Bear, Stearns & Co. to conduct an auction of the Expanets business subject to auction procedures defined in a purchase agreement with Cerberus California, Inc. At the auction held on October 29, 2003, the final bid by Avaya was accepted by Expanets. NorthWestern, as controlling shareholder, has consented to the transaction. Expanets will continue operations in the ordinary course of business until the transaction is closed. The closing is expected to occur prior to the end of November, 2003, subject to the satisfaction of certain conditions. Included in discontinued operations during the third quarter of 2003 is a charge of approximately $30 million to reduce our investment in Expanets to amounts expected to be realized on disposal.

We are also attempting to sell other non-core assets, including the Montana First Megawatts generation project, and we are seeking to enforce an existing contract to sell certain Colstrip transmission assets to a third party. In an effort to facilitate the timely sale of the Montana First Megawatts project and its ultimate development at its current location in Great Falls, MT, we filed the power sales agreement with the Federal Energy Regulatory Commission (FERC) on August 18, 2003, requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NorthWestern Energy. A late motion to intervene and protest was filed by the Montana Public Service Commission (MPSC) and the Montana Consumer Counsel (MCC). On October 17, 2003, the FERC issued an order conditionally accepting the power sales agreement, subject to suspension for a designated period, to permit resolution of certain concerns voiced by the MPSC and MCC in their filing. We are currently working with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve the documented MPSC and MCC concerns in a timely manner. During the second quarter of 2003, we consummated the sale of one non-core business for cash consideration of $6.6 million and a note receivable of $4.7 million (see Note 6 for further discussion).

### (4)  Acquisition

On February 15, 2002, we completed the asset acquisition of Montana Power's energy transmission and distribution business for $478.0 million in cash and the assumption of $511.1 million in existing

13

debt and mandatorily redeemable preferred securities of subsidiary trusts (net of cash received). Acquisition costs were approximately $24.8 million. We completed this acquisition to expand our presence in the energy market. As a result of the acquisition, we are now a provider of natural gas and electricity to approximately 598,000 customers in Montana, South Dakota and Nebraska. Results of our Montana operations have been included in the accompanying consolidated financial statements since the effective date of the acquisition.

The following unaudited pro forma results of consolidated operations for the nine months ended September 30, 2002, give effect as if the acquisition had occurred as of January 1, 2002 (in thousands, except per share amounts):

|  | Nine Months Ended September 30, 2002 |
| --- | --- |
| Revenues | $      601,735 |
| Net Loss | (106,165) |
| Diluted loss per share | $          (4.68) |

The pro forma results are not necessarily indicative of what actually would have occurred if the acquisition had been completed as of the beginning of the period, nor are they necessarily indicative of future consolidated results.

### (5) Goodwill

A summary of changes in our goodwill for the nine months ended September 30, 2003 by business segment, is as follows (in thousands):

|  | Electric and Natural Gas |
| --- | --- |
| Balance as of December 31, 2002 | $      375,798 |
| Goodwill acquired | — |
| Balance as of September 30, 2003 | $      375,798 |

We determined that our Chapter 11 bankruptcy filing constitutes an event that may reduce the fair value of our reporting unit below its carrying value. Therefore we have retained a third party to assist us in completing a goodwill impairment test as required by SFAS No. 142, *Goodwill and Other Intangible Assets*. Our impairment testing is currently in process and, while we have not yet completed our analysis, an impairment charge may be necessary during the fourth quarter of 2003.

### (6) Discontinued Operations

During the second quarter of 2003, we committed to a plan to sell our interest in Expanets and Blue Dot. In accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, we classified the results of operations of Expanets and Blue Dot as discontinued operations.

NorthWestern, NorthWestern Capital Corporation, NorthWestern Growth Corporation and Expanets have entered into an Asset Purchase and Sale Agreement with Avaya, Inc. (NYSE: AV) in connection with the sale of substantially all of the assets and business of Expanets. Under the terms of the agreement, Avaya will purchase substantially all of the Expanets assets for $152 million in cash, less items discussed in Note 3. We currently estimate that we will receive net cash proceeds ranging between $70 and $80 million. Expanets engaged Bear, Stearns & Co. to conduct an auction of the Expanets business subject to auction procedures defined in a purchase agreement with Cerberus California, Inc. At the auction held on October 29, 2003, the final bid by Avaya was accepted by Expanets. NorthWestern, as controlling shareholder, has consented to the transaction. Expanets will continue operations in the ordinary course of business until the transaction is closed. The closing is

14

expected to occur prior to the end of November, 2003, subject to the satisfaction of certain conditions. During the third quarter of 2003, we recognized an estimated loss on disposal of $30 million based on the terms of the transaction.

Summary financial information for the discontinued Expanets operations is as follows (in thousands):

|  | September 30, 2003 | December 31, 2002 |
|---|---|---|
| Accounts receivable, net | $ 87,624 | $ 101,990 |
| Other current assets | 62,475 | 72,170 |
| Current assets of discontinued operations | $ 150,099 | $ 174,160 |
| Other noncurrent assets of discontinued operations | $ 97,913 | $ 155,781 |
| Accounts payable | $ 38,096 | $ 34,735 |
| Other current liabilities | 124,030 | 125,066 |
| Current liabilities of discontinued operations | $ 162,126 | $ 159,801 |
| Other noncurrent liabilities of discontinued operations | $ 12,767 | $ 71,971 |

| | Three months ended | |
|---|---|---|
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 163,054 | $ 172,263 |
| Loss before income taxes and minority interests | (7,264) | (12,124) |
| Estimated loss on disposal | (30,000) | — |
| Income tax benefit (provision) | (1,381) | 13,406 |
| Loss from discontinued operations, net of income taxes and minority interests | $ (38,645) | $ 1,282 |

| | Nine months ended | |
|---|---|---|
|  | September 30, 2003 | September 30, 2002 |
| Revenues | $ 491,721 | $ 546,905 |
| Income (Loss) before income taxes and minority interests | 7,091 | (57,878) |
| Estimated loss on disposal | (30,000) | — |
| Minority interests | — | 11,152 |
| Income tax benefit (provision) | (1,634) | 30,977 |

Loss from discontinued operations, net of income taxes and minority

| | | |
|---|---|---|
| interests | $ (24,543) | $ (15,749) |

Expanets' income before income taxes and minority interests for the nine months ended September 30, 2003 includes a gain on debt extinguishment of $27.3 million.

Blue Dot has sold 25 businesses (with annualized revenues of approximately $179.1 million) during the nine months ended September 30, 2003, generating approximately $13.8 million in cash, of which a portion was used to pay down its credit facility provider and a portion was retained for working capital purposes. An additional 13 businesses (with annualized revenues of approximately $112.4 million) have

15

been sold between September 30, 2003 and November 7, 2003, for proceeds of approximately $10.6 million. As of September 30, 2003, the Blue Dot credit facility balance was $9.1 million. Since September 30, 2003, the credit facility has been paid off in its entirety from sales proceeds and available working capital at Blue Dot. Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004. Summary financial information for the discontinued Blue Dot operations is as follows (in thousands). The operating results for the three and nine months ending September 30, 2003 reflect the results of operations of the 25 sold businesses through the dates of such sales:

| | September 30, 2003 | December 31, 2002 |
|---|---|---|
| Accounts receivable, net | $ 47,722 | $ 56,393 |
| Other current assets | 28,911 | 36,668 |
| Current assets of discontinued operations | $ 76,633 | $ 93,061 |
| Other noncurrent assets of discontinued operations | $ 722 | $ 185 |
| Accounts payable | $ 20,417 | $ 18,945 |
| Other current liabilities | 36,278 | 61,266 |
| Current liabilities of discontinued operations | $ 56,695 | $ 80,211 |
| Other noncurrent liabilities of discontinued operations | $ 4,953 | $ 10,611 |

| | Three months ended | |
|---|---|---|
| | September 30, 2003 | September 30, 2002 |
| Revenues | $ 112,186 | $ 131,925 |
| Income before income taxes and minority interests | 3,153 | 2,420 |
| Gain on disposal | 12,921 | — |
| Income tax provision | (441) | (801) |
| Income from discontinued operations, net of income taxes | $ 15,633 | $ 1,619 |

|  | Nine months ended | |
|  | September 30, 2003 | September 30, 2002 |
|---|---|---|
| Revenues | $ 338,427 | $ 344,183 |
| Income (Loss) before income taxes and minority interests | 3,500 | (317) |
| Gain on disposal | 11,208 | — |
| Minority interests | — | 3,762 |
| Income tax benefit (provision) | (1,032) | 115 |
| Income (Loss) from discontinued operations, net of income taxes | $ 13,676 | $ 3,560 |

During the second and third quarters of 2003, we also sold our interest in two other subsidiaries. The sale of One Call Locators, Ltd., was completed in June for consideration of $6.6 million in cash and a note receivable of $4.7 million. We recorded the carrying value of the note receivable based on the fair value of our trust preferred securities at the date of the transaction and we recognized a loss of approximately $3.4 million on this sale. The acquiring entity elected to prepay the note receivable on August 25, 2003 by presenting trust preferred obligated securities of NorthWestern, which were

16

accepted at face value. We recognized a gain of $3.3 million on the extinguishment of trust preferred obligated securities during the third quarter of 2003. We sold assets of the other subsidiary in July for $0.2 million in cash and a note receivable of $0.3 million. We recognized a loss of approximately $2.2 million on this sale. We have classified the results of these subsidiaries and CornerStone Propane Partners, L.P. (see discussion below) in discontinued operations and summary financial information is as follows (in thousands):

|  | Three months ended | |
|  | September 30, 2003 | September 30, 2002 |
|---|---|---|
| Revenues | $ — | $ 66,258 |
| Loss before income taxes and minority interests | (41) | (12,380) |
| Loss on disposal | — | (57,055) |
| Income tax benefit (provision) | — | 14,607 |
| Income (Loss) from discontinued operations, net of income taxes and minority interests | $ (41) | $ (54,828) |

|  | Nine months ended | |
|  | September 30, 2003 | September 30, 2002 |
|---|---|---|
| Revenues | $ 19,493 | $ 422,400 |

| | | |
|---|---:|---:|
| Income (Loss) before income taxes and minority interests | 376 | (17,803) |
| Loss on disposal | (5,624) | (97,055) |
| Income tax benefit (provision) | (3,724) | 15,369 |
| Loss from discontinued operations, net of income taxes and minority interests | $ (8,972) | $ (99,489) |

Effective November 1, 2002, we relinquished our direct and indirect equity interests in CornerStone Propane Partners, L.P. and CornerStone Propane, L.P. We do, however, own a non-economic voting interest in a limited liability company, which owns 100 percent of the stock of the managing general partner of CornerStone. As a result, the assets and liabilities of CornerStone are no longer included in our Consolidated Balance Sheets subsequent to November 1, 2002. Effective November 1, 2002, we no longer reflect the results of CornerStone's operations in the Consolidated Income Statements. The results for CornerStone's operations and impairments related to our investments in and advances to CornerStone for the three and nine months ended September 30, 2002, have been presented as discontinued operations in the Consolidated Statements of Loss.

On August 20, 2002, NorthWestern purchased the lenders' interest in approximately $19.9 million of CornerStone short-term debt outstanding under CornerStone's credit facility together with approximately $6.1 million in letters of credit, which NorthWestern had previously guaranteed. No further drawings may be made under this facility. In addition, NorthWestern is owed $13.5 million from CornerStone and NorthWestern also has $9.2 million in letters of credit outstanding on behalf of CornerStone. During the third quarter of 2003, included in investment income and other on the Consolidated Statement of Loss is an impairment charge of $9.1 million to reduce our note receivable to an estimated recoverable amount. As of September 30, 2003, the net recorded value of our receivables from CornerStone was $11 million. In October 2003, the $9.2 million in letters of credit outstanding on behalf of CornerStone were drawn by their respective beneficiaries.

17

# (7) Regulatory Matters

On June 2, 2003, we filed an annual gas cost tracker request with the MPSC for the projected gas costs for the twelve-month period ending June 30, 2004. On July 3, 2003, the MPSC issued two separate orders, a final order and an interim order, with respect to our recovery of gas costs.

The final order issued by the MPSC disallowed our estimated recovery of $6.2 million of natural gas costs we incurred during the past eight months. The MPSC also rejected a motion for reconsideration filed by us. We filed suit in district court on July 28, 2003 seeking to overturn the MPSC's decision to disallow recovery of these costs. Included in other current assets was $6.2 million, which was written off during June to comply with the final order. In the event the MPSC's decision is overturned, we will reinstate the asset.

The MPSC also granted an interim order on July 3, 2003 for the projected gas cost adjusted for a portion of the gas portfolio at a fixed price of $3.50 per MMbtu as opposed to the market price submitted in the original filing, which was higher. Assuming our average forecast price over the next nine months occurs, the impact of this disallowance on the volumes at the imputed price compared to market price would be approximately $4.1 million for the period July 1, 2003, through June 30, 2004.

In Nebraska, where natural gas companies have been regulated by the municipalities in which they serve, the 2003 Nebraska Unicameral Legislature enacted a new law during the second quarter of 2003, shifting the regulation to the Nebraska Public Service Commission (NPSC). Under the new law, the NPSC regulates rates and terms and conditions of service for natural gas companies, however, the law provides that a natural gas company and the cities in which it serves have the ability to negotiate rates for natural gas service when the natural gas company files an application for increased rates. If the cities and the company choose not to negotiate or they are unable to reach an agreement, the NPSC will review the rate filing. Our initial tariffs, including our rates, terms and conditions for service consistent with those formerly filed with the municipalities, were filed with and accepted by the NPSC.

On August 12, 2003, the MCC has filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the MPSC. On October 21, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices, and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. Although we believe this matter is stayed as result of our bankruptcy filing, the MPSC and MCC disagree. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, we may become subject to material monetary penalties and fines. Notwithstanding the foregoing, we are providing certain requested information to the MPSC and MCC on a voluntary informational basis.

## (8)  Other Comprehensive Loss

The Financial Accounting Standards Board defines comprehensive income as all changes to the equity of a business enterprise during a period, except for those resulting from transactions with owners. For example, dividend distributions are excepted. Comprehensive income consists of net income and other comprehensive income. Net income may include such items as income from continuing operations, discontinued operations, extraordinary items, and cumulative effects of changes in accounting principles. Other comprehensive income may include foreign currency translations,

18

adjustments of minimum pension liability, and unrealized gains and losses on certain investments in debt and equity securities. Comprehensive income (loss) is calculated as follows (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2003 | 2002 | 2003 | 2002 |
| Net loss | $ (52,740) | $ (55,361) | $ (85,685) | $ (115,384) |
| Other comprehensive income (loss), net of tax: | | | | |
| Unrealized gain (loss) on investments | — | 944 | (349) | 1,334 |
| Gain on termination of hedge | — | — | — | 5,121 |
| Amortization of hedge gain | (137) | (176) | (416) | (385) |
| Foreign currency translation | 5 | (52) | 211 | 2 |
| Minimum pension liability | — | (1,424) | — | (1,424) |
| Comprehensive loss | $ (52,872) | $ (56,069) | $ (86,239) | $ (110,736) |

## (9)  Restructuring Reserve

We recognized a restructuring charge in the fourth quarter of 2001 related to certain cost savings initiatives. We summarize the activity in accrued expenses related to the restructuring charge in our Consolidated Balance Sheets in the following table (in thousands):

|  | December 31, 2002 | Payments | September 30, 2003 |
| --- | --- | --- | --- |
| Employee termination benefits | $ 1,783 | $ (1,549) | $ 234 |

**(10) Income Taxes**

The following table reconciles our effective income tax rate to the federal statutory rate:

|  | Three months ended September 30, 2003 | Nine months ended September 30, 2003 |
|---|---|---|
| Federal statutory rate | (35.0)% | (35.0)% |
| State income, net of federal provisions | (2.5) | (3.3) |
| Amortization of investment tax credit | (0.4) | (0.6) |
| Minority interest preferred stock | — | (7.8) |
| Dividends received deduction and other investments | (0.6) | (0.6) |
| Valuation allowance | 35.2 | 46.5 |
| Other, net | (2.0) | (0.9) |
|  | (5.3)% | (1.7)% |

For the three and nine months ended September 30, 2003, we have recorded a valuation allowance against the tax benefits resulting from our net operating losses, as it is more likely than not that these benefits will not be realized. Additionally, we have recorded a benefit in the third quarter to reflect tax refunds received related to net operating losses that were carried back to prior years.

**(11) Segment Information**

We currently operate our business in three reporting segments: (i) electric utility operations; (ii) natural gas utility operations; and (iii) all other, which primarily consists of our other miscellaneous service and non-energy related operations and activities that are not included in the other identified

19

segments, together with the unallocated corporate costs and investments, and any eliminating amounts. Items below operating income are not allocated between our electric and natural gas segments.

The results of operations of our electric and natural gas utility segments and all other operations for the nine months ended September 30, 2002, include the results of our Montana operations since February 1, 2002, the effective date of our acquisition. The operations of Expanets, Blue Dot and CornerStone, which were formerly additional reporting segments, and our interest in these subsidiaries has been reflected in the consolidated financial statements as Discontinued Operations (see Note 6 for further discussion).

The accounting policies of the operating segments are the same as the parent except that the parent allocates some of its operating expenses and interest expense to the operating segments according to a methodology designed by management for internal reporting purposes and involves estimates and assumptions. Financial data for the business segments, excluding discontinued operations, are as follows (in thousands):

| | Three Months Ended September 30, 2003 | | | | |
|---|---|---|---|---|---|
| | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
| Operating Revenues | $ 183,937 | $ 48,907 | $ 232,844 | $ 2,544 | $ 235,388 |
| Cost of Sales | 88,762 | 31,670 | 120,432 | 654 | 121,086 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Gross Margin | 95,175 | 17,237 | 112,412 | 1,890 | 114,302 |
| Operating, general, & administrative | 46,395 | 14,400 | 60,795 | 17,858 | 78,653 |
| Depreciation | 13,814 | 3,671 | 17,485 | 463 | 17,948 |
| Reorganization expenses | — | — | — | 174 | 174 |
| Operating income (loss) | 34,966 | (834) | 34,132 | (16,605) | 17,527 |
| Interest expense | N/A | N/A | (25,205) | (19,649) | (44,854) |
| Gain on debt extinguishment | N/A | N/A | — | 3,300 | 3,300 |
| Investment income and other | N/A | N/A | 1,670 | (8,976) | (7,306) |
| Income (Loss) before taxes | N/A | N/A | 10,597 | (41,930) | (31,333) |
| Benefit (provision) for taxes | N/A | N/A | (2,884) | 4,530 | 1,646 |
| Loss from continuing operations | N/A | N/A | $ 7,713 | $ (37,400) | $ (29,687) |
| Total Assets | N/A | N/A | $ 2,038,319 | $ 179,884 | $ 2,218,203 |
| Capital Expenditures | N/A | N/A | $ 20,793 | $ 74 | $ 20,867 |

20

| | Three Months Ended September 30, 2002 | | | | |
|---|---|---|---|---|---|
| | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
| Operating Revenues | $ 152,740 | $ 28,681 | $ 181,421 | $ 2,844 | $ 184,265 |
| Cost of Sales | 55,591 | 12,025 | 67,616 | 3,071 | 70,687 |
| Gross Margin | 97,149 | 16,656 | 113,805 | (227) | 113,578 |
| Operating, general, & administrative | 46,643 | 15,149 | 61,792 | 4,609 | 66,401 |
| Depreciation | 13,148 | 2,581 | 15,729 | 860 | 16,589 |
| Reorganization expenses | — | — | — | — | — |
| Operating income (loss) | 37,358 | (1,074) | 36,284 | (5,696) | 30,588 |
| Interest expense | N/A | N/A | (4,585) | (29,000) | (33,585) |
| Gain (loss) on debt extinguishment | N/A | N/A | — | — | — |
| Investment income and other | N/A | N/A | 962 | 101 | 1,063 |
| Income (loss) before taxes | N/A | N/A | 32,661 | (34,595) | (1,934) |
| Benefit (provision) for taxes | N/A | N/A | (2,391) | 891 | (1,500) |
| Income (loss) from continuing operations | N/A | N/A | $ 30,270 | $ (33,704) | $ (3,434) |
| Total Assets | N/A | N/A | $ 2,049,064 | $ 186,906 | $ 2,235,970 |
| Capital Expenditures | N/A | N/A | $ 43,258 | $ 5,678 | $ 48,936 |

| | Nine Months Ended September 30, 2003 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
| Operating Revenues | $ 514,585 | $ 237,845 | $ 752,430 | $ 7,210 | $ 759,640 |
| Cost of Sales | 242,088 | 161,419 | 403,507 | 2,036 | 405,543 |
| Gross Margin | 272,497 | 76,426 | 348,923 | 5,174 | 354,097 |
| Operating, general, & administrative | 140,222 | 44,432 | 184,654 | 42,172 | 226,826 |
| Impairment on assets held for sale | — | — | | 12,399 | 12,399 |
| Depreciation | 40,889 | 10,589 | 51,478 | 1,325 | 52,803 |
| Reorganization expenses | — | — | | 174 | 174 |
| Operating income (loss) | 91,386 | 21,405 | 112,791 | (50,896) | 61,895 |
| Interest expense | N/A | N/A | (75,312) | (50,723) | (126,035) |
| Gain on debt extinguishment | N/A | N/A | — | 3,300 | 3,300 |
| Investment income and other | N/A | N/A | 2,658 | (8,809) | (6,151) |
| Income (loss) before taxes | N/A | N/A | 40,137 | (107,128) | (66,991) |
| Benefit (provision) for taxes | N/A | N/A | (17,196) | 18,341 | 1,145 |
| Income (loss) from continuing operations | N/A | N/A | $ 22,941 | $ (88,787) | $ (65,846) |
| Total Assets | N/A | N/A | $ 2,038,319 | $ 179,884 | $ 2,218,203 |
| Capital Expenditures | N/A | N/A | $ 52,619 | $ 74 | $ 52,693 |

21

| | Nine Months Ended September 30, 2002 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Electric | Natural Gas | Total Electric and Natural Gas | All Other | Total |
| Operating Revenues | $ 368,572 | $ 159,970 | $ 528,542 | $ 9,230 | $ 537,772 |
| Cost of Sales | 126,751 | 86,988 | 213,739 | 7,346 | 221,085 |
| Gross Margin | 241,821 | 72,982 | 314,803 | 1,884 | 316,687 |
| Operating, general, & administrative | 122,155 | 40,356 | 162,511 | 11,527 | 174,038 |
| Depreciation | 36,468 | 8,058 | 44,526 | 1,739 | 46,265 |
| Reorganization expenses | | | — | | |
| Operating income (loss) | 83,198 | 24,568 | 107,766 | (11,382) | 96,384 |
| Interest expense | N/A | N/A | (24,265) | (58,504) | (82,769) |
| Loss on debt extinguishment | N/A | N/A | — | (20,688) | (20,688) |
| Investment income and other | N/A | N/A | 2,087 | (3,001) | (914) |
| Income (loss) before taxes | N/A | N/A | 85,588 | (93,575) | (7,987) |
| Benefit (provision) for taxes | N/A | N/A | (14,984) | 19,265 | 4,281 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Income (loss) from continuing operations | N/A | N/A | $ | 70,604 | $ | (74,310) | $ | (3,706) |
| Total Assets | N/A | N/A | $ | 2,049,064 | $ | 186,906 | $ | 2,235,970 |
| Capital Expenditures | N/A | N/A | $ | 43,258 | $ | 5,678 | $ | 48,936 |

## (12) New Accounting Standards

In June 2001, the Financial Accounting Standards Board issued SFAS No. 143, *Accounting for Asset Retirement Obligations,* which was effective January 1, 2003. The statement provides accounting and disclosure requirements for retirement obligations associated with long-lived assets. The statement requires the present value of future retirement costs for which the Corporation has a legal obligation be recorded as liabilities with an equivalent amount added to the asset cost and depreciated over the asset life.

We have completed an assessment of the specific applicability and implications of SFAS No. 143. We have identified, but have not recognized, asset retirement obligation, or ARO, liabilities related to our electric and natural gas transmission and distribution assets. Many of these assets are installed on easements over property not owned by us. The easements are generally perpetual and only require retirement action upon abandonment or cessation of use of the property for the specified purpose. The ARO liability is not estimable for such easements as we intend to utilize these properties indefinitely. In the event we decide to abandon or cease the use of a particular easement, an ARO liability would be recorded at that time.

Our regulated utility operations have, however, previously recognized removal costs of transmission and distribution assets as a component of depreciation in accordance with regulatory treatment. To the extent these amounts do not represent SFAS No. 143 legal retirement obligations, they are to be disclosed upon adoption of the statement. As of September 30, 2003, we have estimated accrued removal costs related to our Montana transmission and distribution operations in the amount of $117.3 million and $4.8 million for our South Dakota and Nebraska operations, all of which are included in accumulated depreciation.

For our generation properties, we have accrued decommissioning costs since the generating units were first put into service in the amount of $11.7 million, which is classified as a noncurrent regulatory liability.

22

SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Correction*s, was issued in April 2002. SFAS No. 145 eliminates the requirement that gains and losses from the extinguishments of debt be aggregated and classified as extraordinary items, net of the related income tax. It also requires sale-leaseback treatment for certain modifications of a capital lease that result in the lease being classified as an operating lease. We adopted SFAS No. 145 on January 1, 2003. As a result of the adoption, effective January 1, 2003, we reclassified the recognition of deferred costs related to interim financing of $20.7 million, incurred for the three months ended March 31, 2002, from an extraordinary loss to loss on debt extinguishment on the Consolidated Statement of Loss. The related tax benefit of $7.2 million has been reclassified from an extraordinary loss to benefit (provision) for income taxes on the Consolidated Statement of Loss.

SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities*, was issued in June 2002. SFAS No. 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan, including lease termination costs and certain employee termination benefits that are associated with a restructuring, discontinued operation, plant closing or other exit or disposal activity. SFAS No. 146 will be applied prospectively and is effective for exit or disposal activities that are initiated after December 31, 2002. We adopted SFAS No. 146 on January 1, 2003. The adoption of SFAS No. 146 did not have a material impact on our consolidated results of operations, financial position, or cash flows.

FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others* (FIN 45), was issued in November 2002. FIN 45 elaborates on the

existing disclosure requirements for most guarantees. It also clarifies that at the time a company issues a guarantee, the company must recognize an initial liability for the fair market value of the obligations it assumes under that guarantee and must disclose that information in its interim and annual financial statements. The initial recognition and measurement provisions of the FIN 45 apply on a prospective basis to guarantees issued or modified after December 31, 2002. We adopted FIN 45 effective December 2002 and the applicable disclosures are reflected in Note 18, "Commitments and Contingencies."

SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure—an Amendment of FASB Statement No. 123*, was issued in December 2002. It provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. SFAS No. 148 is effective for fiscal years beginning after December 15, 2003. We do not expect to voluntarily adopt the fair value based method of SFAS No. 123 and, therefore, do not expect the measurement provisions of SFAS No. 148 to affect our financial position or results of operations. We have included disclosures required by SFAS No. 148 in these financial statements. We apply the intrinsic value based method of Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for our stock option plan. No compensation cost is recognized, as the option exercise price is equal to the market price of the underlying stock on the date of grant. For the three and six months ended June 30, our pro forma net income and earnings per share would have been as indicated below had the fair value of option

23

grants been charged to compensation expense in accordance with SFAS No. 123 (in thousands, except per share amounts):

| | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2003 | 2002 | 2003 | 2002 |
| Earnings (loss) on common stock: | | | | |
| As reported | $ (52,740) | $ (63,130) | $ (100,630) | $ (136,948) |
| Less: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | 38 | (437) | 112 | (1,176) |
| Pro forma | $ (52,702) | $ (63,567) | $ (100,518) | $ (138,124) |
| Basic and diluted earnings per average common share: | | | | |
| As reported | $ (1.41) | $ (2.30) | $ (2.69) | $ (5.00) |
| Pro forma | $ — | $ (2.32) | $ — | $ (5.04) |

FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), was issued in January 2003. This interpretation changes the method of determining whether certain entities, including securitization entities, should be included in a company's Consolidated Financial Statements. An entity is subject to FIN 46 and is called a variable interest entity, or VIE, if it has equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, or equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation in accordance with SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. The provisions of the interpretation are to be applied immediately to VIEs created after January 31, 2003, and to VIEs in which an enterprise obtains an interest after that date. For VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003, FIN 46 applies in the first fiscal period beginning after June 15, 2003. For any VIEs that must be consolidated under FIN 46 that were created before February 1, 2003, the assets, liabilities and non-controlling interest of the VIE would be initially measured at their carrying amounts with any difference between the net amount added to the balance sheet and any previously recognized interest being recognized as the cumulative effect of an accounting

change. If determining the carrying amounts is not practicable, fair value at the date FIN 46 first applies may be used to measure the assets, liabilities and non-controlling interest of the VIE. FIN 46 also mandates new disclosures about VIEs, some of which are required to be presented in financial statements issued after January 31, 2003. In October 2003, the FASB deferred the implementation date of FIN 46 to the fourth quarter of 2003. We will be required to deconsolidate our Subsidiary Trusts, which hold our Company Obligated Mandatorily Redeemable Preferred Securities, upon adoption of FIN 46. The impact of deconsolidation is that we will report our investments in Subsidiary Trusts as a separate investment in unconsolidated entity and reflect notes payable to the Subsidiary Trusts on our consolidated balance sheet.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*, which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. SFAS No. 149 is effective prospectively for contracts entered into or modified after June 30, 2003, and for hedging relationships designated after June 30, 2003. The exception to these requirements are the provisions of SFAS No. 149 related to SFAS No. 133

24

implementation issues that have been effective for fiscal quarters that began prior to June 15, 2003, should continue to be applied in accordance with their respective effective dates. In addition, paragraphs 7(a) and 23(a), which relate to forward purchases or sales of when-issued securities or other securities that do not yet exist, should be applied to both existing contracts and new contracts entered into after June 30, 2003. The adoption of SFAS No. 149 did not have a material impact on our consolidated results of operations, financial condition or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Instruments with Characteristics of Both Liabilities and Equity*, which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope, which may have previously been reported as equity, as a liability or an asset in some circumstances. SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. In accordance with SFAS No. 150, we have presented our Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts as liabilities as of September 30, 2003, and the respective dividends of approximately $7.4 million have been reflected as interest expense for the three months ended September 30, 2003. Prior period amounts have not been reclassified.

**(13) Reclassifications**

Certain 2002 amounts have been reclassified to conform to the 2003 presentation. Such reclassifications have no impact on net loss or shareholders' deficit as previously reported.

**(14) Earnings (Loss) per Average Common Share**

Basic earnings per share is computed on the basis of the weighted average number of common shares outstanding. Diluted earnings per share is computed on the basis of the weighted average number of common shares outstanding plus the effect of the outstanding stock options and warrants. The following table presents the shares used in computing the basic and diluted earnings per share for 2003 and 2002:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2003** | **2002** | **2003** | **2002** |
| Average Common Shares Outstanding For Basic Computation | 37,396,762 | 27,396,762 | 37,396,792 | 27,396,762 |
| Dilutive Effect of: | | | | |

| | | | | |
|---|---|---|---|---|
| Stock Options | — | — | — | — |
| Average Common Shares Outstanding For Diluted Computation | 37,396,762 | 27,396,762 | 37,396,762 | 27,396,762 |

Certain outstanding antidilutive options have been excluded from the earnings per share calculation. These options total 1,697,501 and 2,659,981 for the three months ended September 30, 2003 and 2002, respectively. For the nine months ended September 30, 2003 and 2002, these options total 1,697,501 and 2,659,981, respectively.

**(15) Impairment on assets held for sale**

During the second quarter of 2003, we recorded an additional impairment charge of $12.4 million due to further decline in the estimated realizable value of our investment in our Montana First Megawatts project. We had previously recorded an impairment charge of $35.7 million during the

25

fourth quarter of 2002. We are actively attempting to sell the equipment and land related to this project.

**(16) Gain (Loss) on Debt Extinguishment**

As discussed in Note 6, on August 25, 2003, we recognized a gain of $3.3 million on the extinguishment of trust preferred obligated securities.

In March 2002, we retired a $720 million term loan, due February 2003, that was used for interim financing for the acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company. The recognition of deferred costs related to the interim financing resulted in a loss of $20.7 million.

**(17) Employee Benefit Plans**

We offered an Early Retirement Incentive (ERI) Program for eligible team members of our pension plan in South Dakota and Nebraska effective August 31, 2003. As a result of the ERI, during the third quarter we recognized a Special Termination Benefit expense of $785,000 due to the increased benefits paid to the 13 eligible participants.

In May 2003, our Board of Directors adopted a resolution to terminate or amend various employee benefit plans. We terminated our non-qualified supplemental 401(k) plan effective May 6, 2003. Any investment elections in our common stock were presented as Treasury Stock; other investments as part of Investments; and an offsetting liability for both as part of Other Noncurrent Liabilities in the Consolidated Balance Sheets. In June 2003, plan assets were distributed to participants (including 174,019 treasury shares) and no further liability remains. Our employee stock purchase plan was also terminated, with no impact to our operating results.

Two nonqualified postretirement defined benefit plans were amended effective May 6, 2003 to permit vested participants the option of continuing the current benefits level or take a present value lump sum distribution. We recognized a loss of approximately $0.3 million in the second quarter due to the amendment of these plans. A third nonqualified postretirement defined benefit plan was terminated effective May 6, 2003, with no impact to our operating results.

Our Employee Stock Ownership Plan ("ESOP") was terminated effective July 19, 2003. Due to the suspension of our common stock dividend and the declining stock price, we accrued $5.9 million as of December 31, 2002, to satisfy the ESOP loan requirement. This loan was paid off in the second quarter and no further liability remains. Shares held by the plan were included in the number of average shares outstanding when computing our basic and diluted earnings per share, therefore the termination has no impact on these calculations.

**(18) Commitments and Contingencies**

### Environmental Liabilities

We are subject to numerous state and federal environmental regulations. Because laws and regulations applicable to our businesses are continually developing and are subject to amendment, reinterpretation and varying degrees of enforcement, we may be subject to, but can not predict with certainty the nature and amount of future environmental liabilities. The Clean Air Act Amendments of 1990 (the Act) stipulate limitations on sulfur dioxide and nitrogen oxide emissions from coal-fired power plants. We believe we can comply with such sulfur dioxide emission requirements at our generating plants and that we are in compliance with all presently applicable environmental protection requirements and regulations. We also are subject to other environmental statutes and regulations including those that related to former manufactured gas plant sites and other past and present operations and facilities. In addition, we may be subject to financial liabilities related to the

26

investigation and remediation from activities of previous owners or operators of our industrial and generating facilities. The range of exposure for environmental remediation obligations at present is estimated to range between $35.3 million to $72.6 million. We have an environmental reserve of $35.3 million at September 30, 2003, primarily related to liabilities from our Montana operations. This reserve was established in anticipation of future remediation activities at our various environmental sites and does not factor in any exposure arising from private tort actions or government claims for damages allegedly associated with specific environmental conditions. We are in the process of engaging a third party environmental consulting firm to perform a comprehensive evaluation of our operations, facilities and regulated business. We will use this third party information to evaluate the adequacy of our current environmental reserve. Based upon the results of this evaluation, we may be required to increase the reserve amount. It is possible that the increase could be material in amount.

In light of the Environmental Protection Agency's (EPA's) public announcement in early 2003, favoring removal of the Milltown Dam structure as part of the remedy to address heavy metals contamination in the Milltown Reservoir, we commenced negotiations with The Atlantic Richfield Company, or ARCO, to prevent a challenge from ARCO to our statutorily exempt status under the Comprehensive Environmental Response Compensation and Liability Act as a potentially responsible party. On September 10, 2003, ARCO and the Corporation executed a confidential settlement agreement which, among other things, caps our maximum contribution towards remediation of the Milltown Reservoir superfund site. The amount of our expected contribution has been fully accrued in the accompanying financial statements. Commencing in January 2004 and each month thereafter, we will pay $500,000 into the escrow account until our total agreed upon amount is funded. No interest will accrue on the unpaid balance due ARCO. The escrow account will remain funded until a final, non-appealable consent decree is entered by the United States District Court. If, however, we are unable to negotiate an acceptable consent decree with the interested parties, then we can terminate the settlement agreement with ARCO, which will trigger the return of the escrowed funds to us. The settlement agreement, which is subject to Bankruptcy Court approval, provides us with appropriate ARCO releases and indemnifications. There can be no assurance that the proposed settlement with ARCO will be approved by the Bankruptcy Court.

### Legal Proceedings

We, and certain of our present and former officers and directors, were named as defendants in numerous complaints purporting to be class actions filed in the United States District Court for the District of South Dakota, Southern Division, alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaints contained varying allegations, including that the defendants misrepresented and omitted material facts with respect to our 2000, 2001, and 2002 financial results and operations included in our filings with the SEC, press releases, and registration statements and prospectuses disseminated in connection with certain offerings of debt, equity, and trust preferred securities. The complaints seek unspecified compensatory damages, rescission, and attorneys' fees and costs as well as accountants' and experts' fees. In June 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Securities Litigation*, Case No. 03-4049, and Carpenters Pension Trust for Southern California, Oppenheim Investment Management, LLC, and Richard C. Slump were named as co-lead plaintiffs (the "Lead Plaintiffs"). In July 2003, the Lead Plaintiffs filed a consolidated amended class action complaint naming as defendants NorthWestern, NorthWestern Capital Financing II and III, Blue Dot, Expanets, certain of our present and former officers and directors, along with a number of investment banks that

participated in the securities offerings. The amended complaint alleges that the defendants misrepresented and omitted material facts concerning the business operations and financial performance of NorthWestern, Expanets, Blue Dot and CornerStone, overstated NorthWestern's revenues and earnings by, among other things, maintaining insufficient reserves for accounts receivable

27

at Expanets, failing to disclose billing problems and lapses and data conversion problems, failing to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system, concealing losses at Expanets and Blue Dot by improperly allocating losses to minority interest shareholders, maintaining insufficient internal controls, and profiting from improper related-party transactions. We, and certain of our present and former officers and directors, were also named as defendants in two complaints purporting to be class actions which were filed in the United States District Court for the Southern District of New York, entitled *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.*, Case No. 03CV3223, and *Arthur Laufer v. Merle Lewis, et al.*, Case No. 03CV3716, which were brought on behalf of the purchasers of our 7.20%, 8.25%, and 8.10% trust preferred securities which were offered and sold pursuant to our registration statement on Form S-3 filed on July 12, 1999. The plaintiffs' claims are based on similar allegations of material misrepresentations and omissions of fact relating to the registration statement in violation of Sections 11 and 12 of the Securities Act of 1933 and they seek unspecified compensatory damages, rescission and attorneys', accountants' and experts' fees. In July 2003, *Arthur Laufer v. Merle Lewis, et al.* was transferred to the District of South Dakota and consolidated with the consolidated actions pending in that court. In September 2003, *Sanford & Beatrice Golman Family Trust, et al. v. NorthWestern Corp., et al.* was also transferred to the District of South Dakota. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. In October 2003, Expanets, Blue Dot, and certain of NorthWestern's present and former officers and directors filed motions to dismiss the consolidated amended class action complaint for failure to state a claim, which are currently pending in the District of South Dakota. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

Certain of our present and former officers and directors and NorthWestern, as a nominal defendant, have been named in two shareholder derivative actions commenced in the United States District Court for the District of South Dakota, Southern Division, entitled *Deryl Lusty, et al. v. Richard R. Hylland, et al.*, Case No. CIV034091 and *Jerald and Betty Stewart, et al. v. Richard R. Hylland, et al.*, Case No. CIV034114. These shareholder derivative lawsuits allege that the defendants breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal shareholder suits. The plaintiffs seek unspecified compensatory damages, restitution of improper salaries, insider trading profits and payments from NorthWestern, and disgorgement under the Sarbanes Oxley Act of 2002. In July 2003, the complaints were consolidated in the United States District Court for the District of South Dakota and given the caption *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091. In October 2003, the action was stayed pending a ruling on defendants' motions to dismiss in the related securities class action, *In re NorthWestern Corporation Securities Litigation*. On November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining the plaintiffs in *In re NorthWestern Corporation Derivative Litigation* from prosecuting the litigation against NorthWestern, its subsidiaries and its current and former officers and directors until further order of the Bankruptcy Court. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

In April 2003, the SEC notified NorthWestern that it is conducting an informal inquiry relating to questions regarding the restatements of our 2002 quarterly reports on Form 10-Q and other accounting and financial reporting matters. We are cooperating fully with the SEC's informal inquiry and have provided requested information as expeditiously as possible. Other than the informal SEC inquiry, as of the date hereof, we are not aware of any additional litigation or inquiry or investigation having been commenced against us related to these matters, but we cannot predict whether or not any such

28

litigation or regulatory inquiry or investigation will be commenced or, if it is, the outcome of any such litigation or regulatory inquiry or investigation.

We are one of several defendants in a class action lawsuit entitled McGreevey, et al. v. The Montana Power Company, et al., now pending in federal court in Montana. The lawsuit, which was filed by the former shareholders of The Montana Power Company (many of whom became shareholders of Touch America Holdings, Inc. as a result of a corporate reorganization of The Montana Power Company), claims that the disposition of various generating and energy-related assets by The Montana Power Company was void because of the failure to obtain shareholder approval for the transactions. Plaintiffs thus seek to reverse those transactions, or receive fair value for their stock as of late 2001, when plaintiffs claim shareholder approval should have been sought. NorthWestern Corporation is named as a defendant due to the fact that we purchased Montana Power LLC, which plaintiffs claim is a successor to The Montana Power Company. We intend to vigorously defend against this lawsuit. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or our ability to timely confirm a plan of reorganization.

We are also one of several defendants in a class action lawsuit entitled In Re Touch America ERISA Litigation, which is currently pending in federal court in Montana. The lawsuit was filed by participants in the former Montana Power Company retirement savings plan and alleges that there was a breach of fiduciary duty in connection with the employee stock ownership aspects of the plan. The federal court has recently entered orders indefinitely staying the ERISA litigation because of Touch America Holdings Inc.'s bankruptcy filing. We intend to vigorously defend against these lawsuits. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or our ability to timely confirm a plan of reorganization.

We, and certain of our present and former officers and directors, were named as defendants in certain complaints filed against CornerStone Propane Partners LP, and other defendants purporting to be class actions which were filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Through November 1, 2002, we held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P. Certain present and former officers and directors of NorthWestern who are named as defendants in certain of these actions have also been sued in their capacities as directors of the managing general partner. These complaints allege that defendants sold units of CornerStone Propane Partners, L.P. based upon false and misleading statements and failed to disclose material information about CornerStone Propane Partners' financial condition and future prospects, including overpayment for acquisitions, overstating earnings and net income, and that it lacked adequate internal controls. All of the lawsuits have now been consolidated and Gilbert H. Lamphere has been named as lead plaintiff. The actions have been stayed as to NorthWestern Corporation due to its bankruptcy filing. On October 27, 2003, the plaintiffs filed an amended consolidated class action complaint. The new complaint does not name NorthWestern as a defendant, although it alleges facts relating to NorthWestern's conduct. Certain of our former officers and directors are named as defendants in the amended consolidated complaint. The plaintiffs seek compensatory damages, prejudgment and post judgment interest and costs, injunctive relief, and other relief. We intend to vigorously defend against these lawsuits. On November 6, 2003, the Bankruptcy Court entered an order approving a stipulation between NorthWestern and plaintiffs in this litigation. The stipulation provides that litigation as against NorthWestern shall be temporarily stayed for 180 days from the date of the stipulation. Pursuant to the stipulation and after providing notice to Northwestern,

the plaintiffs may move the Bankruptcy Court for termination of the temporary stay. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of this lawsuit may harm our business and have a material adverse impact on our financial condition or our ability to timely confirm a plan of reorganization.

Certain of our present and former officers and directors, and CornerStone Propane Partners, L.P., as a nominal defendant, are among other defendants named in two derivative actions commenced in the Superior Court for the State of California, County of Santa Cruz, entitled Adelaide Andrews v. Keith G. Baxter, et al., Case No. CV146662 and Ralph Tyndall v. Keith G. Baxter, et al., Case No. CV146661. These derivative lawsuits allege that the defendants

breached various fiduciary duties based upon the same general set of alleged facts and circumstances as the federal unitholder suits. The plaintiffs seek unspecified compensatory damages, treble damages pursuant to the California Corporations Code, injunctive relief, restitution, disgorgement, costs, and other relief. We cannot currently predict the impact or resolution of this litigation or reasonably estimate a range of possible loss, which could be material, and the resolution of these lawsuits may harm our business and have a material adverse impact on our financial condition or ability to timely confirm a plan of reorganization.

On April 30, 2003, Mr. Richard Hylland, our former President and Chief Operating Officer, filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortuous interference and a claim for punitive damages. Mr. Hylland is seeking relief in an amount of $25 million, plus interest, attorney's fees, costs, and punitive damages. We dispute Mr. Hylland's claims and intend to vigorously defend the arbitration. On May 8, 2003, we reported that the Special Committee of the Board formed to evaluate Mr. Hylland's performance and conduct in connection with the management of NorthWestern and its subsidiaries had completed its evaluation. Based on the recommendations of the Special Committee, on May 6, 2003, the Board determined that Mr. Hylland's performance and conduct as President and Chief Operating Officer warranted termination under his employment contract. This arbitration has been stayed due to our bankruptcy filing.

We are also subject to various other legal proceedings and claims that arise in the ordinary course of business. In the opinion of management, the amount of ultimate liability with respect to these actions will not materially affect our financial position or results of operations or ability to timely confirm a plan of reorganization.

### *Residual value guarantees*

We have residual value guarantees related to certain vehicles under operating leases by Expanets and Blue Dot, in the event of default and subsequent failure to cure such default. At September 30, 2003, the maximum exposure under these residual value guarantees is approximately $0.8 million and $13.5 million related to Expanets and Blue Dot, respectively.

### *Performance Bonds*

Expanets has various performance bonds and guarantees in place to cover the installation of equipment and inventory purchases. The maximum potential payout under these performance bonds is $16.6 million and $49.9 million as of September 30, 2003 and December 31, 2002, respectively.

In May 2003 a vendor of Expanets presented a claim against a performance bond. We advanced $10 million in satisfaction of this claim pursuant to a previously existing indemnity agreement supporting the performance bond. Expanets has repaid $500,000 on the advance. Expanets has located and is using alternative supply sources.

30

---

Blue Dot has various license, bid and performance bonds in place to secure performance of contracts and the adequate provision of services. The maximum potential payout under these performance bonds is $7.2 million and $14.3 million as of September 30, 2003 and December 31, 2002, respectively.

We have issued indemnity agreements that support the outstanding performance bonds of Expanets and Blue Dot.

### *Letters of Credit*

We have various letter of credit requirements and other collateral obligations of approximately $24.0 million and $48.1 million as of September 30, 2003 and December 31, 2002, respectively. Approximately $9 million and $18.6 million of these obligations as of September 30, 2003 and December 31, 2002, respectively, serve to support performance bonds primarily related to Expanets and Blue Dot. In addition, included in other assets at September 30, 2003 is $7.1 million of deposits that support performance bonds related to Expanets and Blue Dot. No such amounts existed at December 31, 2002.

*Other Contractual Obligations*

On June 19, 2002, NorthWestern Energy Marketing, LLC (NEM), our power marketing subsidiary, entered into two five-year power supply contracts to supply a total of approximately 20 megawatts of electricity to customers located in Montana. These supply obligations commenced on July 1, 2002 and continue through June 30, 2007. NEM secured supply to cover these contractual obligations through June 30, 2003. Due to our financial condition, NEM has been unable to secure a source of power to cover its contractual obligation subsequent to June 30, 2003. Based on the uncertainty of supply, as of July 1, 2003, the two customers elected to secure their power supply needs from the Montana default supply. Shortly thereafter, the customers notified NEM that they would seek damages to compensate them for their increased power supply costs. NEM reached a settlement with its two customers on October 27, 2003, and subsequently paid $1.5 million in full settlement of its obligations.

We are party to various commitment contracts to purchase and sell electric and gas. On September 15, 2003, we received a notice of termination from a party with a contract to purchase electricity from us during off-peak hours. This party has demanded a termination payment based on the difference between the contract price for electricity and the market value at the date of termination. This party is currently holding a $3 million deposit from us related to the contract. We have attempted to schedule power with this party and we are disputing their claim based on various terms of the contract and the methodology for calculating the termination payment.

The proposed sale of Expanets' assets and business could result, upon the lapse of various notice and cure periods, in a default in Expanets' credit agreement with Avaya. The holder of the note issued under the credit agreement, could accelerate payment of the note upon such default. We guaranteed payment by Expanets of the note, which was formerly held by Avaya and currently evidences indebtedness in an amount equal to $27.1 million. Expanets may not have sufficient funds to satisfy this obligation and our guarantee could be called on by the holder of the note, although any action to enforce the guarantee would likely be subject to a stay in Bankruptcy Court and would, while subject to the stay, not trigger any cross-defaults under other NorthWestern debt instruments. If the sale of Expanets' assets to Avaya is consummated, the note will be paid from the proceeds at closing and our obligations under the guarantee will be cancelled. If the sale of Expanets' assets is not consummated, Expanets will remain obligated to pay the amounts owing under the note, which unless accelerated comes due in 2004. We have no intention of providing additional funds to Expanets if it does not have sufficient funds to satisfy this obligation. We are also prohibited by the MPSC from making advances of more than $10 million in the aggregate to our non-regulated businesses without their prior consent.

31

Default in our obligation to pay the note pursuant to our guarantee could result in a default under our various credit agreements.

Blue Dot and Expanets, in making certain of their business acquisitions, issued equity in various classes and series to the former owners of such businesses. In connection with those issuances, in certain cases, Blue Dot and Expanets entered into agreements providing exchange or put rights giving the security holders certain rights related to those shares. NorthWestern Growth Corporation entered into agreements with Blue Dot and Expanets, under which it agreed to support obligations related to the exercise of the exchange or put rights in certain of the underlying agreements. Blue Dot and Expanets have requested that NorthWestern Growth Corporation provide funds necessary to perform their obligations under those agreements.

NorthWestern has indicated that it believes its obligations with respect to Expanets' instruments have expired and that, in any event, no additional funds will be provided while NorthWestern pursues the sale or disposition of those businesses or their assets. The maximum aggregate amount of payments that may be required of NorthWestern under the various Expanets agreements is $3.2 million as of September 30, 2003.

The maximum aggregate amount of payments that may be required of NorthWestern under the various Blue Dot agreements is approximately $10.3 million as of September 30, 2003, of which approximately $2.9 million may be required within the next twelve months. For the period of September 30, 2003 to November 7, 2003, Blue Dot has sold 13 businesses that will result in a decrease in the maximum aggregate amount of payments that may be required of NorthWestern of $3.8 million, of which approximately $0.6 million would have been required within the next twelve months.

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*Unless the context requires otherwise, references to "we," "us," "our" and "NorthWestern" refer specifically to NorthWestern Corporation and its subsidiaries.*

## OVERVIEW

Our financial condition has been significantly and negatively affected by the poor performance of our non-energy businesses and our significant indebtedness. In early 2003, we undertook a series of steps designed to refinance, reduce and extend the maturities of our debt. Notwithstanding these efforts, our financial position continued to deteriorate, principally due to the poor performance of our non-utility subsidiaries and our leveraged condition. As a result of these developments, in June 2003 we announced that we would seek to fundamentally restructure our capital, and announced that we had retained legal and financial advisors to assist us in these efforts. We ultimately decided to seek to reorganize under Chapter 11 of the Federal Bankruptcy Code.

On September 14, 2003 (the "Petition Date"), we filed a voluntary petition for relief under the provisions of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (Bankruptcy Court) under Chapter 11 Case number 03-12872 (CGC). Pursuant to Chapter 11, we retain control of our assets and are authorized to operate our business as a debtor-in-possession while being subject to the jurisdiction of the Bankruptcy Court. Included in the consolidated financial statements are subsidiaries that are not party to the Chapter 11 case and are not debtors. The assets and liabilities of such non-debtor subsidiaries are not considered to be material to the consolidated financial statements or are included in discontinued operations.

As a result of our Chapter 11 filing, we operate our business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable court orders. All vendors are being paid for all goods furnished and services provided after the Petition Date under the supervision of the Bankruptcy Court. As a debtor-in-possession, we are authorized to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without the approval of the Court, after notice and an opportunity for a hearing.

On September 16, 2003, following first day hearings held on September 15, 2003, the Court entered orders granting us authority to, among other things, pay pre-petition and post-petition employee wages, salaries, benefits and other employee obligations, pay selected vendors and other providers for the post-petition delivery of goods and services, continue bank accounts and existing cash management system, and continue existing forward power contracts and enter into additional similar contracts in the ordinary course of business. Additionally, the court approved, under interim order, access of up to $50 million of the $100 million debtor-in-possession financing facility arranged by the company with Bank One, N.A. (the DIP Facility). Following hearings held on November 6, 2003, the Bankruptcy Court gave final approval to the DIP Facility and our access will increase to $85 million under this facility. A final order to evidence the Court's oral ruling is in the process of being entered. Access to the balance is subject to obtaining necessary regulatory approvals. The DIP Facility bears interest at a variable rate tied to the Eurodollar rate plus a spread of 3.00% or at the prime rate plus a spread of 1.00%. The DIP Facility expires on September 18, 2004. The DIP Facility will provide a source of liquidity during the course of our bankruptcy, but requires that we maintain certain financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments, sales of assets, investments and acquisitions. As of November 13, 2003, there were no amounts outstanding under the DIP facility, however we have issued letters of credit in the approximate amount of $6 million. At a hearing held on November 6, 2003, the Bankruptcy Court entered an order preliminarily enjoining prosecution of *In re NorthWestern Corporation Derivative Litigation*, Case No. 03-4091 as against

NorthWestern, its subsidiaries and its current and former officers and directors. The Bankruptcy Court also approved the following two stipulations (i) stipulation staying the *McGreevey, et al. v. The Montana Power Company, et al.* litigation as against NorthWestern, Clark Fork & Blackfoot LLC, the Montana Power Company, Montana Power LLC and Jack Haffey for 180 days from the date of the stipulation and (ii) stipulation staying the complaints filed against CornerStone Propane Partners LP, and other defendants purporting to be class actions which were filed in the United States District Court for the Northern District of California by purchasers of units of CornerStone Propane Partners alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder as against NorthWestern for 180 days from the date of the stipulation.

The Chapter 11 filing triggered defaults, or termination events, on substantially all of our debt and lease obligations, and certain contractual obligations. As such, we have classified all of our secured debt as current as of September 30, 2003. Subject to certain exceptions under the Bankruptcy Code, our Chapter 11 filing automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against us or our property to recover on, collect or secure a claim arising prior to the Petition Date. Thus, for example, creditor actions to obtain possession of our property, or to create, perfect or enforce any lien against our property, or to collect on or otherwise exercise rights or remedies with respect to a pre-petition claim are enjoined unless and until the Bankruptcy Court lifts the automatic stay.

On November 4, 2003, we filed our schedules and statements of financial affairs with the Bankruptcy Court, setting forth, among other things, the assets and liabilities of the Company. Our schedules, which were prepared by management and are unaudited, list total assets of approximately $1.7 billion and total liabilities of approximately $2.4 billion, as of September 14, 2003. However, the amount of the claims to be filed against us by our creditors could be significantly different than the amount of the liabilities that we have recorded. We also have numerous executory contracts and other agreements that could be assumed or rejected during the Chapter 11 proceedings. In the event we choose to reject an executory contract or unexpired lease, parties affected by these rejections may file claims with the court-appointed claims agent as proscribed by the Bankruptcy Code and/or orders of the Bankruptcy Court. Unless otherwise agreed, the assumption of an executory contract or unexpired lease will require us to cure all prior defaults under such executory contract or lease, including all pre-petition liabilities, some of which may be significant. We expect that liabilities that will be subject to compromise through the Chapter 11 process will arise in the future as a result of the rejection of additional executory contracts and/or unexpired leases, and from the determination of the Bankruptcy Court (or agreement by parties in interest) of allowed claims for items that we now claim as contingent or disputed. Conversely, we would expect that the assumption of additional executory contracts may convert some liabilities shown on our financial statements as subject to compromise to post-petition liabilities.

In order to successfully exit Chapter 11, we will need to propose, and obtain confirmation by the Bankruptcy Court of a plan of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would resolve, among other things, the debtor's pre-petition obligations, set forth the revised capital structure of the newly reorganized entity and provide for its corporate governance subsequent to exit from bankruptcy. Under the Chapter 11 proceedings, the rights of and ultimate payments to pre-petition creditors, rejection damage claimants and equity and trust preferred investors may be substantially altered. This could result in claims being allowed and/or satisfied in the Chapter 11 proceedings at less (possibly substantially less) than 100% of their face value, and we anticipate the interests of our equity investors will be cancelled. We have not yet proposed a plan of reorganization. Our "exclusivity period," during which we are the only party permitted to file a plan of reorganization extends to January 12, 2004. Absent an order of the Bankruptcy Court, substantially all pre-petition liabilities are subject to settlement under a plan of reorganization to be voted upon by our pre-petition creditors and equity investors and approved by the Bankruptcy Court. Although we expect to file a plan

of reorganization that provides for our emergence from bankruptcy as a going concern, there can be no assurance at this time that a plan of reorganization will be confirmed by the Bankruptcy Court or that any such plan will be implemented successfully. We have incurred, and will continue to incur pending emergence, significant costs associated with the reorganization.

The United States Trustee for the Bankruptcy Court has appointed an official committee of unsecured creditors (the Creditors' Committee). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court and may take positions on matters that come before the Bankruptcy

Court. We will negotiate the terms of our ultimate plan of reorganization with the Creditors' Committee. There can be no assurance that the Creditors' Committee will support our positions or our ultimate plan of reorganization, once proposed, and disagreements between us and the Creditors' Committee could protract the Chapter 11 case, could negatively impact our ability to operate during the Chapter 11 case and could prevent our emergence from Chapter 11.

At this time, it is not possible to predict accurately the effect of the Chapter 11 reorganization process on our business or when we may emerge from Chapter 11. The potential adverse publicity associated with the Chapter 11 filing and the resulting uncertainty regarding our future may hinder our ongoing business activities and our ability to operate, fund and execute our business plan. Such potential negative publicity may impair our relations with existing and potential customers, negatively impact our ability to attract and retain key employees, limit our ability to obtain trade credit and impair present and future relationships with vendors and service providers.

As a result of the Chapter 11 filing, the realization of assets and liquidation of liabilities are subject to uncertainty. While operating as a debtor-in-possession under the protection of the Bankruptcy Code, and while subject to Bankruptcy Court approval or otherwise as permitted in the normal course of business, we may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

Our future results depend on the timely and successful confirmation and implementation of a plan of reorganization. Under the system of priorities of claim established by the Bankruptcy Code, unless creditors agree otherwise, pre- and post-petition liabilities must be satisfied in full before shareholders are entitled to receive any distribution or retain any property under a plan. The ultimate recovery to creditors and/or holders of our common stock and trust preferred securities, if any, will not be determined until confirmation of a plan of reorganization. No assurance can be given as to what values, if any, will be ascribed in the bankruptcy proceedings to each of these constituencies, and it is probable that our common equity and trust preferred securities will be restructured in a manner that will eliminate or substantially reduce any remaining value. The value of these securities, therefore, is highly speculative. We have previously stated that our planned sale of non-core assets is not expected to change our view that our common stock has no value as a result of our bankruptcy filing and that the interests of our equity investors will be cancelled in connection with our reorganization. Accordingly, we urge that appropriate caution be exercised with respect to existing and future investments in any of our liabilities and/or securities.

On September 15, 2003, in connection with our Chapter 11 filing the New York Stock Exchange (NYSE) suspended trading and subsequently delisted our common stock and all series of our trust preferred securities. On October 10, 2003, the SEC issued an order granting the application of the New York Stock Exchange ("NYSE") to delist our common stock and trust preferred securities. As a result

of the delisting of our securities, there can be no assurance that a liquid trading market for those securities will continue.

Our ability to continue as a going concern is predicated upon numerous issues, including our ability to achieve the following:

- having a plan of reorganization confirmed by the Bankruptcy Court in a timely manner;

- being able to successfully implement our business plans and otherwise offset the negative effects that the Chapter 11 filing has had and may continue to have on our business, including the impairment of vendor relations;

- operating within the framework of our DIP Facility, including, among other things, limitations on capital expenditures and financial covenants, our ability to generate cash flows from operations or seek other sources of financing and the availability of projected vendor credit terms; and

- attracting, motivating and/or retaining key executives and associates.

These challenges are in addition to those operational, regulatory and other challenges that we face in connection with our business as a regional utility.

Certain additional risk factors associated with our Chapter 11 case include, but are not limited to, the following: potential adverse developments with respect to our liquidity, results of operations or ability to continue as a going concern; Bankruptcy Court approval of the motions that we may file from time to time; risks associated with third parties seeking and obtaining court approval (i) to terminate or shorten the exclusivity period during which we may propose and confirm a plan of reorganization, (ii) for the appointment of a Chapter 11 trustee or (iii) to convert our case to a Chapter 7 case for the liquidation of our businesses; and our ability to execute on our business plan. See "Special Note Regarding Forward-Looking Statements" and "Risk Factors".

NorthWestern, NorthWestern Capital Corporation, NorthWestern Growth Corporation and Expanets have entered into an Asset Purchase and Sale Agreement with Avaya, Inc. (NYSE: AV) in connection with the sale of substantially all of the assets and business of Expanets. Under the terms of the agreement, Avaya will purchase substantially all of the Expanets assets for $152 million in cash, less payment of an outstanding note of approximately $27 million to a third party, certain working capital adjustments, the payment of transaction costs and certain excluded other liabilities. We currently estimate that we will receive net cash proceeds ranging between $70 and $80 million. Expanets engaged Bear, Stearns & Co. to conduct an auction of the Expanets business subject to defined auction procedures. At the auction held on October 29, 2003, the final bid by Avaya was accepted by Expanets. NorthWestern, as controlling shareholder, has consented to the transaction. Expanets was not included in our Chapter 11 filing. Expanets will continue operations in the ordinary course of business until the transaction is closed. The closing is expected to occur prior to the end of November 2003, subject to the satisfaction of certain conditions. During the third quarter of 2003, we recognized an estimated loss on disposal of $30 million based on the terms of the transaction.

We are also attempting to sell other non-core assets, including the Montana First Megawatts generation project, and we are seeking to enforce an existing contract to sell certain Colstrip transmission assets to a third party. In an effort to facilitate the timely sale of the Montana First Megawatts project and its ultimate development at its current location in Great Falls, MT, we filed the power sales agreement with the FERC on August 18, 2003, requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NorthWestern Energy. A late motion to intervene and protest was filed by the MPSC and the MCC. On October 17, 2003, the FERC issued an order conditionally accepting the power sales agreement, subject to suspension for a designated period, to permit resolution of certain concerns voiced by the

36

MPSC and MCC in their filing. We are currently working with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve the documented MPSC and MCC concerns in a timely manner. During the second quarter of 2003, we consummated the sale of one non-core business for cash consideration of $6.6 million and a note receivable of $4.7 million (see Note 6 in the Notes to Consolidated Financial Statements for further discussion).

On August 12, 2003, the MCC has filed a Petition for Investigation, Adoption of Additional Regulatory Controls and Related Relief with the MPSC. On October 21, 2003, the MPSC issued an order initiating an investigation of NorthWestern Energy relating to, among others, finances, corporate structure, capital structure, cash management practices, and affiliated transactions. The relief sought includes adoption of new regulatory controls that would specifically apply to NorthWestern, including additional reporting, cost allocation and financing rules and requirements, and examination of affiliate transactions necessary to ensure that we are not operating our energy division, and will not in the future operate, in a manner that would prejudice our ability to furnish reasonably adequate service and facilities at reasonable and just charges as required under Montana law. Although we believe this matter is stayed as a result of our bankruptcy filing, the MPSC and MCC disagree. We cannot determine the impact or resolution of this petition, however, any action taken by the MPSC to increase the regulatory controls under which we operate may have a material affect on our liquidity, operations and financial condition. If we are unable to comply with any MPSC orders in a timely manner, we may become subject to material monetary penalties and fines. Not withstanding the foregoing, we are providing certain requested information to the MPSC and MCC on a voluntary informational basis.