# APP. 9

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | Case No. 03-12872 (CGC) |
| NORTHWESTERN CORPORATION | : | |
| | : | **Objections Due:  8-2-04 at 4:00 p.m.** |
| | : | **Briefs Opposing Confirmation Due:** |
| | : | **8-9-04** |
| Debtor. | : | **Hearing Date:  8-25-04 at 9:00 a.m.** |
| | x | |

### OBJECTION BY HARBERT MANAGEMENT CORPORATION TO CONFIRMATION OF THE DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE [Related to Docket No. 1295]

Harbert Management Corporation ("Harbert") hereby objects to the confirmation of the First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan") filed by NorthWestern Corporation ("NorthWestern" or the "Debtor"), and in support thereof respectfully states as follows:

## I.    INTRODUCTION

1.    Harbert is acting on behalf of Harbert Distressed Investment Master Fund, Ltd, and Alpha Sub Fund VI, LLC, the entities that own or beneficially own some of the above referenced Debtor's unsecured debt securities as more particularly reflected in their proofs of claim (Claims Register Nos. 687 and 689), which debt securities include the TOPrS Notes[1] that are classified, with the QUIPS Notes, in Class 8 as Unsecured Subordinated Note Claims.

2.    The Debtor's Plan recognizes and proposes to pay in Class 7 - Unsecured Notes certain purportedly senior unsecured debt that was issued in March 2002 in the principal amount

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning set forth in the Plan.

of $720 million (the "March 2002 Debt").[2]    The March 2002 Debt was issued in violation of federal law – the Public Utility Holding Company Act of 1935, 15 U.S.C § 79a, *et seq.* ("PUHCA"), and thus, is void *ab initio* and unenforceable against the Debtor, or at a minimum, should be stripped of its alleged "senior" status.[3]

3.    Notwithstanding the Debtor's violation of PUHCA and the status of the March 2002 Debt under PUHCA, the Debtor has proposed treatment of the March 2002 Debt in the Plan – which treatment was negotiated with and is supported by the Official Committee of Unsecured Creditors (the "Committee") (whose five members notably include HSBC and three holders of the March 2002 Debt) – that will result in the holders of the March 2002 Debt receiving their share of 98-100% of the New Common Stock in the Reorganized Debtor.    In contrast, Harbert and other holders of Unsecured Subordinated Note Claims will receive *nothing* if they reject the Plan and only 2% of the New Common Stock if they accept the Plan.    Such treatment was not negotiated or proposed in good faith and is not fair and equitable. Accordingly, the Plan cannot be confirmed under 11 U.S.C. § 1129.

---

[2]    The March 2002 Debt includes the 6.95% Senior Unsecured Debentures due 2028 and the 7.875% Senior Notes due 2007, both of which were issued under that certain Indenture, dated November 1, 1998 (and the supplements thereto), between the Debtor as issuer and The Chase Manhattan Bank, as Indenture Trustee (the "Senior Indenture").  HSBC Bank USA, as Indenture Trustee ("HSBC"), serves as successor trustee under the Senior Indenture.

[3]    On July 12, 2004, Harbert and Wilmington Trust Company, as indenture trustee (the "Trustee") filed a *Motion To Disallow And Objection To Claims Of HSBC Bank USA, as Indenture Trustee, and Oaktree Capital Management, LLC Based On Violations of Public Utility Holding Company Act of 1935* (Docket Nos. 1640-1644) (the "Claim Objection").   The Claim Objection is set for hearing with the confirmation hearing on  August 25, 2004.

4.      In addition, the Plan cannot be confirmed because it impermissibly releases potentially valuable claims that the Debtor's estate may have against the Debtor's officers and directors and other third parties for no consideration.

## II.        CONFIRMATION STANDARDS

5.      As proponent of the Plan, the Debtor has the burden of proving that the requirements of 11 U.S.C. § 1129(a) are met. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001); *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

6.      A nonconsensual plan requires the proponent to prove all but one of the thirteen elements (that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8)), plus the additional requirements of section 1129(b), that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable. *Id.* Harbert expects that the Plan will not be consensual with respect to Class 8 – Unsecured Subordinated Note Claims, and thus, that the Debtor must prove the additional requirements of section 1129(b).

## III.        OBJECTIONS TO CONFIRMATION

### A.    THE PLAN IMPROPERLY RECOGNIZES AND PROPOSES TO PAY AS SENIOR DEBT THE MARCH 2002 DEBT THAT WAS ISSUED IN VIOLATION OF PUHCA

#### (1)    The PUHCA Violation

7.      PUHCA was enacted in 1935, and was designed to "to meet the problems and eliminate the evils . . . connected with public-utility holding companies." 15 U.S.C. § 79a(c); *In re United Corp.*, 232 F.2d 601 (3d Cir.), *cert. denied* 352 U.S. 839, 77 S.Ct. 59, 1 L.Ed.2d 56; *In re Commonwealth & Southern Corp.*, 186 F.2d 708 (3d Cir. 1951) (PUHCA designed to protect

public, investors and consumers from the economic effect of complex, unwieldy and dishonest organization of public utilities, and from the effect of false, misleading and irresponsible security advertising).

8.    PUHCA was intended to provide rationalization and stabilization of holding company structures and finances, and to regulate transactions in interstate commerce that state commissions were precluded from regulating by virtue of the dormant Commerce Clause of the U.S. Constitution.  As the Congressional debates surrounding PUHCA reveal, Congress was concerned that holding companies' structures were unsound and could distort utility rates.  For instance, the financial collapse of the Insull collection of utilities (including the resulting bankruptcy of numerous utility companies) spurred Congress to act.

9.    Public utility holding companies are required to either register with the Securities Exchange Commission (the "Commission" or "SEC"), or qualify for one of several enumerated exceptions, under PUHCA.  15 U.S.C. §§ 79d, 79e.

10.    Montana Power LLC (the "LLC"), formerly Montana Power Company, was an electric utility company for PUHCA purposes by virtue of owning or operating facilities "for the . . . transmission or distribution of electric energy for sale . . ."  15 U.S.C. § 79b(a)(3).  NorthWestern qualified as a "holding company" for PUHCA purposes because, by virtue of its acquisition in February 2002 of the sole membership unit in the LLC, it controlled at least 10% of the outstanding securities of the LLC.[4]  15 U.S.C. § 79b(a)(7).  NorthWestern admitted as

---

[4]    After the Debtor's acquisition of the LLC in February 2002, the LLC's name was changed to NorthWestern Energy LLC and later to Clark Fork & Blackfoot LLC.

much.   However, on or about February 14, 2002, NorthWestern filed with the Commission an

application for exemption under Section 3(a)(3) from various aspects of PUHCA (the

"Application").   NorthWestern claimed to rely in *good faith* upon the applicability of the

exemption from registered holding company status offered by PUHCA Section 3(a)(3), and the

provisions of Section 3(c), which provide an exemption to a holding company that:

> . . . is only incidentally a holding company, being primarily
> engaged or interested in one or more businesses other than the
> business of a public-utility company and . . . not deriving, directly
> or indirectly, any material part of its income from any one or more
> subsidiary companies, the principal business of which is that of a
> public utility company. . . .

15 U.S.C. § 79c(a)(3).

11.   The "only incidentally a holding company" exemption of Section 3(a)(3) has

several critical requirements, all of which NorthWestern fails.   Section 3(a)(3) requires a

showing that (1) the utility subsidiaries generally must be functionally related to the non-utility

business; that is, the utility business should be an incident of the non-utility business and not

simply a small part of the overall enterprise, (2) amounts of income derived from utility

subsidiaries generally should be very small, (3) utility operations are small both in a relative and

in an absolute sense, and (4) the holding company's business is essentially non-utility in nature.

12.   NorthWestern's own public filings establish that NorthWestern's Application

claiming the exemption was false and misleading and not filed in good faith.   Key elements of

this evidence are summarized as follows:[5]

---

[5]   The Claim Objection contains further authority and exhibits in support of Harbert's position which will
not be repeated herein, but are incorporated by reference.

(a)    NorthWestern filed the Application and asserted that it was entitled to an
exemption from PUHCA because it "is only incidentally a holding company,"
being "primarily engaged or interested in one or more businesses other than the
business of a public-utility company" and "not deriving, directly or indirectly,
any material part of its income from any one or more subsidiary companies,
the principal business of which is that of a public utility company."   The
Application included the following representations by NorthWestern:

    (i)    "Revenues from utility operations comprise only a small part of
NorthWestern total revenues."  Application, page 2.

    (ii)    Northwestern "is primarily engaged in the provision of energy and
communication services that are nonutility businesses for purposes
of the Act."  Application, page 3.

    (iii)    In describing NorthWestern's "primary nonutility business,"
NorthWestern stated that "Cornerstone is one of the nation's
largest retail propane distributors" and "[i]n 2001, Cornerstone
generated approximately $2.5 billion in revenues."   Application,
pages 4-5.

    (iv)    "Section 3(a)(3) of the Act is applicable to NorthWestern because
NorthWestern will be 'only incidentally' a holding company, as it
is and will be primarily engaged and interested in nonutility
businesses, and will not derive a material part of its income from a
public-utility company."  Application, page 11.

    (v)    "NorthWestern is primarily engaged and interested in its nonutility
energy and communications businesses," and "LLC will not be a
material subsidiary of NorthWestern within the meaning of the
Act." Application, page 12.

(b)    Prior to the filing of the Application and during the pendency of the  Application,
NorthWestern provided information and made representations in its other public
filings that were directly contradictory to the Application, including the
following:

    (i)    "CornerStone has historically been a *minor contributor* to
NorthWestern's earnings and cash flow."  "By excluding
CornerStone and adding Montana Power's utility operations,
*approximately two-thirds of NorthWestern's targeted 2002*

*earnings* before interest, taxes and depreciation and amortization *is attributable to our utility businesses*."[6]

     (ii)     "We operate one of the premier regional electric and natural gas utilities in the upper Midwest of the United States through our energy division, NorthWestern Services Group, or NSG, and our wholly-owned subsidiary, The Montana Power, L.L.C. On February 15, 2002, we completed the acquisition of the electric and natural gas transmission and distribution businesses of The Montana Power Company . . . . We believe the acquisition creates greater regional scale allowing us to realize the full value of our existing energy assets and provides a strong platform for future growth. *Our regulated business contributed a majority of our consolidated earnings before interest, taxes, depreciation and amortization, or EBITDA, for the year ended December 31, 2001 on a pro forma basis after giving effect to the acquisition*.[7]

     (iii)     NorthWestern also characterized CornerStone's first quarter 2002 results (in light of the effort to sell that business) as part of its "discontinued operations" and reflected that its *electric and natural gas operations provided all of the operating income of NorthWestern from continuing operations*.[8]

   (c)     As reflected in NorthWestern's publicly disclosed financial information, the importance of the electric and natural gas operations to NorthWestern's continued viability was clear before the Application was filed and before the March 2002 Debt was issued. By 2001, the data show that under any reasonable

---

[6]  *See* "NorthWestern Corporation Reports 2001 EPS of $2.03 before Restructuring Charges," at 2 (hereinafter "February 7, 2002 Announcement") (emphasis added) (attached to the Claim Objection as Exhibit 6). This statement was made *before* NorthWestern filed its Application for an exemption under PUHCA Section 3(a)(3), which, to be effective, must be filed in good faith.

[7]  NorthWestern Corp., Form 8-K, Exh. 99.8 (emphasis added) (Feb. 15, 2002) (attached to the Claim Objection as Exhibit 5). This statement was issued February 15, 2002, just one day after the Application had been filed.

[8]  NorthWestern Corp., Form 10-Q for the quarter ending March 31, 2002, at 7 and 10 (attached to the Claim Objection as Exhibit 7). Electric and natural gas operations produced 44% of NorthWestern's total operating revenues, not remotely comparable to the figures recited in NorthWestern's Application. Thus, it was impossible to maintain in good faith that the utility operations would not be furnishing a very material portion – perhaps all – of NorthWestern's income.

measure, utility income was a very material component -- in some periods the
*only* source -- of NorthWestern's net income, certainly at a level far above the 11-
12% range found significant in SEC case law. *The gas and electric operations
contributed 100% of the positive income (before accounting for minority
interests) experienced by all of NorthWestern's lines of business* in the nine
months ending September 30, 2001[9] and approximately 96% in the same period
during 2000; the corresponding proportion of operating income was 81% for 2001
and 73% for 2000. *Gas and electric operations contributed income of $23 million
to NorthWestern in the nine months ending September 30, 2001 compared to
losses (before minority interest) for every other line of business during that
period.*[10] Total NorthWestern operating *losses* were $42 million during that
period; utility operating *income* amounted to $42 million.

13.     Given these circumstances, NorthWestern could not have entertained a good faith

belief that it qualified for the Section 3(a)(3) exemption.  That is, NorthWestern knew that

material statements made in its Application were false and misleading.

14.     Pursuant to PUHCA, it is unlawful for an unregistered holding company:

> to distribute or make any public offering for sale or exchange of
> any security of such holding company, any subsidiary company or
> affiliate of such holding company, any public-utility company, or
> any holding company, by use of the mails or any means or
> instrumentality of interstate commerce, or to sell any such security
> having reason to believe that such security, by use of the mails or
> any means or instrumentality of interstate commerce, will be
> distributed or made the subject of a public offering.

11 U.S.C. § 79d(a)(3).  Even a registered holding company cannot issue or sell the security of

itself or a subsidiary company or exercise any right to alter preferences, priorities or other rights

---

[9]  Harbert is emphasizing the results for the nine month period because that was the information readily
available in NorthWestern's public filings prior to filing of the Application or the issuance of the March
2002 Debt.   *See* NorthWestern Corp., Form 10-Q for the quarter ending September 30, 2001 (filed on
November 14, 2001), at 10-11 (attached to the Claim Objection as Exhibit 4).   Once the full year results
were available, the trend discussed above was even more evident.

[10]  NorthWestern Corp., Form 10-Q for the fiscal period ending September 30, 2001 (filed on November
14, 2001), at 10 (attached to the Claim Objection as Exhibit 4).

of holders of outstanding securities in itself or a subsidiary company without making a filing

with the Commission which the Commission may allow to become effective, or condition such

acceptance, or deny the authorization sought. 15 U.S.C. §§ 79f, 79g.

15.    NorthWestern, as an unexempted and unregistered holding company, thus

violated PUHCA by issuing the March 2002 Debt.

16.    Pursuant to PUHCA Section 26(b):

> *Every contract made in violation of any provision of this chapter
> or of any rule, regulation, or order thereunder*, and every contract
> heretofore or hereafter made, the performance of which involves
> the violation of, or the continuance of any relationship or practice
> in violation of, any provision of this chapter, or any rule,
> regulation, or order thereunder, *shall be void* (1) as regards the
> rights of any person who, in violation of any such provision, rule,
> regulation, or order, shall have made or engaged in the
> performance of any such contract, and (2) as regards the rights of
> any person who, not being a party to such contract, shall have
> acquired any right thereunder with actual knowledge of the facts
> by reason of which the making or performance of such contract
> was in violation of any such provision, rule, regulation, or order.

15 U.S.C. § 79z(b) (emphasis added).

17.    In enforcing PUHCA Section 26, the SEC has signaled that there is no discretion;

a contract is void with respect to "any person" (not just a holding company or a member of a

holding company system) falling within the provision's terms, and it is apparently void *ab initio*.

*See Virginia Public Service Co., et al*., 14 S.E.C. 406 (1943).

18.    The March 2002 Debt is dependent upon contracts made in violation of PUHCA

(including the supplement to the Senior Indenture pursuant to which the March 2002 Debt was

issued and related documents).  Pursuant to Section 26(b)(1), the contracts made in violation of

PUHCA are void as to the rights of any person who in violation of PUHCA made or engaged in the performance of the contracts (including the indenture trustee under the Senior Indenture). Thus, HSBC as indenture trustee under the Senior Indenture (on its own or on behalf of the holders of the March 2002 Debt) cannot assert rights (*e.g.,* a right to interest or principal) under such contracts, or at a minimum, should not be given senior status over other validly issued debt.[11]   Accordingly, the issuance of the March 2002 Debt, and continuing activities after that date, violated Section 4 of PUHCA, and therefore the debt is void *ab initio* as to rights of parties who made or engaged in the performance of the contracts in violation of PUHCA under Section 26(b)(1).

19.     Moreover, even if it could somehow be argued that HSBC did not make or engage in the performance of contracts in violation of PUHCA or that holders' rights are independent of those of the indenture trustee, there are at least two separate bases for disallowing claims based on the March 2002 Debt, or at a minimum, stripping such claims of their alleged "senior" status. First, the holders that held March 2002 Debt during the pendency of the violation were themselves engaged in the performance of contracts in violation of PUHCA.  Accordingly, such holders' rights are void *ab initio* under PUHCA Section 26(b)(1).

20.     Second, PUHCA Section 26(b)(2) provides that any person who, <u>not</u> being a party to the contracts, acquired any right under contracts with actual knowledge of the facts on which a

---

[11]   While HSBC did not become successor trustee until December 11, 2003, HSBC took an assignment of the Resigning Trustee's right, title, and interest in and to the Trusts under the Indenture; rights, powers, trusts, and duties of the Trustee under the Indenture; and all property and money held by such Resigning Trustee.  *See* Exhibit A to the Claim Objection (incorporating as Exhibit D the Instrument of Resignation, Appointment and Acceptance, dated as of December 11, 2003, at section 103.)  Thus, HSBC stands in the shoes of the Resigning Trustee who made and engaged in the performance of the contracts in violation of PUHCA.

violation rests cannot assert rights under contracts made in violation of a provision of PUHCA. Here, the facts demonstrating a violation were apparent to anyone willing to look. Accordingly, HSBC and the holders of the March 2002 Debt cannot assert rights (*e.g.,* a right to interest or principal) under such contracts, and pursuant to PUHCA Section 26(b)(2), the March 2002 Debt is void *ab initio*, or at a minimum, should be stripped of its alleged "senior" status.

> **(2)**   **Debtor's Recognition and Proposed Treatment of March 2002 Debt in Class 7 of the Plan**

21.   Notwithstanding the Debtor's violation of PUHCA and the consequences of such a violation with respect the March 2002 Debt, the Debtor's Plan recognizes the March 2002 Debt as valid, enforceable, and "senior" debt and proposes to pay such debt as part of the Unsecured Note Claims in Class 7 of the Plan. Specifically, pursuant to Section 4.7(b) of the Plan, the Unsecured Note Claims shall be deemed allowed in the aggregate amount of $893,264,683. Pursuant to Section 4.7(c) of the Plan, the holders of the Unsecured Note Claims shall receive, along with the holders of the Class 9 General Unsecured Claims, 34,790,000 shares of New Common Stock (representing 98% of the New Common Stock), *plus* 710,000 shares of New Common Stock (representing 2% of the New Common Stock) allocated to Class 8 if Class rejects the Plan.

22.   According to the Debtor's Disclosure Statement, the Class 7 distribution will represent a recovery of approximately 73.7% on Unsecured Note Claims. However, Harbert believes that the Debtor's Plan is predicated on a very substantial undervaluation of the Debtor and thus, that the New Common Stock is worth much more than the artificially low value ascribed to it by the Debtor. Harbert therefore asserts that Debtor is proposing to pay the holders

of the March 2002 Debt more than 100% of their claims.[12]   In contrast, Harbert and the other

holders of Unsecured Subordinated Note Claims will receive only 2% of the New Common

Stock if they accept the Plan and *nothing* if they reject the Plan.

> **(3)      The Plan Does Not Satisfy § 1129(a)(3) Of The Bankruptcy Code.**

23.      Section 1129(a)(3) requires that a Plan be proposed in good faith and not by any

means forbidden by law.   As set forth in *In re Genesis Health Ventures, Inc.*:

> The Code does not define "good faith" in the § 1129(a)(3) context.
> Courts have found a plan to be proposed in good faith where the
> plan:  (1) fosters a result consistent with the Code's objectives . . . ;
> (2) the plan has been proposed with honesty and good intentions
> and with a basis for expecting that reorganization can be effected, .
> . .  and (3) there was fundamental fairness in dealing with the
> creditors, . . . .
>
> The determination of good faith must be based on the totality of
> the circumstances. . . . The issue of good faith looks to the
> purposes that would be achieved by the plan.

266 B.R.591, 609 (Bankr. D. Del. 2001) (citations omitted).  *See also In re Coram Healthcare*

*Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) ("In evaluating the totality of circumstances

surrounding a plan, a court has 'considerable judicial discretion' in finding good faith, with the

most important feature being an inquiry into the 'fundamental fairness' of the plan.").

24.      Here, the Debtor did not act in good faith in filing the PUHCA Exemption

Application, and the Debtor violated federal law when it issued the March 2002 Debt.

Accordingly, Harbert asserts that the Debtor cannot in good faith recognize and propose to pay

ahead of Harbert and other holders of Unsecured Subordinated Note Claims the March 2002

---

[12]  For purposes of this objection, Harbert is not addressing the valuation issues.  Instead, as set forth
below, Harbert joins in the objection filed by Wilmington Trust Company, as indenture trustee, with
respect to valuation and certain other issues.

Debt that is void under PUHCA, or that at a minimum, should be stripped of its alleged "senior" status.   Such a proposal by the Debtor is not fundamentally fair to the holders of the Unsecured Subordinated Note Claims and thus, cannot be confirmed.

**(4)      The Plan Does Not Satisfy § 1129(b) Of The Bankruptcy Code.**

25.      Harbert expects that the Plan will not be consensual with respect to Class 8 – Unsecured Subordinated Note Claims, and thus, that the Debtor must prove the additional requirements of section 1129(b) in order to cram down the Plan.

26.      Pursuant to section 1129(b), the Court shall confirm the Plan under the cram down provisions only if it "does not discriminate unfairly" and "is fair and equitable" with respect to each impaired class that does not accept the Plan.   *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 611 (Bankr. D. Del. 2001); *In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003).

27.      In order to satisfy the requirement that a plan be "'fair and equitable,' the plan must *literally* be fair and equitable."  *See In re Grandfather Mountain Ltd. Partnership,* 207 B.R. 475, 487 (Bankr. M.D.N.C. 1996).   In addition, the plan must meet the Bankruptcy Code's absolute priority rule – it cannot provide junior classes with a recovery unless senior dissenting classes are paid in full.[13]

---

[13]   "With respect to unsecured claims, § 1129(b)(2)(B) provides that a plan may be confirmed notwithstanding the dissent of a class of unsecured creditors if the plan does not offer a junior claimant any property before each unsecured claimant receives full satisfaction of its allowed claim." *Genesis*, 266 B.R. at 612.   Subsection 1129(b)(2) provides "illustrative ways to satisfy the fair and equitable standard." *Id.*   Even if the Court determines that the Plan meets each of the enumerated standards under § 1129(b)(2), the Plan may still not be "fair and equitable" and capable of being confirmed.  *See FSLIC v. D & F Constr., Inc. (In re D & F Constr., Inc.),* 865 F.2d 673, 675 (5th Cir. 1989) ("technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable'").  *See also*

28.     It is well settled that "a corollary of the absolute priority rule is that *a senior class cannot receive more than full compensation for its claims.*"  *Exide*, 303 B.R. at 61 (emphasis added) (citing *Genesis* and *In re MCorp Financial, Inc.*, 137 B.R. 219, 225 (Bankr. S.D.Tex.1992)). Accordingly, where as here, a plan distributes New Common Stock in the Reorganized Debtor to senior creditors as opposed to cash, "[a] determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable' as required by 11 U.S.C. §1129(b)."  *Exide*, 303 B.R. at 61.

29.     Here, the Debtor proposes to pay the March 2002 Debt that is void *ab initio* under PUHCA while Harbert and the other holders of the Unsecured Subordinated Note Claims receive *nothing* based on their rejection of the Plan.  There is nothing fair or equitable about the holders of void debt, or debt that at a minimum should be stripped of its alleged "senior" status, being paid in preference to other valid claims including the Unsecured Subordinated Note Claims. Moreover, the holders of the March 2002 Debt are receiving more on account of their claims than they are entitled under federal law.  Accordingly, the Plan violates the absolute priority rule and cannot be confirmed.

30.     While the holders of the March 2002 Debt will undoubtedly assert that they can defend the voiding of the March 2002 Debt under PUHCA, two additional points must be made which demonstrate that the Plan still cannot be confirmed under section 1129(b).  First, assuming *arguendo*: (a) that the defense contained in PUHCA section 26(c)(2) (15 U.S.C. §79z(c)(2))

*In re Sunflower Racing, Inc.,* 226 B.R. 673, 687 (D. Kan. 1998) ("section 1129(b)(2) sets forth only minimum standards of what is fair and equitable").

-14-

could apply on the present facts,[14] and (b) that the holders of the March 2002 Debt could establish that they *acquired* the March 2002 Debt in *good faith **and** without knowledge* (three of the four elements of the defense), Harbert asserts that the defense also requires a certain quantum of *value* or is otherwise limited *to the extent of the value* given (the fourth element of the defense).[15] Accordingly, because the holders of the March 2002 Debt, upon information and belief, *bought their debt at a substantial discount from full value*, they would still not be entitled to be paid under PUHCA, or at least, would not be entitled to the full value of the March 2002 Debt. And, since the Plan proposes to pay their claims based on the full value, the Plan would provide a windfall to the holders of the March 2002 Debt to the detriment of the Unsecured Subordinated Note Claims. Thus, the Plan would still violate the absolute priority rule (by allowing the holders of the March 2002 Debt to be paid more than they are entitled under federal law) and not be fair and equitable to the holders of the Unsecured Subordinated Note Claims.

---

[14]  As set for the in the Claim Objection, Harbert believes that the Court does not have to address PUHCA section 26(c)(2) in this case because HSBC (and the holders of the March 2002 Debt) lose as a threshold matter under PUHCA section 26(b) (15 U.S.C. § 79z(b)).

[15]  There is little case law interpreting Section 26(c) of PUHCA. However, the Bankruptcy Code provides similar protection for secondary transferees that take for value, in good faith, and without knowledge in 11 U.S.C. § 550(b)(1). The value requirement is Section 550(b)(1) has been construed by some courts as meaning "fair market value." *See, e.g., In re Auxano, Inc.,* 96 B.R. 957 (Bankr. W.D. Mo. 1989); *Burtrum v. Laughlin (In the Matter of Laughlin)*, 18 B.R. 778, 781 (Bankr. W.D. Mo. 1982). Other courts have construed the value requirement as meaning "reasonably equivalent value." *See e.g., Rodgers v. Monaghan Co.* (*In re Laguna Beach Motors, Inc.*), 159 B.R. 562, 568 (Bankr. C.D. Cal. 1993). In addition, at least one Circuit has indicated that the protection may be limited "to the extent" of the value given. *See Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 897 (7th Cir. 1988) (explaining that "Section 550(b)(1) implements a system well known in commercial law, in which a transferee of commercial paper or chattels acquires an interest ***to the extent he purchased*** the items without knowledge of a defect in the chain") (emphasis added).

31.    In addition, even if the result of the Claim Objection was to treat the March 2002 Debt as *pari passu* with, instead of senior to, the Unsecured Subordinated Note Claims (*e.g.* if upon the voiding of the March 2002 Debt, the holders still have restitution claims for the monies advanced to the Debtor), the Plan would be unfairly discriminatory given the disparity in treatment between Class 7 (receiving their share of 98-100% of New Common Stock) and Class 8 (receiving *nothing* if Class 8 rejects the Plan).[16]    The Plan would also violate the absolute priority rule by allowing the holders of the March 2002 Debt to be paid more than in full and would not be not fair and equitable.   Thus, the Plan could not be confirmed under section 1129(b).

32.    Harbert further asserts that the conditional distribution to Class 8 (2% of the New Common Stock if Class 8 votes to accept the Plan and *nothing* if Class 8 votes to reject) is itself not fair and equitable and unfairly discriminatory.   Therefore, the Plan cannot be confirmed with

---

[16]   The concept of unfair discrimination is not defined under the Bankruptcy Code and various standards have been developed by the courts to test whether or not a plan unfairly discriminates.   *Genesis*, 266 B.R. at 611.   "The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."   *Id.*   In *Genesis*, the Court explained that:

> One court has adopted a modified test for unfair discrimination, which gives rise to: a rebuttable presumption of unfair discrimination . . . where there is:  (1) a dissenting class;  (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Id.* (citing  *In re Dow Corning Corp.,* 244 B.R. 696, 702 (Bankr.E.D.Mich.1999) (adopting the test proposed in Bruce A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11", 72 AM.BANKR.L.J. 227 (1998)).

such a "death-trap" provision. *See In re Mcorp Financial, Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992) (noting that similar provision was "egregious in its 'carrot and stick' approach" and resulted in the plan not being fair and equitable and in unfair discrimination); *In re Allegheny Intern., Inc.*, 118 B.R. 282, 304 n. 15 (Bankr. W.D. Pa. 1990) (noting that there is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization); *but see In re Zenith Elec. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (Walrath) (finding no prohibition in the Bankruptcy Code against a Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the Plan and that such treatment does not violate the fair and equitable requirement).

**B.    THE PLAN IMPERMISSIBLY RELEASES CLAIMS THAT THE DEBTOR'S ESTATE MAY HAVE AGAINST THE DEBTOR'S OFFICERS AND DIRECTORS AND OTHER THIRD PARTIES FOR NO CONSIDERATION.**

33.    The Plan also cannot be confirmed because it impermissibly releases potentially valuable claims that the Debtor's estate may have against the Debtor's officers and directors and other third parties for no consideration.

34.    Pursuant to Section 10.3 of the Plan, the "General Released Parties" (which include the "Debtor, Reorganized Debtor, the DIP Lenders, the Creditors' Committee, and each of their respective Affiliates and their respective parents, subsidiaries, Affiliates, *Officers or Directors,* or any of their *former or present stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals* in their capacities as such") are giving each other mutual releases in exchange for no consideration of:

all known and unknown Causes of Action of any nature that such General Released Party has asserted, may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the other General Released Parties based on any act or omission *relating to the Debtor or the Debtor's business operations (including, without limitation, the organization or capitalization of the Debtor or extensions of credit and other financial services and accommodations made or not made to the Debtor) or the Chapter 11 Case on or prior to the Effective Date.*

35.    The Debtor's release of its officers and directors for no consideration expressly violates the Court's holdings in *In re Genesis Health Ventures, Inc.*, 266 B.R.591, 606-7 (Bankr. D. Del. 2001) and *In re Exide Techs.*, 303 B.R. 48, 72 and 75 (Bankr. D. Del. 2003).  Indeed, the Debtor cannot satisfy a single one of the prescribed factors that the Court is bound to analyze in deciding whether to approve a release of claims against officers and directors.

36.    Courts in the Third Circuit employ a five part test for determining the propriety of non-consensual releases: (1) whether there is an identity of interest between the debtor and the third party such that a suit against the non-debtor is, in essence, a suit against the debtor; (2) whether the non-debtor has made a substantial contribution of assets to the organization; (3) the essential nature of the injunction to the reorganization to the extent that without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the class or classes affected by the injunction. *See Genesis*, 266 B.R. at 606 n. 15; *In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

37.     These factors are considered in determining the propriety of a debtor's release of

its own claims against officers and directors, in addition to evaluating the release of third party

claims.  *See Genesis*, 266 B.R. at 606-7.  When inadequate consideration is provided in exchange

for the release, courts typically will not approve the release.  *See Exide*, 303 B.R. at 74  (holding

that a release of claims against officers and directors based on prepetition conduct was not

supported by the equities of the case, despite contributions of officers and directors to the

reorganization, when the majority of unsecured creditors do not support the injunction and the

plan provided for only minimal payment of the class affected by the injunction);  *Genesis*, 266

B.R. at 606-607 (refusing to approve release, finding that officers and directors had not

contributed assets to the debtors when they were already compensated for the meaningful

contributions they made to the reorganization).

38.     Notably, in *Genesis*, the Court stated that even a "meaningful contribution" in the

form of assistance of the reorganization process by the debtor's officers and directors does not

constitute a "substantial contribution of assets," as is required:

> As to the debtors' management personnel here, there is no showing
> that the individual releasees have made a substantial contribution
> of assets to the reorganization.  As in *Zenith*, the officers and
> directors of the debtors no doubt made meaningful contribution to
> the operational restructuring of the companies, and negotiating the
> financial restructuring with parties in interest.  However, the
> officers and directors and employees have been otherwise
> compensated for their contribution and the management functions
> they performed do not constitute contributions of 'assets' to the
> reorganization.

*Id.* at 606.

-19-

39.    In addition, the *Genesis* court specifically rejected the debtors' "desire to avoid distractions to its officers and directors of ongoing litigation" as a factor to consider in analyzing the propriety of the releases:

> As well, there can be no conclusion drawn that absent such an injunction in favor of debtors' officers, directors and employees, the reorganization has little likelihood of success. It is understood that the debtors wish to retain current management, and seek to avoid potential distractions to management that such litigation might create. However, the rationale offered does not support the release of debtor's management for pre-petition conduct.

*Id.* at 607.

40.    On July 14, 2004, the Debtor presented testimony by William Austin in connection with the releases proposed under the Debtor's Motion for Order Pursuant to Bankruptcy Rule 9019 Approving Memorandum of Understanding (the "MOU Motion"). *See* Transcript of Proceedings Before the Honorable Charles G. Case, II United States Bankruptcy Judge, Case No. 03-12872 (CGC), July 14, 2004 (Docket No. 1723) (hereinafter the "Transcript"). Mr. Austin's testimony was clear that there was no "substantial contribution by the non-Debtors of assets to the reorganization," *i.e.*, the officers and directors were not paying for the release. *See* Transcript at 136:11-14. Likewise, there was no testimony from Mr. Austin that the release of the officers and directors was "so essential to the reorganization to the extent that without it there is little likelihood of success." *See* Transcript at 136:15-25 through 137:1. Finally, Mr. Austin confirmed that claims of creditors such as Harbert would not "all or substantially all be paid"; instead, under the Debtor's proposed plan, they would receive only an approximate 3% distribution if they vote for the Plan, at most. *See* Transcript at 132:16-25

through 133:1-3.    Accordingly, the Debtor fails to satisfy any of the factors that the Court is bound to analyze in deciding whether to approve a release of claims against officers and directors.

41.    The Plan also impermissibly releases the Debtor's claims against other third parties, including advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals for no consideration.    Once again, these releases are for no consideration and fail to meet every single one of the factors listed in *Genesis*, *Exide*, and *Zenith.*

**C.    HARBERT'S JOINDER IN FURTHER OBJECTIONS BY WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE**

42.    In addition to the foregoing objections, Harbert hereby joins in the objection to confirmation filed by Wilmington Trust Company, as Indenture Trustee.

## IV.    CONCLUSION

43.    For the foregoing reasons, confirmation of the Debtor's Plan must be denied.

## V.    RESERVATION OF RIGHTS

44.     Harbert is currently engaging in discovery with the Debtor and others in connection with the confirmation of the Debtor's Plan.    Harbert reserves the right to amend or supplement this Objection based on that discovery or to otherwise assert additional bases for denying confirmation of the Debtor's Plan.

45.    In addition, in accordance with the Court's Scheduling Order for Confirmation Hearing, Harbert intends to file a Brief in further support of its objections to confirmation on August 9, 2004.

WHEREFORE Harbert respectfully requests that this Court deny confirmation of the Debtor's Plan and grant to Harbert such other and further relief as it may be entitled.

Dated: August 2, 2004                   CONNOLLY BOVE LODGE & HUTZ LLP


                                        By: **/s/ Christina M. Thompson**
                                            Jeffrey C. Wisler (#2795)
                                            Christina M. Thompson (#3976)
                                            1007 North Orange Street
                                            P. O. Box 2207
                                            Wilmington, Delaware  19899
                                            Telephone:  (302) 658-9141
                                            Telecopy:  (302) 658-5614

                                            and

                                            James Donnell (Texas Bar No. 05981300)
                                            Jennifer M. Gore (Texas Bar No. 00796655)
                                            Andrews Kurth LLP
                                            600 Travis, Suite 4200
                                            Houston, Texas 77002
                                            Telephone: (713) 220-4200
                                            Telecopy:  (713) 220-4285
                                            Counsel For Harbert Management Corporation

#348432