# APP. 11

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) <br> ) <br> NORTHWESTERN CORPORATION, ) <br> ) <br> ) <br> Debtor. ) <br> ) | Chapter 11 <br> Case No. 03-12872 (CGC) <br> Related Docket No. 1803 <br> **Briefs in Opposition Due:  August 9, 2004** <br> **Hearing Date:  August 25, 2004** |

**MEMORANDUM OF LAW IN SUPPORT OF LAW DEBENTURE TRUST COMPANY
OF NEW YORK'S OBJECTION TO CONFIRMATION OF
<u>DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION</u>**

Law Debenture Trust Company of New York, as successor Trustee (the "Indenture Trustee") to the Bank of New York, under that certain Indenture (the "QUIPS Indenture") dated as of November 1, 1996, as amended, pursuant to which the Montana Power Company ("Montana Power") issue certain 8.45% Junior Subordinated Debentures (the "Debentures") to Montana Capital I, which, then issued certain 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPS"), by and through its undersigned counsel, hereby objects to confirmation of the Debtor's First Amended Plan of Reorganization (the "Plan").  In support of its objection, the Indenture Trustee respectfully states as follows:

**PRELIMINARY STATEMENT**

As a threshold matter, the Debtor is seeking confirmation of the Plan prior to the resolution of litigation brought by the Indenture Trustee on behalf of the holders of the QUIPS that will determine whether the primary assets around which the Debtor is attempting to reorganize properly belong within the Debtor's estate or whether those assets will be disgorged and returned to the Debtor's non-debtor subsidiary, Clark Fork and Blackfoot, LLC ("Clark

Fork"). As this Court is aware, the Indenture Trustee and Magten Asset Management Corporation ("Magten") holder of QUIPS have filed a complaint seeking to avoid the transfer of the Montana Utility Assets to the Debtor. As a result, the Indenture Trustee and the holders of the QUIPS retain unique rights in the Montana Utility Assets arising from the fraudulent transfer litigation asserted against the Debtor in connection with the so-called "going flat transaction" – rights that cannot be discharged or otherwise modified through confirmation of the Plan. To the extent the Plan purports to modify those rights it is contrary to § 1129(a)(1) and cannot be confirmed. At minimum, accordingly, any order confirming the Plan must recognize and preserve the Indenture Trustee's unique interest in the Montana Utility Assets. Furthermore, to the extent that this Court determines that it is appropriate to confirm the Plan before the pending litigation to recover the Montana Utility Assets is resolved pursuant to a final non-appealable order, § 1129(a)(11) requires that the Debtor set aside not less than $69 million (the approximate amount plus accrued interest and other charges due under the QUIPS Indenture) ("QUIPS Claims") to secure any judgment obtained by the Indenture Trustee.

Second, because the Indenture Trustee and the QUIPS holders have a unique property interest in the Montana Utility Assets arising from their fraudulent transfer causes of action, their claims are not properly classified with the claims of the holders of TOPrS. Due to its improper classification, confirmation of the Plan is contrary to §§ 1122 and 1129(a)(1) of the Bankruptcy Code. Furthermore, the QUIPS claims are not subordinate to general unsecured claims, and the Plan's treatment of other general unsecured claims as other than pari passu with the QUIPS is contrary to § 1129(b)(1).

Third, the Plan is not fair and equitable within the meaning of §1129(b)(2) because it pays senior unsecured debt value in excess of the amount of their claims to the detriment of junior creditors.

Finally, through the Plan, the Debtor is releasing and waiving any causes of action it may have against, among others, its subsidiaries, officers and directors, employees and advisors, and thereby giving up potentially valuable claims for an apparent consideration.

In short, because of each of these defects, the Plan does not satisfy the necessary requirements of section 1129 of the Bankruptcy Code and cannot be confirmed.

## BACKGROUND

### A. The Subordinated Debt Evidenced by the QUIPS Indenture

1. Montana Power was the successor to an electric utility formed in 1912 through the merger of four regional electric companies.

2. In November 1996, Montana Power and the Indenture Trustee's predecessor entered into the QUIPS Indenture. Pursuant to the QUIPS Indenture, Montana Power issued the Debentures to Montana Power Capital I, a Delaware business trust (the "Trust"). The Trust, in turn, issued the QUIPS, which are now widely held by both institutional investors and individual investors.

3. Pursuant to §§1501 and 101 of the Indenture, the Junior Debentures are contractually subordinate only to the Debtor's obligations "<u>for borrowed money</u>" (emphasis supplied) but are not similarly subordinated to other general unsecured claims arising from debts other than "for borrowed money." Under QUIPS Indenture, the Indenture Trustee has "the right

to institute a judicial proceeding against [the Debtor]" to enforce rights relating to the QUIPS and the Junior Debentures.

      **B.**    **Transfer of Montana Utility Assets to the Debtor and the Commencement of the Debtor's Chapter 11 Case.**

      4.    On or about September 29, 2000, the Debtor entered into a Unit Purchase Agreement with Montana Power, by which the Debtor was to purchase substantially all of Montana Power's electric, natural gas, and propane utility assets (the "Montana Utility Assets").

      5.    In order to facilitate that transaction, Montana Power created a subsidiary then known as Montana Power LLC ("MPLLC") now known as Clark Fork. The Montana Utility Assets were transferred to MPLLC. The Debtor's acquisition of the Montana Utility Assets, in turn, was accomplished in essentially two steps. First, on February 15, 2002, the Debtor acquired Montana Power's shares in MPLLC, and MPLLC became a wholly owned subsidiary of the Debtor known as NorthWestern Energy LLC. Second, on or about November 15, 2002, NorthWestern Energy LLC transferred substantially all of the Montana Utility Assets to the Debtor. This latter transaction is known as the Going Flat Transaction (the "Going Flat Transaction"). NorthWestern Energy LLC subsequently changed its name to Clark Fork.

      6.    Less than a year later, the Debtor commenced the above-captioned case by filing a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

**C.     The Indenture Trustee's Adversary Proceeding to Avoid and Recover the Montana Utility Assets**

7.     On April 16, 2004, the Indenture Trustee, along with Magten, commenced an adversary proceeding (the "Adversary Proceeding")[1] against the Debtor seeking to avoid and recover the Montana Utility Assets.  In the Adversary Proceeding, the Indenture Trustee contends, among other things, that the Going Flat Transaction was a fraudulent transaction in which assets worth $1.15 billion were transferred from a solvent obligor to the hopelessly insolvent Debtor for effectively no consideration.

8.     In response, on May 14, 2004, the Debtor filed a motion to dismiss the Indenture Trustee and Magten's Complaint, and the Debtor's motion together with the Indenture Trustee and Magten's opposition is presently under advisement by this Court.

**D.     The Plan**

9.     The Plan designates six classes of non-priority unsecured claims, including, in pertinent part:

- Class 7 consisting of approximately $898 million of allegedly senior debt (the "Senior Unsecured Debt").[2]

- Class 8 consisting of approximately $391 million in outstanding subordinated debentures, including the QUIPs and unsecured debentures issued pursuant to the TOPrS Indenture[3];

---

[1] The Adversary Proceeding is styled Magten Asset Management Corporation and Law Debenture Trust Company of New York v. Northwestern Corporation, Adversary No. 04-53324.  Copies of the QUIPS Indenture and other relevant documents are attached as exhibits to the Indenture Trustee's Complaint in the Adversary Proceeding and are incorporated by reference here.  In conjunction with the Adversary Proceeding, Magten commenced a civil action in the United States District Court for the District of Montana against certain of Clark Fork's officers and directors for breach of fiduciary duty in connection with the Going Flat Transaction.

[2] Of the $898 million of Senior Unsecured Debt, approximately $720 million is presently subject to an objection interposed by Harbert Management Corporation ("Harbert") and Wilmington Trust Company ("Wilmington") (Document Nos. 1640-1644).  In their objection Harbert and Wilmington contend that pursuant to the Public Utility Holding Company Act of 1935, 15 U.S.C. §79a, et. seq. ("PUHCA") the Debtor's Senior Unsecured Debt is void or should be stripped of its senior status.

[3] Capitalized words that are not otherwise defined have the meanings ascribed to them in the Plan.

- Class 9 consisting of "General Unsecured Claims" of approximately $46 million; and

- Class 11 consisting of Environment Claims of approximately $44 million.

10. Generally speaking, under the Plan, holders of unsecured claims other than Class 8 claims will either be paid in full or receive a pro rata distribution of New Common Stock in the reorganized Debtor equivalent to not less than between 98% to 100% of the issued and outstanding New Common Stock on the Plan's Effective Date. Specifically, the Debtor proposes to satisfy Class 7 claims with a pro rata distribution of New Common Stock representing 98% of the stock issued and outstanding on the Plan's Effective Date. If Class 8 votes to reject the Plan, however, distributions of stock will increase and the holders of Class 7 claims will receive a pro rata distribution from 100% of the New Common Stock issued and outstanding on the Effective Date. Similarly, with respect to Class 9 claims, the Plan authorizes the Debtor either to reinstate those claims or to satisfy such claims with pro rata distribution of New Common Stock (with Class 7) representing 98% of the common stock issued and outstanding on the Plan's Effective Date. Like the distributions to holders of Class 7 claims under the Plan, holders of Class 9 claims' pro rata distribution of New Common Stock will be based on 100% of the issued and outstanding common stock of the reorganized Debtor to the extent that Class 8 votes to reject the Plan. Finally, with respect to Class 11, the Plan contemplates those claims will be "assumed" by the reorganized Debtor and paid in full "in the ordinary course" as they come due.

11. In sharp contrast, the Plan contemplates satisfying Class 8 claims with a pro rata distribution of common stock in the reorganized Debtor representing just 2% of the New Common Stock issued and outstanding on the Effective Date but only if Class 8 votes to accept the Plan. In the event that Class 8 votes to reject the Plan, the Plan provides for no distributions to the holders of such claims.

# ARGUMENT

A.  **Avoidance of the Going Flat Transaction and Recovery of the Montana Utility Assets in the Adversary Proceeding Will Likely Require the Liquidation or Further Financial Reorganization of the Debtor.**

12. In the Adversary Proceeding, the Indenture Trustee seeks to unwind the Going Flat Transaction and recover the Montana Utility Assets, assets from which a substantial portion of the Debtor's projected post-confirmation cash flow is expected to be generated. Moreover, even if any judgment in the Adversary Proceeding was limited to the outstanding principal and interest due under the QUIPS (approximately $69 million), a judgment of that magnitude would have a dramatic impact on post-confirmation cash flows and threatened the commercial viability of the reorganized Debtor. Yet, the Plan makes no provision whatsoever for the contingency that Indenture Trustee may obtain a judgment in the Adversary Proceeding.

13. This fatal omission renders the Plan unfeasible and § 1129(a)(11) precludes confirmation until the Adversary Proceeding is fully adjudicated by a final nonappealable order. In re Agawam Creative Marketing Associates, Inc., 63 B.R. 612, 620 (Bankr. Mass. 1986) (confirmation of debtor's plan would be denied on feasibility grounds where debtor's plan did not provide for a sufficient "cushion" to address contingencies which would effect debtor's post-confirmation operations); In re Snider Farms, Inc., 83 B.R. 1003 (Bankr. N.D. Ind. 1988) (where debtor leaves no room in plan for reserve for contingencies and its plan is so tightly construed that even the slightest increase in expenses or decrease of income would be fatal to the plan, such plan cannot be confirmed). Alternatively, confirmation of the Plan, while the Adversary Proceeding is still pending in this Court or on appeal, should be conditioned on the Debtor setting aside not less than $69 million on the Plan's Effective Date to satisfy any judgment the Indenture Trustee may obtain. Compare In re Sagewood Manor Assoc.,

L.P., 223 B.R. 756, 763 (Bankr. D. Nev. 1998) (confirming plan which included enough cushion in debtor's projections to accommodate unforeseen setbacks).

> **B.   The Indenture Trustee Objects to Confirmation to the Extent That the Plan Purports to Extinguish or Otherwise Modify the Property Rights of its and the QUIPS Holders in the Montana Utility Assets.**

14.   In the Adversary Proceeding, the Indenture Trustee on behalf of the holders of the QUIPS is seeking to unwind the transfer of the Montana Utility Assets from Clark Fork to the Debtor. In addition, pending avoidance and recovery of those assets in the Adversary Proceeding, the Indenture Trustee further asserts that the Montana Utility Assets are subject to a constructive trust in favor of the holders of the QUIPS.

15.   The Indenture Trustee objects to any confirmation of the Plan which does not recognize and preserve the Indenture Trustee's and the QUIPS holders' unique property interests (and other rights in) the Montana Utility Assets arising from the causes of action and remedies asserted in the Adversary Proceeding. In addition, the Indenture Trustee specifically objects to § 5.6 of the Plan which purports to revest the Montana Utility Assets in the reorganized Debtor free and clear of the QUIPS holders property interests and claims to the Montana Assets and any provision of the Plan which purports to grant liens on the Montana Utility Assets inconsistent with the QUIPS holders' property interests.

16.   Pursuant to § 1129(a)(1), the Debtor simply cannot alter, extinguish or otherwise modify the QUIPS holders property interest (and/or other rights in) the Montana Utility Assets arising from the causes of action and remedies asserted in the Adversary Proceeding. To the extent that the Plan purports to do so it cannot be confirmed. At minimum, the order confirming the Plan must clarify that, notwithstanding anything to the contrary contained in the Plan, including, but not limited to § 5.6 of the Plan, the rights and interests of the holders of the QUIPS in the Montana Utility Assets shall not be affected by confirmation.

{KMM4690.DOC}                                  8

> **C.  Because of the QUIPS Holders Have a Unique Property Interest and/or Other Rights in the Montana Utility Assets arising from their fraudulent transfer and related causes of action, their Claims are Not Properly Classified With the Claims of the Holders of the TOPrS and the Confirmation of the Plan is Contrary to §§1122 and 1129(a)(1) of the Bankruptcy Code.**

17.  Section 1129(a)(1) requires that in order for a plan to be confirmed, a plan must comply with the applicable provisions of the Bankruptcy Code.  In turn, Section 1122 of the Bankruptcy Code requires, in pertinent part, that "…[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).  However, the Plan fails to satisfy the requirements of Section 1122 with respect to the classification of the claims of the holders of the QUIPS.

18.  A chapter 11 plan proponent must demonstrate that there is a reasonable basis for the plan's classification and must show that all claims within a class are substantially similar.  In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).  Cf. In re Bugg, 172 B.R. 781, 783-84 (Bankr. E.D. Pa. 1994) (secured creditors with secured interests in distinct properties must be classified separately).  Courts have defined "substantially similar claims" as those claims that share a common priority status and other legal rights against the debtor's assets.  In re Fairfield Executive Assocs., 161 B.R. 595, 600, n. 6 (Bankr. D.N.J. 1993) (citing In re Greystone III Joint Venture, 948 F.2d 134, 139 (5th Cir. 1991).

19.  The Plan defines Class 8 to include both: (a) the QUIPS Claims ; (b) the claims of the holders of the TOPrS.  By virtue of the unique property interests, equitable remedies and other rights in the Montana Utility Assets arising from the Adversary Proceeding, the QUIPS Claims are fundamentally different from the claims of TOPrS holders.  Unlike the claims of TOPrS holders, the property and other rights of the QUIPS Claims in the Montana Utility Assets are not subject to administration, discharge or other modification in the above-

{KMM4690.DOC}                                9

captioned case. Aggregating these unique rights held by the Indenture Trustee and the QUIPS holders with the claims of the holders of TOPrS is inconsistent with §§ 1122 and 1129(a)(1) and preclude confirmation of the Plan.

      **D.**    **The Plan's Treatment of Other Unsecured Claims Discriminates Unfairly with Respect to Class 8.**

      20.    In order to be confirmed under § 1129(b)(1), the Bankruptcy Code requires that a plan not discriminate unfairly by proposing disparate treatment of similarly situated creditors. See, e.g., In re Salem Suede, Inc., 219 B.R. 922, 933-34 (Bankr. D. Mass. 1999) (a plan may not discriminate unfairly; and any discrimination must be supported by a legally accepted rationale and the extent of the discrimination must be necessary in light of the rationale). Furthermore, a presumption of unfair discrimination arises where, like the present case, there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either: (a) a materially lower percentage recovery for a dissenting class (measured in terms of the net present value of all payments); (b) regardless of the percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution. In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) (adopting the test proposed in Bruce A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11," 72 Am. Bankr. L.J. 227 (1998)); In re Genesis Health Venture, Inc., 266 B.R. 591, 610 (Bank. D. Del. 2001) (adopting same test); In re Lernout & Houspie Speech Prods., N.V., 301 B.R. 651 (Bankr. D. Del. 2003) (same).

      21.    Each of these elements of unfair discrimination could not be more conspicuously present in the instant case. Although the holders of QUIPS contractually agreed to subordinate their claims to "Senior Indebtedness" – obligations "for borrowed money," claims

arising from the QUIPS are pari passu with other unsecured claims. Simply put, the claims in Classes 8, 9 and 11 all have identical priority against the assets in Debtor's estate.

22. Yet, the treatment of such claims under the Plan could not be any more different. Under the Plan, holders of Class 9 and Class 11 claims will receive not less than a 73.7% and 100% recovery on their respective claims; while the holders of Class 8 claims (if in fact the Class votes to accept the plan) can expect to receive at most only a 3.6% recovery on their claims. Section 1129(b)(1) bars such grossly unfair discrimination and precludes confirmation of the Plan absent the consent of the holders of QUIPS claims.

### E. The Plan is Not Fair and Equitable Because it Pays Senior Debt Value in Excess of the Amount of their Claims to the Detriment of Junior Creditors.

23. A plan can be confirmed over the rejection of the impaired class only if the plan is "fair and equitable." See 11 U.S.C. § 1129(b)(2). To be fair and equitable, a plan must meet the Bankruptcy Code's absolute priority rule. Similarly, it is well settled that "a corollary of the absolute priority rule is that a senior class can not receive more than full compensation for its claims." In re Exide Technologies, et al., 303 B.R. 48, 61 (Bankr. D. Del. 2003) (citations omitted); In re Genesis Health Ventures, Inc., 266 B.R. 591, 612 (Bankr. D. Del. 2001).[4]

24. As detailed above, the Plan provides that holders of Class 7 Unsecured Note Claims Class 9 General Unsecured Claims will receive their pro rata share of not less than 98% of the New Common Stock issued under the Plan. Discovery in connection with confirmation of Plan, however, has revealed that the value of the New Common Stock to be

---

[4] The legislative history of the absolute priority rule further emphasizes the statutory basis for this collorary:

> One requirement applies generally to all decrees before the Court may confirm under this subsection. No class may be paid more than full.

*(Footnote continued on next page)*

distributed to Class 7 and Class 9 on the Effective Date exceeds the allowed amount of those claims and in fact is likely to be more than sufficient to pay Class 8 claims in full.

25.     Specifically, information disclosed by the Debtor and its testifying experts since approval of the Disclosure Statement has revealed that the value of the reorganized Debtor's New Common Stock proffered in the Disclosure Statement substantially understates the true enterprise value of the Debtor because, among other things, it is premised on flawed methodologies and marbled with defective economic, demographic and regulatory assumptions. Based on that discovery and on the valuation report prepared by Seneca Financial Group, Inc. obtained from RCG Carpathia Master Fund, Ltd. and Kellog Capital Group, LLC, (the Shareholders") the Indenture Trustee believes that the true enterprise value of the reorganized Debtor could be as high as between $2.2 billion and $2.4 billion.[5] The Indenture Trustee, accordingly, joins the shareholders objection to confirmation based on the absolute priority rule and reserves the right to challenge the value of the Debtor ascribes to the New Common Stock to be distributed under the Plan and to contest any clam down of the Plan on absolute priority grounds.

F.      **To the Extent that Senior Unsecured Debt is Void or Subordinated Because it Was Issued or Acquired in Violation of PUHCA, the Distributions to the Holders of Class 7 Claims Contemplated by the Plan Are Contrary to §§ 1129(a)(1) and 1129(b)(2).**

26.     As detailed previously, the Plan contemplates that the holders of Class 7 claims will receive a share in 98-100% of the New Common Stock in the reorganized Debtor;

---

*(Footnote continued from previous page)*
House Report No. 95-595, 95th Cong., 1st Sess. 413-418 (1977).

[5] At the hearing to consider confirmation of the Plan, the Indenture Trustee also reserves the right to rely on the valuation report prepared by Goldin Associates LLC and Bob Anderson, prepared on behalf of Wilmington.

while the holders of QUIPS and other Class 8 claims against the Debtor, in contrast, will only be allowed to share in not more than 2% of New Common Stock issue of the Effective Date.

27. The substantial majority of Class 7 claims (approximately $770 million out of $898 million), however, are subject to an objection by Harbert and Wilmington that certain of the Senior Unsecured Debt was issued and/or acquired in contravention of PUHCA and, therefore, should be disallowed or alternatively, stripped of its senior status[6]. To the extent that Class 7 claims are disallowed or treated as pari passu with other unsecured claims, the distribution scheme contemplated by the Plan is contrary to §§ 1129(a)(1) and 1129(b). The Indenture Trustee, accordingly, joins Harbert's objection to the confirmation based on PUHCA and reserves the right to contest confirmation of the Plan on the grounds that distributions contemplated by the Plan are contrary to PUHCA and unfairly discriminate among unsecured claims of identical priority.

    **G.**    **The Plan Impermissibly Releases Claims that the Debtor's Estate May Have Against the Debtor's Officers and Directors and Other Third Parties for No Consideration**

28. The form of ballot (the "Ballot") to be executed by holders of impaired claims for voting to accept or reject the Plan allows the claim holder to vote to reject certain non-debtor releases contained in Article X of the Plan. However, a vote to reject the releases, injunctions and exculpations in the Plan is limited to a rejection of the releases provided by third

---

[6] Among other things, Harbert and Wilmington allege that Northwestern's application for an exemption from various aspects of PUHCA when it issued certain of the Senior Unsecured Debt was false, misleading and not filed in good faith. They further contend that, among other things, the persons who acquired such debt securities had actual knowledge of the Debtor's misconduct and that any protection afforded to secondary purchasers of those securities under PUHCA Section 26 (c)(2) (15 U.S.C. § 79(c)(2)) should be limited to the consideration actually paid for the Senior Unsecured Debt.

parties to the Debtor and certain non-Debtor entities, and does not extend to releases given by the Debtor for any causes of actions it may assert against the "General Released Parties."[7]

29. Section 10.3 of the Plan provides, in part, that

> [E]ach of the General Released Parties hereby unconditionally forever releases, waives and discharges all known and unknown Causes of Action of any nature that such General Released Party has asserted, may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the other General Released Parties based on any act or omission relating to the Debtor or the Debtor's business operations … or the Chapter 11 Case on or prior to the Effective Date.

30. "General Released Parties", as defined in Section 10.2 of the Plan, is so overly broad and inclusive that by virtue of Section 10.3 of the Plan, the Debtor is releasing, waiving and discharging any claims it has or may have against, among others, the Creditors' Committee, the DIP Lenders, and each of the their respective (as well as the Debtor's) affiliates, parents, subsidiaries, officers and directors, or any of their former or present, advisors or professionals. Thus, the Debtor, through its release of all "Causes of Action of any nature," is abandoning every potential colorable claim and cause of action that may ultimately result in great value to the Debtor's estate. The Debtor is releasing all of these claims despite the fact that many of its creditors, including the holders of the QUIPS, are receiving minimal recoveries pursuant to the Plan, and is thereby waiving its right to enhance the Debtor's estate and, consequently, provide a greater recovery to creditors pursuant to the Plan.

31. As this Court is aware, the Debtor is seeking to settle a number of substantial claims (including derivative claims) brought by shareholders for an aggregate amount

---

[7] "General Released Parties" is defined in Section 10.2 of the Plan as "each of the Debtor, the Reorganized Debtor, the DIP Lenders, the Creditors' Committee, and each of their respective parents, subsidiaries, Affiliates, Officers or
*(Footnote continued on next page)*

of approximately $100 million.  The settlement of these claims illustrates that the value of the claims being released far exceeds $100 million.  By releasing these claims, the Debtor is depriving creditors, who are currently not receiving any distributions under the Plan, from receiving a recovery on account of their claims.  In fact, even if one were to assume that the valuation underlying the Plan represents the Debtor's true enterprise value on a going concern basis, if the value of the claims being settled and the potential claims being released were added to the Debtor's enterprise value, the added value would provide those creditors who are currently receiving nothing under the Plan with actual recovery on account of their claims. Thus, by virtue of the releases contained in Section 10.3 of the Plan, the Debtor is forfeiting considerable value that would inure to the benefit of the Debtor's creditors.

        32. In addition, the Plan is ambiguous with respect to the effect that a vote to reject the "Releases" contained in Article X of the Plan will have on a creditor's ability to bring its claims against non-debtor entities.  To the extent that the Debtor asserts that the holders' of QUIPS claims vote to reject the "Releases" in Article X of the Plan does not allow such holder to pursue any claims it may have against any non-debtor entities, the Indenture Trustee reserves the right to submit further briefing with respect to the inappropriateness of the releases contained in the Plan on the grounds that the sweeping discharge provided by the Plan violates section 524(e) of the Bankruptcy Code, as well as prevailing Third Circuit precedent[8] and, therefore, is unlawful.

---

*(Footnote continued from previous page)*
Directors, or any of their former or present stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals in their capacities as such."

[8] Courts within the Third Circuit have held that the type of non-consensual non-debtor release provisions that the Debtor seeks in the Plan violates the Bankruptcy Code.  See In re Continental Airlines, 203 F.3d 203, 214 n.11 (3d Cir. 2000) (citing In re Zenith Electronics Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999); In re Arrowmill Dev. Corp., 211 B.R. 497, 506-507 (Bankr. D. N.J. 1997)).

## **CONCLUSION**

33. Based on the foregoing, the Indenture Trustee respectfully requests that an order be entered denying confirmation of the Plan and granting such other relief as the Court deems just and proper.

August 9, 2004

                                           SMITH, KATZENSTEIN & FURLOW, LLP

                                           /s/Kathleen M. Miller
                                           Kathleen M. Miller (DE No. 2898)
                                           800 Delaware Avenue, 7th Floor
                                           P.O. Box 410
                                           Wilmington, DE 19899
                                           Telephone:     (302) 652-8400
                                           Facsimile:       (302) 652-8405

                                                              - and -

                                           NIXON PEABODY LLP
                                           John V. Snellings (BBO No. 548791)
                                           Francis C. Morrissey  (BBO No. 567589)
                                           Lee Harrington (BBO No. 548791)
                                           100 Summer Street
                                           Boston, MA 02110
                                           Telephone:     (617) 345-1201
                                           Facsimile:       (866) 947-1732

                                           Counsel for Law Debenture Trust Company of
                                           New York