# APP. 13

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
|  | : |
| Debtor. | : |
|  | : |
|  | : **Hearing Date: August 25, 2004** |
|  | : **9:00 a.m. MST** |
|  | : |

---

### MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
### OF DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**PAUL, HASTINGS, JANOFSKY &**
**WALKER LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
(404) 815-2400

**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street
Suite 1540
Wilmington, DE 19801
(302) 661-7000

Co-Counsel to the Debtor and Debtor-in-Possession

Dated: August 18, 2004
     Wilmington, Delaware

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................1

II.  THE SETTLEMENT ...............................................................................3

III. THE FACTUAL BACKGROUND ..........................................................4

    A.   The Debtor and Appointment of The Committee ..................................4

    B.   The Plan Solicitation of the First Amended Plan .................................5

    C.   The Plans .............................................................................................8

IV.  JURISDICTION AND VENUE ............................................................14

V.   THE SECOND AMENDED PLAN COMPLIES WITH ALL OF THE
    APPLICABLE REQUIREMENTS OF SECTION 1129 OF THE
    BANKRUPTCY CODE AND SHOULD BE CONFIRMED .........................14

    A.   The Second Amended Plan Meets The Objectives Of Chapter 11 ......14

    B.   The Second Amended Plan Satisfies the Applicable Confirmation
        Requirements Set Forth in Section 1129(a) of the Bankruptcy Code .................14

        1.   The First Amended Plan and Second Amended Plan Comply with
            the Applicable Provisions of Title 11 ......................................................14

        2.   The Classification of Claims and Interests in the Plan is Proper.............15

        3.   The First Amended Plan and Second Amended Plan Comply with
            the Mandatory Provisions of Section 1123(a) .........................................16

        4.   The Plan Complies with the Permissive Provisions of Section
            1123(b)....................................................................................................21

VI.  SUMMARY...........................................................................................24

    A.   The Debtor has Complied with the Applicable Provisions of Title 11 .................24

        1.   The Debtor has Complied with the Disclosure Requirements of
            Section 1125(b) of the Bankruptcy Code ................................................25

        2.   The Proposed Resolicitation Procedures .................................................26

        3.   The Debtor has Received the Requisite Accepting Votes Pursuant
            to Section 1126 of the Bankruptcy Code .................................................27

        4.   The Debtor has Complied with Bankruptcy Rule 3016............................29

        5.   Both Plans Have Been Proposed in Good Faith and not by any
            Means Forbidden by Law ........................................................................30

        6.   Payments Made or Promised for Services or for Costs and
            Expenses in or in Connection with the Plan have been Disclosed or
            are Subject to Court Approval .................................................................32

# TABLE OF CONTENTS
## (continued)

Page

7.     The Plan Complies with the Requirements of Section 1129(a)(5) ...........34

8.     Neither Plan Contains Rate Changes ........................................35

9.     Both Plans are in the "Best Interests" of Each Creditor and Equity Security Holders ................................................................35

10.    Acceptance of the Plan ....................................................41

11.    Priority Claims are Treated Appropriately under the Plan ......................56

12.    At Least One Impaired Class Of Claims Has Accepted The Plan............58

13.    The Plan is Feasible .......................................................58

14.    28 U.S.C. 1930 Fees Have Been Or Will Be Paid...................................62

15.    Retiree Benefits ...........................................................63

B.     The Plans Comply with Section 1129(d) of the Bankruptcy Code .....................63

C.     The Second Amended Plan Complies with Section 1127 of the Bankruptcy Code................................................................................64

VII.    THE DISCHARGE, RELEASE AND INJUNCTIVE PROVISIONS OF BOTH OF THE PLANS ARE REASONABLE AND CONSISTENT WITH APPLICABLE LAW ................................................................65

A.     The Discharge Provisions of the Plans are Appropriate ......................65

B.     The Release, Exculpation and Injunction Provisions of the Second Amended Plan are Appropriate ................................................65

1.     The Release, Exculpation and Injunctions to be Given by Third Party Non-Debtors are Consensual..........................................66

2.     The Exculpation and Release are Limited in Scope ................................67

3.     The Release, Exculpation and Injunctions to be Given by the Debtor are Appropriate under Controlling Case Law..............................68

C.     As with the Releases and Exculpation, the D&O Trust Channeling Injunction and D&O Insurance Entity Injunction are Appropriate and Necessary to Implement the D&O Trust .............................................73

VIII.   DEBTOR'S RESPONSE TO OBJECTIONS OF MAGTEN AND LAW DEBENTURE................................................................................77

A.     Objection to Adequate Information...................................................77

B.     Objection to Classification Scheme ................................................78

C.     Objection to Treatment of Class 8 Claims..........................................79

D.     Objection to Releases .....................................................83

**TABLE OF CONTENTS**
(continued)

**Page**

IX.    RESPONSE TO OBJECTION OF RCG AND DAVID FISHEL ....................................84

X.     RESPONSE TO HYLLAND OBJECTION....................................................................86

XI.    REMAINING OBJECTIONS ........................................................................................88

XII.   CONCLUSION..............................................................................................................89

CONFIRMATION MEMORANDUM OF LAW

# TABLE OF AUTHORITIES

**Page**

## CASES

In re A.G. Consultants Grain Division, Inc.,
  77 B.R. 665 (Bankr. N.D. Ind. 1987) ............................................................37
In re Acequia, Inc.,
  787 F.2d 1352 (9th Cir. 1986) ......................................................................20
In re American Family Enterprises,
  256 B.R. 377 (D.N.J. 2000) ..........................................................................30
In re Apex Oil Co.,
  118 B.R. 683 (Bankr. E.D. Mo. 1990).........................................................34
In re Aztec Co.,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) .....................................................83
Bank of America National Trust & Sav. Association v. 203 N. LaSalle St. Partnership, ,
  526 U.S. 434 (1999).................................................................................35, 36
In re Bergman,
  585 F.2d 1171 (2d Cir. 1978) .......................................................................59
Berkeley Federal Bank & Trust v. Sea Garden Motel & Apartments, (In re Sea Garden
    Motel & Apartment),
  195 B.R. 294 (D.N.J. 1996) ..........................................................................59
Boston Post Road L.P. v. FDIC (In re Boston Post Road L.P.),
  21 F.3d 477 (2d Cir. 1994), cert. denied, 513 U.S. 1109 (1995) ................15
In re Cellular Information System, Inc.,
  171 B.R. 926 (Bankr. S.D.N.Y. 1994).....................................................30, 59
In re Central Jersey Airport Services, LLC,
  282 B.R. 176 (Bankr. D.N.J. 2002) ..............................................................66
In re Central Medical Ctr., Inc.,
  122 B.R. 568 (Bankr. E.D. Mo. 1990)..........................................................19
Century Glove, Inc. v. First America Bank,
  860 F.2d 94 (3d Cir. 1988) ...........................................................................26
Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),
  767 F.2d 417 (8th Cir. 1985) ........................................................................59
Cohen v. National Union Fire Insurance Co. (In re County Seat Stores, Inc.),
  280 B.R. 319 (Bankr. S.D.N.Y. 2002)...........................................................71
In re Combustion Engineering, Inc.,
  295 B.R. 459 (Bankr. D. Del. 2003) .............................................................74
In re Commercial W. Finance Corp.,
  761 F.2d 1329 (9th Cir. 1985) ......................................................................15
In re Consul Restaurant Corp.,
  146 B.R. 979 (Bankr. D. Minn. 1992) ..........................................................83
Crowthers McCall,
  120 B.R. at 297-98........................................................................................38
In re Dow Corning Corp.,
  280 F.3d 648 (6th Cir. 2002) ........................................................................74
In re Drexel Burnham Lambert Group, Inc.,

## <u>TABLE OF AUTHORITIES (continued)</u>

**Page**

138 B.R. 723 (Bankr. S.D.N.Y. 1992)............................................................14, 16, 60, 61

<u>In re Entz-White Lumber & Supply, Inc.</u>,
850 F.2d 1338 (9th Cir. 1988) ........................................................................................28

<u>In re Exide Techs.</u>,
303 B.R. 48 (Bankr. D. Del. 2003) ............................................................................66, 69

<u>In re Fur Creations By Varriale, Ltd.</u>,
188 B.R. 754 (Bankr. S.D.N.Y. 1995)A ..........................................................................36

<u>In re Future Energy Corp.</u>,
83 B.R. 470 (Bankr. S.D. Ohio 1998) ..............................................................................36

<u>In re Genesis Health Ventures, Inc.</u>,
266 B.R. 591 (Bankr. D. Del. 2001)..........................................................47, 52, 67, 69

<u>Gillman v. Continental Airlines (In re Continental Airlines)</u>,
203 F.3d 203 (3d Cir. 2000) ......................................................................................66, 69

<u>In re Global Ocean Carriers Ltd.</u>,
251 B.R. 31 (Bankr. D. Del. 2000) ..................................................................................70

<u>In re Greate Bay Hotel & Casino, Inc.</u>,
251 B.R. 213 (Bankr. D.N.J. 2000) ................................................................................82

<u>Grogan v. Garner</u>,
498 U.S. 279 (1991)..........................................................................................................14

<u>Gruen Marketing Corp. v. Asia Commercial Co. (In re Jewelcor Inc.)</u>,
150 B.R. 580 (Bankr. M.D. Pa. 1992) ..............................................................................23

<u>In re Heron, Burchette, Ruckert & Rothwell</u>,
148 B.R. 660 (Bankr. D.D.C. 1992) ................................................................................15

<u>In re IPC Atlanta L.P.</u>,
142 B.R. 547 (Bankr. N.D. Ga. 1992) ..............................................................................59

<u>In re Jartran, Inc.</u>,
44 B.R. 331 (Bankr. N.D. Ill. 1984) ................................................................................37

<u>Jasik v. Conrad (In re Jasik)</u>,
727 F.2d 1379 (5th Cir. 1984), <u>reh' g denied</u>, 731 F.2d 888 (5th Cir. 1984) ...................30

<u>In re Johns-Manville Corp.</u>,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), <u>aff'd in part, rev'd in part on other grounds</u>,
78 B.R. 407 (S.D.N.Y. 1987), <u>aff'd sub nom.</u>, <u>Kane v. Johns-Manville Corp.</u>, 843
F.2d 636 (2d Cir. 1988) ............................................................................15, 24, 42, 60

<u>In re Joint E. & S. District Asbestos Litigation</u>,
982 F.2d 721 (2d Cir. 1992), <u>modified on reh'g</u>, 993 F.2d 7 (2d Cir. 1993) ..............18, 19

<u>Kane v. Johns-Manville Corp.</u>,
843 F.2d 636 (2d Cir. 1988) ................................................................15, 24, 42, 59, 60

<u>In re Kemp</u>,
134 B.R. 413 (Bankr. E.D. Cal. 1991)..............................................................................14

<u>In re Lakeside Global II, Ltd.</u>,
116 B.R. 499 (Bankr. S.D. Tex. 1989) ............................................................................58

## TABLE OF AUTHORITIES (continued)

**Page**

In re Leslie Fay Cos.,
207 B.R. 764 (Bankr. S.D.N.Y. 1997)..............................................................30

In re MCorp. Finance, Inc.,
160 B.R. 941 (S.D. Tex. 1993) ................................................................47, 48

In re MCorp. Financial, Inc.,
137 B.R. 219 (Bankr. S.D. Tex. 1992) ...........................................................52

Manville Corp. v. Equity Sec. Holders Committee (In re Johns-Manville Corp.),
801 F.2d 60 (2d Cir. 1986) ..............................................................................18

In re Master Mortgage Investment Fund, Inc.,
168 B.R. 930 (Bankr. W.D. Mo. 1994) ...........................................................68

In re Mayer Pollock Steel Corp.,
174 B.R. 414 (Bankr. E.D. Pa. 1994)...............................................................60

Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.),
880 F.2d 694 (6th Cir. 1989) ...........................................................................74

NLRB v. Bildisco & Bildisco,
465 U.S. 513 (1984)..........................................................................................14

In re Nuclear Imaging,
270 B.R. 365 (Bankr. E.D. Pa. 2001) ..............................................................47

Official Unsecured Creditors' Committee v. Stern (In re SPM Manufacturing Corp.),
984 F.2d 1305 (1st Cir. 1993)..........................................................................47

In re Orlando Investors, L.P.,
103 B.R. 593 (Bankr. E.D. Pa. 1989) ..............................................................60

In re PWS Holding Corp.,
228 F.3d 224 (3d Cir. 2000), cert. denied, 538 U.S. 924 (2003) ................24, 67

In re Parke Imperial Canton, Ltd.,
No. 92-61004, 1994 WL. 842777 (Bankr. N.D. Ohio Nov. 14, 1994) ............47

Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture (In re Greystone III
Joint Venture),
995 F.2d 1274 (5th Cir. 1991), cert. denied, 506 U.S. 821 (1992) ................15

Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.),
761 F.2d 1374 (9th Cir. 1985) .........................................................................61

In re Prudential Energy Co.,
58 B.R. 857 (Bankr. S.D.N.Y. 1986).................................................................61

In re Resorts International, Inc.,
145 B.R. 412 (Bankr. D.N.J. 1990) ...............................................18, 24, 42, 61

In re River Village Associates,
161 B.R. 127 (Bankr. E.D. Pa. 1993), aff'd, 181 B.R. 795 (E.D. Pa. 1995).....33

In re Rolling Green Country Club,
26 B.R. 729 (Bankr. D. Minn. 1982) ...............................................................58

In re Sound Radio, Inc.,
93 B.R. 849 (Bankr. D.N.J. 1988) ..............................................................30, 60

CONFIRMATION MEMORANDUM OF LAW

## <u>TABLE OF AUTHORITIES (continued)</u>

**Page**

In re Specialty Equip. Cos.,
  3 F.3d 1043 (7th Cir. 1993) ....................................................................................67
In re Stratford Associates L.P.,
  145 B.R. 689 (Bankr. D. Kan. 1992) .......................................................................60
Sure-Snap Corp. v. State St. Bank & Trust Co.,
  948 F.2d 869 (2d Cir. 1991) ...................................................................................25
In re Teligent, Inc.,
  282 B.R. 765 (Bankr. S.D.N.Y. 2002).....................................................................47
In re Texaco,
  84 B.R. 893 (Bankr. S.D.N.Y 1988).........................................................25, 30, 61
In re Toy & Sports Warehouse, Inc.,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984).......................................................34, 36, 61
In re U.S. Truck Co., Inc.,
  47 B.R. 932 (E.D. Mich. 1985), aff'd, 800 F.2d 581 (6th Cir. 1986) ...............32
In re Union Finance Services Group, Inc.,
  303 B.R. 390 (Bankr. E.D. Mo. 2003).....................................................48, 49, 79
In re Victory Construction Co., Inc.,
  42 B.R. 145 (Bankr. C.D. Cal. 1984) ......................................................................37
In re Walnut Equipment Leasing Co.,
  No. 97-19699, 1999 WL. 1068448 (Bankr. E.D. Pa. Nov. 23, 1999) ..............83
In re White Glove, Inc.,
  1998 WL. 731611 (Bankr. E.D. Pa. Oct 4, 1998)............................................47
In re Wiggles,
  7 B.R. 373 (Bankr. N.D. Ga. 1980) ......................................................................30
In re Wolf,
  61 B.R. 1010 (Bankr. N.D. Iowa 1986) ................................................................61
In re Zenith Electrics Corp.,
  241 B.R. 92 (Bankr. D. Del. 1999)....................................................................66, 69

## STATUTES

11 U.S.C. § 1122..............................................................................................................15
11 U.S.C. § 1123..............................................................................................................15
11 U.S.C. §1123(a)(1) .....................................................................................................17
11 U.S.C. § 1123(a)(2) ....................................................................................................17
11 U.S.C. § 1123(a)(3) ....................................................................................................18
11 U.S.C. § 1123(a)(4) ....................................................................................................18
11 U.S.C. § 1123(a)(5) ....................................................................................................19
11 U.S.C. § 1123(a)(6) ....................................................................................................20
11 U.S.C. § 1123(a)(7) ....................................................................................................21
11 U.S.C. § 1123(b)..........................................................................................................21

## <u>TABLE OF AUTHORITIES (continued)</u>

**Page**

11 U.S.C. § 1123(b)(1) ................................................................................21
11 U.S.C. § 1124 ........................................................................................18
11 U.S.C. § 1126(a) ...................................................................................28
11 U.S.C. § 1126(c) ...................................................................................29
11 U.S.C. § 1126(f) ....................................................................................28
11 U.S.C. § 1126(f) ......................................................................................8
11 U.S.C. § 1126(g) ...............................................................................8, 28
11 U.S.C. § 1127(a) ...................................................................................64
11 U.S.C. § 1129 ........................................................................................51
11 U.S.C. § 1129 (a) ....................................................................................4
11 U.S.C. § 1129(a)(10) ............................................................................58
11 U.S.C. § 1129(a)(11) ............................................................................58
11 U.S.C. § 1129(a)(12) ............................................................................62
11 U.S.C. § 1129(a)(13) ............................................................................63
11 U.S.C. § 1129(a)(2) ..............................................................................24
11 U.S.C. § 1129(a)(3) ..............................................................................30
11 U.S.C. § 1129(a)(4) ..............................................................................32
11 U.S.C. § 1129(a)(5) ..............................................................................34
11 U.S.C. § 1129(a)(6) ..............................................................................35
11 U.S.C. § 1129(a)(7) ..............................................................................35
11 U.S.C. § 1129(a)(8) ..............................................................................41
11 U.S.C. § 1129(b) ..............................................................................42, 49
11 U.S.C. § 1129(b)(2) ....................................................................50, 51, 52
11 U.S.C. § 1129(d) ..............................................................................63, 64
11 U.S.C. § 365 ..........................................................................................22
11 U.S.C. § 726 ..........................................................................................38
28 U.S.C. § 1334 ........................................................................................14
28 U.S.C. §§ 1408 ......................................................................................14
28 U.S.C. §§ 157 ........................................................................................23
28 U.S.C. § 157(b)(2) ................................................................................14
28 U.S.C. 1930 .....................................................................................62, ii
28 U.S.C. § 1961 ........................................................................................57

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1978) ................................79, 80, 81, 82

## MISCELLANEOUS

5 Lawrence P. King, <u>Collier on Bankruptcy</u> ¶ 1122.03[3], at 1122-8 (15th ed. rev. 2004) ..........15
7 Lawrence P. King, <u>Collier on Bankruptcy</u> ¶ 1123.01[6], at 1123-14 (15th ed. rev. 2004)20, 32, 60

- v -

## <u>TABLE OF AUTHORITIES (continued)</u>

**Page**

9 Lawrence P. King, <u>Collier on Bankruptcy</u> ¶ 3019.01, at 3019-3 (15th ed. rev. 2004) ...............64

6 Queenan <u>et al.</u>, Chapter 11 ......................................................................................................23

CONFIRMATION MEMORANDUM OF LAW

## I.     INTRODUCTION

NorthWestern Corporation ("NorthWestern" or the "Debtor") submits this Memorandum of Law in Support of Confirmation of the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of Bankruptcy Code dated August 18, 2004 (as it may be amended or supplemented and including its Exhibits, the "Second Amended Plan"). The Second Amended Plan evidences the proposed settlement as between the Debtor and Classes 7, 8 and 9 in response to Class 8's rejection of the Debtor's proposed First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated May 17, 2004 (the "First Amended Plan"). The settlement is more fully described in the Debtor's Second Amended and Restated Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of the Debtor dated August 18, 2004 (the "Second Amended Disclosure Statement").[1]

NorthWestern was incorporated in 1923 and is a publicly traded Delaware corporation. NorthWestern and its direct and indirect non-Debtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

On September 14, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). After substantial effort and negotiations with various creditor constituencies, the Debtor filed its Plan of Reorganization and Disclosure Statement on March 11, 2004 and its First Amended Plan on

---

[1]     Unless otherwise indicated, all capitalized terms used herein have the same meaning defined in the Second Amended Plan. The Second Amended Plan and Second Amended Disclosure Statement are being filed concurrently herewith. As discussed below, contemporaneously herewith the Debtor has filed its motion for an order seeking approval of the Second Amended Disclosure Statement and the resolicitation procedures.

May 17, 2004. After certain modifications, on May 26, 2004, the Court approved the Debtor's First Amended Disclosure Statement Pursuant To Section 1125 of the Bankruptcy Code dated as of May 17, 2004 (the "First Amended Disclosure Statement") and entered an order (i) authorizing solicitation of votes, (ii) scheduling a confirmation hearing for the First Amended Plan for August 25, 2004 (the "Confirmation Hearing"), (iii) establishing notice requirements regarding the Confirmation Hearing and approving the form and manner of notice, and (iv) granting related relief respecting the Debtor's First Amended Plan [Docket No. 1305, dated May 26, 2004] (the "Disclosure Statement Order").

On or about June 4, 2004, the Debtor commenced solicitation of votes from Impaired Classes of creditors entitled to vote on the First Amended Plan. The Debtor sent copies of the First Amended Disclosure Statement, the First Amended Plan, and a ballot to each creditor and solicited votes to accept or reject the First Amended Plan, in accordance with Section 1126(b) of the Bankruptcy Code. The voting period ended at 5:00 p.m. (PDT) on August 2, 2004 (the "Voting Deadline").

The Debtor has received approximately seventeen (17) objections to confirmation of the First Amended Plan (the "Objections"). The Debtor believes that most of the Objections have been resolved consensually or withdrawn through the proposed settlement discussed in greater detail below. As the table attached hereto as Exhibit A indicates, a majority of the remaining Objections have been resolved through proposed technical modifications and amendments now set forth in the Debtor's proposed Second Amended Plan. The remaining unresolved Objections relate to:

    (1)      the classification of Class 8 Claims;
    (2)      discharges, releases and injunctions under the First Amended Plan;
    (3)      the absolute priority rule; and

CONFIRMATION MEMORANDUM OF LAW

(4)   cramdown.

Contemporaneously with the filing of this Confirmation Memorandum of Law the Debtor has filed the following:  (i) the Second Amended Plan; (ii) Second Amended Disclosure Statement and Summary Disclosure Statement; (iii) Motion for an Order (A) Approving Debtor's Summary Disclosure Statement and Summary Disclosure Statement; (B) Establishing Procedures for Limited Resolicitation and Tabulation of Votes on Debtor's Second Amended and Restated Plan of Reorganization (the "Resolicitation Procedures"); (C) Approving the Form and Manner of Notice; and (D) Granting Related Relief (the "Resolicitation Procedures Motion"); and (iv) Offer of Proof and Outline of Evidence in Support of the Adequacy of Debtor's Procedures and Notice in Conjunction with its Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Offer of Proof").

## II.   THE SETTLEMENT

Since entry of the Disclosure Statement Order, settlement negotiations have taken place by and among representatives and counsel for the Debtor, the Official Committee of Unsecured Creditors (the "Committee"), Wilmington Trust Company ("Wilmington Trust"), as indenture trustee under the TOPrS Indenture and Harbert Management Corporation ("Harbert"), on behalf of itself and on behalf of the investors it represents.

These settlement negotiations resulted in a proposed settlement agreement (the "Class 8 Settlement") pursuant to which Class 7 has agreed, in simple terms, to increase the Distribution to Class 8 by contributing a portion of the Distribution to which Class 7 is otherwise contractually and legally entitled.  The parties have further agreed to implement the Class 8 Settlement through the Second Amended Plan and through a resolicitation of Classes 7, 8 and 9 (approval of the Second Amended Disclosure Statement and of proposed Resolicitation

Procedures is being sought in the concurrently filed Resolicitation Procedures Motion). Treatment of Classes 7, 8 and 9 under the proposed Second Amended Plan is discussed in greater detail below. In short, Class 7 consensually is reducing its Distribution to increase the Distribution to Class 8 from 2% to 8%, and agreeing to the issuance of Warrants to Class 8 which shall be exercisable for an additional 13% of New Common Stock under the terms of the Second Amended Plan.

The Second Amended Plan is substantially similar to the First Amended Plan with the exception of the treatment of Class 7, 8 and 9 Claims as a result of the implementation of the proposed Class 8 Settlement, and certain amendments that have been made as a result of the Objections. At the Confirmation Hearing, the Debtor will accordingly seek approval of Resolicitation Procedures and related relief requested by the Resolicitation Procedures Motion and confirmation of the Second Amended Plan, subject only to resolicitation of Classes 7, 8 and 9.

The Second Amended Plan complies with all applicable provisions of the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). Compliance with the Bankruptcy Code includes compliance with Section 1129 (a) of the Bankruptcy Code and, as necessary, Section 1129(b) of the Bankruptcy Code, the cramdown provision.

## III.    THE FACTUAL BACKGROUND

### A.    The Debtor and Appointment of The Committee

The Debtor is a proper debtor under Section 109(d) of the Bankruptcy Code, and a proper proponent of the Second Amended Plan (which amends the First Amended Plan) under Section 1121(a) of the Bankruptcy Code. Since the Petition Date, the Debtor has continued to

CONFIRMATION MEMORANDUM OF LAW

operate its businesses and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in this case. The Committee was appointed by the Office of the United States Trustee on September 30, 2003. By Memorandum Decision dated May 13, 2004, this Court denied a request by certain equity holders for appointment of an official committee of equity security holders.

> **B.**      **The Plan Solicitation of the First Amended Plan**

After holding a hearing on May 17, 2004, the Court entered the Disclosure Statement Order on or about May 26, 2004. The Disclosure Statement Order (i) approved the First Amended Disclosure Statement, (ii) authorized solicitation of votes, (iii) scheduled the Confirmation Hearing, and (iv) established notice requirements regarding the Confirmation Hearing and approving the form and manner of notice.

To obtain requisite acceptance of the First Amended Plan, the Debtor solicited acceptances from creditor classes entitled to vote on the First Amended Plan (specifically, Classes 7, 8, 9 and 12) in accordance with Section 1126(b) of the Bankruptcy Code. Kurtzman Carson Consultants, LLC (the "Balloting Agent") prepared solicitation packages (the "Solicitation Package") which consisted of the following:

> (a)      the First Amended Plan;
>
> (b)      the First Amended Disclosure Statement;
>
> (c)      the Disclosure Statement Order;
>
> (d)      Notice of (1) Hearing to Consider Confirmation of the Debtor's First Amended Plan of Reorganization and Related Matters, and (2) the Time Within Which (a) Ballots Reflecting Acceptances or Rejections of the Plan Must be Received; and (b) Objections to Confirmation of the Plan Must be Served and Filed with the Court ("Confirmation Hearing Notice");
>
> (e)      Notice of Non-Voting Status with Respect to Unimpaired Classes 1, 2, 3, 4, 5, 6, 10, and 11 Deemed to Accept the Debtor's First

Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code;

(f)     Notice of Non-Voting Status with Respect to Impaired Classes 13 and 15 Deemed to Reject the Debtor's First Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code;

(g)     Notice of Non-Voting Status with Respect to Class 14 under the Debtor's First Amended Plan of Reorganization;

(h)     Notice to Class 7 and 8 Noteholders who filed Proofs of Claim;

(i)     a ballot for accepting or rejecting the First Amended Plan, intended for the appropriate voting classes as described below:

(1)     Beneficial Holders of Class 7 Unsecured Notes and Class 7 Master Ballot;

(2)     Beneficial Holders of Class 8 Unsecured Subordinated Notes and Class 8 Master Ballot;

(3)     Class 9 General Unsecured Claims;

(4)     Class 12 D&O Trust Claims; and

(j)     a self-addressed, postage paid return envelope.

On or before June 4, 2004, the Balloting Agent sent, via first class mail, the applicable Solicitation Package as detailed in the Solicitation Affidavit.[2]  All ballots were required to be returned to the Balloting Agent by the Voting Deadline.

The Confirmation Hearing Notice which contained the date, time and place of the Confirmation Hearing, as well as the deadline for filing objections to the confirmation of the First Amended Plan, was sent by first class mail to the following interested parties (collectively referred to herein as the "Notice Parties"):

(a)     all creditors of the Debtor;

(b)     all equity security holders of the Debtor;

(c)     all entities which are parties to executory contracts or unexpired leases with the Debtor;

(d)     all applicable federal, state and local taxing authorities;

(e)     the Internal Revenue Service;

(f)     the Securities and Exchange Commission;

(g)     the Office of the United States Trustee;

(h)     counsel for the Debtor's Pre-Petition Lenders;

---

2     The "Solicitation Affidavit" shall mean that certain Affidavit of Service of Kurtzman Carson Consultants, LLC as Claims and Noticing Agent for the Debtor and Debtor-in-Possession to Assist in the Dissemination of Solicitation Packages for the Debtor's First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code (Docket No. 1469, dated June 14, 2004).

Confirmation Memorandum of Law

(i)      counsel for the Debtor's Post-Petition Lenders;

(j)      counsel for the Official Committee of Unsecured Creditors;

(k)      the Federal Energy Regulatory Commission;

(l)      the Montana Public Service Commission;

(m)      the South Dakota Public Utilities Commission;

(n)      the Nebraska Public Service Commission;

(o)      the Environmental Protection Agency; and

(p)      all parties that have requested special notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.

In addition, the Debtor published the Confirmation Hearing Notice once in each of the following publications on June 7, 2004 as reflected by the Affidavits filed herein and identified below:

(a)      The Wall Street Journal (national edition); *See* Affidavit of Publication of Mike Henley in The Wall Street Journal [Docket No. 1564, dated June 29, 2004];

(b)      USA Today; *See* Affidavit of Publication of Jessica Jones in USA Today [Docket No. 1563, dated June 29, 2004];

(c)      Rapid City Journal; *See* Affidavit of Publication of Patricia K. Van Patten in Rapid City Journal [Docket No. 1562, dated June 29, 2004];

(d)      The New York Times (national edition); *See* Affidavit of Publication of Arlene Moller in The New York Times [Docket No. 1561, dated June 29, 2004];

(e)      The Missoulian; *See* Affidavit of Publication of Kalena Vanleuven in The Missoulian [Docket No. 1560, dated June 29, 2004];

(f)      The Great Falls Tribune; *See* Affidavit of Publication of Terry Vanlieshout in The Great Falls Tribune [Docket No. 1559, dated June 29, 2004];

(g)      The Billings Gazette; S*ee* Affidavit of Publication of Tammy Haar in The Billings Gazette [Docket No. 1558, dated June 29, 2004]; and

(h)      The Argus Leader; *See* Affidavit of Publication of Vicki Kiel in The Argus Leader [Docket No. 1557, dated June 29, 2004].

The results of the voting are contained in the Declaration of Voting Agent Regarding Tabulation of Votes in Connection with Debtor's First Amended Plan of Reorganization (the "Voting Agent Declaration"). As the Voting Agent Declaration reflects,

with the exception of Class 8, all Impaired Classes of Claims that voted, voted to accept the First Amended Plan. [3]

### C.    The Plans

Under the First Amended Plan and the Second Amended Plan, Claims against and Interests in the Debtor are categorized into Classes (with Class 8 subdivided further as described below).  In connection with the proposed Class 8 Settlement, and to address objections raised by Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture"), the Debtor with the Committee's agreement has divided Class 8 into two subclasses:  (i) Class 8(a) for the TOPrS Notes (Wilmington Trust and Harbert), and (ii) Class 8(b) for the QUIPS Notes (Law Debenture and Magten).  The division is appropriate and necessary to resolve Magten's ongoing classification objection and to compliment the terms of the proposed Class 8 Settlement with accepting Creditors such as Wilmington Trust and Harbert.  As set forth below at pages 44-47, the indenture documents for the TOPrS Notes and QUIPS Notes contain express language that makes the TOPrS Notes and QUIPS Notes subordinate to the senior debt held by the Class 7 claimants.  Moreover, certain creditors have asserted that the QUIPS Notes are subordinate to both Class 7 and the TOPrS Notes.

Class 1 (Priority Claims).  Class 1 Priority Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 1 Claim will be paid in full, in cash, as specified in the First Amended Plan, § 4.1, and Second Amended Plan, § 4.1.

---

[3]    Those Classes of Claims unimpaired by the First Amended Plan (specifically, Classes 1 through 6 and Classes 10, 11 and 14) are deemed to have accepted the First Amended Plan by virtue of Section 1126(f) of the Bankruptcy Code.  11 U.S.C. § 1126(f).  Those Classes of Claims and Interests Impaired by the First Amended Plan (specifically, Class 13 Equity Interests and Class 15 Opt-out Securities Claims) are not entitled to receive or retain any property or interest in property under the First Amended Plan and are deemed to reject the First Amended Plan by virtue of Section 1126(g) of the Bankruptcy Code.  11 U.S.C. § 1126(g).

CONFIRMATION MEMORANDUM OF LAW

Class 2 (Unsecured Priority Claims).  Class 2 Unsecured Priority Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 2 Claim will be paid in full, in cash, as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.2, and Second Amended Plan, § 4.2.

Class 3 (Bank One DIP Financing Claims).  Class 3 Bank One DIP Financing Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 3 Claim will have its Claim paid in full on the Effective Date as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.3, and Second Amended Plan, § 4.3.

Class 4 (CSFB Financing Claims).  Class 4 CSFB Financing Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 4 Claim will be satisfied through the continuation of such Allowed CSFB Financing Claim pursuant to the CSFB Order and the CSFB Financing Documents as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.4, and Second Amended Plan, § 4.4.

Class 5 (Secured Bondholder Claims).  Class 5 Secured Bondholder Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 5 Claim will have its Claim reinstated as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.5, and Second Amended Plan, § 4.5.

Class 6 (Other Secured Claims).  Class 6 Other Secured Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 6 Claim will have its Claim reinstated as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.6, and Second Amended Plan, § 4.6.

CONFIRMATION MEMORANDUM OF LAW

Class 7 (Unsecured Note Claims). Class 7 is directly impacted by the proposed Class 8 Settlement and, as identified in the Second Amended Plan, Class 7 Unsecured Note Claims are Impaired under the Second Amended Plan. Each holder of an Allowed Class 7 Unsecured Note Claim and Allowed Class 9 General Unsecured Claim which does not choose to be an Allowed Convenience Claim will receive its Pro Rata Share of: (a) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants); plus (b) the 497,000 shares of New Common Stock allocated to Class 8(b), if Class 8(b), as a class, votes to reject the Second Amended Plan. Second Amended Plan, § 4.7(c).

Class 8 (Unsecured Subordinated Note Claims). Class 8 Unsecured Subordinated Note Claims remain Impaired under the Second Amended Plan. As discussed above, under the Second Amended Plan, Class 8 has been split into two classes: (i) Class 8(a) – Unsecured Subordinated Note Claims represented by TOPrS Notes and (ii) Class 8(b) – Unsecured Subordinated Note Claims represented by QUIPS Notes.

a.      Class 8(a) – Unsecured Subordinated Note Claims represented by TOPrS Notes. Each holder of Class 8(a) Claims will receive its Pro Rata Share of: (i) 2,343,000 shares of New Common Stock (such 2,343,000 shares representing 6.6% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants); plus (ii) Warrants exercisable for an additional 10.7% of New Common Stock. Second Amended Plan, § 4.8(a)(ii).

b.    Class 8(b) – Unsecured Subordinated Note Claims represented by QUIPS Notes.  So long as holders of Class 8(b) vote to accept the proposed Class 8 Settlement set forth in the Second Amended Plan, each holder of Allowed Class 8(b) Claims will receive its Pro Rata Share of: (i) 497,000 shares of New Common Stock (such 497,000 shares representing 1.4% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants); plus (ii) Warrants exercisable for an additional 2.3% of New Common Stock.  Second Amended Plan, § 4.8(b)(ii).  In the event holders of Allowed Class 8(b) Claims do not vote to accept the Second Amended Plan, then the holders of Allowed Class 8(b) Claims will not receive any distribution.  Second Amended Plan § 4.8(b)(ii).

Class 9 (General Unsecured Claims).  Class 9 General Unsecured Claims are Impaired under the First Amended Plan and Second Amended Plan.  Each holder of an Allowed Class 7 Unsecured Note Claim and Allowed Class 9 General Unsecured Claim which does not choose to be an Allowed Convenience Claim will receive its Pro Rata Share of: (a) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants); plus (b) the 497,000 shares of New Common Stock allocated to Class 8(b), if Class 8(b), as a class, votes to reject the Second Amended Plan.  Second Amended Plan, § 4.9(c).

Class 10 (Unsecured Convenience Claims).  Class 10 Unsecured Convenience Claims consist of each holder of an Allowed Class 9 General Unsecured Claim who (A) elects to participate in Class 10 (by voting to accept the Second Amended Plan and marking the Ballot in the space provided) and (B) holds a Claims that is in an amount either (i) up to $20,000 or (ii)

over $20,000, but which such holder elects to reduce to $20,000.  Class 10 Unsecured Convenience Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 10 Claim will be paid in full, in cash, as specified in the Second Amended Plan.  First Amended Plan, § 4.10, and Second Amended Plan, § 4.10.

Class 11 (Environmental Claims).  Class 11 Environmental Claims are Unimpaired under the First Amended Plan and Second Amended Plan and each holder of an Allowed Class 11 Claim will have its Claim reinstated as specified in the First Amended Plan and Second Amended Plan; provided, however, that Claims related to the Milltown Settlement and Stipulation shall be treated as provided for in the Milltown Settlement, Milltown Stipulation, the final consent decree and FERC order related to Milltown Dam.  First Amended Plan, § 4.11, and Second Amended Plan, § 4.11.

Class 12 (D&O Trust Claims).  Class 12 D&O Trust Claims are Impaired under the First Amended Plan and Second Amended Plan and will be paid from the D&O Trust in FIFO order based on the date of entry of the D&O Proceeding Final Order providing for a Final Award in the D&O Proceeding giving rise to such D&O Trust Claim as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.12, and  Second Amended Plan, § 4.12.

Class 13 (Other Equity Interests Claims).  Class 13 Other Equity Interests Claims are deemed Impaired under the First Amended Plan and Second Amended Plan.  The holders of Class 13 Claims shall not receive or retain any property or interest in property under the First Amended Plan and Second Amended Plan on account of such Claims.  First Amended Plan, § 4.13, and Second Amended Plan, § 4.13.

CONFIRMATION MEMORANDUM OF LAW

Class 14 (Securities Claims).  Class 14 Securities Claims are Unimpaired under the First Amended Plan and Second Amended Plan.  Allowed Class 14 Claims will be paid from the Settlement Fund in the amount of $41 million in accordance with the proposed Stipulation of Settlement to be entered in the Class Action as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.14, and Second Amended Plan, § 4.14.  Holders of Securities Claims who exercise the Opt-Out Election and preserve their rights to proceed against the Debtor in accordance with the requirements of the Class Action Settlement Documents shall be holders of Class 15 Claims.

Class 15 (Opt-Out Securities Claims).  Class 15 Opt-Out Securities Claims are deemed Impaired under the First Amended Plan and Second Amended Plan.  The holders of Class 15 Claims shall not receive or retain any property under the First Amended Plan and Second Amended Plan on account of such Claims as specified in the First Amended Plan and Second Amended Plan.  First Amended Plan, § 4.15, and Second Amended Plan, § 4.15.

Section 1123(a)(1) of the Bankruptcy Code does not require classification of certain priority claims against a debtor.  In the Chapter 11 Case, these unclassified Claims are (i) Administrative Claims for payment of a kind specified in Section 503(b) of the Bankruptcy Code and referred to in Section 507(a)(1) of the Bankruptcy Code, and (ii) Priority Tax Claims for payment of a kind specified in Section 503(b) of the Bankruptcy Code and referred to in Section 507(a)(8) of the Bankruptcy Code.

CONFIRMATION MEMORANDUM OF LAW

**IV.    JURISDICTION AND VENUE**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this Chapter 11 case and this Motion are proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**V.    THE SECOND AMENDED PLAN COMPLIES WITH ALL OF THE APPLICABLE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED**

**A.    The Second Amended Plan Meets The Objectives Of Chapter 11**

Chapter 11 of the Bankruptcy Code is designed to promote dual fundamental purposes.  Chapter 11 enables restructuring of a troubled company, thereby "prevent[ing] a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."  NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984); see In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).  The aim of Chapter 11 is also to resolve disputes with and facilitate fair and expeditious payment to creditors.  In re Kemp, 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991).  The First Amended Plan, as amended by the Second Amended Plan, meets these objectives by enabling the Debtor to avoid liquidation and providing for prompt and substantial distributions to creditors.  Under the Second Amended Plan, the Debtor will be restructured permitting it to emerge from Chapter 11 as a viable competitive enterprise.

**B.    The Second Amended Plan Satisfies the Applicable Confirmation Requirements Set Forth in Section 1129(a) of the Bankruptcy Code**

**1.    The First Amended Plan and Second Amended Plan Comply with the Applicable Provisions of Title 11**

A plan of reorganization must  meet the requirements of  Section 1129(a) of the Bankruptcy Code.  Grogan v. Garner, 498 U.S. 279, 291 (1991).  A plan must also comply with

- 14 –

the applicable provisions of Chapter 11, including Sections 1122 and 1123, which govern the classification of claims and interests and the mandatory and permissive contents of a plan of reorganization. 11 U.S.C. §§ 1122, 1123; In re Commercial W. Fin. Corp., 761 F.2d 1329, 1338 (9th Cir. 1985); In re Johns-Manville Corp., 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom., Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988). Here, the Second Amended Plan satisfies each of the relevant provisions of Sections 1129(a)(1), 1122, and 1123.

### 2.    The Classification of Claims and Interests in the Plan is Proper

11 U.S.C. § 1122(a) authorizes a plan to classify a claim or interest within a class if the claim or interest is substantially similar to other claims or interests in the class. "Substantially similar" means "similar in legal character or effect as a claim against the debtor's assets or as an interest in the debtor."  5 Lawrence P. King, Collier on Bankruptcy ¶ 1122.03[3], at 1122-8 (15th ed. rev. 2004); see also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1277 (5th Cir. 1991),  ("Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets") cert. denied, 506 U.S. 821 (1992).  Claim identity is not required.  In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 670 (Bankr. D.D.C. 1992) ("[S]ection 1122(a) requires only that claims in a class be substantially similar, not identical").  Rather, the debtor as the plan proponent is accorded broad discretion in classifying claims under Section 1122(a) provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar.  See Boston Post Rd. L.P. v. FDIC (In re Boston Post Rd. L.P.), 21 F.3d 477, 481 (2d Cir. 1994), cert. denied, 513 U.S. 1109 (1995) (asserting that plan proponent is not barred from separately

- 15 –

classifying similar claims but must show legitimate reason for separate classification of similar claims); Drexel, 138 B.R. at 757 ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.").

Articles II and III of the First Amended Plan and the Second Amended Plan designate 15 Classes of Claims and Interests.  Other than objections by Magten and Law Debenture which are addressed on pages 77-84 herein, no disputes exist as to the Debtor's classification of Claims under the First Amended Plan and Second Amended Plan.  Each Claim or Interest in these Classes is substantially similar to the other Claims or Interests in each Class. Each classification has a rational basis because it is based on the respective legal rights of each holder of a Claim or Equity Interest against the Debtor's Estate.  Because the Claims within each Class are substantially similar, and have been designated in appropriate priority order, the designation of Classes in the First Amended Plan and Second Amended Plan do not unfairly discriminate between or among holders of Claims and Equity Interests.  Accordingly, the Second Amended Plan's classification scheme complies with Section 1122(a) and should be approved.

**3.    The First Amended Plan and Second Amended Plan Comply with the Mandatory Provisions of Section 1123(a)**

Section 1123 of the Bankruptcy Code sets forth the mandatory and permissive contents of a plan.  As demonstrated below, the First Amended Plan and the Second Amended Plan each contain mandatory provisions listed in Section 1123(a) of the Bankruptcy Code.

(a)    Designation of Classes of Claims and Interests

11 U.S.C. §1123(a)(1) requires a debtor's plan to designate classes of claims other than claims of a kind specified in Section 507(a)(1) (administrative claims), Section 507(a)(2) (claims arising during the "gap" period in an involuntary case), and Section 507(a)(8) (tax claims) and to designate classes of interests. The First Amended Plan and Second Amended Plan each designate both Administrative Claims and Priority Tax Claims as "unclassified." First Amended Plan, § 2.1, and Second Amended Plan, § 2.1. Furthermore, because this is a voluntary Chapter 11 case, there are no Claims of the kind specified in Section 507(a)(2). All other Classes of Claims and Interests are designated in Articles II and III of the First Amended Plan and Second Amended Plan and are classified in Classes 1 through 15. First Amended Plan, §§ 4.1 through 4.15. Second Amended Plan, §§ 4.1 through 4.15. Accordingly, the First Amended Plan and Second Amended Plan each satisfy Section 1123(a)(1) of the Bankruptcy Code.

(b)    Specification of Unimpaired Classes

11 U.S.C. § 1123(a)(2) requires a debtor's plan to "specify any class of claims or interests that is not impaired under the plan." Article 4 of the First Amended Plan and Second Amended Plan provides that Classes 1 through 6, Classes 10 and 11 and Class 14, as well as Administrative Claims and Priority Tax Claims, are Unimpaired. First Amended Plan, § 4.1 through § 4.6, § 4.10, § 4.11 and § 4.14; Second Amended Plan § 4.1 through § 4.6, § 4.10, § 4.11 and § 4.14. Accordingly, the First Amended Plan and Second Amended Plan both satisfy Section 1123(a)(2) of the Bankruptcy Code.

CONFIRMATION MEMORANDUM OF LAW

(c)     Specification of Treatment of Impaired Classes

11 U.S.C. § 1123(a)(3) requires that a debtor's plan "specify the treatment of any class of claims or interests that is impaired under the plan." "Impairment" refers to the alteration of legal, equitable or contractual rights of holders of claims or interests. 11 U.S.C. § 1124. See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62 n.3 (2d Cir. 1986).

The First Amended Plan and Second Amended Plan each designate Class 7, Class 8, Class 9, Class 12, Class 13 and Class 15 as Impaired in that the legal, equitable or contractual rights of holders of Claims or Interests in these Classes are altered under each of the First Amended Plan and Second Amended Plan. In accordance with Section 1123(a)(3), Article 4 of both of these plans specifies the treatment of each Impaired Class of Claims and each Impaired Class of Interests. First Amended Plan, § 4.7, § 4.8, § 4.9, § 4.12, § 4.13 and § 4.15; Second Amended Plan, § 4.7, § 4.8, § 4.9, § 4.12, § 4.13, and § 4.15. Accordingly, the First Amended Plan and Second Amended Plan both satisfy Section 1123(a)(3) of the Bankruptcy Code.

(d)     Same Treatment of Claims Within Each Class

11 U.S.C. § 1123(a)(4) requires that a debtor's plan provide the same treatment for each claim or interest in a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest. Section 1123(a)(4) does not require that all members of a class receive treatment that is identical, or that all claims within a class must be treated precisely the same in all respects in order for the "same treatment" standard to be met. See In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 749 (2d Cir. 1992), modified on reh'g, 993 F.2d 7 (2d Cir. 1993) ("some classification of claimants within a class is permissible"); In re Resorts Int'l., Inc., 145 B.R. 412, 448 (Bankr. D.N.J. 1990) (claims

- 18 –

may be classified together if "substantially similar and their treatment is approximately equal"). Nor does Section 1123(a)(4) require the same pecuniary result for each class member. See In re Central Med. Ctr., Inc., 122 B.R. 568, 574-75 (Bankr. E.D. Mo. 1990) (holding that, by subjecting members or a class to the same random lottery system, all such members were receiving the "same treatment," even though some may ultimately receive more money than others); In re Joint E. & S. Dist., 982 F.2d at 749 ("Without question, the 'same treatment' standard of Section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.").

Article 4 of both the First Amended Plan and Second Amended Plan provides the same treatment to each Claim or Interest classified within a particular Class. First Amended Plan, Article 4; Second Amended Plan, Article 4. Accordingly, both of these plans satisfy Section 1123(a)(4) of the Bankruptcy Code.

(e)     Adequate Means for Implementation of the Plan

11 U.S.C. § 1123(a)(5) requires that a debtor's plan "provide adequate means for the plan's implementation," and sets forth several examples of adequate means. Articles IV, V, VI and IX of both the First Amended Plan and Second Amended Plan set forth adequate means for implementation by providing for, among other things: (i) the funding of the plan (First Amended Plan, § 5.1; Second Amended Plan, § 5.1); (ii) the issuance and distribution of New Common Stock (First Amended Plan, § 5.4; Second Amended Plan, § 5.4); (iii) the creation of the D&O Trust and the transfer of the D&O Trust Assets and any proceeds or Causes of Action thereunder to the D&O Trust (First Amended Plan, § 5.1, Article 6; Second Amended Plan, § 5.1, Article 6); (iv) the disbursement of cash payments to certain parties in accordance with the plan (First Amended Plan, § 5.1; Second Amended Plan, § 5.1); (v) the cancellation of the

Unsecured Notes, Unsecured Subordinated Notes and all Equity Interests (First Amended Plan, §
4.7(c), § 4.7(d), § 4.8(c), § 4.8(d), § 4.13(a), § 4.13(b) and § 5.5; Second Amended Plan, §
4.7(c), § 4.7(d), § 4.8(a)(ii), §4.8 (b)(ii), § 4.8(c), § 4.13(a), § 4.13(b) and § 5.5); (vi) the
continued corporate existence of the Debtor (First Amended Plan, § 5.3, § 5.7, § 9.4; Second
Amended Plan, § 5.3, § 5.7 and § 9.4); (vii) the selection of the directors and officers of the
Reorganized Debtor (First Amended Plan, § 9.1 and § 9.2; Second Amended Plan, § 9.1 and §
9.2); and (viii) the necessary corporate action to be taken to effectuate the foregoing (First
Amended Plan, § 9.3; Second Amended Plan, § 9.3).  Accordingly, both the First Amended Plan
and Second Amended Plan satisfy Section 1123(a)(5) of the Bankruptcy Code.

(f)    Charter of Reorganized Debtor

11 U.S.C. § 1123(a)(6) requires that, with respect to a corporate debtor, a plan
provide for the inclusion in the debtor's charter of a prohibition against the issuance of nonvoting
equity securities.  Thus, new stock issued under a plan of reorganization must have voting rights.
See In re Acequia, Inc., 787 F.2d 1352, 1361 (9th Cir. 1986).  This provision requires that a
debtor's securities be distributed "so that the allocation of voting power – i.e. the control of the
company – properly recognizes the respective position of the claimants and stockholders
according to their rank and rights they surrender."   See 7 *Lawrence P. King, Collier on
Bankruptcy* ¶ 1123.01[6], at 1123-14 (15th ed. rev. 2004).

Both the First Amended Plan and Second Amended Plan provide for adoption by
the Reorganized Debtor of an Amended Certificate of Incorporation that prohibits the issuance of
nonvoting equity securities.   See Amended and Restated Certificate of Incorporation of
NorthWestern Corporation (attached as Exhibit A to the First Amended Plan and Second
Amended Plan); see also First Amended Plan, § 5.3; Second Amended Plan, § 5.3.  Accordingly,

both the First Amended Plan and Second Amended Plan satisfy Section 1123(a)(6) of the Bankruptcy Code.

(g)    Selection of Directors and Officers

11 U.S.C. § 1123(a)(7), requires that a plan provide for the selection of officers, directors, or trustees in a manner consistent with the interests of creditors and equity security holders.  11 U.S.C. § 1123(a)(7).  Both the First Amended Plan and Second Amended Plan provide that the new board of Reorganized Debtor shall consist of seven directors of which six will be designated by the Committee and one of which shall be the Chief Executive Officer of the Reorganized Debtor.  First Amended Plan, § 9.2(a); Second Amended Plan, § 9.2(a).  On August 10, 2004, the Debtor filed a designation of the initial members of the new Board with the Bankruptcy Court. Plan Supplement [Docket No. 1878].  Accordingly, both the First Amended Plan and Second Amended Plan satisfy Section 1123(a)(7) of the Bankruptcy Code.

**4.    The Plan Complies with the Permissive Provisions of Section 1123(b)**

11 U.S.C. § 1123(b) of the Bankruptcy Code permits the inclusion of provisions in a plan that are "not inconsistent with the applicable provisions of this title."  Both the First Amended Plan and Second Amended Plan include limited discharge, release and injunctive provisions, retention of jurisdiction provisions and other appropriate administrative provisions. First Amended Plan, §§ 10.1-10.5; Article 13; Second Amended Plan, §§ 10.1-10.5; Article 13. Each of these provisions is appropriate and consistent with Section 1123(b) and other applicable provisions of the Bankruptcy Code.

(a)    Impairment of Claims

11 U.S.C. § 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  Both the First Amended Plan and Second

Amended Plan contain provisions which both impair and leave unimpaired classes of claims and interests.  First Amended Plan, Article III and Article IV; Second Amended Plan, Article III and Article IV.

(b)     Treatment of Executory Contracts and Unexpired Leases

Subject to 11 U.S.C. § 365, 11 U.S.C. § 1123(b)(2) permits a plan to provide for "the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected . . . ."  Both the First Amended Plan and Second Amended Plan provide for the assumption of certain executory contracts and unexpired leases, the Debtor's insurance policies (except for the proceeds of certain D&O Policies being assigned to the D&O Trust), all employment plans, practices, programs and policies maintained by the Debtor, and the QF agreements that have not been previously assumed or rejected under Section 365 of the Bankruptcy Code.  First Amended Plan, Article VIII; Second Amended Plan, Article VIII. These plans also provide for the rejection of other unexpired executory contracts and leases. First Amended Plan, §8.2; Second Amended Plan, § 8.2.  And both of these plans satisfy Section 365(b)(1) of the Bankruptcy Code by providing that the Debtor will cure defaults under any executory contract or unexpired lease assumed pursuant to such plan.  First Amended Plan, §8.1(b); Second Amended Plan, § 8.1(b).  The Debtor has also filed the Notice of Contracts the Debtor Intends to Assume And/Or Reject Pursuant To Section IV.F Of The Debtor's First Amended Disclosure Statement Pursuant To Section 1125 Of The Bankruptcy Code For The Plan Of Reorganization [Docket No,. 1700, dated July 16, 2004]; and the Notice Of Amendment Of Contracts The Debtor Intends To Assume and/or Reject Pursuant To Section IV.F Of The Debtor's First Amended Disclosure Statement Pursuant To Section 1125 Of The Bankruptcy Code For The Plan Of Reorganization [Docket No. 1866, dated August 6, 2004].

CONFIRMATION MEMORANDUM OF LAW

     (c)     The Retention of Jurisdiction Provisions Satisfy Section 1123(B)

Both the First Amended Plan and Second Amended Plan contain provisions providing for the Bankruptcy Court's retention of jurisdiction over the Debtor and the property of the Estate following confirmation, which is permitted by the Bankruptcy Code:

> Section 1141 [of the Bankruptcy Code], which deals with the consequences of confirmation, says nothing about reducing the court's jurisdiction. The court therefore retains jurisdiction under its general statutory grants of jurisdiction to the extent those grants remain relevant post confirmation.

6 Queenan et al., CHAPTER 11 THEORY AND PRACTICE, IN A GUIDE TO REORGANIZATION § 32-04, at 32:6 (1994); accord Gruen Mktg. Corp. v. Asia Commercial Co. (In re Jewelcor Inc.), 150 B.R. 580, 582 (Bankr. M.D. Pa. 1992) ("There is no doubt that the bankruptcy court's jurisdiction continues post confirmation to protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation.").

Under Article XIII of both the First Amended Plan and Second Amended Plan, the Bankruptcy Court retains jurisdiction to the extent such retention is legally permissible, including without limitation jurisdiction over the allowance and classification of all claims, the distribution process, matters related to the assumption, assumption and assignment or rejection of contracts, and any disputes that arise under such plan. All of the matters outlined in Article XIII of both of these plans are matters over which the Bankruptcy Court would otherwise have jurisdiction during the pendency of this Chapter 11 Case. See 28 U.S.C. §§ 157 and 1334. The Bankruptcy Court's continuing jurisdiction, as provided in Article XIII of both the First Amended Plan and Second Amended Plan, is appropriate, necessary, and wholly consistent with applicable law.

CONFIRMATION MEMORANDUM OF LAW

## VI.    SUMMARY

Both the First Amended Plan and Second Amended Plan comply with the (1) classification provisions of Section 1122, (2) mandatory provisions of Section 1123(a) and (3) applicable provisions of Section 1123(b) of the Bankruptcy Code. Accordingly, as both the mandatory and permissive contents of both the First Amended Plan and Second Amended Plan each satisfy Section 1123 of the Bankruptcy Code, both of these plans satisfy Section 1129(a)(1) of the Bankruptcy Code.[4]

### A.    The Debtor has Complied with the Applicable Provisions of Title 11

11 U.S.C. § 1129(a)(2) requires that the Debtor, as proponent of both the First Amended Plan and Second Amended Plan, comply with the applicable provisions of Title 11. In re PWS Holding Corp., 228 F.3d 224, 248 (3d Cir. 2000), cert. denied, 538 U.S. 924 (2003). The principal purpose of Section 1129(a)(2) is to ensure that a debtor, as a plan proponent, complies with the disclosure and solicitation requirements of Sections 1125 and 1126 of the Bankruptcy Code in the solicitation of acceptances to a plan. See In re Johns-Manville Corp., 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom., Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code."); In re Resorts Int'l Inc., 145 B.R. 412, 468 (Bankr. D.N.J. 1990) (applying Section 1129(a)(2) only to disclosure requirements of Bankruptcy Code). As set forth below and except as otherwise provided or permitted by orders of the Bankruptcy Court, the Debtor has complied with the disclosure and solicitation

---

[4]    Section 1123(b)(6) permits a plan to include discharge, limited release, exculpation and injunctive provisions, which are appropriate provisions that are not inconsistent with the Bankruptcy Code. The propriety of such provisions in both the First Amended Plan and Second Amended Plan are addressed at pages 65-77 herein.

requirements, including Sections 1125, 1126, and 1141(d)(3) of the Bankruptcy Code, in connection with the First Amended Plan and First Amended Disclosure Statement.  Pursuant to the Resolicitation Procedures Motion filed concurrently herewith, the Debtor is seeking approval of the Second Amended Disclosure Statement as containing adequate information and approval of the proposed Solicitation Procedures including the Summary Disclosure Statement and related relief in connection with the Second Amended Plan.

### 1.    The Debtor has Complied with the Disclosure Requirements of Section 1125(b) of the Bankruptcy Code

Section 1125(b) prohibits a debtor, as a plan proponent, from soliciting acceptances of a plan unless, at or before the time of solicitation, there is transmitted to the claimant whose vote on the plan was solicited, a copy of the plan and the court-approved disclosure statement.  See In re Texaco, 84 B.R. 893, 907 (Bankr. S.D.N.Y 1988).  A disclosure statement is required to list "adequate information" sufficient to enable holders of claims to make an informed decision about whether to vote in favor or against the plan.  See Sure-Snap Corp. v. State St. Bank & Trust Co., 948 F.2d 869, 873 (2d Cir. 1991).

After notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order finding that the First Amended Disclosure Statement contained "adequate information" to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the First Amended Plan.  The First Amended Disclosure Statement (which includes as an exhibit a copy of the First Amended Plan) and certain additional solicitation materials approved by the Bankruptcy Court in the First Amended Disclosure Statement were mailed to all creditors "entitled to vote on the plan."  FED. R. BANKR. P. 3017(d).  Additionally, a notice of the Confirmation Hearing was mailed to the Notice Parties.  Finally, notices regarding non-voting status were mailed to creditors not entitled

CONFIRMATION MEMORANDUM OF LAW

to vote and to other parties-in-interest.  The Debtor did not solicit the acceptance or rejection of the First Amended Plan by any creditor or equity interest holder prior to the transmission of the First Amended Disclosure Statement.  Cf. Century Glove, Inc. v. First Am. Bank, 860 F.2d 94 (3d Cir. 1988).   Accordingly, the First Amended Plan satisfies Section 1125(b) of the Bankruptcy Code.

### 2.    The Proposed Resolicitation Procedures

In connection with the Resolicitation Procedures Motion, the Debtor seeks an order granting the following relief:

(a)    approving the Second Amended Disclosure Statement (as it may hereafter be modified or amended) as containing "adequate information" with respect to the Second Amended Plan,  (ii) approving the Summary Disclosure Statement, detailing the differences between the First Amended Plan and Second Amended Plan, as containing "adequate information" with respect to the Second Amended Plan, and (iii) authorizing the Debtor to resolicit acceptances or rejections of the Second Amended Plan from holders of Allowed, Impaired Claims in Class 7, Class 8 and Class 9 against the Debtor by the transmission of a copy of the Summary Disclosure Statement (as approved by the Bankruptcy Court) pursuant to Resolicitation Procedures for which approval is sought in the Resolicitation Procedures Motion;

(b)    fixing the time and manner for the resolicitation of acceptances or rejections of the Second Amended Plan and establishing voting and related procedures in connection herewith;

(c)    approving the forms of ballots to be used by the Debtor in connection with the resolicitation of votes on the Second Amended Plan;

(d)      setting a hearing date and time for the continued Confirmation Hearing;

and

(e)      granting such other and further relief as the Bankruptcy Court may deem

just and proper.

At the continued Confirmation Hearing, the Debtor will establish compliance with

the Resolicitation Procedures as to Classes 7, 8 and 9.

### 3.      The Debtor has Received the Requisite Accepting Votes Pursuant to Section 1126 of the Bankruptcy Code

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a plan.  In accordance with Section 1126 of the Bankruptcy Code, only holders of allowed claims

and allowed equity interests in impaired classes of claims or equity interests that will receive or

retain property under a plan on account of such claims or equity interests are permitted to vote to

accept or reject such plan.  Section 1126 provides, in part:

(a)      The holder of a claim or interest allowed under section 502 of [the

Bankruptcy Code] may accept or reject a plan.

*                    *                    *

(f)      Notwithstanding any other provision of this section, a class that is

not impaired under a plan, and each holder of a claim or interest of such class, are

conclusively presumed to have accepted the plan, and solicitation of acceptances with

respect to such class from the holders of claims or interests of such class is not required.

(g)      Notwithstanding any other provision of this section, a class is

deemed not to have accepted a plan if such plan provides that the claims or interests of

such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(a), (f) and (g).

In accordance with Section 1126 of the Bankruptcy Code and pursuant to the Disclosure Statement Order, the Debtor solicited acceptances or rejections of the First Amended Plan from holders of all Allowed Claims in each Class of Impaired Claims that are to receive Distributions under the First Amended Plan. Classes 1 through 6 and Classes 10, 11 and 14 of the First Amended Plan are Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, holders of Claims in those Classes are conclusively presumed to have accepted the First Amended Plan. 11 U.S.C. § 1126(f); In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338, 1340 n.3 (9th Cir. 1988). Classes 7, 8, 9 and 12 of the First Amended Plan are Impaired. As a result, pursuant to Section 1126(a) of the Bankruptcy Code, holders of Claims in such Classes were entitled to vote to accept or reject the First Amended Plan. 11 U.S.C. § 1126(a). Although holders of Equity Interests in Class 13 and Class 15 Opt-out Securities Claims under the First Amended Plan are Impaired, since they will receive no Distributions on account of such Interests or Claims, they are conclusively presumed to have rejected the First Amended Plan and are not entitled to vote to accept or reject the First Amended Plan pursuant to Section 1126(g) of the Bankruptcy Code. 11 U.S.C. § 1126(g).

As to Impaired Classes of Claims entitled to vote to accept or reject the First Amended Plan, Section 1126(c) of the Bankruptcy Code provides that such Classes accept the First Amended Plan if (a) the holders of at least two-thirds (2/3rds) in dollar amount of the Allowed Claims actually voting in such Class (other than Claims held by any holder designated pursuant to Section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept

the First Amended Plan and (b) more than one-half (½) in number of such Allowed Claims actually voting in such Class (other than claims held by any holder designated pursuant to Section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the First Amended Plan. See 11 U.S.C. § 1126(c).

As set forth in the Voting Agent Declaration, Classes 7, 9 and 12 voted to accept the First Amended Plan by the requisite majorities that meet the acceptance requirements of Section 1126(c). Only Class 8 voted to reject the First Amended Plan.[5] Across all voting Classes, approximately 2,098 creditors voted to accept the First Amended Plan totaling approximately $580 million in the aggregate, and approximately 743 creditors voted to reject the First Amended Plan totaling approximately $61 million in the aggregate. Accordingly, the First Amended Plan satisfies Section 1126 of the Bankruptcy Code.

At the Confirmation Hearing, the Debtor will accordingly seek confirmation of the Second Amended Plan, which amends the First Amended Plan, subject to pending resolicitation of Classes 7, 8 and 9 pursuant to procedures to be approved by this Court in the Resolicitation Procedures Motion.

### 4.     The Debtor has Complied with Bankruptcy Rule 3016

Bankruptcy Rule 3016(a) requires that a plan "be dated" and identify the "name of the entity or entities submitting or filing it." FED. R. BANKR. P. 3016(a). Both the First Amended Plan and Second Amended Plan are dated and identify the Debtor as the entity submitting it. Accordingly, each satisfies Bankruptcy Rule 3016(a).

---

[5]     Class 8 met the numerosity requirement but failed to achieve the vote of at least 2/3 in dollar amount of the Allowed Claims. See Voting Agent Declaration, ¶ 14.

CONFIRMATION MEMORANDUM OF LAW

### 5.     Both Plans Have Been Proposed in Good Faith and not by any Means Forbidden by Law

11 U.S.C. § 1129(a)(3) of the Bankruptcy Code requires, as a prerequisite to confirmation, that a plan be "proposed in good faith and not by any means forbidden by law."  In considering whether a plan has been proposed in good faith, the Court should determine, given the totality of circumstances, "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code"  In re Leslie Fay Cos., 207 B.R. 764, 780-81 (Bankr. S.D.N.Y. 1997); In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988), aff'd in part and remanded in part, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990) (good faith shown where "the plan was proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.").[6]  In making its determination, the Bankruptcy Court should not impose a quantitative payment, as "[t]he overview and vote of the creditors in Chapter 11 . . . supplies both the assurance that the plan is a fair effort of the debtor to pay unsecured creditors . . . ."  In re Wiggles, 7 B.R. 373, 381 (Bankr. N.D. Ga. 1980).

The Debtor proposed the First Amended Plan and, subsequently, the Second Amended Plan, only after lengthy negotiations with the Committee and many other parties-in-interest.  The Debtor has proposed these plans with the intent of exiting from bankruptcy and providing a return to unsecured creditors.  Thus, both the First Amended Plan and Second Amended Plan:

---

[6]     Undoubtedly, "[t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals."  Jasik v. Conrad (In re Jasik), 727 F.2d 1379, 1383 (5th Cir. 1984), reh'g denied, 731 F.2d 888 (5th Cir. 1984) (citing Public Fin. Corp. v. Freeman, 712 F.2d 219, 221 (5th Cir. 1983)); see also In re Cellular Info. Sys., Inc., 171 B.R. 926, 946 (Bankr. S.D.N.Y. 1994); In re American Family Enters., 256 B.R. 377, 401 (D.N.J. 2000) (stating that the court has considerable discretion in finding good faith "with the most important feature being an inquiry into the 'fundamental fairness' of the plan"). "According to the good faith requirement of Section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code."  In re Texaco, Inc., 84 B.R. at 907 (citing In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984)).

CONFIRMATION MEMORANDUM OF LAW

a.    restructure and recapitalize the Debtor's indebtedness and operations;

b.    will enable the Debtor to emerge from Chapter 11 as a viable and competitive enterprise;

c.    will enhance the Debtor's ability to effect a return to profitability;

d.    preserve the approximately 1,400 jobs the Debtor currently supports;

e.    provide for the expeditious resolution of disputes;

f.    provide for 100% distribution, in cash, to Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Class 1 Priority Claims, Allowed Class 2 Unsecured Priority Claims, Allowed Class 3 Bank One DIP Financing Claims, Class 10 Convenience Claims;

g.    provide for the continuation or reinstatement of Allowed Class 4 CSFB Financing Claims, Allowed Class 5 Secured Bondholder Claims, Allowed Class 6 Other Secured Claims, Allowed Class 11 Environmental Claims;

h.    provide in the Second Amended Plan substantial payments to holders of Class 7 Claims and Class 9 Claims (for an approximate return of 68%);

i.    provide in the Second Amended Plan for payments to holders of Class 8(a) (for an approximate return of [15.3%]);

j.    provide in the Second Amended Plan for payments to holders of Class 8(b) (for an approximate return of 15.3%);

k.    establish a D&O Trust in order to effectuate payments to holders of Class 12 D&O Trust Claims; and

l.    establish a Settlement Fund in the amount of $41 million to fund payments to holders of Class 14 Securities Claims who do not exercise the Opt-Out Election.

Both the First Amended Plan and Second Amended Plan are supported by substantially all major economic parties-in-interest in the Chapter 11 Case, including the Committee, as well as the various parties with whom the Debtor has negotiated settlements and who have voted in favor of the First Amended Plan.[7]  Moreover, the role of the Committee in developing each plan, the broadly consensual nature of each plan, the resolution of the many Objections to confirmation, and the favorable reception by those parties voting on these plans, all lead to the conclusion that the First Amended Plan and Second Amended Plan are fundamentally fair and have been proposed in good faith.

In sum, the Debtor has proposed the First Amended Plan and Second Amended Plan in good faith, and its goals are consistent with the purposes of, and standards prescribed under, the Bankruptcy Code.  Accordingly, the First Amended Plan and Second Amended Plan each satisfy Section 1129(a)(3) of the Bankruptcy Code.

**6.      Payments Made or Promised for Services or for Costs and Expenses in or in Connection with the Plan have been Disclosed or are Subject to Court Approval**

11 U.S.C. § 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  Section 1129(a)(4) is intended to protect the integrity of the reorganization process "by assuring creditors that payments from the debtor's estate will be subject to court review."[7] Lawrence P. King, <u>Collier on Bankruptcy</u> ¶ 1129.02[4], at 1129-35 (15th ed. rev. 2004); <u>see also</u> <u>In re U.S. Truck Co., Inc.</u>, 47 B.R. 932 (E.D. Mich. 1985), <u>aff'd</u>, 800 F.2d 581 (6th Cir. 1986);

---

[7]     In light of the compromise and settlement reached with Harbert and Wilmington Trust and amendment to the First Amended Plan, Harbert and Wilmington Trust have indicated their support of the Second Amended Plan.

In re River Vill. Assocs., 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993), aff'd, 181 B.R. 795 (E.D. Pa. 1995).

Any agreements by the Debtor to retain professionals to provide services in connection with this Chapter 11 Case have been disclosed in the applications to employ those professionals filed with the Bankruptcy Court. Further, pursuant to the interim application procedures established pursuant to Section 331 of the Bankruptcy Code, the Bankruptcy Court has authorized and approved the payment of certain fees and expenses of professionals retained in this Chapter 11 Case. See Order Establishing Procedures for Payment of Interim Compensation and Reimbursement of Expenses to Professionals [Docket No. 202, dated October 10, 2003], as modified by the Amended Order Establishing Procedures for Payment of Interim Compensation and Reimbursement of Expenses to Professionals [Docket No. 699, dated January 14, 2004]. All such fees and expenses, as well as all other accrued fees and expenses of professionals through and including the Effective Date, remain subject to final review by the Fee Auditor and the Bankruptcy Court for reasonableness under Section 330 of the Bankruptcy Code. See Order Appointing Fee Auditor and Establishing Related Procedures Concerning the Allowance and Payment of Compensation and Reimbursement of Expenses of Professionals and Members of Official Committees and Consideration of Fee Applications [Docket No. 925, dated March November 14, 2003]. In addition, pursuant to Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, the Bankruptcy Court has reviewed all applications for substantial contribution to ensure compliance with the statutory requirements that fees and expenses requested were reasonable and necessary. Moreover, all payments to be made in connection with the Effective Date or which relate to the success of the reorganization or which otherwise are required to be disclosed, including any amounts to be paid to Officers and

CONFIRMATION MEMORANDUM OF LAW

Directors, either are disclosed in the Second Amended Disclosure Statement or will be disclosed at or prior to the Confirmation Hearing.

Accordingly, the procedures for the Bankruptcy Court's review and ultimate determination of fees and expenses to be paid by the Debtor satisfy Section 1129(a)(4).

### 7.     The Plan Complies with the Requirements of Section 1129(a)(5)

11 U.S.C. § 1129(a)(5)(A) requires the Debtor, as the plan proponent, to disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan," and requires a finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy." Section 1129(a)(5)(B) requires that the Debtor, as the plan proponent, also disclose the identity of any insider that will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider. 11 U.S.C. § 1129(a)(5)(B). The Debtor has met these requirements.

The First Amended Plan and Second Amended Plan both provide that the new Board of Reorganized Debtor shall consist of seven directors of which six will be designated by the Committee and one of which shall be the Chief Executive Officer of the Reorganized Debtor. On August 10, 2004, the Debtor filed a designation of the initial members of the new Board with the Bankruptcy Court [Docket No. 1878]. First Amended Plan, § 9.2 (a); Second Amended Plan, § 9.2(a). See In re Apex Oil Co., 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990) (where debtors and the creditors' committee believe control of entity by proposed individuals will be beneficial, the requirements of Section 1129(a)(5) are satisfied); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149-50 (Bankr. S.D.N.Y. 1984) (continuation of debtor's president and founder, who

had many years of experience in the debtors' business, satisfied Section 1129(a)(5) and enhanced feasibility of the plan).  With the limited exception of the identity of the D&O Trustee, all disclosures required by Section 1129(a)(5)(B) have been made and the requirements of Section 1129(a)(5) have been satisfied or will be satisfied upon the Effective Date.  The Debtor intends to file its designation of the D&O Trustee prior to the continued Confirmation Hearing.

### 8.    Neither Plan Contains Rate Changes

11 U.S.C. § 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  On July 15, 2004, the Court approved a settlement between the Montana Public Service Commission (the "MPSC") and the Debtor (the "MPSC Settlement"). The MPSC Settlement addresses the rate issues by providing for the timing of the submission by the Debtor of the next rate case.  Accordingly, neither of the plans contain any changes in rates subject to the jurisdiction of any governmental regulatory commission, and, therefore, both the First Amended Plan and Second Amended Plan comply with Section 1129(a)(6) of the Bankruptcy Code.

### 9.    Both Plans are in the "Best Interests" of Each Creditor and Equity Security Holders

The "best interests" test set forth in 11 U.S.C. § 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, the holder of each claim or interest in such class has <u>either</u> accepted the proposed plan <u>or</u> will receive or retain property of a value as of the effective date of the plan that is not less than the amount that such holder would receive or retain if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.  See also <u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,</u>

- 35 –

526 U.S. 434, 442 (1999).  The test is not whether each impaired non-accepting creditor will receive more through the plan, but rather whether each such creditor would receive less than in a Chapter 7 case commencing on the effective date.  See In re Fur Creations By Varriale, Ltd., 188 B.R. 754, 759 (Bankr. S.D.N.Y. 1995) ("To apply this test … courts must determine … that each non-accepting claimant or interest holder will receive at least as much under the plan as it would if the debtor's assets were liquidated under Chapter 7 at the date of confirmation.") (citing In re Best Prods. Co., 168 B.R. 35, 71 (Bankr. S.D.N.Y. 1994), appeal dismissed, 177 B.R. 79 (Bankr. S.D.N.Y. 1995), aff'd on other grounds, 68 F.3d 26 (2d Cir. 1995); In re Genesis, 266 B.R at 610; Drexel, 138 B.R. at 761; In re Sound Radio, 93 B.R. at 854; see also In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990).

As Section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test focuses on individual, dissenting impaired holders of claims and interests, rather than entire classes of claims or interests.  See 203 N. LaSalle, 526 U.S. at 441 n.13; In re Future Energy Corp., 83 B.R. 470, 489 (Bankr. S.D. Ohio 1998); In re Toy & Sports Warehouse, Inc., 37 B.R. at 150.  Accordingly, if a class of claims or equity interests unanimously accepts a plan, as with Classes 7 and 9 here, the best interests test automatically is deemed satisfied for all members of that accepting class.  Similarly, because Classes 1 through 6 and Classes 10, 11 and 14 of both plans are unimpaired, such classes are conclusively deemed to have accepted both the First Amended Plan and Second Amended Plan pursuant to Section 1126(f) of the Bankruptcy Code and the best interests test is satisfied with respect to each of these Classes.

In determining whether the best interest test is satisfied with respect to dissenting holders of claims or interests, a liquidation analysis generally is performed in order to derive the dollar amount that would be generated from a hypothetical liquidation of the Debtor's assets

under a Chapter 7 liquidation.  See In re A.G. Consultants Grain Div., Inc., 77 B.R. 665 (Bankr. N.D. Ind. 1987); In re Jartran, Inc., 44 B.R. 331, 389-93 (Bankr. N.D. Ill. 1984) (best interests test is satisfied by showing that, upon liquidation, the cash received would be insufficient to pay priority claims and secured creditors and that unsecured creditors and shareholders would receive nothing); In re Victory Constr. Co., Inc., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984) (court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated").  Exhibit G to the First Amended Disclosure Statement and Exhibit H to the Second Amended Disclosure Statement contains the liquidation analysis (the "Liquidation Analysis") prepared by the Debtor.  See First Amended Disclosure Statement, Exhibit G, and Second Amended Disclosure Statement, Exhibit H.  The Liquidation Analysis in the Second Amended Disclosure Statement is unchanged from the First Amended Disclosure Statement.

> (a) The Proceeds from the Hypothetical Liquidation of the Debtor's Assets

To determine the value impaired creditors and impaired equity interest holders would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the hypothetical liquidation of the Debtor's assets and properties in the context of a Chapter 7 liquidation case.  In a hypothetical liquidation, the cash available for satisfaction of administrative expenses, priority claims, unsecured claims, and equity interests in the Debtor consists of the asset liquidation proceeds resulting from the statutorily mandated disposition of the Debtor's unencumbered assets, plus any unencumbered cash held by the Debtor at the time of the commencement of the Chapter 7 case.[8]  Any cash

---

[8]    The Liquidation Analysis assumes, among other things, conversion of the Chapter 11 Case as of September 30, 2004 and beginning cash balances based on projected cash balances without discount.  See First Amended Disclosure Statement,

CONFIRMATION MEMORANDUM OF LAW

amount is then reduced by the amount of any debt secured by the sold assets, the costs and expenses of the liquidation, and any additional administrative expenses and priority claims (such as taxes payable) that may result from the termination of the Debtor's operations and the use of Chapter 7 for the purposes of the liquidation. Such claims are senior to general unsecured claims and need to be satisfied prior to payments to junior creditors. Any remaining cash and asset liquidation proceeds after satisfaction of secured, administrative, and priority claims is then allocated to general unsecured creditors and shareholders in strict priority in accordance with 11 U.S.C. § 726. The present value of such allocations (taking into account the time necessary to accomplish the liquidation) is then derived.

(b)     The Costs of Liquidation

The Debtor's costs of liquidation under Chapter 7 would include the fees payable to the Chapter 7 trustee, as well as those which might be payable to attorneys and other professionals that the trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case and allowed in the Chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals, and costs and expenses of members of the Committee. In addition, the forced sale of the Debtor in a Chapter 7 liquidation may result in the rejection of additional executory contracts and unexpired real property leases thereby increasing unsecured claims and lowering unsecured creditor recoveries.[9]

---

Exhibit G, and Second Amended Disclosure Statement, Exhibit H. The Liquidation Analysis contains a description of all estimates and assumptions incorporated into the Debtor's liquidation analysis. See Crowthers McCall, 120 B.R. at 297-98 (the determination of what an impaired, non-consenting class member would receive in a hypothetical Chapter 7 liquidation necessarily requires the making of assumptions and judgments, which must be reasonable). Given that the Debtor is a regulated public utility, it has been assumed that the Chapter 7 liquidation process would be effectuated through a distressed sale of the operating businesses rather than a liquidation of individual assets. Accordingly, it has been assumed that the company's operating businesses would be marketed for sale and the cash proceeds, net of liquidation-related costs, would be distributed to creditors. Id.

[9]     Due to the uncertainty as to which contracts and leases would ultimately be rejected, no such rejection claims were included in the liquidation analysis.

CONFIRMATION MEMORANDUM OF LAW

Moreover, the Debtor believes that there would be certain actual and contingent liabilities and expenses for which provision would be required in any Chapter 7 liquidation before distributions could be made to holders of Claims in addition to the reorganization expenses that would be incurred in a Chapter 11 reorganization, including administrative claims and other liabilities (e.g., retirement, vacation pay and other employee-related administrative costs and liabilities for employees not retained by a purchaser) and escrow and hold-back amounts that purchasers of the Debtor's businesses presumably would require in connection with disposition transactions if the Debtor were in liquidation. These liabilities, claims, costs, expenses, and fees and such other claims which may arise in a liquidation case or result from a pending Chapter 11 case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims.

(c)    Summary of the Liquidation Analysis

Once the estimated present value of the distributions from the proceeds of the liquidation of the Debtor's assets and properties is determined, the estimated amounts attributable to the foregoing claims are subtracted. This derived value is then compared with the value of the property proposed to be distributed to Classes of Claims and Equity Interests under the Second Amended Plan.

Recoveries to Unsecured Note Claims under a Chapter 7 liquidation are estimated to range from 15% to 45% compared to 73% under the First Amended Plan and 68% under the Second Amended Plan. Recoveries to General Unsecured Claims are estimated to range from 10% to 31% under a Chapter 7 liquidation compared to 73% under the First Amended Plan and 68% under the Second Amended Plan. Unsecured Subordinated Note Claims would realize no recovery under the Liquidation Analysis; whereas, the First Amended Plan provides for a

recovery of 3.6% and the Second Amended Plan provides for a recovery of 15%. Common equity holders would realize no recovery in either the Chapter 7 liquidation scenario or pursuant to either the First Amended Plan or Second Amended Plan. As set forth in Exhibit G to the First Amended Disclosure Statement and Exhibit H to the Second Amended Disclosure Statement, in light of the foregoing priority, if the Chapter 11 Case were converted to a Chapter 7 liquidation, holders of Claims in Classes 7, 8, 9, 10, 11, and 12 would receive less than they will receive under either the First Amended Plan or the Second Amended Plan and holders of all other Claims and Equity Interests would receive no Distributions under either the First Amended Plan or Second Amended Plan.

The "best interests" test is also satisfied because both the First Amended Plan and Second Amended Plan contemplate Distributions in the order of absolute priority, or in the case of the Class 8 Settlement, provide for a consensual reduction by Class 7 in the amount it would otherwise be entitled to receive. Given the values of the Debtor's assets in liquidation, the costs of a Chapter 7 liquidation, the delays in distributions as a result of the delays in a Chapter 7 liquidation, and the ensuing deterioration of the Debtor's enterprise value, the impaired and rejecting classes would recover no more value in a Chapter 7 liquidation.

Class 8 Claims are Impaired Claims under both the First Amended Plan and Second Amended Plan. Under the Second Amended Plan, and as a result of Class 7 and Class 9 contributing additional funds for distribution to Class 8, holders of Class 8 Claims will receive Distributions of New Common Stock as described in the Second Amended Plan. Second Amended Plan, § 4.8. The remaining Classes of Impaired Claims and Interests under both plans (Class 13 and Class 15) are holders of subordinated Claims and Interests, and will not receive any Distribution or retain any property under the First Amended Plan or Second Amended Plan

CONFIRMATION MEMORANDUM OF LAW

on account of such Claims or Interests. Thus, Classes 13 and 15 are each deemed to have rejected both of these plans by virtue of Section 1126(g) of the Bankruptcy Code. Given their subordinated status, the holders of Claims in Classes 8, 13 and 15 would not receive a distribution in a Chapter 7 liquidation, and their treatment under either the First Amended Plan or Second Amended Plan would be better and/or identical to treatment in a Chapter 7 case.

Accordingly, because both of the plans provide for a distribution greater than creditors would receive in a liquidation, both the First Amended Plan and Second Amended Plan satisfy the requirements set forth in Section 1129(a)(7) of the Bankruptcy Code.

### 10.    Acceptance of the Plan

11 U.S.C. § 1129(a)(8) of the Bankruptcy Code requires, as a condition to confirmation, that each class of claims and interests has either accepted the plan or is not impaired thereunder. 11 U.S.C. § 1129(a)(8). In this case:

> Classes 1 through 6 and Classes 10, 11 and 14 are Unimpaired under the First Amended Plan (and Second Amended Plan);

> Classes 7, 9 and 12 have voted to accept the First Amended Plan;

> Class 8 is the only Impaired Class that voted to reject the First Amended Plan; and

> Class 12 Equity Interests and Class 15 Opt-out Securities Claims, are conclusively presumed to have rejected the First Amended Plan (because such Classes will receive no Distributions under the First Amended Plan) and, accordingly, were not entitled to vote to accept or reject the First Amended Plan (and for the same reason will not be entitled to vote to accept or reject the Second Amended Plan and will be deemed to reject it).

Therefore, the First Amended Plan fails to satisfy the requirements of Section 1129(a)(8) with respect to Classes 8, 12 and 15. By virtue of Section 1129(b) of the Bankruptcy Code, however, the First Amended Plan may be confirmed despite the rejection by Class 8 and the deemed rejection by Classes 12 and 15 because (a) the First Amended Plan does not

discriminate unfairly with respect to each non-accepting Impaired Class; (b) the First Amended Plan is "fair and equitable" with respect to each non-accepting Impaired Class; (c) at least one Impaired Class has accepted the First Amended Plan (without counting acceptances by insiders); and (d) the First Amended Plan satisfies the requirements set forth in Section 1129(a) of the Bankruptcy Code other than Section 1129(a)(8).  See 11 U.S.C. § 1129(b).

While the Debtor intends to resolicit votes from Classes 7, 8 and 9 pursuant to the Resolicitation Procedures, and hopes to confirm a consensual plan, in the event Class 8 still does not vote to approve the Second Amended Plan after such resolicitation, the Debtor submits that the grounds for confirmation pursuant to Section 1129(b) of the Bankruptcy Code described in the preceding sentence apply equally to the Second Amended Plan.

        (a)        The Plans Do Not Discriminate Unfairly with Respect to the Non-Accepting Classes

Neither of the plans discriminate unfairly with respect to any Impaired, non-accepting Class.  Although "unfair discrimination" is not defined in the Bankruptcy Code, a plan does not discriminate unfairly if the plan does not segregate similar claims or interests into separate classes or provide disparate treatment for those classes.  See, e.g., In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom., Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) ("'unfair discrimination' standard . . . ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes") (citation omitted); In re Resorts Int'l, Inc., 145 B.R. 412, 481 (Bankr. D.N.J. 1990).

Neither the First Amended Plan nor Second Amended Plan segregates similar Claims or Interests into separate Classes or provides disparate treatment for those Classes.  In

Confirmation Memorandum of Law

fact, the First Amended Plan only separately classifies Claims and Interests based on the requirements of the Bankruptcy Code. Each Impaired, non-accepting Class (that is, Classes 8, 12 and 15) represents a distinct Class of Claims and Interests unlike Claims or Interests within other Classes. As a result of the proposed Class 8 Settlement and Objections filed by Magten and Law Debenture, the Second Amended Plan created two subclasses in the Unsecured Subordinated Note Claims Class (Class 8) consisting of Class 8(a) TOPrS Notes holders and Class 8(b) QUIPS Notes holders based primarily on the subordination of the QUIPS Notes to the TOPrS Notes (discussed at greater length below). Moreover, each holder of a Claim or Interest within these Impaired, non-accepting Classes receives identical treatment under both plans — no Distribution. Accordingly, neither the First Amended Plan nor the Second Amended Plan discriminates unfairly with respect to any Impaired, non-accepting Class.

> (b)     Neither Plan Discriminates Unfairly with Respect to Class 8 Claims

In the event Class 8 and now Classes 8(a) and 8(b) vote to accept the Second Amended Plan, the recovery that Class 8(a) and 8(b) are projected to receive is the direct result of Class 7's decision to settle with members of Class 8(a) and 8(b) subject to the terms and conditions set forth in the Second Amended Plan and Second Amended Disclosure Statement as described on pages 3-4 herein. It has long been held that a senior creditor can choose to contribute to plan consideration to effectuate a settlement. This is particularly true where, as here, a senior creditor bargained for express subordination rights and has determined to give up a portion of the benefit of its rights to effectuate a settlement. In this circumstance, the Class 7 creditors have determined, in order to resolve plan objections raised by Harbert and Wilmington Trust, that it is appropriate to contribute a portion of the Distribution to which they are legally

entitled under the express subordination language set forth in the QUIPS Indenture (as defined below) and the TOPrS Indenture (as defined below).  The Class 7 creditors have also determined to offer the benefit of the settlement to the QUIPS holders even though such holders did not participate in the settlement process and have made no indication as to whether the proposed terms are acceptable to them.  As discussed below, the TOPrS Notes and QUIPS Notes are subordinate to the Class 7 Claims.  Certain creditors have asserted the QUIPS Notes are subordinate to the TOPrS Notes.  If, in fact, these creditors are correct, the proposed Class 8 Settlement and the creation of the subclasses is even more appropriate.

(1)     QUIPS

The Indenture dated as of November 1, 1996 (the "QUIPS Indenture") between The Montana Power Company ("MPC") and The Bank of New York authorized MPC to issue unsecured subordinated debt securities (the "QUIPS").  Pursuant to the Second Supplemental Indenture dated as of August 13, 2002, NorthWestern assumed the obligations under the QUIPS Indenture of The Montana Power, L.L.C., successor by merger to MPC.  Section 1501 of the QUIPS Indenture provides for subordination of the QUIPS as follows:

> The Company, for itself, its successors and assigns, covenants and agrees, and each Holder of the Securities of each series, by its acceptance thereof, likewise covenants and agrees, that the payment of the principal of and premium, if any, and interest, if any, on each and all of the Securities is hereby expressly subordinated to the extent and in the manner set forth in this Article, in right of payment to the prior payment in full of all Senior Indebtedness.

Section 1502 provides that, in the event of bankruptcy:

> [T]he holders of all Senior Indebtedness shall first be entitled to receive payment of the full amount due thereon, or provision shall be made for such payment in money or money's worth, before the Holders of any of the Securities are entitled to receive a payment on account of the principal of or interest on the indebtedness

- 44 –

evidenced by the Securities, including, without limitation, any payments made pursuant to Articles Four and Five.

Section 101 defines Senior Indebtedness as:

> [A]ll obligations (other than non-recourse obligations and the indebtedness issued under this Indenture) of, or guaranteed or assumed by, the Company for borrowed money, including both senior and subordinated indebtedness for borrowed money (other than the Securities), or for the payment of money relating to any lease which is capitalized on the consolidated balance sheet of the Company and its subsidiaries in accordance with generally accepted accounting principles as in effect from time to time, or evidenced by bonds, debentures, notes or other similar instruments, and in each case, amendments, renewals, extensions, modifications and refundings of any such indebtedness or obligations, whether existing as of the date of this Indenture or subsequently incurred by the Company unless, in the case of any particular indebtedness, obligation, renewal, extension or refunding, the instrument creating or evidencing the same or the assumption or guarantee of the same expressly provides that such indebtedness, obligation, renewal, extension or refunding is not superior in right of payment to or is pari passu with the Securities; provided that the Company's obligations under any Guarantee shall not be deemed to be Senior Indebtedness.

(2)     TOPrS

The Subordinated Debt Securities Indenture dated as of August 1, 1995 (the "TOPrS Indenture") between Northwestern Public Service Company ("NWPS"), a predecessor entity to NorthWestern, and The Chase Manhattan Bank, N.A. authorized NWPS to issue subordinated unsecured debt securities (the "TOPrS"). The parties subsequently entered into the First Supplemental Indenture dated as of August 1, 1995, the Second Supplemental Indenture dated as of November 15, 1998, the Third Supplemental Indenture dated as of December 21, 2001 and the Fourth Supplemental Indenture dated as of January 31, 2002 to provide for specific issuances of TOPrS. Section 6.1 of each Supplemental Indenture provides for subordination of the TOPrS as follows:

CONFIRMATION MEMORANDUM OF LAW

The payment by the Company of the principal of, premium, if any, and interest on all Debentures issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full of all Senior Indebtedness of the Company, whether outstanding at the date of this Indenture or thereafter incurred.

Section 6.3 of each Supplemental Indenture provides that, upon bankruptcy:

[A]ll amounts due upon all Senior Indebtedness of the Company shall first be paid in full, or payment thereof provided for in money in accordance with its terms, before any payment is made by the Company on account of the principal (and premium, if any) or interest on the Debentures.

The Supplemental Indentures define Senior Indebtedness as:

[T]he principal, premium, if any, and interest in respect of (A) indebtedness of such obligor for money borrowed and (B) indebtedness evidenced by securities, debentures, bonds or other similar instruments issued by such obligor, including, without limitation, all obligations under its General Mortgage and Deed of Trust dated as of August 1, 1993 between the Company and JPMorgan Chase Bank, as successor to The Chase Manhattan Bank, as trustee, and the Indenture dated as of November 1, 1998 between the Company and JPMorgan Chase Bank, as trustee; (ii) all capital lease obligations of such obligor; (iii) all obligations of such obligor issued or assumed as the deferred purchase price of property, all conditional sale obligations of such obligor and all obligations of such obligor under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business); (iv) all obligations of such obligor for the reimbursement on any letter of credit, banker's acceptance, security purchase facility or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other persons for the payment of which such obligor is responsible or liable as obligor, guarantor or otherwise; and (vi) all obligations of the type referred to in clauses (i) through (v) of other persons secured by any lien on any property or asset of such obligation (whether or not such obligation is assumed by such obligor), except for (1) any such indebtedness that is by its terms subordinated to or pari passu with the Debentures, as the case may be, and (2) any indebtedness between or among any obligor and its Affiliates, including all other debt securities and guarantees in respect of those debt securities, issued to (a) any other NWPS Trust, or a trustee of such trust, and (b) any other trust or a trustee

of such trust, partnership or other entity affiliated with the Company which is a financing vehicle of the Company ("Financing Entity") in connection with an issuance of preferred securities by such Financing Entity of preferred securities or other securities which rank pari passu with or junior to the Preferred Securities.

A senior lender may share a portion of its proceeds from the debtor's estate with general unsecured creditors when priority creditors were not receiving a distribution under the debtor's plan. Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305 (1st Cir. 1993). In SPM, the court noted that while debtors may be restricted in the distributions they can make, "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors." Id. at 1313. Other courts have adopted SPM to support similar arrangements. See In re Teligent, Inc., 282 B.R. 765 (Bankr. S.D.N.Y. 2002).[10]

The Bankruptcy Code is not implicated when one class of creditors agrees to give up a portion of their legally entitled distribution in order to effectuate a settlement with objecting creditors, so long as all other creditors receive at least as much as they would have received absent the settlement. Here, instead of utilizing an intercreditor arrangement, the Debtor, with the Committee's support, is amending the First Amended Plan to effectuate the proposed Class 8 Settlement described in the Second Amended Plan and resoliciting Classes 7, 8 and 9 pursuant to the proposed Resolicitation Procedures. The result is similar to that achieved in In re MCorp. Fin., Inc., 160 B.R. 941 (S.D. Tex. 1993). In MCorp., the court approved an agreement pursuant to which bondholders gave up a portion of their recovery to the FDIC to settle the debtors'

---

[10]    In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001) (holding that held that a debtor did not "unfairly discriminate" with its proposed plan against creditors holding punitive damage claims merely because it classified punitive damage claims apart from other general unsecured claims and proposed to pay a dividend of approximately 7% to the latter and no distribution at all on the punitive claims, except to the extent of available insurance coverage); In re Nuclear Imaging, 270 B.R. 365 (Bankr. E.D. Pa. 2001); In re White Glove, Inc., 1998 WL 731611 (Bankr. E.D. Pa. Oct 4, 1998); In re Parke Imperial Canton, Ltd., No. 92-61004, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994).

litigation with the FDIC.  MCorp., 160 B.R. at 954.  Certain creditors argued that they would have received a greater recovery absent the settlement; however, the court held that the settlement was appropriate in light of the uncertainty on the outcome of the FDIC litigation, which was causing delay and eroding the value of the estates.  Id. at 964.  The settlement was approved because the net present value of the benefits of the settlement exceeded the expected net present value of the benefits to be gained from litigation.  Id. at 953.  The MCorp. court ultimately found no unfair discrimination existed where a plan allocated to a class of junior creditors certain value that otherwise would have been required by applicable law to be paid directly to more senior creditors.  See, e.g., In re Union Fin. Servs. Group, Inc., 303 B.R. 390, 421-22 (Bankr. E.D. Mo. 2003) (confirming a plan which provided that within 30 days after the plan's effective date, "Critical Business Claims," "Allowed Utility Claims," and "De Minimis Claims" would be paid in full from cash collateral otherwise payable to the senior secured lenders, while other unsecured creditors received nothing).

        As discussed above, Class 7, as represented by the Committee, supports the proposed Class 8 Settlement pursuant to which Class 7 members will, by agreement, contribute plan proceeds to enable a recovery by Class 8.  But for the contribution of Class 7, Classes 8(a) and 8(b) would not receive any Distribution because there is insufficient value in the Debtor's estate to pay Class 7 in full.  As a result, because of Class 7's agreement to the Class 8 Settlement there can be no violation of the absolute priority rule.

        The Second Amended Plan provides for Classes 8(a) and 8(b) to receive a portion of the Distributions otherwise entirely allocated to Class 7 in an effort to avoid potentially complex, lengthy, and costly litigation in connection with confirmation.  In the event Class 8(a) and Class 8(b) accept the Second Amended Plan, the Debtor will be able to minimize the

CONFIRMATION MEMORANDUM OF LAW

expense of a contested and possibly protracted confirmation process.  Class 8, however, voted as a Class to reject the First Amended Plan.  By voting to reject the First Amended Plan, holders of Class 8 can have no expectation of any Distribution under the First Amended Plan.  If Class 8 votes to reject the Second Amended Plan, the analysis is unchanged.  Because Class 8 has no right, title or interest, neither plan discriminates unfairly with respect to Class 8 as a matter of fact and law. Id. at 422.

        (c)      The Plan Does not Discriminate Unfairly with Respect to Classes 12 and 15 Claims

Because there is insufficient value to pay all creditors in full with interest, and because, in neither the First Amended Plan nor Second Amended Plan, no creditors were willing to set aside a portion of their Distribution to satisfy the claims of interest holders in Class 12 and Class 15, neither of the plans discriminates unfairly with respect to Class 12 and Class 15.

        (d)      The Plan is Fair and Equitable with Respect to Each Non-Accepting Class

In addition to not discriminating unfairly, a plan must be fair and equitable with respect to non-accepting classes.  Unlike the unfair discrimination test, Section 1129(b) of the Bankruptcy Code provides explicit guidance as to the meaning of "fair and equitable."  See 11 U.S.C. § 1129(b).  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class.

        (e)      The Plan is Fair and Equitable with Respect to Class 8 Claims

Section 1129(b)(2)(B) permits the "cram down" of non-assenting classes of unsecured claims so long as:

        (1)      the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a

value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(2)     the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior interest any property.

See 11 U.S.C. § 1129(b)(2)(B).

As addressed in this memorandum, Distributions made to Class 7 conform with the requirements of Section 1129(b)(2)(B)(ii) of the Bankruptcy Code because such Distributions are made based upon the strict order of priority such that, absent consent, holders of Class 7 Claims must be paid in full with interest before any Distribution is made to the more-junior Class 8 creditors.

In the event the holders of Class 8 Unsecured Subordinated Notes vote, as a class, to reject the Second Amended Plan, the holders of Class 8 Unsecured Subordinated Note Claims will not receive or retain any property under the Second Amended Plan on account of such Claims. Second Amended Plan, § 4.8. An identical provision was contained in the First Amended Plan. See First Amended Plan, § 4.8. Accordingly, the Debtor may permissibly "cram down" either of the plans over the non-acceptance of such plan by Class 8.

(f)     The Plans are Both Fair and Equitable With Respect to Classes 12 and 15 Claims

Section 1129(b)(2)(C) permits the "cram down" of non-assenting classes of equity interests so long as:

(1)     the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

CONFIRMATION MEMORANDUM OF LAW

(2)    the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

<u>See</u> 11 U.S.C. § 1129(b)(2)(C).

As with respect to Class 8, both the First Amended Plan and Second Amended Plan permissibly provide that no Distributions will be made to Class 12 and Class 15. As stated in the legislative history to Section 1129 (subparagraph (b)(2)(C)), "[i]f the interests are 'under water' then they will be valueless and the plan may be confirmed notwithstanding the dissent of that class of interests even if the plan provides that the holders of such interests will not receive any property on account of such interests." 11 U.S.C. § 1129. This is the case here, as holders of Interests in the Debtor would realize no value with respect to such Interests in a liquidation scenario. Thus, clause (i) of Section 1129(b)(2)(C) is satisfied.

The legislative history of Section 1129(b)(2)(C) goes on to note that "[a]lternatively, under clause (ii), the court must confirm the plan notwithstanding the dissent of a class of interests if the plan provides that the holders of any interests junior to the dissenting class of interests will not receive or retain any property on account of such junior interests. Clearly, if there are no junior interests junior to the class of dissenting interests, then the condition of clause (ii) is satisfied." This is also the case here, as Classes 12 and 15 are the most junior Classes under both of the plans. Accordingly, the Debtor may permissibly "cram down" both the First Amended Plan or the Second Amended Plan over the non-acceptance by Class 13.

(g)    Both of the Plans Comply with the Absolute Priority Rule

Section 1129(b)(2) sets forth the "absolute priority rule," which provides that a plan may be confirmed despite rejection by a class of creditors if the plan does not offer a junior claimant any property before each senior claimholder receives full satisfaction of its allowed

- 51 –

claim unless otherwise agreed by the senior creditor.  11 U.S.C. § 1129(b)(2)(B)(ii); <u>Genesis Health Ventures</u>, 266 B.R. 591, 612 (Bankr. D. Del. 2001).  Courts have decided that "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." <u>Id.</u> (citing <u>In re MCorp. Financial, Inc.</u>, 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992)).

At the Confirmation Hearing, the Debtor intends to introduce the testimony of Andrew Yearley, a Managing Director of Lazard Freres & Co. LLC ("<u>Lazard</u>"), in support of confirmation of the Second Amended Plan and to rebut the valuation prepared by Seneca Financial Group, Inc.  Lazard has undertaken its valuation analysis for the purpose of determining value available for distribution to creditors and interest holders pursuant to the First Amended Plan and Second Amended Plan and to analyze the relative recoveries to creditors and interest holders thereunder.

The estimated total value available for distribution to creditors and interest holders is comprised of three primary components: (i) an estimated value of the Reorganized Debtor's utility operations on a going concern basis ("<u>Enterprise Value</u>"); (ii) the value of certain expected net operating loss carry forwards ("<u>NOLs</u>") of the Reorganized Debtor; plus (iii) cash available for Distribution to creditors in excess of the Reorganized Debtor's minimum operating cash requirements ("<u>Distributable Cash</u>").

(h)    Lazard's Valuation of the Reorganized Debtor

The Debtor intends to prove at the Confirmation Hearing that the Enterprise Value of the Reorganized Debtor, including the value of its NOLs, ranges from $1.415 billion to $1.585 billion, with a midpoint value of $1.500 billion as of an assumed Effective Date of the Second Amended Plan of September 30, 2004.  At this Enterprise Value, the Class 13 Equity

Interests are not entitled to receive any Distribution under either plan, and therefore, neither the First Amended Plan nor Second Amended Plan violates the absolute priority rule and both are "fair and equitable" with respect to Class 13.

Lazard correctly employed three standard common valuation methodologies consisting of: (i) comparable company analysis; (ii) comparable transaction analysis; and (iii) discounted cash flow analysis.

(i)     Comparable Company Analysis

Comparable company analysis estimates the value of a company based on the implied valuations of other similar companies that are publicly traded. Under this methodology, the enterprise values for the selected public companies are typically expressed as multiples of earnings. The analysis also includes a multi-year financial comparison where each company's performance, profitability, operating margins, leverage and business trends are examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation statistics as compared to the Reorganized Debtor. The primary valuation metrics applied in this analysis include Enterprise Value to earnings before interest, taxes and depreciation and amortization ("<u>EBITDA</u>"), Enterprise Value to earnings before interest and taxes ("<u>EBIT</u>") and Equity Value to net income (price earnings ratio).

Lazard's Comparable Company Analysis valuation methodology yielded an Enterprise Valuation range for the Reorganized Debtor's utility operations of $1.400 to $1.550 billion with a mid-point of value of $1.475 billion.

(j)    Precedent Transactions Analysis

Precedent transactions analysis estimates the value of a company based on the implied valuations of merger and acquisition transactions in the target company's industry. Valuation multiples for these transactions are calculated based on the purchase price (including any debt assumed where appropriate) paid for the acquired company as a multiple of EBITDA, EBIT, and net income. Lazard's Precedent Transaction Analysis valuation methodology yielded an Enterprise Valuation range for the Reorganized Debtor's utility operations of $1.450 to $1.600 billion with a mid-point value of $1.525 billion.

(k)    Discounted Cash Flow Analysis

The discounted cash flow ("DCF") methodology values a business by determining the current value of the estimated future cash flows to be generated by that business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based on its capital structure. The value of the firm is determined by calculating the present value of the Reorganized Debtor's un-levered after-tax free cash flows provided in the Debtor's business plan (five-year projection) plus a proxy for the value of the firm beyond the projection period known as the terminal value. The terminal value was derived by applying a multiple to the Reorganized Debtor's projected EBITDA in the year following the Projection Period.

Lazard's resulting Enterprise Valuation range using the DCF methodology is $1.575 billion to $1.750 billion with a mid-point value of $1.663 billion.

(l)    Distributable Cash

When calculating expected recoveries pursuant to the Plan, Lazard added Distributable Cash to Enterprise Value to derive the total distributable value available to satisfy Claims ("Total Distributable Value"). Pro forma Distributable Cash as of the Effective Date is estimated at approximately $145.0 million. Distributable Cash includes excess cash from operations and estimated proceeds from the sale of non-core assets. Excess cash from operations reflects the Debtor's projected unrestricted cash balance as of September 30, 2004 of approximately $81 million plus an estimated $97 million in asset sale proceeds[11] less approximately $35 million of minimum cash to be retained by the Reorganized Debtor as a liquidity cushion.

(m)    Net Operating Losses

The Reorganized Debtor is expected to have approximately $655 million of NOLs prior to emergence from bankruptcy which will be reduced by an estimated $460 million of cancellation-of-debt (COD) income generated by the extinguishment of Unsecured Notes and Subordinated Notes. The resulting NOL balance of $195 million should significantly reduce the Reorganized Debtor's current tax liability over the Projection Period. Lazard valued the NOLs by calculating the present value of the tax savings provided relative to the taxes the Reorganized Debtor would otherwise pay absent application of such NOLs. These cash flows are discounted at the Reorganized Debtor's estimated cost of equity of 10.25%. Based on this approach, Lazard arrived at a valuation of the Reorganized Debtor's NOLs of approximately $45.0 million.

---

[11]    In order to determine the cash available for distribution as of the assumed Effective Date of the Second Amended Plan, Lazard has calculated the present value of the estimated asset sale proceeds as of September 30, 2004 using the Reorganized Debtor's Discount Rate of 7%.

In summary, Lazard estimated the range of value for the Reorganized Debtor's utility operations including the value of the Colstrip 4 lease, the losses associated with the qualified facility contracts, and the value of NOLs at $1.415 billion to $1.585 billion with a mid-point value of $1.50 billion.  Given the Lazard valuation, the Class 13 Equity Interests are not entitled to receive any  Distribution under either of the Plan, and therefore, the Plan does not violate the absolute priority rule and is "fair and equitable" with respect to Class 13.

### 11.     Priority Claims are Treated Appropriately under the Plan

Section 1129(a)(9) of the Bankruptcy Code requires that, unless the holder of a particular claim agrees to a different treatment of such claim:

> (a)     holders of claims entitled to priority under section 507(a)(1) or (2) must receive cash in the allowed amounts of such claims on the effective date of the plan;

> (b)     holders of claims entitled to priority under section 507(a)(3), (4), (5), (6) or (7) must receive cash in the allowed amounts of such claims on the effective date of the plan or deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims; and

> (c)     holders of tax claims entitled to priority under section 507(a)(8) must receive on account of such claims deferred cash payments, over a period not exceeding six years, of a value, as of the effective date of the plan, equal to the allowed amounts of such claims.

In this case and in accordance with Section 1129(a)(9)(A) and Section 1129(a)(9)(B) of the Bankruptcy Code, both of the plans provide that all Allowed Administrative Claims under Section 503(b) of the Bankruptcy Code (Administrative Claims: § 2.2 of the First Amended Plan, and § 2.2 of the Second Amended Plan) and all Allowed Priority Non-Tax Claims under Sections 507(a)(3), (4), (5), (6) or (7) of the Bankruptcy Code (Priority Non-Tax Claims (Class 1: § 4.1 of First Amended Plan, § 4.1 of the Second Amended Plan) will be paid in full, in cash, on the later of the Effective Date, the date on which such Claim becomes an

Allowed Administrative Claim after entry of a final order or a date agreed to by the Debtor and the holder of any such Claim. Allowed Administrative Claims representing liabilities incurred by the Debtor in the ordinary course of its business during the Chapter 11 Case, however, will be paid in the ordinary course of business and in accordance with the terms and conditions of any agreements relating thereto. See First Amended Plan, § 2.2(a), § 4.1; Second Amended Plan, §2.2(a), §4.1.

Both the First Amended Plan and Second Amended Plan also satisfy the requirements of Section 1129(a)(9)(C) with respect to the treatment of Allowed Priority Tax Claims: under Section 507(a)(8) of the Bankruptcy Code (Priority Tax Claims; § 2.3 of the First Amended Plan, §2.3 of the Second Amended Plan) by providing that such Claims will be paid in full, in cash, on the later of the Effective Date, the date on which such Claim becomes an Allowed Priority Tax Claim after entry of a final order, the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Case had not been commenced or a date agreed to by the Debtor and the holder of any such Claim. In accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, the Debtor maintains the option of making deferred cash payments over a period of six years from the date of assessment of the tax so long as the amount so paid has a value, as of the Effective Date of the Plan, equal to the Allowed amount of the Priority Tax Claim. Interest on any deferred cash payments will accrue from the Effective Date on the unpaid portion of such Allowed Priority Tax Claim at: (x) any applicable statutory rate; (y) the rate applicable to federal judgments pursuant to 28 U.S.C. § 1961; or (z) a rate to be agreed to by the Debtor (or Reorganized Debtor, as the case may be) and the appropriate governmental unit or, if they are unable to agree, as determined by the Bankruptcy Court. See First Amended Plan, § 2.3; Second Amended Plan, § 2.3.

The Debtor believes that the foregoing treatment of Administrative Claims, Allowed Priority Non-Tax Claims, and Priority Tax Claims under both of its plans complies in all respects with Section 1129(a)(9) of the Bankruptcy Code.

### 12.    At Least One Impaired Class Of Claims Has Accepted The Plan

Section 1129(a)(10) requires that at least one impaired class of claims accept the plan, the determination of which must be made without including the acceptance of the plan by any insider holding a claim in such class. 11 U.S.C. § 1129(a)(10). Classes 7, 9 and 12 have each voted to accept the First Amended Plan (without including acceptances by any insiders in such Class). The treatment of such classes in the Second Amended Plan is identical to that in the First Amended Plan, or, in the case of Class 9, such treatment has been agreed to in negotiations with the Committee whose members hold more than 2/3 in amount and 1/2 in number of such class. The requirements of Section 1129(a)(10), therefore, have been satisfied.

### 13.    The Plan is Feasible

Section 1129(a)(11) requires the Bankruptcy Court to find that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11). This requirement, commonly known as the "feasibility" standard, encompasses two interrelated yet independent determinations — the first relates to the debtor's ability to consummate the provisions of the plan, and the second relates to the debtor's ability to reorganize as a viable entity. See In re Lakeside Global II, Ltd., 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) ("This definition [of feasibility] has been slightly broadened and contemplates whether [a] the debtor can realistically carry out its plan, . . . and [b] whether the plan offers a reasonable prospect of success and is workable."); In re Rolling Green Country Club, 26 B.R.

729, 734 (Bankr. D. Minn. 1982) ("The court assumes that the word 'confirmation' in [Section 1129(a)(11)] contemplates as well an execution or consummation of the plan, the real intendment of the subsection being to avoid confirmation of plans which even if consummated are fruitless as an instrument to reorganization.").

Courts generally have held that the first determination of the feasibility requirement contemplates "'the probability of actual performance of the provisions of the plan . . . . The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'"  Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson), 767 F.2d 417, 420 (8thCir. 1985) (citing In re Bergman, 585 F.2d 1171, 1179 (2d Cir. 1978) (citation omitted)).  See also In re IPC Atlanta L.P., 142 B.R. 547, 560 (Bankr. N.D. Ga. 1992) (feasibility requires court to "see whether the Debtor can realistically carry out the provisions of the plan").

To satisfy itself that the Debtor can consummate either of its plans, which do not differ in any way that should affect feasibility, the Bankruptcy Court must determine whether the components of the First Amended Plan and Second Amended Plan which are necessary for consummation are likely to be in place.  The Debtor's ability to consummate, however, need only be reasonable and probable, not guaranteed.  Accordingly, the plan proponent must demonstrate that the plan's prospects of success are realistic and reasonable, as opposed to impractical or speculative.  See In re Johns-Manville, 843 F.2d at 649 ("the feasibility standard is whether the plan offers a reasonable assurance of success . . . [s]uccess need not be guaranteed"); Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments, (In re Sea Garden Motel & Apartment), 195 B.R. 294, 304 (D.N.J. 1996) ("The purpose of [Section 1129(a)(11)] 'is to prevent confirmation of visionary schemes which promise creditors more under a proposed plan than that which the debtor[s] can possibly attain after confirmation.'"); Cellular Info. Sys., 171

B.R. at 945 ("[t]he plan proponent is not required to guarantee the ultimate success of the reorganized company . . . . Rather, the plan proponent is only required to provide a 'reasonable assurance of success'") (quoting Johns-Manville Corp., 68 B.R. at 635 (citations omitted)); In re Stratford Assocs. L.P., 145 B.R. 689, 697 (Bankr. D. Kan. 1992) (same); In re Orlando Investors, L.P., 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989) ("Feasibility does not require that substantial consummation of the plan be guaranteed; rather, the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms."); Sound Radio, Inc., 93 B.R. at 855 ("The feasibility test is firmly rooted in predictions based on objective fact and looks at the probability of actual performance of the provisions of the proposed plan"); 7 Lawrence P. King, Collier on Bankruptcy ¶ 1129.03[11], at 1129-65 (15th ed. rev. 2004 ("The inquiry [into feasibility] is on the viability of the reorganized debtor, and its ability to meet its future obligations, both as provided for in the plan and as may be incurred in operations").

The second determination — that the debtor, after consummation of the plan, is likely to reorganize as a successful, viable entity — also does not require that "'success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success.'" Drexel, 138 B.R. at 762 (quoting 5 Lawrence P. King, Collier on Bankruptcy ¶ 1129.02[11], at 1129-54 (15th ed. 1995)). See also Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) ("the feasibility standard is whether the plan offers a reasonable assurance of success . . . [s]uccess need not be guaranteed"); In re Mayer Pollock Steel Corp., 174 B.R. 414, 421 (Bankr. E.D. Pa. 1994) ("We note that, except for [two cases], we have never relied on § 1129(a)(11) as a basis to deny confirmation of

a debtor's plan."); In re Texaco Inc., 84 B.R. at 910 ("[a]ll that is required is that there be reasonable assurance of commercial viability").[12]

Applying the above standards of feasibility, courts have identified the following factors as probative:  (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) economic conditions; (iv) the ability of management; (v) the probability of the continuation of the same management; and (vi) any other related matters that will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.  Toy & Sports, 37 B.R. at 151; accord Resorts, 145 B.R. at 479; Texaco, 84 B.R. at 910; In re Prudential Energy Co., 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986).

For purposes of determining whether the plans satisfy the above-described feasibility standards, the Debtor has analyzed its ability to fulfill its obligations thereunder (the Second Amended Plan does not differ from the First Amended Plan with respect to the matters that would affect feasibility).  See First Amended Disclosure Statement, Exhibit H; Second Amended Disclosure Statement, Exhibit I.  Exhibit H to the First Amended Disclosure Statement and Exhibit I to the Second Amended Disclosure Statement contain projections for approximately five (5) years following confirmation and a pro forma balance sheet as of the Effective Date.[13]  The Debtor believes that given estimated expenses and income, and taking into account cash reserves, the Reorganized Debtor will be able to satisfy its obligations under either

---

[12] The feasibility requirement is not designed to prevent confirmation of a plan that offers a reasonable likelihood of success. As noted by the Ninth Circuit:  "[t]he purpose of § 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374, 1382 (9th Cir.  1985) (citation omitted); see also In re Drexel Burnham, 138 B.R. at 762 ("Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.").

[13] In re Wolf, 61 B.R. 1010, 1011 (Bankr. N.D. Iowa 1986) ("the projections submitted by a debtor in reorganization need not be viewed as an 'exact science'") (citing In re Monnier Bros., 755 F.2d 1336, 1341-42 (8th Cir. 1985)).

CONFIRMATION MEMORANDUM OF LAW

its First Amended Plan or Second Amended Plan, as well as its obligations arising in connection with its ongoing business operations.

The plans proposed by the Debtor have more than a reasonable likelihood of success and adequately provide the means for the Debtor's financial reorganization. As will be shown at the Confirmation Hearing, the First Amended Plan, as amended by the Second Amended Plan, is feasible because it: (i) provides the financial wherewithal necessary to implement such plan; and (ii) offers reasonable assurance that consummation of such plan will not be followed by a liquidation or subsequent reorganization of the Reorganized Debtor. The Debtor has analyzed many pertinent factors, and has concluded that it will be able to meet its obligations under such plan.

Accordingly, both the First Amended Plan and Second Amended Plan satisfy both requirements of Section 1129(a)(11).

### 14.     28 U.S.C. 1930 Fees Have Been Or Will Be Paid

Section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under 28 U.S.C. § 1930 — fees payable to the Clerk or the United States Trustee — be paid. 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] Chapter 123 of Title 28" are afforded priority as administrative expenses. In accordance with Sections 507 and 1129(a)(12) of the Bankruptcy Code, both plans provide that all such fees and charges, to the extent not previously paid, will be paid until a final decree is entered. See First Amended Plan, § 5.16; Second Amended Plan, § 5.16. The Debtor has budgeted for and has the necessary cash to pay these fees and charges. Accordingly, both the First Amended Plan and Second Amended Plan satisfy the requirements of Section 1129(a)(12) of the Bankruptcy Code.

CONFIRMATION MEMORANDUM OF LAW

### 15.    Retiree Benefits

Section 1129(a)(13) requires that all retiree benefits, as defined in Section 1114 of the Bankruptcy Code, be continued after the Effective Date of the Plan.    11 U.S.C. § 1129(a)(13).    In compliance with Section 1129(a)(13) of the Bankruptcy Code, the First Amended Plan and Second Amended Plan each provides that, from and after the Effective Date, the Reorganized Debtor shall continue to pay any retiree benefits (as such benefits may have been modified during the Chapter 11 Case) solely to the extent, and for the duration of the period, the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under applicable law (including, without limitation, the Debtor's right to amend or terminate such benefits prior to or after the Effective Date).    See First Amended Plan, § 8.6; Second Amended Plan, § 8.6.  In light of the foregoing, both of these plans satisfy all of the requirements set forth in Section 1129(a) of the Bankruptcy Code.

### B.    The Plans Comply with Section 1129(d) of the Bankruptcy Code

Section 1129(d) provides that:

> [O]n request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933 . . . .

11 U.S.C. § 1129(d).

The principal purpose of neither plan is to avoid taxes or the registration requirements of the securities laws.  Rather, the principal purpose of both the First Amended Plan and Second Amended Plan is to effectuate the Debtor's financial recovery through a distribution mechanism that will maximize creditor recoveries.  Id.  Further, no governmental unit has requested the denial of confirmation on any of the foregoing grounds, and they are not

applicable here.  Id.  Consequently, both of these plans meet the requirements set forth in Section

1129(d).

### C.    The Second Amended Plan Complies with Section 1127 of the Bankruptcy Code

Pursuant to Section 1127 of the Bankruptcy Code, a plan proponent may modify a

plan at any time before confirmation so long as the plan, as modified, satisfies the requirements

of Sections 1122 and 1123 of the Bankruptcy Code.  11 U.S.C. § 1127(a).  In addition,

Bankruptcy Rule 3019 provides, in relevant part:

> after a plan has been accepted and before its confirmation, the proponent may file
> a modification to the plan. If the court finds after hearing on notice to the trustee,
> any committee appointed under the Code, and any other entity designated by the
> court that the proposed modification does not adversely change the treatment of
> the claim of any creditor or the interest of any equity security holder who has not
> accepted in writing the modification, it shall be deemed accepted by all creditors
> and equity security holders who have previously accepted the plan.

FED. R. BANKR. P. 3019.

A modification is material if it "so affects any creditor or interest holder who

accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its

acceptance." 9 Lawrence P. King, Collier on Bankruptcy ¶ 3019.01, at 3019-3 (15th ed. rev.

2004).

The Second Amended Plan fully complies with Sections 1122, 1123 and 1125 of

the Bankruptcy Code.  As a result, the requirements of Section 1127 of the Bankruptcy Code

have been fully satisfied.

CONFIRMATION MEMORANDUM OF LAW

## VII. THE DISCHARGE, RELEASE AND INJUNCTIVE PROVISIONS OF BOTH OF THE PLANS ARE REASONABLE AND CONSISTENT WITH APPLICABLE LAW

### A. <u>The Discharge Provisions of the Plans are Appropriate</u>

In accordance with the provisions of Section 1141(d)(1) of the Bankruptcy Code, Section 10.4 of the First Amended Plan and Section 10.4 of the Second Amended Plan discharges the Debtor from any debt that arose before the Effective Date and any debt of a kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and Section 10.5(a) of both plans provides for an injunction related to such discharge. Such provisions are therefore consistent with the Bankruptcy Code and should be approved.

### B. <u>The Release, Exculpation and Injunction Provisions of the Second Amended Plan are Appropriate</u>

Article X of the Second Amended Plan provides, <u>inter alia</u>, for a limited release of claims against the General Released Parties (Section 10.2), mutual releases between the General Released Parties (Section 10.3), an exculpation of certain claims against the Exculpated Parties (Section 10.1), and injunctions related to the limited release of the General Released Parties and the exculpation of the Exculpated Parties (Section 10.5(c)).[14] These releases, exculpation and injunctions are reasonable and appropriate in light of the structure of the Second Amended Plan and applicable law, and should be approved.

---

[14] The "Exculpated Parties" consist of the Debtor, the Reorganized Debtor, the DIP Lenders, the Committee (excluding Magten, a former Committee member) or any of their respective present or former stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, agents or Professionals in their capacities as such. The "General Released Parties" consist of the Debtor, the Reorganized Debtor, the DIP Lenders, the Committee (excluding Magten, a former Committee member) and each of their respective Affiliates and their respective parents, subsidiaries, Affiliates, Officers or Directors, or any of their former or present stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals in their capacities as such.

1.     **The Release, Exculpation and Injunctions to be Given by Third Party Non-Debtors are Consensual**

Pursuant to Section 10.13 of the Second Amended Plan, any release, exculpation or injunction to be granted pursuant to the Second Amended Plan will only be binding upon creditors and interest holders who vote in favor of the Second Amended Plan and specifically mark the approval of such provisions on a check-off box contained on their ballots. Specifically, Section 10.13[15] provides:

> 10.13   Limitations of Releases, Exculpation, Discharge and Injunction. Except as specifically provided for in this Plan, the releases, exculpation, discharge and injunctions (other than the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction) with respect to non-Debtor third parties shall be effective only as to those holders of Claims and Interests which vote to accept the Plan and mark their respective ballots in the place provided consenting and agreeing to the release, exculpation, discharge and injunction provisions of the Plan.

Because the releases, exculpation and injunctions set forth in the Second Amended Plan apply only to those creditors who affirmatively consent to these provisions, they squarely fit within the precedential authority established in the Third Circuit and in this District. See Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203 (3d Cir. 2000) (Court declined to establish per se rule to proscribe non-debtor releases and permanent injunctions); In re Exide Techs., 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving consensual releases and holding that such releases do not require that Court consider Zenith factors for permissible non-consensual third party releases); In re Central Jersey Airport Servs, LLC, 282 B.R. 176, 182 (Bankr. D.N.J. 2002) (holding that voluntary consensual releases are permissible and do not implicate Section 524(e) of Bankruptcy Code, and finding Continental requirements

---

[15]   Section 10.13 does not, however, allow creditors or interest holders to vote for or against the D&O Channeling Injunction set forth in Section 10.5(d) or the D&O Insurance Entity Injunction set forth in Section 10.5(c). A discussion of the appropriateness of the D&O Channeling Injunction and the D&O Insurance Entity Injunction is set forth below.

CONFIRMATION MEMORANDUM OF LAW

of fairness and necessity inapplicable to consensual releases); In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999) (approving consensual third party releases where creditors voted in favor of the plan). The releases, exculpation and injunction provided for in Sections 10.1, 10.2, 10.3 and 10.5(c) of the Second Amended Plan should be approved as to those parties voting in favor of these provisions on their ballots because they are consensual, and thereby such parties are agreeing to be bound to these provisions. See also In re Specialty Equip. Cos., 3 F.3d 1043, 1047 (7th Cir. 1993) (noting that consensual releases bind creditors voting in favor of plan of reorganization).

### 2.     The Exculpation and Release are Limited in Scope

The exculpation in Section 10.1 of the Second Amended Plan and the limited release in Section 10.2 of the Second Amended Plan are substantially similar to the provision approved by the Third Circuit in In re PWS Holding Corp. and should therefore be approved by this Court. In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000) (approving exculpation provision in plan that limited liability to willful misconduct or gross negligence). The exculpation and release provisions of the Second Amended Plan limit the scope of claims that are to be released to those Claims or Causes of Action based on any act or omission in connection with, related to or arising out of the Chapter 11 Case, the preparation or formulation of the plan, the pursuit of confirmation of the plan, the consummation of the plan or the administration of the plan or the property to be distributed under the Second Amended Plan. In addition, both provisions provide an exception for willful misconduct or gross negligence of any Exculpated Party or General Released Party, just as there was in the provision approved by the Third Circuit in PWS. 228 F.3d at 246-47. Finally, both provisions limit the release being provided to Officers and Directors of the Debtor to only post-petition Officers and Directors. In

- 67 –

re Genesis Health Ventures, 266 B.R. 591, 604-05 (Bankr. D. Del. 2001) (holding that release by debtor of claims against its officers and directors must be limited to those arising post-petition). Accordingly, both Section 10.1 and 10.2 are appropriate provisions and should be approved by this Court.

> **3.    The Release, Exculpation and Injunctions to be Given by the Debtor are Appropriate under Controlling Case Law**

In addition to the releases, exculpation and injunctions to be given by non-debtors to the General Released Parties, the Second Amended Plan also provides for the Debtor to release the General Released Parties and exculpate the Exculpated Parties.[16]  First, the Debtor's release of the General Released Parties complies with the controlling case law in this District, as each of the factors of the Master Mortgage test, which has been adopted by the Delaware courts, has been satisfied.  Second, the Debtor cannot recover under any D&O insurance policy for any claims against its officers and directors because of the "insured versus insured" exclusions in those policies.  Therefore, the Debtor determined that any claims it may have against its Officers and Directors would be essentially valueless and, in return for the consideration provided by those parties in exchange for the release from the Debtor, determined that a release of its claims against these third parties was appropriate.

In determining whether to approve releases granted by a debtor to third parties, courts in this District and other Circuits consider a number of factors initially set forth in In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994), including:

> (1)    an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

---

[16]    Both Magten and Law Debenture have objected to the Debtor's release of potential claims against the General Released Parties and contend that the Debtor is abandoning potential value to the Estate.

(2)    the non-debtor has contributed substantial assets to the reorganization;

(3)    the injunction is essential to reorganization, so that, without it, there is little likelihood of success;

(4)    a substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment; and

(5)    the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

Continental Airlines, 203 F.3d at 217 n.17; Exide, 303 B.R. 48; Genesis, 266 B.R. at 606; Zenith, 241 B.R. at 110.  The Master Mortgage factors "are neither exclusive nor are they a list of conjunctive requirements."  Exide, 303 B.R. at 71-72 (Bankr. D. Del. 2003).  The provisions of the First Amended Plan and Second Amended Plan meet each of the factors set forth in Master Mortgage.

        The first prong requiring an identity of interest between the Debtor and the releasees under the plan is satisfied.  The Debtor's Officers and Directors share an identity of interest with the Debtor based on statutory and contractual indemnification rights negotiated with the Debtor and provided in the Debtor's Certificate of Incorporation.   The DIP Lender is providing funding that allows the Debtor to continue to operate through confirmation of its Second Amended Plan.  The Committee was instrumental in formulating both the First Amended Plan and Second Amended Plan.  Both the DIP Lender and the Committee share an identity of interest with the Debtor in seeing the Second Amended Plan succeed and the Debtor reorganize.  See Zenith, 241 B.R. at 110 (holding that lender as funder of plan and bondholder committee, which was instrumental in formulating plan, both had identity of interest with debtor in seeing plan succeed and company reorganize).

The second prong is also satisfied because each of the parties being released have provided sufficient consideration for such release. The post-petition Officers and Directors have provided consideration because the remaining D&O policy proceeds for which they are the beneficiaries are being contributed to fund the D&O Trust under the Second Amended Plan. In addition, the Officers and Directors defense costs and related claims are being channeled to the D&O Trust to be paid on a FIFO basis subject to the D&O Trust's ability to collect on its claims from the D&O carriers.

The releases, exculpation and injunctions are integral elements of the First Amended Plan and Second Amended Plan and are necessary to the reorganization of the Debtor, thereby satisfying the third prong of the Master Mortgage factors. The Second Amended Plan represents a global agreement among the parties in this case, which is premised on all of the mutually interdependent elements, including the releases, exculpation, injunctions and the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction. Without the releases and the D&O Trust Channeling Injunction, there would be no D&O Trust established and therefore no means to accomplish the Securities Litigation settlement which requires the Debtor to provide a mechanism to make distributions to parties who choose to opt out of that settlement. In addition, the Debtor's ability to reorganize would be jeopardized without the D&O Injunctions and the releases in the Second Amended Plan because of the threat of disruption and dismemberment of the Debtor's estate through claims for indemnification or the risk of liability being imputed against the Debtor from liability established against any Officer or Director. Inclusion of the D&O Injunctions will permit the Plan to be confirmed, conferring material benefits upon creditors of this estate.

The fourth prong, requiring an agreement by a substantial majority of the impacted classes in support of the plan, is likewise satisfied in this case. In Global Ocean, the Delaware Bankruptcy Court concluded that "the 'overwhelming support' factor articulated in Master Mortgage requires that the affected class accept the plan by at least the percentages required by Section 1126 of the Bankruptcy Code." In re Global Ocean Carriers Ltd., 251 B.R. 31, 43 (Bankr. D. Del. 2000). In this case, of those Classes entitled to vote, Classes 7, 9 and 12 voted to accept the First Amended Plan. Of those creditors who actually voted within each of these Classes, between 71.43 to 82.38% of each class also voted specifically in favor of the releases set forth in the First Amended Plan, including the release to be given by the Debtor to the General Released Parties. Class 8 voted to reject the First Amended Plan; however, of those creditors who voted in Class 8, 66.47% voted in favor of the releases set forth in the First Amended Plan, including the release to be given by the Debtor to the General Released Parties.

The fifth and last prong, that the plan provide for payment of substantially all of the claims affected by the release or injunction, has also been satisfied. The Second Amended Plan provides for payments of all Classes of Claims, other than those Classes of Equity and Securities Claims which would be entitled to no recovery under a liquidation and, other than Claims in Class 12, far in excess of the liquidation value of those Claims. The Second Amended Plan also provides a mechanism in the D&O Trust Channeling Injunction to pay claimants in Class 12 pursuant to the terms of the D&O Trust on a FIFO basis. It is unknown at this time what Claims will be made against the D&O Trust and therefore what amount any claimant in Class 12 will receive; however, the Debtor has agreed to pay an additional $2.5 million if D&O insurance proceeds are not sufficient to cover existing director and officer reimbursement claims. These circumstances support approval of the releases, exculpation and injunctions.

Confirmation Memorandum of Law

Moreover, by providing the releases and injunctions to the General Released Parties in its plans, the Debtor is not, as is asserted by Magten and Law Debenture, giving up potentially valuable claims against third parties. While the Debtor succeeded to any derivative claims parties may have against its Officers and Directors upon the bankruptcy filing, the Debtor is precluded from recovering under any applicable D&O Policy for any such claims against its Officers and Directors because of the "insured versus insured" exclusion in the D&O Policies. See, e.g., Cohen v. National Union Fire Ins. Co. (In re County Seat Stores, Inc.), 280 B.R. 319 (Bankr. S.D.N.Y. 2002) (holding that trustee in bankruptcy was not precluded from bringing claims against debtor's officers and directors and having such claims covered by insurance, but implying that debtor in possession would be precluded by insured versus insured exclusion in D&O insurance policies from coverage for same claims). The "insured versus insured" provision in a D&O policy excludes coverage for claims made against a director or officer brought by or on behalf of the company or another insured person. As established at the hearing on the Debtor's Motion for Order Pursuant to Bankruptcy Rule 9019 Approving Memorandum of Understanding and post hearing briefing, each of the Debtor's D&O Policies include an express "insured versus insured" exclusion. In the absence of any insurance coverage, the Debtor has determined that any claims it may have against its Officers and Directors are essentially valueless. As a result, the Debtor concluded mutual releases between the Released Parties were appropriate.

Consequently, the releases, exculpation and injunction provisions set forth in Article X of the First Amended Plan and Second Amended Plan, both those being provided consensually by non-debtor third parties and those being provided by the Debtor, squarely comport with the governing law of this Circuit and District and should be approved.

**C.**    **As with the Releases and Exculpation, the D&O Trust Channeling Injunction and D&O Insurance Entity Injunction are Appropriate and Necessary to Implement the D&O Trust**

Section 10.5(d) of both of the plans contains a D&O Channeling Injunction, which provides for the channeling of all D&O Trust Claims in Class 12 into the D&O Trust. On the Effective Date, the D&O Trust shall assume liability for any D&O Trust Claims that arise out of the D&O Proceedings and shall pay the D&O Trust Claims and Defense Costs in accordance with the trust distribution procedures (defined as the "TDP"). The sole recourse of the holder of a D&O Trust Claim shall be against the D&O Trust, and no holder of a D&O Trust Claim shall have the right to assert such claim against the Debtor, Reorganized Debtor or any Released Party or any property or interest in property of such parties.[17]

The D&O Channeling Injunction also provides that holders of D&O Trust Claims, including Indemnification Claims in connection with any D&O Proceeding, shall be permanently stayed, restrained and enjoined from taking the actions enumerated in Section 10.5(e)(i) – (v) for the purpose of directly or indirectly collecting, recovering or receiving payment with respect to any D&O Trust Claim, other than from the D&O Trust in accordance with the D&O Trust Channeling Injunction and pursuant to the D&O Trust Documents.

In addition, Section 6.6 of the First Amended Plan and Second Amended Plan provides that the transfer to, vesting in and assumption by the D&O Trust of the D&O Trust Assets and the D&O Insurance Assignment shall discharge, release and extinguish all obligations and liabilities (i) of the Debtor and Reorganized Debtor for and in respect of all D&O Trust Claims, and (ii) of the Released Parties for an in respect of all D&O Trust Claims.

---

[17]    The "Released Parties" under the Second Amended Plan are the Debtor, the Reorganized Debtor, Officers and Directors, or any of their former or present employees, advisors, attorneys, financial advisors, accountants and other professionals in their capacities as such, and each of their representatives and agents (including any professionals retained by such persons or entities).

Finally, Section 6.9 and 10.5(c) of the plans provide for a D&O Insurance Entity Injunction, which will enjoin all Persons (except the D&O Trust and, to the extent permitted or required under Section 6.7 of the plans or the Insurance Assignment Agreement, Reorganized Debtor and the D&O Insurance Entities) that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, demand or Cause of Action against any D&O Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, demand, D&O Insurance Rights, D&O Policies or Released Parties Settlement Agreement from taking any action enumerated in Section 6.9(b)(i) – (v), with the exception of those reservations listed in Section 6.9(c).[18]

The Delaware Bankruptcy Court has previously approved the establishment of a similar settlement fund for class action securities claims against a debtor and certain third parties, including the debtor's current and former directors and officers, which was substantially funded by the proceeds of the debtor's insurance policies.  See Order Confirming the Third Amended Plan of Reorganization of the Columbia Gas System, Inc., dated Nov. 15, 1995 (Bankr. D. Del.). Accordingly, there is precedent in this Bankruptcy Court for a channeling injunction of similar claims as is being proposed in this Chapter 11 case.  In addition, the Bankruptcy Court for the Southern District of New York approved a channeling injunction and related releases that channeled claims pursuant to securities litigation settlements into a trust and enjoined claims against the debtor's officers and directors and other third parties with potential contribution or indemnification claims against the debtors.  Drexel, 138 B.R. 723 (Bankr. S.D.N.Y. 1992).

More recently, in the case of In re Combustion Eng'g., Inc., 295 B.R. 459 (Bankr. D. Del. 2003), the Court held that  Section 105(a) of the Bankruptcy Code permits a stay of

---

[18]    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall be collectively referred to herein as the "D&O Injunctions."

CONFIRMATION MEMORANDUM OF LAW

proceedings and channeling injunction, even outside of asbestos trusts.  In re Combustion Eng'g, Inc., at 483 *67 (citing In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002); Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.), 880 F.2d 694 (6th Cir. 1989)).  The Combustion Engineering court combined the analyses of the courts in Dow Corning and A.H. Robbins in finding that Section 524(e) of the Bankruptcy Code does not limit the equitable power of a bankruptcy court to enjoin suits against third parties where the injunction is necessary to the plan and a workable reorganization, if the seven factors enumerated by the court in Dow Corning are met.  The Dow Corning factors are virtually identical to the Master Mortgage factors discussed above, with the addition of the following two factors:

> (a)    the plan provides an opportunity for those claimants who choose not to settle to recover in full; and

> (b)    the bankruptcy court made a record of specific factual findings that support its conclusions.

The D&O Injunctions meet each of these factors and should therefore be approved by the Bankruptcy Court.  The first prong requires that there be an identity of interest between the Debtor and the releases under the D&O Injunctions.  Because the Debtor's Officers and Directors share an identity of interest with the Debtor based on their statutory and contractual indemnification rights, this prong is satisfied.

The second prong is also satisfied because each of the parties being released have provided sufficient consideration for such release.  The post-petition Officers and Directors have provided consideration because the remaining proceeds of the D&O Policies, for which they are the beneficiaries, are being contributed to fund the D&O Trust under the Plan.  In addition, the Officers and Directors are giving up their direct access to the D&O Policies, which were in place and which they relied upon when the Officers and Directors agreed to accept their positions with

- 75 -

the Debtor, and are agreeing to be channeled into the D&O Trust with no guaranty that their defense costs will be paid in full.   The Debtor and Reorganized Debtor are providing consideration of $2.5 million if the D&O Trust funds are exhausted.

The D&O Injunctions are integral elements of the First Amended Plan and Second Amended Plan and are necessary to the reorganization of the Debtor, thereby satisfying the third prong of the Dow Corning factors.  The plans represent a global agreement among the parties in this case, which is premised on all of the mutually interdependent elements, including the formation and funding of the D&O Trust and the D&O Injunctions necessary to implement the D&O Trust.  The D&O Injunctions are necessary to implement the D&O Trust.  The D&O Trust is necessary to provide a means to accomplish the Securities Litigation settlement, which requires the Debtor to provide a mechanism to make distributions to parties who choose to opt out of that settlement.

The fourth prong, requiring an agreement by a substantial majority of the impacted classes in support of the plan, is likewise satisfied in this case.  In this case 100% of the holders of Claims in Class 12 who submitted ballots, the only class impacted by the D&O Injunctions, voted to accept the First Amended Plan.

The fifth prong, that the plan provides for payment of substantially all of the claims affected by the release or injunction, may or may not be satisfied.  The First Amended Plan and Second Amended Plan provide a mechanism in the D&O Trust Channeling Injunction to pay claimants in Class 12 pursuant to the terms of the D&O Trust.  It is not known at this time, however, what claims will be made against the D&O Trust, so it is impossible at this time to determine whether all claims made against the D&O Trust will be paid, although the Debtor currently is not projecting that all such claims will be paid in full.

CONFIRMATION MEMORANDUM OF LAW

The sixth prong, that the plan provides an opportunity for those claimants who choose not to settle to recover in full, again may or may not be met as to any particular claimant. Holders of Class 12 D&O Claims will have the ability to pursue their causes of action and then to present any valid claims to the D&O Trust for distribution, if funds remain available. It is expected that certain holders of Claims in Class 12, although potentially not all such claimants, will be paid all or substantially all of their Claim.

Finally, the last prong, that the Bankruptcy Court make a record of specific factual findings that support its conclusions, would be satisfied at the Confirmation Hearing and through the Confirmation Order.

Consequently, the releases, exculpation, discharge and injunction provisions in Article X of the Second Amended Plan, including the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction, squarely comport with the governing law of this Circuit and District and should be approved.

## VIII. DEBTOR'S RESPONSE TO OBJECTIONS OF MAGTEN AND LAW DEBENTURE

### A.    Objection to Adequate Information

On or about August 9, 2004 Magten filed its Objection of Magten Asset Management Corporation to Confirmation of the Debtor's First Amended Plan of Reorganization (the "Magten Confirmation Objection") [Docket No. 1801, dated August 9, 2004]. To the extent Magten bases its objection on insufficient disclosure, the objection must be overruled. On May 26, 2004 this Court determined that the First Amended Disclosure Statement contains "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the First

Amended Plan. As a result, to the extent Magten objects because of alleged insufficient disclosure, the objection must be overruled.

### B. **Objection to Classification Scheme**

Magten and Law Debenture complain that the separate classification of Class 8 from Class 9 and Class 11 is impermissible. Magten and Law Debenture are wrong. As discussed <u>supra</u> at page 11, Class 8 is now composed of Class 8(a), the TOPrS Notes and Class 8(b), the QUIPS Notes. Both Class 8(a) and 8(b) are subordinated to Class 7 by the express subordination language in the TOPrS Indenture and the QUIPS Indenture.

Moreover, because of Magten and Law Debenture's continuing and ongoing classification objection, the Debtor has created separate subclasses. Since Magten and Law Debenture have objected to all subordinated debt being placed in Class 8, the Debtor has separated the class into subclasses based on the separate indenture documents. This classification is particularly appropriate in light of the proposed Class 8 Settlement as between the Debtor, the Committee and Wilmington Trust and Harbert. Since Magten is subordinate to Class 7, and as other creditors have asserted, may be subordinate to the TOPrS Notes, its assertion regarding classification is correct. By accommodating Magten and Law Debenture, the Debtor has created an even more specific classification scheme thereby enhancing the similarity of Claims within each Class.

As a result, the Debtor has addressed the classification objections of Magten and Law Debenture and the classification set forth in Articles II and III of the Second Amended Plan is consistent with Section 1122 of the Bankruptcy Code and should be approved.

C.    **Objection to Treatment of Class 8 Claims**

Magten asserts that the First Amended Plan discriminates unfairly against holders of Class 8 Claims because claimants in Class 9 and Class 11 will receive Distributions greater than those to Class 8.    Magten Confirmation Objection at ¶ 36.    Magten ignores the subordination agreement set forth in the QUIPS Indenture and makes the remarkable (and totally unsupported) statement that "subordination agreements are not considered" for purposes of "determining whether a plan 'discriminates unfairly' against classes of equal rank. . . ."  Id. at ¶ 36, n.10.

But for the proposed Class 8 Settlement set forth in the Second Amended Plan and the Class 7 agreement to offer a 2% recovery to Class 8 pursuant to the First Amended Plan, there would be no distribution to Class 8.    There can be no unfair discrimination where a plan allocates to a class of junior creditors certain value to which those creditors "[had] no right, title or interest … [and] which would otherwise [have been] required by applicable law to be paid directly to" more senior creditors.    See, e.g., In re Union Financial Services Group, Inc., 303 B.R. 390, 421-22 (Bankr. E.D. Mo. 2003).    As discussed in greater detail at pages 43-47 herein, Section 1501 of the QUIPS Indenture provides for the subordination of the QUIPS Notes as follows:

> The Company, for itself, its successors and assigns, covenants and agrees, and each Holder of the Securities of each series, by its acceptance thereof, likewise covenants and agrees, that the payment of the principal of and premium, if any, and interest, if any, on each and all of the Securities is hereby expressly subordinated to the extent and in the manner set forth in this Article, in right to payment to the prior payment in full of all Senior Indebtedness.

QUIPS Indenture, §1501.  In the Debtor's case, there is insufficient value for Class 8(a) or Class 8(b) to receive any Distribution in accordance with the strict priority rule ; the only way Class

8(a) or Class 8(b) receive any Distribution is through the proposed Class 8 Settlement provided for in the Second Amended Plan.

The legislative history of Section 1129(b) specifically addresses the importance of enforcing subordination agreements when determining whether a plan discriminates unfairly and details the unfair discrimination test using the following example where there are three classes of unsecured creditors – trade creditors, senior debt and subordinated debt. H.R. Rep. No. 95-595, p. 416 (1977). Each are owed $100 and the plan proposes to pay $45 in value. This hypothetical can be illustrated by the following chart:

| | TRADE CREDITORS | SENIOR DEBT | SUBORDINATED DEBT | TOTALS |
|---|---|---|---|---|
| Claims | $100 | $100 | $100 | $300 |
| Distribution | $15 | $15 | $15 | $45 |
| Weighted Aliquot Distribution | $15 | $15 | $15 | $45 |

Id. at 416. Here, there is no unfair discrimination because the "total consideration" given to the senior debt and the subordinated debt "does not exceed the amount that would result from an exact aliquot distribution." Id. Thus, in this example, the senior debt and the subordinated debt are receiving $30 of the total $45 available to unsecured creditors and, accordingly, are not receiving more than their aliquot share of distribution to classes of equal rank. Id.

The legislative history recognizes, however, that from the perspective of the senior debt, subordinated debentures are junior. H.R. Rep. No. 95-595, p. 416. Accordingly, the legislative history states that the following is an example of a distribution scheme that is not unfairly discriminatory:

CONFIRMATION MEMORANDUM OF LAW

| | TRADE CREDITORS | SENIOR DEBT | SUBORDINATED DEBT | TOTALS |
|---|---|---|---|---|
| Claims | $100 | $100 | $100 | $300 |
| Distribution | $15 | $30 | $0 | $45 |
| Weighted Aliquot Distribution | $15 | $15 | $15 | $45 |

Id. at 416.  As the legislative history states, notwithstanding the fact that the subordinated debt receives no distribution, a plan that provides this type of distribution also does not unfairly discriminate because "the total consideration given all other classes of equal rank does not exceed the amount that would result from an exact aliquot distribution."  Id.  In other words, Section 1129(b) recognizes the effect of a subordination agreement as between the senior debt and the subordinated debt.  Id.  Moreover, in this example (as with the example before) the senior debt and the subordinated debt are receiving $30 of the total $45 available to unsecured creditors and, accordingly, are not receiving more than their aliquot share of distribution to classes of equal rank.  Id.

However, the following plan is unfairly discriminatory to the senior debt "because from its perspective a junior class received property under the plan."  H.R. Rep. No. 95-595, p. 416.

| | TRADE CREDITORS | SENIOR DEBT | SUBORDINATED DEBT | TOTALS |
|---|---|---|---|---|
| Claims | $100 | $100 | $100 | $300 |
| Distribution | $15 | $25 | $5 | $45 |
| Weighted Aliquot Distribution | $15 | $15 | $15 | $45 |

CONFIRMATION MEMORANDUM OF LAW

This plan would nevertheless be confirmable if "senior debt was unimpaired, received full value, or accepted the plan. . . ." H.R. Rep. No. 95-595, p. 416.

### *Application of the Legislative History of Section 1129(b) to the Plan*

Similarly, the Debtor's Second Amended Plan is not unfairly discriminatory with respect to the Class 7 Unsecured Note Claims, the Class 8 Unsecured Subordinated Notes or the Class 9 General Unsecured Claims. The Second Amended Plan's treatment of these unsecured claims can be illustrated by the following chart:

| | CLASS 9 GENERAL UNSECURED CLAIMS | CLASS 7 UNSECURED NOTE CLAIMS | CLASS 8 UNSECURED SUBORDINATED NOTES | TOTALS |
|---|---|---|---|---|
| Claims (in millions) | $46.1 | $898.3 | $390.6 | $1,335.1 |
| Distribution (in millions) | $31.6 | $614.0 | $59.9 | $705.5 |
| Weighted Aliquot Distribution | $24.4 | $474.7 | $206.4 | $705.5 |

Here, the Second Amended Plan is not unfairly discriminatory because the "total consideration" that Class 7 and Class 8 will receive, $673.9 million ($59.9 million plus $614.0 million), does not "exceed the amount that would result from an exact aliquot distribution" or $681.1 million ($206.4 million plus $474.7 million). H.R. Rep. No. 95-595, p. 416. And while Class 7 Unsecured Note Claims could have objected to Class 8 Unsecured Subordinated Notes receiving any property under the First Amended Plan, Class 7 "has accepted the plan" and,

accordingly, has consented to such a distribution to a junior class receiving property when the more-senior class has not been paid in full.[19]

Not surprisingly, bankruptcy courts agree with the legislative history. For example, the court in Greate Bay found that Section 1129(b) of the Bankruptcy Code only prohibits unfair discrimination among creditors who have the same level of priority. In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 232 (Bankr. D.N.J. 2000). Since a subordination agreement "change[d] the level or priority enjoyed" by the subordinated debt holder, the plan did not "unfairly discriminate" against such a subordinate creditor where the plan recognized the effect of the subordination in connection with distributions to creditors. Accord In re Walnut Equipment Leasing Co., No. 97-19699, 1999 WL 1068448 (Bankr. E.D. Pa. Nov. 23, 1999) (concluding that absent a finding that an indenture for subordinated debt was unenforceable, a plan's treatment of subordinated debt in accordance with provisions of such indenture was not unfair or discriminatory). See also In re Aztec Co., 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("The legislative history of 1129(b)(1) considers only one circumstance which would support disparate treatment, a subordination agreement."). In re Consul Rest. Corp., 146 B.R. 979, 987-88 (Bankr. D. Minn. 1992) ("[I]t is generally understood that [subordination] rights are enforceable under the discrimination and fair and equitable concepts of [1129(b)(1)].").

## D.    Objection to Releases

Both Magten and Law Debenture have objected to the Debtor's release of potential claims against the General Released Parties and contend that the Debtor is abandoning

---

[19] Pursuant to the indenture for the QUIPS and TOPrS, holders of Class 7 Unsecured Note Claims have a contractual right against holders of Class 8 Unsecured Subordinated Notes to be paid in full prior to Class 8 Claims receiving distributions. Section 1501 of the QUIPS Indenture provides that the QUIPS are "expressly subordinated to the extent and in the manner set forth in this Article, in right of payment to the prior payment in full of all Senior Indebtedness." Class 7 Unsecured Notes constitute "Senior Indebtedness" under the QUIPS Indenture.

potential value to the Estate. First, as discussed above, the Debtor's release of the General Released Parties complies with the controlling case law in this District, as each of the factors of the Master Mortgage test, which has been adopted by the Delaware courts, has been satisfied. Second, the Debtor cannot recover under any D&O insurance policy for any claims against its Officers and Directors because of the "insured versus insured" exclusions in those policies.[20] The Debtor has exercised its business judgment and conclude the mutual releases as to the General Released Parties is necessary and appropriate under the circumstances. This is particularly true when the implementation of the D&O Trust is considered as a number of the General Released Parties are not receiving any recovery under the Second Amended Plan other than the right to have their remaining D&O Claims channeled to the D&O Trust. Lastly, it should be noted that the Debtor has learned that Magten traded while on the Committee and while subject to various confidentiality agreements in breach of its fiduciary duty to the Committee and the other creditors of this Estate. The Debtor anticipates filing prior to Confirmation an adversary complaint seeking, among other things, to subordinate Magten's claim under Section 510(c) of the Bankruptcy Code.

IX.    **RESPONSE TO OBJECTION OF RCG AND DAVID FISHEL**

RCG Carpathia Master Fund, LTD. ("RCG"), Kellogg Capital Group, LLC f/k/a Performance Capital and David Fishel each assert that Lazard, the Debtor's financial advisor, has undervalued the Debtor. RCG through Seneca Financial Group, Inc. (its financial advisor) asserts the enterprise value of the Reorganized Debtor is between $2.2 billion and $2.4 billion and the value of the Class 13 Equity Stock Interests is between $110 and $310 million. RCG further asserts that the First Amended Plan violates the absolute priority rule because Class 13

---

[20]    See supra at page 71-72.

shareholders are recovering substantially less than the value of their equity interests, which have no value and are being cancelled under the First Amended Plan. RCG also argues that subjective adjustments to the valuation analysis should be disallowed.

As set forth in the Second Amended Plan and Second Amended Disclosure Statement, common equity holders will receive no recovery in either a Chapter 7 liquidation or pursuant to the Second Amended Plan. As set forth in Exhibit H to the Second Amended Disclosure Statement, if the Chapter 11 Case were converted to a Chapter 7 liquidation, holders of Claims in Classes 7, 8, 9, 10, 11, and 12 would receive less than they will receive under the Second Amended Plan and holders of all other Claims and Equity Interests would receive no Distributions under the Second Amended Plan.

As set forth in the Affidavit of Andrew Yearley in Support of Confirmation of First Amended Plan of Reorganization of NorthWestern Corporation (the "Yearley Affidavit"), and as Mr. Yearley is expected to testify at the Confirmation Hearing, Lazard has undertaken its valuation analysis for the purpose of determining value available for distribution to creditors and interest holders pursuant to the Second Amended Plan and to analyze the relative recoveries to creditors and interest holders thereunder. (Yearley Affidavit, at p. 3.)

Lazard estimated the range of value for the Reorganized Debtor's utility operations including the value of the Colstrip 4 lease, the losses associated with the qualified facility contracts, and the value of NOLs at $1.415 billion to $1.585 billion with a mid-point value of $1.50 billion. Given the Lazard valuation, the Class 13 Equity Stock Interests are not entitled to receive any Distribution under the Second Amended Plan, and therefore, the Second Amended Plan does not violate the absolute priority rule and is "fair and equitable" with respect to Class 13.

## X.     RESPONSE TO HYLLAND OBJECTION

Richard R. Hylland has objected to the provisions of the D&O Trust as discriminatory, inequitable and unfair in the following respects:  (1) Hylland objects to Section 10.5(d) of the First Amended Plan to the extent it does not propose treatment of his indemnification claims against the Debtor in accordance with the treatment provided to claims in Classes 7 and 9 if his indemnification claims are not paid by the D&O Trust; (2) Hylland objects to the FIFO method of payment of claims; and (3) Hylland objects to the provision of the D&O Trust that if the D&O insurance policy proceeds used to fund the D&O Trust is exhausted, the Debtor will contribute up to $2.5 million to pay defense costs incurred by current Officers and Directors only, but not the claims of former Officers and Directors.

As to the first objection, no  Director and Officer is receiving the second bite of the apple Mr. Hylland seeks.  Access to the D&O Trust is the only remedy available to a Director or Officer for reimbursement of costs and related to indemnification claims.

As to Hylland's specific objections to the provisions of the D&O Trust's FIFO method of paying claims and the Debtor's agreement that if the D&O Trust proceeds are exhausted, the Debtor has agreed it will contribute up to an additional $2.5 million into the D&O Trust to pay the defense costs of the current Officers and Directors.  The Debtor believes that under the circumstances of this case, the FIFO method of payment of claims is not only appropriate, but also the most equitable distribution method available to the Debtor.  The Debtor has significant and broad statutory and contractual indemnity obligations to its current Officers and Directors.  Several of the  current Officers and Directors have employment contracts that provide that the Debtor will indemnify them against any claims incurred during or arising out of their employment with the Debtor, including the provision of defense costs.  In addition, Section

CONFIRMATION MEMORANDUM OF LAW

145 of the Delaware General Corporation Law provides officers and directors of a Delaware corporation with a statutory basis for indemnification and recovery of defense costs. 8 Del. C. § 145. The Debtor's current Officers and Directors are direct beneficiaries under the D&O Policies and relied on the existence of the D&O Policies in agreeing to continue to serve in their respective positions post-petition. Since the proceeds of the D&O Policies are being used to fund the D&O Trust, it is only appropriate current that the current Officers and Directors be able to access the D&O Trust on a FIFO basis. Moreover, to the extent that there are other former directors, officers or D&O claimants with ripe claims, it is only appropriate that claims be submitted as and when they become ripe under the applicable D&O Trust Distribution Procedures.

Lastly, as to Hylland's objection to the Debtor's contribution of up to $2.5 million to pay defense costs incurred by current Officers and Directors only, the Debtor's agreement to pay an additional $2.5 million for the defense costs of current Officers and Directors if the remainder of the D&O Trust assets are exhausted is in recognition of the Debtor's statutory and contractual indemnity obligations to its current Officers and Directors, who have continued to serve the Debtor post-petition. Because of the current Directors and Officers' post-petition services throughout this proceeding, this provision is appropriate and should be approved by the Court.

The Debtor has advised Mr. Hylland that, excluding his D&O Claims, to the extent he holds Class 9 Claims that are not D&O Claims that he will be treated as a Class 9 claimant as to the portion of his Claim that so qualifies. Accordingly, the D&O Trust, the D&O Trust Procedures and the Debtor's additional contribution to pay defense costs incurred by

CONFIRMATION MEMORANDUM OF LAW

current Officers and Directors is fair and consistent with the provisions and goals of the Bankruptcy Code.

## XI.     REMAINING OBJECTIONS

The Debtor proposes certain minor modifications in the Second Amended Plan to resolve other objections received to confirmation of the first Amended Plan.  <u>Exhibit A</u> identifies where these changes have been implemented in order to resolve the other objections the Debtor received and the proposed resolution of such objection.

CONFIRMATION MEMORANDUM OF LAW

## XII.    CONCLUSION

For the reasons presented above, the Debtor submits that the First Amended Plan and Second Amended Plan each satisfies all of the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules and should be confirmed.   Accordingly, the Debtor respectfully requests that this Court enter an Order confirming the  Second Amended  Plan subject to the Debtor's compliance with the Resolicitation Procedures and meeting the voting requirements set forth in Sections 1126(c) and 1129(a)(b) of the Bankruptcy Code.

Dated: Wilmington, Delaware
              August 18, 2004

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Jesse H. Austin, III
Karol K. Denniston
Telephone: (404) 815-2400

- and -

GREENBERG TRAURIG, LLP
/s/ William E. Chipman, Jr.

Scott D. Cousins (No. 3079)
William E. Chipman, Jr. (No. 3818)
Paul D. Brown (No. 3903)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

***Co-Counsel for the Debtor and
Debtor-in-Possession***

- 89 –

**EXHIBIT A**

**[Table of Responses to Objections]**

**see attached**

CONFIRMATION MEMORANDUM OF LAW

**NorthWestern Corporation – Case No. 03-12872 (CGC)**
**Revised Status Chart of Objections to First Amended Plan[1] as of August 18, 2004**

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| 1) Objection of Stephen R. Heflin [Docket No. 1779] | Notice of Objection does not have Objection attached. Objection has not been received by PHJW nor is it filed on the docket. | The Debtor has not received a copy of Mr. Heflin's Objection to the Plan. Mr. Heflin is a pro se claimant. While he has served a document styled as "Notice of (1) Objection to Confirmation of the Plan of Reorganization, and (2) Monetary Claim in the Amount of $1,225," there is no corresponding objection. Without having received an actual objection the Debtor is unable to effectively respond. | Without having received an actual objection the Debtor is unable respond. |
| 2) Objection of Wells Fargo, N.A. (as Indenture Trustee) [Docket No. 1780] | a) Wells Fargo seeks clarification regarding the procedural mechanism for payment and recovery of the pre-Effective Date fees and expenses it has incurred as Indenture Trustee | As presently drafted, Wells Fargo contends that Section 5.17 of the First Amended Plan (p. 46) could be read to require the Indenture Trustee to exercise its lien charging rights under the Indentures (in the event of non-payment or delayed payment of its fees and expenses), thus resulting in a reduction in payments to the bondholders, in violation of the proposed treatment of the Class 5 Secured Bondholder Claims.<br><br>Section 5.17 currently reads as follows:<br><br>Indenture Trustees Charging Lien.  On the Effective Date, Reorganized Debtor will pay the Indenture Trustees' Fees and Expenses in full and in Cash, in an amount allowed by the Court pursuant to Section 503(b) of the Bankruptcy Code or otherwise. (emphasis added).<br><br>Wells Fargo seeks modification of the First Amended Plan to clarify the position that the Reorganized Debtor intends to pay Wells Fargo's fees and expenses without further application to, or order from, the Bankruptcy Court, and to subject any dispute to judicial determination only in the event that Wells Fargo and the Debtor cannot reach an agreement on the appropriate amount of fees and expenses. Wells Fargo basically wants clarification of the "or otherwise" language above. | This objection has been addressed in the Plan. See Section 5.17, Indenture Trustees Charging Lien.[2] |

---

[1] "First Amended Plan" shall refer the Debtor's proposed First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated May 17, 2004.

ATL /1051489.9

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | b) Wells Fargo also seeks to incorporate the proposed language contained herein to correct definitional inconsistencies contained in the First Amended Plan. | Wells Fargo proposes the following changes to correct inconsistencies in the definitions contained in the First Amended Plan:<br><br>(i)  In Section 1.158 (p. 22), captioned "Secured Bonds," the reference to "South Dakota Pollution Control **Bond Obligations**" should be changed to "South Dakota Pollution Control **Bonds**"<br><br>(ii)  The proposed change to Section 1.158 requires a definition for "South Dakota Pollution Control Bonds," which term is presently undefined.  Wells Fargo suggests the following language:<br><br>    "South Dakota Pollution Control Bonds" shall mean any outstanding bonds issued under the South Dakota Pollution Control Indentures.<br><br>(iii) In Section 1.164 (p. 23), captioned "South Dakota Pollution Control Bond Claims,"  the reference to "South Dakota Pollution Control **Bond Obligations**" should be changed to "South Dakota Pollution Control **Bond**."<br><br>(iv)  In Section 5.17 (p. 46), captioned "Indenture Trustees Charging Lien," the reference to "South Dakota Pollution Control **Bond Obligation Claims**," which appears in the last sentence of the first paragraph, should be changed to "South Dakota Pollution Control **Bond Claims**." | These objections have been addressed in the Plan.<br><br>See Section 1.164, Secured Bonds.<br><br>See Section 1.171, South Dakota Pollution Control Bonds.<br><br>See Section 1.172, South Dakota Pollution Control Bond Claims.<br><br>See Section 5.18, Indenture Trustees Charging Lien. |
| 3)  Limited Objection of U.S. Bank, N.A. ( as Indenture Trustee) [Docket No. 1781] | a) U.S. Bank seeks clarification regarding the procedural mechanism for payment and recovery of the pre-Effective Date fees and expenses it has incurred as Indenture Trustee | As presently drafted, U.S. Bank contends that Section 5.17 of the First Amended Plan (p. 46) could be read to require the Indenture Trustee to exercise its lien charging rights under the Indentures (in the event of non-payment or delayed payment of its fees and expenses), thus resulting in a reduction in payments to the bondholders, in violation of the proposed treatment of  the Class 5 Secured Bondholder Claims.<br><br>Section 5.17 currently reads as follows:<br><br>Indenture Trustees Charging Lien.  On the Effective Date, Reorganized Debtor will pay the Indenture Trustees' Fees and | This objection has been addressed in the Plan.<br><br>See Section 5.18, Indenture Trustees Charging Lien. |

2    The "Plan" shall refer the proposed Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated as of August 18, 2004.

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | | Expenses in full and in Cash, in an amount allowed by the Court pursuant to Section 503(b) of the Bankruptcy Code or otherwise. (emphasis added).<br><br>U.S. Bank seeks modification of the First Amended Plan to clarify the position that the Reorganized Debtor intends to pay U.S. Bank's fees and expenses without further application to, or order from, the Bankruptcy Court, and to subject any dispute to judicial determination only in the event that U.S. Bank and the Debtor cannot reach an agreement on the appropriate amount of fees and expenses. U.S. Bank basically wants clarification of the "or otherwise" language above. | |
| | b) U.S. Bank also seeks to incorporate the proposed language contained herein to correct definitional inconsistencies contained in the First Amended Plan. | U.S. Bank proposes the following changes to correct inconsistencies in the definitions contained in the First Amended Plan:<br>In Section 5.5(b) (p. 42), captioned "Cancellation and Surrender of Existing Securities Agreements," the reference to "Gas Transmission **Bond Obligations**," which appears in the last sentence, should be changed to "Gas Transmission **Bond Claims**." | This objection has been addressed in the Plan.<br>See Section 5.5(b), Cancellation and Surrender of Existing Securities Agreements. |
| 4)  Limited Objection of PPL Montana, LLC ("PPLM") [Docket No. 1784] | a) The First Amended Plan Injunction impermissibly attempts to extinguish a broad array of rights and claims, including counterclaims and setoff rights which PPLM has preserved and pursued, and which are protected by orders of this Court and the | PPLM's first objection is summarized as follows:<br>(i) Applicable Third Circuit law prohibits a plan of reorganization from extinguishing setoff rights that have been timely preserved by a creditor.<br>(ii) PPLM's setoff right is a secured claim pursuant to the Bankruptcy Code and is a property interest protected by the Fifth Amendment to the U.S. Constitution that cannot be taken without just compensation being given to PPLM.<br>(iii) The First Amended Plan cannot be confirmed because it impermissibly treats similarly situated creditors differently in violation of Sections 1122 and 1123 of the Bankruptcy Code by requiring PPLM to provide additional consideration (namely the relinquishment of valid setoff and counterclaim rights) which | This objection has been addressed in the Plan.<br>See Section 10.5(b), Injunctions. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|-------|----------------------|--------------------|--------------------|
|  | Bankruptcy Code | other claimants are not required to provide before receiving plan distributions.  Because of this, PPLM contends that the First Amended Plan is unfair, discriminatory and inequitable. |  |
|  |  | (iv) PPLM contends that NOR must remove the alleged offending language or revise it to make it clear that the rights  PPLM preserved prior to confirmation, including setoff rights and the right to pursue its counterclaims, will not be extinguished or otherwise adversely affected by confirmation of the First Amended Plan.  PPLM suggests that the following language be added to the Plan as Section 10.5(a)(1) and be included in any injunction provisions contained in the Confirmation Order: |  |
|  |  | The foregoing "Injunction Related to Discharge" set forth in Section 10.5 of the Plan shall not enjoin or extinguish any rights or claims asserted by PPL Montana, LLC in its Proof of Claim dated January 13, 2004 or any rights or claims asserted  in any subsequent amended proof of claim filed by PPL Montana, LLC (the "PPL Proofs of Claim") or asserted in any other manner.  Accordingly, Section 10.5 of the Plan shall in no way be construed to extinguish, limit, reduce, or otherwise adversely affect the rights and claims set forth in the PPLM Proofs of Claim, including, without limitation, PPLM's counterclaims and right of setoff. |  |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | b) The Debtor makes inadequate provisions for the manner and timing of reserves for disputed claims | PPLM's second objection is summarized as follows:<br><br>(i)  Section 7.5 (p. 53) of the First Amended Plan, captioned "Establishment and Maintenance of Reserve for Disputed Claims," establishes three procedures for funding such reserves: (1) the Debtor can seek an order of the court setting the maximum allowed amount of the claim for purposes of Plan distributions; (2) the Debtor can seek an order of the court establishing the amount of the claim for reserve purposes only; and (3) the Debtor and the holder of the Disputed Claim can agree to an amount to be reserved.  PPLM contends that notwithstanding the above procedures, the Debtor intends to negotiate a global reserve amount for all Disputed Claims with the Official Committee of Unsecured Creditors, which, due to being comprised of holders of undisputed claims, has no interest in ensuring that any reserve amount will be sufficient to pay all disputed claims. In essence, PPLM argues that it has information and belief that the Debtor does not plan to follow its published Disputed Claims Reserve procedures that are articulated in the First Amended Plan.  This Objection does not seem to be directed at the First Amended Plan itself, but rather at the methods that PPLM believes the Debtor will actually use in carrying out the First Amended Plan.<br><br>(ii)  PPLM also objects to the First Amended Plan because it does not state when or how Disputed Claims will be valued.  Although no such Disputed Claims Reserve has been established to date, PPLM argues that the Debtor must be required to establish a good faith reserve amount for all Disputed Claims, to allow for objections to such amount, if disputed by the creditor, and to further allow for this Court's resolution of any such disputes. | Issues relating to the establishment and maintenance of reserve for Disputed Claims shall be addressed at the continued Confirmation Hearing. |
| 5)  Objection of Wilmington Trust Company (as Indenture Trustee) [Docket No. 1789] | a)  The First Amended Plan is not fair and equitable because it pays senior debt value in excess of the amount of their claims to the detriment of junior | In its Objection, Wilmington Trust stated that it would file a brief in opposition to confirmation by the August 9, 2004 deadline, which would set forth in greater detail the legal and factual bases supporting this Objection. | Wilmington Trust's objection is subject to ongoing settlement negotiations and a draft term sheet.  It is the Debtor's expectation that a settlement will be finalized and the objection withdrawn.  Consistent with this understanding, Wilmington Trust has not filed a brief in support of its Objection. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | creditors | | |
| | b) The First Amended Plan violates sections 1129(b)(1) and 1129(b)(2) of the Bankruptcy Code by proposing to pay all Senior Unsecured Debt in full, even though that Debt is voidable, or at best pari passu with the Subordinated Debt, as a result of the Debtor's alleged PUHCA violations | In its Objection, Wilmington Trust stated that it would file a brief in opposition to confirmation by the August 9, 2004 deadline, which would set forth in greater detail the legal and factual bases supporting this Objection. . | See (a) above. |
| | c) The First Amended Plan improperly classifies the QUIPs and TOPrS in the same class in violation of sections 510(a) and 1123(a)(1) of the Bankruptcy Code | In its Objection, Wilmington Trust stated that it would file a brief in opposition to confirmation by the August 9, 2004 deadline, which would set forth in greater detail the legal and factual bases supporting this Objection. | See (a) above. |
| 6) Objection by Harbert Management Corporation [Docket No. 1790] | a) The First Amended Plan improperly recognizes and proposes to pay as Senior Debt the March 2002 Debt (Class 7 – Unsecured Notes) that was issued in violation of | Harbert's objection is summarized as follows: (i) Harbert contends that NOR could not have entertained a good faith belief that it qualified for the PUHCA exemption, and, as such, NOR violated PUHCA by issuing the March 2002 Debt. Harbert alleges that since the March 2002 Debt was issued pursuant to contracts that should be void ab initio due to the Debtor's alleged PUHCA violations, HBSC (as Indenture Trustee under the Senior Indenture) cannot assert rights under such contracts or, at a minimum, HBSC should not be given senior | Harbert's objection is subject to ongoing settlement negotiations and a draft term sheet. It is the Debtor's expectation that a settlement will be finalized and the objection withdrawn. Consistent with this understanding Harbert has not filed a brief in support of its Objection. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | PUHCA | status over other validly issued debt.<br><br>(ii)  Harbert believes that the Debtor's First Amended Plan is predicated on a very substantial undervaluation of the Debtor and thus, that the New Common Stock is worth much more than the artificially low value ascribed to it by the Debtor.  Harbert therefore asserts that Debtor is proposing to pay the holders of the March 2002 Debt more than 100% of their claim, while Harbert and other holders of Unsecured Subordinated Note Claims will receive only 2% of the New Common Stock if they accept the First Amended Plan and nothing if they reject the First Amended Plan.<br><br>(iii)  Section 1129(a)(3) of the Bankruptcy Code requires that a First Amended Plan be proposed in good faith and not by any means forbidden by law.  Harbert contends that the Debtor did not act in good faith in filing the PUHCA Exemption and that the Debtor violated federal law when it issued the March 2002 Debt<br><br>(iv)  Harbert also contends that the First Amended Plan violates Section 1129(b) of the Code, as the First Amended Plan cannot be crammed down with respect to the Class 8 Unsecured Subordinated Note claims because it discriminates unfairly and it is not fair and equitable, as set forth above.  Harbert also contends that since the March 2002 Debt should be void, or at least subordinated, the First Amended Plan cannot provide for priority payments on such claims because it would violate the absolute priority rule.<br><br>(v)  Harbert further asserts that the First Amended Plan cannot be confirmed with a "death trap" provision which entitles holders of Class 8 claims to 2% of the New Common Stock only if the Class votes for the First Amended Plan.  Harbert cites a few cases in support of the position that such clauses are inequitable and unfairly discriminate. | |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | b)  The First Amended Plan impermissibly releases claims that the Debtor's estate may have against the Debtor's officers and directors and other third parties for no consideration | Harbert contends that all such releases are impermissible because the releases are being given without consideration and without satisfying any of the factors that the Court is bound to analyze in deciding whether to approve a release of claims against officers and directors set forth in In re Genesis Health Ventures, Inc., 266 B.R. 592, 607-7 (Bankr. D. Del. 2001).  Harbert also contends that the First Amended Plan impermissibly releases the Debtor's claims against other third parties, including advisors, accountants, auditors, agents or Professionals for no consideration. | See (a) above. |
| | c)  Harbert's joinder in further Objections by Wilmington Trust Company (above) | Harbert also joins in the Objection to confirmation filed by the Wilmington Trust Company, as Indenture Trustee. | See (a) above. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| 7) Objection of Official Committee of Unsecured Creditors in Chapter 11 Case of Touch America Holdings, Inc. (the "TA Committee") [Docket No. 1791] | The TA Committee believes that the First Amended Plan's provisions for injunctive relief are based upon exceedingly broad definitions that could give the First Amended Plan the appearance of limiting or releasing certain claims held by the TA Debtors' estates against entities other than NorthWestern | The TA Committee's objection is summarized as follows: (i)  The injunctive provisions in Section 6.9 (pp. 49-51), enjoin all parties from pursuing any claim against any of the issuers of the "D&O Policies" if such claim arises in connection with any "D&O Insurance Rights [or] D&O Policies." (ii).  The First Amended Plan does not include a statement that the First Amended Plan does not, and cannot, enjoin, limit or release any rights, claims or interests held by the TA Debtors that may arise under any of the D&O Policies listed in Exhibit "C." (iii)  To the extent, if any, that any "D&O Protected Party" is an individual who previously served as an officer or director of any of the TA Debtors or their present or former affiliates or predecessors, the First Amended Plan cannot release any claims the TA Debtors may hold against such individuals. In sum, the TA Committee wants the First Amended Plan to be amended to confirm that the First Amended Plan does not, and cannot, enjoin, limit or release any rights, claims or interests held by the TA Debtors that may arise under any of the D&O Policies, and does not release any claims the TA Debtors may hold against any D&O Protected Party to the extent such claim is against an individual in his or her capacity as a former director or officer of any of the TA Debtors or their present or former affiliates or predecessor. | This objection has been addressed in the Plan. See Section 6.9(c), D&O Insurance Entity Injunction. See Section 1.49, D&O Protected Party. |
| 8)  Limited Objection of Richard R. Hylland ("Hylland") [Docket No. 1793] | a)  The Debtor's attempt to expand the Court's jurisdiction post-confirmation is not appropriate | Hylland objects to the First Amended Plan to the extent that by Section 13.1 (pp. 66-67) the Debtor is attempting to deprive Hylland of his rights, subject to direction from the District Court or this Court, to liquidate his claims in arbitration in accordance with the terms of his Employment Agreement. Section 13.1 of the First Amended Plan provides, in relevant part, as follows: "Following the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and this Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: | This objection has been addressed in Section X of the Debtor's Memorandum of Law in Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Confirmation Brief"). |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | | (a) to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any claims;<br><br>(d) to liquidate any Disputed Claim | |
| | b) The Proposed plan injunction is inappropriate | Hylland's objection is summarized as follows:<br><br>(i) Hylland objects to any attempt by the Debtor, pursuant to Section 10.5(a) of the First Amended Plan (pp. 60-61), to prevent Hylland from seeking and the Court (or the District Court) from ordering that Hylland's claim be liquidated in the pending arbitration proceeding.<br><br>Section 10.5(a) of the First Amended Plan provides, in relevant part, as follows:<br><br>"Injunction Related to Discharge. As of the Effective Date and subject to its occurrence, all Persons that have held, currently hold or may have asserted, directly, indirectly, derivatively or otherwise, a Claim, a Cause of Action or an Equity Interest that is discharged, released or terminated pursuant to this Plan, are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, creating, perfecting or enforcing any lien or encumbrance, asserting a set-off, or right of subrogation of any kind against any Debt, liability, or obligation due to any such releasing Person, and from commencing or continuing any action, in any manner or in any place where the foregoing does not comply with or is inconsistent with the provisions of this Plan, and the Confirmation Order shall provide for such injunctions."<br><br>(ii) Although Hylland disputes NOR's claim against him, he also objects to the First Amended Plan in that Section 10.5 would also impermissibly impair Hylland's set-off rights. | This objection has been addressed in Section X of the Confirmation Brief.<br><br>See also Section 10.5(b) of the Plan, Injunctions. |
| | c) The D&O Trust Provisions are discriminatory and inappropriate because similarly | Hylland contends that the D&O Trust Provisions in the First Amended Plan are discriminatory, inequitable and unfair in the following three respects:<br><br>1) The Proposed Channeling Function – Hylland objects to | Each of the enumerated objections have been addressed in Section X of the Confirmation Brief. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|-------|------------------------|--------------------|--------------------|
| | situated claims are treated differently thereunder | Section 10.5(d) specifically, to the extent that the First Amended Plan does not propose treatment of his indemnification claims against the Debtor, to the extent not paid by the D&O Trust, in accordance with the treatment provided to claims in Classes 7 and 9.<br><br>2) The FIFO Method of Payment of Claims – To ensure proper treatment of the D&O Claims, such claims should be paid in an equivalent manner (not first in, first out).  Hylland contends that FIFO treatment is clearly discriminatory.<br><br>3) The $2.5 Million Payable Only to Current Officers and Directors – The D&O Trust provides that if the D&O insurance policy proceeds used to fund the trusts are exhausted the Debtor will contribute up to $2.5 million to pay defense costs incurred by current officers and directors only.  Hylland submits that the use of estate funds to pay such claims on a dollar for dollar basis above insurance recoveries would be discriminatory and unfair treatment of similarly situated [former director and officer] claims. | |
| | d)  Hylland is entitled to participate in the D&O Trust and the assumed classification of his contract claim in Class 9 cannot foreclose such right | Hylland argues that the placement of his claim in Class 9, rather than Class 12, to the extent such classification is intended by the Debtor as foreclosing Hylland's rights in the proceeds of the D&O Policy, is an improper impairment of Hylland's rights in and to the D&O Policy proceeds.<br><br>Hylland also asserts his right to proceeds under the excess insurance policy (Emergency Insurance Mutual policy number 900588-00DO) (the "Excess Policy").  Hylland claims that he cannot be foreclosed from sharing in the distributions otherwise earmarked for Class 12 claims with respect to the D&O Policy and the Excess Policy. | Hylland's claims may have multiple classifications.  To the extent that Hylland has a claim for indemnification, advancement and/or legal fees and expenses channeled under the Second Amended Plan and D&O Trust, such claim has been properly classified as a Class 12 claim.   It is not the Debtor's intention to foreclose Hylland from participating in the D&O Trust along with other similarly situated claimants.  To the extent Hylland has an Allowed Class 9 claim, he will be treated as other similarly situated Class 9 claimants.  Consistent with the foregoing, Hylland received ballots for both Class 9 and Class 12.  For whatever reason, Hylland elected to return only the Class 9 ballot. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | e) Hylland is not an Insider and the treatment of his claim cannot be affected thereby | In Article 4.9(a) of the First Amended Plan, captioned "Impairment and Voting" (with respect to Class 9 Claims) (p.34), the Debtor states that "Insiders holding General Unsecured Claims are not entitled to vote to accept or reject this Plan." Hylland claims that he is not an Insider, as defined in Section 101(31) of the Code. Hylland objects to the First Amended Plan to the extent that the Debtor, in the First Amended Plan, proposes some treatment of Hylland's claims at odds with that afforded to class 9 or Class 12 creditors based on his asserted insider status. Hylland argues that such treatment would be inappropriate because he is not an insider. | This is a misstatement of the Section 4.9(a) of the First Amended Plan (also Section 4.9(a) of the Plan). Section 4.9(a) of the Plan states in relevant part as follows:<br><br>"Insiders are entitled to vote on the Debtor's Plan; provided, however, pursuant to Section 1129(a)(10) of the Bankruptcy Code, if a class of claims is impaired under the Plan, in order to determine if at least one class of claims that is impaired under the Plan has accepted the Plan, such determination shall be made without including any acceptances of the Plan by any Insiders." |
| 9) Objection of Goldman, Sachs & Co. [Docket No. 1795] | Goldman Sachs objects to confirmation of the First Amended Plan to the extent that the D&O Trust Channeling Injunction would in any manner impair Goldman Sachs' potential claims against non-Debtors, including former officers and directors of Montana Power. | Section 10.8 (p. 62) of the First Amended Plan provides that "the releases, exculpation, discharge and injunctions with respect to non-Debtor third parties shall be effective only as to those holders of Claims and Interests which vote to accept the Plan and mark their respective ballots in the place provided, consenting and agreeing to the release, exculpation, discharge and injunction provisions of the Plan." Goldman Sachs is not consenting to the release, exculpation, discharge and injunction provisions of the First Amended Plan, and it understands the quoted language above to mean that the release, exculpation, discharge and injunction provisions of the First Amended Plan, including without limitation the D&O Trust Channeling Injunction set out in Article 10 of the First Amended Plan, will not affect any claims Goldman Sachs may have against any non-Debtor party in connection with the McGreevey litigation.<br><br>According to Goldman Sachs, however, to the extent the D&O Trust Channeling Injunction could be construed to impair Goldman Sachs' rights against any non-Debtor party, that provision would be inappropriate and would violate Goldman Sachs' rights. | This objection has been addressed in Section VII(B)(1) of the Confirmation Brief.<br><br>See also Section 10.9 of the Plan, No Release for Non-Debtor Third Parties as to Goldman Sachs & Co. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| 10) Objection of RCG Carpathia Master Fund, LTD. and Kellogg Capital Group, LLC F/K/A Performance Capital ("RCG") [Docket No. 1797] | RCG claims that the First Amended Plan violates the absolute priority rule, codified in section 1129(b) o f the Bankruptcy Code. | RCG argues that Seneca (its financial advisors) estimates the value of the equity of the reorganized Debtor will be between $110 Million and $310 million, not $0 as the Debtor maintains. Thus, RCG claims that the First Amended Plan violates the absolute priority rule because the Class 13 shareholders are recovering substantially less than the value of their equity interests, which are being cancelled and have been accorded a value of $0.<br><br>RCG argues that the Debtor's use of a low ball growth rate in its projections is clearly designed to arrive at a result that will support its First Amended Plan by reducing the enterprise value of the reorganized Debtor.  Further, RCG contends that the expenses contained in the Debtor's valuation projections may be inflated by over $30 million per year for each year of the projections through 2008.<br><br>RCG also attacks the valuation methods and analysis of Lazard, stating that artificially low multiples and growth rates were used to determine the value of NOR.  RCG argues that subjective adjustments to the valuation analysis should be disallowed. | This objection has been addressed in Sections VI(A)(10)(g)-(m) and IX of the Confirmation Brief. |
| 11) Objection of David Fishel and Joinder of David Fishel to Objection of RCG [Docket No. 1800] | Fishel contends that the Debtor's First Amended Plan violates the absolute priority rule of Section 1129(b) of the Bankruptcy Code | Fishel argues that the First Amended Plan violates the absolute priority rule because the Class 13 shareholders are to receive drastically less than the value of their equity interests  - - an amount which is greater than zero, as the Debtor claims.  Fishel relies on Seneca's valuation of the Class 13 Equity Stock Interests at between $110 million and $310 million to argue that there is value that should be distributed to the shareholders and that the First Amended Plan violates the absolute priority rule.<br><br>Fishel also joins in the Objection by RCG above. | This objection has been addressed in Section VI(A)(10)(g)-(m) and IX of the Confirmation Brief. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| 12) Objection of Magten Asset Management Corporation ("Magten") [Docket No. 1801] | a) The First Amended Plan cannot be confirmed until the Adversary Proceeding between Magten, Law Debenture, and NOR is finally resolved | Magten's objection is summarized as follows:<br><br>(i)  Magten argues that the holders of the QUIPS (Magten holds in excess of 33% of the QUIPS issued by Montana Capital I) retain a right to an equitable remedy for the fraudulent conveyance of the Montana Utility Assets – a right that cannot be discharged upon the Debtor's emergence from bankruptcy and one which survives confirmation of the First Amended Plan.  Until the Adversary Proceeding is resolved by a final non-appealable order, Magten contends that the First Amended Plan cannot be confirmed.<br><br>(ii)  Magten further argues that because the Montana Utility Assets are being held in constructive trust for the holders of the QUIPS, the Plan violates Section 1129(a)(1) of the Bankruptcy Code (the "Code") by seeking to administer property – the Montana Utility Assets – that is not property of the estate pursuant to Section 541 of the Code.<br><br>(iii)  Magten contends that in order for the First Amended Plan to be confirmable, the confirmation order must clarify that, notwithstanding anything to the contrary in the First Amended Plan, including Section 5.6 of the First Amended Plan, the rights and interests of the holders of the QUIPS in the Montana Utility Assets shall not be affected by confirmation of the First Amended Plan.<br><br>(iv)  Magten also asserts that should the Court confirm the Debtor's First Amended Plan, the Court should at least clarify in the confirmation order that the causes of action set forth in the Adversary Proceeding are not dischargeable and, therefore, survive confirmation of the First Amended Plan.  Further, Magten states that the Debtor should be required to reserve approximately $69 million in cash to secure the Debtor's obligation to return the assets to Clark Fork. | This objection is addressed in Section VIII of the Confirmation Brief. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | b) The First Amended Plan fails to comply with Sections 1122 and 1129(a)(1) of the Code because the QUIPS' claims are not properly classified. | Magten asserts that the First Amended Plan cannot satisfy Section 1122(a) of the Code because the First Amended Plan classifies the claims of the holders of the QUIPS for principal plus accrued interest together with the causes of actions asserted by the holders of the QUIPS in the Adversary Proceeding. Magten argues that these claims are not substantially similar and by classifying these claims together in Class 8, the First Amended Plan is unconfirmable under Section 1129(a)(1) of the Code. Magten contends that claims related to the value of the QUIPS Notes are claims rooted in bankruptcy, while the causes of action related to the fraudulent conveyance are claims in equity, thus, they are not substantially similar claims.<br><br>To correct this alleged defect in the First Amended Plan, Magten urges the Debtor to limit the definition of the "QUIPS Claims" to mean "an Allowed Claim by the holders of a QUIPS NOTE with respect to obligations arising under the QUIPS Notes." Further, in the event that the Court holds that causes of action in the Adversary Proceeding are "claims," the First Amended Plan must clarify that such "claims" are included as General Unsecured Claims in Class 9. | This objection is addressed in Section VIII(B) of the Confirmation Brief. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | c) The First Amended Plan fails to satisfy the requirements of Section 1129(b) of the Code | Magten believes that Class 8 will vote to reject the First Amended Plan and, consequently, the Debtor will be required to seek confirmation of the First Amended Plan pursuant to Section 1129(b) of the Code.  Magten argues, however, that the First Amended Plan does not satisfy the requirements of Section 1129(b) because it provides distributions to equity holders and creditors whose claims are subordinate to creditors in Class 8 and discriminates unfairly against that class.  In support of this argument, Magten asserts the following:<br><br>    1. The First Amended Plan Discriminates Unfairly Between Claims Ranking Equally<br><br>    The First Amended Plan unfairly discriminates against Class 8 because the claimants in Class 9 and Class 11, whose claims rank equal to the claims in Class 8, are receiving recoveries far in excess of the pro rata distribution to which they are entitled.  Because Classes 9 and 11 are pari passu with Class 8, any additional recovery being distributed to those three classes of creditors should be shared equally among them.   By reinstating the General Unsecured Claims in Class 9 and the Environmental Claims in Class 11 and paying those claims in full, the First Amended Plan ignores a fundamental requirement of Section 1129; and<br><br>    2. The First Amended Plan is Not Fair and Equitable and Therefore Violates the Absolute Priority Rule<br><br>    Pursuant to the First Amended Plan, holders of equity interests that have filed securities law and other claims against the Debtor are classified as Class 12 and Class 14, and such classes are to receive more than $37 million in distributions of estate property.  However, the doctrine of absolute priority is clear that senior creditors must receive full compensation for their claims before other classes can participate in the First Amended Plan.<br><br>    Further,  the Debtor's estate could benefit from the proceeds of the D&O insurance policy as such proceeds could be distributed to the impaired classes of creditors that are senior in rank to those equity interests in Classes 12 and 14. | These objections are addressed in Section VI(A)(10) and VIII(C) of the Confirmation Brief. |

| Party | Nature of Objection(s) | Detailed Objection | Debtor's Response |
|---|---|---|---|
| | d) The Debtor is releasing all potential claims against the General Released Parties thereby abandoning potential value to the estate | Magten argues that the Debtor, through the First Amended Plan, is giving up potentially valuable claims by releasing and waiving any causes of action it may have against, among others, its subsidiaries, officers, directors, employees and advisors. Magten contends that by seeking to release claims that have substantial value, the Debtor is seeking to forfeit significant value that would inure to those classes that are currently not receiving any recovery under the First Amended Plan.<br><br>Further, Magten argues that the First Amended Plan is ambiguous with respect to the effect that a vote to reject the "Releases" contained in Article X of the First Amended Plan will have on a creditor's ability to bring its claims against non-debtor entities. Magten argues that non-consensual non-debtor release provisions violate the Code (cases cited in Brief). | This objection is addressed in Sections VII(B) and (C) and VIII(D) of the Confirmation Brief. |
| 13) Objection of Law Debenture Trust Company of New York (the "Law Debenture") [Docket No. 1803] | a) Avoidance of the Going Flat transaction and recovery of the Montana Utility Assets in the Adversary Proceeding will likely require the liquidation or further reorganization of the Debtor. | Law Debenture argues that the QUIPS retain unique rights in the Montana Utility Assets arising from the fraudulent transfer litigation related to the "going flat" transaction – rights that cannot be discharged or otherwise modified through confirmation of the First Amended Plan. To the extent the First Amended Plan purports to modify those rights, it is contrary to § 1129 (a)(1) of the Code and cannot be confirmed. Law Debenture asserts that at a minimum, any order confirming the First Amended Plan must recognize and preserve its interest in the Montana Utility Assets. Further, Law Debenture contends that if the Court determines that it is appropriate to confirm the First Amended Plan before the pending Adversary Proceeding is completely resolved pursuant to a final order, the Court should require that the Debtor set aside at least $69 million (for accrued interest and other charges under the QUIPS) to secure any judgment obtained by Law Debenture. | See Section VIII of the Confirmation Brief. |
| | b) Law Debenture argues that its claims are not properly classified with the claims of the holders of the TOPrS under the Plan. | The First Amended Plan defines Class 8 to include both (a) the QUIPS Claims and (b) the claims of the holders of the TOPrS. Because of the unique property interests, equitable remedies and other rights in the Montana Utility Assets arising from the Adversary Proceeding, Law Debenture argues that the QUIPS claims are fundamentally different from the claims of the TOPrS holders. Law Debenture states that aggregating the rights held by the QUIPS with the holders of the TOPrS is inconsistent with § | This objection has been addressed in the Plan which now has classified the QUIPS Claims separately from the TOPrS Claims. See Section 4.8 of the Plan. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | c) The First Amended Plan's treatment of other Unsecured Claims discriminates unfairly with respect to Class 8 | 1122 and 1129(a)(1) of the Code and should preclude confirmation of the First Amended Plan.<br><br>Claims in Classes 8, 9 and 11 all have identical priority interests in the Debtor's estate. Law Debenture, however, argues that the First Amended Plan does not provide for equal treatment for these Classes. Law Debenture contends that under the First Amended Plan, holders of Class 9 and Class 11 claims will receive not less than a 73.7% and 100% recovery on their respective claims while the holders of Class 8 claims (if, in fact, the Class votes to accept the First Amended Plan) can expect to receive at most only a 3.6% recovery. Law Debenture argues that Section 1129(b)(1) bars such unfair discrimination and precludes confirmation of the First Amended Plan absent the consent of the holders of the QUIPS claims. | These objections are addressed in Section VI(A)(10) and VIII(C) of the Confirmation Brief. |
| | d) The First Amended Plan is not fair and equitable because it pays senior debt value in excess of the amount of their claims to the detriment of junior creditors | The First Amended Plan provides that holders of Class 7 Unsecured Note Claims and Class 9 General Unsecured Claims will receive their pro rata share of not less than 98% of the New Common Stock issued under the First Amended Plan. Law Debenture argues that discovery has revealed that the value of the New Common Stock to be distributed to Classes 7 and 9 on the Effective Date exceeds the allowed amount of those claims and is likely to be even more than sufficient to pay the Class 8 claims in full. In support of its assertions, Law Debenture argues that the value of the reorganized Debtor's stock in the Disclosure Statement is grossly understated because it is based on improper valuation methods. As such, Law Debenture joins RCG Carpathia Master Fund, Ltd., et al.'s assertions that the valuation used in the Disclosure Statement was drastically understated. | This objection has been addressed in Section VI(A)(10)(g)-(m) and IX of the Confirmation Brief. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| | e) To the extent that Senior Unsecured Debt is void or subordinated because it was issued or acquired in violation of PUHCA, the distributions to the holders of Class 7 claims contemplated by the First Amended Plan are contrary to Sections 1129(a)(1) and 1129(b)(2) of the Code. | The First Amended Plan contemplates that the holders of Class 7 claims will receive a share in 98-100% of the New Common Stock in the reorganized Debtor.  Law Debenture argues that the majority of the Class 7 claims are subject to an objection by Harbert and Wilmington Trust, who contend that certain of the Senior Unsecured Debt was issued and/or acquired in contravention of PUHCA and should be disallowed or alternatively, stripped of its senior status.  To the extent that Class 7 claims are disallowed or treated as pari passu with other unsecured claims, Law Debenture argues that the distribution scheme currently contemplated by the First Amended Plan is contrary to Sections 1129(a)(1) & (b) of the Code.  Accordingly, Law Debenture joins Harbert's objection to First Amended Plan confirmation based on PUHCA. | Harbert's objection is subject to ongoing settlement negotiations and a draft term sheet and is expected to be withdrawn in connection with the proposed settlement with the Debtor. |
| | f) The First Amended Plan impermissibly releases claims that the Debtor's estate may have against the Debtor's officers and directors and other third parties for no consideration. | Law Debenture basically joins the objection of Magten as to this issue.  Law Debenture argues that the Debtor, through the First Amended Plan, is giving up potentially valuable claims by releasing and waiving any causes of action it may have against, among others, its subsidiaries, officers and directors, employees and advisors.  Law Debenture contends that by seeking to release claims that have substantial value, the Debtor is seeking to forfeit significant value that would inure to those classes that are currently not receiving any recovery (or minimal recovery) under the First Amended Plan.<br><br> Further, Law Debenture argues that the First Amended Plan downplays the effect that a vote to reject the "Releases" contained in Article X of the First Amended Plan will have on a creditor's ability to bring its claims against non-debtor entities.  Law Debenture argues that non-consensual non-debtor release provisions violate the Code (cases cited in Brief). | These objections are addressed in Sections VII(B) and (C) and VIII(D) of the Confirmation Brief. |

| PARTY | NATURE OF OBJECTION(S) | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| 16) Limited Objection of Touch America Holdings, Inc., et al., Debtors in Possession ("TA"), to Debtor's First Amended Plan of Reorganization | TA objects to the First Amended Plan to the extent that it improperly classifies its various claims against the Debtor. | TA filed its Limited Objection to the First Amended Plan in order to object to the characterization of the Touch America Claim in its entirety by NOR as a D&O Trust Claim and to preserve TA's ability to receive distributions as a Class 9 claimant on account of any Allowed General Unsecured Claims stemming from those portions of its Claim that are properly classified as General Unsecured Claims.  In essence, TA disagrees with NOR's characterization of the Touch America Claim in its entirety as a D&O Trust Claim.  TA seeks clarification from the Debtor that those portions of the Touch America Claim that are properly characterized as Class 9 General Unsecured Claims shall be treated as such, while those portions of the Touch America Claim that are properly characterized as D&O Trust Claims, if allowed, will receive pro rata distribution from the D&O Trust.  TA also wants assurance that NOR has adequate reserves to pay any potential Class 9 or Class 12 claims stemming from the Touch America Claim.<br><br>TA argues that any effort by the Debtor to limit the Touch America Claim, in its entirety, as a D&O Trust Claim would result in disparate treatment in violation of Section 1123(a)(4) of the Code.  Further, TA argues that absent proper characterization of those portions of the Touch America Claim that are rightly characterized as general Unsecured Claims, treatment of Touch America's potential General Unsecured Claims on par with the claims asserted by other Class 9 claimants, and assurance that NOR has properly reserved enough funds for both Class 9 and Class 12 claims, the First Amended Plan should not be confirmed. | To the extent that Touch America has an Allowed General Unsecured Claim such claim shall receive distributions as provided for under the Plan.  The Debtor is working on clarifying language.<br><br>The Debtor will provide clarifying language in its confirmation order which will provide that to the extent Touch America has an Allowed General Unsecured Claim such claim shall receive distributions as provided for in the Plan.  As part of the resolicitation process, the Debtor shall provide Touch America with a Class 9 ballot. |
|  |  |  |  |

| Party | Nature of Objection(s) | Detailed Objection | Debtor's Response |
|---|---|---|---|
| 17) Objection of the United States of America to Confirmation of the Debtor's First Amended Plan of Reorganization Dated May 17, 2004 | a) Payment of the Forest Service Permits;<br><br>b) The U.S. wants confirmation that three BPA contracts will be assumed.<br><br>c) Preservation of the Government's setoff rights. | a) The U.S. asserts that the Debtor owes undisputed prepetition and post-petition fees under the Permits.<br><br>b) The U.S. on behalf of the BPA filed the objection to preserve its rights in the event there is a dispute regarding the terms of assumption for certain BPA contracts.<br><br>c) The U.S. asserts that it has the common law right to setoff mutual debts. | The Debtor intends to assume its obligations under the Permits.<br><br>The Debtor intends to assume the following contracts with the BPA:<br><br>(i) 00PB-12160 Settlement Agreement (Residential Exchange Benefits agreement) running through 2011; (ii) 03PB-11269 Agreement regarding FY 2003 Deferral Amount; and (iii) 03PB-11353 Deposit Account Agreement.<br><br>See Section 10.5(b) of the Plan, Injunctions. |

| PARTY REQUESTING CHANGES | NATURE OF CHANGES REQUESTED | DETAILED OBJECTION | DEBTOR'S RESPONSE |
|---|---|---|---|
| Office of the United States Trustee | a)  The term "Released Parties" under the First Amended Plan could lead to a situation where a former officer or director, who was also an employee, could claim to be released from liability as a former employee.<br><br>b)  Section 2.2(b) of the First Amended Plan does not provide for a deadline for objection to claims for Professional compensation.<br><br>c)  Section 14.2 of the First Amended Plan should track the language set forth in Section 1146 (c) of the Bankruptcy Code.<br><br>d) The releases in the First Amended Plan should be modified to exclude Magten from the scope of the releases. | None filed. | See Section 1.154 of the Plan, Released Parties.<br><br>See Section 2.2(b) of the Plan, Administrative Claims.<br><br>See Section 14.2 of the Plan, Exemption from Transfer Tax.<br><br>See Section 10.11 of the Plan, No Release for Magten Asset Management Corporation. |

| Securities and Exchange Commission | The SEC requested a carve-out from the release provisions of the First Amended Plan. | None filed. | See Section 10.8 of the Plan, No Release as to the Securities and Exchange Commission.. |
|---|---|---|---|
| Official Committee of Unsecured Creditors for Netexit, Inc., et al. | The Netexit Committee requested language regarding the Netexit Committee's ability to fully deal with claims brought in Netexit cases or raise claims against parties which may be included in the releases under the First Amended Plan.. | None filed. | See Section 1.47 (g) of the Plan, D&O Proceedings. See Section 1.49 of the Plan, D&O Protected Party. See Section 6.9(c)(viii) and (ix) of the Plan, D&O Insurance Entity Injunction. See Section 10.5(b) of the Plan, Injunctions. See Section 10.10 of the Plan, No Release for Certain Netexit Parties. |