# APP. 16

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |

## DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PAUL, HASTINGS, JANOFSKY &**
**WALKER LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
(404) 815-2400

**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street
Suite 1540
Wilmington, DE 19801
(302) 661-7000

Co-Counsel to the Debtor and Debtor-in-Possession

Dated: August 18, 2004
Wilmington, Delaware

ARTICLE I DEFINITIONS AND CONSTRUCTION OF TERMS...................... 1

ARTICLE II TREATMENT OF ALLOWED ADMINISTRATIVE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS ................ 29

ARTICLE III CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................................................................. 31

ARTICLE IV TREATMENT OF CLAIMS AND EQUITY INTERESTS ............ 32

ARTICLE V MEANS OF IMPLEMENTATION AND EFFECT OF CONFIRMATION OF PLAN ........................................... 45

ARTICLE VI IMPLEMENTATION OF THE D&O TRUST ................................ 53

ARTICLE VII VOTING AND DISTRIBUTIONS; AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS............................................. 57

ARTICLE VIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION CLAIMS; AND RETIREE BENEFITS ....... 61

ARTICLE IX CORPORATE GOVERNANCE, MANAGEMENT AND STRUCTURE OF REORGANIZED DEBTOR............................... 64

ARTICLE X EXCULPATION, INJUNCTIONS, AND DISCHARGE................ 65

ARTICLE XI EFFECTIVENESS OF THIS PLAN .................................... 71

ARTICLE XII REGULATION........................................................... 75

ARTICLE XIII RETENTION OF JURISDICTION.................................... 75

ARTICLE XIV MISCELLANEOUS PROVISIONS.................................... 76

**SCHEDULES**

**SCHEDULE 4.8 WARRANT TERM SHEET**

**SCHEDULE 9.3 SPECIAL RECOGNITION GRANTS**

**EXHIBITS**

EXHIBIT A CERTIFICATE OF INCORPORATION OF REORGANIZED DEBTOR

EXHIBIT B FORM OF INSURANCE ASSIGNMENT AGREEMENT

EXHIBIT C D&O POLICIES

EXHIBIT D D&O PROTECTED PARTIES SETTLEMENT AGREEMENT

EXHIBIT E    NORTHWESTERN CORPORATION D&O TRUST
             AGREEMENT

EXHIBIT F    NORTHWESTERN CORPORATION D&O TRUST
             DISTRIBUTION PROCEDURES

EXHIBIT G    WARRANT AGREEMENT

EXHIBIT H    REGISTRATION RIGHTS AGREEMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |
| | : |

## DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NorthWestern Corporation, the above captioned debtor and debtor-in-possession, proposes the following second amended and restated plan of reorganization (the "Plan") under Sections 1121(a) and 1127(a) of title 11 of the United States Code:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions; Interpretation; Application of Definitions and Rules of Construction. For purposes of this Plan, the following terms shall have the meanings specified in this Article I. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code and the rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction hereof. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in this Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, this Plan and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, sub-Section or clause contained in this Plan.

1.1    "Additional Indemnitees" shall mean each past, present and future member of the TAC.

1.2    "Administrative Claim" shall mean a right to payment under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case as authorized and approved by a Final Order, (b) any actual and

necessary costs and expenses incurred after the Petition Date in the ordinary course of the Debtor's business, (c) fees and expenses of Professionals to the extent allowed by Final Order under Sections 330, 331, or 503 of the Bankruptcy Code, and (d) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

1.3    "Administrative Claim Bar Date" shall mean the last date established for filing Administrative Claims, as ordered by the Bankruptcy Court.

1.4    "Affiliate" shall have the meaning set forth in 11 U.S.C. § 101(2).

1.5    "Allowed" shall mean, with reference to any Claim: (a) a Claim that has been listed by the Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of claim has been filed as of the Bar Date in a sum certain and either (i) no objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; (d) any Claim expressly allowed under this Plan; or (e) any Claim expressly allowed by Final Order.

1.6    "Allowed Class Designation/Type" shall mean an Allowed Claim of a specified class or of a specified type.

1.7    "Avoidance Action" shall mean an action brought pursuant to Section 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code by or on behalf of the Debtor.

1.8    "Ballot" shall mean the form or forms distributed to each holder of an impaired Claim entitled to vote on this Plan upon which an acceptance or rejection of this Plan shall be indicated in accordance with the instructions specified in such form or forms.

1.9    "Bank One DIP Financing Claims" shall mean the Claims of Bank One, N.A., as agent, or any successor agent thereto, under the DIP Financing Order and the DIP Loan Documents.

1.10    "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.11    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case and, to the extent of any reference under 28 U.S.C. § 157, the bankruptcy unit of such District Court under 28 U.S.C. § 151.

1.12    "Bankruptcy Rules" shall mean the following: (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under Section 2075 of Title 28 of the United States Code; (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under Section 2072 of Title 28 of the United States Code; (iii) the applicable Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware; and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case or proceeding therein, as the case may be.

1.13    "Bar Date" shall mean the date(s) fixed by the order of the Bankruptcy Court dated October 10, 2003 (the "Bar Date Order") by which Persons asserting a Claim against the Debtor, and who are required to file a proof of claim on account of such Claim, must file a proof of claim or be forever barred from asserting a Claim against the Debtor or its property and from voting on this Plan and/or sharing in distributions hereunder as provided in the Bar Date Order.

1.14    "Business Day" shall mean any day other than a Saturday, Sunday or a day which in Wilmington, Delaware or Sioux Falls, South Dakota, is a legal holiday or any day designated in Bankruptcy Rule 9006(a) as a "legal holiday".

1.15    "Cash" shall mean cash, cash equivalents and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

1.16    "Causes of Action" shall mean, without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims and demands whatsoever, whether known or unknown, in law, equity or otherwise.

1.17    "Chapter 11 Case" shall mean the Debtor's case under Chapter 11 of the Bankruptcy Code administered in the Bankruptcy Court.

1.18    "Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to

payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.19    "Claimant's Jurisdiction" shall mean the jurisdiction in which the Claim was filed (if at all) against the Debtor in the court system prior to the Petition Date.

1.20    "Claims Agent" shall mean Kurtzman Carson Consultants, LLC, the claims agent appointed by order of the Bankruptcy Court dated September 15, 2003.

1.21    "Class" shall mean any category of Claims or Equity Interests which are substantially similar to each other as classified.

1.22    "Class Action" shall mean those certain consolidated actions:

(a)    In re NorthWestern Corporation Securities Litigation (Case No. CIV 03-3049), a consolidated securities class action lawsuit pending in the United States District Court for the District of South Dakota before the Honorable Lawrence L. Piersol; and

(b)    In re NorthWestern Corporation Derivative Litigation (Case No. 03-4091), a consolidated action of two derivative securities lawsuits pending in the United States District Court for the District of South Dakota before the Honorable Lawrence L. Piersol.

1.23    "Class Action Settlement Documents" shall mean the Stipulation of Settlement, memorandum of understanding and any agreements entered into in connection therewith or pursuant hereto or thereto and the orders of the District Court in the Class Action in furtherance thereof.

1.24    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

1.25    "Committee" shall mean any committee appointed in the Chapter 11 Case pursuant to Section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee is from time to time constituted and reconstituted.

1.26    "Confirmation Date" shall mean the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.27    "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of this Plan pursuant to Section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.28    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming this Plan pursuant to the provisions of the Bankruptcy Code.

1.29    "Contingent Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court which was not filed in a sum certain, or which has not accrued and is dependent upon a future event that has not occurred or may never occur.

1.30    "Convenience Claim" shall mean an Unsecured Claim that is $20,000 or less and held by a Person that is not an Insider but excluding any Unsecured Note Claims, Trust Originated Preferred Securities (TOPrS) Claims and QUIPS Claims.

1.31    "Creditor" shall mean a Person that has a Claim against the Debtor that arose at the time of or before the Petition Date, or a Person that has a Claim against the Estate of the Debtor of a kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.

1.32    "Creditors' Committee" shall mean the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case.

1.33    "CSFB Facility" shall mean that certain Amended and Restated Credit Agreement, dated as of November 10, 2003, amending a pre-petition financing arrangement with Credit Suisse First Boston, acting through its Cayman Islands Branch, as administrative agent, such amended pre-petition financing arrangement approved by the Bankruptcy Court on or about December 15, 2003, as the same shall be amended or modified from time to time.

1.34    "CSFB Facility Montana First Mortgage Bonds" shall mean any outstanding First Mortgage Bonds, Credit Agreement (2002) Series, due 2006, issued under the Montana Indenture.

1.35    "CSFB Facility South Dakota First Mortgage Bonds" shall mean any New Mortgage Bonds, Credit Agreement (2002) Series, due 2006, issued under the South Dakota Indenture.

1.36    "CSFB Financing Claims" shall mean the Claims of Credit Suisse First Boston, as agent, under the CSFB Order and CSFB Financing Documents.

1.37    "CSFB Financing Documents" shall mean the CSFB Facility and all other documents and instruments evidencing and/or setting forth the terms of the financing arrangements under the CSFB Facility as approved by the CSFB Order, as the same shall be amended or modified from time to time.

1.38    "CSFB Lenders" shall mean the syndicate of financial institutions party to the CSFB Financing Documents.

1.39   "CSFB Order" shall mean that certain Final Order Granting Motion pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 for Entry of an Order (A) Amending Pre-Petition Credit Facility, (B) Providing Protections under Section 364(c)(1), on a permanent basis, and (C) Granting Related Relief.

1.40   "Current Employee Claim" shall mean an Allowed Claim entitled to priority under Section 507 of the Bankruptcy Code and any Unsecured Claims for wages in excess of the Claims entitled to priority under Section 507 of the Bankruptcy Code.

1.41   "D&O Insurance Assignment" shall mean the transactions contemplated by the Insurance Assignment Agreement.

1.42   "D&O Insurance Contributor" shall mean the Debtor, former and current directors and officers and any non-debtor affiliate of the Debtor who makes a D&O Insurance Assignment.

1.43   "D&O Insurance Entity" shall mean any Person other than the Debtor and Reorganized Debtor including, but not limited to, any insurance company, broker, or guaranty association, that has issued or that has actual or potential liability, duties or obligations with respect to, any D&O Policies.

1.44   "D&O Insurance Entity Injunction" shall mean the injunction described in Section 6.9 of this Plan.

1.45   "D&O Insurance Rights" shall mean rights arising under or related to the D&O Policies.

1.46   "D&O Policies" shall mean the insurance policies, to the extent such policies and the proceeds of such policies are property of the Debtor's estate, held by the Debtor identified in Exhibit C to this Plan. As reflected by Exhibit C, the Cornerstone Propane Partners, L.P. insurance policies are not being channeled to the D&O Trust.

1.47   "D&O Proceedings" shall mean any proceeding and/or claim against the Debtor or D&O Protected Party, currently existing or initiated prior to the Effective Date, which may be covered by the D&O Policies, including, but not limited to, the following:

(a)   In re Cornerstone Propane Partners LP Securities Litigation (Case No. 03-2522 MHP), a consolidated securities class action pending in the United States District Court for the Northern District of California before the Honorable Marilyn Hall Patel;

(b)    Mewhinney v. Cornerstone Propane, GP, Inc. (Case No. 032-01181(a), Cir. Ct of the City of St. Louis, MO), a securities class action in the city court of St. Louis, Missouri;

(c)    McGreevey, *et al*. v. The Montana Power Company, *et al*. (Case No. CV 03-01-BU-SEH), a securities class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon;

(d)    In re Touch America ERISA Litigation (Case No. CV-02-106-BU-SEH), an ERISA class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon;

(e)    Securities and Exchange Commission ("SEC") Inquiry (D-02572-A) (the "SEC Inquiry"), a non-public SEC inquiry into various issues;

(f)    the Class Action; and

(g)    any proceeding and/or claim against any D&O Protected Party which may be covered by the D&O Policies and brought by the Netexit Debtors, or any creditor, trustee, or the Official Committee of Unsecured Creditors appointed in the Netexit Cases, at any time before or after the Effective Date, but not later than the date the Netexit Cases are closed by final decree; provided, however, that any such claim shall remain subject to the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction.

1.48    "D&O Proceedings Final Order" shall mean the final, non-appealable order of the relevant court providing a Final Award in any D&O Proceeding or finally approving a settlement, or the final judgment of the SEC (in the case of the SEC Inquiry).

1.49    "D&O Protected Party" shall mean the following: (i) the Debtor; (ii) Reorganized Debtor; (iii) any subsidiary and/or Affiliate of the Debtor; or (iv) any Person that, pursuant to this Plan or otherwise after the Effective Date, was a former or present director or officer of the Debtor or becomes a director or officer or indirect transferee of, or successor to, the Debtor, Reorganized Debtor or any subsidiary or Affiliate of the Debtor; provided, however, that D&O Protected Party shall exclude any individual who previously served as an officer or director of any of the TA Debtors, or their present or former predecessors, in such individual's capacity as an officer or director of such TA Debtor.

1.50    "D&O Protected Parties Settlement Agreement" shall mean that D&O Protected Parties Settlement Agreement attached as Exhibit D to this Plan.

1.51    "D&O Trust" shall mean the trust created pursuant to the D&O Trust Agreement and related documents.

1.52    "D&O Trust Agreement" shall mean that certain NorthWestern Corporation D&O Trust Agreement attached as Exhibit E to this Plan.

1.53    "D&O Trust Assets" shall mean the proceeds of the D&O Insurance Rights assigned to the D&O Trust pursuant to the Insurance Assignment Agreement and any interest on or appreciation of such D&O Insurance Rights or any other sums collected by the trustee of the D&O Trust to enforce such D&O Insurance Rights.

1.54    "D&O Trust Channeling Injunction" shall mean the injunction described in Section 10.5(d) of this Plan.

1.55    "D&O Trust Claim Holder" shall mean the holder of a D&O Trust Claim.

1.56    "D&O Trust Claims" shall mean the amount of any Final Award apportioned to an individual plaintiff in any D&O Proceeding in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Proceeding and the amount of any Defense Costs.

1.57    "D&O Trust Distribution Procedures" or "TDP" shall mean that certain trust distribution procedures attached as Exhibit F to this Plan.

1.58    "D&O Trust Documents" shall mean the D&O Trust Agreement, the by-laws of the D&O Trust and the other agreements, instruments and documents governing the establishment and administration of the D&O Trust as such may be amended from time to time.

1.59    "Debt" shall mean liability on a Claim.

1.60    "Debtor" shall mean NorthWestern Corporation, as debtor and debtor-in-possession in the Chapter 11 Case.

1.61    "Debtor Indemnified Parties" shall mean the Persons which the Debtor is obligated to indemnify and exculpate, including its present and former officers and directors, as provided in any of: (i) the Debtor's certificate of incorporation; (ii) the Debtor's by-laws; (iii) any written agreement with the Debtor; (iv) similar documents or agreements of or with the Debtor; or (v) state or common law.

1.62    "Defense Cost Motion" shall mean that certain Motion for an Order (I) Authorizing Reimbursement for Defense Costs Incurred on Behalf of Itself and its Present and Former Officers and Directors (II) Authorizing Reimbursement for Defense Costs Incurred by Other Insureds, and (III) Granting Related Relief, as such motion was approved by the Court on January 14, 2004 in an Order Authorizing (I) Reimbursement for Defense Costs Incurred on behalf of itself and its Present and Former

Officers and Directors, (II) Reimbursement for Defense Costs Incurred by Other Insureds and (III) Granting Related Relief, as amended by a stipulated order entered on February 17, 2004.

1.63    "Defense Costs" shall mean the legal fees and associated expenses (including expert fee(s)) incurred in defending the D&O Proceedings by the Debtor or any D&O Protected Party on behalf of the Debtor or any D&O Protected Party.

1.64    "Delaware General Corporation Law" shall mean Title 8 of the Delaware Code, as now in effect or hereafter amended.

1.65    "DIP Financing Order" shall mean that certain Final Order (I) Authorizing Debtor-in-Possession to Enter into Post-petition Credit Agreement and Obtain Post-petition Financing pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Granting Liens, Security Interests and Superpriority Claims, (III) Authorizing Adequate Protection Payments to Debtor's Senior Secured Debt.

1.66    "DIP Lenders" shall mean Bank One, N.A., as agent and lender, and the syndicate of financial institutions party to the DIP Loan Documents.

1.67    "DIP Loan Agreement" shall mean that certain Senior Secured, Pari Passu Debtor-in-Possession Credit Agreement, dated as of September 19, 2003 (as same has been or may be amended), among the Debtor, the lender parties thereto and Bank One, N.A., as DIP Agent.

1.68    "DIP Loan Documents" shall mean the DIP Loan Agreement and all other documents and instruments evidencing and/or setting forth the terms of debtor-in-possession financing arrangements in the Chapter 11 Case as approved by the DIP Financing Order.

1.69    "Disallowed" shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtor which: (a) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court; (b) has been withdrawn by agreement of the Debtor and the holder thereof, in whole or in part; (c) has been withdrawn, in whole or in part, by the holder thereof; (d) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a proof of claim has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court or other applicable bankruptcy law; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of claim or proof of interest; or (f) is evidenced by a proof of claim or a proof of interest which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of claim or proof of interest was not timely or properly filed.    In each case a Disallowed Claim or a

Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.70    "Disallowed Claim" shall mean a Claim, or any portion thereof, that is Disallowed.

1.71    "Disbursing Agent" shall mean Reorganized Debtor or such other Person to be identified by Reorganized Debtor at or prior to the Confirmation Hearing, which shall (i) make the distributions to be made pursuant to and in accordance with the terms of this Plan, the Confirmation Order or any other relevant Final Order of the Bankruptcy Court, and (ii) perform any other act or task that is or may be delegated to the Disbursing Agent under this Plan.

1.72    "Disclosure Statement" shall mean the disclosure statement relating to this Plan in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and all exhibits and schedules thereto.

1.73    "Disputed" shall mean, with respect to Claims or Equity Interests, any such Claim or Equity Interest: (a) that is listed in the Schedules as unliquidated, disputed or contingent for which no proof of claim has been timely filed; (b) as to which the Debtor or any other party-in-interest has interposed a timely objection or request for estimation, or have sought to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, or which is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; (c) which is a contingent Claim; or (d) which has not been Allowed.

1.74    "Disputed Claims Reserve" shall mean the reserve established pursuant to Section 7.5 of this Plan.

1.75    "Disputed Policies" shall have the meaning set forth on Exhibit C to this Plan.

1.76    "Distribution" shall mean the distribution in accordance with this Plan of Cash or other property, as the case may be.

1.77    "Distribution Address" shall mean the last known address of a Creditor, whether derived from the Schedules, a proof of claim filed with the Bankruptcy Court or other written notification of the Debtor as to where a Distribution under this Plan is to be sent.

1.78    "Distribution Date" shall mean any date that is: (a) the Initial Distribution Date; (b) any Subsequent Distribution Date; or (c) the Final Distribution Date.

1.79    "District Court" shall mean the United States District Court for the District of South Dakota.

1.80    "Effective Date" shall mean a Business Day on or after the Confirmation Date specified by the Debtor on which all conditions precedent to the occurrence of the Effective Date set forth in Section 11.2 of this Plan have been satisfied or waived pursuant to Section 11.3 of this Plan.

1.81    "Environmental Claims" shall mean all Claims against the Debtor, including, but not limited to, the Claims listed on Attachments 17(a), (b), and (c) of the Debtor's Statement of Financial Affairs, as may be amended from time to time, arising from (i) any accusation, allegation, notice of violation, action, claim, environmental Lien, demand, abatement or other order, restriction or direction (conditional or otherwise) by any governmental entity or other Person for personal injury (including, but not limited to, sickness, disease or death), tangible or intangible property damage, punitive damages, damage to the environment, nuisance, pollution, contamination or other adverse effect on the environment or costs (to the extent recoverable under applicable non-bankruptcy law) of any governmental entity related thereto, in each case resulting from or based upon (a) the existence, or the continuation of the existence, of a release of (including, but not limited to, sudden or non-sudden accidental or non-accidental releases), or exposure to, any hazardous or deleterious material, substance, waste, pollutant or contaminant, odor or audible noise in, into or onto the environment (including, but not limited to, the air, soil, surface water or groundwater) at, in, by, from or related to any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary, or any activities or operations thereof, (b) the transportation, storage, treatment or disposal of any hazardous or deleterious material, substance, waste, pollutant or contaminant in connection with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary, its operation or facilities, or (c) the violation or alleged violation, of any environmental law, order or environmental permit or license of or from any governmental entity relating to environmental matters connected with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary (including, without limitation, any FERC license pertaining to any environmental matter); and (ii) any claim for indemnification or contribution (whether based on contract, statute or common law) against the Debtor by any third party, where such indemnification or contribution claim of such third party is based on a claim against such third party that if asserted directly against the Debtor would be a claim included within the immediately preceding clause (i); provided, however, that Environmental Claims shall not include any Claims (other than the Claims of Atlantic Richfield Company addressed in the Milltown Settlement) fully settled, liquidated or determined by a final order of an appropriate court or a binding award, agreement or

settlement, which has become fully effective on the terms of such final order, binding award, agreement or settlement, prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum or by a series of payments.

1.82    "Equity Interests" or "Interests" shall mean: (a) a share in the capital stock of the Debtor, whether or not transferable or denominated "stock" or a similar security; or (b) an option, a warrant, or a right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (a) of this paragraph, whether vested or unvested, exercised or outstanding.

1.83    "Estate" shall mean the estate created in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

1.84    "Exculpated Parties" shall have the meaning set forth in Section 10.1 of this Plan.

1.85    "FERC" shall mean the Federal Energy Regulatory Commission.

1.86    "FIFO" shall mean first-in-first-out.

1.87    "Final Approval" shall mean the date on which all of the following events have occurred: (a) entry of judgment by the District Court in the Class Action, including a bar order, approving the Stipulation of Settlement and dismissing the Class Action as against all defendants in the Class Action with prejudice and without cost to any party, that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise; (b) an order of the Bankruptcy Court in the Chapter 11 Case approving the Stipulation of Settlement pursuant to the terms of any executed memorandum of understanding and that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise; and (c) an order in the Chapter 11 Case confirming a plan of reorganization for the Debtor that has become final and no longer subject to further appeal or review, whether by exhaustion of any possible appeal, lapse of time, or otherwise.

1.88    "Final Distribution Date" shall mean the date established by the Debtor pursuant to which all Distributions shall have been made.

1.89    "Final Order" shall mean an order, ruling or judgment of the Bankruptcy Court as to which the time to appeal, petition for *certiorari,* or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari,* or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for *certiorari,* reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or, on and after the Effective Date, Reorganized Debtor or, in the event that an appeal, writ of *certiorari,* or reargument

or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari,* reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.90  "<u>Gas Transition Bond</u>" shall mean any outstanding bonds issued in accordance with, or related to, *inter alia*, the (i) Indenture between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee, dated as of December 22, 1998; (ii) MPC Natural Gas Funding Trust Trust Agreement among Patrick Corcoran and Ellen Senechal, as Beneficiary Trustees, Wilmington Trust Company, as Issuer Trustee, Delaware Trustee and Independent Trustee, and The Montana Power Company, as Grantor and Owner, dated as of December 11, 1998; (iii) Transition Property Purchase and Sale Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Seller, dated as of December 22, 1998; and (iv) Transition Property Servicing Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Servicer, dated as of December 22, 1998.

1.91  "<u>Gas Transition Bond Claims</u>" shall mean an Allowed Claim by the holder of a Gas Transition Bond.

1.92  "<u>Gas Transition Bond Obligations</u>" shall mean any obligations under any of the following, and related documents: (i) Indenture between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee, dated as of December 22, 1998; (ii) MPC Natural Gas Funding Trust Trust Agreement among Patrick Corcoran and Ellen Senechal, as Beneficiary Trustees, Wilmington Trust Company, as Issuer Trustee, Delaware Trustee and Independent Trustee, and The Montana Power Company, as Grantor and Owner, dated as of December 11, 1998; (iii) Transition Property Purchase and Sale Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Seller, dated as of December 22, 1998; and (iv) Transition Property Servicing Agreement between MPC Natural Gas Funding Trust, as Issuer, and The Montana Power Company, as Servicer, dated as of December 22, 1998.

1.93  "<u>Gas Transition Indenture</u>" shall mean the Indenture between MPC Natural Gas Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee, dated as of December 22, 1998.

1.94  "<u>General Released Parties</u>" shall have the meaning set forth in Section 10.2 of the Plan.

1.95   "General Unsecured Claim" shall mean any Claim that is not a Administrative Claim, Fee Claim, Priority Tax Claim, Priority Claim, Unsecured Priority Claim, Bank One DIP Financing Claim, CSFB Financing Claim, Secured Claim, Unsecured Note Claim, Unsecured Subordinated Note Claim, Unsecured Convenience Claim, D&O Trust Claim, Other Equity Interest, Securities Claim, Opt-Out Securities Claim or Environmental Claim, but shall specifically include an Allowed QF Claim.

1.96   "Harbert" shall mean Harbert Management Corporation on behalf of itself and Harbert Distressed Investment Master Fund, Ltd. and Alpha Sub Fund VI, LLC.

1.97   "Indemnification Claims" shall mean all obligations relating to contribution, indemnification and exculpation by the Debtor Indemnified Parties as provided in any of: (i) the Debtor's certificate of incorporation as in effect prior to or as of the Confirmation Date; (ii) the Debtor's by-laws as in effect prior to or as of the Confirmation Date; (iii) any written agreement with the Debtor; (iv) similar documents or agreements of or with the Debtor as in effect prior to or as of the Confirmation Date; or (v) the result of the application of state or common law.

1.98   "Indenture Trustee Charging Lien" shall mean any Lien or other priority in payment or right available to an Indenture Trustee pursuant to an Unsecured Note Indenture, an Unsecured Subordinated Note Indenture, the South Dakota Pollution Control Indentures, the Montana Pollution Control indentures the Montana Indenture, the South Dakota Indenture, or the Gas Transition Indenture or otherwise available to an Indenture Trustee under applicable law, for the payment of reasonable fees, costs and expenses, including, without limitation, the reasonable fees and expenses of an Indenture Trustee's professional.

1.99   "Indentures" shall mean the Unsecured Note Indentures, the Unsecured Subordinated Note Indentures, the South Dakota Pollution Control Indentures, the Montana Pollution Control Indentures, the Montana Indenture, the South Dakota Indenture, and the Gas Transition Indenture.

1.100   "Indenture Trustees" shall mean the Unsecured Notes Trustee, the Unsecured Subordinated Notes Trustees, and the trustees under the South Dakota Pollution Control Indentures, the Montana Pollution Control Indentures, the Montana Indenture, South Dakota Indenture, and the Gas Transition Indenture.

1.101   "Indenture Trustees' Fees and Expenses" means the reasonable compensation, fees, costs, expenses and indemnity claims (including, without limitation, reasonable legal fees, costs and expenses) incurred by any of the Indenture Trustees, whether prior to or after the Petition Date.

1.102   "Initial Distribution Date" shall mean, with respect to Allowed Claims in Class 10, the first Business Day which is twenty (20) days (or such longer

period not to exceed sixty (60) days as may be reasonably determined by Reorganized Debtor) after the Effective Date.

1.103 "Injunction Default" shall mean a default under the D&O Trust Channeling Injunction.

1.104 "Insider" shall have the meaning set forth in Section 101(31) of the Bankruptcy Code.

1.105 "Insurance Assignment Agreement" shall mean that certain insurance assignment and funding agreement attached as Exhibit B to this Plan.

1.106 "Insured Claim" shall mean any claim arising from an incident or occurrence that is covered under any applicable insurance policy.

1.107 "Investment Grade" shall mean, when used in respect of a security, that such security has been rated higher than Ba1 and BB+ by Moody's Investors Service, Inc. and Standard & Poor's Rating Group, respectively.

1.108 "Landlord Priority Claim" shall mean a Claim held by a landlord or Person that leased non-residential property to the Debtor, that is entitled to priority under Section 507 of the Bankruptcy Code.

1.109 "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; except that a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code shall not constitute a lien.

1.110 "McGreevey Litigation" shall mean that certain litigation styled as McGreevey, et al. v. The Montana Power Company, et al. (Case No. CV 03-01-BU-SEH), a securities class action pending in the United States District Court for the District of Montana before the Honorable Sam E. Haddon.

1.111 "MPSC" shall mean The Montana Department of Public Service Regulation, Montana Public Service Commission, or any successor agency.

1.112 "Milltown Settlement" shall mean that certain settlement agreement among the Debtor, Clark Fork and Blackfoot, LLC and Atlantic Richfield Company.

1.113 "Milltown Stipulation" shall meant that certain stipulation among the Debtor, Clark Fork and Blackfoot, LLC, Atlantic Richfield Company, the United States, the State of Montana and the Confederated Salish and Kootenai Tribes.

1.114 "Montana Consumer Counsel" shall mean the State of Montana Consumer Counsel or any successor thereto.

1.115 "Montana Indenture" shall mean the First Mortgage and Deed of Trust, dated as of October 1, 1945, between the Montana Power Company, as issuer, and Guaranty Trust Company of New York and Arthur E. Burke, as trustees, and any supplements thereto.

1.116 "Montana First Mortgage Bond Claims" shall mean an Allowed Claim by the holder of a Montana First Mortgage Bond.

1.117 "Montana First Mortgage Bonds" shall mean any outstanding bonds issued under the Montana Indenture other than any CSFB Facility Montana First Mortgage Bonds or any Montana Pollution Control Bonds, specifically any of the following:

First Mortgage Bonds, 7% Series due 2005;

First Mortgage Bonds, 7.30% Series due 2006;

First Mortgage Bonds, 8-1/4% Series due 2007;

First Mortgage Bonds, 8.95% Series due 2022;

First Mortgage Bonds, 6.125% Series due 2003;

First Mortgage Bonds, 5.70% due 2003;

Secured Medium-Term Notes due 2008; and

CSFB Facility Montana First Mortgage Bonds.

1.118 "Montana Pollution Control Bonds" shall mean, collectively, the Montana Pollution Control Bond Obligations and any outstanding bonds issued under the Montana Indenture of either of the following two series:

First Mortgage Bonds, 6-1/8% Series due 2023; and

First Mortgage Bonds, 5.90% Series due 2023.

1.119 "Montana Pollution Control Bond Obligations" shall mean any and all obligations under any of the following agreements and indentures:

Indenture of Trust dated as of December 1, 1993 between City of Forsyth, Rosebud County and the First National Bank of Chicago related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B;

Loan Agreement dated as of December 1, 1993 between City of Forsyth, Rosebud County and the Montana Power Company, related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B

Indenture of Trust dated as of December 1, 1993 between City of Forsyth, Rosebud County and the relevant indenture trustee related to the $90,205,000 Pollution Control Revenue Refunding Bonds, Series 1993A; and

Loan Agreement dated as of December 1, 1993 between City of Forsyth, Rosebud County and the Montana Power Company, related to the $90,205,000 Pollution Control Revenue Refunding Bonds, Series 1993A.

1.120 "Montana Pollution Control Bond Claims" shall mean an Allowed Claim by the holders of a Montana Pollution Control Bond.

The "Montana Pollution Control Indentures" means the following indentures:

The indenture of Trust dated as of December 1, 1993 between City of Forsyth, Rosebud County, and the First National Bank of Chicago related to the $80,000,000 Pollution Control Revenue Refunding Bonds, Series 1993B;

The Indenture of Trust dated as of December 1, 1993 and between City of Forsyth, Rosebud County and the relevant indenture trustee related to the $90,205,000 Pollution Control Revenue Refunding Bonds, Series 1993A

1.121 "Montana Public Utilities Law" means Title 69 of the Montana Code Annotated, Title 38 of the Administrative Rules of Montana, or any rules or regulations promulgated thereunder, as the same may be amended or modified from time to time.

1.122 "Netexit Cases" shall mean those jointly administered chapter 11 cases of the Netexit Debtors, captioned In re Netexit, Inc., et al, Case No. 04-11321 (CGC).

1.123 "Netexit Debtors" shall mean Netexit Inc., ATS Financial Services, Inc., Netexit of California Construction, Inc., Netexit of California, Inc., Netexit of Indiana, Inc., Netexit of Indiana, LLC, Netexit of North America, LLC, Netexit of Tennessee, Inc., Netexit of Pacific Northwest, Inc., Netexit of Oklahoma, Inc., Netexit of New York, Inc., Netexit of Mississippi, Inc., Netexit of Hawaii, Inc., and Eagle a Netexit Company Inc., as debtors and debtors-in-possession in the Netexit Cases.

1.124  "New Board" shall have the meaning set forth in Section 9.1 hereof.

1.125  "New Common Stock" shall mean the shares of authorized common stock of Reorganized Debtor issued pursuant to this Plan.

1.126  "New Incentive Plan" shall mean the incentive plans to be established by the New Board. Such plans may, at the sole discretion of the New Board, provide for the granting of options for or the outright issuance of up to 2,265,957 additional shares of New Common Stock (inclusive of any shares of New Common Stock issued as Special Recognition Grants). Any stock, warrants or options issued in connection with the New Incentive Plan when issued or fully exercised shall dilute New Common Stock issued by the Reorganized Debtor to the holders of Allowed Claims in Class 7, Class 8 and Class 9.

1.127  "NPSC" shall mean the Nebraska Public Service Commission, or any successor thereto.

1.128  "Officers and Directors" shall mean (i) with respect to the Debtor, Reorganized Debtor and their Affiliates all of the officers and directors of such entities, in each case, as determined commencing with the Petition Date and (ii) with respect to all other entities, all present and former officers and directors of such entities.

1.129  "Opt-Out Election" has the meaning set forth in Section 4.14 hereof.

1.130  "Opt-Out Form" means a form approved by the District Court for submission by a holder of a Securities Claim to evidence its exercise of the Opt-Out Election.

1.131  "Opt-Out Securities Claim" means a Securities Claim the holder of which has exercised the Opt-Out Election in compliance with the requirements of the Class Action Settlement Documents.

1.132  "Option 1" has the meaning set forth in Section 4.8(b)(ii) hereof.

1.133  "Option 2" has the meaning set forth in Section 4.8(b)(ii) hereof.

1.134  "Other Secured Claims" shall mean any Secured Claim, exclusive of Priority Claims, Bank One DIP Financing Claims, CSFB Financing Claims and Secured Bondholder Claims.

1.135  "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, estate, trust,

unincorporated association or organization, governmental agency or political subdivision thereof, or other entity.

1.136 "Petition Date" shall mean September 14, 2003, the date on which the Debtor filed its voluntary Chapter 11 petition with the Bankruptcy Court pursuant to the Bankruptcy Code.

1.137 "Plan" shall mean this Chapter 11 plan of reorganization, including, without limitation, all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof or as approved by the Bankruptcy Court.

1.138 "Plan Committee" shall have the meaning set forth in Section 7.9 hereof.

1.139 "Plan Committee By-Laws" shall mean the by-laws of the Plan Committee, which shall be filed with the Bankruptcy Court on or prior to five (5) business days prior to the commencement date of the Confirmation Hearing, or such other date as the Bankruptcy Court may establish.

1.140 "Plan Documents" shall mean the Plan, the Disclosure Statement, all exhibits and schedules attached to the Plan and to the Disclosure Statement, including the D&O Protected Parties Settlement Agreement (including all exhibits, schedules and documents referred to therein or attached thereto or to be entered into thereunder), the D&O Trust Agreement, the TDP, the Insurance Assignment Agreement, the Warrant Agreement and the Registration Rights Agreement.

1.141 "Plan Supplement" shall mean those documents which may be filed pursuant to Section 14.6 hereof.

1.142 "PPL Montana" shall have the meaning set forth in Section 10.5(b) hereof.

1.143 "Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under Sections 503(b) and 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

1.144 "Priority Tax Claim" shall mean any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.145 "Pro Rata Share" shall mean a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the amount of all Allowed Claims in such Class.

1.146 "<u>Professional Fees</u>" shall mean the reasonable fees and expenses of Professionals.

1.147 "<u>Professionals</u>" shall mean those Persons (a) employed by the Debtor or the Creditors' Committee pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

1.148 "<u>QF Claim</u>" shall mean any Claims related to the qualifying facilities operating pursuant to the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601, P.L. 95-617 and related regulations and include the following:

(a) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 14, 1984 (Barney Creek);

(b) Cogeneration and Small Power Production Power Purchase Agreement dated March 1, 1991 (BGI);

(c) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 30, 1987 (Broadwater Dam);

(d) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 1, 1984 (Cascade Creek);

(e) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 26, 1984 (Jenni Hydro);

(f) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 15, 1984 (Montana One-Colstrip);

(g) Power Purchase Agreement dated April 1, 1998 (Mission Creek);

(h) Power Purchase Agreement dated January 1, 1998 (Montana Marginal Energy);

(i) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 15, 1984 (Pine Creek);

(j) Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated July 1, 1984 (Pony Generating Station);

(k) Power Purchase Agreement dated July 24, 1996 (Ross Creek Hydro);

(l)    Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 16, 1984 (Wisconsin Creek);

(m)    Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated November 15, 1984 (Strawberry Creek); and

(n)    Cogeneration and Small Power Production Long-Term Power Purchase Agreement dated October 31, 1984 (South Dry Creek).

1.149  "QSF" shall mean a "qualified settlement fund" within the meaning of Section 1.468B-1(c) of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended from time to time.

1.150  "QUIPS" shall mean any outstanding 8.45% Cumulative Quarterly Income Preferred Securities, Series A, issued by Montana Power Capital I, a Delaware statutory business trust.

1.151  "QUIPS Claims" shall mean an Allowed Claim by the holder of a QUIPS Note.

1.152  "QUIPS Indenture" shall mean the Indenture, dated as of November 1, 1996, between The Montana Power Company, as issuer, and The Bank of New York, as trustee, as amended or supplemented from time to time.

1.153  "QUIPS Litigation" shall mean that certain adversary proceeding filed in the Chapter 11 Case against the Debtor by Magten Asset Management Corporation and Law Debenture Company of New York, in its capacity as indenture trustee, identified as Adversary Proceeding No. 04-53324 (CGC).

1.154  "QUIPS Notes" shall mean any outstanding 8.45% Junior Subordinated Debentures of the Montana Power Company due 2036, issued under the QUIPS Indenture.

1.155  "Record Date" shall mean the date established in the Confirmation Order for determining the identity of holders of Allowed Claims entitled to Distributions under this Plan. If no Record Date is established in the Confirmation Order, then the Record Date shall be the Confirmation Date.

1.156  "Registration Rights Agreement" shall mean that certain registration rights agreement with certain entities providing for the registration of the New Common Stock, including New Common Stock issuable pursuant to the Warrants.

1.157  "Reinstated" or "Reinstatement" shall mean: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired in accordance with Section 1124 of the

Bankruptcy Code; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitled the holder of such Claim. Anything to the contrary notwithstanding, the South Dakota First Mortgage Bond Claims, the Montana First Mortgage Bond Claims, the CSFB Facility Montana First Mortgage Bonds, the CSFB Facility South Dakota First Mortgage Bonds, South Dakota Pollution Control Bond Claims, the Gas Transition Bond Obligations and the Montana Pollution Control Bond Claims, and the documents evidencing same, shall remain in full force and effect and not be cancelled, and the Debtor's obligations thereunder, and the obligations of the MPC Natural Gas Funding Trust, shall not be discharged pursuant to the terms of this Plan or otherwise, and the Debtor shall cause and require the MPC Natural Gas Funding Trust to act in accordance therewith.

1.158 "Released Parties" shall mean the Debtor, Reorganized Debtor, Officers and Directors, or any of their former or present employees (excluding persons whose service as Officers or Directors of the Debtor or any Affiliate thereof terminated prior to the Petition Date), advisors, attorneys, financial advisors, accountants and other professionals in their capacities as such, and each of their representatives and agents (including any professionals retained by such persons or entities).

1.159 "Reorganized Debtor" shall mean the Debtor after the Effective Date.

1.160 "Reorganized Debtor Charter" shall mean the certificate of incorporation of Reorganized Debtor attached as Exhibit A to this Plan.

1.161 "Retiree Benefits" shall mean payments to any Person for the purpose of providing or reimbursing payments for retired employees of the Debtor and of any other entities as to which the Debtor is obligated to provide retiree benefits and the eligible spouses and eligible dependents of such retired employees, for medical, surgical, or hospital care benefits, or in the event of death of a retiree under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established by the Debtor prior to the Petition Date, as such plan, fund or program was then in effect or as heretofore or hereafter amended.

1.162 "SEC" shall have the meaning set forth in Section 1.46, D&O Proceedings definition, supra.

1.163  "SEC Inquiry" shall have the meaning set forth in Section 1.46, D&O Proceedings definition, supra.

1.164  "Securities Claims" means any Claim or claim asserted in, arising under or related to the Class Action other than any Claim asserted therein on behalf of any Person that is a defendant in the Class Action and other than any Claim asserted therein on behalf of any Person whose liability in respect of the subject matter of the Class Action will be released pursuant to the Class Action Settlement Documents.

1.165  "Schedules" shall mean, collectively, the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

1.166  "SDPUC" shall mean the South Dakota Public Utilities Commission, or any successor thereto.

1.167  "Secured Bondholder Claims" shall mean an Allowed Claim by the holder of any Secured Bond.

1.168  "Secured Bonds" shall mean any and all of the Gas Transition Bonds, the South Dakota First Mortgage Bonds, the Montana First Mortgage Bonds, CSFB Facility Montana First Mortgage Bonds, CSFB Facility South Dakota First Mortgage Bonds, the Montana Pollution Control Bonds, or the South Dakota Pollution Control Bonds.

1.169  "Secured Claim" shall mean any Claim which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

1.170  "Setoff" shall mean any right of a Creditor to offset a mutual debt owing by such Creditor and any right of the Debtor to offset a mutual debt owing by such Debtor to a Creditor against a Claim of the Debtor, including, without limitation, such rights under Section 553 of the Bankruptcy Code.

1.171  "South Dakota First Mortgage Bond Claims" shall mean an Allowed Claim by the holder of a South Dakota Mortgage Bond.

1.172  "South Dakota First Mortgage Bonds" shall mean any outstanding bonds issued under the South Dakota Indenture other than any CSFB Facility South Dakota First Mortgage Bonds, specifically any of the following:

First Mortgage Bonds, 7% Series due 2023; and

New Mortgage Bonds, 7.10% Series due 2005.

1.173 "South Dakota Indenture" shall mean the General Mortgage Indenture and Deed of Trust, dated as of August 1, 1993, between Northwestern Public Service Company, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto.

1.174 "South Dakota Pollution Control Bonds" shall mean any outstanding bonds issued under the South Dakota Pollution Control Indentures.

1.175 "South Dakota Pollution Control Bond Claims" shall mean an Allowed Claim by the holder of a South Dakota Pollution Control Bond.

1.176 "South Dakota Pollution Control Bond Obligations" shall mean any obligations under any of the following agreements or indentures:

Sale Agreement, dated as of June 1, 1993, between Mercer County, North Dakota and Northwestern Public Service Company, relating to $7,550,000 Pollution Control Refunding Revenue Bonds Series 1993;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Mercer County, North Dakota, relating to $7,550,000 Pollution Control Refunding Revenue Bonds Series 1993;

Loan Agreement, dated as of June 1, 1993, between Grant County, South Dakota and Northwestern Public Service Company, relating to $6,400,000 Pollution Control Refunding Revenue Bonds Series 1993A;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Grant County, South Dakota, relating to $6,400,000 Pollution Control Refunding Revenue Bonds Series 1993A;

Loan Agreement, dated as of June 1, 1993, between Grant County, South Dakota and Northwestern Public Service Company, relating to $3,400,000 Pollution Control Refunding Revenue Bonds Series 1993B;

Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to Grant County, South Dakota, relating to $3,400,000 Pollution Control Refunding Revenue Bonds Series 1993B;

> Loan Agreement, dated as of June 1, 1993, between City of Salix, Iowa and Northwestern Public Service Company, relating to $4,000,000 Pollution Control Refunding Revenue Bonds Series 1993; and
>
> Indenture and Security Agreement, dated as of June 1, 1993, from Northwestern Public Service to City of Salix, Iowa, relating to $4,000,000 Pollution Control Refunding Revenue Bonds Series 1993.

1.177 "South Dakota Pollution Control Indentures" means the following indentures:

> Indenture of Trust, dated as of June 1, 1993, between Grant County, South Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee (Series A);
>
> Indenture of Trust, dated as of June 1, 1993, between Grant County, South Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee (Series B);
>
> Indenture of Trust, dated as of June 1, 1993, between Mercer County, North Dakota, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee; and
>
> Indenture of Trust, dated as of June 1, 1993, between the City of Salix, Iowa, as issuer, and Wells Fargo Bank Minnesota, National Association, as trustee.

1.178 "South Dakota Public Utilities Law" means the provisions of Chapter 49-34A of the South Dakota Codified Laws, and any rules and regulations promulgated in connection therewith, and as the same may be amended or modified from time to time, including any order previously issued by the South Dakota Public Utilities Commission.

1.179 "Special Recognition Grants" shall have the meaning set forth in Section 9.3(b) hereof.

1.180 "Stipulation of Settlement" shall mean that certain stipulation of settlement to be entered in the Class Action.

1.181 "Subordinated Claim" shall mean any Claim: (a) payment of which is subordinated in right of treatment or payment to other Claims under an agreement enforceable under applicable non-bankruptcy law, but only to the extent provided in such agreement; (b) for reimbursement or contribution of a Person that is

liable with the Debtor on another Creditor's Allowed Claim unless and until such Claim is paid in full; or (c) subordinated in right of treatment or payment pursuant to Sections 509(c) or 510 of the Bankruptcy Code.

1.182 "Subsequent Distribution Date" shall mean each six (6) month anniversary of the Effective Date.

1.183 "Surplus Distributions" shall mean the Distributions created pursuant to Section 7.7 of this Plan.

1.184 "TAC" shall mean the Trust Advisory Committee established pursuant to Article 5 of the D&O Trust Agreement.

1.185 "TA Debtors" shall mean the debtors and debtors-in-possession in the jointly administered bankruptcy cases of Touch America Holdings, Inc, *et al.*

1.186 "TDP" or "D&O Trust Distribution Procedures" shall mean that certain trust distribution procedures attached as Exhibit F to this Plan.

1.187 "Tax Claim" shall mean an Allowed Claim for an amount entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.188 "TOPrS Indenture" shall mean the Subordinated Debt Securities Indenture, dated as of August 1, 1995, between Northwestern Public Service Company, as issuer, and The Chase Manhattan Bank, as trustee, as amended or supplemented from time to time.

1.189 "TOPrS Notes" shall mean any outstanding Subordinated Debentures issued pursuant to the TOPrS Indenture, specifically any of the following:

8.125% Junior Subordinated Deferrable Interest Debentures due 2025, issued pursuant to a First Supplemental Indenture, dated as of August 1, 1995;

7.20% Junior Subordinated Deferrable Interest Debentures due 2038, issued pursuant to a Second Supplemental Indenture, dated as of November 15, 1995;

8.25% Junior Subordinated Deferrable Interest Debentures due 2031, issued pursuant to a Third Supplemental Indenture, dated as of December 21, 2001; and

8.10% Junior Subordinated Deferrable Interest Debentures due 2032, issued pursuant to a Fourth Supplemental Indenture, dated as of January 31, 2002.

1.190 "Tort Claim" shall mean any Claim relating to personal injury, property damage or products liability or other similar Claim asserted against the Debtor, its subsidiaries and/or Affiliates that has not been compromised and settled or otherwise resolved. Tort Claims include Claims arising from or related to products or services provided by the Debtor, its subsidiaries and/or Affiliates or their predecessors prior to the Petition Date regardless of when the accident or injury occurs.

1.191 "Trust Expenses" shall mean the expenses incurred by the D&O Trust as contemplated by the D&O Trust Agreement.

1.192 "Trust Originated Preferred Securities (TOPrS) Claims" shall mean an Allowed Claim by the holder of a TOPrS Note.

1.193 "Trustee" shall mean any Person appointed by the Bankruptcy Court pursuant to Section 6.2 of this Plan and pursuant to the D&O Trust Agreement.

1.194 "Unclaimed Property" shall mean any Distribution of Cash or any other property made to the holder of an Allowed Claim pursuant to this Plan that: (a) is returned to Reorganized Debtor as undeliverable and no appropriate forwarding address is received within the later of (x) one (1) year after the Effective Date and (y) one (1) year after Distribution is made to such holder; or (b) in the case of a Distribution made in the form of a check, is not negotiated and no request for reissuance is made by the holder of such Allowed Claim.

1.195 "Unsecured Claim" shall mean a Claim for which no property of any kind of the Debtor's Estate serves as security or Collateral other than Claims with respect to Unsecured Note Claims, Trust Originated Preferred Securities (TOPrS) Claims and QUIPS Claims.

1.196 "Unsecured Insider Claims" shall mean Unsecured Claims held by Insiders.

1.197 "Unsecured Note Claims" shall mean an Allowed Claim by the holder of an Unsecured Note.

1.198 "Unsecured Note Indentures" shall mean:

(a) the Indenture, dated as of November 1, 1998, between the Debtor, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto (the "1998 Indenture"); and

(b) the Indenture, dated as of December 1, 1989, between The Montana Power Company, as issuer, and Citibank, N.A., as trustee, and any supplements thereto (the "1989 Indenture").

1.199  "Unsecured Note Trustee" shall mean HSBC Bank USA, or any successor thereto (whether under the 1998 Indenture or the 1989 Indenture), in such Person's capacity as indenture trustee under such Unsecured Note Indenture.

1.200  "Unsecured Notes" shall mean any outstanding notes issued under:

(a)      the Indenture, dated as of November 1, 1998, between the Debtor, as issuer, and The Chase Manhattan Bank, as trustee, and any supplements thereto, specifically any of the following:

6.95% Senior Unsecured Debentures due 2028;

7.875% Senior Notes due 2007; and

8.75% Senior Notes due 2012; and

(b)      the Indenture, dated as of December 1, 1989, between The Montana Power Company, as issuer, and Citibank, N.A., as trustee, and any supplements thereto, specifically any of the following:

7.07% Unsecured Medium-Term Notes due 2006;

7.875% Unsecured Medium-Term Notes due 2026; and

7.96% Unsecured Medium-Term Notes due 2026.

1.201  "Unsecured Priority Claims" shall mean Unsecured Claims entitled to priority status pursuant to Section 507 of the Bankruptcy Code.

1.202  "Unsecured Subordinated Note Claims" shall mean an Allowed Claim by the holder of an Unsecured Subordinated Note.

1.203  "Unsecured Subordinated Note Indentures" shall mean the QUIPS Indenture and the TOPrS Indenture.

1.204  "Unsecured Subordinated Note Trustees" shall mean:

(a)      with respect to the QUIPS Indenture, Law Debenture Trust Company of New York; and

(b)      with respect to the TOPrS Indenture, Wilmington Trust,

in either case, or any successor thereto, in such Person's capacity as indenture trustee under such Unsecured Subordinated Note Indenture.

1.205   "Unsecured Subordinated Notes" shall mean the QUIPS Notes and the TOPrS Notes.

1.206   "Warrant Agreement" shall have the meaning set forth in Section 4.7(c) hereof.

1.207   "Warrants" shall have the meaning set forth in Section 4.7(c) hereof.

1.208   "Wilmington Trust" shall mean Wilmington Trust Company in its capacity as Indenture Trustee with respect to the TOPrS Notes.


# ARTICLE II

## TREATMENT OF ALLOWED ADMINISTRATIVE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS

2.1   Non-Classification.   As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims against the Debtor are not classified for the purposes of voting on or receiving Distributions under this Plan. All such Claims are instead treated separately upon the terms set forth in this Article II.

2.2   Administrative Claims.

(a)   In General.   All Administrative Claims shall be paid in full, in Cash, in such amounts as (a) are actual and necessary costs and expenses incurred after the Petition Date in the ordinary course of the Debtor's business when and as such Claims become due and owing or (b) are Allowed by the Bankruptcy Court upon the later of (i) the Effective Date, (ii) the date upon which there is a Final Order allowing such Claim as an Administrative Claim, or (iii) any other date specified in such order, or as may be agreed upon between the holder of such Administrative Claim and the Debtor. Such Administrative Claims shall include all obligations owing to the DIP Lenders arising under the DIP Loan Documents and the DIP Financing Order (including, without limitation, the payment of all fees and expenses required thereunder), costs incurred in the operation of the Debtor's businesses after the Petition Date, the reasonable fees and expenses of Professionals retained by the Debtor and the Creditors' Committee, and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

(b)   Professional Compensation and Expense Reimbursement Claims. Except as otherwise provided here, all Persons seeking an award by the Bankruptcy Court of Professional Fees, or of compensation for services rendered to the Debtor or a Committee or reimbursement of expenses incurred through and including the Effective Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy

Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days after the Effective Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Claim and the Debtor or, on and after the Effective Date, Reorganized Debtor, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court.    Parties-in-interest shall have thirty (30) days after the filing of a final fee application to object to such fee application.  All Professional Fees for services rendered in connection with the Chapter 11 Case and this Plan after the Effective Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of Causes of Action preserved hereunder and the resolution of Disputed Claims, shall be paid by Reorganized Debtor upon receipt of an invoice therefor, or on such other terms as Reorganized Debtor may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order.  If Reorganized Debtor and any Professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such Professional, such amount shall be determined by the Bankruptcy Court.

(c)    _Claims of DIP Lenders_.   On the Effective Date, all outstanding obligations of the Debtor to the DIP Lenders pursuant to the DIP Loan Documents, if any, shall be fully and finally satisfied in accordance with the terms of the DIP Loan Documents, the DIP Financing Order, and this Plan.

(d)    _U.S. Trustee's Claims_.   U.S. Trustee Claims that are unpaid as of the Effective Date will be paid in cash on the Effective Date.

2.3    _Priority Tax Claims_.  Allowed Priority Tax Claims shall be paid in full, in cash, upon the later of: (a) the Effective Date; (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim; (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Case had not been commenced; or (d) upon such other terms as may be agreed to between the Debtor and any holder of an Allowed Priority Tax Claim; provided, however, that the Debtor may, at its option, in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, make cash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code and, in such event, the principal amount of such Allowed Priority Tax Claims shall be amortized in equal annual installments over six (6) years from the Effective Date and interest shall accrue from the Effective Date on the unpaid portion of such Allowed Priority Tax Claim at: (x) any applicable statutory rate; (y) the rate applicable to federal judgments pursuant to 28 U.S.C. § 1961; or (z) a rate to be agreed to by the Debtor (or Reorganized Debtor, as the

case may be) and the appropriate governmental unit or, if they are unable to agree, as determined by the Bankruptcy Court.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims (other than Allowed Administrative Claims and Allowed Priority Tax Claims) and Equity Interests are classified for all purposes, including voting on, confirmation of and distribution pursuant to this Plan, as follows:

| Class | | Status |
|---|---|---|
| Class 1 - - | Priority Claims | Unimpaired |
| Class 2 - - | Unsecured Priority Claims | Unimpaired |
| Class 3 - - | Bank One DIP Financing Claims | Unimpaired |
| Class 4 - - | CSFB Financing Claims | Unimpaired |
| Class 5 - - | Secured Bondholder Claims | Unimpaired |
| Class 6 - - | Other Secured Claims | Unimpaired |
| Class 7 - - | Unsecured Note Claims | Impaired |
| Class 8 - - | Unsecured Subordinated Note Claims | Impaired |
| | Class 8 (a) - Unsecured Subordinated Note Claims Represented by TOPrS Notes | Impaired |
| | Class 8 (b) - Unsecured Subordinated Note Claims Represented by QUIPS Notes | Impaired |
| Class 9 - - | General Unsecured Claims | Impaired |
| Class 10 - - | Unsecured Convenience Claims of $20,000 or Less | Unimpaired |
| Class 11 - - | Environmental Claims | Unimpaired |
| Class 12 - - | D&O Trust Claims | Impaired |
| Class 13 - - | Other Equity Interests | Impaired |
| Class 14 - - | Securities Claims | Unimpaired |
| Class 15 - - | Opt-Out Securities Claims | Impaired |

# ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1    CLASS 1 – PRIORITY CLAIMS

(a)    _Impairment and Voting_.    Class 1 is unimpaired by this Plan. Consequently, each holder of an Allowed Priority Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    _Distributions_.    Each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release and discharge thereof,  Cash in an amount equal to such Allowed Priority Claim on the later of: (i) the Effective Date; and (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim or any other date specified in such Final Order, or as soon thereafter as is practicable, unless the holder of an Allowed Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

### 4.2    CLASS 2 – UNSECURED PRIORITY CLAIMS

(a)    _Impairment and Voting_.    Class 2 is unimpaired by this Plan. Consequently, each holder of an Allowed Unsecured Priority Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    _Distributions_.    Each holder of an Allowed Unsecured Priority Claim shall receive, in full satisfaction, settlement, release and discharge thereof,  Cash in an amount equal to such Allowed Unsecured Priority Claim on the later of: (i) the Effective Date; and (ii) the date that is ten (10) Business Days after the date upon which there is a Final Order allowing such Claim as an Allowed Unsecured Priority Claim or any other date specified in such Final Order, or as soon thereafter as is practicable, unless the holder of an Allowed Unsecured Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

### 4.3    CLASS 3 – BANK ONE DIP FINANCING CLAIMS

(a)    _Impairment and Voting_.    Class 3 is unimpaired by this Plan. Consequently, each holder of an Allowed Bank One DIP Financing Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    _Distributions_.    Each holder of an Allowed Bank One DIP Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, the amount of such Allowed Claim pursuant to the DIP Financing Order and the DIP Loan Documents on the Effective Date, unless the holder of the

Allowed Bank One DIP Financing Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

### 4.4    CLASS 4 – CSFB FINANCING CLAIMS

(a)    <u>Impairment and Voting</u>.  Class 4 is unimpaired by this Plan. Consequently, each holder of an Allowed CSFB Financing Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed CSFB Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim pursuant to the CSFB Order and the CSFB Financing Documents.

### 4.5    CLASS 5 – SECURED BONDHOLDER CLAIMS

(a)    <u>Impairment and Voting</u>.  Class 5 is unimpaired by this Plan. Consequently, each holder of an Allowed Secured Bondholder Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Secured Bondholder Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim.

### 4.6    CLASS 6 – OTHER SECURED CLAIMS

(a)    <u>Impairment and Voting</u>.  Class 6 is unimpaired by this Plan. Consequently, each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted this Plan and is not entitled to vote to accept or reject this Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Other Secured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, full Reinstatement of such Allowed Claim.

### 4.7    CLASS 7 – UNSECURED NOTE CLAIMS

(a)    <u>Impairment and Voting</u>.  Class 7 is impaired by this Plan and holders of Allowed Unsecured Note Claims are entitled to vote to accept or reject this Plan.

(b)    <u>Allowance of Unsecured Note Claims</u>.  On the Effective Date, the Unsecured Note Claims shall be deemed Allowed in the aggregate amount of

$898,264,683, which includes accrued and unpaid interest on the Unsecured Note Claims relating to the period up to but not including the Petition Date.

      (c)    <u>Distributions and Effects Thereof</u>.   On the Effective Date the Unsecured Note Claims shall be automatically cancelled, annulled and extinguished.[1]   On the Effective Date, or as soon thereafter as practicable, each holder of an Unsecured Note Claim, along with holders of Allowed Class 9 General Unsecured Claims which do not choose to be an Allowed Convenience Claim, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its Pro Rata Share of: (i) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the warrants to purchase additional shares of New Common Stock allocated to the Class 8(a) and Class 8(b) holders described below (the "<u>Warrants</u>" and the agreement pursuant to which such Warrants are to be issued, the "<u>Warrant Agreement</u>")); <u>plus</u> (ii) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b) as a class rejects the Plan.  The New Common Stock issued pursuant to this Section 4.7(c) shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter, as may be amended from time to time.

      (d)    <u>Cancellation of Unsecured Notes and Related Instruments</u>.  As of the Effective Date, (i) all Unsecured Notes, shall be cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under the Unsecured Notes, the Unsecured Note Indentures and all other agreements, instruments and documents evidencing the Unsecured Notes and the rights of the holders thereof, shall be automatically cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), except that such Unsecured Notes Indentures and other agreements that govern the rights of holders of the Unsecured Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided herein, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 hereof.  Without limiting the foregoing, each holder of an Unsecured Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor.

---

[1]    Any securities held by the Debtor for Unsecured Note Claims, Class 7, shall be cancelled, annulled, and extinguished.  The Debtor will not share in any Distributions on account of such holdings.