# APP. 20

1

2          UNITED STATES BANKRUPTCY COURT
               DISTRICT OF DELAWARE

3

4    IN RE:                    .        Chapter  11
                               .
5    Northwestern Corporation, .
                               .
6                              .
         Debtor.              .        Bankruptcy #03-12872 (CGC)
7    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

8                        Wilmington, DE
                        August 25, 2004
9                          9:00 a.m.

10           TRANSCRIPT OF CONFIRMATION HEARING
       BEFORE THE HONORABLE CHARLES G. CASE, II
11            UNITED STATES BANKRUPTCY JUDGE

12
     APPEARANCES:
13
     For The Debtor:               William E. Chipman, Jr., Esq.
14                                 Greenberg, Traurig, LLP
                                   The Brandywine Bldg.
15                                 1000 West St.-Ste. 1540
                                   Wilmington, DE 19801
16
                                   Adam Cole, Esq.
17                                 Greenberg, Traurig, LLP
                                   The Brandywine Bldg.
18                                 1000 West St.-Ste. 1540
                                   Wilmington, DE 19801
19
                                   Scott Cousins, Esq.
20                                 Greenberg, Traurig, LLP
                                   The Brandywine Bldg.
21                                 1000 West St.-Ste. 1540
                                   Wilmington, DE 19801
22
                                   Jesse Austin, Esq.
23                                 Paul Hastings Janofsky
                                   & Walker, LLP
24                                 600 Peachtree St.-24th Fl.
                                   Atlanta, GA  30308
25

2

```
 1                              Karol Denniston, Esq.
                                Paul Hastings Janofsky
 2                              & Walker, LLP
                                600 Peachtree St.-24th Fl.
 3                              Atlanta, GA  30308

 4   For Net Exit Comm.:        Donna L. Harris, Esq.
                                Cross & Simon, LLC
 5                              913 North Market St.-Ste. 1001
                                Wilmington, DE 19801
 6
     For The Official Creditor's: Neil Glassman, Esq.
 7   Committee                  The Bayard Firm
                                222 Delaware Ave.-Ste. 900
 8                              Wilmington, DE 19899

 9                              Alan W. Kornberg, Esq.
                                Paul Weiss Rifkind Wharton
10                              & Garrison, LLP
                                1285 Avenue of the Americas
11                              New York, NY 10019

12                              Mikhail Ratner, Esq.
                                Paul Weiss Rifkind Wharton
13                              & Garrison, LLP
                                1285 Avenue of the Americas
14                              New York, NY 10019

15                              Ephraim Diamond, Esq.
                                Paul Weiss Rifkind Wharton
16                              & Garrison, LLP
                                1285 Avenue of the Americas
17                              New York, NY 10019

18                              Mark Alcott, Esq.
                                Paul Weiss Rifkind Wharton
19                              & Garrison, LLP
                                1285 Avenue of the Americas
20                              New York, NY 10019

21   For Harbert Management:    James Donnell, Esq.
                                Andrews Kurth, LLP
22                              Ste. 200
                                600 Travis
23                              Houston, TX  77002

24

25
```

3

| | | |
|---|---|---|
| 1 | For Magten Asset Management: | Bonnie Steingart, Esq. |
| 2 | | Fried Frank Harris Shriver & Jacobson, LLP |
| 3 | | One New York Plaza New York, NY 10004 |
| 4 | For MBIA Insurance Corp.: | Stefanie Burbrower, Esq. King & Spalding, LLP |
| 5 | | 1185 Ave. of the Americas New York, NY 10036 |
| 6 | | |
| 7 | For the State of Montana: | Francis Monaco, Esq. Monzack & Monaco, PA |
| 8 | | 400 Commerce Center 12th & Orange Sts. Wilmington, DE 19899 |
| 9 | | |
| 10 | For Montana Public Service: Commission | Brady Williamson, Esq. State of Montana |
| 11 | (Via telephone) | Public Service Commission 1701 Prospect Ave. Helena, MT 59620 |
| 12 | | |
| 13 | For PPL Montana: | Lon A. Jenkins, Esq. LeBoeuf Lamb Greene |
| 14 | | & MacRae, LLP 1000 Kearns Bldg. |
| 15 | | 136 S. Main Street Salt Lake City, UT 84101 |
| 16 | For Credit Suisse First: Boston | Jason C. DiBattista, Esq. Morrison & Foerster, LLP |
| 17 | | 1290 Ave. of the Americas New York, NY 10104 |
| 18 | | |
| 19 | For RCG Carpathia Master Fund | Eric Haber, Esq. Kronish Lieb Weiner |
| 20 | | & Hellman, LLP 1114 Avenue of the Americas New York, NY 10036 |
| 21 | | |
| 22 | | John A. Morris, Esq. Kronish Lieb Weiner |
| 23 | | & Hellman, LLP 1114 Avenue of the Americas New York, NY 10036 |
| 24 | | |
| 25 | | |

4

```
 1                              Megan N. Harper, Esq.
                                Landis Rath & Cobb, LLP
 2                              919 N. Market Street-Ste. 600
                                Wilmington, DE 19801
 3
       For Wilmington Trust Co:     Philip Bentley, Esq.
 4                              Kramer Levin Naftalis
                                & Frankel, LLP
 5                              919 Third Ave.
                                New York, NY 10022
 6
       For Deutsche Bank,:      Joseph K. Koury, Esq.
 7     Indentured Trustee       Bifferato Gentilotti & Biden
                                Bruckner Building
 8                              1308 Delaware Ave.
                                Wilmington, DE 19899
 9
                                Kimberly Newmarch, Esq.
10                              Richards Layton & Finger
                                One Rodney Square
11                              Wilmington, DE 19801

12     For                      Ronald S. Gellert, Esq.
                                Eckert Seamans Cherin
13                              & Mellott, LLC
                                4 East 8th St.-Ste. 200
14                              Wilmington, DE 19801

15     For                      Rachel Lowey Werkheiser, Esq.
                                Pachulski Stang Ziehl Young
16                              Jones 7 Weintraub, PC
                                919 North Market Street-16th Fl.
17                              Wilmington, DE 19899

18     For                      Leslie B. Spoltore, Esq.
                                Fox Rothschild, LLP
19                              Citizens Bank Center
                                919 N. Market Street-Ste. 1300
20                              Wilmington, DE 19899

21     For Milbank Tweed Hadley:    Mark Shinderman, Esq.
       & McCloy, LLP            Manger Tolles & Olsen, LLP
22                              355 South Grand Ave.
                                Los Angeles, CA 90017
23
       For Securities Class Action: Michael S. Etkin, Esq.
24     Plaintiffs              Lowenstein Sandler, PC
                                65 Livingston Ave.
25                              Roseland, NJ 07068
```

5

```
1    For Wells Fargo & U.S.:        Monica L. Clark, Esq.
     Bank                           Dorsey & Whitney, LLP
2                                   Ste. 1500
                                    50 South Sixth Street
3                                   Minneapolis, MN 55402

4    Audio Operator:                Stacy Pavese

5    Transcribing Firm:             Writer's Cramp, Inc.
                                    6 Norton Rd.
6                                   Monmouth Jct., NJ 08852
                                    732-329-0191
7
   Proceedings recorded by electronic sound recording, transcript
8  produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

```
                              Index
                                                    Further
                     Direct Cross Redirect Recross Redirect

Witnesses For The:
 Creditor's Committee

   Mr. Geer
   (by Mr. Alcott)      295
   (by Mr. Austin)            317
   (by Mr. Morris)            318

   Mr. Harris
   (by Mr. Ratner)      335           400
   (by Mr. Austin)            370             403

Witnesses For The
 Debtor:

   Mr. Carson
   (by Ms. Denniston)    73
   (by Mr. Austin)       81           125
   (by Mr. Morris)            116
   (by Mr. Houston)           122

   Mr. Hanson
   (by Ms. Denniston)   128           188
   (by Mr. Morris)            167
   (by Mr. Houston)           184

   Mr. Bird
   (by Ms. Denniston)   189
   (by Mr. Austin)                    220
   (by Mr. Morris)            215             221
   (by Mr. Houston)           218

   Mr. Yearley
   (by Ms. Denniston)   223           292
   (by Mr. Morris)            248             293


MOTIONS:



EXHIBITS:                                   Marked   Received

   E-1      Growth Rate Report                400
```

7

| | | | |
|---|---|---|---|
| C-1 | Engagement Letter | 300 |
| C-2 | Case List | 297 |
| C-3 | Summary Chart | 307 |
| C-4 | Comparable Transaction Chart | 308 |
| C-5 | Cash Discount Chart | 310 |
| C-6 | Value Computation Chart | 314 |
| | | |
| D-16 | Declaration & Affidavit | 230 |
| D-32 | Affidavit | 71 |
| D-114 | Operation Statement | 194 |
| D-115 | Cash Flow Statement | 195 |
| D-116 | Projected Balance Sheet | 195 |
| D-117 | Pro Forma Capital Structure | 203 |
| D-118 | Projected Asset Sales | 210 |
| D-119 | Cash History Statement | 207 |
| D-120 | Secured Debt Schedule | 207 |
| D-121 | Exit Financing Sources | 205 |
| D-128 | Not Identified | 133 |
| D-139 | Valuation Materials | 247 |
| D-141 | Case Valuation Report | 337 |
| D-142 | Not Identified | 231 |
| D-144 | Claims Chart | 243 |
| D-145 | Valuation Comparison Report | 244 |
| D-146 | Not Identified | 245 |
| D-150 | Slides | 71 |

SUMMATION BY:

THE COURT: Finding

1    THE CLERK:  Case #03-12872, <u>Northwestern Corporation</u>.

2    THE COURT:  Good morning.  I'll note the appearances

3    of counsel on the appearance sheet, as well as the appearance

4    of those parties who are participating in the hearing today by

5    telephone.  I'm going to ask everybody who appears today,

6    please, to identify yourself so that the Court Reporter can

7    keep a good record of our proceedings.  I know you're all

8    legends in your own mind, but we don't necessarily -- the

9    keeper of the record won't necessarily know that, so just

10   please identify yourself before you speak.  Thank you.  All

11   right, are we ready to proceed?  Okay, let me get my -- let me

12   get the right binder here.

13   THE CLERK:  You want the one with the agenda in it?

14   THE COURT:  Yes, it's on the bottom.

15   (Pause in proceedings)

16   THE COURT:  All right.  Let's go forward, Counsel.

17   MR. AUSTIN:  Thank you, Your Honor.  For the record, I

18   am Jess Austin on behalf of Northwestern Corporation, the

19   Debtor-in-Possession in this Chapter 11 case.  We are here

20   today to begin the confirmation hearing on the Debtor's

21   proposed Reorganization Plan, which based on matters which we

22   will present this morning, will be its second amended and

23   restated Plan resulting from the settlement which we announced

24   to the Court a weeks ago with Harbert Management Corporation

25   and Wilmington Trust on behalf of the, what is referred to as

1  the Toppers.  With respect to where we anticipate proceeding

2  today, Your Honor, I'd like to outline what we see as the

3  process.  As I'm standing here, I will be, obviously, making

4  the opening and slight introduction as relate to the -- where

5  we anticipate going.  We obviously have the Court agenda.  From

6  the Debtor's standpoint, we would like to proceed in two

7  primary areas.  The first is to deal with the Motions to Allow

8  Approval of the Amended Disclosure Statement and the approval

9  of the Summary Disclosure Statement and the approval of the

10  Resolicitation Procedures.

11      Following that, Your Honor, we'd like to then move into

12  directly the confirmation hearing, which from that standpoint,

13  we would like to first off begin by highlighting the primary

14  differences between the First Amended Plan and the proposed

15  Second Amended Plan.  We'd like to then present those matters

16  which we think that this Court could take notice of relative to

17  the evidentiary record and procedure compliance offer approved

18  as it relates to the technical compliance with Statute 1129 of

19  the Bankruptcy Code, as well as with the issues relative to the

20  voting.  We need to make the voting point.

21      Upon completing that, Your Honor, we would move into our

22  line of testimony, which the Debtor has four witnesses it

23  intends to present today:  Mr. Wayne Austin, Mr. Michael

24  Hansen, Mr. Brian Byrd and Mr. Andrew Yearly.  At that point,

25  Your Honor, we would anticipate that the evidence, from the

10

1  Debtor's standpoint, would be closed as the rights to the

2  submission to be issued before the Court today subject,

3  obviously, to the opening issues or the reservation of issues

4  as we may come back on a second hearing following the

5  resolicitation.

6      At that point, we believe the Committee has a witness to

7  present, and then, to our knowledge, there is -- the only other

8  parties that have indicated a possibility of presenting live

9  witnesses are the equity interest holders and possibly of Law

10  Debenture.  This obviously is not taking into consideration the

11  timing on cross examination relative to the conclusion once the

12  testimony's been presented, Your Honor.  I think that the

13  question we would anticipate addressing is just the date for

14  the continuance of the confirmation hearing, and then reserve

15  summations and closing arguments to the conclusion of that

16  hearing.

17      I would like to make one announcement, Your Honor, and we

18  are aware that as a result of the -- especially the Court's

19  ruling from this past Friday dealing with the Motion to

20  Dismiss, the action filed by both Magten and Law Debenture,

21  that they will be necessarily require some additional update in

22  our disclosure statement.  And we are aware that at least we

23  received a copy of the Law Debenture, some objections to the

24  disclosure statement as amended.  We've not had a chance to

25  review it.  We only received that this morning.  We've been

1  advised that Magten has also filed objections to the disclosure

2  statement.  Again, we've not had a chance to review that, but

3  at least in the same practice which we did with the prior

4  disclosure statement, we obviously are, as on behalf of the

5  Debtor, willing to make appropriate changes to, as necessary,

6  to the disclosure statement proof.

7       With respect to the Court's ruling, we also are

8  contemplating, Your Honor, and have discussed with counsel for

9  the Committee and also with counsel for Law Debenture, one

10 modification to the treatment of the class B, 8B, holders of

11 the Quips' subordinated debt.  And that option, it would be

12 modification which we are contemplating, Your Honor, is to

13 offer two options to the class 8B holders.  Option number one

14 is that a class 8B Quips holder, if it accepts the Plan, could

15 chose to receive its pro rata share of the stock and warrants

16 that are currently being offered for the class 8B holders.  And

17 that would be in satisfaction of its claims and recovery

18 against the Debtor's estate.  Or that claim holder of a class

19 8B claim could chose to make a recovery, make an affirmative

20 choice, to pursue a recovery under the fraud and conveyance

21 action that is still alive relative to the Court's ruling.  If

22 that were to occur, those class 8B holders that accept it and

23 made that choice, would then fall into the class 9 general

24 unsecured claims, and we'd make an estimation hearing on what

25 would need to be reserved from the distributions of the stock

1  that would otherwise go to the class 9 and the class 7 holders
2  on a pro rata basis while we ultimately litigated the validity
3  of that particular plan.  If a claimant in that class did not
4  affirmatively choose, we would propose that they would be
5  deemed to take the distribution of the stock and the warrants.
6  If a claimant in that class action rejected, then it would
7  obviously fall into the litigation claim which we think is
8  obviously currently provided for in the plan.  We think that
9  may well be an appropriate way to deal with the issues that
10  arise as a result of the Court's rulings from last Friday and
11  at least gives the holders of those Quips, because there may
12  well be a group of the claim holders that still -- that held
13  those -- bought those Quips prior to November 2002 and hold
14  those claims today.  And there're obviously claim holders such
15  as Magten who acquired those claims post-November 2002 that may
16  find themselves, at least from the Debtor's perspective, in a
17  different category.  So that is a possible modification to the
18  Plan which we are contemplating, Your Honor.  It -- obviously a
19  decision on that would be made by the time we finalize the
20  disclosure statement and Plan and is one we are discussing with
21  counsel for the Creditors' Committee and counsel for Law
22  Debenture and is something that may well proceed during the
23  course of today's hearing.  I did want to alert the Court to
24  that possible modification as a result of this Court's ruling
25  from last Friday.

13

1    With that, Your Honor, I'd like to turn this matter over

2  to Ms. Denniston who will go through both the agenda and then

3  begin with proceeding on the resolicitation procedures.

4    MS. DENNISTON:  Good morning, Your Honor.  Karol

5  Denniston on behalf of the Debtor.  Turning to the Amended

6  Notice of Agenda of matters scheduled for today's hearing, with

7  regard to matter one, the pre-trial conference on the amended

8  verified complaint for declaratory temporary and permanent

9  injunctive relief, we would request that this matter be

10 continued to September 15 hearing.

11    THE COURT:  So ordered.

12    MS. DENNISTON:  Thank you, Your Honor.  With regard to

13 matter number two, the confirmation of the Debtor's First

14 Amended Plan, we would ask to move that to the end of the

15 docket today so that we can address the other matters.

16    THE COURT:  All right.

17    MS. DENNISTON:  Matter number three, Your Honor, is

18 the Motion of RCG Carpathia Master Fund and Kellogg Capital

19 Group for authority to file portions of objection to the

20 Debtor's First Amended Plan under seal.  The Debtor has no

21 objection and is happy to stipulate to that filing.

22    THE COURT:  Anybody else wish to be heard in

23 connection with item number three?

24    MR. HABER:  Good morning, Your Honor.  Eric Haber of

25 Kronish, Lieb, Weiner & Hellman for RCG --

1    THE COURT:  You need to make sure -- I want to just

2  warn all counsel -- make sure you wait until you get to the

3  podium before you start speaking and then speak up loudly

4  because we have a host of folks on the telephone who otherwise

5  won't be able to hear what's going on.

6    MR. HABER:  I apologize, Your Honor.  Eric Haber of

7  Kronish, Lieb, Weiner & Hellman for RCG Carpathia Master Fund

8  and Kellogg Capital Group.  We have a proposed order to hand up

9  if the Court pleases?

10    THE COURT:  All right.

11    MR. HABER:  Thank you.

12    THE COURT:  I think there may be somebody on the

13  telephone who is typing on a computer and is on a speaker

14  phone.  If that is you, please don't do that.  If you need to

15  type on a computer, you need to take it off the speaker phone

16  because it's a very loud noise here in the Courtroom that will

17  bother everybody.  Thank you.

18    (The Court reviews document)

19    THE COURT:  I've signed the order.

20    MS. DENNISTON:  Thank you, Your Honor.  With regard to

21  matter number four, the Motion of Credit Suisse First Boston

22  for Order Granting Leave to File a Response to Objection of

23  Magten Asset Management Corporation and Law Debenture, the

24  Debtor has no objection to this Motion.

25    THE COURT:  Anybody else wish to be heard in

1    connection with this matter?

2        MR. DIBATTISTA:  Good morning, Your Honor.  Jason

3    DiBattista from Morrison & Foerster representing Credit Suisse

4    First Boston.  I have a proposed order to hand up to Your Honor

5    if the Court pleases.

6        THE COURT:  All right.

7        MR. DIBATTISTA:  Thank you.

8        (The Court receives document)

9        THE COURT:  I've signed the order, thank you.

10       MS. DENNISTON:  Your Honor, the next matter on the

11   agenda is matter number five, the Emergency Motion of Law

12   Debenture Trust Company of New York to adjourn the Debtor's

13   confirmation hearing.  We believe this matter was addressed by

14   the teleconference with the Court on August 20 --

15       THE COURT:  It's already --

16       MS. DENNISTON:  -- 2004.

17       THE COURT:  -- vacated.  It's ordered vacating the

18   hearing.

19       MS. DENNISTON:  Thank you, Your Honor.  Matter number

20   six is the Motion to Approve the Debtor's second amended and

21   restated disclosure statement and summary disclosure statement,

22   establish procedures for limited solicitation, tabulation of

23   votes on Debtor's second amended and restated Plan, approving

24   the form and manner of notice, and granting related relief.

25   I'd ask to come back to that, Your Honor, as soon as we've

1    completed the agenda.

2         THE COURT:  All right.

3         MS. DENNISTON:  Matter number seven is the Motion of

4    PPL Montana for Extension, or in the alternative, for an order

5    directing that the resolution of the objection of PPL Montana's

6    Proof of Claim be determined by the United States District

7    Court.  A stipulation has been reached, Your Honor, to continue

8    that matter to September 15th, and I would -- the parties have

9    signed and filed that stipulation and I would ask that that --

10   that I be able to hand up the order so it can be entered at

11   this time.

12        THE COURT:  All right, please do.

13      (The Court receives document)

14        THE COURT:  I've signed the order.

15        MS. DENNISTON:  Thank you, Your Honor.  Two other

16   housekeeping details with regard to stipulations.  The first

17   one is a stipulation and order adjourning the hearing date

18   related to section three of the limited objection of PPL

19   Montana to confirmation of the Debtor's First Amended Plan.

20   The parties have stipulated that this objection, if not

21   resolved prior to the continued hearing date, will be continued

22   and heard at the continued confirmation hearing.  This

23   stipulation has been filed with the Court.  I'd like to hand

24   that up so that we can get the order signed.

25      (The Court receives document))

1    THE COURT:    I've signed the order.

2    MS. DENNISTON:    Thank you, Your Honor.    The last

3  stipulation is the stipulation and order between and among the

4  Debtor, the Official Committee of Unsecured Creditors, RCG

5  Carpathia Master Fund and Kellogg Capital Group stipulating to

6  the qualification of certain witnesses identified by the

7  parties pursuant to Federal Rule of Evidence 702.    The parties

8  have signed the stipulation this morning.    I'd like to hand

9  that up so that we can get the order entered.

10    THE COURT:    All right.

11    (The Court receives document)

12    THE COURT:    I've signed the order.

13    MS. DENNISTON:    Thank you, Your Honor.    With that,

14  we'd like to return to matter number six, the Motion to Approve

15  the Debtor's second amended and restated disclosure statement

16  and summary disclosure statement.

17    THE COURT:    Okay.

18    MS. DENNISTON:    Consistent with the Debtor's approach

19  to getting -- obtaining approval of its first amended

20  disclosure statement, the Debtor has followed a similar

21  process, Your Honor.    We circulated -- well, we filed the

22  pleadings last Wednesday and since that time, we have been

23  speaking with the parties regarding requested changes, both to

24  the Plan and the disclosure statement.    I'd like to make a

25  record of those changes that the Debtor has already agreed to

18

1   in connection with objections that were received by telephone

2   and in connection with some of the written objections and then

3   move on to those objections that remain unresolved at this

4   time.  We would ask that, consistent with the prior disclosure

5   statement hearing, that to the extent that there are additional

6   objections being made that the parties would place on the

7   record today those changes that they would like made to the

8   disclosure statement so that the Debtor can make those changes,

9   circulate the disclosure statement.  We would anticipate on

10  circulating the disclosure statement on Friday so that it could

11  be filed and, hopefully, have an order by the first part of

12  next week.

13          THE COURT:  Okay.

14          MS. DENNISTON:  With that, Your Honor, with regard to

15  the changes to the Plan and disclosure statement, the Second

16  Amended Plan, the second amended disclosure statement, and the

17  summary disclosure statement will be revised to reflect that

18  class 8A will receive 2 million 334,409 shares of new common

19  stock plus the warrants exercisable for an additional 10.7% of

20  new common stock.  Class 8B, in the event that it votes to

21  accept as a class to accept the Plan, will receive 505,591

22  shares of new common stock plus warrants exercisable for an

23  additional 1.4% of the new common stock.  With regard to PPL

24  Montana, the Plan and disclosure statement have been updated to

25  reflect that PPL Montana amended its Proof of Claim on August

1  3rd, 2004 and to reflect the continuing objection related to

2  the establishment of the claim reserve pursuant to the Plan.

3      U.S. Bank and Wells Fargo have requested clarification

4  regarding section 5.20 of the Second Amended Plan.  Section

5  5.20 states that, "Upon receipt of acceptance of a distribution

6  from the Reorganized Debtor, any and all claims and causes of

7  action as between the Debtor and the claimant accepting the

8  distribution shall be fully and finally resolved."  Section

9  5.20 applies only to full distribution.  It is not meant to

10  apply in the event of a partial distribution.  The disclosure

11  statement and Plan will be updated to reflect this Court's

12  decision in the Magten adversary proceeding.  I have noted that

13  that is an objection that has been raised by Magten and Law

14  Debenture.  While the Debtor is happy to supplement, we would

15  ask that during the course of this proceeding that they place

16  on the record that language that they want so that we can

17  proceed to update the disclosure statement.

18      The disclosure statement will be updated to reflect the

19  filing of the Exit Financing Motion by the Debtor on August 20,

20  2004.  It will also be updated to reflect the Montana Public

21  Service Commission's entry of the consent order approving the

22  stipulation and settlement.

23      As to National Union, the Plan and disclosure statement

24  will be updated to reflect that there is an adversary

25  proceeding in connection with the National Union Fire Insurance

1   Company of Pittsburgh.  National Union has contested

2   Northwestern's ownership of the policy and ability to assume

3   such policy under the Plan.  Northwestern's interest in the

4   policy will be determined in the adversary proceeding and

5   nothing in the Plan is intended to affect either the Debtors or

6   National Union's rights in connection with the adversary

7   proceeding.  National Union has suggested language which the

8   Debtor has accepted and that language is as follows, "The

9   Debtor is the Plaintiff in an adversary proceeding styled

10  Northwestern Corporation versus National Union Fire Insurance

11  Company of Pittsburgh, PA, Adversary Proceeding #04-53072

12  {parenthetical} (CGC) {close parenthetical}, the National Union

13  Adversary Proceeding.  In the National Union Adversary

14  Proceeding, the Debtors dispute whether the Debtor -- the

15  parties dispute whether the Debtor has a right to coverage

16  arising from or under commercial umbrella policy #BE9329674

17  with the policy period of September 1, 1999 through September

18  1, 2000 issued to Montana Power Company by National Union Fire

19  Insurance of Pittsburgh, PA, the National Union Policy.  The

20  parties intend only that a final binding order or settlement

21  agreement entered into the National Union Adversary Proceeding

22  shall control the parties' respective rights and obligations

23  arising from or under the National Union Policy.  As such,

24  nothing contained in the Plan or the confirmation order,

25  including the Debtor's purported assumption of executory

21

1   contracts under section 8.1 through 8.3 of the Plan, shall

2   affect coverage under the National Union policy or National

3   Union's rights, defenses, limitations and/or exclusions to be

4   raised in the National Union adversary proceeding."

5       With regard to Milbank Tweed, the Debtor has agreed to add

6   similar language consistent with the language provided to

7   Goldman Sachs to section 10.9 of the Second Amended Plan.  The

8   proposed language is as follows:  "No injunction against

9   impairment of claims of Goldman Sachs & Co. or Milbank Tweed

10  Hadley & McCloy LLP against non-Debtors, notwithstanding any

11  language to the contrary in the disclosure statement plan

12  and/or confirmation order, no provision of the plan or

13  confirmation order enjoins, releases or otherwise impairs any

14  claim of Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy

15  against any person or any entity other than the Debtor and the

16  Reorganized Debtor or otherwise limits any defense, set off,

17  counterclaim or cross-claim either may have against any party,

18  person or entity except that any recovery by Goldman Sachs &

19  Co. or Milbank Tweed Hadley & McCloy on such counter claim or

20  cross-claim against the Debtor or Reorganized Debtor shall be

21  limited by the plan."

22      We have corrected in section 5.8, the defined term "Cash"

23  has been capitalized.  In Section 1.126, the new incentive

24  plan, "special reorganization grants" has been changed to

25  "special recognition grants."  And with regard to the Montana

22

1  Benefit Restoration Plan, we are working on counsel, the

2  disclosure statement will reflect that the Debtor is working

3  with counsel on determining alternatives for participants in

4  the Montana Benefit Restoration Plan and that as to their

5  objection related to the claims reserve that that matter would

6  be continued to the continued confirmation hearing.

7       Those, Your Honor, in short, are a summary of the changes

8  that the Debtor has been requested to make and has agreed to

9  make in connection with the second amended disclosure

10 statement.  I note that we have this morning objections filed

11 by Magten and Law Debenture.  And I think, subject to the

12 Court's concurrence, that we turn that matter over to them so

13 we can address those objections at this time.

14      THE COURT:  All right.

15      MR. SNELLINGS:  Good morning, Your Honor.  John

16 Snellings for Law Debenture.  Just before I turn to our

17 objection which we did file electronically today and I handed

18 up a copy of it earlier, with respect to Mr. Austin's statement

19 regarding a possible new amendment to the Plan with regard to

20 treatment of the Quips, I just want to note on the record that

21 it has been just proposed this morning just prior to this

22 hearing.  It is certainly under consideration; however, due to

23 the start of the hearing, we haven't had any opportunity to

24 discuss it with our client.  But also, just as a note of

25 caution and to control the tyranny of expectations, I would

23

1  want to put on the record that as of now, that offer is

2  rejected because we do not believe that it takes into

3  consideration the value of the claim.  But we will continue to

4  discuss this with the Committee and with the Debtor and see if

5  we can get somewhere in the next few days.  With regard to our

6  objection to the disclosure statement, we believe Mr. Austin

7  has also addressed the primary issue that we believe that the

8  second amended disclosure statement needs further work due to

9  your order that was issued last Friday and more accurately,

10  presenting to those that are going to vote on these amendments

11  with regard to the status of the adversary proceeding.  We

12  believe that given the Hobson's choice that this particular

13  plan, as it now stands, provides to the Quip holders, which is

14  either to vote for the plan and waive their adversary

15  proceeding versus voting for the plan and accepting the

16  treatment that is there for 8B, that it is an important and

17  necessary revision to give them a full and candid presentation

18  of the present status of this adversary proceeding, not only

19  with respect to your decision, which we would suggest given the

20  limited solicitation that a copy of that decision should be

21  attached as an exhibit both to the amended disclosure statement

22  and the summary, but also with respect to in the summary and in

23  the disclosure statement itself when it talks about the waiving

24  or foregoing of claims and other things, including the

25  adversary proceeding, that needs to be very explicit.  So the

1  individual holders who may not be as sophisticated as some of

2  our other holders will understand exactly what they're giving

3  up.

4      I'd also like to state, just so that we're clear on this,

5  when I make these comments regarding the amendments to the

6  disclosure statement, I would want them parallel with and

7  consistent with the summary that is being proposed, and I will

8  address that as an additional, practical concern that we have.

9  So the first one is the amendment to the disclosure statement

10 with regard to characterizing the litigation.

11      Second, we also believe that it needs to be highlighted in

12 greater detail and with greater explicisity that -- if that's a

13 word -- the treatment of the fact that they are giving up this

14 litigation.  While it's referred to, we do not believe that it

15 is highlighted as much so that people can make an informed

16 decision with regard to that.

17      Next, Your Honor, of course as we've discussed last Friday

18 and has been presented today, the biggest alteration to the

19 plan is the splitting or bifurcating of class 8 into class A

20 and class B.  We do not believe that the disclosure statement

21 nor the summary does enough to explain the business rationale

22 and the purpose of that particular decision to split these

23 classes.  If, in fact, the Debtor wanted to obtain approval of

24 their plan as now amended to the settlement with Wilmington,

25 they could have kept the class as one and Harbert's change of

1   their vote would have had an accepting class.  Instead, they

2   have split the classes and while they make a summary statement

3   that, "We did it because the Quips and the Toppers asked for

4   it," I believe that it's just not enough and that they should

5   have to present why they actually did the bifurcation and what

6   was the legitimate business reason behind that so that the

7   people who are going to vote on this understand what the Debtor

8   was thinking at that time.

9       Furthermore, Your Honor, it has been stated in Friday's

10  hearing as well as here, that A and B are being treated as the

11  same and getting the same treatment.  Certainly, the share of

12  the enhanced 8% as well as the warrants under that division is

13  similar treatment; however, I do not believe that the

14  disclosure statement goes into three particular areas in which

15  the treatment is different.  And that has to be highlighted so

16  that the Quips holders can understand that.  One, it is my

17  understanding, reading further into the disclosure statement,

18  that Harbert and Wilmington will be receiving an additional

19  $2.25 million to cover their fees and expenses.  A similar

20  treatment is not being afforded Law Debenture or Magten.  Also,

21  class 8A claims are explicitly liquidated, but in contrast, the

22  Quip claims, the Debtor is reserving for itself or any other

23  interested party the right to object to the claims of Quip

24  holders.  That is not similar treatment and it needs to be

25  highlighted that, in fact, there is a different level of

26

1  treatment here.  And, of course, class 8A is not saddled with

2  the death trap imposed on 8B and that needs to be explained as

3  well and disclosed why that different treatment is being

4  afforded class 8A.

5      Also, Your Honor, we -- with regard to the fact -- and

6  this is sort of the book end with regard to the adversary

7  proceeding -- now that the Motion to Dismiss has been decided,

8  we believe that the second amended disclosure statement needs

9  to be amended to disclose how the Debtor will deal with and how

10  it -- this Plan will be affected by the possibility of a

11  judgment in the Quips' favor with regard to the fraudulent

12  transfer, whether they're going to reserve for that and how

13  they're going to proceed.  It was enough at the time of the

14  original disclosure statement to say, "We're going to

15  vigorously defend this and we filed a Motion to Dismiss."  Now

16  that the Motion to Dismiss has been decided and we're moving

17  forward, I think that the Debtor owes it to all Creditors to

18  discuss how they will deal with this pending litigation and how

19  it might or might not affect the feasibility of the Plan or the

20  value of the common stock that is going to be issued under this

21  Plan.

22      Those are, basically, the objections to the disclosure

23  statement.  We do have a concern, and we raised this in our

24  objection, with regard to the solicitation procedures.  We are

25  concerned with the significant changes that are being made in

27

1  the disclosure statement, especially with regard to the

2  characterization of the litigation that only the Debtor has

3  requested that you allow them to only send out to the Quip

4  holders, as well as those in class 7 and 9, the summary.  We

5  think that that is inadequate and that they should be able to

6  review the entire modified disclosure statement and not just a

7  summary.

8       We are also concerned with the logistics of getting the

9  vote.  This is very difficult because of the structure of these

10  types of indentures and how they're held.  It takes time and

11  effort to get these ballots in the hands of those who will

12  actually be casting the ballots.  And we are concerned that,

13  with regard to the death trap provisions as well as the fact

14  that if no vote is received that it's deemed to be the same

15  vote that they had before, that we need some assurances that

16  the Debtor and its balloting agent can get this information

17  into the hands of individual Quip holders in sufficient time

18  for them to have a reasonable amount of time to analyze it and

19  make an informed vote and not be caught up by a deadline.  And

20  whether this comes from a certification that as to when it was

21  mailed and to whom it was mailed, I'm not sure, but there needs

22  to be some protections afforded these folks since they're

23  giving up significant rights that, in fact, they have been

24  fully informed of these changes in the Plan.  Thank you, Your

25  Honor.

1      THE COURT:  Thank you, Mr. Snellings.

2      MS. STEINGART:  Good morning, Your Honor.  Bonnie

3  Steingart from Fried, Frank on behalf of Magten.  We also filed

4  an objection to the disclosure statement this morning, a

5  limited objection, that touched on two points, which I will not

6  go into in great detail because Law Debenture has covered most

7  of it more than adequately.  First was we believed as well that

8  the description of the reasons for deconstructing class 8 were

9  not clear, and the business purpose of that was certainly not

10  apparent.  That concern is exacerbated, from our point of view,

11  this morning because I heard for the first time as Mr. Austin

12  was speaking today about an additional voting adjustment that

13  is being discussed with respect to the Quip holders with

14  respect to before and after and individuals, and I'm not really

15  quite sure that I understood it.  I'm sure I'll see it in

16  writing at some point and I'll have an opportunity to be heard

17  on it.  But given the initial uncertainty about the

18  appropriateness of the difference in classes given the

19  similarity of recoveries, this additional suggestion is

20  something that on its face does not, you know, appear to

21  advance the interests of the Quips.  Indeed to the extent that

22  there are distinctions that either the Debtor or others believe

23  need to be made as a result of whether people held before 2002

24  or after 2002 or whether that makes some difference in

25  entitlement with respect to the litigation, Your Honor, I

1  submit that those are motions that need to be made and legal
2  issues that need to be decided and certainly cannot be, you
3  know, sort of imposed as some sort of voting adjustment or
4  segregating voting of the Quips in some way at this late date.
5  To -- you know, to the extent that those are concerns I think
6  that we would need to deal with them in the context of the
7  adversary to the extent that the Debtor continues to have an
8  interest in seeking to have the Quips unbundled in that way.
9      We also join Lloyd and Law Debenture in seeking to have the
10 Debtors provide some more cogent discussion of their view of
11 the impact of Your Honor's decision on Friday with respect to
12 the Motion to Dismiss.  Indeed, you know, we didn't expect to,
13 you know, to see it this soon.  Of course, you know, people
14 need to read the opinion, they need to determine what
15 disclosure is appropriate, and we are available and prepared to
16 discuss adjustments to that disclosure with the Debtor in the
17 hope of if Friday's the time that people want to have reached
18 agreement with respect to disclosure, I'm hopeful that we can
19 achieve that.  Thank you, Your Honor.
20         THE COURT:  Anybody else wish to be heard in
21 connection with the proposed modifications to the disclosure
22 statement?
23         MR. HOUSTON:  Yes, Your Honor.  May it please the
24 Court, this is Joseph Houston of Stevens & Lee on behalf of
25 Richard Hylland.

1    THE COURT:  All right.

2    MR. HOUSTON:  If it please the Court, Your Honor, we

3    filed a limited objection to the second amended and restated

4    disclosure statement last night.  It's Docket Item 1985 and it

5    deals specifically and only with respect to article 4(H), as in

6    Henry, paragraph 7 of the disclosure statement and Article

7    10.13 of the Plan; identical language at each place.  I

8    don't -- does the Court have a copy of either the blackline or

9    the Plan in front?

10    THE COURT:  Well, a copy of your objection or a copy

11    of the Plan?

12    MR. HOUSTON:  A copy of the disclosure statement or

13    the Plan.

14    THE COURT:  I'm sure I do.

15    MR. HOUSTON:  And the reason that I ask that is that

16    our objection is that language that was added to both of those

17    provisions is unclear at best.

18    THE COURT:  All right.  Well, let's go back and talk

19    about -- I'm now looking at the blackline second amended and

20    restated disclosure statement.

21    MR. HOUSTON:  Very good, Sir.  If you'll go to page

22    81.

23    THE COURT:  Okay.

24    MR. HOUSTON:  And if you look at paragraph 7, there is

25    a sentence that's been added at the end of paragraph 7 towards

31

1    the top of the page.  It begins, "The releases, exculpation,"

2    et cetera, et cetera.

3            THE COURT:  Okay.

4            MR. HOUSTON:  Now, at least four sets of eyes, to whom

5    I spoke, read this and were unable to come up with agreement

6    about what it meant.  I believe that there is a word, at least

7    one word, missing in the third line.  It says, "and settlement

8    of claims proposed."  I think it should say, "to be released."

9    But what it purports to say is that -- it looks as though -- I

10   mean, it says that this is a paragraph about limitations on

11   releases, exculpation, discharge and injunction, and what the

12   sentence purports to say is that if the releases, exculpation,

13   discharge, et cetera provided for the Plan also shall not be

14   affected.  Perhaps that should say "be effective," with respect

15   to those releases and settlement of claims proposed to be

16   released and settled under the class action settlement

17   document.  And none of the readers of this, at least on my side

18   of things, could tell whether that was intended to protect the

19   class action settlement or the Plan releases, whether that was

20   to expand the Plan releases --

21           THE COURT:  All right.  Why don't we just -- why don't

22   we ask Miss Denniston to say what they were trying to do and

23   maybe the matter can be addressed that way.

24           MR. HOUSTON:  And, Your Honor, if I may, just one

25   left.  An important part is that there is a carve out at the

32

1   end of that paragraph -- at the end of the added language that

2   suggests that the class action settlement, if Your Honor does

3   not approve it as submitted, Your Honor might approve the

4   settlement but limit the parties to whom the Debtor may give

5   releases.  That is not the understanding in the class action

6   settlement.  The class action settlement is one whole

7   transaction.  If Your Honor chooses not to approve it, it is

8   not approved, and I suppose that either the parties are back to

9   the drawing board or the chips fall where they do.  If Your

10  Honor does approve it, then the class action is settled in the

11  District Court.  But there is no suggestion or provision in any

12  of the documents that this is submitted to Your Honor to allow

13  you to then amend the provision of the class action settlement

14  document.  And to the extent that this language suggests that

15  that is a prospect, I don't believe that there is anyone who is

16  a settling party who agrees that that is the intention of the

17  agreement.  It's either -- it's a "yay" or "nay", up or down.

18          THE COURT:  I understand --

19          MR. HOUSTON:  Either Your Honor -- if Your Honor

20  approves it or --

21          THE COURT:  I understand your point.

22          MR. HOUSTON:  Okay.

23          THE COURT:  Ms. Denniston?

24          MS. DENNISTON:  Yes, Your Honor.  The language here

25  was an effort to basically, since the Debtor is not a fortune

1  teller, to basically say that the Plan is the Plan.  The order

2  on the MOU is the order on the MOU.  And whatever the Court

3  determines drives.  And if the Court makes a decision on the

4  MOU, that's a decision that doesn't impact what's happened in

5  the Plan subject to the Debtor's ability to confirm that Plan.

6  And that's all that that language was intended to do was to

7  make it very clear to everyone that if the Court were to give

8  them an option to either take the settlement with no releases,

9  some releases, or as the Debtor has requested, that that in and

10 of itself would not impact the release provisions that are set

11 forth in the Plan.  The Debtor and the estate view this as an

12 issue that, you know, now lies with the Court as to what

13 releases are being given in connection with the MOU and what

14 releases are being given in connection with the Plan.  And the

15 Debtor is only trying to communicate, at this point, that

16 whatever the Court determines will be the order.

17         THE COURT:  Well, I mean, to take up the last point of

18 Mr. Hylland's counsel first, I don't think anybody is expecting

19 or has asked me to blue pencil the agreement, in affect saying,

20 "I'm going to take out this release, this release, this release

21 and then approve it."  That's not to say that I couldn't issue

22 an order if I wanted to that said, "I will not approve this

23 settlement the way it is but if it came back to me with these

24 blue penciled, then I would approve it.  Or at least I would

25 approve -- I would not have an objection to those releases."

1  I'm not suggesting that's what I'm going to do.  And, you know,

2  it would be easier, of course, if that order were out now.  We

3  wouldn't be talking about this but -- and I feel that, too.  So

4  I agree with Mr. Hylland's counsel that it's not my job to blue

5  pencil it but I can certainly tell you what I would find

6  acceptable.  Then the parties can say, "Okay, well, we'll

7  settle on that basis or we won't settle on that basis,"

8  depending upon what it is.  And if I understand what else

9  you're saying is that -- I take it however that turns out that

10 does not affect the confirmability of the Plan.  Is that what

11 you're saying?

12      MS. DENNISTON:  Yes, Your Honor.  That's what we're

13 saying.  We're also saying that to the extent that there were

14 changes in the order that that wouldn't affect the proposed

15 releases that are provided for in the Plan.  Unfortunate as

16 that might be, the bankruptcy estate has an obligation to take

17 care of the estate.  And while we have been aligned with those

18 parties to the MOU and would certainly like to see the MOU

19 order entered as proposed, that in the event that there were

20 differences that those parties would have to elect whatever

21 treatment they found acceptable under the MOU as approved and

22 whatever treatment is provided for in the Plan.

23      THE COURT:  Okay.

24      MR. HOUSTON:  Your Honor, Joe Houston again.  It is my

25 belief, given the explanation that's been offered, that this

1    language is probably, therefore, unnecessary because paragraph

2    7 begins by saying, "except as specifically provided for in the

3    Plan the releases, exculpation," et cetera, et cetera with

4    respect to the litigation, the remaining -- there are millions

5    of words in the disclosure statement and many of them used to

6    describe specifically what is going to happen in the settlement

7    of various litigation what the nature of the releases are, the

8    agreements between Mr. Hylland and the Debtors, which are

9    different in certain respects from other agreements.  And my

10   suggestion on this would be either -- and again, I think if you

11   just simply sit and read the language, it is unclear at best --

12   that this entire sentence either be taken out entirely or that

13   we spend -- that we be permitted to spend some time off the

14   Court's time with the Debtor to try to work out slightly more

15   simple language to try to get them where they want to be.

16          THE COURT:  All right.  I see Mr. Etkin wants to weigh

17   in on this.

18          MR. ETKIN:  Thank you, Your Honor.  Michael Etkin on

19   behalf of the Class Action Plaintiffs in the securities

20   litigation.  I agree with Mr. Houston that there -- some

21   language doesn't make sense, and certainly it can be taken care

22   of with some language changes.  But I think the purpose of this

23   language, at least from my perspective, is significant.  And I

24   think it relates back also to a protective objection that we

25   had filed with respect to the disclosure statement originally

1    that was taken care of with respect to some language in the

2    initial disclosure statement, which I was mentioning to Mr.

3    Austin before, needs a little clean up as well. But the

4    purpose, the bottom line, is that the understanding is if a

5    settlement is not approved, that there will be nothing in this

6    Plan that precludes the securities litigation from going

7    forward with respect to any non-Debtor Defendant in that

8    litigation. And that's really the intention. And I think it's

9    important -- this addition is important, assuming that that's

10   what it's intended to accomplish, to make that clear.

11        One other point, however, Your Honor.  The approval

12   process with respect to the stipulation settlement which has

13   been preliminarily approved by the District Court, I think as

14   this Court knows, is a two-prong process.  So while the

15   approval by this Court is a condition with respect to the

16   settlement ultimately, that settlement has to be approved by

17   the District Court as well.  So even if it is approved by this

18   Court, if it's not approved by way of a final approval order in

19   the District Court, everything goes away as well.  So I think

20   that this language also has to be tweaked a bit to make it

21   clear that it's not just the approval of this Court but also of

22   the District Court.  And if both Courts approve, then, as

23   hopefully this Court and the District Court will, then we have

24   no issue.  But if either Court doesn't approve, then we're back

25   to square one.

1    THE COURT:  All right.  So Mr. Houston, I think you've

2  raised a valid point that needs to be addressed.  I understand,

3  I think, what the Debtor and what the securities Plaintiffs are

4  trying to accomplish here, and it seems to me to be reasonable.

5  But I do think you ought to take another cut at the language.

6    MS. DENNISTON:  Your Honor, what I would propose,

7  since Mr. Etkin is here, that we utilize that to get some

8  proposed language that perhaps we can put on the record later

9  in the day.

10    THE COURT:  All right.  That sounds like it makes

11  sense.

12    MR. HOUSTON:  And my suggestion is that this could be

13  as simple as saying, "the releases, exculpation, discharge and

14  injunctions provided for in the Plan shall not be affected in

15  any way by the approval or failure of approval by either the

16  Bankruptcy Court or the District Court," period, full stop.

17    THE COURT:  Well, and I think what Mr. Etkin was

18  saying and vice versa, is what I heard.

19    MS. DENNISTON:  Thank you, Mr. Etkin.

20    MR. ETKIN:  We'll work it out, Your Honor.  Thank you.

21    THE COURT:  Okay.  Let's go on, then.

22    MS. DENNISTON:  Thank you, Your Honor.

23    MR. HOUSTON:  Thank you, Your Honor.

24    MS. DENNISTON:  Thank you, Your Honor.  With regard to

25  the objections that have been raised by Magten and by Law

1    Debenture, I'd like to take those in the order as presented.

2    As to the status of the adversary proceeding and order entered

3    by this Court on Friday, one of the things that the Debtor said

4    up front at this hearing was that, "we're going to change

5    that."  I have read their objection, at least Law Debenture's

6    objection, and would ask that by the end of the day before this

7    hearing closes that they would just give us whatever language

8    that we want and consistent -- or what they want.  And

9    consistent with the way we've handled that before, if the

10   Debtor disagrees with their analysis, the Debtor will certainly

11   say that these are the assertions and the Debtor disagrees with

12   them.  But I'd like to get proposed language rather than just a

13   description of the adversary proceeding and its impact.  With

14   regard to attaching a copy of the order itself, the Debtor has

15   no problem attaching a copy of the order to the full disclosure

16   statement and making it available on the website and to be sent

17   out to those Creditors that request it.  The summary disclosure

18   statement is -- will be updated to reflect that, but the fuller

19   description and the order, I think, would be more appropriately

20   attached to the disclosure statement which the solicitation

21   package provides that will be posted on multiple websites.  And

22   also any Creditor that calls, the solicitation agent, the

23   Debtor or anybody, the company will be provided with a full set

24   of the disclosure statement and Plan.

25          THE COURT:  Well, let's just put on the record what

1  your proposed procedure here is with regard to the summary
2  disclosure statement.

3          MS. DENNISTON:  Of course.  Our proposed procedure,
4  Your Honor, would be to distribute the summary disclosure
5  statement with the amended ballots for class 7, 8 and 9.  In
6  that summary disclosure statement, there is in -- repeated in a
7  number of places is the information where parties can obtain
8  the full solicitation package which would be the black line and
9  the Second Amended Plan and disclosure statement with the
10 exhibits and with the -- all of the changes that we're making
11 today.  The purpose of the summary disclosure statement, at
12 this Court knows, is a question of cost and timing to try to
13 meet the exit time that the company's looking at.  And if we
14 have to go through a full solicitation not only would that be,
15 we believe, unnecessarily burdensome because we could easily
16 make available to anybody who requests the full documents.

17      As Mr. Austin indicated this morning, though, in the event
18 that there is a change in the structure and treatment of class
19 8 with the opt out proposal, we would have to submit an amended
20 ballot for class 8B which --

21          THE COURT:  Now, I take it the idea is that there's a
22 website from which all of these documents can be downloaded?

23          MS. DENNISTON:  Yes, Your Honor.  There's a number of
24 websites, the --

25          THE COURT:  As well as you would provide a hard copy

1  to somebody who requested it?

2      MS. DENNISTON:  That's correct, Your Honor.  The

3  company runs a website.  Kurtzman, the solicitation, runs a

4  website and there is also -- there would also be access through

5  Pacer.  So there would be a number of options in addition to

6  just calling anyone involved with the Debtor that would be

7  happy to send copies.

8      THE COURT:  Of course, access through Pacer requires a

9  password and so on.

10      MS. DENNISTON:  That's correct, Your Honor.  And

11  that's a comment for the counsel because there's a number of

12  these people represented by very able counsel that we do know

13  have access to Pacer.

14      THE COURT:  But in any event, what you're doing is

15  posting it somewhere else where there won't be that attendant

16  both charge and password accessibility requirement.

17      MS. DENNISTON:  That's correct.

18      THE COURT:  Well, you know, we can talk about that a

19  little later.  Let me just tell you what my view on those sorts

20  of things are because I heard either Mr. Snellings or Ms.

21  Steingart, I don't remember who, say that everybody should get

22  the whole package.  Sometimes, I think that might be counter-

23  productive.  When you get an enormous package of stuff, it may

24  be less likely to adequately inform somebody than a more

25  focused document with clear ability to gain access to the full

41

1    documents for those who care.  What I'm interested in here is

2    that the disclosure is adequate and that the parties have --

3    any party who is voting has full access and the ability to know

4    everything that needs to be known before they -- it makes its

5    vote.  I'm not always convinced that that is best accomplished

6    by putting three feet of paper on their desk because I think a

7    lot of people tend to throw that in the circular file as

8    opposed to read something that may be more compact.  So

9    generally, I'm in favor of this sort of thing the Debtor is

10   proposing, not only because of the cost but because, I think,

11   it may be better calculated to actually provide meaningful

12   information without overwhelming the recipient, so.  I know

13   I -- you now, if I get proxy statements, I'm overwhelmed.  So I

14   always am looking for ways to see if there's a way that you can

15   actually get the real information, for example, from a download

16   or from a request to the Debtor or to the voting agent or

17   whoever.  But that's not -- but a full package is not always

18   the best way that's calculated to get the most information in

19   the best way.  So let's move on.

20           MS. DENNISTON:  Okay.  Your Honor, with regard to the

21   language itself, both for the summary disclosure statement and

22   the amended second disclosure statement, the Debtor would ask

23   that Magten and Law Debenture provide us with the language that

24   they would like included, including a description of the status

25   of the adversary, any language that they would like to

42

1  highlight the death trap, anything else that is of concern to

2  them because the Debtor, at this point, is solely interested in

3  getting the information out so that the solicitation process

4  can begin.  We'd like to receive that language today so that if

5  there is a problem and we're unable to reach agreement that we

6  can address that with this Court today and be moving forward

7  with the solicitation.

8      With regard to the classification issues that were raised,

9  the Debtor believes that the language that we have now

10  identifies accurately the classification.  Now if that is

11  subject to change and there is an opt-out created for class 8B,

12  of course that's going to have to be addressed.  And the Debtor

13  would need to propose that language and circulate it and to see

14  if anybody else had further comment on it.

15     But setting aside that issue for the moment, I think what

16  we've really got here from Magten and Law Debenture is a

17  question that is really a confirmation issue, and that is that

18  whatever classification ends up being put out for class 8B is

19  subject to confirmation and not necessarily the adequacy of the

20  disclosure.  The different treatment, though, Your Honor, just

21  so that it can be clear and the Debtor is certainly willing to

22  supplement the disclosure documents to reflect this, is that if

23  you look at a settlement between class 8A a designation that's

24  separate based on different indentures between 8A and 8B is

25  certainly appropriate.  Not notwithstanding the fact that as

43

1  this Court probably recalls from a disclosure statement

2  hearing, that was an initial request made at that time.  Now

3  that we have a settlement with Harbert and with Wilmington

4  Trust, it's appropriate that the non-settling parties that are

5  subject to different indentures, a whole different set of

6  obligations, that they should be set aside to be dealt with

7  separately.  With regard to the issues on whether or not 8A and

8  8B are liquidated, that in and of itself is a direct result of

9  the settlement being reached.  And the same thing is true for

10  the payment of attorneys' fees.  If Magten and Law Debenture

11  want language in the disclosure statement that outlines the

12  benefits of the settlement that the Debtor has reached with

13  Wilmington Trust and Harbert, the Debtor has no problem

14  including that because one can only guess that were a

15  settlement reached with Magten, that some portion of that would

16  probably be offered to Magten as well.  So, in short, with

17  regard to the classification objection, the Debtor believes, as

18  it stated at the earlier disclosure statement hearing, that

19  that is a confirmation issue that should be addressed at

20  this -- as this Court decided at the continuance hearing on

21  Friday.  And that to the extent that Magten wants additional

22  disclosure on the settlement and the benefits of the settlement

23  or it wishes further disclosure in connection with anything

24  else, if it would provide the language to the Debtor, we'd like

25  to reach an agreement on that today.

1    THE COURT:  All right.  Let's hear from Magten to see

2    if we can wrap this issue up.

3    MS. STEINGART:  Your Honor, we would be happy to

4    suggest some language to the Debtor; however, to the extent

5    that the Debtor has created two classes, has created a death

6    trap, has created other consequences for the Quips holders, the

7    Debtor has an obligation to help that group.  I'm not talking

8    about Magten.  Of course my clients can understand and Law

9    Debenture will continue to talk about what the other Quips may

10   require.  But to the extent that they are creating these risks

11   and these different kinds of decisions and more complex

12   decisions that need to be made, it does become the burden of

13   the Debtor to provide clear, fair, full disclosure and --

14   THE COURT:  Of what, though?  I mean, what is it,

15   beyond what Miss Denniston said, is it that you would want?

16   MS. STEINGART:  Well, certainly I think that Magten

17   needs to -- I'm sorry, I think that the Debtor needs to

18   disclose what the consequences of the long-term pursuit of the

19   adversary will be with respect to the assets available to the

20   Debtor concerning the effectuation of the Debtor's Plan.  I

21   think that the Debtor needs to --

22   THE COURT:  I thought I heard her address that first

23   and say yes, they're going to do that.

24   MS. STEINGART:  Okay, and --

25   THE COURT:  What we're talking about now,

1   specifically, is the A and B classification and what has to be

2   disclosed.  I agree with Ms. Denniston that this is a

3   confirmation issue.

4           MS. STEINGART:  Right, I --

5           THE COURT:  It's not --

6           MS. STEINGART:  -- agree --

7           THE COURT:  -- going away if it's not disclosed.

8   They're going to have to show that there's a legitimate

9   business reason for -- a legally sufficient reason, whatever

10  the appropriate standard may be, for the separate

11  classification.

12          MS. STEINGART:  Right, I --

13          THE COURT:  And I accept that.  I think what she was

14  suggesting in terms of saying, "This is what they get, there

15  has been a settlement with the Toppers and this is what they

16  get as a result of the settlement.  There has not been a

17  settlement with the Quips and so their treatment is A, B, C and

18  D, and they don't get this or they do get that and they have

19  this option and the other folks don't."  I think that's all

20  fair and that's what I heard her say she was going to put in

21  there.  Much beyond that, I don't see where there's a

22  disclosure issue.

23          MS. STEINGART:  Right.  Well, Your Honor, I do think

24  that those things need to be added.  And while we can

25  contribute in terms of indicating to the Debtor what we think

46

1  they need to say about the adversary, in terms of the class

2  treatment and the options and the downside and the risks that

3  Quips holders now have in terms of voting for or against which

4  were not present when class 8 was one class --

5          THE COURT:  Well, what are the risks --

6          MS. STEINGART:  -- with no death trap.

7          THE COURT:  -- that are different?  Because their

8  treatment hasn't really changed.

9          MS. STEINGART:  Well, there's a death trap now, Your

10 Honor.

11         THE COURT:  And there was a death trap before.  As to

12 --

13         MS. STEINGART:  Well --

14         THE COURT:  As to all of class 8.

15         MS. STEINGART:  As to all the class 8.

16         THE COURT:  Right.  So there's the same death trap for

17 the Quips as there was before.  That's what I'm not

18 understanding how their risks have changed from what they were

19 to begin with.

20         MS. STEINGART:  Well, the risks have changed because

21 in -- because to the extent that the Toppers accepted the

22 settlement, then the class would receive the proceeds of the

23 settlement, the entire class would have received the proceeds

24 of the settlement.  And I --

25         THE COURT:  Well, I don't understand what you mean.

1    MS. STEINGART:  Well --

2    THE COURT:  There is no settlement with the Quips.  So

3    the fact that the Toppers are getting the benefits of a

4    settlement doesn't really change the risk for the Quips unless

5    -- now if it does in some way that I'm not understanding, I

6    think that would be a fair point.  But I don't see where the

7    fact that there's a settlement with the Toppers changes the

8    risks for the Quips.

9    MS. STEINGART:  Well, the change -- Your Honor, there

10    is that to the extent that class 8 had remained as it was and

11    Harbert changed its vote, then the proceeds of the settlement

12    would have been distributed to the entire class and the

13    adversary would have continued.  With the change in the

14    classes, the fact that Harbert's change of vote carries the

15    class does not -- it changes the treatment --

16    THE COURT:  But I think the settlement --

17    MS. STEINGART:  -- of the entire class.

18    THE COURT:  -- only -- the settlement with regard to

19    the adversary -- there was no settlement with regard to the

20    adversary as far as Harbert was concerned, was there?

21    MS. STEINGART:  There is no settlement of the

22    adversary.  It --

23    THE COURT:  I mean as far as --

24    MS. STEINGART:  -- you know --

25    THE COURT:  -- in other words --

1    MS. STEINGART:  -- the adversary is a non-sequitur

2  with respect to Harbert, Your Honor.

3    THE COURT:  But if the class carried because Harbert

4  changed its vote, if it had remained as class 8, under the

5  original Plan, what is your view of what would have happened to

6  the adversary that is different from what would happen now?

7    MS. STEINGART:  Well, under the Plan as proposed

8  before, the adversary would have continued.

9    THE COURT:  Well, wasn't there the same kind of

10  requirement?  I thought there was with regard to affirmative

11  acceptance by the holders of the Quips.  But I -- you know, you

12  all understand this better than I do.  Ms. Denniston, am I

13  missing something here?  Or was there -- or Mr. Austin, was

14  there a real -- is there a fundamental difference -- are the --

15  here's the question:  are the Quips put at more risk in terms

16  of the continuation of the adversary or the noncontinuation of

17  the adversary under the A/B structure than they were under the

18  single unitary 8 structure.

19    MR. AUSTIN:  None.  None whatsoever, Your Honor.

20    THE COURT:  Explain why --

21    MR. AUSTIN:  They had the --

22    THE COURT:  -- that's true.

23    MR. AUSTIN:  -- same level of risk.  Same -- it was

24  the same death trap today as it was in the prior Plan.  In

25  fact, they have -- as a practical matter, they have the benefit

49

1   of retaining all of their particular interests because if you

2   follow what Ms. Steingart would want us to do, which is say

3   okay, throw this all together back in class 8, let Harbert

4   effectively control the vote of the class, the way the Plan was

5   drafted, the way the plan is Drafted is that at that point, if

6   the class accepted the treatment, the adversary case actually

7   goes away because you only take what you're able to get on a

8   distribution that you've consented to from the class.  So from

9   that standpoint, if we actually followed what she wanted us to

10   do, which sometimes I think maybe I should fall into her briar

11   patch, is that, hey, if I do that then that does take care of

12   the adversary.  But then I assume she's going to be standing

13   over here at the same time saying, "Oh, but you can't take that

14   away from me."  So the way we've classified it today is their

15   risk is the same today as it was under the old Plan.  They

16   either can accept the Plan to get the distributions or they can

17   reject the plan and get the death trap clause and they can work

18   solely through their adversary case.

19         MS. STEINGART:  A clarification, Your Honor.  In the

20   Plan as prepared with a unitary class 8, to the extent that the

21   class accepted, those of the class who wanted to receive the

22   distribution would receive them.  Those in the class that voted

23   against the Plan and determined not to receive the distribution

24   would be left to the adversary.  In the class now as unbundled,

25   if the class rejects the Plan, no one in the class will receive

1  the distribution.  Okay?  And from my point of view, Your

2  Honor, that is a change.  So if there had been no adjustment to

3  A and B and Harbert changed its vote, the Quips holders who

4  desired -- if the Quips holders, as a separate class, were not

5  sufficient in number and amount to accept the Plan, okay, but

6  some Quips holders wanted to accept the Plan, they could.  They

7  would be out of the adversary, don't get me wrong.  I mean,

8  they couldn't take the distribution under the Plan and pursue

9  the adversary, but there would be the option of Quips holders

10 who did want to pursue the adversary to do that, and those who

11 wanted to accept the proposal in the Plan to do that.  As

12 currently proposed, if the class rejects the Plan, there is not

13 the opportunity for those --

14        THE COURT:  If Class 8B -- you're talking about?

15        MS. STEINGART:  I'm sorry.  Yes, Your Honor.  If class

16 8B rejects the Plan, there is not the ability of those persons,

17 Quips holders in class 8 who would prefer to have the x or y

18 amount, to have it and for the others to pursue the adversary.

19 So I think, Your Honor, that is a change.  But I agree with Mr.

20 Austin and I agree with Your Honor that that is something that

21 we can deal with at confirmation whether -- other than

22 gerrymandering that vote is a reason for that and a business

23 purpose.  We need to deal with that today.  But I do think that

24 it impacts on the kind and extent and the nature of the

25 disclosures.  I don't think people should be getting three