1  feet.  I agree with you.  But I do think that Quips holders,

2  and there are a number of them we believe that have held all

3  along, that are small people who don't have Fried Frank or

4  don't have their own law firms.  I do think that they have to

5  get a package of material given the constant change in their

6  treatment and the additional sort of suggestions here that

7  enable them to understand what has happened and what their

8  options are.  And I'm --

9          THE COURT:  Well, I'm going to leave --

10         MS. STEINGART:  -- happy to work with the Debtor on

11 that.

12         THE COURT:  -- it like this.  I think that obviously

13 the difference ought to be fully disclosed, if there is one.

14 The sense I get is that there is not agreement between how you

15 read the Plan before and now in terms of the treatment, and the

16 way the Debtor or the Committee or others read it.  That it is

17 not -- so, I mean there may be some difficulty in terms of

18 making sure that what actually happens is clear -- I think

19 that's a point that has been well made -- and making sure that

20 what actually happens is clearly disclosed.  Everybody would

21 agree with that.  I'm a little troubled by the fact that what

22 you see as the difference in treatment, nobody else sees.

23         MS. STEINGART:  Well, Your Honor --

24         THE COURT:  Or maybe Law Debenture sees, but, I mean,

25 the Debtor doesn't see, for example.

1           MS. STEINGART:  But, I'm happy --

2           MR. AUSTIN:  Your Honor, I think the problem that I

3    believe -- the fundamental issue here is understanding what the

4    1129(a) says, which is if a class votes to accept that there

5    may be members of that class that vote "no," but if the class

6    as a class has voted to accept, 50% in number and ⅔ in dollar

7    amount, the class carries.

8           THE COURT:  Right.

9           MR. AUSTIN:  Whatever goes to the class, goes to that

10   class and you get -- effectively what you have in the parlance

11   is a cram down within the class.

12          THE COURT:  But --

13          MR. AUSTIN:  And that's --

14          THE COURT:  Well, we understand that.  But the issue

15   here is are there separate rights being given to the dissenting

16   holders in the accepting class under the first Plan that are

17   not being given to the dissenting holders under the second

18   Plan?

19          MR. AUSTIN:  The answer is no, Your Honor.  We'll be

20   -- we'll address it.

21          MS. STEINGART:  Right.  We disagree, but we are happy

22   to work with the Debtors on this.  The other (indiscern.) I had

23   is that I'm not sure that by the end of the day today, many of

24   the players being in Court and having to attend to these

25   proceedings, that that language can be produced, embedded and

1  discussed I'm thinking.  So hopefully, you know, if we had 'til

2  the end of the day, hopefully tomorrow, we could work together

3  --

4          THE COURT:  But there's --

5          MS. STEINGART:  -- and have a set of disclosures which

6  we all can be satisfied with.

7          THE COURT:  Well, I'd like to get through this stage

8  of it so we can get to the evidence, that's what I'm concerned

9  about.  Mr. Kornberg?

10         MR. KORNBERG:  Yes, Your Honor, very briefly, two

11 points.  One, we don't agree with the description of the prior

12 Plan that was just put on the record by Ms. Steinberg.  But

13 again, absolutely the changes that are being made in the

14 distributional scheme have to be described, and I'm sure we can

15 do that.  It's not that elaborate.  The other point I would

16 make, Your Honor, is that we strongly support the Debtor's

17 intent to distribute just a summary disclosure statement.  We

18 agree with Your Honor that it's much more effective to give

19 Creditors merely a description of the changes in the Plan,

20 rather than the entire restated document, which we don't think

21 will capture their attention for other reasons Your Honor

22 noted.  So as long as the documents can be readily available on

23 websites and otherwise, the Committee believes that just

24 distributing the summary is the most effective way to go here.

25         THE COURT:  And that summary will say, "This is what

1  the treatment used to be and this is what the treatment is

2  now."

3      MR. KORNBERG:  Yes, Your Honor.  And I would just say

4  I don't think we need to describe other potential plans.  We

5  need to describe, "This is what you were getting under the

6  original Plan.  This is how it's changed.  If you want to see

7  further documentation, we refer you to these resources and you

8  can get it."  And that's what Creditors really need here, and

9  Your Honor, that's consistent with how this is done in many

10  other situations.

11      THE COURT:  I think it's the right thing to do.

12      MR. KORNBERG:  Thank you.

13      THE COURT:  I'm fully supportive of that.  As long as

14  they have the opportunity to get the full information, I think

15  a more bullet-pointed, laser-like description is more likely to

16  inform a Creditor than sending them three feet of documents.

17  Yes, Sir, Mr. Snellings.

18      MR. SNELLINGS:  Your Honor, just one -- I'm here to a

19  certain point -- my colleague's here in the Courtroom.  We will

20  work on language as long as we have someone identified to work

21  with and try to get that done today.  With regard to a change

22  in the Plan, all I would suggest is that you have to look at

23  the blackline version of the disclosure statement on page 56 in

24  which the blackline indicates that there's new language with

25  regard to, "if 8B accepts the Plan that the notes are cancelled

1  and the rights of the holders thereof."  And then there's new

2  language including but not limited to, "any claims or positive

3  action including but not limited to fraudulent transfer claims

4  against the Debtor."  If that was consistent with what was

5  being offered us under the original Plan and disclosure

6  statement, there wouldn't be a need for that insertion.  But

7  we'll take that up with you later.

8           THE COURT:  All right.  We have a lot of capable

9  counsel in the room.  We're proceeding with our hearing.  Not

10  everybody has to listen to the hearing.  We have lots of

11  working rooms right outside there if you all would like to send

12  representatives to go work on that.  There are four separate

13  rooms right outside there where these matters can be worked on

14  and take advantage of the breath-taking billing rate we have

15  going today with this confirmation hearing.  I think that would

16  be a very useful thing to do for us to see if we can reach some

17  kind of consensus before the end of the day.  Ms. Denniston?

18           MS. DENNISTON:  Your Honor, one other issue was

19  raised, and I just want to make sure that the Court has a

20  record on it, and that was the question of timing on the

21  solicitation process.  We have in the Courtroom today Jonathan

22  Carson, who is the representative of KCC, the Debtor's claims

23  and solicitation agent.  And in connection with the proposed

24  solicitation procedures, we asked Kurtzman Carson to develop

25  the resolicitation timeline on which the deadlines are based.

56

1    And I would be happy to call Mr. Carson to the stand to affirm

2    the dates that are set forth in the solicitation package.    I

3    would proffer to the Court that his testimony would be that he

4    reviewed the solicitation package going out, confirmed with

5    those that were necessary to get the ballots to the holders and

6    determined that the timing proposed by the Debtor was

7    appropriate.

8            THE COURT:    Now this is for the new solicitation?

9            MS. DENNISTON:    This is for the new solicitation, Your

10   Honor.    Magten and Law Debenture, I believe, raised questions

11   as to --

12           THE COURT:    Let's --

13           MS. DENNISTON:    -- whether --

14           THE COURT:    -- let's talk specifically about what

15   those proposals are.

16           MS. DENNISTON:    Those proposals are, Your Honor, that

17   we would establish a record date that would continue to apply

18   to the ballot of May 26th, that the voting deadline for the

19   First Amended Plan was actually August 2nd, and then we have

20   the hearing today.    We have done the initial cut based on an

21   August 27th order, although we have allowed some time there for

22   an order that could be entered a couple of days later.    During

23   the period of August 22nd to August 30, Kurtzman Carson would

24   send the resolicitation package, Merrill would print the

25   resolicitation packages, and a resolicitation package would be

1  sent out both to the class 9, which is approximately 201

2  Creditors, and then the packages to the non-ADP class 7 and 8

3  record holders.  And of the time period between August 31 and

4  September 3, ADP is in --

5       THE COURT:  I'm sorry, when you say non-ADP?

6       MS. DENNISTON:  Yeah, ADP is the agent that has to

7  assemble the -- and send out the resolicitation ballots to a

8  number of the individual holders.  And that would have to be

9  completed by September the 3rd.  That assumes that we have

10 gotten a notice of a voting deadline of 14 days, which is

11 what's proposed in the Resolicitation Motion.

12      THE COURT:  So by September 3rd, what, precisely, has

13 happened?

14      MS. DENNISTON:  Everybody will have put -- been

15 received -- be in receipt of or it will be in the mail going to

16 them, the resolicitation package which would consist of the

17 summary disclosure statement, the information as to how to

18 reach the website or call somebody for copies, and the new

19 ballots.

20      THE COURT:  Okay.

21      MS. DENNISTON:  And that would -- we have provided for

22 a 14-day solicitation period.  September 8th is the proposed

23 deadline for serving the continued hearing notice regarding the

24 continuation of the confirmation hearing on all the parties not

25 receiving the solicitation package, and that the voting

1   deadline would be established as September 17th.  And that

2   assumes that we have the order entered on a certain date that

3   they could let drop or move to September 19th, for example, if

4   the order's entered a couple of days late.

5   THE COURT:  So by September 17th, the votes have to be

6   actually received by the agent, or do they have to be post-

7   marked or mailed or what?

8   MS. DENNISTON:  We have asked that they be received by

9   the voting agent because the timetable that we have is that the

10  voting agent has advised us that they will need a 4 or 5-day

11  period to tabulate and file the resolicitation vote.

12  THE COURT:  How many steps do we have?  By steps, I

13  mean how many steps have to take place before the packet is in

14  the hands of the person who is actually going to make the

15  decision?  Does it have to go to a middleman who then passes it

16  out to the folks, or does it go directly to the holders, let's

17  say, of the Quips or the class 9 people or whatever?

18  MS. DENNISTON:  The answer to that, Your Honor, is

19  both.  It goes directly to class 9, it goes directly to those

20  holders in class 7 and 8 that are non-ADP service holders.

21  THE COURT:  And if it goes to ADP, what's the

22  turnaround with the ADP people?

23  MS. DENNISTON:  ADP has indicated that their

24  turnaround -- that they will have the ballots out in the period

25  of August 31 to September the 3rd.

59

1        THE COURT:  So are you saying it's the same?

2        MS. DENNISTON:  It's the same, Your Honor.  Kurtzman

3   will be getting its ballots out under this analysis between

4   August 30 and 31.  ADP will assemble, have the ballots ready to

5   go, and they'll be mailed out because the number of ballots

6   between August 31 and September the 3rd would be the last date

7   under this timeline.

8        THE COURT:  Let me ask you this question:  what

9   problems, if any -- if I heard testimony from the agent, what

10  problems, if any, occurred during the last solicitation in this

11  case?

12       MS. DENNISTON:  Your Honor, based on the information

13  that was provided to the Debtor, we had no problems during the

14  initial solicitation period.

15       THE COURT:  And what was the solicitation period that

16  was made available the last time?  How long was the --

17       MS. DENNISTON:  It was the full 28 days, Your Honor.

18       THE COURT:  Do we have any information as to whether

19  or not there were circumstances when that full 28 days was

20  necessary?

21       MS. DENNISTON:  I would --

22       THE COURT:  You know --

23       MS. DENNISTON:  -- that --

24       THE COURT:  -- we've all had this arise in other

25  cases.

1          MS. DENNISTON:  I would have to --

2          THE COURT:  Mr. Kornberg was in that case.  Weren't

3    you in that case, Mr. Kornberg?

4          MR. KORNBERG:  Probably.

5       (Laughter)

6          THE COURT:  No, I mean in the _Einstein_ case.  In the

7    _Einstein_ case, we had precisely the issue where a proponent of

8    the plan came in and was very heavily involved in making sure

9    that we had a quick solicitation.  And then what happened was

10   there were three or four key votes that were received after the

11   voting deadline.  This is close enough for government work.

12       (Laughter)

13          THE COURT:  So then what happened was -- then there

14   was a motion that said, you know, let's allow those as really

15   validly filed claim.  We have a whole evidentiary hearing,

16   which I actually did not do.  What happened then was, the plan

17   wasn't accepted when, in fact, if you counted those others, the

18   plan would have been accepted.  But it seemed to me that was

19   the fairest level playing field circumstance.  That was not an

20   evidentiary hearing that anybody wanted to have, including me

21   which is -- and the problem could maybe have been addressed so

22   long as we had a long enough time.  That's why I'm

23   hypersensitive to this is I don't want to have that situation

24   again.  I don't want to have somebody who, you know, FedExs it

25   off somewhere and it arrives two days late and it doesn't get

61

1  counted and then we spend a lot of time figuring out whether

2  that's a valid vote or not.  That's why I'm asking these

3  questions.

4          MS. DENNISTON:  Fair enough, Your Honor.

5          THE COURT:  So I want to make sure that we're

6  comfortable that they actually get in the hands of the holders.

7  And part of the problem there was, you know, the multi-step

8  process.  You had to go here, here, here, here and then finally

9  somebody gets it and then it has to go here, here, here back,

10 and medallions and stamps and all that stuff and before you --

11 the time you, you know, you get to the agent, it's too long.

12         MS. DENNISTON:  Well, Your Honor, I would say to this

13 to that if the Court could tell us what the Court's thinking is

14 on the continued hearing date, we might be able to avoid this

15 problem altogether because what we did in terms of setting the

16 most -- the shortest but the most feasible solicitation period

17 was to look at when we might have the opportunity for the first

18 hearing.  What I would propose, if there's any information the

19 Court could give us on that, is that we would extend out that

20 solicitation period to utilize those times.

21         THE COURT:  Well, what is it you were -- what was your

22 thought basis for when that hearing was going to take place

23 based -- upon which this schedule was based?

24         MS. DENNISTON:  Well, I mean that -- and that's a very

25 unitary sort of Debtor's preference thought analysis, Your

1   Honor, but we were looking for something on or after September

2   the 23rd, subject to the Court's calendar.

3           THE COURT:  Well, that's not possible.  I am not -- I

4   am gone, out of pocket, from the 23rd through October 1.

5           MS. DENNISTON:  That's fine, Your Honor.  If the Court

6   could just indicate what date, then, what I would propose we do

7   is that we would revise the solicitation procedures to provide

8   for additional time on the voting, given the Court's calendar.

9        (Pause in proceedings)

10          THE COURT:  Well, Rhonda?

11          THE CLERK:  Yes, Sir?

12          THE COURT:  We have that trial in the MicroAge case on

13  the 5th of October.

14          THE CLERK:  Correct.

15          THE COURT:  Which I think is likely to go.  We have a

16  number of hearings set on the 6th of October that I think we

17  could move to the 8th.

18          THE CLERK:  You could move the 6th to the 8th.

19          THE COURT:  Yes, and that would then free up a day on

20  the 6th.

21          THE CLERK:  Right.

22          THE COURT:  That may be about as good as I can do.

23          MS. DENNISTON:  Thank you, Your Honor.

24          THE COURT:  October 6th.

25          MS. DENNISTON: Would that be in Phoenix or Wilmington?

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

1       THE COURT:  The -- that would be here.

2       MS. DENNISTON:  Thank you, Your Honor.  Well, with

3  that --

4       THE COURT:  The weather's nicer in October is what it

5  is.

6     (Laughter)

7       MS. DENNISTON:  With that, Your Honor, I think that we

8  could comfortably provide a 14 -- or a 21-day, possibly 22 or

9  23-day solicitation period which would move the voting

10  deadline, I think, to a comfortable date, certainly for the

11  Debtor and the voting parties.

12       THE COURT:  Well, I think -- the other thing we need

13  to discuss is assuming that we have -- we continue to have a

14  contested confirmation hearing, and we get in the evidence

15  we're hoping to get in today, how much additional time do you

16  think you'll need?  Because what I've done is cleared a day.

17  I've not cleared 2 days or 3 days or whatever.  I've cleared 1

18  day.

19       MS. DENNISTON:  Your Honor, I think we can do it in a

20  day.

21       THE COURT:  Okay.  All right.  We'll say October 6th,

22  then.

23       MS. DENNISTON:  Thank you, Your Honor.  And with that,

24  we will circulate a proposed -- the revised re-solicitation

25  package to extend out the voting solicitation period consistent

1  with the Court's setting of the hearing on October 6.  For the

2  purpose of completing the notice, would we be beginning at 9

3  o'clock, Your Honor?

4         THE COURT:  Yes, sure.

5         MS. DENNISTON:  Thank you.

6         THE COURT:  Well, we'll start as early as you would

7  like.  9 o'clock's probably as early as you would like.

8         MS. DENNISTON:  Thank you, Your Honor.  With that,

9  subject to the additional revisions that are being worked on to

10  the disclosure statement and the revised solicitation

11  procedures, I think it would be appropriate for the Debtor to

12  make those revisions, circulate those documents and then file

13  the proposed order once we have resolved the final objections

14  subject to the need for this Court to run interference on any

15  ability to reach agreement about the language.

16         THE COURT:  Okay.

17         MR. SHINDERMAN:  Excuse me, Your Honor.  This is Mark

18  Shinderman of Manger Tolles & Olsen on behalf of Milbank Tweed.

19         THE COURT:  Okay.

20         MR. SHINDERMAN:  Additional disclosure statement

21  objections Ms. Denniston read into the record revision of

22  Section 10.9 which is acceptable.  It also has six specific

23  questions that we were hoping the disclosure statement has.

24         THE COURT:  And those are?  Shall we deal with them

25  right now?

1        MR. SHINDERMAN:  In Section 10 of the Plan,

2  (inaudible) a trust and channeling injunction of how those

3  provisions worked.  For the six questions that ideally we would

4  like to address, the point is what does the trust and

5  channeling injunction seek to accomplish?  Does it affect what

6  is commonly referred to as the McGreevey litigation, affect

7  other Defendants such as Milbank in the McGreevey litigation?

8  The point is, how does it relate to an MOU which is the subject

9  of a Settlement Motion, I believe it's scheduled to be heard by

10 Your Honor on September 15th.   The question is how does it

11 affect insurance policies that are commonly referred to as the

12 Montana policies (inaudible) policies are.  Six, to the extent

13 that it has an affect on the policies or the litigation --

14 litigational plaintiffs, (inaudible) for that affect is.  Just

15 reading those provisions, it's hard to understand (inaudible)

16 accomplish how and why.

17       MS. DENNISTON:  Your Honor, I would respond that the

18 Debtor can work on language and submit that for review.  I

19 think that a number of those questions have already been

20 addressed, particularly with counsel for Milbank and Goldman,

21 but we're certainly happy to add a paragraph to the disclosure

22 statement making clear how those component parts interrelate.

23       MR. SHINDERMAN:  And, Your Honor, that would be fine

24 with us with one caveat.  I assume then if we have any further

25 objections and confirmation issues, those would be addressed at

1  the continued hearing.

2          MS. DENNISTON:  That's the Debtor's understanding,

3  Your Honor.

4          THE COURT:  All right, thank you.

5          MS. DENNISTON:  Your Honor, that concludes the

6  Debtor's presentation, at least as to the disclosure statement.

7          THE COURT:  All right, thank you.

8          MS. DENNISTON:  Would it be appropriate at this point

9  to take a brief recess so that we can set up for the

10 confirmation hearing, Your Honor --

11          THE COURT:  Sure.

12          MS. DENNISTON:  -- which is the next item on the

13 agenda.

14          THE COURT:  All right.  We'll take a brief recess.

15          MS. DENNISTON:  Thank you.

16          UNIDENTIFIED SPEAKER:  For those on the phone, is

17 there any idea about how long this is going to be?

18          ALL:  Brief.

19      (Recess)

20          THE CLERK:  All rise.

21          THE COURT:  Please be seated.  All right, are we ready

22 to proceed?  Mr. Austin?

23          MR. AUSTIN:  Yes, we are, Your Honor.  We are ready to

24 proceed with the beginning of the confirmation hearing for

25 Northwestern Corporation's Second Amended Plan of

1  Reorganization.  What we propose to do here, Your Honor, is to

2  give this Court a brief introduction and highlight the

3  differences between the First Amended Plan and the Second

4  Amended Plan and then to go through the process of the

5  technical compliance with sections 1129(a) to which we have not

6  received any objections, to advise the Court on what the vote

7  was, at least with respect to the First Amended Plan, and then

8  go directly into the questioning of the witnesses and putting

9  on our evidentiary case as we think we need to put on.  In the

10  interest of time, the Debtor also proposes at this point to

11  waive any type of opening statement.  And this Court is well

12  aware of what Northwestern is, and we've been here for now

13  almost a year.  And from our perspective, it's time to move on.

14  We'd like to get started.

15          THE COURT:  All right.  Please begin.

16          MS. DENNISTON:  Thank you, Your Honor.  In an effort

17  to try to expedite matters today and to utilize the Court's

18  time for the important things which are the witnesses that the

19  Debtor and others believe that the Court needs to hear from,

20  but recognizing this is a contested confirmation hearing, the

21  Debtor filed a request for judicial notice so that we could put

22  into the record in connection with this confirmation proceeding

23  certain pleadings and documents filed with the Court during the

24  course of this case and address issues that may come up.  And

25  rather than go through all of the pleadings, we filed a

68

1  request.  There was no objection to the request for judicial

2  notice, and we would ask that the Court just enter the so-

3  ordered order at this time.

4          THE COURT:  All right.  I'll enter the order.

5          MS. DENNISTON:  Okay, thank you, Your Honor.  If I

6  could approach.

7      (The Court receives document)

8          THE COURT:  I've signed the order.

9          MS. DENNISTON:  Thank you, Your Honor.  The next thing

10  that the Debtor did to try to expedite matters today, because

11  there have been no challenges to the voting and solicitation in

12  connection with the Debtor's First Amendment Plan, is that we

13  filed an offer of proof and outline of evidence in support of

14  the adequacy of the Debtor's procedures and notice in

15  conjunction with the debt Debtor's Second Amended and Restated

16  Plan.  This offer of proof also includes the affidavit of the

17  solicitation agent, as well as the evidence regarding the

18  publication.  And I can walk the Court through a series of

19  slides at this point that summarizes that, or if the Court

20  would like, we could also call the solicitation agent to the

21  stand.

22          THE COURT:  Let's walk through that and we'll see if

23  there's any questions that come out of it.

24          MS. DENNISTON:  Okay, with that Your Honor, I'd like

25  to offer up what the Debtor has marked as an exhibit.  This is

1   Exhibit #150.  This is a copy of the slides that are gonna be

2   used today and because there was some last minute changes, we

3   just made a clean copy for the Court.  And we also have copies

4   available depending on how the Court would like this.  We've

5   asked that this document is a copy of all the slides that will

6   be used.  To the extent that documents have been offered into

7   or will be offered into evidence as exhibits,  they'll find

8   those exhibit numbers on the bottoms of the slides.

9       With that, Your Honor, let's talk just briefly about the

10  Debtor's compliance with the notice of solicitation procedures.

11  We just addressed the request for judicial notice and the Court

12  has now entered that order.  We have also filed with the Court

13  the Declaration of Voting Agent regarding the tabulation of

14  votes.  This is slide #3.  Jonathan Carson of Kurtzman, Carson

15  Consultants is here today and that affidavit is Exhibit-32.

16  There've been no objections to the offer of proof or any

17  requests to cross Mr. Carson.  This Court entered a bar date on

18  October 10, 2003.  The general bar date was January 15, 2004.

19  The governmental bar date was April 15, 2004 and the bar date

20  notice and form B-10 proof of claims was distributed on

21  November 14th, 2003 by the voting agent.  And that's set forth

22  in the declaration of paragraph 5.

23      Publication of the bar date notice was filed as indicated

24  in the publications identified on slide #4.  The docket entries

25  reflect the filing of the affidavits of the compliance with

1    those notice procedures.    On slide #5 we have the following:

2    the entry of the disclosure statement order, which occurred on

3    May 26, the record date was May 26, 2004 as set forth in the

4    Kurtzman declaration at paragraph 8, and the voting deadline

5    was August 2nd, 2004 at 5 o'clock Pacific time.

6        The solicitation package is consistent with the Court's

7    order, consistent of the First Amended Plan, and the First

8    Amended Disclosure Statement.    The disclosure statement order,

9    the confirmation hearing notice, the notice of non-voting

10    status, the notice to class 7 and 8 note holders who filed

11    proofs of claim, the ballots for 7, 8, 9 and 12, and the self-

12    addressed postage paid return envelope.

13        The Debtor has also complied with the publication of

14    confirmation hearing notice.    Again, these are publications

15    that are identified on slide #7.    The docket entries reflect

16    the filing of the affidavits that the publication did occur.

17    Those have been offered into evidence with exhibit numbers that

18    are set forth on the slide.    These were included in the

19    Debtor's request for judicial notice.

20        Balloting and tabulation process.    KCC created a voting

21    database to reflect the names, addresses and classification of

22    claims in the voting classes for 7, 8, 9 and 12.    KCC received

23    and tabulated the ballots as follows:    each ballot was opened

24    and inspected, the ballots were date stamped, sorted and

25    scanned, and all ballots received by the voting deadline were

1   entered into their system and tabulated in accordance with the

2   rules set forth in the disclosure statement order.  KCC's

3   declaration of paragraphs 10 and 13 sets out the compliance

4   with the process just described.

5       The request for solicitation procedures, we have followed

6   the order as set forth in slide 9.  You will see where the

7   notices were filed and the hearing on the Resolicitation Motion

8   has occurred this morning.  In our request today, we've just

9   been through those with the Court so I won't bore the Court

10  going through them again, but in the event that we had had

11  questions, this was the timeline that the Court just walked

12  through with us.

13      And with that Your Honor, we would offer the offer of

14  proof and request the Court's findings at this time that the

15  Debtor has complied with the notice of solicitation procedures

16  set forth under the Bankruptcy Code and as required under this

17  Court's solicitation order as to this First Amendment Plan.

18      (Debtor's Exhibit-150 previously marked for

19  identification)

20      (Debtor's Exhibit-32 previously marked for identification)

21      THE COURT:  Is there anyone who wishes to cross-

22  examine the voting agent?

23      MR. HOUSTON:  Yes, Your Honor, this is Joseph Houston,

24  for Richard Hylland, and I would like to reserve that before --

25  until getting a point of clarification.  And forgive me, my

1  colleague, John Demmy, has been representing Mr. Hylland and I

2  and was asked just a day or so ago because of his

3  unavailability to step in.  I am informed that Mr. Hylland's

4  ballot, which voted against the Plan but did not vote with

5  respect to the relief, was treated as an abstention and I -- in

6  looking at the report of the voting tabulation, I see that all

7  ballots cast as class 12 claims, 28 in number, are deemed as

8  accepting.  There is a number zero for rejecting and there is a

9  number zero for abstained.  And before we go into the cross-

10  examination, and am -- is there a way that we can determine

11  whether my understanding is correct or incorrect about how Mr.

12  Hylland's vote was treated?

13         MS. DENNISTON:  Your Honor, we would have to call Mr.

14  Carson to the stand so that he walk through the calculation on

15  that question.

16         THE COURT:  All right, Mr. Carson, are you here?

17         MR. CARSON:  (Indiscern.).

18         THE COURT:  All right, come forward here, Mr. Carson,

19  please to be sworn.  Do we have a copy of the voting report or

20  his declaration from Mr. Carson?

21         MS. DENNISTON:  Yes we do, Your Honor, and that is

22  Exhibit Number --

23         MR. HOUSTON:  E, I think.

24         MS. DENNISTON:  Well, it's Exhibit-D to his affidavit,

25  but I need the exhibit number, one second.

1   MR. HOUSTON:  Oh, forgive me.

2   MS. DENNISTON:  30 -- 32.

3   THE COURT:  All right, Sir, come forward here to the

4   Courtroom Deputy.

5   JONATHAN CARSON, DEBTOR'S WITNESS, SWORN

6   THE COURT:  Please take a seat to my right in the

7   witness chair.  And first, why don't we have Ms. Denniston ask

8   some questions about the treatment of those particular ballots.

9   Do you need any -- do you need a document?  Do you need your --

10  MS. DENNISTON:  Your Honor, I'd like to approach and

11  hand the witness a copy of the Debtor's Exhibit-#2, which is

12  the Declaration of the Voting Agent regarding tabulation of the

13  vote.

14  THE COURT:  All right.  I'll note that Exhibit-2 is

15  being handed to the voting agent -- to the witness.

16  MS. DENNISTON:  Exhibit-#32, Your Honor, just so

17  that --

18  THE COURT:  32.  And this has specifically to do with

19  class 12, is that correct?

20  MS. DENNISTON:  Yes, Your Honor, I believe the inquiry

21  from Mr. Hylland's counsel had to do with only class 12.

22  MR. HOUSTON:  That's correct, Your Honor.

23  DIRECT EXAMINATION

24  BY MS. DENNISTON:

25  Q.  Mr. Carson, can you state your name for the record?

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

1   A.   Jonathan Carson, C-A-R-S-O-N.

2   Q.   And are you familiar with Debtor's Exhibit-#32, which I've

3   just handed to you?

4   A.   Yes.

5   Q.   And is that your signature that appears at the end of the

6   Exhibit -- at the end of the affidavit?

7   A.   It is my name, yes.

8   Q.   Okay, and did you assist in the preparation or did you

9   prepare this affidavit?

10  A.   Yes.

11  Q.   And have you signed the original?

12  A.   Yes.

13  Q.   With that, I want to turn specifically to the line of

14  inquiry in terms of the tabulation of the class 12 votes.

15  Could you describe for the Court how those votes were tabulated

16  and walk the Court through the summary of the votes for class

17  12?

18  A.   The votes were tabulated by our office receiving original

19  ballots, as you had described earlier, date stamping those

20  ballots, and processing them in our system.

21  Q.   With regard to page 14, which shows -- or paragraph 14 of

22  your affidavit, it shows that that voting tabulation is as

23  follows -- and I want you to look down at class 12 D&O Trust

24  Claims -- and can you tell us how Mr. Hylland's ballot was

25  treated in connection with class 12?

1  A.  Paragraph 14 is a summary of the ballots received and shows

2  that 28 ballots were received accepting the Plan, whereas zero

3  received rejecting it.

4  Q.  Okay, and have you, in connection with preparation for this

5  confirmation, you or anyone else at Kurtzman Carson, reviewed

6  Mr. Hylland's ballots?

7  A.  I don't have it in front of me right now.

8  Q.  Okay --

9  A.  I have reviewed the ballots in preparation for our

10  confirmation.

11  Q.  And what was Mr. Hylland's vote?

12  A.  I would need to see the actual ballot to refresh my

13  recollection.

14  Q.  Okay, and do we not have the ballots with us?

15  A.  We do.  I don't have a copy right in front of me at the

16  moment.

17  Q.  Okay, Your Honor, since the witness doesn't have Mr.

18  Hylland's ballots, the Debtor did ask for certification of Mr.

19  Hylland's ballots, I would request that we come back and recall

20  this witness so that he can have the additional document that

21  he needs to resolve the question.  I'd rather not delay the

22  Court's time while our associate finds those certifications.

23          THE COURT:  All right.

24          MR. HOUSTON:  That's certainly agreeable to us, Your

25  Honor.

1    THE COURT:  All right, thank you.  Then perhaps you
2  should step down now.  And well -- it looks like Debtor's
3  counsel will be chasing down that issues, Mr. Houston.
4    MR. HOUSTON:  Thank you very much, Sir.
5    MS. DENNISTON:  Your Honor, when we get the ballots
6  and have a break we'll resume this testimony and provide the
7  certification as to specific ballots.
8    THE COURT:  All right, well let's remember then also
9  that -- is there anybody else who has any questions of the
10  agent?
11    ALL:  (No verbal response).
12    THE COURT:  Then I will find, other than with respect
13  to Mr. Hylland's vote, that the presentation will be accepted
14  and treated as effective for satisfaction of the requirements
15  for solicitation.  We'll hold in abeyance any further findings
16  with regard to Mr. Hylland's vote.
17    MS. DENNISTON:  Thank you, Your Honor.
18    MR. HOUSTON:  Thank you, Your Honor.
19    MS. DENNISTON:  With that, we're gonna turn to the
20  Debtor's compliance and to establish the record for this Court
21  as to those Code requirements for which the Debtors did not
22  received any objection in connection with 1129, 1122 and 1123.
23  With regard to the Debtor's compliance, this Debtor filed a
24  fairly voluminous trial brief in connection with the matters
25  that are gonna be addressed in the summary fashion.  Your

1    Honor, we would ask the Court to take into consideration the

2    brief and the further explanation, but I wanted to walk the

3    Court through the Debtor's compliance here.

4        Section 1122, the Plan itself as set forth in Articles 2

5    and 3, classifies the claims and classes for the claims of

6    class members are substantially similar.  We recognize that a

7    continued hearing there will be a further discussion on the

8    claims classification with -- as to class 8.  But as to all the

9    other classes, those classifications are appropriate.

10        As to Section 1123(a)(1), Northwestern has complied with

11   Title 11, treatment of administrative and priority claims as

12   set forth in sections 2.1, 2.2 and 2.3 of the First and Second

13   Amended Plan.  As to Section 1123(a)(2), the designation of

14   unimpaired classes in both First and Second Amended Plan and

15   Article 4 and the sites set forth on slide 15 and confirmation

16   brief, Section V-B3B, the Debtor has demonstrated its

17   compliance.  With regard to Section 1123(a)(3) specifies the

18   treatment of the impaired classes.  This is addressed in a

19   confirmation brief at V-B3 and is set forth, again, in Article

20   4 of the First and Second Amended Plan.  With regard to

21   1123(a)(4), the same treatment for each claim for interest in

22   particular class.  With regard to all of the classes with

23   exception of the eight proposed AD class, the Debtor has

24   complied with 1123(a)(4), and the Debtor is seeking today to

25   confirm a plan on that basis carving out the issues with Magten

78

1  and Law Debenture in class 8.  Section 1123(a)(5), the adequate

2  means of plan implementation, the Debtor addresses this in the

3  confirmation brief at V-B3E.  As to funding, that's addressed

4  in Section 5.1, and the Debtor filed on Friday its Motion to

5  Approve exit financing, which is set for a hearing September

6  15th.

7       The issuance of the Reorganized Debtor new common stock is

8  provided for in Section 5.4.  The D&O Trust with assets is

9  addressed in Section 5.1 and Article 6.  The disbursments of

10 cash payments is addressed in Section 5.1.  With regard to

11 Section 1123(a)(5), the adequate means continued, we have

12 provided for the cancellation of unsecured notes, unsecured

13 subordinating notes, and all equity interest as set forth in

14 the First and Second Amended Plans of Sections 4.7, 4.8, 4.13

15 and 5.5.

16      And for the continued existence of the Debtor, that is set

17 forth in Sections 5.3, 5.7, and again in Article 9.  Section

18 1123(a)(5), adequate means for implementation continued, the

19 selection of the officers and directors of the Reorganized

20 Debtor has been addressed in Sections 9.1 and 9.2, and the

21 Debtor filed its notice of designation award members for the

22 Reorganized Debtor on August 10th at Docket 1878 and that's

23 Exhibit-#4.

24      With regard to the corporate charter prohibition against

25 issuance of non-voting equity securities, this is addressed in

1  Exhibit-A to the Plan and in Section 5.3.  With regard to the
2  selection of the officers, directors and trustees consistent
3  with the interest to the Creditors and the equity holders,
4  that's addressed in Section 9.2(a).  And again, the designation
5  of the D&O Trustee and information regarding the salaries for
6  the directors and officers of the Reorganized Debtors is still
7  being determined and will be filed prior to the continued
8  confirmation hearing.  With regard to 1129(a)(9), payment of
9  administrative claims, this is provided for in Sections 2.2,
10  2.3 and 4.1 of the Plan.  With regard to 1129(a)(10), the
11  acceptance of at least one (indiscern.) non-insider class, this
12  is provided for in classes 7,9 and 12.  We voted to accept the
13  Plan and the treatment for 7, 9 and 12 is the same two -- is
14  the same as that provided in the First Amended Plan or as has
15  been agreed to by class 7 and 9 in connection with settlement.
16  And that would be subject to the Debtor's resolicitation.
17      Section 1129(a)(12), the fees to the U.S. Trustee and the
18  Court are paid or will be paid on the effective date.  This is
19  provided for in Section 5.15 of the First Plan and 5.16 of the
20  Second Amended Plan.  With regard to the continuation of
21  defined benefit plans, this is provided for in 8.6.  The Debtor
22  has assumed the obligations on all of its qualified Plans and
23  continues to comply with those Plans throughout this process.
24  As to the non-qualified Plans, the Debtor is still working with
25  the various representatives and beneficiaries of those Plans to

1  make a determination as to how we will proceed with the non-

2  qualified Plans.

3       The Debtors remaining burdens, as a result as to what was

4  demonstrated both in the confirmation brief and what remains

5  unopposed, have just been set out.  Right now, we are looking

6  at feasibility in terms of establishing that through the record

7  that will be made today by the Debtor's witnesses.  We are also

8  going to be addressing the valuation question and the

9  objections filed by the equity of RCG Carpathia and Kellogg and

10  David Fishel.  We will have remaining Plan objections that will

11  need to be addressed at the continued confirmation hearing.

12  Those will involve Richard Hylland, Magten Asset Management,

13  the beneficiaries of the Benefit Restoration Plan, which is one

14  of the Debtor's non-qualified Plans.  There are settlement

15  discussions underway.  The Debtor intends to file a Motion to

16  Terminate this plan and not reject it as asserted by the

17  various members.  But what we're trying to do is to work out an

18  acceptable treatment in connection with that Plan.  The lead

19  Plaintiffs and the class claimants in the securities litigation

20  have filed a protective objection pending Bankruptcy and

21  District Court approval.  We're asking that that objection will

22  be continued.  And PPL Montana and the Debtor have entered into

23  a stipulation that this Court entered earlier today continuing

24  their objection regarding the claim reserve, which would be set

25  for the continued hearing.

1    With that, Your Honor, we won't go into detail on the

2  objections that are being continued, but we would like now to

3  turn to the Debtor's evidence in support of its Plan, and we

4  call Mr. Austin to the stand.

5         THE COURT:  All right, Mr. Austin, come forward please

6  to be sworn.

7         WILLIAM AUSTIN, DEBTOR'S WITNESS, SWORN

8         THE COURT:  Mr. Austin, please take a seat to my right

9  in the witness chair and speak up clearly into the microphone.

10        MR. AUSTIN:  Yes, Your Honor.

11        THE COURT:  We have a little more comfortable witness

12  chair here than we do in Wilmington.

13        MR. AUSTIN:  I was about to note that.

14     (Laughter)

15                    DIRECT EXAMINATION

16  BY MR. AUSTIN:

17  Q.  Good morning, Mr. Austin.

18  A.  Good morning.

19  Q.  Mr. Austin, just for the record and for the purpose of this

20  hearing, would you state what your position is with

21  Northwestern?

22  A.  I am the Chief Restructuring Officer for Northwestern

23  Corporation.

24  Q.  And in that capacity, what has been your responsibilities?

25  A.  Well, I was hired in April of 2003 with the

1  responsibilities primarily to, at least at that time, to sell

2  the non-core assets of the company as designated, to help

3  formulate a plan, or a restructuring plan, to restructure the

4  company and to help with the reporting requirements -- the

5  financial reporting requirements of the company.

6  Q.   And when were you first engaged by Northwestern?

7  A.   It was in April of 2003.

8  Q.   Prior to that, can you give a general background of -- a

9  broad overview of your employment and your work experience?

10  A.   Without going too far back, I was employed at Banker's

11  Trust Company for almost 18 years.  Did a stint to run the

12  energy business for Banker's Trust Company in Houston, Texas.

13  Did a short period of time in the leverage buyout business, as

14  well, for Banker's Trust Company.  I then joined McDonald

15  Douglas Company as a -- initially as the Treasurer of the

16  company and later as the Chief Financial Officer of the

17  military business.  When that was acquired by Boeing, I joined

18  a company in Houston, Texas called BMC Software where I was the

19  Chief Financial Officer.  I left BMC Software and joined a

20  company called Exodus Communication which was a troubled

21  telecommunications company in California.  We entered Chapter

22  11 bankruptcy procedures with that and sold most of the assets

23  to Cable and Wireless.  I then joined Northwestern Corporation

24  as the Chief Restructuring Officer again in April of 2003.

25  Q.   And you continue in that capacity today?

1   A.   I do.

2   Q.   And just state what is your education?  What degrees do you

3   have as far as your education is concerned?

4   A.   I have a BS in Electrical Engineering from Brown University

5   and I have a Master's Degree from Columbia University in

6   finance, an MBA.

7   Q.   In your connection with your employment at Banker's Trust,

8   that was in the energy finance area?

9   A.   It was.

10  Q.   And in your capacity at that employment, did you have

11  occasions from time to time to do valuations on businesses?

12  A.   We did, I did.

13  Q.   Now, once you took the position as Chief Restructuring

14  Officer at Northwestern, what did you do, if anything, to

15  familiarize yourself with the company and its business?

16  A.   Well, initially we clearly went over the plans at the time,

17  the financial plans, and familiarized myself with the

18  operations of the company.  I spent a fair amount of time

19  looking at the non-core assets and the values that we might be

20  able to generate from those non-core assets.

21  Q.   And did you familiarize yourself with Creditor's claims

22  against the company?

23  A.   I did.

24  Q.   And how would you, again, describe broadly your

25  responsibilities?

1   A.   At the time, again, I looked at not only the non-core

2   assets in generating cash from those non-core assets, but I

3   looked at formulating a plan, a restructuring plan, in order to

4   restructure the debt obligations of the company at that time.

5   Clearly it was an over-leveraged situation.  We had just filed

6   -- shortly after I joined, we filed a 10K.  That 10K -- in that

7   10K, we wrote off almost $880 million worth of assets.  And the

8   company, at that time, had a negative net worth of almost $500

9   million.

10  Q.   Prior to that write off, was the company showing a positive

11  net worth?

12  A.   Prior to the write off, it was.

13  Q.   And so once there was a write off, it then went to a

14  negative equity value?

15  A.   It did.

16  Q.   In connection with your responsibilities as Chief

17  Restructuring Officer, did you have occasion to review the

18  company's financial projections at that time?

19  A.   I did.

20  Q.   By that time, I mean the summer -- right after your

21  engagement in the Summer 2003?

22  A.   Yeah.  Shortly after I joined, I did review the financial

23  projections and did look at not only the projections for the

24  year, but for their 5-year projections at that time.

25  Q.   And 5-year projections at that point, is that correct?

1  A.  At that point, that's correct.

2  Q.  How would you describe Northwestern's business?  What

3  exactly do you -- would you say Northwestern does?

4  A.  Well, Northwestern as it's restructured now is a gas and

5  electric utility with primarily a service area in South Dakota

6  and Montana and parts of Wyoming -- of Nebraska, I should say.

7  Prior to the divestiture of the non-core assets, though, it was

8  engaged in other activities such as heating, ventilation and

9  air conditioning businesses, telecommunications through

10 Expanets.  And then just prior to my joining it, it also had

11 propane distributor ships and propane trading operations.

12 Q.  Is -- when you say Northwestern's involved in the gas and

13 electrical business, is it in the power generation business?

14 A.  The company has a small, a very small, portion of the power

15 generation, primarily held, there's minority interest in the

16 few power generation plants.  But primarily it's a transmission

17 and distribution company.

18 Q.  And what is the distinction between a transmission and

19 distribution company and a more fully integrated utility?

20 A.  Well, for one, in the transmission and distribution

21 business, you really make money as a tolling operation.  You

22 make money when power, gas or electric power, goes through your

23 lines and is eventually distributed to the retailers or, in

24 fact, commercial operations.  In a traditional power company,

25 you might have power plants, you might have -- frankly, you

Austin - Direct                    86

1   might have oil and gas interests or other power interests.  And

2   the issue for the company at that time is -- in a traditional

3   power company you can benefit from increases, if you will, or

4   decreases in power costs.  You know, in a transmission and

5   distribution company like Northwestern, you don't make money on

6   the power supply, you just make money on the tolling and the

7   transportation -- transmission business.

8   Q.  Based on your experience, both at Northwestern as well as

9   your historical experience in the finance area, and also based

10  on the current market conditions, do have a perspective on

11  whether there would be a market valuation difference between a

12  transmission distribution company and a fully integrated energy

13  company?

14  A.  Well, it certainly can be, especially in this time period.

15  In a transmission and distribution business, you've got a very

16  easily -- or more easily predictable type of cash flow in

17  earnings situations so that the multiples that you generate

18  from a transmission and distribution business are a little more

19  -- are better understood.  You don't get the wide variety of

20  swings that you get, for instance, in a power company where the

21  outlook for the power generation business might be wildly

22  positive or, in fact, might be wildly negative.  And you get a

23  much bigger variation in the multiples that you would put on

24  the valuation of a traditional power company versus a

25  transmission and development -- transmission and distribution

1  company, I should say.

2  Q.  Okay.  Based on your experience and that answer and today's

3  market conditions, would you anticipate that a transmission

4  distribution company will trade at a lower or higher multiple

5  than a more fully integrated energy company?

6  A.  Based on today's conditions, it would trade at a lower

7  multiple because there's not as much upside from the energy

8  run-up in prices that is presently going on.

9  Q.  So let's talk, at this point, and kind of break down in

10  components your experience at Northwestern.  Let's focus on the

11  chain of events, the developments, say, from your arrival in

12  April to September 2003 at the filing of the bankruptcy

13  proceeding.  Now I believe you testified that when you --

14  fairly soon after you arrived, the company filed its 10K and in

15  connection with that 10K, had a significant restatement of its

16  financial condition, is that correct?

17  A.  That is correct.

18  Q.  And that your testimony was that it went from a positive

19  net worth to a negative net worth?

20  A.  That's correct.

21  Q.  What was the impact, if any, on the company's business of

22  the development of the (indiscern.) statement and going to a

23  negative equity position?

24  A.  Well, there was an impact in general at that time because

25  we had already made an announcement that the company was going

1  to sell its non-core assets and basically slim down to the key

2  or core gas and electric utility.  So the marketplace at that

3  time understood that we were going through a financial

4  restructure.  When we made the announcement of the $880

5  million, I think that was the exact number, right down it

6  clearly put more stress on our vendors, our suppliers, in fact,

7  our employees.  But basically what was going on at that time

8  period was that the liquidity of the company was starting to

9  deteriorate.  It had started early in the year but in the

10 spring and then later in the summer, vendors that had looked at

11 our financial situation and had read the press releases and

12 frankly looked at the condition of the company started to

13 shorten up on their ability to finance us.

14 Q.  And what was -- can you quantify what was the impact on the

15 liquidity?

16 A.  It's a little difficult to quantify from the beginning of

17 the year until September, but somewhere near 60 to $70 million

18 of liquidity at the core utility was deteriorated at that time.

19 In the meantime, the non-core businesses were also experiencing

20 their own liquidity runs, both Expanets and Blue Dot had

21 difficulties with their vendors, and those vendors included

22 some of our financial participants, mainly the insurance

23 companies that were doing bid and performance bonds and the

24 like.

25 Q.  And with respect to that liquidity, when you say there was

1  a 50 or $60 million negative impact, is that correct?

2  A.  Yep, somewhere between 50 and 70.

3  Q.  Seventy.  Was that actually because you had to -- the

4  company had to put additional deposits, letters of credits and

5  the like on energy suppliers?

6  A.  Yeah, with the energy suppliers, you know, most of the

7  contracts that we had were, you know, 30-day payments or 45-day

8  payments.  As soon as the -- it became apparent that the

9  company was in financial distress, in many cases we had to put

10 up pre-paids or pay within 3 to 5 days as opposed to giving us

11 terms.  So the liquidity was impacted by those kinds of demands

12 by our vendors.

13 Q.  All right, when you first took this assignment as Chief

14 Restructuring Officer, and in your early weeks, or say month or

15 so with the company, was there a perspective at the time that

16 filing Chapter 11 was inevitable?

17 A.  No, it certainly was a possibility when you analyze the

18 liquidity condition that the company was in.  But at that time,

19 we were trying to put together a Restructuring Plan that

20 heavily depended on us selling the non-core assets for

21 significant amounts of money.  If, in fact, we were successful

22 with those sales and there was a Plan, that would have kept us

23 as an operational company and allow us to not file, frankly,

24 Chapter 11.

25 Q.  When you speak of the non-core assets, I believe you

1   testified a minute ago that at least the propane business -- is

2   that Cornerstone?

3   A.   Cornerstone Property.

4   Q.   The Cornerstone propane business had previously been

5   divested prior to your arrival, is that correct?

6   A.   That is correct.

7   Q.   What are the -- identify please the remaining non-core

8   assets, the focus of your -- of the company's efforts to

9   dispose of that?

10  A.   The primary non-core assets were a company called Expanets,

11  which is a telecommunications company based in Denver.  Blue

12  Dot, which is HVAC, heating, ventilation and air conditioning

13  company.  We also had an operation in Montana called Montana --

14  MFM, Montana First Megawatts, which was a power generation

15  project that was -- we tried to embark upon up in Great Falls,

16  Montana.  We were trying to sell that as a project.  We also

17  had a note from Cornerstone, which was in the amount of about

18  $27 million the time that we considered a non-core asset which

19  was to be divested.  And then we also had a relationship or a

20  contract with PPL for the sale of some coal-strip properties.

21  And those -- there were five basic non-core assets that we were

22  trying to liquidate at the time.

23  Q.   And was the company successful in liquidating those assets

24  in the Summer 2003?

25  A.   Not by the Summer 2003.  In fact, as -- in a case when

1  you're in financial distress, it always takes longer and you

2  always get less when you're trying to sell assets under those

3  kinds of conditions.

4  Q.   And the PPL situation was engaged in litigation, correct?

5  A.   It was, it still is.

6  Q.   It still is.  Now, you're initial involvement with the

7  company -- and you familiarized yourself with the company and

8  its operations in this business -- did you have a perspective,

9  say in the June, July timeframe as to what may be the value

10 that could be recovered by the company's senior unsecured note

11 holders?

12 A.   At the time, we had not put a plan together that was a

13 liquidation plan, if you will.  At that time, we were still

14 attempting to sell the non-core assets.  We had started to

15 value the firm, and it was clear that when we valued the firm

16 with the non-core assets and the remaining core utility

17 business that that value was less than what was the claims on

18 the company.  In other words, it was less than the $2.3 billion

19 worth of debt obligations that we had at the time.

20 Q.   So, you had at least a perspective that there was no value

21 to the equity?

22 A.   At the time, on a strict liquidation basis with a strict

23 waterfall basis, there was no value to the equity at that time,

24 or if it was, it was very de minimis and it would have depended

25 upon the non-core assets going for significantly greater than

1  what we thought they could go for at that time.

2  Q.  And to be timely received?

3  A.  And be timely received.

4  Q.  Now, there came a time where ultimately the company

5  obviously did file Chapter 11 on September 14th, correct?

6  A.  That is correct.

7  Q.  Can you explain what were the events -- what were the

8  actions if you can quantify them as to what ultimately lead to

9  and precipitated the bankruptcy filing?

10  A.  Well, before I do that, we ought to talk about -- at the

11  time we were trying to formulate a plan to keep us out of

12  bankruptcy, we had a number of things that had to occur for us

13  to meet our liquidity requirements.  One, we were seeking a

14  financing on our accounts receivable.  As I previously stated,

15  our liquidity was deteriorating during this time period.  We

16  had approached a number of lenders to try to get some financing

17  on our accounts receivable.  The lender that we were working

18  with most closely was GE.  We were also trying to sell the non-

19  core assets for cash and with those proceeds --

20         (Telephone interruption)

21         THE COURT:  Hello, you're breaking into a conference

22  call.

23         OPERATOR:  Oh, just a moment.

24         THE COURT:  And this -- we're in the middle of a Court

25  proceeding so we need to have silence on the other end of the

1  line.  All right, thank you.

2  A.  At the time, we were trying to generate liquidity because

3  we did have a number of obligations that were coming up that

4  needed to be paid in the September timeframe.  We also had a

5  number of obligations that needed to be paid in the June

6  timeframe, including our real estate taxes in Montana, coal

7  strip for the lease payments, and we had a number of

8  obligations that were going drain our liquidity.  So while we

9  were looking at the non-core assets, we were looking at

10 financing of accounts receivable, we were also looking at a way

11 to do debt for equity swaps at that period.  One of the issues

12 that we had in virtually all of the efforts that we undertook

13 to get those liquidity requirements, namely the financing with

14 GE, the sale of the non-core assets and later, the amending of

15 the charter of the company all failed during the summer of

16 2003.

17 Q.  And while this liquidity price was materializing, did the

18 company take any efforts -- undertake any action to preserve

19 liquidity?

20 A.  Clearly at the time we were trying to watch every dollar

21 that was being spent, both from a capital expenditure

22 standpoint and we even went to the extent that we had real

23 estate taxes to pay to Montana in the June period of 2003, and

24 we took the opportunity to extend those payments and incur

25 finance charges by not completely paying the real estate taxes

Austin - Direct                              94

1  to the State of Montana.  And that was a fairly precipitous

2  type of an approach because it clearly would offend some of the

3  -- our constituencies in Montana as we extended the terms of

4  those agreements.

5  Q.  All right, was any other efforts undertaken to preserve

6  liquidity, such as failure to make payments on certain debt

7  obligations?

8  A.  We did forestall -- or actually we cancelled our payments

9  under the Toppers.  We were allowed to do that and roll that

10  forward so we stopped that, I believe, in May of 2003.

11  Q.  And what about Quips?

12  A.  When I refer to the Toppers, I refer to all the

13  subordinating debt.  We cancelled payments on all subordinating

14  debt.

15  Q.  And what about payments on the senior unsecured notes?  Was

16  there any payment due to them during the summer of 2003?

17  A.  The payment and -- the precipitating payment was due on

18  September 15th, 2003.  It was approximately a $30 million

19  payment.  And basically, all of our liquidity and all of our

20  efforts was to -- were to get liquidity so we could meet that

21  payment on September 15th.  When, in fact, none of our -- none

22  of our efforts proved to be fruitful, we couldn't make the

23  payment on September 15th.

24  Q.  So during the summer, efforts were being taken then to --

25  just kind of summarized for the moment -- efforts were being

1  taken to try and do an out of Court restructure for

2  Northwestern?

3  A.   Absolutely.

4  Q.   And in connection with that, the company was attempting to

5  expedite disposition of the non-core assets?

6  A.   Right.

7  Q.   It was attempting to obtain an asset receivable

8  securitization facility from a number of lenders such as GE?

9  A.   That's correct.

10  Q.   And it had preserved -- attempted to preserve equity -- I

11  mean liquidity by delaying its property tax payment as well as

12  extending payments on the subordinating debt?

13  A.   We did.  And in fact, we had one other issue that was

14  facing us in that September timeframe and that is we had a

15  pension payment that we had to pay prior to September 15th --

16  or it was in our best interest to pay it prior to September

17  15th.

18  Q.   Now, were efforts also underway during this time to try and

19  get the company's common stick shareholders to approve a

20  charter amendment to allow for the disposition of additional

21  stock as well as --

22  A.   Yeah.

23  Q.   -- debt for equity?

24  A.   As part of the plan that we were putting together, it

25  required, again, not only to sell non-core assets for a

1  substantial amount of money, but it also required that we'd

2  have to do debt for equity swaps with the -- with our

3  shareholders and with our debt holders.  We did undertake an

4  amendment to the charter of the company where upon we asked

5  for, I believe it was an extra $200 million shares to

6  facilitate debt for equity swaps.  That vote was opposed to the

7  shareholders and was defeated, I think it was around April --

8  I'm sorry, August the 15th of 2003.  So we did not get the

9  approval to do debt for equity swaps.

10 Q.   So at that point, you also didn't get your shareholders

11 support to do an out-of-Court transaction, is that correct?

12 A.   That's was the final straw for us in terms of doing an out-

13 of-Court restructuring.

14 Q.   So then, what then actually became the events that lead to

15 the bankruptcy filing on September 14th, with the conclusion

16 that --

17 A.   Well --

18 Q.   -- we have no choice but to file?

19 A.   It was a fairly simple calculation.  Our liquidity was

20 deteriorating, we faced a $30 million payment on September

21 15th, we faced a $10.6 million payment on our pension funds.

22 We had additional real estate taxes that were due and payable,

23 not only to catch up for what we had not paid on June the 30th,

24 but we were gonna have another payment on -- sometime in

25 November, I believe -- or December.  So that fact of the matter

1  is we simply were running out of cash, and in order to preserve

2  the estate, we decided not to make the payment on September

3  15th and in fact, to file Chapter 11 on September 14th.

4  Q.  Now, let's talk about the Chapter 11 filing and the first

5  few months of the Chapter 11 proceedings, say up to about

6  December.  The company has filed.  Did the company have any

7  stated or developed goals that it wanted to accomplish now that

8  it had chosen to -- or had to actually to get into Chapter 11?

9  A.  Well, I would add -- just before we filed on September the

10 14th, we did execute an agreement to sell one of the non-core

11 assets.  So that was one issue that was very important and to

12 start the process as a stalking horse, non-core asset sale.

13 But as we entered Chapter 11, it was clear that we had to

14 stabilize the operation and to stabilize the operation,

15 including dealing with our vendors, our employees, our

16 regulators and our debt holders.  So the first thing was to do

17 was to focus on getting the information out and stabilizing the

18 relationships that we had with all our constituencies.  The

19 second was to focus on the sale of the non-core assets, which

20 as I said, just prior to going in, we did sell or entered into

21 an agreement to sell one of the non-core assets.  The third

22 issue was to develop a plan that would enable us to emerge as a

23 credit worthy operation, which we did.  And the forth issue was

24 to basically put together our own financial plan that was a

25 disciplined and thoughtful financial plan that we could operate

1  under.

2  Q.  Was there any focus on rebuilding liquidity for the

3  company?

4  A.  We always focused on cash.  We did enter into a DIP loan,

5  which gave us some liquidity.  It was a hundred million dollar

6  DIP loan that the initial entry to Chapter 11.  But we focused

7  on our 13-week forecast, we focused on cash, and tried to build

8  up liquidity, as I say, through the sale of the non-core

9  assets; put the focus on our cash from operations.

10  Q.  What was the effort, at that point, relative to the payment

11  on debt, especially as it related to your unsecured senior note

12  and subordinated debt?

13  A.  We always planned -- we planned as we entered into Chapter

14  11 to pay our secured note holders on a current basis.  We had

15  -- we looked at our financial plan and felt we could pay those

16  on a current basis rather then deferring that to the end of a

17  Chapter 11 process.  Then our second plan was that as we looked

18  at the unsecured and the subordinated debt holders, in order

19  for us to emerge as an investment grade, or near investment

20  grade company, we would have to convert all of that into

21  equity.  And we did approach the -- initially the Ad Hoc

22  Committee and then later the Creditors' Committee with that as

23  our initial focus.

24  Q.  To divert all the unsecured public debt into equity?

25  A.  To convert all the unsecured public debt into equity.

1  Q.  Now, converting that debt into equity at that point in the

2  early stages of the case, did you have a preconceived notion

3  of how that -- the equity in the new company would then be

4  divided?

5  A.  No, we did not.

6  Q.  So, there was just a general concept that you were going to

7  develop -- excuse me, were going to convert the debt to equity

8  and would let it figure out, once we get an evaluation done,

9  how it would be divided?

10 A.  The issue is -- our effort was to create the most value for

11 the estate that we could.  Our effort was not directed towards

12 who would get that equity at the end of the day.

13 Q.  And where was the company at this point on its relationship

14 with its regulators, especially the state regulators?

15 A.  Well, as I said before, we had certainly scared the

16 regulators, and I would say the relationship was one of

17 distrust of -- on the part of the regulators as to here we were

18 a company that had recently purchased -- distrust mostly on the

19 Montana side -- we were a company that as early as 2 years

20 before had bought the company out of a difficult situation in

21 Montana, and here we were filing for Chapter 11.  It clearly

22 upset the regulators in Montana.  And frankly, that's

23 understandable.

24 Q.  And so, one of the -- one of the ultimate goals of the

25 proceedings is to try to rebuild that relationship?

1  A.  Well, as I said, we had to deal with all of our

2  constituencies including the employee vendors and regulators,

3  and we embarked upon a process where upon we tried to inform

4  the regulators and have an open book view as to how we were

5  going to operate the company in Chapter 11 and how we were

6  planning to come out of Chapter 11 in a very short time period.

7  In effect, we tried to convince the regulators that at, during

8  and after this process that we would protect their interest

9  (inaudible) a viable company.

10 Q.  Was there an effort to then focus on (inaudible) quickly?

11     (Telephone line interruption)

12 A.  I think you're gonna have to repeat that one.

13     THE COURT:  Hello, this Judge Case in Phoenix.

14 Whoever is placing calls while on this line needs to terminate

15 the call.

16     UNIDENTIFIED SPEAKER:  I'm not commencing any calls.

17     THE COURT:  Well --

18     UNIDENTIFIED SPEAKER:  I'll terminate the call though,

19 Your Honor.

20     THE COURT:  You're answering a phone and it's

21 disrupting the proceedings, so please don't do it.

22     UNIDENTIFIED SPEAKER:  Thank you.  I didn't realize

23 you were on the line, thanks.

24 BY MR. AUSTIN:

25 Q.  Let me just --

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*