1   A.   Yeah, one more time, please.

2   Q.   One more time.  Why was emerging as quickly as possible a

3   goal of the company -- emerging from Chapter 11?

4   A.   Well first of all, as I said, our relationship with the

5   regulators was not at its zenith at the time and we felt that

6   in order to preserve the -- and enhance the estate, enhance the

7   assets, minimize the costs that are involved in a Chapter 11

8   proceeding.  And to do this -- to do this on a quick basis was

9   in the best interest of the estate.

10  Q.   So to kind of recap, Mr. Austin, you filed Chapter 11 now,

11  you had the efforts pre-bankruptcy to try and restructure out

12  of proceedings, you now filed Chapter and you developed a list

13  of goals of trying to stabilize the business, correct?

14  A.   That's correct.

15  Q.   Rebuilding liquidity?

16  A.   That's correct.

17  Q.   Sell off the non-core business?

18  A.   That's correct.

19  Q.   And focus on the core utility assets?

20  A.   That's right.

21  Q.   And then to focus on converting the unsecured debt to

22  equity?

23  A.   That was the plan.

24  Q.   And rebuild the relationship with regulators and to emerge

25  as quickly as possible?

Austin - Direct                    102

1  A.    That's right.

2  Q.    Now, let's focus on the goal -- 'cause I think you talked

3  about rebuilding liquidity.  You did that with the DIP loan,

4  correct?

5  A.    We did, that was our backstop.

6  Q.    And then -- just on that --

7  A.    I would add that we used that DIP loan to the tune of about

8  13 or $14 million only for letters of credit to backstop some

9  of our vendors, but we never actually borrowed under that DIP

10  facility.  Basically because we focused on the cash generation

11  and liquidity from the operation so we had a very successful

12  processing.

13  Q.    So you definitely achieved that goal?

14  A.    We did.

15  Q.    Let's focus on the business and the stabilization.  Did

16  that focus on both the operation as well as the financial?

17  A.    Yes, it did.

18  Q.    All right, and when you were looking at that, what was the

19  focus of trying to develop both a sound business plan and a

20  financial model?

21  A.    Well, we had had a financial plan in the summer of 2003.

22  What was clear is that it was not a tightly developed plan, it

23  was not a bottoms-up plan.  And we had to develop a plan that

24  the management team, including all of the operational people

25  and all of the divisional people, bought into.  So we spent the

1   -- really the late summer and the fall of 2003 developing a

2   financial plan that everyone could buy in, whether it be the --

3   at the divisional level all the way up to the Chief Operating

4   Officer and the CEO.  So we developed a rigorous, thoughtful

5   financial plan, which was the first one that was developed at

6   the company.

7   Q.  And that was what I was gonna ask you was how did you

8   believe, based on your experience at the company, how to

9   develop that -- we'll call it the -- let's refer to it as the

10  5-year business plan -- how did it compare to what had --

11  previous plans that had been developed by the company?

12  A.  Well again, you had to recognize that this company had only

13  owned -- when the first plan was developed -- the first plan

14  that I saw, which was in the early part of 2003, that was a

15  plan that was developed and the company had only owned Montana

16  for a little less than a year at that point.  So a lot of those

17  plans were top-down, financial projections, and did not have

18  the buy-in of all the people below the financial planners, if

19  you will.  It didn't have all the operational buy-in.  So, the

20  plan that we were operating to in 2003 was one that we were

21  clearly not achieving those plans.  Some of it was due to the

22  liquidity and the stress that was put on the company.  But some

23  if it the plan just was an overly aggressive plan.  So, as we

24  headed into the bankruptcy process, we had to develop a plan

25  that was more of a bottoms-up plan;  was rigorously bought in

1  by all of the constituencies.

2  Q.  All right, what was your perspective, if any, of the

3  reliability of Northwestern's forecast and projections in the

4  September or October, early November timeframe?

5  A.  Well, they were getting better with each passing cut of the

6  plan.  I mean, basically we developed a plan and went through a

7  number of modifications.  In fact, a number of the cost

8  elements that were later introduced into the plan were

9  recognized, if you will, during that time period.  As a for

10 instance, we didn't have in the original plan that was -- what

11 I'll call it 2003 plan -- we didn't have an original cost in

12 there for the pension expense.  And as we studied the pension

13 expense and the funding that the company had at that time, it

14 was clear that we had that we had to put in a substantial

15 change into the pension expense line, which went into the G&A

16 line of the forecast.

17 Q.  Do you recall how much was added for pension obligations or

18 expense throughout -- say for 2005?

19 A.  I think we added in the final analysis it was a $19.6

20 million add to the pension plan at that time.

21 Q.  And just to isolate that, did that have any --

22 A.  I'm sorry, what it was -- it was 10.6 for the 2003, but on

23 the go forward basis, it was closer 19 a year.

24 Q.  And just to isolate that one item, what impact, if any, did

25 that have on the company's EBITDA?

1  A.   Well, it would be a direct cost to the EBITDA, so it'd take

2  the EBITDA down by that 19.6 or in -- for 2003, took it down by

3  the 10.6.   For the 2005 and beyond, it took it down by almost

4  19½ -- $19.6 million.

5  Q.   And that additional pension obligation, for example, was

6  not embedded in the initial runs and numbers, say, in October,

7  to your knowledge?

8  A.   I don't know if it was in -- it certainly wasn't in the

9  middle of the summer, I don't know if was -- we captured it in

10 October or not.

11 Q.   From your perspective, when was there available the first

12 good numbers of the 5-year business plan?

13 A.   The first number -- and we went through, as I said, a more

14 rigorous and discipline process in then we presented the

15 results of that in early December to the Board.   And the Board

16 of Directors approved that plan.   We later presented that plan

17 to the Creditors' Committee.   But those were the first, what I

18 would call, rigorously done -- professionally done, financial

19 plans for the core business, the core business that was left

20 behind, that the company did.   Period.

21 Q.   And, when you say the first time that business plan was

22 presented to the Creditors' Committee was in mid-December?

23 A.   Mid-December, that's correct.

24 Q.   Now, is that 5-year business plan -- is that the business

25 plan and projections that serve to support the Northwestern's

1   proposed reorganization plan?

2   A.   It is.   I think there's been a few minor tweaks to it, but

3   the genesis of the plan is the plan that we developed for that

4   December of 2003.

5   Q.   And from your perspective, any modifications from December

6   to today, for example, have been just small updates, technical

7   amendments (inaudible)?

8   A.   Yeah, updates -- there've been updates for cash.  We've

9   done a little bit better on the cash generation than what was

10  in the plan.  But the fact of the matter is, as we look at that

11  plan for 2004, we're behind that plan.  So while there's a

12  great deal of effort to say that that plan is a low-ball plan,

13  the fact of the matter is, we're behind that plan from an

14  EBITDA standpoint.  Now, we're ahead of the plan from a cash

15  standpoint, but from an EBITDA standpoint, we're behind that

16  plan.

17  Q.   Now, from your perspective, how would you compare, say if

18  it's better or worse or no real change, how would you compare

19  the 5-year business plan supporting the Debtor's Reorganization

20  Plan to the projections that were that were developed in the

21  October/November 2003 timeframe?

22  A.   Well you know, the discipline in the plan, the ability for

23  us to measure and manage that on a monthly basis now is far

24  superior to anything that we had in the summer and fall of

25  2003.   And part of that is we brought in a new CFO, a CFO who

1  has helped with the discipline on the plan and the reporting

2  process.  And we're -- you know, the company now can operate in

3  a much more stable business environment.

4  Q.  Now, you developed the projections in this 5-year business

5  plan, you presented to the Creditors' Committee in a mid-

6  December timeframe 2003.  Prior to that, I think you testified

7  there was no preconception about how any new equity and

8  restructure in Northwestern would be divided between the senior

9  unsecured notes and subordinated, correct?

10  A.  That's right.  Our objective was to clearly manage or -- to

11  optimize the value of the estate and not figure out who was

12  gonna own what.

13  Q.  But was your perspective that there was no value to equity?

14  A.  That's correct.  When we added up the value that we got,

15  approximately it's about -- actually approximately it's the

16  value that we have today, it was about a billion six, in total

17  value of the company -- of the entity.

18  Q.  So that December evaluation indicated a value of

19  approximately $1.6 billion?

20  A.  That's correct.

21  Q.  And that has not really shifted very much since then,

22  correct?

23  A.  Some of the elements have shifted, we -- in early December,

24  we thought, in fact, that we had more value coming from the

25  non-core assets and, in fact, we've had less value.  We thought

1  we were gonna have less cash flow coming from the main

2  operations, in fact we had a little more value.

3          MR. MORRIS:  Your Honor, I'm gonna object to that last

4  question -- the last question before that was --

5          THE COURT:  You need to state your name counsel.

6          MR. MORRIS:  I apologize.  My name is John Morris, I'm

7  from Kronish Lieb, I'm for the equity holders Kellogg Capital

8  and RCG Carpathia.  I've been very lenient, especially in the

9  background.  We're getting into substance and I would just

10  request that Mr. Austin not lead the witness on these important

11  figures.

12          MR. AUSTIN:  That's fine, Your Honor.

13          THE COURT:  All right.

14  BY MR. AUSTIN:

15  Q.  Mr. Austin, what is your perspective on whether management

16  has included or not included all material factors in it's 5-

17  year business plan of projections?

18  A.  We've tried very diligently, as had the rest of the

19  management team, to identify and consider all major factors in

20  our business plan.

21  Q.  And you're familiar with that business plan, correct?

22  A.  I am.

23  Q.  One of the elements of that business plan is the -- I

24  believe, that there's a need for approximately $35 million in

25  cash at all times to be retained by reorganized Northwestern?

1    A.    What we've projected in -- as you identify what your

2    liquidity needs are, both from a rating agency and from a

3    vendor standpoint, we chose that $35 million number.  And I

4    think that it shows as of September of 2004 that $35 million

5    number.  In fact, what happens during the winter season is that

6    some of that liquidity will be used up because as you go into

7    the heating season, we have to buy a lot more gas, we have to

8    buy a lot more electricity.  And our need for financing, if you

9    will, working capital financing, increases during the -- I

10   think peaks sometime in January.  So the $35 million may be the

11   number at September 30th.  That would decrease going into the

12   winter season.

13   Q.    If the cash was used, is that correct?

14   A.    If the cash was used or the debt -- we also plan of having

15   a hundred million dollar exit revolving credit facility.

16   Q.    Well, if the company is able to attain a working capital

17   credit line, can you explain why there's a need to also retain

18   $35 million in cash from the voucher?

19   A.    Well, you really want a combination of the two.  Do you

20   need $35 million everyday?  Absolutely not.  That's a good

21   place holder so that you operate.  As I said, in some cases

22   you'll have $35 million, as you go into the winter season, it

23   might drop down to 5 or $10 million.  As long as you have that

24   backstop or that working -- the revolver, you're fine.  But the

25   rating agencies and your vendors are looking for some liquidity

1   measure in the form of cash on the balance sheet, I believe.

2   Q.  Let's focus on two other general areas of inquiry before we

3   finally conclude your examination.  First is an area referred

4   to, I think you've (indiscern.) QF.

5   A.  Right.

6   Q.  Can you explain what a QF?

7   A.  A QF stands for Qualifying Facilities.  It's a third party

8   energy producer and generally an alternate -- alternative

9   energy wind, Wing Cogen, hydro, that we enter into contracts

10  with these third party power generated.  It's under FERC

11  regulations.  It's under -- I should say federal regulation,

12  but we enter into these facilities as part of our default power

13  supply from Montana.  I think there's approximately 19 of them

14  that we have.

15  Q.  Is there any liability recorded on the company's balance

16  sheet related to these QFs?

17  A.  We record the liability and the reason for that liability

18  is that the amount of contractual obligations we have for these

19  qualifying facilities is greater than the amount that we can

20  recapture as we pass through to our customers.  And the amount

21  that we have listed as a balance sheet item is 140 --

22  approximately $140 million.

23  Q.  And that's calculated how?

24  A.  It's a fairly -- I was about to say simple calculation.

25  It's calculation that looks at the amount that we pay out over

1    the next, in some cases, 26, 27 years, and the amount that we

2    are allowed to pass through in the form of charges to our

3    customers.    The difference is a cash flow stream, again, over

4    this about 26, 28 year period.    We take that negative cash flow

5    stream and discount it back to present value and use that

6    discounted value and that comes up with $141 million.

7    Q.    Can you describe what actions, if any, were taken to try

8    and reduce that liability?

9    A.    We did analyze the QFs.    We looked at as to whether or not

10   we could, in fact, reject them as executory contracts.    We

11   tried to run a calculation as to if they were rejected, what

12   would be the claim.    If they were rejected, what would be the

13   resultant response from Montana and specifically consumer power

14   -- I'm sorry, the Consumer Counsel in Montana, because to that

15   extent that we achieved some benefit by the rejection or the

16   renegotiation, if you will, of those qualifying facilities,

17   some of those benefits might be claimed by the Consumer Counsel

18   and from the Montana PFC at that point.    So, we looked at them,

19   we determined that it was really not in the best interest of

20   the estate to reject them because the claims would be greater

21   than the benefit that we would accrue to the company.

22   Q.    Just on a rough basis, could you -- do you recall what may

23   have been the general claim that may have resulted if the

24   company could have rejected the QF contracts?

25   A.    Well, the total amount of contractual obligation that we

1   had in the QFs was almost $2 billion.  And in taking -- you

2   could have had claims at or -- and that was our calculation,

3   depending on what the QF parties -- the third parties came up

4   with.  They may have come up with claims higher than that in

5   fact.

6   Q.  Is that gross or is that a present value note?

7   A.  That's a gross number.

8   Q.  Now, one more question of QFs.

9   A.  Actually, to correct the record, I think it's actually

10  higher than that.  And for the life of me, I can't remember the

11  exact number.  I think the gross number is actually higher than

12  1.9 million, but --

13  Q.  These QF contracts, as you explained it, are actual

14  contractual agreements for the company to purchase power, is

15  that correct?

16  A.  That's correct.

17  Q.  Now, based on your experience, Mr. Austin, if a third party

18  came in to acquire Northwestern, what impact, if any, would

19  this $140 million liability have on the purchase price?

20  A.  Well, if I were looking -- and I did some of this analysis

21  back when I was in the leveraged buyout business -- but if I

22  looked at an obligation like this, it's a true cash obligation

23  and I would subtract it from the valuation that I would be

24  willing to pay for any company.

25  Q.  Now another asset which the company is identifying in its

1 Reorganization Plan is net operating losses.  Are you familiar

2 with those on a general basis?

3 A.  On a general basis, absolutely.

4 Q.  All right.  Do you have an understanding of whether there's

5 any change in the value of the NOL with the company that

6 utilized from say, early December to sometime later?

7 A.  When we originally looked at the NOL situation, which would

8 have been in the summer of 2003, at that time our calculation

9 came up with -- and our calculation was done basically with

10 Deloitte & Touche and the help of their tax experts.  We

11 calculated some $735 million of NOL's.  That subsequently has

12 been reduced, primarily because of a re-look at the NOL

13 calculation by Deloitte & Touche later in that year.  Actually

14 it would have been early in 2004 when the recalculation was

15 done.

16 Q.  So that's just for a final re-analysis?

17 A.  Yeah, these are -- I wouldn't say they're arcane, but

18 they're intricate calculations, and depending on what --

19 depending upon the operating history of the company and how

20 Deloitte & Touche looks at those numbers, they can change from

21 time to time.

22 Q.  Mr. Austin, you identified, I think, a number of goals that

23 this company had, Northwestern had at the beginning of this

24 Chapter 11 case.  Sitting here today, what is your perspective

25 that if this Debtor's Plan is confirmed of what's been

Austin - Direct                                        114

1    accomplished by this Debtor?  Have those goals been
2    accomplished from this case?
3    A.   I think a great deal has been accomplished.  You know, the
4    company is now operating in a very stable situation.  It's
5    improved its relationships with the regulators, it's built
6    liquidity, it's sold primarily the non-core assets, although we
7    still have a little bit to go.  It should come out as a near
8    investment grade -- and I say near, because I don't think we'll
9    achieve the investment grade status on the first -- upon
10   emergence.  But I think a lot has been accomplished and I think
11   the company is now a stable company that should emerge as a
12   quality operating company.
13   Q.   Based on your understanding of the company, your
14   familiarity with the company and this proposed Reorganization
15   Plan, do you have a perspective on whether the recoveries under
16   the Reorganization Plan would be better than if Northwestern
17   were to be liquidated?
18   A.   Well, we have, during this timeframe, entertained a number
19   of offers from strategic buyers that have offered to buy the
20   company -- or, I shouldn't say offered, they've shown some
21   indications of interest.  We were never able to get a firm
22   offer, I would add, but those indications of interest were all
23   at or below the value that we think was gonna come out of the
24   emerged company here.  So, I think as an emerged company, this
25   the best thing for the Debtor to do.

1  Q.  Mr. Austin, if this Plan is confirmed, do you have a

2  perspective as to whether Northwestern will be able meet the

3  obligations it providing for under the Reorganization Plan and

4  not have to go through further restructuring?

5  A.  I believe it's a stable Plan, the company -- it's a stable

6  operation and can meet its debt obligations and note

7  obligations as they come due.

8  Q.  Do you have a perspective today whether there is any

9  distribual value to Northwestern's equity holders?

10  A.  I do not believe there is any distribual value, based on

11  the waterfall analysis and based on the value that we've worked

12  at in conjunction with our advisors.

13  Q.  If there's any significant additional delay in Northwestern

14  obtaining confirmation of this Plan and exiting Chapter 11, do

15  you have a perspective whether there would be any impact on the

16  value that is proposed to be distributed to Northwestern

17  Creditors?

18  A.  Well, one of issues and one of the reasons for speed in

19  this case is that the company -- well, it's got a stable EBITDA

20  and a stable financial projection.  It does trade as an

21  interest sensitive stock, or it should, I believe, should trade

22  as an interest sensitive stock.  And if you look at interest

23  rates today versus what they'll be in 3 months -- and while I'm

24  not a soothsayer on that -- I think the pressure for interest

25  rate increases is higher than interest rate decreases.  And the

1    sooner we get out, do our exit financing, I think the more

2    value the company will have.  That's just from the investment

3    banking side.  From the standpoint of staying in bankruptcy and

4    incurring the kinds of costs that we're incurring today, I

5    think is a detriment to the estate.  So, the sooner we get out,

6    I think, the better it is.

7    Q.  I assume present company excepting that?

8    A.  No, I wouldn't even except that.

9         MR. AUSTIN:  Your Honor, that's all the questions I

10   have for Mr. Austin.

11        THE COURT:  All right, is there anybody who has

12   questions of Mr. Austin who is a proponent of the Plan?

13        ALL:  (No verbal response).

14        THE COURT:  If not, is there any cross examination

15   from any objector?

16        MR. MORRIS:  Yes, Your Honor.  Just a few questions.

17   Again, John Morris for the equity holders.

18                      CROSS EXAMINATION

19   BY MR. MORRIS:

20   Q.  Good afternoon, Mr. Austin.

21   A.  Good afternoon, John.

22   Q.  I think you said that at the time the company went into

23   Chapter 11 it did not have a good relationship with state

24   regulators, is that correct?

25   A.  I would say that is correct.

1  Q.  And in fact, it was a poor relationship, is that correct?

2  A.  I would characterize it as poor.

3  Q.  And that was in part because of the decision by

4  Northwestern to extend the payment of taxes back in June as you

5  described, is that right?

6  A.  Well, I think that's a little bit -- I think it ran a lot

7  deeper than just a non-payment of real estate taxes.

8  Q.  I'm just asking, is that one particular reason?

9  A.  I think that's one.

10  Q.  And another particular reason was a consequence of

11  Northwestern's decision to attempt to diversify, is that right?

12  A.  That's correct.

13  Q.  And go into all of these other businesses outside of their

14  core energy business, is that right?

15  A.  It's clear that the diversification strategy was poorly

16  contemplated and poorly executed.

17  Q.  And it was poorly received by the regulators, isn't that

18  right?

19  A.  And it was poorly received by the regulators.

20  Q.  And it was poorly executed as well, isn't that right?

21  A.  That is correct.

22  Q.  These were losing propositions?

23  A.  Yes, Sir.

24  Q.  And the regulators didn't want the rate payers,

25  Northwestern's company -- customers to pay for the strategic

1  mistakes made by Northwestern, is that correct?

2  A.   I think that is an accurate assessment of their position.

3  Q.   And to address those concerns that we've just talked about,

4  Northwestern has, in fact, either sold or will shortly sell off

5  it's non-core businesses, is that right?

6  A.   That's right.  It will revert back to it's core utility

7  business, that's correct.

8  Q.   And was there a settlement recently reached with the

9  Montana Public Service Commission?

10  A.   There has been, yes.

11  Q.   Can you describe that for the Court?

12  A.   Well, I -- in general, it's a settlement as to how the

13  company will operate on a going-forward basis.  It does

14  ascribe, or prescribe, us to stay as a core gas and electric

15  utility business.  And it has certain restrictions and certain

16  reporting requirements and the like.  But basically what it

17  says is we're gonna operate in the -- in a stable, straight-

18  forward manner in the utility business.

19  Q.   And that's something that I take it was a positive

20  development vis-a-vis Northwestern's relationship with the

21  regulators?

22  A.   I believe it has been, yes.

23  Q.   Okay.  If one of the goals with -- of Northwestern in

24  entering Chapter 11 was rebuilding its relationship with the

25  state regulators, and we've identified the settlement and the

1  sale of the non-core businesses, what other steps has

2  Northwestern taken during the pendency of the bankruptcy case

3  to improve its relationship with the state regulators?

4  A.  Well, I think one thing is the frequency of contact and the

5  openness of the communication.  And I think we've tried to do

6  that and I think -- and I hope it's been appreciated by the

7  regulators.  I mean, we owe it to the regulators to be forth

8  right and up front an open in terms of our finances and our

9  communications.  And I think we've gone a long way to doing

10  that.  Whether or not they all believe that yet, I don't know.

11  Q.  But it is your understanding heading into bankruptcy that

12  one of the concerns the regulators had about Northwestern was

13  its lack of openness, is that right?

14  A.  That's my understanding.

15  Q.  And to the best of your knowledge, Northwestern has done

16  all it could to address that particular concern, is that right?

17  A.  We are trying, yes, Sir.

18  Q.  Are there any other ways in which Northwestern has

19  attempted to improve its relationship with state regulators?

20  A.  I can't think of any others.

21  Q.  But it is your belief that today Northwestern has a much

22  better relationship with the regulators than it did prior to

23  the time it entered bankruptcy, correct?

24  A.  I believe it to be so, yes.

25  Q.  You talked a bit about the projections, do you recall that?

1  A.   I do.

2  Q.   And over time, beginning last summer through the end of the

3  year, the projections got better and better with each cut of

4  the plan, is that right?

5  A.   I believe they got more disciplined and more accurate,

6  that's correct.

7  Q.   And one of the things that was a result of that process was

8  the inclusion of these pension expenses that you talked about,

9  is that right?

10 A.   That's correct.

11 Q.   And the projections now include approximately $20 million

12 per year in pension expense throughout the projection period,

13 is that right?

14 A.   That's correct.

15 Q.   And is that today the company's best estimate of what the

16 pension expense will be over that time?

17 A.   To the best of my knowledge, that's the -- there'll be some

18 tweaks from time to time and we'll look at it every year, but

19 that's our best guess at this point.

20 Q.   Okay.  But it is the company's position that the

21 projections today fully reflect the pension expense that's

22 expected over time?

23 A.   Yes.

24 Q.   And in fact, in creating the projections Northwestern tried

25 diligently to consider all of the major factors in creating the

1    projections, is that right?

2    A.   I believe we did.

3    Q.   Just a couple of more questions, Mr. Austin, and thank you

4    for your patience.  You talked for a few minutes about the net

5    operating losses, do you remember that?

6    A.   Yes.

7    Q.   And you said that in the summer of 2003, Deloitte's best

8    estimate at that time was that they were available $735 million

9    of net operating losses, is that right?

10   A.   Right, that's my recollection and that would have been as

11   of the date of emerge -- what we always do is we look at the

12   net operating losses as the date that we plan to emerge.  So if

13   we look at it at 735, we looked at it such that it -- that's

14   what we would calculate it would be at the date of emergence.

15   Q.   And when you talk about the date of emergence, you're

16   talking about the period of time immediately after the Plan is

17   confirmed and the company is no longer in bankruptcy, is that

18   right?

19   A.   That's right, and we always estimated that at about

20   September 30th of this year.

21   Q.   And so that would also be the time in which the conversion

22   of debt to equity has already been accomplished?

23   A.   Right.

24   Q.   What is your understanding of the current best estimate of

25   the value of the NOLs?

1  A.   It's somewhat less than that, I don't know the exact

2  number, but it's less than that.

3  Q.   Is it fair to say it's north of 600 million?

4  A.   I think it is north of $600 million.

5  Q.   No further questions, Your Honor.

6         THE COURT:  Okay, anybody else have any questions?

7         MR. HOUSTON:  Yes, Your Honor, this is Joseph Houston

8  here for Mr. Hylland.

9         THE COURT:  All right, Mr. Houston.

10         MR. HOUSTON:  Thank you, Your Honor.

11                         CROSS EXAMINATION

12  BY MR. HOUSTON:

13  Q.   Sir, I'm assuming that you are familiar with the name

14  Richard Hylland?

15  A.   I am.

16  Q.   And I'm assuming that you are familiar that he has filed an

17  objection -- a limited objection to the proposed Plan of

18  Reorganization, correct?

19  A.   That's my understanding.

20  Q.   And do you know what the nature of his objection is?

21  A.   Frankly, I do not.

22  Q.   Well, I'll tell you that one of them is that the way in

23  which to -- the proposed distribution (inaudible) relating to

24  the D&O Trust is set up is unfair and discriminatory.  Are you

25  aware of that?

1  A.   As I said, I'm not aware of how (inaudible).

2       (Telephone connection interference)

3  Q.   Can you hear me?

4  A.   I said I'm not aware of how his objection was

5  characterized.

6  Q.   Well, Mr. Hylland has objected on the basis, in part, that

7  the manner in which the D&O Trust is set up is FIFO.  Are you

8  familiar with the term FIFO?

9       MR. AUSTIN:  Your Honor, I'd like to raise an

10 objection that this cross examination is beyond the scope and

11 it also -- of the Direct examination, and also that he's really

12 arguing confirmation issues.

13      THE COURT:  Well, it strikes me more as argument.  The

14 witness has already indicated that he is not familiar with the

15 Hylland objection.

16 A.   Right.

17      THE COURT:  So I think there may be a lack of

18 foundation here.  Where are you going with this, Counsel?

19      MR. HOUSTON:  Well Your Honor, I want to see if this

20 witness understands what the term FIFO is and whether this

21 witness is -- adopts the {quote} "Debtor's response" to Mr.

22 Hylland's objection with respect to this trust.  And I think

23 that -- and I also have a couple of factual questions that I

24 need to establish from him.

25      THE COURT:  I think you ought to go to the factual

1    issues because I think the others are argument, and those can

2    be raised, those are preserved.  But the witness has already

3    testified that he doesn't -- he's not familiar with the Hylland

4    objection.  So why don't you move onto the factual issues as to

5    which this witness may have some information.

6              MR. HOUSTON:  Very good, Sir.

7    BY MR. HOUSTON:

8    Q.  Sir, do you understand the term FIFO, F-as in Fred, I-F-as

9    in Fred, O?

10             THE COURT:  No.

11             MR. AUSTIN:  Objection, Your Honor.

12             THE COURT:  Sustained.  That's not what I want you to

13   talk about.  I don't think that's within the scope of what this

14   witness has indicated he had foundation to talk about.  So I

15   think you ought to -- if you have factual questions, please ask

16   them.

17             MR. HOUSTON:  Very good.

18   BY MR. HOUSTON:

19   Q.  Sir, is it your understanding of the operation of the D&O

20   Trust that if there are let's say, for example, 28 claimants to

21   the Trust, and that happens to be the number of class 12

22   ballots that were reflected in the voting.  If there are 28

23   claimants to the Trust and let's say claimants numbers one

24   through 25 submit claims and exhaust the trust, that claims

25   numbers 26 through 28 get zero?

1    MR. AUSTIN:  Objection, again, Your Honor, same basis

2    as before.  He's just going at it at a different angle.

3    A.  I don't pretend to be qualified to talk about the

4    channeling trust and --

5          THE COURT:  Sustained.

6          MR. HOUSTON:  Very good, Sir.  Nothing further.

7          THE COURT:  All right, thank you.  Anybody else have

8    anything --

9          MR. MORRIS:  In fact, nothing at all, I guess,

10   actually.

11       (Laughter)

12         MR. HOUSTON:  Very good, Sir.  Nothing further.

13         THE COURT:  All right, thank you.  Anybody else --

14         MR. HOUSTON:  In fact, nothing at all, I guess

15   actually.

16       (Laughter)

17         MR. AUSTIN:  Your Honor, I have one comment to make

18   and I have then -- I'd like to ask one question on redirect.

19   And I will get my question out of the way and then I'll do my

20   comment.

21                     REDIRECT EXAMINATION

22   BY MR. AUSTIN:

23   Q.  Mr. Austin, as relates to the sale of the non-core

24   business, which you had previously testified to, do you have a

25   perspective as to whether the Debtor will actually have access

1  to the cash from the disposition of those non-core assets such

2  as the Cornerstone note, Expanets and Blue Dot and MFN by, for

3  example, October 30th?

4          MR. RATNER:  Objection, this is beyond the scope of my

5  cross.

6          MR. AUSTIN:  You asked a question about timing on the

7  non-core assets.

8          MR. RATNER:  I don't believe I did at all, Your Honor.

9  All I did was ask whether or not the sale of the non-core

10  assets satisfied one of the concerns of the regulators.

11          THE COURT:  Overruled.

12  BY MR. AUSTIN:

13  Q.  You can answer the question.

14          THE COURT:  Can you answer the question?

15  A.  I don't believe we'll have access -- we may have access to

16  some small amount from Blue Dot, but we will not have access, I

17  don't believe, from the sale of the other (inaudible).

18          MR. AUSTIN:  Your Honor, that's all the questions I

19  have.

20          THE COURT:  Let me see, does anybody else have any

21  questions?  I thought I saw Mr. Snellings --

22          MR. AUSTIN:  Well, my comment, that's one of the

23  things -- why Mr. Snellings is rising is pursuant to the

24  agreements that were stated at the telephonic hearing last

25  Friday and today is Mr. Snellings, on behalf of his client, Law

1   Debenture and I believe Ms. Steingart on behalf of Mag Ten, the

2   agreement is that they do not have to participate in the cross

3   examination of the witnesses today.  They reserve their right

4   to cross examine the witnesses when we come back for the

5   hearing on October the 6th.  And I think they will undertake to

6   let us know whether indeed we need to bring back any or all of

7   these witnesses for that purpose prior to the next hearing.

8           MR. SNELLINGS:  That's right.  I just want to make

9   sure that was on the record, and we don't want to put it on the

10  record for every witness, but --

11          THE COURT:  All right, that's the understanding I have

12  from the hearing we had telephonically last Friday.

13          MR. SNELLINGS:  Thank you.

14          THE COURT:  That's acceptable.

15          MR. AUSTIN:  Thank you, Your Honor.

16          THE COURT:  All right, is there anybody else?  If not

17  then thank you, Mr. Austin, you may step down.  Would this be a

18  good time to take a short break for lunch and then we'll start

19  up again?  Who do we have coming next.

20          MR. AUSTIN:  We have -- Mr. Hanson will be our next

21  witness, Your Honor, followed by Mr. Byrd and (inaudible).

22          THE COURT:  All right, well, we will start again in 1

23  hour.  So let's get back in time to do that.

24          ALL:  Thank you, Your Honor.

25      (Recess)

1    THE COURT:  Please be seated.  All right, are we ready

2  to proceed?

3    MS. DENNISTON:  We are, Your Honor.

4    THE COURT:  All right, Ms. Denniston?

5    MS. DENNISTON:  Thank you, Your Honor.  We would call

6  Mike Hanson to the stand at this time.

7    THE COURT:  All right Mr. Hanson, come forward to the

8  Courtroom Deputy to be sworn.

9       MIKE HANSON, DEBTOR'S WITNESS, SWORN

10    THE COURT:  All right, please speak up clearly, Mr.

11  Hanson, into the microphone.

12    MR. HANSON:  Yes, Your Honor.

13                   DIRECT EXAMINATION

14  BY MS. DENNISTON:

15  Q.  Mr. Hanson, can you state your name for the record please?

16  A.  My name is Mike Hanson.  Last name is spelled H-A-N-S-O-N.

17  W.  And what is your position at Northwestern?

18  A.  I'm the Chief Operating Officer.

19  Q.  Can you give us a brief description of what your duties and

20  responsibilities are as the Chief Operating Officer?

21  A.  As Chief Operating Officer, I'm responsible for the day-to-

22  day operations of the utility business that includes

23  transmission operations, distribution operations, regulatory

24  affairs, government affairs, customer care, as we call it, or

25  customer service, information technology and various support

1   functions.

2   Q.  And how long have you been employed at Northwestern?

3   A.  A little over 6 years.  I joined the company June 1st in

4   1998.

5   Q.  And can you tell us what capacities that you've been

6   employed in at Northwestern?

7   A.  Since joining the company I was originally -- my title was

8   President and Chief Executive Officer of the energy division of

9   Northwestern Corporation.  And then last year, upon divestiture

10  of the non-utility and consolidation of the corporation to one

11  entity, the utility, I became Chief Operating Officer in

12  August.

13  Q.  August of 2004?

14  A.  2000 --

15  Q.  2003.

16  A.  2003, yes.

17  Q.  And have you served in that capacity throughout this

18  bankruptcy proceeding?

19  A.  Yes I have.

20  Q.  And do you expect to continue to serve in that capacity

21  upon the Debtor's exit?

22  A.  Yes I do.

23  Q.  Can you tell me a little bit about Northwestern's

24  management?  I want to talk about the senior management.  And

25  basically, can you tell me are you familiar with Northwestern's

1  senior management?

2  A.   Certainly.

3  Q.   And you are a part of that senior management team?

4  A.   Yes I am.

5  Q.   And do you expect the senior management team to continue to

6  manage Northwestern upon exit?

7  A.   Yes we do.

8  Q.   Can you give the Court a bit of background on each of the

9  individuals that constitute the senior management team?

10  A.   Our President and Chief Executive Officer, Gary Drook, has

11  been a Director of the company since 1998.  He came on as the

12  President and CEO of Northwestern Corporation January 6th of

13  2003.  Gary has over 26 years with regulated utility experience

14  in the telephone industry.  He spent a -- that part of his

15  career with the Bell system and eventually what was Ameritech.

16  He retired, I believe it was 1995, from Ameritech and took over

17  an in-bound telemarketing business called Aphena, at which time

18  then he joined the Board and, as I said, came on as President

19  and CEO.

20      I've been in the utility business for almost 24 years;

21  started in the business in the gas construction department of

22  Northern State's Power Company in LaCrosse, Wisconsin back in

23  1981.  Went from there to the office doing budgeting and

24  variance analysis while I was completing a degree at UW-

25  Lacrosse.  Upon getting my accounting degree from UW-Lacrosse,

1  I moved to Minneapolis and was in their accounting department

2  and then later became the internal auditor for about 5 years.

3  While I was an internal auditor, I went to law school at

4  William Mitchell College of Law, graduated in May of 1989 and

5  became a regulatory attorney for NSP.  Did that for about 5

6  years until January of '94 they appointed me to be the Chief

7  Executive of their South Dakota operations.  In 1997 their

8  North and South Dakota operations were combined under me.  And

9  then I was recruited by previous management of Northwestern to

10  come in as President and CEO of what was then called

11  Northwestern Public Service in January -- or June, excuse me,

12  of 1998.

13       Brian Byrd is our Chief Financial Officer.  He joined our

14  company in December of 2003.  He has 18 years of financial

15  management experience with a variety of different companies,

16  from airlines to the Minnesota Vikings, but 7 years of that is

17  in the energy business.  He was with NRG, a subsidiary of Excel

18  Energy, and most recently Insight Energy.  He joined the

19  company in December.

20       And Roger Schrum, who is our Vice President of Human

21  Resources and Communications has about 20 years of regulated

22  utility experience with Northwestern and Scana in South

23  Carolina.

24  Q.  And this would be Northwestern's proposed senior management

25  upon exit?

1  A.  That's correct.

2  Q.  And was this senior management team involved in the Chapter

3  11 bankruptcy proceeding?

4  A.  Yes.

5  Q.  With regard to the people that you supervise as the Chief

6  Operating Officer, can you give us a brief overview of your

7  direct reports?

8  A.  Yes.  Very briefly, starting in the lower left corner, Pat

9  Corcoran is the Vice President of Regulatory Affairs for our

10  entire enterprise, all three states.  He has 26 years, all of

11  it in the regulatory department in Montana.  Dave Gates is Vice

12  President of Transmission Operations.  He also has 26 years of

13  utility experience with Montana Power Company and ourselves.

14  Dave has managed energy supply distribution operations and now

15  transmission operations.  Dennis Lopatch, who's called Vice

16  President of Administration, is in charge of government

17  affairs, our lobbying effort, and legal responsibilities in

18  Montana.  He was once an attorney for the Montana Public

19  Service Commission and then went and spent the majority of his

20  career with Mountain Bell, later U.S. West, and joined us in

21  2001.  Kurt Pole is Vice President of Distribution Operations,

22  Again, for all three states.  He resides in Montana.  He has 18

23  years of experience, all of it with Northwestern.  Bobby

24  Shrapel is Vice President of Customer Care.  She has 11 years

25  of utility experience with Minkota Electric Co-Op in Minnesota

1    and now Northwestern.  Bart Thielbar, Vice President of

2    Information Technology has about 18 years of IT experience, 6

3    of that with Northwestern.  And Greg Trandon, who's Vice

4    President of Support Services, which is Fleet facilities,

5    supply chain, things of that nature, has 28 years of utility

6    experience with Excel Energy and Northwestern.

7    Q.  Okay if we look at this, what's been marked as Debtor's

8    Exhibit-128, can you tell us which individuals have been

9    directly involved in working with Northwestern throughout this

10   bankruptcy proceeding?  I think there's a few others.

11        (Debtor's Exhibit-128 previously marked for

12   identification)

13   A.  Okay, in terms of the senior management, Gary Drook has

14   been there throughout.  I mentioned Brian Byrd joining us in

15   December.  I've been there throughout the process, as has Roger

16   Schrum, Eric Jacobson, our general counsel.  And Bill Austin,

17   our Chief Restructuring Officer, joined us in April of that

18   year.  All of these people have been in their current

19   capacities since before the bankruptcy proceeding began.

20   Q.  Okay, and just to sum up with regard to your role as to any

21   of the other senior management, who is the person that's

22   primarily responsible for the -- maintaining the relationship

23   with the regulatory entity?

24   A.  That would be myself and Pat Corcoran.

25   Q.  Let's talk a little bit about Northwestern's operations.

1  Can you give us a quick summary of the -- Northwestern Energy's

2  operations?

3  A.   We deliver energy, gas and electric energy, to about

4  608,000 customers in three states:   Montana, South Dakota and

5  Nebraska.   I have the customers broken down in the slide, but

6  we have about 305,000 electric customers in Montana.   We have

7  about 7,000 miles of transmission lines in that state.   We have

8  58,000 electric customers in South Dakota, and over 3,100 miles

9  of electric transmission lines in that state.   Natural gas, we

10  deliver to 163,000 customers in Montana, with 3,500 miles of

11  distribution lines, 2,000 miles of transmission pipeline, and

12  82,000 customers in South Dakota and Nebraska, split roughly

13  equally; there's about 41,000 in each state, 2,100 miles.   In

14  each of those we are the transmission and distribution

15  provider.   We do not own any production in Montana.   We have a

16  small amount of electric production in South Dakota.

17  Q.   And how would you characterize Northwestern's business?

18  A.   We are a transmission and distribution utility.

19  Q.   And what percentage of Northwestern's business is

20  regulated?

21  A.   We get over 90% -- I believe it's about 95% of our gross

22  margin comes from the regulated operations.

23  Q.   Let's talk just a bit about the energy supply structure.

24  What can you tell us about Northwestern's energy supply

25  structure?

1   A.   Well, I'll start first with electric supply because it's a

2   little different in South Dakota than Montana, the two states

3   we have electricity.   In South Dakota we do only electric

4   generators, and so we'll describe ourselves as being vertically

5   integrated for electric supply.   We don't own fuel sources,

6   coal mines or gas wells, like some utilities.   But we own some

7   shares of base load plants of other PE plants, the transmission

8   and distribution lines, and we supply through what are called

9   bundle rates; it's a combined rate for generation and the

10  delivery transmission distribution.

11       In Montana, we are the electric default supplier, as it's

12  called, which means that we procure electricity and deliver it

13  to customers that have not chosen to procure electricity from

14  another source.   They may choose to do that, they don't have

15  to.   Some states call that the provider of last resort, but we

16  don't own any electric production and we make no margin on that

17  service.   We sell the electricity exactly at cost.   We do own

18  the transmission and distribution lines and make our margins on

19  the delivery.

20       In natural gas we are the local distribution company in

21  all three states.   In Montana, we also serve the role of

22  default supplier, again, for people who have not chosen to buy

23  the commodity from someone else.   And in South Dakota/Nebraska,

24  we procure commodity on behalf of customers, deliver it through

25  our pipes to their homes and businesses, and we do earn a small

Hanson - Direct                                136

1    margin on that in those two states.

2    Q.  And how does being a default supply impact Northwestern's

3    business plan?

4    A.  Well, it impacts it because we procure -- depending on what

5    commodity prices do over the year, if it's something north of

6    $400 million a year of natural gas and electricity that we make

7    no margin and it puts risk on us over whether we're going to

8    recover those costs or not.

9    Q.  Okay, and what portion of those costs is not recovered?

10   A.  We've -- what portion is not recovered?  The on the

11   electric side we have not had any disallowances of costs.  We

12   do not recover all of our administrative expenses at this time.

13   The cost, for example, of the people doing the procurement

14   activity are not included in the commodity charge; it's a

15   glitch we hope to fix in future rates.  In natural gas we have

16   had a recent disallowance of about $6 million a year for a 2

17   year period, or 12 million, on natural gas.  So it's not been

18   large but still $12 million is a significant amount to us.

19   Q.  And how did that become disallowed?  Can you give us just a

20   bit of background there?

21   A.  Certainly.  The Commission, in reviewing our annual gas

22   cost (indiscern.), looked at the way we procured natural gas,

23   determined that we had not replaced what was a fixed price

24   contract with another fixed price contract.  That fixed price

25   contract that expired was a buy-back agreement when Montana

1   Power sold the gas production.  And we couldn't replace it in

2   the market anyway, but they determined us to be imprudent in

3   failing to replace that at a fixed price and then imputed a

4   price against us and disallowed the difference.

5   Q.  And what has been Northwestern's response, if any?

6   A.  Well, our response was to ask for reconsideration, which

7   failed.  And we have now appealed that decision to the District

8   Court in the state of Montana.

9   Q.  Would it be fair to characterize that as an ongoing

10  dispute?

11  A.  It is still continuing, yes.

12  Q.  Let's talk briefly about Northwestern's service profile.

13  What can you tell us -- and let's start with Montana -- what

14  can you tell us about Northwestern's service profile in

15  Montana?

16  A.  Well, this map depicts the service area we have in Montana;

17  it's about 107,000 square miles.  It's the western ⅔ of the

18  state.  The population in that area as of the 2000 census was

19  about 786,000 people, (indiscern.) 305,000 electric customers

20  and 160,000 gas customers.

21          THE COURT:  Can we -- excuse me.  Can we just take a

22  very short break here?  I have another matter I have to take up

23  that'll be very short, I'm so informed.

24          MS. DENNISTON:  Thank you, Your Honor.

25          THE COURT:  Sorry.  Don't leave, Mr. Hanson.

1         MR. HANSON:   Yes Sir.

2      (Recess)

3         THE COURT:   Okay, Ms. Denniston.

4         MS. DENNISTON:   Thank you, Your Honor.

5   BY MS. DENNISTON:

6   Q.   With regard to Montana, can you just -- just to back up and

7   be sure that we're clear.   The total population in Montana

8   was what?

9   A.   The total population of Montana as of the 2000 census was

10  about 902,000.   The areas that we serve at a population of

11  about 786,000.   And if you think back to the many miles of line

12  that I talked about, we have a widely dispersed area, a very

13  low customer and low density in Montana.   Similarly in eastern

14  South Dakota, we serve roughly the eastern third.   The

15  population of the state of South Dakota was 754,000.   We serve

16  an area that covers less than 100,000 people; it's about

17  97½ thousand as of the 2000 census.   It's a little hard to see

18  on this map, but it'll appear.   The reason is we do not serve

19  Sioux Falls, which is right here, the largest city in the

20  state, or the second largest city, Rapid City, out here.   But

21  again, many miles of line, low customer density, both states,

22  both gas and electricity in those two areas.   And then we serve

23  four communities in central Nebraska:   Grand Island, Kearney,

24  North Platt and Aldo, with a combined population of less than

25  100,000, it's about 75,000 people.   Just natural gas

1  distribution in Nebraska.

2  Q.  Turning to specifics of electric transmission.  What can

3  you tell us about the service territory and electric

4  transmission for Northwestern?

5  A.  Well, as this slide points out, 125,000 square miles

6  service area is very large.  The two pieces of Montana and

7  South Dakota are in two different reliability counsels.  A

8  liability counsel -- Western Electricity Coordinating Counsel

9  in Mid-Common Area Power Pool are power pools where the

10  generation and transmission is all interconnected to maintain

11  stability and reliability of the system.  And so they are

12  coordinating operations between all utilities in that region.

13  The two happen to fall into two different reliability counsels.

14  Despite that fact, our System Operation and Control Center in

15  Butte is -- does the system operation and dispatch for our gas

16  and electric operations in all three states.  I mentioned

17  earlier that we are not vertically integrated in Montana.  We

18  do not have any generation in Montana, we just have

19  transmission and distribution.  We do have a small amount of

20  generation in South Dakota.  Our System Control Center in

21  Montana also functions as what's called a control area

22  operator.  And what a control area operator does is the one who

23  actually dispatches the power plants to match the generation to

24  the load at every moment of every day.  So notwithstanding that

25  we don't own it, we are directing the owners of the plant of

1  what load to carry and what power plants to run.  We have

2  almost 7,000 circuit miles in Montana and 1,300 in South

3  Dakota.

4  Q.  Let's talk just a bit about the gas transmission and

5  storage.  What can you tell us about Northwestern's gas

6  transmission and storage?

7  A.  Well, we have a very extensive transmission -- gas

8  transmission system in Montana, with about 2,000 miles of gas

9  transmission pipe.  There are six interconnections, four of

10  them that are significant:  TransCanada Pipeline coming out of

11  Alberta to the north, Colorado Interstate Gas coming up from

12  Wyoming to the south, the Williston Base and Interstate

13  Pipeline --  well, pick up the pace, I take it.

14      (Laughter)

15  Q.  Sorry about that, Mike.

16          THE COURT:  Ah, technology.

17          MS. DENNISTON:  I hear Mr. Austin sitting over there

18  thinking, "I told you so."

19      (Court and counsel confer)

20          MS. DENNISTON:  There you go, Mike.

21  A.  I was describing the significant pipeline interconnections.

22  Williston Basin Pipeline to the northeast, and Cana Gathering

23  System also in Canada.  Energy West and Haver Pipeline are

24  small interconnections within the state of Montana.  We also

25  happen to have about 17 BCF of storage.  To put that into

Hanson - Direct                                        141

1  perspective, the annual gas load for our customers in Montana

2  is about 22 BCF.  So you can store not quite a year's worth of

3  gas.  What this allows us to do is deliver from the Rockies

4  Production Zone or the Canadian Production Zone into the state.

5  In just rough terms to put it into perspective, the gas

6  transmission and distribution constitutes about 25% of our

7  gross margin.  Electric distribution and transmission is about

8  75%.

9  Q.  Let's talk a bit about the South Dakota generation.  You

10  mentioned briefly that there was some generation in South

11  Dakota.  What can you tell us about that?

12  A.  We own -- we are a minority interest holder of three base

13  load coal generating units:  One of them Cayota Station up in

14  North Dakota, the Big Stone Plant in eastern South Dakota, and

15  a portion of Neo Unit in Iowa.  Cayota and Big Stone are

16  operated by Outerdale Power Company, the Neo Unit by Mid-

17  American.  So we're a non-operating minority holder.  We don't

18  operate the plants.  In total, 208 megawatts of base load

19  generation.  We also have about 119 megawatts of small gas and

20  oil fired peaking units that are throughout our territory, so

21  we own a total of, you know, just under 327 megawatts, but

22  we're not an operator of power plants, per se.  The electric

23  generation that we own constitutes less than 5% of our revenue

24  and margin on the company as a whole.

25  Q.  And do you have an understanding of how this ownership

1  impacts Northwestern's valuation?

2  A.   I'm not an expert on valuation, but since it's such a small

3  part, less than 5%, I wouldn't think it'd have any material

4  effect on the valuation.

5          MS. DENNISTON:  And for the record, Your Honor, we're

6  skipping slide #40 as we've already covered the electric system

7  and distribution system, just so that the record's clear.

8  BY MS. DENNISTON:

9  Q.   Mr. Hanson, are you familiar with the other utility

10  companies in the industry that have both gas and electric

11  distribution?

12  A.   Most of them.

13  Q.   And do you have an understanding as to whether or not they

14  have a similar ratio of -- if I were to ask you, similar ratio

15  of gas to electric?

16  A.   For many of them --

17  Q.   For example --

18  A.   -- some do, some don't.

19  Q.   -- Vectron.

20  A.   Yes.

21  Q.   How is Vectron compared to Northwestern?

22  A.   Vectron is almost the opposite.  They're in Indiana and

23  Ohio and they get about 70% of their revenue from gas and 30%

24  from electric.  We're almost the inverse.  We get about 75 from

25  electric and 25 from gas.

Hanson - Direct                                    143

1   Q.   Okay.  And I believe you testified earlier that

2   Northwestern was how much -- what percentage regulated?

3   A.   It's about 95%.

4   Q.   And do you haven an understanding as to the other -- some

5   of the other utility companies in the industry as to their

6   percentage of regulation versus non-regulated activity?

7   A.   I have reviewed many of them and I do, yes.

8   Q.   And what do you -- if I were to ask you what would be the

9   difference on Allegheny Energy?

10  A.   Well, Allegheny as an example, in 2003 got about 40% of

11  it's revenues from non-regulated operations.

12  Q.   And how about Synergy Corporation?

13  A.   Synergy about -- not quite 40, 37% I believe.

14  Q.   And how about PNM Resources?

15  A.   PNM also had about 37% from non-regulated activities.

16  Q.   And in your roll as the Chief Operating Officer, do you

17  keep up to date with the various industry periodicals and trade

18  magazines?

19  A.   Certainly.

20  Q.   And do you review those on a regular basis?

21  A.   Yes I do.

22  Q.   With regard to -- I want to switch now -- switch gears and

23  talk a little bit more about the specifics of the regulation

24  that Northwestern has to contend with.  What can you tell us

25  about the Federal Energy Regulatory Commission?

1  A.  Well, the Federal Energy Regulatory Commission regulates

2  energy transactions in interstate commerce basically.  And so

3  if sales of electricity -- what we would call wholesale sales

4  or sales to other utilities are deemed to be an interstate

5  commerce and regulated by the FERC, as is transmission --

6  electric transmission or gas transmission sales to other

7  utilities.

8  Q.  And who at Northwestern is the primary person that

9  interacts with FERC?

10  A.  Pat Corcoran.

11  Q.  And are you -- do you supervise Mr. Corcoran?

12  A.  I do, yes.

13  Q.  So would you consider yourself to be up to date on

14  activities as between Northwestern and FERC?

15  A.  Yes.

16  Q.  And can you tell us how you would characterize the

17  relationship Northwestern has with FERC?

18  A.  The relationship and regulatory environment with FERC is

19  stable.  We don't have any major issues or controversies

20  recently or pending with FERC.

21  Q.  Northwestern is also subject to another layer of

22  regulation, is it not?

23  A.  Yes, state regulation.

24  Q.  What can you tell us about the state regulation?

25  A.  Well, each of the state public service or public utility

1  commissions regulate the rates and terms and conditions of

2  service within their state.  They have varying jurisdiction on

3  other matters.  For example, Montana has jurisdiction to

4  oversee financing and the capital structure of the company

5  whereas the others do not.  But they all regulate the rates

6  that we charge to retail customers and the terms, the tariff

7  conditions, for those services.

8  Q.  Okay, and with regard to Montana Public Service Commission,

9  who is the primary person at Northwestern responsible for that

10 relationship?

11 A.  That is Pat Corcoran and myself.

12 Q.  Okay, and would you say -- are you up to date on the status

13 of the relationship as between Northwestern and the Commission?

14 A.  Yes.

15 Q.  And how would you describe the relationship Northwestern

16 has with the Commission?

17 A.  The environment in Montana has been very challenging I

18 would say.  We've had a large number of issues, matters before

19 the Commission.  The Commission has had a long history before

20 Northwestern acquired Montana Power of a -- what I would say

21 more consumer-oriented results, meaning less favorable to the

22 company.  I might contrast that with South Dakota in

23 particular.  We've had a long environment in South Dakota with

24 very little issues and controversy.  The Nebraska Public

25 Service Commission is fairly new.  It's been around just less

1  than 2 years, but we've established a pretty good rapport with

2  that Commission and, again, have no major issues or

3  controversies pending in Nebraska.

4  Q.  And are you familiar with the stipulation and settlement

5  that the Debtor has entered into as between the Debtor, the

6  Public Service Commission from Montana and the Consumer's

7  Counsel?

8  A.  Yes I am.

9  Q.  Were you involved in the negotiations leading up to that

10  stipulation?

11  A.  Yes I was.

12  Q.  What can you tell us about how that stipulation has

13  impacted the relationship between Northwestern and the Montana

14  Public Service Commission?

15  A.  Well, the stipulation certainly resolves a number of issues

16  that were raised by the Commission and the Montana Consumer

17  Counsel in this bankruptcy proceeding.  It does not resolve all

18  of the issues and controversies that we have pending before

19  that Commission.

20  Q.  And what did the Debtor accomplish by entering into that

21  stipulation?

22  A.  Well, the main accomplishment in resolving these issues was

23  to get the Commission and Consumer Counsel support, or at least

24  they're no longer objecting to our Plan of Reorganization, and

25  they are and have authorized the financing activities necessary

Hanson - Direct                              147

1  to effectuate that Plan.

2  Q.  And do you know if the Public Service Commission has

3  entered a order approving stipulation?

4  A.  Yes, they just recently did that.

5  Q.  Let's talk about some of the issues or some of the points

6  under the stipulation.  What is the impact of the ring fencing

7  component?

8  A.  Well, let me first describe what's meant by the term.  Ring

9  fencing is structurally separating ownership of utility assets

10  from non-utility assets.  So under this stipulation, the parent

11  company of Northwestern will own only regulated utility assets.

12  Any non-utility or non-regulated assets we may own will be

13  relatively minor, but they will be held in subsidiary

14  companies.  Any debt that we take on at the parent company to

15  finance the activities of the utility cannot be used to fund

16  non-utility activities except for a limited investment basket,

17  which I'll describe in just a second.  Any debt associated with

18  the non-utility subsidiaries must be non-recourse to the parent

19  and you can't have cross default provisions, things of that

20  nature.  This limited investment basket is -- starts out at $60

21  million, and that was created in order to allow the company to

22  provide basically working capital support for the small non-

23  utility subs that it does have.  If any assets are divested,

24  whether they be utility assets of the parent or non-utility at

25  one of the subs, debt attached to that or associated with --

1  must follow the asset.  Another pretty significant provision, I

2  think, is that the Commission will not institute a rate review

3  any sooner than the fall of 2006.  We are required by September

4  of that year to file rate information based on a 2005

5  (inaudible) as it's called with the Commission and the Consumer

6  Counsel.  It is not clear whether there will be any party

7  seeking a change in rates.  If there is a party, ourselves or

8  the Consumer Counsel for example, that party bears the burden

9  of proof.  But with that, we know that rates will not be

10 changed any sooner than 2007, following the review period from

11 this filing.

12 Q.  So in connection with the time period between now and that

13 filing the rates won't go up or down?

14 A.  Our T&D rates will not go up or down.  The commodity costs

15 are collected through a past supervision not covered by this

16 (inaudible).  T&D rates we earn our margin or profit on will

17 not go up or down in that period.

18 Q.  In connection with the stipulation, how would you

19 characterize whether Northwestern's receiving a greater or

20 lesser degree of regulation?

21 A.  Well, I think in many respects a greater degree because

22 with this stipulation we have various filing requirements,

23 information; we've got to keep them informed.  The Commission

24 apparently takes a view that gives them an active role in

25 anything from management of the company to ownership.  There

1    was a recent public statement covered in the press in Montana

2    that the Commission believes that if the company were to be

3    sold that it has the right to approve the sale and is proposing

4    that it create criteria by which it will judge the fitness of

5    any prospective buyer.  Another issue not on the slide, but we

6    were asked in conjunction with the stipulation to do a -- to

7    hire a third party to assess the condition of our plant, our

8    physical plant, the transmission and distribution systems, gas

9    and electric.  We retained a firm by the name of Liberty

10   Consulting to do that.  And now we need to file a follow-up

11   report with the Commission, and they're going to monitor our

12   progress in implementing any changes to our maintenance or

13   construction activities.

14   Q.   Have you had a chance to review the Liberty Consulting

15   Group's report?

16   A.   Yes, certainly.  In great detail.

17   Q.   And have you made a determination as to what the impact is

18   going to be on Northwestern from a cash flow perspective?

19   A.   We haven't come up with a final figure.  Some of the

20   activities that are recommended are covered within our current

21   budget, they're just a change in approach.  Others are going to

22   require additional resources.  But I would say that without

23   question it's going to put some upward pressure on our costs,

24   both from an operating expense standpoint and in capital

25   expenditure standpoint.  Some of those we may be able to offset

1   with other (inaudible).  As of right now, we do not have an

2   assessment of the total impact.

3           THE COURT:  Excuse me for just a moment.  We are

4   getting a good deal of interference on the telephone lines, so

5   it sounds as if there's either a bad connection or maybe

6   somebody is shuffling something.  I must advise you that if

7   this continues, I'm going to require that the telephone

8   connection be terminated and re-established.  We're hearing it

9   right now.  So the next time that happens, we're going to

10  terminate the telephone line --

11          (Telephone interference continues)

12          THE COURT:  Let's do it.  Let's terminate the

13  telephone connection and set it up again.  Everybody on the

14  telephone, you are being terminated at this moment.

15          (Telephone connections terminated)

16          THE COURT:  All right, I think we can go ahead and

17  proceed.  My view of the world is that anybody who is on the

18  telephone takes the risk of technology, and so let's not waste

19  everybody else's time here.  We'll try to get that hooked up

20  again.  How as -- who was in charge of doing that, somebody at

21  the Debtors -- who hooked up this?

22          MS. DENNISTON:  I think -- Mr. Chipman, do you know

23  anything about this?

24          (Laughter)

25          (Counsel confer)