1    THE COURT:  All right, let's proceed.

2    MS. DENNISTON:  Thank you, Your Honor.

3  BY MS. DENNISTON:

4  Q.  With regard to the Liberty report, is Northwestern under an

5  obligation to accept all recommendations made by Liberty under

6  the stipulation (indiscern.)?

7  A.  The stipulation does not require us to accept and implement

8  all the recommendations.  It requires that we file a report

9  with the Commission as to our view or response to those, and

10  those steps or actions that are agreed between ourselves and

11  the Commission are to be implemented.

12  Q.  And do you anticipate any discussion with the Commission as

13  to the scope of what steps will need to be --

14  A.  I would expect yes, they're going to want us to explain for

15  each of the 21 recommendations if we're not adopting it as

16  proposed why not and what we do plan to do to address the issue

17  that was raised.

18  Q.  And would it be fair to characterize that as an ongoing

19  discussion?

20  A.  Yes, absolutely.

21  Q.  Let's turn to the Montana Consumer Counsel.  Are you

22  familiar with the Montana Consumer Counsel?

23  A.  Yes.

24  Q.  And can you tell the Court what the Montana Consumer

25  Counsel is?

1  A.   It's an office created by the Montana Constitution to

2  represent consumer interests in matters pending before the

3  Public Service Commission, so they are a automatic intervener

4  into all rate cases and any other costs or other proceedings

5  that go before that Commission.

6  Q.   And how does the -- and what kind of relationship does

7  Northwestern have with the Montana Consumer Counsel?

8  A.   Well, the relationship is, you know, by definition an

9  adversary in the sense that they come in, and like an advocate

10  for any party, they're going to recommend the position in the

11  interest of their client in the most extreme and opposite of

12  that of the company.

13  Q.   And has the Montana Consumer Counsel raised any issues with

14  Northwestern regarding over-earning (indiscern.)?

15  A.   Yes, the Consumer Counsel, while this case had been pending

16  and preceding the stipulation, has made a number of public

17  statements where they believe the company may be over-earning.

18  Q.   And what is over-earning?

19  A.   Over-earning simply means that the rate of return being

20  received exceeds what has been authorized by the Commission.

21  Q.   And what happens if there is, in fact, over-earning?

22  A.   If the Commission were to find over-earning in a rate

23  proceeding, it would reduce our rates.

24  Q.   And in connection with the rate review provided for under

25  the stipulation, would the Consumer Counsel have an opportunity

1  to review that case?

2  A.   Yes they will.

3  Q.   And what will be the risk to Northwestern if they did?

4  A.   The risk to us if they were successful in establishing

5  over-earning is that our rates beginning in 2007 would be

6  reduced.

7  Q.   Okay, so is it accurate to say that while there's no change

8  in the rates until 2007, there's a risk that the rates could go

9  down?

10 A.   Yes.

11 Q.   What can you tell us about the various trackers that

12 Northwestern has in place?

13 A.   Well, the tracker accounts are set up to recoup costs that

14 are largely outside of the control of the company.  The biggest

15 example is the gas and electric commodity costs.  As I said, we

16 procure that on behalf of customers who have not chosen to buy

17 from someone else.  We make no margin or profit whatsoever on

18 that, but we try to recover our costs.  These tracking

19 mechanisms are designed to make sure that we recover our costs

20 without -- not more and not less.  The other example provided

21 for in state law that we do not have in place is a property tax

22 tracker.  Property taxes are, other than energy, probably our

23 next to the largest operating costs.  In fact they -- in

24 Montana, our property tax exceeds our labor expenses out there.

25 And so the legislature authorized the Commission to establish

1  tracking accounts for property taxes, but we have not yet put
2  that in place in Montana.
3  Q.  Well, as to Montana, who or what makes the determination as
4  to whether a tracker can be put in place?
5  A.  The Commission will make that determination.  We will
6  petition the Commission requesting a property tax tracker, and
7  they will determine whether or not they will authorize it.
8  Q.  And that again, is that an ongoing discussion between
9  Northwestern and the Commission?
10  A.  It will be.  We have not yet filed our petition for it.  We
11  plan to do that this fall.
12  Q.  Let's turn now to another topic, the qualified facilities.
13  Are you familiar with the qualified facilities?
14  A.  Yes.
15  Q.  Can you tell the Court what a qualified facility is?
16  A.  It's a creation of -- under the Public Utility Regulatory
17  Policies Act of 1978 where if generators met certain criteria
18  as to the type of fuel or type of generator and ownership
19  criteria, they were exempt from cost of service regulation by
20  the Federal Energy Regulatory Commission.  And instead of
21  selling at rate regulated prices, there's mandatory purchase
22  obligation of the resident utility to buy the power from them
23  at what's called avoided cost rates.  The Federal statute sets
24  up the obligation to purchase.  The avoided costs were left for
25  the state commissions to determine what that is.  And simply

1  stated, it's whatever that utility's alternatives would be;

2  either to build or buy from somebody else at the time.  Most of

3  these QF's were created following 1978 and the early to mid-

4  80s, signed up for very long-term contracts.  The longest run

5  to the year 2028.  Montana Power had, at the time we acquired

6  them, about 15 of those contracts.  There's 13 of them

7  remaining.

8  Q.   Presently?

9  A.   That's correct.

10  Q.   And what is the impact of the QF contracts on

11  Northwestern's operation?

12  A.   Well, the impact is over that long period of time we're

13  going to have a negative cash flow impact or cash flow deficit

14  because when we bought Montana Power, then pending before the

15  Commission was a proceeding to determine which costs associated

16  with those would be allowed to be recovered in rates.  And the

17  so-called in-market portion, that is the portion that is equal

18  to the existing market, is recovered in our base default supply

19  costs.  And then the Commission authorized what was called a

20  competitive transition charge, or CTC.  It's a fixed per-unit

21  charge that goes out through 2028.  And then any costs above

22  that are not recovered in rates.

23  Q.   So is that a negative -- so to sum up --

24  A.   Yes.

25  Q.   -- it would be a negative to the operation?

1  A.   It is a negative to operations that increases over time.

2  Q.   And has Northwestern made any adjustments on its books to

3  address this liability?

4  A.   Yes.   When we acquired the Montana Power Company, we did a

5  forecast or assessment of what the contract costs would be over

6  the remaining life of those contracts, as well as the cost

7  recovery.   We took the difference between the two and

8  calculated a net present value number and booked that as a

9  liability on our books that is about $140 million.

10 Q.   Does Northwestern have any opportunity not to continue to

11 operate under these contracts?

12 A.   No, we cannot avoid these contracts.   We could and we hope

13 to try to re-negotiate some terms, but we cannot avoid the

14 contract.

15 Q.   And were you involved in any analysis as to whether the QF

16 contracts should be rejected under the Bankruptcy Code?

17 A.   Yes, I was.

18 Q.   And what was the reason that the contracts were not

19 rejected?

20 A.   We did an assessment of what the claim might be, the

21 contract rejection claim.   And I don't recall what the gross

22 number was, but on the net present value basis the claim was

23 going to be in excess of $400 million; if I recall correctly,

24 450 to $460 million that they would be entitled to claim for

25 the loss of the value of their contract.   We looked then at the

1  savings that might be enjoyed by the company for no longer

2  having the burden of paying these contracts.  And the

3  difficulty we ran into was that because we have the CTC QF, as

4  it's called, it's likely that a large portion of those savings

5  would be returned to consumers through some kind of a rebate.

6  And so the net of the two was that the savings that we felt

7  were present did not exceed the claim that these people would

8  make, and so that Northwestern was not better off rejecting

9  those contracts.  In fact, we felt that the estate was better

10 off assuming them and have filed a Notice of Intent to assume

11 those contracts.

12 Q.  Thank you.  Let's turn now to the collective bargaining

13 agreements.  If you'll recall in the May time period when we

14 filed the initial disclosure there was a contract that was up

15 for renewal.  Can you tell us what has happened with the IBEW

16 44 Collective Bargaining Agreement?

17 A.  Yes.  We've reached an agreement with the union leadership

18 for IBEW Local 44.  They are the electrical workers in Montana,

19 the linemen and other electrical workers.  It's the largest

20 union that we have.  We've reached a 4-year agreement with them

21 that has been ratified by the membership.  In fact, went into

22 effect retroactive to May 1st.  It is currently awaiting

23 approval by the national office of IBEW, which we've not

24 received, but we have put that agreement into effect.

25 Q.  And what is the financial impact, if any, on the company

1  under the new agreement?

2  A.   Well, let me talk about wages, they're really the economic

3  factors.   There were no wage increases during 2004.   There will

4  be a 2% retroactive lump sum payment in January of '05 and then

5  intermittent wage increases over the balance of the term.   The

6  aggregate total of the wage increases are 13% over the 4-year

7  term, and then there were also some other work rule changes and

8  improvements that were made in that contract.

9  Q.   With regard to the financial changes, the increase in

10  wages, have those numbers been included in the Debtor's

11  projections?

12  A.   Yes they have.

13  Q.   Let's turn now to the Debtor's 5-year business plan.   Were

14  you -- Mr. Hanson, can you tell us what is the 5-year business

15  plan?

16  A.   The 5-year plan is actually a tool that the company's had

17  in place for some time for longer-term strategic planning, if

18  you will.   And what we do is we put together a financial model

19  for the current and 5-year's forecast, 5-years pending.

20  Q.   And did you update that model in connection with this

21  bankruptcy proceeding?

22  A.   Yes, we did.

23  Q.   And were you involved in that process?

24  A.   Yes, I was.

25  Q.   What was your involvement in the development or the

1   revisions or the refinement of the 5-year business plan?

2   A.   My involvement was to take all of the underlying

3   assumptions from revenue, margin, volume growth, operating

4   expenses, administrative expenses that come from the operations

5   side and cash flows related to the utility operations, review

6   those, confer with my direct reports and other people in

7   operations to make sure that we felt those assumptions were

8   reasonable and achievable.  As the Chief Operating Officer, I'm

9   very interested in making sure we have a realistic plan that we

10  can achieve.

11  Q.   And with regard to that, your obligations under that --

12  development of that plan, did you also communicate with anyone

13  else on the senior management team?

14  A.   Well, certainly.  We had a series of meetings, you know,

15  Bill Austin joined the company in April, and in the fall,

16  somewhere around, you know, following filing in September

17  through the November timeframe we had weekly cash meetings, we

18  had weekly management meetings of Gary Drook, Bill and I, the

19  other senior leadership, sometimes special meetings to talk

20  about just the subject of the 5-year plan and that -- what we

21  had referred to as the "top-down" view of that plan.  But at

22  the same time, I was working with people in my own organization

23  that do load forecasting or, you know, customer care, or the

24  operations folks to see if the budget assumptions were

25  accurate, the load and volume forecasts were accurate, and so

1  on.  And so that was what we referred to as a "bottoms-up."  So

2  we were simultaneously doing a top-down and bottoms-up review

3  over that September to November time period.

4  Q.  Okay, what can you tell us about the 5-year business plan?

5  A.  Well, the significant changes in the plan, starting with

6  the balance sheet, of course, it is our plan to retire 1.3

7  billion of unsecured debt with the issuance of new equity that

8  we've valued at 710 million.  We also believe we'll have enough

9  cash to pay down a portion of our existing secured debt and

10 have approximately 800 million of secured debt coming out of

11 bankruptcy or shortly thereafter, after we complete that.  And

12 then we're planning to refinance a portion of the secured debt

13 to move out and smooth out the maturity dates.

14 Q.  And with regard to the exit financing and the things that

15 you've just described, who at the company was responsible for

16 taking the lead on that?

17 A.  On the exit financing, that would be Brian Byrd in the

18 treasury department.

19 Q.  Let's look at the operational side of the business plan.

20 What can you tell us about the Debtor's assumptions on volume

21 and revenue growth?

22 A.  We -- when we began looking at this particular assumption,

23 it was a bit higher at the time.  We started tearing apart the

24 underlying data.  We've got a group in the regulatory

25 department that does load forecasting and they were working

1   together with financial planning and analysis and taking a look

2   at customer growth information, load growth information,

3   revenue and margin.  And as we analyzed that, we quickly

4   realized that revenue growth is a misleading factor in our

5   business because such a large part of it, the commodity prices

6   fluctuate over time, up or down and -- but, we make no margin

7   on it.  So what we really need to do is focus on what the sales

8   volumes are going to be.  Because we have unit rates, it is the

9   sales volumes that will drive what our margin growth will be

10  and so we did some historic and projected analysis of that and

11  determined that, on an average, we think we'll grow at 1.2% a

12  year.

13  Q.  And who supervised the determination of the 1.2 average

14  annual growth rate?

15  A.  There are many people involved in the discussion but I

16  suppose I supervised it.

17  Q.  And as you sit here today, do you still believe that to be

18  a reasonable and accurate figure?

19  A.  Yes, I do.

20  Q.  Let's talk a bit about the overall expense increase.  What

21  can you tell us about the Debtor's projections in that regard?

22  A.  We are projecting that our operating and maintenance

23  expenses are going to increase an average of just under 1% per

24  year.  That includes the wage increases that are going to be,

25  you know, 3% a year offset, partly, by productivity

1  enhancements.  On the overhead burden or G&A side of the

2  business, we're going to look to reduce those over time by an

3  average of 3.3% a year.  And that's what's built into the 5-

4  year plan.  It does not factor in any incremental costs that

5  may be associated with this Liberty consulting report that I

6  mentioned as we don't know exactly what those costs are going

7  to be yet or what rate treatment we might get.  This plan

8  assumes that there is no rate change over that 5-year horizon.

9  Q.  Other key assumptions.  What other things did the Debtor

10  consider?

11  A.  Significant ones were an increase in the funding

12  requirement for a pension fund in Montana.  Ourselves, like

13  many companies, as the market had turned down the last couple

14  of years, we determined that we were underfunded.  The future

15  earnings projections that our actuaries do were coming down,

16  were underfunded by more than 100 million.  So we contributed

17  $10 million in cash in 2004 and we're projecting that we will

18  contribute another, little over 19 million for the 2005 to 2008

19  time period.  And based on discussions with our actuaries, we

20  think this is the funding level required to get fully funded

21  over that time period.  We also assumed that there would be no

22  change to the QF contracts.  They would continue as is.  With

23  respect to Colstrip, we have two issues here.  One is the sale

24  that's -- to PPL that's in dispute for the transmission related

25  to units 1, 2 and 3.  We assume for purposes of this plan that

1  we were not able to complete that sale, that we would keep

2  those assets and continue to operate them.  We also assumed

3  that there'd be no changes in our leasehold interests for

4  Colstrip unit 4.  We believe we're going to see an improvement

5  in working capital.  In fact, we have seen that improvement.

6  As we exit, we think we're going to need 35 million in cash in

7  the bank, cash working capital, which will allow us to,

8  hopefully, normalize trade terms with our energy suppliers.

9  Q.  Why does the Debtor need 35 million in working capital?

10 A.  When -- on our energy supply contracts, if we are

11 investment grade, they can, but don't have to, traditionally

12 they would extend to us normal credit terms allowing us to pay

13 some time following receipt of the energy.  If we are not

14 investment grade, they have a right to demand cash deposits,

15 pre-payments or other collateral against -- to secure those

16 agreements.  We've been able, notwithstanding that we're not

17 investment grade, to work on more reasonable credit terms

18 provided that we have enough cash in the bank.  So they look at

19 cash in the revolver of liquidity, but there's still an element

20 of cash required to satisfy the suppliers that we can pay our

21 obligations when they come due.  And so from my perspective as

22 Chief Operating Officer and responsible for energy procurement,

23 I don't believe we can live with anything less than that

24 because that's what's it's going to take to get normal trade

25 terms with these energy suppliers.

1  Q.  So it's your business judgment that that's the appropriate

2  number?

3  A.  Yes.

4  Q.  Do any of the regulators -- have any of the regulators

5  weighed in on the Debtor's need for working capital?

6  A.  The Montana Commission and Consumer Council in the

7  discussions we had leading to the stipulation made it clear

8  that they wanted adequate liquidity.  There's a minimum showing

9  required under that stipulation; I think it's 100 million of

10 cash and available credit.  But they made it clear that they,

11 too, view a certain amount of cash in the bank is necessary and

12 helpful.

13 Q.  So it's the Debtor's position that any lower number would

14 not be sufficient?

15 A.  Yes.

16 Q.  A few more questions.  With regard to the sales of various

17 assets, let me ask you, has the Debtor received, as of today,

18 any payments or proceeds from Cornerstone?

19 A.  No.

20 Q.  Do you -- does the -- when does the Debtor expect to

21 receive anything from Cornerstone?

22 A.  I do not know the answer to that question.

23 Q.  But you have not received any proceeds to date?

24 A.  No.

25 Q.  What about the status of the sale of MFN?

1   A.   We continue to negotiate with interested parties but we

2   have not completed that sale and have not received any cash for

3   that either.

4   Q.   Okay.  I understand that there's -- the Debtor has

5   expectation of receiving some money from Expanet.  Has the

6   Debtor received any money from Expanets, which is now Netexit?

7   A.   We have not.

8   Q.   With regard to Blue Dot, the same question.

9   A.   We have not received any cash for that either.

10  Q.   So would it be fair to say the Debtor has no cash on hand

11  from recoveries from any of the foregoing?

12  A.   That's correct.

13  Q.   What are the risks of the Debtor's ability to implement the

14  5-year plan?

15  A.   Well, the major risks are going to be, again, whether we

16  can recover all of our energy supply costs because they are a

17  significant element to us, and we've had a regulatory history

18  disallowing a portion of those.  Since we have volumetric

19  rates, we are affected greatly by the weather.  So if there's

20  variations from normal weather, that will affect us.  Our plan

21  assumes that there'll be normal weather.  Inside the plan, I

22  mentioned, for example, on operating and maintenance expenses,

23  an average increase of less than 1% despite the fact that we're

24  having wage increases above that.  So there's execution risk of

25  whether or not we're going to be able to manage all of our cost

1  elements.  And lastly, the Liberty report and our response to

2  that.  Having not yet determined what the final impact will be,

3  we're going to have to figure out what activities could be

4  funded and how -- what rate treatment they might receive.

5  Q.  As the Chief Operating Officer, do you have an opinion as

6  to whether or not the Debtor can achieve the 5-year plan?

7  A.  I believe we can achieve the plan.  I'm simply pointing out

8  that there are management actions necessary to get there.  But

9  I do believe we can achieve this plan.

10  Q.  If this plan is confirmed, do you believe that the Debtor

11  can meet its debt obligations that will be incurred under the

12  plan?

13  A.  Yes.

14  Q.  Do you believe that management has included all the

15  material factors in the forecast?

16  A.  Yes, I do.

17  Q.  Did you, as the Chief Operating Officer, leave out any

18  factor that would implicate Northwestern's ability to perform

19  under the plan?

20  A.  No.

21  Q.  Did -- is -- can you tell us whether management proposed

22  this plan in good faith?

23  A.  Yes, we did.

24  Q.  Okay.  And do you believe that there is any distributable

25  value to the equity holders?

1   A.   Unfortunately, no, I do not.

2          MS. DENNISTON:  Your Honor, at this time, the Debtor

3   has no more questions for Mr. Hanson.

4          THE COURT:  Is there anybody who is a proponent of the

5   plan who wishes to ask Mr. Hanson any questions?  If not, are

6   there any objectors who wish to question Mr. Hanson?

7          MR. HOUSTON:  Yes, Your Honor.  Joseph Houston here.

8          THE COURT:  All right, Mr. Houston.  Let's -- you can

9   go next, but not --

10         MR. HOUSTON:  Thank you.

11         THE COURT:  -- not next, but after counsel for

12  Carpathia --

13         MR. MORRIS:  The equity holders.

14         THE COURT:  The equity holders.

15         MR. MORRIS:  John Morris again.

16         MR. HOUSTON:  Thank you, Your Honor.

17                        CROSS EXAMINATION

18  BY MR. MORRIS:

19  Q.   Good afternoon, Mr. Hanson.

20  A.   Good afternoon.

21  Q.   These are some of the assumptions that are contained in

22  your 5-year business plan, is that right?

23  A.   That's correct.

24  Q.   When you talk about the 5-year business plan, you're

25  talking about, in fact, the projections, is that right?

1    A.   That is correct, yes.

2    Q.   And one of the things that has been included in your

3    projections is a liability, if you will, associated with the

4    Montana pension funding.  Is that right?

5    A.   That's right.

6    Q.   And that -- those amounts that relate to the Montana

7    pension funding are the amounts that the company today believes

8    will be necessary to satisfy its obligations over time.  Is

9    that right?

10    A.   In conference with the actuarials that help us determine

11    funding requirements, that is correct.

12    Q.   And you've also assumed that the QFs remain unchanged.  Is

13    that right?

14    A.   Yes.

15    Q.   And when you say that the QFs remain unchanged for purposes

16    of your projections, what you're really saying is that you have

17    assumed both the revenues that will be derived from the QF

18    energy as well as the cost that would be incurred in connection

19    with the QF energy, is that correct?

20    A.   You can conclude that.  What I meant by that statement is

21    that the QF contracts remain unchanged and we do not negotiate

22    any modification to those contracts.

23    Q.   Okay.  But for purposes of the projections, all of the QF

24    liability is already built in there.  Is that correct?

25    A.   No.  No, no, no.  The QF liability -- we have booked $140

1   million liability on a net present value basis on our balance

2   sheet.

3   Q.  I'm not asking --

4   A.  And it kept --

5   Q.  -- you -- I'm sorry to interrupt, but I'm not asking you

6   about a balance sheet.  I'm asking you about your forecast.

7   Your forecast contained both projected revenue and projected

8   cost.  Is that right?

9   A.  For those 5 years, that is correct.

10  Q.  And that for those 5 years your projections take into

11  account the cost and the liability, if you will, associated

12  with the QF.  Is that right?

13  A.  The -- for that 5-year term, but these contracts run out as

14  far as 2028.

15  Q.  I'm just asking you about your projections, Sir.  Do your

16  projections take into account the QF liability?

17  A.  For the 5-year term of it, it does.

18  Q.  And you only have projections for 5 years, right?

19  A.  That's right.

20  Q.  Okay.  And -- I'm not terribly familiar with this, but is

21  YELP a QF?

22  A.  YELP is Yellowstone Energy Limited Partnership.  It's the

23  name of the limited partnership that manages one that -- the QF

24  is called Billings Generation Inc. or BGI.

25  Q.  And did Northwestern recently enter into some type of

1  settlement agreement with YELP?

2  A.  We have a proposed settlement, but it did not receive

3  approval from one of the major equity holders of BGI so it has

4  not been completed.

5  Q.  Do negotiations continue?

6  A.  Yes.

7  Q.  And what portion of the QF liability relates to YELP?

8  A.  I don't know that -- of the 140 million, I don't know

9  exactly what relates to BGI.  The three largest constitute

10  about 90% of that and BGI --

11  Q.  And is YELP --

12  A.  -- is the largest.

13  Q.  YELP is one of the three largest?

14  A.  Yes, it is.

15  Q.  And will a resolution of the dispute with YELP result in a

16  reduction of the QF liability that you've described?

17  A.  If the proposed adjustment is approved, it would, yes.

18  Q.  And by what magnitude?

19  A.  We estimate $17 million.

20  Q.  Out of the 140?

21  A.  That's correct.

22  Q.  And that is the net present value over a 30-year period?

23  A.  Or of the remaining --

24  Q.  Of the QF liability?

25  A.  -- life of the contract, yes.

1  Q.  And what portion of the QF liability, the $140 million QF

2  liability that you're talking about, is embedded in your

3  projections over the next 5 years?

4  A.  Don't have precise numbers, but it's going to be

5  approximately 12 to $15 million.

6  Q.  If it's being present value -- withdrawn.  Is the QF

7  liability assumed to be static over time?

8  A.  No, it's not.

9  Q.  Okay.  And can you tell me, is it assumed to be a greater

10  liability in the early years or the later years?

11  A.  It begins as it -- the difference between the revenues and

12  the expenses are relatively small in the early years.  It,

13  beginning in about 2002, is about 2 million.  Presently it's in

14  the 4 to $5 million range.  It grows over time to the years

15  2015 to 2020 when it approximates $20 million and then begins

16  to taper off as some of these contracts begin to terminate.

17  Q.  I'm sorry.  What did you say it was currently?

18  A.  It's in -- on an annual basis, the -- it's approximately 4

19  to $5 million.  I -- without having the schedule in front of me

20  to look at I can't give you an exact number.

21  Q.  Were you here for Mr. Austin's testimony this morning?

22  A.  I was.

23  Q.  Did you hear him describe that as a result of more

24  communication, the sale of non-core assets, the recent

25  settlement agreement with the MPSC, that, from his perspective,

Hanson - Cross

1  the company's relationship with the Montana regulators has gone

2  from terrible to much better?

3  A.  I recall him saying it has improved.  I don't remember if

4  he said it was much better.

5  Q.  Do you believe that it's improved?

6  A.  I believe it has improved some.  I believe there are more

7  challenges ahead.

8  Q.  And the issues that Mr. Austin described, being the lack of

9  communication, the foray into unprofitable, non-core

10  businesses, those are issues, to the best of your

11  understanding, that the Montana regulators expressed concern

12  about, isn't that right?

13  A.  Well, they have but they've -- there's more to it than that

14  but.

15  Q.  Those are the ones that Mr. Austin identified and he didn't

16  identify any others.  You're aware of that, right?

17  A.  I --

18  Q.  You sat here --

19  A.  -- heard what Mr. Austin --

20  Q.  -- for his testimony, right?

21  A.  -- said, yes.

22  Q.  And he's the Chief Restructuring Officer, is that right?

23  A.  He is.

24  Q.  And one of the goals that he set out before you put this

25  company into bankruptcy was to improve the relationship with

1  the regulators.  Isn't that right?

2  A.  Yes.

3  Q.  And he's overseeing this restructuring and he's the one

4  who's responsible for making sure the goals of the bankruptcy

5  are met, isn't that right?

6  A.  He is responsible for the restructuring of the company.

7  I'm responsible for the regulatory aspects of it.

8  Q.  This is the summary of the stipulation with the MPSC, is

9  that right?  We're looking at slide 43.

10 A.  This is what I provided as the high points, yes.

11 Q.  Okay.  Now, all of these items on here, the four items on

12 here that you describe as the high points, those are all things

13 that the MPSC wanted is that right?

14 A.  Yes, I believe they did.

15 Q.  They're all things that restrict Northwestern in certain

16 ways, isn't that right?

17 A.  I think that's fair.

18 Q.  And, in fact, the first three of them all relate to this

19 issue of the unprofitable foray into non-core businesses, isn't

20 that right?

21 A.  Yes.

22 Q.  Can you tell me, Sir, before Northwestern signed this

23 stipulation, did it review it carefully?

24 A.  Certainly.

25 Q.  Did it negotiate with the MPSC?

1  A.   Yes.

2  Q.   If you put up a slide for the Court that listed the

3  benefits to Northwestern, what would it say, 'cause we don't

4  have that?

5  A.   Well, I believe there -- at least some of the benefits are

6  covered here as well.  The rate stability between now and 2007

7  I think is a benefit as well as an obligation under that

8  stipulation.  Since we've announced that it is our intent to

9  focus on regulated utility operations going forward, ring

10 fencing those operations from the immaterial non-regulated was

11 not a great burden and could arguably be considered a benefit.

12 Q.   These four items are things that the MPSC wanted and

13 Northwestern agreed to, is that correct?

14 A.   I don't think that you characterize the negotiations that

15 they asked for and we conceded.  I think that both parties

16 agreed that this would be appropriate.

17 Q.   Well, whose idea was it to ring fence, the MPSC's or

18 Northwestern?

19 A.   I think we both proposed ring fencing, that we had

20 initially different methodologies for accomplishing that and

21 what was negotiated was the fashion in which we would achieve

22 that.

23 Q.   Okay.  How about the second bullet point?  Is that

24 Northwestern's idea or the MPSC's idea?

25 A.   I would say that that was the MPSC and Consumer Council's

1  proposal.

2  Q.   And what about the third point?

3  A.   This was actually something that we proposed to them --

4  Q.   Okay.

5  A.   -- and they agreed to.

6  Q.   Are there any benefits to Northwestern in the stipulation

7  with MPSC that are not listed on this chart?

8  A.   There are certainly intangibles related to, as we said,

9  resolving these issues.

10  Q.   Were these the major issues confronting Northwestern's

11  relationship with MPSC?

12  A.   These were the major issues related to the concerns that

13  they raised in this proceeding.  We have other issues

14  associated with energy supply, pursuit of property tax trackers

15  and many other things, other tracking accounts and other

16  routine filings that we do with the Commission that aren't

17  related to this proceeding and are not covered by this

18  stipulation.

19  Q.   Okay, but the major issues that are related to this

20  proceeding have now all been resolved, is that right?

21  A.   Of these, yes.

22  Q.   And one of the reasons -- one of the benefits to

23  Northwestern from entering into this stipulation with the MPSC

24  is that Northwestern expects that as a result its relationship

25  with the MPSC will be improved, is that correct?

Hanson - Cross                    176

1  A.  Major benefit to us was that they are no longer objecting

2  to our plan and emergence from bankruptcy.

3  Q.  And as a result of the stipulation and agreement where

4  Northwestern and the MPSC were able to reach common ground,

5  it's Northwestern's expectation that as result, its

6  relationship with the MPSC will be improved, correct?

7  A.  I would certainly hope so.

8  Q.  Now you mentioned the Montana Consumer Council?

9  A.  Yes.

10 Q.  They're not a regulator, are they?

11 A.  No.

12 Q.  They have no ability to raise or decrease Northwestern's

13 rates, do they?

14 A.  They can petition the Commission to do that.

15 Q.  They're an advocate, isn't that right?

16 A.  They are an advocate, that's correct.

17 Q.  And isn't it true that any regulated utility in the United

18 States is gonna have an advocate arguing on behalf of

19 consumers on the other side?

20 A.  Not necessarily.

21 Q.  Does Con Edison face an advocate group on the other side

22 when it's negotiating with its regulatory authorities?

23 A.  I don't know.  There are many utilities that do.  I could

24 cite you some jurisdictions where there are not --

25 Q.  Okay.

1  A.   -- either statutory, or in this case, Constitutional

2  interveners.

3  Q.   Is it fair to say that based on your experience, most

4  regulated utilities are gonna face an advocate on the other

5  side?

6  A.   True.

7  Q.   That's fair, isn't it?

8  A.   Yes.

9  Q.   There's nothing unique to Northwestern about having to deal

10 with somebody who is representing the interests of the rate

11 payers, is there?

12 A.   With respect to having someone advocating a different

13 position, no.  With respect to the history and -- of

14 proceedings in Montana, I think it is different than many other

15 jurisdictions.

16 Q.   How many jurisdictions have you studied to measure the

17 impact of a rate payer advocates group as compared to

18 Northwestern's?

19 A.   I have personally worked in four, and I review -- there's a

20 number of entities that put out rating evaluations of

21 regulatory agencies.  Bank of America, for example, puts out

22 one.  Some of the debt and equity investment advisors do that

23 and they summarize different approaches and the positions at

24 various commissions.

25 Q.   How many --

1  A.  I review them all.

2  Q.  How many times has the Montana Public Service Commission

3  lowered the rates that Northwestern can charge to its rate

4  payers?

5  A.  They have not lowered the rate since we acquired Montana

6  Power Company.

7  Q.  So notwithstanding this advocate group, the Montana

8  Consumer Council, the rates haven't gone down a penny, is that

9  right?  Since Northwestern acquired Montana?

10  A.  That is correct.

11  Q.  And as a result of one of the provisions in the

12  stipulation, I think you cite it as a benefit that rates aren't

13  going to change for at least 3 years, is that right?

14  A.  If you include 2004, that's correct.

15  Q.  Three years from today, I think you testified that the rate

16  -- any rate change wouldn't become effective until the year

17  after September 2006, right?

18  A.  I did not -- I don't believe I said a year after September

19  2006.  I did say sometime in 2007, following the review

20  period --

21  Q.  Okay.

22  A.  -- for this case.

23  Q.  Okay, but for 2½ to 3½ years then, rates are gonna remain

24  unchanged, and that's a benefit to Northwestern, is that right?

25  A.  Yes.

Hanson - Cross                                      179

1   Q.   And so, there's nothing the Montana Consumer Council can do

2   to affect rates during that period of time, is that right?

3   A.   Not our T&D rates; of course, commodity charge is a

4   different question.

5   Q.   Well, you did mention that one of the risks in your

6   business plan is that the Montana Public Service Commission

7   might not enable Northwestern to recover certain supply costs,

8   is that right?

9   A.   That's right.

10  Q.   And since the time Northwestern acquired Montana Energy

11  Company, they've disallowed, what, $12 million in the

12  aggregate?

13  A.   Of natural gas costs, that's right.

14  Q.   And out of the total revenue during the period of time

15  since Northwestern acquired Montana, what is $12 million amount

16  to on a percentage basis?

17  A.   We do a billion dollars of revenue, so on a revenue basis,

18  it's not much.  But if your net income is about -- in the $60

19  million range that falls straight to your net income, that's a

20  large percentage.

21  Q.   And that's 60 -- did you say 60 million net income a year?

22  A.   Yeah, just a ballpark number.

23  Q.   Okay.  And so over 3 years, you would have had $180 million

24  in net income, on a ballpark basis?

25  A.   If you assume the 60 million is, you know, average annual

1  number, Sir.

2  Q.  Okay, and so it's 12 over 180 is the totality of the

3  recovery of supply costs that have been disallowed by Montana

4  since 2002, is that right?

5  A.  It is 12 million over a 2-year period, times 6 million per

6  year over the 2 years that they have reviewed.  They have not

7  completed their review of future periods, so it's the 2002/2003

8  timeframe.

9  Q.  Okay.  So they have been -- there's been no disallowance at

10  all yet for 2004, is that right?

11  A.  That's right.

12  Q.  Okay.  You talked about the weather as a risk in heating

13  and projections.  The weather is a risk that any of

14  Northwestern's competitors are going to face, is that correct?

15  A.  Yes.

16  Q.  And is it fair to say that there's a 50/50 chance today

17  that the weather will either have a positive impact or a

18  negative impact on Northwestern?

19  A.  Weather could be better or worse than projected.

20  Q.  If you have hot summers and cold winters, that's gonna have

21  a very positive affect on Northwestern, correct?

22  A.  That's true.

23  Q.  And if you have, I guess, cold summers and warm winters,

24  that'll have a negative affect, right?

25  A.  It does.

1   Q.   And as you sit here today, you have no idea which of those

2   is possible?  Withdrawn.  As you sit here today, you have no

3   idea which of those possibilities is likely to occur, correct?

4   A.   In projecting the future, we had to assume normal weather.

5   Q.   Okay.

6   A.   In 2004, we have had a warmer than normal winter, followed

7   by a cooler than normal summer.

8        (Pause in proceedings)

9   Q.   You included all material factors in the projections that

10  you created?

11  A.   I believe I did, yes.

12  Q.   And you were aware at the time that you created the

13  projections of the state of Northwestern's relationship with

14  regulators, correct?

15  A.   The projections are forecasts of revenues, margins,

16  expenses.  We did not adjust either expenses or margins due to

17  regulatory issues pending.  We did -- you know, we had the

18  write off for the gas costs, we assumed going forward we would

19  recoup our costs in full.

20  Q.   And since the time the projections were created in

21  December, there's actually been the positive developments vis-

22  a-vis the regulators that we've talked about, right?

23  A.   We completed a stipulation since then, yes.

24  Q.   And while I appreciate that -- you know, let's talk about

25  that for a second.  While I appreciate that Northwestern has

1  not yet closed on any of the transactions relating to its non-

2  core assets, can you tell me whether or not the assets that you

3  described -- whether it's Expanets or Blue Dot -- whether the

4  company has any contracts right now for the sale of any of

5  those assets?

6  A.  My understanding that our interest in Expanets and Blue Dot

7  have been sold net exit, or what we now call it is itself in

8  bankruptcy and there're various claims and litigation pending

9  and Blue Dot has a similar situation.

10  Q.  So the sale of the assets is complete, it's just a matter

11  of when and how the process gets resolved before --

12  A.  Resolving claims and then determining, you know, the

13  remaining amounts.

14  Q.  Okay.  And other than the Expanets and Blue Dot, what was

15  the other non-core asset?  What was the --

16  A.  We had the Montana First megawatt project.

17  Q.  And where does the sale of that stand for the potential

18  seller?

19  A.  We had a non-binding letter of intent signed by a party

20  that the exclusivity period has concluded without reaching a

21  definitive agreement, so we are back to negotiating with

22  multiple parties for the sale of that --

23  Q.  And --

24  A.  There is no Sale Agreement currently in place.

25  Q.  Any other non-core assets that are either under contract or

Hanson - Cross                                183

1  that Northwestern is actively marketing today?

2  A.   We included the discussion of Cornerstone.  Again, the

3  company's interest in Cornerstone is -- been divested.  There

4  are claims by Cornerstone back against the company, and we're

5  trying to resolve those is my understanding of that.

6  Q.   So, negotiations continue?

7  A.   I believe they do.

8  Q.   What percentage of Northwestern's revenues are derived from

9  its generation abilities?

10 A.   Less than --

11 Q.   It's power generation abilities?

12 A.   Less than 5%.

13 Q.   That's for revenue?

14 A.   Revenue and gross margin.

15 Q.   Okay.  You talked about how revenue is not necessarily the

16 best measure of Northwestern's financial condition but that you

17 think volume is a better indicator, is that right?

18 A.   What I said was revenue's not a good indicator.  We focus

19 on gross margin.  Gross margin is driven by volume sales so

20 long as you don't have a rate change.

21 Q.   And volume is gonna be affected by population growth, is

22 that right?

23 A.   Yes, to the extent that drives additional consumption, yes.

24 Q.   And consumption by existing rate payers can also drive

25 volume up or down, is that right?

1  A.   That is correct.

2  Q.   And so in assessing projected usage by existing rate

3  customers is it fair to look at statistics such as unemployment

4  statistics and personal income growth projections?

5  A.   Those are considerations that are included in the

6  econometric modeling tool we use.

7  Q.   Okay.  What other considerations did you use in assessing

8  future volume growth?

9  A.   Well, I couldn't list them all, but there's factors of the

10 general economy, the economy in that area, population growth,

11 consumption trends.  You also look at, you know, specifically

12 by class of customer whether any of the large industrials have

13 curtailed operations or coming back on-line or expanding.

14 They're all inputs into the evaluation of our projected growth.

15        MR. MORRIS:  Your Honor, I have no further questions.

16 Thank you.

17        THE COURT:  All right.  Anybody else?

18        MR. HOUSTON:  Yes, Your Honor, Joe Houston here.

19        THE COURT:  Okay, Mr. Houston.

20        MR. HOUSTON:  Thank you, Your Honor.

21                   CROSS EXAMINATION

22 BY MR. HOUSTON:

23 Q.   Mr. Hanson, just one or two questions.  Back in the

24 beginning of your testimony you discussed the management of the

25 reorganized Debtors, correct?

1  A.   Yes.

2  Q.   It's true, is it not, that of the Board of Directors, which

3  has existed with the Debtor since the petition date, six out of

4  seven are going to resign as of the affective date, correct?

5  A.   I believe that's true.  We will have a new board -- six new

6  board members.

7  Q.   How many people are on your current board?

8  A.   Seven.

9  Q.   So that means six out of seven will resign, right?

10  A.   Yes.

11  Q.   And the Unsecured Creditors Committee, I believe, gets to

12  select six replacements for those who will resign, correct?

13  A.   I believe they did, yes.

14        MR. HOUSTON:  Thank you, I have no further questions,

15  Your Honor.

16        THE COURT:  Okay, thank you.  Before we have -- let

17  me just ask a couple of questions that might be relevant to

18  your examination, too.

19  BY THE COURT:

20  Q.   Mr. Hanson, you said in response to Mr. Morris' questions

21  that there are a number of other challenges with the regulators

22  that I think you said {quote}, "go deeper," {close quote}.

23  Could you give me a sense of what those are?

24  A.   Yes, certainly, Your Honor.  Mainly I was addressing issues

25  that are not resolved by the stipulation.  The on-going

186

1  discussion with the commission over natural gas procurement is

2  on appeal in State Court, we do not have rules in place for the

3  procurement of gas.  That's been a very contentious issue.  We

4  -- it remains to be seen whether the commission will be

5  satisfied with our response to the Liberty audit, and actions

6  that we take, and then I was thinking of basically two

7  instances of public comment, one prior to our filing of our

8  electric and natural gas tracker, annual tracker filings, those

9  comments published in the paper by commission indicating that

10 we might expect more of the same with respect to how they're

11 going to view our gas and electric costs.  That was of concern

12 to me because we hadn't made the filings yet.  And the other

13 was the recent public statements that they're gonna take an

14 active role in monitoring not only the management but ownership

15 of the company and look to develop criteria by which they would

16 judge potential owners.  So the totality of those items just

17 tells me that while it's certainly an improvement the

18 stipulation would not resolve all of the issues, and there are

19 more challenges ahead.

20 Q.  Explain to me briefly the tracker issue, what that means.

21 A.  I'm sorry, yes.  When we file for our commodity costs we

22 will have a true up of any over or under recovery of the

23 previous year's cost plus our projection of the cost to be

24 incurred over the future year, and that will be what we set the

25 per unit rate to be, and then we will do a monthly adjustment

187

1  on a 12-month rolling average, but we {quote}, "track" our

2  actual costs against the recoveries.  Again, volumes may be

3  different than what were projected and things like that.  So at

4  the end of that period we will have a difference between our

5  actual expenditures for the year and our recoveries for the

6  year, and that difference, again, gets rolled into the next

7  year.  So, that's what we mean when we say tracking or tracker

8  account.  It's to assure that you recovery exactly your

9  out-of-pocket cost, no more, no less.

10 Q.  Now, the energy that you purchase from the QFs and others,

11 is there some primary energy source, I mean, is it coal, is it

12 oil, is it natural gas, is it nuclear, is it solar?  What is

13 it?

14 A.  The -- well, they do vary, Your Honor.  Of the three

15 largest, since they're the primary dollars, the Billings

16 Generation, Inc. is burning petroleum coke produced by the

17 refineries in Billings.  The one that we call Coal Strip Energy

18 Limited Partnership is mining waste products at the coal strip

19 mine, and the third largest is a hydroelectric damn, the broad

20 water damn owned by the state of Montana.

21 Q.  Now, am I correct that the theory here is that if, for

22 example, the price of oil continues to go up and you have some

23 petroleum-based energy that you're purchasing, that your actual

24 cost through this commodity recovery and tracker system that

25 you've described will be neutral to your revenue?  Am I correct

Hanson - Redirect                                          188

1  about that?

2  A.   That's the intent of a tracker in theory, yes.

3  Q.   So that whether the price of oil goes up or down, or the

4  price of natural gas goes up or down or whatever, theoretically

5  it's not supposed to affect your bottom line?

6  A.   That's right.  We earn no profit but we shouldn't lose any

7  money.

8  Q.   The difficulty comes to the extent that what you're allowed

9  from -- to recover from the Commission, if that's different

10  from what your actual cost is, is where the crunch comes, and

11  that's what you really can't forecast, is that correct?

12  A.   That's right.

13  Q.   All right.

14         THE COURT:  Ms. Denniston, do you have any other --

15         MS. DENNISTON:  Your Honor, I only have two brief

16  questions.

17                     REDIRECT EXAMINATION

18  BY MS. DENNISTON:

19  Q.   Mr. Hanson, since the -- Northwestern acquired Montana

20  Power, has there been a rate case?

21  A.   No, there has not.

22  Q.   Okay.  With regard to the 6 million that you testified was

23  left unreimbursed on the gas situation, can you tell us what

24  affect that has on EBITDA?

25  A.   Well, in the year that we had to write it off it was a $6

1  million deduct or hit to EBITDA.

2        MS. DENNISTON:  Thank you, Your Honor, I have no

3  further questions.

4        THE COURT:  All right, thank you, Mr. Hanson.

5  A.  Thank you, Your Honor.

6        THE COURT:  You may step down.

7        MR. AUSTIN::  Your Honor, our next witness will be

8  Mr. Brian Bird.  Prior to calling him can we take about a 10

9  minute break?

10        THE COURT:  Sure.  Be back at 10 minutes after 3.

11      (Recess)

12        THE COURT:  Please be seated.

13        MR. AUSTIN:  Your Honor, the Debtor's ready to

14  proceed.  We'd like to call Mr. Brian Bird.

15        THE COURT:  All right, Mr. Bird, come forward,

16  please, to the witness stand to be sworn.

17           BRIAN BIRD, DEBTOR'S WITNESS, SWORN

18                  DIRECT EXAMINATION

19  BY MR. AUSTIN:

20  Q.  Would you please state your name for the record?

21  A.  Brian Bird.

22  Q.  And Mr. Bird, you're currently employed by Northwestern?

23  A.  That's correct.

24  Q.  And you're in the position of Chief Financial Officer,

25  correct?

Bird - Direct                           190

1   A.   Correct.

2   Q.   Been in that position since around December the 1st?

3   A.   December 1st.

4   Q.   Prior to that would you briefly describe your experience in

5   the energy industry?

6   A.   Sure.   In the energy industry in 1997 I joined a company

7   called NRG Energy as its Vice President and Treasurer, and I

8   was there for five years.   In '02 I became CFO -- left that

9   company became CFO of Insight Energy, it's a Warbert Pinkus

10  firm that was in the generation development area.

11  Q.   And what did it do by way of generation development, buy

12  generation assets?

13  A.   We tried to buy generation assets.

14  Q.   All right.   And NRG, was that -- how would you describe

15  what NRG did?

16  A.   NRG Energy was an independent power producer.   It ran power

17  plants.

18  Q.   Ran power plants and sold the power?

19  A.   That's correct.

20  Q.   And was NRG owned by another utility company?

21  A.   It was indeed.   It was owned by Excel Energy, which is an

22  integrated utility in Minneapolis.

23  Q.   What's your educational background?

24  A.   I have an undergraduate degree and a double major in

25  accounting and finance from the University of Wisconsin, Au

1  Claire.  I have an MBA in finance from the University of

2  Minnesota.  I hold a CPA certificate.

3  Q.  Once you arrived at Northwestern can you generally describe

4  for the Court your involvement in the senior management

5  organization.

6  A.  I was a member of the senior management team and we met

7  weekly to talk about various issues, and so dealt with the team

8  on a, at least a weekly basis.

9  Q.  And I believe you've been in the Courtroom when Mr. Hanson

10 testified earlier, is that correct?

11 A.  That's correct.

12 Q.  And Mr. Hanson testified about who his direct reports were.

13 Did you in your capacity as Chief Financial Officer have a

14 number of people who were direct reports to you?

15 A.  I do.  I have five direct reports.  I have the controller,

16 Kevin Cleaver; I have the treasurer, gentleman named Paul

17 Evans; the head of tax, Chris Bonds; head of financial planning

18 and analysis, Mike Neaman; and the head of audit controls,

19 George Boils.

20 Q.  And can you describe from your perspective what are your

21 primary duties and responsibilities as Chief Financial Officer

22 of Northwestern?

23 A.  Indeed.  To actually lead all of those particular areas in

24 terms of accounting and finance and help in terms of leading

25 the organization from a finance perspective.

1  Q.  Is one of your responsibilities development or otherwise

2  refinement of the company's five-year business plan?

3  A.  That is correct.

4  Q.  And that includes a five-year business plan which is part

5  of the Debtor's plan of reorganization?

6  A.  That is correct.

7  Q.  And you have reviewed that business plan, is that correct?

8  A.  I have.

9  Q.  Can you briefly describe from your perspective what you

10  believe Northwestern's business is?

11  A.  Northwestern is a T&D utility.

12  Q.  What do you mean by T&D utility?

13  A.  It's in the transmission and distribution business, both

14  electric and gas.

15  Q.  As opposed to power generation like NRG, for example?

16  A.  Correct.  Northwestern has just over 500 megawatts if you

17  include its interest in Colstrip.  That's 500 net megawatts.

18  To me that's not a generation company.

19  Q.  And what -- when you say 500 megawatts of generation, that

20  includes Colstrip lease holdings?

21  A.  That does indeed.

22  Q.  If you subtract the Colstrip lease hold, do you recall what

23  is the megawatt generation capacity?

24  A.  Approximately 320 net megawatts in South Dakota.

25  Q.  Any in Montana?

Bird - Direct                                        193

1   A.  No, none other than the lease hold.

2   Q.  And does Northwestern own any producing gas wells, natural

3   gas wells?

4   A.  No.

5   Q.  So, for your gas supply, Northwestern's gas supply, you

6   have to buy that on the open market?

7   A.  That's correct.

8   Q.  And would you -- I'm not sure I recall, did you testify

9   about what is the amount of the company's business derived from

10  transmission distribution?

11  A.  At the utility level 95% of our business is from the

12  transmission distribution business.

13  Q.  And what is the level of Northwestern's revenue which is

14  regulated?

15  A.  95% also at the consolidated level is regulated.

16  Q.  Now, you've had discussions here for -- with some of the

17  credit rating agencies, is that correct?

18  A.  That is correct.

19  Q.  Is one of those rating agencies Standard & Poors?

20  A.  Correct.

21  Q.  How does Standard & Poors classify Northwestern?

22  A.  We are classified as a TD utility.

23  Q.  What is your experience as a Chief Financial Officer having

24  experience in the energy area on trading (indiscern.) of a

25  transmission distribution company like Northwestern in

Bird - Direct                                    194

1   comparison to a more integrated utility company?

2          MR. MORRIS:  Your Honor, I object to the extent that

3   this is really expert testimony.  We've got expert witnesses

4   who have been designated who are here to testify --

5          THE COURT:  Let me hear -- I understand your

6   objection.  Let me hear the question again.

7          MR. MORRIS:  Okay.

8          MR. AUSTIN:  The question, Your Honor, is based on

9   his experience and in his capacity as Chief Financial Officer

10  of Northwestern is what are the trading multiples of a

11  transmission distribution company like Northwestern in

12  comparison to more integrated utility companies?

13         THE COURT:  All right.  I think the witness can

14  answer that question.

15  A.   In my experience a T&D utility would trade in the 7 to 8

16  times multiple.

17  BY MR. AUSTIN:

18  Q.   Is that a multiple that's lower or higher than an

19  integrated utility company?

20  A.   That would be lower than an integrated utility.

21  Q.   Let's look at exhibit #114, Mr. Bird.  Can you identify

22  this exhibit please?

23         (Debtor's Exhibit-114 previously marked for

24  identification)

25  A.   That is our projected statement of operations that is

Bird - Direct                                     195

1   included in the May 17th Disclosure Statement.

2   Q.   All right.  And I want to take you through two more

3   exhibits, Exhibit-115 -- can you identify that exhibit?

4        (Debtor's Exhibit-115 previously marked for

5   identification)

6   A.   That is the projected statement of cash flows, also in the

7   Disclosure Statement.

8   Q.   And now let's look at Exhibit-116.

9        (Debtor's Exhibit-116 previously marked for

10  identification)

11  A.   Our projected balance sheets.

12  Q.   And are these three exhibits, 114, 115, and 116 summations

13  of the financial projections of the five-year business plan

14  supporting Northwestern's proposed plan of reorganization?

15  A.   That is correct.

16  Q.   And what was your involvement in developing these -- this

17  five-year business plan and these financial projections?

18  A.   Well, I joined the company on December 1st, 2003, and I'm

19  the 17th and 18th (inaudible).  I had to present the business

20  client to both our Board of Directors and to the Creditors

21  Committee, so on day one I was deeply involved in understanding

22  the business plan, and it followed through that up until today.

23  Q.   And is it your understanding, is it your testimony the

24  first time this business plan was actually presented to the

25  Creditors Committee was in mid-December, 2003?

Bird - Direct                                         196

1    A.    That's correct.

2    Q.    Since mid-December, 2003, can you identify any major areas

3    of change in the business plan from that which is now presented

4    on Exhibits-114 through 116?

5    A.    Yeah, from the time of that Creditors Committee meeting to

6    our first Disclosure Statement we adjusted EBITDA in 2004.  We

7    actually increased EBITDA in 2004.  We initially had 19.2

8    million across the board in terms of pension expense, and what

9    we did there is we actually reduced the pension expense, one of

10   the items we did, it was the major item, is reduce that in 2004

11   which increased the EBITDA.  We also adjusted slightly some

12   other benefit costs in the '06 through '08 period, which again

13   improved EBITDA for that time period.  And then after that

14   there were no material changes.

15   Q.    Do you have a perspective of whether the numbers which are

16   in the -- excuse me, in the current Disclosure Statement and

17   that support the proposed plan of reorganization are good,

18   solid numbers?

19   A.    I do indeed believe they're good, solid numbers.

20   Q.    From your perspective how reliable are those numbers?

21   A.    I think they're very reliable.

22   Q.    In comparison to earlier projections which you may have

23   reviewed as Chief Financial Officer at Northwestern?

24   A.    You know, when I came on board I understand that there were

25   changes in the financial projections, but by the time I'd come

1    on board most of those changes were made by early December,

2    relatively close to these numbers here.

3    Q.    Fine.    Now, what's your perspective on how the company's

4    financial reporting is today, say in contrast to -- even prior

5    to your arrival as Chief Financial Officer?

6    A.    Depends on how far you go back.    I think financial

7    reporting for the company, if you look at how D and T evaluates

8    the financial reporting, we had a management letter from 2002

9    that had, you know, approximately 65 management comments, three

10   of which were material weaknesses.    So, we were in a pretty bad

11   shape from a financial reporting perspective.    The following

12   year's, 2003's management letter we had 19 comments.    Now the

13   fact that Expanets and Blue Dot were gone contributed to

14   improvement there, but we continued to make vast improvements

15   in our financial reporting at Northwestern.    We brought on a

16   controller with solid SEC reporting skills, Ken Cleaver, he's

17   helped in that regard.    Mike Neaman in the financial planning

18   area also helps me in putting together monthly reporting which

19   the company did a poor job in the past on.    So, we've improved

20   from that perspective.

21   Q.    From your perspective, has management included all material

22   factors in the development of the five-year business plan?

23   A.    Yes, we've discussed that five-year business plan

24   frequently, particularly before we brought it to the Creditors

25   Committee.

Bird - Direct                              198

1   Q.  And you know of no major items that have been deleted, left

2   out of, not included in the business plan do you?

3   A.  No.

4   Q.  Let's go back to exhibit #114.  In this exhibit I believe

5   it demonstrates, or at least shows the gross margin line

6   compounded average growth rate of approximately 1.2%?

7   A.  Correct.

8   Q.  Can you explain why the company's using only 1.2% growth

9   rate as opposed to maybe something higher?

10  A.  Yeah, when I came on board, obviously, it's one of the

11  question I had too, try and understand the growth rate that was

12  being used, and they considered a lot of factors, customer

13  growth, population growth, those types of things, but the main

14  driver in the gross margin of our business is through put in

15  both decatherms in the gas business and megawatt hours in the

16  energy business, the electric business.  And so we felt that

17  was the most reliable measure in terms of growth rate, and

18  effectively how we got to 1.2% is we showed from historical

19  standpoint a five-year period that the electric and gas the

20  retail electric and gas the business grew at 1% and then the

21  wholesale electric and our nonreg businesses grew about 2.5%,

22  and on a weighted average basis we came up with 1% growth rate.

23  Q.  Was there any time prior to 2004 that the company saw a

24  significant increase, higher than 1.2%, in for example its

25  customer base?

Bird - Direct                                           199

1   A.   Yeah.   There were spikes both up and down.   I mean, from a

2   customer perspective, customers were given choice earlier on.

3   They were able to change providers of energy so we had a

4   reduction in customers.   A lot of those customers came back so

5   we had a drop in customers then a large increase in customers.

6   But on a static level if you looked over a five-year period

7   that increase wasn't much different than what we're showing

8   here.

9   Q.   And was that increase in the customer growth was that

10  primarily in the state of Montana?

11  A.   Correct.

12  Q.   When that -- was that associated with a customer that had

13  gone to another supplier and then chose to come back to

14  Northwestern as the default supplier --

15  A.   As a default supplier.

16  Q.   -- in Montana?

17  A.   Correct.

18  Q.   Under those circumstances, was there really any change --

19  or what change can you describe to the company's actual earning

20  capacity associated with that spike in the number of customers

21  that came back on?

22  A.   Well, the one thing about our business is -- our default

23  supply business is comes in as a dollar revenue and is also a

24  dollar of cost of goods sold.   So, it has no impact on gross

25  margin.   In almost 50% of our revenues are from default

Bird - Direct

1  supplies coming in as revenue and cost of goods sold and so

2  there's no impact on gross margin from that perspective.  It

3  gets down to the through put again.  What goes across our pipes

4  and our wires.

5  Q.  The point is, you were already through putting, if you

6  will, energy.  You just had a different meter that you were

7  reading?

8  A.  That's correct.

9  Q.  From your perspective, would you characterize the 1.2%

10 growth rate reasonable or unreasonable?

11 A.  I think it's reasonable.

12 Q.  You think there's any way that it really could be much

13 higher than that?

14 A.  No, in our service territory I do not believe it would be

15 much higher than that.

16 Q.  And what is it about your service territory that impacts

17 that response?

18 A.  It's a relatively low growth.  Any growth that we have is

19 mainly in the residential aspect.  There's not a lot of new

20 businesses going up in our service territory.

21 Q.  But I thought that Northwestern services the state of South

22 Dakota?

23 A.  It does, but the two largest cities, and actually the two

24 fastest growing cities we do not serve, that is Sioux Falls and

25 Rapid City.