1  Q.  Let's go to slide, or Exhibit 115, Mr. Bird.  This projects

2  your cash flow, is that correct?

3  A.  That is correct.

4  Q.  And I believe this exhibit shows that the company retained

5  $35 million of cash a year?

6  A.  That's correct.

7  Q.  Can you explain why in your position as Chief Financial

8  Officer you believe that you should retain $35 million of cash?

9  A.  Yeah, it's a function of -- mainly the underlying measure

10  there is really a hundred million of cash and capacity at all

11  times, and we can have 35 million in cash but we could have

12  drawn down on our revolving credit facility LCs currently 15

13  million, but that can go up to 35 million upon emergence as a

14  non-investment grade, or at certain times during the year we

15  may need to draw up on our line because of required gas

16  purchases going into the heating season.  So, net I think

17  that's the kind of cash balance that we would have netting out

18  LCs bring us back to about a hundred million of cash and

19  capacity.

20  Q.  So, it's management's judgment that you need 35 million in

21  cash in addition to whatever revolving credit line you can

22  obtain?

23  A.  That's right.

24  Q.  Okay.  Let's go to Exhibit-116.  There's been some

25  testimony today about QFs.  Are you familiar with what is the

1   QFs as relates to Northwestern?

2   A.   Relatively familiar with QFs, yes.

3   Q.   And are you familiar that Northwestern is covering, or at

4   least has a recording of $140 million liability on its balance

5   sheet, is that correct?

6   A.   That is correct.

7   Q.   Within this exhibit where would that $140 million be

8   effectively located?

9   A.   In the other liabilities line item.

10  Q.   Now, with respect to that QF liability, that is -- was that

11  the present value of the out of market costs associated with QF

12  contracts present value back to current time?

13  A.   Correct.

14  Q.   Do you have a perspective of whether that $140 million

15  liability will materially reduce over the next five years?

16  A.   Well, no.  The fact that -- what happens in the earlier

17  years it's a smaller amount, so as a year passes by you're one

18  year closer to the larger amounts, the back-ended heavier

19  amounts of 20 million, and actually as a result because of the

20  net present value calculation the liability will actually

21  increase.  It believe it increases up to around 180 million,

22  and I don't know if that's in 10 years or 8 years, but I think

23  that's the peek that we're showing on our schedule.

24  Q.   Now, if you can't ultimately consummate the transaction

25  where you modified the Yellowstone Energy limited partnership

Bird - Direct                                                    203

1   you have contract, will the company at least see some reduction

2   in QF liability?

3   A.   Repeat the question please.

4   Q.   If you can actually consummate the amendment to the

5   Yellowstone, the YELP contract, will the company see some

6   reduction in the $140 million liability?

7   A.   Yes.

8   Q.   And that would be approximately $17 million?

9   A.   Correct.

10  Q.   But this time the Yellowstone side of the equation's not

11  obtained consent, is that correct?

12          MR. MORRIS:   Objection, leading, Your Honor.

13          THE COURT:   Overruled as far as this is concerned.   I

14  mean, we've already had testimony about these items.   When we

15  get into matters that are new I would sustain the objection.

16  A.   Could you repeat the question?

17  BY MR. AUSTIN:

18  Q.   Have you consummated the amendment with Yellowstone and

19  actually enjoyed the benefit of being under contract?

20  A.   No, we haven't.

21  Q.   Let's go to slide number -- exhibit #117.   Can you identify

22  what this exhibit is, Mr. Bird?

23      (Debtor's Exhibit-117 previously marked for

24  identification)

25  A.   Yes, this is our pro forma capital structure immediately

1  pre-emergence and immediately post-emergence from bankruptcy.

2  Q.   This illustrative balance sheet reflects implementation of

3  the proposed reorganization plan?

4  A.   That's correct.

5  Q.   And it contemplates, obviously, exchange in the senior

6  unsecured trust preferred bonds to equity, correct?

7  A.   That is correct.

8  Q.   There's a debt and total capitalization number, do you see

9  that?

10  A.   Yes, I do.

11  Q.   Is that -- can you tell me whether that is a gap number, or

12  is that a regulated number?

13  A.   That is a gap number.

14  Q.   And what is the difference between a gap debt to

15  capitalization versus a regulated debt to capitalization?

16  A.   Well, regulated would be, you know, as your capitalization

17  they would use what our rate base is.  Our rate base is just

18  under 1.2 billion for our total utility, and so, you know, if

19  you did the math we're looking at, you know, closer to a 70 to

20  75% debt to cap, as cap being as a rate base percentage.  So, I

21  think, you know, from that perspective, you know, particularly

22  the Montana commission still believes we're over levered

23  because of that's how they look at our capitalization.

24  Q.   Have they indicated to you one way or the other whether

25  they believe that creates additional risk for Northwestern?

Bird - Direct                                            205

1   A.   Absolutely.   They still believe upon post-emergence that we

2   are a highly levered company.

3   Q.   Now, who at Northwestern is currently responsible for

4   developing and evaluating and possibly negotiating exit

5   financing?

6   A.   I'm ultimately responsible for negotiating exit financing.

7   Q.   I would like to go to exhibit #121, please.

8        (Debtor's Exhibit-121 previously marked for

9   identification)

10           THE COURT:   Looks like that's #55?

11           MR. AUSTIN:   Right there, Your Honor, page 55.

12   BY MR. AUSTIN:

13   Q.   Can you identify this exhibit and what it's intending to

14   show, Mr. Bird?

15   A.   This is our exit financing sources and uses.  This is the

16   -- what cash we would use or how we would actually refinance

17   the debt.

18   Q.   And explain in broad terms what is the proposed exit

19   financing that the company is proposing to enter into?

20   A.   Well, first and foremost we need to ultimately replace our

21   D-I-P financing, and so we're proposing $100 million revolving

22   credit facility that has a five-year term.  In addition to that

23   we felt it was in our best interest to refinance the -- what's

24   called the CSFB facility, a 383 million facility shown there,

25   and there's some other miscellaneous debt maturities that we

Bird - Direct                                                206

1   felt we'd make in our best interest to refinance, and so in

2   order to do that in addition to the 100 million revolver we're

3   looking at a 200 million senior secured loan, which would be a

4   10-year note at a fixed rate, and also a term loan B, which is

5   a 7-year facility with a floating interest rate.  That's 150

6   million.

7   Q.  Is any of this financing committed at this time?

8   A.  We have a commitment letter for the revolving credit

9   facility and the term loan B.

10  Q.  Can you describe generally what the benefits if this

11  financing could be implemented upon confirmation of the

12  reorganization plan?

13  A.  Well, first and foremost it achieves liquidity

14  requirements, and if we have liquidity requirements from the

15  commission it's actually 75 million upon emergence.  Also I'd

16  still use a hundred million as our target that we need to have

17  in liquidity at all times, and that's mainly from discussions

18  with the rating agency is in terms of their concerns about

19  liquidity for all of the debt issuers.  The other thing that we

20  felt made sense is based upon current interest rate environment

21  we could save the company money in terms of interest expense by

22  doing the refinancing now.

23  Q.  Let's look at Exhibit-119.  119 would be page 53.  Can you

24  identify this exhibit and explain what it is attempting to

25  show?

1    (Debtor's Exhibit-119 previously marked for

2   identification)

3   A.   This is our cash history.  The dark blue and the red was

4   the D-I-P availability and our actual cash balance.  The light

5   yellow is our cash forecast, and the green is the actual when

6   the exit revolver comes into play that will be the capacity

7   available.  So, you can see in the last three months of the

8   year we're expected emergence that we'd have over a hundred

9   million in cash capacity.

10  Q.   And that's assuming that you're also keeping in place $35

11  million in cash?

12  A.   Yes.  See the yellow down at the bottom representing

13  approximately that amount.

14  Q.   And that's again because -- can you explain again?

15  A.   Well, again, between cash and capacity we have to have from

16  our perspective and making sure the rate agencies comfortable

17  that we have a hundred million in capacity, and we do -- we

18  will have some LC draws on our revolving credit facility.  So,

19  we feel we need to have cash to fill in that gap.

20  Q.   Let's look at exhibit #120, please.  Can you identify this

21  exhibit and describe what it is showing?

22       (Debtor's Exhibit-120 previously marked for

23  identification)

24  A.   Yeah, this is -- the top portion is our secured debt

25  maturity schedule currently, and we call the item 2006 the

Bird - Direct                                              208

1  wall, and one of the issues we have is, you know, certainly it
2  was raised by the rating agencies, but from our own perspective
3  was concerns about being able to refinance that CFSB facility,
4  another reason we're talking about refinancing and maybe the
5  most important is to push the maturity out from '06 and the
6  future years, and so 350 million that we're planning to move in
7  future years with this refinancing.
8  Q.   And is -- in the 2006 years most of that $533 million of
9  debt that is then associated with the CFSB facility?
10  A.   Correct.
11  Q.   Current CFSB?
12  A.   Correct.
13  Q.   If the company is able to achieve confirmation of the plan
14  and go to the capital structure which we've identified in these
15  prior exhibits, enter into the exit financing that moves out
16  the maturities, what is your perspective on what that will do
17  for the company relative to whether it may retain, or retain
18  again, investment grade status?
19  A.   I think it helps us with the rating agencies.  It puts us
20  that step closer to investment grade.  We're trying to do those
21  things that they've identified we need to do to ultimately
22  obtain an investment grade rating, and what that does pushing
23  that wall onto future years obviously there's concerns about
24  refinancing risk and they always have concerns about you may
25  not be able to access the capital markets when those maturities

1  come up for whatever reason.  So, if we access the capital

2  markets now and take that out we can remove that fear of

3  theirs.

4  Q.  Now, with respect to your existing D-I-P credit facility,

5  when does that currently mature?

6  A.  It will expire -- it expires -- I'm not sure the exact date

7  but we will have to renew that on October 1st based upon our

8  new date that was mentioned today we'll extend that through the

9  end of November.

10  Q.  And with respect to the commitment letter which you have

11  for the revolving facility and the term one B are you aware of

12  whether there's a time deadline on that commitment expiring?

13  A.  Yeah, that commitment expires the end of October.

14  Q.  The financial five-year business plan, which is the --

15  serves as the foundation for the company's reorganization plan,

16  can you describe whether that was ultimately the base by which

17  Lazard used to come up with this valuation of the company?

18  A.  Correct.  They utilized our five-year plan numbers

19  incorporated in their valuation.

20  Q.  Now, within part of the valuation I believe the company's

21  identified as an asset certain net operating losses, is that

22  correct?

23  A.  That is correct.

24  Q.  I believe you were here when Mr. Austin, Bill Austin,

25  testified that the amount of those net operating losses was

1  approximately $665 million?

2  A.  Yeah, it's -- I think it's 655 actually.

3  Q.  Okay.  Is that a gross amount?  Is that something that you

4  -- can you use and actually attribute value to all of that?

5  A.  Well, that would be the balance just prior to

6  pre-emergence, and what happened is, they'll be something

7  called cancellation of debt income, and what we have to --

8  we'll have to allocate a portion of that towards this net

9  operating losses, and the cancellation of debt income would be

10  about 460 million, and so the net operating losses after that

11  is about 195 million that would be utilized over the five-year

12  plan.

13  Q.  Now, let's go to Exhibit-118.  Can you identify this

14  exhibit and what it is intending to show?

15      (Debtor's Exhibit-118 previously marked for

16  identification)

17  A.  Yeah, these are our projected asset sales and the proceeds

18  from those asset sales.

19  Q.  Are these proceeds that the company anticipates receiving?

20  A.  Indeed.

21  Q.  Now, do you have any of this cash in hand today?

22  A.  Not at Northwestern, no.

23  Q.  Do you anticipate having this cash in hand, or any portion

24  of this cash in hand say by October 30th?

25  A.  The only thing we could get in by October 30 is a portion

1    of the Blue Dot.  What we're waiting there is the Bankruptcy

2    Court approval and the South Dakota Federal District Court's

3    approval of the shareholders settlement, and upon that then we

4    (inaudible) moving some of the Blue Dot (inaudible) up to

5    Northwestern.  The issue is there are still some locations that

6    are yet to be sold and they are still operating.  So, we'll

7    leave some of the money there.

8    Q.  But you don't have that money today, correct?

9    A.  No, we do not.

10   Q.  And do you anticipate receiving any proceeds from the

11   proposed sale of the cold strip transmission lines to PPL

12   between now and October 30th?

13   A.  No, we don't have that in our plan.

14   Q.  At all?

15   A.  At all.

16   Q.  Mr. Bird, if the Debtor's plan is confirmed do you have a

17   perspective of what will have been accomplished through the

18   bankruptcy proceedings?

19   A.  From my perspective I think back to our first meeting with

20   the rating agencies and we talked about the lists that we had

21   to -- things we needed to accomplish to emerge from bankruptcy

22   in terms of litigation settlement, selling assets, a lot of

23   things, and getting our balance sheet in order and adjusting a

24   lot of control issues we had internally.  I think as a

25   management team we've accomplished a tremendous amount.

Bird - Direct                                  212

1   Q.  Do you have a perspective of whether this plan was proposed

2   in good faith?

3   A.  I believe it was proposed in good faith.

4   Q.  Do you have a perspective that if this plan is confirmed

5   whether Northwestern will be or not be a better company?

6   A.  It'll indeed be a better company, I believe with a very

7   stable balance sheet.

8   Q.  In your capacity as the Chief Financial Officer do you have

9   a perspective whether recoveries under the plan would be better

10  than if Northwestern were liquidated?

11  A.  The execution of this plan would be better than a

12  liquidation.

13  Q.  Do you have any concerns that if this plan is confirmed

14  whether Northwestern can achieve and make it's ability --

15  excuse me, strike that, Your Honor.  Do you have any concerns

16  whether Northwestern will be able to perform under this plan?

17  A.  Yeah, well, we've mentioned, obviously, weather and this

18  weather can go up and down.  We've unfortunately had mild

19  weather the past couple years.  In addition to that though

20  there's always the uncertainty of future cost disallowances,

21  and people have shared that.  We have that concern and others

22  have shared that as, you know, what's gonna stop that from

23  happening to be true?  There's other costs, increase in costs.

24  For instance, we talked about improvement and controls.

25  There's, you know, (indiscern.) and other things we have to

1  increase costs associated with that.  Now, yes, we may be able

2  to get some of that back in rates, but we're not sure, and

3  obviously we're gonna have a freeze for a number of years.  So,

4  yeah, I'm not sure that we'd captured some of those

5  (indiscern.).

6  Q.  You have any concerns about Northwestern's ability to meet

7  its obligations under this plan (indiscern.) if this plan is

8  confirmed?

9  A.  I believe Northwestern will opt (inaudible).

10  Q.  Do you have a perspective of whether there's any

11  distributable value available to Northwestern's equity holders?

12  A.  I do not believe equity will receive any value.

13  Q.  Last question, Mr. Bird, if there's any significant

14  additional delay and Northwestern obtains confirmation of its

15  plan and exit in Chapter 11 do you have a perspective whether

16  there's any negative impact or could be any negative impact on

17  the value that could be distributed to Northwestern's creditors

18  under its plan?

19  A.  Well, Your Honor mentioned additional costs of legal

20  counsel and other professional fees that we would incur over

21  that time period.  I'm also nervous about exit financing.  You

22  know, this is a pretty decent interest rate environment.  I

23  think if we can execute in a relatively short period of time

24  we'll keep our interest cost down.  Any delays will, in a

25  raising interest rate environment, could be a problem.  And,

1  you know, there could be whatever reason for dislocation of the

2  capital markets.  That could be a problem for us as well.

3          MR. AUSTIN:  I have no more questions, Your Honor.

4          THE COURT:  All right.  Is there anybody in favor who

5  is a proponent of the plan who wishes to ask any questions of

6  Mr. Bird?

7          ALL:  (No verbal response).

8          THE COURT:  Apparently not.  Are there any opponents

9  to the plan who wish to ask questions of Mr. Bird?

10         MR. MORRIS:  Just a few, Your Honor.

11         THE COURT:  I'll have Mr. Morris go first.

12         MR. MORRIS:  I have just a few questions that relate

13  to the scope of the direct examination.  I do have a few

14  questions that go beyond the scope of that.  Mr. Bird is on my

15  witness list and he either, with the Debtor's permission, go

16  beyond the scope to ask those few questions or just call him

17  back (indiscern.).

18         MR. AUSTIN:  What I'd like him to do, Your Honor, is

19  if he could at least do the inquiry of the things within the

20  scope and before he then shifts to the items outside the scope

21  because obviously he's calling him as his own witness I'm not

22  sure he can ask (indiscern.) questions.

23         THE COURT:  Well, he can switch at that point.

24     (Laughter)

25         THE COURT:  I think it makes sense, since we have the

Bird - Cross                                          215

1    witness here, to cover both of those and just --

2              MR. MORRIS:  I'll be very brief in any event.

3              THE COURT:  You know like when a horse starts leading

4    with another foot it's called a change in lead or flying lead

5    change.  That's what you get to do.  You get to do a flying

6    lead change.

7              MR. MORRIS:  I'll do the best I can.

8                         CROSS EXAMINATION

9    BY MR. MORRIS:

10   Q.  Mr. Bird, you said that T&D companies, based on your

11   knowledge, trade on a multiple of 7 to 8 times, is that right?

12   A.  That's correct.

13   Q.  Is that 7 to 8 times EBITDA or some other --

14   A.  EBITDA.

15   Q.  And what, based on your knowledge, do T&D companies trade

16   on on an EBIT basis?

17   A.  EBIT basis I wouldn't particularly have a good guess.  I

18   focus on EBITDA as being the multiple that I follow the

19   companies when I was at my NRG days.

20   Q.  Now about on a price-to-earnings ratio basis?  Do you know

21   what that would be?

22   A.  No, I don't happen to offhand.

23   Q.  Do you know if the 7 to 8 times multiple is a multiple that

24   applies to the last 12 months or to some other time period?

25   A.  Most cases the last 12 months.

1  Q.  So, you believe it's your testimony that T&D companies on

2  the last 12 months trade a 7 to 8 multiple, EBITDA multiple?

3  A.  Correct, correct.

4  Q.  And what do they trade at based on a 2004 estimated

5  multiple?

6  A.  2004, well I don't know what they would trade on that

7  perspective.  I don't know.  I can't say the intricacies

8  between the two.

9  Q.  How about on a 2004 estimated price-to-earnings ratio?  Do

10  you know what T&D companies trade at?

11  A.  No, I don't know offhand.

12  Q.  Do you have any basis for your testimony that T&D companies

13  trade at a 7 to 8 times last 12 months EBITDA multiple other

14  than Lazard's report?

15  A.  No, I think that from my perspective, yeah, there's a --

16  when I worked at NRG Energy we followed our space, which was

17  more of the generation space.  Plus Excel Energy, which was an

18  integrated space, and from their perspective they were trading

19  in a multiple higher than that because of the generation they

20  had.  So, north of 8 times.

21  Q.  Do you know of any T&D companies that trade north of 8

22  times?

23  A.  Sure, I do.

24  Q.  Can you identify some of them please?

25  A.  I can't identify today who might be traded.  There could be

Bird - Cross                                      217

1  various reasons why they might be trading higher than that.

2  Q.  Okay.  So, T&D companies may well trade above 8, correct?

3  A.  They do indeed in some cases.

4  Q.  And so the only bases for your testimony that T&D trades at

5  7 to 8 times last 12 months multiple is Lazard's report and

6  basically a discount off of what you thought to be generation

7  and integration energy company multiples, correct?

8  A.  To some extent correct, yes.

9  Q.  In fact, to all extents, correct?

10 A.  Correct.

11 Q.  Thank you.  And you have absolutely no knowledge about any

12 of the other measures of profitability or financial conditions

13 such as EBIT or price to earnings multiples for T&D companies,

14 correct?

15 A.  That's correct.

16         MR. MORRIS:  Now, Your Honor, I'd like to go beyond

17 the scope.

18         THE COURT:  All right.

19         MR. MORRIS:  I told you I'd be brief.

20 BY MR. MORRIS:

21 Q.  Mr. Bird, you're familiar with -- are you familiar with the

22 settlement that Northwestern has with the MPSC?

23 A.  I am indeed.

24 Q.  And is it your view that that settlement was a very

25 positive step for the company in its relationship with the

Bird - Cross                      218

1   Montana Commission?

2   A.   I think it was a positive step, yes.

3   Q.   Do you think it's a very positive step?

4   A.   I think it's a very positive step.

5          MR. MORRIS:  No further questions.

6          THE COURT:  All right.  Anybody else?

7          MR. HOUSTON:  Yes, Your Honor, Joe Houston here.

8          THE COURT:  Okay, Mr. Houston, go ahead.

9          MR. HOUSTON:  Thank you.  Just one or two, Your

10  Honor.

11                    CROSS EXAMINATION

12  BY MR. HOUSTON:

13  Q.   Sir, you're the CFO of the company, correct?

14  A.   That is correct.

15  Q.   And are you familiar with the accounting terms FIFO and

16  LIFO?

17          MR. AUSTIN:  Objection, Your Honor.  I'm going to go

18  down the same road that he started with Mr. Austin.  I think we

19  established that that's not appropriate today.

20          MR. HOUSTON:  Your Honor, those are two concepts that

21  are used in the calculation of cost of sales or cost of good

22  sales as to which this gentleman testified about 15 or 20

23  minutes ago.

24          THE COURT:  I think what you ought to -- is that why

25  you're asking it or are you asking it in connection with the

Bird - Cross                                219

1   treatment of your client?

2           MR. HOUSTON:  I want to know whether the company uses

3   FIFO or LIFO in any of its financial reporting or accounting.

4           THE COURT:  All right.  I'll let you ask that

5   question.

6   A.  I do not know in terms of inventory how we would handle any

7   FIFO, first-in, first-out versus LIFO, last-in, first-out.

8   BY MR. HOUSTON:

9   Q.  But those are both systems of value and inventory, correct?

10  A.  That is correct.

11  Q.  And your principal business is in {quote}, "through put of

12  energy," correct?

13  A.  That is correct.

14  Q.  Which is not subject to inventory, correct?

15  A.  We do have some inventory of gas that we have on our books.

16  There is inventory on our balance sheet.

17  Q.  But you don't apply either FIFO or LIFO to that do you?

18  A.  I am not sure what we apply in terms of that measure.

19  Q.  But to the vast majority of your {quote}, "through put of

20  energy" FIFO and LIFO are irrelevant?

21  A.  Well, indeed, since we do not maintain large inventory.

22  Only in our storage do we have inventory of gas.  Otherwise,

23  we're procuring gas and using it within our business and not

24  keeping it in inventory.  So, in most cases LIFO and FIFO would

25  not matter.

Bird - Redirect                                220

Q.    Thank you.

        MR. AUSTIN:  No further questions, Your Honor.

        THE COURT:  All right.  Anybody else?  Anybody else?

        MR. AUSTIN:  (Indiscern.) Mr. Bird.

        THE COURT:  And I would like the counsel and the
gallery basically to control themselves about the comments that
are made.  You know, this is not -- we're not here to make
comments about whatever questions may be asked or whatever the
responses of any witnesses are.  If you're here to participate
then you get up and participate.  Otherwise you can listen.  Is
that clear?  Thank you.  Mr. Austin.

                    REDIRECT EXAMINATION

BY MR. AUSTIN:

Q.    Mr. Bird, Mr. Morris was asking you about the settlement
agreement with the Public Service Commission.

A.    Correct.

Q.    I believe you testified that you believe that it improved
relationships, is that correct?

A.    Yes, indeed.

Q.    Solve all the issues --

A.    No.

Q.    -- with the Public Service Commission?

A.    No.

Q.    Did it -- did they concede and give you back the gas that
they disallowed a year or so ago?

1  A.  Absolutely not.

2  Q.  And from your perspective what are the issues that still

3  remain that you have to deal with for the Public Service

4  Commission?

5  A.  Well, obviously we, you know, we're still fighting over

6  that gas cost disallowance, and we have future electric and gas

7  that we file with the Commission, and you know, we're not sure

8  that we'll get full recovery there as well.

9              MR. AUSTIN:  That's all I have, Your Honor.

10                     RECROSS EXAMINATION

11  BY MR. MORRIS:

12  Q.  Is there any basis for your statement that you're not sure

13  you'll get future recoveries other than they did it once in the

14  past and they might do it again?

15  A.  In addition the fact that they've done it once and might do

16  it again is the fact that they publicly stated, we may run into

17  this issue again.

18  Q.  What's the first step in the process of disallowance?

19  A.  They review our filings and they take a look at the

20  prudence that we had in our procurement of gas and electricity,

21  and if they felt that we were prudent in any way then they

22  would claim that there be a disallowance.

23  Q.  And are there any filings that have already been submitted

24  for either 2003 or 2004?

25  A.  We have a large filing both in gas and electric that I

Bird - Recross                                    222

1  believe are in place at this time.

2  Q.  And what is the first step that happens if the Commission

3  wants to put you on notice that it's going to challenge some of

4  the supply costs (inaudible).

5  A.  I'm -- not being there at the time that they did our last

6  gas cost disallowance I don't know what the first thing they

7  would do in terms of indicating, letting us know that we had a

8  gas cost disallowance.

9  Q.  Is it fair to say as you sit here today you have received

10 no notice of any intent on the part of the MPSC to disallow any

11 portion of our supply costs?

12 A.  That is correct.

13 Q.  And not only haven't you received formal notice, you

14 haven't received any specific informal indication that the MPSC

15 intends to come after retroactively any of Northwestern's

16 supply costs, isn't that right, sir?

17 A.  That is correct.

18         MR. MORRIS:  No further questions.

19         THE COURT:  All right, thank you, Mr. Bird, you may

20 step down.  Okay, Mr. Austin.

21         MR. AUSTIN:  The next witness is Mr. Andrew Yearley,

22 Your Honor, and Ms. Denniston will be doing the examination.

23         THE COURT:  Okay, Mr. Yearley, come forward to the

24 Courtroom Deputy to be sworn.

25         ANDREW YEARLEY, DEBTOR'S WITNESS, SWORN

Yearley - Direct                                           223

DIRECT EXAMINATION

BY MS. DENNISTON:

Q.  Mr. Yearley, could you state your name for the record, please?

A.  Andrew Yearley.

Q.  And you're here today to testify as an expert witness in connection with the confirmation of the Debtor's plan, correct?

A.  That is correct.

Q.  And can you tell us or just give us a brief description of Northwestern's retention of Lazard?

A.  Lazard was retained in the spring of 2003 to essentially assist the company in looking at out of Court alternatives sort of as previously described today by Mr. Austin.

Q.  Can you give me a brief --

        THE COURT:  Let me just -- bear up for a minute.  For scheduling purposes what does it look like for the rest of the day here?  We have Mr. Yearley, correct?

        MS. DENNISTON:  That's correct, Your Honor.

        THE COURT:  Then will that be the end then of the witnesses being presented today by the Debtor?

        MR. AUSTIN:  That's correct, Your Honor.

        THE COURT:  Then do we have Mr. Harris?

        MR. MORRIS:  Yes, Your Honor.

        THE COURT:  And do we have anybody besides Mr. Harris?

1        MR. ALCOTT:  Yes, Your Honor, Mark Alcott of Paul

2   Weiss Rifkind for the Creditors Committee.  We have a witness,

3   an expert witness.

4        THE COURT:  What is the reasonable expectation of

5   when or if we can put all of those witnesses on during the

6   course of the remainder of the day?  I know it depend on how

7   long the day lasts, so what I'm really trying to figure out

8   from you all is what we're looking at here for the rest of the

9   day.

10       MR. AUSTIN:  I think, Your Honor, from the Debtor's

11  perspective, depending on how long the direct examinations of

12  the --

13       THE COURT:  Well, why don't we start here with

14  Mr. Yearley.  What do you expect in terms of direct

15  examination?

16       MS. DENNISTON:  Your Honor, I would expect somewhere

17  between 30 and 45 minutes.

18       THE COURT:  And then we'll have cross examination

19  presumably.

20       MR. MORRIS:  My guess is 45 minutes to an hour.

21       THE COURT:  All right.  So, let's say that's

22  optimistically and hour-and-a-half.

23       (Laughter)

24       THE COURT:  I mean an hour-and-a-half for both is

25  what I was trying to say.

1          MR. MORRIS:  Oh, yes, I'm sorry.

2          THE COURT:  Then what about the Creditors Committee

3    witnesses?

4          MR. ALCOTT:  Yes, I don't anticipate any cross

5    examination of the witness from Lazard, but in terms of the

6    witness we will be presenting I anticipate 45 minutes of

7    direct.

8          THE COURT:  All right.  And then about the same, you

9    think, in terms of cross examination?

10          MR. MORRIS:  Yes, Sir.

11          THE COURT:  So we're at three hours there.  And then

12    are we going to expect the same thing from Mr. Harris more or

13    less?

14          MR. MORRIS:  My guess is I would expect something

15    similar.

16          THE COURT:  So, we have four-and-a-half hours left if

17    we try to finish today, is that right?

18          MR. MORRIS:  Without breaks.

19          THE COURT:  Without breaks, yes.  Is that what

20    everybody wants to do?

21          MR. HOUSTON:  Judge Case, this is Joe Houston.  Do

22    you anticipate -- I do not anticipate examining any -- at all

23    any of these witnesses.  Do you anticipate that we will simply

24    close the record on testimony and have -- actually, address the

25    legal arguments on objections to the plan at the continued

1  hearing?

2         THE COURT:  I think that we're going to have some

3  evidence at the continued hearing based upon the stipulation

4  among the parties that we've already discussed, particularly

5  the Magten entities, Magten law debenture and so on.

6         MR. AUSTIN:  That's correct, Your Honor, if they

7  decide to have us bring back our witness.

8         THE COURT:  Right.  If they decide to have you bring

9  back the witnesses, you know, my preference would be -- I'm

10 sure I told you, but I'm leaving tomorrow.  I can't -- I don't

11 have any time tomorrow to continue.  We're all here.

12        MR. AUSTIN:  Debtor's prepared to move forward.

13        THE COURT:  If we have to go until 9 o'clock let's --

14 why don't we just sort of make 9 o'clock our outside time

15 period and have everybody figure that we've got three experts

16 and that time is going to be divided equally among those three

17 experts.

18        MR. HOUSTON:  And Your Honor, therefore arguments

19 that addressing the legal issues of objection to confirmation

20 would be at the continued hearing, correct?

21        THE COURT:  Right, we will not have any arguments.

22 All we're trying to do today is to complete our record.

23        MR. HOUSTON:  Very good, Sir.

24        MR. ALCOTT:  That's acceptable to the Creditors

25 Committee, Your Honor.

1    MR. MORRIS:  It is to the equity holders as well,

2  Your Honor, with one caveat.  At 9 o'clock is, in fact, the

3  time that I really do have to run to catch my plane, but what I

4  really don't want to happen is if these -- if Mr. Yearley and

5  the fellow from Hoolihan Lokey take an extended period of time

6  I don't want to leave Mr. Harris hanging in the middle.

7    THE COURT:  I want to have -- what I'm suggesting

8  here is that we've got three witnesses, it's more or less 4

9  o'clock, let's allocate an hour-and-a-half to each of the

10  expert witnesses and to ask the questions accordingly.  In

11  other words, really hone in on the direct and hone in on the

12  cross to make sure that the really truly important salient

13  points are the ones that we get across.

14    MR. MORRIS:  Will do, Your Honor.

15    MR. HOUSTON:  Judge Case, Joe Houston again, please

16  forgive me.  With your indulgence, since I'm trying to conserve

17  our client's assets, if I may be excused at such time as I deem

18  appropriate will Your Honor indulge me that?

19    THE COURT:  Of course.  Anybody can be excused

20  whenever they want.

21    MR. HOUSTON:  Thank you, Sir.

22    THE COURT:  All right.  So, with that let's keep on

23  going.

24    MS. DENNISTON:  Your Honor, would it be appropriate

25  at this time while we're dealing with housekeeping details to

1    clean up the agenda vis-a-vis the objection chart, or would you

2    prefer to do that at the end, because a number of the

3    objections have been resolved or otherwise withdrawn and we

4    need to be sure the agenda has been completed, and we ask --

5             THE COURT:  We might even be able to do that by

6    written submission I would think, as opposed to necessarily

7    taking the Court time.

8             MS. DENNISTON:  Okay.

9             THE COURT:  What I really want to do is while we have

10   people here take the Court time for the evidence.

11            MS. DENNISTON:  Well, there's the minor matter of

12   cleaning up the solicitation issue vis-a-vis (inaudible) and

13   we'll probably need maybe 5, 10 minutes for that.

14            THE COURT:  Let's -- we have this witness ready,

15   let's get him going.

16            MS. DENNISTON:  All right.

17   BY MS. DENNISTON:

18   Q.   Mr. Yearley, can you give us a brief description of your

19   professional background?

20   A.   Sure.  I spent the first four years of my career in

21   commercial banking starting with the chase Manhattan Bank,

22   spent five years after that at Ernst & Young in their

23   restructuring practice, and five years after that in

24   combination of Lazard and (inaudible), again, doing investment

25   banking in the restructuring field.

1  Q.  And what has been your involvement in connection with

2  Lazard's work for Northwestern?

3  A.  I have been the day-to-day individual responsible for the

4  Northwestern accounts since again the spring of 2003 when

5  Lazard was originally engaged.

6  Q.  And can you give me a brief description of the activities

7  that have taken place since Lazard was engaged in the spring of

8  2003?

9  A.  Again, we spent the spring and summer working with the

10 senior management team in trying to develop the out of Court

11 restructuring alternatives that were discussed earlier today.

12 When those efforts were not successful the company obviously

13 ultimately filed for bankruptcy.  We assisted the company in

14 arranging its Debtor-In-Possession financing to ensure that the

15 Debtor had adequate liquidity for the balance of the

16 bankruptcy, and then spent really the fall and winter working

17 with the company both preparing the valuation working with the

18 company in terms of the vetting of their business plan and

19 projections.  We did prepare the liquidation analysis that is

20 in the Disclosure Statement as well, and then finally we

21 advised the company on any third-party offers that were

22 received during the course of our engagement.

23 Q.  And is the business plan that you refer to what we've been

24 referring to today in Court as the five-year business plan?

25 A.  It is.

Q.   And how is the five-year business plan different from the valuation that was already performed?

A.   Again, the business plan formed the basis on which Lazard then valued the company.

Q.   I want to ask you -- I'm gonna hand you what we have marked as Debtor's Exhibit #16 and ask if you could tell me what this document is.

     (Debtor's Exhibit-16 previously marked for identification)

A.   This is my declaration and affidavit in support of the confirmation of the plan of reorganization.

Q.   And is that your signature at the last page of the affidavit?

A.   It is.

Q.   And has anything changed since you filed this affidavit?

A.   No.

Q.   I'm gonna ask you what is the opinion that's set forth in the affidavit?

A.   Again, it's an opinion of a valuation that -- as reflected in the Disclosure Statement.

Q.   And there were no changes as between the affidavit and the information set forth in this Disclosure Statement, correct?

A.   That is correct.

Q.   Can you describe the approaches that Lazard used to value the Debtor?

A.   Sure.  We use three standard valuation approaches.  We call

1  it the three legs of the stool.  Precedent transaction analysis

2  which is just a fancy term for looking at M&A transactions in

3  the market.  Discounted cash flow approach, and then last

4  comparable public company analysis.  As this chart shows over

5  on the right here the blue bars are essentially the range of

6  values arrived at under each one of these approaches.  Lazard

7  enterprise value range is the bar at the bottom here.  As you

8  can see, the midpoint of that range, again, contained in the

9  Disclosure Statement, is $1.5 billion.

10  Q.  Okay.  What can you tell us about the multiple pro forma

11  that's set forth on the Exhibit-142?

12     (Debtor's Exhibit-142 previously marked for

13  identification)

14  A.  Off to the right at the bottom we just list the implied

15  multiples as a result of the midpoint of our valuation.  So, we

16  looked at the valuation of the Debtor on three pro forma

17  earnings metrix, the first being EBITDA, interest before -- I'm

18  sorry, earnings before interest, taxes, depreciation,

19  amortization, EBIT, and then net income otherwise known as

20  price earnings.  These, again, are multiples of the Debtor's

21  projected 2004 earnings as adjusted from non-recurring and

22  one-time charges.  So, it's meant to be a proxy for the

23  earnings power of the company as projected by management.

24  Q.  Did you weight any of these approaches?

25  A.  We weighted each one of these approaches equally, again, to

Yearley - Direct                                    232

1    arrive at the midpoint valuation of a billion five.

2    Q.   And what is the midpoint valuation?

3    A.   Again, 1.5 billion.

4    Q.   What factors did you consider in reaching this midpoint

5    valuation?

6    A.   Again, we looked at all three different approaches as we

7    looked -- this chart's probably unfair this late in the day to

8    go through this but let's do it.  What we've shown here both

9    from the top of this chart and from the bottom of this chart

10   are the EBITDA multiples or the public companies that we looked

11   at, and then down below the EBIT -- I'm sorry EBITDA multiples

12   for the M&A transactions that we chose.  What you will see is

13   the yellow line represents the mean of all those various data

14   points on the two charts.  So, if you look at the public -- the

15   company now that says, you're looking at a mean of roughly 7.7

16   times EBITDA in terms of a valuation metric.  That mean, by the

17   way, does include Duquesne Light Holdings, which is sort of an

18   out (indiscern.) here.  If you were to exclude them, which we

19   didn't, that mean obviously would move much more towards the

20   left.  Duquesne, it's interesting, is a company that shares a

21   lot of operating characteristics similar to Northwestern.  It

22   happens to trade at a much higher EBITDA multiple because it

23   pays a much higher dividend, which is attractive, again, on a

24   dividend yield basis for investors.  Same thing down below on

25   this M&A transaction analysis.  The mean came in to about 7.5.

1   When you look at all this data set, again, including some of
2   these sort of higher multiples out here to the right.  When we
3   went and looked at what multiple we thought was appropriate to
4   use for Northwestern we thought in terms of working with
5   management there was specific factors that justified using a
6   somewhat lower multiple than the mean.  So, the multiples we
7   use are shaded towards the lower end.  We use 7.0 from the
8   public comps and 6.75 from the M&A transactions comps, again,
9   related to three key factors, many of which have been talked
10  about earlier today.
11  Q.  Okay.  If -- what does that result in in terms of it as an
12  adjustment to the valuation?
13  A.  If you were not to include the adjustment as we did here
14  you're probably talking about in total $150 million upward
15  adjustment to the valuation.
16  Q.  And if we excluded the 10% discount, hypothetically
17  speaking, that Lazard applied what would that mean in terms of
18  any potential distribution to the equity?
19  A.  Again, you're talking about from -- and we'll get to this
20  in a few slides -- from where the mean point of our valuation
21  at a billion five to where we think the equity needs to get to
22  is roughly a $700 million difference, you're talking, again,
23  about a $150 million change when you need to get to $700
24  million of change.  So, at the end of the day there would be no
25  impact on potential recovery debt (indiscern.).

1  Q.  In terms of the factors that Lazard considered in valuing

2  the Debtor, what if any consideration did you give to core

3  utility value?

4  A.  I'm sorry, could you repeat the question?

5  Q.  Yeah.  What consideration, if any, did you give to core

6  utility value?

7  A.  Again, the valuation was done on the following basis, we

8  valued the core utility in and of itself, we separately valued

9  the NOLs that have been talked about today, and then we

10  separately valued one other asset, which is the Debtor's

11  minority leasehold interest in Colstrip.  That asset is a

12  25-year live asset.  So to take a multiple of the earnings one

13  year of Colstrip doesn't make any sense.  So, we valued that

14  asset separately, we valued the NOL separately, and then again,

15  as has been discussed earlier today, we deducted from these

16  valuations the present value of the QF liabilities, again, in

17  the amount of $140 million because the QF losses that run

18  through the income statement each year are not captured in any

19  of the earnings figures that we talked about.  They're not in

20  EBIT, it's not in EBITDA, and we made sure it wasn't in our net

21  income number that we used.  So, we, again, deducted that

22  liability separately.

23  Q.  And did you have any conversations with the Debtor about

24  the 1.2% growth rate that's been testified about earlier today?

25  A.  We did.  We had extensive discussions.  That's obviously a

1  key assumption in these projections.  As has been discussed

2  again today, we spent time with the senior management

3  understanding how the load group in Montana put together their

4  forecasts, the basis on which they looked at both historical

5  and prospective estimates of low growth and got comfortable

6  with the 1.2%.

7  Q.  And at any time with the interactions that you or anybody

8  else from Lazard had with the Debtor did management ever

9  provide you with any instructions that you were uncomfortable

10  with?

11  A.  No, they did not.

12  Q.  Okay.  And did you receive all the information that you

13  requested in connection with preparing the valuation?

14  A.  We did.

15  Q.  Okay.  Based on your experience and familiarity with

16  Northwestern are the projections that the Debtor has included

17  in its five-year business plan reasonable?

18  A.  I believe they are reasonable.

19  Q.  Do you think those projections are achievable?

20  A.  I do.

21  Q.  Now let's turn back to the 10% discount.  What are the

22  factors that you used that -- I think you gave us a brief

23  overview that you've used in reaching the conclusion that the

24  10% discount was appropriate?

25  A.  We looked at three factors that we've listed here, first

1  being what we call low growth/below average total return.  This

2  is an issue that if you're to look at Northwestern on a

3  projected basis versus its peer group it is likely, in terms of

4  its projections, to have lower growth than its peers.

5  Investors at the end of the day invest in value utilities based

6  on growth, and growth comes really from two avenues.  The first

7  is dividend yield, i.e., if you own a stock -- a utility stock

8  how much money do you have to get paid on a dividend yield,

9  because again, an investment in a utility is really an

10  alternative to investing in a bond.  Secondly, over and above

11  the dividend yield I'm going to get is there underlying growth

12  in the business that's gonna drive performance in the stock?

13  Is the stock gonna increase over time?  If you're to look at

14  the peer group for Northwestern on average they grow between

15  dividend yield and estimated long-term growth in the area of 9

16  to 10%.  Northwestern, pursuant to its plan, it's going to be

17  issuing a dividend somewhere south of 4% a year and its

18  expected long-term growth between the 1.2% we talked about plus

19  some expense savings built into the plan, about 3%.  So, you're

20  talking about sort of a 7% or less growth profile for

21  Northwestern versus 9 to 10% for the peer group, and we think

22  that impacts valuation and should be taken into account.

23  Separately we've talked -- there's been an awful lot of talk

24  today about the regulatory environment.  I would echo Mike

25  Hanson's testimony from earlier today.  I do have some

1  experience with this Commission having been involved for

2  roughly four months in negotiating the, ultimately the term

3  sheet and agreement of principal with the Montana Commission.

4  I would say at the end of the day that the investment community

5  looks first and foremost to predictability in the regulatory

6  environment.  I think it's safe to say that we've had a

7  challenge relationship with Montana, I think the investment

8  community's concerned about the predictability of the

9  Commission, and its's -- there's sort of one key point that no

10  one has really talked about today, but we essentially cut a

11  deal with a Commission that was made up of five commissioners.

12  It was led by Chairman Rowe who was very constructive in the

13  course of those negotiations.  As we stand here today three of

14  those five commissioners, including Chairman Rowe, are

15  essentially on their way out and there's an election going on.

16  We are gonna have three new commissioners in the first part of

17  next year.  So, we're gonna be dealing with an entirely new

18  Commission.  Again, I can't tell you today whether that's gonna

19  be good or bad, but it's certainly not, you know, gonna be

20  predictable as we stand here.  These are gonna be new

21  individuals in new positions.  So, again, I would add that to

22  concerns in the market again about the predictability of this

23  Commission and at lease their track record of being very

24  consumer friendly.

25  Q.  Is it fair to say or fair to characterize that as something

1  that causes uncertainly even though we now have the stipulation

2  of settlement?

3  A.   That is correct.   The last factor we listed up here is

4  small market capitalization.   At the end of the day financial

5  theory would tell you that investors like larger companies

6  versus small companies.   They require a premium, typically, in

7  return for smaller cap companies.   Northwestern is going to

8  come out with an estimated equity value of 710 million.   That

9  is roughly -- their competitors in the comp group, if you were

10 to look at them, are roughly four times the size of

11 Northwestern.   They all have probably greater access to the

12 capital markets, and that net small market capitalization is a

13 detractor from valuation.   So, again, in total, those are the

14 three factors that we looked at in terms of stacking up

15 Northwestern versus both the peer group and the M&A accounts we

16 looked at and believe that there are specific factors that

17 warrant a reduction.

18 Q.   As you sit here today, and particularly in light of the

19 testimony that you've heard given today, has anything changed

20 in terms of your comfort level with the 10% discount that was

21 applied?

22 A.   I'm still comfortable with that.

23 Q.   And you still --

24 A.   That approach.

25 Q.   I'm sorry.   You still think that number's appropriate?

1  A.   I do.

2  Q.   What backers, if any, could impact the Debtor's ability to

3  perform under their five-year plan?

4  A.   We've heard many of them today and I share the views we've

5  heard today.  Anything from, again, meeting cost targets,

6  making sure that they, in fact, are reimbursed on all their

7  default supply.  At the end of the day, again, you've got

8  regulatory issues going forward that we talked about whether

9  it's the gas tracker or just the energy tracker.  Generally,

10  those are sort of the key items that come to mind.

11  Q.   Would any of these factors or risks cause the Debtor not to

12  be able to comply with the terms of plan of reorganization and

13  make distributions to Creditors?

14  A.   No.

15  Q.   And is it your opinion that the Debtor's plan, based on the

16  information that you reviewed, is feasible?

17  A.   I do believe it's feasible.

18  Q.   Is there any confirmation that Lazard's valuation is

19  correct?

20  A.   Again, during the course of the bankruptcy the company was

21  approached by both financial and strategic buyers.  We did

22  receive five written initial indications of interest.  We've

23  listed on this chart off to the right the -- I'm sorry, there

24  were four -- the four offers we did receive.  I would just note

25  that the ranges, as you look at these, from a billion four up

1  to a billion 625, and I'll talk about the billion 625 in a

2  minute, on average are right within the range of our valuation.

3  The party within this group that probably did the most work had

4  meetings with management, did some secondary due diligence, was

5  a strategic buyer here at the very bottom.  Their bid actually

6  went down after they completed some additional due diligence.

7  One comment on the financial buyer here at the top, the 1625.

8  This is a bid that we received a few weeks ago.  It was from a

9  financial buyer.  The company and the Creditors decided not to

10 pursue it further for a number of reasons.  It was an offer

11 that had significant contingencies, subject to due diligence,

12 didn't have any financing in place, was a structure that at the

13 end of the day we did not think would fly with the Montana

14 Commission.  As a result we continued along our pace of trying

15 to get the company confirmed and out of bankruptcy.

16 Q.  With regard to the 1.6 billion offer from the financial

17 buyer, was that a hard offer?

18 A.  No.  It was just an initial indication of interest based on

19 public information.

20 Q.  And at that time the offer was made had any due diligence

21 been conducted?

22 A.  No.

23 Q.  And back up question just by way of foundation, what was

24 your involvement in connection with the receipt of these offers

25 made to Northwestern?

1  A.  Northwestern generally had a process any time we received

2  an offer, again, we set up meetings with the perspective

3  purchaser, went through their bid, tried to understand the

4  basis on which they put it together and how they valued the

5  company.  We had a special committee of the board that was

6  established that we would then review that offer with the

7  board.  We would then communicate the offer to the Creditors

8  Committee, and through all that input we'd eventually go back

9  to the buyer with our response and feedback.

10  Q.  And were you personally involved in that process?

11  A.  I was involved in that process.

12  Q.  What are the recoveries being proposed under the plan

13  reorganization by the debt class?

14  A.  As shown on this chart but a little hard to read, but class

15  7 under the plan would receive 68.4% recovery; class 8, 15.3%;

16  and class 9, again, the same 68.4%.

17  Q.  And are you aware of the proposed settlement with the

18  Toppers and Wilmington Trust?

19  A.  I am.

20  Q.  And what impact does that have on the recoveries under the

21  plan?

22  A.  Again, it essentially provides additional recovery to class

23  8 through basically a gifting of the recovery from the class 7

24  and 9 Creditors to that class.

25  Q.  I believe you testified earlier that Lazard was asked to

1  prepare liquidation analysis and that was addressed in the
2  affidavit that you filed in connection with confirmation,
3  correct?
4  A.  That is correct.
5  Q.  And what can you tell us about the liquidation analysis
6  that was prepared?  What conclusions did you draw?
7  A.  Just quickly, it was prepared, again, pursuant to a
8  hypothetical Chapter 7 liquidation.  This would be a
9  liquidation not where you shut the doors and turn off the
10 lights 'cause this is a public utility but where you have to go
11 out and sell the utility in a fire sale and realize reduced
12 proceeds, and again, there's incremental costs to sell the
13 asset.  So, the recoveries under the liquidation analysis, due
14 to those two factors, are significantly reduced as shown on the
15 chart.  Again, class 7 and 9 Creditors would recover
16 significantly less than under the plan, and class 8 Creditors
17 would receive nothing.
18 Q.  And as you sit here today, what is a -- would it be better
19 or worse for Northwestern to liquidate when compared to the
20 proposed plan of reorganization?
21 A.  Again, Creditors do much better under the proposed plan of
22 reorganization.
23 Q.  Did you have a chance to review the expert report provided
24 by Seneca?
25 A.  I did.

1  Q.  And did you compare it to the report prepared by Lazard?

2  A.  I did.

3  Q.  Were the informations set forth in your affidavit?

4  A.  Yes.

5  Q.  What can you tell me, at least as to this exhibit, which is

6  144, there's two notations up at the top.  What are those lines

7  and what do they mean?

8      (Debtor's Exhibit-144 previously marked for

9  identification)

10 A.  What this chart shows in the purple, red, and sort of gray

11 colors is the various claims as outlined in the Disclosure

12 Statement leading up to sort of a threshold or break point by

13 which the equity would then be in the money.  What it shows is

14 that that threshold is approximately $2.2 billion.  The Seneca

15 -- the midpoint of the Seneca valuation is $2.3 billion.  Just

16 noted that if you're to deduct the QF liabilities which we

17 talked about today, which I believe Seneca's does not deduct

18 from their valuation, you actually would be below the

19 threshold.

20 Q.  Were there any other adjustments that needed to be made in

21 connection with the Seneca valuation in terms of the benchmarks

22 or adjustments?

23 A.  I'm not sure I understand the question.

24 Q.  For example, did you look at whether or not post-petition

25 interest had been included?

1  A.  We -- can we just go back a slide?  To clarify the slide,

2  this -- first of all, the senior secured debt, net, that's the

3  senior secured debt net of the distributable cash that would be

4  available so that that claim amount reflects the application of

5  excess cash, and then separately the unsecured claims and

6  unsecured subordinated notes include post-petition interest

7  from dividends as applicable.

8  Q.  What can you tell me in Debtor's Exhibit -- what is

9  Debtor's Exhibit-145?

10      (Debtor's Exhibit-145 previously marked for

11  identification)

12  A.  What we've done in this exhibit is just compare under the

13  three common valuation approaches the Lazard valuation and the

14  Seneca valuation just to sort of understand the differences.

15  The blue bar is the Lazard valuation under both -- under the

16  three valuation methods.  The gray bar is the Seneca valuation

17  under the three methods, and off to the right is what we have

18  called this claims hurdle, or the $2.2 billion threshold that

19  you would need to cross again to be in the land of equity

20  value.  It's an interesting chart in that it shows, if you're

21  to look at the precedent transaction analysis, Seneca's

22  actually largely in line with Lazard.  In fact, if you deduct

23  the QF liability as we did we're almost at the same number.

24  The comparable public company analysis there is a large

25  divergence, although interesting enough, even at the large

1  divergence we don't get to the claims hurdle that you need to

2  even if you include the QF -- you don't deduct the QF

3  liability, and then the DCF valuations where you have your

4  largest divergence, and again, you only get to the claim hurdle

5  if you have not deducted the QF liability, but if you, again,

6  were to deduct the QF liability you're below the hurdle once

7  again.  The value conclusion is sort of interesting to me.  The

8  Seneca folks sort of looked at the present transaction analysis

9  and said, not applicable.  Looked at the comparable company

10 analysis said, not applicable.  Looked at the DCF and said,

11 yep, that's the one we're using and that's our -- the midpoint

12 of our valuation at 2.3 billion, again, only works if the QF

13 liability isn't deducted.  The final chart shows if you were to

14 actually weigh the three methods equally, again, under our

15 approach you get to the billion five, under the Seneca approach

16 you're a little over 2 billion, again below the claims hurdle,

17 and it gets -- obviously gets lower if you deduct QFs.

18 Q.  And does this -- does Exhibit 145 take into account the

19 hundred million for post-petition interest on the senior notes,

20 the sub-debt?

21 A.  It does.

22 Q.  It does.  Turn to Debtor's Exhibit-146.  What can you tell

23 me about the Lazard to Seneca valuation bridge?

24         (Debtor's Exhibit-146 previously marked for

25 identification)

1  A.  Well, what we tried to do here is then go back and say,
2  okay, we've isolated that discount and cash flow is the
3  approach that Seneca used among the three they looked at so
4  let's compare what are the differences?  What are we arguing
5  about at the end of the day between the Lazard DCF and the
6  Seneca DCF?  Before we even get there let's just remember that
7  the Lazard valuation overall isn't a billion six, it's a
8  billion five because we weighted the three approaches, but for
9  purposes of just doing the bridge let's just start with our
10  billion six and bridge from there.  All these things need to
11  happen -- all these changes at Seneca has made need to happen,
12  you need to believe them essentially to get to the valuation at
13  the end of the day and it gets them in the money, and what are
14  those adjustments?  Seneca has taken a very different approach
15  to taxes and discounted cash flow, an approach that neither
16  frankly we agree with or necessarily totally understand, but
17  again, it creates $207 million of value under their DCF
18  approach.  They had used a higher growth rate.  They've made an
19  assumption that the company won't grow at 1.2% but at 2½%.
20  That get's them another roughly 111 million of value.  And the
21  biggest contributor is they've used an exit multiple of 9.5
22  times EBITDA in their discounted cash flow approach.  So, if
23  you remember a discounted cash flow is two parts.  It's a
24  discounting of the cash flows during the projection period, and
25  it's a calculation proxy for the value of the company into the

1   future and that's typically done as a multiple of earnings.

2   They have used, again, a multiple significantly higher than any

3   we have seen in a T&D company based on our composite group and

4   that contributes $359 million of value.  And then there's a

5   basket of other items that basically contributes 53 million and

6   that gets them to, again, 2.3.  So, the concluding comment of

7   having this chart is first you have to believe DCF is the only

8   approach you should use.  Second, you should believe that the

9   QF liability should not be deducted.  And third, you need to

10  believe that their rate on taxes, higher growth, terminal

11  value, and other to get to the conclusion that there's value

12  for equity.

13  Q.   Okay.  And by way of summation, they have to hit it on

14  every single one of those items to get to a return to equity,

15  is that correct?

16  A.   That is correct.

17  Q.   One last question, Mr. Yearley.  I want to hand you what's

18  been marked as Debtor's Exhibit-139 and ask if you can identify

19  on the record what this is.

20       (Debtor's Exhibit-139 previously marked for

21  identification)

22  A.   These were the supporting materials that we provided as

23  part of discovery used in our valuation.

24  Q.   Okay.  And just for further clarification, if the tab

25  numbers 1 through 22 of Exhibit-139 comprises the documents you

1   used in reaching the midpoint valuation, correct?

2   A.   That is correct.

3          MS. DENNISTON:   Thank you, Your Honor, no further

4   questions.

5          THE COURT:   All right.   Is there anybody who is a

6   proponent who wishes to examine Mr. Yearley?

7          ALL:   (No verbal response).

8          THE COURT:   If not then let's have cross examination.

9                       CROSS EXAMINATION

10  BY MR. MORRIS:

11  Q.   Good afternoon, Mr. Yearley.

12  A.   How are you?

13  Q.   Good, thank you.   In your comparable company analysis you

14  selected eight companies that you believe are comparable to

15  Northwestern, correct?

16  A.   Again, in aggregate that's correct.

17  Q.   Can you take Exhibit-139, please, and turn to the document

18  with Bates #5917?   Just let me know when you have that in front

19  of you.

20  A.   I do.

21         MR. MORRIS:   Do you, Your Honor?

22         THE COURT:   Yes, I do.

23  BY MR. MORRIS:

24  Q.   Now, these are the eight companies that you in your

25  judgment decided were comparable to Northwestern, correct?

Writer's Cramp, Inc.

Certified Court Transcribers

732-329-0191

1  A.  I would say yes just caveated by the Lazard team was both

2  my team on the restructuring side and then our energy bankers,

3  so working --

4  Q.  Well, I'll use the word "Lazard."

5  A.  Lazard.

6  Q.  These are the eight companies that Lazard determined in its

7  judgment were comparable to Northwestern, correct?

8  A.  That is a fair comment.

9  Q.  Okay.  And -- my copy is a little difficult to read because

10 there's a shaded area, but is it true that the median 2004

11 estimated EBITDA multiple for your -- for Lazard's comparable

12 companies is 7.4?

13 A.  That's correct.

14 Q.  And the median last 12 months EBITDA multiple for Lazard's

15 comparable companies is 7.8, correct?

16 A.  That's correct.  I guess it's last 12 months as of December

17 2003.

18 Q.  Correct.  Now, in your opinion you used a discount off the

19 2004 estimated EBITDA, is that right?

20 A.  Correct, the mean.

21 Q.  And -- the mean.  The simple mean of 7.7?

22 A.  Correct.

23 Q.  Now, none of your comparable companies have released 2004

24 projections, have they?

25 A.  Again, all these companies provide earnings estimate to the

1  street.

2  Q.  None of these companies have released 2004 projections,

3  have they, sir?

4  A.  That I don't know the answer to.

5  Q.  You're not aware of any of Lazard's comparable companies

6  having released 2004 projections, correct?

7  A.  I think I answered I'm not aware of that.

8  Q.  And, in fact, the 2004 estimates come from market research

9  as you say in your affidavit at page 80, correct?

10 A.  That's correct.

11 Q.  Now, in your comparable company analysis you didn't use

12 either the 8 times EBITDA simple mean that's based on the last

13 12 months or the 7 times -- the 7.7 times 2004 estimated

14 EBITDA, is that right?

15 A.  That's right.  Those are 2003 historicals, since we're

16 coming now to September 2004 we used an estimated for '04.

17 Q.  But you didn't use even the estimated for 2004 that's based

18 on your comparable companies, correct?  You reduced that,

19 right?

20 A.  That's correct.

21 Q.  And you reduced that to a range of 6.5 to 7.5 with a

22 midpoint of 7, is that right?

23 A.  That's correct.

24 Q.  And you did that because in your subjective opinion you

25 didn't believe using the market derived mean from your own