1  comparable companies would produce an appropriate enterprise

2  value for Northwestern, correct?

3  A.   Correct.  We didn't think Northwestern was comparable to

4  this group.

5  Q.   And you believe that the use of the mean that was derived

6  from your own comparable companies would result in an

7  enterprise value that was too high, correct?

8  A.   That's not correct.

9  Q.   Well, you decided to reduce the multiple, is that right?

10  A.   Again, we thought that the discount was appropriate given

11  the factors that I had earlier talked about.

12  Q.   And that's because without the discount the --

13  A.   The discount would --

14  Q.   -- the straightforward use of the EBITDA numbers that are

15  derived from your own comparable companies would have resulted

16  in an enterprise value that was too high, right?

17  A.   You're qualifying it as if there's -- what I would say is

18  by using a lower multiple resulted in a lower valuation, that

19  is correct.

20  Q.   And you believe that that lower valuation is more

21  reflective, in your opinion, of Northwestern's value as opposed

22  to getting a value based on your comparable companies EBITDA

23  multiples, correct?

24  A.   Again, you're isolating multiples.  There's three

25  approaches that then got blended into --

Yearley - Cross                                    252

1   Q.   I'm just asking about this one approach from your

2   perspective of that one approach my question is correct, isn't

3   that right, sir?

4   A.   Could you repeat your question?

5   Q.   An enterprise value that's derived from the straightforward

6   application of the EBITDA multiple derived from your own

7   comparable companies would have resulted in an enterprise value

8   that was, in your subjective opinion, too high, isn't that

9   right?

10  A.   If we had used the simple mean on this sheet the enterprise

11  value would have been higher, that is correct.

12  Q.   And you decided to reduce the multiple in order to get a

13  lower value that would, in your opinion, appropriately value

14  Northwestern, correct?

15  A.   We used a lower value for the factors we talked about which

16  resulted in a lower valuation.

17  Q.   Okay.   Let's talk about some of those factors in a moment,

18  but you discounted not only the EBITDA multiple but you

19  discounted the EBIT multiple and the price of the earnings

20  multiple.   You discounted every multiple derived from your

21  comparable companies, correct?

22  A.   We took a consistent approach across the earnings multiples

23  at approximately the same discount.

24       (Pause in proceedings)

25  Q.   Now, your decision to reduce the multiples that are derived

Yearley - Cross                              253

1  from your own comparable companies, that's a decision that's

2  based on your own subjective judgment for the factors that you

3  described, correct?

4  A.   That's correct.

5  Q.   And it's your contention that the reduction in the multiple

6  is necessary to take into account three unique characteristics

7  of Northwestern, is that right?

8  A.   That's correct.

9  Q.   And one of those unique characteristics is Northwestern's

10 size relative to your comparable companies, correct?

11 A.   That's correct.

12 Q.   It's not Lazard's position, is it, that smaller companies

13 are inherently less profitable than large companies?

14 A.   I wouldn't have an opinion one way or the other on that.

15 Q.   But nevertheless, because Northwestern is smaller than the

16 comparable companies that you selected you thought that that

17 was a factor worthy of reducing the multiple, correct?

18 A.   Again, I provided some reasons for that in my testimony.

19 Q.   Let's test that theory.  Go back to the document that's

20 Bates #5917, and if you take a look you included a company

21 called Black Hills, is that right?

22 A.   That's correct.

23 Q.   And based on enterprise value Black Hills is the smallest

24 of your comparable companies, correct?

25 A.   That's correct.

1  Q.   And, in fact, Black Hills had the lowest 2004 estimated

2  EBITDA multiple, isn't that right?

3  A.   That's correct.

4  Q.   So, that kind of supports your theories that the smaller

5  companies have lower multiples?

6  A.   Black Hills is a very different company than some of the

7  others here, so you're -- one of the problems with your theory

8  is that you have an apple and an orange.  You have no perfect

9  comp to figure out size.  I mean, if you had the exact same

10 business in different size I would agree with you, but these

11 are all different businesses.

12 Q.   You analyzed the universe of utility companies and came up

13 with eight that you thought were sufficiently comparable that

14 you could value Northwestern, isn't that right?

15 A.   That is correct.

16 Q.   There are differences, aren't there?

17 A.   There are differences of what?

18 Q.   Among the companies and Northwestern?

19 A.   Sure.

20 Q.   But not so great as to exclude them from a comparable

21 company analysis on which you're asking this Court to value

22 Northwestern, isn't that right?

23 A.   Again, as I stated earlier, the goal of the comparable

24 company analysis is to come up with a composite.  So, you're

25 trying to get companies with different businesses and

1  characteristics since on a composite basis you like your comp

2  group.  Black Hills happens to be one of the comps that we

3  chose because 1) it serves a rural market, 2) it has comparable

4  size to Northwestern.  The negative is it has a significant

5  portion of its business is being unregulated.  We were willing

6  to kind of take that characteristic given our goal to get a

7  smaller rural provider in our mix.  So, you happen to pick one

8  that happens to be different than many of the others.

9  Q.  But that one actually supports your theory that the smaller

10  company has a smaller multiple, right?  I mean, that's one of

11  the reasons -- that's one of the three reasons you think you

12  should be discounting Northwestern because it's small relative

13  to its peers?

14  A.  I understand.  I'm just going to the general point of --

15  Q.  Okay, okay.  Duquesne Light, that's the second smallest

16  comp based on enterprise value, correct?

17  A.  Correct.

18  Q.  And yet it has kind of by a lot the highest 2004 EBITDA

19  multiple of any of your comparables, correct?

20  A.  Correct.

21  Q.  Let's look at it the other way.  Pepco is the second

22  biggest comp based on enterprise value, correct?

23  A.  Correct.

24  Q.  Yet Pepco's 2004 EBITDA multiple ranks fifth among your

25  comparable companies, isn't that right?

Yearley - Cross                                      256

1   A.    In terms of what?

2   Q.    In terms of 2004 EBITDA multiple.  It's got the fifth

3   highest of your eight?

4   A.    Correct.

5   Q.    And of the four companies with higher EBITDA multiples

6   three of them, in fact, are smaller based on enterprise value

7   than Pepco, correct?

8   A.    Correct.

9   Q.    And Con Edison is by far, by far your biggest comparable

10  company based on enterprise value, correct?

11  A.    Correct.

12  Q.    Yet Con Edison's last 12 month EBITDA multiple ranks sixth

13  out of your eight comparable companies, isn't that right?

14  A.    On what basis?

15  Q.    On the last 12 months EBITDA multiple?  There's only two

16  that have --

17  A.    Correct.

18  Q.    All right.  Pepco, again, is your second largest comp,

19  right?

20          THE COURT:  Well, wait.  I'm trying to understand the

21  last exchange.

22          MR. MORRIS:  Oh, if I'm going too fast I apologize.

23          THE COURT:  Well, I want to make sure I'm looking at

24  the same thing you're talking about.

25          MR. MORRIS:  Okay.

Yearley - Cross                                    257

1          THE COURT:  I'm looking on 5917.

2          MR. MORRIS:  Correct.

3          THE COURT:  Last 12 months ending 12/03 EBITDA

4  multiple, correct?  Isn't that the column you wanted me to look

5  at?

6          MR. MORRIS:  That is what I said, Your Honor.

7          THE COURT:  Right.  And then what I see --

8          MR. MORRIS:  Oh, I'm sorry, no, no, no, no, no.  It

9  should be last 12 months EBIT.

10         THE COURT:  Right.  Well, that's because under that

11 one Con Edison is #3, I think, not #6.  It goes 10.2, 8.7, 8.3,

12 which would be --

13         MR. MORRIS:  No, it goes 16.1 --

14         THE COURT:  Right, well, that's what my confusion was

15 is that you --

16         MR. MORRIS:  Oh, I apologize.

17         THE COURT:  In other words, you said, EBITDA, I

18 think --

19         MR. MORRIS:  I misspoke, I did misspeak.  I

20 appreciate that, Your Honor, and let me just make the record

21 clear.  Thank you, very much.

22 BY MR. MORRIS:

23 Q.  Con Edison, despite being the second largest based on

24 enterprise value ranks sixth out of eight on a last 12 months

25 EBIT basis, correct?

Yearley - Cross                                258

1  A.   Con Edison is the largest in terms of enterprise value.

2  Q.   And not only is it the largest as measured by enterprise

3  value, it ranks sixth out of eight based on last 12 months

4  EBIT, correct?

5  A.   (No verbal response).

6  Q.   There's only two that are --

7  A.   You know, I have to count these ever time you say it, so

8  just give me a minute, please.

9  Q.   I'm sorry, take your time.

10  A.   Correct.

11  Q.   Correct?

12  A.   Correct.

13  Q.   And Pepco, again, is your second largest comp based on

14  enterprise value, is that right?

15  A.   Correct.

16  Q.   And despite being the second largest Pepco is dead last

17  among your comps based on 2004 estimated price-to-earnings

18  ratios, correct?

19  A.   Right now we're on price earnings?

20  Q.   Now we're moving on to price-to-earnings ratio.  At 12.6

21  times it has the lowest 2004 estimated P&E among your

22  comparable companies, correct?

23  A.   Correct.

24  Q.   Is that right?

25  A.   Correct.

1  Q.  And that's true with respect to 2005 price-to-earnings
2  ratios, correct?
3  A.  That's correct.
4  Q.  So, is it fair to say that based on your own comparable
5  companies, smaller companies can have high multiples relative
6  to the other comps?
7  A.  I guess in a data set of eight companies that are very
8  different you could have any set of relationships.
9  Q.  Well, it's the only set of relationships that we have in
10 front of us right now, correct?
11 A.  That is true.
12 Q.  And it's also fair to say that larger companies can have
13 lower, indeed among the lowest multiples relative to your other
14 comps, correct?
15 A.  As I just said, you could have any set of results.
16 Q.  Well, you're discounting Northwestern's multiple off of
17 your own comparable companies and yet we've just seen that
18 there's absolutely no relationship between size and multiples,
19 at least among the very comparables from which you are
20 reducing, correct?
21 A.  That is true.  You haven't let me respond to any of them so
22 that's fine.
23 Q.  Okay.  In fact, one of the three reasons that you
24 identified in your affidavit for subjectively reducing the
25 comparable company multiple was size, isn't that right?

Yearley - Cross

260

1    A.    That's correct.

2    Q.    Now, you also decided to downwardly adjust the multiples

3    because of Northwestern's difficult regulatory environment, is

4    that right?

5    A.    That's correct.

6    Q.    And is it fair to say that one of the problems with the

7    regulatory environment was the regulator's dissatisfaction with

8    the poor investment strategy Northwestern embarked on with

9    respect to its non-core businesses?

10   A.    I think that was one of the factors.

11   Q.    And it's also fair to say that the settlement -- did the

12   settlement occur before or after you signed this affidavit?

13   A.    Before.

14   Q.    And you were aware of that settlement at the time you

15   signed this affidavit and decided to reduce the multiple

16   derived from your own comparable companies based on the

17   so-called difficult regulatory environment?

18   A.    Yes.

19   Q.    Did you hear Mr. Bird testify that he thought the

20   settlement had a very positive impact on Northwestern's

21   relationship with the regulators?

22   A.    I heard him say, I thought it was a step in the right

23   direction but there are lots of issues still outstanding.

24   Q.    How about Mr. Austin this morning?  Did you hear the Chief

25   Restructuring Officer testify that he thought the relationship

Yearley - Cross                                        261

1   Northwestern had with its regulators went from terrible

2   pre-petition to very good now?

3   A.   I did hear him say that.

4   Q.   Okay.  And yet you believe in your opinion that you ought

5   to discount the multiple for the current state of

6   Northwestern's relationship with its regulators, correct?

7   A.   Challenging regulatory environment, yes.

8   Q.   The settlement that was approved was approved by a vote of

9   five to nothing, isn't that right?

10  A.   That's correct.

11  Q.   There were no regulators who voted against the settlement

12  with Northwestern, right?

13  A.   Doesn't sound like it.

14  Q.   And you talk about the fact that three of the regulators

15  are going to be replaced in an election coming soon, is that

16  right?

17  A.   I think three are term limited, so there'll be new

18  commissioners.

19  Q.   And as you sit here today I think you said you don't know

20  whether that will be a positive or a negative impact on

21  Northwestern, right?

22  A.   That's correct.  The only comment I would add is, again,

23  the commissioner, Chairman Rowe, who was very constructive

24  during the negotiations will obviously no longer be part of the

25  Commission.  So, that's obviously a loss I think from the

1  company's view.

2  Q.  It's kind of like the weather.  You can make a prediction

3  but you don't really know, as you sit here right now, whether

4  you're gonna have a warm winter or a cold winter, right?

5  A.  I wouldn't have characterized it that way, but --

6  Q.  But you don't disagree with that, do you?

7  A.  Again, I testified earlier I can't tell you whether it

8  would be good or bad.  It's just --

9  Q.  That's right.

10  A.    -- unpredictable.

11  Q.  And so what you're reducing for, at least in that regard,

12  is simply unpredictability.  It's not knowledge, correct?

13  A.  Correct.

14  Q.  And you claim that the difficult regulatory environment is

15  unique to Northwestern, warrants a downward adjustment of the

16  multiple, is that right?

17  A.  Correct.

18  Q.  You haven't done any study, have you, of the relationships

19  between each of your comparable companies and their respective

20  regulators, correct?

21  A.  That's correct.

22  Q.  So, you can't even say that Northwestern's situation is

23  unique, correct?

24  A.  Yeah, I've had extensive discussions with Mike Hanson,

25  who's, you know, lived and practiced in this world, and -- the

1    regulatory world has kind of the most experience with the

2    Montana Commission, and, you know, in talking to the company

3    and in dealing with it through the negotiation of the

4    settlement with Montana we came to that conclusion.

5    Q.   So, your testimony that Northwestern faces a difficult

6    regulatory environment, a uniquely difficult regulatory

7    environment, is testimony that's based solely on what

8    Mr. Hanson told you, is that right?

9    A.   No, I mean, there are a number of third-party publications.

10   In fact, I haven't found one that's actually talked about a

11   positive regulatory environment in Montana, but there are -- I

12   think as Mr. Hanson testified to earlier, there are rating

13   agencies and various third parties that evaluate regulatory

14   environments and in any of the reports I have seen they rate

15   the Montana authority as a consumer-friendly, politicized,

16   challenging environment.

17   Q.   But you haven't done any study of your own comps to see

18   whether or not they operate in a difficult regulatory

19   environment, correct?

20   A.   I think asked and answered.

21   Q.   And the answer is yes, correct?

22   A.   Yes.

23   Q.   And have you examined how many times requests for rate

24   increases by your comps have either been turned down or reduced

25   by regulators?

1  A.  I have not done that study.

2  Q.  You also claim that because Northwestern is a default

3  supplier it's subject to the risk of retroactive review and

4  disallowance of past (indiscern.), correct?

5  A.  That's correct.

6  Q.  That's what you say in your affidavit, right?

7  A.  I'd have to review it again, but I certainly signed my

8  deposition so I'm comfortable with it.

9  Q.  Okay.  And that's part and parcel of this idea that

10  Northwestern operates in a uniquely difficult regulatory

11  environment, correct?

12  A.  That's your characterization.

13  Q.  No, it's actually your characterization.  Can you get your

14  affidavit, please?

15  A.  Sure.

16  Q.  I'm -- and turn to page 8.  And then the first full

17  paragraph at the bottom of the page you state, and I'm gonna

18  summarize it, if I summarize it incorrectly please let me know,

19  that you're reducing the multiple to reflect the number of risk

20  factors you need to the reorganized Debtor, is that right?

21  A.  That's correct.

22  Q.  And one of those you -- factors that you contend is unique

23  to the reorganized Debtor is this challenging regulatory

24  environment, is that right?

25  A.  Yeah, I didn't -- I wasn't intending to dispute that.  I

1    was just disputing the way you had characterized it in your
2    last sentence.  I would agree with the statement that it -- one
3    of the factors is a challenging regulatory environment of which
4    default supply is an important issue.
5    Q.   Okay.  Do you know whether or not any of your comparable
6    companies have default suppliers?
7    A.   I don't specifically.
8    Q.   You don't know.  So, you're making the statement that the
9    multiple ought to be reduced because Northwestern is a default
10   supplier, but you don't even no whether or not any of your
11   comparable companies are default suppliers, correct?
12   A.   There's a subtlety, which is I'm not aware of any of our
13   comparable companies having had a disallowance of a default
14   supply.  That's a different factor.
15   Q.   That's not what I asked you though, sir.  I asked you very
16   specifically whether you know whether any of your comps are
17   default suppliers and you said, no, isn't that right?
18   A.   I said I'm not aware, that's correct.
19   Q.   Okay.  So, you're not aware of any of your comps being
20   default suppliers.  It's not that you're -- withdrawn.  I want
21   to make this very, very clear to you.  You do not know one way
22   or the other whether any of your comparable companies act as
23   default suppliers, correct?
24   A.   That's correct.
25   Q.   And so you also do not know whether any of those comparable

1 companies may be subject to the retroactive review and

2 disallowance of (indiscern.), correct?

3 A.   Correct.

4 Q.   Now, the third reason you decided to reduce the multiples

5 derived from your own comparable companies was to take into

6 account what you perceived to be Northwestern's low growth

7 environment, is that right?

8 A.   No, total return, which one factor is their growth.

9 Q.   Okay.  And I think you testified earlier that the

10 difference between Northwestern and your comps is that

11 Northwestern had a total growth package, dividend plus -- was

12 it EBITDA growth?

13 A.   Just expected growth and earnings, yes.

14 Q.   Okay.  Dividends plus EBITDA growth of 7% versus 9 to 10%

15 for the comps, is that right?

16 A.   That's correct.

17 Q.   So, let's just talk about the earnings growth for a moment.

18 Northwestern can grow its business if they get more customers,

19 is that right?

20 A.   No, if they get more load.

21 Q.   Well, more customers is gonna give you more load, generally

22 speaking, isn't that right?

23 A.   Not necessarily, because even with more customers -- energy

24 use has become much more efficient so it's not necessarily a

25 correlation.

1  Q.  So, is it your contention that population growth is not a

2  consideration that should be taken into account in trying to

3  assess Northwestern's future growth?

4  A.  It's certainly one consideration, but ultimately it's load

5  that you're -- or volume that you're really concerned with.

6  Q.  Right.  But the more customers you have that's likely to be

7  a good thing, right?

8  A.  All else being equal that's a good thing.

9  Q.  Okay.  And you consider population growth in trying to

10 assess whether 1.2% is an appropriate growth rate, correct?

11 A.  The company's load forecasting group did that as described

12 earlier in terms of the way they looked at it.

13 Q.  Can you also --

14 A.  I'm sorry, just to clarify, obviously, that was one of many

15 factors.

16 Q.  We're just gonna go through some of them now.  And

17 Northwestern can also grow it's business if it's existing

18 customers use more energy, correct?

19 A.  That's correct.

20 Q.  So that the economic dynamics in Northwestern's service

21 area is also a relevant factor in assessing Northwestern's

22 potential growth, correct?

23 A.  Correct.

24 Q.  Are you aware that personal growth in Northwestern's

25 service area exceeded the national average in 2003?

Yearley - Cross

268

1   A.   Not aware of that.

2   Q.   Are you aware that Northwestern's service area had

3   unemployment rates that are significantly lower than the

4   national average in 2003?

5   A.   No.

6   Q.   Are you aware that the Census Bureau shows that the three

7   states that Northwestern services are expected -- serves are

8   expected to experience population growth which will

9   significantly exceed the national average over the next 4

10  years?

11  A.   Not aware of that.

12  Q.   Did you look at census data at all?

13  A.   The load forecasting group did.  In fact, they -- my

14  understanding is they took census data right from the state.

15  That's one of the factors that they used in coming up with

16  their 1.2%.

17  Q.   Now, you participated in a presentation to Standard & Poors

18  in 2004, isn't that right?

19  A.   Correct.

20  Q.   And that meeting was held so that Northwestern could

21  educate Standard & Poors in connection with Standard & Poors'

22  grading process, correct?

23  A.   To educate them where we were in the bankruptcy and, yes,

24  start that process.

25  Q.   And you, or the Debtor, made a written presentation to

Yearley - Cross

269

1   Standard & Poors at that meeting, isn't that right?

2   A.   That's correct.

3   Q.   And that written presentation, if you recall, had showed

4   that electric sales increased in Montana by 4% in 2003, is that

5   right?

6   A.   I don't recall that specific number.

7   Q.   Does that surprise you?

8   A.   I'm sorry, state your question -- what time period are we

9   talking about?

10  Q.   2003.

11  A.   In one year?

12  Q.   Yes.

13  A.   Again, I don't --

14  Q.   Electric sales in Montana?

15  A.   Does that -- doesn't surprise me or not surprise me,

16  because I don't recall the meeting.

17  Q.   Well, would that be relevant to your assessment of the

18  appropriateness of a -- of the appropriateness of a 1.2% growth

19  rate?

20  A.   I have no context to that number.  I don't know what's in

21  it, I don't know if it's population, is it load growth, it's

22  one year.

23  Q.   How about 2.4% annual increase over the last five years for

24  retail gas customers?  Do you remember that being in the S & P

25  report?

1   A.   I don't.

2   Q.   Let's talk about your precedent transaction analysis for a

3   moment.  That can be found on page 5915.  Is this the list of

4   transactions that you included in your precedent transaction

5   analysis?

6   A.   It appears to be, yes.

7   Q.   And you concluded 11 transactions, although the top one did

8   not close, is that right, that's what the footnote is telling

9   us?

10  A.   That's correct.

11  Q.   And so the other ten that we have here are all 3½ to what,

12  more than six years old, is that right?

13  A.   That's correct.

14  Q.   So, you would agree with me, would you not, that this

15  analysis does not produce forward-looking multiples?

16  A.   Well, again, they were calculated based on forward-looking

17  multiples at the time the transaction was done.

18  Q.   But for --

19  A.   You can't do a forward-looking multiple when you've had a

20  transaction in '98, obviously.

21  Q.   That's right.

22  A.   I mean, we did a forward -- if it closed in '98 we did a

23  1999 forward-looking multiple to be consistent.

24  Q.   Okay.  But as of today to use these multiples is not to use

25  a forward-looking multiple, is that right?

Yearley - Cross

271

1   A.   You can't.

2   Q.   Okay.   Your last 12 month average on an EBITDA basis is a

3   multiple of what, 7.6?

4   A.   That's correct.

5   Q.   Is that what you discounted off of?

6   A.   No.   We did the forward -- the number just below that, the

7   FY plus 1 so that -- the 7.5.

8   Q.   Okay, 7.5?

9   A.   Correct.

10  Q.   But you didn't use 7.5 in your precedent transaction

11  analysis, correct?

12  A.   That's correct.

13  Q.   You adjusted the EBITDA multiple downward to a range of 6

14  and a quarter to 7 and a quarter with a midpoint of 6.75,

15  correct?

16  A.   That is correct.

17  Q.   So again, the upper end of your range, 7.25 is less than

18  the EBITDA multiple that's derived from your own transactions,

19  correct?

20  A.   Correct.

21  Q.   And the same would be true if you looked at it on an EBIT

22  basis, isn't that right, that the high end of your EBIT range

23  -- you know, I don't want to test your memory.

24  A.   I'd have to go look at --

25  Q.   Yeah, let's go do that, let's go do that so the Court can

Yearley - Cross                                    272

1    follow along as well.  I think if you take a look at page 5908.

2    Is that what you were looking for?

3    A.   Yes.

4    Q.   Okay.  So, if we take a look at page 5908 you've got on an

5    EBIT basis a multiple range from your precedent transaction of

6    10 to 11, is that right?  Whereas -- is that correct?

7    A.   That is correct.

8    Q.   Whereas the average of your own comparable transactions is

9    11.7 so that your high end is still substantially lower than

10   the average derived from your comparable transactions, correct?

11   A.   It is lower.

12   Q.   And the same is true with respect to the net income

13   numbers, isn't that right?  We've got a net income range of 13½

14   to 14½, that's what you utilized, but you've got back among

15   your comparable transactions an average of 15.7?

16   A.   That is correct.

17   Q.   And the reasons for reducing the multiples in the

18   comparable transactions analysis are the same as the reasons

19   you offered for reducing the multiples in the comparable

20   company analysis, correct?

21   A.   Yes, it's a consistent approach.

22   Q.   Now, if we stick with the comparable transaction analysis

23   for just a few more minutes, still on page 5915, again, let's

24   just test some of those reasons again.  Let's look at the issue

25   of size.  You contend that upon emergence Northwestern's

Yearley - Cross                                                    273

1  enterprise value will be about a billion six or a billion five?
2  A.   Billion five, right.
3  Q.   Okay.  Seven of your transactions had enterprise values of
4  between 1.1 and 3.8 billion, isn't that right?
5  A.   That's correct.
6  Q.   So, notwithstanding the fact that a large majority of your
7  transactions involved transactions having enterprise values
8  similar to Northwestern, you still took size into account as
9  one of only three reasons to reduce the transaction multiple,
10 correct?
11 A.   Sorry, can you repeat that, please?
12 Q.   I apologize since I ask questions that are too long.
13 Despite the fact that the majority of your transactions, seven
14 of ten or eleven, depending on how you count, had enterprise
15 values that were similar to Northwestern's, you still reduced
16 the multiple because of, for one of three reasons, size?
17 A.   Well, I mean, three of the ones you mentioned are 600
18 million or greater above the enterprise value of Northwestern,
19 so I guess I wouldn't agree with your seven number to start
20 with, right.
21 Q.   Is --
22 A.   3.9 billion is not all that close to 1.5, right?
23 Q.   You're the expert, you tell me.  In your experience and
24 your practice is it Lazard's practice to take a discount off of
25 a multiple when you've got a $1.5 billion company versus what

1  did you say, $3.8 billion company?  That in and of itself is

2  enough to warrant a discount off the multiple?

3  A.  No, you were -- I was responding to your set up of the

4  seven companies.  That's all I was responding to.

5  Q.  Okay.  Do you want to use six and do you think that 3.8 is

6  too high?

7  A.  Again, the general notion is that investors require greater

8  return for companies that have smaller market cap.  That was

9  the premise.

10  Q.  I understand that very limited premise, and now I'm testing

11  it, okay?  Seven of your comparable transactions are between

12  1.1 and $3.8 billion based on enterprise value, correct?

13  A.  Correct.

14  Q.  And yet notwithstanding that fact, you believe the

15  transaction multiple ought to be reduced because of size,

16  correct?

17  A.  And again, I would look at it differently, but -- because

18  what I talked about was equity value, not enterprise value.  We

19  already talked about the 710 million of equity value, and so if

20  you look at this comp group, you know, there are 1, 2, 3, maybe

21  4 of the 10 that are in the neighborhood of our size.  The

22  balance are larger.  Billion three, 2.2, 3 billion, 4.4

23  billion, 3.3, those are --

24  Q.  And --

25  A.  -- can I just finish?

1  Q.  Yes, you can.

2  A.  Thank you.  Those are 3, 4, 5 times our equity value.

3  Q.  So, for this purpose you want to compare your companies by

4  enterprise value, is that right?

5  A.  I'm using your premise in just trying to respond to the --

6  Q.  No, I'm using -- please answer my questions, okay.  I am

7  looking at it based on enterprise value because that is how

8  EBITDA multiples are calculated, correct?

9  A.  That's how EBITDA multiples are calculated.

10 Q.  Okay.  So for purposes of the EBITDA multiple, which you

11 have decided to reduce based on size, looking at enterprise

12 value seven of your comparable transactions fall into the range

13 of 1.1 to $3.8 billion, correct?

14 A.  That is factually correct.

15 Q.  Okay, thank you.  And in fact, not only do most of your

16 comparable transactions involve similar enterprise value, but

17 there's again no correlation between size and multiple,

18 correct?

19 A.  I'm sorry, repeat your question.

20 Q.  There's no correlation between size and multiple among your

21 comparable transactions, is there?

22 A.  I don't know, I'd have to go look at it.

23 Q.  Well, let's look at it.  Your biggest based on enterprise

24 value is the First Energy GPU transaction, do you see that?

25 A.  Yes.

Yearley - Cross                                         276

1   Q.   That had an enterprise value of $11 billion, is that right?

2   A.   Correct.

3   Q.   And that had -- that transaction had by far the lowest

4   price-to-earnings ratio, isn't that right?

5   A.   It had -- price to earning -- it has the lowest, yes.

6   Q.   And it also has the lowest EBIT multiples, correct?

7   A.   No, there's one more, two lower.  I'm sorry, EBIT, I was on

8   EBITDA.

9   Q.   Yeah, EBIT.  It's the second lowest?

10  A.   Second lowest, correct.

11  Q.   Second lowest out of the 11, and it has the second lowest

12  EBITDA multiple, isn't that right?

13  A.   Correct.

14  Q.   Now, based on enterprise value, the four smallest are

15  Energy East, New England Electric, BEC Group, and the Con Ed

16  transaction, is that right?

17  A.   Appears to be correct.

18  Q.   And those four transactions, despite being the four

19  smallest, all have the highest price-to-earnings multiples,

20  isn't that right?

21  A.   You have to list the four again.

22  Q.   It's the bottom -- it's all of the ones on the bottom

23  except for National Grid.

24  A.   Okay.  Starting with New England Electric?

25  Q.   If you look at the price-to-earnings ratio of Energy East,

Yearley - Cross                                              277

1  Energy East is 17.4?

2  A.   That appears to be correct, your statement.

3  Q.   And New England Electric is 16.9, is that right?

4  A.   That's correct.

5  Q.   And BEC Group is 17.9, is that correct?

6  A.   Yes.

7  Q.   And Con Ed transaction is 17.8, is that right?

8  A.   Yes.

9  Q.   And so those are the four highest price-to-earnings

10  multiples notwithstanding that they are the four smallest

11  transactions, correct?

12  A.   Correct.

13  Q.   But again, you thought it was appropriate to reduce the

14  multiple in part because of Northwestern's size, is that right?

15  A.   That's correct.

16  Q.   Can we turn to the last page of this exhibit?

17  A.   The last page of what exhibit?

18  Q.   Of the entire exhibit, so it would be page 6210.

19  A.   Okay.

20  Q.   Do you have that in front of you, Mr. Yearley?  Yeah, it's

21  the one with the four offers or expressions of interest.

22  A.   Right.

23  Q.   Whatever it is (indiscern.).

24        MR. MORRIS:  Do you have that in front of you, Your

25  Honor?

Yearley - Cross                                    278

1    THE COURT:  Yes, I have it.

2    A.  Okay.

3    BY MR. MORRIS:

4    Q.  Now, Power Management Company, is that the same one we

5    looked at before that had 1.6 or something?

6    A.  Yes, it is.

7    Q.  And how come it's 1.77 in this document, do you know?

8    A.  I believe -- well, that's my recollection.  I believe in

9    talking to them there were certain liabilities that they were

10   -- or assets they were assuming they were buying or not so

11   there were adjustments to the price.  That's the best of my

12   recollection.

13   Q.  All right.  But it's your understanding, based on this

14   document, not that summary document -- withdrawn.  Did Lazard

15   prepare this page?

16   A.  Yes, we did.

17   Q.  Okay.  And based on Lazard's understanding Power Management

18   Company sent an offer letter that described total distributable

19   value of $1.77 billion, is that right?

20   A.  That's correct.

21   Q.  Okay.  Now, based on the --

22   A.  I'm sorry, just to -- I do know the answer as I look at it

23   now.  The difference is that they were deducting the QF

24   liability in their purchase.  So to get to --

25   Q.  Is 1.77 the total distributable value or not?

1  A.  No, it's 177 less the QF liability.

2  Q.  Okay.  So, you're -- this analysis is incorrect here?

3  A.  I don't know if it's incorrect, it may be on a different --

4  I don't know how we treated the other offers relative to QF

5  liability here.  I guess what I'm saying is when we looked at

6  it relative to our valuation on the slide we were doing it on

7  an apples-to-apples basis.

8  Q.  Okay.

9  A.  And since we deducted the QF liability from our valuation

10  we were deducting it from their bid.

11  Q.  Oh, I see.  So, their offer really was 1.77 but you

12  adjusted it in the other slide to do what you're describing is

13  an apples-to apples comparison, is that right?

14  A.  That's correct.

15  Q.  Okay.  Let's stick with what their offer was.  Based on

16  your normalized, the Lazard normalized 2004 EBITDA of $214

17  million, this potential transaction with Power Management

18  Company had a multiple of approximately 8.3, is that right?

19  A.  It's right, but I just want to be very clear on this point.

20  At the end of the day this group would not pay us 1.770.

21  They'd pay us 1.770 less the QF liabilities.  So the multiple

22  is off of that number.

23  Q.  That's not what you wrote when you did this page, correct?

24  A.  It is what I wrote.  It's just on this -- this is looking

25  at all these bids on a different approach, that's all.

Yearley - Cross

1  Q.  Okay.

2  A.  The 1645 doesn't have the QF liability, so that's why our

3  valuation is a billion five.

4  Q.  Okay.  Well, the 8.3 that would result -- the fact of the

5  matter is Northwestern didn't supply a counter offer to 1.77,

6  did they?

7  A.  No.

8  Q.  And so, you did describe earlier, and you heard the

9  testimony from the three witnesses before you, about all of the

10 positive things that management has done during the course of

11 this bankruptcy proceeding, correct?

12 A.  Correct.

13 Q.  And do you disagree with all of the positive steps that

14 these guys have taken over the last year to turn this company

15 around?

16 A.  I think there have been many positive steps.

17 Q.  And those positive steps, if Northwestern really wanted to

18 market itself and try to get the highest value possible, those

19 positive steps would be disclosed and described for potential

20 purchasers like Power Management Company, correct?

21 A.  Those positive steps, I believe, are largely described in

22 the Disclosure Statement on which all these bids are based.

23 Q.  Now, the 8.3 EBITDA multiple that's implied by a Power

24 Management Company offer of 1.77 is quite a bit higher than the

25 average EBITDA multiples derived from your historical

Yearley - Cross                                    281

1   transactions, is that right?

2   A.   It is.

3   Q.   And 8.3 times EBITDA is considerably higher than the 6.7

4   times multiple you use in your comparable transactions?

5   A.   6.75, that's correct.

6   Q.   And even if we look at the lowest among these four

7   expressions of interest or offers, even if we look at MBU at

8   $1.542 billion, that results in an EBITDA multiple, an implied

9   EBITDA multiple of 7.2, isn't that right?

10  A.   It's right, but it's really not the right way to look at it

11  because they're not paying us a billion 542.  They're paying us

12  a billion 542 less the 140.  So, I just want to be clear.

13  Q.   Well, that's not what you wrote here, is it?  That's what

14  you're telling us now, but that's not the analysis that Lazard

15  wrote as part of the back up to its analysis --

16  A.   But can we just spend one minute on this so we can have a

17  logical conversation?  The plan of reorganization, is our

18  valuation a billion 645 in the plan, or is it a billion five,

19  which is net of the $140 million QF liability.  So, this is, on

20  an apples-to-apples basis without the QF deduction, which all

21  these bidders gross up their bids because it looks better to

22  the world and say, yeah, we're assuming the QF liability, but

23  guess what, if we do it it's deduction to price.

24  Q.   Sir, the fact of the matter is, every one of these

25  potential offers, even if you take into account a QF liability,

Yearley - Cross                                    282

1  is gonna wind up with a multiple in excess of 7, right?

2  A.  That's not true, actually.  MDU, I think, is a billion

3  four, so it's not a multiple in excess of 7.  It's below 7.

4  Q.  And Northwestern --

5           THE COURT:  Just -- let me -- I'm sorry to interrupt

6  you.  What is the EBITDA upon which you were basing these

7  multiples?  I just want to make sure I know that number.

8  What's the number here?

9  A.  Can I answer that?

10          THE COURT:  Yes.

11  A.  About 211.

12          THE COURT:  211.

13  BY MR. MORRIS:

14  Q.  Which is Lazard's normalized EBITDA, right?

15  A.  Normalized 2004 projected EBITDA for the company.

16  Q.  And do you know what Northwestern's projected 2004 EBITDA

17  is?

18  A.  It's about 206, 207.

19  Q.  Now, you also did a discounted cash flow analysis, is that

20  right?

21  A.  We did.

22  Q.  And in your DCF to calculate the terminal value you used,

23  again, the 6.75 multiple, is that right?

24  A.  We did.

25  Q.  So, you used -- and the 6.75 multiple is derived by

1  adjusting the actual multiples --

2  A.   It's the precedent --

3  Q.   Withdrawn.  It's the precedent transaction multiple

4  adjusted for the reasons that we discussed, right?

5  A.   That is correct.

6  Q.   And it's the precedent transaction multiple that's derived

7  from transactions that are 3½ to 6-plus years old, right?

8  A.   Well, if you want me to look at something I'll be happy to

9  look at it.

10  Q.   I thought we had looked at that already.

11  A.   We did, but there are -- I'll just look at it to confirm

12  what you just said.

13  Q.   Okay.

14  A.   That's correct.

15  Q.   Okay.  So, you didn't use the simple mean of 8 times last

16  12 months that's derived from your comparable companies,

17  correct?

18  A.   Used 6.75.

19  Q.   And you didn't use the 7.7 EBITDA simple mean for the 2004

20  estimates that are derived from your comparable companies,

21  right?

22  A.   We used 6.75.

23  Q.   And you didn't use the 6.7 EBITDA multiple derived from

24  even your own comparable transactions, right?

25  A.   We used 6.75.

1  Q.  Okay.

2        THE COURT:  I just want everybody to understand in my

3  view there's 15 minutes left.

4        MR. MORRIS:  Thank you, Your Honor.

5        THE COURT:  Just so you can focus your last questions

6  here and make sure you get in what you want.

7        MR. MORRIS:  I appreciate that, thank you, very much.

8  I'm grateful for the opportunity to make my airplane tonight.

9  BY MR. MORRIS:

10  Q.  Can you take a look at page 5919, please?

11  A.  Sure.

12  Q.  Now, this is your weighted average cost of capital -- I'm

13  sorry, tell me when you have it in front of you.

14  A.  I have it in front of me.

15        MR. MORRIS:  Do you, Your Honor?

16        THE COURT:  Yes.

17  BY MR. MORRIS:

18  Q.  5919.  And what you're doing in the discounted cash flow

19  analysis is you're taking future cash flows, discounting them

20  back to a present value, is that right?

21  A.  Discounting the company's projected cash flows during the

22  projection period and then a terminal value --

23  Q.  Right.

24  A.    -- for the future cash flows.

25  Q.  And the discount rate that you're going to use and that you

1  did in fact used was based on a weighted average cost of

2  capital analysis, is that right?

3  A.   It is correct.

4  Q.   And that weighted average cost of capital analysis is

5  reflected on page 5919, is that right?

6  A.   That is right.

7  Q.   Now, in calculating the cost of equity, if we look under

8  the assumptions, the assumption box in the middle of the page

9  -- withdrawn.  Are those assumptions the assumptions that

10  Lazard used in calculating Northwestern's cost of equity?

11  A.   Yes, they are.

12  Q.   And among the assumptions used in calculating the cost of

13  equity was a 1% addition for an implementation risk premium, is

14  that right?

15  A.   That is correct.

16  Q.   And one of the reasons that you decided to add a 1%

17  implementation risk premium to Northwestern's cost of equity

18  was to take into account the Montana regulatory risk, is that

19  right?

20  A.   No, again, the factors that we talked about earlier, the

21  three factors.

22  Q.   Well, those three factors are what led you to reduce the

23  multiple, correct?

24  A.   Correct.

25  Q.   And one of those three factors, the regulatory risk, is yet

Yearley - Cross

286

1  another factor to add to the cost of equity premium, isn't that

2  right?

3  A.  And two parts of the discounted cash flow, you have the

4  multiple, which you have just highlighted in terms of the

5  reduction we took, and we've talked about ad nauseam here, and

6  then you have the risk of the cash flows during the five-year

7  projection period, and that's this implementation risk premium

8  is what was used to affect that.  Now just to keep in mind,

9  that's a cost of equity.  We weighted equity at 45%, so it's a

10  45-basis point adjustment (indiscern.).

11  Q.  To answer my question --

12  A.  Sure.  Can you repeat it, sorry?

13  Q.  Yeah.  You took the regulatory risk into account, or the

14  regulatory risk that you've identified in both reducing the

15  multiple and adding the premium to the cost of equity, correct?

16  A.  That is correct.  Although again, it's not just regulatory

17  risk.

18  Q.  Please, just -- it's either correct or it's not.

19  A.  Well, I'm clarifying because that actually wasn't correct

20  then.  It's the three factors, that's all.

21  Q.  Okay.  Your weighted average cost of capital analysis also

22  includes a 1.4% market risk premium, is that right?  That's one

23  of the assumptions you have here?

24  A.  Yeah, that's probably poorly labeled, but it's, as you can

25  see in the footnote, it's the size premium for companies that

1  have the market cap that Northwestern does.

2  Q.  And again, the size -- again, so you're taking accounts

3  Northwestern's size and reducing the multiple relatives to the

4  comps as well as in calculating its cost of equity, correct?

5  A.  That's true.

6  Q.  In fact, instead of adding an implementation risk, we go

7  back to the implementation risk, you could have just reduced

8  Northwestern's projections, is that right?

9  A.  We could have.

10  Q.  And the result would have been the exact same on an

11  enterprise value basis, correct?

12  A.  Yes, again --

13  Q.  And so even though --

14  A.  Can I just finish my answer?

15  Q.  The result would have been the same had you reduced the

16  projections or reduced the multiples, you come out in the same

17  place, correct?

18  A.  That's correct.

19  Q.  That's just a matter of math, isn't that right?

20  A.  It is math, although the math here is minuscule.

21  Q.  But nevertheless, despite the fact that you say you find

22  the Debtor's projections to be reasonable and achievable, you

23  nevertheless engaged in adding premiums that effectively say

24  that management's projections of 1.2% growth are too high,

25  isn't that right?

1    A.   I'm sorry, repeat your question.

2    Q.   Your -- instead of reducing -- withdrawn.  Instead of

3    adding the implementation risk premium you could have, instead,

4    simply reduced the projections, correct?

5    A.   Mathematically that's correct.

6    Q.   And I think you testified earlier that the projections in

7    your opinion are reasonable and achievable at 1.2%, is that

8    right?

9    A.   That's correct.

10   Q.   And notwithstanding the fact that you believe the

11   projections are reasonable and achievable you still add an

12   implementation risk premium that is effectively the same as

13   reducing those very same reasonable and achievable projections,

14   correct?

15   A.   Correct, with the caveat that the impact here from

16   valuation standpoint is incredibly minor.

17   Q.   Do you know what the EBITDA growth rate, the implied EBITDA

18   growth rate would be in the projections -- withdrawn.  Let me

19   make sure I ask --

20        (Pause in proceedings)

21          MR. MORRIS:  You know what, I'm gonna stop there,

22   mindful of the time.

23          THE COURT:  All right, thank you.  I just want to ask

24   one very short series of questions, make sure I understand.

25   BY THE COURT:

1   Q.  Going to 6210, which is the offers that were made --

2   A.  Sure.

3   Q.  The plan of reorganization shows a million five plus excess

4   distributable cash of 145, leaving 1645, correct?

5   A.  Correct.

6   Q.  Are you suggesting that from that 1645 the 140 is also

7   supposed to be deducted, or is the 140 already deducted as part

8   of the million five?

9   A.  Yeah, I was incorrect in my prior because I was looking at

10  the 1645.  It's been deducted from the billion five.

11  Q.  So, that's what I thought.  So, this billion five is your

12  net enterprise value after taking into account your $140

13  million deduction for the QF amount?

14  A.  Correct.

15  Q.  Now what about with regard to these other numbers, the

16  other four?  Which of these, if any, have that deduction?

17  A.  Can we go back to the slide, the earlier slide on the --

18  that looks at the (indiscern.)?

19          UNIDENTIFIED SPEAKER:  Which one do you want?

20  A.  The next one.

21          UNIDENTIFIED SPEAKER:  This one?

22  A.  No, that one.

23      (Pause in proceedings)

24  A.  Yeah, I misspoke.  Let me make sure I've done this right.

25  The item that makes this apples-to-apples is we were showing

1  this as a billion five, so we did not include the 145 million

2  of cash that had been netted out.  So, if you were to go to the

3  strategic buyer at a billion four, which is MDU, MDU's bid was

4  a billion 542, but included the $145 million cash.  So, on an

5  enterprise value, they're paying us a billion four, and you

6  know, there's a $145 million of cash in the system that was

7  available for distribution.  So, said differently, if you're to

8  look at this page you'd have to take our billion five and add

9  145 million to it to get the 1645.

10  Q.  But then that's not true of Lindsey, Goldberg & Bessamer or

11  of Power Management because those 145 -- the 145 million is not

12  listed on 6210.

13  A.  Agreed, but in their bid they were taking all the non-core

14  assets and distributable cash.  They're buying the business,

15  cash and all.  So, you deduct it to get to the enterprise

16  value.

17  Q.  So I guess my question is, so you deducted --

18  A.  We were trying to make it apples-to-apples to our valuation

19  at a billion five.  So I guess said differently, you would

20  compare the 1770 to a billion five plus 145 million in cash or

21  1645.

22  Q.  But I don't see 1645 up there.

23  A.  It's not.  That's what I'm saying.  I was trying to get you

24  from this sheet to that sheet.  So, let's start with that

25  sheet.  Our Disclosure Statement value of the utility, forget

1   the cash, was a billion five.

2   Q.   Right.

3   A.   The -- which one do you want to take, the Lindsey or the --

4   Q.   Let's take Lindsey.

5   A.   Okay.  So Lindsey, which is the --

6   Q.   Is $50 million difference.

7   A.   Is the 1430.

8   Q.   Lindsey is 1575.

9   A.   Right.  But the Lindsey bid up there is the financial buyer

10  that says 1430.

11  Q.   So, you take out --

12  A.   And the reason they're different is their 145 million in

13  cash that's in this bid.  They're buying the company at 1575

14  and saying, by the way, I'm taking the 145 million in cash as

15  well.  So, to make it apples-to-apples to the way we showed it

16  up here, we showed just the utility valuation on that sheet,

17  not the cash.  Lindsey includes the cash.

18  Q.   But I guess -- hold on.  What about the QF liability?

19  A.   These have been adjusted for QFs.  I was incorrect on the

20  QF adjustment.

21  Q.   So, all across 6210 that's all been adjusted for the QF?

22  A.   Been adjusted for the QF, not for the cash.

23  Q.   And -- well again, I guess my question --

24  A.   It just so happens the numbers are about the same.

25  Q.   -- is, for example, Power Management does not have the

Yearley - Redirect                                    292

1  $145 million in cash, in fact, it has zero.

2  A.  I understand, but if you're to look at the bid they were

3  actually buying the (inaudible).

4  Q.  So, we can't really tell from this exhibit 6210 --

5  A.  It's poorly shown.  It's in the 820.  We have cash

6  proceeds.  They're essentially using our cash to purchase the

7  business.

8  Q.  To buy.  All right.  Okay.

9           THE COURT:  Do we have --

10 A.  Sorry for the confusion.

11          THE COURT:  I don't think we need to beat that horse

12 anymore.  I think to the extent I'm going to understand it, I

13 do.

14      (Laughter)

15          THE COURT:  Do we have any redirect here in the final

16 minute and a half?

17          MS. DENNISTON:  I have two small questions.

18                   REDIRECT EXAMINATION

19 BY MS. DENNISTON:

20 Q.  Mr. Yearley, if we take the enterprise value of 1.5

21 million --

22 A.  Billion.

23 Q.  And we take out the discount applied, the 10% to the three

24 -- under the three approaches --

25 A.  Right.

1  Q.    -- what would the enterprise value be?

2  A.    Approximately a billion 650.

3  Q.    A million?

4  A.    A billion 650.

5  Q.    Thank you.  With regard to the Standard & Poors meeting

6  that you were asked about, did you prepare the written

7  presentation for that?

8  A.    I did not.

9  Q.    And did you reply on that presentation in connection with

10 rendering your opinion?

11 A.    I did not.

12         MS. DENNISTON:  Thank you, Your Honor, I have no

13 further questions.

14         THE COURT:  Okay.

15         MR. MORRIS:  Your Honor, I have one question.

16                    RECROSS EXAMINATION

17 BY MR. MORRIS:

18 Q.    You mean to tell me, sir, that a document that was prepared

19 by the company that set forth growth rates was a company that

20 you didn't reply on in assessing the reasonableness of the

21 projections?

22 A.    Again, the 1.2% growth rate was developed at the time the

23 company was building up their bottoms up business plan that's

24 been talked about in December of '03.  That's the information

25 we used in the -- getting comfortable with the plan and the

1   projections.

2   Q.   And the S&P meeting occurred two months later, correct?

3   A.   That is correct, and again, I didn't prepare the document.

4   I showed up at the meeting and it was presented.  It was

5   subsequently discovered that the information was, frankly, a

6   little misleading.

7           MR. MORRIS:  I'm just gonna leave that alone, Your

8   Honor.

9           THE COURT:  All right.  Okay, well we made our one

10  hour and 30 minute thing, and I thought that was an

11  enlightening hour-and-a-half.  We have the Hoolihan witness

12  next.  I do want to take a very short break.  Let's do 10

13  minutes and then we'll start with Hoolihan.

14      (Recess)

15          THE COURT:  Please be seated.  Are we ready to

16  proceed?

17          MR. ALCOTT:  We are, Your Honor.  If the Court

18  please, I'm Mark Alcott of Paul, Weiss, Rifkind, Wharton &

19  Garrison representing the Official Committee of Unsecured

20  Creditors.  We call Bradley Geer.

21          THE COURT:  All right.  Just come forward, sir, to be

22  sworn.  Give me a head's up on what the exhibit number of his

23  affidavit or report.

24          MR. ALCOTT:  Your Honor, yes, well --

25          THE COURT:  Is it yours?

Geer - Direct

295

1    MR. ALCOTT:  -- let's say we have a rather low-tech
2    presentation.  I have a book with all the exhibits that we're
3    gonna use during the examination.
4            THE COURT:  I think I have it here, too.
5            MR. ALCOTT:  Do you have it?  I'm not sure it's the
6    same.
7            THE COURT:  It appears to be.  It's a little --
8            MR. ALCOTT:  You should have -- no, but it's a
9    different --
10           THE COURT:  It's a different book.
11           MR. ALCOTT:  If I may.  This is what we're gonna be
12   using.  I've given copies to all the adversaries.  It contains
13   the report in it, and a few other exhibits which are
14   essentially isolated pages.
15           THE COURT:  That's fine.  Let's swear in the witness
16   and let's get going.
17           BRADLEY GEER, COMMITTEE'S WITNESS, SWORN
18                   DIRECT EXAMINATION
19   BY MR. ALCOTT:
20   Q.  Please introduce yourself.
21   A.  I'm Bradley Geer from Minneapolis, Minnesota.
22   Q.  What is your profession, Mr. Geer?
23   A.  I'm an investment banker with a specialization in financial
24   restructuring.
25   Q.  Could I ask you to speak up a little bit, please?  And what

1  kind of services do you render to your clients as a financial

2  restructuring specialist?

3  A.   In bankruptcies we provide services such as analyzing,

4  financing, analyzing business projections, advising committees

5  on Key Employee Retention Plans, do valuation work in all our

6  cases, as well as debt capacity analyses, among others.

7  Q.   And do you render those services, including valuation

8  services, to Debtors or to Creditors?

9  A.   We do both.

10  Q.   You represent both?

11  A.   Yes.

12  Q.   Through what firm do you render these services?

13  A.   Hoolihan, Lokey, Howard & Zefrin.

14  Q.   And how large a firm is that?

15  A.   Hoolihan Lokey has about approximately 550 employees.

16  Q.   Where is it located?

17  A.   It has eight offices throughout the United States.  I work

18  in the Minneapolis office.

19  Q.   And what is the specialty of Hoolihan Lokey?

20  A.   Hoolihan Lokey has the largest financial restructuring

21  practice in the country with over 100 professionals dedicated

22  soley to financial restructing.  It also has the largest

23  valuation advisory services practice in the country, with

24  thousands of clients and we render hundreds of opinions each

25  year.

1  Q. And what involvement has your firm had in some of the major

2  bankruptcies in recent years?

3  A.   Hoolihan Lokey has been involved in most all of the major

4  bankruptcies, either in on the Creditor's side or the Debtor's

5  side.   In particular, almost all of the energy or power-related

6  bankruptcies, including NRG, Morant (phonetic), Enron in which

7  we oversaw the sale of Portland General, additionally which is

8  a utility, SOCAL Edison, Allegheny, among others.

9  Q.   What is your position in the firm?

10  A.   I'm a Director.

11  Q.   And how long have you been with the firm?

12  A.   Approximately six years.

13  Q.   What do you do as a Director?   On a particular engagement,

14  what role do you play?

15  A.   I oversee all of the day-to-day ongoings in the case and I

16  manage the team of professionals that we have on the case.

17  Q.   Would you take a look please, at Exhibit-2 which is your --

18  a disclosure on a particular page that's marked Roman numeral

19  II?   What does that set forth?

20      (Committee's Exhibit-2 previously marked for

21  identification)

22  A.   This is a list of some of the cases in which I have been

23  directly involved.

24  Q.   And how many of those matters require you to do evaluation

25  work?

1   A.   All of them.

2   Q.   What kind -- for example, look at Korea First Bank, what

3   kind of evaluations did you do in that engagement?

4   A.   In that engagement, we valued the entire balance sheet of

5   the bank -- the entire balance sheet of the bank, including

6   doing hundreds of detailed valuations of individual Debtors to

7   the bank, as well as thousands of less detailed valuations of

8   the smaller Debtors to the bank.

9   Q.   And what about NRG, N-R-G Energy?  What kinds of

10  evaluations did you do there?

11  A.   In NRG, similar to this case, we advised the Creditor's

12  Committee.  During that process, we did a valuation of the

13  entire NRG Enterprise which encompassed valuing approximately

14  50 or 60 power subsidiaries that the company owns.

15  Q.   Have you been involved in other matters where the

16  valuations of energy companies and utilities was required?

17  A.   Yes, in addition to NRG in this case, there were three

18  other situations in chich I'm currently directly involved, all

19  of which are at this time are confidential, one of which,

20  excuse me, involves one of the country's largest utilities for

21  which were hired on the Debtor's side to do a complete

22  evaluation of its strategic alternatives around a potential

23  restructuring which also included valuation and debt capacity

24  analyses.

25  Q.   And before we leave this subject of your qualifications,

1   can you tell us what your educational background is that

2   trained you for this field?

3   A.   I have both a bachelors and masters degree in Quanitative

4   Economics from Stanford University.

5   Q.   What briefly, was your employment background before you

6   joined Hoolihan Lokey?

7   A.   Directly before joining Hoolihan Lokey, I was employed for

8   approximately a year with a fund that was co-managed by

9   Hoolihan Lokey and another Minneapolis firm in which we did

10  leverage buyouts, largely of ESOP-related companies and I was

11  in charge of doing valuations of the target companies.

12  Q.   Have you testified as an expert in other cases?

13  A.   Yes, I have.

14  Q.   Did there come a time when Hoolihan Lokey was engaged by the

15  Creditor's Committee in this matter?

16  A.   Yes, we were engaged approximately early October 2003.

17  Q.   And have you been involved in the engagement of Creditor's

18  Committe since the -- since it began?

19  A.   Yes, I have.

20  Q.   What was the assignment that the Creditor's Committee gave

21  to Hoolihan?

22  A.   The assignment was to advise the Committee on all financial

23  matters related to the case, including financing, D-I-P

24  financing, Key Employee Retention Plan issues, liquidity and

25  valuation, as well as debt capacity.  The Committee wanted an

1    independent perspective on those matters.

2    Q.   And did the Committee tell you why they didn't simply

3    accept the Lazard evaluation, why they wanted their own

4    financial advisor?

5    A.   Well, the Committee wanted an independent view of what

6    their recoveries in the case could be estimated to be.  They

7    also wanted an independent view as to whether the company's

8    proposal of converting all of the unsecured debt to equity, was

9    in fact necessary.

10   Q.   That was part of the Plan of Reorganization?

11   A.   Yes.

12   Q.   Now, if you'd take a look in the book at Exhibit-1, is that

13   your engagement letter?

14        (Committee's Exhibit-1 marked for identification)

15   A.   Yes.

16   Q.   Does it set forth the terms of firm's compensation?

17   A.   Yes, it does.

18   Q.   Is the firm's compensation in any way related to the value

19   that it opines on in this matter?

20   A.   No, it is not.

21   Q.   Were you given any instructions by the Creditor's Commitee

22   as to what value, or levels of value they wanted you to reach

23   or hoped you would reach?

24   A.   No, we were not.

25   Q.   Now, after your firm was engaged, what kind of work did you