1  do to -- with your colleagues, to prepare yourself, to make

2  this analysis?

3  A.  Well, we had meetings with the company.  At its

4  headquarters we had discussions and interviews with management.

5  We analyzed the company's financial statements, as well as the

6  business plan projections.  We analayzed comparable companies,

7  things of that nature.

8  Q.  And did you interview members of management?

9  A.  Yes.

10  Q.  Take a look please, at pages 1 through 2 of your disclosure

11  which is Exhibit-2 in this little book and tell me if that

12  accurately sets forth the due diligence that you did.

13  A.  Yes, it does.

14  Q.  When did you first report on value to the Creditor's

15  Committee?

16  A.  It would have been early January 2004.

17  Q.  And when did you submit your most recent report?

18  A.  Very recently, within the last two to three weeks.

19  Q.  And that's the report embodied in Exhibit-2, is that right?

20  A.  Yes.

21  Q.  How does your current report differ from your January 2004

22  report, if at all?

23  A.  The methodology is the same.  We simply updated the

24  analysis for the movement in the comparable companies since

25  January.

1  Q.  And which assets of Northwestern Corporation did you value?

2  A.  All of them.

3  Q.  Did you make any distinction in valuing any groups of

4  assets?

5  A.  We valued the core utility business and then we had a

6  separate valuation of the non-core operations, as well, meaning

7  Blue Dot, Expanets of those assets.

8  Q.  All right, well now, starting then with your valuation of

9  the core utility business, what evaluation methodology did you

10  use for that purpose?

11  A.  We used the standard valuation methodologies that was --

12  are use, a DCF approach, a comparable company approach and a

13  comparabe transaction approach.

14  Q.  Let's start with the comparable company approach.  Is that

15  ever referred to by any other name?

16  A.  Market multiple approach, capitalization of earnings

17  approach.

18  Q.  Could you describe the technique that's used in this market

19  multiple approach?

20  A.  Well, the first step is to determine a normalized level of

21  earnings for the company.  And by earnings, I mean, EBITDA,

22  EBIT, and net income, which includes making certain adjustments

23  for one time items and other items from the reported earnings

24  of the company to get to a, {quote}, normalized level which

25  then is used to capitalize like multiple.  So, that's the first

1  step.  The second step would be to determine a group of
2  comparable companies, calculate their multiples based on a
3  calculation of their enterprise value from the market trading
4  prices of the company's debt and equity and once that multiple
5  is calculated, after cleansing the enterprise value of those
6  companies for certain non-core assets, then the ensuing
7  multiples selected from that group of multiples and applied to
8  the company's normalized level of earnings.
9  Q.  All right, well let's just go back over those steps
10  starting with your determination of the normalized earnings or
11  cash flows.  Where do you get the basic data on which you make
12  those computations?
13  A.  Basic data is from the company's financial statements and
14  projections.
15  Q.  And then you say you make certain adjustments.  Let me call
16  your attention pleae to page 24 of your report and disclosure,
17  Exhibit-2.  And does this reflect the normalization adjustments
18  that you just described?
19  A.  Yes, it does.
20  Q.  Can you explain to us, the calculations that are reflected
21  on page 24?
22  A.  Well, we simply have, at a summary level, added back one
23  time items such as professional fees associated with the
24  bankruptcy and made certain normalizations for things such as
25  the pension expense which in the next few years, is at a

1  somewhat higher level than it will be over the life of the

2  company.  So, we made that adjustment, as well.  All of that on

3  a LTM or last twelve month basis, added up to $66 million worth

4  of adjustments.  That $66 million was added to the company's

5  reported EBITDA of 151 million, approximately to get to a $217

6  million, {quote}, "representative level" of EBITDA.  Now,

7  embeddied in that is assumption that the company will be able

8  to achieve certain cost cuts related to its GNA expenses, which

9  is somewhat a leap of faith that we're making, but the

10  company's management team believes that it will be able to

11  achieve that.  But it is not yet achieved.

12  Q.  But you accepted that based on the management's view?

13  A.  Yes.

14  Q.  So, do I understand you to be saying that the effect of the

15  adjustments you made was to increase the EBITDA?

16  A.  Correct.

17  Q.  And therefore, did that have the effect of increasing your

18  value or decreasing it?

19  A.  On a relative basis, increasing it.

20  Q.  Now, I think you said the next step was to derive multiples

21  from comparable companies.  What characteristics do you believe

22  in your opinion as an expert, were characteristic of

23  Northwestern and therefore would render another company

24  comparable?  What were the characteristics you were looking

25  for?

1   A.   Well, the primary characteristics we looked at were first

2   the percentage of a company's business as derived from

3   regulated activities, because of the fact that when a companies

4   emerges from bankrupty, it will be nearly 100% regulated, but

5   certainly above 95% of its revenues will be generated from

6   regulated activies.  A lot of the, {quote}, "utility

7   businesses" out there have very low percentages of revenues

8   derived from regulated activity.  So, we had as a threshold the

9   minimum of 80% of revenues derived from regulated activities

10  and in fact, I believe the minimum in our group had an EBITDA

11  of closer to 85% derived from regulated activities.  And

12  secondarily, we are also looking at the percentage of revenues

13  generated from electric versus gas activities given the company

14  derives significantly more of its revenues from electric rather

15  than gas revenues.  We were seeking companies that also had

16  more electric than gas.

17  Q.   Did you have a particular threshold for gas operations

18  versus electric --

19  A.   It wasn't a --

20  Q.   -- or was it just a --

21  A.   -- hard line.  But given that the company is roughly 75/25

22  electric/gas, we weren't going to select a company that was the

23  reverse, 25/75.

24  Q.   Would you look at page 25 of your report.  Does that

25  reflect the comparables that you chose, comparable companies?

1  A.   Yes.   This shows the comparables that we selected, yes.

2  Q.   And I see you did not agree with Lazard in every instance.

3  How do you explain those differences?

4  A.   Well, our analysis was done completely independently of

5  Lazard and they had certain criteria that they used in

6  selecting their multiples and we had certain criteria.   In some

7  cases, it generated comparables that overlaped and in other

8  cases, we had different comparables.

9  Q.   And now once you selected the comparables, how did you go

10  about determining the multiples?

11  A.   Well, the multiples were calculated based on the trading

12  prices of the comparable's debt and equity securities, a very

13  standard calculation.   We cleansed the enterprise values of

14  those comparable companies by reducing the enterprise values by

15  the net book value of the non-core or, {quote}, "other assets"

16  that those companies have that are not related to their

17  regulated businesses and made a similiar adjustment to the

18  income streams, the other income lines related to these

19  businesses.

20  Q.   All right, now I'd ask my colleague to put on the easel, a

21  chart which is Exhibit-3 in the book.   It might be easier to

22  look it, on the easel.   Will you explain --

23       (Pause in proceedings)

24  Q.   Can you explain the calculations that are on that chart

25  that you prepared?

1     (Committee's Exhibit-3 previously marked for

2 identification)

3 A.  Well, this is just a summary chart that simply shows the --

4 for each of the three types of earnings, meaning EBITDA, EBIT

5 and net income, and the three different time periods that we

6 looked at, meaning the last 12 months 2004 estimated and 2005

7 estimated, what the resulting range of gross utility value was

8 based on the comparable multiples selected.

9 Q.  And is that the gross range that you were referring to

10 right in here?

11 A.  That is the selected range, yes.

12 Q.  How did you go about selecting that range?

13 A.  That was selected based on our professional experience

14 doing valuations.

15 Q.  And then would you explain the adjustments that you made,

16 both below and in the high range?

17 A.  Well, we deducted from the gross range, the QF liability

18 which has been talked about at great length today, as well as

19 the pension liability.  And we added the net present value of

20 working capital that is likely to be generated over the life of

21 the projections to get at a -- to get a net value range.

22 Q.  And that the net value on the bottom line there?

23 A.  Yes, approximately 1.25 billion to 1.37 billion.

24 Q.  Is that your conclusion then as to what the value of the

25 company's utility operations are using this particular method?

1  A.  Yes, based on the market multiple approach, yes, that is.

2  Q.  All right.  Then let's turn to -- I think we're finished

3  with that.  The next methodology you said was a comparable

4  transaction analysis.  Can you explain, in general, how that

5  method works?

6  A.  The comparable transaction methodology is very similar to

7  the comparable company methodology that I just explained, but

8  rather than using trading prices of market comparables, you're

9  using M&A transactions as the relevant comparables.

10 Q.  Where do you get the information about comparable M&A

11 transactions?

12 A.  From public announcements, public filings.

13 Q.  And what, within what timeframe, relative to the present,

14 do you regard these transactions as being comparable and worthy

15 of analysis here?

16 A.  Oh, the last 2 to 3 years, primarily.

17 Q.  So, you didn't go back to earlier years?

18 A.  We didn't go much beyond that, no.

19 Q.  All right, well let's take a look please at Exhibit-4 and

20 I'd ask that my colleague put that on the easel, which is

21 headed as "Summary of Comparable Transaction Approach?"  Would

22 you explain the calculations you give as reflected on that

23 chart?

24     (Committee's Exhibit-4 previously marked for

25 identification)

Geer - Direct                                   309

1  A.  Well, it's essentially the same basic calculation as we saw

2  on the last chart where we're taking the selected EBITDA and

3  EBIT multiples and multiplying them by the representative

4  levels of EBITDA and EBIT, respectively to achieve a gross

5  selected range from which we made the -- to which we made the

6  same adjustments that I described earlier, meaning, we deducted

7  the QF liabilities and pension liabilities and added the net

8  present value of the excess working cash, or working capital.

9  Q.  So, the representative EBITDA and the representative EBIT

10 are each respectively the same as those numbers that you used

11 in the prior --

12 A.  Correct.

13 Q.  -- methodology?  And likewise, the adjustments are the same

14 as the adjustments you made at the prior methodology?  What's

15 different then I take it are the multiples, is that right?

16 A.  Yes.

17 Q.  And those multiples are derived from comparable

18 transactions as you just testified to, right?

19 A.  Correct.

20 Q.  Now, as a result, did you come up with a conclusion as to

21 what the value of Northwestern's utility operations are based

22 on this methodology?

23 A.  Yes, we did.  Based on this methodology, we concluded a

24 value range from approximately 1.23 billion to approximately

25 1.33 billion.

1  Q.   Now, let's turn to the final methodology that you used,

2  which I think you said was the DCF discount cash flow method.

3  Would you explain how that method works and how it worked in

4  this case?

5  A.   Well, there are essentially two parts to the DCF, meaning,

6  the first part would be the discounting of the cash flows, the

7  net cash flows over the life of the company's business

8  projections.  Because those projections cover only a finite

9  number of years, there is a second part which is the terminal

10  value, which encompasses, or embodies, all of the value of the

11  cash flows past, the life of the five-year projection period.

12  Q.   Well, let's start with the first part.  Do I understand you

13  to say that it is based on the company's forecast as to

14  performance over the next five years?

15  A.   Yes.

16  Q.   Did you make an independent analysis and forecast of what

17  the company's performance would be over the next five years?

18  A.   We relied on the company's projections.

19  Q.   And let me then ask, Mr. Ratner, please to put on the

20  easel, Exhibit-5 which is headed, "Summary of Discount Cash

21  Flow Approach."  It's not so easy to see.  It's also in the

22  book, so you could do it either way and explain the

23  calculations that you did there, please.

24      (Committee's Exhibit-5 previously marked for

25  identification)

1  A.   Well, for the first part of the approach --

2  Q.   The first part, we're talking about this?

3  A.   We're talking about the upper left --

4  Q.   Yes.

5  A.   -- part of the diagram that summarizes the discounting on a

6  net present value basis of the net cash flows over the life of

7  the projections.  We start by taking the company's projections

8  for EBITDA, make certain minor adjustments for transition bonds

9  to get an adjusted EBITDA and then we subtract taxes.  We

10  deduct captial expenditures, add changes in working capital to

11  get to a net debt-free cash flow which we then discount to get

12  the resulting net present value figures that are along the

13  botton line in that upper lefthand corner.

14  Q.   And that would be these?

15  A.   Yes.

16  Q.   And then you then aggregate the discount cash flows --

17  A.   Yes.

18  Q.   -- in all of those years?

19  A.   Aggregate of the discounted cash flows over that period is

20  roughly 475 million.

21  Q.   All right, now I think you said the second piece of the

22  analysis was to determine the terminal value.  Explain what you

23  mean by terminal value?

24  A.   The terminal value represents the value of the cash flows

25  beyond the period that the projections cover.

1  Q.  So, in other words, the projections go out five years, but

2  the company still has a life an existence and a value at the

3  end of those five years?

4  A.  Correct.

5  Q.  And that's referred to as terminal value?

6  A.  Yes.

7  Q.  How did you go about ascertaining the terminal value?

8  A.  The terminal value calculation is very similiar to what I

9  described in the market multiple and transaction multiple

10 approach.  It's based on using a multiple, in this case, a 6.75

11 times as shown on the upper righthand box on the page, times in

12 this case, 2,008 projected EBITDA, which got us a gross

13 terminal value of approximately 1.6 billion which then was

14 discounted back to the present to arrive at a present value of

15 the terminal value which was approximately 1.15 billion.

16 Q.  And did you then aggregate the terminal value with the

17 aggregate discounted cash flows to come up with a value under

18 this approach?

19 A.  Yes, we did.  We aggregated the 475 million and the 1.55

20 billion to arrive at a total gross present value of

21 approxiamately 1.6 billion.

22 Q.  And then explain how you ultimately came up with the

23 numbers reflected on your bottom line here.

24 A.  What we did is sensitize the two primary variables in this

25 methodology, namely that a discount rate and the terminal

1  muliple, that sensitivity results in the values shown in the

2  table that is in the middle part of the page.  Along the top

3  line, you can see the sensitivities of the terminal multiple

4  and along the left side, you see the sensitivities on the

5  discount rate.  The middle box shows the 1.62 value that I

6  described before, which is at the intersection of the 7.8%

7  discount rate and the 6.75 times exit multiple that we used in

8  the chart above.  The next larger box is the box from which we

9  selected the range of enterprise values that is shown along the

10  bottom part of the page, namely the 1.6 to 1.66 gross range

11  there.

12  Q.  All right, now as a result of this, did you come up with a

13  conclusion as to what the value of the company's utility

14  operations were using this method?

15  A.  Yes, we did.  We deducted from that gross range, the QF

16  liability to get a net value of -- approximately from 1.46 to

17  1.52 billion.

18  Q.  And those are the numbers here?

19  A.  And I shoud mention in this case relative to the other

20  cases, the pension and working capital adjustments you will not

21  see on this approach because of the fact that they are embedded

22  in the discounted cash flows above and a separate adjustment

23  was not needed.

24  Q.  So, the only adjustment you made was to the QF liability --

25  A.  Correct.

1  Q.   -- that which we've had an abundance of testimony?

2  A.   Yes.

3  Q.   I won't ask you then to repeat any of that.  All right.

4  Now, let's look at the final chart which is Exhibit-6.  And

5  does that reflect your computations as to the total value?

6       (Committee's Exhibit-6 previously marked for

7  identification)

8  A.   It does, yes.

9  Q.   Let me start with what you refer to here as the "Indicative

10 Utility Enterprise Value."  Can you explain what that is?

11 A.   That is our selected concluded utility enterprise value

12 based on the three approaches that I previously described and

13 which are summarized above that line.

14 Q.   And that would be the market multiple approach, the

15 comparable transaction approach and the DCF approach, correct?

16 A.   Correct.

17 Q.   That which you've just testified.  And then would you

18 explain the adjustment that you've made to get to the total

19 distributable value?

20 A.   Well, this is the value of the company's cash, the

21 company's anticipated cash proceeds from its non-employer asset

22 dispositions, includign Blue DOT, Expanets, MFM.  It also

23 includes the value of the non -- the NOLs on a net present

24 value basis, as well as certain smaller negative values for

25 administrative expenses and things of that nature.

Geer - Direct                                           315

1  Q.  Now, as a result of all your calculations that you have

2  described here in your analyses, did you reach a conclusion,

3  and form an opinion within a reasonable degree of certainty, as

4  to the total distributive value of Northwestern Corporation?

5  A.  Yes, we concluded a total distributable value range of,

6  from approximately 1.4 billion to 1.67 billion.

7  Q.  Did did you so advise the Creditor's Committee?

8  A.  Yes.

9  Q.  And those are the numbers, I take it, that are expressed on

10 this chart as the total distributable value range, correct?

11 A.  Correct.

12 Q.  Now, did also reach a conclusion as to whether the

13 Equityholders' stake in Northwestern has any value?

14 A.  Yes.

15 Q.  And is that reflected also in your calculations on Exhibit-

16 6?

17 A.  It is on the bottom part of the chart is showing the total

18 claims, 922 million, approximately of secured claims, 1.33

19 billion, approximately of unsecured claims.  That excludes, by

20 the way, post-petition interest which would be another hundred

21 plus million to get to total claims of roughly 2.26 billion.

22 Q.  And so what did you conclude as the shortfall between the

23 value of the company as you determined it, and the amount

24 needed to put the Equityholders in the money?

25 A.  A minimum of 586 million.

1  Q.  And what multiples would be needed, for example to EBITDA,

2  in order to reach those shortfalls?

3  A.  Well, using round numbers, assuming a normalized level of

4  EBITDA of approximately 220 million for the business, it would

5  require a EBITDA multiple in excess of 10 times to get to the

6  point where the equity was a dollar in the money.  And then as

7  I mentioned before, excludes any post-petition interest on the

8  toppers.

9  Q.  And is a multiple of 10 times EBITDA your opinion, a

10  reasonable multiple for Northwestern Corporation?

11  A.  No, there's no reasonable basis on which you could select

12  10 times for this business.  It would have to be closer to 10

13  and a quarter at a mimimum.

14  Q.  And did you so advise the Creditor's Committee?

15  A.  Yes.

16  Q.  And based on these calculations and this analysis, what

17  advise did you give the Creditor's Committee about the Proposed

18  Plan of Reorganization?

19  A.  That the Plan is a good one, that the treatment under the

20  Plan is appropriate.

21  Q.  All right.  Thank you, Mr. Geer.

22        MR. ALCOTT:  I have nothing further, Your Honor.

23        THE COURT:  Is there anybody who is a proponet of the

24  Plan who wants to ask any questions before we have cross

25  examinations?  Mr. Austin?

1     DIRECT EXAMINATION (CONT'D)

2  BY MR. AUSTIN:

3  Q.  Good afternoon, Mr. Geer.  I'm Jess Austin on behalf of

4  Northwestern Corporation.  Just a few questions.  In reviewing

5  your exhibits, it appears that your EBITDA multiples that you

6  were using through your various methodologies ranged between

7  6.75 and 7 times, is that correct?

8  A.  Correct.

9  Q.  But you did not make any adjustment.  Hoolihan, in its --

10 coming up with this range did not make any adjustments for the

11 factors that's identified by Lazard.  Is that correct?

12 A.  We -- our approach was slightly different.  We took the, as

13 I mentioned before, the gross enterprise values of the

14 comparable companies and reduced them by their other assets,

15 their non-core assets, which reduced the multiples somewhat.

16 Additionally, we took into account the fact that the company is

17 less efficient on an EBITDA margin basis than the comparable

18 companies, meaning the company's EBITDA margin is approximately

19 20 to 21% versus our comparable companies were in the 24%

20 range.  Furthermore, as I mentioned earlier, we're capitalizing

21 an earnings stream that has embedded in it, the assumed

22 achievement of certain cost savings with respect to general

23 administrative expenses.  And so, therefore there's risks that

24 those won't be obtained.  So, from the median multiple of the

25 comparables, we did take a very slight deduction of

Geer - Cross                    318

1   approximately .2 on an LTM basis which got us from the median

2   of 7.2, I believe it was, to 7.

3   Q.  But thereafter, once you got to that 7, did Hoolihan

4   further adjust that multiple?  For example, for the three

5   factors identified by Lazard, which it then had -- did some

6   adjustment for low growth, low average of term, regulatory

7   environment and small market capitalization?

8   A.  Those were certainly things that we considered.  Those

9   three factors certainly weren't going to cause us to increase

10  the multiple relative to the peers.  And yes, if anything, they

11  caused us to maintain a downward bias relative to the peers.

12  Q.  Now, once you then determined the value I believe in each

13  one of the evaluation examples, Hoolihan subtracted

14  approximately $140 million for the QF liability, correct?

15  A.  Yes, we did.

16  Q.  And I believe you testified, but I would just like to hear

17  it clear, Hoolihan Lokey reached its valuation analysis

18  independent of what ever Lazard came up with.  Is that correct?

19          MR. RATNER:  Objection.  Leading, Your Honor.

20          THE COURT:  Overruled.

21  A.  Correct.

22          MR. AUSTIN:  Thank you.

23          THE COURT:  All right, cross examination.

24                  CROSS EXAMINATION

25  BY MR. MORRIS:

1  Q.  Good afternoon, Mr. Geer.  My name is John Morris.  You say

2  that you reached your valuation independent of Lazard, is that

3  right?

4  A.  Correct.

5  Q.  At the time you did your report, you had Lazard's valuation

6  in your hand, didn't you?

7  A.  Lazard presented to the Committee, a preliminary evaluation

8  sometime in the late 2003, I believe.

9  Q.  And you know exactly what their analsyis was, isn't that

10  right, sir?

11  A.  We had seen their analysis, yes.

12  Q.  And your analysis mirrors in most material respect,

13  Lazard's analsys, isn't that right?

14  A.  No, I disagree.

15  Q.  Okay, well, Mr. Austin just asked you if you reduced your

16  multiple for the same reasons that Lazard did.  Do you remember

17  that?

18  A.  Yes, I do.

19  Q.  And in your report, you actually say the exact thing that

20  Lazard did, isn't that right?

21  A.  And I said that there were -- that those things were taken

22  into considertion --

23  Q.  Let's take a --

24  A.  -- as well as other things that Lazard did not consider.

25  Q.  Let's take a look at page 7 of your report, please.

Geer - Cross                                   320

1      THE COURT:  Is this the Summary of Conclusion's page?

2      MR. MORRIS:  Yes, Your Honor.

3  Q.  Do you have that, Mr. Geer?

4  A.  I do.

5  Q.  These are the four factors that you considered in deciding

6  to reduce the multiples that were derived from your

7  comparables, correct?

8  A.  In addition to those I also mentioned, yes.

9  Q.  Well, these are the only four that you decided to disclose

10  in this particular document, right?

11  A.  It appears so.

12  Q.  And the first one is a smaller size, isn't that right?

13  A.  It is.

14  Q.  And that's exactly the one that -- that's exactly one of

15  the ones that Lazard used, right?

16  A.  Uhm-hum.

17  Q.  And the second one is lower growth markets, so you see

18  that?

19  A.  I do.

20  Q.  That's exactly one of the three that Lazard mentioned,

21  correct?

22  A.  Yes.

23  Q.  And the third one is a difficult regulatory environment.

24  That's the last one that Lazard used, correct?

25  A.  Correct.

1  Q.   And so the last one that you used that Lazard didn't, was

2  uncertainty with respect to the company's ability to achieve

3  projected overhead cost savings?  That's the only difference in

4  the basis that's disclosed, is the reason for reducing

5  multiples, right?

6  A.   That, based on this summary, yes.

7  Q.   Yes.

8  A.   Yes.

9  Q.   And in fact, like Lazard, not only did you reduce the

10 multiple, you used and you discounted cash flow analysis to a

11 lower transacton multiple subject to your adjustment, rather

12 than the higher comparable company multiple, correct?

13 A.   That is the multiple that we believe based on professional

14 experience is appropriate.

15 Q.   And, but that -- you did it exactly like Lazard, right?

16 A.   No.

17 Q.   Didn't you both use an adjusted transaction multiple in

18 your DCF?

19 A.   No, that multiple is not solely based on the adjusted

20 transaction multiple.  It happens to be the same, 6.7 -- 6.75,

21 I can't remember which, it also happens to be the same --

22 Q.   No, no, no.  I'm sorry, sir.

23      MR. ALCOTT:  Excuse me, could we let the witness

24 finish his answer?

25 Q.   I withdraw my question.

Geer - Cross                                    322

1          MR. ALCOTT:  Counsel has the --

2          THE COURT:  I think he's --

3          MR. ALCOTT:  -- well, I --

4          THE COURT:  That's all right.  I think --

5          MR. ALCOTT:  -- when gets an answer he doesn't like,

6    he withdraws the question.

7          THE COURT:  The sense I got was that counsel realized

8    that the question he asked was not one, was not being

9    understood and he was trying to change it.

10         MR. RATNER:  Well, I --

11         THE COURT:  I do agree that the witness ought to be

12   allowed to answer, but let's not get in a fight over something

13   that I think is not really fightable at this point.

14   BY MR. MORRIS:

15   Q.  All I was asking you sir, was not with respect to the

16   numbers that the two of you ultimately came up with, but as a

17   matter of methodology, both you and Mr. Yearly used in your

18   discounted cash flow analysis, a -- an adjusted transactional

19   multiple, not a comparable company multiple.  Is that right?

20   A.  No.

21   Q.  Let's take a look at your comparable companies.  You know

22   what, let's stick with that for a second.  Do you understand

23   that Lazard in their DCF, used a multiple that was based on a

24   discount off of its transaction multiple?

25   A.  It's not something I had focused on.

Geer - Cross                                            323

1   Q.   Is that what you did?

2   A.   No.

3   Q.   Okay.  What did you -- what multiple did you use in your

4   DCF?  Why don't you turn to your Exhibit-5.

5   A.   Okay.

6   Q.   You have a multiple, a terminal multiple of 6.75, is that

7   right?

8   A.   Yes.

9   Q.   And that's the same multiple that Lazard had, is that

10  right?

11  A.   I don't know what Lazard's multiple is offhand.

12  Q.   Okay.  But nevertheless, where did you come up with 6.75?

13  A.   Well, if you turn to Exhibit-3, you'll notice that it is

14  the mid-point between the LTM EBITDA multiple and the next

15  fiscal year plus one multiple.  Additionally, if you turn to

16  Exhibit-4, you'll notice that it's a premium of .05 to the

17  transactional multiple --

18  Q.   Of 505?

19  A.   -- it's a premium.  It is a premim.

20  Q.   Okay.

21  A.   Not a discount.

22  Q.   Okay.  Understood.  Let's look at your comparable

23  companies, please.

24  A.   Okay.  A particular page?

25  Q.   I'm looking, give me just a minute.  Page, 26.

1  A.  Okay.

2  Q.  Now, you said you -- do you have that, sir?

3  A.  I have page 26.

4  Q.  Okay.  You said that these are multiples that reflect

5  adjustments you made to take into account non-core operations

6  and investments, is that right?

7  A.  Correct.

8  Q.  And the adjustments that you made you said were based on

9  the company's stated net book value for the assets, is that

10 right?

11 A.  Yes.

12 Q.  Now, based on your experience, there's not always a good

13 relationship between book value and market value is that right?

14 A.  Book value is the best measure available on public

15 financials.

16 Q.  That's right, but to answer my question, based on your

17 experience, there's not always a very good relationship between

18 book value and real market value, correct?

19 A.  Based on my experience, the two can diverge, yes.

20 Q.  And you don't know whether or not in making your

21 adjustments, whether you adjusted too high or too low relative

22 to true market values, correct?

23 A.  Well, I believe that making adjustment based on the public

24 financials is better than making no adjustment.

25 Q.  You don't know, do you sir, whether or not the adjustments

1  you made overstated or understated or got right, the discount

2  that you were trying to capture, the elimination of the non-

3  core assets, correct?

4  A.   It was the best adjustment based on the public available

5  financials that were able to make.

6  Q.   Okay.  And as with Mr. Yearly, if we look at your

7  comparable companies, there is no relationship between your

8  comparable companies, EBITDA and their size, correct?

9  A.   I'm not sure what you're asking.

10  Q.   Do you have page 26 in front of you?

11  A.   Yes.

12  Q.   One of the factors you took into account in reducing your

13  multiples was size, right?  That's we just looked at?

14  A.   Yes.  But size as it pertains to such things as the

15  company's ability to achieve or acess the capital markets and

16  achieve the lowest cost of financing going forward, not

17  necessarily, the trading multiple.

18  Q. All of that is going to be taken into account by the market,

19  isn't that right?

20  A.   There are in infinite number of items that ultimately get

21  factored into a market trading multiple.

22  Q.   And at the end of the day, the exercise that we're doing

23  here is trying to build a valuation based on market value of

24  your comparable companies, correct?

25  A.   That's right.

1  Q.  And your comparable companies are going to take into

2  account all of the things you just mentioned, isn't that right?

3  A.  That is correct.

4  Q.  Okay.  So, we go back and look at your chart, for example,

5  Duquesne Light is among your smallest comps based on enterprise

6  value, correct?

7  A.  It is one of the smallest.

8  Q.  And yet it has the highest last 12 months EBITDA multiples,

9  correct?  Second highest, I apologize.

10  A. It happens to, yes.

11  Q.  Second highest?

12  A.  Yes.

13  Q.  And Energy East is your second largest comp, isn't that

14  right?

15  A.  Uhm-hum.

16  Q.  And it has the second lowest last 12 months EBITDA

17  multiple, correct?

18  A.  Yes.

19  Q.  Looking at the EBIT chart, IDACorp is one of your smaller

20  comps, correct?

21  A.  That it is.

22  Q.  Yet it has the highest next fiscal year EBIT multiple,

23  correct?

24  A.  Yes, it does as a result of the fact that its depreciation

25  is out of line with the other comparables.

1  Q.   But notwithstanding that, you decided to include this among

2  your comparables, correct?

3  A.   Well, it gets cleansed out when you look back at the EBITDA

4  multiple.

5  Q. And with respect to Energy East being the second largest

6  comp, but having among the lowest EBIT multiples, what's going

7  on there?   How do you explain that?

8  A.   I'm sorry?

9  Q.   How do you explain the fact that Energy East is your second

10 largest comp, but yet has among the smallest EBIT multiples for

11 the next fiscal year?

12 A.   Energy East EBIT multiple on a LTM basis is 11.4 times and

13 the median is 11.4 times.

14 Q.   Right and how about next fiscal year?

15 A.   Next fiscal year, 9.7 versus 10.8.

16 Q.   There's only two that are lower, isn't that right?

17 A.   Well --

18 Q.   Is that right, there are only two that are lower?

19        MR. ALCOTT:   Your Honor, he, really, he does not let

20 the witness finish the question.   I really think the witness is

21 entitled to --

22        THE COURT:   Yes.   I'd just like to make sure that

23 there's enough time between the question and the answer.

24        MR. MORRIS:   Very well, Your Honor.   This is cross and

25 these are pretty straightforward --

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

1    THE COURT:  Cross, but you have to let him answer the

2  questions.

3    MR. MORRIS:  I can certainly agree.

4    THE COURT:He started to say a word and then you

5  started to talk again --

6    MR. MORRIS:  I completely agree.

7    THE COURT:  -- so let's not do that.

8  BY MR. MORRIS:

9  Q.  There are only two that are -- have lower multiples, isn't

10  that right, sir?

11  A.  I'm sorry.  Are were looking at Energy East?

12  Q.  Yes.  Next fiscal year even.

13  A.  Correct.

14  Q.  Thank you.  Even if we look at it on an unadjusted basis if

15  you turn the page.  We can go through this if we -- if you want

16  to stand by your testimony that size is an appropriate basis to

17  reduce the multiples.  Is that still your testimony?

18    MR. ALCOTT:  Misstates the testimony.

19    THE COURT:  Overruled.  He can ask the question.

20  BY MR. MORRIS:

21  Q.  Is it still your testimony that size is a legitimate basis

22  to reduce multiples?

23  A.  My testimony is that there were a number of factors which

24  caused us to select.  For example, an EBITDA multiple that was

25  .2 times lower than the median multiple, .2, that represents

1  maybe 40 to $60 million in value, based on four or five

2  different variables --

3  Q.  I'm not asking you, sir --

4  A.  -- one of which was size to a certain degree, but it really

5  wasn't that important.

6  Q.  Okay, and is it not important at all after what we just

7  looked at?

8  A.  No, I wouldn't say that.

9  Q.  Do you still think it's important?

10  A.  Yes.

11  Q.  Okay, then let's continue on, page 27.

12  A.  From the standpoint, as I said before, access to capital

13  markets and things like that.

14          MR. MORRIS:  I move to strike, Your Honor, there's no

15  question pending.

16          THE COURT:  Sustained.  Granted.

17  BY MR. MORRIS:

18  Q.  Look at price to earnings.  Vista Corp. is one of your

19  comparable companies, correct?

20  A.  It is, yes.

21  Q.  And it is by far, the smallest based on MVE, correct?

22  A.  That it is.

23  Q.  And yet it has by far, the largest price to earnings

24  multiple for the last 12 months, correct?

25  A.  That it does.

1  Q.  And it also has the second highest price to earning ratio

2  for the next fiscal year, correct?

3  A.  That is does.

4  Q.  IDA Corp. is one of your smallest comps based on MVE, is

5  that right?

6  A.  IDA Corp., yes.

7  Q.  What does FYE stand for?

8  A.  Fiscal year end.

9  Q.  It had the highest P to E ratio for the fiscal year ending,

10 is that correct?

11 A.  Yes.

12 Q.  Notwithstanding the fact that it was your second smallest

13 comp, correct?

14 A.  Correct.

15 Q.  With respect to the regulatory environment sir, did you

16 ever meet with Northwestern's regulators?

17 A.  Yes.

18 Q.  When did you do that?

19 A.  Oh, on two different occasions, I believe in New York --

20 Q.  Was it -- I'm sorry.  Are you finished?

21 A.  Yeah, I'm finished.

22 Q.  Was it with company officials?

23 A.  No, we met with them separately, as well.

24 Q.  And when was the last time you met with them?

25 A.  Probably, I'm gonna say, April.  That's a -- it's a rough

Geer - Cross                              331

1  recollection.

2  Q.  Was that before or after the settlement with the --

3  A.  It was during the process of the negotiations.

4  Q.  So, it was before the settlement was reached?  Is that

5  right?

6  A.  Yes.

7  Q.  And you didn't partake in those negotiations, did you, sir?

8  A.  We were not directly involved although we did discuss the

9  issues thoroughly with the Commission.

10  Q.  You weren't authorized by the company to negotiate on the

11  company's behalf, were you sir?

12  A.  Correct.

13  Q.  Like Lazard, you added a 1% risk premium to your weighted

14  average cost of capital analysis, correct?

15  A.  Yes, we did.

16  Q.  Could you turn to your DCF, please.  I guess that's

17  Exhibit-5.

18  A.  Okay.

19  Q.  There's a line there over the projection period that says,

20  "Less Taxes."  Do you see that?

21  A.  Yes.

22  Q.  Do you know where you got those numbers?

23  A.  Yes, I do.

24  Q.  Where did they come from?

25  A.  Well, there's a schedule -- schedule if you would refer to

1  page 35 in the report.

2  Q.  Yes.

3  A.  Two-thirds of the way down the page.  It's footnote number

4  two, calculation of taxes.

5  Q.  And where does the adjusted EBITDA line come from?

6  A.  That is if you look up on that page, the third line down,

7  simply the EBITDA plus we've added to the company's EBITDA,

8  transition bond revenue to account for the fact that the

9  transition bonds are included in the secured debt of the

10  company.

11  Q.  And did you reduced -- where did you get the tax DNA from?

12  A.  That's from the company.  That is, just like it says, that

13  is the DNA that it uses for tax purposes.

14  Q.  And then you just apply the 38.5% tax rate to the taxable

15  EBIT that results?

16  A.  Correct.

17  Q.  How do you take into account the net operating losses that

18  we've talked about?

19  A.  We valued those separately that are included in the value

20  of the non-operating assets, the 150 to 195 million that was on

21  the last chart that we had up.

22  Q.  Take a look at Exhibit, for example.

23  A.  Right.

24  Q.  Is the NOL value included here?

25  A.  No.  If you refer to the last exhibit, Exhibit-6 --

Geer - Cross                                    333

1   Q.   Right.

2   A.   -- there's a line in the middle that says, "Non-Utility

3   Assets and Adjustments, 150 million to 195 million."

4   Q.   Right.

5   A.   It's embedded in there and there's a breakout of that if

6   you would like to see it.  If you refer to page 38 in the

7   report --

8   Q.   Yes.

9   A.   -- that summarizes all of the items that have gone into the

10  150 to 195 range, the last item of which is the taxed assets.

11  Q.   So, the company has today on its books and records, net

12  operating losses of approximately $665 million and Hoolihan

13  Lokey has determined that the value of those NOLs is between 20

14  and $30 million today?  Is that right?

15  A.   Yes.  The reason is that the NOLs get reduced by the COD

16  income.  The resulting value is, I can't remember the exact

17  number, 100 million or something like that.  Because the

18  company's tax depreciation is so high, the tax depreciation

19  reduces the taxable income so signficantly that even if the

20  company had even more NOLs to use, the value of those NOLs is -

21  - very low because of the fact that there's very little taxable

22  income left over to shield after you apply the tax DNA against

23  the taxable income.

24        MR. MORRIS:  I move to strike everything after the

25  word yes, Your Honor, as unresponsive to my question.

Geer - Cross                               334

1           THE COURT:  Overruled, denied.

2           MR. MORRIS:  Okay.  I have no further --

3           THE COURT:  If you wanted to do that, you should have

4   done it earlier.

5           MR. MORRIS:  Okay.

6           THE COURT:  All right.

7           MR. MORRIS:  I'll know next time.

8           THE COURT:  Well, I mean once he started to talk, it

9   seemed to me that you were accepting the answer.  That's why

10  I'm denying the motion.

11          MR. MORRIS:  I didn't want to step on his words like I

12  was told not to, but thank you.

13          THE COURT:  Any redirect?

14          MR. RATNER:  I have nothing further, Your Honor.

15          THE COURT:  Okay.  I don't have any questions, thank

16  you, sir.  You may step down.

17          MR. AUSTIN:  Your Honor, I think Mr. Harris is next if

18  we could just take a short break since we seem to be just

19  minutes ahead of schedule?

20          THE COURT:  All right, that's fine.

21          MR. AUSTIN:  Thank you very much, Your Honor.

22      (Recess)

23          ALL:  Good afternoon, Your Honor.

24          MR. RATNER:  The Equityholders call James W. Harris of

25  Seneca Financial Group.

Harris - Direct                                    335

1    THE COURT:  Mr. Harris, please come forward to the

2  Courtroom Deputy to be sworn.

3         JAMES W. HARRIS, CREDITOR'S WITNESS, SWORN

4    THE COURT:  All right, thank you, Mr. Harris.  Please

5  be seated.  Speak up clearly into the microphone.

6                      DIRECT EXAMINATION

7  BY MR. RATNER:

8  Q.  Good afternoon, Mr. Harris.

9  A.  Good afternoon.

10 Q.  I guess, good evening at this point.  Are you currently

11 employed, sir?

12 A.  For the moment, yes.

13 Q.  By whom?

14 A.  Senceca Finacial Group.

15 Q.  And how long have you been with Seneca?

16 A.  Well, I started the company in 1993.

17 Q.  And what is the nature of Seneca's business?

18 A.  We provide advisory work for creditors, debtors, equity

19 committees on restructuring matters.

20 Q.  And can you describe briefly your employment background

21 prior to the time you formed Seneca Financial?

22 A.  Prior to forming Seneca Financial, I was at Sherson Lehman,

23 now Lehman Brothers -- excuse me, from 1982 to 1993.  During my

24 last 6 -- 6½ years there, I ran the financial restructing

25 practice at Lehman.  And prior to joining Lehman, I was with

Harris - Direct                                    336

1   Citibank as a lending officer for 10 years.

2   Q.   While you were the head of Lehman's restructing group, did

3   you work on any utility or energy matters?

4   A.   Yes.  Yes I did.

5   Q.   Can you describe generally what those matters were?

6   A.   We did some work on Tucson Electric which was down in

7   Tucson, representing a energy supplier to Tucson.  And we did

8   work with Public Service of New Hampshire.  I've done work with

9   other energy companies, Columbia Gas for one, representing the

10  Creditors.

11  Q.   Do you sit on any boards of directors today, sir?

12  A.   Yes, I do.

13  Q.   And which companies boards do you sit?

14  A.   I sit on the Board of El Paso Electric and I sit on the

15  Board of Paragon Systems.

16  Q.   And what's the nature of El Paso Electric's business?

17  A.   El Paso Electric is a vertically integrated utility based

18  in El Paso.

19  Q.   And how long have you sat on that company's Board?

20  A.   I believe I went on the Board in '95, I believe.

21  Q.   And do currently hold any positions on the Board?

22  A.   I'm on the Executive Committee and I'm Chairman of the

23  Governance Committee.

24  Q.   Have you offered expert evaluation testimony at any time in

25  the past?

1  A.  Yes, I have.

2  Q.  And if you take a look at --

3         MR. RATNER:  Your Honor, may I hand the witness his

4  report?

5         THE COURT:  Yes, I was going to ask where will I find

6  the report?

7         MR. RATNER:  I'm actually just gonna use the Debtor's

8  Exhibit-141.

9      (Debtor's Exhibit-141 previously marked for

10 identification)

11        THE COURT:  All right, thank you.

12 BY MR. RATNER:

13 Q.  If you take a look at the, page 82.  Do you have that in

14 front of you?

15 A.  Yes, I do.

16        MR. RATNER:  Your Honor, do you have that?

17        THE COURT:  Yes.

18 Q.  And can you describe to the Court what that page is?

19 A.  This represents the cases in which I've provided either

20 expert witness or depositions or reports.

21 Q.  Are these all valuation cases?

22 A.  Most of them are.

23 Q.  Can you identify for the Court which of these cases where

24 you provided testimony, involve both valuation issues, as well

25 as either utility or energy issues?

1  A.  Pacific Gas & Electric, we provided expert reports.

2  O'Brien Energy, we provided expert reports and testimony.

3  Public Service New Hampshire, we provided an expert report.

4  Texaco, we provided expert report and testimony.  I also worked

5  in Columbia Gas, but we never did a report.

6  Q.  And who did you represent from Pacific Gas & Electric?

7  A.  I worked with the law firm representing the California

8  Public Utility Commission.

9  Q.  So that, the California Public Utility Commission was your

10  client?  Is that right?

11  A.  Basically, yes.

12  Q.  Can you turn to page 3 of your report, please?  Do you have

13  that in front of your, sir?

14  A.  Yes, I do.

15  Q.  Now, were you here for the testimony of both Mr. Yearly and

16  Mr. Geer?

17  A.  Yes.

18  Q.  And did you hear them describe the equity hurdle or the

19  claims hurdle, if you will, as being $2.2 billion?

20  A.  Yes.

21  Q.  What's your understanding of what the claims hurdle is?

22  A.  Well, the claims hurdle as we understand it as being set

23  forth on page 3, using the claims that the Debtors provided and

24  subtracting the cash that the Debtor has projected having on

25  hand.

1  Q.  Do you have any opinion as to whether or not the Debtors

2  estimated $180 million is a valid number today?

3  A.  Well, it would appear to be because the last MOR Report had

4  well in excess of 100 million of cash in hand.  There's another

5  projected 100 million of asset sales to be consummated.  It's

6  not quite clear when that will happen.  The Debtor is

7  forecasting it to happen by 2/1/05, I believe.

8  Q.  Just one second.

9      (Counsel reviews documents)

10  Q.  Do you know what accounts for the difference in the claims

11  hurdle as you describe it and claims hurdle as Mr. Yearly and

12  Mr. Geer, described it?

13  A.  Well, I'm not quite certain how they got to their number.

14  I mean, we've taken it from what the Debtor has provided.

15  Q.  And do the footnotes on this page reference the sources for

16  each of the entries on the Claims Hurdle Analysis?

17  A.  Yes, they do.

18  Q.  Could you turn, turn to page 16 of your report?  Did you do

19  a valuation analysis of Northwestern?

20  A.  Yes, we did.

21  Q.  And what methodologies did you use in valuing Northwestern?

22  A.  Well, we used the same methodologies that all the other

23  firms used.  We've looked at comparable transactions.  We've

24  look at the comparable trading ranges and we've looked at the

25  DCF.  And we relied most heavily on the DCF.

Harris - Direct                                340

1  Q.  And why did you -- withdrawn.  Did you weight those three

2  methodologies?

3  A.  No.

4  Q.  Why not?

5  A.  I just used my judgment.

6  Q.  And did you rely most heavily on the DCF?

7  A.  Well, if you look at the comparable transactions, and I

8  have not seen the Hoolihan Report, but I would suspect that all

9  three show the same idiocyncrancy and that the comparable

10 precedent transactions where companies are being sold and

11 control values being exchanged, actually have lower multiples

12 than the trading multiples and you would ordinarily expect the

13 opposite to occur because of the so-called, "control premium."

14 But that doesn't seem to be applicable to the utilities.  I

15 think there are reasons for that, but let's just say for the

16 time being, it's just a phenomen and unique to the utility

17 industry where the comparables seem to be trading at a higer

18 rate than the precedent transactions.  So, we really looked at

19 the trading multiples.  And if you look at trading multiples

20 and do a DCF, you're still relying heavily on the multiples

21 that you're obtaining from those comps.  So, to use comparable

22 transactions when they're justified is fine.  I didn't feel

23 they were justified in this case.  Comparable trading and DCF

24 are really used in the same set of numbers twice.  So --

25       MR. AUSTIN:  Your Honor?

1    A.    -- in a DCF, you have advantage of having the Debtor's

2    forecast, in this case, management's forecast, available to

3    you, which you do not have in these other situations.

4    Q.    Just so I understand you, correct me.  You're saying that,

5    that unlike the DCF, the comparable company and the comparable

6    transaction analysis don't rely on management's projections?

7    A.    Well, usually when a company is being acquired, the

8    acquiror will make their own estimates or forecast future

9    earnings and future cash flows and that's how they will base

10   the price they're willing to pay.  So, they're making the

11   forecast.  They're usually not relying too heavily on

12   management's forecast.  At least that's been my experience.

13        MR. RATNER:  Your Honor, can I approach the witness

14   and just show him the Debtor's Exhibit-145?

15        THE COURT:  Sure.

16        (Counsel approaches the witness)

17   Q.    Mr. Harris, I've put before you, Debtor's Exhibit-145, can

18   you see that?

19   A.    Yes, I do.

20   Q.    Does that accurately describe what you did in valuing

21   Northwestern?

22   A.    No, it does not.

23   Q.    In what way in your opinion, does that not accurately

24   describe what you've done?

25   A.    Well, I'm assuming that what is being characterized here is

Harris - Direct                          342

1   distibutable value and to --
2          THE COURT:  It's page 60 of the slides, correct?
3   A.   Pardon me?
4          THE COURT:  That's what we're looking at, page 60 of
5   the slide package?  That's right, Debtor's Exhibit-145.
6   A.   It's the next to the last set of graphs on the Debtor's
7   package, I believe.
8   Q.   Okay.  Go ahead, Mr. Harris.  Why don't you believe that
9   accurately reflects what you've done?
10  A.   Well, it deducts the QFs.  It deducts this theoretical
11  liability that is owed to the QFs when there's not gonna be a
12  distribution of value to the QFs.
13  Q.   And when you did your analsyses --
14  A.   It also excludes cash which will be distributed.
15  Q.   To whom will the cash be distributed?
16  A.   To Creditors, Secured Creditors, primarily and the
17  Convenience Class Creditors.
18  Q.   And in your opinion, should the cash being distributed to
19  those classes be taken into account when valuing Northwestern?
20  A.   I would think so, yes.
21  Q.   And you did not make any adjustment for the so-called, "QF
22  liability?"
23  A.   No, I did not.
24  Q.   And why didn't you do that?
25  A.   Well, first of all, the QFs, the cost of the QFs are being

1  paid each year on a pay as you go basis and there are plenty of

2  utilities around the country, PG&E was one, there is a case

3  that we reference in our report, Tucson Electric was another,

4  where you have contracts in place that are uneconomic and

5  they're either gonna get resolved or they're not.  But you

6  don't start deducting value day one if a contract's sitting out

7  there and doesn't have a due date for 10 or 20 years.  I've

8  only seen once instance in the utility industry where a

9  contract has caused a company to have to re-negotiate its

10  balance sheet, and that was Tucson Electric.  And Tucson

11  Electric had default contracts all over the landscape.  The

12  Creditors filed an involuntary petition and that involuntary

13  petition for pending for a year while these contracts which

14  were supposedly, you know, insurmountable, got worked out.  In

15  the case of Columbia Gas, Columbia Gas did have the funds

16  because it had contracts that were out of the market, and

17  significantly out of the market.  That case got worked out, as

18  well.  So, it's not unheard of for contracts to be on a balance

19  sheet or represented in a company's financial structure, but

20  you don't fund those contracts day one if they become a problem

21  and you don't fund them necessarily coming out of a

22  reorganization.  And you're not funding them coming out of this

23  reoganization.

24  Q.  Is it your understanding that the Debtor's projections have

25  been taken into account, the QF liability during the projection

1  period?

2  A.   My understanding is, they have because the cost is embedded

3  in the cost of providing the service, and the revenues are

4  being recouped up to the unrecovered portion.

5  Q.   Could you turn to page 17 of your report, please?  Can you

6  describe -- withdrawn.  You did a comparable company analysis,

7  is that right?

8  A.   Yes, we did.

9  Q.   And does page 17 identify the companies that you selected

10  as comparable?

11  A.   Yes.

12  Q.   And can you describe for the Court, the factors that you

13  considered in selecting your comparable companies?

14  A.   We tried to look at the companies that were involved in

15  supplying electricity and gas to a diverse set of markets.  We

16  have not necessarily looked at size, although you know, people

17  have testified that that is a criteria.  We think that gets

18  reflected in the discount rate.  We have looked at basically

19  companies that compete in a similiar vein to Northwestern.

20  Q.   Did you include any companies with significant regulated

21  generation capacity?

22  A.   The companies in here have regulated and unregulated

23  segments to them.  That wasn't a primary driver in our view.

24  Companies tend to trade based on their competitive

25  characteristics.  I'm not aware of markets making a discernment

1  as to whether the revenues are regulated or unregulated unless

2  one or the other becomes a signficant problem.

3  Q.  Can you turn to page 18?  Can you describe for the Court,

4  what is set forth in the box in the middle of that page?

5  A.  Basically, what's in the box is our comparable company

6  analysis using the core energy results and looking at the

7  multiples that are derived from the trading prices relative to

8  the EBITDA multiples and applying those to Northwestern.

9  Q.  And do you know what accounts for the difference in the

10  median EBITDA multiple that you have of 9.5 and the multiples

11  that Mr. Yearly and Mr. Geer testified, at least before they

12  adjusted them?  Were the multiples derived from their

13  comparables?

14  A.  Well, prior to the adjustment, it's really related to the

15  selection of the comps.  I mean it's the companies that are

16  involved in the comp universe.  I mean the one we agree on is

17  Duquesne.  So, if we all agree to value it as Duquesne, we

18  could go on.

19  Q.  Why do you say that?

20  A.  That's the one we all agree on.

21  Q.  Is Duquesne the only company that you know of --

22  A.  That's --

23  Q.  -- that all three of you --

24  A.  That seems --

25  Q.  -- identified?

```
 1   A.   -- to be the one.
 2   Q.   And what is Duquesne's EBITDA?
 3   A.   It's about 11 and change.
 4   Q.   And based on $210,000,000 of EBITDA, where does the
 5   enterprise value come out?
 6   A.   It'd be over 2.2.
 7   Q.   Can you turn to pages 41 -- 40 to 42 of your report,
 8   please?  Do these pages describe the attributes of the
 9   companies you selected as comparable?
10   A.   Yes.
11   Q.   Can we talk just for a moment about Allegheny?  In what way
12   did you determine that Allegheny was appropriate for inclusion
13   in your analysis?
14   A.   Well, we looked at the multi-regional operating nature of
15   the business.  We looked at the mix between gas and electric.
16   And we felt it was appropriate as a company.
17   Q.   I think Mr. Hanson this morning testified that Allegheny
18   had approximately 60% of its revenue derived from regulated
19   activity.  Were you here for that?
20   A.   What I heard was that -- I believe he said 37% came from
21   unregulated activity.
22   Q.   Okay.  I said it the opposite.  Is it your understand that
23   that statement is accurate today?
24   A.   Well, I think that may have been true at one time.  But
25   they have sized down considerably due to regulatory pressure,
```

1  their unregulated businesses.

2  Q.  You've also included on page 41 a description of a company

3  called PNM.

4  A.  Right.

5  Q.  Do you see that?

6  A.  Yes.

7  Q.  Why did you decide to include PNM in your comparable

8  company analysis?

9  A.  Well, PNM operates in the gas and the electrical area.  It

10  has a good distribution network.  It operates power plants and

11  sources its electricity.  And we felt that was -- it's also in

12  a challenging regulatory environment.  New Mexico is a tough

13  regulatory state.

14  Q.  And how do you know that?

15  A.  Well, El Paso also sells electricity -- New Mexico.

16  Q.  And how about Vectren?  I think Mr. Hanson testified that

17  Vectren had 70% of its revenue derived from gas operations.

18  Were you here for that?

19  A.  That is correct.

20  Q.  And why did you nevertheless -- withdrawn.  Does

21  Northwestern have gas operations?

22  A.  Yes, it does.

23  Q.  And what's your understanding of the percentage of

24  Northwestern's revenues derived from gas operations?

25  A.  I believe it's roughly 30% --

1  Q.   And why --

2  A.    -- 35%.

3  Q.   -- despite the difference in the percentage of revenues

4  derived from gas did you nevertheless include Vectren in your

5  comparable company analysis?

6  A.   Well again it operates in multiple markets.  It does give

7  us a better handle I think on the gas distribution side of the

8  business.

9  Q.   Did you make any adjustments to your multiples derived from

10  your comparable companies?

11  A.   No.

12  Q.   Why not?

13  A.   The only reason I can see for putting a lower multiple than

14  what the market has done is to try to argue the value down.

15  And at the end of the day --

16       THE COURT:   I'm sorry, argue -- I'm sorry, what?

17  A.   Argue the value down.  I don't have a better judgment than

18  the market.  The market pays up every day for companies.  And

19  if you're gonna look at them, I don't think you should be

20  different.

21  BY MR. RATNER:

22  Q.   Would you turn to page 19 of your report, please?  Can you

23  describe for the Court what's in the box on the bottom of that

24  page?

25  A.   We have looked at the precedent transactions analysis, and

Harris - Direct                349

1  derived the same set of multiples as we did for the comparable

2  trading, and then divide those to the valuation of

3  Northwestern.

4  Q.  Did you make any adjustment to your precedent transaction

5  multiples?

6  A.  No, we did not.

7  Q.  Can you turn to page 20, please?  Are these the five

8  transactions that you've identified as comparable to

9  Northwestern's reorganization?

10 A.  Yes.

11 Q.  Are you aware of a recent transaction between PNM and

12 Texas/New Mexico Power?

13 A.  Yes.

14 Q.  Can you describe for the Court what you know about that

15 particular transaction?

16 A.  Well that transaction has recently been announced.  And

17 based on the limited information that we've been able to get so

18 far, it would appear that the transaction is occurring at about

19 an 8.8 times multiple --

20     MR. AUSTIN:  Your Honor, I move to strike that.

21 A.  -- EBITDA.

22     MR. AUSTIN:  I think it's obvious from the answer that

23 the witness did not formulate any of the basis of his report.

24 I don't believe it should be part of the testimony.

25     THE COURT:  Sustained.  I think the transaction and

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    the information has to be disclosed.  And it has to be

2    available for discovery.  And in the absence of that -- I think

3    Rule 26 is pretty clear about that.  In the absence of that I

4    think the witness should not testify about it.

5             MR. RATNER:  This transaction occurred after the time

6    he issued his report.

7             THE COURT:  I understand that.

8             MR. RATNER:  And after the time he was deposed.

9             THE COURT:  I understand that.  The objection is

10   sustained.

11            MR. RATNER:  Thank you, Your Honor.

12   BY MR. RATNER:

13   Q.  Can you turn to page 21, please?  Can you describe for the

14   Court what this?

15   A.  Basically this is the DCF analysis that we did.

16   Q.  Now, did you separately value the net operating losses?

17   A.  No, we did not.

18   Q.  Can you describe for the Court -- there's a line in there

19   that says, "Less projected current taxes"?  Do you see that?

20   A.  Yes.

21   Q.  Can you -- does that line reflect the utilization of the

22   net operating losses during the projection period?

23   A.  Well I believe it does, because this came from the company.

24   This was the company's own estimate of what it said it was

25   gonna pay in taxes.