1  Q.  Can you describe to the Court how you got the projected

2  current taxes for this particular line entry?

3  A.  Well --

4  Q.  Where does it come from?

5  A.  Well, it comes from two sources.  One is the Disclosure

6  Statement.  And the second is the presentation to the S&P

7  people that the company did where they basically said they were

8  gonna be a 5% taxpayer for the next five years.

9  Q.  Is the S&P presentation one of the documents that you

10 reviewed in connection with the preparation of your report?

11 A.  Yes.

12 Q.  And below that line there's a phrase, "EBIAT, E-B-I-A-T."

13 Do you see that?

14 A.  Yes, that's --

15 Q.  What is that?

16 A.  That stands for Earnings Before Interest After Taxes.

17 Q.  And why do you include that line on this chart?

18 A.  Because we're calculating cash flow before we pay interest

19 on an unlevered basis but after taxes which we're gonna have to

20 -- we're gonna have to pay taxes before we can get to free cash

21 flow.

22 Q.  So -- now, did you look at the Debtor's 1.2 projected sales

23 growth?

24 A.  Yes, we did.

25 Q.  And did you do any independent analysis to test the

1  reasonableness of that particular revenue growth rate?

2  A.  Yes, we did.

3  Q.  And did you form an opinion as to whether or not 1.2% is a

4  reasonable growth rate?

5  A.  I believe it's too conservative for what we see happening

6  in the markets in South Dakota and Montana.

7  Q.  And what do you see happening in the markets in South

8  Dakota and Montana?

9  A.  Well we've set forth a number of criteria we use to look at

10  that.  But they all indicate that growth will be -- should be

11  above 1% for the company going forward.

12  Q.  Looking at page 22, did Seneca -- there is a reference to

13  the first dash there about the materials discussed earlier --

14  indicate that recent consumer growth -- customer growth alone

15  has been 1.2%, and that electricity consumption growth has been

16  even more robust at 6.6%.  Do you see that?

17  A.  Yes.

18  Q.  And what was the basis for those statements?

19  A.  Well, we looked at the regulatory filings in the state.

20  And we had talked to some of the people in the economic

21  agencies within Montana and South Dakota.

22  Q.  Could you turn to page 23, please?  In your opinion is

23  there a relationship between National GDP growth and energy

24  usage?

25  A.  Yes, there is.

1  Q.   And what's your opinion as to that relationship?

2  A.   Well there's a very strong correlation, as you can see in

3  the chart below.  You can also see that repeated at the state

4  and local levels within various stages.  At El Paso we use a

5  very similar type of chart between local growth and GDPU -- I

6  guess you call it GLP -- and the energy usage.

7  Q.   Could you turn to page 24?  Did you look at personal income

8  growth in the three states that Northwestern serves?

9  A.   Yes, we did.

10  Q.   Why did you do that?

11  A.   Well, there have been a number of studies that show that as

12  income grows, people acquire more appliances, people acquire a

13  better standard of living, and they tend to use more

14  electricity.

15  Q.   And how does the recent personal income growth in the three

16  states that Montana serves compare with the growth rates

17  throughout the United States?

18  A.   Well if you look at the chart -- which I guess the colors

19  don't really come through -- you'll see that Montana, Nebraska

20  and South Dakota all exceeded the U.S. in 2003.  South Dakota

21  was below the average in 2002.

22  Q.   On page 25 did you look at unemployment rates within

23  Northwestern's service area?

24  A.   Yes, we did.

25  Q.   And why did you do that?

1   A.   This is another statistic that looks at economic health

2   within a given region.  And economic health and electric

3   consumption would appear to be highly correlated.

4   Q.   And what did you find the unemployment rate in

5   Northwestern's service areas to be relative to the United

6   States for the period 2001 to 2004?

7   A.   They were below the national average.

8   Q.   By what magnitude?

9   A.   Well a significant magnitude.  Again you can't see it very

10  well on the chart without the colors, but the -- I believe the

11  U.S. average is the line at the top.

12  Q.   And the next page references projected population growth in

13  Northwestern's service area.  Do you see that?

14  A.   Yes.

15  Q.   Is that also something that Seneca looked at?

16  A.   Yes.

17  Q.   How come?

18  A.   Well again, population growth would indicate increased

19  electrical usage.

20  Q.   And what's the difference between this Series A and Series

21  B estimate?

22  A.   Don't ask.  We talked to the Bureau of Labor Statistics for

23  a half hour.  And all I can tell you is that at the end of the

24  half hour I got a migraine.  I have no idea what it was.  But

25  they do it on two series.  And it is the most convoluted

1   algorithm I've ever sat through.  And Series B is worse.

2   Q.  Thank you for reminding me of the old adage, don't ask a

3   question if you don't know the answer.

4       (Laughter)

5   Q.  Let's turn to -- excuse me -- page 27.

6           MR. RATNER:  Your Honor, may I just get some water?

7           THE COURT:  Sure.

8   A.  Could I trouble you for some too?

9           THE COURT:  Of course.

10  A.  Thank you.

11  BY MR. RATNER:

12  Q.  On page 27, Mr. Harris.

13  A.  Yes.

14  Q.  You've got forecasted energy demand for a 23-year period.

15  And the top seems to refer to the Mountain Region.  What's the

16  Mountain Region?

17  A.  I'm sorry.  You're -- I just --

18  Q.  I'm looking at the top half of page 27, and just wondering

19  which of the --

20  A.  The Mountain Region --

21  Q.  -- which portion of Northwestern's region is covered by

22  that?

23  A.  The Mountain Region would include the Montana region.

24  Q.  Okay.  And what was the source of the information regarding

25  forecasted energy demand in the Mountain Region for 2002 to

1  2005?

2  A.   This is the Energy Information Administration.

3  Q.   And what did it show with respect to electricity use over

4  that time?

5  A.   That it would increase at a higher rate than the U.S.

6  average.

7  Q.   And at what annual rate it is expected to increase during

8  that time period?

9  A.   Over 2%.

10  Q.   And what about total energy use?  At what rate is it

11  expected to increase during this period?

12  A.   It's going to increase over 1%.  Are you talking about the

13  natural gas or total energy?

14  Q.   I'm sorry.  I'm looking above --

15  A.   Oh, at the electric.  Total energy will increase at 2½.

16  Electricity will increase at something greater than 2%.

17  Q.   Okay.  And if you look down below, there's a reference to

18  the West North Central Region.  And what is the extent of the

19  natural gas annual increases over the projected period?

20  A.   Natural gas is expected to increase at a rate greater than

21  1%.  And total energy use is also expected to increase at a

22  rate greater than 1%.

23  Q.   Now, do these charts on this page deal only with the demand

24  side of Northwestern's revenue?

25  A.   Well, it indicates to us that the demand for electric usage

1    is gonna increase at greater than 1%.

2    Q.   And this -- these charts don't take into account any price

3    increases that may also result in revenue --

4    A.   No, this is --

5    Q.   -- from growth?

6    A.   My understanding is this is unit consumption.  Volume, as

7    it's been referred to.

8    Q.   And based on all of the -- withdrawn.  You referred earlier

9    to an S&P report.  Do you remember that?

10   A.   I referred to an S&P presentation.

11   Q.   And what is that document?

12   A.   That was the document, I think dated March, presumably made

13   to S&P which we reviewed in the course of doing our evaluation.

14   Q.   And was there any information in that report that related

15   to the issue of growth rates?

16   A.   Yes, there were representations made about historic growth

17   rates and future growth rates.

18   Q.   Now, did you ultimately form an opinion that a 1.2% growth

19   rate was overly conservative?

20   A.   I felt that based on the information we received, that it

21   was likely to be too conservative.

22   Q.   And did you do a DCF analysis that uses a higher growth

23   rate?

24   A.   Yes.

25   Q.   And what was the higher growth rate that you used?

1   A.   Two and a half percent.

2   Q.   And what was the reason that you used a higher growth rate?

3   A.    We felt that the demand growth and the opportunity to get

4   additional revenues out of some of the markets would enable

5   them to grow at a rate of 2½%.

6   Q.   And did you also -- could you take a look at page 29?

7   Actually before you do that, page 28.   Is the DCF on page 28

8   the analysis on which Seneca primarily relies in concluding

9   that there is equity value in Northwestern?

10  A.   Yes.

11  Q.   Now what's on page 29?   Can you tell the Court what that

12  is?

13  A.    Yes.   We looked at EBITDA margins, because when we looked

14  at the company's forecast we noticed that the forecasted EBITDA

15  margins were significantly below our comps and Lazard's comps.

16  Now, I think management here has done a very good job.   I don't

17  want to belittle them in any way, because I think they've taken

18  a very big mess and turned it around nicely.   And I think

19  they'll continue to make good progress.   But I also understand

20  that managers like to be compensated based on their results.

21  And so they want to be very conservative in how they present

22  the forecast, which is fine.   I understand that.   But, you

23  know, we're talking about people being wiped out of their

24  investment, and people losing money.   And I think one has to

25  look very carefully at what those numbers are telling you.   And

1  in this particular case if you look at the ability of

2  management to get the numbers back to the peer group level, you

3  start to get significant gains in value.  And under this Plan,

4  that value is all going to flow to a select group of Creditors.

5  Now they're entitled to be paid first, but other people are

6  gonna be left out in the cold.

7  Q.  On page 29, is that simply a reflection of the company

8  achieving margins comparable to the margins achieved by both

9  Seneca's and Lazard's comps?

10 A.  Yes.

11 Q.  And what's the resulting enterprise value if the Court

12 simply assumes that Northwestern will perform as the comps on a

13 margin basis?

14 A.  The value would go to 2.7 billion.

15 Q.  The next page, page 30, describes something called an asset

16 based analysis.  Do you see that?

17 A.  Yes.

18 Q.  Now, did you ultimately rely on this analysis?

19 A.  Well it did not form part of our value conclusion, although

20 we did use it in an average.

21 Q.  And what is -- can you describe for the Court, because this

22 is something we haven't seen at all today, I don't think, what

23 an asset based analysis is?

24 A.  Well, you look at the net utility plant and service.  And

25 then look at the enterprise value relative to the value of the

1  plant and service.

2  Q.  And where do the net utility plant and service figures come

3  from?

4  A.  Those come from the Form 1 filing.

5  Q.  And is that an analysis -- is the asset based analysis an

6  analysis that you have employed in other cases?

7  A.  Well, I've looked at it in other cases.  It's been used in

8  other cases.  But I don't know that it's formed a specific

9  valuation point for anyone.

10  Q.  You also did a sum of the parts analysis on page 32.

11  A.  Yes.

12  Q.  Can you describe for the Court what a sum of the parts

13  analysis is?

14  A.  Well, we looked at the various component parts, and tried

15  to come up with a value.  Sometimes this is referred to as the

16  bust up value.  And then we try to see what the company might

17  be worth if it were broken up and sold as going concerns

18  wherever possible.

19  Q.  And if you take a look at page 33, is that the analysis of

20  the sum of the parts valuation?

21  A.  Yes.

22  Q.  And where did you derive those valuation numbers from?

23  A.  Well, we have identified the source wherever possible.  If

24  you look at the Montana operations, we took the value -- the

25  offer that was made by the Montana municipalities -- to re-

1   acquire -- put those assets under some form of

2   municipalization.  On the coal strip we basically used

3   generating asset sales as a means of trying to get at the

4   value.  In the South Dakota we used -- we assumed that capacity

5   would be sold to the South Dakota and Nebraska customers, and

6   looked at the comparable generating asset sales analysis.  So

7   we took a multiple of looking at the coal plants involved, and

8   what that might bring.  And then we also broke down the South

9   Dakota oil and gas generating assets, and sold those based on

10  values that have been absorbed in the marketplace.  And then we

11  looked at the actual operations in South Dakota and Nebraska,

12  and developed a comparable company analysis for the multiples

13  that we think could be gotten there.

14  Q.  I'm going to assume that somebody else might have a couple

15  of questions for you, so I want to be mindful of the time,

16          MR. RATNER:  Just ten more minutes, Your Honor.  I'd

17  like to just show the witness what's been marked as Debtor's --

18  I'd like to show the witness what has been marked as Debtor's

19  Exhibit 146.  I believe it might be Slide 61.

20  BY MR. RATNER:

21  Q.  Do you see that in front of you, Mr. Harris?

22  A.  Yes.

23  Q.  All right.  Do you have any opinions regarding the

24  presentation on that particular exhibit?

25  A.  Well I think when we calculated the tax difference, we came

1   to a higher number.  So I'm not quite sure how this got to be

2   like this.  But --

3   Q.  What do you mean by that, that you came up with a higher

4   number when you did the tax --

5   A.  We just --

6   Q.  -- analysis?

7   A.  When we went back and redid the Lazard DCF, and used cash

8   taxes versus the theoretical 35%, we came -- I think we came to

9   a slightly higher number than they did.  But I think -- I agree

10  with this chart.  But I -- in principle.  But you really should

11  start at, I think, a higher number than 1,600,000,000 because

12  the 1,600,000,000 excludes the QF, which I don't think is

13  appropriate.  And it excludes the cash, which I also don't

14  think is appropriate.  And then you start to build up from

15  there.  But otherwise, you know, I think, yes, we do have a

16  difference between taxes because Lazard used a theoretical tax

17  payment which was not being made, and then went back and valued

18  the tax separately.  And we can't figure out for the life of us

19  how that was done.  We see the assumptions that were made.  And

20  I think we walked them through the assumptions.  Those

21  assumptions do not agree with what the company has testified to

22  today as to what they intend to do.  So there's a discrepancy

23  there.  If you're gonna calculate cash flow, you calculate cash

24  flow.  You know, if you calculate hypothetical cash flow.

25  That's what we've all done.  But they did it a different way.

1  So we think you need to make that correction, and you would get

2  a higher value.  We put in a number that does represent a

3  higher growth and revenues.  Yes, that is factually correct.

4  The terminal value -- we did not discount the terminal value.

5  We took the value of the comparable companies and applied that

6  to the DCF.  And this is the number we got.  We did not

7  discount it.  If you take the Lazard number, and remove one of

8  the discounting factors -- you know, you can't say, "Well, I'm

9  gonna take a lower discount rate, and then I'm gonna add" -- or

10 you can't, "I'm not gonna take a higher discount rate, and take

11 a lower multiple for the same purposes."  You're double

12 counting.  I mean come on.  So we did not have an

13 implementation risk, whatever that means.  So, yes, there's a

14 difference in the terminal value.  And then I don't know what

15 the other refers to.  I have no idea what they're talking

16 about.  I don't believe the QF liability is part of

17 distributable value.  They're not distributing any value to it.

18 So why is it in here?

19 Q.  And as I think we started, there's also a difference as to

20 where you and Lazard believe the claims hurdle is.  Is that

21 right?

22 A.  Well, they have their number, we have our number.  Our

23 number is laid out in here.

24 Q.  Okay.  Let's go to page 5.  Now let's go to the front of

25 your report, which I think deals specifically with the Lazard

1  analysis.  Actually I'm gonna skip along a little bit.  Page 6.

2  These are more growth statistics.  Is that right?

3  A.  Yes.

4  Q.  And over the four-year period here you have historical

5  electric customers in Montana and South Dakota.  That grew at

6  an average rate of 1.2%.  Is that right?

7  A.  That's correct.

8  Q.  But that -- does that reflect only growth in the number of

9  customers?

10  A.  I'm not sure what your question is.

11  Q.  Well, that doesn't measure -- these two boxes here, the one

12  for electric customers, and the one for gas customers below it,

13  that doesn't measure any increased consumption by existing

14  customers, does it?

15  A.  No, it's just the number of customers as the company has

16  reported to the Montana and South Dakota Public Utility

17  Commission.

18  Q.  Okay.  And electric sales by state grew at over 6½% on an

19  annual basis during these three years -- four years.  Is that

20  right?

21  A.  6.6%, yes, yes.

22  Q.  Okay.  Can you turn the page, please, to page 7?  Rate

23  growth is one way in which Northwestern can increase profits

24  and revenue.  Is that right?

25  A.  That's correct.

Harris - Direct                                    365

1  Q.  Okay.  And what are you describing here on page seven?

2  A.  We're looking at the historical electric rate change used

3  in Montana from '97 through July of '03.

4  Q.  And what did you conclude?

5  A.  Well, that basically rates are increasing.  Now, the

6  argument is being made that, yes, they're increasing, but it's

7  just on a flow through basis.  But the flow through does

8  provide for some recapture of cost, as long as they're proven.

9  Managements play -- love to play cat and mouse games with the

10  regulators.  And there's nothing wrong with it.  It gets done

11  every day.  And it's their job to go out and try to recoup as

12  much money as they can from the regulators.  And good managers

13  can do that.

14  Q.  Can you describe for the Court what's on page 8?

15  A.  Well, this gets back to the old issue of size.  Small

16  market cap versus large market cap.  And what we've done here

17  is look at the Lazard comparables based on the PE ratios versus

18  market cap.  And we've looked at it in terms of where they are

19  relative to their EBITDA and the healthy PE ratios.

20  Q.  And what did you conclude based on that?

21  A.  Well, you know, that basically size and -- or LTM EBITDA

22  multiples and market caps aren't necessarily correlated.

23  Q.  And on page 9 are you --

24  A.  And, by the way, even if you're doing a DCF, you're going

25  to take size into account by virtue of the discount factor that

1  you use.  There are ways of doing that.

2  Q.  And in fact did your DCM utilize a size premium?

3  A.  Yes, it does.

4  Q.  So at least insofar as the one methodology on which you

5  primarily rely, that methodology did in fact take into account

6  this size issue.  Correct?

7  A.  That's correct.

8  Q.  On page nine, are you aware that one of the reasons Lazard

9  discounted its multiple was because of the regulatory

10  environment?

11  A.  Yes.

12  Q.  Did you do any work or any analysis as to whether or not

13  there's a correlation between regulatory environments and

14  EBITDA multiples?

15  A.  Well, we've looked at it.  And we've looked at it before in

16  other situations.

17  Q.  Okay.  And can you describe for the Court what's reflected

18  on page 9.

19  A.  Well, if you look at, you know, the business profile rank,

20  and look at multiples based on how S&P would rank the business

21  profile, you see that the lower end of the spectrum has the

22  best business profile, and the higher end has some pretty iffy

23  profiles, at least according to S&P.  So I mean if you look at

24  the valuations -- California is generally regarded to be one of

25  the worst regulatory environments.  It's, you know, been

1  referred to as a regulatory snake pit.  And that's by some of

2  the friends.  So if you look at the valuations of those

3  companies in an awful environment -- what many people view as

4  an awful environment -- they seem to be doing okay.

5  Q.  On page 10, is the top half of the chart on page 10 simply

6  a reproduction of Lazard's summary?

7  A.  Yes, as set forth in the Disclosure Statement.

8  Q.  And what is the bottom half of that chart?

9  A.  That shows the adjusted ranges based on the actual market

10  data.

11  Q.  You mean that if you use Lazard's multiples, but didn't

12  adjust that, that the mid-point of the valuation range

13  increases by $250,000,000?

14  A.  That's correct.

15  Q.  Let's -- at the time you prepared this report, you were not

16  aware of the transactions that Lazard relied upon.  Is that

17  correct?

18  A.  That's correct.

19  Q.  That hadn't been disclosed yet.  Is that right?

20  A.  That's correct.

21  Q.  Page 12, please.  Did you review Lazard's DCF?

22  A.  Yes, we did.

23  Q.  And is it your understanding that Lazard assumed Northwest

24  would be a full taxpayer upon emergence from Chapter 11?

25  A.  That is reflected in their analysis.

1  Q.   Okay.  And would you describe the conclusion on page 12

2  about in your opinion the problems with such an assumption?

3  A.   Yes.

4  Q.   And what are those problems?

5  A.   Well, by eliminating or by assuming that they're a full

6  taxpayer in calculating the cash flows, you basically are

7  deducting from value payments that are not being made.  Now,

8  they will come back and say, "Well, we're gonna add 50,000,000

9  of value, or 40,000,000 of value -- by value, meaning a well --

10 in and of itself."  However, the discrepancy in value -- if you

11 look at their valuation, and then you make the change for cash

12 taxes -- is far greater than 40,000,000.  Their own chart shows

13 that there's a difference of 200,000,000.  We think it's

14 greater than that.  They said 280.

15 Q.   Okay.  Page 13, is that just Lazard's DCF -- if you look at

16 page 13?  With the 6.8 multiple and the tax analysis as they

17 did it?

18 A.   Yes.

19 Q.   So there's been no changes here.  That's just -- you're

20 just beginning with their DCF.  Is that right?

21 A.   This is our recreation of their DCF.

22 Q.   And have you seen the DCF since the time --

23 A.   We did get a version that was sent to us --

24 Q.   And are there any --

25 A.   -- after this report was turned in.

1   Q.  Are there any material differences between their actual DCF

2   and the one that you recreated here?

3   A.  No, we came very -- we were within I think 50 or

4   60,000,000 --

5   Q.  Okay.

6   A.  -- of each other.

7   Q.  Turning to page 14, is the only adjustment you made to

8   Lazard's DCF on this page the use of the projected current

9   taxes as opposed to assuming a full taxpayer status?

10  A.  Yes.

11  Q.  And if you make simply that one change, what is Lazard's

12  valuation?

13  A.  It goes to 1.9 billion.

14  Q.  Can you turn the page, please?  And if you add just one

15  more change -- withdrawn.  On page 15, did you make the same

16  tax change but also utilize Lazard's unadjusted multiple?

17  A.  We used 7.8, which was the multiple from their own

18  comparable companies.

19  Q.  That's not Seneca's multiple, is it?

20  A.  No, it's not.

21  Q.  That's Lazard's unadjusted multiple?

22  A.  Yes.

23  Q.  And what's the enterprise value if you make just those two

24  changes?

25  A.  The enterprise value goes to 2.1 billion.

Harris - Cross                                370

1   Q.  You're not here telling the Court there's a billion dollars

2   of equity value, are you?

3   A.  No, I'm not.

4   Q.  Is it your professional opinion based on your experience

5   both as a banker and as a seasoned professional in the energy

6   industry that there is, however, equity value here?

7   A.  Well, I wouldn't be sitting here today, and I certainly

8   wouldn't be getting ready to take a red eye back if I didn't

9   believe that.  I've got better things to do.

10  Q.  Thank you.

11          MR. RATNER:  No further questions.

12          THE COURT:  Do we have cross examination?

13          MR. AUSTIN:  Yes, Your Honor.  A few seconds, Your

14  Honor.

15      (Pause in proceedings)

16                    CROSS EXAMINATION

17  BY MR. AUSTIN:

18  Q.  Mr. Harris, I'm Jess Austin, counsel for the Debtor.  I

19  have a few questions for you.

20  A.  Yes, sir.

21  Q.  I believe your testimony was earlier that you essentially

22  do not disagree with this slide that presents going from where

23  Lazard valuation of 1.6 billion to your determined valuation of

24  2.3.  Is that correct?

25  A.  With the qualifications that I made, that's correct.

1  Q.  And that's -- your main qualification in part deals with

2  the QFs?

3  A.  The QFs and the cash.

4  Q.  And we'll talk about that in a minute.  The point is, to go

5  from 1.6 to 2.3, you've got to hit on everything.  Correct?

6  You have got to be right on every point, correct, to get equity

7  value from this company?

8  A.  Well, I don't know that I have to hit on every point.  I

9  think we have to --

10 Q.  You've got --

11 A.  -- correct a couple of things.

12 Q.  You have to hit on --

13         THE COURT:  Make sure that we don't interrupt the

14 witness.

15         MR. AUSTIN:  Yes, Your Honor.

16 BY MR. AUSTIN:

17 Q.  You'd certainly have to hit on a higher multiple.  Is that

18 correct?

19 A.  Well, that's correct.

20 Q.  And you certainly have to hit on higher growth.

21 A.  That too is correct, yes, sir.

22 Q.  Now, isn't it also correct, Mr. Harris, that the starting

23 point for Seneca's analysis is the Debtor's projections set

24 forth in the Plan of Reorganization?

25 A.  That's correct, yes, sir.

1  Q.  So we're all starting from basically the same point.

2  A.  That's correct.

3  Q.  Do you have your report in front of you?

4  A.  Yes, I do.

5  Q.  Would you look at page 3 of that report, please?  Now,

6  with that, you have concluded that this Debtor you believe has

7  a value of $2.3 billion.  Correct?

8  A.  That's correct.

9  Q.  But irrespective of what Lazard has done, irrespective of

10 what Houlihan has done, and irrespective of what management has

11 testified to today, you've not subtracted from that value the

12 $140,000,000 allotted for QFs.  Correct?

13 A.  That's correct.

14 Q.  But if it was appropriate to do that, then you would have

15 to take that off the 2.3 billion, would you not?

16 A.  If you were making the payment, yes.

17 Q.  And that would reduce your valuation to 2,160,000,000.

18 Correct?

19 A.  If that payment were being made, that's correct.

20 Q.  Now, on page 3 you have a reference to claims total.

21 Correct?

22 A.  Yes.

23 Q.  And you list claims at, in this instance, $2,269,381,000

24 roughly.  Correct?

25 A.  Well that's the Debtor's Disclosure Statement.  That's

1  where we obtained this from.

2  Q.   That's where you took that number, right?

3  A.   That's correct.

4  Q.   Now, that's as of the date of the bankruptcy filing.  And

5  I'll believe your testimony from your deposition, right?

6  A.   Well, whatever the date the Debtor is using is the date

7  that we're using.

8  Q.   But you've heard Mr. Yearley and others testify today that

9  you add to that, interest of $100,000 for post petition

10  interest to the Senior Noteholders and the Subordinated

11  Noteholders before equity gets anything.

12  A.   If the company is judged to be solvent, then --

13           THE COURT:  One hundred --

14           MR. AUSTIN:  A hundred million.

15           THE COURT:  You said 100,000.

16           MR. AUSTIN:  Excuse me, $100,000,000.

17  BY MR. AUSTIN:

18  Q.   So that's going to increase your claims total to

19  $2,369,000,000 right there.  Correct?

20  A.   Well, I'll accept your calculation of 100,000,000.  I mean

21  I just --

22  Q.   But you would agree that before equity gets anything, all

23  the interest has to be paid to the Senior Creditors?

24  A.   To the Creditors who are trying to get, that's correct, and

25  who haven't already gotten it.  That's correct.

1  Q.  So even if you didn't take out the $140,000,000 for the

2  QFs, this adjustment is getting pretty darn close to where your

3  $2.3 billion of value is.  Correct?

4  A.  By those calculations, that's correct.

5  Q.  And then you throw the subtraction on your page 3,

6  $180,000,000 in cash.  Correct?

7  A.  That's correct.

8  Q.  And you're assuming the Debtor has -- the company has

9  $180,000,000 in cash on the effective date.  Correct?

10  A.  Well, that's the Debtor's forecast.

11  Q.  No, that's not the Debtor's forecast.  The Debtor's

12  forecast had other cash coming in subsequent.  You have

13  included in that $180,000,000, do you not, all of the proceeds

14  from Cornerstone, NFM, Net Exit, and Blue Dot.  Correct?

15  A.  Well, that's what the Debtor has forecasted.

16          THE COURT:  Mr. Austin --

17          MR. AUSTIN:  Yes, Your Honor.

18          THE COURT:  If you're gonna write, I'll let you stay

19  over there.  If you're not gonna write, you have to come back

20  to the podium.

21          MR. AUSTIN:  I'm getting ready to do some more

22  writing.

23          THE COURT:  Why don't you bring your microphone

24  closer?  Nobody else has been allowed to wander, and I won't

25  allow you to wonder either.

Harris - Cross                                    375

1      MR. AUSTIN:   I understand, Your Honor.

2  BY MR. AUSTIN:

3  Q.  Well, is not the only cash, based on the testimony today,

4  that the Debtor says -- and you've been in the Courtroom today,

5  correct --

6  A.  That's correct.

7  Q.  -- that it's going to distribute, have available to

8  distribute, is just $45,000,000?

9  A.  Well, I've heard various cash numbers thrown around.

10 Q.  Well, you've heard the Debtor principals testify that they

11 don't have the $100,000,000, and don't anticipate having the

12 $100,000,000 by the end of October from the sale of the non-

13 core assets.  Correct?

14 A.  Well, they have forecasted the cash to come in.  Now

15 whether it's gonna be on the settlement date or the effective

16 date or not, who knows.

17 Q.  But, Mr. Harris --

18 A.  But that cash isn't gonna flow to the equity holders, is

19 it?  It's gonna flow to the Creditors.

20 Q.  Mr. Harris, your analysis on page 3 specifically is

21 anticipating that it is available on the effective date.

22 Correct?

23 A.  We are assuming, based on what the Debtor has said, that it

24 is, yes.

25 Q.  But the Debtor's testimony today is that that cash is not

Harris - Cross                                    376

1   available.  Correct?

2           THE COURT:  We don't need to argue.  I think the

3   record speaks for itself.

4   BY MR. AUSTIN:

5   Q.  The Debtor has also testified that it needs to retain

6   $35,000,000 for working capital.  Correct?

7   A.  I've heard that, yes.

8   Q.  So that rather than having $180,000,000 available to pay

9   Creditors, based on the Debtor's testimony today it does indeed

10  only have $45,000,000.  Correct?

11  A.  That's what they said.  That's not what's in the schedules.

12  But that's what they said.

13  Q.  And so if you take the 45 off the 2.3 billion, that leaves

14  a number here of a claims total of $2,324,000,000 roughly.

15  Correct, Mr. Harris?

16  A.  Those are your calculations.  I'll stipulate to them.

17  Q.  And then when you compare that to the 2.1 billion after

18  allocating for the QFs -- and I understand we have a

19  disagreement about that --

20  A.  Yes, we do.

21  Q.  -- then that leaves a negative equity value of

22  $164,000,000.  Does it not?

23  A.  We're making progress.  We started off this morning with

24  700,000,000, so --

25  Q.  Well we make -- we're gonna get there.

1         (Laughter)

2    A.    I'm sure if I give you long enough.    We only have until

3    9:00.

4    Q.    But that's correct.    That's mathematically correct.

5    Correct?

6    A.    Mathematically I agree with you.

7    Q.    And so if you're at a negative 164,000,000, before we even

8    get into discussions about your comparable companies and market

9    multiples, and any higher growth rate which -- if you add those

10   numbers at 359 -- that was a negative -- and here you agree

11   it's about $100,000,000 difference in the growth rate.    Is that

12   correct -- in valuation?    The differences between you and where

13   Lazard is, or the company's number at the --

14   A.    Yes, we adjust the growth rate.    You're right, yes.

15   Q.    So when you add all those numbers up, that gets you to

16   about a $623,000,000 negative equity number.    Does it not?

17   A.    That's correct.

18   Q.    In comparison to Seneca's 2.3 billion with Lazard's $1.6

19   billion DCF analysis.    Correct?    Roughly $700,000,000

20   difference.    Correct?

21   A.    Yes.

22   Q.    So we see where most of the difference, is it not, in the

23   multiple and in the growth rate?

24   A.    No, I don't agree.    There's a big difference in the taxes,

25   in Lazard's own numbers.

Harris - Cross                              378

1  Q.  But say you're right on the taxes.  That's not gonna get
2  you all the way to $2.3 billion in equity value.  Is it?
3  A.  No, we never said it would.
4  Q.  Now, let's look at page 1 of your report.  Do you have
5  that?
6  A.  Yes.
7  Q.  Now, two points there.  One, you did not undertake at all
8  to verify any of the information given to you and included in
9  the company's financial projections.  Is that correct?
10 A.  Well, we had other information the company supplied us,
11 which satisfied us that they had done a reasonably good job of
12 procuring the projections.
13 Q.  And in fact I believe your testimony at deposition was that
14 your assumption was that the Debtor's management had included
15 all relevant information within their projections.  Correct?
16 A.  That's correct, we believe that.
17 Q.  And I also believe your testimony was that in those
18 instances you didn't think it would be appropriate to
19 substitute your judgment for management's.
20         MR. RATNER:  Objection.  Objection, Your Honor.  If he
21 wants to cross him, if he needs to cross him with his
22 deposition testimony, that's okay.  But otherwise --
23         THE COURT:  Yeah.
24         MR. RATNER:  -- he should just ask questions.
25         THE COURT:  I agree.  Sustained.  Use the deposition

1    to impeach if you think you have an impeachable situation.

2    Otherwise just ask him the question.

3    BY MR. AUSTIN:

4    Q.   So you believe at this point management included all the

5    relevant information in the projections.   Correct?

6    A.   That's correct.

7    Q.   And you're not attempting in any way to substitute your

8    judgment for management's as it relates to its financial

9    projection.

10   A.   Well the only area we did, as I said before, was in the

11   rate of growth and revenue.   We think there's adequate grounds

12   to say that management's been overly conservative.

13   Q.   Now, in that regard though, as indicated on your report,

14   you didn't conduct any interview with management, did you?

15   A.   No, we did not talk to management.

16   Q.   And you didn't talk to Lazard, did you?

17   A.   No.

18   Q.   And you didn't talk to Houlihan, did you?

19   A.   No.   We didn't even see the report until just recently.

20   Q.   Did you speak to any of the regulators in South Dakota?

21   A.   We did not talk to them, no.

22   Q.   Did you speak --

23   A.   We did talk to people in the economic sector and the

24   economic agencies that -- in South Dakota and Montana.

25   Q.   Did you speak to any regulators in Montana?

Harris - Cross                                              380

1  A.  No.

2  Q.  So even though this is a company that's a regulated

3  industry, you didn't think it was appropriate to, as you're

4  doing your due diligence on valuation, to speak to any of them?

5  A.  Well, there was an issue, some debate of seriousness

6  between the Montana regulators and Montana, I'm sure you're

7  familiar with.  And we didn't want to roil those waters in any

8  way.

9  Q.  But you didn't go to South Dakota yourself though, right?

10 A.  No.

11 Q.  Now, I believe your testimony earlier was that when you

12 look at your valuation methodology, the one you believe is the

13 most appropriate to evaluate is the discounted cash flow.

14 Correct?

15 A.  That's correct.

16 Q.  And in fact if you look on page 39 of your report, that is

17 a summary of those -- of all your comparables, or all your

18 valuations.  Is that correct?

19 A.  Yes.

20 Q.  And if you look at those, even with utilizing your number

21 as it relates to the claims hurdle, there's no equity value for

22 the comparable companies analysis, is there?

23 A.  If there's 100,000,000 of cash on the balance sheet, it's

24 close.  And if there's another 100,000,000 of asset sales which

25 aren't in here, it's close.

Harris - Cross                                          381

1    Q.   If -- but it's not there.   Correct?

2    A.   I think it is there.

3    Q.   Well, you don't --

4    A.   We're just talking about the value of the enterprise.   We

5    haven't deducted, as you would have us do, the QF.   And we

6    haven't added the cash.

7    Q.   But if you deduct the QFs, sure there's no value.   Correct?

8    A.   Well, as I said earlier we're not finding the QFs.   We're

9    looking at distributable value.

10   Q.   And there's no value in the sum of the parts analysis.

11   Correct?

12   A.   Well, again you're looking at cash.   You're getting close.

13   But --

14   Q.   But the real focus is on the DCF.   Correct?

15   A.   Well, for reasons I've stated, that's correct.

16   Q.   Now, let's talk about QF analysis just a minute.   Do you

17   dispute management's determination that there is a liability

18   associated with QF contracts of approximately $140,000,000?

19   A.   If that's their calculation, I would accept that there is a

20   contingent liability out there for 140,000,000.

21   Q.   Have you reviewed the common balance sheet?

22   A.   Yes.

23   Q.   Isn't there indeed an actual --

24   A.   Yes, there is.

25   Q.   -- a recorded liability?   Not a contingent, but a

1    recorded --

2    A.  Yes, there --

3    Q.  -- liability of $140,000,000 on the balance sheet?

4    A.  I'd have to go back and look at the most recent one, but

5    I'll accept your word for it.

6    Q.  If management's determined it actually has to record a

7    liability of $140,000,000, then that's something that

8    management -- that's in management's judgment.  Correct?

9    A.  That's correct.

10   Q.  Now, as I understand your testimony, your perception is

11   that this may not have to be paid?

12   A.  It'll either get resolved or it'll wind up in another

13   Chapter proceeding.  If somewhere down the road, 10 years --

14   Q.  But didn't management testify today that it had -- believed

15   it was going to have to assume those liabilities?

16   A.  Well, I believe it already has assumed them by virtue of

17   buying the company.

18   Q.  So that's a liability to the company.

19   A.  Well, they do that when they bought the company.

20   Q.  But it's a liability today.

21   A.  It's a liability that's been recorded for future periods.

22   But it's being paid today on a pay as you go basis.  They're

23   collecting revenues, and they are paying out the QF

24   liabilities.  And a portion of that is being recovered, and a

25   portion is not.

1   Q.   And isn't the $140,000,000 liability, based on management's

2   testimony, Mr. Harris, associated with the unrecovered

3   obligations under those contracts?

4   A.   Yes, the bulk of which occurs more than 10 years out.

5   Q.   But it's still a liability today.

6   A.   It's still a liability today, just like a decommissioning

7   expense is a liability today, or any contract of a long-term

8   nature is a potential liability today.

9   Q.   And if someone purchased the company, would they not have -

10  - and assumed those contracts, would they not have to take that

11  liability into consideration, the value which they would pay

12  for the company?

13  A.   Yes.   But they're not buying a company today.   The offers

14  that have been made haven't been followed up on, so there's no

15  purchase.

16  Q.   Let's talk about the growth rate.   I believe your testimony

17  is that irrespective of management's best judgment, that you

18  believe they should have a higher growth rate in its numbers.

19  Correct?

20  A.   I believe a higher growth rate is warranted, yes.

21  Q.   Now, on page 7 of your report -- can you turn to that?

22  That appears to be reflecting increase in rate changes over the

23  course of a number of years.   Is that what this is reflecting?

24  A.   Those are the rates that are being charged, yes.

25  Q.   But these are rates not -- but these are not base rate

1   changes, are they?  This is not showing a base rate change in

2   the company's -- what it charges for its consumers, is it?

3   A.   No, these are the rates that are being collected.

4   Q.   These are -- aren't these really tracker charges, just the

5   increase in charges which are just a simple recapture?

6   A.   Well, I don't know that it's a simple recapture.  They are

7   allowed to recapture costs if they're prudent.

8   Q.   And isn't this chart reflecting solely the increase in the

9   rates associated recapture of the tracker charges?

10  A.   These are electric rate changes in Montana.  And if they

11  are tracker changes, they are tracker changes.  There has not

12  been --

13  Q.   Do you --

14  A.   -- a rate case.  We're not suggesting that they've gone in

15  and upped the rates.  But these are the rates that are being

16  collected.

17  Q.   But if it's solely a tracker charge or recapture, Mr.

18  Harris, there's no impact, positive or negative, if they

19  capture 100% to the company's bottom line, is there?

20  A.   Well, I've heard that statement made.  To the extent that

21  there are costs involved, and those costs are recovered, and

22  they can be shown to be prudently incurred, then there may be

23  some impact on margin.

24  Q.   But management has said here today that it's a negative --

25  I mean there's --

Harris - Cross                                385

1    A.   I've heard.   Management has said they're a T&D company.

2    And yet in March they were saying to S&P they were an

3    integrated utility in South Dakota.   So management has said

4    different things depending on the circumstances.   I have heard

5    what they've said.

6    Q.   But you've not interviewed management, have you?

7    A.   No, I haven't.

8    Q.   And you don't know of any base rate increase in Montana

9    over the last five years, do you?

10   A.   I don't believe there's been a rate hearing advisory.

11   Q.   Now, on page 6 of your report you make a reference here to

12   this attempting to show increase in energy sales.   Correct?

13   A.   That's one of the components.

14   Q.   And is these charts to reflect Northwestern's individual

15   actual market?   Or is this by the entire state?

16   A.   Well --

17   Q.   Montana or South Dakota, for example.

18   A.   You're asking the wrong person.   I mean these came out of

19   the reports that were filed with the Montana and South Dakota

20   Public Service Commission.   So these are the company's numbers,

21   not ours.

22   Q.   Did you determine, or did you check to see how closely they

23   aligned directly with the company's service area?

24   A.   Well, if the company is filing them, I would assume that

25   they are reporting their service territory.   Maybe I'm

1   incorrect on that, but that's what we assumed.

2           THE COURT:  Mr. Austin, I just want to remind you we

3   are shutting down at 9 o'clock.

4           MR. AUSTIN:  I understand, Your Honor.

5   BY MR. AUSTIN:

6   Q.  All right, Mr. -- I'd like you to flip over please,

7   quickly, to page 22 of your report.  And going through -- let's

8   quickly flip through.  On page 24, for example, you make a

9   statement that personal income growth through the service area

10  has outpaced the national average.  Is that correct?

11  A.  Yes, that's our understanding.

12  Q.  When you're looking at the service area, are you looking at

13  the state in total, or did you specifically go in and look at

14  the actual service area in Montana and actually in Sioux Falls

15  -- excuse me -- in South Dakota?

16  A.  This came from the BEA, so I'm assuming they're for the

17  state.

18  Q.  They're just broadly part of the state?

19  A.  Well, the company is broadly part of Montana.  I mean it

20  covers 77% of the territory.

21  Q.  But in the state of South Dakota, for example --

22  A.  We may have missed a few hermits somewhere, but I think

23  it's pretty inclusive.

24  Q.  In the state of South Dakota, for example, Mr. Harris, it

25  does not service the city of Sioux Falls.  Does it not?

Harris - Cross                    387

1  A.  No, but it services the surrounding areas.

2  Q.  And it does not service Rapid City, South Dakota.  Does it

3  not?

4  A.  But it services the surrounding areas of it.

5  Q.  I believe the testimony this morning was it does not indeed

6  service the surrounding areas of Rapid City.

7  A.  Well, all right.

8  Q.  The point is you have not done -- in evaluating your

9  revenue growth, you have not taken that and looked at the

10 individual components of Northwestern's customer mix and

11 service area.  Have you not?

12 A.  We've looked at the state in terms of the service area.  So

13 we've assumed that the state reflects the service area, which I

14 believe it does.

15 Q.  On what basis can you make that statement --

16 A.  Well, as I said --

17 Q.  -- if you've not done a detailed analysis?

18 A.  As I said earlier, in Montana they cover 77%.  The

19 testimony here today was they service 80% of the people.

20 Q.  But you've not looked at the details on all of this, have

21 you?

22 A.  Well, they provided the details today.  Didn't they?  I

23 think I heard that.  Or was I asleep.

24 Q.  Just based on what they testified to today --

25 A.  They said they covered 77% of the territory.  They said

Harris - Cross                    388

1  they covered 80% of the population.  That is consistent with
2  what they told the people at Standard & Poors.
3  Q.  And that in and of itself is just going to say we're going
4  to grow 2½%?
5           MR. RATNER:  Objection.  Argumentative.
6           THE COURT:  I think it is argumentative.
7  BY MR. AUSTIN:
8  Q.  That in and of itself is going to -- that leads you to the
9  conclusion for 2½% growth rate?
10 A.  No, Mr. Austin.  We've presented in here why we feel that's
11 appropriate.  And it's in the report.
12 Q.  But your report, I don't see how it specifically focuses on
13 the company's actual service components.
14          MR. RATNER:  Objection.
15          THE COURT:  Sustained.  The point's been made.
16 BY MR. AUSTIN:
17 Q.  Page 27.  You make a reference to the Mountain Region in
18 your report.  Do you see that?
19 A.  Yes, sir.
20 Q.  Of which Montana is a member.
21 A.  Yes.
22 Q.  Who else is a member of the Mountain Region?  What other
23 states?
24 A.  I believe it's Idaho, Wyoming.
25 Q.  Do you know for sure?

Harris - Cross                            389

1  A.  I can find out.  I don't have it right at the tip of my --

2  Q.  Well, in this energy usage do you have a breakdown as to

3  what are the relative usage of the states that make up the

4  Mountain Region?

5  A.  Not with me.  But when we did the chart, we did.  I don't

6  have it with me.

7  Q.  Now, have you read the -- in fact it's my understanding

8  you've actually not read the settlement with Montana Public

9  Service Commission.  Is that correct?

10  A.  No, I did read it last night.

11  Q.  Last night.  But you'd not read it prior to make this

12  report?

13  A.  That's correct.

14  Q.  And are you aware that there is actually in effect a rate

15  freeze in the state of Montana for the next two to three years?

16  A.  Well, there's not going to be a rate hearing for the next

17  two or three years, that's for sure.

18  Q.  So from that standpoint doesn't that lead to the conclusion

19  there's not gonna be a base rate increase?

20  A.  Well, we never said there was gonna be a base rate

21  increase.

22  Q.  Well how else were you going to get a 2½% growth rate?

23  A.  You're gonna have population growth.  You're gonna have

24  demand growth.

25  Q.  Well, let's look at that from the standpoint of the

Harris - Cross                                    390

1  population growth.  You're saying 2½% growth rate.  Correct?

2  A.  Yes.

3  Q.  And in Montana I think the testimony today was that they

4  serve, you know, mainly, what, 700,000 people?

5  A.  I believe that's the number.

6  Q.  So 2½% is only gonna give you, what, 19,000 more customers?

7  A.  Well, if you're assuming that that's applied to that

8  statistic, yes, that's what will result.

9  Q.  And in the state of Montana I believe -- excuse me -- South

10 Dakota, their population service is only about -- roughly about

11 100,000.  Correct?

12 A.  That's correct.

13 Q.  And so there 2½% growth rate is only 2,500 customers.

14 A.  That's -- again, that would be the logical result.

15 Q.  And from that standpoint your anticipation that that type

16 of customer growth is gonna lead to an additional $100,000,000

17 increase in value.

18 A.  Well, the growth rate that we're assuming has been after

19 you've taken away a significant number of customers, and have

20 them return, in Montana.  So you've seen a dip in the numbers,

21 and now you're starting to see a return.

22 Q.  But that would be because of default supply shift in the

23 state of Montana.  Correct?

24 A.  That's correct.

25 Q.  And if Northwestern is a transmission distribution company,

1  aren't they already getting the value effectively even if their

2  customer is getting this electricity from somebody else?

3  A.   Well, they're a transmission and distribution company in

4  Montana.

5  Q.   You just used Montana as an example.

6  A.   Yes.

7  Q.   So from that standpoint, even if they lose a customer and

8  gain that customer back, they get no real additional revenue,

9  do they not, because they've already got it in their T&D rates.

10  Correct?

11  A.   Mr. Austin, if you buy a business --

12  Q.   Answer my question.

13  A.   I'm answering it.  I'm gonna answer it.  It makes no sense

14  to buy a business where you have no growth at all.  You can't

15  argue that there's value here when there's no growth.  And the

16  fact is there's been growth historically, and there will be

17  growth in the future.  Management has said it's 1.2%.  We

18  disagree.  We think it's gonna be higher.  We have statistics

19  that support that.  You disagree with that, and I respect that.

20  But our conclusion is that it's gonna be higher.  And if it

21  higher, then equity will have been wiped out for nothing.

22  Q.   Mr. Harris, my question to you was that to the extent a

23  customer who has gone with another supplier comes back to

24  Northwestern -- Northwestern was already getting the revenue

25  from that customer in its T&D transmission rates.  Was it not?

1  A.   In the transmission and the wheeling charges, yes.

2  Q.   Instead -- on the default supply basis it gains no real

3  bottom line value.  Does it not?

4  A.   Well, it should be getting incremental revenue from

5  supplying the electricity to the home on a distribution.

6  Q.   But on a gross revenue basis that's just a pass through.

7  Correct?

8  A.   Well, you keep using that word, but that's my point.  If it

9  in fact is a zero sum gain, then there's no business here.

10  Q.   But you don't know any different on that, do you not,

11  because you've not --

12  A.   Well I've seen --

13  Q.   -- interviewed management.

14  A.   -- their -- the tracker provides for prudently incurred

15  costs to be recovered.  That's what it says.  And managements

16  can be very adept at getting prudent cost recovery.  That's our

17  point.

18  Q.   You're not suggesting that management here has been playing

19  any games on those regards, have you?

20  A.   No, not at all.

21  Q.   Let's go to your comparable companies because one of the

22  biggest differences here is in the multiple.  Correct?

23  A.   Yes, that's correct.

24  Q.   Effectively you have chosen higher multiple companies than

25  Lazard or Houlihan.

Harris - Cross                                    393

1    A.   Well, we chose companies that have higher multiples.

2    Q.   It's the same thing.

3    A.   Not really, but that's your --

4    Q.   Now --

5    A.   -- characterization.

6    Q.   I believe it was your perspective that Lazard chose

7    companies that were more straight up T&D type companies?

8    A.   No, I wouldn't necessarily say so.

9    Q.   Well then from that standpoint let's do look at your

10   deposition.

11        (Pause in proceedings)

12            MR. AUSTIN:   May I approach, Your Honor?

13            THE COURT:   Yes.

14   BY MR. AUSTIN:

15   Q.   Mr. Harris, I'm gonna hand you your deposition, page 36.

16   And would you read what is at line 16, your answer to one of my

17   questions?

18            MR. RATNER:   Your Honor, may I have the question read,

19   please?

20   BY MR. AUSTIN:

21   Q.   Well that question was --

22   A.   You mean in the transcript.

23   Q.   Well, that term gets used a lot, excuse me.   Question, "Of

24   the companies that Seneca chose on page 30, would any of them

25   be described as what you call a transmission distribution

1  company?"  And would you read your at least partial response at

2  page 16?  I mean at line 16.

3  A.  Wait, I'm sorry, I've gotten lost.  Where did you want me

4  to start reading from?

5  Q.  Page 36, line 16, because my question is -- my question to

6  you was, "Did not you previously respond that most of Lazard's

7  comp are T&D companies without generation effects?"

8  A.  Most of them, yes.  Not all of them.

9  Q.  And you've heard management testify today that they believe

10 their company to be a T&D company.  Correct?

11 A.  Well, that's not what they told S&P.

12 Q.  Well, let's say -- you weren't at that meeting when they

13 talked to S&P, were you?

14 A.  They sent us the report.

15 Q.  You weren't at the meeting when they met with S&P.

16 A.  I didn't say I was.  I said I reviewed the report they gave

17 to S&P.

18 Q.  Right.  Are you disputing management's testimony today

19 about them being a transmission distribution company?

20 A.  They sent us a report that says something different.  And

21 that's what we relied on when picked the comps.  Now you can

22 argue with that, but that's the best information we have.  And

23 they said to S&P they were supplying 100% of their power

24 requirements in South Dakota with generated power.  That makes

25 them a vertically integrated company, which is how they

1 characterize themselves.

2 Q.  I believe, Mr. Harris, one of the basis by which you looked

3 at your comparable companies is that you felt like -- look on

4 page 17 of your report.  Correct?  Please look at page 17.  Got

5 it?

6 A.  Go ahead.

7 Q.  There you stated that you felt like the company, or you

8 believed that the company generated 30% of electricity needs,

9 and 34% in 2002 -- 2003 and 2002 respectively.  Do you see

10 that?

11 A.  Yes.

12 Q.  And as a result, you did not feel -- Seneca did not feel

13 constrained to limit its comparable companies to T&D oriented

14 companies.  Correct?

15 A.  That's correct.

16 Q.  But management's testified that it only generates -- it

17 only actually produces 5% of its needs.  Did you hear that

18 testimony today?

19 A.  They told S&P that they generated over 30.

20 Q.  But again --

21 A.  I know.

22 Q.  -- you weren't there.

23 A.  But I'm just telling you.  Who do I believe?  Do you want

24 me to believe them as of March or as of today?

25 Q.  Do you think they were lying today?

1   A.   I don't know what they were doing.  I'm just telling you

2   there are two different representations that have been made.

3   What am I supposed to do?  Flip a coin?

4   Q.   Did you analyze actually how much generation capacity

5   Northwestern had?

6   A.   They show it in their own charts.

7   Q.   And is not their generation capacity no more than 300 plus

8   megawatts in South Dakota?

9   A.   Well, they are representing that they can generate 100% of

10  their -- of peak need in the summer months through their

11  generation.

12        THE COURT:  I suggest we move onto something else.

13  The point's been made.

14  BY MR. AUSTIN:

15  Q.   Comparable companies.  Would you look at your summary, page

16  41, Allegheny Energy?  Do you know how much generation capacity

17  Allegheny Energy has?

18  A.   Off the top of my head, no, not in terms of the megawatts.

19  Q.   Significantly more than 500 megawatts.  Wouldn't you agree?

20  A.   Yes.  Well, they're a bigger company, yes.

21  Q.   What about Synergy?  Significantly more than 500 megawatts?

22  A.   Yes.

23  Q.   Pepco, the next page, 42.  You actually identify theirs as

24  4,500 megawatts of generation capacity.

25  A.   That's correct.

1  Q.  Correct?

2  A.  Yes.

3  Q.  And PNM Resources actually has 1,900 megawatts.  Correct?

4  A.  That's correct.

5  Q.  I believe your testimony was that it has -- its mix for --

6  looking at what's presented here, it would appear that its mix

7  of gas and electricity is 50/50.  Correct?

8  A.  I believe it's maybe a little bit different than that, but

9  that's close, yes.

10 Q.  Well it's got 400,000 --

11 A.  Yes.

12 Q.  -- in electricity, and 460 in gas.  Right?

13 A.  Yes.

14 Q.  We've heard testimony here that the mix is 70% electricity

15 for Northwestern, 30% gas.  Correct?

16 A.  That's correct.

17 Q.  Sierra Pacific Resource is 2,800 megawatts of generation

18 capacity.  Correct?

19 A.  Right.

20 Q.  Unisource, next page.  Do you know how much generation

21 capacity it has?

22 A.  I'd have to double check.  I don't want to give you a bad

23 number.

24 Q.  Significantly more than --

25 A.  I'd have to check.

Harris - Cross                              398

1   Q.   -- 300 megawatts of power?

2   A.   I'd have to double check on that one.

3   Q.   And Vectra, that's just a gas company.  Correct?

4   A.   Well, it distributes electricity, but it's basically a gas

5   company, yes.

6   Q.   It has 1,400 megawatts of coal fire generation capacity.

7   Does it have its own gas wells?

8   A.   That I'd have to double check.  I'm not sure.  It may have

9   some.

10  Q.   Now you chose all these companies that have all of this

11  generation capacity in comparison to Northwestern who has less

12  than 500 megawatts.  But you deemed these companies comparable.

13  A.   I did, yes.

14  Q.   And what real basis?

15  A.   Well, they are in distribution of gas.  They're in the

16  distribution business for electricity.  And they do generate

17  their own power to some extent.

18  Q.   Did any of your comparable companies generate 95% of their

19  revenue from transmission and distribution business?

20  A.   No.

21  Q.   And the testimony today was that is what comes from

22  Northwestern transmission and distribution business -- 95% of

23  its revenue.  Correct?

24  A.   Well, again, I mean that's what I heard today.  That's not

25  what I've seen in the documents that I've been given.

1  Q.  What have you seen that suggests anything different?

2  A.  Well as I said before, they represented to S&P, and I've

3  seen their filings with the states that show something

4  different.  But I mean I'm not gonna sit here and argue with

5  them.  They said what they said, and they've written what

6  they've written.

7  Q.  Well, you would agree that if you were using a more T&D

8  company that the multiple in that may well be lower than the

9  ones you chose on a comparable company basis.

10  A.  Well, there's a broad universe of T&D companies out there.

11  But the statement's been made that T&D companies tend to trade

12  its lower multiples.

13  Q.  Do you disagree with that?

14  A.  I'd have to go back and look at that.

15  Q.  You think they trade as high as a comparable company that

16  you put in your report though.

17  A.  I think there may be some.

18  Q.  Some?

19  A.  Yeah.

20  Q.  But not all?

21  A.  No, not all, no.

22          MR. AUSTIN:  That's all the questions I have, Your

23  Honor.

24          THE COURT:  Any redirect here, Mr. Morris?

25          MR. RATNER:  Yes, Your Honor.  May I hand the witness

Harris - Redirect                                    400

1   -- it hasn't been pre-marked, and I don't have another copy,
2   but it's the S&P report.  You know, in fact it's my only copy.
3   But I'm prepared to mark it and put it into evidence because I
4   think this is a very important point.
5        (Pause in proceedings)
6            MR. RATNER:  All right.  We've got it now.  And let's
7   just mark it as Equity Holders' Exhibit 1 for this purpose.
8            THE COURT:  Bring it over to mark -- have her mark it.
9            MR. RATNER:  Thank you.
10       (Equity Holders' Exhibit-1 marked for identification)
11                       REDIRECT EXAMINATION
12  BY MR. RATNER:
13  Q.  Mr. Harris, I'm showing you what's been marked as Equity
14  Holder Exhibit 1.  Do you know what that is, sir?
15  A.  Yes.  This is the presentation, that we were given, to S&P,
16  Standard & Poors.
17  Q.  And is that the presentation that you were referring to
18  earlier in your testimony in response to Mr. Austin's
19  questions?
20  A.  Yes, it is.
21  Q.  And I wasn't actually prepared to do this, but are you able
22  to find the growth statistics that you were referring to?
23  A.  I think if you start on page 20.
24  Q.  And what does page 20 say, because I don't think the Court
25  has --

1  A.   Utility operations --

2  Q.   -- a copy of it in front of it.

3  A.   -- overview.

4  Q.   And what does it say there with respect to various growth

5  rates?

6  A.   Well, it says projecting revenue growth 1.2% per year.  And

7  then on page 21 it talks about the electric system and the gas

8  system.  On page 24 -- 22, I'm sorry, Montana operations,

9  retail electric sales increased 4% in 2003 as choice customers

10  returned to the default supply.  Retail electric customer

11  growth average of 1% over five years.  Retail gas customer

12  growth averaged 2.4% over five years.

13  Q.   Did you say 1 or 1.5%?

14  A.   1.5%.

15  Q.   Okay.

16  A.   Commercial and industrial electric and gas local is

17  declined due to customer choice and conservation.  South Dakota

18  -- on page 23, South Dakota operations are vertically

19  integrated, 206 megawatt of base load coal fire generation

20  through joint ownership, 106 megawatt of gas or oil owned, and

21  operating peak and generation.  Residential electric load

22  growth average of 1.9% over last five years.  Commercial

23  electric load growth average of 1.7% over the last five years.

24  South Dakota residential gas sales growth average of 1.5% over

25  the last five years.  Gas transport volumes to 160 South

1  Dakota.  Large volume users increased 19% over the last five
2  years.
3  Q.  And are those the growth statistics that you were referring
4  to earlier in response to Mr. Austin's questions?
5  A.  Yes.
6  Q.  And are those some of the growth statistics upon which you
7  relied in determining that 2.5% and not 1.2% was an appropriate
8  growth rate to use?
9  A.  Those -- these, and in addition to the statistics that we
10 cited in our report.
11        MR. RATNER:  I have no further questions, Your Honor.
12 BY THE COURT:
13 Q.  Is there anything else other than the reference you made
14 there to South Dakota being vertically integrated that's
15 contained in the S&P report that goes to this issue of --
16        MR. RATNER:  T&D versus --
17 Q.  -- T&D versus an integrated company?  I heard you read that
18 part.  And it said it's a fully integrated company.  It also
19 said there's 300 megawatts.
20 A.  Right.
21 Q.  Is there anything else in there that bears on that subject?
22 A.  Yes.  There's a chart that shows --
23 Q.  Why don't you give us a page?
24 A.  Well, if I could find it, I would.  Page 29
25        MR. RATNER:  What's the heading, Mr. Harris, if you

Harris - Recross                                403

1  see it?

2  A.   Fuel mix and supply, South Dakota.   It shows 310 megawatts

3  of available power, which is titled, "Our share of 2003 peak

4  summer demonstrated capacity."   And then it shows percent of

5  total 2003 peak summer demonstrated capacity.   And so it shows

6  varying rates of 34 to 17% of power being generated and used to

7  meet peak needs.

8          THE COURT:   Thank you, Mr. Harris.

9          MR. RATNER:   Thank you very much, Your Honor.

10 A.   Thank you.

11         THE COURT:   Do you have a final question there, Mr.

12 Austin?

13                    RECROSS EXAMINATION

14 BY MR. AUSTIN:

15 Q.   On that very page, Mr. Harris, two questions.   One, it

16 relates only to South Dakota.   Does it not?

17 A.   That's correct.

18 Q.   And two, that relates only to peak summer demand.   Does it

19 not?

20 A.   Well, that's when you usually demonstrate that you can meet

21 your peak need.   If you can meet your peak need, you can meet

22 the need all through the year.

23         MR. AUSTIN:   That's it, Your Honor.

24         THE COURT:   All right.   Well, for purposes of today

25 then the evidence will be closed.   The -- we'll have our

Harris - Recross                                    404

1   continued hearing on October 6th pursuant to the stipulations

2   that have been entered on the record.  And I appreciate

3   everybody's patience and good behavior during the day.  It's

4   been a long one.  And we'll see you again soon.

5           MR. RATNER:  Thank you very much, Your Honor.

6       (Court adjourned)

7

8

9                           CERTIFICATION
    I certify that the foregoing is a correct transcript from the
10  electronic sound recording of the proceedings in the above-
    entitled matter.

11

12  _____              9-14-04
    Signature of Transcriber                Date

13

14

15

16

17

18

19

20

21

22

23

24

25

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191