# APP. 21

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (CGC) |
| | ) | **Briefs in Opposition Due: September 21, 2004** |
| Debtor. | ) | **Hearing Date:  October 6, 2004** |
| | ) | |

**LAW DEBENTURE TRUST COMPANY OF NEW YORK'S
SUPPLEMENTAL OBJECTION TO CONFIRMATION OF
DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION**

Law Debenture Trust Company of New York, as successor Trustee (the "Indenture Trustee") to the Bank of New York, under that certain Indenture (the "QUIPS Indenture") dated as of November 1, 1996, as amended, pursuant to which the Montana Power Company ("Montana Power") issued certain 8.45% Junior Subordinated Debentures (the "QUIPS Debentures") to Montana Capital I, which, then issued certain 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPS"), by and through its undersigned counsel, hereby objects to confirmation of the Debtor's Second Amended Plan of Reorganization (the "Plan").  This objection supplements the Indenture Trustee's previous objections to the Debtor's First Amended Plan set forth in Law Debenture's Memorandum of Law in Support of its Objection to confirmation of the Debtor's First Amended Plan of Reorganization dated August 9, 2000 [Docket No. 1871] (the "First Objection").  Each of the objections to confirmation raised in the First Objection are incorporated by reference as if set forth fully herein.  In support of its supplemental objection, the Indenture Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

Notwithstanding the substantial amendments, the Debtors still have not proposed a confirmable plan of reorganization in this case.  First, the Second Amended Plan is inconsistent with the QUIPS holders property rights under state law.  Specifically, the plan attempts to convert the QUIPS holder in rem Property Rights in the Montana Utility Assets into general unsecured claims against this estate.  This is improper and precludes confirmation at the Second Amended Plan.

Second, the Plan improperly conditions distributions on the claims the QUIPS holders have asserted against the Debtor on a release of the in rem property rights that they have asserted in the Montana Utility Assets.  As detailed below, the holders of QUIPS debt are entitled to, not less than, the same pro rata distribution of stock and warrants that is being made to the holders of unsecured debt of equal rank under the Plan.  Instead, in contrast with other unsecured creditors, the QUIPS holders are coerced to surrender unique and potentially valuable property rights to obtain the same treatment they are otherwise entitled to under the Bankruptcy Code.  This too precludes confirmation of the Second Amended Plan.

## BACKGROUND

**A.    The Transfer of the Montana Utility Assets to the Debtor.**

1.    Montana Power was the successor to an electric utility originally formed almost a century ago in 1912.

2.    In November 1996, Montana Power, and the Indenture Trustee's predecessor entered into the QUIPS Indenture.  Pursuant to the QUIPS Indenture, Montana Power issued the QUIPS Debentures to Montana Power Capital, a special purpose business trust (the "Trust").  The Trust, in turn, issued the QUIPS, which are now widely held by both institutional and

individual investors.   In September 2000, the Debtor agreed to purchase substantially all of Montana Power's Electric, natural gas, and propane utility assets (the "Montana Utility Assets") pursuant to a Unit Purchase Agreement dated September 29, 2000.

       3.   The Debtor's pre-petition acquisition of the Montana Utility Assets was implemented through three separate and distinct transactions.   <u>First</u>, Montana Power created a subsidiary Montana Power LLC ("MPLLC") and the Montana Utility Assets were transferred to MPLLC.   <u>Second</u>, on or about February 15, 2002, the Debtor acquired Montana Power's interests in MPLLC and MPLLC became a wholly-owned subsidiary of the Debtor known as Northwestern Energy LLC.   <u>Third</u>, approximately eight months later, on or about November 15, 2002, Northwestern Energy LLC transferred substantially all of the Montana Utility Assets to the Debtor.   This latter transaction is known as the "going flat" transaction the ("Going Flat Transaction").   Following the Going Flat Transaction, Northwestern Energy LLC changed its name and is now known as Clark Fork and Blackfoot LLC ("Clark Fork").

     **B.**    **Restatement of the Debtor's Earnings and Commencement of the Debtor's Chapter 11 Case.**

       5.   On April 16, 2003, a mere five months after the Going Flat Transaction, the Debtor reported its financial results for fiscal year 2002, the fiscal year in which the Going Flat Transaction occurred.   In those filings, the Debtor restated its earnings previously reported in unaudited quarterly reports and identified for the first time $878.5 million in previously unreported "negative charges."   Immediately thereafter, the United States Securities and Exchange Commission (the "SEC") launched an informal investigation into the Debtor's restatement of its financial results.   That investigation became a formal investigation in December 2003, and has not yet been concluded.

6.    On September 14, 2003, ten months after the Going Flat Transaction, the Debtor commenced the above-captioned case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the united States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.  Clark Fork, however, did not seek bankruptcy relief.

7.    On January 14, 2004, the Indenture Trustee, on behalf of the QUIPS holders, filed a proof of claim (the "Proof of Claim") asserting an unsecured claim and claims arising from the Going Flat transaction in the amount of $69,512,463.89 for unpaid principal and interest due under the Debentures and that the Going Flat Transaction was a fraudulent conveyance under Montana law.

### C.    The Indenture Trustee's Adversary Proceeding to Avoid and Recover the Montana Utility Assets.

8.    On April 16, 2004, the Indenture Trustee, along with Magten Asset Management Corporation ("Magten"),[1] commenced an adversary proceeding (the "Adversary Proceeding") to recover the Montana Utility Assets.[2]  In the Adversary Proceeding, the Indenture Trustee alleges that the Going Flat Transaction was a fraudulent transfer and seeks, among other things, an order from this Court:  (a) voiding the transfer of the Montana Utility Assets to the Debtor; and (b) requiring the Debtor to return those assets to Clark Fork.

9.    On or about May 15, 2004, the Debtor filed a motion to dismiss the Complaint for failure to state a claim.  In that motion, the Debtor contended that as a threshold matter the QUIPS holders lacked standing to assert fraudulent transfer claims to recover the Montana

---

[1] Magten is the holder of approximately 40% of the QUIPS debt.

[2] The Adversary Proceeding is styled <u>Magten Asset Management Corp., et al. v. Northwestern Corp.</u>, Adversary No. 04-53324. Copies of the QUIPS Indenture and other relevant documents are attached as exhibits to the Indenture Trustee's Complaint in the Adversary Proceeding and are Incorporated herein by reference.  In conjunction with the Adversary Proceeding, Magten commenced a civil action in the United States District Court for the District of

*(Footnote continued on next page)*

Utility Assets because under the terms of the QUIPS Indenture the Debtor assumed the obligations evidenced by that instrument and Clark Fork's liabilities were fully released. In response, the Indenture Trustee argued, among other things, that the QUIPS holders remain creditors of Clark Fork because any release of Clark Fork under the QUIPS Indenture was ineffective because it was obtained by fraud.

10. On August 20, 2004, this Court ruled on the Debtor's motion. In its decision, the Court specifically found that the Indenture Trustee's claim that the alleged release of Clark Fork is ineffective because it was obtained by fraud "may have legs" and ordered that the Indenture Trustee could prosecute the Adversary Proceeding on behalf of QUIPS holders if it could prove that such release "was obtained through actual fraud or as part of a fraudulent scheme." A copy of the court's decision is attached hereto and incorporated herein by reference as <u>Exhibit A</u>.

11. The Indenture Trustee, on behalf of the QUIPS holders, accordingly, has asserted two separate and distinct varieties of claims against this estate. First, though the Proof of Claim filed on behalf QUIPS holders, the Indenture Trustee has asserted claims against the Debtor in its capacity as the obligor under the QUIPS Indenture (herein referred to as the "Indenture Claims"). Such claims have not been disputed by the Debtor. Indeed, this estate's liability on those claims has been asserted as the basis for the Debtor's defense in the Adversary Proceeding. Second, through the Adversary Proceeding, the Indenture Trustee, on behalf of QUIPS holders, has asserted causes of action against the Debtor as the transferee of assets fraudulently conveyed from Clark Fork. The Indenture Trustee further asserts that, by virtue of such causes of action, the QUIPS holders have <u>in rem</u> property rights in the Montana Utility Assets and that, if it

---

*(Footnote continued from previous page)*
Montana against certain of Clark Fork's officers and directors for breach of fiduciary duty in connection with Going Flat Transaction.

obtains a judgment against the Debtor in the Adversary Proceeding, the obligations under the

QUIPS Indenture could be paid in full, in cash from the Montana Utility Assets (such causes of

action and in rem property rights being collectively referred to herein as the "In Rem Rights").

> **D.    The Debtor's Previous Attempts to Resolve the Adversary Proceeding through the Plan.**

12.    On May 12, 2004, the Debtor filed its First Amended Plan of Reorganization (the

"First Amended Plan").

13.    The First Amended Plan designated six classes of non-priority unsecured claims,

including, in pertinent part:

- Class 7 consisting of approximately $898 million of alleged senior debt (the "Senior Unsecured Debt");

- Class 8 consisting of approximately $391 million in outstanding subordinated debentures, including the QUIPS and unsecured debentures issued pursuant to the TOPrS Indenture (collectively, the "Unsecured Subordinated Debt Claims");[3] and

- Class 9 consisting of "General Unsecured Claims" of approximately $46 million.

14.    Through the First Amended Plan, the Debtor sought to satisfy all claims arising

under the QUIPS and TOPrS Indenture, including the In Rem Rights the Indenture Trustee has

asserted against the Montana Utility Assets, with a pro rata distribution of common stock in the

reorganized Debtor representing just 2% of the New Common Stock issued and outstanding on

the Effective Date.  All such distributions to holders of Class 8 claims, however, were subject to

the First Amended Plan's so-called "death trap" provisions.  Specifically, all distributions to

Class 8 holders were conditioned on the class voting to accept the First Amended Plan.  In the

---

[3] Capitalized words not otherwise defined have the meanings ascribed to them in the Second Amended Plan.

event that the class voted to reject the Plan, no distributions whatsoever would be made to Class 8 under the First Amended Plan.

15. Notwithstanding these death-trap provisions, Class 8 voted to reject the First Amended Plan.

16. On August 18, 2004, accordingly, the Debtor filed its Second Amended Plan. The stated purpose of this new plan was to memorialize a settlement the Debtor had reached with Wilmington Trust Company, as indenture trustee under the TOPrS Indenture and Harbert Management Corporation, on behalf of itself, and on behalf of certain TOPrS holders. Significantly, neither the Indenture Trustee nor Magten had an opportunity to participate in these negotiations.

17. In the Second Amended Plan, the Debtor proposed to satisfy claims arising under the QUIPS and the TOPrS Indentures with a pro rata distribution of: (a) common stock in the reorganized Debtor representing 8% of the New Common Stock issued and outstanding on the Effective Date; plus (b) Warrants exercisable for an additional 13% of the New Common Stock.

18. As calculated by the Debtor, from those aggregate amounts, the holders of QUIPS and TOPrS claims would separately be entitled to 1.4% and 6.6%, respectively, of the New Common Stock issued on the Effective Date and Warrants exercisable for an additional 2.3% and 10.7% respectively, of the New Common Stock.

19. Although, on information and belief, after settlement with Harbert and Wilmington Trust, the votes of the TOPrS holders were sufficient in number and amount to bind Class 8, the Second Amended Plan separately classified the claims arising under the TOPrS and the QUIPS Indentures. Specifically, under the Second Amended Plan, Class 8 was divided into two classes: Class 8(a) - consisting of claims related to the TOPrS Indenture and Class 8(b) - consisting of

claims related to the QUIPS Indenture, including In Rem Rights to the Montana Utility Assets. The Second Amended Plan, however, conditioned all distributions of New Common Stock and warrants to Class 8(b) on Class 8(b) voting "as a class" to accept the plan and, thereby, release the causes of action asserted in the Adversary Proceeding.  Alternatively, the Second Amended Plan provided that:  "[I]n the event that Class 8(b) as a class, votes to reject the Second Amended Plan, the holders of Unsecured Subordinated Note Claims represented by the QUIPS Notes and related Claims and Causes of Action shall receive nothing under the Second Amended Plan." (emphasis supplied.)  Distributions to Class 8(a), however, were not subject to the same "death trap" provisions.

> **E.    The Debtor's Present Proposal with Respect to the QUIPS Notes and the Causes of Action Asserted in the Adversary Proceeding.**

20.  In apparent response to this Court's decision rejecting the Debtor's motion to dismiss the Adversary Proceeding, on August 18, 2004, the Debtor, at the eleventh hour, amended the proposed treatment of QUIPS' claims under its plan yet again.  The present version of the Second Amended Plan now provides holders with QUIPS claims with a "choice" of two mutually-exclusive options for satisfaction of their claims.   Under so-called Option 1, in exchange for a release of the causes of action and the in rem rights in the Montana Utility Assets asserted in the Adversary Proceeding, QUIPS holders will receive a pro rata interest in the New Common Stock and Warrants allocated to Unsecured Subordinated Note Claims under the Second Amended Plan.[4]  As detailed above, under the Second Amended Plan up to 1.4% of the

---

[4] In sharp contrast with prior iterations of the plan, the release effected in the present version of the Second Amended Plan is express:  "If a holder of a Class 8(b) Unsecured Subordinated Note claim votes to accept or reject the Plan and chooses Option 1, then:  (i) such holder will receive its Pro Rata Share of the Distribution provided for under  Option 1; and (ii) such Distribution will be in lieu of and release of any claims or rights the holders may have with respect to the QUIPS Litigation." (emphasis supplied)

New Common Stock of the Reorganized Debtor is available to QUIPS holders.   In addition, QUIPS holders who elect to have their claims satisfied under Option 1 will also receive a <u>pro rata</u> share of the Warrants allocated to Unsecured Subordinated Note Claims, exercisable for an additional 2.3% of the New Common Stock.

21.   Alternatively, the Second Amended Plan allows QUIPS holders to "elect" to have their claims satisfied under Option 2.  Under Option 2, QUIPS holders will receive: "a <u>pro rata</u> share of recoveries, if any, upon resolution of [the Adversary Proceeding]."   The Second Amended Plan further provides that any recoveries from the Adversary Proceeding will be treated as Class 9 General Unsecured Claims and satisfied with New Common Stock in the reorganized Debtor rather than cash when the Adversary Proceeding is ultimately resolved. Holders of QUIPS debt who elect Option 2 must also forego any distribution from New Common Stock and warrants made allocate to the holders of TOPrS debt and the holders of QUIPS debt who elect Option 1.

## <u>ARGUMENT</u>

### A.   The Plan Improperly Attempts to Convert the QUIPS Holders <u>In Rem</u> Property Rights in the Montana Utility Assets into General Unsecured Claims Against This Estate.

22.   As a matter of state law, the QUIPS holders' remedy against the Debtor, as a transfer of fraudulently conveyed property is not limited to merely obtaining a money judgment against the transferee.  Just the opposite, the distinctive feature of fraudulent conveyance is that it vests creditors like the QUIPS holders, with <u>in rem</u> rights in the <u>res</u> transferred.  <u>See</u>, <u>United States v. Kensington Shipyard & Drydock Corp.</u>,  187 F.2d 709 (3rd Cir. 1951) (finding that possible remedies available to the creditor in cases of fraudulent transfers include the right to treat the conveyance as void and proceed to levy execution upon the property); <u>In re Bell</u>, 55 Bankr. 246,

249 (Bankr. M.D. Tenn. 1985) (holding that, assuming that the conveyances are fraudulent as to a creditor, upon recovery, a creditor's recorded judgment lien is attached to the property as if it had never been conveyed). Indeed, the ability of creditors (both individually and as a group) to avoid the transfer of specific property and recover against that property is the principal remedy created by fraudulent conveyance law. See, e.g., Mooney Construction Co. v. Ayles, 373 P. 2d 703 (Mon. 1962) (the right to seek a money judgment is merely collateral to the primary right to set aside the conveyance); compare 11 U.S.C. § 550(a) (to the extent that a transfer is avoided as a fraudulent conveyance, "the trustee may recover for the benefit of the estate, the property transferred . . .") (emphasis supplied) Thus, under Montana's fraudulent transfer statute, if the Indenture Trustee obtains a judgment against the Debtor in the Adversary Proceeding it will be able to avoid the Going Flat Transaction and levy execution on the Montana Utility Assets. See Mont. Code Ann. § 37-2-339, compare Matter of Luftman, 245 F. Supp. 723, 725 (S.D. N.Y. 1969) ("A creditor may treat a fraudulent conveyance as if it had never been made and immediately attach or levy execution on the property conveyed."); Chemical Bank v. Dana, 234 B.R. 585, 596 (D. Conn. 1999) ("Property fraudulently conveyed may, as to creditors of the grantor be treated as if no conveyance of it had been made.") (emphasis original).

23. Moreover, the QUIPS holders' property interests in the Montana Utility Assets is recognized and preserved by federal bankruptcy law. Property obtained by fraud of the debtor or of another is not part of the debtor's estate. In re Paragon Securities Company, 589 F.2d 1240, 1242 (3d Cir. 1978); In re North American Coin and Currency, Ltd., 767 F.2d 1573, 1576 (9th Cir. 1985). Alternatively, this estate only holds bare legal title to Montana Utility Assets subject to a constructive trust in favor of the QUIPS holders. See, e.g., Chemical Bank v. Coan, 2001 WL 99815 (2d Cir. Feb. 2, 2001) (finding that, under state law, a court may avoid a fraudulent

transfer and impress a constructive trust on the transferee for the benefit of creditors); Banister v. Solomon, 126 F.2d 740, 741 (2d Cir. 1942) (Judge Learned Hand recognizing the rule that property fraudulently conveyed by debtor is subject to a constructive trust in favor of creditors) In re McGavin, 189 F.3d 1215 (10th Cir. 1999) (same); Chemical Bank v. Dana, 234 B.R. at 585 (same); see also 11 U.S.C. § 541(d) ("Property in which the debtor holds … only legal title and not an equitable interest . . . becomes property of the estate … only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); United States v. Whiting Pools, Inc., 462 U.S. 198, 705 n. 10 (1989) (Bankruptcy Code "plainly excludes [from the bankruptcy estate] property of other held by the debtor in trust at the time of the filing of the [bankruptcy] petition."); Official Comm. of Unsecured Creditors v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.), 997 F.2d 1039, 1059 (3d Cir. 1993) ("Congress clearly intended the exclusion created by § 541(a) to include not only funds held in express trust, but also funds held in constructive trust."); In re Mariner Post-Acute Network, Inc., 267 B.R. 46 (Bankr. D. Del. 2001) (property held in constructive trust for another cannot be used by the debtor to pay its creditors).

24.    Through the Plan, the Debtor seeks to avoid litigating the property dispute joined in the Adversary Proceeding concerning whether or not the Montana Utility Assets are properly within this estate and convert the in rem property rights the Indenture Trustee has asserted in that litigation into general unsecured claims against this estate.  First, Section 5.7 of the Plan provides that "title to all properties and assets of the Debtor shall pass from the Debtor to the Reorganized Debtor free and clear of all claims, liens, encumbrances and interests of creditors."  Second, pursuant to Section 4.8 of the Plan, any recoveries from the Adversary Proceeding will be treated as general unsecured claims. This is improper.  These provisions are contrary to the QUIPS

holders' state law property rights in the Montana Utility Assets and preclude confirmation of the Second Amended Plan.  See 11 U.S.C. § 1129(a)(1); Butner v. United States, 440 U.S.C. 48, 55 (1979) ("Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently because an interested party is involved in a bankruptcy proceeding.")

**B.**    **The Plan Improperly Conditions Distributions On The Claims The QUIPS Holders Have Asserted Against The Debtor As The Obligor Under The QUIPS Indenture On A Release Of The <u>in rem</u> Property Rights That They Have Asserted In The Montana Utility Assets.**

1.    The Second Amended Plan is contrary to the Bankruptcy Code's priority scheme and fundamentally unfair because it provides for substantially different treatment of claims of identical rank.

25.  The Indenture Claims (the claims for principal and interest against the Debtor as the obligor under the QUIPS Indenture) are identical in priority to the TOPrS claims and should entitle the holders of such unsecured subordinated debt to identical treatment under the Second Amended Plan.   Indeed, the Second Amended Plan is deliberately structured to give the appearance that the holders of Class 8(a) and Class 8(b) claims will be receiving equal treatment under the plan – a pro rata distribution in the New Common Stock and Warrants allocated to Unsecured Subordinated Debt Claims.  In fact, as both a legal and economic matter, the QUIPS holders are receiving substantially less than the TOPrS holders because they are required to surrender valuable (although as yet unliquidated) property rights to obtain the same pro rata distribution as the TOPrS under the Plan.  See In re AOV Industries, Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986) ("It is disparate treatment when members of a common class are required to tender more valuable consideration - be it their claim against specific property of the debtor or some cognizable close in action – in exchange for the same percentage recovery.")

26. An accurate assessment of a creditor's legal and economic treatment under a plan requires an analysis of not only what the creditor is to receive but also what the creditor must give up to receive distributions under a plan. AOV Industries, 792 F.2d at 1152. Furthermore, requiring similarly-situated creditors to give up unequal consideration for the same treatment under a plan necessarily results in unfair treatment. Id. This commercial reality was the subject matter of the D.C. Circuit's seminal decision in In re AOV Industries, Inc., 792 F.2d 1140 (1986).

27. In AOV Industries, all unsecured creditors were placed in one class and each member of that class was given an "option": (i) tender a release to the third parties funding the plan in exchange for a 13% dividend; or (ii) retain its claim and seek a more substantial recovery by pursing litigation against the plan funders. AOV Industries, 792 F.2d at 1150; see also In re AOV Industries, 31 B.R. 1008, 1009 (Bankr. D. D.C. 1986). The creditors within the class, however, had different types of claims against the third parties funding the plan. Certain creditors held direct (although unliquidated and disputed) contract claims against the plan funders while the remaining creditors possessed only derivative claims against the third parties. The D.C. Circuit held that the proposed treatments of unsecured creditors under the Plan was inherently unequal even though unsecured creditors had the option to forego distributions from the plan funders and prosecute their claims against those third parties:

> The most conspicuous [type of] inequality … is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claim against specific property of the debtor or some cognizable close in action – in exchange for the same percentage of recovery.

AOV Industries, 792 F.2d at 1152. (emphasis supplied)

28.  Although <u>AOV Industries</u> was decided under § 1123(a)(4), its rationale requires that the disparate treatment of TOPrS and QUIPS debt proposed in the Second Amended Plan be rejected by this Court.  Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to less favorable treatment of such claim or interest.   Until the Debtor's recent settlement with Wilmington and Harbert, and this Court's decision denying the Debtor's motion to dismiss in the Adversary Proceeding, the TOPrS claims and QUIPS Indenture Claims were classified in the same class in each and every iteration of the Plan and the treatment of their respective claims was governed by Section 1123(a)(4).  Furthermore, the claims of the TOPrS and the QUIPS Indenture Claims were treated as a single class in negotiations with other plan constituencies concerning the consideration to be paid on account of unsecured subordinated debt and a single bundle of consideration (8% of the New Common Stock issued on the Effective Date and Warrants exercisable for additional 13% of the New Common Stock) is dedicated to the satisfaction of those claims under the Second Amended Plan.  The Debtor should not be allowed to now draft around the rule in <u>AOV Industries</u> and the requirement of equal treatment under Section 1123(a)(4) by merely separately classifying similarly-situated claims against the Debtor as the obligor under the TOPrS and QUIPS Indentures.   Instead, this Court should disregard the Debtor's classification ledgermain and require the Debtor to comply with its obligations under Section 1123(a)(4) by treating the claims against the Debtor as obligor under TOPrS Indenture and the QUIPS indenture claims equally.

2.    The Debtor's scheme to strip the QUIPS holders of their <u>in rem</u> rights in the Montana Utility Assets for no consideration also violates Sections 1122, 1129(a)(1), 1129(a)(4) and 1129(b) of the Bankruptcy Code.

29.  In addition to Section 1123(a)(4), the grossly disparate treatment of Class 8(a) and Class 8(b) in the Second Amended Plan is also contrary to Sections 1122, 1129(a)(1), 1129(a)(4) and 1129(b) of the Bankruptcy Code.  <u>First</u>, as a threshold matter, the Second Amended Plan's classification scheme violates Section 1122 because it classifies the QUIPS holder's Indenture Claims with their In Rem Rights in the Montana Utility Assets.  Pursuant to Section 1122, a plan may not classify claims and interests in the same class.  <u>See</u> 11 U.S.C. Section 1122(a) (distinguishing, for the purposes of plan classification, between claims and interests); <u>see also</u>, <u>In Martin's Point Ltd Partnership</u>, 121 B.R. 721, 726 (Bankr. N.D. Ga 1981) (finding that the Code requires that an interest that a party may have in a Debtor is to be placed in a class separate from a claim that that party may have against the Debtor).  Each represents a different type of legal relationship to the debtor and, by definition, is not substantially similar.

30.  <u>Second</u>, Sections 1122 and 1129(a)(3) of the Bankruptcy Code constrain the Debtor's ability to separately classify claims for principal and interest under the TOPrS and the QUIPS Indenture Claims.  Those claims are of equal rank and should be classified together.  <u>See</u> e.g. <u>In re Greystone III Joint Venture</u>, 995 F.2d 1274, 1278 (9th Cir. 1991) ("substantially similar claims to those which share common priority rights against the debtor's estate, should be placed in the same class"); <u>Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund</u>, 748 F.2d 42, 46 (1st Cir. 1984).  Separate classification of those substantially similar claims can be only justified under Sections 1122 and 1129(a)(3) for compelling and legitimate business reasons.  <u>In re Chateauquay Corp.</u>, 89 F. 3d 942 2d Cir. 1996); <u>In re Boston</u>

Post Road Ltd. Partnership, 21 F. 3d 477, 483 (2d Cir. 1994); In re Greystone III Joint Venture, 995 F.2d at 1279.  The Debtor has proffered no compelling or legitimate reason for the separate classification of Class 8(a) and Class 8(b) Unsecured Subordinated Debt Claims in the Second Amended Plan, nor could it.

31.  The Debtor's assertion that it bifurcated the Unsecured Subordinated Debt Claims asserted against this estate into separate classes to "accommodate" the holders of the QUIPS is simply disingenuous.  Just the opposite is true.  The treatment of Class 8(b) claims under the Second Amended Plan is structured to strip the holders of QUIPS of their potentially valuable In Rem Rights against the Montana Utility Assets for no consideration.  It does this by holding distributions on account of the QUIPS Indenture Claims hostage and requiring QUIPS holders to give up those distributions if they wish to seek an adjudication of their In Rem Rights in the Adversary Proceeding.  This is hardly an accommodation.  Nor is it a legitimate business reason for separate classification for purposes of Sections 1122 and 1123(a)(4).

32.  Third, requiring the QUIPS holders to give up their In Rem Rights against the Montana Utility Assets as a condition to receiving any distributions on their Indenture Claims against the Debtor is contrary to Sections 524(e) and 1129(a)(1) of the Bankruptcy Code.  By requiring the QUIPS holders to surrender their In Rem Rights under the Second Amended Plan, the Debtor, in effect, is extracting a non-consensual release in favor of non-debtor third parties, Clark Fork and its officers and directors, for no consideration.  Under Option 1, fraudulent transfer claims against Clark Fork and aiding and abetting claims against Clark Fork's officer and directors are released.  In  exchange for that release, however, the QUIPS holders will receive what they are already entitled to under their Indenture Claims – the same pro rata distribution of stock and warrants that is being made to the holders of unsecured debt of equal

rank.  Cf. AOV Industries, 792 F.2d at 1152.  This "exchange" is necessarily coersive, and is not supported by any consideration flowing to the holders of QUIPS debt.  Id.

33.  Fourth, and finally, the Second Amended Plan unfairly discriminates against the QUIPS holders because they are receiving substantially less than the holders of claims of equal rank under the Plan.  "It is unfair discrimination for a plan proponent to pay claims of equal, non-bankruptcy priority, a different distribution than a class of the same legal rank without a legitimate and rational basis for the disparate treatment."  In re Salem Suede, 291 B.R. 922, 933 (Bankr. D. Mass. 1998).   As detailed above, the holders of QUIPS debt are receiving substantially less under the Second Amended Plan because they, in contrast with the TOPrS holders and other creditors, are required to surrender unique in rem property rights in order to obtain the same pro rata distribution of stock and warrants that is being made to the holders of claims of the same legal rank.  AOV Industries, 792 F.2d at 1152.  This disparate treatment is unfair discrimination and is prohibited under § 1129(b).  See, e.g. In re Eisenbarth, 77 B.R. 228, 235-36 (Bankr. D. N.D. 1987) (citing AOV as being relevant to the question of whether a plan unfairly discriminates under § 1129(b)).

34.  In sum, each of these provisions of the Bankruptcy Code prevent the Debtor from imposing on the holders of the QUIPS the Hobson's choice of surrendering their disputed In Rem Rights in the Montana Utility Assets or foregoing any distribution on account of their Indenture Claims.  This Hobson's choice could be likened to requiring a creditor asserting a disputed secured claim to forfeit its disputed lien rights in order to receive distributions as an unsecured creditor.  A plan with such a provision could not be confirmed (and would, in fact, be summarily rejected) because the provision requires a creditor to give up potentially valuable rights to obtain the treatment it is already entitled to under the Bankruptcy Code.  Similarly, the

proposed treatment of Class 8(b) in the Second Amended Plan should be unconfirmable. The holders of QUIPS debt should not be required to forfeit the In Rem Rights that they have asserted in the Adversary Proceeding to receive the same treatment as the holders of other Unsecured Subordinated Debt under the Second Amended Plan. In short, the holders of QUIPS are entitled to not less than their <u>pro rata</u> share of the stock and warrants distributed to other creditors of the same priority and the Debtor's attempt to condition such distributions on QUIPS holders' surrendering their In Rem Rights is improper.

### C. The Debtor Cannot Avoid the Cram Down Requirements and Offer Requirements of § 1129 Merely by Labeling the Distributions Contemplated by the Second Amended Plan a "gift" from More Senior Creditors.

35. In response to the Indenture Trustee's objection to the First Amended Plan, the Debtor has asserted that any distribution on account of QUIPS debt is a "gift" from senior classes and that "[t]he Bankruptcy Code is not implicated when any of the creditors agrees to give up a portion of their legally entitled distribution in order to effectuate a settlement with objecting creditors." <u>See</u>, Debtor's Memorandum of Law in Support of Confirmation of its Second Amended and Restated Plan dated August 18, 2004 at 47. As detailed below, the Debtor's "gift" theory lacks any factual or legal basis and the Debtor should not be allowed to circumvent statutory confirmation requirements merely because senior creditors may not be getting paid in full under the Second Amended Plan.

36. First, as a factual matter, the Indenture Trustee contends that the Debtor is grossly undervaluing the stock that is to be distributed under the Second Amended Plan and senior creditors may be receiving more than full compensation on their claims even after taking into account the proposed maximum distributions to be made with Class 8(a) and Class 8(b). Second, as both a legal and a factual mater, the proposed distributions made to the holders of QUIPS debt

are coming from the Debtor pursuant to a plan of reorganization rather than an intercreditor agreement with senior classes outside of bankruptcy. Third, and perhaps most fundamentally, a plan proponent, whether it is a third party, a senior creditor or a debtor-in-possession, cannot unfairly discriminate among creditors that are "out of the money" and avoid other specific statutory confirmation requirements even where senior creditors are not being paid in full. See, In Sentry Operating Co. of Texas, Inc., 264 B. R. 850, 864-65 (Bankr. S. D. Tx. 2001) (emphatically rejecting a secured creditors claim that junior creditors "cannot be heard to complain" that a plan unfairly discriminates where distributions are a "gift" from senior creditors and concluding the argument is a "siren's song.")

37.    A similar claim that senior creditors "funding" payments to junior creditors were not constrained by the Code's prohibition are unfair discrimination was comprehensively analyzed and ultimately emphatically rejected in In re Sentry Operating Company of Texas, Inc., 264 B.R. 850 (S. D. Tex. 2001). After comprehensively reviewing the history of the prohibition on unfair discrimination from its origins in equity receivership practice to its present version in § 1129(b) and "the interrelationship of creditor protections evidenced in the statutory confirmation requirements" prescribed by the Bankruptcy Code, the Sentry court concluded:

> To accept [the senior creditor's] argument that a [senior creditor] can without any reference to fairness, decide which creditors get paid and how much these creditors get paid, is to reject the historical foundation of equity receiverships and to read the § 1129(b) requirements out of the Code. If the argument were accepted with respect to § 1129(b)['s] "unfair discrimination requirement," there is no logical reason not to apply it to the § 1129(a)(10) requirement that at least one class has accepted the plan. To accept that argument is simply to start down a slippery slope that does great violence to history and positive law.

Sentry Operating, 264 B. R. at 864.

38.     In the final analysis, the court concluded that the Bankruptcy Code provides senior creditors with substantial benefits not available under state law.  The <u>Sentry</u> court further concluded that:

> The Bankruptcy Code establishes the price of these powerful equitable tools (when as class of creditors is impaired) as negotiation to win over the acceptance of an impaired class and treatment of all non-accepting classes fairly, equitably, and without unfair discrimination.

<u>Id</u>. at 864.

So too, even if assuming <u>arguendo</u> that senior creditors are not being paid in full under the Second Amended Plan, the value of the stock they are receiving is the result of the unique protections and advantages afforded to debtors reorganizing under the Bankruptcy Code.  The "price" of these benefits is that holders of QUIPS debt be treated fairly, equitably, and without unfair discrimination and that the Second Amended Plan otherwise comply with the requirement of § 1129 of the Bankruptcy Code.  <u>Id</u>.

### D.   The Plan is Not Fair and Equitable Because it Pays Senior Debt Value in Excess of the Amount of their Claims to the Detriment of Junior Creditors.

39.   A plan can be confirmed over the rejection of the impaired class only if the plan is "fair and equitable."  <u>See</u> 11 U.S.C. § 1129(b)(2).  To be fair and equitable, a plan must meet the Bankruptcy Code's absolute priority rule.  Similarly, it is well settled that "a corollary of the absolute priority rule is that a senior class can not receive more than full compensation for its claims."  <u>In re Exide Technologies, et al.</u>, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (citations omitted); <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591, 612 (Bankr. D. Del. 2001).[5]

---

[5] The legislative history of the absolute priority rule further emphasizes the statutory basis for this collorary:

> One requirement applies generally to all decrees before the Court may confirm under this subsection.  No class may be paid more than full.

House Report No. 95-595, 95th Cong., 1st Sess. 413-418 (1977).

40.  As detailed above, the Plan provides that holders of Class 7 Unsecured Note Claims Class 9 General Unsecured Claims will receive their <u>pro rata</u> share of not less than 90% of the New Common Stock issued on the Effective Date under the Plan.  Discovery in connection with confirmation of Plan, and expert evidenced proferred at the hearing on August 25, 2004 to consider confirmation of the Plan, however, has revealed that the value of the New Common Stock to be distributed to Class 7 and Class 9 on the Effective Date exceeds the allowed amount of those claims and in fact is likely to be more than sufficient to pay all unsecured claims in full.

41.  Specifically, information disclosed by the Debtor and its testifying experts since approval of the Disclosure Statement has revealed that the value of the reorganized Debtor's New Common Stock proffered in the Disclosure Statement substantially understates the true enterprise value of the Debtor because, among other things, it is premised on flawed methodologies and marbled with defective economic, demographic and regulatory assumptions. Based on that discovery and on the valuation report prepared by Seneca Financial Group, Inc. obtained from RCG Carpathia Master Fund, Ltd. and Kellog Capital Group, LLC, (the Shareholders") the Indenture Trustee believes that the true enterprise value of the reorganized Debtor could be as high as between $2.2 billion and $2.4 billion.[6]  The Indenture Trustee, accordingly, joins the shareholders objection to confirmation based on the absolute priority rule and reserves the right to challenge the value of the Debtor ascribes to the New Common Stock to be distributed under the Plan and to contest any cram down of the Plan on absolute priority grounds.

---

[6] At the hearing to consider confirmation of the Plan, the Indenture Trustee also reserves the right to rely on the valuation report prepared by Goldin Associates LLC and Bob Anderson, prepared on behalf of Wilmington.

**E.  The Plan Cannot Be Confirmed Because the Plan Does Not Provide the Appropriate Mechanisms to Administer Distributions to be Made to Class 8(b) Creditors.**

42.  In its rush to amend the plan to subdivide Class 8 and to give the QUIPS holders their fictitious "choice," the Debtor has failed to provide appropriate mechanisms in the Second Amended Plan to allow the Indenture Trustee, the Property Trustee, intermediaries and nominee holders to track and legend the choices that QUIPS holders will make pursuant to the Plan and then administer distributions in accordance with the Plan.  The ballots sent to the nominees are in the form of ballots common to those requesting a vote on a plan of reorganization for any large bankruptcy case.   Such ballots typically request that the nominee holders and other intermediaries send out individual ballots to their respective beneficial holders, collect the ballots from them, tabulate the votes and send in the results pursuant to master ballot.  The Debtor's ballots, however, purport to do much more:  they purport to give beneficial holders choices of recoveries in addition to, or despite, the vote of the Class to accept or reject the plan.  The ballots also give beneficial holders the option of accepting or rejecting certain releases given in the Plan.  Such elections, however, can be made independently of each other and are not tied to a holder's election to accept or reject the Plan.  In addition, a vote by a beneficial holder made pursuant to the resolicitation overrides the holder's previous vote.  Conversely, a failure to vote pursuant to the resolicitation, imposes certain elections on a holder based on its prior vote.  Despite these complexities and irregularities, the Second Amended Plan makes no provisions to properly notify nominees and other intermediaries of the elaborate bookkeeping that they are called upon to engage in nor does it establish a mechanism for the nominees and intermediaries to properly track and legend the securities of the QUIPS holders to reflect the various "choices" imposed on each beneficial holder under the Plan.

43.  In addition, the Debtor has made no provision for redeeming the QUIPS or otherwise legending the QUIPS in order to allow holders to collect their distribution.  The Depository Trust Company and its participants are not set up to give distributions to some holders and not others without undertaking an elaborate redemption process.  The process is neither provided for in the Plan, nor are the costs of such a labor-intensive process addressed in the Plan.

44.  In addition the Debtor has made no provision for the survival of the QUIPS and payment of the Indenture Trustee's fees and expenses after the effective date of the Plan.  While coming up with an elaborate scheme to give QUIPS holders a "choice," pursuant to recoveries in the Adversary Proceeding, no provision is made for the securities of those QUIPS holder to survive, nor for the payment of the fees and expenses of the Indenture Trustee which will be required to continue fulfilling its fiduciary duty to those QUIPS holders who elect to continue to pursue recoveries in the Adversary Proceeding.

## RESERVATION OF RIGHTS

45.  The Indenture Trustee is currently engaging in discovery with the Debtor and others in connection with confirmation of the Debtor's Second Amended Plan.  The Indenture Trustee, accordingly, reserves the right to amend or supplement this objection based on that discovery or to otherwise assert additional bases for denying confirmation of the Debtor's plan.

## CONCLUSION

Based on the foregoing, the Indenture Trustee respectfully requests that the Court enter an order denying confirmation of the Second Amended Plan and granting such other relief as the Court deems just and proper.

September 21, 2004                    SMITH, KATZENSTEIN & FURLOW, LLP


                                     /s/ Kathleen M. Miller
                                     Kathleen M. Miller (DE No. 2898)
                                     800 Delaware Avenue, 7th Floor
                                     P.O. Box 410
                                     Wilmington, DE 19899
                                     Telephone:    (302) 652-8400
                                     Facsimile:    (302) 652-8405

                                         - and -

                                     NIXON PEABODY LLP
                                     John V. Snellings (BBO No. 548791)
                                     Francis C. Morrissey  (BBO No. 567589)
                                     Lee Harrington (BBO No. 548791)
                                     100 Summer Street
                                     Boston, MA 02110
                                     Telephone:    (617) 345-1201
                                     Facsimile:    (866) 947-1732

                                     Counsel for Law Debenture Trust Company of
                                     New York

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re NORTHWESTERN<br>CORPORATION,<br><br>        Debtor.<br>————————————————<br><br>MAGTEN ASSET MANAGEMENT<br>CORPORATION & LAW DEBENTURE<br>TRUST COMPANY OF NEW YORK,<br><br>        Plaintiffs,<br><br>v.<br><br>NORTHWESTERN CORPORATION,<br><br>        Defendant.<br>———————————————— | In Chapter 11 proceedings<br><br>Case No. 03-12872 (CGC)<br><br><br>ADV. NO. 04-53324 (PBL)<br><br><br>UNDER ADVISEMENT<br>DECISION RE: MOTION TO<br>DISMISS |

## I.    Introduction

Plaintiffs Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York ("Law Debenture") (collectively referred to hereafter as "Plaintiffs") filed a complaint against Debtor NorthWestern Corporation in April, 2004, challenging the prepetition transfer from Clark Fork and Blackfoot, LLC ("Clark Fook"), fka NorthWestern Energy, LLC, of essentially all of its assets to its parent corporation Debtor NorthWestern. The crux of Plaintiffs' complaint is that Debtor caused the transfer of over $1 billion in Clark Fork assets to itself in exchange for the assumption by Debtor of only about $700 million in Clark Fork liabilities. Plaintiffs allege the transfer ultimately left Debtor unable to pay its own creditors and resulted in Debtor's bankruptcy, under which Plaintiffs will receive virtually nothing. Further, the transfer rendered Clark Fork insolvent and undercapitalized, again leaving Plaintiffs, as creditors of Clark Fork, with nothing. Not only was the transfer itself a fraudulent conveyance, Plaintiffs argue, but Debtor also engaged in a fraudulent scheme by misrepresenting its financial standing at the time of the transfer.

In Count I, Plaintiffs contend that Debtor made the transfer with the actual intent to hinder,

delay or defraud its creditors as defined by section 31-20333 of the Montana Code. In Counts II and III, Plaintiffs allege that the transfer was fraudulent under section 31-2-334 of the Montana Code because Debtor made the transfer without receiving equivalent value and because Debtor was insolvent at the time or rendered insolvent as a result of the transfer. In Count IV, Plaintiffs allege that Debtor and its creditors were unjustly enriched by the transfer.

## II.    Factual Background

In 1996, the Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork/Northwestern Energy, created the Montana Power Capital Trust I ("Trust") as a financing vehicle with the Bank of New York ("BNY") as Trustee. The sole asset of the Trust was 8.45% Junior Subordinated Debentures due 2036 ("Junior Debentures"). After formation of the Trust, Montana Power and BNY entered into the Indenture for Unsecured Subordinated Debt Securities relating to the Trust Securities ("Indenture"). At about the same time, the Trust issued $65 million of 8.45% cumulative Quarterly Income Preferred Securities ("QUIPS"), Series A, the proceeds of which were used to purchase an equal amount of Junior Debentures, 8.45% Series due 2036, from Montana Power. Montana Power also entered into a Guarantee Agreement with BNY, under which Montana Power provided a limited guarantee of obligations with respect to the QUIPS – "only if and to the extent that the Property Trustee has available in the Payment Account funds sufficient to make payment."

Four years later, in 2000, Debtor NorthWestern purchased substantially all of Montana Power's electric, natural gas, and propane utility assets under a Unit Purchase Agreement. The structure of the sale was as follows. Montana Power created a subsidiary called The Montana Power LLC ("MP-LLC"), which Debtor intended to acquire as a division of itself as opposed to a subsidiary. The parties refer to such an acquisition as "going flat."

The going flat deal was disclosed to the Federal Energy Regulatory Commission ("FERC") by Debtor and Montana Power in their Joint Application of the Montana Power Company and NorthWestern Corporation for Approval of Disposition of Jurisdictional Facilities. In the application, the parties indicated that the proposed sale was not contingent on any particular

2

structure, but that NorthWestern intended to either form a holding company to acquire MP-LLC as a wholly owned subsidiary or to acquire MP-LLC in its current "flat" structure such that MP-LLC would become a separate division of NorthWestern and not a subsidiary. After resolving a variety of issues with respect to the transfer, it was approved by both the FERC and the Montana Public Service Commission.

The assets were then transferred to MP-LLC by Montana Power in February, 2002. As part of this conveyance, the MP-LLC and BNY, as Trustee, executed a supplemental indenture under which MP-LLC assumed all obligations of Montana Power under the original Indenture. Subsequently, Debtor NorthWestern's acquisition of MP-LLC was completed with the payment of $478 million cash and the assumption of $511 million of MP-LLC's liabilities, which included the claims of the QUIPS and the Indenture. MP-LLC was then a subsidiary of Debtor and renamed NorthWestern Energy, LLC.

In order to "go flat" with the now named Northwestern Energy, as it originally intended, Debtor disclosed to the SEC that it intended "to transfer the energy and natural gas transmission and distribution operations of NorthWestern Energy, LLC to NorthWestern Corporation." NorthWestern accomplished this by executing a Second Supplemental Indenture with NorthWestern Energy and the Trustee BNY, in which it contends it "fully and unconditionally assumed NorthWestern Energy's obligations (as successor to MP-LLC, as the successor to Montana Power) with respect to the QUIPS and the performance of every covenant, obligation and agreement under the Indenture." It apparently paid no cash for NorthWestern Energy's assets, but assumed all its liabilities except those associated with the Milltown Dam. The Second Supplemental Indenture also expressly subordinated the obligations Debtor assumed from NorthWestern Energy to its "Senior Indebtedness" and released NorthWestern Energy from any and all obligations under the QUIPS debenture, the Indenture and the Second Supplemental Indenture.

NorthWestern, Northwestern Energy and BNY also executed the Amendment to Guaranty Agreement whereby NorthWestern attempted to assume completely the limited obligations of Montana Power under the original Guaranty Agreement. Debtor subsequently sought and received

3

the FERC's approval to assume the QUIPS, along with other debt of NorthWestern Energy. A Third Supplemental Indenture was executed in which Debtor expressly assumed "the covenants of NorthWestern Energy contained in the Indenture and the Securities issued thereunder" and assumed the payments of principal and premium on outstanding securities issued under the Indenture and the performance of every covenant thereunder.   Subsequently, NorthWestern Energy was renamed Clark Fork and Blackfoot, LLC.

Plaintiff Magten holds in excess of 33% of the Series A, 8.45% QUIPS issued by the Trust. Plaintiff Magten purchased its share of the QUIPS *after* the transfer of NorthWestern Energy's assets to Debtor and sometime shortly before or after Debtor filed bankruptcy.  Plaintiff Law Debenture is the successor trustee to BNY under the Indenture on behalf of the holders of the QUIPS.

As a result of these transfers, Plaintiffs complain that they have relegated to the bottom of the heap of Debtor's creditors.  While they (or their predecessors) were once essentially at the top of the heap of Clark Fork's creditors, upon the transfer to Debtor, they were subordinated to Debtor's senior creditors, which in essence left them with little at the end of the day under Debtor's Plan. By this action, they seek to undo the transfer so that the assets will be returned to Clark Fork.

### III.    Analysis

Debtor NorthWestern seeks dismissal of Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in bankrupcty proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.   In determining whether to grant the motion to dismiss, this Court must assume the facts as pled in the complaint are true. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Debtor begins by challenging Plaintiffs' standing, alleging that they are creditors of Debtor NorthWestern only and not of Clark Fork. The standing argument highlights the difficulty with this case. This is not a typical fraudulent conveyance complaint where the *debtor in possession* sues a *third party* seeking to bring assets back *into* the estate. Instead, this is an alleged *creditor of a non-debtor* suing the *Debtor* in order to *divest the estate* of assets and return them to the non-debtor. Acknowledging that they must be creditors of Clark Fork to bring this action,  Plaintiffs argue that

4

they are so due to the invalidity of the transfers.

Debtor says this is impossible, as the very structure of the transfer ended any debtor-creditor relationship between Plaintiffs and Clark Fork. Debtor argues that any transfers of assets completed in accordance with Section 1101 of the Indenture result in the successor entity (Debtor in this case) succeeding to and being substituted for the prior entities (Clark Fork) such that the successor entity (Debtor) is the only entity obligated to the QUIPS. Critically, Section 1102 of the Indenture in turn expressly relieves the predecessor entity, here Clark Fork, of all obligations and covenants under the Indenture. The QUIPS holders, therefore, are creditors solely of Debtor as long as the transfer was in compliance with Section 1101 of the Indenture, which Debtor contends Plaintiffs do not challenge.

### A.    Did Debtor Comply with the Indenture?

#### 1.    Is there a guarantee of solvency?

Plaintiffs disagree for several reasons. First, Plaintiffs argue that because Debtor used false financial statements and was insolvent, it did not in fact comply with the terms of the Indenture and, therefore, did not properly assume Clark Fork's liabilities: Clark Fork is therefore still liable to Plaintiffs. In support of this position, Plaintiffs point to two requirements in Section 1101 of the Indenture requiring Debtor to "assume . . . [1]the due and punctual payment of the principal and premium, if any, and interest, if any on all Outstanding Securities *and [2]* the performance of every covenant of this Indenture on the part of [Clark Fork] to be performed or observed." Plaintiffs assert that, because Debtor is unable to make the payments due the QUIPS, Debtor did not in fact comply with the terms of Section 1101 of the Indenture.

Plaintiffs argument is flawed. Plaintiffs read this language as a guarantee of solvency by Debtor upon executing the transfer. It is not. The language only requires that Debtor assume the obligations, not that it actually be able to perform the obligations. Debtor in fact did assume the obligations.

#### 2.    Was Consent of the Holders Required?

Plaintiffs also argue that Debtor's alleged insolvency wrongfully impaired their rights

under the Indenture to receive payment of principal and interest and therefore the transaction had to be approved by the holders of the securities. This argument is similarly misplaced. While the Indenture and the Trust Indenture Act of 1939 do in fact provide that "the right of any holder of any indenture security to receive payment of the principal of and interest on such security . . . shall not be impaired," this applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself. Plaintiffs' legal rights were not impaired. Again, there is no guarantee against default.

### B.    Are the Plaintiffs Creditors Under The Guarantee?

Plaintiffs are also not creditors of Clark Fork by way of the Guarantee Agreement that is part of the original debt transaction. Both parties have treated this argument in a superficial and conclusory fashion; it is more complicated than it seems.

As noted, the QUIPS were issued in a two-step transaction. Montana Power Company (referred to for ease of reference as "Clark Fork") issued subordinated debentures (the "Debentures"), all of which were purchased and held by the Trust. The Trust, in turn, issued the QUIPS to Holders, such as Magten's predecessor in interest, in consideration of payment of a corresponding pro rata amount of the Debentures (which funds were then used to purchase that amount of the Debentures). The Holders then were entitled to a specific percentage of the distributions made by Clark Fork to the Trust on account of the Debentures.[1]

The Guarantee appears to exist as protection against the unlikely event that Clark Fork makes required distributions to the Trust but the Trust thereafter fails to distribute the funds to the Holders. Although it contains many of the same terms and obligations of a true third party guarantee, it is fundamentally different. In the third party setting, the guarantor unconditionally guarantees that a creditor will receive payment of its debt from the obligor. In this case, Clark Fork guaranteed that the Holders would receive their distributions only to the extent that Clark Fork had already paid the

---

[1]Technically, the distributions were made by Clark Fork to a Property Trust (created simultaneously with the Trust with the same trustee) to receive and distribute the funds on a pro rata basis to the holders of the QUIPS.

Trust. Guarantee § 1.01 (definition of "Guarantee Payments"). In no event would Clark Fork be liable to "pay twice"; rather, its liability is limited to the situation where the middleman (the Trust) fails to pay over what it has already received from Clark Fork. For example, it does not guarantee payment in the situation where, for whatever reason, the Trust receives the money and uses it for some other purpose.[2] Or, more bluntly, it does not guarantee payment if the Trustee misuses or commingles the Trust's assets. In either of those situations, the extent of Clark Fork's guarantee liability is limited to the *lesser* of the aggregate of the Liquidation Amount (a defined term) and all accrued and unpaid distributions *and* the amount of Trust's assets remaining available for distribution.[3] Thus, regardless of whether the Liquidation Amount and the accrued and unpaid distributions exceed the amount of assets remaining in the Trust, Clark Fork's liability is limited to those assets. In a real sense, therefore, Clark Fork's guarantee liability is fundamentally *in rem* because it is limited to the whatever remains of the distributions it has already paid over to the Trust.[4]

The Guarantee specifically references Article 11 of the Indenture and provides that Clark Fork's obligations under the Guarantee may only be assigned pursuant to a transaction authorized thereunder. However, as noted by Plaintiff Magten, the Guarantee does not specifically provide, as does Section 1102 of the Indenture, that a Section 1101 transaction releases Clark Fork from its guarantee obligations. Debtor NorthWestern fails to address this critical issue and merely assumes that a Section 1102 transaction releases the guarantee obligation to the same extent as the underlying obligation on the debentures. The question is – does it?

Under Delaware law, all related documents and instruments in a single transaction together

---

[2]Again, this is a highly unlikely event given that the Trust is a specially created vehicle solely for the purpose of this transaction.

[3]Of course, the Holders may have claims in these circumstances against the Trustee but that is irrelevant for the purpose of determining if these plaintiffs have standing in this case.

[4]If the guarantee is triggered, Clark Fork is subrogated to the rights of the Holders to pursue the issuer for the funds it holds but has not paid. Guarantee § 5.06.

are harmonized to the extent possible. *Simon v. The Navellier Series Fund,* 2000 WL 1597890 (Del. Ch. 2000) (citing *Crown Books,* 17A C.J.S. *Contracts* § 315, at 337 (1999), 11 Williston on Contracts § 30:26, at 239-42 (4th ed. 1999), and Restatement (Second) of Contracts § 202(2) (1981)); *Crown Books Corp. v Bookstop, Inc.,* 1990 WL 26166 (Del. Ch. 1990). An interpretation that leads to an absurd result is disfavored. *Collins & Aikman Corp. v. Compo Industries, Inc.,* 1982 WL 17804 (Del. Ch. 1982). Here, the Indenture specifically provides that Clark Fork is released from its underlying liability on the debentures in a Section 1101 transaction. All of those obligations, including making distributions to the Trust for the purpose of paying the Holders, now lie exclusively with the successor in interest, here Debtor NorthWestern. Given the quasi *in rem* nature of the guarantee,[5] it is nonsensical that a stranger to the transaction (Clark Fork after the Section 1101 transaction) would retain any liability under the Guarantee. It only makes sense that any such liability has been released as well.

While the language is not explicit, Section 8.01 supports this interpretation: "Except in connection with a consolidation, merger or sale involving the Guarantor that is permitted under Article Eleven of the Indenture, the Guarantor shall not assign its obligations hereunder." The specific reference to Article Eleven (and not merely Section 1101) implies that all aspects of that Article are to be effective. Because a transaction that is permitted under Article Eleven automatically effects a release of the underlying debt, it is consistent to conclude that such a release would also extend to the guarantee.

Section 5.03 of the Guarantee does not compel a contrary result. That section makes clear that the validity of the Guarantee is not affected by the release or waiver of any of the *Issuer's* (the Trust's) obligations or by any lack of diligence by the *Holders* or any invalidity of the *QUIPS*. However, it does not say that the guarantee survives the release of Clark Fork's obligations under the debentures in the event of an Section 1101 transaction. Clearly, the guarantee would survive if Clark Fork's liability were "settled" or "compromised" outside of Section 1101 (Section 5.03(f));

---

[5] The liability is not technically *in rem* because the guarantor must first pay and is allowed to recover through subrogation.

8

but that is far different from a release of Clark Fork's obligations that occurs because a successor has assumed all of those obligations in a permitted transaction. Finally, Section's 5.03(g)'s admonition that "it [is] the intent of this Section 5.03 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances" is wholly consistent with the full, complete, absolute and unconditional assumption of the Guarantor's obligations in a permitted Section 1101 transaction. It is neither reasonable nor logical to read Section 5.03(g) to apply to a Section 1101 transaction.

For these reasons, the Court concludes that Plaintiffs are not creditors of Clark Fork because of the Guarantee. Rather, Clark Fork's obligations under the Guarantee, to the same extent as its obligations under the Debentures, were released in the Section 1101 transaction with NorthWestern. Therefore, the Guarantee is not a source of standing for these Plaintiffs. However, the question remains whether Plaintiffs have standing under their fraudulent scheme argument.

### 3.    Was there a Fraudulent Scheme?

Next, Plaintiffs argue that the purported release of Clark Fork under Section 1102 itself was obtained by fraud such that the release is void. According to Plaintiffs, at the time of the transfer, Debtor intentionally and fraudulently concealed the fact that its financial condition was much worse than reported publicly. This argument may have legs. Simply because Debtor may have complied with the technical, procedural requirements of the Indenture does not mean Debtor can insulate the fraudulent transaction from all attack. The argument goes well beyond merely alleging the transaction was a fraudulent conveyance. This argument at its essence is that Debtor engaged in a knowing and conscious fraudulent scheme.

Critical to Debtor's position is that the release of Clark Fork under Section 1102 was effective, thereby removing Plaintiffs as creditors of Clark Fork. However, if Plaintiffs can prove (as they have alleged) that the release was obtained through fraud, then the release would be ineffective.

"If action is taken for a fraudulent purpose or to carry out a fraudulent purpose or to carry out a fraudulent scheme, the action is void and of no force or effect." Richard A. Lord, *Williston On*

9

*Contracts* Sec. 69.4 (4th Ed. 2003). A release may be set aside if it was obtained fraudulently. *Stanley v. Holms*, 975 P.2d 1242 (Mont. 1999) (recognizing the invalidity of releases under fraudulent conditions but granting a motion for summary judgment because party had not set forth sufficient indicia of fraud); *Riggs et al. v. Gillespie*, 241 F. 311 (4th Cir. 1917) (finding a release invalid as it was obtained by a "fraud in equity"); *see also Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 199 (S.D.N.Y. 2001) (acknowledging that a release is a voidable contract when a party is fraudulently induced to execute a release). If a release is obtained by fraud, it is unenforceable under Montana law. *Association of Unit Owners of the Deer Lodge Condominium v. Big Sky of Montana, Inc.*, 798 P.2d 1018 (Mont. 1990). In that sense, a release is treated as any other contract obtained by fraud. *See Interdonato v. Interdonato*, 521 A.2d 1124, 1133-34 (D.C. App. 1987) (reversing lower court's grant of summary judgment and permitting plaintiffs to proceed with underlying claims where plaintiffs' purported release of such claims was part of the misrepresentation of which the defendant was accused).

Debtor directly challenges Plaintiffs' fraud argument, contending that this case must be dismissed because there simply was no fraud. Debtor hangs its hat on the fact that numerous transactions making up to the transfer were disclosed in both regulatory filings and in documents executed by the Trustee. According to Debtor, the terms of the deals were known to all and, therefore, by definition mean there was in fact no fraudulent intent on Debtor's part.

While Debtor's disclosure may be one factor in favor of finding no fraudulent intent on Debtor's part, it is far from conclusive at the motion to dismiss stage. Debtor may have disclosed the nuts and bolts of the transfers, but Plaintiffs' allegations go beyond simply that the actual transfer itself was fraudulent in its terms. As alleged, the questions are whether Debtor knew at the time that it could not do the transaction based on its restated accountings etc. and whether the financial information Debtor provided the public was in fact false. These are fact questions not appropriately resolved on a motion to dismiss.

## III.    Conclusion

Therefore, the motion to dismiss will be granted in part and denied in part, as follows:

10

The Plaintiffs lack standing as creditors of Clark Fork to pursue a fraudulent conveyance action against the Debtor because of the Section 1102 release, unless they can prove under applicable law that the Section 1102 release was obtained through actual fraud or as part of a fraudulent scheme.

Counsel for Debtor is to submit an order under certification of counsel.

So ordered.

DATED: _8/20/04_

_____
CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

11