# APP. 31

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 03-12872 (JLP) |
| NORTHWESTERN CORPORATION, | ) | Hearing Date: May 3, 2005 |
| | ) | at 9:30 a.m. |
| Debtor. | ) | Related to Docket No. 2427 |

**REPLY OF LAW DEBENTURE TRUST COMPANY OF NEW YORK, INDENTURE
TRUSTEE, TO THE DEBTOR'S OBJECTION TO ITS REQUEST FOR PAYMENT
OF FEES AND REIMBURSEMENT OF EXPENSES PURSUANT TO THE
DEBTOR'S PLAN OF REORGANIZATION AND APPLICABLE TRUST
INDENTURE AND DEBTOR'S OBJECTION TO ITS REQUEST FOR PAYMENT
OF ADMINISTRATIVE EXPENSES PURSUANT TO 11 U.S.C. SECTION 503**

Law Debenture Trust Company of New York, as Indenture Trustee[1], by and through its
undersigned counsel, hereby replies to the Debtor's Objection to Law Debenture's Request for
Payment of Fees and Reimbursement of Expenses Pursuant to the Debtor's Plan of Reorganization
and Applicable Trust Indenture and Debtor's Objection to the Request for Payment of Administrative
Expenses Pursuant to 11 U.S.C. Section 503 (the "Fee Request") as follows:

## PROCEDURAL AND FACTUAL BACKGROUND

**A.     The QUIPS Indenture.**

1.     Law Debenture Trust Company of New York, is successor Trustee (in such capacity,
the "Indenture Trustee" or "Law Debenture") to the Bank of New York, under that certain Indenture
(the "QUIPS Indenture") dated as of November 1, 1996, as amended, pursuant to which the Montana
Power Company ("Montana Power") issued certain 8.5% Junior Subordinated Debentures (the
"QUIPS Debentures") to Montana Capital I (the "Property Trust"). Law Debenture Trust Company
of New York also serves as the successor Trustee of the Property Trust (the "Property Trustee") and
as such Property Trustee is the sole holder of the QUIPS Debentures. Concurrently with the issuance

---

[1]     Law Debenture Trust Company of New York holds no QUIPS for its own investment purposes and is acting solely
in its capacity as Indenture Trustee in this case. Law Debenture is a New York trust company which provides
fiduciary services to the capital markets. It and its professionals are compensated on a fee for service basis only.

of the QUIPS Debentures, the Property Trust issued certain 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPS"), which are now widely held by both NorthWestern institutions and individual investors.

2.    NorthWestern Corporation (or the "Debtor") obtained Montana Power's utility assets (the "Montana Utility Assets") and assumed liability as issuer under the QUIPS Indenture through a series of transfers known as the "Going Flat Transaction" between the Debtor and Montana Power's successor, Clarkfork and Blackfoot LLC ("Clarkfork").

3.    The QUIPS Indenture provides for reimbursement to Law Debenture of its reasonable fees and expenses (including those of its professionals) and grants to Law Debenture a lien on all distributions to QUIPS holders from the issuer or its estate to secure those reimbursement obligations. Specifically, § 907 of the QUIPS Indenture provides that the Company (as defined in the QUIPS Indenture) shall:

> [R]eimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any provision of this Indenture (including reasonable compensation and expenses and disbursements of its agent and counsel), except to the extent that any such expense, disbursement or advance may be attributable to the Trustee's negligence, willful misconduct or bad faith …

4.    Section 907 further provides that when the Indenture Trustee incurs expenses in connection with an Event of Default arising from the commencement of a bankruptcy proceeding of the Debtor:

> the expenses and the compensation for the services (including the fees and expenses of its agent and counsel) are intended to constitute expenses of administration under Bankruptcy Law.

**B.**    **Other Indenture Trustees With Reimbursement Claims Against This Estate.**

5.    HSBC Bank USA ("HSBC") is the indenture trustee under the Unsecured Note Indentures.[2]

6.    Wilmington Trust Company ("Wilmington") is the indenture trustee under the TOPrS Indentures. Harbert Management Corporation ("Harbert") is the largest holder of TOPrS Notes.

7.    Like the QUIPS Indenture, both the Unsecured Note Indentures and the TOPrS Indentures provide for the reimbursement of their respective indenture trustees' reasonable fees and expenses (including professional fees) and grant to each such trustee a lien on all distributions to the holders from the Debtor or its estate to secure those reimbursement obligations.

**C.**    **Commencement Of NorthWestern's Chapter 11 Case And Law Debenture's Adversary Proceeding To Avoid And Recover The Montana Utility Assets.**

8.    On September 14, 2003 (the "Petition Date"), NorthWestern filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

9.    Subsequently, on April 16, 2004, Law Debenture, along with the largest QUIPS holder, Magten, commenced an Adversary Proceeding to avoid the Going Flat Transaction and to recover the Montana Utility Assets (the "Adversary Proceeding").

10.    In the Adversary Proceeding, Law Debenture seeks to assert in rem rights in the Montana Utility Assets fraudulently conveyed to NorthWestern. Specifically, Law Debenture seeks an order from this Court: (a) voiding the transfer of the Montana Utility Assets to NorthWestern; and (b) requiring NorthWestern to return those assets to Clarkfork. Alternatively, Law Debenture seeks a declaration that the Montana Utility Assets were subject to a constructive trust and therefore not a part of this Debtor's estate.

---

[2]    Capitalized terms not otherwise defined have the meaning ascribed to them in the Debtor's Second Amended and Restated Plan of Reorganization.

D.    **Treatment Of The Indenture Trustees' Fees And Expenses Under The First Amendment Plan.**

11.    On May 17, 2004, the Debtor filed its First Amended Disclosure Statement in connection with its First Amended Plan of Reorganization [Docket No. 1305] (the "First Amended Plan").

12.    The First Amended Plan designated six classes of non-priority, unsecured claims, including in pertinent part:

- Class 7 consisting of Unsecured Note Claims against the Debtor;

- Class 8 consisting of Unsecured Subordinated Note Claims against the Debtor; and

- Class 9 consisting of General Unsecured Claims against the Debtor.

13.    The First Amended Plan further provided that the unsecured claims in these classes would be satisfied by a distribution of New Common Stock in the Reorganized Debtor. In particular, under the First Amended Plan, holders of Class 7 and Class 9 claims were to share pro rata in 98% of the New Common Stock to be issued by the Reorganized Debtor on the Effective Date of the Plan. In addition, provided Class 8 voted to accept the Plan, holders of TOPrS and QUIPS, in turn, were to receive pro rata share of 2% of the New Common Stock to be issued on the Effective Date.[3]

14.    In addition to distributions of New Common Stock, the First Amended Plan also contemplated that Class 7 and 8 claims would also be satisfied by the payment in cash of their respective indenture trustee's fees and expenses on the Effective Date of the Plan. Specifically, the First Amended Plan provided that:

> On the Effective Date, Reorganized Debtor will pay the Indenture Trustees' Fees and Expenses in full in cash, in an amount to be agreed upon among the Debtor and each of the Indenture Trustees.

(emphasis supplied). First Amended Plan, § 5.18.

---

[3]    In the event that Class 8 voted to reject the plan, no distributions of New Common Stock were to be made to the holders of TOPrS and QUIPS – the so-called "death trap" provision.

The First Amended Plan further provided that:

[D]istributions to holders of Unsecured Notes [and] Unsecured Subordinated Notes…will not be reduced on account of payments made to the Indenture Trustee.

Id. (emphasis supplied).

15.     These provisions were intended to address the commercial reality that any distribution of securities to the holders of the debt evidenced by the Unsecured Note Indenture and the Unsecured Subordinate Notes Indenture would be subject to charging liens in favor of HSBC, Wilmington and Law Debenture for any unpaid fees and expenses.  And, to the extent that the Indenture Trustee fees and expenses were not satisfied by the estate, the distribution of securities to holders of NorthWestern's senior and subordinated securities would be reduced pro tanto.

16.     Consistent with these Plan provisions, the Disclosure Statement for the First Amended Plan calculated the projected recoveries to the holders of Class 7 and Class 8 claims in the Disclosure Statement assumed that none of the securities distributed to those holders would be used to satisfy the fees and expenses of HSBC, Wilmington or Law Debenture; but, instead, those fees would be paid in cash in accordance with § 5.18 of the Plan.  In sum, as originally drafted and solicited, recoveries to holders of Unsecured Note Claims (Class 7) and Unsecured Subordinated Note Claims (Class 8) under the First Amended Plan were to come from two separate and distinct sources:  (a) a distribution of New Common Stock in the Reorganized Debtor, and (b) payment of each of their respective indenture trustees' fees and expenses.

E.     **Wilmington's And Law Debenture's Objections To Confirmation Of The First Amended Plan.**

17.     Notwithstanding the Plan's death trap provision, Class 8 voted to reject the First Amended Plan on August 2, 2004.  Wilmington, Harbert, Law Debenture and Magten Asset Management Corp. ("Magten") also timely interposed substantially similar objections to the First Amended Plan.  Among other things, each of them asserted the First Amended Plan improperly recognized and proposed to pay debt (i.e. the Unsecured Notes) that was issued in violation of the

Public Utility Holding Company Act of 1935, 15 U.S.C. § 79.[4] Similarly, Wilmington, Harbert, Law Debenture and Magten also objected to the First Amended Plan on absolute priority grounds. Specifically, they claimed that the Debtor had understated the value of the New Common Stock to be issued on the Effective Date of the Plan and, accordingly, that the Class 7 and Class 9 claimants were receiving more than full satisfaction of their claims. In addition, in connection with those objections, Wilmington and Harbert engaged in extensive discovery on the expedited basis throughout June and July, 2004, while Law Debenture and Magten chose not to do so for purposes of judicial economy and preservation of the estate.

18.    Following the prosecution of these objections, the Debtor elected to pursue settlement negotiations with Wilmington and Harbert, but not Law Debenture. That settlement is memorialized in the Second Amended Plan.

**F.    The Second Amended Plan.**

19.    In the Second Amended Plan, the Debtor agreed to satisfy claims *arising* under both the QUIPS and the TOPrS Indentures with, among other things, a pro rata distribution of: (a) common stock in the Reorganized Debtor representing 8% of the New Common Stock issued and outstanding on the Effective Date; plus (b) warrants exercisable for an additional 13% of the New Common Stock.

20.    As with the First Amended Plan, the Second Amended Plan also contemplated that distributions to the holders of Unsecured Note and Unsecured Subordinated Note Claims would be enhanced by the payment of their respective indenture trustees' fees and expenses from estate funds. In addition, with respect to the TOPrS, the Debtor also agreed to pay the legal fees and related costs

---

[4]    On July 12, 2004, Harbert and Wilmington also filed a Motion to Disallow and Objection to Claim, of HSBC Bank USA, as Indenture Trustee, and Oaktree Capital Management, LLC, based on violation of the Public Utility Hold Company Act of 1935. [Docket No. 1640] (1640-1644) (the "Wilmington Claim Objection"). A hearing to consider the merits of the Wilmington Claim Objection was scheduled with the hearing to consider confirmation of the First Amended Plan.

of Harbert who, on information and belief, directed the tasks performed in the case by Wilmington and advanced sums for Wilmington's accrued fees and expenses in connection with confirmation and other litigation.[5]

21.    The aggregate amount of fees and expenses that the estate was required to pay Wilmington and Harbert, was liquidated at $2.25 million in the Second Amended Plan.  In contrast, under the Second Amended Plan, payment of HSBC and Law Debenture's fees and expenses continued to be governed by the provisions recited above originally contained in the First Amended Plan concerning payment of indenture trustees' fees and expenses.  As detailed above, those provisions contemplated that each of HSBC's and Law Debenture's reasonable fees and expenses in this case would be paid from the estate and not from recoveries to debt holders under the Unsecured Note and QUIPS Indentures.

22.    Finally, even though the fees and expenses to be paid to Law Debenture under the Second Amended Plan were not liquidated, the Disclosure Statement for the Plan represented that pro rata recoveries to the holders of TOPrS and QUIPS would be identical – 15.3%.

### G.    Law Debenture's Claim That The QUIPS Holders Were Receiving Substantially Less Than The TOPrS Under The Second Amended Plan.

23.    Even though the votes of the TOPrS holders were sufficient in number and amount to bind Class 8, and the distribution of securities under the Plan to the holders of TOPrS and QUIPS were coming from the same bundle of consideration, the Second Amended Plan, in contrast with the First Amended Plan, separately classified the claims arising under the TOPrS and the QUIPS

---

[5]    It is important to note that special counsel and financial advisors hired by Wilmington, as indenture trustee for the TOPrS, were, upon information and belief, designated by and working in the best interests of. Harbert. Consequently, payment of Wilmington's fees and expenses were, in fact, a payment of Harbert's fees and expenses. Moreover, in addition to paying Wilmington's professionals, specific monies were earmarked for Harbert individually. In contrast, Law Debenture and its largest holder, Magten, have had separate counsel throughout these proceedings. This decision was made by mutual agreement between Magten and Law Debenture because of the potential divergence of the interests of Magten and the many individuals who bought the QUIPS on the retail market at full value. Therefore, the fees and expenses requested by Law Debenture in its fee application do not benefit Magten, which to date has incurred substantial fees and expenses of its own.

Indentures. See Voting Agent Resolicitation Declaration 9016 [Docket No. 2170, Debtor's Exhibit 1853]. Specifically, under the Second Amended Plan, Class 8 was divided into two classes – 8(a) consisting of the claims related to the TOPrS Indenture, including PUHCA-related claims; and Class 8(b) – consisting of claims related to the QUIPS Indenture, including the disputed property rights in the Montana Utility Assets asserted in the Adversary Proceeding.

24.    In addition, treatment of Class 8(b) claims was specifically tailored to obtain a release of the disputed property rights asserted in the Adversary Proceeding. In particular, the Second Amended Plan provided QUIPS holders with a "choice" of two mutually-exclusive options for the satisfaction of their claims whether or not Class 8(b) voted to accept the Plan. Under so-called "Option 1," in exchange for an express release of the causes of action and property rights asserted in the Adversary Proceeding, QUIPS holders were to receive a pro rata interest in the New Common Stock and Warrants allocated to Unsecured Subordinated Note Claims under the Second Amended Plan. Alternatively, under "Option 2," QUIPS holders recoveries if any, were limited to: "a pro rata share of recoveries, if any, upon resolution of [the Adversary Proceeding]."

25.    Law Debenture on behalf of the QUIPS holders timely objected to the Second Amended Plan. The gist of Law Debenture's objection was that even though the Second Amended Plan was structured to give the appearance that the holders of QUIPS and TOPrS Claims would receive identical distributions from the estate, the QUIPS holders who elected Option 1 were receiving substantially less than the TOPrS holders because they, unlike the TOPrS, were required to give up valuable (although admittedly disputed) in rem rights in the Montana Utility Assets to receive the same distribution under the Plan.

26.    Law Debenture further argued that the disparate treatment of the TOPrS and QUIPS claims under the Second Amended Plan was contrary to the Bankruptcy Code's priority scheme because it provided for substantially different treatment of claims of identical rank. In addition, Law Debenture asserted that the separate classification of TOPrS and QUIPS claims in the Second

Amended Plan was (i) a veiled attempt by NorthWestern to avoid § 1123(a)(4)'s requirement that a plan provide the same treatment for each claim in a particular class, and (ii) constituted unfair discrimination for purposes of § 1129(b) of the Bankruptcy Code.

### H.    The Debtor's Representation And The Court's Finding That The QUIPS And TOPrS Holders Are To Receive Identical Treatment Under The Plan.

27.    In response to Law Debenture's claim that QUIPS holders were receiving substantially less than TOPrS holders, NorthWestern represented both in its papers and in oral argument at the hearing to consider confirmation of the plan that the Second Amended Plan should be confirmed because the holders of the TOPrS and the QUIPS were receiving identical distributions under such Plan in exchange for the release of comparable claims against the estate. Specifically, NorthWestern represented:

> The Plan … does not provide disparate treatment for Class 8(a) [the TOPrS] and Class 8(b) [the QUIPS]. Both will receive the same distribution if each respective class accepts the Plan.

See, Debtor's Memorandum of Law in Further Support of Confirmation of Debtor's Second Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code and In Response to Supplemental Objection to Confirmation at p. 14. (emphasis supplied.)

28.    Based on the Debtor's representations that the TOPrS and the QUIPS holders were receiving the "same distribution" under the Second Amended Plan, this Court overruled Law Debenture's objection and confirmed the Plan. Furthermore, the Court's Order confirming the Second Amended Plan is expressly premised on the finding that:

> Both Class 8(a) and Class 8(b) will receive the same distribution if each respective class accepts the Plan; accordingly, the Court finds that the plan does not provide for disparate treatment of Class 8(a) and Class 8(b).

29.    The Court's Order confirming the Plan was further premised on the finding that there was no disparate treatment between the holders of Class 8(a) and Class 8(b) claims because:

> Consistent with the treatment provided to Class 8(a), the Plan provides the holders of QUIPS the same opportunity to settle their QUIPS Litigation Claims that was provided to the holders of TOPrS to settle their PUHCA-related claims.

Id. at 34.

### I. The Debtor's Post-Confirmation Payment Of Indenture Trustees' Fees And Expenses.

30.     Shortly after confirmation of the Plan, the Reorganized Debtor expressly acknowledged in writing its obligation to pay Law Debenture's and other indenture trustee's fees and expenses in full on the Effective Date. In contemplation of the Effective Date, the Reorganized Debtor posted on its website a notice that:

> All of the fees and expenses of the Indenture Trustees will have been paid in full on the Effective Date with the exception of Wilmington Trust Company, Indenture Trustee for Class 8(b) [sic] Trust Preferred Securities, which will receive shares of New Common Stock for its final fees and expenses.

See Affidavit, Francis C. Morrissey attached hereto as Ex. 1 (the "Morrissey Affidavit"), Exhibit A, p. 2.

31.     Shortly thereafter, on or about November 1, 2004, the Debtor paid the fees and expenses of each and every Indenture Trustee in this case except Law Debenture. Furthermore, the Debtor did not require any of the other Indenture Trustees to file fee applications in this case. In fact, the Debtor made the payments with little, if any, review of the invoices or other documentation evidencing the reasonableness of those fees. The Debtor paid Wilmington $1,948,367.20 and Harbert $301,632.80.[6] Before making those payments, however, the Debtor did not review a single invoice from Wilmington or Harbert or any other document which purported to memorialize their actual expenses and the activities for which they were seeking compensation from this estate. Morrissey Affidavit, Exhibit E, p. 59. The Debtor also paid HSBC and the professionals it employed in this case a total of $745,029.18. Id. at Exhibit E, p. 38. Before making those payments, the Debtor did not require either HSBC or its counsel, LeBoeuf Lamb Greene & MacKay ("LeBoeuf")

---

[6] Wilmington also asserted its charging lien for additional amounts due. As a result, 55,640 shares of New Common Stock allocated to the TOPrS were issued to Wilmington resulting in a reduction in the recoveries of the TOPrS holders of less than one-half of one percentage point.

and Pryor Cashman Sherman & Flynn, LLP ("Pryor") to prepare and submit fee applications. Instead, the Debtor reviewed HSBC's, LeBoeuf's and Cashman's invoices in cursory fashion prior to paying them. Id. at p. 21. Further, the Debtor also paid Law Debenture's predecessor in interest Bank of New York $54,302.48.[7]

**J.    The Debtor's Repudiation Of Its Obligation Under The Plan To Pay Law Debenture's Fees And Expenses.**

32.    On November 1, 2004, in accordance with Section 5.18 of the Second Amended Plan, Law Debenture submitted copies of its bills for legal fees incurred during this Chapter 11 case and other documents evidencing its fees and expenses to the Debtor for review and payment by the estate. In response, on November 9, 2004, NorthWestern advised Law Debenture that it "disputes and will not pay any of the fees submitted on behalf of Law Debenture." The NorthWestern further advised Law Debenture that: "[f]rom our perspective, Law Debenture did not make a substantial contribution in NorthWestern's Chapter 11 such that any fees and expenses incurred by or on behalf of Law Debenture should be allowed pursuant to Section 503 of the Bankruptcy Code." (emphasis supplied.)    Affidavit of Karol K. Denniston in Connection with NorthWestern Corporation's Objection to the Request of Law Debenture Trust Company of New York for Payment of Fees and Reimbursement of Expenses Pursuant to the Debtor's Plan of Reorganization and Applicable Trust Indenture ("Denniston Affidavit"), Ex. B, p. 1. Finally, NorthWestern informed Law Debenture that if it wished to contest this position, the deadline for filing final fee applications, including an application pursuant to Section 503 of the Bankruptcy Code, was December 1, 2004. Id.

33.    Faced with the Debtors' objection to any payment whatsoever by this estate on account of Law Debenture's fees and expenses, Law Debenture was required to exercise its

---

[7]    Ironically, the fees and expenses of Bank of New York, Law Debenture's predecessor, had little to do with its duties as Indenture Trustee for the QUIPS holders, as Nixon Peabody LLP represented it in that capacity until the successorship could be completed. The fees and expenses paid by the Debtor related mostly to Bank of New York's pre-petition fees and expenses, analysis of actions taken by Bank of New York pre-petition in connection with the Going Flat Transaction, and legal matters arising out of Bank of New York's conflict situation.

Changing Lien on the stock to be distributed to the QUIPS holders who elected Option 1 under the Plan. Denniston Affidavit, Exhibit A, pp. 2-3. On November 10, 2004, accordingly, Law Debenture served Depository Trust Company LaSalle Bank, N.A., and Debtor's counsel with a notice that it was exercising its changing lien, in accordance with the Plan and the QUIPS Indenture and directed them that no shares of New Common Stock are to be distributed to the QUIPS holders who elected Option 1 until Law Debenture has delivered to DTC a written notice that all of Law Debenture's fees and expenses, including its reasonable legal fees and expenses have been paid in full. Morrissey Affidavit, Exhibit B, pp. 5-6.

34.    On December 1, 2004 Law Debenture timely filed the fee application with the Court.[8] It was the only Indenture Trustee in this case required to do so. In addition, counsel to Law Debenture advised the Debtor that its position that Law Debenture was not entitled to the payment of any fees and expenses simply because the Debtor "disputes" them was inconsistent with the Plan, representations made to the Court in support of confirmation of the Plan and counsel to the Debtor's out-of-court statements to counsel for Law Debenture.[9] Morrissey Affidavit, Exhibit C, p. 2.

35.    In response, by letters dated November 30, 2004 and December 21, 2004, the Debtor advised Law Debenture that it intended to comply with its obligations to pay Law Debenture's reasonable fees and expenses pursuant to § 5.18 of the Plan, but took the position that it "did not have sufficient information to determine the reasonableness of the fees and expenses requested by Law Debenture." Denniston Affidavit, Exhibit E, pp. 2-3. The Debtor further represented that:

---

[8]    The Fee Request covers all fees and expenses of the Indenture Trustee up to the Effective Date, November 1, 2004. The Indenture Trustee has accrued and continues to accrue substantial fees and expenses due to, in part, the necessity of filing and prosecuting the current Fee Request; administration of any distribution to QUIPS; continued involvement in the Adversary Proceeding as provided for in the Plan and negotiating and documentation of any settlement agreements. The Indenture Trustee hereby reserves the right to file additional fee requests to seek reimbursement for post-Effective Date activities.

[9]    On or about October 6 and 7, 2004, Debtor's counsel indicated to Law Debenture's counsel that all fees and expenses would be taken care of. See Affidavit of Amanda D. Darwin, attached hereto as Ex. 2 ("Darwin Affidavit"). ¶¶ 4-5.

Upon receipt of the additional information regarding the fees and expenses incurred by Law Debenture, the Debtor timely will conduct a reasonableness review at such fees and expenses. Upon completion of its review, the Debtor will advise Law Debenture of the fees and expenses incurred which the Debtor has determined to be reasonable and will pay consistent with the terms of Section 5.18 ... .

Id.

36.     Even though Law Debenture's fee application conformed with both applicable bankruptcy and local rules and contained more than sufficient information to determine the reasonableness of Law Debenture's fees and expenses, Law Debenture complied with the Debtor's request. Specifically, at the Debtor's insistence, Law Debenture reformatted the information previously furnished in its application and its invoices and on December 30, 2005 provided the Debtor with, among other things, a 57-page Excel spreadsheet that broke out all of Nixon Peabody's time entries by category in the format requested by the Debtor. Morrissey Affidavit, Exhibit C, p. 3.

37.     Notwithstanding this reformatted information, on January 3, 2005, the Debtor filed its objection to Law Debenture's fees and expenses. Shortly thereafter, Law Debenture commenced discovery in connection with the Debtor's objection and learned the Debtor's request for additional information was merely pretextual and not made in good faith. The Debtor designated Kendall Kliewer as its representative with full and complete knowledge of the reasonableness of Law Debenture's fees and expenses in this case. At his deposition, however, Mr. Kliewer testified, in part, that:

- He never reviewed or even received a copy of Law Debenture's or its professionals invoices in this case;

- He never reviewed or even received a copy of Law Debenture's or its professionals' fee request;

- He did not assist in the preparation of the Debtor's objection to Law Debenture's fee request; and

- Finally, he did not know if any other business people at the Debtor assisted in the preparation of Law Debenture's objection to Law Debenture's fee requests.

Morrissey Affidavit, Exhibit E, pp. 97-98.

    K.    **The Debtor's Linkage Of The Payment Of Law Debenture's Fees To Global Settlement Of The Adversary Proceeding And Magten's Appeal Of The Confirmation Order.**

    38.    In January 2005, shortly after objecting to Law Debenture's fees and expenses in their entirety, the Debtor, Magten and Law Debenture began negotiating a possible settlement that included, inter alia, dismissal of the Adversary Proceeding and ancillary litigation; a payment to non-accepting holders of QUIPS in exchange for the release of the claims asserted in the Adversary Proceeding; and payment of Law Debenture's fees and expenses. The Debtor, Law Debenture and Magten reached an agreement that simultaneously (a) resolved all litigation commenced by Law Debenture and Magten against the Debtor and its estate and (b) contrary to its objection, provided for payment of Law Debenture's pre and post Effective Date accrued fees and expenses in full. The terms of that agreement were memorialized in a Settlement Agreement dated as of January 27, 2005. Ultimately, the Debtor repudiated the Settlement Agreement and refused to present it to the Court for approval. In response, Law Debenture and Magten were required to file their own motion under Fed. R. Bankr. P. 9019 seeking approval of the Settlement Agreement and by order dated March 10, 2005 the Court denied Law Debenture and Magten's motion.

    L.    **Debtor's Representations Concerning The Payment Of Law Debenture's Fees And Expenses During Negotiations To Resolve The Dispute Of Claims Reserved For QUIPS Holders Who Elected Option 2.**

    39.    Prior to the confirmation of the Plan, on September 17, 2004, the Debtor filed a motion to estimate the claims of the QUIPS holders who elected Option 2 and to establish a disputed claim reserve for such claims. Law Debenture timely filed an objection to the Debtor's motion.

    40.    Immediately following confirmation of the Plan, Debtor's counsel contacted counsel to Law Debenture and advised her that establishing a claims reserve for the Option 2 QUIPS holders was a condition to substantial consummation of the Plan. Darwin Affidavit, ¶ 2. The Debtor and Law Debenture engaged in negotiations concerning the appropriate amount of that claims reserve,

with the understanding that Law Debenture's fees and expenses would not be disputed by the Debtor and would be paid in accordance with the Plan. Based on Debtor's counsel's representation that the New Common Stock allocated to the dispute claims reserve need not be subject to further reduction by the exercise of Law Debenture's accrued fees and expenses through the Effective Date, Law Debenture agreed to a \$25 million claims reserve, and on October 29, 2004, the Debtor and Law Debenture filed a stipulation concerning the claims reserve with the Court. Id. at ¶¶ 2-6.  On November 3, 2004 the Court approved the claims reserve.

**ARGUMENT**

A.    **The Plain Language of the Second Amended Plan Provides for the Payment of Law Debenture's Fees and Expenses in Full.**

41.    Section 5.18 of the Second Amended Plan provides that "[o]n the Effective Date, Reorganized Debtor will pay the Indenture Trustee's Fees and Expenses in full and in cash, in amount to be agreed upon among the Debtor and each of the Indenture Trustees." That section further provides distributions to holders "will not be reduced on account of payments made to the Indenture Trustees," and that the payment of those fees and expenses requires neither Bankruptcy Court approval nor even preparation of a fee application for review by the Debtor, the Fee Auditor and other parties in the interest in this case. The Second Amended Plan further acknowledges and confirms the Indenture Trustee's changing lien by providing that: "[i]f the fees and expenses of the respective Indenture Trustees are not reimbursed in full by the Debtor, then any deficiency may be paid out of the distributions received by the respective Indenture Trustee on behalf of their respective class claimants."

42.    Solicitation of acceptances for the Second Amended Plan was premised on the representations of the Debtor that the Indenture Trustees' fees and expenses would be paid and would not impact the recoveries of the holders. The Plan proposed to include the payment of indenture trustee's reasonable fees and expenses as part of the distributions to be made to holders of claims

subject to such fees and expense and solicit acceptances to the plan from these holders by proposing distributions of New Common Stock in the Reorganized Debtor net of accrued indenture trustee fees and expenses.  Compare, In the Matter of Federated Department Stores, Inc. and Allied Store Corporation, et al., United States Bankruptcy Court for the Southern District of Ohio, Consolidated Case No. 190-00130 (plan confirmed provided for the payment to indenture trustees of cash in an amount equal to the amount of their claim secured by "Indenture Trustee Charging Liens" (Third Amended Joint Plan of Reorganization, Article VI. I.2)); In re E-11 Holdings, United States Bankruptcy Court for the Southern District of New York, Case No. 92B - 43614 (plan specifically stated that indenture trustees should receive all of their trustee expenses so that such amounts would not reduce distributions to the holders of the respective securities (Debtor's Second Amended Plan, Article III, Description of Class 2 and Class 3)).

43.    Notwithstanding the Plan language and the Debtor's own representations to this Court that the TOPrS and the QUIPS will "receive the same distribution if each respective class accepts the Plan", in its Objection, the Debtor now disavows any liability whatsoever for Law Debenture's fees and expenses in this case.  In support of that Objection, the Debtor does not contest that Law Debenture's fees and expenses are unreasonable.  Nor could it properly do so.  Instead, in stark contrast to the representation made on its website and its treatment of each and every other indenture trustee in this case, the Debtor disingenuously argues that all of Law Debenture's fees and expenses in this case are subject to §503(b)'s "substantial contribution" standard and that NONE of those fees and expenses are compensable by the estate because Law Debenture "acted solely in its own interest" and "its actions [did not] result in an actual and demonstrable contribution to the Debtor's case."

**B.**    **Debtor's Objection is Made in Bad Faith and is Inconsistent with the Treatment Of Other Indenture Trustees in this Case.**

44.    In support of its contention that substantially all of Law Debenture's fees and expenses are effectively not compensable by this estate, the Debtor relies exclusively on the following language from § 5.18 of the Plan: "In the event that the parties cannot reach an agreement of the amount [of an Indenture Trustee's reasonable fees and expenses] any disputed amount shall be determined by the Bankruptcy Court, pursuant to Section 503 of the Bankruptcy Code". The Debtor then simply asserts that it does not agree to pay any of Law Debenture's fees and expenses. The Debtor's construction of this provision of the Plan runs headlong into the implied covenant of good faith contained in the Plan which requires the Debtor to refrain from arbitrary and unreasonable conduct, prevents QUIPS holders from receiving the distributions promised to them under the Plan, runs contrary to the representations the Debtor made to Law Debenture, to other creditors, to counsel and to this Court when it sought to confirm the Plan, and is contrary to its course of performance with every other indenture trustee in this case.

45.    In essence, a plan of reorganization is an offer of promises made by a debtor and accepted by creditors following serious and frequently protracted negotiations. In re UNR Industries, Inc., 173 B.R. 149, 157 (N.D. Ill. 1994) (and cases cited therein); Contract law principles, accordingly, govern the interpretation of a plan of reorganization. Id.; see also Matter of Texas General Petroleum Corp., 52 F. 3d 1330, 1335 (5th Cir. 1995); Salmon v. Laser Plot, Inc., 189 B.R. 559, 560 (Bankr. D. 1995). And pursuant to § 14.11 of the Plan, Delaware contract law governs the parties rights and obligations under the Plan.

46.    Delaware law, in turn, imposes a duty of good faith and fair dealing in every contract. See, e.g., True North Composites, LLC v. Trinity Industries, Inc., 191 F. Supp. 2d 484 (D. Del. 2002). This duty is a contract term implied by courts to prevent one party from unfairly taking

advantage of the other side. Id. The implied covenant emphasizes faithfulness to, and an agreed common purpose and consistency with, the justified expectations of the other party.

47.    Furthermore, the implied covenant of good faith and fair dealing applies even where the contract allows a party to exercise discretion. See, e.g., Wilmington Leasing, Inc. v. Parrish Leading Co., L.P., 1996 WL 560190, at *2 (Del. Ch. Sept. 25, 1996). It requires a party exercising such discretion "to refrain from arbitrary, or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." Wilgus v. Salt Pond Ins. Co., 498 A. 2d 151, 159 (Del. Ch. 1989) (citing Restatement (Second) of Contracts § 205 (1981)), overruled by statute on other grounds; Ace & Co. v. Balfour Beatty PLC, 148 F. Supp. 2d 418, q426 (D. Del. 2001). In short, under the Plan, the payment of Law Debenture's reasonable fees and expenses and the recoveries ultimately obtained by QUIPS holders are simply not subject to the Debtor's whim. Any exercise of the Debtor's right to object to Law Debenture's fees and expenses is subject to the covenant of good faith and fair dealing imposed by applicable federal and state law. That covenant prohibits the Debtor from interposing opportunistic, improperly motivated, bad faith objections calculated to gain leverage in pending litigation with Law Debenture and the QUIPS holders who elected Option 2 under the Plan.

48.    The Debtor's objection to Law Debenture's fees and expenses is plainly contrary to the covenant of good faith imposed by controlling federal and state law. The scope of the Debtor's objection to Law Debenture's fee and expenses, the dramatically disparate treatment of Law Debenture's fees and expenses in this case, the substantial impact on recoveries to QUIPS holders if the Debtors objection is sustained, the absence of any other objection to those fees by the Fee Auditor, Plan Committee or any other party-in-interest and, lastly and perhaps most compellingly, the Debtor's admitted failure to even review the invoices and other documents Law Debenture provided it in support of its fees and expenses, all lead to the inescapable conclusion that the Debtor's insistence that this Court determine the amount of fees and expenses the estate pays Law

Debenture on behalf of QUIPS holders under a "substantial contribution" standard is improperly motivated and designed solely to obtain an unfair advantage in ongoing litigation with QUIPS holders who elected Option 2 under the Plan.

49.    In sharp contrast with the millions of dollars of fees and expenses <u>already</u> <u>paid</u> <u>months</u> <u>ago</u> to other Indenture Trustees on the Effective Date of the Plan (not to mention the tens of millions requested by the professionals of the Debtor and the Committee), the Debtor disputes payment from this estate on account of Law Debenture's accrued fees and expenses.  Moreover, rather than identify specific fees and expenses it contends are unreasonable and subject to <u>bona</u> <u>fide</u> dispute, the Debtor disavows any liability for Law Debenture's fees and expenses under the Plan and insists that this Court disallow them in their entirety under a substantial contribution standard.  The motivation for this disparatement treatment is not difficult to discern.  Law Debenture on behalf of QUIPS holders who elected Option 2 under the Plan is the only Indenture Trustee who continues to prosecute litigation against this estate and the Debtor has coupled any payment of Law Debenture's fees and expenses by the estate on settlement of that litigation.    Put bluntly, such bad faith, opportunistic behavior is exactly what the covenant of good faith is intended to police and that doctrine prohibits the Debtor from holding bargained-for-distributions to QUIPS holders who elected Option 1 hostage as means of gaining advantage in litigation with other QUIPS holders.  Finally, any doubt that the Debtor's insistence that **ALL** of Law Debenture's fees and expenses be determined under "substantial contribution" standard is an improper attempt to obtain advantage in litigation with the QUIPS holders who elected Option 2 under the Plan is permanently removed by the Debtor's admission that it never even reviewed Law Debenture's, (or its professionals) invoices before it objected to those fees and expenses in their entirety.  In short, on this record the Debtor's bad faith could not be any more transparent and its pretextual objection to Law Debenture's fees and expenses should be summarily overruled.

**C.    The Debtor's Objection is Contrary to the Treatment Provided the QUIPS Holders under the Plan and to Representations Made by the Debtor to this Court, and the Debtor is Now Judicially Estopped From Claiming That The Estate Is Not Liable For Law Debenture's Reasonable Fees And Expenses.**

50.    The Debtor's representations to this Court that Class 8(a) and Class 8(b) will receive "the same distribution" under the Second Amended Plan is in stark contrast to the Debtor's contesting paying of any of Law Debenture's fees and expenses on a showing of "substantial contribution." After representing to this Court that the holders of QUIPS and TOPrS debt would receive the same pro rata distribution of New Common Stock under the Plan, and after this Court premised its Confirmation Order on an express finding that Class 8(a) and Class 8(b) would be receiving the "same distribution", the Debtor can not now be heard to claim that Law Debenture's reasonable fees and expenses are not compensable from the estate.

51.    Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it will be to the prejudice [of other parties]." New Hampshire v. Maine, 532 U.S. 742 (2001). The express purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. Id.

52.    Both the Supreme Court and the Third Circuit have recognized that the circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation. Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case:

- First, a party's later position must be inconsistent with its earlier position;

- Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that the court was misled.

- • Third, courts ask whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire, 532 U.S. at 743.

53.    Each of these elements are present in this case and estop the Debtor from now claiming that reimbursement of Law Debentures reasonable fees and expenses was not part of the consideration to be paid under the Second Amended Plan or that those reasonable *fees and* expenses are subject to § 503(b)'s "substantial contribution" standard.  Simply put, each of those self-serving positions is flatly inconsistent with the representations the Debtor made when it solicited acceptances for the Second Amended Plan and argued for its confirmation before this Court – that the holders of the TOPrS and the QUIPS were receiving the "same distribution" under the Plan.  As detailed below, the QUIPS holders are receiving dramatically less than the TOPrS holders if Law Debenture is required to seek reimbursement through its charging lien from the distributions of New Common Stock made to QUIPS holders.

54.    The Debtors' opportunism and cavalier disregard of representations made to this Court in October is further highlighted by its treatment of the fees and expenses of the other indenture trustees in this case.  All of those fees and expenses were paid in full by this estate on the Effective Date and could not and were not subject to review under § 503(b).  Although those Indenture Trustees have already been compensated for the very work for which Law Debenture seeks compensation, those Indenture Trustees did not object to the Second Amended Plan and do not continue to prosecute litigation following confirmation of the Plan.  The doctrine of judicial estoppel, however, precludes the Debtor from punishing Law Debenture for continuing to prosecute litigation contemplated by the Plan and seeking to gain an unfair advantage in that litigation by repudiating representations made to and adopted by this Court.  Instead, that doctrine requires that the QUIPS holders get exactly what they were promised under the Second Amended Plan: their pro rata interest

in the New Common Stock to be issued to Class 8 net of Law Debenture's reasonable fees and expenses as of the Effective Date.

   D.    **Law Debenture Has Made a Significant Contribution to the NorthWestern Corporation Chapter 11 Reorganization.**

   55.    Over the course of its involvement with the Northwestern Corporation Chapter 11 reorganization proceeding, Law Debenture, in its capacity as Indenture Trustee, has contributed to the reorganization process similar to customary contributions made by indenture trustees in such proceedings. Accordingly, the fees and expenses it has incurred in the course of the Chapter 11 case are appropriately paid pursuant to the Plan or as an expense of administration. The contributions made by Law Debenture include:

- serving as a member of the Creditors' Committee;

- filing a Proof of Claim on behalf of the holders of QUIPS;

- serving as a vehicle by which QUIPS holders could be informed about the progress of the reorganization effort and could gather information as to how the holders of QUIPS felt about various aspects of that effort;

- continuing to administer the QUIPS Indenture;

- identifying reasons why the proposals made by the Debtor, and documents filed, notably the Plan of Reorganization, the First Amended Plan of Reorganization, and the Second Amended Plan of Reorganization, each with their attendant Disclosure Statements, were deficient and could not achieve confirmation;

- post-confirmation work with the Debtor necessary to allow the confirmed Second Amended Plan of Reorganization to become effective, including resolution of disputed claims reserve;

- post-confirmation work in accordance with Section 5.18 of the Second Amended Plan of Reorganization and the QUIPS Indenture.

   56.    The Debtor's Objection to Law Debenture's request for payment of its fees and expenses rests on the premise that because Law Debenture took positions during the Chapter 11 case adverse to the Debtor, Law Debenture did not make a substantial contribution to the

reorganization of the Debtor. Put another way, the Debtor posits that reaching an agreement with the Debtor is a prerequisite for treating the Indenture Trustee's fees and expenses as an administrative expense. That is not now, nor should it ever be, the standard for measuring a substantial contribution by an indenture trustee in a reorganization case. To hold otherwise would put an indenture trustee, who serves as a fiduciary for holders of securities covered by the trust indenture, in an impossible position where to serve those holders it must submit to the demands of the debtor simply so that its fees and expenses will be reimbursed by the estate rather than subtracted from the distribution allocated in the plan to the beneficiaries of the trust indenture.

57. The term "substantial contribution" is not defined in the Bankruptcy Code. It is, therefore, left to the Courts to develop the standard as a matter of law[10] and the inquiry as to whether that standard has been met is a question of fact.[11] In the Third Circuit, the controlling case on this issue is Lebron v. Mecham Financial Inc., 27 F. 3d 937 (3rd Cir. 1994). Pursuant to Lebron, a contribution is substantial if "the benefit received by the estate [is] more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."[12] It is clear that in each of its actions in this case, Law Debenture was not acting for its own benefit. It had no economic stake in the issues. Rather, it was acting solely as a fiduciary for the holders of the QUIPS and its actions provided a benefit received by the estate. It is also clear that Law Debenture's actions assisted the debtor in confirming a Chapter 11 plan.

---

[10]   Manufacturers Hanover Trust Company v. Bartsh (In re Flight Transportation Corporation Securities Litigation), 874 F.2d 576 (8th Cir. 1989).

[11]   Lebron v. Mecham Financial Inc., 27 F. 3d 937, 946 (3rd Cir. 1994), In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1253 (5th Cir. 1986).

[12]   Lebron, supra, at 944.

As a result, the fees and expenses of Law Debenture are allowable under § 503(b) (3) (d) and the fees and expenses of its counsel are reimbursable under § 503(b) (4).[13]

58.  It should be beyond conjecture that the fees and expenses incurred by Law Debenture as a member of the Creditors' Committee are allowable and payable as an administrative expense in accordance with Section 503(b).  Law Debenture served as a member of the Creditors' Committee from its appointment as such on February 20, 2004, until its removal from the Committee on May 6, 2004.  Its term as a member of the Committee followed immediately on the heels of the service on the Committee by the prior Indenture Trustee for the QUIPS, The Bank of New York, which had served as such from the initial formation of the Committee until The Bank of New York was forced by a conflict to resign as Indenture Trustee.[14]

59.  The Office of the United States Trustee, in forming the Creditors' Committee pursuant to Section 1102 of the Bankruptcy Code, and in forming a committee that would be representative of the creditor body,[15] clearly made the determination that the Committee, and therefore the administration of the reorganization case, would be enhanced if the Committee included the Indenture Trustee for the QUIPS.  Although a significant holder of the QUIPS, Magten would also become a member of the Creditors' Committee.  In contrast to Magten, Law Debenture was not itself invested in the QUIPS.  It was Law Debenture's unique role as an Indenture Trustee for all of the holders of QUIPS, not just the largest holder, that provided a substantial benefit to the Creditors' Committee and to the reorganization process in general.  It could and did bring to the table the

---

[13]  The fees and expenses are also reimbursable and allowable as a general unsecured claim, and Law Debenture has filed a Proof of Claim asserting a general unsecured claim.

[14]  The Bank of New York was forced to resign as Indenture Trustee for the QUIPS due to an impermissible conflict. Law Debenture was selected as successor Indenture Trustee and an agreement substituting Law Debenture for Bank of New York was entered into by the Debtor, Bank of New York and Law Debenture during this Chapter 11 case (hereinafter referred to as the "Tripartite Agreement").

[15]  See 11 U.S.C. § 1102(b)(1).

interests of many small and diverse holders of QUIPS, each in their own right not able to participate directly in the reorganization process. This representative role thus was a substantial benefit.[16]

60. The Debtor's own actions reveal that it viewed the role of the Indenture Trustee for the QUIPS as providing a substantial benefit to the reorganization process. The Debtor has paid The Bank of New York, Law Debenture's predecessor as Indenture Trustee for the QUIPS, all of its fees and expenses associated with the QUIPS Indenture including those stemming from its own conflict of interest. There is simply no credible reason why Law Debenture should be treated any differently than The Bank of New York relative to this or any other aspect of its services.

61. The subsequent removal of Law Debenture from the Creditors' Committee cannot be a basis for denying that a substantial contribution was made by Law Debenture. Its removal was caused by Law Debenture having filed a Complaint against the Debtor seeking to set aside what Law Debenture and the large majority of the QUIPS holders believe to have been a fraudulent transfer. While the filing of the Complaint necessarily means that Law Debenture became, at that time, adverse to the Debtor with respect to the matters raised in the Complaint, the filing of the Complaint was necessitated by the role played by Law Debenture, i.e. its role as a fiduciary for the holders of the QUIPS.

---

[16] Section 503(b)(3)(F) provides an alternative basis for the payment of the fees and expenses of Law Debenture as a member of the Creditors' Committee. That Section provides that there shall be allowed administrative expenses, including—"... a member of the committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee" provides for reimbursement of actual, necessary expenses "incurred in performance of the duties of such committee." Since Law Debenture was a member of the Creditors' Committee in this case, a committee which was appointed under section 1102 of the Bankruptcy Code, Law Debenture is entitled to have its expenses that were incurred in the performance of the duties of the Creditors' Committee reimbursed by the Debtor as an administrative expense.

It is also beyond dispute in this circuit and this district, that the expenses incurred by a member of the committee for legal representation are reimbursable as an administrative expense according to a standard of reasonableness and not according to a standard of substantial contribution. See In re First Merchants Acceptance Corporation, 198 F. 3d 394 (3rd Cir. 1999) (members of creditors committee have standing to recover attorneys' fees on a standard of reasonableness rather than substantial contribution). Accord In re Worldwide Direct, Inc., 259 B.R. 56 (Bankr. D. Del. 2001). But, see In re County of Orange, 179 B.R. 195 (Bankr. C.D. Cal. 1995) (the substantial contribution standard, not the reasonableness standard, under Section 503(b) (3) (F) pertains to applications for reimbursement of committee members for their professional fees.) and In re Firstplus Fin., 45 C.B.C. 2d 187, 254 B.R. 888 (Bankr. N.D. Tex. 2000).

62. It should also be beyond conjecture that the fees and expenses incurred by Law Debenture in administering the QUIPS Indenture during this Chapter 11 proceeding are allowable and payable as an administrative expense in accordance with Section 503(b).[17]  These fees include the $15,000.00 per year administrative fee chargeable by the Indenture Trustee to the Debtor in accordance with the provisions of the QUIPS Indenture, which are now $45,000.00.[18]  They also include the fees and expenses of counsel in connection with the administrative functions of the trust, e.g. post-petition fees and expenses of the Indenture Trustee and those of its counsel in providing advice or legal representation in connection with the Tripartite Agreements by which Law Debenture became the Successor Indenture Trustee, Successor Guarantee Trustee and Successor Property Trustee, other administrative matters, and in connection with the Indenture Trustee's appropriate concerns over the appropriateness of its predecessor having entered into certain of the supplemental indentures.

63. The Debtor by its actions has admitted the importance, and thereby the benefit to the Debtor that Law Debenture is providing by continuing to serve as Indenture Trustee for the QUIPS. That admission is evident in the very terms of the Second Amended Plan of Reorganization which specifically requires that the Indenture Trustee continue to serve post-confirmation as Indenture Trustee for the QUIPS. The Second Amended Plan states, and the Order Confirming the Second Amended Plan repeats, that "... [the] Quips Indentures and all other agreements that govern the rights of holders of the Unsecured Subordinated Notes represented by the QUIPS Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make

---

[17]   They are also allowable and payable pursuant to Section 365(b).

[18]   This case presents a different set of circumstances than was presented to the Court in In re Michigan General Corporation, et al, 102 B.R. 554, 557 (Bankr. N.D. TX 1988) where the Court would not allow payment of an indenture trustee's administrative fee as an administrative expense under Section 503(b). In that case, the administrative fee covered both pre-petition and post-confirmation periods of time in the context of a plan which specifically provided that the indenture was rejected. In contrast, in this case, the administrative fee does not include pre-petition amounts, covers the time during the Chapter 11 reorganization and the post-confirmation period in the context of a plan where the indenture is specifically required to remain viable. See Section 5.18 of the Plan.

the distributions to be made on account of such Claims under the Plan, as provided in the Plan, and allowing such Indenture Trustee, agent or servicer to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Plan." See Section 5.18 of the Plan and pages 67-68 of the Confirmation Order.[19]  The Confirmation Order goes on to provide that so long as the Indenture Trustee shall remain the plaintiff in the Adversary proceeding, the QUIPS holders need not join the lawsuit, thereby ratifying and confirming the Indenture Trustee's role as class representative even after the Effective Date.

64.  The Debtor is a party to the QUIPS Indenture and willingly obligated itself by that signature to pay, in accordance with that QUIPS Indenture, all of the fees accrued thereunder by the Trustee, and to reimburse all of the Trustee's reasonable fees and expenses, including the fees and expenses of its counsel.  In the Plan, the Debtor chose to require that the Indenture Trustee continue to serve as such.  It is the height of hypocrisy to require servitude on the one hand and refuse compensation for the services required on the other hand.  It is the inescapable conclusion that these services have been and must continue to be a substantial benefit to the Debtor and to this reorganization.

65.  Section 501 of the Bankruptcy Code authorizes an indenture trustee to file a proof of claim.  As the legislative history indicates, the section is permissive and does not require the indenture trustee to file a proof of claim on behalf of the beneficiaries of the trust.  124 Cong. Rec. H 11,093 (Sept. 28, 1978); S. 17,410 (Oct. 6, 1978).  Law Debenture filed a proof of claim in this case on behalf of the holders of QUIPS.  In doing so, it not only relieved the thousands of holders of QUIPS from having to prepare and file individual proofs of claim, it also relieved the Debtor from

---

19    The Courts have likewise found the routine services of an indenture trustee, rendered in accordance with the trust indenture, to be compensable as ordinary expenses of administration under § 503(a)(1) without the necessity of a showing of substantial contribution.  See In re Revere Cooper and Brass Incorporated, et al., 60 B.R. 892, 896, Fn. 4 (Bankr. S.D.N.Y. 1986) ("Although routine, the court is of the view that the amounts sought as administrative fees ... and agency fees ... are compensable as ordinary expenses of administration under Code § 503(a)(1) without the necessity of a showing of substantial contribution. This is because these fees relate to ordinary and ongoing services necessary for the recordkeeping aspects of a public issue").

having to process all of those proofs of claim, from providing certain notices to each of the QUIPS holders during the course of the case and from now making individualized distributions to those holders. In light of the expense that the Debtor would otherwise incur to accomplish these tasks in favor of thousands of QUIPS holders, the estate is substantially benefited by Law Debenture performing these tasks and is not being harmed by having to reimburse Law Debenture for the fees and expenses it incurred in filing a proof of claim on behalf of the holders of QUIPS.

66.    As mentioned above, the continued existence of the QUIPS Indenture, as required by the Debtor both during this reorganization case and now post-confirmation, requires that the Indenture Trustee continue to perform the services required of it by the QUIPS Indenture.    These services include communication with the holders of QUIPS.    During the Chapter 11 case, the Indenture Trustee and its counsel have fielded and continue to field calls from holders of QUIPS. The holders want to understand what was happening in the Chapter 11 case, have had questions about events, and have wanted to express their opinion about those events and about the Going Flat Transaction to the Indenture Trustee and through the Indenture Trustee to the Debtor or to this Court.    Had it not been for the participation by the Indenture Trustee, the Debtor-in-Possession, its counsel or the Creditors' Committee's counsel, would have been required to field these inquiries directly.[20]    See § 704(7) of the Bankruptcy Code, made applicable to a Debtor-in-Possession by § 1107(a).    In fact, both the attorneys for the Debtor and the Attorneys for the Creditors Committee fielded inquiries from creditors and have asked this Court to reimburse them for that service.    And in fact, both the Debtor and Creditors Committee have referred inquiries from QUIPS holders to Law Debenture.    It is unfair and discriminatory to allow payment as an administrative expense for the same role if played by a

---

[20]    See In re Essential Therapeutics, Inc., et al., Case # 03-11317, page 10 of the Memorandum Opinion of J. Walrath issued on April 21, 2004 (in allowing partial payment to a preferred stockholder who sought reimbursement for his fees and expenses including fees and expenses incurred by his counsel in a Chapter 11 reorganization case, the Court states that "Without this assistance, the Debtor's counsel would have had to devote significant time and resources to perform these services while they were busy with other matters. As a result, the Debtors were able to cut costs by focusing their efforts on their areas of expertise and allowing the Preferred Stockholders to assist where appropriate and beneficial to the estate").

debtor's counsel or counsel to a creditors' committee, but to refuse that same treatment to an indenture trustee. By relieving the Debtor's counsel and counsel to the Creditors' Committee from this task, those key parties in the reorganization effort were freed up to focus their attention on the tasks at hand, i.e. the reorganization of the Debtor. If those attorneys had been required to deal with these creditor inquiries, they surely would have sought compensation for the effort and been paid as an administrative expense for having done so. Therefore, the estate is not diminished by Law Debenture or its counsel being reimbursed for having done so. Law Debenture, therefore, provided a substantial contribution to the reorganization effort by handling communications with the holders of QUIPS.

67. By far the most activity required of the Indenture Trustee revolved around the Debtor's efforts to formulate, negotiate and confirm a Chapter 11 Plan. The Debtor first filed its Plan of Reorganization on May 17, 2004, later filed a First Amended Plan of Reorganization, and finally a Second Amended Plan of Reorganization. At each step, the Debtor also filed a proposed form of Disclosure Statement providing what it asserted was adequate information from which holders of claims against or equity interests in the debtor could determine how to vote on the reorganization proposed in Plan. Also at each step, the Indenture Trustee reviewed the relevant plan and disclosure statement, contacted the Debtor's or Creditors' Committee's representative to discuss the provisions or disclosures made, and, if those discussions were not fruitful in causing a change to be made, and unless convinced to the contrary, filed an objection thereto.

68. At the earliest possible time, Law Debenture and its counsel brought to the Debtor's attention certain realities about the Plan of Reorganization being proposed by the Debtor and each amendment thereto. The deficiencies identified were such, in the view of the Indenture Trustee, as would prevent the Debtor's Plan from being confirmed by this Court. They were generally correct in that assessment. The initial Plan of Reorganization and the First Amended Plan of Reorganization proposed by the Debtor were simply not confirmable in accordance with the requirements of Section

1129 of the Bankruptcy Code. This was not the fault of Law Debenture and it cannot be rightly criticized for having filed and prosecuted objections to those plans. "[S]ubstantial contribution does not necessarily require such contribution as will lead to confirmation of a plan for, in many cases, it might be a more valuable and substantial contribution if the action of the ... indenture trustee ... has led to proceedings leading to a denial of confirmation of a plan."[21] Along the way, many of the issues raised by Law Debenture and its counsel in their objections were adopted by the Debtor and found their way into the terms of the Second Amended Plan of Reorganization that was ultimately confirmed by the Court. Since the raising of many of these issues, and their subsequently being addressed by the Debtor in an amendment to the Plan, resulted in a confirmed Plan in this case, the efforts put forth by Law Debenture to identify, evaluate, and raise these issues and then get the Debtor to amend or otherwise modify the Plan accordingly, provided a substantial benefit to the case, i.e. confirmation of a plan of reorganization. This benefit extended to all creditors and not solely to the holders of QUIPS for whom Law Debenture served as a fiduciary.

69.    The role of Law Debenture in this plan process is informative on the issue of whether it provided a substantial benefit to the estate. Law Debenture, as previously noted, was not a creditor of the Debtor. Its only role was as a fiduciary for holders of QUIPS. Accordingly, in pursuing the plan negotiation and confirmation process, Law Debenture was not working for its own benefit. Rather, it had two separate and distinct goals. First, and consistent with its fiduciary responsibilities as an indenture trustee, it sought to obtain the best possible dividend for the holders of QUIPS. However, there was a secondary role that provided a real and substantial benefit to the reorganization process. Instead of simply pursing a course for or against the relevant version of the plan, as was done by Magten, the holder of a significant portion of the QUIPS, Law Debenture wanted to assure that whatever Plan resulted from the process was confirmable. In many of its positions taken during

---

[21]    3 W. Collier. Collier on Bankruptcy ¶ 503.04 [3] [d], at 503-47 (15th ed. 1988), cited in Manufacturers Hanover Trust Company v. Bartsh (In re Flight Transportation Corporation Securities Litigation), supra at 583, fnt. 7 (8th Cir. 1989).

the plan negotiation and approval process, Law Debenture did not pursue issues raised and pursued by Magten. However, the initial Plan of Reorganization proposed by the Debtor was simply not confirmable. Filing objections to this Plan allowed the Debtor to identify how the Plan needed to be changed in order to achieve confirmation. The Second Amended Plan of Reorganization represented a significant improvement over the initial proposal. Many of the issues raised by Law Debenture had been incorporated. While these changes may have benefited the holders of QUIPS (albeit not to the extent advocated by Law Debenture) and while the QUIPS holders saw their dividend increase significantly from the initial plan proposal to the one proposed in the Second Amended Plan of Reorganization, all creditors and the Debtor benefited by getting the Plan to the point where it was capable of confirmation.[22]

These changes were numerous and included without limitation, the following:

- an acknowledgement by a split in Class 8 that the QUIPS holders have rights separate and apart from the TOPrS arising out of their claims resulting from the Going Flat Transaction now pending in the Adversary Proceeding;

- deathtrap provision with respect to non-assenting QUIPS holders was removed;

- QUIPS holders were given a choice of recoveries;

- QUIPS holders were given more information regarding their rights and the choices afforded them in the Plan;

- resolicitation of the QUIPS holders afforded them the opportunity to change their votes based on the above-described revised class treatment and heightened disclosure.

All of these changes, while not entirely to the liking of Law Debenture, were changes made by the Debtor to the Plan directly as a result of the objections raised by Law Debenture and the Master. These changes resulted in a Plan that this Court could, and did, find confirmable.

---

[22]    Many of the issues raised by Law Debenture were also raised by the Indenture Trustee of the TOPrS, Wilmington Trust Company. The Debtor, in the Second Amended Plan, has paid substantially all of the fees and expenses of the Indenture Trustee of the TOPrS, presumably because it has concluded that the Indenture Trustee of the TOPrS, in filing and pursuing many of the same objections raised by Law Debenture, provided a substantial benefit to the reorganization process. The fact that Law Debenture pursued an objection to the Second Amended Plan of Reorganization while the Indenture Trustee of the TOPrS did not is not a sufficient basis to distinguish the substantial contribution made by each of them.

70. A significant number of the holders of QUIPS did vote to accept the Second Amended Plan of Reorganization. A larger percentage voted in favor of the releases that formed an integral part of the Plan. The ability of an Indenture Trustee to be reimbursed by the estate for its fees and expenses under § 503(b) as having made a substantial contribution is not and should not be dependent on its ability to deliver votes by a majority of the holders of the securities under the relevant indenture in favor of the particular plan. If that were the case, the indenture trustee would always be risking a breach of fiduciary duty to the beneficiaries of the trust indenture, including those who might decide to vote against the plan. That cannot be and is not the relevant standard. Instead, what must be expected of an indenture trustee is to work to make the plan as good as possible and still confirmable so that all of the holders, whether they voted to accept or reject the plan, are benefited. This was exactly the role actually performed by Law Debenture in this case and in performing that role, it provided a substantial contribution to the reorganization process.

71. Perhaps the most virulent accusation made by the Debtor against Law Debenture is that the fees and expenses incurred in filing and prosecuting a Complaint against the Debtor for a fraudulent transfer should not be reimbursed as an administrative expense because it did not make a substantial contribution to the reorganization of the Debtor. The entirety of the Debtor's argument is that the Complaint, of necessity, is adverse to the Debtor's estate and other creditors. According to the Debtor, Law Debenture's pursuit of the Complaint and the Adversary Proceeding it initiated could not be of benefit and, instead, has been quite costly to the estate and, derivatively, to other creditors. However, taking a position adverse to the estate does not automatically disqualify a creditor or its representative from making a substantial contribution to the reorganization effort. Law Debenture was certainly bound by its fiduciary duty to the holders of QUIPS to pursue their interests. In accordance with that fiduciary duty it filed the complaint. The fact that the Complaint has

survived the Debtor's Motion to Dismiss has confirmed the viability of the Complaint.[23]  Therefore, the pursuit of the Complaint has not been a fool's errand.  Rather, filing the Complaint allowed all parties to see and evaluate a right that holders of QUIPS were entitled to pursue.  It allowed the Plan process to be molded to permit those holders who wished to pursue the litigation initiated by the Complaint, rather than accept what the Second Amended Plan otherwise provided for holders of QUIPS, to elect to do so and give up the dividend otherwise provided.  This election was key to the Court's ability to satisfy the 'best interest of creditors test,[24] a necessity to confirmation of the Second Amended Plan, since the holders of QUIPS were entitled to pursue the litigation if the Debtor were liquidated under Chapter 7.  Accordingly, it follows that the efforts of Law Debenture respecting the Adversary Proceeding, and prevailing on the Motion to Dismiss, just as was the case with its efforts to otherwise modify the various versions of the Plan to the point where it could be confirmed, allowed the Debtor to provide in the Plan for the holders of QUIPS in such a way as their rights to pursue the litigation were not lost in the reorganization process and the Second Amended Plan which recognized that right could be and was confirmed.

> **D.      The Contract Obligations With The Indenture Trustee Pursuant To The QUIPS Indenture Have Been Assumed By The Debtor Which Is Therefore Under An Obligation To Cure All Defaults, Including The Payment Of All Fees And Expenses Incurred By The Indenture Trustee In Accordance With The Terms Of The QUIPS Indenture.**

72.   An alternative basis for paying the fees and expenses of the Indenture Trustee for trust indenture administrative work is found in Section 365 of the Bankruptcy Code which requires that

---

[23]   It is not required that Law Debenture prevail in the Adversary Proceeding in order to be entitled to reimbursement of its fees and expenses under Section 503(b) as having made a substantial contribution.  See In re Revere Cooper and Brass Incorporated, et al., supra, at page 897 (Bankr. S.D.N.Y. 1986) ("This is not to say that the ultimate outcome of any litigation will in and of itself determine a party's ability to recover reimbursement for expenses incurred and services rendered under Code § 503(b)(3), (4) or (5).  "Substantial contribution" may not always be synonymous with victory in litigation relevant to a Chapter 11 case.  There may be instances where the mere existence of the litigation, the quality of the representation therein, and/or the strength and merits of the party's legal or factual case greatly adds to and benefits the reorganization of a Chapter 11 debtor regardless of the litigation's ultimate outcome").  In accord, In the Matter of Baldwin-United Corporation, et al., 79 B. R. 321, 340 (Bankr. S.D. OH 1987) ("prevailing in such opposition is not necessarily a prerequisite to finding substantial contribution ...").

[24]   11 U.S.C. § 1129 (a)(7)(ii).

the debtor's assumption of an executory contract be accompanied by the debtor's cure of all obligations under that executory contract. Since the Debtor has chosen to cause the QUIPS Indenture to remain in place post-confirmation, and has required that the QUIPS Indenture Trustee continue to perform as such, the Debtor has effectively assumed the QUIPS Indenture and should be required to pay, as an administrative expense, all of the past and future fees and expenses required to be paid pursuant to that QUIPS Indenture. See § 5.18 of the Plan and § 365(b) (1) (a) of the Bankruptcy Code. See also, In re Klein Sleep Products, Inc., 78 F. 3d 18 (2nd Cir. 1996) (once an executory contract is assumed, future obligations under the contract as an expense of administration).

73.    The QUIPS Indenture is clearly an executory contract. See In re Texaco, 73 B.R. 960 (Bankr. S.D.N.Y. 1987). Pursuant to the QUIPS Indenture, the Debtor contracted with the Indenture Trustee to provide administrative and fiduciary serves for and on behalf of the QUIPS holders both prior to and after an event of default, including after the filing of a voluntary petition in bankruptcy (referred to here in the "Indenture Trustee Contract Obligations"). In exchange, the Debtor agreed to pay the fees and expenses of the Indenture Trustee, including payment after a bankruptcy filing as an administrative expense.

74.    It is axiomatic that executory contracts are to be either assumed or rejected in Chapter 11 cases and the Debtor's assumption or rejection of an executory contract is governed by Section 365(b) of the Bankruptcy Code.[25]    The fact that the QUIPS Indenture was dealt with in the Second Amended Plan as opposed to by the filing of a specific motion to assume or reject the QUIPS Indenture does not alter the analysis.    In discussing the permissible provisions of a plan of reorganization, § 1123(b) (2) of the Bankruptcy Code provides that a plan may, "... subject to section 365 ... provide for the assumption, rejection, or assignment of any executory contract..."

---

[25]    The Debtor can also assign an executory contract, but assumption is a prerequisite to assignment. See § 365(f)(2).

75. The Second Amended Plan includes the following provision applicable to executory contracts:

> Article VIII, Section 8.1 <u>Executory Contracts and Unexpired Leases</u>:
>
> "(a) Subject to Section 8.1(b) of this Plan, and excluding the Milltown Settlement and Milltown Stipulation, any unexpired lease or executory contract that has not been expressly rejected by the Debtor or treated in this Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date shall, as of the Effective Date, be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Effective Date a motion to reject such unexpired lease or executory contract...."

76. The QUIPS Indenture Contract Obligations were not "expressly rejected" by the Debtor either prior to or as part of the reorganization process. No motion to assume or reject the Contract Obligations was ever filed. There are several applicable provisions of the Second Amended Plan and Confirmation Order that touch on the Indenture Trustee Contract Obligations. One, Section 4.8(b), deals with the treatment afforded to holders of the QUIPS. It provides, in pertinent part:

> and (ii) ... all obligations of any Person under or in respect of ... the Unsecured Subordinated Note Indentures and all other agreements, instruments and documents evidencing the Unsecured Subordinated Notes represented by the QUIPS Notes and the rights of the holders thereof, including, but not limited to, the QUIPS Litigation against the Debtor ..., shall be cancelled and deemed null and void and of no further force and effect ..., except that such Unsecured Subordinated Notes represented by the QUIPS Notes shall continue in effect solely for the purposes of allowing the indenture trustee, agent or servicer thereunder to make distributions to be made on account of such Claims under the Second Amended Plan, as described herein, and allowing such indenture trustee to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Second Amended Plan.

77. This provision is expanded upon in Section 12(b) of the Confirmation Order, page 68, which specifically carves out the unsecured claims of Option 2 holders as an exception to the cancellation of the QUIPS securities and provides for the Indenture Trustee to continue its duties and obligations as Indenture Trustee thereunder by remaining as plaintiff on behalf of all Option 2 holders and by acknowledging and confirming the Indenture with respect to the Indenture Trustee's

obligations with respect to distribution to QUIPS holders and with respect to the Indenture Trustee's Changing Lien rights.

78.   It is clear from these sections of the Second Amended Plan and Confirmation Order that the QUIPS Indenture was not "expressly rejected" by the Debtor in the Plan.  It is also clear from these provisions that the QUIPS Indenture was intended to have a continued existence after the Effective Date of the Second Amended Plan.  It was clearly contemplated that the Indenture Trustee would, after the Effective Date. continue in its role as such, would receive the *distributions* under the Second Amended Plan applicable to Class 8(b) and would distribute whatever was to be paid out to holders of the QUIPS in accordance with the QUIPS Indenture, would continue to represent the interests of QUIPS holders who elected, in accordance with Class 8(b), to retain rights in the QUIPS Litigation, would continue to have the rights to the charging lien and would otherwise continue to act as a fiduciary in accordance with the terms of the QUIPS Indenture.

79.   This continued role is consistent with the Indenture Trustee Contract Obligations not having been expressly rejected by the Debtor.  In point of fact, this continued role is consistent with the affirmation of those Contract Obligations by the Debtor pursuant to the terms of the Second Amended Plan and Confirmation Order.  Since Section 1123 of the Bankruptcy Code requires that the treatment of an executory contract in a plan of reorganization be subject to the provisions of Section 365, and since Section 365(b) requires that the debtor cure any defaults under the executory contract as a condition to assumption of the executory contract, the Second Amended Plan could only have been confirmed in accordance with Section 1129(a)(1)[26]. if the Debtor promised to cure all defaults with respect to the Indenture Trustee Contract Obligations under the QUIPS Indenture by payment in full of the Indenture Trustee's fees and expenses.

---

[26]   Section 1129(a)(1) provides that the Court can only confirm a plan if it complies with all applicable provisions of the Bankruptcy Code.  This implicates Section 1123 and its required treatment of executory contracts in *accordance with* Section 365.

80.  Having assumed the QUIPS Indenture, the Debtor is now obligated to pay the Indenture Trustee's fees and expenses incurred in accordance with Section 907 of the QUIPS Indenture.

81.  The Debtor has argued in its Objection that the applicable standard to apply to payment of the Indenture Trustee's fees and expenses is "substantial contribution."  However, 'substantial contribution' is <u>not</u> the standard set forth in Section 5.18 of the Plan.  That section does not mention the 'substantial contribution" standard anywhere within its terms.  Rather, compliance with § 503 of the Bankruptcy Code and the QUIPS Indenture are what it requires.  Since the Debtor must cure any defaults under the QUIPS Indenture in accordance with § 365 as part of its assumption of the QUIPS Indenture, and since cure obligations are administrative expenses payable under § 503 of the Bankruptcy Code,[27] compliance with the reasonableness standard of the QUIPS Indenture rather than the 'substantial contribution' standard is the appropriate measure for the Debtor's obligation to reimburse the Indenture Trustee's fees and expenses pursuant to § 503 of the Bankruptcy Code.

## CONCLUSION

82.  For all of the foregoing reasons, the Indenture Trustee respectfully requests that its Fee Request be granted in full and that the Court grant any additional relief it deems necessary and proper.

SMITH, KATZENSTEIN & FURLOW, LLP

April 25, 2005

Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405

- and -

---

[27]    <u>See</u> Footnote 13 <u>supra</u> and <u>see</u> In re Revere Cooper and Brass Incorporated, et al., 60 B.R. 892, 896, Fn. 4 (Bankr. S.D.N.Y. 1986)

NIXON PEABODY LLP
John V. Snellings (BBO No. 548791)
Francis C. Morrissey  (BBO No. 567589)
Lee Harrington (BBO No. 548791)
100 Summer Street
Boston, MA 02110
Telephone:     (617) 345-1201
Facsimile:     (866) 947-1732

Counsel for Law Debenture Trust Company of
New York