# EXHIBIT E

Page 1

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

NORTH WESTERN CORPORATION,
                              Chapter 11
                              Case No 03-12872-JLP

        Debtor.


              DEPOSITION OF KENDALL KLIEWER

                 New York, New York

              Wednesday, January 26, 2005


Reported by:
Adrienne M. Mignano
JOB NO. 169725

ORIGINAL

1

2

3

4              January 26, 2005

5              10:25 a.m.

6

7         Deposition of KENDALL KLIEWER,

8    held at the offices of Nixon Peabody,

9    437 Madison Avenue, New York, New York,

10   pursuant to Notice, before Adrienne M.

11   Mignano, a Notary Public of the State

12   of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4


    NIXON PEABODY, LLP
5    Attorneys for Law Debenture
    Trust Company of New York
6         100 Summer Street
         Boston, MA 02110
7    BY:   JOHN V. SNELLINGS, ESQ.

8

9


    PAUL, HASTINGS, JANOFSKY & WALKER, LLP
10    Attorneys for North Western
         600 Peachtree Street, NE - Suite 2400
11         Atlanta, GA 30308-2222
    BY:   KAROL K. DENNISTON, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

Page 4

1

2    IT IS HEREBY STIPULATED AND AGREED,

3    by and between the attorneys for the

4    respective parties herein, that filing

5    and sealing be and the same are hereby

6    waived.

7    IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the

9    form of the question, shall be reserved

10   to the time of the trial.

11   IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be sworn

13   to and signed before any officer

14   authorized to administer an oath, with

15   the same force and effect as if signed

16   and sworn to before the Court.

17

18

19

20

21

22

23

24

25

K. Kliewer

1

2  K E N D A L L   K L I E W E R,   called as a

3      witness, having been duly sworn by a

4      Notary Public, was examined and

5      testified as follows:

6  EXAMINATION BY

7  MR. SNELLINGS:

8      Q.    Would you state your full name for

9  the record, please.

10     A.    Kendall Kliewer.

11     Q.    And Mr. Kliewer, could you give us

12  your home address?

13     A.    My home address is 4510 South River

14  Oaks Drive, Sioux Falls, South Dakota 57105.

15     Q.    Thank you for traveling.

16           What is your position at the

17  debtor, North Western?

18     A.    I'm the controller.

19     Q.    How long have you been the

20  controller?

21     A.    I have been the controller since

22  July of 2004.  I have been the chief

23  accounting officer since November of 2002.

24     Q.    And what are your responsibilities

25  in that role?

1          K. Kliewer

2      A.    I oversee the accounting function

3   at North Western to include filing 10-Ks,

4   10-Qs and all external financial statements,

5   the financial statements that are filed with

6   bankruptcy court, the monthly operating

7   reports, and then I oversee all of the

8   internal accounting reporting functions.

9      Q.    And those are responsibilities you

10  have had throughout your employment there?

11     A.    Yes, I have.

12     Q.    Where did you work before you

13  started with North Western?

14     A.    KPMG.

15     Q.    With regard to your

16  responsibilities as controller, do you have

17  any oversight with respect to the bankruptcy

18  with regard to payment of professional fees

19  and fee applications that have been filed in

20  the case?

21     A.    Yes, I have.  I have reviewed and

22  approved -- been involved in the approval of

23  all of the fee applications and other

24  professionals that we have paid throughout

25  the bankruptcy.

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1                    K. Kliewer

2        Q.    Has that been those that have been

3    retained solely by the debtor of all

4    professionals?

5        A.    All professionals.

6        Q.    Including the creditors committee

7    council?

8        A.    Correct.

9        Q.    Creditors committee advisors?

10       A.    Yes.

11       Q.    Financial advisors?

12       A.    Yes.

13       Q.    Are you familiar with the legal and

14   consulting and professional fees and expenses

15   paid to HSBC Bank by the debtor in connection

16   with this Chapter 11?

17       A.    Yes, I am.

18       Q.    Did you review their fee

19   application?

20       A.    They didn't have a fee application.

21   They provided invoices prior to emerging on

22   November 1st.

23       Q.    I'm going to show you a notice of

24   deposition that was filed in this matter with

25   regard to this deposition.

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1                      K. Kliewer

2                Have you seen that document before?

3    A.    Yes, I have.

4                MR. SNELLINGS:  And could we mark

5        that as Exhibit 1.

6                (Kliewer Exhibit 1, Deposition

7    Notice, marked for identification, as

8    of this date.)

9        Q.    Mr. Kliewer, have you ever been

10   deposed before?

11   A.    Yes, I have.

12       Q.    In connection with the North

13   Western case?

14   A.    Not in connection with North

15   Western's case.  I have been deposed in

16   connection with a subsidiary of North Western

17   and I have also been deposed by the SEC in

18   connection with securities -- with their

19   investigation of the company.

20       Q.    Now, this is a notice of deposition

21   that we filed that we have marked as Exhibit

22   1.  It asks for North Western to designate an

23   individual who has knowledge with respect to

24   those items listed on schedule A.

25               Have you reviewed schedule A?

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

K. Kliewer

1

2     A.     Yes, I have.

3     Q.     And are you the person that North

4  Western has designated to discuss those

5  various topics?

6     A.     Yes, I am.

7     Q.     Now, with respect to -- how many

8  topics are there?  I don't have it in front

9  of me.

10    A.     Thirteen.

11    Q.     In your review of those, do you

12 feel that you have sufficient knowledge and

13 information with regard to the debtor's

14 operations and those particular items to

15 testify to them today?

16    A.     Let me take a quick look at them

17 again.

18    Q.     Take your time.

19    A.     Yes, I do.

20    Q.     Is there anyone else at North

21 Western, to your knowledge, that also would

22 have information regarding these various

23 topics?

24    A.     Well, I'm sure there are several

25 with knowledge on various components of these

1          K. Kliewer

2   topics.  I'm not sure that anyone would have

3   more knowledge related to all 13 of them than

4   I do.

5      Q.    In preparation for being here

6   today, did you speak with anyone or consult

7   with anyone at the company about these

8   various topics?

9      A.    I briefly spoke with Brian Bird,

10  our CFO, and very briefly with Tom Knapp, our

11  general counsel.

12          We didn't -- the conversation did

13  not go into detail on this schedule.  It was

14  essentially overall what the deposition was

15  related to.

16      Q.    During the bankruptcy, did Mr. Bird

17  participate in making decisions with regard

18  to the payment of professional fees in the

19  case?

20      A.    Yes, he did.

21      Q.    Who else participated in those

22  decisions?

23      A.    Gary Drook, our CEO, Tom Knapp, our

24  general counsel.  At the time Tom Knapp

25  was -- he has been the assistant general

Page 11

K. Kliewer

1
2    counsel throughout the bankruptcy up until
3    recently, he was appointed general counsel.
4        Q.    Now, were these discussions that
5    you regularly had at meetings or was it just
6    casual conversation about fees as the
7    applications were filed?
8        A.    Essentially as the applications
9    were filed, their invoices were submitted to
10   the company for payment.  I would typically
11   take the initial review and send my approval
12   or my recommendation for approval then to
13   Brian Bird or Tom Knapp.
14            If the fees were above 250,000 but
15   below a million, either one of them could
16   approve it.  And so that was the reason for
17   sending the applications on to them.
18            If they were above a million, then
19   Gary Drook had to approve payment.
20       Q.    Do you recall an instance in which
21   fees were not approved in that process that
22   you have just outlined for us?
23       A.    Not -- no, I don't recall any fees
24   not being approved.
25            Let me step back a minute.

K. Kliewer

1
2          We did have professionals that
3   were -- that we had various negotiations with
4   and ended up reducing -- they ended up
5   reducing their professional fees.  White &
6   Case and Ernst & Young were the two that come
7   to mind immediately that ended up reducing
8   their professional fees as a result of
9   ongoing negotiations throughout the
10  bankruptcy.
11          Q.    White & Case, were they engaged by
12  the debtor directly?
13          A.    No, they were not.  They were
14  engaged by, I believe, Mellon on behalf of
15  their ownership in the Kolstrip,
16  K-O-L-S-T-R-I-P, leasehold interest.
17          Q.    And Ernst & Young worked for whom
18  in the case?
19          A.    Ernst & Young was hired by White &
20  Case to assist them.
21          Q.    Now, are you familiar with the
22  legal advisory consulting and other
23  professional fees that were paid to
24  Wilmington Trust Company?
25          A.    Yes, I am.

Page 13

K. Kliewer

1
2     Q.    And were you involved in the
3    negotiations or decisions to make that
4    payment?
5     A.    I was not involved in the
6    negotiations.  I received drafts of the
7    settlement negotiations as they were -- as it
8    was being contemplated and reviewed, but in
9    terms of making the decision on the
10    settlement, no.
11        Once I noted what was in the plan
12    of reorganization and what the settlement
13    terms were when we received the information
14    from Wilmington Trust, we paid the fees.
15     Q.    We'll go into that in a little more
16    detail later, but now, there are another --
17        MR. SNELLINGS:  Strike that.
18     Q.    There are several other indenture
19    trustees other than Wilmington and HSBC and
20    my client, Law Debenture.  There are JP
21    Morgan Trust, I think Bank of New York was
22    one indenture.  Wells Fargo is an indenture
23    for the control bonds.
24        Have they all been paid their fees,
25    to your knowledge?

1                    K. Kliewer

2         A.    Yes, I believe they have.

3         Q.    Did you participate in any analysis

4    with regard to those fees?

5         A.    Yes, I reviewed invoices as they

6    came through.

7         Q.    And are you familiar with fees paid

8    to Harbert?

9         A.    Yes, I am.

10         Q.    And did you authorize the payment

11    of those fees?

12         A.    Yes, I did.

13         Q.    I'd like to first sort of focus on

14    HSBC.

15              Do you have an understanding of

16    what their role was or position in the North

17    Western bankruptcy?

18         A.    Yes, HSBC was the indenture trustee

19    for many of our unsecured notes, so they were

20    part of the indenture trustee for class 7

21    claimants.

22         Q.    So this is the class 7 indenture

23    trustee.

24              Did they sit on the committee?

25         A.    I believe they did.

Page 15

K. Kliewer

1

2      Q.    And do you have any recollection of

3   whether or not they commenced any adversary

4   proceedings in the bankruptcy?

5      A.    I do not recall any adversary

6   proceedings.

7      Q.    How about contested matters, do you

8   know what that term means?

9      A.    I know what the term means.   I

10   don't recall HSBC bringing any contested

11   matters.

12      Q.    And if the claim is that it

13   represented as the senior noteholders class

14   7, that was an unsecured plan, correct?

15      A.    Correct.

16      Q.    With regard to -- do you have any

17   recollection of how much in fees were paid to

18   HSBC by the debtor?

19      A.    I believe it was roughly 700 to

20   $750,000.

21      Q.    I'm going to try to be disciplined.

22   When I say "you", I'm talking about you

23   personally.  I'll try to indicate that.

24   Sometimes I'll say "you" meaning the company.

25   I'll try to indicate that too.  Sometimes

1          K. Kliewer

2     these 30(b)(6) depositions can get very

3     confusing that way.

4          With regard to your personal

5     experience, did you have any personal

6     discussions with HSBC about its fees and

7     expenses?

8        A.    No, I did not.

9        Q.    Do you know if anyone at the

10    company, at North Western, had any

11    discussions with HSBC regarding their fees

12    and expenses?

13       A.    Not to my knowledge.

14       Q.    Do you know if anyone at Paul,

15    Hastings, your counsel, had any discussions

16    with HSBC regarding their fees and expenses?

17       A.    Not to my knowledge.

18       Q.    How was it determined that the fees

19    and expenses of HSBC was between, as you

20    said, $700,000 to $750,000 and approved by

21    the company?

22       A.    How were the fees determined to be

23    $750,000?

24       Q.    Yes.

25       A.    HSBC provided invoices mainly from

K. Kliewer

1
2    their bankruptcy counsel, very detailed
3    invoices, that added up to the $750,000,
4    roughly $750,000.
5         And on review of those invoices, I
6    discussed -- I had a brief conversation with
7    Brian Bird, our CFO.  I also had a
8    conversation with counsel from Paul, Hastings
9    to say we checked back to see if we had paid
10   any fees along the way or had received any
11   invoices along the way.  And we talked about
12   what the fees related to and the amount of
13   the fees and determined that they were
14   reasonable in conversations amongst counsel
15   and internally.
16        Q.    And with regard to that which was
17   paid with regard to HSBC's role in the case,
18   those fees included fees that were particular
19   to HSBC, the institution itself as indenture
20   trustee as well as their counsel?
21        A.    Yes, I believe the annual
22   administrative fees were also included in
23   that number.
24        Q.    And with regard to their counsel,
25   that was Pryor, Cashman?

K. Kliewer

1

2       A.      Correct.

3       Q.      Did they have any other counsel; do

4    you recall?

5       A.      I don't recall.

6       Q.      And were these fees, if you recall,

7    paid on or about the effective date?

8       A.      They were.

9       Q.      Which was November 1, 2004?

10      A.      Correct.

11      Q.      Let me show you a document that was

12   produced in connection with a document

13   request that we made of the company in

14   connection with this bankruptcy.

15      A.      Okay.

16      Q.      Have you seen this document before?

17      A.      Yes, I have.

18             MR. SNELLINGS:  Can we have this

19        marked as Exhibit 2.

20             (Kliewer Exhibit 2, Invoice from

21        HSBC, marked for identification, as of

22        this date.)

23      Q.      Mr. Kliewer, you indicated that you

24   had seen this document before.

25             Can you in your own words tell us

1                    K. Kliewer

2    what this is?

3         A.     This is one of a couple of the

4    invoices that were provided by HSBC prior to

5    the effective date for payment that are

6    included in the total of approximately

7    $750,000.

8         Q.     And with regard to this invoice

9    dated October 4, 2004, this is actually from

10   HSBC itself, correct?

11        A.     Correct.

12        Q.     And did you in connection with

13   approving their fees review this particular

14   document?

15        A.     Yes, I did.

16        Q.     Anybody else at North Western

17   review this document, to your knowledge?

18        A.     The -- what I had provided was a

19   summary of all of the professional fees to be

20   paid upon the effective date to both the CFO

21   and the CEO, and as all of those fees

22   aggregated more than a million dollars, the

23   CEO provided approval.

24             I don't know that he specifically

25   reviewed each invoice.

K. Kliewer

1

2  Q.    With regard to the amounts that

3  were paid, the total paid in excess of

4  $700,000 to HSBC, is it your testimony that

5  that's to the best of your recollection the

6  total of this invoice, which is $46,209.30,

7  which is on page 7 here, was included in that

8  $700,000?

9  A.    Yes, I believe it was.

10  Q.    Did you have any -- and, again,

11  personally, did you have any conversations

12  with anyone from HSBC or their counsel

13  regarding this particular invoice?

14  A.    No, I did not.

15  Q.    Do you know if your counsel or

16  anyone from Paul, Hastings discussed this

17  invoice with HSBC or their counsel?

18  A.    No, I don't.

19  Q.    Was this submitted on October 4,

20  2004 by HSBC in anticipation of the effective

21  date?

22  A.    Yes, I believe it was.  Actually,

23  we -- the company did not receive it on

24  October 4th, but it was after they sent it

25  out.  It was probably closer to October 15th

Page 21

K. Kliewer

1

2    before we received it, but, yes, I believe it

3    was.

4        Q.    Other than this invoice with regard

5    to fees associated with HSBC, did you receive

6    any other documents in support of this

7    particular invoice?

8        A.    I don't recall.  I don't believe we

9    received anything as additional support for

10   this invoice, but I don't recall.

11       Q.    Turning to this particular

12   document, I just have a few questions.

13            On the face of it, there are

14   initials after the date of each entry; it's

15   usually RC or RP.

16            Do you know -- those are usually an

17   indication of the person performing the task.

18   Do you know who those were?

19       A.    No, I don't.

20       Q.    Did you ask HSBC as to who those

21   individuals might have been?

22       A.    No, I did not.

23       Q.    And with regard to the column that

24   says hours/rate, is it your understanding the

25   second part of that entry, where it says $382

Page 22

K. Kliewer

1

2  per hour, that that's the hourly rate of the

3  individual performing the task?

4      A.    That's my understanding, yes.

5      Q.    Did you ever ask HSBC or their

6  counsel with regard to the reasonableness of

7  that hourly rate?

8      A.    No, I did not.  We reviewed that as

9  compared to other professional rates and it

10  did not appear out of line, so we didn't

11  request any information from HSBC.

12      Q.    On the first page here, there are

13  seven entries all saying the same thing,

14  review of miscellaneous documents/court

15  papers, et cetera.

16          Do you have an understanding of

17  what they were doing during that task?

18      A.    Well, this was close to the dates

19  of our initial bankruptcy, and a lot of

20  the -- it would have been after the first day

21  hearings, but a lot of the initial filings

22  and motions with the court.  So do I recall

23  specifically?  No.  But, obviously, there

24  were a lot of documents filed with the court

25  at that time and would have been reviewed by

K. Kliewer

1
2  not only HSBC attorneys but yourself and
3  several others as well.
4      Q.    I agree.
5          And did you ever ask HSBC for a
6  further detail as to what documents they were
7  looking at or court papers they were
8  examining?
9      A.    No, we did not.
10     Q.    On the third page, there is a time
11  entry of the third one down, January 28,
12  2004, in part saying preparation and mailing
13  of notice to holders.
14          Do you have any understanding of
15  what that task might have been?
16     A.    I don't recall offhand what those
17  notices would have related to.
18     Q.    But is it normal sort of course of
19  task of an indenture trustee to give notice
20  to their holders during pendency of a
21  bankruptcy?
22     A.    It is my understanding that it
23  would be, yes.
24     Q.    But did you or anyone else ask for
25  any detail with regard to that particular

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1                      K. Kliewer

2    task?

3        A.    Not specifically, no.

4        Q.    It appears, if you follow the rate

5    structure, that there is a point in time

6    where the rates for these individuals that

7    were performing these tasks went from $382 to

8    $425.

9              Did you investigate or ask any

10   questions as to why there was an increase in

11   the hourly rate for these individuals?

12       A.    My assumption is that that's -- it

13   happened right at the first of the year and

14   having worked for professional services

15   firms, that seemed customary that rates would

16   increase at the beginning of a firm's fiscal

17   year calendar or otherwise.

18       Q.    Since October 4th, has HSBC amended

19   this invoice to your knowledge?

20       A.    No, they have not.

21       Q.    Turning to the last page of this

22   particular exhibit, there is a one-page

23   document that's different than the invoice,

24   and it's an invoice dated December 19, 2003,

25   directed to North Western Corporation, to the

1                    K. Kliewer

2       attention of Gary Drook.

3                    Who is Mr. Drook?

4            A.      Gary Drook is the president and CEO

5       of the company.

6            Q.      Still is?

7            A.      Yes.

8            Q.      And this invoice, have you seen

9       this document before?

10           A.      Yes, I have.

11           Q.      And could you describe for me what

12      your understanding is, what it is indicating

13      here?

14           A.      It is the annual trustee fee for

15      three different issuances as indicated on the

16      invoice itself.  Do you want me to state

17      those issuances?

18           Q.      I think we can see them.

19           A.      Okay.

20           Q.      Do you have an understanding of

21      what this annual fee as trustee registrar

22      paying agent -- what type of fee that is?

23           A.      Basically my understanding is it is

24      an administration fee we have been charged

25      not only by HSBC but other indenture trustees

1          K. Kliewer

2    as well.   Annual fees in conjunction with the

3    issuances that they act as indenture trustee

4    on.

5        Q.    Was this part of the $750,000 that

6    was paid to HSBC?

7        A.    I believe it was, yes.

8        Q.    And did you do any investigation

9    with regard to whether or not the fee here

10   was reasonable?

11       A.    When we received this invoice, I

12   looked at the previous year to ensure that

13   this wasn't something new that was being

14   billed by HSBC, and upon review of the prior

15   year annual fees, this was consistent with

16   those and we went ahead and paid it.

17       Q.    Do you know if HSBC filed a fee

18   request or fee application in connection

19   with -- with the bankruptcy court in

20   connection with getting their fees paid?

21       A.    I do not believe they filed any fee

22   applications.

23       Q.    And so there has been no court

24   review of these fees?

25       A.    That's correct.

Page 27

K. Kliewer

1

2  Q.    Do you know if the fee auditor
3  received anything from HSBC to be reviewed?
4  A.    I don't know.
5  Q.    Have you ever seen a report from
6  the fee auditor regarding HSBC fees?
7  A.    No, I haven't.
8  Q.    Do you know the law firm of LeBouf
9  Lamb, Greene and MacRae?
10  A.    That one does not ring a bell.
11  Q.    Do you recall them participating in
12  the bankruptcy by representing any party?
13  A.    No, I don't recall that name.
14  Q.    Would it help you if I told you
15  that they were one of the counsel that
16  represented HSBC in the bankruptcy?
17  A.    Okay.  I'll take your word for it.
18  Q.    Let me show you their invoice.  See
19  if you have seen this before.
20  A.    I don't recall this one
21  specifically, but I assume it was part of the
22  invoices that were provided in support of the
23  seven some odd thousand that was paid to
24  HSBC.
25  MR. SNELLINGS:  Could we have

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1           K. Kliewer

2       this marked as Exhibit 3.

3           (Kliewer Exhibit 3, LeBouf

4   Invoice, marked for identification, as

5   of this date.)

6       Q.    So would you now confirm that

7   LeBouf worked for HSBC in the North Western

8   bankruptcy?

9       A.    Yes, I would.

10      Q.    And do you have any personal

11  knowledge or understanding of what I will

12  just call the PUHCA controversy in the North

13  Western controversy?

14      A.    I have a very limited understanding

15  of the PUHCA issues.  I was aware of those

16  but could not speak intelligently to those.

17      Q.    What was your understanding?

18      A.    Essentially that being a public

19  utility, there were various issues we had to

20  deal with under PUHCA and that both our

21  counsel, Paul, Hastings, and others had

22  raised it on various calls that I was on, but

23  that's about the extent of my understanding.

24      Q.    Do you have any understanding or

25  knowledge that Wilmington Trust and Harbert

1                K. Kliewer

2    filed an objection to HSBC's claim based on

3    an alleged PUHCA violation?

4        A.    I do not know recall that.

5        Q.    Do you have any understanding of

6    how the PUHCA claimed filed by Wilmington

7    would affect the claim of HSBC and the

8    bankruptcy?

9        A.    No, I don't.

10       Q.    Do you have any actual recollection

11   of reviewing this particular invoice in

12   connection with the payment of HSBC's fees?

13       A.    Like I said, I don't recall it

14   specifically, but I am assuming if I went

15   back to my files, it would be part of those

16   invoices that supported the $750,000.

17       Q.    Today you don't have any

18   recollection of asking any questions

19   regarding this particular invoice from

20   LeBouf?

21       A.    No, I'm sure I didn't ask any

22   specific questions about this.

23       Q.    Do you know in your files or in the

24   files of North Western are there any other

25   documents which evidence or refer to the work

1                    K. Kliewer

2    LeBouf performed referring to the work of

3    HSBC?

4        A.    I don't recall any other documents

5    referring to LeBouf.

6        Q.    Do you recall whether or not LeBouf

7    filed a fee application in the case?

8        A.    No, they did not.

9        Q.    So they were being paid pursuant to

10   the plan's treatment of indenture trustees?

11       A.    That's correct.

12       Q.    In your review of the fees

13   associated with HSBC, and in particular since

14   we have LeBouf's invoice in front of us, did

15   you make any determination with regard to the

16   reasonableness of their fees?

17       A.    Of LeBouf's specifically?

18       Q.    Yes.

19       A.    No, upon review of the invoice and

20   discussion with counsel, we received all of

21   HSBC invoices at once from, obviously, LeBouf

22   and Pryor, Cashman and the other HSBC

23   invoices.  Upon review of those and the

24   discussion with counsel and understanding --

25   an overall understanding of the issues that

K. Kliewer

2  were covered in the bankruptcy case and

3  adversary proceedings that had arisen

4  throughout the case, and HSBC's involvement

5  in and support of the plan, we looked at

6  their fees kind of in total, the $750,000,

7  and determined that based on the time period

8  that was covered and all the issues that

9  overall they appeared reasonable.  We didn't

10  do a specific review of all of the invoices.

11      Q.    And was your main criteria

12  reasonableness when you were looking at these

13  fees?

14      A.    It was reasonableness and

15  discussion with our counsel in terms of

16  obtaining understanding of what -- there were

17  several professionals that we were paying

18  along the way, obviously, so if I didn't

19  understand who the professional related to, I

20  would call up personnel from Paul, Hastings

21  and ask what does this relate to, do these

22  appear reasonable, and that's exactly what we

23  did here with HSBC.  Do they appear

24  reasonable?  Considering the nature of the

25  case and what went on, yes, they do.

Page 32

K. Kliewer

2   Q.    And do you have an understanding of
3   what the debtor's obligation is and was under
4   the plan with regard to indenture trustees'
5   fees?

6   A.    My understanding under the plan was
7   that we were to reimburse indenture trustee
8   fees for costs that were reasonably incurred
9   and that benefitted the estate.

10   Q.    And with regard to HSBC, what
11   benefits to the estate was received?

12   A.    Their benefit to the estate was the
13   support of the plan and the assistance with
14   or assisting North Western and the rest of
15   the creditors committee in getting the plan
16   approved in a timely manner.

17   Q.    But with regard to, let's say,
18   LeBouf's fees that are here in this invoice,
19   did you use a similar standard to that, to
20   analyze these particular entries or were you
21   just looking at the request as a whole?

22   A.    Like I said, personally I didn't
23   have enough involvement in the PUHCA issues
24   to speak intelligently to that, but my
25   understanding is that yes, based on the

Page 33

K. Kliewer

1
2    issues that are -- that were arising and
3    HSBC's involvement, that they were
4    reasonable.
5        Q.    Do you recall how much time did you
6    take in reviewing all of the HSBC related
7    invoices?
8        A.    Well, we received -- the company
9    received all of those invoices in one day
10   shortly before the effective date, so it was
11   a matter of probably three hours that day
12   receiving the invoices, reviewing those and
13   then over the course of that day and the next
14   couple days prior to the effective date,
15   calling counsel at Paul, Hastings and talking
16   with the CFO, CEO and others.  So all in all,
17   probably internal time was probably four to
18   six hours.
19       Q.    If you turn to the second page of
20   the LeBouf invoice, I have a few more
21   questions.  The third entry down, do you know
22   who LEM is?
23       A.    No, I don't.
24       Q.    Okay.  There is an entry on
25   7-23-04, review motion by Wilmington Trust

Page 34

1                     K. Kliewer

2      avoid bonds of HSBC.  One hour.  And later

3      on, there is an entry that begins draft

4      response to objections.

5                     Would you agree with me that

6      Wilmington Trust in seeking to avoid the

7      bonds of HSBC and the filing of objections

8      was for the benefit of HSBC?

9          A.    Can you repeat the question?

10         Q.    With regard to this, the work that

11     I have just identified, those entries

12     reviewing the motion by Wilmington Trust

13     trying to avoid the bonds of HSBC and then

14     the later entry drafting a response, that

15     with regard to LeBouf as counsel to HSBC that

16     their interest is protecting HSBC by this

17     work?

18         A.    By review of this, I would say

19     that.

20         Q.    And with regard to that, what

21     benefit to the estate would that type of work

22     have that the debtor should pay LeBouf for

23     that work?

24         A.    I would assume the benefit to the

25     estate would be in having less ongoing

K. Kliewer

1

2  professional fees as a result of additional

3  review and documentation down the road, but I

4  don't specifically know what the benefit to

5  North Western would be as a result of those

6  items.

7      Q.    But it is your recollection that

8  this was included in the fees that were paid

9  to HSBC?

10     A.    Yes, it is.

11     Q.    Do you think it is reasonable for

12 HSBC to expect payment by the debtor of such

13 charges?

14     A.    Yes, I do.  I guess overall.

15 Obviously, we paid the invoices, so yes, we

16 were in agreement with those.

17     Q.    Do you know if when HSBC submitted

18 their invoices including LeBouf's and Pryor,

19 Cashman, did anyone at Paul, Hastings review

20 those invoices?

21     A.    Yes, I believe they did.  I don't

22 know who specifically, but they were reviewed

23 by Paul, Hastings personnel.

24     Q.    How about Greenberg Traurig, did

25 they review invoices?

K. Kliewer

1

2      A.    I don't believe they would have

3  reviewed invoices.

4      Q.    Did you receive any reports from

5  Paul, Hastings regarding invoices?

6      A.    I did not receive any written

7  reports.  We did have telephone

8  conversations.

9      Q.    Mr. Kliewer, let me show you

10  another document that was produced pursuant

11  to our document request which was an invoice

12  from Pryor, Cashman.

13          If you can take a second to look at

14  it and tell me if you're familiar with it.

15      A.    Yes, I am.

16          MR. SNELLINGS:  Can we have this

17      marked as Exhibit 4.

18          (Kliewer Exhibit 4, Pryor,

19      Cashman Invoice, marked for

20      identification, as of this date.)

21      Q.    What we have marked here as Exhibit

22  4 is an invoice from Pryor, Cashman, Sherman

23  & Flynn, LLP, dated November 24, 2004.  It's

24  addressed to HSBC Bank USA.

25          Have you seen this document before?

1                    K. Kliewer

2          A.    Yes, I have.

3          Q.    Could you tell us at what occasion

4     did you see this invoice?

5          A.    This invoice was included in the

6     invoices provided by HSBC requesting payment

7     of their indenture trustee fees relating to

8     the bankruptcy.

9          Q.    Do you have any understanding that

10    these, the total balance is $643,364.33, was

11    that part of the total fee payment to HSBC?

12         A.    Yes, it was.

13         Q.    And it is certainly the largest

14    part?

15         A.    The bulk of it.  Attorneys.

16         Q.    No debate.

17              And this was one of the documents

18    you reviewed along with the other documents

19    that we have already marked from HSBC?

20         A.    Yes, I did.

21         Q.    Did you have any discussions

22    regarding this invoice with anyone else at

23    the company?

24         A.    Yes, again, it was part of the

25    overall discussion of the HSBC fees with

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

Page 38

1              K. Kliewer

2   Brian Bird and Gary Drook and counsel from

3   Paul, Hastings.

4        Q.    And with regard to the payment to

5   HSBC, did all of these fees get paid through

6   HSBC?

7        A.    Yes, they did.

8        Q.    Did North Western or you request

9   from HSBC or Pryor, Cashman any further

10  detail or backup with regard to this

11  particular invoice?

12       A.    No, we did not.

13       Q.    Do you know if anyone from Paul,

14  Hastings sought further backup or further

15  detail from Pryor, Cashman?

16       A.    I'm not aware that anyone from

17  Paul, Hastings did.

18       Q.    And consistent with your prior

19  testimony, you did not have any conversations

20  with HSBC about Pryor Cashman's fees as they

21  were included in the HSBC request?

22       A.    That's correct.

23       Q.    And Pryor, Cashman has never filed

24  a fee application with the bankruptcy court

25  for these fees to be reviewed?

Page 39

K. Kliewer

1

2    A.    That's correct.

3    Q.    Do you recall when you received

4    this particular invoice?

5    A.    This was included in the other

6    HSBC -- with the other HSBC invoices, and the

7    company received it within the week prior to

8    November 1.

9    Q.    Just sort of looking at some of the

10   items that is found on page 2 of this

11   invoice, there is time entries, the fourth

12   one down talking about a tri-party agreement.

13       Do you have any knowledge of what

14   those terms mean in this context?

15   A.    No, I'm not aware -- I don't know

16   what that is referencing.

17   Q.    Was this with regard to the senior

18   notes as we were discussing them before, the

19   senior unsecured notes class 7; was HSBC

20   always the indenture trustee throughout the

21   bankruptcy?

22   A.    I believe they were.  We changed

23   the indenture trustees at one point, but I

24   don't recall exactly when.  I believe HSBC

25   was the indenture trustee throughout the term