Page 40

1                      K. Kliewer
2    of the bankruptcy.
3         Q.    But right now, you don't have any
4    personal knowledge or understanding of what
5    this tri-party agreement is and the time
6    that's associated with it?
7         A.    No, I don't.
8         Q.    Did you ask for any clarification
9    from HSBC or Pryor, Cashman about that prior
10   to authorizing payment of these fees?
11        A.    I did not.  If I had, they would
12   have billed me another hour.
13        Q.    Probably.
14              If you turn to page 12 --
15              MR. SNELLINGS:  Off the record.
16              (Discussion held off the record.)
17        Q.    If you look at page 12, there is a
18   third item down file maintenance, three
19   hours.  Did you ask or anyone else ask for
20   any type of clarification as to what that
21   particular task was?
22        A.    No, we didn't.  I did not
23   personally.
24        Q.    Do you have any understanding of
25   what that would mean in an invoice such as

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1                    K. Kliewer

2    this?

3         A.    I do not.

4         Q.    Have you seen it in other invoices

5    that you have reviewed from law firms in

6    which they would charge their client for

7    final maintenance?

8         A.    I don't recall specifically, but

9    I'm pretty sure they would.

10        Q.    As far as you know, this particular

11   item was paid, correct?

12        A.    Yes, it was.

13        Q.    Would you agree that in cases such

14   as this, that maintenance of files and

15   because of numerous pleadings, correspondence

16   and documents that that is a reasonable

17   charge and one that can be expected to be

18   paid?

19        A.    I would agree given that this was

20   done by a paralegal.  If it was done by a

21   partner, I would have had a little more

22   concern over it.

23        Q.    Turning to page 14.  With regard to

24   the bankruptcy, HSBC filed a proof of claim

25   on behalf of its holders, and which was

1              K. Kliewer

2    prepared of course by their counsel.  And

3    there are numerous entries regarding the

4    preparation of a proof of claim, and there is

5    one that starts I think on the December 17,

6    '03 line item, preparing proof of claim.

7              Do you think it is a reasonable

8    expectation for indenture trustee to be paid

9    for those activities of filing a proof of

10   claim in the bankruptcy in which you're

11   representing their bondholders?

12        A.    Yes, it would appear to be a

13   reasonable activity.

14        Q.    And would you also agree that that

15   is sort of a normal course responsibility and

16   duty of an indenture trustee in representing

17   their bondholders?

18        A.    I would, yes, given the bankruptcy.

19        Q.    And as far as you know, these

20   entries regarding the preparation and filing

21   of proof of claim have been paid for?

22        A.    Yes, they have.

23        Q.    Moving right along to page 25, the

24   first plan of reordering disclosure statement

25   was filed in March of '04, correct?

1                    K. Kliewer

2        A.    Correct.

3        Q.    And as you can see on page 25 of

4   this particular exhibit, Pryor, Cashman

5   starts to spend time on a review and plan of

6   disclosure statement.

7             And as that goes through the rest

8   of the process, it did take some time.  There

9   is numerous entries with regard to another

10  plan and disclosure statement as well as

11  amendments.

12            Do you -- would you agree with me

13  that that is a normal responsibility and duty

14  of an indenture trustee in a bankruptcy to

15  review and comment on the plan of disclosure

16  statement on behalf of their holders?

17       A.    Yes, I would.

18       Q.    And with regard to what Pryor,

19  Cashman has done in this particular -- as

20  evidenced by this particular invoice, they

21  have been paid for their work with regard to

22  reviewing commenting on the plan and

23  disclosure statement?

24       A.    Yes.

25       Q.    On page 28 of this invoice for

1             K. Kliewer
2    April 6, 2004, there is an entry regarding
3    the preparation of notices of Citibank
4    indenture as well as a Chase indenture.  We
5    already discussed this in connection with
6    HSBC's, but is it your understanding that it
7    is a function of counsel for indenture
8    trustees to assist the indenture trustee in
9    preparing notices to their holders?
10        A.    That's my understanding, yes.
11        Q.    And with regard to that, do you
12   think it is reasonable to expect
13   reasonable -- for an indenture trustee to
14   expect payment of their counsel fees for
15   those type of duties?
16        A.    Yes.
17        Q.    On page 30 of this invoice, there
18   is an entry as of 4-16-04, which indicates
19   that someone at Pryor, Cashman reviewed Fried
20   Frank letter regarding complaint against the
21   debtor and review Magten complaint to Avoid
22   Fraudulent Transfer.
23             Do you have any knowledge of the
24   complaint that they are referring to there?
25        A.    I have knowledge of the -- I have

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1           K. Kliewer

2     knowledge of Magten's complaint, yes.

3         Q.    And that is a complaint against

4     North Western?

5         A.    Yes.

6         Q.    And HSBC is not a party to that

7     complaint, correct?

8         A.    Not to my knowledge.

9         Q.    And I guess with regard to that

10    type of activity, here they are reading a

11    complaint brought by another creditor against

12    the debtor.  Why would it be reasonable to

13    compensate HSBC and their counsel for those

14    types of activities?

15         MS. DENNISTON:    I'm going to

16         object just on the grounds that I'm

17         not sure I understood the question.

18         There is double speculation or double

19         assumption.  We're trying to project

20         what they are saying in a time

21         description.  To the extent that you

22         understood what a time description is,

23         it's fine, go ahead and answer, but

24         don't try to guess.

25         A.    So can you repeat the question?

1          K. Kliewer

2     Q.    With regard to this particular time

3  entry and HSBC's request that their counsel

4  be paid by the debtor on this, I was just

5  asking why is it reasonable that Pryor,

6  Cashman would be compensated for at least

7  what it seems to indicate here, a review of a

8  complaint in which their client is not a

9  party?  Why should they be compensated from

10 the debtor with regard to that particular

11 task?

12     A.    As far as the debtor compensating

13 them, they were -- HSBC and other class 7

14 holders were supporting the plan of

15 reorganization.  This complaint against the

16 company obviously would have a significant

17 impact to class 7 recoveries, and given their

18 support and North Western's desire to build

19 support amongst as many constituents as

20 possible to refute this complaint, we overall

21 benefitted the estate and led to a less

22 adversary.  Obviously, there have been

23 adversarial proceedings but less parties not

24 supporting the plan as we went into the

25 confirmation hearing.

1          K. Kliewer

2          MR. SNELLINGS:  Why don't we take

3      about a five minute break.

4          (Recess was taken.)

5      Q.    Let's turn to Wilmington Trust

6  Company.

7          Now, do you have an understanding

8  of who Wilmington Trust is or what Wilmington

9  Trust is in this bankruptcy?

10     A.    Yes, I do.

11     Q.    Do you know who they represented as

12  the indenture trustee?

13     A.    They were the indenture trustee for

14  TOPrS, T-O-P-r-S.

15     Q.    And as indenture trustee, they sat

16  on the committee, correct?

17     A.    Yes, I believe they did.

18     Q.    Do you have any knowledge of

19  whether or not they commenced any adversary

20  proceedings in the case?

21     A.    I don't recall them initiating

22  adversary proceedings.

23     Q.    Just in your estimation, would

24  you -- and your experience of watching the

25  case as it developed, would you consider them

1                     K. Kliewer

2    an active party in the case?

3         A.    Yes, I would consider them active.

4         Q.    Why would you consider them an

5    active party in the case?

6         A.    Basically just through

7    conversations with our counsel and seeing who

8    was present at the hearings.  And I had a

9    couple of different conversations with the

10   representative from Wilmington Trust, not on

11   their fees, but more on reconciling out their

12   claim amounts.

13        Q.    Was that Sandra Ortiz at

14   Wilmington?

15        A.    Yes.

16        Q.    And other than that particular

17   instance that you just mentioned, did you

18   have, you personally, any other interaction

19   with Wilmington or its counsel during the

20   case?

21        A.    No, I had a couple of different

22   conversations with Sandra on the claims

23   reconciliation; that was the extent of it.

24        Q.    By claims reconciliation, what do

25   you mean?

1          K. Kliewer

2     A.    We had some differences in what we

3  reflected in our statements and schedules

4  than what their claim was, and I worked

5  through the reconciliation process with

6  Sandra.  To reconcile their claim to what we

7  had in the statements and schedules and

8  determine what the ultimate claim was.

9     Q.    Do you know whether or not

10  Wilmington commenced any contested matters in

11  the Chapter 11 case of North Western?

12     A.    I don't recall any.

13     Q.    Do you recall them objecting to the

14  claims of HSBC as indenture trustee?

15     A.    No, I don't recall that.

16     Q.    Do you recall them with regard to

17  that objection filing a claim against HSBC

18  based on PUHCA violation?

19     A.    I was not specifically involved in

20  that so I don't recall what all happened

21  around then.

22     Q.    And I guess within, and you may --

23  and I apologize if you actually said this

24  before, in the context of what was going on

25  in the proceedings, I know that you talked

1              K. Kliewer

2    about doing the monthly reports.  With regard

3    to what was happening in the proceeding, the

4    plan of disclosure, process, objections to

5    claims, what did you follow and what didn't

6    you follow pursuant to your role at the

7    company?

8         A.    I followed -- I have been very much

9    involved with our objection to various

10   claims.  Typically I have signed either the

11   affidavits or the objections to various

12   claims, and I have followed -- I have not

13   followed adversary proceedings, and until

14   essentially there has been resolution to

15   those, and I kind of have an understanding

16   along the way that there was proceedings

17   going on, but have not had any involvement in

18   those.

19              I was very much involved in the

20   viewing and commenting on the plan of

21   reorganization and disclosure statement and

22   the subsequent amendments to those as we

23   filed them.

24        Q.    With regard to the plan and

25   disclosure statement, what aspects of the

K. Kliewer

1

2  plan and disclosure statement did you comment

3  on?  I'm just speaking generally now.

4       A.      Generally, the claims, the

5  different classes of claims and reconciling

6  the numbers that were included in there, and

7  just overall, reviewing and providing input

8  where I saw that I had had previous

9  involvement or that I had knowledge of what

10 was included in the plan or in the disclosure

11 statement.

12            I reviewed the entire documents,

13 but if there were cases that I didn't have

14 specific knowledge, I didn't comment on.  In

15 cases where I did, I provided comments.

16      Q.    In that regard, I mean you

17 understand that I represent Law Debenture

18 which is the QUIPS, all in caps.

19            Do you have an understanding with

20 regard to how the plan treated the QUIPS

21 versus the TOPrS?

22      A.    Yes, I do.

23      Q.    And what is that understanding?

24      A.    Essentially I don't remember which

25 version we changed, but initially they were

1                   K. Kliewer

2    all considered part of class 8.  Subsequent

3    to, I think, I believe, to the settlement

4    with Harbert and Wilmington Trust, the

5    classes were split between TOPrS and QUIPS,

6    class 8A and class 8B, and essentially with

7    the second amended plan, we offered 8B, the

8    8B claimants, common shares and warrants

9    equivalent to what was offered to the class

10   8A claimants, and that's essentially where we

11   are to date.

12       Q.    And did you participate in any

13   discussions or provide comments on that

14   particular aspect of the plan, the treatment

15   of the TOPrS and the QUIPS?

16       A.    Primarily in terms of reconciling

17   the amounts of the claims to what we had on

18   the books, that was pretty much the extent of

19   my involvement.  In an understanding of what

20   the different offerings were.

21       Q.    You had indicated earlier that you

22   had an understanding or an opinion that

23   Wilmington was an active participant in the

24   North Western bankruptcy.

25            Do you have any recollection or

1                  K. Kliewer
2    knowledge of any objections they filed
3    throughout the case?
4         A.    I don't recall offhand what, if
5    any, objections they filed.
6         Q.    Do you recall whether or not they
7    objected to the first amended plan?
8         A.    I believe they did.
9         Q.    Do you have any recollection of
10   what the basis of that objection was?
11        A.    No, I don't.
12        Q.    Do you recall whether or not
13   Wilmington conducted any discovery, meaning
14   depositions, document requests, relating to
15   their objection to the plan of
16   reorganization?
17        A.    Yes, I do recall discovery request.
18        Q.    And do you recall any depositions?
19        A.    No, I don't recall any depositions.
20        Q.    But you don't recall any of the
21   specific grounds in which they objected to
22   the plan?
23        A.    No, not offhand.
24        Q.    Did you participate in putting
25   together or commenting on the term sheet of

Page 54

1                   K. Kliewer

2    the settlement between the debtor, Wilmington

3    and Harbert?

4        A.    I reviewed it as it was -- as the

5    settlement was being negotiated, but in terms

6    of providing any comments to it, no.

7        Q.    Do you know who represented

8    Wilmington in the Chapter 11 case?

9        A.    I don't recall.

10        Q.    Do you have any understanding of

11    what the relationship is between Wilmington

12    Trust Company as indenture trustee to the

13    TOPrS and Harbert?  I think it is Harbert

14    Management.

15        A.    Harbert Management was a holder of

16    a portion of the TOPrS and Wilmington Trust

17    was the indenture trustee for all of the

18    TOPrS.

19        Q.    Do you recall who was representing

20    Harbert in the bankruptcy as counsel?

21        A.    I don't recall the name of the

22    firm.  I recall the gentleman very well.

23        Q.    What was his name?

24        A.    I don't even know his name.  I just

25    remember seeing him way too often.

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1               K. Kliewer

2        Q.    Why did you have such an occasion

3    to see him way too often?

4        A.    Every bankruptcy hearing I

5    attended.  I saw you way too often as well.

6            MS. DENNISTON:  Don't tell him

7        what you really think.

8        A.    I'm speaking from the client who is

9    paying the bills perspective.  I see Karol

10   way too often do.

11       Q.    Do you know if Wilmington hired any

12   financial advisors in the case?

13       A.    No, I don't know that they hired

14   any.

15       Q.    And how about are you familiar with

16   Golden Associates?

17       A.    No.

18       Q.    Do you know whether or not they

19   were hired to consult Wilmington?

20       A.    No.

21       Q.    Do you know of any role that Golden

22   Associates played in the bankruptcy?

23       A.    I don't recall.

24       Q.    Do you know what line of business

25   Harbert is in?

1                    K. Kliewer

2        A.    My understanding is that they

3   invest in -- they are an investment company

4   investing in distressed companies.  I'm sure

5   I don't know to what extent they invest in

6   other investments or otherwise.

7        Q.    To your knowledge, did they -- did

8   they only work through Wilmington or did they

9   independently file motions or objections in

10  the case?

11       A.    I believe they did both.

12       Q.    And you do not recall who

13  represented them?

14       A.    I don't recall the name.

15       Q.    Did Harbert commence any adversary

16  proceedings in the case?

17       A.    I believe they did.  I don't recall

18  what -- I don't recall what they all were,

19  but there were either several objections

20  throughout the case -- I don't recall any

21  specific adversary proceedings.

22       Q.    How about contested matters such as

23  an objection to financing, that type of

24  thing?

25       A.    Yes.

1                   K. Kliewer

2       Q.      They did?

3       A.      They did.

4       Q.      Do you know if they employed any --

5  Harbert employed any financial advisors in

6  the case?

7       A.      I don't recall.

8       Q.      Are you familiar with the agreement

9  between the debtor -- you said you had

10  reviewed the term sheet of the agreement

11  between Wilmington, Harbert and the debtor.

12           Do you have any specific

13  recollection with regard to that agreement

14  and the payment of fees for legal advisory

15  consulting and professional fees and expenses

16  to Wilmington?

17       A.      I recall as we finalized or as the

18  term sheet was finalized, and then what was

19  ultimately put into the plan of

20  reorganization was that their professional

21  fees would be paid up to a cap of $2.25

22  million to split between Harbert and

23  Wilmington Trust.

24           And as the negotiation -- as a

25  party to the negotiations and a

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

Page 58

K. Kliewer

1
2    representative of the company, the bulk, the
3    actual negotiations were primarily between
4    the creditors committee and Wilmington Trust
5    and Harbert.  The company was involved and
6    had knowledge of what was going on, and
7    obviously overall had to approve the ultimate
8    terms of the settlement.
9              And based on that, the end result
10   was rather than engage in a protracted and
11   prolonged adversary proceeding with Harbert,
12   Wilmington Trust, that these, the ultimate
13   settlement to include the cap of $2.25
14   million to their fees was beneficial to the
15   estate and was recommended by the creditors
16   committee and reviewed by our counsel and
17   company management and determined to be
18   reasonable and ultimately paid.
19        Q.    So they have been paid the 2.25
20   million?
21        A.    Yes, they have.
22        Q.    And since there was a cap, then is
23   it safe to assume that they actually had fees
24   and expenses in excess of 2.25 million?
25        A.    Yes.

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

1          K. Kliewer

2      Q.    Do you know what the amount was as

3  of, let's say, the negotiation of their

4  agreement?

5      A.    No, I don't know what their total

6  fees were.  What we received was breakdown

7  between the two, between Harbert and

8  Wilmington Trust, saying here is the total up

9  to the cap and that's what we used as support

10  for paying them, along with the understanding

11  that it was provided for in the plan of

12  reorganization.

13      Q.    Did you participate in your review

14  in negotiating that cap at all?

15      A.    No, I did not.

16      Q.    That was, as you said before,

17  between the creditors committee and Harbert

18  and Wilmington?

19      A.    Correct.

20      Q.    That was recommended to the debtor?

21      A.    Correct.

22      Q.    Did anyone from the debtor, meaning

23  the company, or its counsel participate in

24  the negotiations with Harbert and the

25  committee and Wilmington?

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

K. Kliewer

1
2    A.    I believe our counsel for Paul,
3  Hastings participated in the negotiations and
4  advised the company and company management as
5  it was playing out what the -- what was going
6  on and whether they recommended accepting the
7  settlement or not.
8    Q.    Do you have any recollection as to
9  why or how it developed that the treatment of
10  class 8 through these negotiations was
11  increased?
12    A.    Why the treatment was increased?
13    Q.    From whatever it was in the first
14  amended plan up to the present sort of --
15    A.    Okay.  Yes, in essence the
16  creditors committee's desire and the
17  company's desire overall was to obtain
18  support of class A constituents, and in order
19  to do that, the creditors committee
20  determined they were willing to go up to the
21  settlement amount, and as the company
22  management reviewed that, it was deemed
23  beneficial to the estate because we knew that
24  overall we would incur less legal costs on
25  our own counsel as well as an extended

K. Kliewer

1
2     bankruptcy proceedings that would have
3     obviously extended it past the confirmation
4     date that we did achieve if we hadn't, if the
5     creditors committee and the company had not
6     negotiated a settlement with class 8A
7     holders.

8          Q.    And do you have any understanding
9     of how Wilmington or Harbert would be paid
10    their fees in excess of the 2.25 million
11    pursuant to the plan?

12         A.    I believe the plan provided that if
13    they requested payment above that, that it
14    would have to be reviewed by the fee examiner
15    and approved by the court.

16         Q.    Do you know if they have submitted
17    any such fee request?

18         A.    I have not seen any submissions, so
19    I don't believe they have.

20         Q.    Yet it is true that they have
21    exercised their charging lien against the
22    recovery to the TOPrS in order to pay that
23    excess?

24         A.    I'm not personally aware of that.

25         Q.    Before paying the Wilmington fees

1              K. Kliewer

2    of 2.25 million, did the debtor review any

3    invoices or descriptions or professional fees

4    or expenses incurred by Wilmington, Harbert

5    or its professionals?

6         A.    No, we did not.  As I said

7    previously, the plan provided for the cap of

8    2.25 million, and it was an understanding

9    that they had exceeded the 2.25 million, so

10   we requested the split between the two and

11   that's what we used in support for paying

12   both Harbert and Wilmington Trust.

13        Q.    So there is no independent review

14   of any of those fees and expenses by the

15   debtor?

16        A.    Not by the debtor, no.

17        Q.    How about by the debtor's

18   professionals?

19        A.    Not to my knowledge.

20        Q.    Do you know whether or not within

21   the context of the negotiations between the

22   committee and Harbert and Wilmington whether

23   or not the committee reviewed any invoices or

24   other description of professional fees

25   incurred?

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

Page 63

1                     K. Kliewer

2      A.    I'm not aware if they did.

3      Q.    Do you know or have you seen any

4  document, you know, with regard to those

5  negotiations, in which prior to the breakdown

6  that you just referenced, those numbers were

7  provided to the committee even generally not

8  with the descriptions?

9      A.    Not to my knowledge.

10     Q.    Other than a breakdown which you

11  referred to of what should be paid to

12  Wilmington versus Harbert, did the debtor

13  receive anything prior to that regarding

14  Wilmington's fees or the fees of their

15  professionals?

16     A.    Not to my knowledge.

17     Q.    Have you ever heard of the firm of

18  Connolly, Bove, Lodge & Hatz?

19     A.    I recall the name.  I don't recall

20  specifically who they represented or what

21  their involvement was.

22     Q.    How about Andrews Kurth?

23     A.    I recall the name as well.

24     Q.    But were they associated with

25  Harbert in Wilmington?

29eeeec1-3f2e-411f-b1ce-6a9644668bc1

Page 64

1                     K. Kliewer

2        A.     I believe so.

3        Q.     Now, you testified earlier that you

4    had reviewed HSBC's invoices of HSBC and

5    their professionals.  Did you make a request

6    at any time to review Wilmington and

7    Harbert's?

8        A.     No, we did not.  Based on the cap

9    and knowing that every good attorney would

10   exceed the cap if they could, we determined

11   that that was reasonable and we paid the fees

12   up to the cap.

13       Q.     To your knowledge, has the legal

14   fee examiner appointed in the case reviewed

15   any of Wilmington's bills?

16       A.     Not to my knowledge.

17       Q.     Any of their counsel or

18   professionals hired?

19       A.     Not to my knowledge.

20       Q.     Do you know why not?

21       A.     I don't know -- I guess it was my

22   understanding that with intra trustee fees

23   that they weren't subject to examiner review,

24   and it was based on a negotiated settlement

25   that was approved by the creditors committee

1           K. Kliewer

2    and ultimately approved by the court with our

3    plan of reorganization, that it would be an

4    unnecessary cost to incur to review those.

5          Q.    Let me show you a copy of an e-mail

6    that we received in connection with the

7    production of documents.  Let's see if you

8    recognize it since it is addressed to you at

9    one point.

10          A.    Yes, I do.

11              MR. SNELLINGS:  We'll mark that

12        as 5.

13              (Kliewer Exhibit 5, E-Mail,

14        marked for identification, as of this

15        date.)

16          Q.    What we have marked as number 5,

17    have you seen that document before?

18          A.    Yes, I have.

19          Q.    Can you describe what it is?

20          A.    This is the breakdown I referenced

21    earlier.  This is essentially what we used

22    along with the documentation, the end of plan

23    reorganization, to pay Wilmington Trust and

24    Harbert their fees.

25          Q.    And to the best of your knowledge,

Page 66

K. Kliewer

1   those amounts have been paid?

2   A.    Yes, they have.

3   Q.    And not to repeat ourselves but

4   just to make sure we're putting the right

5   point on this, other than this document, did

6   you receive any other breakdown as to how the

7   fees would be paid between Harbert and

8   Wilmington?

9   A.    Not specific to the $2.25 million,

10  no.

11  Q.    And there is no other further

12  backup justifying or descrbing how those

13  amounts were derived?

14  A.    Only the plan of reorganization.

15  Q.    This e-mail is cc'd to Karen Reach.

16  Do you know who she is?

17  A.    She is an attorney with Paul,

18  Hastings.

19  Q.    And Phil Bentley, do you know him?

20  A.    Phil Bentley, I don't recall.

21  Q.    In this paragraph here where it

22  says, "In addition, pursuant to paragraph 16

23  of the confirmation order, please transfer

24  115,910.72 on account of the indenture

Page 67

```
 1              K. Kliewer
 2    trustee's fees and expenses."
 3              Do you know what that is
 4    referencing?
 5         A.    It is there was additional support
 6    provided for those fees and I don't recall
 7    offhand exactly what it was.  I believe a
 8    copy was provided to you.
 9         Q.    And was that amount paid?
10         A.    Yes, it was.
11         Q.    And that was over and above or in
12    addition to 2.25 million?
13         A.    Yes, it was.
14         Q.    And is this the breakdown that you
15    just referred to?
16         A.    Yes, it is.
17              MR. SNELLINGS:  Can we have that
18         marked as Exhibit 6.
19              (Kliewer Exhibit 6, Annual
20         Trustee Administration Dues, marked for
21         identification, as of this date.)
22         Q.    Do you recall when you received
23    what we have just marked as Exhibit 6?
24         A.    I believe we received this within a
25    week of the effective date, so probably about
```

1                    K. Kliewer

2    a week prior to November 1st.

3        Q.    And with regard to that, did you on

4    behalf of the company do any investigation

5    with regard to whether or not these annual

6    trustee administration dues were due and

7    owing and whether or not the amounts were

8    accurate pursuant to the indenture?

9        A.    Yes, I discussed it -- I reviewed

10   what we had paid in the prior year and

11   discussed it with our assistant treasurer

12   briefly and determined that they appeared

13   reasonable and hence we paid the fees.

14       Q.    And with regard to default

15   administration charges, do you know how that

16   number of 60,023.70 was derived?

17       A.    Well, that was part of the

18   discussion with Sandra Ortiz was, you know,

19   in dealing with the reconciliation of the

20   claims and other areas that she was involved

21   in.  I don't know specifically what else she

22   did other than my personal dealings with her.

23       Q.    But it is your understanding that

24   that was basically an hourly rate that she

25   charged and there must be some time records

Page 69

1                     K. Kliewer

2     somewhere that would indicate a certain

3     number of hours over that period of time?

4          A.    I would assume so, yes.

5          Q.    You didn't ask her for a breakdown

6     of those hours?

7          A.    No, we did not.

8          Q.    No descriptions were given or

9     requested?

10          A.    No.

11          Q.    And with regard to the expenses

12     that are listed here, did you do any

13     investigation with regard to those expenses?

14          A.    No, the 7,463.74 which was the

15     other half of the expenses was subject to the

16     cap as referenced in Exhibit 5.  And the

17     remaining amounts didn't appear out of line

18     so we didn't request additional information.

19          Q.    Now, do you have any knowledge of

20     monies that were paid to Golden & Associates?

21          A.    By who?

22          Q.    Wilmington or Harbert.

23          A.    No, I don't.

24          Q.    So other than the breakdown of

25     these three numbers with regard to the fees