# APP. 34

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor | : | Hearing Date:  November 3, 2004 @ 2:00 p.m. |
| | : | Objections Due:  October 27, 2004 @ 4:00 p.m. |
| | : | |

**OBJECTION OF LAW DEBENTURE TRUST COMPANY
OF NEW YORK, AS INDENTURE TRUSTEE,
TO THE CLAIM OF HSBC BANK USA, AS INDENTURE TRUSTEE**

Law Debenture Trust Company of New York, as Indenture Trustee, a party in interest in the above referenced bankruptcy case, files this Objection to the Claim of HSBC Bank USA ("HSBC"), as Indenture Trustee, based on violations by NorthWestern Corporation ("Debtor") of the Public Utility Holding Company Act of 1935.   In support thereof, the Indenture Trustee respectfully states as follows:

I.        **PARTIES**

Law Debenture Trust Company of New York is the successor trustee (the "Indenture Trustee") to the Bank of New York, under the Indenture for the Unsecured Subordinated Debt Securities Relating to Trust Securities (the "QUIPS Indenture") dated as of November 1, 1996, as amended, pursuant to which The Montana Power Company issued the 8.45% Junior Subordinated Debentures (the "Montana Debentures") to Montana Power Capital I, which then issued the 8.45% Cumulative Quarterly Income Preferred Securities, Series A (the "QUIPS").

HSBC serves as successor trustee under the Indenture, dated November 1, 1998 (and the supplements thereto), between the Debtor as issuer and The Chase Manhattan Bank, as Indenture

{MCM9777.DOC}

Trustee (the "Senior Indenture").    Pursuant to the Senior Indenture, various notes were issued, including (a) the 7.875% unsecured registered Senior Notes due March 15, 2007, in the aggregate principal amount of $250,000,000 (the "7.875% Notes") and (b) the 8.75% unsecured registered Senior Notes due March 15, 2012, in the aggregate principal amount of $470,000,000 (the "8.75% Notes"). The 7.875% Notes and 8.75% Notes were both issued on March 13, 2002 and are collectively referred to as the "March 2002 Debt."    On January 13, 2004, HSBC filed a proof of claim in the Debtor's bankruptcy case (claims docket #711) with respect to various amounts owing by the Debtor (the "HSBC Claim").

A portion of the HSBC Claim is for amounts owing with respect to the March 2002 Debt. HSBC may be served as follows:  HSBC Bank USA, Attn: Robert Conrad, Vice President - Issuer Services, 10 East 40th Street, New York, NY 10016-0200, with a copy to its counsel of record in this case, Pryor Cashman Sherman & Flynn, LLP, Attn: Tina M. Moss, 410 Park Avenue, New York, NY 10022.

## II.    JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to Sections 157 and 1334 of Title 28 of the United States Code.  This action constitutes a civil proceeding arising out of, or related to, the Debtor's chapter 11 case under the Bankruptcy Code, which is now pending in the United States Bankruptcy Court for the District of Delaware.

This matter qualifies as a core proceeding under sections 157(b)(2)(A), (B), and (O) of Title 28 of the United States Code.

Venue is appropriate under 28 U.S.C. § 1409(a).

## III.    SUMMARY OF RELIEF SOUGHT

The March 2002 Debt was issued in violation of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79a, *et seq*. ("PUHCA" or the "Act"), and is therefore void *ab initio* and

unenforceable against the Debtor.  The Indenture Trustee objects to the HSBC Claim and seeks disallowance of such claim to the extent that it is based on the March 2002 Debt, pursuant to 11 U.S.C. § 502(b)(l), Bankruptcy Rule 3007 and Local Bankruptcy Rule 3007-1.

## IV.    BACKGROUND AND VIOLATION OF PUHCA

### A.    FACTS

#### 1)    The Public Utility Holding Company Act of 1935

The Public Utility Holding Company Act of 1935, 15 U.S.C. § 79a, *et seq*., was enacted, in part, to provide regulatory oversight of holding company structures and finances.  Congress was concerned that holding company structures could be used to manipulate and exploit public utility companies to the detriment of consumers and investors.  15 U.S.C. § 79b(c).

A "holding company" is defined in PUHCA as "any company which directly or indirectly owns, controls, or holds with power to vote, 10 per centum or more of the outstanding voting securities of a public-utility company. . . ."  15 U.S.C. § 79b(7).  A "public utility" is defined as either "an electric utility company or gas utility company."  15 U.S.C. § 79b(5).  An "electric utility company" is defined as "any company which owns or operates facilities used for the generation, transmission or distribution of electric energy for sale . . . ."  15 U.S.C. § 79b(3).  A "gas utility company" is defined as "any company which owns or operates facilities used for distribution at retail . . . of natural or manufactured gas for heat, light or power."  15 U.S.C. § 79b(4).

A public utility holding company must either register with the Securities and Exchange Commission ("SEC" or the "Commission") or qualify for one of several enumerated exemptions specified in the Act.  Unless exempt, it is unlawful for a public utility holding company, or its affiliates, to make any public offering of debt.  15 U.S.C. § 79d(a)(3).  A registered public utility holding company and its affiliates must obtain authorization from the SEC prior to issuing or selling securities or other related instruments.  15 U.S.C. §§ 79(f), 79(g).

As relevant here, PUHCA exempts a holding company that is "only incidentally" a holding company, being primarily engaged in non-utility businesses and that does not derive a material part of its income from a public utility company. Specifically, Section 3(a)(3) of PUHCA exempts a holding company that:

> is only incidentally a holding company, being primarily engaged or interested in one or more businesses other than the business of a public utility company and (A) not deriving, directly or indirectly, any material part of its income from any one or more subsidiary companies, the principal business of which is that of a public utility company . . .

15 U.S.C. § 79c(a)3. Under PUHCA, the filing of an application for exemption, in good faith, suspends the obligation to register as a holding company. 15 U.S.C. § 79c(c).

The Debtor in this case submitted an application to the SEC for exemption from PUHCA that grossly understated the importance of its Montana public utility subsidiary to its business, and therefore, was not filed in good faith. As a result, the exemption was not effective, the Debtor was a registered public utility holding company subject to the jurisdiction of the SEC, and the March 2002 Debt was issued by the Debtor without SEC approval in violation of PUHCA.

### 2) NorthWestern's Acquisition of a Utility Subsidiary

The Montana Power Company ("Montana Power") was incorporated in 1961 under the laws of the State of Montana as the successor to a corporation formed in 1912 by the merger of four local electric companies. By 1999, it was a vertically-integrated utility owning and operating electric generation, transmission and distribution facilities, as well as natural gas facilities. Starting in late 1999, Montana Power sold most of its electric generating assets to PP&L Montana, LLC but retained its electric transmission and distribution facilities.

NorthWestern is a Delaware corporation with its principal offices in South Dakota. NorthWestern is one of the largest providers of electricity and natural gas in the upper Midwest and

Northwest region of the United States and serves close to 600,000 customers in Montana, South Dakota and Nebraska.

On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with the Debtor, pursuant to which the Debtor agreed to purchase Montana Power's electric, natural gas and propane utility assets (the "Montana Utility Assets"). In order to facilitate the asset sale to the Debtor, Montana Power created a subsidiary, Montana Power LLC ("MPLLC").

On February 13, 2002, Montana Power merged its utility assets into MPLLC. As a result of this merger, MPLLC held and operated the Montana Utility Assets.

On February 14, 2002, to avoid having to register under PUHCA and be subject to the regulatory oversight of the SEC, Debtor filed an application for exemption under Section 3(a)(3) of PUHCA, claiming that it fell within the exemption for companies that are primarily engaged in non-utility businesses and are "only incidentally a holding company." See Application Under The Public Utility Holding Company Act of 1935 of NorthWestern Corporation (February 14, 2002), Docket No. 70-1053 (the "PUHCA Exemption Application") (attached hereto as Exhibit 1[1]), described in Release No. 35-27648 (February 7, 2003) (attached hereto as Exhibit 2). The SEC issued a public notice of this filing, providing the opportunity for public comment. NorthWestern offered an opinion of counsel to support its application.

On February 14, 2002, the Debtor's acquisition of MPLLC was completed with the payment by the Debtor of $478 million in cash to the parent of MPLLC and the assumption of $511 million of MPLLC liabilities, including the obligations evidenced by the Montana Debentures.

---

[1] Due to the voluminous nature of the exhibits, they are only being filed on Debtors' counsel, the Trustee, HSBC Bank USA's counsel and the Committee's counsel. If any other party wishes to receive a copy of the exhibits they can contact undersigned counsel.

As a result of the acquisition, on February 15, 2002, MPLLC became a wholly-owned subsidiary of the Debtor, and the Debtor became a public utility holding company as defined under PUHCA, because it controlled more than 10% of the outstanding securities of MPLLC, a public utility company.  On March 19, 2002 MPLLC was renamed NorthWestern Energy LLC.

On November 15, 2002, Debtor, as the sole equity owner of MPLLC, transferred all of the electric and natural gas transmission and distribution operations of MPLLC to itself, with the exception of the Milltown Dam, a hydroelectric dam with substantial environmental liabilities attached to it.[2]  On November 20, 2002 NorthWestern Energy LLC, with its sole remaining asset being the Milltown Dam, was renamed again to Clark Fork and Blackfoot, LLC.

### 3)    The Importance of the Public Utility's Business to NorthWestern

At the time Debtor filed its PUHCA Exemption Application, and contrary to what the Debtor claimed in its application, Debtor was predominantly engaged in the public utility business with the vast majority of its income derived from its utility subsidiary.  Therefore, Debtor did not qualify for the exemption it sought.

In early 2002, NorthWestern controlled certain non-utility businesses which included Expanets, a communications company, Blue Dot, a heating and air-conditioning company, and CornerStone, a propane company.  However, due to the significant drop in the financial performance of Expanets, Blue Dot, and CornerStone in 2001, by early 2002 the electric and natural gas business of NorthWestern *was the primary source of NorthWestern's income*.  NorthWestern did not disclose this in its PUHCA Exemption Application.  To the contrary, NorthWestern stated in its application that MPLLC "will not be a material subsidiary of NorthWestern."  PUHCA Exemption Application (page 12 of 19).

---

[2] NorthWestern Corp., Form 10-K for the fiscal year ending December 31, 2002, at 5 (attached hereto as Exhibit 3).

NorthWestern's Form 10-Q for the three months ending June 30, 2001, disclosed the obvious and dramatic deterioration in the Expanets and Blue Dot businesses. The April 1 - June 30 quarter was dismal for the Debtor's communications segment; operating revenues were down 16%. In 2001, net income from Blue Dot's operations decreased by approximately 84%,[3] communications revenues had fallen by 33%, and year-over-year operating losses had increased by 600%.

The CornerStone operations also were experiencing severe difficulties. On January 18, 2002, the board of directors of the general partner of CornerStone announced that it had retained Credit Suisse First Boston Corporation to review strategic options, including the possible sale or merger of CornerStone.[4] Effective November 1, 2002, NorthWestern disposed of its direct and indirect equity interests in CornerStone.

NorthWestern stated that "[b]y excluding CornerStone and adding Montana Power's utility operations, *approximately two-thirds of NorthWestern's targeted 2002 earnings* before interest, taxes and depreciation and amortization (EBITDA) *is attributable to our utility businesses.*"[5] This statement was made only *one week before* NorthWestern filed its application for an exemption under Section 3(a)(3) of PUHCA.

On February 15, 2002, NorthWestern stated that, on a pro forma basis, it had become predominately an electric and gas company:

> We operate one of the premier regional electric and natural gas utilities in the upper Midwest of the United States through our energy division, NorthWestern Services Group, or NSG, and our wholly owned subsidiary, The Montana Power, L.L.C. On February 15, 2002, we completed the acquisition of the electric and natural gas transmission and distribution businesses of The Montana Power Company. We believe the acquisition creates greater regional scale allowing us to realize the

---

[3] NorthWestern Corp., Form 10-Q for the quarterly period ending June 30, 2001, at 7-8 (attached hereto as Exhibit 4).
[4] *See* "NorthWestern Corporation Reports 2001 EPS of $2.03 before Restructuring charges," at 2 (hereinafter "February 7, 2002 Announcement") (attached hereto as Exhibit 5).
[5] *Id.* (emphasis added).

> full value of our existing energy assets and provides a strong platform for future growth. *Our regulated business contributed a majority of our consolidated earnings before interest, taxes, depreciation and amortization, or EBITDA, for the year ended December 31, 2001 on a pro forma basis after giving effect to the acquisition.*[6]

This statement was issued February 15, 2002, *one day* after the PUHCA Exemption Application was filed.

In short, by February 2002 (before the March 2002 Debt was issued) NorthWestern had become predominately an electric and gas utility and was a public utility holding company required under PUHCA to register and to comply with the provisions of the Act.

4)    **Financial Transactions Undertaken Without SEC Authorization**

By failing to register with the SEC as a public utility holding company, the Debtor was in violation of PUHCA and the March 2002 Debt was issued without the review and approval of the SEC, in violation of PUHCA.

After acquiring the Montana Utility Assets, NorthWestern dramatically increased the amount of debt in its capital structure, including issuing the March 2002 Debt, in part by relying on the Montana Utility Assets, to the point that NorthWestern could no longer sustain the resulting debt burden. Had NorthWestern, and the issuance of the March 2002 Debt, been subject to regulatory oversight by the SEC under PUHCA, NorthWestern would not have been able to undertake such obligations in light of its perilous financial condition and capital structure. As a result, the most egregious of NorthWestern's financial excesses could have been prevented.

NorthWestern financed the February 14, 2002 acquisition of MPLLC with a credit agreement from various banks. The credit agreement was a $1.0 billion credit facility with a term of 364 days following the closing of the acquisition. The credit facility consisted of a $280.0 million revolving

---

[6] NorthWestern Corp., Form 8-K, Exh. 99.8 at 1 (emphasis added) (Feb. 15, 2002) (attached hereto as Exhibit 6).

credit facility and a $720.0 million acquisition term loan.  In connection with the closing of the acquisition, NorthWestern drew $720.0 million of the acquisition term loan and $19.0 million of the revolving credit facility to finance the cash portion of the purchase price.[7]

On March 13, 2002, NorthWestern issued the March 2002 Debt, which, as set forth above, included approximately $250 million in debt bearing a coupon rate of 7.875% and approximately $470 million in debt bearing a coupon rate of 8.75%.  The March 2002 Debt was used to repay the $720 million term loan that had been obtained under NorthWestern's credit facility. [8]  The March 2002 Debt purports to have senior status relative to other debt issues, including the Montana Debentures.

NorthWestern's revolving credit facility was repaid and terminated on February 10, 2003.  In February 2003, NorthWestern closed and received funds from a $390.0 million senior secured term loan (together with the March 2002 Debt, the "post-February 14, 2002 Debt").  A portion of the proceeds from NorthWestern's new $390 million senior secured term loan was secured by $280 million of First Mortgage Bonds secured by substantially all of NorthWestern's Montana Utility Assets and $110 million of First Mortgage Bonds secured by substantially all of NorthWestern's South Dakota and Nebraska utility assets.[9] The net proceeds of $366.0 million, after payment of financing fees and costs, were used to repay approximately $260 million of outstanding debt and accrued interest and retire approximately $20 million of outstanding letter-of-credit commitments under NorthWestern's existing $280 million bank credit facility.[10]  NorthWestern's new senior secured term loan bore interest at a variable rate tied to the Eurodollar rate, with a minimum floor of 3.0%, plus a spread of 5.75% or at the greater of the prime rate and 4.00% plus a spread of 4.75%. The credit

---

[7] NorthWestern Corp., Form 8-K, at 2 (Feb. 15, 2002) (attached hereto as Exhibit 7).
[8] NorthWestern Corp., Form l0-Q for the quarter ending March 31, 2002, at 20 (attached hereto as Exhibit 8).
[9] NorthWestern Corp., Form 10-K for the fiscal year ending December 31, 2002, at F-28/29 (attached hereto as Exhibit 3).
[10] *Id.* at 6.

agreement with respect to NorthWestern's senior secured term loan contained a number of representations and warranties and imposed a number of restrictive covenants.

In sum, by its acquisition of MPLLC, a public utility company, NorthWestern was a public utility holding company as of February 15, 2002. In order to be exempt from oversight and regulation under PUHCA, it represented to the SEC that it was only incidentally a holding company and entitled to an exemption from PUHCA. However, at the time of its application for exemption, NorthWestern did not meet the criteria for exemption and its application for exemption was misleading, and not filed in good faith. NorthWestern was not, as it claimed in its application, "primarily engaged or interested in one or more businesses other than the business of a public utility company," and NorthWestern could not claim that it was "not deriving, directly or indirectly, any material part of its income from any subsidiary company, the principal business of which is that of a public utility company."

      **B.**    **DEBTOR WAS NOT ENTITLED TO EXEMPTION UNDER SECTION 3(a)(3) OF PUHCA**

The "only incidentally a holding company" exemption of Section 3(a)(3) has several critical requirements, all of which NorthWestern failed to satisfy. Under this exemption, the SEC requires a showing that (1) the utility subsidiaries must be functionally-related to the non-utility business; that is, the utility business should be an incident of the non-utility business and not simply a small part of the overall enterprise; (2) the amounts of income derived from utility subsidiaries should be very small, *see Union Pacific Rail*, 1 S.E.C. 441, 442-43 (1936); (3) the utility operations must be small both in a relative and in an absolute sense; and (4) the holding company's business must be essentially non-utility in nature. NorthWestern failed to meet each requirement, and NorthWestern could not have filed its PUHCA Exemption Application with a good faith belief that it qualified for the Section 3(a)(3) exemption.

1)    **NorthWestern Did Not Satisfy the Functionally-Related Test**

As the SEC has determined, "[t]he legislative history indicates that the [3(a)(3)] exemption was intended to reach, for example, a manufacturing concern that generates power for its own use and 'has a little surplus power and sells it to the local community.'"  79 Cong. Rec. 884 (1935), *quoted in AES Corp.*, 1999 SEC LEXIS 1676 (1999).  The functionally-related test imposes a rigorous standard.  The "'other businesses' [must be]. . . *intimately related* to the operations of the retainable public-utility properties . . "[11]  The Commission has noted that "we traditionally have limited an exemption pursuant to Section 3(a)(3) to situations in which the utility operations of an applicant are *necessary* for, or are a natural, *unavoidable product* of, the non-utility activities."  *Enron Corp.*, HCAR No. 3-10909, slip op. at 29 (December 29, 2003) (emphases added).

A functional relationship that satisfies this element of Section 3(a)(3) would be an aluminum producer that owned electric utilities to provide dedicated power for its aluminum production operations.  *See, e.g., Castle & Cook, Inc.*, SEC HCAR No. 23928 (December 2, 1985) (agricultural enterprise owned electric generation to power pineapple processing).  Moreover, the functional relationship must have a special character for Section 3(a)(3) purposes.  For example, the Commission denied a Section 3(a)(3) exemption to an oil pipeline which had a small gas distribution system. *See Cities Service Co.*, 8 S.E.C. 318 (1940).

NorthWestern did not satisfy the functionally-related test, as its public utility operations were not necessary for its non-utility businesses.  The mere existence of a financial benefit to NorthWestern from the utility operation does not satisfy the test.[12]  The existing HVAC, communications, propane

---

[11] See *Panhandle Eastern Pipe Line Co. v. SEC*, 170 F.2d 453, 463 and n.9 (8th Cir. 1948) (emphasis added); see also *Mich. Cons. Gas Co. v. SEC*, 444 F.2d 913, 917 (D.C. Cir. 1971).

[12] For instance, the fact that "applicant's holdings in its utility subsidiaries, and their assets, have constituted a factor of prime importance in the ability of the applicant to function as a credit vehicle for financing the needs of its non-utility subsidiaries," is not sufficient grounds for finding the functional relationship test has been met. *Cities Service*, 8 S.E.C. at 331.

and utility operations of NorthWestern were operating before the acquisition of the Montana Utility Assets and were not dependent on those assets.

2)      **A Material Part Of Debtor's Income Arises From Utility Operations**

NorthWestern also fails the second test necessary in order to qualify for a Section 3(a)(3) exemption – that a material part of the company's income not be from utility operations. *Cities Service Co.*, 8 S.E.C. 318, 329 (1940). The Commission has found that pertinent factors for determining what is material include:

> the size of the company's utility subsidiaries and the scope of their operations, and, where the utility business is small, the company's stake in the utility business as compared with its interest in other lines of business.

*Id.*

As the Commission noted in *AES Corp.*, 1999 SEC LEXIS 1676 at n.15 (1999), the Section 3(a)(3) exemption is unavailable if the holding company derives any material part of its income from one or more utility subsidiaries. In *Cities Service*, the Commission found that the Cities Service's proportion of total income attributable to public utility operations constituted 11-12% of the enterprise's income, and therefore, constituted a "material part of its income" under the provisions of Section 3(a)(3). *Id.* at 334-35.

In its PUHCA Exemption Application (at pages 16-17), NorthWestern attempted to demonstrate that it satisfied the Section 3(a)(3) materiality test, but instead applied the PUHCA Section 3(a)(1) test despite the fact that the SEC has declared that the test for materiality employed under Section 3(a)(l) is different than the test for materiality under Section 3(a)(3):

> our willingness to be flexible in our determination of materiality for purposes of section 3(a)(1) . . . should not be viewed as indicating a willingness to do so in connection with materiality determinations arising in connection with requests for exemption under sections 3(a)(3) and 3(a)(5) of the Act . . . Our interpretation of the term under each section must be informed by the underlying policy concerns that each exemption addresses.

*NIPSCO Industries, Inc.*, 53 S.E.C. 1296, 1318 (1999) (footnote omitted).

The importance of the electric and natural gas utility operations to NorthWestern's continued viability was clear before NorthWestern's PUHCA Exemption Application was filed and before the March 2002 Debt was issued.  By 2002, under any reasonable measure, utility income was a very material component – in some periods the only source – of NorthWestern's net income, certainly at a level far above the 11-12% range found significant in *Cities Service*.  Gas and electric operations contributed 100% of the positive income (before accounting for minority interests) experienced by all of NorthWestern's lines of business in the nine months[13] ending September 30, 2001[14] and approximately 96% in the same period during 2000;[15]  The corresponding proportion of operating income was 81% for 2001[16] and 73% for 2000.[17]

Moreover, NorthWestern's 2001 Annual Shareholder's Report stated "we are targeting approximately two-thirds of NorthWestern's total operating income to come from our energy business in 2002."[18]  Yet NorthWestern's PUHCA Exemption Application failed to even mention, much less analyze, it expectation that NorthWestern's utility operations would provide the lion's share (not just a material part) of its income on a going forward basis.

---

[13] The information for the nine month period was readily available in NorthWestern's public filings prior to filing of the PUHCA Exemption Application or the issuance of the March 2002 Debt.  *See NorthWestern Corp.*, Form 10-Q for the quarter ending September 30, 2001 (filed on November 14, 2001), at 10-11 (attached hereto as Exhibit 9). Once the full year results were available, the trend discussed above was even more evident.

[14] NorthWestern Corp., Form 10-Q for the quarter ending September 30, 2001 (filed on November 14, 2001), at 10-11 (attached hereto as Exhibit 4) *i.e.*, $23.3 million in income before minority interests for electric and natural gas operations out of a total positive income of $23.3 million.

[15] *i.e.*, $13.944 million in income before minority interests for electric and natural gas operations out of a total positive income of $14.56 million. *Id.*

[16] *i.e.*, $41.7 million in electric and natural gas operating income versus a total positive income for all NorthWestern operations of $51 .6 million. *Id.*

[17] *i.e.*, $27.8 million in electric and natural gas operating income versus a total positive income for all NorthWestern operations of $47.145 million.

[18] NorthWestern Corp., Annual Shareholder Report 6-7 (2001) submitted on February 15, 2002 (attached hereto as Exhibit 10).

3)    **The Size of the Utility Operations Disqualified NorthWestern From a Section 3(a)(3) Exemption**

To establish that a holding company is not deriving a material part of its income from a public utility company, applicants seeking an exemption under Section 3(a)(3) also must demonstrate that their utility operations are small, both relative to the applicant's internal operations and with respect to external market realities.[19]   To establish that a utility operation is small with respect to external circumstances, the Commission has required an applicant to show that its subsidiary's utility operations are small in comparison to other utility companies on "a state, regional and national" basis.[20]

The Commission has looked to the fact that the utility subsidiary was the largest investor-owned utility in the state where it operated to find that a holding company was not entitled to the exemption.[21]   Here, NorthWestern owned the largest investor-owned utility operations in the State of Montana, [22] and viewed itself as a dominant player in the market.   Under no circumstances could NorthWestern's utility operations be considered "small" as required by Section 3(a)(3).

For example, according to NorthWestern's 2001 Annual Report, it had "[o]ne of the nation's largest energy distribution service areas" and was "[s]trategically positioned on mid-continent and

---

[19] *See Enron Corp.,* HCAR No. 3-10909, slip op. at 29; AES 1, 70 SEC Docket at 1286.
[20] *See Enron Corp.,* HCAR No. 3-10909, slip op. at 32, AES 1, 70 SEC Docket at 1295; *GAZ Metropolitan, Inc*., 52 S.E.C. 56, 62 (1994).
[21] *See Enron Corp.,* HCAR No. 3-10909, slip op. at 32.
[22] The utility systems of Montana Power and NorthWestern Public Service, a division of NorthWestern, are not contiguous and are located in separate, non-synchronous interconnections and separate North American Electric Reliability Council ("NERC") regions; specifically, Montana Power is part of the Western Systems Coordinating Council ("WSCC") and the Western Interconnection, while NorthWestern Public Service is within the WAPA's Upper Great Plains East control area in the Mid Continent Area Power Pool ("MAPP"), which is part of the Eastern Interconnection. Moreover, the utilities represented that they had no plans to alter their physical electric operations in order to interconnect the two systems, either by constructing transmission lines, reserving a transmission contract path, or otherwise. There was no plan to physically merge or consolidate the utilities' jurisdictional facilities, or alter the manner that the two systems are operated electrically, after the proposed transaction was consummated. "Prepared Direct Testimony of Michael Hanson, *"The Montana Power Co., et al.*, F.E.R.C. Docket No. EC01-47-000, at 8: 1-5 (December 20, 2000).

Western electric transmission grids."[23]  In addition, NorthWestern stated that "NorthWestern Energy [is] one of the largest regional electric and natural gas utilities in the upper Midwest of the United States."[24]

In short, the requirement of Section 3(a)(3) that the holding company be primarily engaged in a business "other than the business of a public-utility company" was simply not satisfied in the instance of NorthWestern.  "It is a holding company whose business is essentially utility in nature, rather than industrial or otherwise nonutility."  *AES Corp.*, 1999 SEC LEXIS 1676 n.48 (1999).  Consequently, NorthWestern could not reasonably maintain that it satisfied this prerequisite to be exempt under PUHCA Section 3(a)(3).

NorthWestern's failure to comply with PUHCA, and its failure to subject its financing proposals to the SEC's review, has resulted in serious harm to the holders of NorthWestern's debt securities in a manner that PUHCA was intended to prevent.  Because it filed an application for exemption from PUHCA under Section 3(a)(3) knowing that it did not meet the standards of the statute, the application was not filed in good faith and the exemption was not effective.  As a result, the March 2002 Debt was issued in violation of PUHCA and is void.

C.    **DEBTOR'S VIOLATION OF PUHCA MEANS THE MARCH 2002 DEBT IS VOID**

Section 26(b) of PUHCA provides that contracts entered into in violation of PUHCA are void as to the rights of (1) "any person" who made or engaged in the performance of such contracts or (2) "any person" not a party to the contract but who has acquired a contractual right with actual knowledge of facts "by reason of which the making or performance of such contract was in violation of" PUHCA.

---

[23] NorthWestern Corp., Annual Shareholder Report 4-5 (2001) (attached hereto as Exhibit 10).
[24] *Id.* at 12-13.

PUHCA Section 26(b); 15 U.S.C. §§ 79z(b).[25]  In enforcing Section 26 of PUHCA, there is no

discretion; a contract is void with respect to "any person" (not just a holding company or a member of

a holding company system) falling within the provision's terms, and it is apparently void *ab initio*.  See

*Virginia Public Service Co.*, et al., 14 S.E.C. 406 (1943) (discussed below).

As a public utility holding company not entitled to an exemption from PUHCA,

NorthWestern's issuance of its March 2002 Debt was prohibited.  PUHCA Section 4(a)(3); 15 U.S.C.

§ 79d(a)(3). As a result:

> (1)   NorthWestern, as a holding company, violated PUHCA;
>
> (2)   The March 2002 Debt is dependent upon contracts made in violation of PUHCA;
>
> (3)   The contracts made in violation of PUHCA are void as to the rights of any person who in violation of PUHCA made or engaged in the performance of the contracts (including the indenture trustee under the Senior Indenture); and
>
> (4)   HSBC as indenture trustee under the Senior Indenture (on its own or on behalf of the holders of the March 2002 Debt[26] cannot assert rights (e.g., a right to interest or principal) under such contracts.

Accordingly, the issuance of the March 2002 Debt, and continuing activities after that date, violated

Section 4 of PUHCA, and therefore the debt is void *ab initio* as to rights of parties who made or

engaged in the performance of the contracts in violation of PUHCA.  This Court must therefore find

---

[25] The full text of PUHCA Section 26(b) is as follows:

> Every contract made in violation of any provision of this chapter or of any rule, regulation, or order thereunder, and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, regulation, or order.
>
> 15 U.S.C. § 79z(b) (2003).

[26] While HSBC did not become successor trustee until December 11, 2003 (i.e. after the Debtor filed this bankruptcy case), HSBC took an assignment of the Resigning Trustee's right, title, and interest in and to the Trusts under the Indenture; rights, powers, trusts, and duties of the Trustee under the Indenture; and all property and money held by such Resigning Trustee. See Exhibit A hereto (incorporating as Exhibit D the Instrument of Resignation, Appointment and Acceptance, dated as of December 11, 2003, at section 103.) Thus, HSBC stands in the shoes of the Resigning Trustee who made and engaged in the performance of the contracts in violation of PUHCA.

the March 2002 Debt void *ab initio* and disallow the HSBC Claim (and, as a result, the claims of all holders of March 2002 Debt) to the extent based on the March 2002 Debt.

Moreover, even if it could be argued that HSBC did not make or engage in the performance of contracts in violation of PUHCA or that holders' rights are independent of those of the indenture trustee, there are at least two separate bases for disallowing claims based on the March 2002 Debt. First, the holders that held March 2002 Debt during the pendency of the violation were themselves engaged in the performance of contracts in violation of PUHCA. Accordingly, such holders' rights are also void <u>*ab*</u> <u>*initio*</u> under PUHCA Section 26(b)(1).

Second, PUHCA Section 26(b)(2) provides that any person who, <u>not</u> being a party to the contracts, acquired any right under contracts with actual knowledge of the facts on which a violation rests cannot assert rights under contracts made in violation of a provision of PUHCA. Here, the facts demonstrating a violation of PUHCA were publicly available and apparent to anyone willing to look. Accordingly, HSBC and the holders of the March 2002 Debt cannot assert rights (e.g., a right to interest or principal) under such contracts, and this Court must find that, under PUHCA Section 26(b)(2), the March 2002 Debt is void *ab initio*, disallowing the HSBC Claim to the extent based on the March 2002 Debt.

> 1)    **The Debtor Filed Its PUHCA Exemption Application In Bad Faith And It Violated PUHCA When It  Issued The March 2002 Debt.**

Under PUHCA Section 26, debt issued without authorization is void as of the date of issuance. *See e.g.*, *Virginia Public Service Co., et al*., 14 S.E.C. 406 (1943) ("Virginia Public Service").

In Virginia Public Service, the SEC found that Virginia Public Service had violated PUHCA by issuing securities without authorization.  As a result, the Commission invoked Section 26, held that the contract to acquire the bonds was invalid and that the claims manifested by the bonds asserted by anyone with knowledge of the facts were void.  *Id.* at 422. "Since the bonds ; . . were void *ab initio*, the

investment must be regarded as a contribution to capital made in [the year the bonds were issued.]" *Id.* at 424.

In addition, to the extent NorthWestern intends to rely on an opinion of counsel for evidence of its "good faith" application, this attempt must fail. A lawyer's opinion alleging an exemption applies would not preclude the finding of a willful violation of the securities laws. *See, e.g., In re Morris Reiter,* 41 S.E.C. 137, 140 (1962); *In re John R. Brick*, 46 S.E.C. 43, 53-54 (1975). ("One who does an act that violates the law is not absolved by pointing to an erroneous opinion of counsel.").

### 2)     Neither HSBC Nor Holders Of The March 2002 Debt Have A Defense To The Voiding Of The March 2002 Debt

Contracts entered into in violation of PUHCA – including the supplement to the Senior Indenture and related documents pursuant to which the March 2002 Debt was issued – are void as to the rights of "any person" who made or engaged in the performance of the contracts in violation of PUHCA. Thus, HSBC as indenture trustee cannot assert rights, including rights to principal and interest, under those contracts. Nor can holders assert such rights, since their rights stand or fall with those of the indenture trustee.

In prior pleadings in the bankruptcy case, NorthWestern, joined by the Official Committee of Unsecured Creditors for NorthWestern (the "Committee"),[27] have asserted that the parties acquiring the March 2002 Debt can defend these PUHCA Section 26(c) (15 U.S.C §§ 79z(c)) allegations because they had no "actual knowledge."[28] Such a claim fails as to HSBC as indenture trustee (and

---

[27] HSBC is a member of the Committee.

[28] The full text of PUHCA Section 26(c) is as follows:

> Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made or of any lien created prior or subsequent to the enactment of this chapter, unless at the time of the making of such loan or extension of credit (or extension or renewal thereof) or the creating of such lien, the person making such loan or extension of credit (or extension or renewal thereof) or acquiring such lien shall have actual knowledge of facts by reason of which the making of such loan or extension of credit (or extension or renewal thereof) or the acquisition of such lien is a violation of the provisions of this chapter or any rule or regulation thereunder or (2) to afford a defense to the collection of any debt or obligation or

derivatively, as to all holders of the March 2002 Debt) because such parties have no rights under the contracts made in violation of PUHCA regardless of whether they had "actual knowledge." Moreover, those holders that held March 2002 Debt during the pendency of the PUHCA violation have no right to enforce the Debt for the independent reason that they were themselves engaged in the performance of contracts in violation of PUHCA.

Furthermore, the Debtor's PUHCA Exemption Application was so lacking in merit, as was evident from the public record, as to have been filed in bad faith.  Consequently, even if "actual knowledge" were relevant, there is ample evidence establishing such knowledge.  Subsequent holders of the March 2002 Debt must show under PUHCA Section 26(c)(2) that they acquired their debt not only without actual knowledge but also in "good faith" and "for value," a showing they cannot make.

### D.  HOLDERS OF THE MARCH 2002 DEBT MUST BE DEEMED TO HAVE ACTUAL KNOWLEDGE

Before the PUHCA exemption application was filed with the Commission, NorthWestern had told investors that for the 2002 calendar year, utility earnings would represent two-thirds of NorthWestern's total operating income.  It was public knowledge in late 2001 that NorthWestern's earnings from non-utility operations were poor to non-existent and in 2002 that NorthWestern had solicited purchase offers for a substantial portion of its non-utility operations.[29] These publicly available facts demonstrated that NorthWestern's predominant focus was its electric and natural gas utility operations. It was also public knowledge in February 2002 that NorthWestern was investing $478 million in cash plus the assumption of $511.1 million in debt in the subsidiary holding the Montana Utility Assets.

---

the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt obligation, or lien.  15 U.S.C. §79z(c).

[29] NorthWestern Corp., Form 10-Q for the quarter ending September 30, 2001, at 13 (attached hereto as Exhibit 4) and NorthWestern Corp. Form 10-K for the fiscal year ending December 31, 2002 (attached hereto as Exhibit 1).

The extraordinary decrease in revenues from Expanets was publicly disclosed. The problems with Blue Dot also had been disclosed by NorthWestern. Those acquiring the March 2002 Debt had access to a substantial amount of financial data showing that NorthWestern could not satisfy the requirements of PUHCA Section 3(a)(3).

In case the circumstances of NorthWestern were not enough, a very high profile exemption filing was at the same time facing scrutiny at the Commission and in the press. Enron Corporation filed an application to amend its pending application for exempt status under 3(a)(1). On October 7, 2002, the SEC noted that "[w]e cannot, from the face of Enron's application for an exemption under Section 3(a)(3), determine facts sufficient to conclude that Enron meets the statutory criteria. To find that these criteria are satisfied, we must determine, among other things, . . . a necessary functional relationship . . . [and] make determinations concerning, among other things, Enron's income derived through Portland General [Electric] in comparison with Enron's other income . . . ."[30] Following a highly publicized hearing, an Administrative Law Judge determined on February 6, 2003 that Enron failed to meet the Section 3(a)(3) criteria on very much the same grounds asserted above regarding NorthWestern.[31] On December 29, 2003 after argument before the full Commission, the SEC rejected Enron's claim regarding Section 3(a)(3).[32]

**E.    THOSE DEBT HOLDERS WHO SUBSEQUENTLY ACQUIRED THE MARCH 2002 DEBT DID NOT OBTAIN SUCH DEBT IN GOOD FAITH AND FOR VALUE**

With respect to person(s) subsequently acquiring the debt, Section 26(c)(2) provides that the persons must have "acquired such debt, obligation, or lien in good faith for value *and* without actual

---

[30] HCAR No. 27574 (October 7, 2002).
[31] Application of Enron Corp., 2003 SEC LEXIS 316 (2003) (pp. 55-60).
[32] Application of Enron Corp., HCAR No. 27782 (Dec. 29, 2003).

knowledge of the violation of any provision of this chapter . . . ." 15 U.S.C. § 79z(c)(2) (emphasis added).[33]

There is evidence that subsequent holders of the March 2002 Debt did not acquire such debt in good faith, for value and without actual knowledge.  Notably, it appears that the majority of the March 2002 Debt is now held in funds managed by sophisticated investment managers who specialize in due diligence, research, and investing in large and troubled companies (and presumably was purchased by such funds for less than the full face value).  Any sophisticated investor could discern the deficiencies in NorthWestern's PUHCA Exemption Application.

## V.      OBJECTION TO HSBC CLAIM TO THE EXTENT BASED ON MARCH 2002 DEBT

This claim objection is made under 11 U.S.C. § 502(b)(l), Bankruptcy Rule 3007, and Local Bankruptcy Rule 3007-1.

The Indenture Trustee repeats and re-alleges the assertions in this Objection above as though fully set forth herein.

Because the March 2002 Debt was issued in violation of PUHCA, such debt is void *ab initio* and unenforceable against the Debtor as set forth herein.  Accordingly, the HSBC Claim should be disallowed under Section 502(b)(l) to the extent that such claim is based on the March 2002 Debt.

---

[33] *See Okin v. Securities and Exchange Comm'n*, 154 F.2d 27, 31 (2d Cir. 1946) (explaining that section 26(c) provides protection for "bona fide holders"). Cf *Gunter v. Hutcheson*, 492 F.Supp. 546, 558 (N.D. Ga. 1980) (construing same language in Securities Exchange Act, 15 U.S.C. § 78cc(c)(2), and explaining that (c)(2) "provides a defense to a defendant who (1) acquires (2) in good faith (3) for value (4) without actual without actual knowledge"). The defense thus has four elements, including good faith and knowledge as separate elements. Mere lack of knowledge therefore cannot satisfy the good faith element.

**WHEREFORE**, the Indenture Trustee requests that this Court sustain its objection and enter an order: (1) disallowing the HSBC Claim to the extent based on the March 2002 Debt; and (2) granting the Indenture Trustee such other and further relief as is just and appropriate under the circumstances.

Dated:  October 1, 2004                         SMITH, KATZENSTEIN & FURLOW, LLP


                                               /s/ Kathleen M. Miller
                                               Kathleen M. Miller (DE No. 2898)
                                               800 Delaware Avenue, 7th Floor
                                               P.O. Box 410
                                               Wilmington, Delaware 19899
                                               Telephone:    (302) 652-8400
                                               Facsimile:    (302) 652-8405
                                               Email:  Kmiller@skfdelaware.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **1st** day of **October, 2004,** a copy of the foregoing ***Objection of Law Debenture Trust Company of New York, as Indenture Trustee, to the of HSBC Bank, USA, as Indenture Trustee*** was served on the attached 2002 list by first class mail.

/s/ Kathleen M. Miller
Kathleen M. Miller