decrease is attributable to a decline in net debt issuances and repayments and an increase in cash used to repurchase subsidiary minority interests, offset by proceeds from common stock issuances in 2001.

During 2001 and 2002, we raised cash proceeds from the following offerings of our securities and new debt facilities.

- We completed a 3.68 million share common stock offering, including an overallotment option, in October 2001. The offering raised $74.9 million of net proceeds, after expenses and commissions. Approximately $35.0 million of these net proceeds were contributed to Blue Dot for the redemption of certain preferred stock and common stock held by former owners of these businesses pursuant to existing agreements and the remainder was used for general corporate purposes, including reducing short term debt and amounts drawn under our old credit facility.

- On December 21, 2001, NorthWestern Capital Financing II sold 4.0 million shares of its $8^{1}/_{4}\%$ trust preferred securities and on January 15, 2002, sold an additional 270,000 shares of its $8\,^{1}/_{4}\%$ trust preferred securities pursuant to an overallotment option. We received approximately $102.9 million in net proceeds from the offering, which we used for general corporate purposes and to repay a portion of the amounts outstanding under our old credit facility. The $8^{1}/_{4}\%$ trust preferred securities will be redeemed either at maturity on December 15, 2031, or upon early redemption.

- On January 31, 2002, NorthWestern Capital Financing III sold 4.0 million shares of its 8.10% trust preferred securities, and on February 5, 2002, sold an additional 440,000 shares of its 8.10% trust preferred securities pursuant to an overallotment option. We received approximately $107.4 million in net proceeds from the offering, which we used for general corporate purposes and to repay a portion of the amounts outstanding under our old credit facility. The 8.10% trust preferred securities will be redeemed either at maturity on January 15, 2032, or upon early redemption.

- On February 15, 2002, in connection with our recently completed acquisition of The Montana Power Company's energy distribution and transmission business, we assumed $511.1 million of debt and preferred stock net of cash received from The Montana Power Company and we entered into a $720 million term loan and drew down a $19.0 million swing line commitment under our $280 million revolving credit facility to fund our acquisition costs and repay borrowings of $132.0 million outstanding under our existing recourse bank credit facility. The $511.1 million of assumed debt and preferred stock includes various series of mortgage bonds,

59

---

pollution control bonds and notes that bear interest rates between 5.90% and 8.95%. These include both secured and unsecured obligations with maturities that range from 2003 to 2026.

- On March 13, 2002, we issued $250 million of our $7^{7}/_{8}\%$ senior notes due March 15, 2007, and $470 million of our $8^{3}/_{4}\%$ senior notes due March 15, 2012, which resulted in net proceeds to us of $713.9 million. We applied these net proceeds together with available cash to fully repay and terminate the $720 million term loan portion of our credit facility. On March 28, 2002, we entered into two fair value hedge agreements, each of $125.0 million, to effectively swap the fixed interest rate on our $250 million five-year senior notes to floating interest rates at the three month London Interbank Offered Rate plus spreads of 2.32% and 2.52%, effective as of April 3, 2002. These fair value hedge agreements were settled on September 17, 2002 resulting in $17.0 million of proceeds and an unrecognized gain to us. The unrecognized gain is recorded in Other Non-Current Liabilities and will be recognized as a reduction of interest expense over the remaining life of the notes. On the nine remaining coupon payments on the five-year notes, the amortization of the gain equates to a $1.9 million interest savings per coupon payment, effectively lowering the annual interest rate on the five-year notes to 6.3%.

- On October 8, 2002, we completed a 10 million share common stock offering. The offering raised $81.0 million of net proceeds, after expenses and commissions. The net proceeds were used for general corporate purposes, including reducing amounts drawn under our credit facility.

Capital expenditures for property, plant and equipment for the years ended December 31, 2002, 2001 and 2000, were $115.9 million, $163.9 million, and $61.4 million, respectively. We estimate that our capital expenditures for 2003 will be approximately $60 million for our regulated business and $23 million for our unregulated businesses. Our capital

expenditures are continually examined and evaluated and may be revised in light of changing business operating conditions, variation in sales and other business factors. Our future investment in any non-utility entity, including Blue Dot, CornerStone or Expanets, is limited to $10 million without the approval of the MPSC, pursuant to an order issued in connection with approval of our senior secured term loan. With the approval of the MPSC, we may make secured loans of up to $30 million for Expanets and $20 million for Blue Dot under the order, but we do not intend to do so. We expect our capital expenditures for our regulated business to approximate $60 million in each of years 2004 through 2007.

As of December 31, 2002, NorthWestern had long-term borrowings of approximately $2.1 billion. Through March 31, 2003, we have:

- Repaid $15.0 million aggregate principal amount of maturing Montana Secured Medium Term Notes.
- Repaid approximately $11.2 million on Expanets' credit facility with Avaya. The remaining outstanding balance on this facility of approximately $27.1 million was formally extended by Avaya and is due in three equal installments of approximately $9.0 million on each of January 1, April 1 and July 1, 2004.
- Agreed with Avaya to cancel the Expanets subordinated note in the face amount of $35.0 million due 2005 that was issued as partial consideration in the GEM acquisition. The subordinated note was non-interest bearing and had a carrying value of approximately $27.0 million as of December 31, 2002.
- Repaid and terminated our $280 million credit facility, of which the outstanding balance at December 31, 2002 was approximately $255.0 million and which was fully drawn, including back-up letters of credit, on the date of repayment, with net proceeds received on a $390 million secured term loan closed during February 2003.

After such repayments, as of March 31, 2003, we now have approximately $2.2 billion in long-term borrowings, with maturities during the balance of 2003 of approximately $9.0 million, which excludes $16 million related to the Blue Dot credit facility, currently in default, which is non-recourse to us. In 2004, we have approximately $42.3 million in maturities, including approximately $27.1 million under Expanets' credit agreement with Avaya, for which we have an obligation to purchase inventory and receivables in an amount equal to the outstanding balance in the event of a default by Expanets.

60

The following table shows our contractual cash obligations and commercial commitments as of December 31, 2002:

| Commitments | Total | Payment Due By Period Year Ending December 31, | | | | | |
| | | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | (in thousands) | | | | | |
| **Debt:** | | | | | | | |
| Senior Notes, 7⅞% and 8¾% | $ 720,000 | $ — | $ — | $ — | $ — | $ 250,000 | $ 470,000 |
| Discount on Senior Notes | (802) | — | — | — | — | — | (802) |
| Senior Unsecured Debt, 6.95% | 105,000 | — | — | — | — | — | 105,000 |
| Credit Facility(1) | 255,000 | 3,900 | 3,900 | 3,900 | 243,300 | — | — |
| South Dakota Mortgage Bonds, 7.00% and 7.10% | 115,000 | — | — | 60,000 | — | — | 55,000 |
| South Dakota Pollution Control Obligations, 5.85% and 5.90% | 21,350 | — | — | — | — | — | 21,350 |
| Montana First Mortgage Bonds, 7.00%, 7.30%, 8.25% and 8.95% | 157,197 | — | — | 5,386 | 150,000 | 365 | 1,446 |
| Discount on Montana First Mortgage Bonds | (3,226) | — | — | — | — | — | (3,226) |
| Montana Pollution Control Obligations, 6.125% and 5.90% | 170,205 | — | — | — | — | — | 170,205 |
| Montana Secured Medium Term Notes, 7.23% and 7.25% | 28,000 | 15,000(2) | — | — | — | — | 13,000 |
| Montana Unsecured Medium Term Notes, 7.07%, 7.96 and 7.875% | 40,000 | — | — | — | 15,000 | — | 25,000 |
| Montana Natural Gas Transition Bonds, 6.20% | 50,866 | 4,364 | 4,052 | 4,744 | 4,712 | 5,248 | 27,746 |
| Expanets credit facility(3) | 38,299 | 11,199(4) | 27,100(4) | — | — | — | — |
| Blue Dot credit facility | 16,000 | 16,000 | — | — | — | — | — |
| Other debt, various(4) | 29,733 | 795 | 1,170 | 27,308 | 221 | 239 | — |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Capital leases(5) | 19,272 | 6,620 | 6,081 | 3,312 | 2,177 | 708 | 374 |
| Total Debt | 1,761,894 | 57,878 | 42,303 | 104,650 | 415,410 | 256,560 | 885,093 |
| Mandatorily Redeemable Preferred Securities of Subsidiary Trusts: | | | | | | | |
| 8.125% mandatorily redeemable preferred securities of subsidiary trust | 32,500 | — | — | — | — | — | 32,500 |
| 7.20% mandatorily redeemable preferred securities of subsidiary trust | 55,000 | — | — | — | — | — | 55,000 |
| 8.45% mandatorily redeemable preferred securities of subsidiary trust | 65,000 | — | — | — | — | — | 65,000 |
| $8\frac{1}{4}$% mandatorily redeemable preferred securities of subsidiary trust | 106,750 | — | — | — | — | — | 106,750 |
| 8.10% mandatorily redeemable preferred securities of subsidiary trust | 111,000 | — | — | — | — | — | 111,000 |
| | 370,250 | — | — | — | — | — | 370,250 |
| Future minimum operating lease payments (5) | 342,086 | 59,891 | 54,461 | 48,379 | 41,405 | 36,004 | 101,946 |
| QF Facilities(6) | 143,606 | 9,395 | 8,075 | 7,908 | 2,811 | 3,804 | 111,613 |
| Power Purchase Contracts(7) | 1,694,561 | 306,293 | 291,984 | 269,869 | 231,096 | 3,804 | 432,935 |
| Interest payments on existing debt and preferred securities | 2,168,988 | 174,471 | 171,110 | 169,270 | 161,771 | 162,384 | 1,383,826 |
| Total Commitments | $ 6,481,565 | $ 608,108 | $ 567,933 | $ 600,076 | $ 852,493 | $ 108,540 | $ 3,285,663 |

(1)  In addition, as of December 31, 2002, NorthWestern had letters of credit totaling $20.4 million outstanding under its $280 million revolving credit facility. This facility was terminated and repaid in full on February 10, 2003. This facility was repaid with a portion of the proceeds from our new $390 million senior secured term loan, which we drew down on February 10, 2003 and which matures on December 1, 2006. We have adjusted the maturity schedule of the amounts outstanding under our $280 million revolving credit facility at December 1, 2002 to match the maturity schedule under our new $390 million senior secured term loan. The entire outstanding balance under the senior secured term loan matures on December 31, 2006, expected to be approximately $378 million, net of scheduled amortization. We have also included the interest payments on our senior secured term loan in the interest payments reflected in this table.

(2)  These Montana Secured Medium Term Notes matured and were repaid in their entirety on January 27 and 28, 2003.

(3)  This facility had an outstanding balance of $27.1 million as of March 31, 2003. Amounts repaid under this facility may not be reborrowed. If Expanets defaults under this facility, we may be obligated to purchase inventory and accounts from Avaya in an amount equal to the outstanding balance of the facility.

*(Footnotes continued on the next page.)*

61

*(Footnotes continued from the preceding page.)*

(4)  Subsequent to December 31, 2002, we reached an agreement with Avaya to settle certain claims and to restructure the terms of Avaya's investments in Expanets' equity and debt securities. In connection with such agreement, Expanets paid down the balance of its credit facility to approximately $27.1 million, which was deferred until 2004 and will be repaid in equal payments on January 1, 2004, April 1, 2004 and July 1, 2004. Further, Expanets' non-interest bearing note in the face amount of $35.0 million which was carried on Expanets' books at a value of approximately $27.0 million at December 31, 2002 and is included in Other debt, various, was forgiven by Avaya. See Item 1. "Business—Communications, Network Services and Data Solutions Business—Expanets—Operating Developments" for further details of this agreement.

(5)  The capital lease obligations are principally used to finance equipment purchases. These leases have various implicit interest rates, which range from 2.0% to 16.1%. NorthWestern has a financial commitment related to certain vehicles under operating leases by Expanets and Blue Dot, in the event of default and subsequent failure to cure such default. At December 31, 2002 the amount of this financial commitment is approximately $24.7 million.

(6)  As discussed in "Utility Regulation—Electric Operations—Montana", with the acquisition of our Montana operations we assumed a liability for expenses associated with certain Qualifying Facilities Contracts, or QFs. The QFs require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our gross contractual obligation related to the QFs is approximately $1.9 billion. A portion of the costs incurred to purchase this energy is recoverable through rates authorized by the MPSC, totaling approximately $1.5 billion. We have established a liability as of the date of the acquisition of $134.3 million, which represents the net present value, utilizing a discount rate of 8.75%, of the difference between our obligations under the QFs and the related amount recoverable in rates. The obligation and payments reflected on this schedule represent the amortization of this liability.

(7)  As discussed in "Electric Operations—Electric Supply" and "Natural Gas Operations—Natural Gas Supply", we have entered into various power purchase commitments, largely purchased power, coal and natural gas supply, electric generation construction and natural gas transportation contracts. These commitments range from one to thirty years.

Each of the debt agreements, mandatorily redeemable preferred securities of subsidiary trust and capital and operating leases described in the above-referenced table, as well as other contractual obligations including the Blue Dot exchange agreements and the obligations under the Defined Benefit Pension and Postretirement Benefit Plan are described under the caption "Description of Indebtedness and Other Contractual Obligations."

For our utility only operations, which excludes Blue Dot, Expanets, and all other unregulated entities, and absent proceeds from the sale of non-core assets, we estimate the following for the years 2003 and 2004 ($ are approximate and in millions):

|  | 2003 | | 2004 | |
| --- | --- | --- | --- | --- |
| Cash flows from operating activities(1) | $ | 30 | $ | 80 |
| Cash flows used in investing activities(2) | | (60) | | (60) |
| Cash flows provided (used) in financing activities(3) | | 32 | | (39) |
| Increase (decrease) in cash and cash equivalents | $ | 2 | $ | (19) |

(1)    The 2003 amount includes a net decrease in working capital of approximately $45 million and interest payments of approximately $140 million. The 2004 amount includes a net decrease in working capital of approximately $15 million and interest payments of approximately $140 million.

(2)    These amounts are comprised of capital expenditures.

62

(3)    The 2003 amount represents the net total of our currently anticipated financing activities for 2003 and is comprised of the following:

| | | |
| --- | --- | --- |
| Net proceeds—Senior secured term loan | $ | 366 |
| Repayment of outstanding debt and retirement of letters-of-credit with proceeds from senior secured loan | | (280) |
| Trust preferred dividend payments | | (30) |
| Other debt payments | | (24) |
| Cash flows provided by financing activities | $ | 32 |

We have the right to defer payment of our trust preferred dividend payments for up to 20 consecutive quarters. The 2004 amount includes trust preferred dividend payments of approximately $30 million, and other debt payments of approximately $9 million.

Based on our current plans and business conditions, we expect that our available cash, cash equivalents and investments, together with amounts generated from operations, will be sufficient to meet our cash requirements for at least the next twelve months. However, due to a decrease in cash and cash equivalents during 2004, we believe that we may need additional funding sources or proceeds from the sale of non-core assets, by the end of 2004 or early in 2005. Commencing in 2005, we face substantial debt reduction payments. Absent the receipt of significant proceeds from the sale of non-core assets, the raising of additional capital or a restructuring of our debt, we will not have the ability to reduce our debt or meet our maturing debt obligations. Even if we are successful in selling some or all of our non-core assets, we will have to restructure our debt or seek new capital.

The principal elements of our turnaround plan will be to focus on our core electric and natural gas utility businesses and to commit to reduce our debt. In that regard,

- We do not intend to make any additional significant investments in, or commitments to, Expanets and Blue

Dot while we examine strategic alternatives for these businesses, including the sale or disposition of each of these businesses or their assets;

- We are seeking to enforce a contract for the sale of our Colstrip Transmission line, and we propose to sell certain of our non-core assets, including our Montana First Megawatts project;

- We intend to review all corporate overhead and significantly reduce expenditures; and

- We have departed from our historical practice of paying dividends on our common stock.

## Description of Indebtedness and Other Contractual Obligations

*Senior Notes.*    The Senior Notes are two series of unsecured notes that we issued in 2002 in connection with our acquisition of NorthWestern Energy LLC. These senior notes mature in 2007 and 2012.

*Senior Unsecured Debt.*    The Senior Unsecured Debt is a general obligation that matures in 2028. We issued this debt in November 1998, and the proceeds were used to repay short-term indebtedness and for general corporate purposes.

*Senior Secured Term Loan.*    In February 2003, we closed and received funds from a $390 million senior secured term loan, which is secured by $280 million of First Mortgage Bonds secured by substantially all of our Montana utility assets and $110 million of First Mortgage Bonds secured by substantially all of our South Dakota and Nebraska utility assets. The net proceeds from this facility were used to repay $260 million outstanding plus approximately $20 million in letters of credit and terminate our prior working capital facility, which had a $280 million revolving line of credit, and provided ongoing liquidity to the Company. Our prior credit facility, which bore interest at a variable

63

rate tied to the London Interbank Offered Rate plus a spread of 1.5% based on our credit ratings and accrued interest at 2.88% per annum as of December 31, 2002, was repaid and terminated on February 10, 2003.

Our new senior secured term loan bears interest at a variable rate tied to the Eurodollar rate, with a floor of 3.0%, plus a spread of 5.75% or at the prime rate, with a floor at 4.00%, plus a spread of 4.75%. Our new senior secured term loan expires on December 1, 2006, although we must make quarterly amortization payments equal to $975,000 commencing on March 31, 2003. The credit agreement with respect to our senior secured term loan contains a number of representations and warranties and imposes a number of restrictive covenants that, among other things, limit our ability to incur indebtedness and make guarantees, create liens, make capital expenditures, pay dividends and make investments in other entities.

In addition, we are required to maintain certain financial ratios for NorthWestern and its subsidiaries, excluding Blue Dot, Expanets and CornerStone (the "Borrower"), including:

- net worth, as defined, on the last day of each fiscal quarter of at least $616.0 million plus 50% of cumulative net income (but not losses) from each quarter commencing with the quarter ending March 31, 2003 ($785.1 million at December 31, 2002);

- a funded debt to total capital ratio, as defined, on the last day of each fiscal quarter of no greater than 72.5% (69.1% at December 31, 2002);

- a ratio of utility business earnings before interest, taxes, depreciation and amortization, or EBITDA(1), to consolidated recourse interest expense (which excludes non-cash interest expense) for the prior four fiscal quarters of at least 1.40 to 1.00 (2.25 at December 31, 2002);

---

(1)    EBITDA is a non-GAAP financial measure and as such, we have not used it in describing our results of operations.

We have used EBITDA in this section specifically to show compliance with our debt covenants and we do not refer to EBITDA for any other purpose herein.

- a ratio of Montana utility business EBITDA to interest expense on the Montana First Mortgage Bonds for the trailing four fiscal quarters of at least 3.00 to 1.00 (7.52 at December 31, 2002);

- a ratio of South Dakota utility business EBITDA to interest expense on the South Dakota First Mortgage Bonds for the trailing four fiscal quarters of at least 2.50 to 1.00 (6.11 at December 31, 2002);

- a ratio of funded debt outstanding on the last day of each fiscal quarter to utility business EBITDA for the trailing four fiscal quarters of less than 8.75 to 1.00 prior to January 1, 2004, less than 8.25 to 1.00 during 2004 and less than 7.50 to 1.00 thereafter (7.68 at December 31, 2002);

- a ratio of the aggregate amount of Montana First Mortgage Bonds outstanding on the last day of each fiscal quarter to Montana utility business EBITDA for the trailing four fiscal quarters of less than 4.25 to 1.00 prior to January 1, 2005 and less than 3.75 to 1.00 thereafter (1.99 at December 31, 2002); and

- a ratio of the aggregate amount of South Dakota First Mortgage Bonds outstanding on the last day of each fiscal quarter to South Dakota utility business EBITDA for the trailing four fiscal quarters of less than 4.75 to 1.00 prior to January 1, 2005 and less than 4.25 to 1.00 thereafter (2.32 at December 31, 2002);

For purposes of determining compliance with these covenants, "net worth" is defined as the sum of shareholders' equity and preferred stock (including mandatorily redeemable preferred stock of subsidiary trusts), preference stock and preferred securities of the Borrower on September 30, 2002, with said total specified as $770 million, plus any gain in (or minus any loss in) the sum of

64

shareholders' equity and preferred stock (including mandatorily redeemable preferred stock of subsidiary trusts), preference stock and preferred securities of the Borrower (excludes losses of subsidiaries Expanets, Blue Dot and CornerStone) after September 30, 2002. Total capital is defined as funded debt on any such date plus net worth (as defined) as of the end of the most recent fiscal quarter. The table below shows the components used to determine net worth (as defined), and the respective amounts of each component, at December 31, 2002:

| | |
|---|---|
| Shareholders' deficit at December 31, 2002 (in thousands) | $    (456,076) |
| Add back losses of Excluded Subsidiaries (as defined): | |
| Loss on discontinued operations | 101,655 |
| Expanets loss for the quarter ended December 31, 2002 | 447,636 |
| Blue Dot loss for the quarter ended December 31, 2002 | 321,602 |
| Company obligated mandatorily redeemable preferred securities of subsidiary trusts | 370,250 |
| Net Worth (as defined) | $    785,067 |

In January 2003, in connection with executing the new senior secured term loan, we applied to the MPSC for authorization to issue up to $280 million aggregate principal amount of First Mortgage Bonds secured by Montana utility assets as security for our new senior secured term loan facility. In granting its approval, the MPSC placed the following conditions on the approval of the First Mortgage Bonds:

- We must apply all proceeds from the sale of non-utility assets, specifically including Blue Dot and Expanets, to debt reduction;

- We must commit to fully funding the operation, maintenance, repair and replacement of our public utility infrastructure in Montana and to file a required maintenance plan and budget with the MPSC, which we have filed;

- We may not provide more than an additional $10 million in the aggregate in capital to any non-utility entity without the prior approval of the MPSC;

- We must report all advances to non-utility companies to the MPSC within 5 business days of such advance; and

- if the existing credit agreements for Blue Dot or Expanets are terminated, we may file an application with the MPSC seeking approval to provide secured loans of up to $20 million to Blue Dot and up to $30 million to Expanets.

Our turnaround plan is dependent upon receiving proceeds from the sale of our non-core assets, in order to reduce our debt. We are generally prohibited from selling our assets, other than sales of our Colstrip transmission system, sales of assets of, or capital stock in, Montana Megawatts I, LLC and other entities formed for the Montana First Megawatts Project, or sales of other assets that do not exceed, in the aggregate, 10% of the value of our consolidated tangible assets for our utility business as of the reference date for the senior secured term loan, or December 17, 2002. All of the net proceeds from a permitted sale or series of sales of utility assets of at least $10 million as well as 50% of the net proceeds of any equity offering of at least $10 million, must first be offered to the lenders to pay principal and accrued interest on the secured term loan. If such first offer is not accepted, we may use an amount not more than the remaining net proceeds of such transactions not accepted by the lenders to prepay other debt. We do not intend to sell any of our core utility assets. Depending upon the price at which Blue Dot, Expanets or other assets may be sold, we may be required to obtain a waiver from the lenders to sell their stock. While Expanets and Blue Dot are not prohibited from selling their assets and distributing the proceeds to their equity holders, the net proceeds would have to be offered for prepayment to the lenders before prepaying any other debt.

65

We may also offer to prepay, not more than once every three months, all on a portion of the senior secured term loan, which payment maybe accepted or rejected by the lenders. However, unlike mandatory prepayment offers required for the disposition of stock or assets or the issuance of equity, as described above, voluntary prepayment amounts declined by the lenders may not be used to prepay other indebtedness unless waived by the lenders.

*Other Mortgage Bonds.*   We have also issued other mortgage bonds under our South Dakota indenture that mature in 2005 and 2023, including our South Dakota Pollution Control Obligations. All of such bonds are secured by substantially all of our South Dakota and Nebraska electric and natural gas assets.

We have also issued other mortgage bonds under our Montana indenture that mature in 2005, 2006, 2007 and 2022. The Montana Pollution Control Obligations are three obligations that The Montana Power Company issued that mature in 2023. The Montana Secured Medium Term Notes are two obligations that The Montana Power Company issued that mature in 2003 and 2008. The Montana Natural Gas Transition Bonds were issued by The Montana Power Company and mature in 2012. All of these obligations are secured by substantially all of our Montana electric and natural gas assets. The series of Montana Secured Medium Notes that matured in January 2003 bore interest at 7.23% per annum and were repaid at their maturity on January 27-28, 2003.

The Montana Unsecured Medium Term Notes are three general obligations issued by The Montana Power Company that mature in 2006 and 2026.

*Blue Dot's Credit Facility.*   On August 30, 2002, Blue Dot entered into a working capital credit facility with a commercial bank that provides $20 million of available credit for general corporate purposes and matures on August 31, 2005. The facility bears interest at a variable rate (5.0% as of December 31, 2002 tied to the prime rate as announced from time to time by the bank under the credit facility or LIBOR plus in each case a variable margin. The margin can range from .25% to 1.00% above the prime rate or 2.75% to 3.50% above LIBOR. The facility is collateralized by substantially all assets of Blue Dot and contains restrictive covenants prohibiting, among other things, the use of cash by Blue Dot for various purposes including acquisitions, dividend payments to NorthWestern, acquiring outstanding shares of Blue Dot equity, as well as any capital expenditures unless funded by NorthWestern. The facility also prohibits the sale of certain assets, such as the non-core locations, without consent of the bank and provides that a default will occur in the event that NorthWestern

ceases to control Blue Dot. The facility is nonrecourse to NorthWestern, but subordinates certain indebtedness owed to NorthWestern by Blue Dot to the obligations owed by Blue Dot under the credit facility. In addition, the facility requires Blue Dot to maintain minimum EBITDA requirements and fixed charge coverage ratios, as defined in the facility documents. As of December 31, 2002, $16.0 million was outstanding on the facility and Blue Dot was in default of certain covenants as a result of its failure to meet its minimum EBITDA requirement for the four quarters ending on December 31, 2002, fund capital expenditures with funds provided by NorthWestern in advance as required under the facility and deliver certain reports. In addition, as of March 31, 2002, the credit facility was fully drawn in the amount of $20 million and Blue Dot was in default on certain other covenants as a result of (i) its failure to meet the minimum EBITDA requirement for the four quarters ending on March 31, 2003, (ii) its failure to fund certain additional capital expenditures with funds provided by NorthWestern in advance as required under the facility, (iii) its failure to pay up to $4.1 million in redemption obligations to certain holders of Series A Preferred Stock and Class C Common Stock and (iv) making certain interest payments on subordinated debt which were prohibited by the terms of the credit facility. These defaults permit the bank at its election to, among other things, increase the interest rates to prime plus 4.00% and LIBOR plus 6.00%, suspend any further LIBOR borrowings, refuse to make any additional loans, terminate the credit facility and require the immediate repayment of all outstanding loans. In addition, the existence of these defaults prevent Blue Dot from making payments under certain subordinated debt, which will result in Blue Dot being in default under

66

these instruments. Blue Dot is currently attempting to obtain a waiver of the existing defaults and modify various financial and other covenants of the facility to prevent further potential defaults under the facility and under certain other obligations of Blue Dot. As of December 31, 2002, the facility has been classified as current in our consolidated Balance Sheet.

*Expanets' Credit Facility.* The Expanets facility represents a short-term line of credit that was provided to Expanets by Avaya for the purpose of financing purchases of Avaya products and services. The remaining outstanding principal balance on the line of credit of approximately $27 million has been extended and is now due in three equal installments of approximately $9 million on each of January 1, April 1 and July 1, 2004. If Expanets defaults on this facility, we may be obligated to purchase inventory and accounts from Avaya in an amount equal to the then outstanding balance of the facility. As of December 31, 2002, the effective interest rate of this loan was 15%. No new borrowings are permitted under the facility and our repurchase obligation will remain in place until the balance is fully paid.

Expanets must achieve financial independence from NorthWestern and is in the process of seeking an asset-based commercial credit facility to replace the Avaya line of credit and to provide operating capital to fund its day-to-day operations. Expanets will incur additional expenses on systems to enhance internal controls.

The Other Debt includes a $35.0 million subordinated note payable to Avaya. In April 2000, Expanets completed a transaction to purchase the Lucent GEM business and, as part of the transaction, Expanets issued Avaya a $35.0 million subordinated note and a $15.0 million convertible note. The $15.0 million note converted into Series D Preferred Stock of Expanets prior to the end of 2001. On March 13, 2003, Avaya cancelled the $35.0 million subordinated note due 2005 and the $15 million Series D Preferred Stock. The subordinated note was non-interest bearing and had a carrying value of $27 million as of December 31, 2002.

*Mandatorily Redeemable Preferred Securities of Subsidiary Trust.* We have established four wholly owned, special-purpose business trusts, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II and NorthWestern Capital Financing III, to issue common and preferred securities and hold subordinated debentures that we issue and The Montana Power Company established Montana Power Capital I (Trust) as a wholly owned business trust to issue common and preferred securities and hold subordinated debentures that it issued. We assumed the obligations of The Montana Power Company under the subordinated debentures that it issued to Montana Power Capital I on November 15, 2002. The sole assets of these trusts are the investments in our subordinated debenture obligations. The trusts use the interest payments received on the subordinated debentures to make quarterly cash distributions on the preferred securities. These subordinated debentures are unsecured and subordinated to all of our other liabilities and rank equally with the guarantees related to the other trusts. We guarantee payment of the dividends on the preferred securities only if we have made the required interest payments on the subordinated debentures held by the trusts. We have also agreed to pay all of the expenses of the trusts. In addition, we own all of the common securities of each trust, equivalent to approximately 3% of the capital of each trust. Five years from the date of each issuance, and earlier in some circumstances if changes in law occur, we have the option to redeem some or all of the subordinated debentures at 100% of their principal amount plus any accrued interest to the date of redemption. All of the subordinated debentures have maturities in excess of 20 years.

We have the right, on one or more occasions, to defer interest payments in the subordinated debentures for up to 20 consecutive quarterly periods unless a default under the subordinated debentures has occurred and is continuing. If we defer interest payments on the subordinated debentures, cash distributions on our trust preferred securities will also be deferred. During this deferral period, distributions will continue to accumulate on both the trust preferred securities and deferred distributions at their respective annual rates. During any period in which we defer interest

67

payments on the subordinated debentures, we will not, with some exceptions, be permitted to pay any dividends or distributions in respect of our capital stock; redeem, purchase or make liquidation payments on our capital stock; make principal, premium or interest payments or repurchase or redeem any of our debt securities that rank equal with or junior to the subordinated debentures; or make any payments with respect to any guarantee of debt securities of any of our subsidiaries, including other guarantees, if such guarantee ranks equal with or junior to the subordinated debentures. Given our significant debt, our board of directors will review the appropriateness of each periodic interest payment under the subordinated debentures in light of, among other factors, the progress of our turnaround plan and our liquidity needs.

At December 31, 2002, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II, NorthWestern Capital Financing III and Montana Power Capital I had 1.3 million, 2.2 million, 4.27 million, 4.44 million and 2.6 million shares of preferred securities outstanding, respectively, accrued distributions at the annual rate of 8.125%, 7.2%, 8.25%, 8.1% and 8.45%, respectively, of their liquidation preference value of $25 per security, and had assets of approximately $33.5 million, $56.7 million, $110.1 million, $114.4 million and $67 million of our subordinated indebtedness, respectively.

*Other Contractual Obligations.*   Many of Blue Dot's acquisitions have involved the issuance of Blue Dot capital stock to the sellers of the acquired businesses. In connection with certain acquisitions, the sellers can elect under certain circumstances to exchange their shares for cash at a predetermined rate. The aggregate amount of exchange obligations as of December 31, 2002 was $3.9 million, of which $2.1 million was presented for exchange on March 31, 2003 and remains unpaid.

For certain other acquisitions, Blue Dot entered into call option agreements giving Blue Dot the right to repurchase these shares at a price that will vary, and may be greater or less than the original issue price, based upon the performance of the designated business unit over a specified time. Certain of these agreements grant the holder the right to put such shares to Blue Dot at their adjusted book value if there has not been an initial public offering of Blue Dot by a specified date or at the lesser of the initial public offering price and the current market price shortly after the public offering occurs. For certain agreements, if the shareholder has not exercised his put or has been subject to the exercise of a put or call, the shareholder may be entitled to receive certain payments under earnout arrangements. These earnouts will vary depending upon the performance of the designated business unit over time. The maximum aggregate obligation in respect of these arrangements was approximately $50.0 million as of December 31, 2002, of which $2 million and $4.4 million was due as of March 31, 2003 and June 30, 2003, respectively. Our subsidiary, NorthWestern Growth Corporation, may be required to provide support for certain of the exchange, call option and earnout obligations by providing, at its election, either cash and/or shares of our registered common stock in an amount equal to such obligation in the event Blue Dot fails to perform. Blue Dot is prohibited under its credit agreement from making such payments with its own funds. We have advised Bue Dot that no additional funds will be provided to support such obligations. Blue Dot is attempting to negotiate extensions or other arrangements to satisfy these obligations. Blue Dot's failure to pay these obligations, and NorthWestern Growth's failure to provide support, may result in liability to such shareholders and additional defaults under Blue Dot's credit agreement.

Similar to Blue Dot, many of Expanets' acquisitions involved the issuance of Expanets capital stock to sellers of acquired businesses. In connection with certain of these acquisitions, the sellers can elect to exchange their Expanets stock for cash at a predetermined exchange rate. NorthWestern Growth Corporation may be required to support Expanets' repurchase obligations. As of March 31, 2003 exchange obligations totaling $6.0 million had been presented to Expanets for payment and $0.8 million of such obligations have been paid. Unless Expanets or NorthWestern Growth satisfies the payment obligations to shareholders under the exchange agreements, such shareholders may pursue enforcement

68

of the obligations, including through litigation. NorthWestern has subsequently indicated that no additional funds will be provided to Expanets or NorthWestern Growth for these purposes.

As discussed in "Critical Accounting Policies and Estimates—Minority Interest in Consolidated Subsidiaries", Blue Dot had exchange obligations totaling $3.9 million and Expanets had exchange agreement obligations totaling $6.0 million that are reflected as Minority Interests at December 31,2002 and may be required to be paid during 2003.

We are required to provide audited financial statements under several of our debt instruments, pension plans and other instruments and arrangements within 90 days after the end of our fiscal year. We have not provided audited financials as of the date of this report and are, therefore, in technical default of these requirements. We intend to satisfy our financial statement delivery requirements promptly following filing of this report.

*Employment Contracts.*   Several, but not all, of our senior executive officers have comprehensive employment agreements with terms through 2004 to 2006. For information about these employment contracts, see "Employment Contracts" at Item 11 of this Report.

*Defined Benefit Pension and Postretirement Benefit Plans.*   With the acquisition of our Montana operations, our pension and other postretirement benefit obligations significantly increased. Our reported costs of providing pension and other postretirement benefits, as described in Note 13 of "Notes to the Consolidated Financial Statements" contained in Item 8, are dependent upon numerous factors resulting from actual plan experience and assumptions of future experience.

Pension and other postretirement benefit costs, are impacted by actual employee demographics, including age and compensation levels, the level of contributions we make to the plan, earnings on plan assets, and health care cost trends. Changes made to the provisions of such plans may also impact current and future benefit costs. Benefit costs may also be significantly affected by changes in key actuarial assumptions, including anticipated rates of return on plan assets and the discount rates used in determining the postretirement benefit obligation and postretirement costs.

As a result of the factors listed above, significant portions of pension and other postretirement benefit costs recorded in any period do not reflect, and are generally greater than, the actual benefits provided to plan participants.

Our pension and other postretirement benefit plan assets are primarily made up of equity and fixed income investments. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased pension and other postretirement benefit costs in future periods. Likewise, changes in assumptions regarding current discount rates and expected rates of return on plan assets could also increase or decrease recorded pension and other postretirement benefit costs.

Due to the sharp declines in United States equity markets since the third quarter of 2000, the value of the assets held in the plans' trusts to satisfy the obligations of the other postretirement plans has decreased significantly. At December 31, 2002 our accumulated benefit obligation exceeded plan assets by approximately $119.1 million for our pension plans. In addition, our projected benefit obligation for other postretirement benefit plans exceeded plan assets by $98.6 million; however, we have life insurance contracts on certain employees with cash surrender values totaling approximately $30 million to partially offset this $98.6 million obligation. Additional contributions may be required in the near future to meet the requirements of the plan to pay benefits to plan participants. To the extent such additional contributions are reflected in the ratemaking process to determine the rates billed to customers, such amounts will be treated as regulatory assets. For the year ended December 31, 2002, contributions to our pension and other postretirement benefit plans were $7.4 million. No contributions were made during 2001. The increase in contributions for fiscal 2002 was the result of the acquisition of The Montana Power, LLC and the excess of our accumulated benefit obligations over plan assets in

69

2001. We expect contributions for pension and other postretirement benefit plans to be at least $17.4 million in 2003.

## NEW ACCOUNTING STANDARDS