| | | | | | |
|---|---:|---|---:|---|---:|
| Fair value of plan assets at January 1 | $ | 48,871 | $ | 58,438 | $ 6,344 |
| Actual loss on plan assets | | (25,147) | | (4,925) | (646) |
| Purchased assets—Montana Power | | 196,223 | | — | — |
| Employer contributions | | 1 | | — | — |
| Settlements | | — | | — | 7,435 |
| Gross benefits paid | | (18,746) | | (4,642) | (8,338) |
| | | | | | |
| Fair value of plan assets at end of year | $ | 201,202 | $ | 48,871 | $ 4,794 |

The total projected benefit obligation and fair value of plan assets for the pension plans with projected benefit obligations in excess of plan assets were $330 million and $201.2 million, respectively as of December 31, 2002. The total accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $320.3 million and $201.2 million, respectively as of December 31, 2002. The total projected benefit obligation and fair value of plan assets for the pension plans with projected benefit obligations in excess of plan assets were $2.4 million and $0, respectively as of December 31, 2001. The total accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $1.6 million and $0, respectively as of December 31, 2001.

F-37

The accrued pension and other post-retirement benefit obligations recognized in the accompanying Consolidated Balance Sheets are computed as follows (in thousands):

| | Pension Benefits | | Other Postretirement Benefits |
|---|---|---|---|
| | 2002 | 2001 | 2002 |
| Funded Status | $ (128,778) | $ (1,656) | $ (98,558) |
| Unrecognized transition amount | 464 | 618 | 18,350 |
| Unrecognized net actuarial loss (gain) | 65,484 | 3,113 | 8,018 |
| Unrecognized prior service cost | 1,793 | 3,195 | — |
| | | | |
| (Accrued) Prepaid benefit cost | $ (61,037) | $ 5,270 | $ (72,190) |
| | | | |
| Prepaid benefit cost | 5,251 | $ 6,067 | — |
| Accrued benefit cost | (66,288) | (797) | (72,190) |
| Additional minimum liability | (58,043) | (801) | — |
| Intangible asset | 2,257 | 801 | — |
| Regulatory asset | 42,696 | — | — |
| Accumulated other comprehensive income | 13,090 | — | — |
| | | | |
| Net amount recognized | $ (61,037) | $ 5,270 | $ (72,190) |

The weighted-average assumptions used in calculating the preceding information are as follows:

| | Pension Benefits | Other Postretirement Benefits |
|---|---|---|

| | 2002 | 2001 | 2000 | 2002 |
|---|---|---|---|---|
| Discount rate | 6.50% | 7.00% | 7.50% | 6.0-6.75% |
| Expected rate of return on assets | 8.50% | 8.50% | 8.50% | 8.5% |
| Long-term rate of increase in compensation levels (non-union) | 4.00% | 3.50% | 3.00% | 4.0% |
| Long-term rate of increase in compensation levels (union) | 3.50% | 3.50% | 3.00% | 3.5% |

The rate of increase in per capita costs of covered health care benefits is assumed to be 12 percent in 2003, decreasing gradually to 5 percent by the year 2009. The following table sets forth the sensitivity of retiree welfare results (in thousands):

| | | |
|---|---|---|
| Effect of a one percentage point increase in assumed health care cost trend | | |
| on total service and interest cost components | $ | 154 |
| on postretirement benefit obligation | | 1,351 |
| Effect of a one percentage point decrease in assumed health care cost trend | | |
| on total service and interest cost components | $ | (134) |
| on postretirement benefit obligation | | (1,194) |

Pension costs in Montana and other postretirement benefit costs in South Dakota are included in rates on a pay as you go basis for regulatory purposes. Pension costs in South Dakota and other postretirement benefit costs in Montana are included in rates on an accrual basis for regulatory purposes. (See Note 15, "Regulatory Assets and Liabilities", for the regulatory assets related to our pension and other post-retirement benefit plans.)

F-38

During 2002 and 2000, we made available to select team members an early retirement program. The impact of that reduction in participants resulted in the Settlement Costs and Special Termination Benefits presented in the above table.

The Company, Expanets and Blue Dot provide various team member savings plans, which permit team members to defer receipt of compensation as provided in Section 401(k) of the Internal Revenue Code. Under the Plans, the team member may elect to direct a percentage of their gross compensation to be contributed to the Plans. We contribute up to a maximum of 3.5% of the team member's gross compensation contributed to the Plan. Expanets contributes up to 66.67% of the first 6% of team member contributions. Blue Dot contributes 25% of the first 6% of team member contributions. Costs incurred under all of these plans were $8.7 million, $8.0 million and $5.3 million in 2002, 2001 and 2000, respectively.

We have a deferred compensation trust available to all team members of corporate and the regulated utility division who are participants in the team member savings plan and whose maximum elective contribution permissible under that plan could be limited by any provision of the Internal Revenue Code. Trust participants may invest contributions in our common stock or other diversified investments available in the plan. Any investment elections in our common stock are presented as Treasury Stock; other investments as part of Investments ($1.3 million as of December 31, 2002); and an offsetting liability ($2.2 million as of December 31, 2002) for both as part of Other Noncurrent Liabilities in the Consolidated Balance Sheets. Our contributions to the plan were $713,000, $64,000 and $56,000 in 2002, 2001 and 2000, respectively.

### 14. Employee Stock Ownership Plan

We provide an Employee Stock Ownership Plan ("ESOP") for full-time team members of corporate and the regulated utility division. The ESOP acquired the majority of its shares through leveraged loans from a financial institution. The ESOP is funded primarily with federal income tax savings which arise from the deductibility of dividends, as allowed by the tax laws applicable to such team member benefit plans. Active team members enrolled in the plan prior to 1989 receive annual cash dividend payments, and may voluntarily contribute back to the plan a percentage of these dividends subject to discrimination rules of the IRS and ERISA. We then contribute a matching contribution equal to two times the voluntary contribution. Any excess after payment of the match is allocated pro rata to all participants. All dividends received on unallocated shares of participants enrolling subsequent to 1989 are used to repay the loans of the leveraged loan segment of the Plan. Shares on this leveraged portion of the plan are released as principal and interest on the loans are made. Certain Company contributions and shares of stock acquired by the ESOP are allocated to participants' accounts in proportion to the

### Natural Gas

Montana's Natural Gas Utility Restructuring and Customer Choice Act, also passed in 1997, provides that a natural gas utility may voluntarily offer its customers choice of natural gas suppliers and provide open access. We have opened access on our gas transmission and distribution systems, and all of our natural gas customers have the opportunity of gas supply choice. We are also the default supplier for the remaining natural gas customers.

### Regulatory Matters

The Montana, South Dakota and Nebraska PSCs regulates our transmission and distribution services and approves the rates that we charge for these services, while FERC regulates our transmission services and our remaining generation operations. There have been no regulatory issues in South Dakota or Nebraska during the past 3 years. Current regulatory issues are discussed below.

#### Montana

#### Electric Rates

On June 20, the Montana PSC directed the company to file new rates effective July 1, 2002 that recover estimated electric supply costs for the period July 1, 2002 through June 30, 2003. The rates are approved on an interim basis pending a prudence review that will be conducted after July 1, 2003. This includes implementation of rates to begin recovery of the out-of-market transition costs from the Tier II proceeding / order.

#### Natural Gas Rates

On October 10, 2002 the Commission issued an order authorizing the revenue changes outlined in a stipulation submitted by Northwestern Energy and the Montana Consumer Counsel that resolved two outstanding dockets. The stipulation finalized the calculation of the amounts that the company would be allowed to include for recovery in its natural gas tracker for purchases under a contract originally entered into with a related party. The issues resolved included the annual quantity of gas subject to purchase under the contract and the periods covered by the contract. We filed our 2002/2003 natural gas tracking filing with the Commission on November 13, 2002. Interim rates were effective December 15, 2002, with a final order still pending.

### FERC

Through a filing with FERC in April 2000, we are seeking recovery of transition costs associated with serving two wholesale electric cooperatives. On July 15, 2002, a FERC administrative judge issued a summary judgment dismissing the company's claim primarily on the grounds that the filing did not use FERC methodology. On December 2, 2002 we filed a "Brief on Exceptions to the Initial Decision" aimed at reversing the initial decision. A decision by FERC is still pending.

## 17. Stock Options and Warrants

Under the NorthWestern Stock Option and Incentive Plan ("Plan"), we have reserved 3,424,595 shares for issuance to officers, key team members and directors as either incentive-based options or nonqualified options. The Nominating and Compensation Committee ("Committee") of our Board of Directors administers the Plan. Unless established differently by the Committee, the per share option

exercise price shall be the fair market value of our common stock at the grant date. The options expire 10 years following the date of grant and options issued prior to 2002 vest over a three-year period beginning in the third year. Options issued during 2002 vest ratably over four years from the date of grant.

In addition, in 1998 we registered 1,279,476 warrants to non employees to purchase shares of NorthWestern common stock at $18.225 per share in connection with a previous acquisition. Warrants for 275,214 shares were exercised prior to December 31, 2000. During 2001, all of those remaining warrants were extinguished through a cashless exchange whereby holders received shares of our common stock equivalent to the difference between the warrant price and the market price of our common stock on the date of the exchange. 271,949 shares of common stock were issued in association with these transactions.

A summary of the activity of stock options is as follows:

|  | Shares | | Option Price Per Share | Weighted Average Option Price |
|---|---|---|---|---|
| Balance December 31, 1999 | 664,067 | $ | 23.00-26.13 | $  24.39 |
| Issued | 741,454 | | 21.50-23.31 | 21.95 |
| Canceled | (14,000) | | 20.63-23.00 | 21.98 |
| Balance December 31, 2000 | 1,391,521 | | 21.19-26.13 | 23.31 |
| Issued | 536,100 | | 22.70-25.00 | 23.03 |
| Canceled | (43,129) | | 21.19-23.31 | 22.31 |
| Balance December 31, 2001 | 1,884,492 | | 21.19-26.13 | 23.26 |
| Issued | 786,200 | | 15.26-20.70 | 20.61 |
| Canceled | (1,132,527) | | 20.30-26.13 | 22.45 |
| Balance December 31, 2002 | 1,538,165 | | 15.26-26.13 | 22.49 |

Options Exercisable as of:

|  | Shares | | Option Price Per Share | Weighted Average Option Price |
|---|---|---|---|---|
| December 31, 2000 | — | | — | — |
| December 31, 2001 | 72,488 | $ | 21.19-26.13 | $  23.11 |
| December 31, 2002 | 245,421 | | 20.70-26.13 | 23.73 |

We follow Accounting Principles Board Opinion 25, "*Accounting for Stock Issued to Employees,*" to account for stock option plans. No compensation cost is recognized because the option exercise price is equal to the market price of the underlying stock on the date of grant.

An alternative method of accounting for stock options is SFAS No. 123, "*Accounting for Stock-Based Compensation.*" Under SFAS No. 123, stock options are valued at grant date using the Black-Scholes valuation model and compensation cost is recognized ratably over the vesting period. SFAS No. 123 also requires disclosure of pro forma net income and earnings per share had the estimated fair value of option grants on their grant date been charged to compensation expense. The weighted average Black Scholes fair value of the options granted under the stock option plan during 2002, 2001 and 2000 was $8.45, $3.17 and $2.95. The weighted-average remaining contractual life of the

F-43

options outstanding at December 31, 2002 was 7.81 years. The table in Note 2 illustrates the effect on net income and earnings per share had the fair value of option grants been charged to compensation expense in the Consolidated Statements of Income.

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model

compensation of team members during the particular year for which the allocation is made subject to certain IRS limits. At December 31, 2002 and 2001, the ESOP had an outstanding loan balance of $5.9 million and $7.0 million, respectively, which is secured by the unallocated assets of the ESOP and guarantees of future minimum debt funding payments we make to the ESOP.

Due to the recent suspension of our common stock dividend and the declining stock price, at December 31, 2002 we accrued $5.9 million to satisfy the ESOP loan requirement. Costs incurred under the plan were $6.7 million, $0.8 million and $1.0 million in 2002, 2001 and 2000, respectively.

The shares held by the plan are included in the number of average shares outstanding when computing our basic and diluted earnings per share and any dividends paid to the plan are included in

F-39

the common dividend totals. The number, classification and fair value of shares held by the plan at December 31 are as follows:

|  | 2002 | | 2001 | |
| --- | --- | --- | --- | --- |
|  | Allocated | Unallocated | Allocated | Unallocated |
| Number of shares | 668,617 | 226,883 | 677,769 | 387,447 |
| Fair value | $ 3,396,574 | $ 1,152,566 | $ 14,267,037 | $ 8,155,759 |

## 15. Regulatory Assets and Liabilities

Our regulated businesses prepares their financial statements in accordance with the provisions of SFAS No. 71, as discussed in Note 2 to the Financial Statements. Pursuant to this pronouncement, certain expenses and credits, normally reflected in income as incurred, are recognized when included in rates and recovered from or refunded to the customers. Accordingly, we have recorded the following major classifications of regulatory assets and liabilities that will be recognized in expenses and revenues in future periods when the matching revenues are collected or refunded. We have specific orders to cover approximately 97% of our regulatory assets and approximately 98% of our regulatory liabilities.

|  | Note Ref. | Remaining Amortization Period | 2002 | 2001 |
| --- | --- | --- | --- | --- |
| Pension | 13 | Undetermined | $ 92,739 | $ — |
| Competitive transition charges |  | 10 Years | 44,809 |  |
| SFAS No. 106 purchase obligation | 13 | Undetermined | 28,951 | — |
| Income taxes | 10 | Plant lives | 35,102 |  |
| Other |  | Various | 14,904 | 8,447 |
| Total regulatory assets |  |  | $ 216,505 | $ 8,447 |
| Utility sale stipulation agreement |  | 1 Year | 16,254 | — |
| Gas storage sales |  | 37 Years | 15,456 | — |
| Proceeds from oil & gas sale |  | 1 Year | 15,982 | — |
| Income taxes | 10 | Plant lives | 6,921 | — |
| Other |  | Various | 1,237 | 6,950 |
| Total regulatory liabilities |  |  | $ 55,850 | $ 6,950 |

A pension regulatory asset has been recognized upon the purchase of Montana Power for the obligation that will be

included in future cost of service. Pension costs in Montana are recovered in rates on a cash basis. Competitive transition charges relate to natural gas properties and earn a rate of return sufficient to meet the debt service requirements of the Montana natural gas transition bonds. No other significant regulatory assets earn a return. A regulatory asset has been recognized for the SFAS No. 106 purchase obligation upon the purchase of Montana Power. The MPSC allows recovery of SFAS No. 106 costs on an annual basis. Tax assets and liabilities primarily reflect the effects of plant related temporary differences such as removal costs, capitalized interest and contributions in aid of construction that we will recover or refund in future rates. During 2000 and 2001 Montana Power made sales of natural gas from its storage field at prices in excess of its original cost, creating a regulatory liability. This gain is being flowed to customers over a period that matches the depreciable life of surface facilities that were added to maintain deliverability from the field after the withdrawal of the

F-40

gas. Montana Power also has a regulatory liability related to oil and gas proceeds, that is being credited to customer bills on a monthly basis. In connection with the acquisition of Montana Power, a stipulation agreement was signed that required a contribution by the previous owner and the Company, which will fund credits to Montana electric distribution customers. The account is being applied on a kilowatt hour basis beginning July 1, 2002 for one year.

## 16. Deregulation and Regulatory Matters

### Deregulation

The electric and natural gas utility businesses in Montana are operating in a competitive market in which commodity energy products and related services are sold directly to wholesale and retail customers.

### Electric

Montana's Electric Utility Industry Restructuring and Customer Choice Act (Electric Act), passed in 1997, provides that all customers will be able to choose their electric supplier by June 30, 2007, with our electric utility acting as default supplier. As default supplier, we are obligated to continue to supply electric energy to customers in our service territory who have not chosen, or have not had an opportunity to choose, other power suppliers.

In its 2001 session, the Montana Legislature passed House Bill 474, which, among other things, reaffirmed full cost recovery for the default supplier by mandating that the MPSC use an electric cost recovery mechanism providing for full recovery of prudently incurred electric energy supply costs. In November 2002, Initiative 117 was passed, repealing HB 474 and allowing a transition period through June 30, 2007. Because of the language that remains from the previous law, we believe we have adequate assurances of recovering our costs of acquiring electric supply.

On October 29, 2001, Montana Power, the former owner of the utility, filed with the PSC the default supply portfolio. That portfolio contained a mix of long and short-term contracts that were negotiated in order to provide electricity to default supply customers. This filing sought approval of the default supply portfolio contracts and establishment of default supply rates for customers who have not chosen alternative suppliers by July 1, 2002.

On that same day, Montana Power submitted an updated Tier II filing with the PSC, addressing the recovery of transition costs of generation assets and other power-purchase contracts, generation-related regulatory asset transition costs, and transition costs associated with the out-of-market QF power-purchase contract costs. The Tier II filing related to the deregulation of electric supply in Montana. On December 28, 2001, together with NorthWestern, the Montana Consumer Counsel, Commercial Energy and the Large Customer Group, Montana Power submitted to the PSC an agreed upon stipulation settling the transition cost recovery in the Tier II filing and approving the sale to NorthWestern. The stipulation called for Montana Power, through Touch America, and NorthWestern to establish a $30 million account that will be used to provide a credit for our electric distribution customers. As of December 31, 2002 this is a regulatory liability of $16.3 million, see Note 15, "Regulatory Assets and Liabilities". The credit is being provided over a one year period to customers on a per kilowatt-hour (Kwh) basis beginning on July 1, 2002, when our current below market energy supply contract expired. The stipulation also states that customers will have no obligation to pay any transition costs accrued under or relating to the accounting orders issued by the PSC.

F-41

with the following weighted-average assumptions:

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Expected life | 8 | 8 | 8 |
| Interest rate | 4.0% | 5.1% | 6.1% |
| Volatility | 26.5% | 18.8% | 21.2% |
| Dividend yield | — | 5.2% | 3.8% |

## 18.  Earnings (Loss) Per Share

Basic earnings per share is computed on the basis of the weighted average number of common shares outstanding. Diluted earnings per share is computed on the basis of the weighted average number of common shares outstanding plus the effect of the outstanding stock options and warrants. Average shares used in computing the basic and diluted earnings per share for 2002, 2001 and 2000 were as follows:

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Basic computation | 29,725,529 | 24,390,184 | 23,140,615 |
| Dilutive effect of |  |  |  |
| Stock options | — | 19,364 | 13,770 |
| Stock warrants | — | 45,760 | 183,396 |
| Diluted computation | 29,725,529 | 24,455,308 | 23,337,781 |

Certain outstanding antidilutive options and warrants have been excluded from the earnings per share calculations. These options and warrants total 1,538,165 shares, 1,221,876 shares and 697,976 shares in 2002, 2001 and 2000, respectively.

## 19.  Guarantees, Commitments and Contingencies

### Qualifying Facilities Liability

With the acquisition of our Montana Operations, we assumed a liability for expenses associated with certain Qualifying Facilities Contracts, or QFs. The QFs require us to purchase minimum amounts of energy at prices ranging from $65 to $138 per megawatt hour through 2029. Our gross contractual obligation related to the QFs is approximately $1.9 billion through 2029. A portion of the costs incurred to purchase this energy is recoverable through rates and payments from the MPSC, totaling approximately $1.5 billion through 2029. Upon completion of the purchase price allocation related to our acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company, we established a liability of $134.3 million, based on the net present value (using an 8.75% discount factor) of the difference between our obligations under the QFs and the related amount recoverable. At December 31, 2002 the liability was $143.6 million.

F-44

The following summarizes the contractual estimated payments, net of recoveries allowed in rates (in thousands):

|  |  |
|---|---|
| 2003 | $    11,100 |
| 2004 | 9,500 |
| 2005 | 10,200 |
| 2006 | 3,900 |
| 2007 | 5,800 |
| Thereafter | 398,800 |

Total                                                              $    439,300

### Long Term Power Purchase Obligations

We have entered into various commitments, largely purchased power, coal and natural gas supply, electric generation construction and natural gas transportation contracts. These commitments range from one to thirty years. The commitments under these contracts as of December 31, 2002 were $306.3 million in 2003, $292.0 million in 2004, $269.9 million in 2005, $231.1 million in 2006, $162.4 million in 2007 and $432.9 million thereafter. These commitments are not reflected in our Consolidated Financial Statements.

### Other Contractual Obligations

In connection with its issuance of shares of Series A Preferred Stock to third parties, Blue Dot entered into certain exchange agreements giving the holders the right to exchange these shares for a predetermined amount, payable in cash or shares of common stock of NorthWestern that have been registered for resale, if an initial public offering of Blue Dot does not occur within a specified time after the issuance of such shares. The aggregate amount of exchange obligations as of December 31, 2002 was $3.9 million (included in Minority Interests in the Consolidated Balance Sheet), of which approximately $2.1 million was required to be paid at the holders' election on March 31, 2003 and of which approximately $0.5 million could be required to be paid at the elections on September 30, 2003. Blue Dot did not make the payments due on March 31, 2003 and is attempting to negotiate extensions, repayment terms or other arrangements to satisfy these obligations with the appropriate parties.

In connection with its issuance of shares of Class C Common Stock, Blue Dot entered into certain call option agreements and call and put option agreements giving Blue Dot the right to repurchase these shares. Both types of agreements permit Blue Dot to acquire such Class C Common Stock at a price that will vary, and may be greater or less than the original issuance price, based upon the performance of a designated Blue Dot operating unit over a specific period of time. The call and put option agreements also give the holders of the Class C Common Stock the right to put these shares to Blue Dot at their adjusted book value if there has not been an initial public offering of Blue Dot by a specified date. In addition, certain of the call and put option agreements give the holders that receive shares of Class A Common Stock upon the conversion of their Class C Common Stock in an initial public offering the right to put their Class A Common Stock to Blue Dot at the lesser of the initial public offering price and the market price at the time of the put shortly after the initial public offering occurs. These arrangements provide for payments in cash and in certain instances cash and/or shares of NorthWestern stock that have been registered for resale. The maximum aggregate amount of the call price for all of these arrangements was approximately $50.0 million as of December 31, 2002. As of

F-45

March 1, 2003, Blue Dot had exercised or was deemed to have exercised its right to purchase 8,512,500 shares of Class C Common Stock with an aggregate call price of approximately $2.0 million on March 31, 2003 and 8,750,000 shares of Class C Common Stock with an aggregate call price of approximately $4.4 million on June 30, 2003. Blue Dot did not make the payment on March 31, 2003 and is attempting to negotiate extensions, repayment terms or other arrangements to satisfy these obligations with the appropriate parties.

If Blue Dot does not exercise its call right and the holders do not exercise their put right with respect to the Class C Common Stock, the holders of the Class C Common Stock will retain these shares and these shares will be converted into shares of Class A Common Stock of Blue Dot with a value that is equal to the call price in the event of an initial public offering. In addition, these holders may also be entitled to receive certain payments under earnout arrangements that were put in place at the time the Class C Common Stock was issued. These earnout payments will vary depending upon the performance of the designated operating unit associated with the shares. In each case, the maximum earnout payment that may be required to be paid by Blue Dot equals or exceeds the original issuance price of the Class C Common Stock. The maximum aggregate amount of earnout payments that may be required under these arrangements is approximately $42.0 million as of December 31, 2002. These earnout arrangements provide for payments in cash, cash and preferred stock of Blue Dot, and/or shares of NorthWestern stock that have been registered for resale. Any preferred stock of Blue Dot that is issued in connection with these arrangements may be exchanged by the holder for cash (or shares of NorthWestern stock that has been registered for resale) at a predetermined exchange rate at the holder's election under certain additional exchange

agreements.

NorthWestern Growth Corporation may be required to purchase or cause the purchase of shares of Blue Dot Class A Common Stock and/or Blue Dot Series B Preferred Stock and/or other classes or series of Blue Dot stock in an amount sufficient to permit Blue Dot to effect its exchange obligations under all of its exchange agreements and honor its payment obligations under certain call and put option agreements (including the payments that might be required of Blue Dot under the various call options, if the call options are exercised, the payments under the put options, if the put options are exercised, and under certain earn-out arrangements) under certain circumstances. Blue Dot has requested that NorthWestern Growth Corporation provide Blue Dot with the funds necessary to perform these obligations. However, NorthWestern has indicated that no additional funds will be provided to Blue Dot while NorthWestern pursues strategic alternatives for Blue Dot, including the sale or disposition of the business or its assets.

The maximum aggregate amount of payments that may be required of Blue Dot under the call option agreements, call and put option agreements, or earn out payments is approximately $50.0 million as of December 31, 2002. Blue Dot currently has a $6.0 million liability accrued related to call notices issued on certain call option agreements.

### Employment Contracts

Several, but not all, of our senior executive officers have comprehensive employment agreements with terms through 2003 to 2006. The employment agreements contain non-compete, confidentiality, and change in control provisions. The agreements also include base salary amounts for the current year and annual incentive plan and long-term incentive plan provisions tied to the success of the organization. The agreements generally provide termination benefits if employment by NorthWestern terminates for any reason (other than death, disability, retirement at age 65 or such earlier age that the

F-46

Board approves, or discharge for gross misconduct in the performance of employment duties that materially injures NorthWestern) within the specified term of the agreement and after a "change in control" or "major transaction" event. A change in control event generally occurs if a person acquires 20% or more of the voting power of NorthWestern's securities. A major transaction event occurs if the shareholders of NorthWestern approve a merger or consolidation in which less than two-thirds of the Board of NorthWestern continue to serve, a plan of liquidation of NorthWestern, or a sale or disposition of all or substantially all of NorthWestern's assets. As part of the termination benefits, NorthWestern must pay the executive officer a lump sum payment (or, at the executive's election, deferred payments) generally equal to the executive's base salary and the higher of the most recent annual or three-year average annual short term and long term incentive compensation plus the annual value of all benefits provided for in the agreement, all multiplied times the remaining term of the agreement plus one year. NorthWestern must pay the officer, or his or her estate in the event of death, a lump sum amount equal to the actuarial equivalent of the additional retirement benefits that would have been due under NorthWestern's retirement plan, if employment had continued for the period for which the benefits referred to in the preceding sentence are payable. To the extent that such benefits are subject to the excise tax imposed by Section 4999 of the Internal Revenue Code of 1954, as amended (the "Code"), with respect to excess "parachute payments" under Section 180G of the Code, NorthWestern will be responsible for such tax. The termination benefits under these agreements are to be provided regardless of whether an executive officer is able to obtain other employment. The remaining obligations under these employment agreements in the ordinary course, excluding a change in control, was approximately $16.0 million at December 31, 2002.

### Performance Bonds

Expanets has various performance bonds and guarantees in place to cover the installation of equipment and inventory purchases. The maximum potential payout under these performance bonds is $49.9 million as of December 31, 2002. Expanets currently has a $2.6 million liability accrued related to one guaranty.

Blue Dot has various performance bonds in place to cover the installation of equipment. The maximum potential payout under these performance bonds is $14.3 million as of December 31, 2002.

### Letters of Credit

We have various letter of credit requirements and other collateral obligations of approximately $48.1 million at

December 31, 2002.

### Environmental Liabilities

We are subject to numerous state and federal environmental regulations. The Clean Air Act Amendments of 1990 (the Act) stipulate limitations on sulfur dioxide and nitrogen oxide emissions from coal-fired power plants. We believe we can comply with such sulfur dioxide emission requirements at our generating plants and that we are in compliance with all presently applicable environmental protection requirements and regulations. We are also subject to other environmental statutes and regulations including matters related to former manufactured gas plant sites. The range of exposure for environmental remediation obligations is estimated to be $36.5 million to $93.0 million. We have an environmental reserve of $36.5 million at December 31, 2002, primarily related to liabilities from our

F-47

Montana operations. When losses from costs of environmental remediation obligations from our utility operations are probable and reasonably estimable, we charge these costs against the established reserve.

### Legal Proceedings

Prior to 1999, Montana Power Company was the principal, vertically integrated electric utility in the state of Montana, owning and operating generation, transmission and distribution facilities as well as operating a telecommunication business and other non-regulated assets. In 1999, Montana Power sold its power generating assets to PP&L Montana, LLC. Thereafter, Montana Power's subsidiary Entech, Inc. undertook a series of sales of Montana Power's non-regulated energy businesses (i.e., its coal, oil and natural gas businesses), and its out-of-state independent power-production business, to several third parties (collectively, the "Entech Sales"). The sale of the power generating assets and the Entech Sales took place over a period of time from December 1999 to April 2001.

On August 16, 2001, eight individuals filed a lawsuit in Montana State District Court, entitled McGreevey, et al. v. Montana Power Company, et al., DV-01-141, 2nd Judicial District, Butte-Silver Bow County, MT, naming The Montana Power Company, all of its outside directors and certain officers, PPL Montana, and Goldman Sachs as defendants (the "Litigation"), alleging that Montana Power and its directors and officers and investment bankers had a legal obligation and/or a fiduciary duty to obtain shareholder approval before consummating the sale of the electric generation assets to PPL Montana. The plaintiffs further allege that because the Montana Power shareholders did not vote to approve the sale, the sale of the generation assets is void and PPL Montana is holding these assets in constructive trust for the shareholders. Alternatively, the plaintiffs allege that Montana Power shareholders should have been allowed to vote on the sale of the generation assets and, if an appropriate majority vote was obtained in favor of the sale, the objecting shareholders should have been given dissenters' rights. The plaintiffs have amended the complaint to add Milbank Tweed (legal advisors to Montana Power and Touch America), The Montana Power, L.L.C., Touch America Holdings, Inc. and the purchasers of the energy-related assets and have claimed that Montana Power and the other defendants engaged in a series of integrated transactions to sell all or substantially all of its assets and deprive the shareholders of a vote.

After denying the original defendants' motions to dismiss the complaint, upon plaintiffs' motion, the court certified a class consisting of shareholders of record as of December 1999. The court has also, upon plaintiffs' motion, added Clark Fork and Blackfoot LLC as a successor to The Montana Power Company and NorthWestern as an additional defendant as a result of the transfer of substantially all of the assets and liabilities from NorthWestern Energy LLC to NorthWestern. Recently, the case has been removed to federal court in Montana upon a petition by Milbank Tweed. Plaintiffs filed a motion to remand the action to state court. The parties are briefing the remand motion and the federal court after a hearing will decide whether or not the case remains in federal court. It is the position of all defendants that The Montana Power Company and its former directors and officers have fully complied with their statutory and fiduciary duties and no shareholder vote was required. Accordingly, all defendants are defending the suit vigorously. We also believe that we have both substantive and procedural defenses to this action and accordingly, we will vigorously defend against any assertion to the effect that NorthWestern Energy LLC or NorthWestern has any liability in this matter.

In September 2000, Montana Power established Touch America Holdings, Inc. as a new holding company with four subsidiaries, The Montana Power, L.L.C., Touch America, Inc., Tetragenics

F-48

Company and Entech LLC (referred to as the "Restructuring"). Entech Inc. was merged into Entech LLC and the ownership of Entech LLC was distributed by The Montana Power, L.L.C. to Touch America Holdings, Inc. Montana Power was merged into The Montana Power, L.L.C. and an exchange of Montana Power common stock for Touch America Holdings, Inc. common stock on a one-for-one basis occurred. Certain assets and liabilities of Montana Power subsequently were transferred to Touch America Holdings, Inc. Pursuant to a Unit Purchase Agreement signed on or about September 29, 2000, NorthWestern acquired the former electric and gas transmission and distribution business of Montana Power by purchasing the sole unit membership interest in The Montana Power, L.L.C. Subsequently, the Company renamed The Montana Power, L.L.C. as Northwestern Energy LLC. In November 2002, NorthWestern and NorthWestern Energy LLC entered into an Asset and Stock Transfer Agreement whereby NorthWestern acquired substantially all of NorthWestern Energy LLC's assets. Finally, NorthWestern Energy LLC was renamed again on November 20, 2002 to become Clark Fork and Blackfoot, L.L.C.

Clark Fork and Blackfoot, L.L.C. and NorthWestern believe that no shareholder vote was required for any of the transactions in question and that the shareholders had an opportunity to vote on the Touch America restructuring and NorthWestern's acquisition, which was fully approved by a supermajority of The Montana Power Company's shareholders in September 2001. In the event that Clark Fork and Blackfoot, L.L.C. or NorthWestern faces liability, we believe that we have an indemnification claim against Touch America for adverse consequences resulting from that liability. In light of the financial difficulties experienced by the telecommunications industry, we are uncertain as to the ability of Touch America to satisfy its contractual indemnification claim arising from this litigation. At this early stage, however, we cannot predict the ultimate outcome of this matter or how it may affect our combined financial position, results of operations or cash flows.

In 1999, Montana Power entered into an Asset Purchase Agreement with PPL Montana pursuant to which Montana Power agreed to sell, among other assets, its portion of the 500-kilovolt transmission system associated with Colstrip Units 1, 2, and 3 for $97.1 million, subject to the receipt of required regulatory approvals. As part of the Touch America reorganization described above, The Montana Power, L.L.C. acquired Montana Power's rights under the Asset Purchase Agreement. In September 2002, Clark Fork and Blackfoot, L.L.C. brought suit in Montana State District Court to compel PPL Montana to perform its obligations under the Asset Purchase Agreement and to recover damages. The case has been removed to the Federal District Court in Butte, Montana. We have filed a motion for partial summary judgment on the issue of specific performance of PPL Montana's obligation to complete the purchase. That motion has been fully briefed and is awaiting decision. NorthWestern believes its claims are meritorious and we intend to vigorously prosecute this litigation. At this early stage of the litigation, however, we cannot predict the ultimate outcome of this matter or how it may affect our financial position, results of operations, or cash flows.

On or about March 7, 2003, plaintiff Dana Ross, individually and on behalf of a class of all others similarly situated, filed a complaint alleging breach of fiduciary duty and violations of federal securities fraud laws (including Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder) against Merle D. Lewis (the former Chairman and Chief Executive Officer of the Company), Kipp D. Orme (the Company's Vice President-Finance and Chief Financial Officer), and the Company. The lawsuit is entitled *Dana Ross, et al. v. Merle D. Lewis, et al.*; Case No. CIV03-4049, In the United States District Court of South Dakota, Southern Division. The putative class consists of all public investors who purchased common stock of NorthWestern from August 2, 2000 to December 13, 2002. Plaintiffs allege that defendants misrepresented NorthWestern's business operations

F-49

and financial performance, overstated NorthWestern's revenue and earnings, among other things, by maintaining insufficient reserves for accounts receivables at Expanets, failed to disclose billing problems and lapses and data conversion problems, and failed to make full disclosures of problems (including the billing and data conversion issues) arising from the implementation of Expanets' EXPERT system. Plaintiffs' complaint alleges that NorthWestern's public statements, omissions, and failures to maintain adequate accounts receivables reserves artificially inflated NorthWestern's earnings and stock price, and that the class has been damaged as a result. The action seeks unspecified compensatory damages, rescission, and attorneys fees and costs as well as accountants and experts fees. The lawsuit has not yet been served. Given that it was only recently filed, we are not able to assess the likely outcome or risk of an adverse decision in this matter.

F-50

We and our partner entities are parties to various other pending proceedings and lawsuits, but in the judgment of our management, the nature of such proceedings and suits and the amounts involved do not depart from the routine litigation and proceedings incident to the kinds of business we conduct, and management believes that such proceedings will not result in any material adverse impact on us.

### Other Items

We have a guaranty obligation to a shareholder with a maximum potential liability of $1.2 million. We also have a financial commitment related to certain vehicles under operating leases by Expanets and Blue Dot, in the event of default and subsequent failure to cure such default. At December 31, 2002 the amount of this financial commitment is approximately $24.7 million.

### 20.  Capital Stock

In December 1996, our Board of Directors declared, pursuant to a shareholders' rights plan, a dividend distribution of one Right on each outstanding share of our common stock. Each Right becomes exercisable, upon the occurrence of certain events, at an exercise price of $50 per share, subject to adjustment. The Rights are currently not exercisable and will be exercisable only if a person or group of affiliated or associated persons ("Acquiring Person") either acquires ownership of 15% or more of our common stock or commences a tender or exchange offer that would result in ownership of 15% or more. In the event we are acquired in a merger or other business combination transaction or 50% or more of our consolidated assets or earnings power are sold, each Right entitles the holder to receive such number of shares of common stock of the Acquiring Person having a market value of two times the then current exercise price of the Right. The Rights, which expire in December 2006, are redeemable in whole, but not in part, at a price of $.005 per Right, at our option at any time until any Acquiring Person has acquired 15% or more of our common stock.

In October 2002, we completed a common stock offering of 10,000,000 shares. The offering resulted in net proceeds of $81.0 million and the funds were used to reduce short-term debt. In October 2001 we completed a common stock offering of 3,680,000 shares. The offering resulted in net proceeds of $74.9 million and the funds were used to redeem certain subsidiary equity arrangements and for general corporate purposes, including reducing debt. We also issued 33,480 shares of common stock in 2001 under a restricted stock plan with a fair value at date of issuance of $0.7 million. The stock vests over a four-year period and compensation expense is recognized ratably over the vesting period. Compensation expense for the year ended December 31, 2002 and 2001 of $0.5 million and $0.2 million, respectively, has been recognized. Consistent with our turnaround plan to increase liquidity and reduce debt, the Board of Directors decided to terminate the historical practice of paying an annual cash dividend. We do not anticipate paying any cash dividends for the foreseeable future. In addition, we are currently prohibited from paying dividends on our common stock under Delaware law. Our senior credit facility also prohibits the payment of dividends during any period of default under the agreement. We are not currently in default under our senior credit facility. To the extent that payment of a cash dividend on our common stock becomes permissible under Delaware law, we would only be able to pay a cash dividend on our common stock to the extent that all required distributions on our mandatorily redeemable preferred securities of trusts had been made.

We are authorized to issue 1,000,000 shares of $100 par cumulative preferred stock. As of December 31, 2001, there were 37,500 shares outstanding of which 26,000 were $4^1/2$% Series and 11,500 were $6^1/2$% Series, all of the shares of which were redeemed during 2002.

F-51

We are authorized to issue a maximum of 1,000,000 shares of preference stock at a par value of $50 per share. No preference shares have been issued.

Treasury stock held by us represents shares held by our deferred compensation plan (see Note 14). 174,016 shares reflected at cost were held at December 31, 2002.

21.  **Company Obligated Mandatorily Redeemable Preferred Securities of Subsidiary Trusts**

| Series | Par Value | | Shares | 2002 | | 2001 | |
|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | |
| 8.125% | $ | 25 | 1,300,000 | $ | 32,500 | $ | 32,500 |
| 7.2% | $ | 25 | 2,200,000 | | 55,000 | | 55,000 |
| 8.25% | $ | 25 | 4,270,000 | | 106,750 | | 100,000 |
| 8.10% | $ | 25 | 4,440,000 | | 111,000 | | — |
| 8.45% Montana Power | $ | 25 | 2,600,000 | | 65,000 | | — |
| | | | 14,810,000 | $ | 370,250 | $ | 187,500 |

We have established four wholly owned, special-purpose business trusts, NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II and NorthWestern Capital Financing III, to issue common and preferred securities and hold Subordinated Debentures that we issue. The sole assets of these trusts are the investments in Subordinated Debentures. The trusts use the interest payments received on the Subordinated Debentures to make quarterly cash distributions on the preferred securities. These Subordinated Debentures are unsecured and subordinated to all of our other liabilities and rank equally with the guarantees related to the other trusts. We guarantee payment of the dividends on the preferred securities only if we have made the required interest payments on the Subordinated Debentures held by the trusts. In addition, we own all of the common securities of each trust, equivalent to approximately 3% of the capital of each trust. Five years from the date of each issuance, we have the option of redeeming some or all of the Subordinated Debentures at 100% of their principal amount plus any accrued interest to the date of redemption. All of the Subordinated Debentures have a 30-year maturity period.

Montana Power had established Montana Power Capital I (Trust) as a wholly owned business trust to issue common and preferred securities and hold Junior Subordinated Deferrable Interest Debentures (Subordinated Debentures) that we issue. Outstanding at December 31, 2002 were $2.6 million units of 8.45 percent Cumulative Quarterly Income Preferred Securities, Series A (QUIPS), which are due in 2036. Holders of the QUIPS are entitled to receive quarterly distributions at an annual rate of 8.45 percent of the liquidation preference value of $25 per security. The Trust will use interest payments received on the Subordinated Debentures that it holds to make the quarterly cash distributions on the QUIPS.

We can wholly redeem the Subordinated Debentures at any time, or partially redeem the Subordinated Debentures from time to time. We also can wholly redeem the Subordinated Debentures if certain events occur before that time. Upon repayment of the Subordinated Debentures at maturity or early redemption, the Trust Securities must be redeemed. In addition, we can terminate the Trust at any time and cause the pro rata distribution of the Subordinated Debentures to the holders of the Trust Securities.

F-52

Besides our obligations under the Subordinated Debentures, we have agreed to certain Back-up Undertakings. We have guaranteed, on a subordinated basis, payment of distributions on the Trust Securities, to the extent the Trust has funds available to pay such distributions. We also have agreed to pay all of the expenses of the Trust. Considered together with the Subordinated Debentures, the Back-up Undertakings constitute a full and unconditional guarantee of the Trust's obligations under the QUIPS. We are the owner of all the common securities of the Trust, which constitute 3 percent of the aggregate liquidation amount of all the Trust Securities.

22.  **Subsequent Events**

In December 2002, we entered into a commitment for a $390 million senior secured term loan. We received net proceeds after payment of financing costs and fees of $366.0 million under this term loan in February 2003. We repaid $259.6 million outstanding under the existing $280 million Bank Credit Facility. Upon extinguishment of the Bank Credit Facility, we also expensed $2.7 million of unamortized deferred financing costs. The remaining proceeds of the term loan

will be utilized to provide working capital and for other general corporate purposes. The term loan requires us to maintain financial covenants and is secured by first mortgage bonds covering certain of our electric and gas assets. The term loan matures in December 2006, provides for quarterly principal and interest payments, and bears interest at a variable rate, subject to an interest rate floor of 8.50%.

On March 14, 2003, Expanets and Avaya restructured their relationship and resolved all outstanding issues between the parties relating to certain operating issues and disputes with respect to customer data migration, and customer data and billing management services stemming from the GEM transaction. The principal terms of the new arrangement are:

- The outstanding principal balance on the Expanets Credit Facility of approximately $27 million has been extended and is now due in three equal installments of approximately $9 million on each of January 1, April 1 and July 1, 2004. No new borrowings are permitted under the facility and our repurchase obligation will remain in place until the balance is fully paid.

- Avaya has cancelled Expanets' subordinated note in the face amount of $35 million due 2005. The subordinated note was non-interest bearing and had a carrying value of $27 million as of December 31, 2002.

- Expanets and Avaya revised their agreement in which Avaya will provide services support for the Expanets Technical Assistance Center.

- Avaya relinquished all of its equity interests in Expanets represented by two series of preferred stock.

### 23.  Segment and Related Information

We operate our business in five reporting segments: (i) electric utility operations; (ii) natural gas utility operations; (iii) communications; (iv) heating, ventilation and air conditioning, or HVAC, and plumbing related services; and (v) all other, which primarily consists of our other miscellaneous service and non-energy related operations and activities that are not included in the other identified segments, together with the unallocated corporate costs and investments, and any eliminating amounts.

F-53

The accounting policies of the operating segments are the same as those described in the summary of significant accounting policies except that the parent allocates some of its operating expenses and interest expense to the operating segments according to a methodology designed by management for internal reporting purposes and involves estimates and assumptions. Financial data for the business segments, excluding the discontinued operations of CornerStone, are as follows:

| 2002 | Total Electric and Natural Gas | | Communications | | HVAC | | All Other | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Operating revenues | $ | 775,369 | $ | 710,452 | $ | 471,824 | $ | 33,864 | $ | 1,991,509 |
| Cost of sales | | 338,731 | | 444,534 | | 306,666 | | 5,478 | | 1,095,409 |
| Gross margin | | 436,638 | | 265,918 | | 165,158 | | 28,386 | | 896,100 |
| Selling, general, and administrative | | 230,203 | | 314,025 | | 166,296 | | 61,102 | | 771,626 |
| Goodwill and other impairment charges | | — | | 288,741 | | 301,653 | | 35,729 | | 626,123 |
| Depreciation | | 61,439 | | 26,238 | | 7,933 | | 2,957 | | 98,567 |
| Amortization of goodwill and other intangibles | | — | | 28,813 | | 586 | | 19 | | 29,418 |
| Operating income (loss) | | 144,996 | | (391,899) | | (311,310) | | (71,421) | | (629,634) |
| Interest expense | | (81,149) | | (30,903) | | (487) | | (16,997) | | (129,536) |
| Investment income and other | | 2,709 | | — | | 123 | | (8,214) | | (5,382) |

| | | | | | |
|---|---|---|---|---|---|
| Income (loss) before taxes and minority interests | 66,556 | (422,802) | (311,674) | (96,632) | (764,552) |
| Benefit (provision) for taxes | (10,190) | (22,780) | (9,071) | 42,839 | 798 |
| Income (loss) before minority interests | $ 56,366 $ | (445,582) $ | (320,745) $ | (53,793) $ | (763,754) |
| Total assets | $ 2,078,245 $ | 333,609 $ | 105,272 $ | 155,799 $ | 2,672,925 |

F-54

| 2001 | Total Electric and Natural Gas | Communications | HVAC | All Other | Total |
|---|---|---|---|---|---|
| Operating revenues | $ 251,208 $ | 1,032,033 $ | 423,803 $ | 16,934 $ | 1,723,978 |
| Cost of sales | 142,112 | 648,036 | 267,978 | 11,230 | 1,069,356 |
| Gross margin | 109,096 | 383,997 | 155,825 | 5,704 | 654,622 |
| Selling, general, and administrative | 42,284 | 431,477 | 145,954 | 22,664 | 642,379 |
| Depreciation | 16,428 | 13,518 | 9,148 | 1,942 | 41,036 |
| Amortization of goodwill and other intangibles | — | 35,647 | 7,245 | 269 | 43,161 |
| Restructuring charge | 4,499 | 5,906 | 7,239 | 7,272 | 24,916 |
| Operating income (loss) | 45,885 | (102,551) | (13,761) | (26,443) | (96,870) |
| Interest expense | (8,692) | (17,330) | (3,835) | (19,391) | (49,248) |
| Investment income and other | 306 | 683 | 204 | 6,830 | 8,023 |
| Income (loss) before taxes and minority interests | 37,499 | (119,198) | (17,392) | (39,004) | (138,095) |
| Benefit (provision) for taxes | (11,857) | 32,190 | 3,830 | 18,307 | 42,470 |
| Income (loss) before minority interests | $ 25,642 $ | (87,008) $ | (13,562) $ | (20,697) $ | (95,625) |
| Total assets | $ 369,915 $ | 775,186 $ | 386,249 $ | 226,491 $ | 1,757,841 |

| 2000 | Total Electric and Natural Gas | Communications | HVAC | All Other | Total |
|---|---|---|---|---|---|
| Operating revenues | $ 181,309 $ | 1,104,034 $ | 408,829 $ | 15,302 $ | 1,709,474 |
| Cost of sales | 88,156 | 740,553 | 260,975 | 10,800 | 1,100,484 |
| Gross margin | 93,153 | 363,481 | 147,854 | 4,502 | 608,990 |
| Selling, general, and administrative | 39,211 | 350,926 | 129,447 | 16,853 | 536,437 |
| Depreciation | 15,919 | 7,614 | 7,901 | 1,328 | 32,762 |
| Amortization of goodwill and other intangibles | — | 29,552 | 5,891 | 38 | 35,481 |
| Operating income (loss) | 38,023 | (24,611) | 4,615 | (13,717) | 4,310 |
| Interest expense | (7,760) | (4,019) | (4,877) | (21,326) | (37,982) |
| Investment income and other | (194) | 508 | 401 | 8,266 | 8,981 |
| Income (loss) before taxes and minority interests | 30,069 | (28,122) | 139 | (26,777) | (24,691) |
| Benefit (provision) for taxes | (9,819) | 8,323 | (2,404) | 10,367 | 6,467 |

Income (loss) before minority

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| interests | $ | 20,250 | $ | (19,799) | $ | (2,265) | $ | (16,410) | $ | (18,224) |
| Total assets | $ | 368,308 | $ | 729,063 | $ | 378,711 | $ | 125,178 | $ | 1,601,260 |

F-55

| | 2002 | | 2001 | | 2000 | |
|---|---|---|---|---|---|---|
| | Electric | Natural Gas | Electric | Natural Gas | Electric | Natural Gas |
| Operating revenues | $ 535,043 | $ 240,326 | $ 106,995 | $ 144,213 | $ 86,575 | $ 94,734 |
| Cost of sales | 205,607 | 133,124 | 23,052 | 119,060 | 16,782 | 71,374 |
| Gross margin | 329,436 | 107,202 | 83,943 | 25,153 | 69,793 | 23,360 |
| Selling, general and administrative | 169,439 | 60,764 | 27,734 | 14,550 | 25,397 | 13,814 |
| Depreciation | 48,888 | 12,551 | 13,193 | 3,235 | 12,663 | 3,256 |
| Restructuring charge | — | — | 3,329 | 1,170 | — | — |
| Operating income | $ 111,109 | $ 33,887 | $ 39,687 | $ 6,198 | $ 31,733 | $ 6,290 |

## 24. Quarterly Financial Data (Unaudited)

The following table sets forth certain unaudited financial data for each of the quarters within fiscal 2002 and 2001. The information for 2002 has been derived from our restated consolidated financial statements for the quarters ended March 30, 2002, June 30, 2002 and September 30, 2002. We have filed amended Quarterly Reports on Form 10-Q/A filed in April 2003 for these respective periods, which provide detailed discussion of the restatement adjustments, and in management's opinion, reflects all adjustments necessary for a fair presentation of the information for the quarters presented. The operating results for any quarter are not necessarily indicative of results for any future period. Amounts presented are in thousands, except per share data:

| 2002 | | First | | Second | | Third | | Fourth |
|---|---|---|---|---|---|---|---|---|
| | | (in thousands except per share amounts) | | | | | | |
| Operating revenues | $ | 456,127 | $ | 494,763 | $ | 501,401 | $ | 539,218 |
| Gross margin | | 188,715 | | 237,740 | | 244,126 | | 225,519 |
| Operating income (loss) | | 10,781 | | 16,979 | | 23,311 | | (680,705) |
| Net loss before Extraordinary Item | | (32,683) | | (13,893) | | (55,362) | | (748,557) |
| Extraordinary Item, net of tax | | (13,447) | | — | | — | | — |
| Net loss | | (46,130) | | (13,893) | | (55,362) | | (748,557) |
| Average common shares outstanding | | 27,397 | | 27,397 | | 27,397 | | 36,636 |
| Loss per average common share (basic and diluted):+ | | | | | | | | |
| Net income (loss) from continuing operations | $ | 0.04 | $ | (0.60) | $ | 0.26 | $ | (20.62) |
| Discontinued operations | | (1.46) | | (0.19) | | (2.04) | | (0.02) |
| Extraordinary loss on debt extinguishment | | (0.49) | | — | | — | | — |
| Net loss | | (1.68) | | (0.51) | | (2.02) | | (20.43) |
| Loss on common stock | $ | (1.91) | $ | (0.79) | $ | (2.30) | $ | (20.64) |
| Dividends per share | $ | .3175 | $ | .3175 | $ | .3175 | $ | .3175 |
| Stock price: | | | | | | | | |
| High | $ | 23.64 | $ | 22.30 | $ | 16.90 | $ | 9.79 |
| Low | $ | 20.35 | $ | 14.20 | $ | 8.40 | $ | 4.30 |
| Quarter-end close | $ | 22.00 | $ | 16.95 | $ | 9.76 | $ | 5.08 |

F-56

2001

| | | | |
|---|---|---|---|
| Operating revenues | $ 477,592 | $ 476,846 | $ 398,705 | $ 370,835 |
| Gross margin | $ 155,144 | $ 188,838 | $ 165,597 | $ 145,043 |
| Operating income (loss) | $ (37,102) | $ (3,235) | $ (12,134) | $ (19,479) |
| Net income | $ 18,389 | $ 10,780 | $ 10,272 | $ 5,091 |
| Average common shares outstanding | 23,433 | 23,669 | 23,706 | 26,724 |
| Income (loss) per average common share (basic): + | | | | |
| Income from continuing operations | $ 0.56 | $ 0.54 | $ 0.59 | $ 0.21 |
| Discontinued operations | 0.22 | (0.09) | (0.16) | (0.02) |
| Net income | 0.78 | 0.46 | 0.43 | 0.19 |
| Earnings on common stock | $ 0.71 | $ 0.38 | $ 0.36 | $ 0.12 |
| Income (loss) per average common share (diluted): + | | | | |
| Income from continuing operations | $ 0.56 | $ 0.54 | $ 0.59 | $ 0.21 |
| Discontinued operations | 0.22 | (0.09) | (0.16) | (0.02) |
| Net income | 0.78 | 0.46 | 0.43 | 0.19 |
| Earnings on common stock | $ 0.70 | $ 0.38 | $ 0.36 | $ 0.12 |
| Dividends per share | $ .2975 | $ .2975 | $ .2975 | $ .3175 |
| Stock price: | | | | |
| High | $ 25.65 | $ 26.75 | $ 23.10 | $ 22.35 |
| Low | $ 21.63 | $ 21.75 | $ 20.90 | $ 18.25 |
| Quarter-end close | $ 24.50 | $ 22.40 | $ 22.00 | $ 21.05 |

+   The quarterly per share amounts do not total to the annual per share amounts due to the effect of common stock issuances during the year.

F-57

## INDEPENDENT AUDITORS' REPORT

To the Shareholders and Board of Directors
of NorthWestern Corporation

We have audited the consolidated financial statements of NorthWestern Corporation (the Company) as of December 31, 2002 and 2001, and for each of the two years in the period ended December 31, 2002, and have issued our report thereon dated April 4, 2003, which expresses an unqualified opinion and includes an explanatory paragraph relating to the adoption of Statement of Financial Accounting Standards (SFAS) No. 142, described in Note 4. Such consolidated financial statements and report are included elsewhere in this Annual Report on Form 10-K. Our audits also included the 2002 and 2001 financial statement schedules of the Company listed in Item 15 (a)(2).

This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audit. In our opinion, such 2002 and 2001 financial statement schedules, when considered in relation to the 2002 and 2001 basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth herein. The financial statement schedule of the Company as of and for the year ended December 31, 2000, before adjustments as discussed in Note 3 to the financial statement schedule, was audited by other auditors who have ceased operations. Those auditors expressed an unqualified opinion on this financial statement schedule in their report dated February 1, 2002, that such financial statement schedule for 2000, when considered in relation to the 2000 basic consolidated financial statements taken as a whole, presented fairly, in all material respects, the information set forth therein.

As discussed above, the financial statement schedule of the Company as of and for the year ended December 31, 2000, was audited by other auditors who have ceased operations. As described in Note 3 to the financial statement schedule, the

Company made adjustments to the 2000 balances to reflect the Company's interest in CornerStone Propane Partners, LP as a discontinued operation, and the amounts disclosed in the financial statement schedule have been restated to conform to the composition of the 2002 and 2001 financial statement schedules. We audited the adjustments that were applied to the restated disclosures reflected in the financial statement schedule for 2000. Our procedures included (1) comparing the adjustment amounts of uncollectible accounts and reorganization/restructuring liabilities of acquired businesses related to the discontinued operations of CornerStone Propane Partners, LP obtained from management, and (2) testing the mathematical accuracy of the reconciliations by applying the adjustments to the amounts previously reported. In our opinion, such adjustments have been properly applied. However, we were not engaged to audit, review, or apply any procedures to the financial statement schedule for 2000 of the Company other than with respect to such adjustments and, accordingly, we do not express an opinion or any other form of assurance on the financial statement schedule for 2000 taken as a whole.

DELOITTE & TOUCHE LLP
Minneapolis, Minnesota
April 4, 2003

F-58

## SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS

### NORTHWESTERN CORPORATION AND SUBSIDIARIES

| Column A | Column B | Column C | | Column D | Column E |
|---|---|---|---|---|---|
| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts(1) | Deductions(2) | Balance End of Period |
| **FOR THE YEAR ENDED DECEMBER 31, 2002 (in thousands) RESERVES DEDUCTED FROM APPLICABLE ASSETS** | | | | | |
| Uncollectible accounts | $ 11,363 | $ 44,595 | $ 1,675 | $ (42,366) | $ 15,267 |
| **OTHER DEFERRED CREDITS** | | | | | |
| Reserve for decommission costs | $ 10,868 | $ 520 | — | — | $ 11,388 |
| Reorganization/restructuring liabilities of acquired businesses | $ 3,051 | — | — | $ (3,051) | $ — |
| Restructuring liability | $ 19,339 | — | — | $ (15,924) | $ 3,415 |
| **FOR THE YEAR ENDED DECEMBER 31, 2001 (in thousands) RESERVES DEDUCTED FROM APPLICABLE ASSETS** | | | | | |
| Uncollectible accounts | $ 8,777 | $ 13,447 | $ 745 | $ (11,606) | $ 11,363 |
| **OTHER DEFERRED CREDITS** | | | | | |
| Reserve for decommission costs | $ 10,349 | $ 519 | — | — | $ 10,868 |
| Reorganization/restructuring liabilities of acquired businesses | $ 6,885 | — | $ 2,043 | $ (5,877) | $ 3,051 |
| Restructuring liability | — | $ 24,916 | — | $ (5,577) | $ 19,339 |
| **FOR THE YEAR ENDED DECEMBER 31, 2000 (in thousands)(3) RESERVES DEDUCTED FROM APPLICABLE ASSETS** | | | | | |
| Uncollectible accounts | $ 4,548 | $ 7,363 | $ 1,788 | $ (4,922) | $ 8,777 |

OTHER DEFERRED CREDITS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Reserve for decommission costs | $ | 9,877 | $ | 472 | — | | — $ | 10,349 |
| Reorganization/restructuring liabilities of acquired businesses | $ | 9,900 | — $ | | 654 $ | | (3,668) $ | 6,885 |

(1)    Recorded via allocation of purchase price to fair value of assets and liabilities of acquired businesses.

(2)    Utilization of previously recorded balances.

(3)    Adjustments have been made to the 2000 balances to reflect our interest in CornerStone Propane Partners LP as a discontinued operation. The amounts disclosed in these balances have been restated to conform to the composition of the 2002 and 2001 financial statement schedules.

F-59

## Index to Exhibits

| Exhibit Number | Description of Document |
|---|---|
| 2.1(a)* | Unit Purchase Agreement, dated as of September 29, 2000, among NorthWestern Corporation, Touch America Holdings, Inc. and The Montana Power Company with respect to all outstanding membership interests in The Montana Power, L.L.C. (incorporated by reference to Exhibit (10)(a)(1) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |
| 2.1(b)* | Amendment No. 1 to the Unit Purchase Agreement, dated as of June 21, 2001 (incorporated by reference to Exhibit (10)(a)(2) of NorthWestern Corporation's Current Report on Form 8-K, dated August 21, 2001, Commission File No. 0-692). |
| 3.1* | Restated Certificate of Incorporation of NorthWestern Corporation, dated November 9, 2000 (incorporated by reference to Exhibit 3(a) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692). |
| 3.2** | By-Laws of NorthWestern Corporation, as amended, dated January 5, 2003. |
| 4.1(a)* | General Mortgage Indenture and Deed of Trust, dated as of August 1, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(a) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(b)* | Supplemental Indenture, dated as of August 15, 1993, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 16, 1993, Commission File No. 0-692). |
| 4.1(c)* | Supplemental Indenture, dated as of August 1, 1995, from NorthWestern Corporation to The Chase Manhattan Bank (National Association), as Trustee (incorporated by reference to Exhibit 4(b) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692). |
| 4.1(d)* | Supplemental Indenture, dated as of February 1, 2003, from NorthWestern Corporation to JPMorgan Chase Bank, as Trustee (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 4.2(a)* | Preferred Securities Guarantee Agreement, dated as of August 3, 1995, between NorthWestern |

Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 1(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(b)*    Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(d) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(c)*    Amended and Restated Declaration of Trust of NWPS Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(d)*    Preferred Securities Guarantee Agreement, dated as of November 18, 1998, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

4.2(e)*    Certificate of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(b)(11) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(f)*    Amended and Restated Declaration of Trust of NorthWestern Capital Financing I (incorporated by reference to Exhibit 4(e) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

4.2(g)*    Preferred Securities Guarantee Agreement, dated as of December 21, 2001, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.7 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(h)*    Restated Certificate of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4(b)(12) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(i)*    Amended and Restated Declaration of Trust of NorthWestern Capital Financing II (incorporated by reference to Exhibit 4.4 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(j)*    Preferred Securities Guarantee Agreement, dated as of January 31, 2002, between NorthWestern Corporation and Wilmington Trust Company (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229).

4.2(k)*    Restated Certificate of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4(b)(13) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 2, 1998, Commission File No. 333-58491).

4.2(l)*    Amended and Restated Declaration of Trust of NorthWestern Capital Financing III (incorporated by reference to Exhibit 4.3 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-16843).

4.2(m)*    Form of Guarantee Agreement, between The Montana Power Company and The Bank of New York, as trustee (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(n)**    Assumption of Guarantee Agreement, dated as of February 13, 2002, by The Montana Power, L.L.C. in favor of The Bank of New York, as trustee.

4.2(o)**    Assumption Agreement (QUIPs Guarantee), dated as of November 15, 2002, by between NorthWestern

Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.2(p)*    Form of Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(a) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(q)**    Assignment and Assumption Agreement (QUIPs Agreements), dated as of November 15, 2002, by between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.2(r)*    Form of Amended and Restated Trust Agreement of Montana Power Capital I (incorporated by reference to Exhibit 4(b) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(s)*    Subordinated Debt Securities Indenture, dated as of August 1, 1995, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(f) of the Company's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(t)*    First Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of August 1, 1995 (incorporated by reference to Exhibit 4(g) of NorthWestern Corporation's Current Report on Form 8-K, dated August 30, 1995, Commission File No. 0-692).

4.2(u)*    Second Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of November 15, 1998 (incorporated by reference to Exhibit 4(f) of NorthWestern Corporation's Registration Statement on Form 8-A (Amendment No. 1), dated December 3, 1998, Commission File No. 001-14623).

4.2(v)*    Third Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of December 21, 2001 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated December 21, 2001, Commission File No. 001-16843).

4.2(w)*    Fourth Supplemental Indenture to the Subordinated Debt Securities Indenture, dated as of January 31, 2002 (incorporated by reference to Exhibit 4.6 of NorthWestern Corporation's Registration Statement on Form 8-A, dated February 1, 2002, Commission File No. 001-31229).

4.2(x)*    Form of Indenture, between The Montana Power Company and The Bank of New York, as Trustee (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-3, dated October 18, 1996, Commission File No. 333-14369).

4.2(y)**    First Supplemental Indenture to the Indenture, dated as of February 13, 2002, between The Montana Power, L.L.C. and The Bank of New York, as trustee.

4.2(z)**    Second Supplemental Indenture to the Indenture, dated as of August 13, 2002, between The Montana Power, L.L.C. and The Bank of New York, as trustee.

4.2(aa)**    Third Supplemental Indenture to the Indenture, dated as of November 15, 2002, between NorthWestern Corporation (successor to NorthWestern Energy, L.L.C., formerly known as The Montana Power, L.L.C.) and The Bank of New York, as trustee.

4.3(a)*    Indenture, dated as of November 1, 1998, between NorthWestern Corporation and The Chase Manhattan Bank, as Trustee (incorporated by reference to Exhibit 4(b)(8) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707).

4.3(b)*    First Supplemental Indenture to the Indenture, dated as of November 1, 1998 (incorporated by reference to Exhibit 4(b)(9) of NorthWestern Corporation's Registration Statement on Form S-3, dated July 12, 1999, Commission File No. 333-82707).

4.3(c)*    Second Supplemental Indenture to the Indenture, dated as of March 13, 2002 (filed as Exhibit 4(f)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

4.4(a)*  Sale Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Mercer County, North Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993 (incorporated by reference to Exhibit 4(b)(1) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(b)*  Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993A (incorporated by reference to Exhibit 4(b)(2) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(c)*  Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and Grant County, South Dakota, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993B (incorporated by reference to Exhibit 4(b)(3) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(d)*  Loan Agreement, dated as of June 1, 1993, between NorthWestern Corporation and the City of Salix, Iowa, related to the issuance of Pollution Control Refunding Revenue Bonds (Northwestern Public Service Company Project) Series 1993 (incorporated by reference to Exhibit 4(b)(4) of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ending June 30, 1993, Commission File No. 0-692).

4.4(e)**  Loan Agreement, dated as of May 1, 1993, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(f)**  1993A First Supplemental Loan Agreement, dated as of September 21, 2001, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(g)**  Assumption Agreement of The Montana Power, L.L.C. to Bank One, as Trustee, dated as of February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(h)**  Assignment and Assumption Agreement (PCRB 1993A Loan Agreement), between NorthWestern Energy, L.L.C., as Assignor, and NorthWestern Corporation, as Assignee, dated as of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(i)**  Loan Agreement, dated as of December 1, 1993, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993B due 2023.

4.4(j)**  1993B First Supplemental Loan Agreement, dated as of September 21, 2001, between The Montana Power Company and the City of Forsyth, Montana, related to the issuance of City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.4(k)**  Assumption Agreement of The Montana Power, L.L.C. to Bank One, as Trustee, dated as of February 13, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993B due 2023.

4.4(l)**  Assignment and Assumption Agreement (PCRB 1993B Loan Agreement), between NorthWestern Energy, L.L.C., as Assignor, and NorthWestern Corporation, as Assignee, dated as of November 15, 2002, related to the City of Forsyth Pollution Control Revenue Bonds Series 1993A due 2023.

4.5(a)*  First Mortgage and Deed of Trust, dated as of October 1, 1945, by The Montana Power Company in favor of Guaranty Trust Company of New York and Arthur E. Burke, as trustees (incorporated by reference to Exhibit 7(e) of The Montana Power Company's Registration Statement, Commission File

No. 002-05927).

| | |
|---|---|
| 4.5(b)* | Thirteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1991 (incorporated by reference to Exhibit 4(a)-14 of The Montana Power Company's Registration Statement on Form S-3, dated December 16, 1992, Commission File No. 033-55816). |
| 4.5(c)* | Fourteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of January 1, 1993 (incorporated by reference to Exhibit 4(c) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576). |
| 4.5(d)* | Fifteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of March 1, 1993 (incorporated by reference to Exhibit 4(d) of The Montana Power Company's Registration Statement on Form S-8, dated June 17, 1993, Commission File No. 033-64576). |
| 4.5(e)* | Sixteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of May 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated September 13, 1993, Commission File No. 033-50235). |
| 4.5(f)* | Seventeenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 1, 1993 (incorporated by reference to Exhibit 99(a) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739). |
| 4.5(g)* | Eighteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of August 5, 1994 (incorporated by reference to Exhibit 99(b) of The Montana Power Company's Registration Statement on Form S-3, dated December 5, 1994, Commission File No. 033-56739). |
| 4.5(h)* | Nineteenth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of December 16, 1999 (incorporated by reference to Exhibit 99 of The Montana Power Company's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 001-04566). |
| 4.5(i)* | Twentieth Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 1, 2001 (incorporated by reference to Exhibit 4(u) of NorthWestern Energy, L.L.C.'s Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276). |
| 4.5(j)* | Twenty-first Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 13, 2002 (incorporated by reference to Exhibit 4(v) of NorthWestern Energy, L.L.C.'s Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 001-31276). |
| 4.5(k)* | Twenty-second Supplemental Indenture to the Mortgage and Deed of Trust, dated as of November 15, 2002 (incorporated by reference to Exhibit 4.1 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 4.5(l)* | Twenty-third Supplemental Indenture to the Mortgage and Deed of Trust, dated as of February 1, 2002 (incorporated by reference to Exhibit 4.2 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692). |
| 4.6(a)* | Form of Indenture, dated as of December 1, 1989, between The Montana Power Company and Citibank, N.A., as Trustee (incorporated by reference to Exhibit 4-A to The Montana Power Company's Registration Statement on Form S-3, dated November 24, 1989, Commission File No. 033-32275). |
| 4.6(b)** | First Supplemental Indenture to the Indenture, dated as of February 13, 2002. |
| 4.6(c)** | Second Supplemental Indenture to the Indenture, dated as of November 15, 2002. |
| 4.7(a)** | Natural Gas Funding Trust Indenture, dated as of December 22, 1998, between MPC Natural Gas |

Funding Trust, as Issuer, and U.S. Bank National Association, as Trustee.

4.7(b)** Natural Gas Funding Trust Agreement, dated as of December 11, 1998, among The Montana Power Company, Wilmington Trust Company, as trustee, and the Beneficiary Trustees party thereto.

4.7(c)** Transition Property Purchase and Sale Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company.

4.7(d)** Transition Property Servicing Agreement, dated as of December 22, 1998, between MPC Natural Gas Funding Trust and The Montana Power Company.

4.7(e)** Assumption Agreement regarding the Transition Property Purchase Agreement and the Transition Property Servicing Agreement, dated as of February 13, 2002, by The Montana Power, L.L.C. to MPC Natural Gas Funding Trust.

4.7(f)** Assignment and Assumption Agreement (Natural Gas Transition Documents), dated as of November 15, 2002, by and between NorthWestern Energy, L.L.C., as assignor, and NorthWestern Corporation, as assignee.

4.8(a)* Rights Agreement, dated as of December 11, 1996, between NorthWestern Corporation and Norwest Bank Minnesota, N.A. as Rights Agent (incorporated by reference to Exhibit 4(c)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

4.8(b)* First Amendment to Rights Agreement, dated as of August 21, 2000, between NorthWestern Corporation and Wells Fargo Bank Minnesota, N.A., (formerly Norwest Bank Minnesota, N.A.), as Rights Agent (incorporated by reference to Exhibit 4(c)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000).

10.1(a)†* NorthWestern Corporation Traditional Pension Equalization Plan, as amended and restated, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(b)†* NorthWestern Corporation Cash Balance Supplemental Executive Retirement Plan, effective as of January 1, 2000 (incorporated by reference to Exhibit 10(a)(3) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(c)†* NorthSTAR Annual Incentive Plan, for all eligible employees, as amended as of May 4, 1999 (incorporated by reference to Exhibit 10(a)(4) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1999, Commission File No. 0-692).

10.1(d)†* NorthWestern Executive Performance Plan, effective as of May 2, 2000 (incorporated by reference to Exhibit 10(a)(5) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692).

10.1(e)†* NorthWestern Stock Option and Incentive Plan, as amended as of January 16, 2001 (incorporated by reference to Exhibit 10(a)(6) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2000, Commission File No. 0-692)

10.1(f)†* Deferred Compensation Plan for Non-employee Directors, adopted as of November 6, 1985 (incorporated by reference to Exhibit 10(g)(2) of NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 1988, Commission File No. 0-692).

10.1(g)†* Supplemental Variable Investment Plan, as amended and restated as of January 1, 2000 (filed as Exhibit 10(a)(7) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.1(h)†* Comprehensive Employment Agreement and Investment Program for Merle D. Lewis, dated as of

June 1, 2000 (incorporated by reference to Exhibit 10.1 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(i)†**    Retirement Agreement, effective as of December 31, 2002, by and between NorthWestern Corporation and Merle D. Lewis.

10.1(j)†*    Comprehensive Employment Agreement and Equity Plan Participation Program for Richard R. Hylland, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.2 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(k)†*    Comprehensive Employment Agreement and Equity Plan Participation Program for Daniel K. Newell, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.3 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(l)†*    Comprehensive Employment Agreement and Equity Plan Participation Program for Michael J. Hanson, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.4 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(m)†*    Comprehensive Employment Agreement and Equity Plan Participation Program for Eric R. Jacobsen, dated as of March 1, 2001 (incorporated by reference to Exhibit 10.7 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(n)†*    Supplemental Income Security Plan for Directors, Officers and Managers, as amended and restated effective as of July 1, 1999 (incorporated by reference to Exhibit 10.8 of NorthWestern Corporation's Current Report on Form 8-K/A (Amendment No. 1), dated December 14, 2001, Commission File No. 0-692).

10.1(o)†*    Form of "Tier 1" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(a) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(p)†*    Form of "Tier 2" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(b) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(q)†*    Form of "Tier 3" Termination Benefits Upon Change in Control Agreement (incorporated by reference to Exhibit 10(c) of The Montana Power Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001, Commission File No. 1-4566).

10.1(r)†**    NorthWestern Capital Partners LLC Limited Liability Company Agreement, dated as of September 30, 1999.

10.1(s)†**    Form of Put Option Agreement, dated as of September 30, 1999.

10.2(a)*    Credit Agreement, dated as of January 14, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (filed as Exhibit 10(b)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.2(b)*    Amendment No. 1 to Credit Agreement, dated as of June 20, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.2(c) of

Amendment No. 1 to NorthWestern Corporation's Registration Statement on Form S-4, dated July 12, 2002, Commission File No. 333-86888).

10.2(c)*    Amendment No. 2 to Credit Agreement, dated as of August 13, 2002, among NorthWestern Corporation, Credit Suisse First Boston, ABN AMRO Bank N.V., CIBC Inc. and Barclays Capital Inc., as co-arrangers, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 10.1 of NorthWestern Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, Commission File No. 0-692.)

10.2(d)*    Credit Agreement, dated as of December 17, 2002, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.2 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.2(e)*    Amendment No. 1 to Credit Agreement, dated as of January 8, 2003, between NorthWestern Corporation and Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner (incorporated by reference to Exhibit 99.3 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.2(f)*    Amendment No. 2 to Credit Agreement, dated as of February 10, 2003, among NorthWestern Corporation, Credit Suisse First Boston, as administrative agent, lead arranger and sole book runner, and the banks and other financial institutions parties thereto (incorporated by reference to Exhibit 99.4 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.2(g)*    Bond Collateral Agreement, dated as of February 10, 2003, between NorthWestern Corporation and Credit Suisse First Boston, acting through its Cayman Islands Branch, as collateral agent (incorporated by reference to Exhibit 99.5 of NorthWestern Corporation's Current Report on Form 8-K, dated February 10, 2003, Commission File No. 0-692).

10.3(a)*    Credit and Security Agreement, dated as of March 31, 2001, between Expanets, Inc. and Avaya Inc. (and NorthWestern Corporation with respect to Section 7.3 only) (filed as Exhibit 10(d)(1) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001 Commission File No. 0-692).

10.3(b)*    First Amendment to Credit and Security Agreement, dated as of August 1, 2001, between Expanets, Inc. and Avaya Inc. (acknowledged by NorthWestern Corporation) (filed as Exhibit 10(d)(2) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001. Commission File No. 0-692).

10.3(c)*    Second Amendment to Credit and Security Agreement; Amendment to Collateral Agreements, dated as of March 5, 2002, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1(h) and 7 only) (filed as Exhibit 10(d)(3) to NorthWestern Corporation's Annual Report on Form 10-K for the year ended December 31, 2001, Commission File No. 0-692).

10.3(d)**    Third Amendment to Credit and Security Agreement, dated as of March 5, 2003, between Expanets, Inc. (and several affiliates of Expanets) and Avaya Inc. (and NorthWestern Corporation with respect to Sections 1 and 6 only)

10.4(a)**    Credit and Security Agreement, dated as of August 30, 2002, between Blue Dot Services Inc. and U.S. Bank, N.A.

12.1**    Statement Regarding Computation of Earnings to Fixed Charges.

21**    Subsidiaries of NorthWestern Corporation.

23.1**   Consent of Independent Public Accountants

23.2**   Notice Regarding Consent of Arthur Andersen LLP

24**   Power of Attorney (included on the signature page of this Annual Report on Form 10-K)

99.1***   Certification Pursuant to 18 United States Code Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

99.2***   Certification Pursuant to 18 United States Code Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

---

†   Management contract or compensatory plan or arrangement.

*   Incorporated by reference.

**   Filed herewith.

***   Pursuant to Commission Release No. 33-8212, this certification will be treated as "accompanying" this Annual Report on Form 10-K and not "filed" as part of such report for purposes of Section 18 of the Exchange Act, or otherwise subject to the liability of Section 18 of the Exchange Act and this certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

All schedules for which provision is made in the applicable accounting regulations of the SEC are not required under the related instructions or are not applicable, and, therefore, have been omitted.

---

QuickLinks

NORTHWESTERN CORPORATION FORM 10-K INDEX
SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS
Part I

ITEM 1. BUSINESSES

ITEM 1A. EXECUTIVE OFFICERS OF THE REGISTRANT
ITEM 2. PROPERTIES
ITEM 3. LEGAL PROCEEDINGS
ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITYHOLDERS

Part II

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS
ITEM 6. SELECTED FINANCIAL DATA

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK
ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Part III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT
ITEM 11. EXECUTIVE COMPENSATION

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
ITEM 14. CONTROLS AND PROCEDURES

Part IV

ITEM 15. EXHIBITS, FINANCIAL STATEMENTS AND REPORTS ON FORM 8-K

SIGNATURES
POWER OF ATTORNEY
CERTIFICATION PURSUANT TO 17 CFR 240. 13a-14 PROMULGATED UNDER SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002
INDEX TO FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES
REPORT OF INDEPENDENT AUDITORS
REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS
NORTHWESTERN CORPORATION CONSOLIDATED STATEMENTS OF INCOME (LOSS)
NORTHWESTERN CORPORATION CONSOLIDATED STATEMENTS OF CASH FLOWS
NORTHWESTERN CORPORATION CONSOLIDATED BALANCE SHEETS
NORTHWESTERN CORPORATION CONSOLIDATED STATEMENTS OF COMMON SHAREHOLDERS' EQUITY (DEFICIT)
INDEPENDENT AUDITORS' REPORT
SCHEDULE II. VALUATION AND QUALIFYING ACCOUNTS NORTHWESTERN CORPORATION AND SUBSIDIARIES
Index to Exhibits